## NO. 22-1927

### In The
# United States Court Of Appeals
## For The Fourth Circuit

### CHRISTOPHER FAIN; SHAUNTAE ANDERSON,
**individually and on behalf of all others similarly situated,**

*Plaintiffs - Appellees,*

v.

### WILLIAM CROUCH,
**in his official capacity as Cabinet Secretary of the
West Virginia Department of Health and Human Resources;
CYNTHIA BEANE,
in her official capacity as Commissioner for the
West Virginia Bureau for Medical Services;
WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, Bureau for Medical Services,**

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

————————

### BRIEF OF APPELLANTS

————————

Kimberly M. Bandy
Lou Ann S. Cyrus
Caleb B. David
Roberta F. Green
SHUMAN MCCUSKEY
  SLICER PLLC
P. O. Box 3953
Charleston, WV  25339
(304) 345-1400

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-1927     Caption: Christopher Fain, et al. v. William Crouch, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

William (Bill) Crouch in his official capacity as Cabinet Secretary of the West Virginia Department of
(name of party/amicus)

Health and Human Resources

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Kimberly M. Bandy                Date:    September 21, 2022

Counsel for: Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-1927        Caption: Christopher Fain, et al. v. William Crouch, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Cynthia Beane in her official capacity as Commissioner for the West Virginia Bureau for Medical Services
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.  Does party/amicus have any parent corporations? ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?                    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?            ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Kimberly M. Bandy                    Date:    September 21, 2022

Counsel for: Appellants

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _22-1927_       Caption: _Christopher Fain, et al. v. William Crouch, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_West Virginia Department of Health and Human Resources, Bureau for Medical Services_
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
      If yes, identify all such owners:


- 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Kimberly M. Bandy                       Date:    September 21, 2022

Counsel for: Appellants

- 2 -

Print to PDF for Filing

**TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF JURISDICTION.........................................................1

ISSUES PRESENTED FOR REVIEW ....................................................2

STATEMENT OF THE CASE AND OF THE FACTS ...........................3

    I.    Plaintiffs Have Not Been Denied Coverage for Gender-Confirming Care by Medicaid................................................................4

    II.   Medicaid Policy Makes No Distinction Between Medicaid Members Based on Transgender Status ..................................6

    III.  Not All Transgender People are Diagnosed with Gender Dysphoria or Seek Gender-Confirming Surgery ..................................7

    IV.   Gender-Confirming Surgeries Are Not the Same Treatments Currently Available to Medicaid Members...........................................8

    V.   CMS Oversees Approval of the State Medicaid Plan and Does Not Require Coverage for Gender-Confirming Surgery....................11

    VI.  Medicaid is Unable to Add Additional Services Due to Budgetary Constraints .........................................................................12

    VII.  Procedural History............................................................................13

SUMMARY OF ARGUMENT ..............................................................15

ARGUMENT ........................................................................................18

    I.    Standard of Review ........................................................................18

    II.   The District Court Erred in Granting Summary Judgment to Plaintiffs Based Upon the Equal Protection Clause............................19

A. The District Court Incorrectly Determined that the Plaintiffs Were Treated Differently from Similarly Situated Medicaid Members .......................................20

B. The District Court Incorrectly Determined that the Policy Facially Discriminates, Ignoring *Geduldig v. Aiello* ...............24

C. The District Court Erred by Circumventing Plaintiffs' Burden to Show Intentional Invidious Discrimination, Which Has Not Been Met .........................................................29

D. The Court Erred in Applying Heightened Scrutiny Instead of Rational Basis Review, Which the Policy Meets ..........................................................................31

III. The District Court Erred in Granting Summary Judgment in Favor of Plaintiffs for Violation of Section 1557 of the Affordable Care Act ....................................................................35

A. Defendants Have Not Violated Section 1557 of the ACA .......36

IV. The District Court Erred in Granting Summary Judgment in Favor of Plaintiffs for Violation of the Medicaid Act ........................38

A. The District Court Erroneously Did Not Give Deference to the Implicit Judgment of CMS that the State Medicaid Plan Complies with Federal Law ..............................................38

B. Defendants Have Not Violated the Medicaid Act's Availability Requirements ........................................................38

C. Defendants Have Not Violated the Medicaid Act's Comparability Requirements ...................................................44

V. The District Court Erred in Finding that Plaintiffs Have Standing and, Therefore, Erred in Denying Defendants' Motion for Summary Judgment .......................................................................48

ii

VI.  The District Court Abused its Discretion in Finding that Plaintiffs Satisfied the Numerosity Requirement for Class Certification, Therefore, the District Court Erred in Granting Plaintiffs' Motion for Class Certification ...........................................50

CONCLUSION .........................................................................................54

STATEMENT REGARDING ORAL ARGUMENT ............................................55

CERTIFICATE OF COMPLIANCE .........................................................56

**TABLE OF AUTHORITIES**

**Page(s):**

**Cases:**

*Adkins v. Rumsfeld*,
 464 F.3d 456 (4th Cir. 2006) ..........................................................25

*Alexander v. Choate*,
 469 U.S. 287 (1985)..................................................................39, 42

*Astrazeneca AB v. UFCW (In re Nexium Antitrust Litig.)*,
 777 F.3d 9 (1st Cir. 2015)..............................................................50

*Beal v. Doe*,
 432 U.S. 438 (1977)..................................................................39, 42

*Bostock v. Clayton Cnty., Georgia*,
 140 S. Ct. 1731 (2020)..........................................................*passim*

*Carcieri v. Salazar*,
 555 U.S. 379 (2009)....................................................................36

*Carrera v. Bayer Corp.*,
 727 F.3d 300 (3d Cir. 2013) ..........................................................51

*Casillas v. Daines*,
 580 F. Supp. 2d 235 (S.D.N.Y. 2008) ......................................40, 47

*City of Cleburne v. Cleburne Living Ctr.*,
 473 U.S. 432 (1985)....................................................................20

*Cmty. Health Ctr. v. Wilson-Coker*,
 311 F.3d 132 (2d Cir. 2002) ..........................................................38

*Davis v. Shah*,
 821 F.3d 231 (2d Cir. 2016) ..........................................................38

*DeSario v. Thomas*,
 139 F.3d 80 (2d Cir. 1998) ............................................................42

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022)................................................................27, 32

*Doe v. Chao*,
    306 F.3d 170 (4th Cir. 2002), *aff'd on other grounds*,
    540 U.S. 614, 124 S. Ct. 1204 (2004) ........................................19

*Doe v. Snyder*,
    2022 U.S. App. LEXIS 6217 (9th Cir. Mar. 10, 2022) ...........12, 37

*Ealy v. Pinkerton Gov't Servs.*,
    514 Fed. Appx. 299 (4th Cir. 2013) ..........................................50

*EQT Prod. Co. v. Adair*,
    764 F.3d 347 (4th Cir. 2014) .....................................................51

*Flaming v. Univ. of Tex. Med. Branch*,
    2016 U.S. Dist. LEXIS 22304, 2016 WL 727941
    (S.D. Tex. Feb. 24, 2016) .....................................................22, 23

*Fletcher v. Alaska*,
    443 F. Supp. 3d 1024 (D. Alaska 2020) .....................................22

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)...................................................................48

*Geduldig v. Aiello*,
    417 U.S. 484 (1974)............................................................*passim*

*Giarratano v. Johnson*,
    521 F.3d 298 (4th Cir. 2008) ................................................32, 33

*Grier v. Goetz*,
    402 F. Supp. 2d 876 (M.D. Tenn. 2005) .....................................42

*Grimm v. Gloucester Cty. School Bd.*,
    972 F.3d 586 (4th Cir. 2020) ..............................................*passim*

*Harris v. McRae*,
    448 U.S. 297 (1980)..............................................................32, 42

*Harris v. Pittman*,
    927 F.3d 266 (4th Cir. 2019) ..................................................................18, 19

*Hennessy-Waller v. Snyder*,
    529 F. Supp. 3d 1031 (D. Ariz. 2021) ...................................................12, 37

*Jacobs v. N.C. Admin. Off. of the Cts.*,
    780 F.3d 562 (4th Cir. 2015) ..................................................................18, 19

*Kadel v. Folwell*,
    1:19-cv-272, 2022 U.S. Dist. LEXIS 103780, 2022 WL 3226731
    (M.D.N.C. June 10, 2022) ............................................................................22

*Lange v. Houston Cty., Georgia*,
    499 F. Supp. 3d 1258 (M.D. Ga. 2020) .................................................27, 29

*Lewis v. Governor of Alabama*,
    896 F.3d 1282 (11th Cir. 2018), *on reh'g en banc*,
    944 F.3d 1287 (11th Cir. 2019) ...................................................................26

*Linda R. S. v. Richard D.*,
    410 U.S. 614 (1973)......................................................................................49

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
    512 U.S. 218 (1994)......................................................................................36

*McMain v. Peters*,
    2019 U.S. App. LEXIS 22095, 2019 WL 3321883
    (9th Cir. July 24, 2019).................................................................................23

*McMain v. Peters*,
    2018 U.S. Dist. LEXIS 132641, 2018 WL3732660
    (D. Or. Aug. 2, 2018).....................................................................................23

*Mennonite Gen. Hosp. v. Molina Healthcare of P. R.*,
    319 F. Supp. 3d 587 (D.P.R. 2018) .............................................................42

*Morrison v. Garraghty*,
    239 F.3d 648 (4th Cir. 2001) .................................................................*passim*

*Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*,
   462 U.S. 669 (1983)...............................................................26

*Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*,
   983 F.3d 671 (4th Cir. 2020) ......................................................19

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256, 99 S. Ct. 2282 (1979) ....................................20, 30

*Rodriguez v. City of New York*,
   197 F.3d 611 (2d Cir. 1999) ...................................................46, 47

*Romer v. Evans*,
   517 U.S. 620 (1996)...............................................................32

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976)................................................................49

*South Carolina v. United States*,
   912 F.3d 720 (4th Cir. 2019) ....................................................48

*Tolan v. Cotton*,
   572 U.S. 650 (2014)...............................................................18

*Toomey v. Arizona*,
   2020 U.S. Dist. LEXIS 224159 (U.S.D.C. D. Ariz. Nov. 30, 2020).............29

*Toomey v. Arizona*,
   2021 U.S. Dist. LEXIS 36944 (D. Ariz. Feb. 26, 2021) ................................29

*Washington v. Seattle Sch. Dist. No. 1*,
   458 U.S. 457 (1982)...............................................................25

*Williams v. Kelly*,
   2018 U.S. Dist. LEXIS 157002 (E.D. La. Sept. 14, 2018)...........................22

*Williams v. Kelly*,
   2018 U.S. Dist. LEXIS 158119 (E.D. La. Aug. 27, 2018)...........................22

**Statutes:**

20 U.S.C. § 1681 ...............................................................................36

28 U.S.C. § 1291 .................................................................................1

42 U.S.C. § 1396a(a)(10)(A)-(B).......................................................*passim*

42 U.S.C. § 1396a(a)(17) ..................................................................39

42 U.S.C. § 1396a(a)(19) ..................................................................41

42 U.S.C. § 18116..............................................................................*passim*

42 U.S.C. § 18116(a) .........................................................................36

**Constitutional Provisions:**

U.S. Const. amend. XIV ....................................................................*passim*

**Regulations:**

42 C.F.R. § 440.200(a)(1) .................................................................40

42 C.F.R. § 440.210 ....................................................................40, 41

42 C.F.R. § 440.210(a)(1) .................................................................40

42 C.F.R. § 440.220 ....................................................................40, 41

42 C.F.R. § 440.225 ...........................................................................41

42 C.F.R. § 440.230 ...........................................................................40

42 C.F.R. § 440.230(d) .................................................................41, 42

42 C.F.R. § 440.240 ...........................................................................45

**Rules:**

Fed. R. App. P. 4(a)(1)(A) ................................................................1

Fed. R. Civ. P. 23 ...............................................................14, 50

Fed. R. Civ. P. 23(a).............................................................50

**Other Authorities:**

10A Charles Alan Wright & Arthur R. Miller et al.,
*Federal Practice & Procedure* § 2728 (3d ed. 1998)....................... 18-19

L. Littman,
"Individuals Treated for Gender Dysphoria with Medical and/or Surgical
Transition Who Subsequently Detransitioned: A Survey of 100
Detransitioners," *Archives of Sexual Behavior* 50:3353-3369, Oct. 2021 .............43

R. Branstrom & J.E. Pachankis,
"Correction to Branstrom and Pachankis,"
Am. J. Psychiatry, 177:8, August 2020 .................................................43

William B. Rubenstein,
Newberg on Class Actions §§ 3:1, 3:3 (5th ed. 2013)....................... 50-51

## STATEMENT OF JURISDICTION

This is an appeal from an action by Plaintiffs, on behalf of themselves and those similarly situated, invoking federal question jurisdiction and seeking declaratory judgment that West Virginia Medicaid's policy violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116, and the comparability and availability requirements of the Medicaid Act, 42 U.S.C. § 1396a(a)(10)(A)-(B). JA120. Plaintiffs seek a permanent injunction barring West Virginia Medicaid from enforcing its policy.  JA120.

Plaintiffs and Defendants filed cross motions for summary judgment. On August 2, 2022, The United States District Court for the Southern District of West Virginia entered a Memorandum Opinion and Order certifying a class. JA2552. On the same date, it entered a second Memorandum Opinion and Order denying Defendants' Motion for Summary Judgment, granting Plaintiffs' Motion for Summary Judgment, and issuing a permanent injunction. JA2562. A Judgment Order was entered on August 17, 2022, which disposed of all claims. JA2592. Defendants timely appealed within thirty days on August 31, 2022. JA2594; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which confers jurisdiction of appeals from all final decisions of the district courts.

1

## ISSUES PRESENTED FOR REVIEW

I.     In granting summary judgment on Plaintiffs' Equal Protection claim, did the district court err in finding that Plaintiffs were treated differently than others similarly situated?

II.    In granting summary judgment on Plaintiffs' Equal Protection claim, did the district court err in finding that Medicaid's policy, which does not cover gender-confirming surgery, is discriminatory on its face, ignoring *Geduldig v. Aiello*, 417 U.S. 484 (1974)?

III.   In granting summary judgment on Plaintiffs' Equal Protection claim, did the district court err in failing to consider Plaintiffs' burden to prove intentional invidious discrimination?

IV.    In granting summary judgment on Plaintiffs' Equal Protection claim, did the district court err in applying heightened scrutiny to Medicaid's facially neutral policy?

V.     In granting summary judgment on Plaintiffs' Affordable Care Act claim, did the district court err in applying the standard set forth in *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020), and in finding that the Medicaid policy discriminates on the basis of sex?

VI.    Given that CMS has approved Medicaid's State plan, in granting summary judgment on Plaintiffs' claims under the Medicaid Act, did the district court err in failing to give deference to the implicit judgment of CMS that the State plan complies with federal law?

VII.   Did the district court err in finding that the Medicaid policy violates the Medicaid Act's Availability Requirements?

VIII.  Did the district court err in finding that the Medicaid policy violates the Medicaid Act's Comparability Requirements?

IX.    Did the district court err in failing to grant summary judgment to Defendants based upon a lack of standing?

X.     Did the district court abuse its discretion in certifying a class?

## STATEMENT OF THE CASE AND OF THE FACTS

Plaintiffs are transgender West Virginia Medicaid members. They challenge Medicaid's policy, which does not cover gender-confirming surgical treatment. The West Virginia Department of Health and Human Resources, Bureau for Medical Services ("Medicaid"), is the State agency that administers West Virginia's Medicaid program. JA1092. Bill Crouch is the Cabinet Secretary of the West Virginia Department of Health and Human Resources. JA1167-1168. Cynthia Beane is the Commissioner for the Bureau for Medical Services. JA1176.

Plaintiffs allege that Medicaid has exclusions from coverage that "categorically deny transgender people coverage for gender-confirming care." JA117-118. Plaintiffs define "gender-confirming care" to include "counseling, hormone replacement therapy, and surgical care." JA118. Plaintiffs allege that "transgender people are targeted for discrimination by exclusions in the state health plans." JA118. Contrary to Plaintiffs' allegations, there is no evidence indicating that coverage for any covered services is denied to members on the basis of transgender identity.

It is undisputed that Medicaid covers treatment related to gender-confirming care, including psychiatric diagnostic evaluation, psychotherapy, psychological evaluation, counseling, office visits, hormones, and lab work. JA94-99, JA1136-1137, JA1296, JA1300, JA1305, JA1306-1307, JA1309, JA1336-1337, JA1339,

JA1345, JA1347, JA1370-1371, JA1374, JA1381-1383, JA2652-2659. Medicaid does not categorically deny transgender people coverage for gender-confirming care, as the Plaintiffs allege.

Medicaid does not, and cannot, cover everything that is medically necessary for its members. JA1200-1201. Medicaid has certain non-covered services that are applicable to all members. Chapter 100 of the Medicaid Policy Manual contains a non-exhaustive list of various services that Medicaid does not cover. JA1152-1153. The Policy Manual identifies at least 20 services that are considered non-covered by Medicaid, including "[t]ranssexual surgery." JA1152-1153. "Transsexual surgery" has been designated as a non-covered service since at least 2004.[1] JA1123-1124, JA1141. The policy has been maintained year-to-year without change and has not been challenged legally until the instant lawsuit. JA1124. The reason for initial adoption of the policy is unknown. JA1127.

## I.    Plaintiffs Have Not Been Denied Coverage for Gender-Confirming Care by Medicaid

Shauntae Anderson has been a Medicaid member since 2019. JA1294. She has been diagnosed with gender dysphoria and is prescribed hormones. JA1295-1296, JA1317-1318. Ms. Anderson confirmed that Medicaid pays for her

---

[1] It is unknown when the policy was initially adopted, as it could not be determined from the change log what changes were added in 2004. No earlier versions could be located. JA1123-1124, JA1141.

psychological/psychiatric visits and her lab work "[j]ust like they do for anyone else." JA1305.

Christopher Fain became a Medicaid member most recently in 2016. JA1333. He has been diagnosed with gender dysphoria and is prescribed hormones. JA1336-1337, JA1356. His doctor's visits and lab work have always been covered, and he is not aware of any denial of a claim made to Medicaid on the basis that he is transgender. JA1336-1337, JA1347-1349.

Plaintiffs Fain and Anderson have each confirmed that they personally have not been denied any coverage for gender-confirming care through Medicaid based on being transgender or having a transgender diagnosis. JA1296, JA1300, JA1347-1349. All medical claims submitted by Fain and Anderson for gender-confirming care have been covered and paid. JA1118-1120, JA1370-1371, JA1374, JA2652-2659. Fain's and Anderson's requests for hormones have never been denied by Medicaid based on transgender identity. JA94-99, JA1296, JA1336-1337, JA1364-1365. Neither Ms. Anderson nor Mr. Fain has submitted any claim to Medicaid to cover gender-confirming surgery.[2] JA1315-1316, JA1360-1363.

---

[2] Additionally, Mr. Fain is not willing to undergo gender-confirming surgery until he has "completely kicked" his smoking habit. JA1361-1362. Therefore, Mr. Fain is not currently in a position to undergo the surgery he desires based upon his stated understanding of the risks. JA1361-1362.

## II. Medicaid Policy Makes No Distinction Between Medicaid Members Based on Transgender Status

Plaintiffs have not demonstrated Medicaid has any exclusion of coverage that pertains categorically to transgender individuals. All services considered covered services by Medicaid are covered for transgender members to the same extent and based on the same criteria as cisgender or other members. There is no service that would be covered for a cisgender person that is not covered for a transgender person meeting the same criteria. The "system does not designate whether an individual is transgender, so all services that are available to all members are available to all members." JA1109.

Medicaid does not track the gender identity of its members. Its system is based upon binary male or female designations, and it does not ask for or designate gender identity. JA1109, JA1462-1464. Because it does not keep data regarding a member's gender identity, it is impossible for Medicaid to make the distinction that Plaintiffs allege.

Approval for surgical coverage under Medicaid is based on many factors other than the diagnosis, such as medical history, previous treatment, severity of diagnosis, and combination of other symptoms and conditions. JA325. Coverage is determined by Medicaid's utilization management vendor, Kepro, which uses guidelines from InterQual, a nationally recognized utilization management software, to determine medical necessity for services. JA1501-1503, JA1505, JA1521. Transgender

Medicaid members seeking to access covered services who meet Kepro's coverage criteria are not denied services based on transgender status.[3] JA1109.

## III. Not All Transgender People are Diagnosed with Gender Dysphoria or Seek Gender-Confirming Surgery

Not all transgender people are affected by Medicaid's policy. Not all transgender individuals are diagnosed with gender dysphoria. There is a difference between a transgender identity and gender dysphoria. JA1411. Being transgender is an identity. JA1411. Gender dysphoria is a DSM-V disorder. JA1411-1412. Further, not all patients with gender dysphoria seek gender-confirming care; while some do, some do not. JA1415-1416. According to Plaintiffs' expert, Dan Karasic, M.D., roughly one in 200 people identifies as transgender. JA1413. About one in a thousand are in clinical care for gender dysphoria. JA1413.

The most recent data in the record indicates that Medicaid enrollment was 628,825 in March 2022. JA1190, JA1213. In the first nine months of 2021, 686 Medicaid members with a diagnosis related to gender dysphoria made claims, but not necessarily for gender-confirming care. JA319-320, JA1517-1520. The number 686 captures those who had made claims whether or not the gender identity disorder diagnosis was the primary diagnosis or the reason for the requested service. JA1517-1520.

---

[3] Mr. Fain's coverage history is instructive. In 2018, he had a hysterectomy, which was not a gender-confirming surgery, that was covered by Medicaid. JA1326-1327.

Of those diagnosed with gender dysphoria who receive care, Dr. Karasic did not specify the number who specifically seek surgical care. The record does not reveal the number of Medicaid members who may seek gender-confirming surgery, and there is no evidence in the record that anyone other than Fain and Anderson seek such treatment. The policy only potentially affects those who are diagnosed with gender dysphoria, seeking gender-confirming surgery, determined to be candidates for surgery, approved for surgery, and who actually submit a claim for such services to Medicaid. This is a different group of people than "all transgender people."

## IV. Gender-Confirming Surgeries Are Not the Same Treatments Currently Available to Medicaid Members.

Plaintiffs allege that cisgender Medicaid members can access "the same kinds of treatments" as the non-covered gender-confirming surgeries. JA151. To the contrary, no member can access gender-confirming surgeries, which are not "the same kinds of treatments" as covered services. InterQual has guidelines that are specific to gender-confirming surgical services. JA967-1014, JA1111-1117, JA1511, JA1521, JA1524. Those guidelines are distinct from the guidelines that relate to surgical services covered by Medicaid and have different criteria than covered services. JA1111-1117, JA1511, JA1521, JA1524. A comparison of the InterQual criteria for covered services and for gender-confirming procedures illustrates the differences. The services identified in the InterQual criteria for covered services include, for example, hysterectomy to treat endometriosis and

8

endometrial cancer. JA2281-2415. Coverage for these services is equally available to all members meeting the criteria regardless of gender identity. The guidelines specific to gender-confirming surgical services are not utilized by Kepro for Medicaid because they are not a covered service. JA1116-1117, JA1511, JA1521, JA1525. The fact that different coverage guidelines have been developed by Kepro that apply exclusively to gender-confirming surgical services demonstrates that the services are, in fact, different services.

Plaintiffs' expert, Loren Schechter, M.D., explained that gender-confirming surgeries "are typically a constellation of procedures that include top surgery, so typically chest or breast, genital surgeries, in addition to, for example, a hysterectomy, oophorectomy, orchiectomy." JA1597. According to Dr. Schechter, transgender individuals are the only individuals that seek access to gender-confirming surgeries. JA1598-1599, JA1602. He further reiterated, "cisgender individuals may undergo mastectomy, as we've said, oophorectomy, and so forth. But those aren't considered to be sex transformation procedures in cisgender individuals." JA1602-1603.

This is further clarified by Dr. Schechter's explanation of what is involved in a vaginoplasty for gender-affirming surgery: removal of the penis and testicles, followed by tissue from the penis being used to construct the vaginal canal, labia and clitoris. JA1659-1661. It is clear from this description this is not a comparable procedure or service a cisgender individual would receive.

Similarly, there is not simply one uniform mastectomy procedure for all purposes. According to Dr. Schechter, "[t]here is a wide range of indications or techniques used to perform mastectomy, whether for gender-affirming mastectomy or for a mastectomy pertaining to oncologic reasons or for risk reduction mastectomies, meaning removing a breast that is not cancerous but may have an increased predilection or risk of breast. There are different ways to perform that mastectomy, so as to how it would be performed compared to a gender affirming mastectomy, again, would depend upon the specific situation."[4] JA1687-1688.

Gender dysphoria is defined and outlined in the DSM-V, a diagnostic manual of psychiatric conditions and their diagnostic criteria. JA1790-1791, JA1796. Medicaid does not provide surgical coverage for any DSM-V diagnosis, regardless of gender identity. JA1819.

Dr. Olson-Kennedy stated that a comparable medically necessary procedure for a cisgender woman would be a procedure to treat distress caused from failure to develop breasts such that their chest is not identifiable as an adult female chest, known as hypomastia. JA1806-1807. Medicaid does not cover surgery for hypomastia, regardless of gender identity. JA1818-1819. Likewise, Medicaid does not cover surgery for gynecomastia (enlargement of breast tissue in males) based

---

[4] Similarly, Plaintiffs' expert Johanna Olson-Kennedy, M.D., describes one such surgery as "masculinizing chest surgery." JA1797. This is distinct from a mastectomy that would be sought by a cisgender woman.

solely on psychosocial symptoms, regardless of gender identity. JA1819, JA2405.

Medicaid's policy of not covering gender-confirming surgeries is consistent with its

policy of not covering surgeries for hypomastia or gynecomastia based solely on

psychosocial symptoms, and gender identity is irrelevant to these determinations.

## V. CMS Oversees Approval of the State Medicaid Plan and Does Not Require Coverage for Gender-Confirming Surgery.

Medicaid is "overseen by the [Centers for Medicare and Medicaid Services

"CMS"] in that [CMS] maintain[s] the Code of Federal Regulations and approve[s]

[Medicaid's] state plan and state plan amendments." JA1129-1130. Medicaid

receives communications from CMS regarding policy and compliance. JA1102,

JA1105-1106, JA1451. CMS communicates with Medicaid to either clarify how

something is to be done or to provide a change that needs to be made.[5] JA1098,

JA1196-1197. CMS has an active role in reviewing and approving changes made in

coverage provided by Medicaid. JA1088. Medicaid has never received any

communication from CMS stating that not covering gender-confirming surgery is in

violation of any law. JA1127, JA1461. CMS does not require coverage for gender-

confirming surgeries. JA1130.

As noted by Defendants' expert, Stephen Levine, M.D., Health and Human

Services ("HHS") evaluated the evidence in 2016 and refused to mandate coverage

---

[5] A recent example was for medication-assisted treatment for individuals with substance use disorder. JA1197-1198,  JA1250-1267.

for transgender surgeries, leaving it up to the individual states to decide, due to lack of evidence of long-term benefits. JA1873. While this decision was made in connection with Medicare, it is notable that HHS, which houses CMS, has declined to mandate coverage for these same services in other contexts.[6] Defendants rely upon guidance from HHS and CMS to determine required coverages. JA310.

## VI. Medicaid is Unable to Add Additional Services Due to Budgetary Constraints.

Medicaid is unable to add gender-confirming surgery to its covered services due to budgetary constraints, including a flat budget and projected deficits. JA1202-1204. Medicaid receives a federal match on state funds allocated to the Medicaid program but is only allocated so many funds by the State Legislature. JA1131. This limits what Medicaid can cover because it must be able to pay for existing coverages on an ongoing basis as well as any services added. JA1131-1132. To add services, Medicaid would "either have to cut existing services or receive additional appropriations from the [L]egislature[.]" JA1203.

Medicaid is projecting a budget deficit within two years. JA1203. The projections demonstrate an inability to maintain services at the current level beginning in fiscal year 2024, with projected deficits for 2024, 2025, 2026, and 2027

---

[6] The District of Arizona found it "instructive that CMS found the clinical evidence is 'inconclusive'" for the Medicare adult population. *Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1041 (D. Ariz. 2021), *aff'd by Doe v. Snyder*, 2022 U.S. App. LEXIS 6217 (9th Cir. Mar. 10, 2022).

each well exceeding $100 million. JA1471-1473, JA1491-1492. Absent receiving necessary funds, Medicaid will "have to make decisions about what will be cut and where." JA1474.

Recent efforts to add services at even a minimal cost have been unsuccessful. In 2022, a bill was presented for Medicaid funding to cover blood pressure cuffs for individuals with uncontrolled blood pressure. JA1202. The corresponding fiscal note indicated that Medicaid's share of that coverage was going to be a little over $500,000. JA1202-1203. The Legislature did not want to increase the Medicaid budget, so the measure failed. JA1202. A second bill that would have cost the State only about $75,000 similarly did not pass. JA1483-1487. Medicaid does not have the funds to add services, regardless of the nature of the services. JA1204.

## VII. Procedural History

Plaintiffs assert claims against the Defendants on behalf of themselves and individuals similarly situated, seeking declaratory judgment that Medicaid's policy violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, Section 1557 of the Patient Protection and Affordable Care Act, and the comparability and availability requirements of the Medicaid Act. JA120. Plaintiffs seek a permanent injunction barring Medicaid from enforcing its policy which designates gender-confirming surgery as a non-covered service. JA120. Defendants filed a Motion to Dismiss based in part upon an argument that Plaintiffs lacked standing, which was denied. JA107-110.

13

On May 31, 2022, several motions were filed. Plaintiffs filed a Motion for Class Certification Pursuant to Fed. R. Civ. P. 23. JA212-214. Plaintiffs filed a Motion to Exclude Expert Testimony of Stephen B. Levine, M.D. JA32. Plaintiffs and Defendants filed cross motions for summary judgment on all claims.[7] JA284-286, JA1076-1082. The motions were argued on July 13, 2022. JA2464-2551.

On August 2, 2022, The United States District Court for the Southern District of West Virginia entered a Memorandum Opinion and Order certifying a class of "all transgender people who are or will be enrolled in [W]est Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusion." JA2552, JA2561. On the same date, it entered a second Memorandum Opinion and Order denying Defendants' Motion for Summary Judgment, granting Plaintiffs' Motion for Summary Judgment, and denying as moot the Motion to Exclude Expert Testimony of Stephen B. Levine, M.D. JA2562, JA2591. The district court concluded that Medicaid's policy "denying coverage for the surgical care for gender dysphoria invidiously discriminates on the basis of sex and transgender status." JA2591. The district court held that the policy "violates the Equal Protection clause of the Fourteenth Amendment, the Affordable Care Act, and the Medicaid Act." JA2591. The district court ordered that "Defendants are enjoined from enforcing or applying the exclusion." JA259. A Judgment Order was entered on August 17, 2022,

---

[7] Defendants again raised the issue of lack of standing. JA1078.

which disposed of all claims. JA2592-2593.[8] Defendants timely appealed on August 31, 2022. JA2594-2597. Defendants challenge class certification and the district court's conclusion that Medicaid's policy violates the Equal Protection Clause, the Affordable Care Act, and the Medicaid Act.

## SUMMARY OF ARGUMENT

In granting summary judgment for Plaintiffs, the district court made several errors. It found that "a surgery, such as a mastectomy, for a gender dysphoria diagnosis and the same surgery for a non-gender dysphoria diagnosis, are not materially different." JA2569. This factual finding contributed to the court erroneously concluding that Plaintiffs were similarly situated to Medicaid members seeking treatments for different diagnoses. JA2574-2575. In the healthcare context, similarly situated individuals are those seeking treatment for the same medical condition. This is true regardless of whether the treatment for different medical conditions may be the same.

The court's conclusion that Plaintiffs are treated differently than similarly situated Medicaid members is erroneous. Because they are not treated differently, the Equal Protection analysis ends there, and Defendants are entitled to summary judgment on Plaintiffs' Equal Protection claim.

---

[8] The only issue remaining to be resolved in the district court is Plaintiffs' Motion for Attorneys' Fees and Expenses, which is currently pending. JA34-35.

The district court erred by finding that the Medicaid policy facially discriminates on the basis of sex and transgender status, and circumventing Plaintiffs' burden to prove intentional discrimination. JA2576-2578. The district court reasoned that one cannot consider the term "transgender" without considering sex. JA2577. The court then erroneously concluded that because "the exclusion references sex on its face," it necessarily discriminates based upon sex. JA2576-2577. In doing so, the district court failed to apply *Geduldig v. Aiello*, 417 U.S. 484 (1974), which expressly held that health insurance programs can cover different risks without running afoul of the Equal Protection Clause, even if one of the risks is tied to a particular sex.

These errors led to the court's erroneous conclusion that "there is no need for Plaintiffs to show discriminatory intent or purpose." JA2578. Because the policy is not facially discriminatory, Plaintiffs must demonstrate that the alleged unequal treatment is "the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). If the district court had examined this issue, it would have inevitably concluded that there is no evidence that Medicaid's policy is the result of intentional or purposeful discrimination, and their Equal Protection claim must fail. Likewise, nothing in the record suggests that the policy is related to perpetuating stereotypes regarding transgender individuals.

The district court erred in finding that "the Plaintiffs in this case fall within a quasi-suspect class, necessitating the application of heightened scrutiny." JA2572.

The appropriate level of scrutiny is rational basis, which the policy meets. Medicaid cannot cover everything that is medically necessary. JA1200-1201. The policy is rationally related to the State's interests in providing coverage consistent with what is required by CMS and in conserving financial resources available to the Medicaid program for the benefit of providing services to its members on an ongoing basis. Contrary to the court's finding, there is evidence in the record to support a questioning of the medical necessity of the surgical treatment of gender dysphoria.

The district court erroneously concluded that the Plaintiffs were subjected to discrimination in healthcare services on the basis of sex, in violation of Section 1557 of the ACA. JA2584-2585. *Bostock*'s holding was limited to Title VII claims involving employers who fired employees because they were gay or transgender. *Bostock*, 140 S. Ct. at 1754. In relying on *Bostock*, the court did not conduct any independent consideration of whether *Bostock* applies to the healthcare arena or whether *Bostock* should apply in cases arising under Title IX in this context.

Even if the test announced in *Bostock* is the appropriate test, the district court has misapplied it to this case. Medicaid's policy does not classify coverage based on sex or transgender identity. Additionally, Medicaid's policy does not violate the ACA because Medicaid does not treat Plaintiffs worse than others similarly situated and because there is no evidence of intentional discrimination based on sex or transgender identity.

In granting summary judgment on the Medicaid Act claims, the district court failed to give deference to CMS's "implicit judgment" that a State Medicaid plan that it has approved complies with federal law. The court erroneously concluded that Medicaid "has either mandated or chosen to cover the same surgical procedures for non-gender-dysphoria related treatment." JA2587. The district court further erroneously concluded that "the unrebutted evidence in the record demonstrates the medical necessity of surgical care." JA2587. In so finding, the court accepted the opinions of Plaintiffs' experts while disregarding the opinions of Defendants' expert, which is an impermissible weighing of the evidence. Contrary to the court's finding, there is ample evidence in the record to rebut the medical necessity of surgical care.

## ARGUMENT

### I.    Standard of Review

A granting of summary judgment is reviewed *de novo*. *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (additional citation omitted). "In considering a motion for summary judgment, the district court must 'view the evidence "in the light most favorable to the"' nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)) (additional citation omitted). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs,* 780 F.3d at 568-569 (quoting 10A Charles Alan Wright & Arthur R. Miller

18

et al., *Federal Practice & Procedure* § 2728 (3d ed. 1998)). "The court therefore cannot weigh the evidence or make credibility determinations." *Jacobs,* 780 F.3d at 569 (additional citations omitted). A district court is required to view the evidence in the light most favorable to the nonmovant and to draw all reasonable inferences in its favor. *Harris,* 927 F.3d at 272.

Standing is a legal question that is reviewed *de novo*. *Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, 983 F.3d 671, 679-680 (4th Cir. 2020) (additional citation omitted).

"A decision of a district court granting or denying a motion for class certification is reviewed on appeal for abuse of discretion, but the district court must exercise its discretion within the confines of Federal Rule of Civil Procedure 23." *Doe v. Chao*, 306 F.3d 170, 183 (4th Cir. 2002), *aff'd on other grounds*, 540 U.S. 614, 124 S. Ct. 1204 (2004) (additional citation omitted).

## II. The District Court Erred in Granting Summary Judgment to Plaintiffs Based Upon the Equal Protection Clause.

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). If this showing is made, "the court proceeds to determine whether the disparity in treatment

can be justified under the requisite level of scrutiny." *Id.* (additional citations omitted).

### A.   The District Court Incorrectly Determined that the Plaintiffs Were Treated Differently from Similarly Situated Medicaid Members.

"The Equal Protection Clause . . . is 'essentially a direction that all persons similarly situated should be treated alike.'" *Grimm v. Gloucester Cty. School Bd.*, 972 F.3d 586, 606 (4th Cir. 2020) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)). "The Clause 'does not take from the States all power of classification,' but 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'" *Morrison*, 239 F.3d at 654 (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271 (1979)) (additional citation omitted).

The district court found that "a surgery, such as a mastectomy, for a gender dysphoria diagnosis and the same surgery for a non-gender dysphoria diagnosis, are not materially different." JA2569. This factual finding led the court to erroneously conclude that Plaintiffs were similarly situated to Medicaid members seeking surgeries for different diagnoses. JA2574-2575. This question of law is reviewed *de novo*.

In making its factual finding, the district court erroneously adopted Plaintiffs' interpretation of Dr. Schechter's testimony and disregarded Dr. Schechter's own statements emphasizing the differences, rather than similarities, in these procedures.

JA1597-1603, JA1659-1661, JA1687-1688, JA2568-2569. Additionally, the court's recitation of facts in support of its conclusion that the surgeries are not materially different is stated in the light most favorable to Plaintiffs, not the Defendants, contrary to the applicable standard of review which requires inferences to be made in the light most favorable to the non-moving party. JA2567-2569. The court's factual finding is erroneous.

Here, "similarly situated" individuals who are "in all relevant respects alike" can only refer to other Medicaid members who seek gender-confirming surgery. Though Plaintiffs seek comparison with cisgender individuals who seek coverage for surgical care for reasons other than gender-confirmation, those individuals are not "in all relevant respects alike" because the procedures sought by cisgender individuals are not gender-confirming procedures, and transgender individuals also have access to those same procedures. For example, when Mr. Fain received coverage for his hysterectomy, Mr. Fain was "similarly situated" "in all relevant respects" to other individuals meeting the criteria for that covered service and was treated in the same manner by receiving coverage. If any person of any gender identity would request gender-confirming surgery, it would not be covered because the policy identifying that service as non-covered is uniformly applied to all members.

Even if the treatments sought are considered the same, Plaintiffs are not similarly situated to others with different diagnoses. As one district court found:

> [P]laintiff is not alleging that she is being treated differently than other prisoners suffering from gender dysphoria. Her complaint is that she, a transgender inmate, is being denied sex reassignment surgery, while cisgender female inmates suffering from cystocele … or rectocele … are provided with surgical treatments for their conditions. However, because plaintiff is not "similarly situated" to the prisoners she uses as a basis of comparison, her equal protection claim necessarily fails.

*Williams v. Kelly*, 2018 U.S. Dist. LEXIS 158119 at *29 (E.D. La. Aug. 27, 2018) (adopted by *Williams v. Kelly*, 2018 U.S. Dist. LEXIS 157002 (E.D. La. Sept. 14, 2018)). The district court found *Williams* unpersuasive because the *Williams* court was not bound by *Grimm* and was decided before *Bostock*'s guidance for analyzing sex discrimination against transgender people. JA2574. However, the reasoning applied in *Williams* involved a fact pattern much more similar to the instant case than those presented in either *Grimm* or *Bostock*, neither of which address the provision of healthcare.[9]

In the healthcare context, similarly-situated individuals are those seeking treatment for the same medical condition. This is true regardless of whether the treatment for different medical conditions may be the same. In *Flaming v. Univ. of*

---

[9] The district court also relied throughout its Memorandum Opinion and Order upon *Kadel v. Folwell*, 1:19-cv-272, 2022 U.S. Dist. LEXIS 103780, 2022 WL 3226731 (M.D.N.C. June 10, 2022), which is currently on appeal before this Court, and *Fletcher v. Alaska*, 443 F. Supp. 3d 1024 (D. Alaska 2020) which is not binding on this Court.

*Tex. Med. Branch*, 2016 U.S. Dist. LEXIS 22304, at \*24, 2016 WL 727941 (S.D. Tex. Feb. 24, 2016), the district court for the Southern District of Texas found that "[a] diagnosis of degenerative disc disease with chronic low back pain is different in fact from a diagnosis of cancer." *Id.* Failure to provide an individual with degenerative disc disease with chronic low back pain the same level of pain management that is given to individuals with cancer did not support an Equal Protection claim. *Id.*, 2016 U.S. Dist. LEXIS 22304, at \*23. Plaintiff was unable to demonstrate that he had been treated differently from other individuals who suffer from the same condition, and his Equal Protection Clause claim failed. *Id.*, 2016 U.S. Dist. LEXIS 22304, at \*24.

Denying an individual testosterone injections when others who experienced similar symptoms and received a diagnosis of Klinefelter Syndrome were allowed to receive them does not violate equal protection. *McMain v. Peters*, 2018 U.S. Dist. LEXIS 132641, at \*\*8-9, 2018 WL3732660 (D. Or. Aug. 2, 2018), *aff'd by McMain v. Peters*, 2019 U.S. App. LEXIS 22095, 2019 WL 3321883 (9th Cir. July 24, 2019). Plaintiff was not treated differently from others similarly situated to him because he did not have Klinefelter Syndrome. *Id.*, 2018 U.S. Dist. LEXIS 132641, at \*9-10. These cases, decided in the context of healthcare, demonstrate that similarity in the diagnosis, not the treatment, is what matters for Equal Protection purposes.

The district court identified the relevant comparison to be "persons who seek the same medically necessary surgeries for non-gender dysphoria related treatments." JA2575. This comparison incorrectly compares the treatment sought rather than the diagnosis. However, even adopting this comparison, Plaintiffs are not treated differently than other members. Dr. Olson-Kennedy identified a comparable medically necessary procedure for a cisgender woman to be a procedure to treat distress caused from failure to develop breasts such that her chest is not identifiable as an adult female chest, known as hypomastia. JA1806-1807. Medicaid does not cover surgery for hypomastia. JA1818-1819. Thus, cisgender females who are most similarly situated to members seeking gender-confirming surgery also would be denied coverage by Medicaid. Likewise, Medicaid does not cover surgery for gynecomastia based solely on psychosocial symptoms. JA1819, JA2405.

The court's conclusion that Plaintiffs are treated differently than similarly situated Medicaid members is erroneous. Because they are not treated differently, the Equal Protection analysis ends there, and Defendants are entitled to summary judgment on Plaintiffs' Equal Protection claim.

### B. The District Court Incorrectly Determined that the Policy Facially Discriminates, Ignoring *Geduldig v. Aiello*.

The district court reasoned that, "generally, a plaintiff must show that a policy based on sex or transgender status had discriminatory intent" but "such a showing is unnecessary when the policy tends to discriminate on its face." JA2576-2577. The

court found that Medicaid's policy discriminates on its face on the basis of sex and transgender status because the language refers explicitly to sex. JA2577-2578. Thus, the court circumvented Plaintiffs' burden to prove intentional discrimination.

The district court reasoned that one cannot consider the term "transgender" without considering sex. JA2577. The court then erroneously concluded that because "the exclusion references sex on its face," it necessarily discriminates based upon sex. JA2576-2577. Intermediate scrutiny is not required for any policy that simply refers to the concept of sex or gender. To constitute a facial classification, the policy must treat a person "differently from others with whom he is similarly situated" on the basis of sex or gender. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Thus, while the terms "husband" and "wife" cannot be understood without considering sex or gender, a statute which defined "spouse" as "husband or wife" does not discriminate based on sex simply because it utilized those terms. *Adkins v. Rumsfeld*, 464 F.3d 456, 468 (4th Cir. 2006).

The district court relied upon *Grimm v. Gloucester Cty. School Bd.*, 972 F.3d 586, 607-08 (4th Cir. 2020), which concerned a bathroom policy that required students to use bathrooms according to their "biological genders." JA2577.[10] The

---

[10] The district court also relied on *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485 (1982), which concerns the political process doctrine and does not support the conclusion that heightened scrutiny applies if a policy contains gendered or sex-related terms. Justices of the Supreme Court have since called this doctrine into

policy at issue in *Grimm* not only referenced sex, but also treated students differently solely on the basis of sex (requiring use of one bathroom instead of another). Unlike the policy in *Grimm*, the Medicaid policy does not discriminate against any member on the basis of sex, gender, or transgender status. It is the procedure, not the identity of the person seeking it, that is considered. Members are not treated differently based upon transgender identity, but rather, whether the member seeks gender-confirming surgery.

The district court further relied upon a misinterpretation of *Bostock v. Clayton Cnty., Georgia,* 140 S. Ct. 1731 (2020), reasoning that the mere usage of the term "transsexual" gives rise to facial discrimination. JA2577-2578. This takes *Bostock* too far. Though *Bostock* stands for the proposition that the term "transgender" implicates sex, it does not hold that any mention of the concept of "transgender" necessarily discriminates. There must still be an element of different treatment because of transgender status, which is absent here. A further problem with relying upon *Grimm* and *Bostock* in this context is that *Geduldig v. Aiello*, 417 U.S. 484 (1974)[11] expressly held that health insurance programs can cover different risks

_____

question. *Lewis v. Governor of Alabama*, 896 F.3d 1282, 1297 (11th Cir. 2018), *on reh'g en banc*, 944 F.3d 1287 (11th Cir. 2019).

[11] Congress amended Title VII in 1978 to prohibit discrimination on the basis of pregnancy, childbirth, or related medical conditions. *See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 678-79 (1983). However, the Court's analysis in *Geduldig* related to whether an insurance exclusion based on a health condition is facially discriminatory under the Equal Protection Clause

without running afoul of the Equal Protection clause, even if one of the risks is tied to a particular sex.

The instant case is analogous to *Geduldig,* where the Supreme Court considered a challenge to a provision in a California disability insurance program that excluded coverage for disability that accompanies normal pregnancy and childbirth. *Id.* at 492. The Court held that the program exclusion did not constitute invidious discrimination on the basis of sex because it did "not discriminate with respect to the persons or groups which are eligible for disability insurance protection under the program." *Id.* at 494. Notably, the Court explained:

> The California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition – pregnancy – from the list of compensable disabilities. While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification . . . [.] Normal pregnancy is an objectively identifiable physical condition with unique characteristics. Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.

> The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups – pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes.

---

remains intact. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-2246 (2022); *Lange v. Houston Cty., Georgia*, 499 F. Supp. 3d 1258, 1276 (M.D. Ga. 2020).

*Id.*, at 496 n. 20. The Court applied rational basis review and acknowledged the state's ability to insure some risks and not others, and specifically found that the state "has an interest in distributing the available resources in such a way as to keep benefit payments at an adequate level for disabilities that are covered, rather than to cover all disabilities adequately." *Id.* at 494-495. By the same analysis, Medicaid's policy does not create a sex-based classification, because it divides members into two groups – those who seek gender-confirming surgery, and all other persons. While the first group may be exclusively comprised of transgender individuals, the second group includes all other persons, whether cisgender, transgender, or other identity, who do not seek gender-confirming surgery.

The district court's effort to distinguish *Geduldig* fails. The court stated that "the nonsuspect class – those not seeking surgical treatment for gender dysphoria – are treated more favorably, as their materially same surgeries are covered." JA2578. The fatal flaw in the court's reasoning is that, here, the class of people not seeking surgical treatment for gender dysphoria that is treated "more favorably" (according to the court) includes cisgender, transgender, and potentially other gender identities. This highlights the fact that the distinction is drawn between individuals based on whether they seek gender-confirming surgery, and not because they identify as either cisgender or transgender. It also illustrates the symmetry between the instant case and *Geduldig*. The district court failed to acknowledge *Geduldig*'s holding that a

28

classification based upon pregnancy, though understood in terms of applying to only one sex, did not violate the Equal Protection clause because not every woman is a pregnant person. The district court's reasoning simply cannot be squared with *Geduldig*.[12]

 Following *Geduldig*, the district court for the Middle District of Georgia concluded that a healthcare plan exclusion for "sex change surgery" was facially neutral for purposes of the Equal Protection Clause. *Lange v. Houston Cty., Georgia*, 499 F. Supp. 3d 1258, 1275 (M.D. Ga. 2020). The district court examined *Bostock* and concluded that *Bostock* had "no bearing on whether a health exclusion is facially discriminatory." *Id.*

### C. The District Court Erred by Circumventing Plaintiffs' Burden to Show Intentional Invidious Discrimination, Which Has Not Been Met.

The court erroneously concluded that "there is no need for Plaintiffs to show discriminatory intent or purpose." JA2578. Because the policy is not facially discriminatory, Plaintiffs must demonstrate that the alleged unequal treatment is "the

---

[12]The district court also found unpersuasive the analysis in *Toomey v. Arizona*, 2020 U.S. Dist. LEXIS 224159 (U.S.D.C. D. Ariz. Nov. 30, 2020), *adopted in part and rejected in part by Toomey v. Arizona*, 2021 U.S. Dist. LEXIS 36944 (D. Ariz. Feb. 26, 2021). Though not adopted by the District of Arizona, the United States Magistrate Judge concluded a policy that affects some, but not all, transgender individuals, is not discrimination on the basis of sex or transgender identity. *Id.* at *14 (additional citations omitted). The reasoning of the Magistrate Judge is consistent with *Geduldig* and involved a fact pattern much more similar to the instant case than those presented in either *Grimm* or *Bostock*.

result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). If the district court had examined this issue, it inevitably would have concluded that the Plaintiffs have no evidence that Medicaid's policy is the result of intentional or purposeful discrimination, and their Equal Protection claims must fail.

Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296 (1979) (additional citation omitted). Rather, it implies that the decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

The district court acknowledged that "there is no known reason as to why this Exclusion was ever adopted in the first place." JA2569. The record indicates that it is unknown how, when, or why the policy was initially enacted. JA1122, JA1124-1125, JA1127. The policy has been in place going back to at least 2004, possibly earlier. JA1123-1124, JA1141. This pre-dated Secretary Crouch's appointment as Secretary in 2017 and Commissioner Beane's selection as both acting Commissioner (2014) and Commissioner (2017). JA1169, JA1176-1177. The policy has been maintained year-to-year without change. JA1124. The Defendants rely upon guidance from CMS to determine required coverages, and,

as the district court acknowledged, CMS does not require coverage for gender-confirming surgery. JA1130, JA2580. None of these facts support a finding of intentional, invidious discrimination. Likewise, nothing in the record suggests that the policy is related to perpetuating stereotypes regarding transgender individuals.

Additionally, the fact that Medicaid covers treatment related to gender-confirming care, including psychiatric diagnostic evaluation, psychotherapy, psychological evaluation, counseling, office visits, hormones, and lab work, establishes the absence of any intent to discriminate against transgender individuals. JA2652-2659.

Therefore, summary judgment for Plaintiffs was erroneous, and summary judgment should be entered in favor of Defendants on the Equal Protection claim.

### D. The Court Erred in Applying Heightened Scrutiny Instead of Rational Basis Review, Which the Policy Meets.

The district court erred in finding that "the Plaintiffs in this case fall within a quasi-suspect class, necessitating the application of heightened scrutiny." JA2572. The "classification" at issue is not directed at transgender individuals at all, but a specific procedure. It potentially affects only individuals who share a DSM-V diagnosis of gender dysphoria and seek surgical care for that diagnosis.

Such a classification is not a suspect or quasi-suspect class; therefore, rational basis review applies.[13]

Endorsing *Geduldig*, the Supreme Court recently reiterated that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretext designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022) (quoting *Geduldig*, 417 U.S. at 496 n.20). Because there is no evidence of intent to effect invidious discrimination, the court erred in applying heightened scrutiny.

If a law "neither burdens a fundamental right nor targets a suspect class," it will be upheld so long as it bears a rational relation to some legitimate end. *Romer v. Evans*, 517 U.S. 620, 631 (1996). It is Plaintiffs' burden "to negate every conceivable basis which might support" the alleged unequal treatment. *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (additional citation omitted). On the other hand, Defendants have "no obligation to produce evidence to support the

---

[13] Similarly, the Supreme Court applied rational basis review when addressing the Hyde Amendment, which restricted the availability of certain medically necessary abortions under Medicaid, finding that the amendment was not predicated on a constitutionally suspect classification. *Harris v. McRae*, 448 U.S. 297, 322-324 (1980). The Court found it was rational to authorize "federal reimbursement for medically necessary services generally, but not for certain medically necessary abortions" because of the inherent difference from other medical procedures. *Id.* at 325.

rationality of the [classification], which may be based on rational speculation unsupported by any evidence or empirical data." *Giarratano*, 521 F.3d at 303 (citation and quotation marks omitted).

Medicaid cannot cover everything that is medically necessary. JA1200-1201. The policy is rationally related to the State's interests in providing coverage consistent with what is required by CMS and in conserving financial resources available to the Medicaid program for the benefit of providing services to its members on an ongoing basis. Medicaid's means are rationally related to its interests because Medicaid cannot add covered services without potentially jeopardizing coverage for existing services on an ongoing basis. Thus, the rational basis test is satisfied.

The district court concluded that "Defendant's cost-related argument is unsupported by the record." JA2569. This finding is erroneous as Defendants have submitted undisputed cost projections demonstrating that budget deficits are anticipated within two years. JA1203. The projections demonstrate an inability to maintain services at the current level beginning in fiscal year 2024, with projected deficits for 2024 through 2027, each exceeding $100 million. JA1471-1473, JA1491-1492. No services, regardless of what they are, can be added without jeopardizing the provision of current services on an ongoing basis. JA1131-1132, JA1203. It is irrelevant whether Defendants have engaged in any cost analysis

specific to gender-confirming surgery when the undisputed evidence supports the inability to add any service based on budgetary constraints.

The court's conclusion that this argument is "unsupported" because the Defendants did not rely on any particular "cost-related documents" is erroneous. JA2569-2570. Whether or not any particular documents were identified as having informed the decision to maintain the policy does not negate the awareness that additional services cannot be added to the State Medicaid Plan unless there are funds to pay for them. The court relies upon purportedly "unrefuted" testimony of Dr. Schechter regarding the cost-effectiveness of gender confirmation surgeries, while erroneously disregarding contrary opinions offered by Dr. Levine. JA1885-1886, JA2571.

The district court erroneously disregarded an assertion by Dr. Levine about the lack of evidence regarding the long-term benefits of gender-confirming surgeries, finding it to be "inconsistent with the body of literature on this topic." JA2580. In doing so, the court impermissibly weighed the evidence instead of adhering to its obligation to construe all facts and inferences in favor of the Defendants. This contributed to the court's erroneous conclusion that Medicaid's interest in adhering to the required services as mandated by CMS was not "sincere." JA2581. The district court acknowledged that CMS does not mandate coverage for the surgical care of gender dysphoria. JA2580.

Similarly, the district court erred in disregarding the Defendants' questioning of the medical necessity of the surgical treatment of gender dysphoria. The court found the assertion to be "without support in the record." JA2581. In so finding, however, the court accepted the opinions of Plaintiffs' experts while disregarding the opinions of Defendants' expert, which is an impermissible weighing of the evidence.[14] Dr. Levine has opined that "[t]he right to bodily autonomy via 'gender-affirming' [] surgical interventions should not be confused with medical necessity" and that in the field of transgender care, "medical necessity" is driven by patient desire and not any objective standard. JA1866, JA1891-1892, JA1897-1899. Contrary to the court's finding, there is evidence in the record to support a questioning of the medical necessity of the surgical treatment of gender dysphoria, providing an additional rational basis for Medicaid's policy.

## III.  The District Court Erred in Granting Summary Judgment in Favor of Plaintiffs for Violation of Section 1557 of the Affordable Care Act.

Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116, states:

> Except as otherwise provided for in this title … an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 …, title IX of the Education Amendments of 1972 …, the Age

---

[14] Although Plaintiffs filed a Motion to Exclude the testimony of defense expert Dr. Levine, the motion was denied as moot in light of the court granting summary judgment in favor of the Plaintiffs. JA2591. The court made no ruling that would justify disregarding Dr. Levine's opinions in favor of differing opinions for purposes of summary judgment.

> Discrimination Act of 1975 …, or section 504 of the Rehabilitation Act
> of 1973 …, be excluded from participation in, be denied the benefits of,
> or be subjected to discrimination under, any health program or activity,
> any part of which is receiving Federal financial assistance[.]

42 U.S.C. § 18116(a), in part.

### A.    Defendants Have Not Violated Section 1557 of the ACA.

The district court erred in concluding that "the test announced in *Bostock* is the appropriate test to determine whether a policy discriminates in violation of the ACA." JA2583. Even applying *Bostock*, the district court erroneously concluded that "Plaintiffs were subjected to discrimination in healthcare services on the basis of sex." JA2584.

*Bostock*'s holding was limited to Title VII claims involving employers who fired employees because they were gay or transgender. *Bostock*, 140 S. Ct. at 1754. Historically in terms of Title IX jurisprudence, the term "sex" referred to the binary sex of male and female, and "gender identity" was understood as a distinct concept. The express language of Title IX indicates Congress's binary definition of "sex." *See* 20 U.S.C. § 1681 (referring to "students of one sex," "both sexes," "students of the other sex").[15] Plaintiffs do not allege classification based upon binary sex and therefore, state no claim that has been recognized by the Supreme Court in the Title

---

[15] When interpreting a statute, courts look to its ordinary meaning at the time it was enacted. *See, e.g.*, *Carcieri v. Salazar*, 555 U.S. 379, 388 (2009); *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994).

IX context. The district court's statement that "*Bostock* rejects this limitation on the scope of discrimination" is erroneous because *Bostock* concerned an employment context only. JA2584.

Even if the test announced in *Bostock* is the appropriate test, the district court has misapplied it to this case. Medicaid's policy does not classify based on sex or transgender identity. Instead, it has designated certain services as non-covered services. The policy looks to whether a person seeks gender-confirming surgery, not whether a person is transgender.

Additionally, to "discriminate against" a person means "treating that individual worse than others who are similarly situated." *Bostock*, 140 S. Ct. at 1740 (additional citation omitted). As set forth above, Medicaid's policy does not treat Plaintiffs worse than others who are similarly situated because it applies its policy uniformly regardless of gender identity. Moreover, "the difference in treatment based on sex must be intentional." *Id.* There is no evidence of intentional discrimination based on sex or transgender identity. Thus, even under *Bostock*, Medicaid's policy does not discriminate on the basis of sex and does not violate the ACA.

A similar conclusion was reached in *Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1045 (D. Ariz. 2021) (*aff'd by Doe v. Snyder*, 2022 U.S. App. LEXIS 6217 (9th Cir. Mar. 10, 2022)), where Plaintiff was found unlikely to succeed on a claim

under Section 1557 where the challenged policy "only excludes gender reassignment *surgery*—it does not exclude coverage for other treatments for gender dysphoria such as hormone therapy." *Id.* (emphasis in original).

**IV.    The District Court Erred in Granting Summary Judgment in Favor of Plaintiffs for Violation of the Medicaid Act.**

**A.    The District Court Erroneously Did Not Give Deference to the Implicit Judgment of CMS that the State Medicaid Plan Complies with Federal Law.**

*Davis v. Shah*, 821 F.3d 231, 247 (2d Cir. 2016), acknowledged that courts "owe a 'significant measure of deference to CMS's interpretation' of the Medicaid Act, including to its 'implicit judgment' that 'a state plan complies with federal law' in approving that plan[.]" *Id.* (quoting *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 137, 140 (2d Cir. 2002)). CMS has approved Medicaid's State plan, a fact which Plaintiffs have not disputed. JA1129-1130. The district court erroneously did not afford any deference to the fact that CMS has approved Medicaid's State plan and thereby has made an implicit judgment that the plan complies with federal law.

**B.    Defendants Have Not Violated the Medicaid Act's Availability Requirements.**

The district court erroneously concluded that "[t]he exclusion violates the availability requirement." JA2588. This conclusion relied upon the court's erroneous finding that gender-confirming procedures are not materially different from covered procedures, and that the medical necessity of the surgeries is "unrebutted." JA2587.

As the Supreme Court has explained, "Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs." *Alexander v. Choate*, 469 U.S. 287, 303 (1985). Instead, the benefit provided by Medicaid "remains the individual services offered[.]" *Id.*

The Medicaid Act states, in relevant part, "[a] State plan for medical assistance must … (10) provide—(A) for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17), (21), (28), (29), and (30) of section 1905(a) [42 USCS § 1396d(a)] …." 42 U.S.C. § 1396a(a)(10)(A). Notably, "nothing in the statute suggests that participating States are required to fund every medical procedure that falls within the delineated categories of medical care." *Beal v. Doe*, 432 U.S. 438, 444 (1977). "Indeed, the statute expressly provides: 'A State plan for medical assistance must… include reasonable standards… for determining eligibility for and the extent of medical assistance under the plan which… are consistent with the objectives of this [Title]….' 42 U.S.C. § 1396a(a)(17) (1970 ed., Supp. V)." *Id.*[16]

HHS regulations implement the statutory requirements of "Section 1902(a)(10), regarding comparability of services for groups of beneficiaries, and the amount, duration, and scope of services described in section 1905(a) of the Act that

---

[16] This language appears in the current version of 42 U.S.C. § 1396a(a)(17), though additional language has been added.

the State plan must provide for beneficiaries[.]" 42 C.F.R. § 440.200(a)(1). The

regulations set forth the criteria for availability:

> (a) The plan must specify the amount, duration, and scope of each service that it provides for—
> > (1) The categorically needy; and
> > (2) Each covered group of medically needy.
>
> (b) Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.
>
> (c) The Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition.
>
> (d) **The agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.**

42 C.F.R. § 440.230 (emphasis added). Thus, it is clear that the regulations permit a

State Medicaid plan to place limits on services even if those services are required to

be covered. *See Casillas v. Daines*, 580 F. Supp. 2d 235, 245-46 (S.D.N.Y. 2008).

Plaintiffs have not demonstrated that gender-confirming care is required to be

covered under the Medicaid Act. Required services are defined under 42 C.F.R. §§

440.210 and 440.220.[17] "A State plan must specify that, at a minimum, categorically

needy beneficiaries are furnished the following services: (1) The services defined in

§§ 440.10 through 440.50, 440.70 …." 42 C.F.R. § 440.210(a)(1). Sections 440.10

through 440.50 and 440.70 describe the following services: inpatient hospital

---

[17] Section 440.220 applies to beneficiaries who are "medically needy." Plaintiffs Fain and Anderson are expansion members and both in the "categorically needy" coverage group addressed in § 440.210.

40

services; outpatient hospital services and rural health clinic services; other laboratory and X-ray services; nursing facility services; physicians' services and medical and surgical services of a dentist; and home health services. 42 C.F.R. §§ 440.10 – 440.50, 440.70. Because gender-confirming surgery is not a mandatory service, it is an optional service. "Any of the services defined in subpart A of this part that are not required under §§ 440.210 and 440.220 may be furnished under the State plan at the State's option." 42 C.F.R. § 440.225. Defendants have chosen not to furnish coverage for gender-confirming surgery as is permitted under the Medicaid Act and its accompanying regulations.

Even if gender-confirming care falls into one of the mandatory covered service categories, State plans are permitted to place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures. 42 C.F.R. § 440.230(d). The Supreme Court has described the availability requirements as follows:

> But Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs. Instead, the benefit provided through Medicaid is a particular package of health care services… That package of services has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered – not "adequate health care."
>
> The federal Medicaid Act makes this point clear. The Act gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in "the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

41

*Alexander,* 469 U.S. at 303. Numerous courts, consistent with *Alexander*, have held that states retain broad discretion to determine the extent of medical assistance offered in their Medicaid programs. *See Mennonite Gen. Hosp. v. Molina Healthcare of P. R.*, 319 F. Supp. 3d 587, 591 (D.P.R. 2018); *DeSario v. Thomas*, 139 F.3d 80, 96 (2d Cir. 1998) ("[W]e reject as baseless and unworkable the view … that a state must cover all medically necessary services.") (citations omitted); *Grier v. Goetz*, 402 F. Supp. 2d 876, 911 (M.D. Tenn. 2005) ("42 C.F.R. § 440.230(d) expressly permits a State to 'place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.'").

The court selectively quoted one portion of *Beal v. Doe*, 432 U.S. 438, 444 (1977), for the proposition that "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage." JA2587. However, the Supreme Court has acknowledged that not all medically necessary services are covered by Medicaid, nor are they required to be covered. *Harris v. McRae*, 448 U.S. 297, 308-310, 325, 325 n.28, 100 S. Ct. 2671 (1980).

The district court erroneously concluded that Medicaid "has either mandated or chosen to cover the same surgical procedures for non-gender-dysphoria related treatment." JA2587. As set forth above, Medicaid disputes that gender-confirming surgeries are the same surgical procedures that are covered services.

42

The district court erroneously concluded that "the unrebutted evidence in the record demonstrates the medical necessity of surgical care." JA2587. To the contrary, there is ample evidence in the record to rebut the medical necessity of surgical care. Dr. Levine has provided the opinion that "[t]he right to bodily autonomy via 'gender-affirming' [] surgical interventions should not be confused with medical necessity" and that in the field of transgender care, "medical necessity" is driven by patient desire and not any objective standard. JA1866, JA1891-1892, JA1897-1899. Medical necessity of gender-confirming surgery is still being debated, is not settled science,[18] and the assumption of such carries significant risks.[19]

---

[18] R. Branstrom & J.E. Pachankis, "Correction to Branstrom and Pachankis," *Am. J. Psychiatry*, 177:8, August 2020 ("Upon request, the authors reanalyzed the data to compare outcomes between individuals diagnosed with gender incongruence who had received gender-affirming surgical treatments and those diagnosed with gender incongruence who had not. … the results demonstrated no advantage of surgery ….") JA1761; CMS Decision Memo, Gender Dysphoria and Gender Reassignment Surgery, Aug. 30, 2016 ("While we are not issuing a [national coverage decision], CMS encourages robust clinical studies that will fill the evidence gaps and help inform which patients are most likely to achieve improved health outcomes with gender reassignment surgery, which types of surgery are most appropriate, and what types of physician criteria and care setting(s) are needed to ensure that patients achieve improved health outcomes.").

[19] L. Littman, "Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners," *Archives of Sexual Behavior* 50:3353-3369, Oct. 2021 ("The majority (55.0%) felt that they did not receive an adequate evaluation from a doctor or mental health professional before starting transition and only 24.0% of respondents informed their clinicians that they had detransitioned. There are many different reasons and experiences leading to detransition. More research is needed to understand this population, determine the prevalence of detransition as an outcome of transition, meet the medical and psychological needs of this population, and better inform the process of evaluation and counseling prior to transition.") (JA1764).

The Medicaid Act's availability requirements do not mandate coverage for gender-confirming care. Thus, gender-confirming surgery is an optional service that may be provided to Medicaid members but is not required. To the extent gender-confirming care falls into a category of mandatory coverage, Defendants have permissibly exercised their discretion and chosen the proper mix of amount, scope, and duration limitations on coverage for gender-confirming care in the best interests of members based, in part, on considerations such as medical necessity and on utilization management considerations such as budgetary constraints. Therefore, Plaintiffs' claim fails as a matter of law, and Defendants are entitled to summary judgment.

## C.    Defendants Have Not Violated the Medicaid Act's Comparability Requirements.

The district court erroneously concluded that the policy "violates the comparability requirement[.]" JA2590.  This conclusion relied upon the court's erroneous finding that surgeries "which are covered to treat non-gender dysphoria diagnoses are materially the same as the surgeries provided to treat gender dysphoria." JA2589.

The Medicaid Act states, in relevant part,

[a] State plan for medical assistance must … (10) provide … (B) that the medical assistance made available to any individual described in subparagraph (A)—
    (i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and

(ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A)[.]

42 U.S.C. § 1396a(a)(10)(B). The comparability requirements also have accompanying regulations:

Except as limited in § 440.250—
(a) The plan must provide that the services available to any categorically needy beneficiary under the plan are not less in amount, duration, and scope than those services available to a medically needy beneficiary; and
(b) The plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all beneficiaries within the group:
(1) The categorically needy.
(2) A covered medically needy group.

42 C.F.R. § 440.240. Thus, the plain language of the regulations prohibits three types of discrimination: (1) against the categorically needy; (2) among the categorically needy; and (3) among the medically needy. *See Schott v. Olszewski*, 401 F.3d 682, 686 (6th Cir. 2005) ("Under the Act, states must provide comparable medical assistance to all Medicaid recipients within each classification, so long as the medically needy do not receive greater benefits than the categorically needy (although the reverse is permitted).").

Medicaid does not cover gender-confirming surgeries for any member regardless of gender identity, and it provides the same services to all members regardless of gender identity. The position argued by Plaintiffs and adopted by the court is that, because Defendants provide coverage for mastectomy for patients with

45

breast cancer, Medicaid is required to provide coverage for mastectomy for any and all diagnoses, including gender dysphoria. This is not what the Act requires.

This argument was advanced and rejected in *Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999). There, the plaintiffs brought suit on the grounds that Medicaid providers reimbursed certain in-home personal care services but did not reimburse safety monitoring for individuals who suffered from mental disabilities. *Id.* at 613-14. The Second Circuit described the plaintiffs' argument as follows:

> [T]hey claim that, because safety monitoring is "comparable" to the … services already provided … the failure to provide such monitoring violates Section 1396a(a)(10)(B). [They] attempt to graft a new requirement on this Section: If two different benefits are "comparable" and one is provided, the other must be as well.

*Id.* at 615-16 (internal citation omitted). Rejecting the plaintiffs' argument, the Court stated,

> However, **Section 1396a(a)(10)(B) does not require a state to fund a benefit that it currently provides to no one. Its only proper application is in situations where the same benefit is funded for some recipients but not others.** A holding to the contrary would both substantially narrow the "broad discretion" the Medicaid Act confers "on the States to adopt standards for determining the extent of medical assistance," and create a disincentive for states to provide services optional under federal law lest a court deem other services "comparable" to those provided -- an elastic concept -- thereby increasing the costs of the optional services. The Act therefore "requires only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." Appellants' decision to distinguish between safety monitoring and other tasks thus does not implicate Section 1396a(a)(10)(B).

*Id.* at 616 (emphasis added) (internal citations omitted). This same reasoning was later applied to gender-confirming surgeries in *Casillas v. Daines*, 580 F. Supp. 2d 235 (S.D.N.Y. 2008). There, the plaintiff argued that, "because a mastectomy is an indicated and reimbursable treatment for breast cancer, then a female-to-male transsexual with a diagnosis of [gender identity disorder] would be entitled to reimbursement for the same treatment." *Id.* at 244. Rejecting the plaintiff's argument and adopting *Rodriguez*, the court stated,

> The *Rodriguez* Court went on to describe the "comparable" concept urged by the plaintiff in that case as "an elastic concept" that would provide a disincentive to providing optional services that later may be found "comparable" with some other service. A similar disincentive would be created by the rule urged in this case because the state would have to consider other possible diagnoses for which the treatment might be prescribed before deciding whether to make it available for any single condition.
> If Congress had intended to compel a state to provide a treatment for all diagnoses if the treatment were provided for any diagnosis, one would have expected it to have done so in clear language.

*Id.* at 245 (internal citation omitted).

In the instant case, taken to its logical conclusion, acceptance of Plaintiffs' argument and the district court's conclusion would mean that, if Medicaid covers mastectomy for a diagnosis of breast cancer, then it must cover any type of mastectomy for any member for any reason. This clearly is not what is meant by the comparability requirement, and it would be impossible for Medicaid to differentiate between any type of mastectomy. As Plaintiffs' expert has stated, there is a wide

range of indications and techniques for mastectomy. JA1687-1688. Coverage for one indication does not require coverage for another. Rather, the comparability requirements prohibit the provision of an identical service to one group to the exclusion of another. Plaintiffs have provided no evidence that any transgender individual, including Plaintiffs, has been denied coverage for an identical service provided to a cisgender member. Therefore, Plaintiffs' claim fails as a matter of law, and Defendants are entitled to summary judgment.

## V.    The District Court Erred in Finding that Plaintiffs Have Standing and, Therefore, Erred in Denying Defendants' Motion for Summary Judgment.

The district court erroneously concluded that Fain and Anderson have standing. In order to establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). Alleged injury must be "palpable and imminent," otherwise, it is too speculative. *Id.* (additional citations omitted). "'Although the law of standing has been greatly changed in [recent] years, we have steadfastly adhered to the requirement that, at least in the absence of a statute

expressly conferring standing, federal plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction.'" *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976) (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 617 (1973)).

The district court erroneously concluded that Fain and Anderson suffered "an actual, concrete injury" because Medicaid "essentially construct[ed] a discriminatory barrier between them and health insurance coverage." JA2590. The district court failed, however, to consider whether Fain or Anderson qualified for gender-affirming surgery had Medicaid's policy provided coverage for it. The evidence presented to the district court demonstrates that neither Fain nor Anderson has submitted a claim for and been denied gender-affirming care by Medicaid. JA1299-1307, JA1336-1348. Neither has submitted a claim for gender-affirming surgery. JA1315-1316, JA1362-1363. Fain testified he is not willing to undergo surgery until he has overcome his smoking habit, which has not yet occurred. JA1362. Anderson has never had a treating physician find that she requires gender-affirming surgery to treat her gender dysphoria. JA1313-1314.

Based upon these undisputed facts, any alleged injury to Fain or Anderson is purely speculative because neither is in a position to undergo the surgeries for which they seek coverage. A lack of coverage for procedures for which a beneficiary either does not qualify or for which a physician has not given a recommendation is not

"palpable and imminent." Thus, neither Plaintiff has established a concrete and particularized injury that is actual or imminent. Both Plaintiffs lack standing, and the district court erred in concluding that Plaintiffs have standing. Therefore, the district court erred in denying Defendants' Motion for Summary Judgment.

**VI.    The District Court Abused its Discretion in Finding that Plaintiffs Satisfied the Numerosity Requirement for Class Certification, Therefore, the District Court Erred in Granting Plaintiffs' Motion for Class Certification.**

The district court erroneously concluded that Plaintiffs presented sufficient evidence to meet the numerosity requirement of Rule 23 of the Federal Rules of Civil Procedure. The district court's clear error is partially based upon its adoption of an indefinite class definition.

A district court's Rule 23 class certification decision is reviewed for an abuse of discretion. *Ealy v. Pinkerton Gov't Servs.*, 514 Fed. Appx. 299, 303 (4th Cir. 2013) (additional citation omitted). A class may only be certified if the class is so numerous that joinder of all members is impracticable, if there are questions of law or fact common to the class, if the claims or defenses of the representative parties are typical of the claims or defenses of the class, and if the representative parties will fairly and adequately protect the interests of the class. *Id.* at 303-04 (citing Fed. R. Civ. P. 23(a)). "[T]he definition of the class must be 'definite,' that is, the standards must allow the class members to be ascertainable." *Astrazeneca AB v. UFCW (In re Nexium Antitrust Litig.)*, 777 F.3d 9, 19 (1st Cir. 2015) (citing William B.

Rubenstein, Newberg on Class Actions §§ 3:1, 3:3 (5th ed. 2013) (explaining that an "implied" requirement for certification is that "a putative class [is] ascertainable with reference to objective criteria"); *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) (As an "essential prerequisite of a class action," plaintiffs "must show, by a preponderance of the evidence, that the class is currently and readily ascertainable based on objective criteria." (citation omitted) (internal quotation marks omitted))); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) ("A class cannot be certified unless a court can readily identify the class members in reference to objective criteria").

Here, the district court adopted the Plaintiffs' proposed class definition, finding that the "class is comprised of all transgender people who are or will be enrolled in [W]est Virginia Medicaid and who are seeking or will seek gender-confirming care." JA2554. Without further analysis, the district court found that "[s]uch factors are well documented and easily ascertainable. Thus, while not all class members have been identified, such members can be easily identified." JA2554.

Based upon the class definition as proposed by Plaintiffs and adopted by the district court, class members meet three criteria: (1) they are transgender; (2) they are or will be enrolled in West Virginia Medicaid; and (3) they are seeking or will seek gender-confirming care. Only Medicaid enrollment status is an objective

51

criterion. Thus, the district court's class certification order is based upon subjective criteria and also is overly broad. While Plaintiffs concede that all of their gender-confirming care is covered with the exception of gender-confirming surgery, the district court's class definition does not limit the class to individuals seeking gender-confirming surgery. The district court's class definition does not limit the class to individuals diagnosed with gender dysphoria, or who have been recommended for gender-confirming surgery, or who meet objective criteria for any gender-confirming surgery, or who have sought and been denied coverage for gender-confirming surgery. Rather, the district court's subjective, overly broad class definition lacks meaningful contours and is more aptly described as all transgender West Virginia Medicaid beneficiaries regardless of whether they are recommended for or qualify for gender-confirming surgery and, thus, regardless of whether they are affected in any way by Medicaid's policy.

Relying upon this subjective, overly broad class definition, the district court erroneously determined that Plaintiffs satisfied the numerosity requirement "as their proposed class includes at least 686 Medicaid participants (which filed claims related to gender dysphoria or gender incongruence between January 1 and September 30, 2021)." JA2555. The district court's numerosity analysis is contradictory: "While all 686 transgender Medicaid participants are not currently seeking surgical care for gender dysphoria, it is <u>only</u> transgender participants that

have the potential to receive this diagnosis." JA2556 (emphasis in original). The district court's order starts with 686 potential class members; however, it finds that a lesser, undetermined number meet the criterion of "seeking or will seek gender-confirming care." The court did not engage in additional analysis to determine whether the lesser, undetermined number would be impracticable for joinder. Rather, the court failed to consider the many factors limiting the number of individuals personally affected by Medicaid's policy.

The policy at issue only potentially affects those individuals who are diagnosed with gender dysphoria, seeking gender-confirming surgery, determined to be candidates for surgery, approved for surgery, and who actually submit a claim for such services to Medicaid. This is a much smaller group of people than all Medicaid members who have a transgender identity. As Plaintiffs' experts have expressly stated, not all transgender individuals are diagnosed with gender dysphoria, and there is a difference between a transgender identity and gender dysphoria. JA1411-1412. According to Plaintiffs' expert Dr. Karasic, roughly one in 200 people identifies as transgender. JA1413. About one in a thousand is in clinical care for gender dysphoria. JA1413. Although the numbers have not been precisely established, the evidence presented to the district court demonstrates that only a fraction of individuals who identify as transgender actually receive care for gender dysphoria, and an even smaller number seek surgery. The district court failed

to consider this evidence and, instead, determined that "[t]he boundaries of this class include all transgender Medicaid participants who <u>may</u> experience gender dysphoria and who <u>may</u> require the surgical treatment of such diagnosis; this includes all 686 identified Medicaid participants and any individual who meets these criteria in the future." JA2556 (emphasis added).

Thus, the foundation of the district court's finding of impracticability is based upon an overly broad number derived from subjective criteria without meaningful boundaries. The district court failed to engage in a rigorous analysis of the numerosity requirement and failed to appropriately limit the boundaries of the class definition to individuals who could be readily identified in reference to objective criteria. When appropriately analyzing the class under objective criteria, it is evident that the Plaintiffs failed to meet their burden in proving the numerosity prerequisite. Therefore, the district court's class certification order is clearly erroneous.

## CONCLUSION

Defendants request that this Court find that the Plaintiffs lack standing and remand the case to the district court with instructions to enter judgment in favor of Defendants for lack of standing. In the alternative, Defendants request that this Court vacate the district court's judgment which granted summary judgment in favor of Plaintiffs and issued a permanent injunction and remand the case to the district court with instructions to enter summary judgment in favor of Crouch, Beane, and

Medicaid on all counts.  Defendants request that this Court vacate the Order of the

district court certifying a class.

## STATEMENT REGARDING ORAL ARGUMENT

Defendants request oral argument pursuant to F.R.A.P. 34(a) in light of the

complexity of the substantive legal and factual issues addressed.

Respectfully submitted,

*/s/ Kimberly M. Bandy*
Kimberly M. Bandy
Lou Ann S. Cyrus
Caleb B. David
Roberta F. Green
SHUMAN MCCUSKEY
  SLICER PLLC
P. O. Box 3953
Charleston, WV  25339
(304) 345-1400

*Counsel for Appellants*

55

## CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   this document contains <u>12,917</u> words.

2.    This document complies with the typeface requirements because:

   This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman.</u>

Respectfully submitted,

<u>*/s/ Kimberly M. Bandy*</u>
Kimberly M. Bandy
Lou Ann S. Cyrus
Caleb B. David
Roberta F. Green
SHUMAN MCCUSKEY
   SLICER PLLC
P. O. Box 3953
Charleston, WV  25339
(304) 345-1400

*Counsel for Appellants*

56