# NO. 22-1927

### In The

# United States Court Of Appeals
### For The Fourth Circuit

**CHRISTOPHER FAIN; SHAUNTAE ANDERSON,**
**individually and on behalf of all others similarly situated,**

*Plaintiffs - Appellees,*

v.

**WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the**
**West Virginia Department of Health and Human Resources; CYNTHIA BEANE,**
**in her official capacity as Commissioner for the West Virginia Bureau for**
**Medical Services; WEST VIRGINIA DEPARTMENT OF HEALTH AND**
**HUMAN RESOURCES, Bureau for Medical Services,**

*Defendants – Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT HUNTINGTON**

_____

**JOINT APPENDIX – Volume I of VI**
**(Pages 1 – 590)**

_____

| | | |
|---|---|---|
| Kimberly M. Bandy | Tara L. Borelli | Carl S. Charles |
| Lou Ann S. Cyrus | LAMBDA LEGAL DEFENSE & | LAMBDA LEGAL DEFENSE & |
| Caleb B. David | EDUCATION FUND, INC. | EDUCATION FUND, INC. |
| Roberta F. Green | 1 West Court Square | 120 Wall Street |
| SHUMAN MCCUSKEY | Suite 105 | Suite 105 |
| SLICER PLLC | Decatur, GA  3003 | New York, NY  10005 |
| P. O. Box 3953 | (470) 225-5341 | (404) 897-1880 |
| Charleston, WV  25339 | | |
| (304) 345-1400 | | |
| | | |
| *Counsel for Appellants* | *Counsel for Appellees* | *Counsel for Appellees* |
| | | |
| Anna P. Prakash | Nora W. Huppert | Avatara A. Smith-Carrington |
| NICHOLS KASTER, LLP | LAMBDA LEGAL DEFENSE & | LAMBDA LEGAL DEFENSE & |
| 4700 IDS Center | EDUCATION FUND, INC. | EDUCATION FUND, INC. |
| 80 South 8th Street | 65 East Wacker Place | 1776 K Street, NW |
| Minneapolis, MN  55402 | Suite 2000 | 8th Floor |
| (612) 256-3200 | Chicago, IL 60613 | Washington, DC  20006 |
| | (847) 345-2094 | (202) 804-6245 |
| | | |
| *Counsel for Appellees* | *Counsel for Appellees* | *Counsel for Appellees* |

## TABLE OF CONTENTS
### Volume I of VI

Page

**District Court Docket Sheet [3:20-cv-00740]**...................................................JA1

**Class Action Complaint**
        filed November 12, 2020 (DE1) ...........................................JA36

**Defendants' Memorandum of Law in Support of Motion for Partial Dismissal of Plaintiffs' Class Action Complaint**
        filed January 11, 2021 (DE25).............................................JA75

<u>**Exhibits**</u> **to**
**Motion to Dismiss**
        filed February 2, 2021 (DE32):

        **A.**    **Affidavit of Angela Wowczuk**
                  sworn February 2, 2021(DE32-1)....................................JA94

        **B.**    **Affidavit of Brian Thompson**
                  sworn February 1, 2021 (DE32-2)...................................JA98

        **C.**    **Affidavit of UniCare Health Plan of West Virginia, Inc.**
                  sworn January 29, 2021 (DE32-3) ................................JA100

**Memorandum Opinion and Order**
**Denying Defendant Cheatham's Motion to Dismiss the Complaint and Defendants William Crouch, Cynthia Beane, and the West Virginia Department of Health and Human Resources, Bureau for Medical Services' Motion for Partial Dismissal of Plaintiffs' Class Action Complaint and Motion to Dismiss and granting Plaintiffs' Motion for Leave to file a Sur-Reply**
        filed May 19, 2021(DE57)....................................................JA101

**First Amended Class Action Complaint**
        filed October 28, 2021 (DE140) ........................................... JA117

**Defendants' Answer to Plaintiff's**
**First Amended Class Action Complaint**
        filed November 12, 2021 (DE151) ....................................... JA162

**Certificate of Service for the**
**Expert Disclosure Report of Dan H. Karasic, M.D.**
        filed January 14, 2022 (DE182) ........................................... JA210

**Plaintiffs' Motion for Class Certification**
**Pursuant to Fed. R. Civ. P. 23**
**With Attachments,**
        filed May 31, 2022 (DE248) ................................................. JA212

        <u>**Attachments:**</u>

    1.    **Declaration of the Employment Law Center, PLLC**
                dated May 31, 2022 (DE248-1) ..................................... JA215

    2.    **Declaration of Nicole J. Schladt in Support of**
          **Plaintiffs' Motion for Class Certification,**
          **With Exhibit A**
                dated May 31, 2022 (DE248-2) ..................................... JA217

          A.    **Nichols Kaster, PLLP Firm Resume (DE248-3)** ......... JA220

**<u>Attachments</u> to**
**Plaintiffs' Motion for Class Certification**
**Pursuant to Fed. R. Civ. P. 23**
    **filed May 31, 2022 (DE248), Continued:**

3.    **Declaration of Avatara Smith-Carrington in Support of Plaintiffs' Motion for Class Certification, With Exhibits A – E**
        **dated May 31, 2022 (DE248-4)** ......................................JA257

    A.    **Resume of Avatara Smith-Carrington (DE248-5)** ....JA265

    B.    **Resume of Tara L. Borelli (DE248-6)** ..........................JA268

    C.    **Resume of Carl S. Charles (DE248-7)** ..........................JA279

    D.    **Resume of Sasha J. Buchert (DE248-8)** .......................JA281

    E.    **Resume of Nora Huppert (DE248-9)** ............................JA282

**Plaintiffs' Motion for Summary Judgment, With Attachments,**
    **filed May 31, 2022 (DE250)** ..................................................JA284

    **<u>Attachments</u>:**

    A.    **Declaration of Christopher Fain**
        **sworn April 27, 2022 (DE250-1)** ....................................JA287

    B.    **Declaration of Shauntae Anderson**
        **sworn April 19, 2022 (DE250-2)** ....................................JA293

<u>Exhibits</u> to
 Plaintiffs' Motion for Summary Judgment,
       filed May 31, 2022 (DE250), Continued:

**C.**    **Declaration of Walt Auvil,**
         **With Exhibits**
                 sworn May 31, 2022 (DE250-3) ....................................JA299

         **1.**    **Defendants' Response to Plaintiff's**
                 **First Set of Requests for Admissions**
                         dated August 27, 2021 (DE250-4).......................JA303

         **2.**    **Defendants' Response to Plaintiff's**
                 **First Set of Interrogatories**
                         dated August 27, 2021 (DE250-5).......................JA309

         **3.**    **Defendants' Response to Plaintiff's**
                 **Second Set of Interrogatories**
                         dated October 25, 2021 (DE250-6) .....................JA317

         **4.**    **Defendants' First Supplemental Response to**
                 **Plaintiff's First Set of Interrogatories**
                         dated November 30, 2021 (DE250-7) ................JA324

         **5.**    **Defendants' Second Supplemental Response to**
                 **Plaintiff's Second Set of Interrogatories**
                         dated November 30, 2021(DE250-8) .................JA330

         **5(a).**   **Defendants' Ninth Supplemental Response to**
                 **Plaintiff's First Set of Requests for Production**
                         dated March 25, 2022 (DE250-9) ........................JA338

<u>Exhibits</u> to

C.    **Declaration of Walt Auvil,**
       **sworn May 31, 2022 (DE250-3), Continued:**

6.    **Redacted Excerpt of Deposition of**
       **Christopher Fain**
              taken April 28, 2022 (DE250-10) ........................ JA346

7.    **Excerpt of Deposition of Shauntae Anderson**
              taken April 22, 2022 (DE250-11) ........................ JA362

8.    **Excerpt of Deposition of Secretary Bill J. Crouch**
              taken March 17, 2022(DE250-12) ...................... JA374

9.    **Excerpt of Deposition of**
       **Commissioner Cynthia Beane**
              taken March 29, 2022 (DE250-13) ...................... JA396

10.   **Excerpt of Deposition of Dr. James Becker**
              taken March 30, 2022 (DE250-14) ...................... JA464

11.   **Excerpt of Deposition of Frederick Lewis**
              taken April 14, 2022 (DE250-15) ........................ JA493

12.   **Excerpt of Deposition of Becky Manning**
              taken April 12, 2022 (DE250-16) ........................ JA514

13.   **Excerpt of Deposition of Brian Thompson**
              taken April 13, 2022 (DE250-17) ........................ JA537

14.   **Excerpt of Deposition of Sarah Young**
              taken March 11, 2022 (DE250-18) ...................... JA549

15.   **Excerpt of Deposition of Dr. Dan H. Karasic, M.D.**
              taken April 15, 2022 (DE250-19) ........................ JA580

## <u>TABLE OF CONTENTS</u>
### Volume II of VI

Page

<u>Exhibits</u> to
C.   **Declaration of Walt Auvil,**
 **sworn May 31, 2022 (DE250-3), Continued:**

16.   **Expert Report of Dan H. Karasic, M.D.**
 **(public version, portions redacted)**
 **dated January 13, 2022 (DE250-20)** ...................JA591

17.   **Expert Rebuttal Report of Dan H. Karasic, M.D.**
 **dated March 17, 2022 (DE250-21)** ......................JA645

18.   **Excerpt of Deposition of**
 **Dr. Loren S. Schechter, M.D.**
 **taken March 28, 2022 (DE250-22)** ......................JA683

19.   **Expert Report of Loren S. Schechter, M.D.**
 **dated January 8, 2022 (DE250-23)** ......................JA690

20.   **Expert Rebuttal Report of**
 **Loren S. Schechter, M.D.**
 **dated March 17, 2022 (DE250-24)** ......................JA774

21.   **Excerpt of Deposition of**
 **Dr. Johanna Olson-Kennedy, M.D., M.S.**
 **taken April 25, 2022 (DE250-25)** ........................JA867

22.   **Expert Rebuttal Report of**
 **Dr. Johanna Olson-Kennedy, M.D., M.S.**
 **dated March 17, 2022 (DE250-26)** ......................JA872

**Exhibits** to

C.    **Declaration of Walt Auvil,**
         **sworn May 31, 2022 (DE250-3), Continued:**

23.    **Excerpt of Bureau for Medical Services**
        **Manual, Chapter 100**
              **undated (DE250-27) ............................................JA931**

24.    **Excerpt of Bureau for Medical Services**
        **Manual, Chapter 519**
              **undated (DE250-28) ............................................JA936**

25.    **Aetna, The Health Plan, and UniCare**
        **Composite Exhibit, Excerpted**
              **undated (DE250-29) ............................................JA944**

26.    **InterQual Composite Exhibit**
              **dated April 2021 (DE250-30) .............................JA967**

27.    **Bureau for Medical Services, "Medicaid 101 An**
        **Overview of West Virginia's Medicaid Program"**
              **undated (DE250-31) ..........................................JA1015**

28.    **Medicaid.gov, "Mandatory &**
        **Optional Medicaid Benefits"**
              **visited November 23, 2021 (DE250-32)...........JA1035**

29.    **Excerpt of State Fiscal Year 2021 Model Purchase**
        **of Service Provider Agreement Between**
        **West Virginia and Aetna Better Health of W.V.**
              **dated May 6, 2021 (DE250-33)..........................JA1039**

**Exhibits** to

C.    **Declaration of Walt Auvil,**
       **sworn May 31, 2022 (DE250-3), Continued:**

30.   **Excerpt of State Fiscal Year 2021 Model Purchase**
       **of Service Provider Agreement Between West**
       **Virginia and UniCare W.V.**
              **dated May 6, 2021 (DE250-34)** .......................... JA1043

31.   **Excerpt of State Fiscal Year 2021 Model Purchase**
       **of Service Provider Agreement between West**
       **Virginia and The Health Plan**
              **dated April 21, 2021 (DE250-35)** ...................... JA1047

32.   **Email re: "[External] Gender Dysphoria Question"**
              **dated October 13, 2020 (DE250-36)** ................. JA1051

33.   **Cost of Care Composite Exhibit, Excerpted**
              **dated January 2019 (DE250-37)** ........................ JA1052

<u>**TABLE OF CONTENTS**</u>
**Volume III of VI**

Page

**Defendants' Motion for Summary Judgment,**
**With Exhibits,**
    filed May 31, 2022 (DE252) ...............................................................JA1076

<u>**Exhibits:**</u>

1.    **Excerpts of Deposition of Sarah Young,**
    **With Exhibits**
        taken March 11, 2022 (DE252-1)..................................JA1083

2.    **Excerpts of Deposition of Secretary Bill Crouch**
        taken March 17, 2022 (DE252-2)..................................JA1163

3.    **Excerpts of Deposition of**
    **Commissioner Cynthia Beane, With Exhibits**
        taken March 29, 2022 (DE252-3)..................................JA1173

4.    **Redacted Excerpts of Deposition of**
    **Shauntae Anderson**
        taken April 22, 2022 (DE252-4)..................................JA1291

5.    **Redacted Excerpts of Deposition of**
    **Christopher Fain**
        taken April 28, 2022 (DE252-5)..................................JA1322

6.    **Redacted Affidavit of Jennifer Myers**
        sworn April 29, 2022 (DE252-6)..................................JA1370

7.    **Excerpts of Deposition of Brian Thompson,**
    **With Exhibits**
        taken April 13, 2022 (DE252-7)..................................JA1378

<u>Exhibits</u> **to**

**Defendants' Motion for Summary Judgment,**
    **filed May 31, 2022 (DE252), Continued:**

8.     **Excerpts of Deposition of Dr. Dan Karasic,**
       **With Exhibits,**
               **taken April 15, 2022 (DE252-8)...................................JA1408**

9.     **Excerpts of Deposition of Dr. James Becker**
               **taken March 30, 2022 (DE252-9)................................JA1448**

10.    **Excerpts of Deposition of Frederick Lewis**
               **taken April 4, 2022 (DE252-10)...................................JA1453**

12.    **Excerpts of Deposition of Becky Manning,**
       **With Exhibits**
               **taken April 12, 2022 (DE252-12)................................JA1468**

14.    **Excerpts of Deposition of Jennifer Myers,**
       **With Exhibits**
               **taken April 8, 2022 (DE252-14) ..................................JA1498**

# TABLE OF CONTENTS
## Volume IV of VI

Page

**Exhibits to**
**Defendants' Motion for Summary Judgment,**
   **filed May 31, 2022 (DE252), Continued:**

15A.  Deposition of Loren S. Schechter, M.D.,
      With Exhibits
           taken March 28, 2022 (DE252-15)...............................JA1533

15C.  Certificate of Service for the Expert Rebuttal Report of
      Loren S. Schechter, M.D.
           filed March 18, 2022 (DE252-17) ................................JA1762
      Littman Article Entitled "Individuals Treated for
      Gender Dysphoria with Medical and/or Surgical
      Transition Who Subsequently Detransitioned: A Survey
      of 100 Detransitioners"
           dated October 19, 2021 (DE252-17)............................JA1764

16.    Excerpts of Deposition of
      Johanna Olson-Kennedy, M.D., With Exhibits
           taken April 25, 2022 (DE252-18) ................................JA1781

17.    Affidavit of Sarah Young
           dated May 27, 2022 (DE252-19) ..................................JA1818

18A.  Excerpts of Deposition of Dr. Stephen Levine
           taken April 27, 2022 (DE252-20)..................................JA1821

18B.  Vandenbussche, "Detransition-Related Needs and
      Support: A Cross-Sectional Online Survey"
           undated (DE252-21)......................................................JA1833

**Plaintiffs' Motion to Exclude Expert
Testimony of Stephen B. Levine, M.D.,
With Exhibits,**
     **filed May 31, 2022 (DE254)** ................................................................JA1853

**Exhibits:**

1.     **Declaration of Carl S. Charles**
         **sworn May 31, 2022 (DE254-1)** ...................................JA1856

   A.   **Expert Disclosure Report of
   Dr. Stephen B. Levine, M.D.**
         **dated February 18, 2022 (DE254-2)**..................JA1860

   B.   **Excerpt of Deposition of Dr. Stephen Levine Fain**
         **taken April 27, 2022 (DE254-3)** ........................JA1957

   C.   **Excerpt of Deposition of Dr. Stephen Levine,
   in relation to** *Kadel v. N.C. State Health Plan for
   Teachers and State Employees*
         **taken September 10, 2021 (DE254-4)** ..............JA2007

   D.   **Excerpt from Transcript of the Bench Trial in**
   *Soneeya v. Turco*, **Bench Trial Day 1,**
         **dated April 8, 2019 (DE254-5)** ..........................JA2066

   E.   **Excerpt Deposition of Cynthia Beane**
         **taken March 29, 2022 (DE254-6)** ......................JA2068

   F.   **Excerpt of Deposition of Dr. Stephen Levine
   in Relation to** *Claire v. Florida Department of
   Management Services*
         **taken December 21, 2020 (DE254-7)** ...............JA2073

<u>**Exhibits**</u> **to**

1.   **Declaration of Carl S. Charles**
        **sworn May 31, 2022 (DE254-1), Continued**

     G.   **Dahlen,** *et al.* **Article "International Clinical**
          **Practice Guidelines for Gender Minority/Trans**
          **People: Systematic Review and Quality**
          **Assessment"**
               **visited April 26, 2022 (DE254-8) ......................JA2085**

     H.   **Statement of Marci L. Bowers, M.D., "Dear**
          **Colleagues, Clients and Friends"**
               **undated (DE254-9) ..............................................JA2096**

     I.   **Printout from the Cass Review website**
          **"About the Review" page**
               **undated (DE254-10) ...........................................JA2099**

     J.   **Excerpt of Expert Rebuttal Report of Dr. Johanna**
          **Olson-Kennedy, M.D., M.S.**
               **dated March 17, 2022 (DE254-11) ....................JA2102**

     K.   **Excerpt from the Published Ph.D. Thesis,**
          **"On Gender Dysphoria" Written by**
          **Cecilia Dhejne, Ph.D.**
               **dated March 31, 2017 (DE254-12) ....................JA2107**

     L.   **Dhejne,** *et al.* **Article "Long-Term Follow-Up of**
          **Transsexual Persons Undergoing Sex**
          **Reassignment Surgery: Cohort Study in Sweden"**
               **dated February 2011(DE254-13).......................JA2111**

<u>**Exhibits**</u> **to**

1.    **Declaration of Carl S. Charles**
    **sworn May 31, 2022 (DE254-1), Continued**

    **M.    Simonsen,** *et al.* **Article "Long-Term Follow-Up of**
    **Individuals Undergoing Sex-Reassignment**
    **Surgery: Somatic Morbidity and Cause of Death"**
    **dated March 2016 (DE254-14) ......................... JA2119**

## TABLE OF CONTENTS
### Volume V of VI

Page

**Exhibits to**

1.  **Declaration of Carl S. Charles**
    **sworn May 31, 2022 (DE254-1Continued**

    N.  **Excerpt from the Diagnostic and Statistical**
        **Manual of Mental Disorders, Version 5**
            **undated (DE254-15) ..........................................JA2129**

    O.  **Excerpt of Deposition of Dan Karasic, M.D.**
            **taken April 15, 2022 (DE254-16) ......................JA2138**

    P.  **InterQual Criteria Sheets for Gender-Confirming**
        **Surgeries (Hysterectomy and Phalloplasty)**
            **dated April 2021 (DE254-17) ...........................JA2143**

    Q.  **Littman Article "Correction: Parent Reports of**
        **Adolescents and Young Adults Perceived to**
        **Show Signs of a Rapid Onset of Gender**
        **Dysphoria"**
            **dated March 19, 2019 (DE254-18) ....................JA2159**

    R.  **Bauer,** *et al*. **Article "Do Clinical Data from**
        **Transgender Adolescents Support the**
        **Phenomenon of 'Rapid-Onset Gender**
        **Dysphoria'?"**
            **undated (DE254-19) ..........................................JA2164**

    S.  **Defendants' Response to Plaintiff's**
        **Second Set of Interrogatories**
            **filed October 25, 2021 (DE254-20) ...................JA2170**

xv

<u>Exhibits</u> to
1.    Declaration of Carl S. Charles
          sworn May 31, 2022 (DE254-1Continued

     T.    Excerpt of Deposition of Dr. Stephen Levine
           in relation to *B.P.J. v. West Virginia*
           *State Board of Education*
               taken March 30, 2022 (DE254-21) ....................JA2177

Plaintiffs' Memorandum of Law in Support of Motion to Exclude
Expert Testimony of Stephen B. Levine, M.D.
     filed May 31, 2022 (DE255).............................................................JA2187

Order
Granting Joint Motion to File Exhibits Under Seal
     filed June 1, 2022 (DE256)................................................................JA2211

Corrected Stipulation of Plaintiffs and Defendants
     filed June 10, 2022 (DE258)..............................................................JA2212

Defendants' Response in Opposition to
Plaintiffs' Motion for Class Certification
     filed June 14, 2022 (DE259)..............................................................JA2217

Defendants' Response to Plaintiffs' Motion to Exclude
Expert Testimony of Stephen B. Levine, M.D.,
With Exhibit,
     filed June 14, 2022 (DE260)..............................................................JA2241

     A.    de Vries, *et al*. "Young Adult Psychological Outcome
           After Puberty Suppression and Gender Reassignment"
               visited October 7,2016 (DE260-1) ...............................JA2265

**Exhibits** **to**
**Defendants' Response in Opposition to**
**Plaintiffs' Motion for Summary Judgment**
     **filed June 14, 2022 (DE261):**

    **19A.  Defendants' Third Supplemental Response to**
         **Plaintiff's First Set of Requests for Production**
           **filed November 30, 2021 (DE261-1)............................JA2276**
         **InterQual Composite Exhibit**
           **dated October 2021 (DE261-1)....................................JA2281**

    **19B.  InterQual Composite Exhibit**
           **dated October 2021 (DE261-2)....................................JA2351**

**Exhibits** **to**
**Plaintiffs' Opposition to Motion for Summary Judgment**
     **filed June 14, 2022 (DE262):**

    **1.    Supplemental Declaration of Walt Auvil,**
        **With Exhibits 34 & 35**
           **dated June 14, 2022 (DE262-1) ....................................JA2416**

        **34.    InterQual, 2012.2 Procedures Adult Criteria,**
            **Reduction Mammoplasty, Male (DE262-2) .............JA2418**

        **35.    InterQual, 2021 Reduction Mammoplasty,**
            **Male (Adolescent) (DE262-3) ....................................JA2422**

Plaintiffs' Reply Memorandum of Law in Support of Motion to
Exclude Expert Testimony of Stephen B. Levine, M.D.,
With Exhibits,
    filed June 21, 2022 (DE266).................................................................JA2428

Exhibits:

1.    Declaration of Carl. S. Charles,
    With Exhibit U
        sworn June 21, 2022 (DE266-1) ...................................JA2452

    U.    Excerpt of Deposition of
        Dr. Johanna Olson-Kennedy
            taken April 25, 2022 (DE266-2) ........................JA2454

Reporter's Transcript of Proceedings Before
The Honorable Robert C. Chambers,
    on July 13, 2022 (DE269) ...................................................JA2464

Memorandum Opinion and Order
Granting Plaintiffs' Motion for Class Certification
    filed August 2, 2022 (DE270)............................................JA2552

Memorandum Opinion and Order
Granting Plaintiffs' Motion for Summary Judgment and
Denying Defendants' Motion for Summary Judgment
    filed August 2, 2022 (DE271)............................................JA2562

Judgment Order
    filed August 17, 2022 (DE273)..........................................JA2592

Defendants' Notice of Appeal
    filed August 31, 2022 (DE277)..........................................JA2594

## <u>TABLE OF CONTENTS</u>
### Volume VI of VI – Under Seal

Page

Ex. A:     Expert Disclosure Report of Dan H. Karasic, M.D.
            dated January 13, 2022 (DE257)..................................JA2598

Ex. B:     Affidavit of Jennifer Myers
            sworn April 29, 2022 (DE257-1)................................JA2652

APPEAL,**LC-C**

# United States District Court
# Southern District of West Virginia (Huntington)
# CIVIL DOCKET FOR CASE #: 3:20-cv-00740
# Internal Use Only



Fain et al v. Crouch et al
Assigned to: Judge Robert C. Chambers
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 11/12/2020
Date Terminated: 08/17/2022
Jury Demand: Defendant
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Christopher Fain**
*and*

represented by **Anna P. Prakash**
NICHOLS KASTER
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-256-3291
Fax: 612-338-4878
Email: aprakash@nka.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Avatara Antoinette Smith-Carrington**
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND
8th Floor
1776 K. Street, NW
Washington, DC 20006-2304
202-804-6245
Fax: 202-478-0210
Email: asmithcarrington@lambdalegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carl S. Charles**
Suite 105
1 West Court Square
Decatur, GA 30030
404-897-1800
Fax: 404-506-9320
Email: ccharles@lambdalegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole Jean Schladt**
NICHOLS KASTER
4700 IDS Center
80 South Eighth St.

**JA1**

Minneapolis, MN 55402
612-256-3256
Email: nschladt@nka.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
Suite 2000
65 East Wacker Place
Chicago, IL 60601
312-663-4413
Fax: 312-663-4307
Email: nhuppert@lambdalegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sasha J. Buchert**
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND
8th Floor
1176 K Street, NW
Washington, DC 20006
202-999-8083
Email: sbuchert@lambdalegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tara L. Borelli**
LAMDA LEGAL DEFENSE AND
EDUCATION FUND
Suite 105
1 West Court Square
Decatur, GA 30030
470-225-5341
Fax: 404-506-9320
Email: tborelli@lambdalegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Walt Auvil**
THE EMPLOYMENT LAW CENTER
1208 Market Street
Parkersburg, WV 26101
304-485-3058
Fax: 304-485-6344
Email: auvil@theemploymentlawcenter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>
**Zachary Martell**                              represented by   **Anna P. Prakash**
*TERMINATED: 01/05/2022*                                         (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**JA2**

**Avatara Antoinette Smith-Carrington**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carl S. Charles**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole Jean Schladt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sasha J. Buchert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tara L. Borelli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Walt Auvil**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Brian McNemar**                    represented by    **Anna P. Prakash**
*TERMINATED: 01/05/2022*                               (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Avatara Antoinette Smith-Carrington**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carl S. Charles**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole Jean Schladt**
(See above for address)

**JA3**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sasha J. Buchert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tara L. Borelli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Walt Auvil**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shawn Anderson**
*TERMINATED: 05/09/2022*
*also known as*
Shauntae Anderson, and
*TERMINATED: 05/09/2022*

represented by **Anna P. Prakash**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Avatara Antoinette Smith-Carrington**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carl S. Charles**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole Jean Schladt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sasha J. Buchert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA4**

Tara L. Borelli
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Walt Auvil
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Leann James**
*individually and on behalf of all others
similarly situated*
*TERMINATED: 03/25/2022*

represented by **Anna P. Prakash**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Avatara Antoinette Smith-Carrington**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carl S. Charles**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole Jean Schladt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sasha J. Buchert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tara L. Borelli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Walt Auvil**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shauntae Anderson**
*individually and on behalf of all others*

represented by **Anna P. Prakash**
(See above for address)

**JA5**

*similarly situated*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Avatara Antoinette Smith-Carrington**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carl S. Charles**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole Jean Schladt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sasha J. Buchert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tara L. Borelli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Walt Auvil**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**William Crouch**
*in his official capacity as Cabinet Secretary*
*of the West Virginia Department of Health*
*and Human Resources*

represented by **Caleb B. David**
SHUMAN MCCUSKEY & SLICER
P. O. Box 3953
Charleston, WV 25339
304/345-1400
Fax: 304/343-1826
Email: cdavid@shumanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimberly M. Bandy**
SHUMAN MCCUSKEY & SLICER

**JA6**

P. O. Box 3953
Charleston, WV 25339
304/345-1400
Fax: 304/343-1826
Email: kbandy@shumanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lou Ann S. Cyrus**
SHUMAN MCCUSKEY & SLICER
P. O. Box 3953
Charleston, WV 25339
304/345-1400
Fax: 304/343-1826
Email: lcyrus@shumanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roberta F. Green**
SHUMAN MCCUSKEY & SLICER
P. O. Box 3953
Charleston, WV 25339
304/345-1400
Fax: 304/343-1826
Email: rgreen@shumanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cynthia Beane**
*in her official capacity as Commissioner for
the West Virginia Bureau for Medical
Services*

represented by **Caleb B. David**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimberly M. Bandy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lou Ann S. Cyrus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roberta F. Green**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**West Virginia Department of Health and
Human Resources, Bureau for Medical
Services**

represented by **Caleb B. David**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA7**

**Kimberly M. Bandy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lou Ann S. Cyrus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roberta F. Green**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ted Cheatham**
*in his official capacity as Director of the*
*West Virginia Public Employees Insurance*
*Agency; and*
*TERMINATED: 11/15/2021*

represented by **Christopher K. Weed**
OXLEY RICH SAMMONS
Suite 1000
517 9th Street
Huntington, WV 25701
304-634-9614
Email: cweed@oxleylawwv.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David E. Rich**
OXLEY RICH SAMMONS
Suite 1000
517 9th Street
Huntington, WV 25701
304-522-1138
Fax: 304-522-9528
Email: drich@oxleylawwv.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Salyers**
OXLEY RICH SAMMONS
P. O. Box 1704
Huntington, WV 25718
304/522-1138
Fax: 304/522-9528
Email: esalyers@oxleylawwv.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Perry W. Oxley**
OXLEY RICH SAMMONS
P. O. Box 1704
Huntington, WV 25718-1704
304/522-1138
Fax: 304/522-9528

**JA8**

Email: poxley@oxleylawwv.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Health Plan of West Virginia, Inc.**
*TERMINATED: 01/05/2022*

represented by **Aaron C. Boone**
BOWLES RICE
P. O. Box 49
Parkersburg, WV 26102-0049
304/485-8500
Fax: 304/420-5587
Email: aboone@bowlesrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart A. McMillan**
BOWLES RICE
P. O. Box 1386
Charleston, WV 25325-1386
304-347-1110
Fax: 304-347-1746
Email: smcmillan@bowlesrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jason Haught**
*Interim Director of the West Virginia Public*
*Employees Insurance Agency*
*TERMINATED: 03/25/2022*

represented by **Christopher K. Weed**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David E. Rich**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Salyers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Perry W. Oxley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mediator**

**Donald B. O'Dell**

represented by **Donald B. O'Dell**
O'DELL LAW / MEDIATION
P. O. Box 320
Huntington, WV 25708
304/525-5700
Fax: 304/525-5701

**JA9**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/12/2020 | 1 | COMPLAINT. Filing Fee $400.00. Receipt # AWVSDC-7798809. (Attachments: # 1 Proposed Summons, # 2 Proposed Summons, # 3 Proposed Summons, # 4 Proposed Summons, # 5 Proposed Summons, # 6 Civil Cover Sheet) (hkl) |
| 11/12/2020 | 2 | STANDING ORDER IN RE: ASSIGNMENT AND REFERRAL OF CIVIL ACTIONS AND MATTERS TO MAGISTRATE JUDGES ENTERED JANUARY 4, 2016. Discovery referred to Magistrate Judge Eifert. (cc: attys; any unrepresented party) (hkl) |
| 11/12/2020 | 3 | ELECTRONIC SUMMONS ISSUED as to William Crouch, Cynthia Beane, West Virginia Department of Health and Humane Resources, Bureau for Medical Services, Ted Cheatham, The Health Plan of West Virginia, Inc., re: 1 Complaint. Summons returnable 21 days. Instructions to Counsel: This is your electronic summons. Please print as many copies of the Summons and Complaint as are necessary to effectuate service under Fed. R. Civ. P. 4. See Proof of Service page of this Summons form for filing a return of service if required by Fed. R. Civ. P. 4(l). (Attachments: # 1 Summons for Cynthia Beane, # 2 Summons for DHHR, Bureau for Medical Services, # 3 Summons for Ted Cheatham, # 4 Summons for The Health Plan of West Virginia, Inc.) (hkl) |
| 11/12/2020 |  | CASE assigned to Judge Robert C. Chambers. (klc) (Entered: 11/13/2020) |
| 11/16/2020 | 4 | STATEMENT OF VISITING ATTORNEY from Nora Huppert on behalf of Zachary Martell, Christopher Fain, Brian McNemar. Local counsel: Walt Auvil. Fee $50.00. Receipt # AWVSDC-7802438. (Auvil, Walt) |
| 11/16/2020 | 5 | STATEMENT OF VISITING ATTORNEY from Avatara Smith-Carrington on behalf of Zachary Martell, Christopher Fain, Brian McNemar. Local counsel: Walt Auvil. Fee $50.00. Receipt # AWVSDC-7802483. (Auvil, Walt) |
| 11/16/2020 | 6 | STATEMENT OF VISITING ATTORNEY from Nicole J. Schladt on behalf of Zachary Martell, Christopher Fain, Brian McNemar. Local counsel: Walt Auvil. Fee $50.00. Receipt # AWVSDC-7802487. (Auvil, Walt) |
| 11/16/2020 | 7 | STATEMENT OF VISITING ATTORNEY from Anna P. Prakash on behalf of Zachary Martell, Christopher Fain, Brian McNemar. Local counsel: Walt Auvil. Fee $50.00. Receipt # AWVSDC-7802496. (Auvil, Walt) |
| 11/16/2020 | 8 | STATEMENT OF VISITING ATTORNEY from Tara L. Borelli on behalf of Zachary Martell, Christopher Fain, Brian McNemar. Local counsel: Walt Auvil. Fee $50.00. Receipt # AWVSDC-7802498. (Auvil, Walt) |
| 11/16/2020 | 9 | STATEMENT OF VISITING ATTORNEY from Sasha J. Buchert on behalf of Zachary Martell, Christopher Fain, Brian McNemar. Local counsel: Walt Auvil. Fee $50.00. Receipt # AWVSDC-7802501. (Auvil, Walt) |
| 11/24/2020 | 10 | SUMMONS RETURNED EXECUTED for William Crouch, William Crouch served on 11/18/2020, answer due 12/9/2020. Summons served on April Robertson.(Auvil, Walt) (Modified on 11/24/2020 to add the name of the person served and the summons as an attachment) (mkw). (Additional attachment added on 11/24/2020: # 1 Summons) (mkw). |
| 11/24/2020 | 11 | SUMMONS RETURNED EXECUTED for Cynthia Beane, Cynthia Beane served on 11/18/2020, answer due 12/9/2020. Summons served on April Robertson. (Auvil, Walt) (Modified on 11/24/2020 to add the name of the person served and to add a copy of the |

**JA10**

| | | |
|---|---|---|
| | | summons as an attachment) (mkw). (Additional attachment) added on 11/24/2020: # 1 Summons) (mkw). |
| 11/24/2020 | 12 | SUMMONS RETURNED EXECUTED for Ted Cheatham, Ted Cheatham served on 11/18/2020, answer due 12/9/2020. Summons served on Thomas Miller. (Auvil, Walt) (Modified on 11/24/2020 to add the name of the person served and a copy of the summons as an attachment) (mkw). (Additional attachment added on 11/24/2020: # 1 Summons) (mkw). |
| 11/24/2020 | 13 | SUMMONS RETURNED EXECUTED for West Virginia Department of Health and Human Resources, Bureau for Medical Services, West Virginia Department of Health and Humane Resources, Bureau for Medical Services served on 11/18/2020, answer due 12/9/2020. Summons served on April Robertson.(Auvil, Walt) Modified on 11/24/2020 to add the name of the person served and a copy of the summons as an attachment) (mkw). (Additional attachment added on 11/24/2020: # 1 Summons) (mkw). |
| 11/30/2020 | 14 | SUMMONS ACCEPTED FOR SERVICE BY SECRETARY OF STATE on 11/20/2020 as to The Health Plan of West Virginia, Inc.. Certified Mail Number: 92148901125134100002961036. (jsa) |
| 12/01/2020 | 15 | NOTICE OF ATTORNEY APPEARANCE by Eric Salyers on behalf of Ted Cheatham. (Salyers, Eric) |
| 12/02/2020 | 16 | STIPULATION REGARDING ANSWER DEADLINE by Ted Cheatham, Christopher Fain, Zachary Martell, Brian McNemar, re: 1 Complaint; the parties stipulate and agree that the Answer or response to the Complaint has been extended to January 11, 2021 to Respond to Complaint. (Salyers, Eric) (Modified on 12/3/2020 to add party filers and to add link to #1 complaint) (mkw). |
| 12/07/2020 | 17 | NOTICE OF APPEARANCE by Stuart A. McMillan and Aaron C. Boone on behalf of The Health Plan of West Virginia, Inc. and STIPULATION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' COMPLAINT by The Health Plan of West Virginia, Inc., Christopher Fain, Zachary Martell, Brian McNemar; the parties stipulate and agree that Defendant The Health Plan of West Virginia, Inc. may respond to Plaintiffs' 1 Complaint by 1/11/2021. (McMillan, Stuart) (Modified on 12/7/2020 to add party filers and to add link to #1 complaint) (mkw). |
| 12/07/2020 | 18 | ENTRY REMOVED; DUPLICATE ENTRY. (McMillan, Stuart) (Modified on 12/7/2020 to remove duplicate entry). (mkw) |
| 12/07/2020 | | NOTICE OF DOCKET CORRECTION re: 18 NOTICE OF APPEARANCE AND STIPULATION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' COMPLAINT. Error: Entry is a duplicate entry of docket entry #17; Correction: Removed duplicate entry. (mkw) |
| 12/07/2020 | | RESET DEADLINE: The Health Plan of West Virginia, Inc. answer due 1/11/2021. (mkw) |
| 12/09/2020 | 19 | STIPULATION EXTENDING TIME FOR DHHR DEFENDANTS TO ANSWER THE COMPLAINT by Christopher Fain, Zachary Martell, Brian McNemar, Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services; re: 1 Complaint; by agreement, the responsive pleading will be due on 1/11/2021. (Cyrus, Lou) (Modified on 12/9/2020 to add party filers and add link to #1 complaint) (mkw). |
| 12/09/2020 | | RESET DEADLINE: Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services answers due 1/11/2021. (mkw) |

**JA11**

| 01/11/2021 | 20 | MOTION by The Health Plan of West Virginia, Inc. to Dismiss With Prejudice, re: 1 Complaint. (McMillan, Stuart) (Modified on 1/11/2021 to add link to #1 complaint) (mkw). |
| 01/11/2021 | 21 | MEMORANDUM by The Health Plan of West Virginia, Inc. in support of 20 MOTION by The Health Plan of West Virginia, Inc. to Dismiss With Prejudice, re: 1 Complaint. (McMillan, Stuart) (Modified on 1/11/2021 to add link to #1 complaint) (mkw). |
| 01/11/2021 | 22 | MOTION by Ted Cheatham to Dismiss With Prejudice, re: 1 Complaint. (Attachment: # 1 Exhibit A)(Oxley, Perry) |
| 01/11/2021 | 23 | MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Partial Dismissal, re: 1 Class Action Complaint. (Cyrus, Lou) (Modified on 1/11/2021 to add link to #1 complaint) (mkw). |
| 01/11/2021 | 24 | MEMORANDUM OF LAW by Ted Cheatham in support of 22 MOTION by Ted Cheatham to Dismiss With Prejudice re: 1 Complaint. (Oxley, Perry) |
| 01/11/2021 | 25 | MEMORANDUM OF LAW by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services in support of 23 MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Partial Dismissal, re: 1 Class Action Complaint. (Cyrus, Lou) (Modified on 1/11/2021 to add link to #1 complaint) (mkw). |
| 01/11/2021 | 26 | ANSWER TO 1 Complaint by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services; Jury demand. (Cyrus, Lou) |
| 01/13/2021 | 27 | ORDER AND NOTICE: Rule 12(b) Motions 2/2/2021. Rule 26(f) Meeting 2/16/2021. Last day to file report of Rule 26(f) Meeting 2/22/2021. Scheduling/status Conference at 11:30 AM on 3/8/2021 in Huntington. Entry of Scheduling Order 3/15/2021. Last Day to make Rule 26(a)(1) disclosures 3/22/2021. Signed by Judge Robert C. Chambers on 1/13/2021. (cc: counsel of record; any unrepresented parties) (hkl) |
| 01/20/2021 | 28 | STATEMENT OF VISITING ATTORNEY from Carl S. Charles on behalf of Christopher Fain.. Fee $50.00. Receipt # AWVSDC-7857503. (Auvil, Walt) |
| 01/20/2021 | 29 | CONSENT MOTION by Christopher Fain, Zachary Martell, Brian McNemar to Extend Time for Response to Defendants' 20 , 22 , and 23 Motions to Dismiss to 02/15/2021. (Auvil, Walt) (Modified on 1/20/2021 to add party filers and to add link to #20, #22 and #23 motions) (mkw). |
| 01/22/2021 | 30 | ORDER granting Plaintiffs' 29 CONSENT MOTION to Extend Time for Response to Defendants' 20 , 22 , 23 Motions to Dismiss; extending Plaintiffs' time to respond by an additional 21 days. Signed by Judge Robert C. Chambers on 1/22/2021. (cc: counsel of record; any unrepresented parties) (hkl) |
| 02/02/2021 | 31 | DISCLOSURE STATEMENT PURSUANT TO RULE 7.1, Federal Rules of Civil Procedure, by Defendant The Health Plan of West Virginia, Inc. (McMillan, Stuart) |
| 02/02/2021 | 32 | MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Dismiss With Prejudice, re: 1 Complaint. (Attachments: # 1 Exhibit A, Affidavit of Angela Wowczuk with Fax Redacted, # 2 Exhibit B, Affidavit of Brian Thompson, # 3 Exhibit C, Affidavit of Unicare)(Cyrus, Lou) (Modified on 2/2/2021 to add link to #1 complaint) (mkw). |
| 02/02/2021 | 33 | MEMORANDUM OF LAW by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services in support of |

| | | |
|---|---|---|
| | | 32 MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Dismiss With Prejudice. (Cyrus, Lou) |
| 02/10/2021 | 34 | CONSENT MOTION by Christopher Fain, Zachary Martell, Brian McNemar to Extend Time and File Combined Brief for Response to 32 Motion to Dismiss Filed by Defendants Crouch, Beane, and West Virginia Department of Health and Human Resources to 03/02/21. (Auvil, Walt) (Modified on 2/10/2021 to add link to #32 motion) (mkw). |
| 02/11/2021 | 35 | ORDER granting Plaintiffs' 34 CONSENT MOTION to Extend Time and File Combined Brief for Response to Motions to Dismiss Filed by Defendants Crouch, Beane, and West Virginia Department of Health and Human Resources; Plaintiffs' collective response in opposition to the 23 and 32 MOTIONS is due on 3/2/2021, and shall total not more than 40 pages in length. Signed by Judge Robert C. Chambers on 2/11/2021. (cc: counsel of record; any unrepresented parties) (jsa) |
| 02/15/2021 | 36 | JOINT MOTION by Brian Mcnemar, Zachary Martell, Ted Cheatham, to Dismiss Without Prejudice Affordable Care Act Claim against Defendant Ted Cheatham, re: 1 Complaint. (Auvil, Walt) (Modified on 2/15/2021 to remove party filer and add correct party filers and to add link to #1 complaint) ) (mkw). |
| 02/15/2021 | 37 | PROPOSED ORDER ORDER DISMISSING AFFORDABLE CARE ACT CLAIM AGAINST DEFENDANT TED CHEATHAM by Brian McNemar, Zachary Martell, Ted Cheatham (Auvil, Walt) (Modified on 2/15/2021 to remove party filer and to add correct party filers) (mkw). |
| 02/15/2021 | 38 | AMENDED MOTION by Brian McNemar, Zachary Martell, Ted Cheatham to Amend 36 JOINT MOTION by Brian Mcnemar, Zachary Martell, Ted Cheatham, to Dismiss Without Prejudice Affordable Care Act Claim against Defendant Ted Cheatham, re: 1 Complaint and 37 Proposed Order Dismissing Affordable Care Act Claim Against Defendant Ted Cheatham. (Attachments: # 1 Proposed Order Amended Proposed Order Dismissing Affordable Care Act Claim Against Ted Cheatham with Prejudice)(Auvil, Walt) (Modified on 2/15/2021 to remove party filer and add correct party filers) (mkw). |
| 02/16/2021 | 39 | RESPONSE by Christopher Fain, Zachary Martell, Brian McNemar in opposition to 20 MOTION by The Health Plan of West Virginia, Inc. to Dismiss With Prejudice, re: 1 Complaint. (Auvil, Walt) (Modified on 2/16/2021 to remove link to #21 memorandum) (mkw). |
| 02/16/2021 | 40 | OPPOSITION by Christopher Fain, Zachary Martell, Brian McNemar to 22 MOTION by Ted Cheatham to Dismiss With Prejudice, re: 1 Complaint. (Auvil, Walt) (Modified on 2/16/2021 to remove link to #24 memorandum) (mkw). |
| 02/17/2021 | 41 | ORDER granting the parties' 38 AMENDED JOINT MOTION to Dismiss Plaintiffs' Affordable Health Care Act Claim against Ted Cheatham; denying as moot the parties' original 36 JOINT MOTION to Dismiss; the claim by Plaintiffs Brian McNemar and Zachary Martell against Defendant Ted Cheatham in Count II of the Complaint is DISMISSED WITH PREJUDICE. Signed by Judge Robert C. Chambers on 2/17/2021. (cc: counsel of record; any unrepresented parties) (jsa) |
| 02/18/2021 | 42 | JOINT MOTION by Christopher Fain, Brian Mcnemar, Zachary Martell, The Health Plan of West Virginia, Inc., Ted Cheatham, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Extension of Deadlines to Conduct Rule 26(F) Meeting and File Rule 26(F) Report. (Auvil, Walt) (Modified on 2/18/2021 to add party filers) (mkw). |
| 02/18/2021 | 43 | ORDER granting the parties' 42 JOINT MOTION for Extension of Deadlines to Conduct |

**JA13**

| | | Rule 26(f) Meeting and File Rule 26(f) Report; directing that the Rule 26(f) meeting be completed within 14 days of the resolution of the pending motions to dismiss and that the Rule 26(f) report be filed within 30 days of the resolution of the pending motions to dismiss. Signed by Judge Robert C. Chambers on 2/18/2021. (cc: counsel of record; any unrepresented parties) (hkl) |
|---|---|---|
| 02/23/2021 | 44 | CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Rule 26(a)(1) Initial Disclosures. (Auvil, Walt) (Modified on 2/23/2021 to add party filers) (mkw). |
| 02/23/2021 | 45 | REPLY by The Health Plan of West Virginia, Inc. to 39 Response In Opposition. (McMillan, Stuart) |
| 02/23/2021 | 46 | CERTIFICATE OF SERVICE by The Health Plan of West Virginia, Inc. for Rule 26(a)(1) Initial Disclosures. (McMillan, Stuart) |
| 02/23/2021 | 47 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Rule 26(a)(1) Initial Disclosures. (Bandy, Kimberly) |
| 02/23/2021 | 48 | REPLY by Ted Cheatham to Plaintiffs' 40 Opposition. (Oxley, Perry) |
| 02/23/2021 | 49 | CERTIFICATE OF SERVICE by Ted Cheatham for Rule 26(a)(1) Initial Disclosures. (Oxley, Perry) |
| 03/02/2021 | 50 | COMBINED OPPOSITION by Christopher Fain to 23 MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Partial Dismissal, re: 1 Class Action Complaint and 32 MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Dismiss With Prejudice, re: 1 Complaint. (Auvil, Walt) |
| 03/05/2021 | 51 | CONSENT MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Extend Time to File Reply to Plaintiff's 50 Combined Opposition to March 19, 2021. (Bandy, Kimberly) |
| 03/08/2021 | 52 | ORDER granting Defendants' 51 CONSENT MOTION to Extend Time to File Reply in Support of Motions Dismiss; extending the reply memorandum due date to 3/19/2021. Signed by Judge Robert C. Chambers on 3/8/2021. (cc: counsel of record; any unrepresented parties) (hkl) |
| 03/19/2021 | 53 | JOINT MOTION by Christopher Fain, Zachary Martell, Brian McNemar, Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Extension of Deadline to File a Reply Brief as to 50 Combined Opposition by Christopher Fain to March 26, 2021. (Bandy, Kimberly) (Modified on 3/19/2021 to add party filers) (mkw) |
| 03/19/2021 | 54 | ORDER granting Defendants William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services' 53 JOINT MOTION to Extend Time to File Reply in Support of 23 and 32 MOTIONS to Dismiss; extending the reply memorandum due date to 3/26/2021. Signed by Judge Robert C. Chambers on 3/19/2021. (cc: counsel of record; any unrepresented parties) (jsa) |
| 03/26/2021 | 55 | REPLY by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Christopher Fain's 50 Combined Opposition. (Bandy, Kimberly) |
| 04/05/2021 | 56 | UNOPPOSED MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Leave to File Sur-Reply in Opposition to Defendants' 32 Motion to Dismiss. |

| | | (Attachments: # 1 Exhibit A to Motion to File Sur-Reply in Opposition to Defendant's Motion to Dismiss)(Auvil, Walt) (Modified on 4/5/2021 to add party filers) (mkw). (Modified on 4/5/2021 to add link to #32 motion) (mkw). |
|---|---|---|
| 05/19/2021 | 57 | MEMORANDUM OPINION AND ORDER denying 22 MOTION by Ted Cheatham to Dismiss With Prejudice, re: 1 Complaint; denying 23 MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Partial Dismissal, re: 1 Class Action Complaint; denying 32 MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Dismiss With Prejudice, re: 1 Complaint; granting 56 UNOPPOSED MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Leave to File Sur-Reply in Opposition to Defendants' 32 Motion to Dismiss. Signed by Judge Robert C. Chambers on 5/19/2021. (cc: attys; any unrepresented party) (mkw) |
| 05/19/2021 | 58 | UNOPPOSED MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Leave to File Sur-Reply in Opposition to Defendants' 32 Motion to Dismiss and Exhibit A attached. (Auvil, Walt) (Modified on 5/19/2021 to add party filers) (mkw). |
| 05/20/2021 | 59 | ORDER denying as moot the second 58 UNOPPOSED MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Leave to File Sur-Reply; directing Plaintiffs to file the signed Sur-Reply. Signed by Judge Robert C. Chambers on 5/20/2021. (cc: attys; any unrepresented parties) (mkw) |
| 05/25/2021 | 60 | SUR-REPLY by Christopher Fain, Zachary Martell, Brian McNemar in opposition to Defendants' 32 Motion to Dismiss. (Auvil, Walt) (Modified on 5/25/2021 to remove link to #56 motion and to add party filers) (mkw). |
| 06/02/2021 | 61 | STIPULATION REGARDING ANSWER DEADLINE by Ted Cheatham, Christopher Fain, Zachary Martell, Brian McNemar; the parties stipulate and agree the new deadline to Answer the 1 Complaint for Defendant Ted Cheatham, in his official capacity as Director of the West Virginia Public Employees Insurance Agency is now 6/16/2021. (Salyers, Eric) (Modified on 6/2/2021 to add party filers and to add link to #1 complaint) (mkw). |
| 06/02/2021 | | RESET DEADLINE: Ted Cheatham answer due 6/16/2021 pursuant to the 61 Stipulation. (mkw) |
| 06/17/2021 | 62 | ANSWER to 1 Complaint by Ted Cheatham; Jury demand. (Oxley, Perry) |
| 06/28/2021 | 63 | MEMORANDUM OPINION AND ORDER denying Defendant The Health Plan of West Virginia's 20 MOTION to Dismiss. Signed by Judge Robert C. Chambers on 6/28/2021. (cc: counsel of record; any unrepresented parties) (jsa) |
| 07/02/2021 | 64 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Tara L. Borelli (Borelli, Tara). (Modified on 7/2/2021 to convert event to Notice of Change of Attorney Information) (mk). |
| 07/09/2021 | 65 | CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiffs' First Set of Interrogatories, Request for Admissions, Request for Production of Documents and Things to Defendants William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services. (Auvil, Walt) |
| 07/09/2021 | 66 | CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiffs' First Set of Interrogatories, Request for Admissions, Request for Production of Documents and Things to Defendant The Health Plan of West Virginia. (Auvil, Walt) |
| 07/09/2021 | 67 | CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiffs' First Set of Interrogatories, Request for Admissions, Request for Production of |

| | | |
|---|---|---|
| | | Documents and Things to Defendant Ted Cheatham. (Auvil, Walt) |
| 07/12/2021 | 68 | STIPULATION REGARDING ANSWER DATE FOR DEFENDANT THE HEALTH PLAN OF WEST VIRGINIA, INC. by Christopher Fain, Zachary Martell, Brian McNemar, The Health Plan of West Virginia, Inc.; said parties stipulate that the date by which said Defendant must answer the 1 Complaint is hereby extended to, and including, 7/23/2021. (Boone, Aaron) (Modified on 7/12/2021 to add party filers) (mkw). |
| 07/12/2021 | | RESET DEADLINE: The Health Plan of West Virginia, Inc. answer due 7/23/2021. (mkw) |
| 07/21/2021 | 69 | AMENDED CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiff's First Set of Request for Admissions, Requests for Production of Documents and Things, and Interrogatories to Defendant Ted Cheatham. (Auvil, Walt) |
| 07/21/2021 | 70 | AMENDED CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiff's First Set of Request for Admissions, Requests for Production of Documents and Things, and Interrogatories to Defendant The Health Plan of WV. (Auvil, Walt) |
| 07/21/2021 | 71 | AMENDED CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiff's First Set of Requests for Admissions, Requests for Production of Documents and Things, and Interrogatories to Defendant W. Crouch, C. Beane and WVDHH - WV Medicaid. (Auvil, Walt) |
| 07/23/2021 | 72 | STIPULATION REGARDING ANSWER DATE FOR DEFENDANT THE HEALTH PLAN OF WEST VIRGINIA, INC. re: 1 Complaint to 7/30/2021 by The Health Plan of West Virginia, Inc., Christopher Fain, Zachary Martell, Brian McNemar. (Boone, Aaron) (Modified on 7/23/2021 to add party filers) (kew). |
| 07/28/2021 | 73 | RULE 26(f) REPORT OF PLANNING MEETING by Christopher Fain, Zachary Martell, Brian McNemar, Cynthia Beane, Ted Cheatham, William Crouch, The Health Plan of West Virginia, Inc., West Virginia Department of health and Human Resources, Bureau for Medical Services. (Auvil, Walt) (Modified on 7/28/2021 to add party filers) (mkw). |
| 07/30/2021 | 74 | ANSWER to 1 Complaint by The Health Plan of West Virginia, Inc.; Jury demand. (Boone, Aaron) |
| 08/06/2021 | 75 | SCHEDULING ORDER: Joinder of Parties, amended pleadings due by 10/8/2021. Discovery requests to be completed by 10/18/2021. Fact discovery shall be completed by 12/1/2021. The expert discovery deadline is 4/29/2022. The last date on which to take a discovery deposition is 45 days after the last date to serve discovery requests. Expert Witness List by parties bearing the burden of proof due by 1/14/2022, by party not bearing burden of proof due by 2/15/2022, and to solely contradict or rebut evidence due by 3/15/2022. Settlement Meeting by 12/15/2021; scheduling a conference for 5/16/2022 at 11:00 a.m. in Huntington to determine the need for Fed. R. Civ. P. 26(a)(3) disclosures and the balance of the schedule. Signed by Judge Robert C. Chambers on 8/6/2021. (cc: counsel of record; any unrepresented parties) (jsa) |
| 08/13/2021 | 76 | STIPULATION FOR EXTENSION OF CASE DEADLINES by Christopher Fain, Zachary Martell, Brian McNemar, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services, Ted Cheatham, The Health Plan of West Virginia, Inc.; the parties stipulate that the deadline to file: 1. An agreed upon ESI Protocol; 2. An agreed upon format for production; 3. An agreed upon Protective Order; 4. An Order Governing the Inadvertent Disclosure of Documents or Other Material; and 5. An Order Setting Deposition Protocol is extended to, and including, 8/20/2021. (Auvil, Walt) (Modified on 8/13/2021 to add party filers) (mkw). |

**JA16**

| 08/20/2021 | 77 | MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Entry of a Partial ESI Protocol, Protective Order, Deposition Protocol Order, 502(D) Clawback Order, and Order Regarding Virtual Depositions. (Attachments: # 1 Declaration, # 2 Proposed Order, # 3 Exhibit 1, # 4 Exhibit 2-Proposed Protective Order, # 5 Exhibit 3-Proposed Order Setting Deposition Protocol, # 6 Exhibit 4-Proposed Agreed Order Governing the Inadvertent Disclosure of Documents, # 7 Exhibit 5-Stipulation for Virtual Depositions) (Auvil, Walt) |
| 08/20/2021 | 78 | RESPONSE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services in opposition to 77 MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Entry of a Partial ESI Protocol, Protective Order, Deposition Protocol Order, 502(D) Clawback Order, and Order Regarding Virtual Depositions (Bandy, Kimberly) |
| 08/20/2021 | | MOTION REFERRED to Magistrate Judge Cheryl A. Eifert: 77 MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Entry of a Partial ESI Protocol, Protective Order, Deposition Protocol Order, 502(D) Clawback Order, and Order Regarding Virtual Depositions. (mk) (Entered: 08/22/2021) |
| 08/23/2021 | 79 | CERTIFICATE OF SERVICE by Ted Cheatham for Defendant Ted Cheatham's Responses to Plaintiff's First Set of Interrogatories. (Oxley, Perry) |
| 08/23/2021 | 80 | CERTIFICATE OF SERVICE by Ted Cheatham for Defendant Ted Cheatham's Responses to Plaintiff's First Set of Requests for Admissions. (Oxley, Perry) |
| 08/23/2021 | 81 | CERTIFICATE OF SERVICE by Ted Cheatham for Defendant Ted Cheatham's Responses to Plaintiff's First Set of Requests for Production of Documents. (Oxley, Perry) |
| 08/24/2021 | 82 | CERTIFICATE OF SERVICE by The Health Plan of West Virginia, Inc. for Answers to Plaintiffs' First Set of Interrogatories. (Boone, Aaron) |
| 08/24/2021 | 83 | CERTIFICATE OF SERVICE by The Health Plan of West Virginia, Inc. for Responses to Plaintiffs' First Set of Requests for Production. (Boone, Aaron) |
| 08/24/2021 | 84 | CERTIFICATE OF SERVICE by The Health Plan of West Virginia, Inc. for Answers to Plaintiffs' First Set of Requests for Admissions. (Boone, Aaron) |
| 08/26/2021 | 85 | REPLY by Christopher Fain, Zachary Martell, Brian McNemar to 78 Response In Opposition. (Auvil, Walt) |
| 08/27/2021 | 86 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Responses to Plaintiff's First Set of Interrogatories. (Cyrus, Lou) |
| 08/27/2021 | 87 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Responses to Plaintiff's First Requests for Production. (Cyrus, Lou) |
| 08/27/2021 | 88 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Responses to Plaintiff's First Set of Requests for Admission. (Bandy, Kimberly) |
| 08/30/2021 | 89 | STIPULATION FOR VIRTUAL DEPOSITIONS by Christopher Fain, Zachary Martell, Brian McNemar, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services, Ted Cheatham, and The Health Plan of West Virginia, Inc.; the parties stipulate and agree to the following parameters to govern all virtual depositions, as more fully set forth herein. (hkl) (Modified on 8/30/2021 to add party filers) (mkw). |

**JA17**

| 08/30/2021 | 90 | PROTECTIVE ORDER setting forth the terms for the handling of confidential documents. Signed by Magistrate Judge Cheryl A. Eifert on 8/30/2021. (cc: counsel of record; any unrepresented party) (hkl) |
| 08/30/2021 | 91 | AGREED ORDER GOVERNING THE INADVERTENT DISCLOSURE OF DOCUMENTS OR OTHER MATERIAL UNDER RULE 502(d) directing that these procedures shall govern the inadvertent production of privileged or confidential documents. Signed by Magistrate Judge Cheryl A. Eifert on 8/30/2021. (cc: counsel of record; any unrepresented party) (hkl) |
| 09/01/2021 | 92 | MOTION by The Health Plan of West Virginia, Inc. to Certify Appeal of the Court's June 28, 2021 63 Memorandum Opinion and Order. (Boone, Aaron) (Modified on 9/1/2021 to add link to #63 memorandum opinion and order) (mkw). |
| 09/01/2021 | 93 | MEMORANDUM OF LAW by The Health Plan of West Virginia, Inc. in support of 92 MOTION by The Health Plan of West Virginia, Inc. to Certify Appeal of the Court's June 28, 2021 63 Memorandum Opinion and Order. (Boone, Aaron) (Modified on 9/1/2021 to add link to #63 memorandum opinion and order) (mkw). |
| 09/01/2021 | 94 | ORDER directing that a Telephonic Motion Hearing shall take place on 9/13/2021 at 2:30 PM before Magistrate Judge Cheryl A. Eifert, re: Plaintiffs' 77 MOTION for Entry of a Partial ESI Protocol, Protective Order, Deposition Protocol Order, 502(d) Clawback Order, and Order Regarding Virtual Depositions. Signed by Magistrate Judge Cheryl A. Eifert on 9/1/2021. (cc: counsel of record; any unrepresented parties) (hkl) |
| 09/03/2021 | 95 | RESPONSE by Ted Cheatham in opposition to 77 MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Entry of a Partial ESI Protocol, Protective Order, Deposition Protocol Order, 502(D) Clawback Order, and Order Regarding Virtual Depositions. (Oxley, Perry) |
| 09/03/2021 | 96 | RESPONSE by The Health Plan of West Virginia, Inc. in opposition to 77 MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Entry of a Partial ESI Protocol, Protective Order, Deposition Protocol Order, 502(D) Clawback Order, and Order Regarding Virtual Depositions. (Boone, Aaron) |
| 09/09/2021 | 97 | REPLY by Christopher Fain, Zachary Martell, Brian McNemar to 95 Response In Opposition, 96 Response In Opposition. (Auvil, Walt) |
| 09/13/2021 | 98 | TELEPHONIC MOTION HEARING held by Magistrate Judge Cheryl A. Eifert on 9/13/2021 re: Plaintiffs' 77 MOTION for Entry of a Partial ESI Protocol and Deposition Protocol Order; Court Reporter: CourtSmart. (hkl) |
| 09/14/2021 | 99 | ORDER granting in part and denying in part Plaintiffs' 77 MOTION For Entry of a Partial ESI Protocol, Protective Order, Deposition Protocol Order, 502(d) Clawback Order, and Order Regarding Virtual Depositions, as more fully set forth herein; directing the parties to promptly submit an agreed, revised Deposition Protocol that allows each party to take up to 10 depositions; directing the parties to meet and confer, and to report to the undersigned, regarding ESI protocols no later than 9/30/2021; the parties shall also attempt to reach an agreement on more complex issues related to the production of ESI, and if they cannot agree, shall notify the undersigned's chambers on or before 9/30/2021 of any outstanding issues and whether the parties require a telephonic discovery conference. Signed by Magistrate Judge Cheryl A. Eifert on 9/14/2021. (cc: counsel of record) (hkl) (Modified on 9/14/2021 to replace image) (mkw). |
| 09/14/2021 | | NOTICE OF DOCKET CORRECTION re: 99 ORDER. Error: The judge's signature was not flattened. Correction: Replaced incorrect image with correct image. (mkw) |
| 09/14/2021 | 100 | ORDER SETTING DEPOSITION PROTOCOL directing that the following protocol |

| | | shall be followed with all depositions conducted herein, as more fully set forth herein. Signed by Magistrate Judge Cheryl A. Eifert on 9/14/2021. (cc: counsel of record) (hkl) |
|---|---|---|
| 09/15/2021 | 101 | OPPOSITION by Christopher Fain, Zachary Martell, Brian McNemar in opposition to 92 MOTION by The Health Plan of West Virginia, Inc. to Certify Appeal of the Court's June 28, 2021 63 Memorandum Opinion and Order. (Auvil, Walt) (Modified on 9/15/2021 to remove link to #93 memorandum and add link to #92 motion) (mkw). |
| 09/17/2021 | 102 | JOINT MOTION by Christopher Fain, Zachary Martell, Brian McNemar, Cynthia Beane, Ted Chetham, William Crouch, The Health Plan of West Virginia, Inc., West Virginia Department of Health and Human Resources, Bureau for Medical Services to Conduct Mediation Over Videoconference. (Auvil, Walt) (Modified on 9/20/2021 to convert event to a motion and to add party filers) (mkw) |
| 09/17/2021 | 103 | JOINT PROPOSED ORDER Joint Proposed Order Granting Joint Motion to Conduct Mediation Over Videoconference by Christopher Fain, Zachary Martell, Brian McNemar, Cynthia Beane, Ted Chetham, William Crouch, The Health Plan of West Virginia, Inc., West Virginia Department of Health and Human Resources, Bureau for Medical Services. (Auvil, Walt) (Modified on 9/20/2021 to add party filers) (mkw). |
| 09/20/2021 | 104 | ORDER GRANTING JOINT MOTION TO CONDUCT MEDIATION OVER VIDEOCONFERENCE granting the parties' 102 JOINT MOTION to Conduct Mediation Over Videoconference; directing that the parties are permitted to conduct mediation over videoconference instead of attending in-person. Signed by Judge Robert C. Chambers on 9/20/2021. (cc: counsel of record; any unrepresented parties) (hkl) |
| 09/20/2021 | 105 | REPLY by The Health Plan of West Virginia, Inc. to 101 Opposition. (Boone, Aaron) |
| 09/23/2021 | 106 | MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Leave to File First Amended Complaint. (Auvil, Walt) |
| 09/23/2021 | 107 | PROPOSED ORDER Order Granting Plaintiffs' Motion for Leave to File First Amended Complaint by Christopher Fain, Zachary Martell, Brian McNemar. (Auvil, Walt) |
| 09/23/2021 | 108 | MEMORANDUM by Christopher Fain, Zachary Martell, Brian McNemar in support of 106 MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Leave to File First Amended Complaint. (Auvil, Walt) |
| 09/23/2021 | 109 | AMENDED MOTION by Christopher Fain, Zachary Martell, Brian McNemar to Amend 106 MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Leave to File First Amended Complaint. (Attachment: # 1 First Amended Complaint)(Auvil, Walt) |
| 09/24/2021 | 110 | CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiffs' Second Set of Requests for Admission to Defendant Ted Cheatham and Plaintiffs' Second Set of Interrogatories to Defendant Ted Cheatham. (Auvil, Walt) |
| 09/24/2021 | 111 | CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiff's Second Set of Interrogatories to Defendants Crouch, Beane, and WVDHHR. (Auvil, Walt) |
| 09/24/2021 | 112 | CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiffs' Second Set of Interrogatories to Defendant the Health Plan of West Virginia. (Auvil, Walt) |
| 10/07/2021 | 113 | CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiffs' First Amended Rule 26(a)(1) Initial Disclosures. (Auvil, Walt) |
| 10/08/2021 | 114 | RESPONSE by Ted Cheatham in opposition to 106 MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Leave to File First Amended Complaint and 109 |

**JA19**

| | | |
|---|---|---|
| | | AMENDED MOTION by Christopher Fain, Zachary Martell, Brian McNemar to Amend 106 MOTION by Christopher Fain, Zachary Martell, Brian McNemar for Leave to File First Amended Complaint. (Oxley, Perry) (Modified on 10/11/2021 to remove link to #107 proposed order and #108 memorandum) (mkw). |
| 10/12/2021 | 115 | REPLY by Christopher Fain, Zachary Martell, Brian McNemar to 114 Response In Opposition. (Auvil, Walt) |
| 10/12/2021 | 116 | ORDER setting a Telephonic Conference concerning discovery issues, and if necessary, issues concerning ESI for 10/14/2021 at 10:00 AM before Magistrate Judge Cheryl A. Eifert. Signed by Magistrate Judge Cheryl A. Eifert on 10/12/2021. (cc: counsel of record; any unrepresented parteis) (hkl) |
| 10/13/2021 | 117 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Defendants' First Supplemental Response to Plaintiff's First Set of Requests for Production to Defendants Crouch, Beane and WVDHHR BMS. (Bandy, Kimberly) |
| 10/14/2021 | 118 | TELEPHONE CONFERENCE held by Magistrate Judge Cheryl A. Eifert on 10/14/2021; Court Reporter: CourtSmart. (hkl) |
| 10/15/2021 | 119 | JOINT MOTION by Christopher Fain, Zachary Martell, Brian McNemar, The Health Plan of West Virginia, Inc. to Stay Certain Case Schedule Deadlines. (Attachment: # 1 Proposed Order Granting Joint Motion to Stay Certain Case Schedule Deadlines)(Auvil, Walt) (Modified on 10/15/2021 to add party filer) (mkw). |
| 10/15/2021 | 120 | MEMORANDUM by Christopher Fain, Zachary Martell, Brian McNemar in support of 119 JOINT MOTION by Christopher Fain, Zachary Martell, Brian McNemar, The Health Plan of West Virginia, Inc. to Stay Certain Case Schedule Deadlines. (Auvil, Walt) (Modified on 10/15/2021 to add party filer) (mkw). |
| 10/18/2021 | 121 | ORDER GRANTING JOINT MOTION TO STAY CERTAIN CASE SCHEDULE DEADLINES granting the 119 JOINT MOTION by Christopher Fain, Zachary Martell, Brian McNemar, The Health Plan of West Virginia, Inc. to Stay Certain Case Schedule Deadlines; the remaining deadlines in the case schedule are stayed with respect to the claims of Plaintiffs Zachary Martell and Brian McNemar against The Health Plan until the Court rules on the parties' anticipated motion for preliminary approval of a class settlement; if that motion is denied, The Health Plan, Mr. Martell, and Mr. McNemar shall file a status report within 10 days of the Court's ruling with the parties' recommendations regarding further proceedings; the remaining deadlines in the case schedule are stayed with respect to the claims of Plaintiffs Zachary Martell and Brian McNemar against Defendant Cheatham until the Court rules on Plaintiffs' pending 109 AMENDED MOTION to file a First Amended Complaint; the 10/18/2021 deadline in the case schedule to serve discovery requests as to claims against Defendant Cheatham is stayed until seven days after the Court rules on the motion to amend the complaint. Signed by Judge Robert C. Chambers on 10/18/2021. (cc: counsel of record; any unrepresented parties) (jsa) |
| 10/18/2021 | 122 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Carl Solomon Charles updating name and/or firm information on behalf of Christopher Fain, Zachary Martell, Brian McNemar. (Charles, Carl) |
| 10/18/2021 | 123 | CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiffs' Subpoenas Duces Tecum to UniCare Health, Aetna Better Health, and the Health Plan. (Auvil, Walt) |
| 10/18/2021 | 124 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Tara L. Borelli updating name and/or firm information. (Borelli, Tara) (Modified on 10/18/2021 to convert event |

| | | to notice of change of attorney information) (ts). |
|---|---|---|
| 10/18/2021 | 125 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for First Supplemental Response to Plaintiff's First Set of Requests for Production. (Bandy, Kimberly) |
| 10/18/2021 | 126 | AMENDED CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for First Set of Interrogatories, Requests for Admission and Requests for Production of Documents to Plaintiff Christopher Fain. (Bandy, Kimberly) |
| 10/19/2021 | 127 | STIPULATION AND ORDER: ESI PROTOCOL stipulating and directing that the following protocol shall govern the discovery of documents and electronically stored information ("ESI"). Signed by Magistrate Judge Cheryl A. Eifert on 10/19/2021. (cc: counsel of record; any unrepresented parties) (hkl) |
| 10/19/2021 | 128 | CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintifffs' Third Set of Interrogatories. (Auvil, Walt) |
| 10/19/2021 | 129 | CERTIFICATE OF SERVICE by Christopher Fain, Zachary Martell, Brian McNemar for Plaintiffs' Second Set of Requests for Production. (Auvil, Walt) |
| 10/20/2021 | 130 | JOINT MOTION by Christopher Fain, Zachary Martell, Brian McNemar, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Extension of Fact Discovery Deadline to 3/1/2022. (Auvil, Walt) (Modified on 10/20/2021 to add party filers) |
| 10/20/2021 | 131 | MEMORANDUM by Christopher Fain, Zachary Martell, Brian McNemar, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services in support of 130 JOINT MOTION by Christopher Fain, Zachary Martell, Brian McNemar, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Extension of Fact Discovery Deadline to 3/1/2022. (Auvil, Walt) (Modified on 10/20/2021 to add party filers) (mkw) |
| 10/20/2021 | 132 | PROPOSED ORDER Order Granting Joint Motion for Extension of Discovery Deadline by Christopher Fain, Zachary Martell, Brian McNemar, Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services. (Auvil, Walt) (Modified on 10/20/2021 to add party filers) (mkw). |
| 10/21/2021 | 133 | ORDER GRANTING JOINT MOTION FOR EXTENSION OF DISCOVERY DEADLINE granting the parties' 130 JOINT MOTION for Extension of Fact Discovery Deadline; the deadline for fact discovery in this case is 3/1/2022. Signed by Judge Robert C. Chambers on 10/21/2021. (cc: counsel of record; any unrepresented parties) (jsa) |
| 10/21/2021 | 134 | AFFIDAVIT OF SERVICE of Cover Letter, Subpoena and Exhibits on Aetna Better Health of West Virginia, dated 10/19/2021, filed on behalf of Zachary Martell, Christopher Fain, Brian McNemar. (Auvil, Walt) |
| 10/21/2021 | 135 | AFFIDAVIT OF SERVICE of Cover Letter, Subpoena and Exhibits on The Health Plan of West Virginia, dated 10/18/2021, filed on behalf of Zachary Martell, Christopher Fain, Brian McNemar. (Auvil, Walt) |
| 10/21/2021 | 136 | AFFIDAVIT OF SERVICE of Cover Letter, Subpoena and Exhibits on Unicare Health Plan of West Virginia, Inc., dated 10/19/2021, filed on behalf of Zachary Martell, Christopher Fain, Brian McNemar. (Auvil, Walt) |
| 10/25/2021 | 137 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia |

| | | |
|---|---|---|
| | | Department of Health and Human Resources, Bureau for Medical Services for Response to Plaintiff's Second Set of Interrogatories. (Bandy, Kimberly) |
| 10/27/2021 | 138 | NOTICE OF MEDIATION by Christopher Fain, Zachary Martell, Brian McNemar. (Auvil, Walt) |
| 10/28/2021 | 139 | MEMORANDUM OPINION AND ORDER granting Plaintiffs' 109 AMENDED MOTION for Leave to File First Amended Complaint; Plaintiffs' first 106 MOTION to File First Amended Complaint is DISMISSED as moot. Signed by Judge Robert C. Chambers on 10/28/2021. (cc: counsel of record; any unrepresented parties) (jsa) |
| 10/28/2021 | 140 | FIRST AMENDED CLASS ACTION COMPLAINT by Zachary Martell, Christopher Fain, Brian McNemar, Shawn Anderson, Leann James against Cynthia Beane, Ted Cheatham, William Crouch, The Health Plan of West Virginia, Inc., West Virginia Department of Health and Human Resources, Bureau for Medical Services. (jsa) |
| 10/29/2021 | 141 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Second Supplemental Response to Plaintiff's First Set of Requests for Production. (Bandy, Kimberly) |
| 10/29/2021 | 142 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for First Supplemental Response to Plaintiff's Second Set of Interrogatories. (Bandy, Kimberly) |
| 11/03/2021 | 143 | CERTIFICATE OF SERVICE by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar for Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action to UMR, Inc. (Auvil, Walt) |
| 11/03/2021 | 144 | CERTIFICATE OF SERVICE by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar for Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action to CVS Caremark. (Auvil, Walt) |
| 11/05/2021 | 145 | CERTIFICATE OF SERVICE by Leann James for Plaintiff James's First Set of Requests for Production of Documents and Things to Defendant Ted Cheatham, Plaintiff's James's First Set of Requests for Admissions to Defendant Ted Cheatham, and Plaintiff James's First Set of Interrogatories to Defendant Ted Cheatham. (Auvil, Walt) Modified on 11/5/2021 to correct party filer (jsa). |
| 11/05/2021 | 146 | RETURN OF SERVICE ON SUBPOENA for UMR, Inc. (Auvil, Walt) (Modified on 11/8/2021 to convert event to a return of service on subpoena and to remove link to #143 certificate of service) (mkw). |
| 11/05/2021 | 147 | RETURN OF SERVICE ON SUBPOENA for CVS Caremark. (Auvil, Walt) (Modified on 11/8/2021 to convert event to a return of service on subpoena and to remove link to #144 certificate of service) (mkw). |
| 11/10/2021 | 148 | CERTIFICATE OF SERVICE by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar for Plaintiffs' Subpoena to the Health Plan of West Virginia. (Auvil, Walt) |
| 11/11/2021 | 149 | PROPOSED ORDER Agreed Order for Substitution of Parties by Ted Cheatham, Christopher Fain, Zachary Martell, Brian McNemar. (Oxley, Perry) (Modified on 11/12/2021 to add party filers) (mkw). |
| 11/11/2021 | 150 | STIPULATION REGARDING ANSWER DEADLINE by Christopher Fain, Zachary Martell, Brian McNemar, Ted Cheatham; said parties stipulate and agree that the deadline for an Answer or response to the 140 First Amended Complaint is 11/18/2021. (Oxley, |

| | | |
|---|---|---|
| | | Perry) (Modified on 11/12/2021 to add party filers and to add link to #140 first amended complaint) (mkw). |
| 11/12/2021 | | RESET DEADLINE: Ted Cheatham answer due 11/18/2021. (mkw) |
| 11/12/2021 | 151 | ANSWER to Plaintiffs' 140 First Amended Complaint, by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services; Jury demand. (Bandy, Kimberly) |
| 11/12/2021 | 152 | MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Extend Time to Serve Written Discovery on Recently Added Plaintiff Shauntae Anderson. (Bandy, Kimberly) |
| 11/12/2021 | 153 | MEMORANDUM OF LAW by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services in support of 152 MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Extend Time to Serve Written Discovery on Recently Added Plaintiff Shauntae Anderson. (Bandy, Kimberly) |
| 11/12/2021 | 154 | PROPOSED ORDER Granting Motion to Extend Time to Serve Written Discovery on Recently Added Plaintiff Shauntae Anderson by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services. (Bandy, Kimberly) |
| 11/15/2021 | 155 | AGREED ORDER FOR SUBSTITUTION OF PARTIES directing that Jason Haught, Interim Director of the West Virginia Public Employees Insurance Agency, shall be substituted as a defendant in place and stead of Ted Cheatham, former Director of the West Virginia Public Employees Insurance Agency; directing the Clerk to update the party names accordingly. Signed by Judge Robert C. Chambers on 11/15/2021. (cc: counsel of record; any unrepresented parties) (jsa) |
| 11/15/2021 | 156 | ORDER GRANTING DEFENDANTS' MOTION TO EXTEND TIME TO SERVE WRITTEN DISCOVERY ON RECENTLY ADDED PLAINTIFF SHAUNTAE ANDERSON granting 152 MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Extend Time to Serve Written Discovery on Recently Added Plaintiff Shauntae Anderson; directing that Defendants may serve written discovery requests on Plaintiff Shauntae Anderson within seven (7) days from entry of this Order. Signed by Judge Robert C. Chambers on 11/15/2021. (cc: counsel of record; any unrepresented parties) (jsa) |
| 11/17/2021 | 157 | CERTIFICATE OF SERVICE by Christopher Fain for Plaintiff Fain's Responses to Defendant Crouch, Beane, and WVDHHR, Bureau for Medical Services' First Set of Interrogatories. (Auvil, Walt) Modified on 11/17/2021 to correct party filers (jsa). |
| 11/17/2021 | 158 | CERTIFICATE OF SERVICE by Christopher Fain for Plaintiff Fain's Responses to Defendants Crouch, Beane, and WVDHHR, Bureau for Medical Services' First Set of Requests for Admissions. (Auvil, Walt) Modified on 11/17/2021 to correct party filers (jsa). |
| 11/17/2021 | 159 | CERTIFICATE OF SERVICE by Christopher Fain for Plaintiff Fain's Responses to Defendants Crouch, Beane, and WVDHHR, Bureau for Medical Services' First Set of Requests for Production of Documents. (Auvil, Walt) Modified on 11/17/2021 to correct party filers (jsa). |
| 11/17/2021 | 160 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Responses to Plaintiffs' Second Set of Requests for Production of Documents and Things. (Bandy, Kimberly) |

| 11/17/2021 | 161 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Answers to Plaintiffs' Third Set of Interrogatories. (Bandy, Kimberly) |
|---|---|---|
| 11/18/2021 | 162 | MOTION by Jason Haught for Abstention. (Oxley, Perry) |
| 11/18/2021 | 163 | MEMORANDUM OF LAW by Jason Haught in support of 162 MOTION by Jason Haught for Abstention. (Oxley, Perry) M |
| 11/19/2021 | 164 | ANSWER to 140 First Amended Class Action Complaint with Jury Demand by Jason Haught. (Oxley, Perry) |
| 11/19/2021 | 165 | STIPULATION REGARDING ANSWER DATE TO 140 FIRST AMENDED CLASS ACTION COMPLAINT by The Health Plan of West Virginia, Inc., Christopher Fain, Zachary Martell, Brian McNemar, Shawn Anderson, Leann James; said parties stipulate that said Defendant does not need to answer the First Amended Class Action Complaint in this matter, as the newly added claims/allegations do not apply to The Health Plan. (Boone, Aaron) (Modified on 11/19/2021 to add party filers) (kew). |
| 11/22/2021 | 166 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for First Set of Interrogatories, Requests for Admission and Requests for Production of Documents to Plaintiff Shauntae Anderson. (Bandy, Kimberly) |
| 11/30/2021 | 167 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for First Supplemental Response to Plaintiff's First Set of Interrogatories. (Bandy, Kimberly) |
| 11/30/2021 | 168 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Second Supplemental Response to Second Set of Interrogatories. (Bandy, Kimberly) |
| 11/30/2021 | 169 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for First Supplemental Responses to Second Set of Requests for Production of Documents and Things. (Bandy, Kimberly) |
| 11/30/2021 | 170 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Third Supplemental Response to First Set of Requests for Production. (Bandy, Kimberly) |
| 12/02/2021 | 171 | OPPOSITION by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar in opposition to 162 MOTION by Jason Haught for Abstention. (Auvil, Walt) |
| 12/09/2021 | 172 | REPLY by Jason Haught to 171 Opposition. (Salyers, Eric) |
| 12/13/2021 | 173 | CERTIFICATE OF SERVICE by Jason Haught for Defendant Jason Haught's Responses to Plaintiff James' First Set of Interrogatories. (Salyers, Eric) |
| 12/13/2021 | 174 | CERTIFICATE OF SERVICE by Jason Haught for Defendant Jason Haught's Responses to Plaintiff James' First Set of Requests for Admissions. (Salyers, Eric) |
| 12/13/2021 | 175 | CERTIFICATE OF SERVICE by Jason Haught for Defendant Jason Haught's Responses to Plaintiff James' First Set of Requests for Production of Documents. (Salyers, Eric) |
| 12/16/2021 | 176 | REPORT OF MEDIATION by Donald B. O'Dell. (jsa) |
| 12/20/2021 | 177 | CERTIFICATE OF SERVICE by Shawn Anderson for Plaintiff Shauntae Anderson's Responses to Defendants William Crouch, Cynthia Beane, and West Virginia Department |

**JA24**

| | | |
|---|---|---|
| | | of Health and Human Resources, Bureau for Medical Services' First Set of Interrogatories. (Auvil, Walt) Modified on 12/20/2021 to correct party filer (jsa). |
| 12/20/2021 | 178 | CERTIFICATE OF SERVICE by Shawn Anderson for Plaintiff Shauntae Anderson's Responses to Defendants William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services' First Set of Requests for Admissions. (Auvil, Walt) Modified on 12/20/2021 to correct party filer (jsa). |
| 12/20/2021 | 179 | CERTIFICATE OF SERVICE by Shawn Anderson for Plaintiff Shauntae Anderson's Responses to Defendants William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services' First Set of Request for Production of Documents. (Auvil, Walt) Modified on 12/20/2021 to correct party filer (jsa). |
| 01/05/2022 | 180 | STIPULATION OF DISMISSAL With Prejudice by Zachary Martell, Brian McNemar, The Health Plan of West Virginia, Inc.; said parties stipulate and agree that The Health Plan and Plaintiffs have reached a settlement to compromise all claims that exist between them, as more fully set forth herein; Plaintiffs' claims against Defendant Haught are also dismissed with prejudice; Plaintiffs and The Health Plan request that the Court direct the Clerk of the Court to remove Plaintiff Zachary Martell, Plaintiff Brian McNemar, and The Health Plan from the style of the case; further, the remaining litigants in this matter need not include The Health Plan on any further documents served in this civil action, including pleadings or discovery. (Boone, Aaron) (Modified on 1/5/2022 to add party filers) (mkw). |
| 01/13/2022 | 181 | CERTIFICATE OF SERVICE by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar for Plaintiffs' Produced Documents Bates-Stamped CFain0002640 - CFain0004791. (Auvil, Walt) |
| 01/14/2022 | 182 | CERTIFICATE OF SERVICE by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar for Rule 26(a)(2) Expert Testimony Disclosures. (Auvil, Walt) |
| 01/14/2022 | 183 | CERTIFICATE OF SERVICE by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar for Rule 26(a)(2) Expert Testimony Disclosures. (Auvil, Walt) |
| 01/18/2022 | 184 | NOTICE by Jason Haught of Withdrawal of 162 MOTION by Jason Haught for Abstention. (Attachment: # 1 Exhibit)(Oxley, Perry) (Modified on 1/18/2022 to replace image for attachment #1) (mkw). |
| 01/18/2022 | 185 | ORDER denying as moot the 92 MOTION by The Health Plan of West Virginia, Inc. to Certify Appeal of the Court's June 28, 2021 63 Memorandum Opinion and Order. Signed by Judge Robert C. Chambers on 1/18/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 01/18/2022 | 186 | ORDER denying as moot Defendant Jason Haught's 162 MOTION for Abstention, pursuant to Defendant's 184 Notice of Withdrawal of the Motion. Signed by Judge Robert C. Chambers on 1/18/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 01/18/2022 | | NOTICE OF DOCKET CORRECTION re: 184 NOTICE OF WITHDRAWAL. Error: The image for attachment #1 contained personal identifiers. Correction: Replaced unredacted image for redacted image. (mkw) |
| 01/21/2022 | 187 | MOTION by Shawn Anderson, Christopher Fain, Leann James for Leave to File Second Amended Complaint. (Attachments: # 1 Exhibit - Proposed Second Amended Complaint, # 2 Declaration of Walt Auvil, # 3 Proposed Order)(Auvil, Walt) (Modified on 1/21/2022 to remove party filers) (mkw). |

| 01/21/2022 | 188 | MEMORANDUM by Shawn Anderson, Christopher Fain, Leann James in support of 187 MOTION by Shawn Anderson, Christopher Fain, Leann James for Leave to File Second Amended Complaint. (Auvil, Walt) (Modified on 1/21/2022 to remove party filers) (mkw). |
| --- | --- | --- |
| 02/01/2022 | 189 | CERTIFICATE OF SERVICE by William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Defendants' Fourth Supplemental Response to Plaintiffs' First Set of Requests for Production to Defendants. (David, Caleb) Modified on 2/2/2022 to correct party filers (jsa). |
| 02/01/2022 | 190 | CERTIFICATE OF SERVICE by William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Defendants' Second Supplemental Responses to Plaintiffs' Second Set of Request for Production of Documents and Things. (David, Caleb) Modified on 2/2/2022 to correct party filers (jsa). |
| 02/03/2022 | 191 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Defendants' Fifth Supplemental Response to Plaintiffs' First Set of Requests for Production. (Cyrus, Lou) |
| 02/03/2022 | 192 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Defendants' Third Supplemental Responses to Plaintiffs' Second Set of Requests for Production of Documents and Things. (Cyrus, Lou) |
| 02/09/2022 | 193 | JOINT MOTION by Christopher Fain, Shawn Anderson, Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Extension of Fact Discovery Deadline to April 29, 2022, re: 133 Order. (Bandy, Kimberly) (Modified on 2/10/2022 to add party filers and to add link to #133 order) (mkw). |
| 02/09/2022 | 194 | MEMORANDUM OF LAW by Christopher Fain, Shawn Anderson, Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services in support of 193 JOINT MOTION by Christopher Fain, Shawn Anderson, Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Extension of Fact Discovery Deadline to April 29, 2022. (Bandy, Kimberly) (Modified on 2/10/2022 to add party filers) (mkw). |
| 02/09/2022 | 195 | PROPOSED ORDER Order Granting Joint Motion for Extension of Fact Discovery Deadline by Christopher Fain, Shawn Anderson, Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services. (Bandy, Kimberly) (Modified on 2/10/2022 to add party filers) (mkw). |
| 02/10/2022 | 196 | ORDER GRANTING JOINT MOTION FOR EXTENSION OF FACT DISCOVERY DEADLINE granting the parties' 193 JOINT MOTION for Extension of Fact Discovery Deadline; the deadline for fact discovery in this case is 4/29/2022. Signed by Judge Robert C. Chambers on 2/10/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 02/10/2022 | 197 | JOINT MOTION by Leann James, Jason Haught to Stay Deadlines, re: 75 Scheduling Order. (Attachment: # 1 Proposed Order)(Oxley, Perry) (Modified on 2/11/2022 to add party filer) (mkw) |
| 02/11/2022 | 198 | ORDER GRANTING JOINT MOTION TO STAY DEADLINES granting the 197 JOINT MOTION by Defendant Jason Haught and Plaintiff Leanne James to Stay the |

| | | |
|---|---|---|
| | | deadlines in the Scheduling Order with respect to the claims of Plaintiff James against Defendant Haught; staying the fact discovery deadline for Defendant Haught and Plaintiff James until a ruling occurs on the Plaintiffs' 187 MOTION for Leave to File the Second Amended Complaint, as more fully set forth herein. Signed by Judge Robert C. Chambers on 2/11/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 02/15/2022 | 199 | JOINT MOTION by Cynthia Beane, William Crouch, Jason Haught, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Extend Defendants' Expert Witness Deadline to February 21, 2022. (Attachments: # 1 Exhibit A) (Salyers, Eric) |
| 02/15/2022 | 200 | PROPOSED ORDER Order Granting Joint Motion to Extend Defendants Expert Witness Deadline by Cynthia Beane, William Crouch, Jason Haught, West Virginia Department of Health and Human Resources, Bureau for Medical Services. (Salyers, Eric) |
| 02/15/2022 | 201 | CERTIFICATE OF SERVICE by Jason Haught for Rule 26(a)(2) Expert Testimony Disclosures. (Salyers, Eric) |
| 02/16/2022 | 202 | ORDER directing that Plaintiffs must respond by the end of the day today, 2/16/2022, raising good cause to deny Defendants' 199 JOINT MOTION to Extend Time to File Expert Witness Disclosure to 2/21/2022. Signed by Judge Robert C. Chambers on 2/16/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 02/16/2022 | 203 | OPPOSITION by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar in opposition to 199 JOINT MOTION by Cynthia Beane, William Crouch, Jason Haught, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Extend Defendants' Expert Witness Deadline to February 21, 2022. (Auvil, Walt) |
| 02/17/2022 | 204 | ORDER granting Defendants' 199 JOINT MOTION for an Extension of Defendants' Expert Witness Deadline to tomorrow, 2/18/2022; commensurately extending Plaintiffs' rebuttal deadline to 3/18/2022. Signed by Judge Robert C. Chambers on 2/17/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 02/18/2022 | 205 | NOTICE OF VIDEOTAPED 30(B)(6) DEPOSITION by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar of Frederick Lewis, Sarah Young, Secretary Crouch, Secretary Crouch, Commissioner Beane, Dr. Becker, Brandon Lewis, Jennifer Myers, Becky Manning on 2/25/2022, 3/11/2022, 3/17/2022, 3/18/2022, 3/29/2022, 3/30/2022, 4/4/2022, 4/8/2022, 4/12/2022 at 9:00 am, 9:00 am, 11:30 am, 12:30 pm, 9:00 am, 8:00 am, 10:00 am, 9:00 am, 10:00 am (Auvil, Walt) |
| 02/18/2022 | 206 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, Jason Haught, West Virginia Department of Health and Human Resources, Bureau for Medical Services for First Supplemental Rule 26(a)(2) Expert Witness Disclosure. (Salyers, Eric) |
| 02/22/2022 | 207 | AMENDED NOTICE OF VIDEOTAPED 30(b)(6) DEPOSITION by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar of Frederick Lewis, Sarah Young, Secretary Crouch, Secretary Crouch, Commissioner Beane, Dr. Becker, Brandon Lewis, Jennifer Myers, Becky Manning on 2/25/2022, 3/11/2022, 3/17/2022, 3/18/2022, 3/29/2022, 3/30/2022, 4/5/2022, 4/8/2022, 4/12/2022 at 9:00 am, 9:00 am, 11:30 am, 12:30 pm, 9:00 am, 8:00 am, 10:00 am, 9:00 am, 10:00 am (Auvil, Walt) |
| 02/24/2022 | 208 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Sixth Supplemental Response to Plaintiff's First Set of Requests for Production. (Bandy, Kimberly) |
| 02/24/2022 | 209 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia |

**JA27**

| | | Department of Health and Human Resources, Bureau for Medical Services for Third Supplemental Response to Second Set of Interrogatories. (Bandy, Kimberly) |
|---|---|---|
| 03/01/2022 | 210 | SECOND AMENDED NOTICE OF VIDEOTAPED 30(b)(6) DEPOSITION by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar of Sarah Young, Secretary Crouch, Secretary Crouch, Commissioner Beane, Dr. Becker, Frederick Lewis,Brandon Lewis, Jennifer Myers, Becky Manning, Brian Thompson on 3/11/2022, 3/17/2022, 3/18/2022, 3/29/2022, 3/30/2022, 4/4/2022, 4/5/2022, 4/8/2022, 4/12/2022, 4/13/2022 at 9:00 a.m., 11:30 a.m., 12:30 p.m., 9:00 a.m., 8:00 a.m., 9:00 a.m., 10:00 a.m., 9:00 a.m., 10:00 a.m., 9:00 a.m. (Auvil, Walt) |
| 03/09/2022 | 211 | NOTICE OF VIDEO DEPOSITION by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar of William Crouch on 3/17/2022 and 3/18/2022 at 11:30 a.m. and 12:30a.m. (Auvil, Walt) |
| 03/09/2022 | 212 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Defendant William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services's Fourth Supplemental Responses to Plaintiffs' Second Set of Requests for Production of Documents and Things. (Bandy, Kimberly) |
| 03/09/2022 | 213 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Defendants' Seventh Supplemental Response to Plaintiffs' First Set of Requests for Production to Defendants William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services. (Bandy, Kimberly) |
| 03/16/2022 | 214 | SUGGESTION OF DEATH by Jason Haught suggesting the death of Plaintiff, Leanne James, upon the record. (Attachment: # 1 Exhibit A)(Salyers, Eric) |
| 03/17/2022 | 215 | MOTION by Jason Haught for Relief as a Result of Suggestion of Death, re: 214 Suggestion of Death. (Attachment: # 1 Proposed Order)(Salyers, Eric) |
| 03/18/2022 | 216 | ORDER directing Plaintiffs to respond to the 215 MOTION by Jason Haught for Relief as a Result of Suggestion of Death by 3/24/2022. Signed by Judge Robert C. Chambers on 3/18/2022. (cc: attys; any unrepresented parties) (mkw) |
| 03/18/2022 | 217 | CERTIFICATE OF SERVICE by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar for Rule 26(a)(2) Expert Testimony Disclosures (Expert Rebuttal Report of Dr. Johanna Olson-Kennedy, M.D., M.S.). (Auvil, Walt) |
| 03/18/2022 | 218 | CERTIFICATE OF SERVICE by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar for Rule 26(a)(2) Expert Testimony Disclosures (Expert Disclosure Report of Dan H. Karasic, M.D.). (Auvil, Walt) |
| 03/18/2022 | 219 | CERTIFICATE OF SERVICE by Shawn Anderson, Christopher Fain, Leann James, Zachary Martell, Brian McNemar for Rule 26(a)(2) Expert Testimony Disclosures (Expert Rebuttal Report of Loren S. Schechter, M.D.). (Auvil, Walt) |
| 03/22/2022 | 220 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Eighth Supplemental Response to Plaintiff's First Set of Requests for Production. (Bandy, Kimberly) |
| 03/22/2022 | 221 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Nora Huppert updating name and/or firm information on behalf of Shawn Anderson, Christopher Fain. (Huppert, Nora) |
| 03/23/2022 | 222 | RESPONSE by Shawn Anderson, Christopher Fain to 215 MOTION by Jason Haught for |

**JA28**

| | | Relief as a Result of Suggestion of Death. (Attachment: # 1 Declaration of Tammy St. Clair)(Auvil, Walt) (Modified on 3/23/2022 to remove link to #216 order and add link to #215 motion) (mkw). |
|---|---|---|
| 03/23/2022 | 223 | NOTICE OF DEPOSITION Duces Tecum of Loren S. Schechter, M.D by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services. (David, Caleb) |
| 03/25/2022 | 224 | PROPOSED ORDER Order Granting Defendant Jason Haught's Motion for Relief as a Result of Suggestion of Death by Jason Haught. (Salyers, Eric) |
| 03/25/2022 | 225 | ORDER granting Defendant Jason Haught's 215 MOTION for Relief as a Result of Suggestion of Death; denying as moot Plaintiffs' 187 MOTION for Leave to File Second Amended Complaint; dismissing Ms. James' existing equal protection claim found in the 140 First Amended Complaint; directing the Clerk to remove Plaintiff Leanne James from the style of the case; further directing that Defendant Haught be DISMISSED from this action without prejudice. Signed by Judge Robert C. Chambers on 3/25/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 03/25/2022 | 226 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Second Supplemental Response to Plaintiff's First Set of Interrogatories. (Bandy, Kimberly) |
| 03/25/2022 | 227 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Ninth Supplemental Response to Plaintiff's First Set of Requests for Production. (Bandy, Kimberly) |
| 03/31/2022 | 228 | STIPULATION OF PLAINTIFFS AND DEFENDANTS by Shawn Anderson, Christopher Fain, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services; the parties enter this stipulation to clarify the testimony that Dr. Becker provided in his deposition testimony on certain topics in this case as an organizational representative for the Department of Health and Human Resources, Bureau of Medical Services, pursuant to Federal Rule of Civil Procedure 30(b)(6), as more fully set forth herein. (Auvil, Walt) (Modified on 4/1/2022 to provide party filers) (mkw) |
| 04/01/2022 | 229 | CERTIFICATE OF SERVICE by Shawn Anderson, Christopher Fain for Certificate of Service for Subpoena to Testify at a Deposition in a Civil Action to Dr. Stephen Levine. (Auvil, Walt) |
| 04/06/2022 | 230 | NOTICE OF VIDEOTAPED DEPOSITION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services of Christopher Fain on 04/28/22 at 10:00 am (Cyrus, Lou) |
| 04/06/2022 | 231 | NOTICE OF VIDEOTAPED DEPOSITION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services of Shawn Anderson a/k/a Shauntae Anderson on 04/22/22 at 10:00 am (Cyrus, Lou) |
| 04/07/2022 | 232 | NOTICE OF VIDEOTAPED DEPOSITION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services of Dr. Johanna Olson-Kennedy, M.D., M.S. on April 25, 2022 at 11:30 A.M. EDT (David, Caleb) |
| 04/07/2022 | 233 | NOTICE OF VIDEOTAPED DEPOSITION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services of Dan H. Karasic, M.D. on April 15, 2022 at 12:00 P.M. EDT (David, Caleb) |
| 04/12/2022 | 234 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia |

| | | |
|---|---|---|
| | | Department of Health and Human Resources, Bureau for Medical Services for Tenth Supplemental Response to Plaintiff's First Set of Requests for Production. (Bandy, Kimberly) |
| 04/20/2022 | 235 | AMENDED NOTICE OF VIDEOTAPED DEPOSITION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services of Christopher Fain on 04/28/22 at 10:00 am (Cyrus, Lou) |
| 04/20/2022 | 236 | AMENDED NOTICE OF VIDEOTAPED DEPOSITION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services of Shawn Anderson a/k/a Shauntae Anderson on 04/22/22 at 10:00 am (Cyrus, Lou) |
| 04/20/2022 | 237 | AMENDED NOTICE OF VIDEOTAPED DEPOSITION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services of Dr. Johanna Olson-Kennedy, M.D., M.S on 04/25/22 at 11:30 a.m. (EST) (8:30 a.m. PST) (Cyrus, Lou) |
| 04/21/2022 | 238 | JOINT MOTION by Shawn Anderson, Christopher Fain, Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Continue Scheduling Conference. (Attachment: # 1 Certificate of Service) (Auvil, Walt) (Modified on 4/21/2022 to remove party filers and to add party filers) (mkw). |
| 04/22/2022 | 239 | ORDER granting the parties' 238 JOINT MOTION to Continue Scheduling Conference; canceling the 5/16/2022 Scheduling Conference and scheduling a case management conference for 7/11/2022 at 11:00 a.m.; Counsel will appear in person; the Court will determine the subject matter of the conference at a later date. Signed by Judge Robert C. Chambers on 4/22/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 04/29/2022 | 240 | CERTIFICATE OF SERVICE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Eleventh Supplemental Response to Plaintiff's First Set of Requests for Production. (Bandy, Kimberly) |
| 05/06/2022 | 241 | NOTICE AND UNOPPOSED MOTION by Shawn Anderson, Christopher Fain to Amend Case Caption. (Attachment: # 1 Proposed Order Granting Unopposed Motion to Amend Case Caption)(Auvil, Walt) |
| 05/09/2022 | 242 | ORDER GRANTING UNOPPOSED MOTION TO AMEND CASE CAPTION granting Plaintiffs' 241 UNOPPOSED MOTION to Amend Case Caption; directing that the caption in this matter shall now read, as more fully set forth herein. Signed by Judge Robert C. Chambers on 5/9/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 05/30/2022 | 243 | MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Exceed Page Limit for Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment. (David, Caleb) |
| 05/30/2022 | 244 | PROPOSED ORDER Order Granting Defendants' Motion to Exceed Page Limit by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services. (David, Caleb) |
| 05/31/2022 | 245 | JOINT MOTION by Shauntae Anderson, Christopher Fain, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services to File Exhibits Under Seal. (Attachments: # 1 Exhibit A - Redacted Karasic Expert Report, # 2 Exhibit B - Redacted Myers Affidavit, # 3 Proposed Order)(Auvil, Walt) (Modified on 5/31/2022 to add party filers) |

**JA30**

| 05/31/2022 | 246 | MEMORANDUM by Shauntae Anderson, Christopher Fain, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services in support of 245 JOINT MOTION by Shauntae Anderson, Christopher Fain, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services to File Exhibits Under Seal. (Auvil, Walt) (Modified on 5/31/2022 to add party filers) (mkw) |
|---|---|---|
| 05/31/2022 | 247 | ORDER GRANTING DEFENDANTS' MOTION TO EXCEED PAGE LIMIT granting Defendants' 243 MOTION to Exceed Page Limit; Defendants are permitted to file a Memorandum not to exceed twenty-five (25) pages; Plaintiffs are permitted to file a response Memorandum not to exceed twenty-five (25) pages. Signed by Judge Robert C. Chambers on 5/31/2022. (cc: attys; any unrepresented party) (mkw) |
| 05/31/2022 | 248 | MOTION by Shauntae Anderson, Christopher Fain for Class Certification Pursuant to Fed. R. Civ. P. 23. (Attachments: # 1 Affidavit of Walt Auvil, # 2 Affidavit of Nicole J. Schladt, # 3 Exhibit A to Schladt Decl. -- Nichols Kaster firm resume, # 4 Affidavit of Avatara Smith-Carrington, # 5 Exhibit A to Smith-Carrington Decl. -- Smith-Carrington C.V., # 6 Exhibit B to Smith-Carrington Decl. -- Borelli C.V., # 7 Exhibit C to Smith-Carrington Decl. -- Charles C.V., # 8 Exhibit D to Smith-Carrington Decl. -- Buchert C.V., # 9 Exhibit E to Smith-Carrington Decl. -- Huppert C.V., # 10 Proposed Order) (Auvil, Walt) |
| 05/31/2022 | 249 | MEMORANDUM by Shauntae Anderson, Christopher Fain in support of 248 MOTION by Shauntae Anderson, Christopher Fain for Class Certification Pursuant to Fed. R. Civ. P. 23. (Auvil, Walt) |
| 05/31/2022 | 250 | MOTION by Shauntae Anderson, Christopher Fain for Summary Judgment. (Attachments: # 1 Affidavit of Christopher Fain, # 2 Affidavit of Shauntae Anderson, # 3 Affidavit of Walt Auvil, # 4 Exhibit 1 -- Defs Resp. to First RFAs, # 5 Exhibit 2 -- Defs Resp. to First Rogs, # 6 Exhibit 3 -- Defs Resp. to Second Rogs, # 7 Exhibit 4 -- Defs First Supp. Resp. to First Rogs, # 8 Exhibit 5 -- Defs Second Supp. Resp. to Second Rogs, # 9 Exhibit 5(a) -- Defs. Second Suppl. Respon. to Pls. Second Rogs, # 10 Exhibit 6 -- Fain Dep. Tr., # 11 Exhibit 7 -- Anderson Dep. Tr., # 12 Exhibit 8 -- Crouch Dep. Tr., # 13 Exhibit 9 -- Beane Dep. Tr., # 14 Exhibit 10 -- Becker Dep. Tr., # 15 Exhibit 11 -- Lewis Dep. Tr., # 16 Exhibit 12 -- Manning Dep. Tr., # 17 Exhibit 13 -- Thompson Dep. Tr., # 18 Exhibit 14 -- Young Dep. Tr., # 19 Exhibit 15 -- Karasic Dep. Tr., # 20 Exhibit 16 -- Karasic Expert Rep., # 21 Exhibit 17 -- Karasic Rebuttal Rep., # 22 Exhibit 18 -- Schechter Dep. Tr., # 23 Exhibit 19 -- Schechter Expert Rep., # 24 Exhibit 20 -- Schechter Rebuttal Rep., # 25 Exhibit 21 -- Olson-Kennedy Dep. Tr., # 26 Exhibit 22 -- Olson-Kennedy Rebuttal Rep., # 27 Exhibit 23 -- BMS Manual Ch. 100, # 28 Exhibit 24 -- BMS Manual Ch. 519, # 29 Exhibit 25 -- Composite -- Health Plans, # 30 Exhibit 26 -- Composite -- InterQual Criteria, # 31 Exhibit 27 -- Medicaid 101, # 32 Exhibit 28 -- Medicaid.gov printout, # 33 Exhibit 29 -- BMS Contract with Aetna, # 34 Exhibit 30 -- BMS Contract with UniCare, # 35 Exhibit 31 -- BMS Contract with The Health Plan, # 36 Exhibit 32 -- Email dated Oct. 13, 2020, # 37 Exhibit 33 -- Composite on Cost of Care)(Auvil, Walt) |
| 05/31/2022 | 251 | MEMORANDUM OF LAW by Shauntae Anderson, Christopher Fain in support of 250 MOTION by Shauntae Anderson, Christopher Fain for Summary Judgment. (Auvil, Walt) |
| 05/31/2022 | 252 | MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Summary Judgment. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15-A, # 16 Exhibit 15-B, # 17 Exhibit 15- |

**JA31**

| | | |
|---|---|---|
| | | C, # <u>18</u> Exhibit 16, # <u>19</u> Exhibit 17, # <u>20</u> Exhibit 18-A, # <u>21</u> Exhibit 18-B, # <u>22</u> Exhibit 18-C)(Bandy, Kimberly) |
| 05/31/2022 | <u>253</u> | MEMORANDUM OF LAW by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services in support of <u>252</u> MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Summary Judgment. (Bandy, Kimberly) |
| 05/31/2022 | <u>254</u> | MOTION by Shauntae Anderson, Christopher Fain to Exclude Expert Testimony of Stephen B. Levine M.D. (Attachments: # <u>1</u> Affidavit of Carl Charles, # <u>2</u> Exhibit A -- Dr. Levine Expert Disclosure, # <u>3</u> Exhibit B -- Dr. Levine Fain Dep. Tr., # <u>4</u> Exhibit C -- Dr. Levine Kadel Dep. Tr., # <u>5</u> Exhibit D -- Soneeya Bench Trial Day 1 Tr., # <u>6</u> Exhibit E -- Beane Dep. Tr., # <u>7</u> Exhibit F -- Dr. Levine Claire Dep. Tr., # <u>8</u> Exhibit G -- Dahlen Article, # <u>9</u> Exhibit H -- Dr. Bowers Statement, # <u>10</u> Exhibit I -- Cass Review Website About Page, # <u>11</u> Exhibit J -- Dr. Olson Kennedy Rebuttal Rep., # <u>12</u> Exhibit K -- Dhejne Thesis Excerpt, # <u>13</u> Exhibit L -- Dhejne Article, # <u>14</u> Exhibit M -- Simonsen Article, # <u>15</u> Exhibit N -- DSM V Excerpt, # <u>16</u> Exhibit O -- Dr. Karasic Dep. Tr., # <u>17</u> Exhibit P-- Defs. Interqual Sheets, # <u>18</u> Exhibit Q -- Correction to Littman Article, # <u>19</u> Exhibit R -- Bauer Article, # <u>20</u> Exhibit S -- Defs. Resp. to Pls. Second Set of Interrogs., # <u>21</u> Exhibit T -- Dr. Levine B.P.J. Dep. Tr., # <u>22</u> Proposed Order)(Auvil, Walt) |
| 05/31/2022 | <u>255</u> | MEMORANDUM OF LAW by Shauntae Anderson, Christopher Fain in support of <u>254</u> MOTION by Shauntae Anderson, Christopher Fain to Exclude Expert Testimony of Stephen B. Levine M.D. (Auvil, Walt) |
| 06/01/2022 | <u>256</u> | ORDER GRANTING JOINT MOTION TO FILE EXHIBITS UNDER SEAL granting the parties' <u>245</u> JOINT MOTION to File Exhibits Under Seal; directing that paragraphs 47-93 of Exhibit A and paragraphs 3(a)-(v) and 5(a)-(q) of Exhibit B to the Parties' motion are ACCEPTED UNDER SEAL. Signed by Judge Robert C. Chambers on 6/1/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 06/01/2022 | <u>257</u> | EXHIBIT A - Paragraphs 47-93 and EXHIBIT B - Paragraphs 3(a)-(v) and 5(a)-(q) filed by Shauntae Anderson, Cynthia Beane, William Crouch, Christopher Fain, West Virginia Department of Health and Human Resources, Bureau for Medical Services; filed under seal pursuant to the <u>256</u> Order. (Attachment: # <u>1</u> Exhibit B) (jsa) |
| 06/10/2022 | <u>258</u> | CORRECTED STIPULATION OF PLAINTIFFS AND DEFENDANTS by Christopher Fain, Shauntae Anderson, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for Medical Services; the parties correct and supersede the <u>228</u> Stipulation. (Bandy, Kimberly) (Modified on 6/10/2022 to add party filers) (mkw). |
| 06/14/2022 | <u>259</u> | RESPONSE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services in opposition to <u>248</u> MOTION by Shauntae Anderson, Christopher Fain for Class Certification Pursuant to Fed. R. Civ. P. 23. (Green, Roberta) (Modified on 6/15/2022 to remove link to #249 memorandum) (mkw). |
| 06/14/2022 | <u>260</u> | RESPONSE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services in opposition to <u>254</u> MOTION by Shauntae Anderson, Christopher Fain to Exclude Expert Testimony of Stephen B. Levine M.D. (Attachment: # <u>1</u> Exhibit A)(David, Caleb) (Modified on 6/15/2022 to remove link to #255 memorandum) (mkw). |
| 06/14/2022 | <u>261</u> | RESPONSE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services in opposition to <u>250</u> MOTION by |

| | | |
|---|---|---|
| | | Shauntae Anderson, Christopher Fain for Summary Judgment. (Attachments: # 1 Exhibit 19-A, # 2 Exhibit 19-B)(Bandy, Kimberly) (Modified on 6/15/2022 to remove link to #251 memorandum and to replace image for attachment #2) (mkw). |
| 06/14/2022 | 262 | OPPOSITION by Shauntae Anderson, Christopher Fain to 252 MOTION by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services for Summary Judgment. (Attachments: # 1 Affidavit of Walt Auvil (Supplemental), # 2 Exhibit 34 InterQual, Male Mammoplasty, # 3 Exhibit 35 InterQual, Adolescent Mammoplasty, # 4 Exhibit 36 Anderson Dep. Tr. Excerpt, # 5 Exhibit 37 Kadel v. Folwell, slip op.)(Auvil, Walt) |
| 06/15/2022 | | NOTICE OF DOCKET CORRECTION re: 261 RESPONSE. Error: The image for attachment #2 was missing the pages of the exhibit. Correction: Replaced incorrect image with correct image. (mkw) |
| 06/21/2022 | 263 | REPLY by Shauntae Anderson, Christopher Fain to 259 Response In Opposition. (Auvil, Walt) |
| 06/21/2022 | 264 | REPLY by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services to Plaintiffs' 262 Opposition. (Bandy, Kimberly) |
| 06/21/2022 | 265 | REPLY MEMORANDUM by Shauntae Anderson, Christopher Fain to 261 Response In Opposition. (Auvil, Walt) |
| 06/21/2022 | 266 | REPLY MEMORANDUM OF LAW by Shauntae Anderson, Christopher Fain to 260 Response In Opposition. (Attachments: # 1 Declaration of Carl S. Charles, # 2 Exhibit U - Olson-Kennedy Deposition Transcript)(Auvil, Walt) |
| 06/27/2022 | 267 | ORDER canceling the current hearing set for 7/11/2022 and rescheduling the hearing for 7/13/2022 at 1 p.m. in Huntington; the Court intends to hear argument on the cross-motions for summary judgment at 1 p.m. and will hear argument on the motion for class certification immediately thereafter; granting permission for Plaintiffs' attorney to appear virtually to argue the motion for class certification. Signed by Judge Robert C. Chambers on 6/27/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 07/13/2022 | 268 | CASE MANAGEMENT CONFERENCE held by Judge Robert C. Chambers on 7/13/2022; Court Reporter: Kathy Swinhart. (trj) |
| 07/27/2022 | 269 | TRANSCRIPT OF PROCEEDINGS of Case Management Conference held on July 13, 2022, before Judge Robert C. Chambers. Court Reporter Kathy Swinhart, Telephone number 304-528-7583. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due 8/8/2022. Redaction Request due 8/17/2022. Redacted Transcript Deadline set for 8/29/2022. Release of Transcript Restriction set for 10/25/2022. (kls) |
| 08/02/2022 | 270 | MEMORANDUM OPINION AND ORDER granting Plaintiffs' 248 MOTION for Class Certification. Signed by Judge Robert C. Chambers on 8/2/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 08/02/2022 | 271 | MEMORANDUM OPINION AND ORDER granting Plaintiffs' 250 MOTION for Summary Judgment and denying Defendants' 252 MOTION for Summary Judgment; denying as moot the 254 MOTION to Exclude Expert Testimony of Stephen B. Levine, M.D. Signed by Judge Robert C. Chambers on 8/2/2022. (cc: counsel of record; any unrepresented parties) (jsa) |
| 08/17/2022 | 272 | JOINT STATUS REPORT by Shauntae Anderson, Christopher Fain, William Crouch, Cynthia Beane, West Virginia Department of Health and Human Resources, Bureau for |

| | | Medical Services. (Attachment: # 1 Proposed Judgment Order)(Auvil, Walt) (Modified on 8/17/2022 to add party filers) (mkw). |
|---|---|---|
| 08/17/2022 | 273 | JUDGMENT ORDER directing that judgment is entered in favor of plaintiffs Christopher Fain, Shauntae Anderson, and the certified Rule 23 Class against defendants William Crouch, Cynthia Beane, and the West Virginia Department of Health and Human Resources, Bureau for Medical Services (the State actors and agencies responsible for administering the Medicaid Program in West Virginia) declaring that the West Virginia State Medicaid Program's exclusion of gender-confirming surgical treatment for transgender West Virginia Medicaid participants violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116; the Medicaid Act's Availability Requirement, 42 U.S.C. § 1396a(a)(10)(A); and the Medicaid Act's Comparability Requirement, 42 U.S.C. § 1396a(a)(10)(B); further directing that defendants William Crouch, Cynthia Beane, and the West Virginia Department of Health and Human Resources, Bureau for Medical Services are PERMANENTLY ENJOINED from enforcing or applying the exclusion; further directing that plaintiffs shall have up to and including 45 days after the date of entry of this judgment to file a bill of costs, and a motion for attorney's fees and costs; further directing that the court retains jurisdiction to enforce the judgment. Signed by Judge Robert C. Chambers on 8/17/2022. (cc: attys; any unrepresented party) (mkw) |
| 08/17/2022 | 274 | TRANSMITTED CERTIFIED COPY of 273 Judgment Order to attorneys and any unrepresented party. (mkw) |
| 08/26/2022 | 275 | LETTER to Clerk of Court, from Brianna Ann Sunshine (non-party) dated 8/23/2022, re: requesting docket sheet and documents. (kew) |
| 08/31/2022 | 276 | LETTER to Brianna Ann Sunshine, from Rory L. Perry II dated 8/31/2022, re: 275 letter requesting docket sheet and documents. (klc) |
| 08/31/2022 | 277 | NOTICE OF APPEAL WITH FEE PAID by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services as to 270 Memorandum Opinion and Order, 271 Memorandum Opinion and Order and 273 Judgment Order. Filing Fee $505. Receipt # AWVSDC-8261232. (Bandy, Kimberly) |
| 09/01/2022 | 278 | TRANSMITTAL OF NOTICE OF APPEAL TO 4CCA via APPEAL TRANSMITTAL SHEET re: 277 Notice of Appeal to the 4CCA of 270 Memorandum Opinion and Order, 271 Memorandum Opinion and Order and 273 Judgment Order. (cla) |
| 09/06/2022 | 279 | NOTICE OF APPELLATE CASE OPENING BY 4CCA re: 277 Notice of Appeal to the 4CCA, in 4CCA Case No. 22-1927. Case Manager: Richard H. Sewell. (jsa) |
| 09/06/2022 | 280 | LETTER to Clerk of Court, from Brianna Ann Sunshine (non-party) dated 9/1/2022, re: requesting documents from docket sheet. (kew) |
| 09/08/2022 | 281 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Avatara Antoinette Smith-Carrington updating name and/or firm information on behalf of Shauntae Anderson, Christopher Fain. (Smith-Carrington, Avatara) |
| 09/12/2022 | 282 | LETTER to Brianna Ann Sunshine, from Rory L. Perry II dated 9/12/2022, re: 280 letter requesting documents from docket sheet. (klc) |
| 09/30/2022 | 283 | PROPOSED BILL OF COSTS by Shauntae Anderson, Christopher Fain (Attachments: # 1 Exhibit A - Itemization of Transcript Costs, # 2 Exhibit B - Transcript Invoices)(Auvil, Walt) |
| 09/30/2022 | 284 | MOTION by Shauntae Anderson, Christopher Fain for Attorneys' Fees and Expenses. (Attachments: # 1 Affidavit of Avatara Smith-Carrington, # 2 Exhibit A to Smith- |

**JA34**

| | | |
|---|---|---|
| | | Carrington Decl. Smith-Carrington CV, # 3 Exhibit B to Smith-Carrington Decl. Smith-Carrington Time Record, # 4 Exhibit C to Smith Carrington Decl. Borelli Time Record, # 5 Exhibit D to Smith-Carrington Decl. Charles Time Record, # 6 Exhibit E to Smith-Carrington Decl. Buchert Time Record, # 7 Exhibit F to Smith-Carrington Decl. Huppert Time Record, # 8 Exhibit G to Smith-Carrington Decl. Clanton-Lockhart Time Record, # 9 Exhibit H to Smith-Carrington Decl. Itemized Costs, # 10 Affidavit of Anna Prakash, # 11 Exhibit A to Prakash Decl. Nichols Kaster Time Record, # 12 Affidavit of Walt Auvil, # 13 Exhibit A to Auvil Decl. Employment Law Center Time Record, # 14 Affidavit of Amy C. Crossan, # 15 Affidavit of Michael J. Farrell, # 16 Proposed Order)(Auvil, Walt) |
| 09/30/2022 | 285 | MEMORANDUM OF LAW by Shauntae Anderson, Christopher Fain in support of 284 MOTION by Shauntae Anderson, Christopher Fain for Attorneys' Fees and Expenses. (Auvil, Walt) (Modified on 9/30/2022 to remove link to #283 bill of costs) (mkw). |
| 10/14/2022 | 286 | RESPONSE by Cynthia Beane, William Crouch, West Virginia Department of Health and Human Resources, Bureau for Medical Services in opposition to 284 MOTION by Shauntae Anderson, Christopher Fain for Attorneys' Fees and Expenses (David, Caleb) |

**JA35**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| CHRISTOPHER FAIN; ZACHARY MARTELL; and BRIAN MCNEMAR, individually and on behalf of all others similarly situated, | Civil Action No. 3:20-cv-00740 |
| *Plaintiffs,* | **CLASS ACTION COMPLAINT** |
| v. | |
| WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; CYNTHIA BEANE, in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES; TED CHEATHAM, in his official capacity as Director of the West Virginia Public Employees Insurance Agency; and THE HEALTH PLAN OF WEST VIRGINIA, INC., | |
| *Defendants.* | |

## INTRODUCTION

1.      This case is about discrimination in health care and employment.  Plaintiffs bring this suit to challenge discrimination under West Virginia state health insurance plans that deprive transgender people of essential, and sometimes life-saving, health care.  These state health plans facially, and categorically, exclude coverage for health care that transgender people require.  The exclusions in the state health plans described in paragraphs 61 and 64 use antiquated and improper language, but their targeting of transgender people on explicitly sex-based terms is unmistakable.  The exclusions all categorically deny transgender people coverage for gender-confirming care.  Gender-confirming care includes, but is not limited to, counseling, hormone

-1-

replacement therapy, and surgical care. Accordingly, as used herein, gender-confirming care includes the care denied pursuant to each of those exclusions. While cisgender people[1] receive coverage for those forms of health care as a matter of course, transgender people are targeted for discrimination by exclusions in the state health plans. This kind of discrimination is unlawful under federal constitutional and statutory guarantees of freedom from discrimination based on sex and transgender status. Because these exclusions constitute a sweeping, uniform denial of care for all transgender people, Plaintiffs bring this class action suit on behalf of themselves and those similarly situated.

2.      Defendants violate the law in two ways. First, Defendants discriminate against low-income transgender people who are Medicaid participants. Inflicting grave harm on a particularly vulnerable group of people, Defendants deny low-income transgender Medicaid participants the same health coverage others receive, targeting them for discrimination based on their sex and transgender status. This care is for the treatment of gender dysphoria—the clinically significant distress that can result from the dissonance between an individual's gender identity and sex assigned at birth—and is also known as gender-confirming care. Defendants categorically deny gender-confirming care to transgender Medicaid participants, even though it is medically necessary and can be life-saving, while routinely providing cisgender participants the same treatments.

3.      Second, Defendants discriminate against state employees and their dependents, by denying coverage for gender-confirming care, even though cisgender people receive the same kinds of treatments as a matter of course. As part of compensation for employment, the State of West Virginia provides health care coverage for employees and their eligible dependents through

---

[1] "Cisgender" refers to people who are not transgender.

2

the Public Employees Insurance Agency ("PEIA"). All available health plans deny coverage for
gender-confirming care, and unlawfully discriminate against people who either are transgender
or have transgender family members who depend on them for health care coverage. In other
words, Defendants deny equal compensation for equal work to employees who are transgender
or have transgender dependents, and harm employees' transgender family members who depend
on them for health care.

4.     The blanket exclusions of gender-confirming care are stated expressly in the
health plans offered to Medicaid participants, and to state employees. While phrased in slightly
different terms across the plans, the exclusions all single out transgender people for differential
treatment and rely explicitly on sex-based considerations. Plaintiffs challenge the exclusions,
and any other source of law, regulation, policy, or practice that denies gender-confirming care to
West Virginia Medicaid participants, state employees, and eligible dependents of state
employees (references herein to the "Exclusions" refer collectively to all such exclusions for
gender-confirming care).

5.     The Exclusions fly in the face of the medical consensus that gender-confirming
care is the only safe and effective medical treatment for gender dysphoria, and wholly disregard
the harms of denying transgender people access to critical health care. The Exclusions
unlawfully deny medically necessary care to transgender Medicaid participants, and state
employees and their dependents. The state's coverage of the same treatments to address health
conditions other than gender dysphoria underscores that West Virginia treats its transgender
Medicaid and state health plan participants in an unfair and discriminatory manner. In doing so,
Defendants expose a particularly vulnerable group to significant and avoidable harms to their

3

health and wellbeing, and inflict needless suffering and financial hardship in violation of the U.S. Constitution and federal law.

6.      Plaintiffs bring this lawsuit on behalf of themselves and other similarly situated Medicaid participants, state employees, and eligible dependents of state employees seeking a declaratory judgment that the Exclusions violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, Section 1557 ("Section 1557") of the Patient Protection and Affordable Care Act ("ACA" or "Affordable Care Act"), 42 U.S.C. § 18116, and the comparability and availability requirements of the federal Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A)-(B); preliminary and permanent injunctions barring Defendants from enforcing the Exclusions to deny gender-confirming care; reasonable attorneys' fees and costs; and such other relief as the Court deems just and equitable.

7.      In their individual capacities, the named Plaintiffs also seek compensatory and consequential damages for the injuries they have suffered as a result of Defendants' unlawful conduct.

## PARTIES

8.      Plaintiff Christopher Fain resides in Huntington, West Virginia. Mr. Fain is a 44-year-old transgender man. Mr. Fain has been enrolled for Medicaid coverage at all times material to this complaint.

9.      Plaintiff Zachary Martell resides in Barboursville, West Virginia. Mr. Martell is a 33-year-old transgender man. Mr. Martell is married to Brian McNemar, a state employee. As the legal spouse of Mr. McNemar, Mr. Martell is an eligible dependent and has been enrolled for state employee health coverage through Mr. McNemar at all times material to this complaint.

4

**JA39**

10.     Plaintiff Brian McNemar resides in Barboursville, West Virginia.  Mr. McNemar is a 37-year-old cisgender man.  Mr. McNemar is a state employee who works at the Mildred Mitchell Bateman Hospital as an Accountant Auditor.  Mr. McNemar is married to Mr. Martell.

11.     Defendant William Crouch is sued in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources.  As Cabinet Secretary, Mr. Crouch is responsible for "[d]evelop[ing] a managed care system to monitor the services provided by the [M]edicaid program to individual clients."  W. Va. Code § 9-2-9(a)(1).  Mr. Crouch is authorized to "[p]repare and submit state plans which … meet the requirements of federal laws, rules governing federal-state assistance."  W. Va. Code § 9-2-6(12).  Additionally, Mr. Crouch is responsible for preparing recommendations "to be submitted to the joint committee on government and finance," and in developing these recommendations Mr. Crouch may "[r]eview … [M]edicaid services which are optional under federal [M]edicaid law and identif[y] … services to be retained, reduced or eliminated."  W. Va. Code § 9-2-9(b)(1).  Mr. Crouch exercises his authority as Cabinet Secretary to ensure that gender-confirming care is designated as an excluded service in the state Medicaid program—targeting transgender Medicaid participants for discriminatory treatment on the basis of their sex and transgender status.  Defendant Crouch is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this complaint.

12.     Defendant Cynthia Beane is sued in her official capacity as Commissioner for the Bureau for Medical Services.  As Commissioner, Ms. Beane's duties include managing and overseeing project development, implementation of health policies, and assuring compliance with federal laws and regulations.  Ms. Beane also led policy implementation for changes to bring West Virginia's Medicaid coverage into compliance with the Affordable Care Act.

5

**JA40**

Despite having the authority to implement health policies to assure compliance with federal law, including the Affordable Care Act, Ms. Beane exercises her authority to ensure that gender-confirming care is designated as a noncovered service for Medicaid participants, thus targeting transgender people for discriminatory treatment on the basis of their sex and transgender status. Defendant Beane is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this complaint.

13.     Defendant West Virginia Department of Health and Human Resources, Bureau for Medical Services ("BMS") is the "single state agency" charged with the responsibility of administering "the [M]edicaid program" in West Virginia. W. Va. Code §§ 9-1-2(n), 9-2-13(a)(3). BMS establishes eligibility standards for Medicaid providers, determines benefits, sets payment rates, and reimburses providers. Additionally, BMS maintains the West Virginia Medicaid State Plan and files amendments to the plan with the appropriate regulatory authorities. West Virginia Medicaid is jointly funded by the state of West Virginia and the federal government. BMS is a recipient of federal funds from the U.S. Department of Health and Human Services ("HHS"), including Medicaid funding. The federal assistance BMS receives makes BMS a "covered entity" subject to the nondiscrimination requirements of Section 1557 of the ACA, which prohibit discrimination on the basis of sex and other protected characteristics.

14.     Defendant Ted Cheatham is sued in his official capacity as Director of PEIA. As Director, Mr. Cheatham is the Chief Administrative Officer of PEIA and is responsible for the "administration and management of the Public Employees Insurance Agency." W. Va. Code § 5-16-3(c). This responsibility includes, but is not limited to, "manag[ing] on a day-to-day basis the group insurance plans" for state employees through "administrative contracting, studies, analyses and audits, ... provider negotiations, provider contracting and payment, *designation of*

6

**JA41**

*covered and noncovered services*, [and] offering of additional coverage options or cost containment incentives." *Id.* (emphasis added). Mr. Cheatham has authority to "make all rules necessary to effectuate" his responsibilities under the statute. *Id.* Mr. Cheatham exercises this authority to ensure that gender-confirming care is designated as a noncovered service in each and every health plan available to state employees and their dependents, thus targeting them for discriminatory treatment on the basis of their, or their dependent's, sex and transgender status. Defendant Cheatham is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this complaint.

15.     Defendant The Health Plan of West Virginia, Inc. ("The Health Plan") was established in 1979 through provisions under the federal Health Maintenance Organization ("HMO") Act, 42 U.S.C. §300e, et seq. The Health Plan is a federally qualified and state-certified 501(c)(4) not-for-profit HMO. The Health Plan is West Virginia's largest HMO, with more than 200,000 members, and its service area encompasses all 55 counties in West Virginia. Many of The Health Plan's members, including Mr. Martell and Mr. McNemar, are enrolled through their state employers; others are enrolled through state Medicaid and Medicare Advantage plans. The Health Plan is offered through PEIA as a health insurance option for qualifying state employees. More than 15,000 of The Health Plan's members are state employees who have obtained coverage through the PEIA. The Health Plan receives federal financial assistance and is a "covered entity" for purposes of Section 1557 of the ACA.

16.     Defendants, through their respective duties and obligations, are responsible for the discriminatory Exclusions of gender-confirming health care to state employees and dependents who are transgender. Each Defendant, and those subject to their direction, supervision, or control, has or intentionally will perform, participate in, aid and/or abet in some manner the acts

7

**JA42**

alleged in this complaint, has or will proximately cause the harm alleged herein, and has or will continue to injure the plaintiffs irreparably if not enjoined. Accordingly, the relief requested herein is sought against each Defendant and their successors, as well as all persons under their supervision, direction, or control, including, but not limited to, their officers, employees, and agents.

## JURISDICTION AND VENUE

17.     This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution; Section 1557 of the ACA, 42 U.S.C. § 18116; and the Medicaid Act's availability and comparability requirements, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(10)(B).

18.     The Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States; and pursuant to 28 U.S.C. § 1343(a)(3) and (4) because the action is brought to redress deprivations, under color of state authority, of rights, privileges, and immunities secured by the U.S. Constitution and seeks to secure damages and equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights.

19.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

20.     Under 28 U.S.C. § 1391(b)(1) and (2), venue is proper in the Southern District of West Virginia because Defendants reside there and all Defendants are residents of West Virginia in which the district is located; and in this district and division because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred herein.

8

**JA43**

21. This Court has personal jurisdiction over Defendants because they are all domiciled within the State of West Virginia.

## FACTS

### A. Sex, Gender Identity, and Gender Dysphoria

22. Every individual's sex is multifaceted, and comprised of a number of characteristics, including but not limited to chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and most importantly, gender identity.

23. Gender identity is a person's internal sense of their sex. It is an essential element of human identity that everyone possesses, and a well-established concept in medicine. Gender identity is innate, immutable, and has biological underpinnings, such as the sex differentiation of the brain that takes place during prenatal development.

24. For everyone, gender identity is the most important determinant of a person's sex and a fundamental component of human identity.

25. A person's sex is generally assigned at birth based solely on a visual assessment of external genitalia at the time of birth. External genitalia are only one of several sex-related characteristics and are not always indicative of a person's sex.

26. For most people, these sex-related characteristics are all aligned, and the visual assessment performed at birth serves as an accurate proxy for that person's gender.

27. Where a person's gender identity does not match that person's sex assigned at birth, however, gender identity is the critical determinant of that person's sex.

28. The ability to live in a manner consistent with one's gender identity is vital to the health and wellbeing of transgender people.

9

**JA44**

29.     Scientific consensus recognizes that attempts to change an individual's gender identity to bring their gender identity into alignment with the sex assigned at birth are ineffective and harmful.

30.     Attempts to force transgender people to live in accordance with their sex assigned at birth, a practice often described as "conversion therapy," is known to cause profound harm. Such efforts are now widely considered unethical and, in many places, are unlawful.

31.     For transgender people, an incongruence between their gender identity and sex assigned at birth can result in a feeling of clinically significant stress and discomfort known as gender dysphoria.  Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition; the World Health Organization's International Classification of Diseases, which is the diagnostic and coding compendia for medical professionals; and by other leading medical and mental health professional groups, including the American Medical Association ("AMA") and the American Psychological Association ("APA").

32.     In addition to clinically significant distress, untreated gender dysphoria can result in severe anxiety, depression, or even suicidality.

33.     Untreated gender dysphoria often intensifies with time.  The longer an individual goes without or is denied adequate treatment for gender dysphoria, the greater the risk of severe harms to the individual's health.

34.     Gender dysphoria can be treated in accordance with internationally recognized Standards of Care formulated by the World Professional Association for Transgender Health ("WPATH").  WPATH is an international, multidisciplinary, professional association whose mission is to promote evidence-based health care protocols for transgender people.  WPATH

**JA45**

publishes Standards of Care that are based on the best available science and expert professional consensus, and which are widely accepted as best practices for treating gender dysphoria.

35.     Under the WPATH Standards of Care, medically necessary treatments may include, among other things, "[h]ormone therapy" and "[s]urgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring)."

36.     The Standards of Care are recognized as authoritative by national medical and behavioral health organizations such as the AMA and APA, which have both called for an end to exclusions of gender-confirming care from health insurance plans.

37.     The individualized steps that many transgender people take to live in a manner consistent with their gender, rather than the sex they were assigned at birth, are known as transitioning.

38.     Transitioning is particular to the individual but typically includes social, legal, and medical transition.

39.     Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life. For example, social transition can include wearing attire, following grooming practices, and using pronouns consistent with that person's gender identity. The steps a transgender person can take as part of their social transition help align their gender identity with all aspects of everyday life.

40.     Legal transition involves steps to formally align a transgender individual's legal identity with their gender identity, such as legally changing one's name and updating the name and gender marker on their driver's license, birth certificate, and other forms of identification.

11

**JA46**

41.     Medical transition, a critical part of transitioning for many transgender people, includes gender-confirming care that bring the sex-specific characteristics of a transgender person's body into alignment with their gender.  Gender-confirming care can involve counseling to obtain a diagnosis of gender dysphoria, hormone replacement therapy, surgical care, or other medically necessary treatments for gender dysphoria.

42.     Hormone replacement therapy involves taking hormones for the purpose of bringing one's secondary sex characteristics into typical alignment with one's gender identity. Secondary sex characteristics are bodily features not associated with external and internal reproductive genitalia (primary sex characteristics).  Secondary sex characteristics include, for example, hair growth patterns, body fat distribution, and muscle mass development.  Hormone replacement therapy can have significant masculinizing or feminizing effects and can assist in bringing a transgender individual's secondary sex characteristics into alignment with their true sex, as determined by their gender identity, and therefore is medically necessary care for transgender people who need it to treat their gender dysphoria.

43.     Gender-confirming surgical care might be sought by a transgender person to better align primary or secondary sex characteristics with their gender identity.  Surgical care can include, but is not limited to, hysterectomies, gonadectomies, mammoplasties, mastectomies orchiectomies, vaginoplasties, and phalloplasties.  These treatments are for the purpose of treating gender dysphoria.

44.     These various components associated with transition—social, legal, and medical transition—do not change an individual's gender, as that is already established by gender identity, but instead bring the individual's appearance, legal identity, and sex-related characteristics into greater alignment with the individual's gender identity and lived experience.

12

45.     The consequences of untreated, or inadequately treated, gender dysphoria are dire. Symptoms of untreated gender dysphoria include intense emotional suffering, anxiety, depression, suicidality, and other attendant mental health issues. Untreated gender dysphoria is associated with higher levels of stigmatization, discrimination, and victimization, contributing to negative self-image and the inability to function effectively in daily life. When transgender people are provided with access to appropriate and individualized gender-confirming care in connection with treatment of gender dysphoria, these symptoms can be alleviated and even prevented.

46.     The AMA, APA, American Psychiatric Association, Endocrine Society, American College of Obstetricians and Gynecologists, American Academy of Family Physicians, and other major medical organizations have recognized that gender-confirming care is medically necessary, safe, and effective treatment for gender dysphoria—and that access to such treatment improves the health and well-being of transgender people. Each of these groups has publicly opposed exclusions of insurance coverage by private and public health insurers, like the Exclusions at issue here.

47.     WPATH has stated that, like hormone replacement therapy and other gender-confirming treatments, the "medical procedures attendant to sex reassignment are not 'cosmetic' or 'elective' or for the mere convenience of the patient," but instead are "medically necessary for the treatment of the diagnosed condition." Nor are they experimental, because "decades of both clinical research and medical research show that they are essential to achieving well-being for the [transgender] patient."

**B.    Defendants' Targeted and Discriminatory Exclusion of Gender-Confirming Care**

**1.    Medicaid health coverage**

48.    Authorized under Title XIX of the Social Security Act of 1965, Medicaid is a joint federal-state program that provides access to health care for Medicaid-eligible individuals. 42 U.S.C. § 1396-1396w-5 ("Medicaid Act"). The purpose of Medicaid is to enable states to "furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the cost of necessary medical services." 42 U.S.C. § 1396-1.

49.    States are not required to participate in the Medicaid program—but all states do. States that choose to participate must comply with the Medicaid Act and its implementing regulations.

50.    The Medicaid Act requires each participating state to establish or designate a single state agency charged with administering or supervising the state's Medicaid program. 42 U.S.C. § 1396a(a)(5). Additionally, each participating state must maintain a comprehensive state plan ("Medicaid Plan") for medical assistance, approved by the Secretary of the U.S. Department of Health and Human Services. 42 U.S.C. § 1396a.

51.    The Medicaid Plan must describe how the state will administer its Medicaid program and affirm the state's commitment to comply with the Medicaid Act and its implementing regulations. Additionally, the Medicaid Plan "sets out groups of individuals to be covered, services to be provided, methodologies for providers to be reimbursed and the administrative activities that are underway in the state."

52.    The federal government reimburses participating states for a substantial portion of the cost of providing medical assistance.

14

53.     Under the Medicaid Act, "the medical assistance made available to any individual
… shall not be less in amount, duration or scope than the medical assistance made available to
any other such individual."  42 U.S.C. § 1396a(a)(10)(B)(i).

54.     Additionally, a state "Medicaid agency may not arbitrarily deny or reduce the
amount, duration, or scope of a required service … to an otherwise eligible recipient solely
because of the diagnosis, type of illness, or condition."  42 C.F.R. § 440.230(c).

55.     States must ensure that "[e]ach service must be sufficient in amount, duration, and
scope to reasonably achieve its purpose."  42 C.F.R. § 440.230(b).  Moreover, state Medicaid
programs must provide medical assistance "in a manner consistent with … the best interests of
the recipients."  42 U.S.C. § 1396a(a)(19).

56.     The State of West Virginia participates in the federal Medicaid program.

57.     Defendant BMS is the designated single state agency charged with the
responsibility of administering the Medicaid program in West Virginia.  W. Va. Code §§ 9-1-
2(n); 9-2-13(a)(3).

58.     Defendant BMS maintains the state's Medicaid Plan and files amendments to the
Medicaid Plan with the appropriate regulatory authorities.  Additionally, Defendant BMS
determines benefits, sets payment rates, and reimburses providers.

59.     Mountain Health Trust is West Virginia's Medicaid managed care program,
which is administered by the BMS.  BMS contracts with several managed care organizations
("MCO"), which are health plans that coordinate services to provide health coverage to Medicaid
participants.  As part of the Mountain Health Trust program, eligible Medicaid participants may
select a primary care provider and one of three MCOs: (1) UniCare Health Plan of West
Virginia, Inc., (2) The Health Plan, and (3) Aetna Better Health of West Virginia.

15

60.     Each MCO provides Medicaid participants with Medicaid-covered health services through their defined network of providers and hospitals. These MCO networks are monitored by Defendant BMS.

61.     Although Defendant BMS, in its administration of the state's Medicaid program, "strives to assure access to appropriate, medically necessary and quality health care services for all members," the Medicaid Policy Manual provides that the Medicaid Plan does not cover "[t]ranssexual surgery." Additionally, each MCO contains a similar exclusion of gender-confirming care in each of their managed care plans: (1) UniCare excludes coverage for "[s]ex transformation procedures and hormone therapy for sex transformation procedures;" (2) The Health Plan provides that "[s]ex change, hormone therapy for sex transformation, and gender transition procedures/expenses will not be paid for by The Health Plan;" and (3) Aetna Better Health excludes coverage for "[s]ex transformation procedures and hormone therapy for sex transformation procedures."

62.     At all relevant times, the state's Medicaid Plan and managed care plans have categorically excluded coverage for gender-confirming care, through the exclusions in paragraph 61, even though the same treatments are covered for cisgender people who are Medicaid participants.

### 2.     State employee health coverage

63.     Qualifying state employees and their eligible dependents can choose from multiple health plan options. Covered services under the state employee health plans generally include coverage of medically necessary prescriptions, counseling, and surgical care at inpatient and outpatient facilities. These plans are distinguished primarily by coverage ratios, deductible amounts, and general costs to the insured employee and their eligible dependent enrollees. The

16

**JA51**

health plans offered to state employees do, however, have at least one feature in common. At all relevant times, all health plans offered to state employees have contained categorical exclusions of coverage for gender-confirming care, even though the same care is covered for cisgender people.

64.    State employees can choose from among seven health insurance plans. These options include (A) four preferred provider benefit plan options through PEIA provided by Defendant Cheatham, and (B) three HMO and point of service plans provided by Defendants Cheatham and The Health Plan.

A.    **Four preferred provider benefit plan options through PEIA provided by Defendant Cheatham:** State employees can enroll for health coverage through four Preferred Provider Benefit plans: (1) "PEIA PPB Plan A," a comprehensive health plan; (2) "PEIA PPB Plan B," which offers lower premiums but higher deductibles and other costs; (3) "PEIA PPB Plan C," an IRS-qualified high-deductible health plan; and (4) "PEIA PPB Plan D," which offers no out-of-state benefits with limited exceptions. All handbooks for these plans contain an identical exclusion for "[s]urgical or pharmaceutical treatments associated with gender dysphoria or any physical, psychiatric, or psychological examinations, testing, treatments or services provided or performed in preparation for, or as a result of, sex transformation surgery." That exclusion appears in the 2020 and 2021 plan year handbooks. Member handbooks for plan years 2013 through 2019 similarly excluded "[s]ex transformation operations and associated services and expenses."

B.    **Three  HMO and point of service plans provided by Defendants Cheatham and The Health Plan:** State employees can also choose from insurance plans approved by Defendant Cheatham and offered through Defendant The Health Plan, which offers

17

**JA52**

three health plans: (a) HMO Plan A; (b) HMO Plan B; and (c) a point of service ("POS") plan.
All three plans include a blanket exclusion of coverage for gender-confirming care.

65.    All seven health plans available to West Virginia state employees exclude
coverage for gender-confirming care.

66.    There is no non-discriminatory health plan option for state employees and their
dependents.

67.    Transgender people may require varying forms of gender-confirming care. The
blanket Exclusions, however, unilaterally and uniformly prevent transgender people from
receiving coverage for gender-confirming care regardless of their need. As a result, the
Exclusions maintained across all state employee health plans discriminatorily target transgender
people, denying coverage for medically necessary gender-confirming care. Cisgender enrollees
receive coverage for medically necessary mental health, prescription drug, and surgical needs;
whereas, transgender enrollees do not because of the Exclusions and based on their sex and
transgender status.

C.    **The Denial of Care to Plaintiffs**

1.    **Plaintiff Christopher Fain (Medicaid)**

68.    Mr. Fain is 44 years old. Mr. Fain was born in West Virginia and has resided in
West Virginia for the vast majority of his life.

69.    Mr. Fain is studying nonprofit leadership at Marshall University, and currently
works as a store associate at a retail clothing store located in Huntington, West Virginia.

70.    Mr. Fain is a man.

71.    Mr. Fain is also transgender. Although his sex assigned at birth was female, his
gender identity is male.

18

72.    Mr. Fain experiences dysphoria related to the distress arising from the incongruence between his gender identity and his sex assigned at birth.

73.    Mr. Fain has been aware of his gender identity since he was six years old, and since that first awareness has identified as male. Mr. Fain delayed his transition for many years, however, for fear that discrimination and stigma against transgender people would prevent him from being able to support his family.

74.    Delaying this vital care took an enormous toll on Mr. Fain, and he eventually came out to his family. Mr. Fain's children are very supportive of Mr. Fain's transition.

75.    Mr. Fain began counseling to help address his gender dysphoria, and was diagnosed with gender dysphoria in or around December 2018.

76.    Mr. Fain obtained a legal name change to reflect his gender identity through a West Virginia court order on April 6, 2018.

77.    Mr. Fain updated his name to reflect his male gender identity on his Social Security account in April 2018, and updated his West Virginia driver's license with his new name in May 2018.

78.    Mr. Fain lives in all ways in accordance with his male gender identity and is recognized as male by his family, his friends, his classmates, and his professors.

79.    Mr. Fain has been enrolled as a Medicaid participant for most of his adult life.

80.    Mr. Fain receives coverage through the MCO UniCare Health Plan of West Virginia, Inc., an Anthem Company.

81.    In or around February 2019, Mr. Fain's mental health provider recommended that he begin hormone therapy to alleviate his gender dysphoria by aligning his physical characteristics with his gender identity. Mr. Fain began hormone care on or around March 2019.

19

82.     In or around June 2019, Mr. Fain was informed by his pharmacist that his current MCO plan would not cover hormone care to treat gender dysphoria.

83.     Because Medicaid will not cover his testosterone prescription, in or around June 2019, Mr. Fain began purchasing needles and related supplies out-of-pocket through an online private vendor and purchasing hormones out-of-pocket through his pharmacy.

84.     Mr. Fain has since paid out-of-pocket for his hormone care and continues to do so. The Medicaid Plan's exclusion of coverage for Mr. Fain's medically necessary care has caused Mr. Fain economic hardship, emotional distress, lowered self-esteem, embarrassment, humiliation, and stigma.

85.     In order to avoid being incorrectly identified as female and to reduce the severe distress and embarrassment over the presence of typically female-appearing breasts on his body, Mr. Fain often wears a "binder," which is a compression garment that flattens or reduces the profile of a person's chest, which is an ongoing source of his gender dysphoria.

86.     Mr. Fain experiences intense discomfort with prolonged use of a binder, which often chafes his skin, and sometimes creates sores and leads to difficulty breathing. Nonetheless, to help manage his gender dysphoria, he sometimes wears the binder for 16 hours at a time.

87.     Mr. Fain requires a bilateral mastectomy as medically necessary care to treat his gender dysphoria and eliminate the need for the ongoing use of a binder. This surgical procedure is a widely accepted and effective treatment for gender dysphoria. However, the blanket exclusion in the Medicaid Plan bars him from receiving this medically necessary care. Mr. Fain accordingly is forced to delay this urgently-needed procedure as a direct and proximate result of Defendants' continuing refusal to cover medically necessary gender-confirming care. As a result, Mr. Fain's symptoms of gender dysphoria and related distress have increased.

20

### 2. Plaintiffs Zachary Martell and Brian McNemar (PEIA)

88.    Mr. McNemar works as an Accountant Auditor in the accounting department of the Mildred-Mitchell Bateman Hospital, a state psychiatric hospital in Huntington, West Virginia, that is operated, supported, and subject to oversight by the state. Mr. McNemar began working in this position on February 18, 2018.

89.    Mr. Martell is a full-time student at Mountwest Community and Technical College ("Mountwest College") in Huntington, West Virginia. Mountwest College does not offer health insurance to students.

90.    At all relevant times, both Mr. McNemar and Mr. Martell have been enrolled in a health plan through PEIA and have relied on that plan for health care coverage. As the spouse and eligible dependent of Mr. McNemar, Mr. Martell is enrolled in the HMO Plan A approved by Defendant Cheatham and offered by Defendant The Health Plan.

91.    Mr. Martell is a man.

92.    Mr. Martell is also transgender. Although his sex assigned at birth was female, his gender identity is male.

93.    Mr. Martell has been medically diagnosed with gender dysphoria. He experiences dysphoria related to the disconnect between his primary and secondary sex characteristics and his gender identity.

94.    From an early age, Mr. Martell felt different: he understood that he was not female and felt discomfort with his primary and secondary sex characteristics. He preferred masculine clothing from a young age. However, he did not have the language or conceptual understanding to describe these feelings. It was not until age 30, with the support of his husband and friends, that he accepted and came to understand himself as transgender.

21

**JA56**

95.    Mr. Martell changed his legal name by West Virginia court order on February 19, 2019. He also updated the name and gender marker on his West Virginia driver's license and his Social Security records. Additionally, Mr. Martell is recognized as male by his friends, classmates, and professors.

96.    As part of his medical transition, Mr. Martell has received treatment for gender dysphoria, including hormone replacement therapy in the form of testosterone, to alleviate his gender dysphoria by aligning his physical characteristics with his gender identity.

97.    In order to avoid being incorrectly identified as female, and to reduce the severe distress and embarrassment over the presence of typically female-appearing breasts on his body, when he leaves the house, Mr. Martell often uses a binder, which flattens or reduces the profile of his chest. However, even with the use of a binder, Mr. Martell experiences distress over the presence of his chest, which is an ongoing source of his gender dysphoria.

98.    Mr. Martell experiences intense discomfort with prolonged use of a binder, which can be painful and cause difficulty breathing, among other health risks. As a result, Mr. Martell must carefully limit the amount of time that he uses a binder. Prior to the current COVID-19 pandemic, Mr. Martell's class schedule required him to be on campus for more than nine hours, forcing him to forego the use of a binder on certain days, and exposing him to increased risk of being incorrectly identified as female, which causes him significant anxiety.

99.    Mr. Martell requires a bilateral mastectomy as medically necessary care to treat his gender dysphoria and eliminate the need for the ongoing use of a binder. This surgical procedure is a widely accepted and effective treatment for gender dysphoria. However, the categorical Exclusion in HMO Plan A bars him from receiving this medically necessary care. Mr. Martell is accordingly forced to delay a medically necessary and urgently-needed procedure

22

as a direct and proximate result of Defendants' continuing refusal to cover gender-confirming care through the Exclusions. As a result, Mr. Martell's symptoms of gender dysphoria and related distress have increased.

100.    On or around April 2018, Mr. Martell began attending counseling as part of his medical transition. On or about November 13, 2018, his mental health provider assessed him as ready to begin hormone replacement therapy and recommended that he do so. When Mr. Martell first sought to begin hormone replacement therapy in the form of testosterone with the guidance of his medical and mental health providers, The Health Plan denied coverage both for the prescriptions and his office visits with the health care provider who managed his hormone replacement therapy.

101.    On or about February 13, 2019, Mr. Martell received a Notice of Adverse Benefit Determination from Defendant The Health Plan. The notice informed Mr. Martell that coverage for his medically necessary hormone replacement therapy would be denied. The notice stated that Mr. Martell "asked us to cover testosterone. After review we are denying the request. Treatments for gender identity issues are excluded from the benefit."

102.    As a result of this denial of medically necessary health care, Mr. Martell and Mr. McNemar were forced to pay out-of-pocket for Mr. Martell's testosterone prescriptions. At times, this expense was too much for Mr. Martell and Mr. McNemar to meet, forcing Mr. Martell to temporarily to forego medically necessary health care to make ends meet. This lapse in health care coverage exacerbated Mr. Martell's anxiety, and suspended the physical changes that were an essential part of his medical transition.

103.    Mr. Martell's medical and mental health providers have recommended that he continue to receive hormone therapy to alleviate his ongoing symptoms of gender dysphoria.

23

Defendants Cheatham and The Health Plan's categorical exclusion of such medical care,
however, denies coverage for this treatment, forcing Mr. Martell and Mr. McNemar to pay out-
of-pocket for medically necessary health care. The denials of coverage for this care have caused
Mr. Martell emotional distress, lowered self-esteem, embarrassment, humiliation, and stigma.

104.    Additionally, the denials of coverage for Mr. Martell's care have caused his
spouse, Mr. McNemar, intense frustration, despair, and aggravation. Mr. McNemar not only
experienced the distress of watching his spouse suffer without coverage for essential medical
care, but also the distress of being discriminated against in his compensation. Other cisgender
state employees receive coverage for their spouses' hormone-related therapy and surgical care,
while Mr. McNemar is denied that important form of compensation simply because his spouse is
transgender. This harms Mr. McNemar by depriving him of equal compensation for equal work,
causes him distress, and stigmatizes both Mr. Martell and Mr. McNemar.

105.    Because of the Exclusions of gender-confirming health care from the state health
plans, the named Plaintiffs have suffered emotional distress, humiliation, degradation,
embarrassment, emotional pain and anguish, violation of their dignity, loss of enjoyment of life,
and other compensatory damages, in an amount to be established at trial.

### CLASS ACTION ALLEGATIONS

106.    Plaintiffs, on behalf of themselves and all similarly situated individuals, bring this
action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

107.    Plaintiffs assert their claims against all Defendants on behalf of the following
Classes and Subclass, collectively, "the Classes").

### Medicaid Class

108.    The proposed Medicaid Class is defined as:  All transgender people who are or

24

**JA59**

will be enrolled in West Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusions.

## State Employee Health Plan Class

109.    The proposed State Employee Health Plan Class is defined as: All people who are enrolled in a State Employee Health Plan and who are either transgender and have sought or will seek gender-confirming care, and/or people whose transgender dependents have sought or will seek gender-confirming care, barred by the Exclusions.

## The Health Plan Subclass

110.    The proposed The Health Plan Subclass is a subclass of the State Employee Health Plan Class and is defined as: All State Employee Health Plan Class Members who are enrolled in The Health Plan.

111.    Plaintiffs and the proposed Classes have been equally affected by Defendants' violations of law.

112.    The persons in the proposed Classes are so numerous that joinder of all members is impracticable. While the precise number of class members has not been determined at this time, upon information and belief, there are more than 40 individuals in the proposed Classes and/or the class members are so numerous that joinder would be impractical.

113.    The common questions of law and fact include, but are not limited to:

A.    Whether Defendants' Exclusions, facially and as applied to members of the proposed Classes, violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

B.    Whether Defendants' Exclusions, facially and as applied to members of the proposed Classes, violate the prohibitions on sex discrimination under Section 1557 of the

25

**JA60**

Affordable Care Act;

      C.      Whether Defendants' Exclusions, facially and as applied to members of the proposed Medicaid Class, violate the availability and comparability provisions of the Medicaid Act; and

      D.      Whether Defendants should be enjoined from enforcing the Exclusions and denying Plaintiffs coverage for and access to gender-confirming care.

114.    The questions of law and fact listed above will yield common answers for Plaintiffs and the proposed Classes.

115.    Plaintiffs' claims are typical of those members of the proposed Classes. Mr. Fain is transgender, is a participant in West Virginia Medicaid, and is denied coverage for gender-confirming care because of an Exclusion. Mr. Martell is transgender, an eligible dependent of Mr. McNemar, and has been denied access to medically necessary gender-confirming care because of an Exclusion. Mr. McNemar is a state employee whose dependent has been denied coverage for gender-confirming care because of an Exclusion. Mr. Fain, representing the Medicaid Class, and Mr. Martell and Mr. McNemar, representing the State Employee Health Plan Class and The Health Plan Subclass, and members of the proposed Classes share the same legal claims under the Equal Protection Clause and Section 1557.

116.    Plaintiffs will fairly and adequately represent the interests of the proposed Classes and have retained counsel experienced in complex class action litigation. Plaintiffs are represented by Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal"), the nation's oldest and largest legal organization dedicated to the rights of lesbian, gay, bisexual, and transgender ("LGBT") people and everyone living with HIV. Lambda Legal has extensive federal court experience litigating on behalf of LGBT people, including regarding transgender

**JA61**

people's access to health care, and has served as class counsel and putative class counsel in a number of LGBT-related cases. Plaintiffs are also represented by Nichols Kaster, PLLP, a leading law firm with significant expertise representing plaintiffs across the country in employment and class action matters, and Walt Auvil of The Employment Law Center, PLLC ("The Employment Law Center"). Mr. Auvil is a West Virginia-based litigator with more than 30 years of experience protecting workers' rights, including through complex class action litigation.

117.    Class treatment is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted on grounds that apply generally to the proposed Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the proposed Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Equal Protection
### U.S. Const. Amend. XIV

*Plaintiff Christopher Fain, on Behalf of the Medicaid Class, Against Defendants Crouch and Beane for Declaratory and Injunctive Relief*

*Plaintiffs Zachary Martell and Brian McNemar, on Behalf of the State Employee Health Plan Class and The Health Plan Subclass, Against Defendant Cheatham for Declaratory and Injunctive Relief*

118.    Plaintiffs re-allege and incorporate by reference the allegations in each of the preceding paragraphs of this complaint, as though fully set forth herein.

119.    Plaintiffs state this cause of action on behalf of themselves and members of the proposed Classes against Defendant Crouch, Defendant Beane, and Defendant Cheatham in their official capacity, for purposes of seeking declaratory and injunctive relief, and challenge Defendants' enforcement of the discriminatory sex-based classifications in the Exclusions both facially and as applied to Plaintiffs and the proposed Classes.

27

**JA62**

120.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

121.    Defendant Crouch is a person acting, at all relevant times, under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiff Fain and the proposed Medicaid Class equal protection of the law.  Through his duties and actions to develop a managed care program that excludes coverage for gender-confirming care, Defendant Crouch has unlawfully discriminated, and continues to discriminate, against Plaintiff Fain and the members of the proposed Medicaid Class based on sex-related considerations.

122.    Defendant Beane is a person acting, at all relevant times, under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiff Fain and the proposed Medicaid Class equal protection of the law.  Through her duties and actions to implement health policies for BMS which exclude gender-confirming care, Defendant Beane has unlawfully discriminated, and continues to discriminate, against Plaintiff Fain and the members of the proposed Medicaid Class based on sex-related considerations.

123.    Defendant Cheatham is a person acting, at all relevant times, under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs Martell and McNemar and the proposed State Employee Health Plan Class equal protection of the law. Through his duties and actions to administer and manage the group insurance plans for state employees and dependents—which includes authority and responsibility for designating noncovered services such as the Exclusions of gender-confirming care, and his actions to ensure that state employees have no nondiscriminatory options—Defendant Cheatham has unlawfully

28

**JA63**

discriminated, and continues to discriminate, against Plaintiffs Martell and McNemar and the members of the proposed State Employee Health Plan Class based on sex-related considerations.

124.    The Exclusions, on their face and as applied to Plaintiffs and the proposed Classes, impermissibly discriminate on the basis of sex, and on the basis of transgender status, and violate their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

125.    The Exclusions treat Plaintiffs and members of the proposed Classes differently from other persons who are similarly situated. Under the Exclusions, transgender Medicaid and state health plan participants who require gender-confirming care are denied coverage for that medically necessary care, while cisgender Medicaid and state health plan participants can access the same kinds of treatments, including when related to their sex. Similarly, state health plan enrollees with a transgender dependent are denied coverage for that medically necessary care, while enrollees with a cisgender dependent are not denied coverage for the same kinds of treatments, including when related to their sex.

A.    **Discrimination on the Basis of Sex**

126.    By maintaining and enforcing the categorical Exclusions of gender-confirming care in the Medicaid and state employee health plans, Defendant Crouch, Defendant Beane, and Defendant Cheatham respectively engage in constitutionally impermissible discrimination on the basis of sex.

127.    Discrimination on the basis of transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition constitutes discrimination on the basis of sex.

29

**JA64**

128.    Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

129.    By ensuring that coverage for gender-confirming care is categorically excluded regardless of medical necessity in all health coverage options for Medicaid and state employee health plan participants, Defendants Crouch, Beane, and Cheatham engage in constitutionally impermissible sex-based discrimination against Plaintiffs and members of the proposed Classes, and violate their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

**B.    Discrimination on the Basis of Transgender Status**

130.    By maintaining and enforcing the categorical Exclusions of gender-confirming care, Defendants Crouch, Beane, and Cheatham engage in constitutionally impermissible discrimination on the basis of transgender status.

131.    As the Fourth Circuit recently confirmed, under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to "at least" heightened scrutiny. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. Aug. 26, 2020), *as amended* (Aug. 28, 2020). That is because:

A.    Transgender people have suffered a long history of discrimination and continue to suffer such discrimination to this day.

B.    Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit state and federal protections to protect them against discrimination through the legislative process.

30

**JA65**

      C.     A person's transgender status bears no relation to a person's ability to contribute to society.

      D.     Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.  Gender identity generally is highly resistant to change through intervention.

132.    Because the Exclusions on their face and as applied to Plaintiffs and the proposed Classes deprive transgender Medicaid and state employee health plan enrollees of their right to equal dignity, liberty, and autonomy by stigmatizing them and branding them as inferior to cisgender health plan enrollees, Defendants Crouch, Beane, and Cheatham deny transgender persons equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.  The categorical Exclusions similarly serve to stigmatize state health plan enrollees whose dependents are transgender, depriving them of their equal treatment and dignity.

133.    Defendants' enforcement of the Exclusions has not, and does not serve even a legitimate state interest, let alone one that is important, or compelling.  Nor are the Exclusions adequately tailored to any such state interest.  Rather, the Exclusions serve only to prevent Plaintiffs and members of the proposed Classes from obtaining gender-confirming care when cisgender enrollees are able to receive the same care as long as it is not required for purposes of treating gender dysphoria.  In effect, the Exclusions punish vulnerable transgender people for being transgender and taking necessary—and sometimes life-saving—steps to live in accordance with their gender identity.

134.    Without injunctive relief from the Exclusions of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

**JA66**

## COUNT TWO
### Violation of Section 1557 of the
### Patient Protection and Affordable Care Act
### 42 U.S.C. § 18116

*Plaintiff Christopher Fain, on Behalf of the Medicaid Class, Against Defendant BMS, Defendant Crouch, and Defendant Beane for Declaratory and Injunctive Relief, and Individually Against Defendant BMS for Compensatory Damages*

*Plaintiffs Zachary Martell and Brian McNemar, on Behalf of the State Employee Health Plan Class Against Defendant Cheatham for Declaratory and Injunctive Relief, on Behalf of The Health Plan Subclass Against Defendant The Health Plan and Defendant Cheatham for Declaratory and Injunctive Relief, and Individually Against Defendant The Health Plan for Compensatory Damages*

135.　Plaintiffs re-allege and incorporate each and every foregoing allegation contained in the preceding paragraphs of this complaint, as though fully set forth herein.

136.　Plaintiffs state this cause of action on behalf of themselves and members of the proposed Classes for purposes of seeking declaratory and injunctive relief, and challenge the discriminatory sex-based classifications in the Exclusions both facially and as applied to Plaintiffs and the proposed Classes. Named Plaintiffs also state this cause of action for compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

137.　Under Section 1557 of the Affordable Care Act, "an individual shall not ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)" on the basis of sex. 42 U.S.C. § 18116.

138.　*"[A]ny health program or activity":*

32

**JA67**

A.     Defendant BMS, which administers and supervises the state's Medicaid Plan, constitutes a health program or activity within the meaning of the statute.

B.     Defendant The Health Plan, as a health maintenance organization serving more than 200,000 people covered through its health plans, constitutes a health program or activity within the meaning of the statute.

139.   *"[A]ny part of which is receiving Federal financial assistance":*

A.     Defendant BMS receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA.  The Centers for Medicare & Medicaid Services ("CMS"), operating within HHS, provide federal financial assistance to BMS for the state's participation in the Medicaid Program.

B.     Defendant The Health Plan receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA.  The Health Plan's "Provider Procedural Manual," which provides guidance to medical providers who care for patients insured through The Health Plan, explains that, "The Health Plan has entered into a contract with the Centers for Medicare and Medicaid Services (CMS), the federal agency that administers the Medicare program.  Under this contract, CMS makes a monthly payment to The Health Plan for each Medicare beneficiary who enrolls in our Plan. … The Health Plan receives a set rate for each member plus any enrollee premium."

140.   The categorical Exclusions maintained by Defendants BMS, The Health Plan, Crouch, Beane, and Cheatham, on their face and as applied to Plaintiffs and members of the proposed Classes, violate Section 1557's prohibition against discrimination on the basis of sex in a health program or activity receiving federal financial assistance.

33

**JA68**

141.    Defendants Crouch, Beane, and Cheatham's actions under color of state law to maintain the categorical Exclusions deprive Plaintiffs and members of the proposed Classes of the protection from sex discrimination secured by Section 1557.

142.    Discrimination on the basis of transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition are all encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

143.    By categorically excluding gender-confirming care regardless of medical necessity, Defendants BMS, The Health Plan, Crouch, Beane, and Cheatham have drawn a classification that has and continues to unlawfully discriminate against Plaintiffs and members of the proposed Classes based on sex, in violation of Section 1557.

144.    Because Defendant BMS and Defendant The Health Plan receive federal funding that flows to health programs or activities, Plaintiffs and the proposed Classes have a right under Section 1557 to receive health insurance through BMS and The Health Plan free from discrimination on the basis of transgender status, sex, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition.

145.    Defendants BMS, The Health Plan, Crouch, Beane, and Cheatham have discriminated against Plaintiffs and the proposed Classes on the basis of sex in violation of Section 1557 and have thereby denied Plaintiffs and the proposed Classes the full and equal participation in, benefits of, and right to be free from discrimination in a health program or activity.

146.    Plaintiffs and the proposed Classes have been and continue to be injured by the application of the Exclusion by Defendants BMS, The Health Plan, Crouch, Beane, and Cheatham to deny coverage for gender-confirming care and have suffered harm as a result.

34

**JA69**

147.    The named Plaintiffs have also suffered emotional distress, stigmatization, humiliation, and a loss of dignity because of BMS' and The Health Plan's targeted discrimination against transgender Medicaid participants and The Health Plan enrollees respectively, which wrongly deems their health care needs as unworthy of equal coverage. By knowingly and intentionally offering health care coverage to Plaintiffs that discriminates on the basis of sex, Defendant BMS and Defendant The Health Plan have intentionally violated the ACA, for which named Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

148.    Without injunctive relief from the Exclusions of coverage for gender-confirming care, Plaintiffs and the proposed Classes will continue to suffer irreparable harm in the future.

<div align="center">

**COUNT THREE**
**Violation of the Medicaid Act's Availability Requirements**
**42 U.S.C. § 1396a(a)(10)(A)**

</div>

*Plaintiff Christopher Fain, on Behalf of the Medicaid Class, Against Defendants Crouch and Beane for Declaratory and Injunctive Relief*

149.    Plaintiffs re-allege and incorporate by reference the allegations in each of the preceding paragraphs of this complaint, as though fully set forth herein.

150.    Plaintiff Fain states this cause of action on behalf of himself and members of the proposed Medicaid Class against Defendants Crouch and Beane in their official capacity, for purposes of seeking declaratory and injunctive relief, and challenges Defendants' enforcement of the Exclusions both facially and as applied to Mr. Fain and the proposed Medicaid Class.

151.    The Medicaid Act's Availability Requirements, 42 U.S.C. § 1396a(a)(10)(A), require that a state plan must "provide for making medical assistance available ... to" eligible individuals.

35

**JA70**

152.    The categorical Exclusions maintained and enforced by Defendants Crouch
and Beane eliminate mandatory Medicaid coverage of medically necessary services and render
them unavailable to Plaintiff Fain and members of the proposed Medicaid Class, thereby
violating Medicaid's availability requirement, 42 U.S.C. § 1396a(a)(10)(A), which is enforceable
by Plaintiff Fain under 42 U.S.C. § 1983.

## COUNT FOUR
### Violation of the Medicaid Act's Comparability Requirements
### 42 U.S.C. § 1396a(a)(10)(B)

*Plaintiff Christopher Fain, on Behalf of the Medicaid Class, Against Defendants Crouch and Beane for Declaratory and Injunctive Relief*

153.    Plaintiffs re-allege and incorporate by reference the allegations in each of the
preceding paragraphs of this complaint, as though fully set forth herein.

154.    Plaintiff Fain states this cause of action on behalf of himself and members of the
proposed Medicaid Class against Defendants Crouch and Beane in their official capacity, for
purposes of seeking declaratory and injunctive relief, and challenges Defendants' enforcement of
the Exclusions both facially and as applied to Mr. Fain and the proposed Medicaid Class.

155.    The Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B),
require that the "medical assistance made available to [eligible individuals] shall not be less in
amount, duration, or scope than the medical assistance made available to" other eligible or
ineligible individuals.

156.    The categorical Exclusions maintained and enforced by Defendants Crouch
and Beane, and the denial of medically necessary services and treatments to Plaintiff Fain and
members of the proposed Medicaid Class, while the same or similar services and treatments are
covered for cisgender Medicaid beneficiaries, violates Medicaid's comparability requirement, 42
U.S.C. § 1396a(a)(10)(B), which is enforceable by Plaintiff Fain under 42 U.S.C. § 1983.

36

**JA71**

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs as class representatives, on behalf of themselves and the proposed Classes, respectfully request that this Court enter judgment in their favor and against Defendants on all claims, as follows:

A.      Certification of a class action pursuant to Fed. R. Civ. P. 23 on behalf of the proposed Classes;

B.      Appointment of Plaintiffs as class representatives and their counsel as class counsel;

C.      Issuance of a preliminary and permanent injunction enjoining any further enforcement or application of the Exclusions, and directing Defendants and their agents to provide access to coverage for all gender-confirming care without regard to the Exclusions;

D.      Declaratory judgment that the Exclusions, facially and as applied to Plaintiffs and members of the proposed Classes:

1.      Violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition), and on the basis of transgender status;

2.      Violate Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition);

3.      Violate the Medicaid Act's availability requirement, 42 U.S.C. § 1396a(a)(10)(A); and,

37

        4.       Violate the Medicaid Act's comparability requirement, 42 U.S.C.

§ 1396a(a)(10)(B);

        E.      An award of the declaratory and injunctive relief requested in this action against

Defendants' officers, agents, servants, employees, and attorneys, as well as any other persons

who are in active concert or participation with them;

        F.      An award of compensatory and consequential damages to the individual Plaintiffs

in an amount that would fully compensate Plaintiffs for their financial harm, emotional distress

and suffering, embarrassment, humiliation, pain and anguish, violations of their dignity, and

other damages that have been caused by the conduct of Defendants BMS and The Health Plan in

violation of the ACA;

        G.      An award of reasonable attorneys' fees, costs, and expenses under 42 U.S.C.

§ 1988 and all other applicable statutes; and

        H.      Such other and further relief as the Court may deem just and proper.

* * *

38

**JA73**

Dated: November 12, 2020

Respectfully submitted,

/s/ Walt Auvil
Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-6344
auvil@theemploymentlawcenter.com

Avatara Smith-Carrington*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: 214-219-8585
Facsimile: 214-219-4455
asmithcarrington@lambdalegal.org

Anna P. Prakash*
Nicole J. Schladt*
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
Phone: 612-256-3200
Facsimile: 612-338-4878
aprakash@nka.com
nschladt@nka.com

Tara L. Borelli*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308
Phone: 470-225-5341
Facsimile: 404-897-1884
tborelli@lambdalegal.org

Nora Huppert*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
Phone: 213-382-7600
Facsimile: 213-351-6050
nhuppert@lambdalegal.org

Sasha Buchert*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Phone: 202-804-6245
Facsimile: 202-429-9574
sbuchert@lambdalegal.org

*Attorneys for Plaintiffs*

* Statement of Visiting Attorney and Designation of Local Counsel forthcoming

**JA74**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others similarly situated,

|  |  |
|---|---|
| **Plaintiffs,** | Civil Action No. 3:20-cv-00740 |
| | Hon. Robert C. Chambers, Judge |

**v.**

**WILLIAM CROUCH,** in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; **CYNTHIA BEANE,** in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; **WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES; TED CHEATHAM,** in his official Capacity as Director of the West Virginia Public Employees Insurance Agency; and **THE HEALTH PLAN OF WEST VIRGINIA, INC.**

**Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES'S MOTION FOR <u>PARTIAL DISMISSAL OF PLAINTIFFS' CLASS ACTION COMPLAINT</u>

Now come Defendants William Crouch, Cynthia Beane, and the West Virginia Department of Health and Human Resources, Bureau for Medical Services ("WVDHHR"), by counsel Lou Ann S. Cyrus, Roberta F. Green, Caleb B. David, Kimberly M. Bandy, and Shuman McCuskey Slicer PLLC, and submit this memorandum of law in support of their request that the Plaintiffs' Class Action Complaint be dismissed in part against them. The WVDHHR moves, pursuant to

Rule 12(b)(1) of the Federal Rules of Civil Procedure, or, in the alternative, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for dismissal of Plaintiff Christopher Fain's claim for compensatory damages asserted in Count II of the Complaint on the basis that the claim is barred by the Eleventh Amendment to the United States Constitution. Additionally, Defendants William Crouch, Cynthia Beane, and the WVDHHR move to dismiss Plaintiffs' request for class certification.

## FACTUAL/PROCEDURAL BACKGROUND

Plaintiffs' Class Action Complaint was filed on November 12, 2020, in the United States District Court for the Southern District of West Virginia. Plaintiff Christopher Fain brings suit against William Crouch, Cynthia Beane, and the WVDHHR, claiming that he has been the subject of discrimination as a Medicaid participant on the basis of his sex and his transgender status.[1] On behalf of himself, and on behalf of a proposed class of Medicaid participants, Plaintiff Fain seeks declaratory and injunctive relief against Defendants Crouch, Beane, and the WVDHHR.[2] Mr. Fain individually seeks compensatory damages from the WVDHHR for violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. §18116.[3] Plaintiffs Zachary Martell and Brian McNemar assert discrimination claims against Defendants Ted Cheatham and The Health Plan of West Virginia, Inc., related to health insurance for State employees and their dependents.[4] The claims of Martell and McNemar (and the related proposed state employee class or subclass) are not directed at Defendants Crouch, Beane, or the WVDHHR.

---

[1] Compl., at ¶¶1, 82-87.
[2] Compl., Counts One, Two, Three, and Four.
[3] Compl., Count Two.
[4] Compl., Counts One and Two.

2

**JA76**

## **STANDARD OF REVIEW**

Rule 8 of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." F.R.C.P. 8(a)(2).  Defendants Crouch, Beane, and the WVDHHR are entitled to dismissal of the claims for class action certification pursuant to Federal Rule of Civil Procedure 12(b)(6) because the subject portions of the Complaint fail to state a claim upon which relief can be granted.

While no specific form of pleading is required, the Plaintiffs must set forth sufficient factual allegations in the Complaint that, if true, would constitute a legal cause of action.  For purposes of a motion to dismiss under Rule 12(b)(6), Courts must consider the Complaint's factual allegations as true, but need not do so with respect to mere conclusory legal allegations, which need not be given such consideration.  "To survive a motion to dismiss, a Complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868, 884 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Additionally, the WVDHHR is entitled to dismissal of Mr. Fain's claim for compensatory damages pursuant to the Eleventh Amendment to the United States Constitution. It appears to be unsettled in the United States Court of Appeals for the Fourth Circuit whether Eleventh Amendment immunity is to be considered under Rule 12(b)(1) for lack of subject matter jurisdiction, or Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[5] To the extent that the specific Rule to be utilized is unsettled, relief is requested in the alternative.

---

[5] *Andrews v. Daw*, 201 F.3d 521, 524 n.2 (2000) ("Our cases have been unclear on whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)").

3

**JA77**

However, under either Rule, the WVDHHR is entitled to immunity from suit for compensatory damages.

## ANALYSIS

**I.    THE WVDHHR IS ENTITLED TO DISMISSAL OF PLAINTIFF CHRISTOPHER FAIN'S CLAIM FOR COMPENSATORY DAMAGES PURSUANT TO THE ELEVENTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE IT IS A STATE AGENCY.**

Mr. Fain's claim against the WVDHHR for compensatory damages is a claim against the State of West Virginia and is barred by the Eleventh Amendment to the United States Constitution.

The Eleventh Amendment to the United States Constitution states, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or Citizens or Subjects of any Foreign State." THE CONSTITUTION OF THE UNITED STATES, Amendment XI.  The Supreme Court of the United States has construed the Amendment to "establish that 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.'"[6]

The WVDHHR is a State agency as recognized in Chapter 9 of the West Virginia Code.[7] Suits against a State or a State agency in federal court for monetary damages are barred by the Eleventh Amendment to the United States Constitution.[8]  Therefore, Mr. Fain cannot maintain his claim for compensatory damages against the WVDHHR.

---

[6] *Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304, 110 S.Ct. 1868, 1872, 109 L. Ed. 2d 264, 271 (1990), (additional citations omitted).

[7] W.Va. Code §§9-1-2, 9-2-1a.

[8] *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 66, 109 S. Ct. 2304, 2309, 105 L. Ed. 2d 45, 55 (1989).

4

**JA78**

Sovereign immunity constitutes "an important constitutional limitation on the power of the federal courts."[9] Eleventh Amendment immunity can be waived in certain limited circumstances. For example, in enacting legislation, the United States Congress can condition the receipt of federal funds on waiver of sovereign immunity. However, such condition must be "'unequivocally expressed' in the text of the relevant statute."[10] The State receiving such funds must be able to clearly ascertain and understand the condition, in order to make a knowing and voluntary waiver of sovereign immunity.[11] To determine whether the declaration is clear and unambiguous, the court "must view the [statute] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal] funds and the obligations that go with those funds."[12] The Supreme Court of the United States has directed that the "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one."[13]

Without a clear declaration of such intent, waiver does not occur. "A State's consent to suit must be 'unequivocally expressed' in the text of the relevant statute." [14] "Only by requiring this 'clear declaration' by the State can we be 'certain that the State in fact consents to suit.'"[15] Waiver

---

[9] *Sossamon v. Texas*, 563 U.S. 277, 284, 131 S. Ct. 1651, 1657, 179 L. Ed. 2d 700, 708 (2011), citing *Pennhurst State School and Hospital v. Halderman*, 465 US.89, 98, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984).

[10] *Sossamon,* 563 U.S. at 284, 131 S. Ct. at 1658, 179 L. Ed. 2d at 708, quoting *Pennhurst State School and Hospital v. Halderman*, 465 U.S. at 99, 104 S. Ct. 900, 79 L. Ed. 2d 67 (additional citation omitted).

[11] *Arlington Cent. Sch. Dist. Bd. Of Educ. v. Murphy*, 548 U.S. 291, 296, 126 S. Ct. 2455, 2459, 165 L. Ed. 2d 526, 533-534 (2006), citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S. Ct. 1531, 67 L. Ed. 2d 694 (1981).

[12] *Arlington Cent. Sch. Dist. Bd. Of Educ. v. Murphy*, 548 U.S. at 296, 126 S. Ct. at 2459, 165 L. Ed. 2d at 534.

[13] *Sossamon v. Texas*, 563 U.S. at 284, 131 S. Ct. at 1658, 179 L. Ed. 2d at 708, quoting *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 675, 119 S. Ct. 2219, 144 L. Ed. 2d 605 (1999) (internal quotation marks omitted).

[14] *Sossaman*, 563 U.S. at 284, 131 S. Ct. at 1658, 179 L. Ed. 2d at 708-709 (additional citation omitted).

[15] *Id.*

**JA79**

will not be implied."[16]  Waiver of sovereign immunity "will be strictly construed, in terms of its

scope, in favor of the sovereign."[17]  Additionally, the waiver of sovereign immunity "must extend

unambiguously" to claims for money damages.[18]

Plaintiff Fain seeks compensatory damages for violation of § 1557 of the Patient Protection

and Affordable Care Act ("ACA"), 42 U.S.C. §18116, which states:

> Except as otherwise provided for in this title (or an amendment made by this title),
> an individual shall not, on the ground prohibited under title VI of the Civil Rights
> Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of
> 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101
> et seq.), or section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be
> excluded from participation in, be denied the benefits of, or be subjected to
> discrimination under, any health program or activity, any part of which is receiving
> Federal financial assistance, including credits, subsidies, or contracts of insurance,
> or under any program or activity that is administered by an Executive Agency or
> any entity established under this title (or amendments). The enforcement
> mechanisms provided for and available under such title VI, title IX, section 504, or
> such Age Discrimination Act shall apply for purposes of violations of this
> subsection.[19]

On its face, 42 U.S.C. §18116 does not specify an unequivocal expression of waiver

of sovereign immunity in exchange for the receipt of federal funds under the ACA.

Therefore, it does not meet the strict requirements for waiver as outlined by the Supreme

Court of the United States. Accordingly, the WVDHHR is entitled to sovereign immunity

and the claims against the WVDHHR for money damages are barred.

## II.  PLAINTIFFS' CLASS ALLEGATIONS MUST BE DISMISSED BECAUSE PLAINTIFFS' ALLEGED CAUSES OF ACTION REQUIRE PARTICULAR PROOF OF INDIVIDUALIZED HARM TO EACH ALLEGED CLASS MEMBER.

Class action claims constitute a deviation from the general rule that litigation must be

---

[16] *Id.*

[17] *Sossamon v. Texas*, 563 U.S. at 285, 131 S. Ct. at 1658, 179 L. Ed. 2d at 709, quoting *Lane v. Pena*, 518 U.S. 187, 192, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996).

[18] *Sossamon*, 563 U.S. at 285, 131 S. Ct. at 1658, 179 L. Ed. 2d at 709, quoting *Lane v. Pena*, 518 U.S. at 192, 116 S. Ct. 2092, 135 L. Ed. 2d 486.

[19] 42 U.S.C. §18116(a).

6

**JA80**

conducted by and on behalf of the individual named parties only.[20] That deviation is justified only to the extent the class representatives possess *inter alia* the same interests and suffer the same injury as the proposed class members.[21] The Supreme Court of the United States has found that class form is appropriate only where economical to combine the claims and that the determination as to whether it is economical is a practical one – when a common injury can be addressed and resolved by a class litigation without doing damage to either, it makes sense to do so as a class action. Here, however, the economies of the class form are unavailable, as particularized discovery would be necessary to determine the individualized facts relative to Defendants' duty to each class member, the underlying facts of the breach of that duty as experienced by each class member, and any causation between that breach and each particular class member's alleged damages, such that the class structure would be counterproductive, uneconomical, and contraindicated.[22] Plaintiffs' class claims fall outside Federal Rule of Civil Procedure Rule 23 (a)(2), which requires that "there are questions of law or fact common to the class," such that dismissal as a matter of law of the class claims herein is necessary and proper at this time.

A class action for monetary damages to determine the scope of Medicaid regulations in any number of specific factual health situations and claims histories undercuts any economies inherent in the Rule 23 process and is substantively improper for class treatment. To the extent Plaintiffs have particularized their claims to their precise diagnosis, their precise medical needs, and their precise claims histories, then Rule 23 offers no economies to what must become multiple separate litigations, joined only in the broadest sense.  Even taking Plaintiffs' claims in the light

---

[20] *Wal-Mart Stores, Inc., v. Dukes,* 564 U.S. 338, 349 (2011), quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979).

[21] *Dukes,* 564 U.S. at 349, quoting *East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (quoting *Schlessinger v. Reservists Comm. To Stop the War,* 418 U.S. 208 (1974)).

[22] *Cyrus ex rel. McSweeney v. Walker,* 233 F.R.D. 467, 470 (SD WV 2005), relying upon *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n.13 (1982).

7

**JA81**

most favorable to them, the class is 'common' only in the very broadest sense, in that, allegedly, each of the Plaintiffs would like to ensure that coverage, and thereby, the requisite care, would not be denied them on the basis that they are transgender, suggesting that the best remedy might be legislative or administrative in nature. *See* Complaint, generally.[23] While more usually commonality would be addressed at the certification stage,[24] where, as here, the proposed class action by logical necessity inescapably falls outside Rule 23, the time to address the issue is now. After all, pursuant to Federal Rule of Civil Procedure Rule 23, a plaintiff may bring suit on behalf of a class of individuals "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).[25] Because the majority of the factual, and, therefore legal questions are unique to each class member, Plaintiffs' class claim must fail as a matter of law.

Plaintiffs have alleged by pertinent example that Defendants "[v]iolate[d] Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116 [ACA], by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including transgender status, sex characteristics,

---

[23] Indeed, in the broadest sense and taken as a matter of fact and law, the Plaintiffs are challenging the healthcare underwriting system itself, such that their claims are largely unrelated to any particular person's experience, suggesting that the true remedy is through administrative or legislative challenge.

[24] *Rhodes v. E.I. DuPont de Nemours & Co.,* 253 F.R.D. 365, 367, 370 (SD WV 2008), noting that this liberal standard must be subjected to rigorous analysis, especially in the instance of medical claims, which finally are not 'cohesive enough' to gain any economies through class action.

[25] While Plaintiffs have alleged a class of 'more than forty' or in any event, a number sufficient to meet Plaintiffs' numerosity mandate under Rule 23(a), Compl. at 112, it is more striking that the number of affected persons and the need to particularize the claims both mitigate in favor of jettisoning the class format and adding the putative plaintiffs as named parties. In point of fact, Plaintiffs' Complaint includes requisite language: the class is so large that it would be impractical or impossible to add the persons as named parties. However, to the extent that Plaintiffs fail to identify sufficient numbers and given the need for such individualized claims, Plaintiffs will have a high hurdle at certification if they have the same small number of exceedingly individual claims. *See American Pipe & Const. Co. v. Utah,* 414 U.S. 538, 552-53 (1974).

8

**JA82**

gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition),"[26] which creates a class of injured persons that would be either overly particularized (if this litigation needs to determine diagnosis, medical care requested, basis for the request, and claims history relative to that request) or insufficiently particularized to the extent that this litigation would focus solely on the catchall: violation of the ACA on the basis of sex. Any effort to particularize the allegations more pointedly would further complicate use of the class format for these claims in that each class member will need to be vetted for inclusion within the rubric (diagnosis, presenting complaints, claim submission, outcome, basis for denial, review sought). Additionally, Plaintiffs' effort to "enjoin enforcement or application of the Exclusions,"[27] while seeking common relief, is meaningless with healthcare claims, which by their very nature are dependent upon particularized assessment and review of individual claims – once again, a poor fit for Rule 23. Whereas Plaintiffs allege the State engaged in categorical denials, even assuming *arguendo* that it was true for purposes of this motion, it would be improper – arguably unconstitutional -- to change contractual relationships and burdens by enforcing coverage categorically.[28]

The Supreme Court of the United States in *Wal-Mart Stores, Inc., v. Dukes* clarified and particularized the issue of which claims are suitable for class consideration, in particular, as relates to commonality. Specifically, in *Dukes,* the Supreme Court recognized that, if plaintiffs generalize their claims broadly enough, certainly any and all persons could qualify as class members so as to meet the commonality mandate. However, the *Dukes* Court cautioned that, while such artful

---

[26] Compl. at Prayer for Relief at D (2).
[27] Compl. at Prayer for Relief at C.
[28] *See, e.g., General Motors Corp. v. Romein,* 503 U.S. 181, 186-87 (1992), questioning whether a change in state law that undercuts contractual relationships violates the due process and contract clauses of the Constitution.

9

**JA83**

pleading alone may appear to reflect commonality,[29] it is incumbent on courts, indeed, this Court, to probe beyond the pleadings to ensure that Plaintiffs do not raise common questions, but rather, seek to generate common answers. In *Dukes,* the Court considered common questions that, finally, were generalized to the point that they no longer meaningfully constituted a basis of commonality: "Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get?"[30]  While all of the *Dukes* plaintiffs truly had these questions at the heart of their claims, the *Dukes* Court found the questions too broad to provide meaningful class inquiry or relief.

Per *Dukes,* it is insufficient to achieve commonality by having a would-be class of plaintiffs allege commonality based on nothing more than violations of the same statute or law. The fact that the *Dukes* plaintiffs alleged violations of Title VII was insufficient alone to make plaintiffs' claims 'common' pursuant to Federal Rules of Civil Procedure Rule 23 (a)(2), which reads that "there are questions of law or fact common to the class." Rather, the class claims must be particularized to a common contention, which the Supreme Court in *Dukes,* an employment discrimination action, suggested could be discriminatory bias on the part of the same supervisor. Yet, the *Dukes* Court declined to extend evidence of one plaintiff's experience to the other class members, absent particularized allegations and proof.[31]  Therefore, citing alleged violations of the Affordable Care Act, absent more, will not constitute commonality. Relying upon the named Plaintiffs' health and claims histories, absent more, will not constitute commonality with the putative plaintiffs. To the extent Plaintiffs were to particularize the experiences of each putative

---

[29] *Dukes,* 564 U.S. at 349, citing Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009).

[30] *Id.*

[31] *Dukes,* 564 U.S. at 356, finding that "[o]ne named plaintiff's experience of discrimination is insufficient to infer that discriminatory treatment is typical of an employer's employment practices."

10

**JA84**

plaintiff, then the economies of class are lost. Relative to the instant suit, class claims add nothing to the challenge and complicate any 'class' handling of allegations that are too broad or proof patterns that are too narrow.

Beyond the particulars necessary for commonality, the *Dukes* Court further specified that the class model is only available where common answers are apt to drive the resolution of the litigation. The relevant inquiry is whether resolution of that particularized common contention is "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 431 U.S. at 350. Therefore, per *Dukes,* what matters is not raising common questions, regardless of how numerous, but rather, whether the class action process will generate common answers that will resolve the litigation. A failure to ensure true commonality inescapably impedes the generation of common answers. *Dukes,* 431 U.S. at 350, quoting Nagareda, *supra,* at 132. As the United States District Court for the Northern District of West Virginia has clarified,

> "[a] common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees. A question is not common, by contrast, if its resolution turns on a consideration of the individual circumstances of each class member." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (internal quotations and citations omitted). "The common questions must be dispositive and over-shadow other issues." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001).[32]

The Supreme Court of the United States in *Dukes* further advised that, "[w]ithout some glue holding the alleged reasons for all those decisions together," "it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the

---

[32] *Paulino v. Dollar Gen. Corp.,* 2014 U.S. Dist. LEXIS 64233 (3:12-CV-75) (ND WV 2014).

11

**JA85**

crucial question *why was I disfavored.*" *Dukes,* 431 at 351.[33] Therefore, while the need for a particularized determination of damages alone will not bar class litigation, the claims are unsuitable for class litigation where the initial alleged breach requires particularized factual inquiry: social and health history, diagnosis, scope of coverage, claims history, denial of claim, explanation of benefits, appeal or challenge, outcome.

Applying *Dukes* to the instant matter, Plaintiffs' class allegations must fail as a matter of law on the basis that they have failed to raise claims that can be particularized sufficiently to be meaningful and yet remain available for a single resolution.  Because Plaintiffs' claims by necessity focus on coverage determinations under particularized policies and the applicability of coverage to individual health issues, Plaintiffs' claims are inherently poorly suited for class treatment in a post-*Dukes* world. For instance, Plaintiffs' Complaint raises broad claims "about discrimination in health care and employment" and is intended "to challenge discrimination under West Virginia state health insurance plans that deprive transgender people of essential, and sometimes life-saving, health care." Complaint at ¶ 1.  Plaintiffs further allege broadly that the suit is necessary because "transgender people are targeted for discrimination by exclusions in the state health plans."  Complaint at ¶ 1.  In violation of *Dukes,* Plaintiffs' proposed class is broadly cast as well: "All transgender people who are or will be enrolled in West Virginia Medicaid and who

---

[33] *See also Paulino* at *13, citing *Cuming v. South Carolina Lottery Comm. Civil No. 3:05-CV—03608-MBS*, 2008 U.S. Dist. LEXIS 26917, 2008 WL 906705 at *4 (holding plaintiffs failed to establish commonality because "the court would be required to conduct an inquiry into the individual circumstances and motivations of each class member"); *Levitt v. Fax.com*, Civil No. WMN-05-949, 2007 U.S. Dist. LEXIS 83143, 2007 WL 3169078, * 3 (D. Md. May 25, 2007) (holding plaintiffs failed to meet the commonality requirement under Rule 23(a) because of the "need to make a determination for each class member as to whether the facsimile transmission was unsolicited").

are seeking or will seek gender-confirming care barred by Exclusions."[34]  The similarities to the

*Dukes* exemplar of the forbidden class are striking:

> "Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get?"

That is, in this instance,

> Are all of us plaintiffs indeed transgender? Do the insurers categorically exclude gender-confirming care? Is that an unlawful practice? What remedies should we get?

In *General Telephone Co. of Southwest v. Falcon, 457 U.S. 147 (1982)*, the Supreme Court

of the United States struck down a class of persons "comprising all employees wrongfully denied

promotions and all applicants wrongfully denied jobs" for failure of commonality and typicality,

citing a conceptual disconnection:

> "Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion [or higher pay] on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims."

*Dukes,* 431 U.S. at 353, quoting *Falcon,* 457 U.S. at 157-158. Here, accepting Plaintiffs' claims

as true for the purposes of this motion, Plaintiffs have been denied insurance coverage on

discriminatory grounds. However, there is a wide gap between that allegation and the assertion

that there exists a class of persons who have suffered the same injury, that they all share common

issues of law or fact, and that the Plaintiffs' claims will be typical of that class. Whereas the *Falcon*

Court suggests two workarounds, neither will work for the instant claims.  That is, a diverse group

of plaintiffs could find commonality in a biased testing procedure (not applicable here) or a general

---

[34] Complaint at ¶ 108.

**JA87**

policy of discrimination that applied to all class members. Here, Plaintiffs allege an exclusionary policy related solely on the basis of their transgender status. However, of note, a word search of the Medicaid State Plan contains not a single instance of the use of the words "transgender," "gender-confirming care," or "gender dysphoria," those characterizations and conditions against which the Plaintiffs contend the Medicaid State Plan discriminates – and Plaintiffs have failed to cite to any express provisions of the Plan that so provide.

Beyond the allegations and the State Plan, the Plaintiffs' claims themselves evidence the individualized complexities of coverage determinations, which further mitigate against the commonality necessary for class action. Specifically, the Complaint dedicates twenty paragraphs to particularizing *inter alia* Plaintiff Fain's medical need, presenting history, status of gender transition, and relationships with friends/family. Compl. at ¶¶ 68-87. The Complaint also dedicates eighteen paragraphs to particularizing *inter alia* Plaintiffs Martell's and McNemar's allegations of domestic situation, employment benefits, medical need, and claim denial history. Compl. at ¶¶ 88-105. By dedicating nearly one-quarter of the Complaint to the named Plaintiffs' estimations of particularized need and unlawful denial, the Plaintiffs unwittingly prove the wisdom of the *Dukes* Court in that each person's medical need, presenting complaints, documented condition and medical recommendations are by necessity different, individual to that person, such that any determination of whether coverage was, first, for medically indicated care; second, denied; third, on what basis; and, fourth, whether that basis was discriminatory, is cumbersome with an individual plaintiff -- and voluminous and unwieldy with a class of persons. Plaintiffs' claims by necessity will involve a particularized determination of the Defendants' duty, if any, to each Plaintiff and putative plaintiff, such that "it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I*

**JA88**

*disfavored*."[35] Whereas the Complaint references 'categorial exclusions,'[36] the terms of the Complaint itself demonstrate through the Plaintiffs' individualized allegations that careful and particularized determinations will have to be made as a predicate to determining, *inter alia,* the applicability of the care and coverage sought.

Pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) as construed,

"a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). To determine whether a claim has crossed "the line from conceivable to plausible," the Court must employ a "context-specific" inquiry, drawing on the court's "experience and common sense." *Iqbal*, 556 U.S. at 679-80 (quoting *Twombly*, 550 U.S. at 570). When performing this inquiry, the Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court need not, however, accept unsupported legal conclusions, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), nor must it agree with legal conclusions couched as factual allegations, *Iqbal*, 556 U.S. at 678, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).[37]

While Plaintiffs must be prepared to defend the suitability of maintaining this suit as a class action at the class certification stage, the class claims can be challenged on 12(b)(6) motion to ensure that, pursuant to *Dukes,* Plaintiffs' claims sounding in coverage determinations and employment benefits are capable of classwide resolution. That is, the Court need not allow discovery on the propriety of any class claims but can determine on a 12(b)(6) motion that the claims are unsuitable for class determination.[38] Here, whereby their very nature, the class claims cannot and will not

---

[35] *Dukes,* 431 at 351.
[36] *See, e.g.,* Complaint at ¶¶ 1, 2, 62, 63, 99.
[37] *Williams v. Potomac Family Dining Group Oper. Co., LLC,* 2019 U.S. Dist. LEXIS 181604, *18.
[38] *Bessett v. Avco Fin. Serv.,* 279 F.R.D. 442 (2002).

15

**JA89**

achieve the requisite commonality, dismissal of the class claims alone will allow the named Plaintiffs' claims to proceed. While Defendants maintain that global relief is better achieved through administrative or legislative change, nonetheless, the class of putative plaintiffs have no role in an insurance coverage determination.

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to challenge the sufficiency of a plaintiff's complaint, and that challenge should be granted where plaintiff has failed to 'state a plausible claim for relief.'[39] The Fourth Circuit has joined the Supreme Court in finding that plaintiffs are required in their complaints to provide a "'showing' rather than a blanket assertion of entitlement to relief."[40] Plaintiffs must provide "enough facts to state a claim to relief that is plausible on its face," that is, that "contain[s] 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"[41] The *Fain* Complaint by its express terms demonstrates the impropriety of the class form for this claim. Rather than await class certification only to determine that the class form will not work with medical complaints and coverage determinations, Defendants Crouch, Beane, and WVDHHR move this Court to dismiss the class claims at this time. Whereas Plaintiffs' individual claims would remain as would other avenues more appropriate for systemic challenges,[42] the parties could avoid the investment of time and resources inherent in proving further that, per *Dukes,* the actual, not presumed, conformance with Rule 23(a), including in particular commonality, is a mandate that is undercut by these putative class members' medical complaints and claims-

---

[39] *Walters v. McMahen,* 684 F.3d 435, 439 (4th Cir. 2012).
[40] *Johnson v. Prosperity Mortgage Corp.,* 2011 U.S. Dist. Lexis at *4-5.
[41] *Johnson,* 2011 U.S. Dist. Lexis, quoting *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 554 (4th Cir. 2013) in reliance upon *Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly,* 350 U.S. 544 (2007).
[42] N.B., however, these Defendants attest and assert, and in no manner waive, the additional grounds for dismissal set forth herein.

16

**JA90**

handling experiences. Defendants seek an early determination that any class claims constitute medical claims, which finally are not 'cohesive enough' to gain any economies through class action.[43]

## <u>CONCLUSION</u>

Plaintiff Christopher Fain's claim for compensatory damages against the WVDHHR is barred by the Eleventh Amendment to the United States Constitution because it is a claim against the State of West Virginia. Additionally, the Plaintiffs' request for class certification should be dismissed. Wherefore, these Defendants request that their Motion for Partial Dismissal be granted, that the subject claims be dismissed against them, with prejudice, and for such other and further relief as the court may direct.

**WILLIAM CROUCH,
CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,**

**By counsel**

<u>/s/ Lou Ann S. Cyrus</u>
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

---

[43] *Rhodes v. E.I. DuPont de Nemours & Co.,* 253 F.R.D. 365, 367, 370 (S.D.W. Va. 2008).

17

**JA91**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

|  |  |
|---|---|
| **Plaintiffs,** | **Civil Action No. 3:20-cv-00740**<br>**Hon. Robert C. Chambers, Judge** |

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

**Defendants.**

**CERTIFICATE OF SERVICE**

Now come Defendants, William Crouch, Cynthia Beane and West Virginia Department of
Health and Human Resources, by counsel, and do hereby certify that on the 11th day of January,
2021, the foregoing **"MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES'S
MOTION FOR PARTIAL DISMISSAL OF PLAINTIFFS' CLASS ACTION
COMPLAINT"** was electronically filed with the Clerk of the Court using the CM/ECF system,
which will send a Notice of Electronic Filing to, and constitutes service on:

Walt Auvil (WVSB#190)
The Employment Law Center, PLLC
1208 Market Street

18

**JA92**

Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

and

Avatara Smith-Carrington, Visiting Attorney
Lambda Legal
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org


*/s/ Lou Ann S. Cyrus*
Lou Ann S. Cyrus, Esquire (WVSB 6588)
Roberta F. Green, Esquire (WVSB#6598)
Caleb B. David, Esquire (WVSB#12732)
Kimberly M. Bandy, Esquire (WVSB 10081)

19

**JA93**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL; and BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

                      **Plaintiffs,**

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

                      **Defendants.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

## AFFIDAVIT OF ANGELA WOWCZUK, DOCTOR OF PHARMACY, BCPS, AAHIVE

STATE OF WEST VIRGINIA,

COUNTY OF  Monongalia

    I, Angela Wowczuk, Doctor of Pharmacy, BCPS, AAHIVE, duly sworn, make oath upon

my knowledge as follows

    1.    I currently serve as Director of the Rational Drug Therapy Program at the West

Virginia University School of Pharmacy in Morgantown, West Virginia.

2.      The Rational Drug Therapy Program is part of West Virginia University School of Pharmacy's Department of Pharmaceutical Systems and Policy and supported through a contract with the West Virginia Bureau for Medical Services (WVBMS). The program provides prior authorization and consultative services for West Virginia Bureau of Medical Services' Medicaid pharmaceuticals program.

3.      I have reviewed the Prior Authorization history for Christopher Fain. Mr. Fain had an approval for testosterone from March 8, 2019, to February 20, 2020.

4.      A Prior Authorization request for testosterone for Mr. Fain came in by fax on May 12, 2020. The Prior Authorization request was for a non-standard dosing regimen, so more information was needed from the provider for a decision. The Rational Drug Therapy Program sent a fax back to the provider that same day, seeking clarification because the patient had been on weekly dosing, and the new request sought dosing every 5 days. (General Drug Prior Authorization Form, attached as Exhibit 1 to this Affidavit). Prior Authorizations are drug and dose specific.

5.      The Rational Drug Therapy Program did not receive information back from the provider in response to the request to clarify the change in dosing. Therefore, the Prior Authorization for testosterone did not go beyond a "pending" status.

6.      The Prior Authorization request for testosterone for Mr. Fain that came in by fax on May 12, 2020 has not been denied. It has neither been denied nor approved because additional information requested from the provider regarding dosing was not received. The Rational Drug Therapy Program has not sent anything to Mr. Fain indicating either approval or denial.

7.      In providing prior authorization services for the West Virginia Bureau of Medical Services' Medicaid pharmaceuticals program, the Rational Drug Therapy Program does not have a policy of denying testosterone for treatment of gender dysphoria. The patient history for

**JA95**

Christopher Fain indicates that testosterone was approved for quite some time. It was only the dose change that required additional information for Prior Authorization, which was not received from the provider.

AND FURTHER AFFIANT SAYETH NOT.

Angela Wowczuk, Doctor of Pharmacy, BCPS,
AAHIVE
Director
Rational Drug Therapy Program

Sworn and subscribed to before me this 2 day of February, 2021.

My commission expires: 2-2-2022

NOTARY PUBLIC

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
William M. Matheny, II
The UPS Store
384 Patteson Dr.
Morgantown WV 26505
My Commission Expires February 02, 2022

Page 3 of 3

**JA96**

05/12/2020 2:48 PM FAX 913047811549          STMARY'S WOMEN & FAMILY          ☑0001/0001

## General Drug Prior Authorization Form

Page 2 of 2

**West Virginia Medicaid**
Drug Prior Authorization Form
http://www.dhhr.wv.gov/bms/Pages/rxprior/default.aspx

Rational Drug Therapy Program
WVU School of Pharmacy
PO Box 9511 HSCN
Morgantown, WV 26506
Fax: 1-800-531-7787
Phone: 1-800-847-3859

| Patient Name (Last) | (First) | (M) | WV Medicaid 11 Digit ID# | Date of Birth (mm/dd/yyyy) |
|---|---|---|---|---|
| Fain | Christopher | | | |

| Prescriber Name (Last) | | (First) | | (MI) |
|---|---|---|---|---|
| | | | | |

| Prescriber Address (Street) | | (City) | (State) | (Zip) |
|---|---|---|---|---|
| | | Buckannsville | WV | 2659? |

| Prescriber 10-Digit NPI# | Phone # (111-222-3333) | Fax # (111-222-3333) |
|---|---|---|
| | | |

**Pharmacy Name (if applicable)**

**Pharmacy Address (Street)** | **(City)** | **(State)** | **(Zip)**

Pending: Please clarify the every 5 day dosing. This was previously reported as qweek dosing

By RDTP ID# 6019 at 3:25 pm on May 12, 2020

**Important Notes:** Preauthorization for medical necessity does not guarantee payment.
The use of pharmaceutical samples will not be considered when evaluating the member if medical condition or prior prescription history for drugs that require prior authorization

| Drug Name | Strength | Route of Administration |
|---|---|---|
| Testosterone Cypionate 100MG/ML Solution | 100MG/ML | Intramuscular |

| Directions | Diagnosis | ICD Diagnosis Code (if available) |
|---|---|---|
| .30mL Q 5days | Transgender | F64.0 |

**Previous Treatment History**

**Other Pertinent Information**

**Attestation:** Your signature (manually or electronically) certifies that the above request is medically necessary, does not exceed the medical needs of the member and is documented in your medical records. Medical/Pharmacy records must be made available upon request.

☐ Check here for electronic signature

Prescriber or Pharmacist Signature:                                          Date:

EXHIBIT 1

**JA97**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL; and BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

               **Plaintiffs,**

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

               **Defendants.**

**Civil Action No. 3:20-cv-00740**
**Hon. Robert C. Chambers, Judge**

## AFFIDAVIT OF BRIAN THOMPSON, M.S. PharmD

STATE OF WEST VIRGINIA,

COUNTY OF   Kanawha

I, Brian Thompson, M.S., PharmD, duly sworn, make oath upon my knowledge as follows:

1.    I currently serve as Director of Pharmacy Services in the Office of Pharmacy Services, West Virginia Bureau for Medical Services (WVBMS).

2.    I have reviewed the patient history for Christopher Fain as it relates to a prior authorization request for testosterone faxed on May 12, 2020 to the Rational Drug Therapy

**JA98**

Program. The prescription requires Prior Authorization to be covered under the Medicaid pharmaceuticals program. Prior Authorization services are provided by The Rational Drug Therapy Program through a contract with WVBMS.

3.     The West Virginia Bureau of Medical Services' Medicaid pharmaceuticals program does not have a policy of denying testosterone for treatment of gender dysphoria.

4.     Based on my review of the patient history, neither the Rational Drug Therapy Program nor WVBMS actively denied coverage of testosterone for Mr. Fain. The request was placed on "pending" status, and clarification was requested from the provider regarding dosing.

5.     Mr. Fain could have contacted WVBMS directly at any time to determine the coverage status of his medication. WVBMS did not receive an Appeal from Mr. Fain or from anyone on his behalf regarding testosterone to be administered every 5 days for gender dysphoria. AND FURTHER AFFIANT SAYETH NOT.

_Brian Thompson_

Brian Thompson, M.S., PharmD,
Director of Pharmacy Services
West Virginia Bureau for Medical Services

Sworn and subscribed to before me this 1st day of February, 2021.

My commission expires: May 30, 2022

_Tina M. Harrison_

NOTARY PUBLIC

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
TINA M. HARRISON
822 7TH AVENUE
ST. ALBANS, WV 25177
My Commission Expires May 30, 2022

**JA99**

## AFFIDAVIT OF

## UNICARE HEALTH PLAN OF WEST VIRGINIA, INC.

I, Tadd Haynes,  President  of UniCare Health Plan of West Virginia, Inc. ("UniCare"), hereby make the following attestation in response to the Bureau of Medicaid Services' request for any documents concerning certain services for Medicaid member C.F.:

    1.    UniCare hereby attests that UniCare has not received any requests or inquiries regarding gender confirming services for Medicaid member C.F.

_____ President __ (Name and Title)

__01/29/2021_____ (Date)

**JA100**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

CHRISTOPHER FAIN;
ZACHARY MARTELL; and
BRIAN MCNEMAR,
individually and on behalf of all others similarly situated,

      Plaintiffs,

v.             CIVIL ACTION NO.   3:20-0740

WILLIAM CROUCH, in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
CYNTHIA BEANE, in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services;
WEST VIRGINIA DEPARTMENT OF HEALTH
AND HUMAN RESOURCES, BUREAU FOR
MEDICAL SERVICES;
TED CHEATHAM, in his official capacity as
Director of the West Virginia Public Employees
Insurance Agency; and
THE HEALTH PLAN OF WEST VIRGINIA, INC.,

      Defendants.

### MEMORANDUM OPINION AND ORDER

   Pending before the Court are Defendant Ted Cheatham's Motion to Dismiss the Complaint (ECF No. 22), and Defendants William Crouch, Cynthia Beane, and the West Virginia Department of Health and Human Resources, Bureau for Medical Services' (collectively, "WVDHHR Defendants") Motion for Partial Dismissal of Plaintiffs' Class Action Complaint (ECF No. 23) and Motion to Dismiss (ECF No. 32). For the reasons stated below, the motions are **DENIED**.

   Also pending before the Court is Plaintiffs' Motion for Leave to file Sur-Reply (ECF No. 56). For good cause shown, this motion is **GRANTED**.

**JA101**

## I.  BACKGROUND

The putative Class Action Complaint asserts several claims, each of which is rooted in the same theory: that Defendants discriminated against Plaintiffs by denying coverage for gender-confirming health care. The Complaint defines "gender-confirming care" as health care which "includes, but is not limited to, counseling, hormone replacement therapy, and surgical care . . . . for the treatment of gender dysphoria—the clinically significant distress that can result from the dissonance between an individual's gender identity and sex assigned at birth . . . . " *Compl*. ¶¶ 1-2. According to the Complaint, these treatments are denied to transgender individuals despite being available to cisgender individuals.[1]

Based on this overarching theory, the Complaint raises two types of individual and class action claims: (1) those brought by Medicaid recipients against the WVDHHR Defendants and (2) those brought by state employees and their dependents against Ted Cheatham, the Director of the West Virginia Public Employee Insurance Administration, and The Health Plan, a health maintenance organization permitted to offer health plans to state employees through PEIA.[2]

(1) <u>WVDHHR Defendants</u>

Christopher Fain, a transgender male, brings four discrimination claims individually and on behalf of the proposed Medicaid Class against the WVDHHR Defendants. As a Medicaid recipient, Fain relies on WVDHHR Medicaid plans for insurance coverage. However, Fain alleges that he has been denied hormone replacement therapy and surgical care (double mastectomy), despite needing that care to treat his gender dysphoria diagnosis. According to Fain, WVDHHR has denied this treatment under its Medicaid Policy Manual, which excludes "[t]ranssexual surgery" from coverage (the "Exclusion"). *Compl*. ¶ 61. Fain challenges the Exclusion as well as

---

[1]  The Complaint defines "cisgender" as "people who are not transgender." *Compl*. ¶ 1 n.1.

[2]  The Health Plan filed a separate motion to dismiss (ECF No. 20), which the Court will address in a subsequent opinion.

similar policies adopted by the three managed care organizations ("MCO") in the Mountain Health Trust system. This includes Fain's MCO, UniCare, which excludes coverage for "[s]ex transformation procedures and hormone therapy for sex transformation procedures." *Id*. at ¶ 61.

Since lodging the Complaint, WVDHHR Defendants submitted an affidavit stating that, "[i]n providing prior authorization services for the West Virginia Bureau of Medical Services' pharmaceuticals program, the Rational Drug Therapy Program does not have a policy of denying testosterone for treatment of gender dysphoria." *Wowczuk Aff*. ¶ 7, ECF No. 32-1. Based on this affidavit, Fain agreed not to pursue his claims based on denial of hormone therapy. *See Stipulation* ¶ 10, ECF No. 53.

With surgical care as his sole basis for recovery, Fain alleges that WVDHHR Defendants' policies are discriminatory because "the same treatments are covered for cisgender people who are Medicaid participants." *Compl*. ¶ 62. According to Plaintiffs, this discrimination violates (1) the Equal Protection clause, (2) the nondiscrimination clause under Section 1557 of the Patient Protection and Affordable Care Act (42 U.S.C. § 18116), (3) the Medicaid Act's Availability Requirements (42 U.S.C. § 1396a(a)(10)(A)), and (4) the Medicaid Act's Comparability Requirements (42 U.S.C. § 1396a(a)(10)(B)). Fain seeks declaratory and injunctive relief for himself and the Medicaid Class as to each of these claims. He also individually seeks compensatory damages under the ACA.

(2) Defendants Cheatham

Plaintiff Brian McNemar is a state employee who is insured through West Virginia's PEIA. McNemar is married to Plaintiff Zachary Martell, who is McNemar's dependent. Martell is a transgender man diagnosed with gender dysphoria and is seeking both hormone replacement therapy and surgical care to treat that diagnosis. McNemar and Martell bring two claims

individually and on behalf of the proposed State Employee Class and The Health Plan Subclass.

Like Plaintiff Fain, McNemar and Martell challenge PEIA and The Health Plan policies and practices which exclude gender-confirming care. According to the Complaint, the PEIA plans exclude "[s]urgical or pharmaceutical treatments associated with gender dysphoria or any physical, psychiatric, or psychological examinations, testing, treatments or services provided or performed in preparation for, or as a result of, sex transformation surgery." *Compl*. ¶ 64. Additionally, there is a similar exclusion in all plans provided by The Health Plan, which are approved by Cheatham. *Id*. Plaintiffs allege Cheatham's approval of discriminatory policies and failure to offer a non-discriminatory option violates the Equal Protection clause. They seek declaratory and injunctive relief on behalf of the class.[3]

## II. WVDHHR DEFENDANTS' MOTIONS TO DISMISS

On January 11, 2021, WVDHHR Defendants moved for partial dismissal (ECF No. 23), challenging Fain's claim for compensatory damages under the Eleventh Amendment and the sufficiency of Fain's class action allegations. On February 2, 2021, WVDHHR Defendants filed a second motion to dismiss (ECF No. 32), this time challenging standing and ripeness, as well as Fain's ability to represent the proposed class. With the filing of Plaintiffs' Unopposed Motion for Leave to File Sur-Reply in Opposition to WVDHHR Defendants' Motion to Dismiss on April 5, 2021, the motions became ripe for review.

(1) <u>Eleventh Amendment Immunity</u>

The first jurisdictional issue raised by WVDHHR Defendants is whether Fain's claim for compensatory damages against WVDHHR under the ACA must be dismissed. WVDHHR argues that this claim is barred by the Eleventh Amendment, whereas Plaintiff argues that WVDHHR

---

[3] Plaintiffs also alleged that Cheatham violated the ACA but have voluntarily dismissed that claim. *Order*, ECF No. 38.

**JA104**

waived its Eleventh Amendment immunity by accepting federal assistance.

The waiver exception applies if a state "voluntarily participat[es] in federal spending programs [and] Congress expresses 'a clear intent to condition participation in the programs . . . on a State's consent to waive its constitutional immunity.'" *Litman v. George Mason Univ*., 186 F.3d 544, 550 (4th Cir. 1999) (quoting *Booth v. Maryland*, 112 F.3d 139, 145 (4th Cir.1997)). Such a waiver must be a "clear and unambiguous" condition of the funding. *Arlington Cent. Sch. Dist. Bd. Of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

Here, Fain argues that Congress clearly and unambiguously conditioned federal Medicaid funding on states' waiver of immunity for nondiscrimination provisions when it enacted Section 1003 of the Civil Rights Remedies Equalization Act of 1986. That Section reads:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7(a)(1). According to Plaintiff, the so-called Residual Clause ("or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance") incorporates Section 1557 of the ACA, which is a nondiscrimination provision. The Court agrees.

The text of the Residual Clause unequivocally waives immunity against violations of "provisions of any other Federal statute prohibiting discrimination." Section 1557 is unambiguously a federal statue which prohibits discrimination by recipients of Federal financial assistance; it states:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part

**JA105**

of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).

42 U.S.C. § 18116. Although there is not yet[4] controlling precedent on Section 1003's application to the ACA, several district courts have held that the Residual Clause incorporates Section 1557. *See, e.g.*, *Kadel v. Folwell*, 446 F. Supp. 3d 1, 17 (M.D.N.C. 2020) ("[T]he Court concludes that Section 1557, when read in conjunction with CRREA, effectuates a valid waiver of sovereign immunity."); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 998 (W.D. Wis. 2018) (same); *Esparza v. Univ. Med. Ctr. Mgmt. Corp.*, No. CV 17-4803, 2017 WL 4791185, at *9 (E.D. La. Oct. 24, 2017) (same).

Defendants argue that Section 1003 is not a sufficient waiver because the Supreme Court requires waivers to be "unequivocally expressed *in the text of the relevant statute*." *Sossamon v. Texas*, 563 U.S. 277, 284 (2011) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984)) (emphasis added). WVDHHR Defendants reason that because Section 1557 does not contain an express waiver, Plaintiffs' claim must be dismissed.

WVDHHR's reading of *Sossamon* is oversimplified and ignores the final section of the opinion. After the Court remarked that the waiver must be "in the text of the relevant statute," it declined to invalidate Section 1003 or the Residual Clause. Instead, it held: "[e]ven assuming that a residual clause like the one in § 1003 could constitute an unequivocal textual waiver, § 3 [of the Religious Land Use and Institutionalized Persons Act] is not unequivocally a 'statute prohibiting discrimination' within the meaning of § 1003." *Sossamon*, 563 U.S. at 292. This analysis supports the finding that Section 1003 may constitute a "relevant statute" under *Sossamon*.

In addition to being undermined by *Sossamon's* analysis, the Court rejects WVDHHR's

---

[4] The issue was recently submitted to the Fourth Circuit in *Kadel v. N.C. State Health Plan*, No. 20-1409 (4th Cir. argued March 11, 2021).

**JA106**

reasoning because it would lead to untenable results. If the Court held that Section 1557 cannot be read in conjunction with Section 1003, it would invalidate the waivers for Section 504 of the Rehabilitation Act of 1973, Title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, and Title VI of the Civil Rights Act of 1964. That contradicts Congress' intent in enacting Section 1003, states' longstanding acceptance of these waivers, and the body of case law upholding Section 1003. *See, e.g.*, *Litman*, 186 F.3d at 554. The Court cannot disregard this longstanding precedent.

In sum, the Court finds that West Virginia waived its immunity from suit under Section 1557 by accepting federal assistance under the ACA, as provided by Section 1003's Residual Clause. WVDHHR's Motion is denied as to immunity.

(2) <u>Standing and Ripeness</u>

WVDHHR Defendants next argue that Fain lacks standing and that his claims are not ripe for review because he has not requested the gender-confirming surgery he claims to have been denied. Consequently, says WVDHHR, Fain's injuries are speculative, and his claims are not ripe.

Federal courts do not have jurisdiction over a suit unless the plaintiff can establish standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In general, standing requires three elements: (1) an injury in fact that is both concrete and actual or imminent; (2) a causal connection between the injury and the defendant's alleged wrongdoing; and (3) a substantial likelihood that a favorable judgment will redress the injury. *Id.*

Ripeness, like standing, is a constitutional and prudential doctrine that limits federal courts' jurisdiction to the "cases" and "controversies" described in Article III, § 2 of the United States Constitution. The doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative

-7-

**JA107**

policies." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). In evaluating whether a dispute is ripe, courts must consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006).

Fain argues that the Complaint meets these standards because he has alleged injury from the denial of care established by the WVDHHR Exclusion, which renders any request for surgery futile. As indicated in the Complaint, the WVDHHR Medicaid Policy Manual excludes coverage for "[t]ranssexual surgery." *Compl.* ¶ 61. According to Fain, this Exclusion dispels WVDHHR's argument that its denial is speculative because it demonstrates that WVDHHR has *already* made the decision to exclude the surgery he requires. The Court again agrees with Plaintiff.

Assuming that the Plaintiffs' allegations are true, as the Court must at the pleading stage, WVDHHR enacted a clear policy that excludes gender-confirming surgical care with no exceptions. In doing so, WVDHHR caused a concrete injury to Plaintiff Fain by constructing an allegedly discriminatory barrier between him and health insurance coverage. This barrier constitutes a concrete, non-speculative injury. Given this injury, Fain has standing to sue, and his claims challenging the policy are ripe for review.

To the extent that the Exclusion does not constitute an outright denial, the Court finds that a request for gender-confirming surgery would be futile. To hold otherwise would require an individual to request a benefit even when he or she knows that the defendant maintains a clear policy to deny that request. Such a request would be nothing more than a formality and is unnecessary for the purposes of Plaintiffs' claims, which are purely legal. Courts do not require

-8-

**JA108**

plaintiffs to perform such futile acts, especially when those acts could subject them to "personal rebuffs." *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977)) ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."); *see also Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1452 (4th Cir. 1990) (quoting same).

    This is not the first time a court has extended the futile gesture doctrine to allegations of health care discrimination. In *Cruz v. Zucker*, 116 F. Supp. 3d 334 (S.D.N.Y. 2015), *aff'd on mot. for reconsideration* 195 F.Supp.3d 554 (July 5, 2016), the transgender plaintiffs challenged a New York Medicaid policy which excluded all "cosmetic" procedures, including gender confirming surgeries. *Id*. at 336. The court held that plaintiffs were not required to seek coverage for their gender-confirming procedures before filing suit because such an attempt would have been futile under the blanket cosmetic exclusion. *Id*. at 349. The court also noted that the question was purely legal, which rendered such fact development unnecessary. *Id*.

    WVDHHR contends that Fain should have been required to request the surgery because it is possible that that the request will be granted. In support of this argument, WVDHHR Defendants point to previous approvals of Fain's hormone therapy, despite its policy excluding coverage for "hormone therapy for sex transformation procedures." *WVDHHR Defs.' Reply* 4-5, ECF No. 55. However, WVDHHR's past approvals for hormonal therapy are inapposite because WVDHHR did not just grant an exception for Fain, it filed an affidavit stating that it was not their policy to deny hormone therapy. WVDHHR Defendants do not contest that their explicit policy is to deny gender confirming surgical care without exception. Moreover, even if WVDHHR is earnest in assertion that Fain's surgical request may be granted, dismissing the suit on that ground would

**JA109**

allow defendants to dodge liability by granting litigants' requests, all while maintaining an allegedly discriminatory policy and practice for anyone who does not file suit. Such a loophole cannot be permitted.

WVDHHR's final argument is that Fain's request would not be futile because it could be denied on grounds other than the Exclusion. However, Plaintiffs allege that the Exclusion denies of coverage without exception. Accordingly, WVDHHR's policy acts as a barrier to Fain's surgery in every instance and renders alternative grounds for denial irrelevant. The Court rejects this argument and concludes that Plaintiffs have plausibly alleged a ripe claim for which they have standing to bring.

### (3) Sufficiency of Class Allegations

Lastly, WVDHHR Defendants argue that the class allegations should be dismissed because the Complaint does not sufficiently allege a viable class action under Federal Rule Civil Procedure 23(c)(1)(A). Rule 23 provides that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Because this determination requires a "rigorous" factual and legal analysis, it is rare for a court to make a class determination at the pleadings stage. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (internal citation omitted). As recently held in this District, class allegations should be stricken only when "it is clear from the face of the complaint that the plaintiff cannot and could not meet Fed. R. Civ. P. 23's requirements for certification . . . . " *Sommerville v. Union Carbide Corp.*, No. 2:19-CV-00878, 2020 WL 2945541, at *3 (S.D. W. Va. June 3, 2020) (Goodwin, J.) (quoting *Williams v. Potomac Family Dining Grp. Operating Co.*, No. GJH-19-1780, 2019 WL 5309628, at *5 (D. Md. Oct. 21, 2019)) (internal quotation marks omitted).

WVDHHR argues that Plaintiffs will not be able to meet the commonality requirement under Fed. R. Civ. Pro. 23(a)(2), which mandates "questions of law or fact common to the class." Although "[a] single common question will suffice, . . . it must be of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014) (quoting *Wal-Mart*, 564 U.S. at 350). This is evident when the "plaintiff shows that the class members have suffered the same injury," and when the common injury arises from "a common contention." *Wal-Mart*, 564 U.S. at 349.

In the discrimination context, the common contention acts as the "glue" which holds each of the claims together and ensures "that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Brown v. Nucor Corp.*, 785 F.3d 895, 909 (4th Cir. 2015) (quoting *Wal-Mart*, 564 U.S. at 349) (emphasis in original) (internal quotation marks omitted). This requirement can be met when the plaintiff shows that the defendant "operated under a general policy of discrimination." *Wal-Mart*, 564 U.S. at 353 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)) (internal quotation marks omitted).

Plaintiffs' allegations are consistent with this standard. As noted above, Plaintiffs allege that the class members suffer from a common injury which arises from a general policy of discrimination: the denial of coverage for "[t]ranssexual surgery" in the WVDHHR Medicaid Policy Manual. *Compl.* ¶ 61. As alleged, this denial generally effects the proposed class, which includes "[a]ll transgender people who are or will be enrolled in West Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusions." *Id.* at ¶ 108.[5]

Based on this common contention, Plaintiffs have appropriately framed the common

_____

[5] To the extent that this definition must be amended to reflect the parties' Stipulation (ECF No. 53), the Court finds that the class certification stage is the appropriate time to do so.

**JA111**

questions as follows: (1) whether WVDHHR's Exclusion facially, and as applied to the proposed Class, violates the U.S. Constitution, the ACA, and the federal Medicaid Act; and (2) whether WVDHHR should be enjoined from enforcing the Exclusion and denying Mr. Fain and members of the proposed Medicaid Class coverage for and access to gender-confirming care. *See Compl.* ¶¶ 118-56. These questions are primarily legal and have the potential to relieve the common injury "in one stroke." *See Wal-Mart*, 564 U.S. at 350.

WVDHHR Defendants attempt to rebut this common contention by representing that "a word search of the Medicaid State Plan contains not a single instance of the use of the words 'transgender,' 'gender-confirming care,' or 'gender dysphoria.'" *WVDHHR Defs.' Mot. for Part. Dismissal* 14, ECF No. 25. This is a classic red herring. The Policy Manual's exclusion of "[t]ranssexual surgery" and Plaintiffs' resulting injury are not disproved by the absence of other terms in the State Plan. This is especially true given WVDHHR's apparent refusal to deny the Exclusion's application to Plaintiffs' alleged surgical needs.

WVDHHR's further attempts to reframe the Complaint are also unconvincing. Defendants argue that Plaintiffs will not be able to establish commonality because "the majority of the factual, and, therefore, legal, questions are unique to each class member . . . ." *WVDHHR Defs.' Mot. for Part. Dismissal* 8, ECF No. 25. WVDHHR Defendants have it backwards; legal standards inform the necessary fact findings. Having started with the conclusion that particularized discovery will be required, Defendants crafted a legal standard which resembles a common negligence claim:

> particularized discovery would be necessary in order to determine the individualized facts relative to Defendants' duty to each class member, the underlying facts of the breach of that duty as experienced by each class member, and any causation between that breach and each particular class member's alleged damages. . . .

*WVDHHR Defs.' Motion to Dismiss* 9, ECF No. 55. Plaintiffs neither assert a negligence claim,

-12-

## JA112

nor do they seek compensatory damages on behalf of the class. Additionally, their Equal Protection, ACA, and Medicaid Act claims do not require evidence of individual "duty" or "breach." These claims are purely legal and require little to no fact development. Having failed to identify any ground upon which the Parties will be required to make particularized and individualized factual findings, WVDHHR's argument must be rejected. The Court denies WVDHHR's Motion for Partial Dismissal of Plaintiffs' Class Action Complaint (ECF No. 23) and Motion to Dismiss (ECF No. 32).

### III. CHEATHAM MOTION TO DISMISS

On January 11, 2021, Defendant Cheatham moved for dismissal, arguing that McNemar and Martell lack standing and have failed to state an Equal Protection Clause claim. For the reasons stated below, the Court finds that dismissal is unwarranted on both grounds.

(1) <u>Standing</u>

Unlike WVDHHR, Cheatham does not contest injury; he argues that Plaintiffs McNemar and Martell's injuries are neither traceable to nor redressable by him. First, Cheatham argues that Plaintiffs' injuries cannot be traced back to PEIA because the insurance policy at issue is drafted, created, and offered by The Health Plan. According to Cheatham, PEIA only facilitates this contractual relationship and "do[es] not contract with these outside agencies on the basis of what is covered under their policies." *Cheatham Mot. to Dismiss* 7-8, ECF No. 24. Second, Cheatham argues that the claims are not redressable by PEIA because the insurance policy is under the control of The Health Plan. Accordingly, PEIA cannot change that plan even if the Court grants Plaintiffs' request for an injunction. As explained below, the Court rejects both arguments.

*Traceability*

Traceability requires a causal connection between the defendant's conduct and the plaintiff's injury such that "there is a genuine nexus" between the two. *Friends of the Earth, Inc. v.*

-13-

**JA113**

*Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). However, as the Fourth Circuit has explained, "the fairly traceable standard is not equivalent to a requirement of tort causation." *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 623 (4th Cir. 2018). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561.

As noted above, Defendant Cheatham argues that Plaintiffs' injuries are not traceable to him because the policy precluding coverage for Martell's gender-confirming care is contained in The Health Plan's HMO policy. However, that does not accurately address Plaintiffs' allegations. Plaintiffs have alleged that their injuries can be traced to Cheatham because he only approves the discriminatory policies (including The Health Plan's HMO policy) and refuses to provide a non-discriminatory alternative. Both allegations are plausible because Cheatham is statutorily responsible for administering PEIA, including overseeing "provider negotiations, provider contracting and payment, designation of covered and noncovered services, [and] offering of additional coverage options or cost containment incentives." W. Va. Code § 5-16-3(c). [6] Therefore, the Court finds that Plaintiffs' have plausibly alleged traceability.

*Redressability*

The same statutory authority under West Virginia Code § 5-16-3(c) enables Cheatham to redress Plaintiffs' injuries if such relief is granted. The Complaint requests an order "directing Defendants and their agents to provide access to coverage for all gender-confirming care without regard to the Exclusion[]." *Compl.* at p. 37(C). According to Plaintiffs, this type of order would prevent Defendant Cheatham from contracting for private plans with a discriminatory policy,

---

[6] Although Cheatham denies that he intentionally chooses discriminatory plans, that is a factual dispute that cannot be resolved at the pleading stage. Even if it could, Cheatham has not submitted any evidence supporting this argument.

prohibit enforcement of discriminatory policies in those plans, or affirmatively require him to provide access to gender-confirming care.

Cheatham provides evidence that he does not have control over existing policies under the PEIA's agreement with The Health Plan. [7] However, even if the Court were to accept this assertion, Cheatham has not shown that the other proposed remedies are inadequate. Given that Cheatham is tasked with "designation of covered and noncovered services" and "offering [] additional coverage options," W. Va. Code § 5-16-3(c), he is statutorily authorized to grant Plaintiffs access to gender-confirming care. Therefore, the Court finds that Plaintiffs' have sufficiently alleged that their injuries are redressable.

(2) Failure to State an Equal Protection Clause Claim

Cheatham's last argument is that Plaintiffs failed to state an Equal Protection claim upon which relief may be granted because the PEIA policy passes heightened scrutiny. In short, Cheatham argues that there are three important government interests which are substantially related to PEIA's policies: (1) "guarantee[ing] the health and safety of the enrollees," (2) "maintain[ing] the medical standards of physicians and other entities that accept the insurance of enrollees," and (3) "sav[ing] taxpayer dollars from use for procedures that are not medically necessary, or FDA approved." *Cheatham Mot*. 11-12, ECF No. 24.

As Plaintiffs argue in their Response, Cheatham's argument is improper because it relies on facts outside of the Complaint. For example, Cheatham's representations regarding patient "safety" and "medically necessary [procedures]" assume facts that are neither in the Complaint nor

---

[7] *See* Exhibit A, ECF No. 24-1 ("The responsibility for determining and providing appropriate health care services in a competent manner to enrollees shall remain with the HMO and the enrollees[,] treating physicians and other health care professionals and facilities, not PEIA.").

JA115

the record. In fact, the Complaint alleges the opposite: that gender-confirming care is medically necessary and safe. *See Compl.* ¶ 67. Therefore, the Court will not entertain Cheatham's fact-based arguments at this stage and denies Cheatham's Motion to Dismiss (ECF No. 22.)

### IV. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant Cheatham's Motion to Dismiss the Complaint (ECF No. 22), and WVDHHR Defendants' Motion for Partial Dismissal of Plaintiffs' Class Action Complaint (ECF No. 23) and Motion to Dismiss (ECF No. 32). The Court also **GRANTS** Plaintiffs' Motion for Leave to file Sur-Reply (ECF No. 56).

The Clerk is **DIRECTED** to send a copy of this Opinion to counsel of Record and any unrepresented party.

ENTER:        May 19, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| CHRISTOPHER FAIN; ZACHARY MARTELL; BRIAN MCNEMAR; SHAWN ANDERSON a/k/a SHAUNTAE ANDERSON; and LEANNE JAMES, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; CYNTHIA BEANE, in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES; TED CHEATHAM, in his official capacity as Director of the West Virginia Public Employees Insurance Agency; and THE HEALTH PLAN OF WEST VIRGINIA, INC.,<br><br>*Defendants.* | Civil Action No.<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>CIVIL ACTION NO. 3:20-cv-00740<br><br>HON. ROBERT C. CHAMBERS, JUDGE |

## INTRODUCTION

1.      This case is about discrimination in health care and employment.  Plaintiffs bring

this suit to challenge discrimination under West Virginia state health insurance plans that deprive

transgender people of essential, and sometimes life-saving, health care.  These state health plans

facially, and categorically, exclude coverage for health care that transgender people require.  The

exclusions in the state health plans described in paragraphs 63 and 66 use antiquated and

improper language, but their targeting of transgender people on explicitly sex-based terms is

unmistakable.  The exclusions all categorically deny transgender people coverage for gender-

-1-

**JA117**

confirming care.  Gender-confirming care includes, but is not limited to, counseling, hormone replacement therapy, and surgical care.  Accordingly, as used herein, gender-confirming care includes the care denied pursuant to each of those exclusions.  While cisgender people[1] receive coverage for those forms of health care as a matter of course, transgender people are targeted for discrimination by exclusions in the state health plans.  This kind of discrimination is unlawful under federal constitutional and statutory guarantees of freedom from discrimination based on sex and transgender status.  Because these exclusions constitute a sweeping, uniform denial of care for all transgender people, Plaintiffs bring this class action suit on behalf of themselves and those similarly situated.

2.    Defendants violate the law in two ways.  First, Defendants discriminate against low-income transgender people who are Medicaid participants.  Inflicting grave harm on a particularly vulnerable group of people, Defendants deny low-income transgender Medicaid participants the same health coverage others receive, targeting them for discrimination based on their sex and transgender status.  This care is for the treatment of gender dysphoria—the clinically significant distress that can result from the dissonance between an individual's gender identity and sex assigned at birth—and is also known as gender-confirming care.  Defendants categorically deny gender-confirming care to transgender Medicaid participants, even though it is medically necessary and can be life-saving, while routinely providing cisgender participants the same treatments.

3.    Second, Defendants discriminate against state employees and their dependents by denying coverage for gender-confirming care, even though cisgender people receive the same kinds of treatments as a matter of course.  As part of compensation for employment, the State of

---

[1] "Cisgender" refers to people who are not transgender.

**JA118**

West Virginia provides health care coverage for employees and their eligible dependents through the Public Employees Insurance Agency ("PEIA"). The health plans offered through PEIA deny coverage for gender-confirming care, and unlawfully discriminate against people who either are transgender or have transgender family members who depend on them for health care coverage. In other words, Defendants deny equal compensation for equal work to employees who are transgender or have transgender dependents, and harm employees' transgender family members who depend on them for health care.

4.      The blanket exclusions of gender-confirming care are stated expressly in the health plans offered to Medicaid participants, and to state employees. While phrased in slightly different terms across the plans, the exclusions all single out transgender people for differential treatment and rely explicitly on sex-based considerations. Plaintiffs challenge the exclusions, and any other source of law, regulation, policy, or practice that denies gender-confirming care to West Virginia Medicaid participants, state employees, and eligible dependents of state employees (references herein to the "Exclusions" refer collectively to all such exclusions for gender-confirming care).

5.      The Exclusions fly in the face of the medical consensus that gender-confirming care is the only safe and effective medical treatment for gender dysphoria, and wholly disregard the harms of denying transgender people access to critical health care. The Exclusions unlawfully deny medically necessary care to Medicaid participants, and state employees and their dependents, who are transgender. The state's coverage of the same treatments to address health conditions other than gender dysphoria underscores that West Virginia treats its transgender Medicaid and state health plan participants in an unfair and discriminatory manner. In doing so, Defendants expose a particularly vulnerable group to significant and avoidable

3

**JA119**

harms to their health and wellbeing, and inflict needless suffering and financial hardship in violation of the U.S. Constitution and federal law.

6.      Plaintiffs bring this lawsuit on behalf of themselves and other similarly situated Medicaid participants, state employees, and eligible dependents of state employees seeking a declaratory judgment that the Exclusions violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, Section 1557 ("Section 1557") of the Patient Protection and Affordable Care Act ("ACA" or "Affordable Care Act"), 42 U.S.C. § 18116, and the comparability and availability requirements of the federal Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A)-(B); preliminary and permanent injunctions barring Defendants from enforcing the Exclusions to deny gender-confirming care; reasonable attorneys' fees and costs; and such other relief as the Court deems just and equitable.

7.      In their individual capacities, the named Plaintiffs also seek compensatory and consequential damages for the injuries they have suffered as a result of Defendants' unlawful conduct.

## PARTIES

8.      Plaintiff Christopher Fain resides in Huntington, West Virginia. Mr. Fain is a 45-year-old transgender man. Mr. Fain has been enrolled for Medicaid coverage at all times material to this complaint.

9.      Plaintiff Shauntae Anderson[2] resides in Charleston, West Virginia. Ms. Anderson is a 45-year-old transgender woman. Ms. Anderson has been enrolled for Medicaid coverage at all times material to this complaint.

---

[2] Ms. Anderson is currently in the process of changing her legal name, which is reflected in the caption, to Shauntae Anderson. Accordingly, the complaint refers to her as Shauntae Anderson throughout.

10.    Plaintiff Leanne James resides in Hurricane, West Virginia. Ms. James is a 43-year-old transgender woman. Ms. James is a public employee who works for the Kanawaha County Board of Education as a Micro Computer Technician. Ms. James has been enrolled for public employee health coverage at all times material to this complaint.

11.    Plaintiff Zachary Martell resides in Barboursville, West Virginia. Mr. Martell is a 34-year-old transgender man. Mr. Martell is married to Brian McNemar, a state employee. As the legal spouse of Mr. McNemar, Mr. Martell is an eligible dependent and has been enrolled for state employee health coverage through Mr. McNemar at all times material to this complaint.

12.    Plaintiff Brian McNemar resides in Barboursville, West Virginia. Mr. McNemar is a 38-year-old cisgender man. Mr. McNemar is a state employee who works at the Mildred Mitchell Bateman Hospital as an Accountant Auditor. Mr. McNemar is married to Mr. Martell.

13.    Defendant William Crouch is sued in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources. As Cabinet Secretary, Mr. Crouch is responsible for "[d]evelop[ing] a managed care system to monitor the services provided by the [M]edicaid program to individual clients." W. Va. Code § 9-2-9(a)(1). Mr. Crouch is authorized to "[p]repare and submit state plans which … meet the requirements of federal laws, rules governing federal-state assistance." W. Va. Code § 9-2-6(12). Additionally, Mr. Crouch is responsible for preparing recommendations "to be submitted to the joint committee on government and finance," and in developing these recommendations Mr. Crouch may "[r]eview … [M]edicaid services which are optional under federal [M]edicaid law and identif[y] … services to be retained, reduced or eliminated." W. Va. Code § 9-2-9(b)(1). Mr. Crouch exercises his authority as Cabinet Secretary to ensure that gender-confirming care is designated as an excluded service in the state Medicaid program—targeting transgender

5

**JA121**

Medicaid participants for discriminatory treatment on the basis of their sex and transgender status. Defendant Crouch is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this complaint.

14.     Defendant Cynthia Beane is sued in her official capacity as Commissioner for the Bureau for Medical Services. As Commissioner, Ms. Beane's duties include managing and overseeing project development, implementation of health policies, and assuring compliance with federal laws and regulations. Ms. Beane also led policy implementation for changes to bring West Virginia's Medicaid coverage into compliance with the Affordable Care Act. Despite having the authority to implement health policies to assure compliance with federal law, including the Affordable Care Act, Ms. Beane exercises her authority to ensure that gender-confirming care is designated as a noncovered service for Medicaid participants, thus targeting transgender people for discriminatory treatment on the basis of their sex and transgender status. Defendant Beane is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this complaint.

15.     Defendant West Virginia Department of Health and Human Resources, Bureau for Medical Services ("BMS") is the "single state agency" charged with the responsibility of administering "the [M]edicaid program" in West Virginia. W. Va. Code §§ 9-1-2(n), 9-2-13(a)(3). BMS establishes eligibility standards for Medicaid providers, determines benefits, sets payment rates, and reimburses providers. Additionally, BMS maintains the West Virginia Medicaid State Plan and files amendments to the plan with the appropriate regulatory authorities. West Virginia Medicaid is jointly funded by the state of West Virginia and the federal government. BMS is a recipient of federal funds from the U.S. Department of Health and Human Services ("HHS"), including Medicaid funding. The federal assistance BMS receives

6

**JA122**

makes BMS a "covered entity" subject to the nondiscrimination requirements of Section 1557 of

the ACA, which prohibit discrimination on the basis of sex and other protected characteristics.

16.     Defendant Ted Cheatham is sued in his official capacity as Director of PEIA. As

Director, Mr. Cheatham is the Chief Administrative Officer of PEIA and is responsible for the

"administration and management of the Public Employees Insurance Agency." W. Va. Code

§ 5-16-3(c). This responsibility includes, but is not limited to, "manag[ing] on a day-to-day basis

the group insurance plans" for state employees through "administrative contracting, studies,

analyses and audits, … provider negotiations, provider contracting and payment, *designation of*

*covered and noncovered services*, [and] offering of additional coverage options or cost

containment incentives." *Id.* (emphasis added). Mr. Cheatham has authority to "make all rules

necessary to effectuate" his responsibilities under the statute. *Id.* Mr. Cheatham exercises this

authority to ensure that gender-confirming care is designated as a noncovered service in each and

every health plan available to state employees and their dependents, thus targeting them for

discriminatory treatment on the basis of their, or their dependent's, sex and transgender status.

Defendant Cheatham is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was,

acting under the color of state law at all times relevant to this complaint.

17.     Defendant The Health Plan of West Virginia, Inc. ("The Health Plan") was

established in 1979 through provisions under the federal Health Maintenance Organization

("HMO") Act, 42 U.S.C. §300e, et seq. The Health Plan is a federally qualified and state-

certified 501(c)(4) not-for-profit HMO. The Health Plan is West Virginia's largest HMO, with

more than 200,000 members, and its service area encompasses all 55 counties in West Virginia.

Many of The Health Plan's members, including Mr. Martell and Mr. McNemar, are enrolled

through their state employers; others are enrolled through state Medicaid and Medicare

7

**JA123**

Advantage plans. The Health Plan is offered through PEIA as a health insurance option for qualifying state employees. More than 15,000 of The Health Plan's members are state employees who have obtained coverage through the PEIA. The Health Plan receives federal financial assistance and is a "covered entity" for purposes of Section 1557 of the ACA.

18.    Defendants, through their respective duties and obligations, are responsible for the discriminatory Exclusions of gender-confirming health care to Medicaid participants, state employees, and dependents who are transgender. Each Defendant, and those subject to their direction, supervision, or control, has or intentionally will perform, participate in, aid and/or abet in some manner the acts alleged in this complaint, has or will proximately cause the harm alleged herein, and has or will continue to injure the plaintiffs irreparably if not enjoined. Accordingly, the relief requested herein is sought against each Defendant and their successors, as well as all persons under their supervision, direction, or control, including, but not limited to, their officers, employees, and agents.

## JURISDICTION AND VENUE

19.    This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution; Section 1557 of the ACA, 42 U.S.C. § 18116; and the Medicaid Act's availability and comparability requirements, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(10)(B).

20.    The Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States; and pursuant to 28 U.S.C. § 1343(a)(3) and (4) because the action is brought to redress deprivations, under color of state authority, of rights, privileges, and immunities secured by the

8

**JA124**

U.S. Constitution and seeks to secure damages and equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights.

21.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

22.     Under 28 U.S.C. § 1391(b)(1) and (2), venue is proper in the Southern District of West Virginia because Defendants reside there and all Defendants are residents of West Virginia in which the district is located; and in this district and division because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred herein.

23.     This Court has personal jurisdiction over Defendants because they are all domiciled within the State of West Virginia.

## FACTS

### A.     Sex, Gender Identity, and Gender Dysphoria

24.     Every individual's sex is multifaceted, and comprised of a number of characteristics, including but not limited to chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and most importantly, gender identity.

25.     Gender identity is a person's internal sense of their sex.  It is an essential element of human identity that everyone possesses, and a well-established concept in medicine.  Gender identity is innate, immutable, and has biological underpinnings, such as the sex differentiation of the brain that takes place during prenatal development.

26.     For everyone, gender identity is the most important determinant of a person's sex and a fundamental component of human identity.

**JA125**

27.    A person's sex is generally assigned at birth based solely on a visual assessment of external genitalia at the time of birth.  External genitalia are only one of several sex-related characteristics and are not always indicative of a person's sex.

28.    For most people, these sex-related characteristics are all aligned, and the visual assessment performed at birth serves as an accurate proxy for that person's gender.

29.    Where a person's gender identity does not match that person's sex assigned at birth, however, gender identity is the critical determinant of that person's sex.

30.    The ability to live in a manner consistent with one's gender identity is vital to the health and wellbeing of transgender people.

31.    Scientific consensus recognizes that attempts to change an individual's gender identity to bring their gender identity into alignment with the sex assigned at birth are ineffective and harmful.

32.    Attempts to force transgender people to live in accordance with their sex assigned at birth, a practice often described as "conversion therapy," is known to cause profound harm. Such efforts are now widely considered unethical and, in many places, are unlawful.

33.    For transgender people, an incongruence between their gender identity and sex assigned at birth can result in a feeling of clinically significant stress and discomfort known as gender dysphoria.  Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition; the World Health Organization's International Classification of Diseases, which is the diagnostic and coding compendia for medical professionals; and by other leading medical and mental health professional groups, including the American Medical Association ("AMA") and the American Psychological Association ("APA").

**JA126**

34.     In addition to clinically significant distress, untreated gender dysphoria can result in severe anxiety, depression, or even suicidality.

35.     Untreated gender dysphoria often intensifies with time.  The longer an individual goes without or is denied adequate treatment for gender dysphoria, the greater the risk of severe harms to the individual's health.

36.     Gender dysphoria can be treated in accordance with internationally recognized Standards of Care formulated by the World Professional Association for Transgender Health ("WPATH").  WPATH is an international, multidisciplinary, professional association whose mission is to promote evidence-based health care protocols for transgender people.  WPATH publishes Standards of Care that are based on the best available science and expert professional consensus, and which are widely accepted as best practices for treating gender dysphoria.

37.     Under the WPATH Standards of Care, medically necessary treatments may include, among other things, "[h]ormone therapy" and "[s]urgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring)."

38.     The Standards of Care are recognized as authoritative by national medical and behavioral health organizations such as the AMA and APA, which have both called for an end to exclusions of gender-confirming care from health insurance plans.

39.     The individualized steps that many transgender people take to live in a manner consistent with their gender, rather than the sex they were assigned at birth, are known as transitioning.

40.     Transitioning is particular to the individual but typically includes social, legal, and medical transition.

**JA127**

41.     Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life. For example, social transition can include wearing attire, following grooming practices, and using pronouns consistent with that person's gender identity. The steps a transgender person can take as part of their social transition help align their gender identity with all aspects of everyday life.

42.     Legal transition involves steps to formally align an individual's legal identity with their gender identity, such as legally changing one's name and updating the name and gender marker on their driver's license, birth certificate, and other forms of identification.

43.     Medical transition, a critical part of transitioning for many transgender people, includes gender-confirming care that brings the sex-specific characteristics of a transgender person's body into alignment with their sense of their gender. Gender-confirming care can involve counseling to obtain a diagnosis of gender dysphoria, hormone replacement therapy, surgical care, or other medically necessary treatments for gender dysphoria.

44.     Hormone replacement therapy involves taking hormones for the purpose of bringing one's secondary sex characteristics into typical alignment with one's gender identity. Secondary sex characteristics are bodily features not associated with external and internal reproductive genitalia (primary sex characteristics). Secondary sex characteristics include, for example, hair growth patterns, body fat distribution, and muscle mass development. Hormone replacement therapy can have significant masculinizing or feminizing effects and can assist in bringing transgender individuals' secondary sex characteristics into alignment with their gender identity, and therefore is medically necessary care for transgender people who need it to treat their gender dysphoria.

12

**JA128**

45.    Gender-confirming surgical care might be sought by transgender people to better align primary or secondary sex characteristics with their gender identity.  Surgical care can include, but is not limited to, hysterectomies, gonadectomies, mammoplasties, mastectomies orchiectomies, vaginoplasties, and phalloplasties.  These treatments are for the purpose of treating gender dysphoria.

46.    These various components associated with transition—social, legal, and medical transition—do not change an individual's gender, as that is already established by gender identity, but instead bring the individual's appearance, legal identity, and sex-related characteristics into greater alignment with the individual's gender identity and lived experience.

47.    The consequences of untreated, or inadequately treated, gender dysphoria are dire. Symptoms of untreated gender dysphoria include intense emotional suffering, anxiety, depression, suicidality, and other attendant mental health issues.  Untreated gender dysphoria is associated with higher levels of stigmatization, discrimination, and victimization, contributing to negative self-image and the inability to function effectively in daily life.  When transgender people are provided with access to appropriate and individualized gender-confirming care in connection with treatment of gender dysphoria, these symptoms can be alleviated and even prevented.

48.    The AMA, APA, American Psychiatric Association, Endocrine Society, American College of Obstetricians and Gynecologists, American Academy of Family Physicians, and other major medical organizations have recognized that gender-confirming care is medically necessary, safe, and effective treatment for gender dysphoria—and that access to such treatment improves the health and well-being of transgender people.  Each of these groups

**JA129**

has publicly opposed exclusions of insurance coverage by private and public health insurers, like the Exclusions at issue here.

49.     WPATH has stated that, like hormone replacement therapy and other gender-confirming treatments, the "medical procedures attendant to sex reassignment are not 'cosmetic' or 'elective' or for the mere convenience of the patient," but instead are "medically necessary for the treatment of the diagnosed condition."  Nor are they experimental, because "decades of both clinical research and medical research show that they are essential to achieving well-being for the patient."

**B.     Defendants' Targeted and Discriminatory Exclusion of Gender-Confirming Care**

**1.     Medicaid health coverage**

50.     Authorized under Title XIX of the Social Security Act of 1965, Medicaid is a joint federal-state program that provides access to health care for Medicaid-eligible individuals. 42 U.S.C. § 1396-1396w-5 ("Medicaid Act").  The purpose of Medicaid is to enable states to "furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the cost of necessary medical services."  42 U.S.C. § 1396-1.

51.     States are not required to participate in the Medicaid program—but all states do. States that choose to participate must comply with the Medicaid Act and its implementing regulations.

52.     The Medicaid Act requires each participating state to establish or designate a single state agency charged with administering or supervising the state's Medicaid program.  42 U.S.C. § 1396a(a)(5).  Additionally, each participating state must maintain a comprehensive state plan ("Medicaid Plan") for medical assistance, approved by the Secretary of the U.S. Department of Health and Human Services.  42 U.S.C. § 1396a.

14

**JA130**

53.     The Medicaid Plan must describe how the state will administer its Medicaid program and affirm the state's commitment to comply with the Medicaid Act and its implementing regulations.  Additionally, the Medicaid Plan "sets out groups of individuals to be covered, services to be provided, methodologies for providers to be reimbursed and the administrative activities that are underway in the state."

54.     The federal government reimburses participating states for a substantial portion of the cost of providing medical assistance.

55.     Under the Medicaid Act, "the medical assistance made available to any individual … shall not be less in amount, duration or scope than the medical assistance made available to any other such individual."  42 U.S.C. § 1396a(a)(10)(B)(i).

56.     Additionally, a state "Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service … to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition."  42 C.F.R. § 440.230(c).

57.     States must ensure that "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose."  42 C.F.R. § 440.230(b).  Moreover, state Medicaid programs must provide medical assistance "in a manner consistent with … the best interests of the recipients."  42 U.S.C. § 1396a(a)(19).

58.     The State of West Virginia participates in the federal Medicaid program.

59.     Defendant BMS is the designated single state agency charged with the responsibility of administering the Medicaid program in West Virginia.  W. Va. Code §§ 9-1-2(n); 9-2-13(a)(3).

15

**JA131**

60.     Defendant BMS maintains the state's Medicaid Plan and files amendments to the Medicaid Plan with the appropriate regulatory authorities.  Additionally, Defendant BMS determines benefits, sets payment rates, and reimburses providers.

61.     Mountain Health Trust is West Virginia's Medicaid managed care program, which is administered by the BMS.  BMS contracts with several managed care organizations ("MCO"), which are health plans that coordinate services to provide health coverage to Medicaid participants.  As part of the Mountain Health Trust program, eligible Medicaid participants may select a primary care provider and one of three MCOs: (1) UniCare Health Plan of West Virginia, Inc., (2) The Health Plan, and (3) Aetna Better Health of West Virginia.

62.     Each MCO provides Medicaid participants with Medicaid-covered health services through their defined network of providers and hospitals.  These MCO networks are monitored by Defendant BMS.

63.     Although Defendant BMS, in its administration of the state's Medicaid program, "strives to assure access to appropriate, medically necessary and quality health care services for all members," the Medicaid Policy Manual provides that the Medicaid Plan does not cover "[t]ranssexual surgery."  Additionally, each MCO contains a similar exclusion of gender-confirming care in each of their managed care plans: (1) UniCare excludes coverage for "[s]ex transformation procedures and hormone therapy for sex transformation procedures;" (2) The Health Plan provides that "[s]ex change, hormone therapy for sex transformation, and gender transition procedures/expenses will not be paid for by The Health Plan;" and (3) Aetna Better Health excludes coverage for "[s]ex transformation procedures and hormone therapy for sex transformation procedures."

**JA132**

64.     At all relevant times, the state's Medicaid Plan and managed care plans have categorically excluded coverage for gender-confirming care, through the exclusions in paragraph 63, even though the same treatments are covered for cisgender people who are Medicaid participants.

### 2.     State employee health coverage

65.     Qualifying state employees and their eligible dependents can choose from multiple health plan options.  Covered services under the state employee health plans generally include coverage of medically necessary prescriptions, counseling, and surgical care at inpatient and outpatient facilities.  These plans are distinguished primarily by coverage ratios, deductible amounts, and general costs to the insured employee and their eligible dependent enrollees.  The health plans offered to state employees do, however, have at least one feature in common.  At all relevant times, all health plans offered to state employees have contained categorical exclusions of coverage for gender-confirming care, even though the same care is covered for cisgender people.

66.     State employees can choose from among seven health insurance plans.  These options include (A) four preferred provider benefit plan options through PEIA provided by Defendant Cheatham, and (B) three HMO and point of service plans provided by Defendants Cheatham and The Health Plan.

A.     **Four preferred provider benefit plan options through PEIA provided by Defendant Cheatham:** State employees can enroll for health coverage through four Preferred Provider Benefit plans: (1) "PEIA PPB Plan A," a comprehensive health plan; (2) "PEIA PPB Plan B," which offers lower premiums but higher deductibles and other costs; (3) "PEIA PPB Plan C," an IRS-qualified high-deductible health plan; and (4) "PEIA PPB Plan D," which offers

17

**JA133**

no out-of-state benefits with limited exceptions. All handbooks for these plans contain an identical exclusion for "[s]urgical or pharmaceutical treatments associated with gender dysphoria or any physical, psychiatric, or psychological examinations, testing, treatments or services provided or performed in preparation for, or as a result of, sex transformation surgery." That exclusion appears in the 2020 and 2021 plan year handbooks. Member handbooks for plan years 2013 through 2019 similarly excluded "[s]ex transformation operations and associated services and expenses."

B.    **Three HMO and point of service plans provided by Defendants Cheatham and The Health Plan:** State employees can also choose from insurance plans approved by Defendant Cheatham and offered through Defendant The Health Plan, which offers three health plans: (a) HMO Plan A; (b) HMO Plan B; and (c) a point of service ("POS") plan. All three plans include a blanket exclusion of coverage for gender-confirming care.

67.    All seven health plans available to West Virginia state employees exclude coverage for gender-confirming care.

68.    Transgender people may require varying forms of gender-confirming care. The blanket Exclusions, however, unilaterally and uniformly prevent transgender people from receiving coverage for gender-confirming care regardless of their need. As a result, the Exclusions maintained across all state employee health plans discriminatorily target transgender people, denying coverage for medically necessary gender-confirming care. Cisgender enrollees receive coverage for medically necessary mental health, prescription drug, and surgical needs; whereas, transgender enrollees do not because of the Exclusions and based on their sex and transgender status.

18

**JA134**

**C.**     **The Denial of Care to Plaintiffs**

      **1.**     **Plaintiff Christopher Fain (Medicaid)**

69.     Mr. Fain is 45 years old.  Mr. Fain was born in West Virginia and has resided in West Virginia for the vast majority of his life.

70.     Mr. Fain is an adjunct professor at Mountwest Community and Technical College ("Mountwest College").

71.     Mr. Fain is a man.

72.     Mr. Fain is also transgender.  Although his sex assigned at birth was female, his gender identity is male.

73.     Mr. Fain experiences dysphoria related to the distress arising from the incongruence between his gender identity and his sex assigned at birth.

74.     Mr. Fain has been aware of his gender identity since he was six years old, and since that first awareness has identified as male.  Mr. Fain delayed his transition for many years, however, for fear that discrimination and stigma against transgender people would prevent him from being able to support his family.

75.     Delaying this vital care took an enormous toll on Mr. Fain, and he eventually came out to his family.  Mr. Fain's children are very supportive of Mr. Fain's transition.

76.     Mr. Fain began counseling to help address his gender dysphoria, and was diagnosed with gender dysphoria in or around December 2018.

77.     Mr. Fain obtained a legal name change to reflect his gender identity through a West Virginia court order on April 6, 2018.

78.     Mr. Fain updated his name to reflect his male gender identity on his Social Security account in April 2018 and, updated his West Virginia driver's license with his new name in May 2018 and correct sex designation in August 2021.

19

**JA135**

79.     Mr. Fain lives in all ways in accordance with his male gender identity and is recognized as male by his family, his friends, his classmates, and his professors.

80.     Mr. Fain has been enrolled as a Medicaid participant for most of his adult life.

81.     Mr. Fain receives coverage through the MCO UniCare Health Plan of West Virginia, Inc., an Anthem Company.

82.     In or around February 2019, Mr. Fain's mental health provider recommended that he begin hormone therapy to alleviate his gender dysphoria by aligning his physical characteristics with his gender identity.  Mr. Fain began hormone care on or around March 2019.

83.     In order to avoid being incorrectly identified as female and to reduce the severe distress and embarrassment over the presence of typically female-appearing breasts on his body, Mr. Fain often wears a "binder," which is a compression garment that flattens or reduces the profile of a person's chest, which is an ongoing source of his gender dysphoria.

84.     Mr. Fain experiences intense discomfort with prolonged use of a binder, which often chafes his skin, and sometimes creates sores and leads to difficulty breathing.  Nonetheless, to help manage his gender dysphoria, he sometimes wears the binder for 16 hours at a time.

85.     Mr. Fain requires a bilateral mastectomy as medically necessary care to treat his gender dysphoria and eliminate the need for the ongoing use of a binder.  This surgical procedure is a widely accepted and effective treatment for gender dysphoria.  However, the blanket exclusion in the Medicaid Plan bars him from receiving this medically necessary care.  Mr. Fain accordingly is forced to delay this urgently-needed procedure as a direct and proximate result of Defendants' continuing refusal to cover medically necessary gender-confirming care.  As a result, Mr. Fain's symptoms of gender dysphoria and related distress have increased.

**JA136**

86.     The Medicaid Plan's exclusion of coverage for Mr. Fain's medically necessary care has caused Mr. Fain economic hardship, emotional distress, lowered self-esteem, embarrassment, humiliation, and stigma.

**2.     Plaintiff Shauntae Anderson (Medicaid)**

87.     Ms. Anderson is 45 years old.  Ms. Anderson was born in West Virginia and has resided in West Virginia for the vast majority of her life.

88.     Ms. Anderson is a woman.

89.     Ms. Anderson is also transgender.  Although her sex assigned at birth was male, her gender identity is female.

90.     Ms. Anderson experiences gender dysphoria related to the disconnect between her primary and secondary sex characteristics and her gender identity.

91.     For much of Ms. Anderson's younger years and into early adulthood, Ms. Anderson was forced to suppress her gender identity due to family disapproval and societal stigma.  As a child, Ms. Anderson never felt "right" in her body.  Ms. Anderson was incredibly shy and was uncomfortable being raised and socialized as a boy.

92.     Around the age of six years old, Ms. Anderson started using her mother's makeup and playing with her sister's toys.  In or around ninth grade, Ms. Anderson attempted to socially transition at school by dressing in a more typically feminine manner and wearing makeup.

93.     In 2010, Ms. Anderson began to medically transition.  Ms. Anderson lacked access to health coverage for this care, but her need to transition was so urgent that she was forced to self-treat.  Ms. Anderson began taking estrogen in the form of birth control pills to help feminize her appearance.  While birth control pills are not remotely adequate as a substitute for hormone therapy, Ms. Anderson's gender dysphoria was so severe that even a modest feminizing effect helped relieve some of her gender dysphoria.

**JA137**

94.    Ms. Anderson subsequently served time in federal prison.  While incarcerated, Ms. Anderson continued the process of socially transitioning, and formally began to medically transition in consultation with and under the care of medical professionals.

95.    During her time in the Bureau of Prisons, Ms. Anderson updated her name to not only reflect her gender identity but also ensure that she would be recognized and treated as a transgender woman for the purpose of security checks.  Additionally, Ms. Anderson was evaluated by medical professionals and received approval to wear typically feminine underwear as part of her transition.

96.    Ms. Anderson began counseling to help address her gender dysphoria, and was diagnosed with gender dysphoria.

97.    In or around 2019, Ms. Anderson's health care providers recommended that she begin hormone therapy to alleviate her gender dysphoria by further aligning her physical characteristics with her gender identity.  Ms. Anderson began hormone therapy in or around May 2019.

98.    Ms. Anderson has been enrolled as a Medicaid participant since 2020.

99.    Ms. Anderson receives coverage through the MCO Aetna Better Health of West Virginia.

100.    Surgical treatment is medically necessary for treatment of Ms. Anderson's gender dysphoria.

101.    Ms. Anderson experiences significant distress related to her genitalia and breasts that negatively impact her daily life. She particularly experiences such distress when she gets dressed and when she is using the restroom.  For example, when Ms. Anderson is using the

22

**JA138**

bathroom, she is often reminded of the fact that there are aspects of her physical body that do not feel right.

102.    In order to avoid being incorrectly identified as male and to reduce the severe distress and embarrassment over the presence of her typically male-appearing features, Ms. Anderson often employs the use of shapewear, like push-up bras, to help with further feminizing her body.  These coping techniques, however, are not adequate to treat her gender dysphoria and do not alleviate her need for medical care.

103.    Ms. Anderson requires gender-confirming surgery, including but not limited to vaginoplasty and breast reconstruction surgery.  These surgical procedures are medically necessary care to treat her gender dysphoria and, are widely accepted and effective treatments for gender dysphoria.

104.    However, the blanket exclusion in the Medicaid Plan bars her from receiving this medically necessary care.  Ms. Anderson, accordingly, is forced to delay this urgently-needed care as a direct and proximate result of Defendants' continuing refusal to cover medically necessary gender-confirming care.  As a result, Ms. Anderson's symptoms of gender dysphoria and related distress have increased.

105.    The Medicaid Plan's exclusion of coverage for Ms. Anderson's medically necessary care has caused Ms. Anderson emotional distress, lowered self-esteem, embarrassment, and stigma.

### 3.    Plaintiff Leanne James (PEIA)

106.    Ms. James is 43 years old.  Ms. James was born in West Virginia and has resided in West Virginia for her entire life.

**JA139**

107.    Ms. James is currently employed as a Programmer at the Information Systems Department for the Kanawha County Board of Education.  She began working for the Kanawha County Board of Education on February 5, 2008.

108.    As part of the terms, conditions, privileges, and status of her employment with the Kanawha County Board of Education, Ms. James is and, at all relevant times, has been enrolled in a health plan through PEIA and relies on that plan for health care coverage.  Ms. James is enrolled in the PPB Plan A approved and offered by Defendant Cheatham.

109.    Ms. James is a woman.

110.    Ms. James is also transgender.  Although her sex assigned at birth was male, her gender identity is female.

111.    Ms. James experiences gender dysphoria related to the disconnect between her primary and secondary sex characteristics and her gender identity.

112.    Ms. James ultimately came to terms with her female gender identity in adulthood after realizing she could no longer ignore or suppress it.

113.    In 2011, Ms. James began her social transition.  However, due to concerns regarding Ms. James' ability to retain employment, which is necessary for ensuring the ongoing care of her daughter, Ms. James delayed certain aspects of her transition.  Ms. James was concerned that transitioning on the job might subject her to stigma and discrimination.

114.    In January 2019, Ms. James was diagnosed with gender dysphoria.

115.    After realizing she could no longer delay her transition, in 2019 Ms. James began hormone therapy to alleviate her gender dysphoria by aligning her physical characteristics with her gender identity.

**JA140**

116.    Ms. James changed her legal name by West Virginia court order on July 23, 2021. She also updated the name on her West Virginia driver's license and birth certificate. Ms. James is recognized as female by her family, friends, and colleagues.

117.    As part of her treatment plan, Ms. James requires routine appointments for bloodwork. Ms. James has been, and continues to be, denied coverage for her bloodwork appointments pursuant to the Exclusion. Because of this, Ms. James is forced to pay out-of-pocket for her bloodwork, which typically costs her $354.00.

118.    Additionally, Ms. James is forced to pay out-of-pocket for her routine visits with her OB-GYN, Dr. Patton, because of Defendant Cheatham's categorical exclusion of such medical care. Ms. James is typically required to pay upwards of $110.00 per visit for her examinations.

119.    Surgical treatment is medically necessary for treatment of Ms. James' gender dysphoria.

120.    Ms. James experiences significant distress related to her genitalia and breasts that negatively impact her daily life.

121.    In order to reduce the severe distress and embarrassment over the presence of her typically male-appearing features, Ms. James often employs the use of breast prosthetics to help feminize her body. This coping technique, however, is not adequate to treat her gender dysphoria and does not alleviate her need for medical care.

122.    Ms. James requires gender-confirming surgery, including but not limited to vaginoplasty and breast reconstruction surgery. These surgical procedures are medically necessary care to treat her gender dysphoria and are widely accepted and effective treatments for gender dysphoria.

123.    However, the categorical exclusion in Defendant Cheatham and PEIA's PPB Plan A bars her from receiving this medically necessary care. Ms. James is forced to delay this urgently-needed care as a direct and proximate result of Defendant Cheatham and PEIA's continuing refusal to cover medically necessary gender-confirming care.

124.    Ms. James has timely submitted a charge to the Equal Employment Opportunity Commission ("EEOC") for sex discrimination in violation of Title VII.

125.    Ms. James will seek leave to amend her complaint to add a claim under Title VII once her claims has been exhausted before the EEOC.

126.    The blanket exclusion of gender-confirming care sends a deeply stigmatizing message to Ms. James that her worth as a public employee is lesser than others, since the exclusion deprives her of compensation that cisgender employees receive. Additionally, the exclusion is particularly humiliating and degrading because PEIA provides coverage for the same medically necessary gender-confirming care for state employees and their dependents who are not transgender.

### 4.    Plaintiffs Zachary Martell and Brian McNemar (PEIA)

127.    Mr. McNemar works as an Accountant Auditor in the accounting department of the Mildred-Mitchell Bateman Hospital, a state psychiatric hospital in Huntington, West Virginia, that is operated, supported, and subject to oversight by the state. Mr. McNemar began working in this position on February 18, 2018.

128.    Mr. Martell is a part-time student at Mountwest Community and Technical College in Huntington, West Virginia. Mountwest College does not offer health insurance to students.

129.    At all relevant times, both Mr. McNemar and Mr. Martell have been enrolled in a health plan through PEIA and have relied on that plan for health care coverage. As the spouse

**JA142**

and eligible dependent of Mr. McNemar, Mr. Martell is enrolled in the HMO Plan A approved by Defendant Cheatham and offered by Defendant The Health Plan.

130.  Mr. Martell is a man.

131.  Mr. Martell is also transgender.  Although his sex assigned at birth was female, his gender identity is male.

132.  Mr. Martell has been medically diagnosed with gender dysphoria.  He experiences dysphoria related to the disconnect between his primary and secondary sex characteristics and his gender identity.

133.  From an early age, Mr. Martell felt different; he understood that he was not female and felt discomfort with his primary and secondary sex characteristics.  He preferred masculine clothing from a young age.  However, he did not have the language or conceptual understanding to describe these feelings.  It was not until age 30, with the support of his husband and friends, that he accepted and came to understand himself as transgender.

134.  Mr. Martell changed his legal name by West Virginia court order on February 19, 2019.  He also updated the name and gender marker on his West Virginia driver's license and his Social Security records.  Additionally, Mr. Martell is recognized as male by his friends, classmates, and professors.

135.  As part of his medical transition, Mr. Martell has received treatment for gender dysphoria, including hormone replacement therapy in the form of testosterone, to alleviate his gender dysphoria by aligning his physical characteristics with his gender identity.

136.  In order to avoid being incorrectly identified as female, and to reduce the severe distress and embarrassment over the presence of typically female-appearing breasts on his body, when he leaves the house, Mr. Martell often uses a binder, which flattens or reduces the profile

27

**JA143**

of his chest.  However, even with the use of a binder, Mr. Martell experiences distress over the presence of his chest, which is an ongoing source of his gender dysphoria.

137.    Mr. Martell experiences intense discomfort with prolonged use of a binder, which can be painful and cause difficulty breathing, among other health risks.  As a result, Mr. Martell must carefully limit the amount of time that he uses a binder.  Prior to the current COVID-19 pandemic, Mr. Martell's class schedule required him to be on campus for more than nine hours, forcing him to forego the use of a binder on certain days, and exposing him to increased risk of being incorrectly identified as female, which causes him significant anxiety.

138.    Mr. Martell requires a bilateral mastectomy as medically necessary care to treat his gender dysphoria and eliminate the need for the ongoing use of a binder.  This surgical procedure is a widely accepted and effective treatment for gender dysphoria.  However, the categorical Exclusion in HMO Plan A bars him from receiving this medically necessary care.  Mr. Martell is accordingly forced to delay a medically necessary and urgently-needed procedure as a direct and proximate result of Defendants' continuing refusal to cover gender-confirming care through the Exclusions.  As a result, Mr. Martell's symptoms of gender dysphoria and related distress have increased.

139.    On or around April 2018, Mr. Martell began attending counseling as part of his medical transition.  On or about November 13, 2018, his mental health provider assessed him as ready to begin hormone replacement therapy and recommended that he do so.  When Mr. Martell first sought to begin hormone replacement therapy in the form of testosterone with the guidance of his medical and mental health providers, The Health Plan denied coverage both for the prescriptions and his office visits with the health care provider who managed his hormone replacement therapy.

JA144

140.    On or about February 13, 2019, Mr. Martell received a Notice of Adverse Benefit Determination from Defendant The Health Plan. The notice informed Mr. Martell that coverage for his medically necessary hormone replacement therapy would be denied. The notice stated that Mr. Martell "asked us to cover testosterone. After review we are denying the request. Treatments for gender identity issues are excluded from the benefit."

141.    As a result of this denial of medically necessary health care, Mr. Martell and Mr. McNemar were forced to pay out-of-pocket for Mr. Martell's testosterone prescriptions. At times, this expense was too much for Mr. Martell and Mr. McNemar to meet, forcing Mr. Martell to temporarily to forego medically necessary health care to make ends meet. This lapse in health care coverage exacerbated Mr. Martell's anxiety, and suspended the physical changes that were an essential part of his medical transition.

142.    Mr. Martell's medical and mental health providers have recommended that he continue to receive hormone therapy to alleviate his ongoing symptoms of gender dysphoria. Defendants Cheatham and The Health Plan's categorical exclusion of such medical care, however, denies coverage for this treatment, forcing Mr. Martell and Mr. McNemar to pay out-of-pocket for medically necessary health care. The denials of coverage for this care have caused Mr. Martell emotional distress, lowered self-esteem, embarrassment, humiliation, and stigma.

143.    Additionally, the denials of coverage for Mr. Martell's care have caused his spouse, Mr. McNemar, intense frustration, despair, and aggravation. Mr. McNemar not only experienced the distress of watching his spouse suffer without coverage for essential medical care, but also the distress of being discriminated against in his compensation. Other cisgender state employees receive coverage for their spouses' hormone-related therapy and surgical care, while Mr. McNemar is denied that important form of compensation simply because his spouse is

29

**JA145**

transgender. This harms Mr. McNemar by depriving him of equal compensation for equal work, causes him distress, and stigmatizes both Mr. Martell and Mr. McNemar.

144.    Because of the Exclusions of coverage for gender-confirming health care in the state health plans, the named Plaintiffs have suffered emotional distress, humiliation, degradation, embarrassment, emotional pain and anguish, violation of their dignity, loss of enjoyment of life, and other compensatory damages, in an amount to be established at trial.

## CLASS ACTION ALLEGATIONS

145.    Plaintiffs, on behalf of themselves and all similarly situated individuals, bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

146.    Plaintiffs assert their claims against all Defendants on behalf of the following Classes and Subclass, collectively, "the Classes").

### Medicaid Class

147.    The proposed Medicaid Class is defined as: All transgender people who are or will be enrolled in West Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusions.

### State Employee Health Plan Class

148.    The proposed State Employee Health Plan Class is defined as: All people who are enrolled in a State Employee Health Plan and who are either transgender and have sought or will seek gender-confirming care, and/or people whose transgender dependents have sought or will seek gender-confirming care, barred by the Exclusions.

### The Health Plan Subclass

**JA146**

149.    The proposed The Health Plan Subclass is a subclass of the State Employee Health Plan Class and is defined as: All State Employee Health Plan Class Members who are enrolled in The Health Plan.

150.    Plaintiffs and the proposed Classes have been equally affected by Defendants' violations of law.

151.    The persons in the proposed Classes are so numerous that joinder of all members is impracticable.  While the precise number of class members has not been determined at this time, upon information and belief, there are more than 40 individuals in the proposed Classes and/or the class members are so numerous that joinder would be impractical.

152.    The common questions of law and fact include, but are not limited to:

A.    Whether Defendants' Exclusions, facially and as applied to members of the proposed Classes, violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

B.    Whether Defendants' Exclusions, facially and as applied to members of the proposed Classes, violate the prohibitions on sex discrimination under Section 1557 of the Affordable Care Act;

C.    Whether Defendants' Exclusions, facially and as applied to members of the proposed Medicaid Class, violate the availability and comparability provisions of the Medicaid Act; and

D.    Whether Defendants should be enjoined from enforcing the Exclusions and denying Plaintiffs coverage for and access to gender-confirming care.

153.    The questions of law and fact listed above will yield common answers for Plaintiffs and the proposed Classes.

**JA147**

154.    Plaintiffs' claims are typical of those members of the proposed Classes.  Mr. Fain and Ms. Anderson are both transgender, are participants in West Virginia Medicaid, and are denied coverage for gender-confirming care because of an Exclusion.  Ms. James is transgender, a public employee, and is denied access to medically necessary gender-confirming care because of an Exclusion.  Mr. Martell is transgender, an eligible dependent of Mr. McNemar, and has been denied access to medically necessary gender-confirming care because of an Exclusion.  Mr. McNemar is a state employee whose dependent has been denied coverage for gender-confirming care because of an Exclusion.  Mr. Fain and Ms. Anderson, representing the Medicaid Class; Ms. James representing the State Employee Health Plan Class; and Mr. Martell and Mr. McNemar, representing the State Employee Health Plan Class and The Health Plan Subclass, and members of the proposed Classes share the same legal claims under the Equal Protection Clause and Section 1557 respectively.

155.    Plaintiffs will fairly and adequately represent the interests of the proposed Classes and have retained counsel experienced in complex class action litigation.  Plaintiffs are represented by Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal"), the nation's oldest and largest legal organization dedicated to the rights of lesbian, gay, bisexual, and transgender ("LGBT") people and everyone living with HIV.  Lambda Legal has extensive federal court experience litigating on behalf of LGBT people, including regarding transgender people's access to health care, and has served as class counsel and putative class counsel in a number of LGBT-related cases.  Plaintiffs are also represented by Nichols Kaster, PLLP, a leading law firm with significant expertise representing plaintiffs across the country in employment and class action matters, and Walt Auvil of The Employment Law Center, PLLC ("The Employment Law Center").  Mr. Auvil is a West Virginia-based litigator with more than

**JA148**

30 years of experience protecting workers' rights, including through complex class action litigation.

156.    Class treatment is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted on grounds that apply generally to the proposed Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the proposed Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Equal Protection
### U.S. Const. Amend. XIV

*Plaintiffs Christopher Fain and Shauntae Anderson on Behalf of the Medicaid Class, Against Defendants Crouch and Beane for Declaratory and Injunctive Relief*

*Plaintiffs Leanne James, Zachary Martell, and Brian McNemar, on Behalf of the State Employee Health Plan Class Against Defendant Cheatham for Declaratory and Injunctive Relief*

*Plaintiffs Zachary Martell and Brian McNemar, on Behalf of The Health Plan Subclass Against Defendant Cheatham for Declaratory and Injunctive Relief*

157.    Plaintiffs re-allege and incorporate by reference the allegations in each of the preceding paragraphs of this complaint, as though fully set forth herein.

158.    Plaintiffs state this cause of action on behalf of themselves and members of the proposed Classes against Defendant Crouch, Defendant Beane, and Defendant Cheatham in their official capacity, for purposes of seeking declaratory and injunctive relief, and challenge Defendants' enforcement of the discriminatory sex-based classifications in the Exclusions both facially and as applied to Plaintiffs and the proposed Classes.

159.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

**JA149**

160. Defendant Crouch is a person acting, at all relevant times, under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs Fain, Anderson, and the proposed Medicaid Class equal protection of the law. Through his duties and actions to develop a managed care program that excludes coverage for gender-confirming care, Defendant Crouch has unlawfully discriminated, and continues to discriminate, against Plaintiffs Fain, Anderson, and the members of the proposed Medicaid Class based on sex-related considerations.

161. Defendant Beane is a person acting, at all relevant times, under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs Fain, Anderson, and the proposed Medicaid Class equal protection of the law. Through her duties and actions to implement health policies for BMS which exclude gender-confirming care, Defendant Beane has unlawfully discriminated, and continues to discriminate, against Plaintiffs Fain, Anderson, and the members of the proposed Medicaid Class based on sex-related considerations.

162. Defendant Cheatham is a person acting, at all relevant times, under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs James, Martell, and McNemar and the proposed State Employee Health Plan Class and The Health Plan Subclass equal protection of the law. Through his duties and actions to administer and manage the group insurance plans for state employees and dependents—which includes authority and responsibility for designating noncovered services such as the Exclusions of gender-confirming care, and his actions to ensure that state employees have no nondiscriminatory options—Defendant Cheatham has unlawfully discriminated, and continues to discriminate, against Plaintiffs James, Martell, and McNemar and the members of the proposed State Employee Health Plan Class and The Health Plan Subclass based on sex-related considerations.

34

**JA150**

163.    The Exclusions, on their face and as applied to Plaintiffs and the proposed Classes, impermissibly discriminate on the basis of sex, and on the basis of transgender status, and violate their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

164.    The Exclusions treat Plaintiffs and members of the proposed Classes differently from other persons who are similarly situated.  Under the Exclusions, transgender Medicaid and state health plan participants who require gender-confirming care are denied coverage for that medically necessary care, while cisgender Medicaid and state health plan participants can access the same kinds of treatments, including when related to their sex.  Similarly, state health plan enrollees with a transgender dependent are denied coverage for that medically necessary care, while enrollees with a cisgender dependent are not denied coverage for the same kinds of treatments, including when related to their sex.

**A.    Discrimination on the Basis of Sex**

165.    By maintaining and enforcing the categorical Exclusions of gender-confirming care in the Medicaid and state employee health plans, Defendant Crouch, Defendant Beane, and Defendant Cheatham respectively engage in constitutionally impermissible discrimination on the basis of sex.

166.    Discrimination on the basis of transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition constitutes discrimination on the basis of sex.

167.    Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

**JA151**

168.    By ensuring that coverage for gender-confirming care is categorically excluded regardless of medical necessity in all health coverage options for Medicaid and state employee health plan participants, Defendants Crouch, Beane, and Cheatham engage in constitutionally impermissible sex-based discrimination against Plaintiffs and members of the proposed Classes, and violate their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

**B.    Discrimination on the Basis of Transgender Status**

169.    By maintaining and enforcing the categorical Exclusions of gender-confirming care, Defendants Crouch, Beane, and Cheatham engage in constitutionally impermissible discrimination on the basis of transgender status.

170.    As the Fourth Circuit recently confirmed, under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to "at least" heightened scrutiny. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. Aug. 26, 2020), *as amended* (Aug. 28, 2020).  That is because:

A.    Transgender people have suffered a long history of discrimination and continue to suffer such discrimination to this day.

B.    Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process.  Transgender people have largely been unable to secure explicit state and federal protections to protect them against discrimination through the legislative process.

C.    A person's transgender status bears no relation to a person's ability to contribute to society.

**JA152**

D.    Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment. Gender identity generally is highly resistant to change through intervention.

171.    Because the Exclusions on their face and as applied to Plaintiffs and the proposed Classes deprive transgender Medicaid and state employee health plan enrollees of their right to equal dignity, liberty, and autonomy by stigmatizing them and branding them as inferior to cisgender health plan enrollees, Defendants Crouch, Beane, and Cheatham deny transgender persons equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment. The categorical Exclusions similarly serve to stigmatize state health plan enrollees whose dependents are transgender, depriving them of their equal treatment and dignity.

172.    Defendants' enforcement of the Exclusions has not, and does not serve even a legitimate state interest, let alone one that is important, or compelling. Nor are the Exclusions adequately tailored to any such state interest. Rather, the Exclusions serve only to prevent Plaintiffs and members of the proposed Classes from obtaining gender-confirming care when cisgender enrollees are able to receive the same care as long as it is not required for purposes of treating gender dysphoria. In effect, the Exclusions punish vulnerable transgender people for being transgender and taking necessary—and sometimes life-saving—steps to live in accordance with their gender identity.

173.    Without injunctive relief from the Exclusions of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

**JA153**

**COUNT TWO**
**Violation of Section 1557 of the**
**Patient Protection and Affordable Care Act**
**42 U.S.C. § 18116**

*Plaintiffs Christopher Fain and Shauntae Anderson on Behalf of the Medicaid Class, Against Defendant BMS, Defendant Crouch, and Defendant Beane for Declaratory and Injunctive Relief, and Individually Against Defendant BMS for Compensatory Damages*

*Plaintiffs Zachary Martell and Brian McNemar, on Behalf of the State Employee Health Plan Class and on Behalf of The Health Plan Subclass Against Defendant The Health Plan for Declaratory and Injunctive Relief, and Individually Against Defendant The Health Plan for Compensatory Damages*

174.   Plaintiffs re-allege and incorporate each and every foregoing allegation contained in the preceding paragraphs of this complaint, as though fully set forth herein.

175.   Plaintiffs state this cause of action on behalf of themselves and members of the proposed Classes for purposes of seeking declaratory and injunctive relief, and challenge the discriminatory sex-based classifications in the Exclusions both facially and as applied to Plaintiffs and the proposed Classes.  Named Plaintiffs also state this cause of action for compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

176.   Under Section 1557 of the Affordable Care Act, "an individual shall not … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)" on the basis of sex.  42 U.S.C. § 18116.

177.   *"[A]ny health program or activity"*:

38

**JA154**

      A.     Defendant BMS, which administers and supervises the state's Medicaid Plan, constitutes a health program or activity within the meaning of the statute.

      B.     Defendant The Health Plan, as a health maintenance organization serving more than 200,000 people covered through its health plans, constitutes a health program or activity within the meaning of the statute.

178.    *"[A]ny part of which is receiving Federal financial assistance":*

      A.     Defendant BMS receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA. The Centers for Medicare & Medicaid Services ("CMS"), operating within HHS, provide federal financial assistance to BMS for the state's participation in the Medicaid Program.

      B.     Defendant The Health Plan receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA. The Health Plan's "Provider Procedural Manual," which provides guidance to medical providers who care for patients insured through The Health Plan, explains that, "The Health Plan has entered into a contract with the Centers for Medicare and Medicaid Services (CMS), the federal agency that administers the Medicare program. Under this contract, CMS makes a monthly payment to The Health Plan for each Medicare beneficiary who enrolls in our Plan. … The Health Plan receives a set rate for each member plus any enrollee premium."

179.    The categorical Exclusions maintained by Defendants BMS, The Health Plan, Crouch, and Beane, on their face and as applied to Plaintiffs and members of the proposed Classes, violate Section 1557's prohibition against discrimination on the basis of sex in a health program or activity receiving federal financial assistance.

**JA155**

180.    Defendants Crouch and Beane's actions under color of state law to maintain the categorical Exclusions deprive Plaintiffs and members of the proposed Classes of the protection from sex discrimination secured by Section 1557.

181.    Discrimination on the basis of transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition are all encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

182.    By categorically excluding gender-confirming care regardless of medical necessity, Defendants BMS, The Health Plan, Crouch, and Beane have drawn a classification that has and continues to unlawfully discriminate against Plaintiffs and members of the proposed Classes based on sex, in violation of Section 1557.

183.    Because Defendant BMS and Defendant The Health Plan receive federal funding that flows to health programs or activities, Plaintiffs and the proposed Classes have a right under Section 1557 to receive health insurance through BMS and The Health Plan free from discrimination on the basis of transgender status, sex, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition.

184.    Defendants BMS, The Health Plan, Crouch, and Beane have discriminated against Plaintiffs and the proposed Classes on the basis of sex in violation of Section 1557 and have thereby denied Plaintiffs and the proposed Classes the full and equal participation in, benefits of, and right to be free from discrimination in a health program or activity.

185.    Plaintiffs and the proposed Classes have been and continue to be injured by the application of the Exclusion by Defendants BMS, The Health Plan, Crouch, and Beane to deny coverage for gender-confirming care and have suffered harm as a result.

**JA156**

186.    The named Plaintiffs have also suffered emotional distress, stigmatization, humiliation, and a loss of dignity because of BMS' and The Health Plan's targeted discrimination against transgender Medicaid participants and The Health Plan enrollees respectively, which wrongly deems their health care needs as unworthy of equal coverage.  By knowingly and intentionally offering health care coverage to Plaintiffs that discriminates on the basis of sex, Defendant BMS and Defendant The Health Plan have intentionally violated the ACA, for which named Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

187.    Without injunctive relief from the Exclusions of coverage for gender-confirming care, Plaintiffs and the proposed Classes will continue to suffer irreparable harm in the future.

### COUNT THREE
#### Violation of the Medicaid Act's Availability Requirements
#### 42 U.S.C. § 1396a(a)(10)(A)

***Plaintiffs Christopher Fain and Shauntae Anderson on Behalf of the Medicaid Class, Against Defendants Crouch and Beane for Declaratory and Injunctive Relief***

188.    Plaintiffs re-allege and incorporate by reference the allegations in each of the preceding paragraphs of this complaint, as though fully set forth herein.

189.    Plaintiffs Fain and Anderson state this cause of action on behalf of themselves and members of the proposed Medicaid Class against Defendants Crouch and Beane in their official capacity, for purposes of seeking declaratory and injunctive relief, and challenge Defendants' enforcement of the Exclusions both facially and as applied to Mr. Fain and Ms. Anderson, and the proposed Medicaid Class.

190.    The Medicaid Act's Availability Requirements, 42 U.S.C. § 1396a(a)(10)(A), require that a state plan must "provide for making medical assistance available ... to" eligible individuals.

**JA157**

191.    The categorical Exclusions maintained and enforced by Defendants Crouch

and Beane eliminate mandatory Medicaid coverage of medically necessary services and render

them unavailable to Plaintiffs Fain, Anderson, and members of the proposed Medicaid Class,

thereby violating Medicaid's availability requirement, 42 U.S.C. § 1396a(a)(10)(A), which is

enforceable by Plaintiffs Fain and Anderson under 42 U.S.C. § 1983.

## COUNT FOUR
### Violation of the Medicaid Act's Comparability Requirements
### 42 U.S.C. § 1396a(a)(10)(B)

*Plaintiffs Christopher Fain and Shauntae Anderson on Behalf of the Medicaid Class, Against Defendants Crouch and Beane for Declaratory and Injunctive Relief*

192.    Plaintiffs re-allege and incorporate by reference the allegations in each of the

preceding paragraphs of this complaint, as though fully set forth herein.

193.    Plaintiff Fain and Anderson state this cause of action on behalf of themselves and

members of the proposed Medicaid Class against Defendants Crouch and Beane in their official

capacity, for purposes of seeking declaratory and injunctive relief, and challenges Defendants'

enforcement of the Exclusions both facially and as applied to Mr. Fain, Ms. Anderson, and the

proposed Medicaid Class.

194.    The Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B),

require that the "medical assistance made available to [eligible individuals] shall not be less in

amount, duration, or scope than the medical assistance made available to" other eligible or

ineligible individuals.

195.    The categorical Exclusions maintained and enforced by Defendants Crouch

and Beane, and the denial of medically necessary services and treatments to Plaintiffs Fain,

Anderson, and members of the proposed Medicaid Class, while the same or similar services and

treatments are covered for cisgender Medicaid beneficiaries, violates Medicaid's comparability

**JA158**

requirement, 42 U.S.C. § 1396a(a)(10)(B), which is enforceable by Plaintiffs Fain and Anderson under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs as class representatives, on behalf of themselves and the proposed Classes, respectfully request that this Court enter judgment in their favor and against Defendants on all claims, as follows:

A.    Certification of a class action pursuant to Fed. R. Civ. P. 23 on behalf of the proposed Classes;

B.    Appointment of Plaintiffs as class representatives and their counsel as class counsel;

C.    Issuance of a preliminary and permanent injunction enjoining any further enforcement or application of the Exclusions, and directing Defendants and their agents to provide access to coverage for all gender-confirming care without regard to the Exclusions;

D.    Declaratory judgment that the Exclusions, facially and as applied to Plaintiffs and members of the proposed Classes:

1.    Violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition), and on the basis of transgender status;

2.    Violate Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition);

43

**JA159**

3.      Violate the Medicaid Act's availability requirement, 42 U.S.C.
§ 1396a(a)(10)(A); and,

4.      Violate the Medicaid Act's comparability requirement, 42 U.S.C.
§ 1396a(a)(10)(B);

E.      An award of the declaratory and injunctive relief requested in this action against
Defendants' officers, agents, servants, employees, and attorneys, as well as any other persons
who are in active concert or participation with them;

F.      An award of compensatory and consequential damages to the individual Plaintiffs
in an amount that would fully compensate Plaintiffs for their financial harm, emotional distress
and suffering, embarrassment, humiliation, pain and anguish, violations of their dignity, and
other damages that have been caused by the conduct of Defendants BMS and The Health Plan in
violation of the ACA;

G.      An award of reasonable attorneys' fees, costs, and expenses under 42 U.S.C.
§ 1988 and all other applicable statutes; and

H.      Such other and further relief as the Court may deem just and proper.

* * *

**JA160**

Dated: September 23, 2021

/s/ Walt Auvil
Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-6344
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
Phone: 612-256-3200
Facsimile: 612-338-4878
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Phone: 202-804-6245
Facsimile: 202-429-9574
sbuchert@lambdalegal.org

Respectfully submitted,

Avatara Smith-Carrington, Visiting Attorney
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: 214-219-8585
Facsimile: 214-219-4455
asmithcarrington@lambdalegal.org

Tara L. Borelli, Visiting Attorney
Carl Charles, Visiting Attorney
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: 470-225-5341
Facsimile: 404-506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Nora Huppert, Visiting Attorney
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
Phone: 213-382-7600
Facsimile: 213-351-6050
nhuppert@lambdalegal.org

*Attorneys for Plaintiffs*

45

**JA161**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL; BRIAN MCNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES,** individually and on
behalf of all others similarly situated,

        **Plaintiffs,**                            **Civil Action No. 3:20-cv-00740**
                                                  **Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

                    **Defendants.**

## DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA
## DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
## BUREAU FOR MEDICAL SERVICES'
## <u>ANSWER TO PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT</u>

      **NOW COME** the Defendants, William Crouch, Cynthia Beane, and West Virginia

Department of Health and Human Resources, Bureau for Medical Services ("these Defendants"),

by counsel, Lou Ann S. Cyrus, Roberta F. Green, Caleb B. David, Kimberly M. Bandy, and

Shuman McCuskey Slicer PLLC, and for their Answer to Plaintiffs' First Amended Class Action

Complaint state and aver as follows:

<div align="center">1</div>

<div align="center">**JA162**</div>

**INTRODUCTION**

1.      Paragraph 1 of Plaintiffs' First Amended Class Action Complaint states legal conclusions and definitions to which no response is required. To the extent a response is deemed required, these Defendants deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 1 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

2.      Paragraph 2 of Plaintiffs' First Amended Class Action Complaint states legal conclusions and definitions to which no response is required. To the extent a response is deemed required, these Defendants deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 2 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

3.      Responding to Paragraph 3 of Plaintiffs' First Amended Class Action Complaint, these Defendants  deny the allegation in the first sentence and demand strict proof thereof. The second sentence of Paragraph 3, referring to the State of West Virginia providing health care coverage for employees and their eligible dependents through the Public Employees Insurance Agency ("PEIA") does not apply to these Defendants, so no response is deemed necessary. The remaining allegations contained in Paragraph 3 of Plaintiffs' First Amended Class Action Complaint state legal conclusions and definitions to which no response is required. To the extent a response is deemed required, these Defendants deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 3 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

4.      Paragraph 4 of Plaintiffs' First Amended Class Action Complaint states legal conclusions and definitions to which no response is required. To the extent a response is deemed required, these Defendants deny any and all allegations of wrongdoing, express or implied, raised

**JA163**

against them in Paragraph 4 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. These Defendants further specifically deny that the Medicaid Plan contains "Exclusions" as described therein and demand strict proof thereof.

5.      Paragraph 5 of Plaintiffs' First Amended Class Action Complaint states legal conclusions and definitions to which no response is required. To the extent a response is deemed required, these Defendants deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 5 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. These Defendants further specifically deny that the Medicaid Plan contains "Exclusions" as described therein and demand strict proof thereof.

6.      Paragraph 6 of Plaintiffs' First Amended Class Action Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants state, consistent with their contemporaneously filed Motion to Dismiss Class Allegations, that the Plaintiffs' First Amended Class Action Complaint does not meet the requirements of Rule 23 of the Federal Rules of Civil Procedure and, therefore, must be stricken. Additionally, these Defendants deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 6 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. These Defendants further deny that Plaintiffs are entitled to any of the relief requested against them.

7.      Paragraph 7 of Plaintiffs' First Amended Class Action Complaint states legal conclusions and definitions to which no response is required. To the extent a response is deemed required, these Defendants deny that Plaintiffs are entitled to any of the relief requested against them and demand strict proof thereof.

**JA164**

**PARTIES**

8.      These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 8 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

9.      These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 9 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

10.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 10 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

11.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 11 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

12.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 12 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

13.     Responding to Paragraph 13 of Plaintiffs' First Amended Class Action Complaint, these Defendants admit that William Crouch is Cabinet Secretary of the West Virginia Department of Health and Human Resources and that Defendant Crouch was acting under the color of state law at all times relevant to Plaintiffs' First Amended Class Action Complaint. The remaining allegations contained in Paragraph 13 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the remaining allegations as written and demand strict proof thereof. Further, these Defendants deny any and all allegations of wrongdoing, express or implied, raised

4

**JA165**

against William Crouch in Paragraph 13 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

14.      Responding to Paragraph 14 of Plaintiffs' First Amended Class Action Complaint, these Defendants admit that Cynthia Beane is Commissioner of the Bureau for Medical Services and that Defendant Beane was acting under the color of state law at all times relevant to Plaintiffs' First Amended Class Action Complaint. The remaining allegations contained in Paragraph 14 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the remaining allegations as written and demand strict proof thereof. Further, these Defendants deny any and all allegations of wrongdoing, express or implied, raised against Cynthia Beane in Paragraph 14 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

15.      Responding to Paragraph 15 of Plaintiffs' First Amended Class Action Complaint, these Defendants admit that Defendant West Virginia Department of Health and Human Resources, Bureau for Medical Services ("BMS") is a state agency that administers the Medicaid program within West Virginia. These Defendants further admit that Defendant BMS maintains the West Virginia Medicaid State Plan and files amendments to the plan with the appropriate regulatory authorities. These Defendants further admit that West Virginia Medicaid is jointly funded by the State of West Virginia and the federal government. These Defendants admit that BMS is a recipient of federal funds from the U.S. Department of Health and Human Services, including Medicaid funding. The remaining allegations contained in Paragraph 15 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants admit that BMS plays a role in setting payment rates, subject to review and approval by The Centers for Medicare & Medicaid Services ("CMS"), admit that BMS reimburses providers for services that are outside of managed

5

**JA166**

care, and deny the remaining allegations as written and demand strict proof thereof. Further, these Defendants deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 15 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

16.     The allegations contained in Paragraph 16 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. Further, the allegations contained in Paragraph 16 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny such allegations as written and demand strict proof thereof.

17.     The allegations contained in Paragraph 17 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. Further, the allegations contained in Paragraph 17 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny such allegations as written and demand strict proof thereof.

18.     These Defendants deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 18 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. These Defendants further deny that Plaintiffs are entitled to any of the relief requested against them. These Defendants further specifically deny that the Medicaid Plan contains "Exclusions" as described therein and demand strict proof thereof.

**JURISDICTION AND VENUE**

19.     The allegations contained in Paragraph 19 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response

6

**JA167**

is deemed required, these Defendants deny the allegations contained in Paragraph 19 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

20.    The allegations contained in Paragraph 20 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 20 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

21.    The allegations contained in Paragraph 21 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 21 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

22.    The allegations contained in Paragraph 22 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 22 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

23.    The allegations contained in Paragraph 23 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants do not dispute that this Court has personal jurisdiction over these Defendants.

## FACTS

### A.    Sex, Gender Identity, and Gender Dysphoria

24.    The allegations contained in Paragraph 24 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph

7

**JA168**

24 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the same and demand strict proof thereof.

25.     The allegations contained in Paragraph 25 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants are without knowledge to admit or deny the allegations contained in Paragraph 25 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 25 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

26.     The allegations contained in Paragraph 26 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 26 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 26 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

27.     The allegations contained in Paragraph 27 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 27 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 27 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

28.     The allegations contained in Paragraph 28 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and,

**JA169**

therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 28 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 28 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

29.    The allegations contained in Paragraph 29 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 29 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 29 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

30.    The allegations contained in Paragraph 30 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 30 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 30 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

31.    The allegations contained in Paragraph 31 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 31 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations

9

**JA170**

contained in Paragraph 31 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

32.    The allegations contained in Paragraph 32 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 32 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 32 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

33.    The allegations contained in Paragraph 33 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 33 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 33 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

34.    The allegations contained in Paragraph 34 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 34 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 34 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

**JA171**

35.     The allegations contained in Paragraph 35 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 35 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 35 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

36.     The allegations contained in Paragraph 36 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 36 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 36 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

37.     The allegations contained in Paragraph 37 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 37 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 37 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

38.     The allegations contained in Paragraph 38 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants

**JA172**

lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 38 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 38 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

39.     The allegations contained in Paragraph 39 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 39 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 39 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

40.     The allegations contained in Paragraph 40 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 40 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 40 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

41.     The allegations contained in Paragraph 41 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 41 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations

contained in Paragraph 41 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

42.     The allegations contained in Paragraph 42 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 42 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 42 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

43.     The allegations contained in Paragraph 43 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 43 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 43 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

44.     The allegations contained in Paragraph 44 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 44 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 44 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

**JA174**

45.     The allegations contained in Paragraph 45 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 45 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 45 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

46.     The allegations contained in Paragraph 46 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 46 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 46 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

47.     The allegations contained in Paragraph 47 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 47 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 47 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

48.     The allegations contained in Paragraph 48 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants

**JA175**

lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 48 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 48 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

49.    The allegations contained in Paragraph 49 of Plaintiffs' First Amended Class Action Complaint state generalized allegations that are not directed at these Defendants and, therefore, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 49 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 49 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

**B.    Defendants' Targeted and Discriminatory Exclusion of Gender-Confirming Care[1]**

**1.    Medicaid health coverage**

50.    The allegations contained in Paragraph 50 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants admit that Medicaid is a joint federal-state program that provides health insurance for Medicaid-eligible individuals. These Defendants deny the remaining allegations contained in Paragraph 50 of Plaintiffs' First Amended Class Action Complaint as written and demand strict proof thereof.

---

[1] These Defendants have included the headings from Plaintiffs' First Amended Class Action Complaint *only* for ease of reference and convenience of the Court and the parties. These Defendants neither admit nor endorse the contents of any heading. Indeed, these Defendants specifically deny that any "Targeted and Discriminatory Exclusion" exists.

15

**JA176**

51.     The allegations contained in Paragraph 51 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants admit, upon information and belief, the allegations contained in Paragraph 51 of Plaintiffs' First Amended Class Action Complaint.

52.     The allegations contained in Paragraph 52 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants admit the allegations contained in Paragraph 52 of Plaintiffs' First Amended Class Action Complaint.

53.     The allegations contained in Paragraph 53 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants admit the allegations contained in Paragraph 53 of Plaintiffs' First Amended Class Action Complaint.

54.     The allegations contained in Paragraph 54 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants state that the phrase "substantial portion of the cost of providing medical assistance" is vague, ambiguous, and capable of multiple meanings, and therefore, these Defendants are unable to admit or deny the allegations contained in Paragraph 54 of Plaintiffs' First Amended Class Action Complaint as written, and therefore, deny the same and demand strict proof thereof.

55.     The allegations contained in Paragraph 55 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 55 of Plaintiffs' First Amended Class Action Complaint as written and demand strict proof thereof. Further, these Defendants deny that they have violated the stated provision and demand strict proof thereof.

16

**JA177**

56.     The allegations contained in Paragraph 56 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 56 of Plaintiffs' First Amended Class Action Complaint as written and demand strict proof thereof. Further, these Defendants deny that they have violated the stated provision and demand strict proof thereof.

57.     The allegations contained in Paragraph 57 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 57 of Plaintiffs' First Amended Class Action Complaint as written and demand strict proof thereof. Further, these Defendants deny that they have violated the stated provision and demand strict proof thereof.

58.     These Defendants admit the allegations contained in Paragraph 58 of Plaintiffs' First Amended Class Action Complaint.

59.     The allegations contained in Paragraph 59 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants admit the allegations contained in Paragraph 59 of Plaintiffs' First Amended Class Action Complaint.

60.     Responding to Paragraph 60 of Plaintiffs' First Amended Class Action Complaint, these Defendants admit that Defendant BMS maintains the West Virginia Medicaid State Plan and files amendments to the plan with the appropriate regulatory authorities. These Defendants deny the remaining allegations contained in Paragraph 60 of Plaintiffs' First Amended Class Action Complaint as written and demand strict proof thereof.

61.     These Defendants admit the allegations contained in Paragraph 61 of Plaintiffs' First Amended Class Action Complaint.

62.     Responding to Paragraph 62 of Plaintiffs' First Amended Class Action Complaint, these Defendants admit that each MCO provides Medicaid participants with access to Medicaid-covered health services through their defined network of providers and hospitals. These Defendants deny the remaining allegations contained in Paragraph 62 of Plaintiffs' First Amended Class Action Complaint as written and demand strict proof thereof.

63.     Responding to Paragraph 63 of Plaintiffs' First Amended Class Action Complaint, these Defendants admit that the Medicaid Policy Manual provides that the Medicaid Plan does not cover, *inter alia*, transsexual surgery. These Defendants admit: that Unicare excludes coverage for, *inter alia*, "[s]ex transformation procedures and hormone therapy for sex transformation procedures;" that The Health Plan provides that "[s]ex change, hormone therapy for sex transformation, and gender transition procedures/expenses will not be paid for by The Health Plan;" These Defendants further admit that Aetna Better Health excludes coverage for, *inter alia*, "[s]ex transformation procedures and hormone therapy for sex transformation procedures." These Defendants deny the remaining allegations contained in Paragraph 63 of Plaintiffs' First Amended Class Action Complaint as written and demand strict proof thereof.

64.     These Defendants deny the allegations contained in Paragraph 64 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

### 2.     State employee health coverage

65.     The allegations contained in Paragraph 65 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 65 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 65 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

18

**JA179**

66.     The allegations contained in Paragraph 66, including sub-sections (A) and (B) of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 66, including sub-sections (A) and (B) of Plaintiffs' First Amended Class Action Complaint and therefore, deny the same and demand strict proof thereof.

67.     The allegations contained in Paragraph 67 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 67 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 67 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

68.     The allegations contained in Paragraph 68 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 68 of Plaintiffs' First Amended Class Action Complaint and therefore, deny the allegations contained in Paragraph 68 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

C.     **The Denial of Care to Plaintiffs**

1.     **Plaintiff Christopher Fain (Medicaid)**

69.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 69 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

19

**JA180**

70.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 70 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

71.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 71 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

72.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 72 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

73.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 73 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

74.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 74 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

75.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 75 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

76.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 76 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

77.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 77 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

**JA181**

78.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 78 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

79.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 79 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

80.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 80 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

81.     These Defendants admit the allegations contained in Paragraph 81 of Plaintiffs' First Amended Class Action Complaint.

82.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 82 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

83.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 83 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

84.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 84 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

85.     These Defendants deny the allegations contained in Paragraph 85 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

86.     These Defendants deny the allegations contained in Paragraph 86 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

### 2.    Plaintiff Shauntae Anderson (Medicaid)

87.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 87 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

88.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 88 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

89.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 89 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

90.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 90 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

91.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 91 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

92.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 92 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

93.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 93 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

**JA183**

94.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 94 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

95.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 95 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

96.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 96 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

97.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 97 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

98.     Upon information and belief, these Defendants admit the allegations contained in Paragraph 98 of Plaintiffs' First Amended Class Action Complaint.

99.     Upon information and belief, these Defendants admit the allegations contained in Paragraph 99 of Plaintiffs' First Amended Class Action Complaint.

100.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 100 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

101.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 101 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

**JA184**

102.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 102 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

103.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 103 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

104.    These Defendants deny the allegations contained in Paragraph 104 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

105.    These Defendants deny the allegations contained in Paragraph 105 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

### 3.    Plaintiff Leanne James (PEIA)

106.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 106 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

107.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 107 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

108.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 108 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

109.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 109 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

**JA185**

110.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 110 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

111.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 111 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

112.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 112 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

113.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 113 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

114.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 114 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

115.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 115 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

116.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 116 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

117.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 117 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

118.    The allegations contained in Paragraph 118 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 118 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

119.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 119 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

120.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 120 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

121.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 121 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

122.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 122 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

123.    The allegations contained in Paragraph 123 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 123 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

124.    The allegations contained in Paragraph 124 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To

the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 124 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

125.   The allegations contained in Paragraph 125 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 125 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

126.   To the extent Paragraph 126 of Plaintiffs' First Amended Class Action Complaint intends to allege that Plaintiffs were denied coverage because they are transgendered, these Defendants deny the allegations contained in Paragraph 126 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. To the extent Paragraph 126 of Plaintiffs' First Amended Class Action Complaint intends to allege that Plaintiff was denied coverage because Plaintiff is transgendered, these Defendants deny the allegations contained in Paragraph 126 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

**4.   Plaintiffs Zachary Martell and Brian McNemar (PEIA)**

127.   These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 127 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

128.   These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 128 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

**JA188**

129.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 129 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

130.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 130 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

131.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 131 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

132.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 132 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

133.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 133 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

134.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 134 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

135.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 135 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

136.     These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 136 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

**JA189**

137.    These Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 137 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

138.    These Defendants deny the allegations contained in Paragraph 138 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

139.    The allegations contained in Paragraph 139 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 139 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

140.    The allegations contained in Paragraph 140 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 140 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

141.    The allegations contained in Paragraph 141 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 141 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof.

142.    The allegations contained in Paragraph 142 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 142 of Plaintiffs' First

**JA190**

Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof. To the extent Paragraph 142 of Plaintiffs' First Amended Class Action Complaint intends to allege that Plaintiffs were denied coverage because they are transgendered, these Defendants deny the allegations contained in Paragraph 142 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

143.    The allegations contained in Paragraph 143 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants lack sufficient information or knowledge to admit or deny the allegations contained in Paragraph 143 of Plaintiffs' First Amended Class Action Complaint and, therefore, deny the same and demand strict proof thereof. To the extent Paragraph 143 of Plaintiffs' First Amended Class Action Complaint intends to allege that Plaintiffs were denied coverage because they are transgendered, these Defendants deny the allegations contained in Paragraph 143 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

144.    To the extent Paragraph 144 of Plaintiffs' First Amended Class Action Complaint intends to allege that Plaintiffs were denied coverage because they are transgendered, these Defendants deny the allegations contained in Paragraph 144 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. To the extent Paragraph 144 of Plaintiffs' First Amended Class Action Complaint intends to allege that Plaintiffs were denied coverage because they are transgendered, these Defendants deny the allegations contained in Paragraph 144 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

**CLASS ACTION ALLEGATIONS**

145.    The allegations contained in Paragraph 145 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a

30

**JA191**

response is deemed required, these Defendants deny that Plaintiffs meet the prerequisites for class treatment pursuant to Rule 23 of the Federal Rules of Civil Procedure and demand strict proof thereof.

146.   The allegations contained in Paragraph 146 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants deny that Plaintiffs meet the prerequisites for class treatment pursuant to Rule 23 of the Federal Rules of Civil Procedure and demand strict proof thereof.

### Medicaid Class

147.   Responding to Paragraph 147 of Plaintiffs' First Amended Class Action Complaint, these Defendants deny that Plaintiffs can maintain a class action. These Defendants further deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 147 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

### State Employee Health Plan Class

148.   Responding to Paragraph 148 of Plaintiffs' First Amended Class Action Complaint, these Defendants deny that Plaintiffs can maintain a class action. These Defendants further deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 148 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

### The Health Plan Subclass

149.   Responding to Paragraph 149 of Plaintiffs' First Amended Class Action Complaint, these Defendants deny that Plaintiffs can maintain a class action. These Defendants further deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 149 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

**JA192**

150.    Responding to Paragraph 150 of Plaintiffs' First Amended Class Action Complaint, these Defendants deny that Plaintiffs can maintain a class action. Further, the allegations contained in Paragraph 150 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 150 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

151.    Responding to Paragraph 151 of Plaintiffs' First Amended Class Action Complaint, these Defendants deny that Plaintiffs can maintain a class action. The allegations contained in Paragraph 151 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 151 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. These Defendants specifically deny that a number of approximately 40 prospective plaintiffs is "so numerous that joinder of all members is impracticable," such that a class action is warranted.

152.    The allegations contained in Paragraph 152 and subparagraphs A through D thereto of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 152 and subparagraphs A through D thereto of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

153.    Responding to Paragraph 153 of Plaintiffs' First Amended Class Action Complaint, these Defendants deny that Plaintiffs can maintain a class action. The allegations contained in Paragraph 153 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants deny

**JA193**

the allegations contained in Paragraph 153 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

154.     Responding to Paragraph 154 of Plaintiffs' First Amended Class Action Complaint, these Defendants deny that Plaintiffs can maintain a class action. The allegations contained in Paragraph 154 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 154 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

155.     Responding to Paragraph 155 of Plaintiffs' First Amended Class Action Complaint, these Defendants deny that Plaintiffs can maintain a class action. The allegations contained in Paragraph 155 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 155 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

156.     Responding to Paragraph 156 of Plaintiffs' First Amended Class Action Complaint, these Defendants deny that Plaintiffs can maintain a class action. The allegations contained in Paragraph 156 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 156 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

## CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Equal Protection
### U.S. Const. Amend. XIV

*Plaintiffs Christopher Fain and Shauntae Anderson, on behalf of the Medicaid Class, Against Defendants Crouch and Beane for Declaratory and Injunctive Relief*

*Plaintiffs Leanne James, Zachary Martell, and Brian McNemar, on behalf of the State Employee Health Plan Class Against Defendant Cheatham for Declaratory and Injunctive Relief*

*Plaintiffs Zachary Martell and Brian McNemar, on Behalf of The Health Plan Subclass Against Defendant Cheatham for Declaratory and Injunctive Relief*

157.    These Defendants restate and reincorporate their responses to Paragraphs 1 through 156 of Plaintiffs' First Amended Class Action Complaint as if fully set forth herein.

158.    The allegations contained in Paragraph 158 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 158 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

159.    The allegations contained in Paragraph 159 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants state that the Fourteenth Amendment to the United States Constitution speaks for itself. Further, these Defendants deny any alleged violation of same and demand strict proof thereof.

160.    These Defendants deny the allegations contained in Paragraph 160 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants specifically deny any wrongdoing or unlawful discrimination, intentional or otherwise, by Defendant Crouch, and demand strict proof thereof.

**JA195**

161.    These Defendants deny the allegations contained in Paragraph 161 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants specifically deny any wrongdoing or unlawful discrimination, intentional or otherwise, by Defendant Beane, and demand strict proof thereof.

162.    The allegations contained in Paragraph 162 of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 162 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

163.    These Defendants deny the allegations contained in Paragraph 163 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants state that there are no "Exclusions" as described as it pertains to the Medicaid Plan and demand strict proof thereof.

164.    These Defendants deny the allegations contained in Paragraph 164 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants state that there are no "Exclusions" as described as it pertains to the Medicaid Plan and demand strict proof thereof.

A.    **Discrimination on the Basis of Sex**

165.    These Defendants deny the allegations contained in Paragraph 165 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants state that there are no "Exclusions" as described as it pertains to the Medicaid Plan and demand strict proof thereof.

166.    The allegations contained in Paragraph 166 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a

**JA196**

response is deemed required, these Defendants deny the allegations contained in Paragraph 166 of Plaintiffs' First Amended Class Action Complaint as written and demand strict proof thereof. These Defendants further deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 166 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

167.    The allegations contained in Paragraph 167 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 167 of Plaintiffs' First Amended Class Action Complaint as written and demand strict proof thereof. These Defendants further deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 167 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

168.    These Defendants deny the allegations contained in Paragraph 168 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

**B.    Discrimination on the Basis of Transgender Status**

169.    These Defendants deny the allegations contained in Paragraph 169 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants state that there are no "Exclusions" as described as it pertains to the Medicaid Plan and demand strict proof thereof.

170.    The allegations contained in Paragraph 170 and subparagraphs A through D thereto of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 170 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. These Defendants further deny any and all allegations of wrongdoing, express or

36

**JA197**

implied, raised against them in Paragraph 170 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

171.    These Defendants deny the allegations contained in Paragraph 171 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants state that there are no "Exclusions" as described as it pertains to the Medicaid Plan and demand strict proof thereof.

172.    These Defendants deny the allegations contained in Paragraph 172 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants state that there are no "Exclusions" as described as it pertains to the Medicaid Plan and demand strict proof thereof.

173.    These Defendants deny the allegations contained in Paragraph 173 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants state that there are no "Exclusions" as described as it pertains to the Medicaid Plan and demand strict proof thereof.

<div align="center">

**COUNT II**
**Violation of Section 1557 of the**
**Patient Protection and Affordable Care Act**
**42 U.S.C. § 18116**

</div>

*Plaintiff Christopher Fain and Shauntae Anderson on behalf of the Medicaid Class, Against Defendant BMS, Defendant Crouch, and Defendant Beane for Declaratory and Injunctive Relief, and Individually Against Defendant BMS for Compensatory Damages*

*Plaintiffs Zachary Martell and Brian McNemar, on behalf of the State Employee Health Plan Class and on Behalf of The Health Plan Subclass Against Defendant The Health Plan for Declaratory and Injunctive Relief, and Individually Against Defendant The Health Plan for Compensatory Damages*

174.    These Defendants restate and reincorporate their responses to Paragraphs 1 through 173 of Plaintiffs' First Amended Class Action Complaint as if fully set forth herein.

<div align="center">

**JA198**

</div>

175.    Responding to Paragraph 175 of Plaintiffs' First Amended Class Action Complaint, these Defendants deny that Plaintiffs can maintain a class action. Additionally, the allegations contained in Paragraph 175 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 175 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

176.    The allegations contained in Paragraph 176 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants state that the Section 1557 of the Affordable Care Act speaks for itself.

177A.    The allegations contained in Paragraph 177A of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants admit the allegations contained in Paragraph 177A of Plaintiffs' First Amended Class Action Complaint.

177B.    The allegations contained in Paragraph 177B of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To the extent a response is deemed required, these Defendants admit the allegations contained in Paragraph 177B of Plaintiffs' First Amended Class Action Complaint.

178A.    The allegations contained in Paragraph 178A of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants admit the allegations contained in Paragraph 178A of Plaintiffs' First Amended Class Action Complaint.

178B.    The allegations contained in Paragraph 178B of Plaintiffs' First Amended Class Action Complaint are not directed at these Defendants, and, as such, no response is required. To

**JA199**

the extent a response is deemed required, these Defendants admit the allegations contained in Paragraph 178B of Plaintiffs' First Amended Class Action Complaint.

179.    These Defendants deny the allegations contained in Paragraph 179 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. These Defendants further deny that the Medicaid Plan contains an "Exclusion" as described.

180.    These Defendants deny the allegations contained in Paragraph 180 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. These Defendants further deny that the Medicaid Plan contains an "Exclusion" as described.

181.    The allegations contained in Paragraph 181 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 181 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

182.    The allegations contained in Paragraph 182 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 182 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. These Defendants further deny that the Medicaid Plan contains an "Exclusion" as described.

183.    The allegations contained in Paragraph 183 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 183 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

184.    These Defendants deny the allegations contained in Paragraph 184 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants specifically deny any and all allegations of wrongdoing, express or implied, raised against them in

**JA200**

Paragraph 184 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

185.    These Defendants deny the allegations contained in Paragraph 185 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants specifically deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 185 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Additionally, these Defendants deny that the Medicaid Plan contains an "Exclusion" as described.

186.    These Defendants deny the allegations contained in Paragraph 186 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Further, these Defendants specifically deny any and all allegations of wrongdoing, express or implied, raised against them in Paragraph 186 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

187.    These Defendants deny the allegations contained in Paragraph 187 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof.

### COUNT THREE
### Violation of the Medicaid Act's Availability Requirements
### 42 U.S.C. § 1396a(a)(10)(A)

*Plaintiff Christopher Fain and Shauntae Anderson on behalf of the Medicaid Class, Against Defendant Crouch and Beane for Declaratory and Injunctive Relief*

188.    These Defendants restate and reincorporate their responses to Paragraphs 1 through 187 of Plaintiffs' First Amended Class Action Complaint as if fully set forth herein.

189.    The allegations contained in Paragraph 189 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 189 of Plaintiffs'

### JA201

First Amended Class Action Complaint and demand strict proof thereof. Additionally, these Defendants deny that the Medicaid Plan contains an "Exclusion" as described.

190.     The allegations contained in Paragraph 190 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a response is deemed required, these Defendants state that 42 U.S.C. § 1396a(a)(10)(A) speaks for itself.

191.     The allegations contained in Paragraph 191 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 191 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Additionally, these Defendants deny that the Medicaid Plan contains an "Exclusion" as described.

<div align="center">

**COUNT FOUR**
**Violation of the Medicaid Act's Comparability Requirements**
**42 U.S.C. § 1396a(a)(10)(B)**

*Plaintiff Christopher Fain and Shauntae Anderson on behalf of the Medicaid Class, Against Defendant Crouch and Beane for Declaratory and Injunctive Relief*

</div>

192.     These Defendants restate and reincorporate their responses to Paragraphs 1 through 191 of Plaintiffs' First Amended Class Action Complaint as if fully set forth herein.

193.     The allegations contained in Paragraph 193 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 193 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Additionally, these Defendants deny that the Medicaid Plan contains an "Exclusion" as described.

194.     The allegations contained in Paragraph 194 of Plaintiffs' First Amended Class Action Complaint state a legal conclusion to which no response is required. To the extent a

<div align="center">

**JA202**

</div>

response is deemed required, these Defendants state that 42 U.S.C. § 1396a(a)(10)(B) speaks for itself.

195.    The allegations contained in Paragraph 195 of Plaintiffs' First Amended Class Action Complaint state legal conclusions to which no response is required. To the extent a response is deemed required, these Defendants deny the allegations contained in Paragraph 195 of Plaintiffs' First Amended Class Action Complaint and demand strict proof thereof. Additionally, these Defendants deny that the Medicaid Plan contains an "Exclusion" as described.

**PRAYER FOR RELIEF**

196.    Responding to the *ad damnum* paragraph and subparagraphs A through H and all sub-subparagraphs thereto of Plaintiffs' First Amended Class Action Complaint, these Defendants deny any and all allegations of wrongdoing raised against them in Plaintiffs' First Amended Class Action Complaint and deny that Plaintiffs are entitled to any of the relief requested therein as against them.

197.    These Defendants deny any and all allegations not specifically admitted herein.

**FIRST AFFIRMATIVE DEFENSE**

Plaintiffs' First Amended Class Action Complaint is/may be barred by the applicable statute of limitations.

**SECOND AFFIRMATIVE DEFENSE**

Plaintiffs' First Amended Class Action Complaint fails to state a claim against these Defendants upon which relief may be granted.

**THIRD AFFIRMATIVE DEFENSE**

These Defendants deny that they breached any affirmative duty or standard of care with respect to the Plaintiffs or putative class members or that any of their acts or omissions proximately caused or contributed to any injuries or damages to the Plaintiffs or putative class members.

42

**JA203**

## FOURTH AFFIRMATIVE DEFENSE

These Defendants assert the defenses of assumption of risk, contributory negligence and/or comparative negligence, as the facts and circumstances as they are developed may indicate that these defenses are appropriate.

## FIFTH AFFIRMATIVE DEFENSE

These Defendants reserve the right to assert such claims, counterclaims, cross-claims, third-party claims or other claims as investigation and discovery may prove applicable, and hereby reserve all of their rights associated with any such claim or potential claim.

## SIXTH AFFIRMATIVE DEFENSE

These Defendants reserve the right to have the fault, and/or negligence of all persons determined in the manner provided by law and hereby reserve their right of contribution and/or indemnity, as the same may prove applicable.

## SEVENTH AFFIRMATIVE DEFENSE

These Defendants assert the affirmative defense of superseding and intervening cause. These Defendants assert all of its rights and privileges to introduce evidence at trial regarding the negligence of another party or a non-party as set forth in *Sydenstricker v. Mohan*, 618 S.E.2d 561 (W.Va. 2005) and/or West Virginia Code 55-7-13d.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' allegations are inappropriate for class certification, as the purported class lacks the requisite numerosity, commonality, adequacy, superiority, and predominance requirements.

## NINTH AFFIRMATIVE DEFENSE

These Defendants deny that the Plaintiffs are entitled to recover any amount whatsoever against them. In particular, Defendants deny that the Plaintiffs are entitled to recover exemplary damages, including punitive damages, attorneys' fees, and costs, against them.

**JA204**

## TENTH AFFIRMATIVE DEFENSE

Pursuant to *Pittsburgh Elevator v. W. Va. Board of Regents*, 310 S.E.2d 675 (W. Va. 1983) and *Parkulo v. West Virginia Board of Probation and Parole*, 483 S.E.2d 507 (W. Va. 1996), these Defendants assert that they have full and complete immunity from liability for all damages sought by Plaintiffs to the extent such damages may exceed or are excluded by the insurance coverage extended to these Defendants by the State of West Virginia.

## ELEVENTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs seek to recover punitive damages from these Defendants, these Defendant assert that any such damages are precluded pursuant to West Virginia Code § 55-17-4.

## TWELFTH AFFIRMATIVE DEFENSE

These Defendants are entitled to absolute immunity from this litigation by virtue of the Eleventh Amendment to the United States Constitution and Article VI, Section 35 of the West Virginia Constitution, which prohibit suits against agents of the State of West Virginia.

## THIRTEENTH AFFIRMATIVE DEFENSE

Qualified immunity shields these Defendants from liability because their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person in the position of these Defendants would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to exhaust their administrative remedies, and, therefore, their claims are barred as a matter of law.

## FIFTEENTH AFFIRMATIVE DEFENSE

These Defendants deny that they deprived any Plaintiff of Equal Protection under the Fourteenth Amendment to the United States Constitution, deny that they violated Section 1557 of the Patient Protection and Affordable Care Act, and deny that they violated the Medicaid Act.

44

**JA205**

## SIXTEENTH AFFIRMATIVE DEFENSE

These Defendants deny that the Plaintiffs are entitled to any compensatory, injunctive, or declaratory relief as against them.

## SEVENTEENTH AFFIRMATIVE DEFENSE

These Defendants specifically reserve the right to plead any and all affirmative defenses not specifically raised herein that may arise during discovery or otherwise.

**WHEREFORE**, having fully answered Plaintiffs' First Amended Class Action Complaint filed herein, Defendants William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services demand that Plaintiffs' First Amended Class Action Complaint against them be dismissed, with prejudice, and that they be awarded costs expended herein and such other relief as the Court deems appropriate.

**THESE DEFENDANTS REQUEST A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

<div style="margin-left:50%">

**WILLIAM CROUCH, CYNTHIA BEANE, and WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,  BUREAU FOR MEDICAL SERVICES,**
**By Counsel,**

</div>

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA206**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL;BRIAN MCNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES,** individually and on
behalf of all others similarly situated,

               **Plaintiffs,**                **Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

               **Defendants.**

## CERTIFICATE OF SERVICE

Now come the Defendants, William Crouch, Cynthia Beane and West Virginia
Department of Health and Human Resources, by counsel, and do hereby certify that on the 12th
day of November, 2021, the foregoing **"DEFENDANTS WILLIAM CROUCH, CYNTHIA
BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL SERVICES'S ANSWER TO PLAINTIFFS'
FIRST AMENDED CLASS ACTION COMPLAINT"** was electronically filed with the Clerk
of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to, and
constitutes service on:

**JA207**

Walt Auvil (WVSB#190)
**Counsel for Plaintiffs**
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com


Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
**Counsel for Plaintiffs**
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org


Avatara Smith-Carrington, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA  90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA  30030
(404) 897-1880
(404) 506-9320 (fax)
ccharles@lamdalegal.org

Tara L. Borelli, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org


Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
**Counsel for Ted Cheatham**
517 9th Street, P.O. Box 1704
Huntington, WV  25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

**JA208**

Stuart A. McMillan (WVSB#6352)
**Counsel for The Health Plan of West Virginia, Inc.**
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV  25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
**Counsel for The Health Plan of West Virginia, Inc.**
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV  26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
**Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services**
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA209**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*,
individually and on behalf of all others
similarly situated,

       *Plaintiffs,*

    v.

WILLIAM CROUCH, *et al.*,

      *Defendants.*

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

**CERTIFICATE OF SERVICE**

I hereby certify that the EXPERT DISCLOSURE REPORT OF DAN H. KARASIC,

M.D. was served electronically on the 14th day of January, 2022 on the following counsel for

Defendants in the above-captioned case:

| | |
|---|---|
| Lou Ann S. Cyrus (WVSB # 6558) | Eric D. Salyers (WVSB #13042) |
| Roberta F. Green (WVSB #6598) | Perry W. Oxley (WVSB # 7211) |
| Caleb B. David (WVSB #12732) | David E. Rich (WVSB #9141) |
| Kimberly M. Bandy (WVSB #10081) | Christopher K. Weed (WVSB #13868) |
| SHUMAN MCCUSKEY SLICER PLLC | OXLEY RICH SAMMONS, PLLC |
| P.O. Box 3953, Charleston, WV 25339 | P.O. Box 1704 |
| (304) 345-1400; (304) 343-1826 (fax) | 517 9th Street, Suite 1000 |
| lcyrus@shumanlaw.com | Huntington, West Virginia 25718 |
| rgreen@shumanlaw.com | Phone: (304) 522-1138 |
| cdavid@shumanlaw.com | Fax: (304) 522-9528 |
| kbandy@shumanlaw.com | poxley@oxleylawwv.com |
| | drich@oxleylawwv.com |
| *Attorneys for Defendants William Crouch;* | esalyers@oxleylawwv.com |
| *Cynthia Beane; and West Virginia* | cweed@oxleylawwv.com |
| *Department of Health and Human Resources,* | |
| *Bureau for Medical Services* | *Attorneys for Defendant Jason Haught* |

1

**JA210**

Dated: January 14, 2022

Respectfully submitted,

s/ Walt Auvil
Walt Auvil, WV Bar No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-3058
auvil@theemploymentlawcenter.com

2

**JA211**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

    *Plaintiffs*,

  v.

WILLIAM CROUCH, *et al.*,

    *Defendants*.

CIVIL ACTION NO. 3:20-cv-00740

HON. ROBERT C. CHAMBERS

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
PURSUANT TO FED. R. CIV. P. 23**

  Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs Christopher Fain and Shauntae Anderson ("Plaintiffs") respectfully move this Court for an order certifying the following class: All transgender people who are or will be enrolled in West Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusion. In addition, Plaintiffs move the Court to appoint Plaintiffs as Class Representatives, and Nichols Kaster, PLLP; Lambda Legal Defense and Education Fund, Inc.; and The Employment Law Center, PLLP, as Class Counsel.

  This Motion is made based on the accompanying Memorandum of Law, Declaration of Nicole J. Schladt and the exhibit affixed thereto, Declaration of Avatara Smith-Carrington and the exhibits affixed thereto, Declaration of Walt Auvil, and all of the files, records, and proceedings in this matter.

1

**JA212**

Dated: May 31, 2022

/s/ Walt Auvil
Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-6344
auvil@theemploymentlawcenter.com

Anna P. Prakash, MN Bar No. 0351362*
Nicole J. Schladt, MN Bar No. 0400234*
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4700
Minneapolis, MN 55402
Phone: 612-256-3200
Facsimile: 612-338-4878
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, OR Bar No. 070686*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
Phone: 202-804-6245
Facsimile: 202-429-9574
sbuchert@lambdalegal.org

Respectfully submitted,

Avatara Smith-Carrington, MD Bar*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
Phone: 214-219-8585
Facsimile: 214-489-9140
asmithcarrington@lambdalegal.org

Tara L. Borelli, GA Bar No. 265084*
Carl Charles, NY Bar No. 5427026*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: 470-225-5341
Facsimile: 404-506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Nora Huppert, CA Bar No. 330552*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA  90010
Phone: 213-382-7600
Facsimile: 213-351-6050
nhuppert@lambdalegal.org

*Attorneys for Plaintiffs*

* Admitted *pro hac vice*

2

**JA213**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

        *Plaintiffs*,

    v.

WILLIAM CROUCH, *et al.*,

        *Defendants*.

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

**CERTIFICATE OF SERVICE**

    I hereby certify that the foregoing document, and any attachments, were served

electronically on May 31, 2022 on the following counsel for Defendants in this case:

Lou Ann S. Cyrus (WVSB # 6558)
Roberta F. Green (WVSB #6598)
Caleb B. David (WVSB #12732)
Kimberly M. Bandy (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953, Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com, rgreen@shumanlaw.com
cdavid@shumanlaw.com, kbandy@shumanlaw.com

*Attorneys for Defendants William Crouch; Cynthia Beane; and West Virginia Department of
Health and Human Resources, Bureau for Medical Services*

Dated: May 31, 2022

Respectfully submitted,

s/ Walt Auvil
Walt Auvil, WV Bar No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-3058
auvil@theemploymentlawcenter.com

**JA214**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

              *Plaintiffs*,

    v.

WILLIAM CROUCH, *et al.*,

              *Defendants.*

CIVIL ACTION NO. 3:20-cv-00740

HON. ROBERT C. CHAMBERS, JUDGE

## DECLARATION OF THE EMPLOYMENT LAW CENTER, PLLC

1.      Counsel for the Plaintiffs, Walt Auvil, is the owner and sole member of The Employment Law Center, PLLC a three-lawyer firm practicing in Wood County, West Virginia.

2.      Walt Auvil was admitted to the West Virginia State Bar and the State and Federal Courts of West Virginia in 1981.

3.      Auvil is a founder and past president of the West Virginia Employment Lawyers Association, national affiliate of the National Employment Lawyers Association.

4.      Auvil is the Chairman of the West Virginia State Bar Labor and Employment Law Committee.

5.      Auvil has served as lead counsel on dozens of discrimination cases in State and Federal Courts throughout the State of West Virginia and has served as lead counsel on several class action matters during the past 30 years.

6.      Auvil is a Fellow of the College of Labor and Employment Lawyers, the first such Fellow in West Virginia.  Auvil is the past chair of the College of Labor and Employment Lawyers Fourth Circuit Credentials Committee.

**JA215**

7.     Auvil is the co-author along with Eric Kinder of an article titled "Rule 30(b)(6) at 45: Is it still your Friend?" published by the American Bar Association, Section of Litigation Pre-Trial Practice and Discovery Newsletter in 2015.

8.     Auvil is also contributing editor to several employment law publications of the American Bar Association and is a frequent speaker on matters of pre-trial procedure for state and National legal conventions.

Further Affiant Sayeth Not.


Date: May 31, 2022         /s/ Walt Auvil
                                  WALT AUVIL

2

**JA216**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

        *Plaintiffs*,

        v.

WILLIAM CROUCH, *et al.*,

        *Defendants*.

CIVIL ACTION NO. 3:20-cv-00740

HON. ROBERT C. CHAMBERS

## DECLARATION OF NICOLE J. SCHLADT IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23

I, Nicole J. Schladt, declare the following:

1.    I am an attorney with the law firm of Nichols Kaster, PLLP and counsel for Plaintiffs in the above-captioned matter. I make this Declaration to support Plaintiffs' Motion for Class Certification Pursuant to Fed. R. Civ. P. 23.

2.    To date, Plaintiffs have responded to multiple motions to dismiss, have filed two motions for leave to amend the complaint, and have engaged in significant and proactive discovery with Defendants.

3.    Plaintiffs Christopher Fain and Shauntae Anderson will be exceptional Class Representatives. Their claims and legal interests are aligned with the members of the proposed class. They have remained actively engaged throughout the litigation. Mr. Fain assisted me and my co-counsel with preparing the Complaints, collected and produced documents, responded to written discovery, and sat for a deposition in which he demonstrated his adequacy as a class representative. Ms. Anderson has participated fully in the litigation by assisting with the preparation of the Amended Complaint, responding to discovery requests, collecting and

**JA217**

producing documents, and sitting for a deposition about her claims.

4.    My co-counsel and I are also adequate to represent the proposed class. The accomplishments and experience of Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal") and The Employment Law Center, PLLC ("ELC") are explained in their declarations, filed in support of this instant Motion. The resume for my firm, Nichols Kaster, PLLP ("NK"), is attached hereto as Exhibit A and summarized below.

5.    NK has been engaged in the practice of law for over 40 years, and is devoted to plaintiff-side litigation, with extensive class action and collective action experience. The firm has been appointed lead counsel or co-counsel on hundreds of class and collective actions, and has recovered significant monetary and injunctive relief for its clients over the years. In 2020, the National Trial Lawyers and ALM named NK the Employment Rights Law Firm of the Year.

6.    I graduated *summa cum laude* from the University of Kentucky in 2014 and graduated with honors from Emory University College of Law in Atlanta, Georgia, in 2018. Since 2019, I have practiced law with NK and have primarily handled civil rights class actions. *See, e.g., Amezcua Peregrina v. SEAM Group,* No. 1:20CV01032 (N.D. Ohio Aug. 30, 2021) (approving a $1.25 million settlement on behalf of a class of TN visa holders alleging human trafficking violations); *Pearson, et al. v. Michigan Department of Corrections, et al.*, No. 19-10707, 2021 WL 3079898 (E.D. Mich. July 21, 2021) (denying defendants' motions to dismiss in a proposed class action involving eighth amendment conditions of confinement claims); *Dale Carmen v. Health Carousel, LLC,* No. 1:20-CV-313, 2021 WL 2476882, at *1 (S.D. Ohio June 17, 2021) (denying defendant's motions to dismiss and strike class allegations in a proposed class action on behalf of immigrant nurses). I also have experience with cases involving sex discrimination in public institutions. *See Doe v. Indep. Sch. Dist. 31,* No. 20-CV-226 (SRN/LIB), 2020 WL 4735503, at *1

**JA218**

(D. Minn. Aug. 14, 2020).

7.      I shared responsibility for the prosecution of this action at my firm with Anna P. Prakash. Ms. Prakash graduated from Cornell Law School in Ithaca, New York, in 2005, and after working for the state and federal governments, she joined NK in March of 2009. She became a partner at the firm in 2016. She is one of the leaders of the firm's Civil Rights and Impact Litigation practice group, has led the firm's National Consumer Class Action practice group, has been a member of the firm's National Wage & Hour practice group, and has authored and argued class and individual appeals at the state and federal level. Ms. Prakash has extensive class action experience and has represented thousands of class and collective members in federal and state courts. *See e.g., Hart v. Rick's Cabaret Int'l, Inc.,* 60 F. Supp. 3d 447 (S.D.N.Y. 2014) (granting plaintiffs' affirmative motion for summary judgment on damages, holding that no reasonable jury could conclude that the Rule 23 class of approximately 2,200 employees were owed less than $10.8 million dollars and denying decertification of the Rule 23 class and FLSA collective); *Monroe v. FTS USA, LLC*, Court File No. 08-cv-02100 (W.D. Tenn.) (jury verdict for an approximately 300-person collective); *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015) (reversing motion to dismiss in proposed class action over student loan practices), reh'g en banc denied, 807 F.3d 839 (7th Cir. 2015), cert. denied, 136 S. Ct. 1607 (2016).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 31, 2022                    By:   _Nicole Schladt_
                                              Nicole J. Schladt

3

**JA219**



# Nichols Kaster, PLLP

## Firm Resume

| **Table of Contents**

Firm Overview .................................................................................................................. 2

Accolades ......................................................................................................................... 3

Judicial Recognition ........................................................................................................ 4

Notable Litigation Results ............................................................................................. 10

Nichols Kaster Attorneys ............................................................................................... 26

## Firm Overview

For more than forty-five years, Nichols Kaster has enjoyed a sterling reputation as a top employment and consumer plaintiffs' litigation firm. We have represented hundreds of thousands of employees and consumers nationwide on a variety of legal issues arising under both state and federal laws.

The Firm's National **Wage and Hour** team represents employees in class and collective actions seeking to recover unpaid wages in circumstances where employers misclassify workers or otherwise fail to compensate them for all hours worked, pursuant to minimum wage and overtime rates, or as required by contract. The Firm also represents groups of employees seeking to recover unpaid commissions and unlawfully pooled tips.

| Employee Representation |
| --- |
| -Wage & Hour Violations |
| -401(k) and Benefit Breaches |
| -Qui Tam/False Claims |
| -Wage Fixing |
| -Equal Pay Violations |
| -Harassment |
| -Discrimination |
| -Retaliation |
| -Medical leave |
| -Failure to Accommodate |
| -Federal Railway Safety Act Violations |
| -Breach of Contract |
| -Severance |
| -Non-Compete Agreements |
| -Defamation |

Nichols Kaster represents people who have endured **discrimination**, who have had their **civil rights** violated, and who have suffered other unfair conditions and treatment in a variety of settings, including as a worker, consumer, student, new immigrant, and person incarcerated. The Firm's employment group is also dedicated to assisting individual employees in Minnesota and surrounding states with a variety of legal needs, including addressing discrimination; harassment; retaliation; accommodation and leave issues; contract, severance, and non-compete disputes; as well as defending against licensure complaints.

The Firm also assists employees and retirement plan participants in protecting their **401(k) investments and other benefits**. Nichols Kaster challenges breaches of fiduciary duty relating to excessive fees, underperforming funds, imprudently managed accounts, and failure to properly pay benefits.

| Consumer Representation |
| --- |
| -Forced-Placed Insurance |
| -Credit Reporting |
| -Improper Background Checks |
| -Student Loans |
| -Predatory Lending |
| -Interest Overcharges and Misapplication of Loan Payments |
| -Billing Practices |
| -Deceptive Practices |
| -Debt Collection Violations |

Nichols Kaster is dedicated to protecting **consumer rights**. Over the years, the Firm has represented consumers with a variety of violations, primarily on a class-wide basis. The Firm led the way in forced-placed flood and hazard litigation and with claims under the Fair Credit and Reporting Act.

Nichols Kaster also represents **whistleblowers and relators** who have "blown

JA221

the whistle" on illegal activity.  These cases involve the reporting of possible government fraud, mishandling of toxic substances, violations of tax or securities laws, discrimination in education, failure to provide access to public facilities, and more.  Nichols Kaster represents individuals who have brought claims on behalf of the government against entities who have defrauded the government under the False Claims Act (also known as "qui tam" lawsuits).

No matter the type of claim, Nichols Kaster helps everyday people seek redress against big corporations.

## Accolades

The NATIONAL TRIAL LAWYERS AND ALM have named Nichols Kaster, PLLP the Employment Rights Law Firm of The Year.  According to an ALM spokesperson,

[T]he lawyers and law firms selected this year from more than 250 submissions have demonstrated repeated success in cutting-edge work on behalf of plaintiffs over the last 15 months.  They possess a solid track record of client wins over the past three to five years. The 2020 Elite Trial Lawyers finalists delivered results for clients across a wide range of cases with some of the most difficult sets of facts, very challenging circumstances, often filing uphill battles for years.  Many were up against some of the most prominent defense firms on the globe… The winners stood out based on the uniqueness and importance of their cases as well as the results delivered for their clients.

The U.S. NEWS & WORLD REPORT has continued to name Nichols Kaster as a Best Law Firm® and honored individual lawyers at the Firm as Best Lawyers®, consecutively since 2012.  LAW360 has listed Nichols Kaster as a top plaintiffs' employment law firm, and MINNESOTA LAWYER has declared it one of Minnesota's top 100 firms.  In 2019, nine of Nichols Kaster's attorneys were named as part of the 500 leading plaintiff employment lawyers on Lawdragon.com's list of the nation's best employment lawyers.  In 2019, nine of Nichols Kaster's attorneys were named Super Lawyers® and eight Rising Stars by SUPER LAWYERS MAGAZINE.  Steve Smith and Matthew Frank were announced as the 2017 Minnesota Lawyers of the Year.  On Martindale Hubbell, the firm has a 5 out of 5 peer rating.

Together the National Law Journal and LAW.COM named Nichols Kaster a top 50 firm for Elite Trial Lawyers "that are doing the most creative and substantial work on the plaintiffs side."  *Introducing America's Elite Trial Lawyers*, THE NAT'L LAW J. (Sept. 8, 2014).

In 2009, Nichols Kaster was ranked as one of the top ten busiest FLSA firms in the country by Litigation Almanac 360, which conducted a study of over 500,000 federal cases and received input from more than 200 law firms. Nichols Kaster was the only plaintiffs' firm in the top ten.

**JA222**

## Judicial Recognition

Nichols Kaster provides employees and consumers with significant results, including substantial settlements, trial victories, and ground-breaking determinations on important legal questions. The Firm's attorneys fight hard for their clients, vigorously litigating complex actions against top national defense firms. Courts have recognized Nichols Kaster's successes and extensive experience and have appointed the Firm as lead or co-lead counsel on hundreds of class and collective actions. Below are just a few examples of this recognition.

*"...Class Counsel is one of the relatively few firms in the country that has the experience and skills necessary to successfully litigate a complex ERISA action such as this."*

The Honorable Judge Michael H. Watson
   *Karpik v. Huntington Bancshares Inc.*, No. 2:17-cv-1153 (S.D. Ohio, Feb. 18, 2021).

*And it's not inappropriate to say, at this juncture, how deeply appreciative the Court is of the lawyering here, and I'm appreciative of the lawyering in two most important respects. One, there's been outstanding advocacy here. I have, um, wrestled with the matters in dispute, found them most challenging, and counsel has behaved throughout with both high ethics and zeal and true advocacy on the part of their clients, and I don't want that to go without saying I appreciate it. At the same time, and equally important, we sometimes lose track in advocacy of the desirability of resolving differences. You people have proved yourselves skilled negotiators willing to compromise, realistic, and the Court honors that as well.*

The Honorable Judge William G. Young
*Moitoso v. FMR, LLC, et al.*, No. 1:18-cv-12122-WGY (USDC MA., Jan. 12, 2021).

*Class Counsel displayed skill and determination. It is unsurprising that only a few firms might invest the considerable resources to ERISA class actions such as this, which require considerable resources and hold uncertain potential for recovery.*

The Honorable Judge Catherine C. Eagles
*Sims v. BB&T Corp.*, No. 1:15-cv-841 (M.D.N.C., May 5, 2019).

*[C]lass counsel achieved a strong result through skillful litigation and settlement negotiation. After filing a detailed complaint and amended complaint, working through a substantial discovery process, litigating a motion to dismiss, and undergoing mediation and settlement discussions, class counsel obtained a settlement of $14 million and a mandatory request for proposal that will help ensure quality management of class members' 401(k) funds down the road. Regarding quality of representation, the litigation and settlement appear by all measures to be the work of skillful and experienced attorneys with significant expertise in the ERISA context.*

The Honorable Judge Nathanael M. Cousins
*Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*, No. 5:16-cv-03698 (N.D. Cal., May 11, 2018).

*The high quality of Nichols Kaster's representation strongly supports approval of the requested fees. The Court has previously commended counsel for their excellent lawyering. The point is worth reiterating here. Nichols Kaster was energetic, effective, and creative throughout this long litigation. The Court found Nichols Kaster's briefs and arguments first-rate. And the documents and deposition transcripts which the Court reviewed in the course of resolving motions revealed the firm's far-sighted and strategic approach to discovery . . . Further, unlike in many class actions, plaintiffs' counsel did not build their case by piggybacking on regulatory investigation or settlement . . . The lawyers at Nichols Kaster can genuinely claim to have been the authors of their clients' success.*

The Honorable Judge Paul A. Engelmayer
*Hart v. RCI Hospitali Holdings, Inc.*, No. 09 Civ. 3043, 2015 WL 5577713 (S.D.N.Y. Sept. 22, 2015)

*I want to commend all of you for the excellent work that you did in conjunction with the special master and the court's technical advisor . . . I'm satisfied that this settlement is fair and reasonable given all the risk and expense of further litigation . . . .*

Honorable Judge Kathryn Vratil
*Sibley v. Sprint Nextel Corp.*, No. 08-cv-2063 (D. Kan. Dec. 20, 2018)

*[T]he attorneys at Nichols Kaster, PLLP are qualified, experienced, and competent, as evidenced by their background in litigating class-action cases involving FCRA violations. . . . . As noted above, Plaintiffs' attorneys are experienced and skilled consumer class action litigators who achieved a favorable result for the Settlement Classes.*

The Honorable Chief Judge Deborah Chasanow
*Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665 (D. Md. 2013)

JA224

*[T]his case's early resolution can partly be attributed to counsel's experience representing thousands of employees in wage and hour cases for thirty years, particularly within the oil and gas industry.*

The Honorable Judge Dale Drozd
*McCulloch v. Baker Hughes Inteq Drilling Fluids, Inc.*, No. 1:16-cv-00157 (E.D. Cal. Nov. 2, 2017)

*Plaintiffs retained counsel with significant experience in prosecuting force-placed insurance cases, and other courts in this district have appointed them class counsel in force-placed insurance cases . . . Counsel have worked vigorously to identify and investigate the claims in this case, and, as this litigation has revealed, understand the applicable law and have represented their clients vigorously and effectively.*

The Honorable Magistrate Judge Laurel Beeler
*Ellsworth v. U.S. Bank, N.A.*, No. C 12-02506, 2014 WL 2734953 (N.D. Cal. June 13, 2014)

*Thank you for all of your good work here. I know that it was really an extraordinarily complex case, and so well done.*

The Honorable Judge Kathryn Vratil
*Harlow v. Sprint Nextel Corp.*, No. 08-2222 (D. Kan. Dec. 10, 2018)

*[Nichols Kaster has] considerable experience in litigating wage and hour class and collective actions.*

*The award . . . follows efficient effort on the part of Class Counsel to achieve a sizeable recovery for the Class Members.*

The Honorable Magistrate Judge Katherine Menendez
*Allen v. All Temporaries, Inc.*, No. 16:cv-04409 (D. Minn. Feb. 14, 2018)

*[T]he quality of representation, as evidenced by the substantial recovery and the qualifications of the attorneys, is high. As then District Judge Gerard E. Lynch recognized, Nichols Kaster is "a reputable plaintiff-side employment litigation boutique with a nationwide practice and special expertise prosecuting FLSA cases."*

The Honorable Judge Sidney H. Stein
*Febus v. Guardian 1st Funding Grp., LLC*, 870 F. Supp. 2d 337 (S.D.N.Y. 2012)

**JA225**

*[T]his court finds that counsel possess more than sufficient experience to represent Plaintiffs fairly and adequately in reaching a fair and equitable settlement in this FLSA collective action . . . The parties are represented by competent and reputable counsel.*

The Honorable Judge Tony N. Leung
*Mayfield-Dillard v. Direct Home Health Care*, No. 1:16-cv-3489 (D. Minn., Dec. 18, 2017)

*I think it was just some very efficient and good work on the part of the plaintiffs' attorney that brought you to the point [of settlement]."*

The Honorable Judge Josephine L. Staton
*Urakhchin v. Allianz Asset Mgm't of Am., L.P.*, No. 8:15-cv-01614 (C.D. Cal. July 27, 2018)

*Counsel's experience in vigorously litigating class/collective wage and hour actions, plus their experience with this industry were essential in obtaining this favorable and efficient result.*

The Honorable Magistrate Judge Jonathon E. Hawley
*Woods v. Club Cabaret, Inc.*, 1:15-cv-01213, 2017 WL 4054523 (C.D. IL, May, 17, 2017)

*The settlement was the result of arm's-length negotiations between experienced counsel. Class Counsel is well known by this Court for their expertise in wage and hour litigation.*

The Honorable Judge Michael J. Davis
*Burch v. Qwest Commc'ns Intl.*, No. 06-03523 (D. Minn. Sept. 14, 2012)

*I want to say that both sides here have performed at an admirable level. And I wish that the lawyers of all cases would perform at your level. I say this to both of you, because you have you have been of assistance to the Court.*

The Honorable Judge William Alsup
*Hofstetter v. Chase Home Fin., LLC*, No. 10-01313 (N.D. Cal. Nov. 7, 2011) (transcript)

**JA226**

*The Court finds that counsel is competent and capable of exercising all responsibilities as Class Counsel for the Settlement Class.*

The Honorable Judge Richard H. Kyle
*Bible v. Gen. Revenue Corp.*, 12-CV-1236 (D. Minn. Jan. 7, 2014)

*Over the past two years, Class Counsel has been active in all stages of litigation and has particularly benefitted Plaintiffs through capable handling of motion practice. For example, Plaintiffs obtained summary judgment on a key issue involving the Morillion doctrine and defeated summary judgment on Defendants' de minimis defense.*

The Honorable Judge Virginia A. Phillips
*Cervantez v. Celestica Corp.*, No. 07-729, 2010 WL 11465133, *7 (C.D. Cal. Oct. 29, 2010)

*[T]he combined experience of Plaintiffs' counsel as well as the fact that employment law, particularly the representation of employees, forms a large part of both the firm and counsel's practice persuades this Court that the law firm of Nichols Kaster, PLLP, and its attorneys Steven Andrew Smith and Anna P. Prakash will more than adequately protect the interests of the Class Members.*

The Honorable Magistrate Judge Tony N. Leung
*Fearn v. Blazin' Beier Ranch, Inc.*, No. 11-743 (D. Minn. Jan. 30, 2012)

*Plaintiffs have shown good cause under Rule 16(b) because Plaintiffs' new counsel has shown the necessary diligence. Plaintiffs brought on Nichols Kaster, an experienced employment law firm of high repute as lead counsel in May 2012. Since that time, Plaintiffs have made a concerted effort to comply with this Court's orders and deadlines.*

The Honorable Magistrate Judge Tony N. Leung
*Alvarez v. Diversified Main. Sys., Inc.*, No. 11-3106 (D. Minn. Aug. 21, 2012)

*Plaintiff's counsel are qualified, experienced attorneys that are fully capable of conducting this class action litigation . . . they are highly qualified, knowledgeable attorneys that are willing to invest the resources necessary to fully prosecute this case.*

The Honorable Judge Gary Larson
*Karl v. Uptown Drink, LLC*, No. 27-CV-10-1926 (Minn. Dist. Ct. Nov. 17, 2010)

**JA227**

*Plaintiffs' Counsel are qualified attorneys with extensive experience in class action and wage and hour litigation and are hereby appointed as Class Counsel.*

The Honorable Judge Susan Richard Nelson of the U.S.D.C. D. Minn.:
*Alvarez v. Diversified Main. Sys., Inc.*, No. 11-3106 (D. Minn. Feb. 14, 2013) (appointing class counsel and preliminarily certifying the class for settlement purposes).

*However, the difficulty of the legal issues involved [and] the skill and experience of Plaintiffs' counsel in FLSA cases . . . make an enhancement of the lodestar amount appropriate in this case.*

The Honorable Judge Thomas D. Schroeder
*Latham v. Branch Banking & Trust Co.*, No. 1:12-cv-00007, 2014 WL 464236 (M.D.N.C. Jan. 14, 2014)

*The Court must consider the work counsel has done in identifying or investigating potential claims in the actions, counsels' experience in handling class actions and other complex litigation and claims of the type asserted in the present action, counsels' knowledge of the applicable law, and the resources counsel will commit to representing the class. Fed.R.Civ.P. 23(g)(1)(C). After reviewing the record, the Court is satisfied that the firms of Nichols Kaster, PLLP and Stueve Siegel Hanson LLP satisfy these criteria and will adequately represent the interests of the class as counsel.*

The Honorable Judge Kathryn Vratil
*Sibley v. Sprint Nextel Corp.*, 254 F.R.D. 662, 677 (D. Kan. 2008)

*The Arbitrator also notes that the briefs submitted by Claimant's counsel and the performance at the hearing by Claimant's counsel were of a very high quality.*

Arbitrator Joel Grossman, Esq.
*Green v. CashCall, Inc.*, JAMS Arbitration No. 1200047225 (JAMS Aug. 22, 2014)

*Plaintiffs' counsel are adequate legal representatives for the class. They have done work identifying and investigating potential claims, have handled class actions in the past, know the applicable law, and have the resources necessary to represent the class. The class will be fairly and adequately represented.*

The Honorable Judge Susan M. Robiner
*Spar v. Cedar Towing & Auction, Inc.*, No. 27-CV-411-24993 (Minn. Dist. Ct. Oct. 16, 2012)

JA228

*[Defendant] doesn't question whether Plaintiffs are represented by qualified and competent counsel, and it's obvious that they are. Plaintiffs' are represented by a national law firm, Nichols Kaster, that specializes in employment and class action law.*

The Honorable Judge Larry Alan Burns
*Norris-Wilson v. Delta-T Grp., Inc.,* 270 F.R.D. 596 (S.D. Cal. 2010)

## Notable Litigation Results

### |  Settlement Results

In *Moitoso v. FMR LLC,* 1:18-cv-12122 (D. Mass. Jan. 22, 2021), the court granted final approval of the parties' $28.5 million settlement in a case where plaintiffs alleged the defendants breached their fiduciary duties in violation of the Employee Retirement Income Security Act ("ERISA").

In *Intravaia v. National Rural Electric Cooperative Ass'n.,* No. 1:19-cv-00973 (E.D. Va. Feb. 2, 2021), the court granted final approval of the parties' $10 million settlement in a case where plaintiffs alleged the defendants breached their fiduciary duties in violation of ERISA.

In *Karpik v. Huntington Bancshares, Inc.,* 2:17-cv-1153 (S.D. Ohio  Feb. 18, 2021), the court granted final approval of the parties' $10.5 million settlement,  resolving plaintiffs' claims against defendants under ERISA.

In *Bhatia v. McKinsey & Co., Inc.,* 1:19-cv-01466 (S.D.N.Y. Feb. 17, 2021), the court granted final approval of the parties' $39.5 million settlement for a class of current and former participants in the McKinsey & Company, Inc. Profit-Sharing Retirement Plan and the McKinsey & Company, Inc. Money Purchase Pension Plan.

In *Reetz v. Lowe's Companies Inc.,* 5:18-cv-00075 (W.D.N.C. September 9, 2021), the court granted final approval of the $12.5 million settlement with defendant Lowe's Companies, Inc. for a class of current and former participants in the Lowe's 401(k) Plan.

In *Baker v. John Hancock Life Insurance Co. (U.S.A.),* 1:20-cv-10397 (D. Mass. Sept. 30, 2021), the court granted final approval of the parties' $14 million settlement in a case where plaintiffs alleged the defendants breached their fiduciary duties in violation of ERISA.

In *Bowers v. BB&T Corp.,* No. 1:15-cv-00732 (M.D.N.C. May 6, 2019), the court granted final approval of the parties' $24 million settlement in a case where plaintiffs alleged the defendants breached their fiduciary duties in violation of ERISA.

In *Moreno v. Deutsche Bank Americas Holding Corp.,* 1:15-cv-09936 (S.D.N.Y. March 1, 2019), the court granted final approval of the parties' $21.9 million settlement in a case where plaintiffs alleged the defendants breached their fiduciary duties in violation of ERISA.

**JA229**

In *Sibley v. Sprint Nextel Corp.*, No. 08-cv-2063 (D. Kan. Dec. 20, 2018), the court granted final approval of a commissions settlement for retail store sales employees totaling $30.5 million.

In *Clark v. Oasis Outsourcing Holdings Inc.*, No. 9:18-cv-81101 (S.D. Fla. Dec. 20, 2018), the court granted final approval of the parties' $5.9 million settlement in a case where plaintiffs alleged the defendants breached their fiduciary duties in violation of ERISA.

In *Harlow v. Sprint Nextel Corp.*, No. 08-2222 (D. Kan. Dec. 10, 2018), the court granted final approval of a commissions settlement of $3,650,000 for business channel sales employees.

In *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 8:15-cv-01614 (C.D. Cal. July 30, 2018), the court granted final approval of the parties' $12 million settlement in a case where plaintiffs allege the defendants breached their fiduciary duties in violation of ERISA.

In *Johnson v. Fujitsu Technology Business of America, Inc.*, No. 5:16-cv-03698 (N.D. Cal. May 11, 2018), the court granted final approval of the parties' $14 million settlement, and approved a class of current and former participants in the Fujitsu Group Defined Contribution and 401(k) Plan

In *Vongkhamchanh v. All Temporaries Midwest, Inc.*, 17:cv-00976 (D. Minn. Apr. 27, 2018), the court approved a settlement for health care workers who would receive over 84% of their unpaid overtime wages, explaining that the Firm's "considerable experience litigating wage and hour class and collective actions, and informed opinions of the fairness of the settlement" provided support for approval of the hybrid state and federal action.

In *Main v. American Airlines, Inc.*, 4:16-cv-00473 (N.D. Tex. Feb. 21, 2018), the court granted final approval of the parties' $22 million settlement for a class of current and former participants in the American Airlines, Inc. 401(k) Plan.

In *Allen v. All Temporaries, Inc.*, No. 16:cv-04409 (D. Minn. Feb. 14, 2018), the court granted final approval of a Rule 23 class action and FLSA collective action for settlement of home health workers' overtime claims. The court noted that "Class Members will recover over 99% of their unpaid overtime wages after the deduction for attorneys' fees, costs, and a class-representative service payment."

In *Mayfield-Dillard v. Direct Home Health Care*, No. 1:16-cv-3489 (D. Minn, Dec. 18, 2017) the court approved the parties' joint motion for settlement approval finding that the settlement was a substantial benefit to the collective as the eligible individuals who accept the settlement will receive all their alleged overtime wage loss. The court found that "counsel possess more than sufficient experience to represent Plaintiffs fairly and adequately in reaching a fair and equitable settlement in this FLSA collective action" and that "[t]he parties are represented by competent and reputable counsel."

In *McCulloch v. Baker Hughes Inteq Drilling Fluids, Inc.*, No. 1:16-cv-00157 (E.D. CA, Nov. 22, 2017), the court approved the settlement finding that $3,000,000 was fair and reasonable and reflected

JA230

a settlement payoff of 92%of the estimated potential value of the class members' claims. The judge commended Nichols Kaster stating, "[T]his case's early resolution can partly be attributed to counsel's experience representing thousands of employees in wage and hour cases for thirty years, particularly within the oil and gas industry."

In *Andrus v. New York Life Ins. Co.*, 1:16-cv-05698 (S.D.N.Y. June 15, 2017), the court granted final approval of the parties' $3,000,000 settlement in a case where plaintiffs alleged that the defendants breached their fiduciary duties in violation of ERISA.

In *Henderson v. 1400 Northside Drive, Inc.*, No. 1:13-cv-03767 (N.D. Ga. Mar. 17, 2017), the Firm achieved a $1,360,000 settlement on the eve of trial on behalf of 37 male exotic dancers who were misclassified as independent contractors and required to pay to work through the imposition of mandatory house fees, fines, and tip-outs of other workers.

In *Vaughan v. M-Enterm't Props., LLC*, No. 1:14-CV-914 (N.D. Ga. May 16, 2017), the court approved a $1,100,000 settlement a week before trial for 28 female exotic dancers who the Court previously found were misclassified as independent contractors and were required to pay to work through fines, fees, and tip-outs to other workers.

In *Febus v. Guardian First Funding Group, LLC*, 90 F. Supp. 3d 240 (S.D.N.Y. Mar. 4, 2015), plaintiffs brought a motion to enforce a wage and hour settlement from which one of the individual defendants defaulted. The court ordered the defendant pay the amount due, imposed an additional thirty percent penalty on the amount due, and awarded interest. The court noted that Nichols Kaster had been "attempting, in vain, to collect," and emphasized that defendant "cannot avoid his contractual obligations because he has decided that the settlement terms no longer suit his interests."

In *Hart v. Rick's Cabaret Int'l, Inc.*, No. 09 Civ. 3043, 2015 WL 5577713 (S.D.N.Y. Sept. 22, 2015). the court granted final approval of a class-wide $15,000,000 gross settlement, finding the settlement to be fair, reasonable, and adequate and further awarding plaintiffs' counsel's attorneys' fees, expenses, and service awards to the named plaintiffs and discovery participants.

In the consolidated lawsuits of *Casey v. Citibank, N.A.*, No. 5:12-cv-0820 (N.D.N.Y. Aug. 21, 2014) and *Coonan v. Citibank, N.A.*, No. 1:13-cv-00353, 2014 WL 4120599 (N.D.N.Y. Aug. 21, 2014), the court granted final approval of an approximately $110,000,000 settlement on behalf of settlement classes who were force-placed with flood or hazard insurance by Citibank, N.A. The settlement also provides substantial injunctive relief, forbidding Citibank and its affiliates from accepting commissions or any other form of compensation in connection with force-placed insurance for a period of six years, places limits on the amount of insurance coverage that Citibank may require borrowers to maintain, and requires Citibank to offer class members the opportunity to reduce their flood insurance coverage if Citibank had increased their coverage amount to an amount in excess of the amount required under federal law. The court found the settlement to be "fair, reasonable, and adequate, in the best interests of the Settlement Classes" and overruled nine objections.

In *Bible v. General Revenue Corp.*, No. 12-cv-01236 RHK (D. Minn. June 27, 2014), the court granted final approval of a $1,250,000 settlement on behalf of approximately 134,000 class members, more than double the statutory cap for a Fair Debt Collection Practices Act class action.

In *Farmer v. Bank of America, N.A.*, No. 5:11-cv-00935 (W.D. Tex. Oct. 18, 2013), the court granted final approval of the parties' multi-million-dollar settlement with significant prospective injunctive relief, finally certifying a class of 25,000 Texas mortgagors who had been sent letters requesting proof of hazard insurance in violation of the language of their deeds of trust, and appointing Nichols Kaster as class counsel.

In *Singleton v. Domino's Pizza, LLC*, No. 8:11-cv-01823 (D. Md. Oct. 2, 2013), the court approved the parties' $2,500,000 million settlement for a class of over 50,000 under the Fair Credit Reporting Act in a case where plaintiffs alleged that the defendant employer had improperly procured consumer reports on employees and applicants and had failed to comply with the pre-adverse action notice requirements of the Act.

In *Ulbrich v. GMAC Mortgage*, No. 11-CIV-62424, 2013 WL 8692404 (S.D. Fla. May 10, 2013), the court granted final settlement approval and appointed Nichols Kaster as class counsel for a 2,000+ nationwide class. The case involved claims against GMAC Mortgage, LLC and Balboa Insurance Services, Inc. relating to force-placed wind insurance.

In *Eldredge v. City of Saint Paul*, No. 09-2018 (D. Minn. Aug. 29, 2011), plaintiff Eldredge reached a settlement of his case that was the second largest paid by the City of Saint Paul in an employment lawsuit.

In *Hofstetter v. JPMorgan Chase Bank, N.A.*, No. C- 10-01313, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011), Nichols Kaster was appointed class counsel for four classes encompassing approximately 40,000 mortgagors against Chase Bank. In the same case, Nichols Kaster secured an approximately $10,000,000 settlement for the classes. *Hofstetter*, 2011 WL 5545912 (N.D. Cal. Nov. 14, 2011).

| **Appellate Achievements**

In *Oman v. Delta Air Lines, Inc.*, 2021 WL 351960 (9th Cir. Feb. 2, 2021) and the companion case *Ward v. United Airlines, Inc.*, 2021 WL 345578 (9th Cir. Feb. 2, 2021), the Ninth Circuit held that California's wage statement and pay timing requirements apply to flight attendants who are based at California airports, rejecting the airlines' argument that compliance with these state laws would impermissibly burden interstate commerce. This ruling followed a decision from the California Supreme Court on certified questions, which held that California' wage statement and pay timing statutes apply to interstate employees who work less than 50% of their time in any one state if the employee's base of operations is in California. *See Oman v. Delta Air Lines, Inc.*, 9 Cal. 5th 762 (2020); *Ward v. United Airlines, Inc.*, 9 Cal. 5th 732 (2020).

**JA232**

In *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17 (1st Cir. 2018), the First Circuit reversed the district court's grant of defendants' directed verdict motion, holding that plaintiffs had met their burden of proving loss causation, and that plaintiffs' damages model constituted a viable measurement of the losses suffered by Putnam's employees as a result of defendants' fiduciary breaches.  The defendant field a writ of certiorari to the U.S. Supreme Court, and in *Putnam Investments, LLC v. Brotherston*, No. 18-926, 2020 WL 129535 (U.S. Jan. 13, 2020), the Supreme Court denied defendants' petition. The case is remanded to the district court for continued trial proceedings under the First Circuit's holding that the burden to prove causation is on defendants and plaintiffs presented sufficient evidence of losses to the plan as a result of defendants' mismanagement.

In *Ray v. County of Los Angeles*, 935 F.3d 703 (9th Cir. 2019), the Ninth Circuit ruled for the plaintiffs on two distinct issues. First, the Court upheld the District Court's ruling that the County of Los Angeles was not entitled to Sovereign Immunity as an arm of the state for its role in implementing the In-Home Supportive Services program for homecare workers in Los Angeles County. In so holding, the Court declined to overturn long-standing Ninth Circuit precedent outlining the "arm of the state" doctrine, and it determined that, under the existing five-factor test, four of the factors weighed against immunity for the County. In the second part of its ruling, the Court reversed the District Court's holding regarding the effective date of Department of Labor regulations governing homecare workers employed by third parties, holding that the regulations at issue were effective January 1, 2015, despite industry challenges to the regulations that were successful at the district court level but ultimately unsuccessful on appeal.

In *Wingate v. Metropolitan Airport Commission* A19-0226 (August 19, 2019), Wingate appealed the district court's summary judgment finding in favor of Metropolitan Airport Commission (MAC) dismissing the whistleblower claim. The court of appeals reversed the district court's decision ruling the evidence presented by Wingate including his positive performance reviews, his supervisor's remarks, MAC's promotion patterns, and a sergeant's similar report of retaliatory conduct support an inference that Wingate's engagement in protective activity was the true reason that MAC did not promote him to sergeant, thus raising a material fact dispute on the issue of pretext.

In *Moore v. City of New Brighton*, A18-2111, (July 29, 2019), the parties filed cross appeals where Moore appealed the district court's summary judgment decision and the city appealed the district court and the Court of Appeals subject-matter jurisdiction over the case. In a published decision, the Minnesota Court of Appeals reversed the district court's summary judgment decision, finding that the evidence showing the city maintained the administrative, home-bound leave for a period so long and so inconsistent with its purported reason for commencing the leave creates a material fact dispute as to whether the city's actions "penalized" the sergeant under the Minnesota Whistleblower Act and whether the city's reason is pretextual. Further, both the district court and the court of appeals rejected the city's jurisdictional argument and held that both courts have subject-matter jurisdiction over Moore's claim under the Minnesota Whistleblower Act.

*Frost v. BNSF Railway, Co.*, 914 F.3d 1189 (9th Cir. 2019), was tried to a jury in Montana in December 2016. Mr. Frost alleged that he was retaliated against when BNSF terminated his

JA233

employment after he reported suffering from PTSD. Mr. Frost was diagnosed with PTSD after he was nearly struck by an oncoming train while repairing a section of the track after his supervisor released track authority but failed to inform him and his fellow crew members. Pursuant to the Defendant's request, the jury was provided an honest belief instruction and a defense verdict resulted. Mr. Frost appealed, arguing that the instruction was error because it conflicted with the clear language of the Federal Railway Safety Act ("FRSA") and granted the jury a short-cut to rule for BNSF while ignoring evidence of retaliation. The Ninth Circuit agreed. In a unanimous decision, the Ninth Circuit definitively held there was no requirement that FRSA plaintiffs separately prove discriminatory intent under the FRSA's contributing factor standard, and thus the instruction was error. The Ninth Circuit reversed the trial verdict and remanded for a new trial.

In *McKeen-Chaplin v. Provident Savings Bank, FSB*, 862 F.3d 847 (9th Cir. 2017), the Ninth Circuit reversed the district court's grant of summary judgment to the defendant, finding that the defendant's mortgage underwriters did not fit within the administrative exemption to the Fair Labor Standards Act and remanding for judgment in the plaintiffs' favor on the issue.

In *Clark v. Centene Co. of Texas, L.P.*, 656 F. App'x 688 (5th Cir. 2016) (per curiam), the U.S. Court of Appeals for the Fifth Circuit affirmed a lower court decision that appeals nurses do not fall within the administrative or professional exemptions of the FLSA overtime requirements.

In *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47 (2d Cir. 2016), the U.S. Court of Appeals for the Second Circuit vacated and remanded the district court's dismissal of plaintiff's complaint, finding that plaintiff's had Article III standing to bring this action regarding the excessive fees for providing copies of plaintiffs' medical records charged by defendants, and stating that "because the complaint alleged that each name plaintiff "through [her or his] counsel" had "paid" the charges demanded for the records, and that the "ultimate expense" was borne by the plaintiffs, the complaint plausibly alleged that plaintiffs, as principals acting through their agents, had been injured by the alleged overcharges."

In *Monroe v. FTS USA, LLC*, 815 F.3d 1000 (6th Cir. 2016), the U.S. Court of Appeals for the Sixth Circuit upheld the lower court's denial of defendant's motion to decertify the collective and affirmed the trial verdict in favor of plaintiffs. The Sixth Circuit ruled that Plaintiff's presentation of representative testimony was appropriate at trial for proving liability for the collective and estimated average approach to calculating damages.

In *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015), *reh'g. en banc denied*, 807 F.3d 839 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1607 (2016), the U.S. Court of Appeals for the Seventh Circuit reversed the district court's dismissal of plaintiff's complaint against a student loan guarantor for wrongfully charging collection fees on a defaulted student loan, finding that plaintiff's claims for breach of contract and for violations of the RICO Act were not preempted by the Higher Education Act, and stating that "a guaranty agency may not impose collection costs on a borrower who is in default for the first time but who has timely entered into and complied with an alternative repayment agreement."

15 | P a g e

**JA234**

In *Perez v. Mortgage Bankers Assoc.*, 135 S. Ct. 1199 (2015), the United States Supreme Court ruled unanimously in favor of a group of employees represented by Nichols Kaster. The Court upheld a Department of Labor interpretation granting minimum wage and overtime compensation for mortgage loan officers.

In *Karl v. Uptown Drink, LLC*, 835 N.W.2d 14 (Minn. Aug. 14, 2013), the Minnesota Supreme Court ruled that under Minnesota law, employers cannot require employees to reimburse them from their tips for items such as cash register shortages, unsigned credit card receipts, and customer walk outs. The Court also found that employees do not have to show that because of the deductions their wages fell below the minimum wage in order to prove a violation of Minn. Stat. § 181.79. In this case, the plaintiffs were over 750 employees who worked at three different bars/night clubs in Minneapolis. At a jury trial in 2011, the plaintiffs prevailed on their record-keeping and certain minimum wage claims, but lost on the unlawful deductions claims. Nichols Kaster appealed the deductions issue, and took it all the way to the Minnesota Supreme Court, where the Court agreed with plaintiffs and instructed the lower court to enter judgment on the plaintiffs' behalf on this claim.

In *Boaz v. Federal Express Customer Info. Services, Inc.*, 725 F.3d 603 (6th Cir. 2013), the U.S. Court of Appeals for the Sixth Circuit ruled that plaintiff, a FedEx project manager who had claimed that FedEx had failed to pay her overtime wages, in violation of the Fair Labor Standards Act, and paid her less than male coworkers performing the same job, in violation of the Equal Pay Act, could pursue her overtime and gender discrimination claims. The federal laws at issue provide employees three years to file a lawsuit and FedEx had plaintiff sign an application which stated that lawsuits had to be brought within 6 months or claims were lost.  The lower court had dismissed plaintiff's claims, citing the application. The Sixth Circuit unanimously sided with plaintiff, reversed the dismissal and remanded the case for trial.

In *Calderon v. GEICO General Insurance Co.*, 809 F.3d 111 (4th Cir. 2015), the U.S. Court of Appeals for the Fourth Circuit affirmed a district court's grant of affirmative summary judgment in favor of approximately one hundred current and former Security Investigators, finding that they were not covered by the administrative exemption. Specifically, the Appellate Court found that plaintiffs' primary job duty was not the performance of work directly related to general business operations.

In *Lass v. Bank of America, N.A.*, 695 F.3d 129 (1st Cir. 2012), the U.S. Court of Appeals for the First Circuit struck down the district court's ruling that had dismissed plaintiff's claims. The court found that plaintiff's allegations regarding excessive flood insurance and improper kickbacks had been properly alleged and that the case should proceed.

In *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325 (2011), the U.S. Supreme Court found in favor of the plaintiff and held that "an oral complaint of a violation of the Fair Labor Standards Act is protected conduct under the [Act's] anti-retaliation provision."  This was a huge win for employees all over the country, as the Supreme Court's decision set a new FLSA anti-retaliation standard.

JA235

| **Trial Verdicts and Arbitration Awards**

In *Cummings v. Chevron Corp.*, JAMS Case No. 1100086694 (June 8, 2018), an arbitrator issued a final award in the amount of $511,533.95 in favor of Donnie Cummings, a Well Site Supervisor who worked for Chevron. The arbitrator ruled that Chevron misclassified Cummings as an independent contractor and also misclassified him as exempt from the overtime provisions of state and federal law. The arbitrator awarded Cummings $284,270.15 in unpaid overtime, liquidated damages, and meal and rest period premiums, and awarded attorneys' fees and costs in the amount of $227,263.80.

In *Kaiser v. Gortmaker et al.*, No. 15-cv-01030, (District of South Dakota, Dec. 21, 2017) following a five-day trial in Aberdeen, South Dakota, a six-person jury returned a $1.2 million verdict in favor of former South Dakota Division of Criminal Investigation agent, Laura Zylstra-Kaiser. At the conclusion of trial, the jury found in favor of Kaiser on both her retaliation and gender discrimination claims. The jury awarded Kaiser $311,812.00 in lost wages, $498,929.00 in lost retirement benefits, and $400,000.00 in emotional distress damages.

In *Clark v. Centene Company of Texas, LP*, 104 F. Supp. 3d 813 (W.D. Tex. 2015), upon the conclusion of a bench trial, the court awarded damages to a collective action of utilization review nurses. The court found that plaintiffs submitted sufficient evidence to create a just and reasonable inference as to overtime hours worked by the collective and awarded liquidated damages. This victory followed the court's order on the parties' cross-motions for summary judgment and defendant's motion for decertification last year, holding that the defendant misclassified its utilization nurses. 44 F. Supp. 3d 674 (W.D. Tex. 2014). The court ruled that plaintiffs are not exempt from the Fair Labor Standards Act's overtime laws and are thus eligible for overtime pay. The court further held that defendant's claim that each plaintiff's claim would need to be analyzed individually to determine liability and damages was without merit.

In *Rhodes v. CashCall*, JAMS Ref. No. 1200047475, *Garcia v. CashCall*, JAMS Ref. No. 1200047422, *Good v. CashCall*, JAMS Ref. No. 1200047220, and *Green v. CashCall, Inc.*, JAMS Ref. No. 1200047225 (2014), a JAMS arbitrator ruled that CashCall misclassified Rhodes and Green, loan processers, and Garcia and Good, underwriters, as exempt from the overtime requirements of California and federal law. The arbitrator awarded Rhodes $15,000 in unpaid overtime plus an additional $15,000 in liquidated damages, along with $88,179 in attorneys' fees and costs, Green was awarded $15,067.72 in damages, as well as $54,165.50 in attorneys' fees and costs. The arbitrator also awarded Garcia $10,000 in unpaid overtime plus an additional $10,000 in liquidated damages, along with $98,709 in attorneys' fees and costs, and Good was awarded $43,631 in unpaid overtime, as well as $50,627.49 in attorneys' fees and costs.

In *Walsten v. Shank Power Products Co., Inc.*, No. 19HA-CV-12-1094 (Minn. Dist. Ct., Sept. 9, 2013), a minority shareholder case, an advisory jury returned a $700,000 verdict for the plaintiff, finding for him on his claims for breach of fiduciary duty and violation of his reasonable expectation of continuing employment. The trial judge subsequently issued an order sustaining the $700,000 advisory verdict and awarding $200,000 in attorneys' fees.

In *Monroe v. FTS USA, LLC*, No. 2:08-cv-21 (W.D. Tenn. Oct. 2011), the jury found that defendants willfully violated the Fair Labor Standards Act by failing to pay nearly 300 cable installers for all overtime hours worked. The district court entered judgment with damages for the plaintiffs.

## | Summary Adjudication

In *Mass v. Regents of the University of California*, No. RG17879223 (Cal. Super. Ct., Alameda Cnty. Nov. 19, 2021), the court denied defendants' motion for summary judgment, finding that there were triable issues of material fact as to whether defendants as trustee/plan administrator owed a duty to the UCRP beneficiaries and the contours of any such duty, whether defendants breached the alleged owed duty, and whether any breach by defendants caused members of the class to suffer any injury.

In *Deluca v. Farmers Ins. Exchange*, 386 F.Supp.3d 1235 (N.D. Cal. 2019), the court granted in part Plaintiffs' affirmative summary judgment motion and denied Defendant's summary judgment motion. The court found that Farmers could not satisfy either duties prong of the administrative exemption. As a result, the court determined that plaintiffs and class members were misclassified as exempt under state and federal law and are entitled to overtime premiums.

In *Rego v. Liberty Mutual Managed Care, LLC*, 367 F. Supp. 3d 849 (E.D. Wis. 2019), the court found as a matter of law that a defendant insurance company misclassified its utilization management nurses as exempt from overtime protections under the administrative and the professional exemptions. The plaintiffs primary job duty consisted of reviewing medical authorization requests against well-established guidelines to determine whether the criteria for medical necessity are satisfied.  The court held in part that this work involved the performance of routine mental work, likened to inspection-type duties as opposed to bedside nursing.

In *Henderson v. 1400 Northside Drive, Inc.*, No. 1:13-cv-3767, 2016 WL 3125012 (N.D. Ga. June 3, 2016), the district court granted in part Plaintiffs' affirmative motion for summary judgment on the issues of: (1) whether the owner qualified as a joint employer, (2) the viability of the defendants' counterclaims, and (3) whether minimum wage damages includes recovery for fines, fees, and tipouts paid by the employee to the employer.  In an earlier order, the court also granted plaintiffs' motion for partial summary judgment on the issues of: (1) the creative professional exemption, finding that defendants misclassified adult entertainers as exempt from the overtime and minimum wage requirements of the FLSA; and (2) offset, finding that defendants could not offset their minimum wage obligations with tips paid by customers to adult entertainers. 110 F. Supp. 3d 1318 (N.D. Ga. 2015).

In *Vaughan v. M-Enterm't Props., LLC*, No. 1:14–CV-914, 2016 WL 7365201 (N.D. Ga. Mar. 15, 2016), the district court granted in part exotic dancer plaintiffs' affirmative motion for summary judgment on the issues of (1) whether entertainers qualify as employees under the FLSA, (2) whether related entity defendants qualified as joint employers, (3) the viability of the defendants' offset defense, and (4) the viability of the defendants' counterclaims.

In *Heaton v. Social Finance, Inc.*, No. 3:14-cv-05191-the, 2015 WL 6003119 (N.D. Cal. Oct. 15, 2015), the court denied defendants' motion for summary judgment, finding that there were triable issues of fact as to whether defendants had violated the statutes at issue, whether the alleged violations were willful, and finding that defendants had failed to meet their burden as to plaintiffs' claims under the California Unfair Competition Law.

In *Hart v. Rick's Cabaret Int'l, Inc.*, the court denied decertification of the FLSA Collective and Rule 23 Class of approximately 2,300 adult entertainers at Rick's Cabaret in New York and granted, in part, plaintiffs' affirmative motion for partial summary judgment on damages, finding that no reasonable jury could conclude the Class was owed less than $10.8 million. No. 09-Civ-3043, 2014 WL 6238175 (S.D.N.Y. Nov. 14, 2014). This significant ruling came approximately one year after the court ruled that the Class and Collective Members are employees as a matter of law under the FLSA and New York Labor Law and that Rick's Cabaret violated both laws by failing to pay wages. The court further held that the money entertainers received from Rick's Cabaret's customers were tips and not service charges that could offset wage obligations and that Rick's Cabaret violated New York Labor Law by charging Class and Collective Members fines and fees as a condition of employment. 967 F. Supp. 2d 901 (S.D.N.Y. Sept. 10, 2013).

In *Wolfram v. PHH Corp.*, No. 1:12-cv-599, 2014 WL 2737990 (S.D. Ohio June 17, 2014), the court granted plaintiffs' motion for partial summary judgment, finding that the assigned real estate offices from where plaintiffs, who are current or former loan officers employed by defendant, worked where all serving as the "employer's place of business" under the outside sales exemption of the Fair Labor Standards Act. This established that an employee may work from multiple sites, not technically owned or operated by the employer, and each of those sites can be considered the "employer's place of business" under the regulations, therefore any work performed at these sites is not "outside" work under the outside sales exemption.

In *MacIntyre v. Lender Processing Services, Inc.*, No. 3:13-cv-89-J-25JBT (M.D. Fla. Apr. 29, 2014), the court granted affirmative summary judgment to plaintiff (a Minnesota resident) on a breach of contract claim for an unpaid bonus and used its discretion to enforce Minnesota state law for defendant's (a Florida company) failure to promptly pay wages. The court simultaneously denied defendant's motion to dismiss plaintiff's gender discrimination claims ruling, in part, that defendant's actions toward plaintiff constituted direct evidence of gender discrimination.

In *Huff v. Pinstripes, Inc.*, 972 F. Supp. 2d 1065 (D. Minn. 2013), the court ruled in plaintiffs' favor on cross-motions for summary judgment, finding that Pinstripes had violated the Minnesota Fair Labor Standards Act's provisions on tip-pooling by requiring its servers to share their tips with "server assistants," who act as servers' support staff at the restaurant.

In *Ernst v. DISH Network, LLC*, No. 12-8794-LGS (S.D.N.Y. Sept. 22, 2014), the court ruled on plaintiff's and two of the defendants' cross-motions for partial summary judgment, granting plaintiff's motion and denying defendants' motion. The court ruled that the summary report received by two of the defendants was a "consumer report" for purposes of the Fair Credit Reporting Act because it

**JA238**

"communicated information bearing on Plaintiff's character, general reputation, or mode of living, and the information was collected and expected to be used for 'employment purposes.'"

In *Kirsch v. St. Paul Motorsports, Inc.*, No. 11-cv-02624, 2013 WL 1900620 (D. Minn. May 7, 2013), the court denied defendants' motion for summary judgment in its entirety, finding that plaintiff had put forth sufficient evidence for a prima facie claim of age discrimination.

In *Bollinger v. Residential Capital*, 863 F. Supp. 2d 1041 (W.D. Wash. 2012), the court granted plaintiffs' motion for partial summary judgment, finding that defendants misclassified the underwriter plaintiffs under the administrative exemption, and rejected defendants' argument that there was no evidence of willful violation of the FLSA, stating that "a jury could conclude that Defendants knowingly and recklessly" misclassified plaintiffs.

In *Clincy v. Galardi South Enterprises, Inc.*, 808 F. Supp. 2d 1326 (N.D. Ga. 2011), the court granted plaintiffs' motion for partial summary judgment on the issue of misclassification, finding that defendants misclassified adult entertainers as independent contractors and that the entertainers were in fact employees covered by the FLSA.

## Class and Collective Certification

In *Brayman v. Keypoint Government Solutions*, No. 18-cv-550-WJM-NRN Dkt 365 (D. Colo. March 31, 2022) the court granted Plaintiffs' Amended Motion for Final Certification of the FLSA Collective and Plaintiffs' Amended Motion for Rule 23 Class Certification and denied Defendant's Amended Motion for Decertification. The court found that the material terms of Plaintiffs' employment, including policies and practices to which they were uniformly subjected to, as well as the similarities of the Plaintiffs'' job functions, weighed in favor of finding Plaintiffs to be similarly situated for purposes of maintaining an FLSA collective.  Further, Plaintiffs met all four requirements of a Rule 23 class and the court found that all class members' claims arise from the same course of conduct favoring certification and granted Plaintiffs' Motion for Rule 23 Class Certification.

In *MacDonald, et al. v. CashCall, Inc., et al.*, No. 2:16-cv-02781-MCA-ESK, Dkt 102 (D. N.J. Oct. 31, 2019) the court granted Plaintiffs' motion for class certification and appointed Nichols Kaster, PLLP class counsel in case involving more than 11,000 borrowers where Defendants are alleged to have violated usury law, the New Jersey Consumer Fraud Act, and RICO.

In *Brotherston v. Putnam Investments, LLC*, No. 1:15-cv-13825 (D. Mass. Dec. 13, 2016), the court certified a class of current and former participants in the Putnam Retirement Plan and appointed Nichols Kaster as class counsel. Plaintiffs alleged that Defendants mismanaged the plan and engaged in prohibited transactions in breach of their fiduciary duties under ERISA.

In *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 620 (D. Neb. 2019), Nichols Kaster won class certification and was appointed class counsel for a class of over 7,000 railroad employees who plaintiffs alleged had been removed from their jobs in violation of the Americans with Disabilities Act

In *Ayala v. GEICO*, No. 7:18-cv-03583 (Dec. 5, 2018), the district court certified a collective class under the FLSA for Auto Adjuster Trainees who alleged they were not paid for all their overtime worked during training.

In *Bell v. Michigan Civil Service Commission and Jan Winters, State Personnel Director*, No. 17-003861-CV (Mich. Cir. Ct., Nov. 17, 2018), Nichols Kaster won class certification and was appointed class counsel for a class of over 600 African-American applicants who plaintiffs alleged had been discriminated against by defendants through the use of their entry-level law enforcement examination.

In *Dunham-Sunde v. The Copper Hen Cakery*, No. 27-CV-17-17288 (Minn. Dist. Ct., Aug. 28, 2018), the court certified a class of over one hundred restaurant servers to pursue claims against a local restaurant for its unlawful tip-sharing practices in violation of the Minnesota Fair Labor Standards Act.

In *Deluca v. Farmers Ins. Exch.*, No. 17-cv-00034, 2018 WL 1981393 (N.D. Cal. Feb. 27, 2018), the court granted class certification of California state law overtime claims and related claims for a group of special investigators who allege that Farmers misclassified them as exempt from overtime. The court previously granted conditional certification of the plaintiffs' FLSA overtime claims.

In *Wildman v. American Century Serv., LLC*, 2017 WL 6045487 (W.D. Mo. Dec. 6, 2017), the court certified a class of current and former participants in the American Century Retirement Plan and appointed Nichols Kaster as class counsel. Plaintiffs alleged that defendants breached their fiduciary duties and engaged in prohibited transactions.

In *Ganci v. MBF Inspection Svcs., Inc.*, 323 F.R.D. 249 (S.D. Ohio 2017), the court granted class certification of a class of pipeline inspectors who worked for MBF and were paid based on a day rate, who sought unpaid overtime under Ohio state law. The court had previously granted conditional collective certification of the plaintiffs' FLSA overtime claims. 2016 WL 5104891 (S.D. Ohio Sept. 20, 2016).

In *Moreno v. Deutsche Bank Americas Holding Corp.*, 1:15-cv-09936, 2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017), the court certified a class of current and former participants in the Deutsche Bank Matched Savings Plan and appointed Nichols Kaster as class counsel. Plaintiffs alleged that Defendants mismanaged the plan in breach of their fiduciary duties under ERISA.

In *Sims v. BB&T Corp.*, No. 1:15-cv-732, 2017 WL 3730552(M.D.N.C. Aug. 28, 2017), the district court certified a class of current and former participants in the BB&T Corporation 401(k) Savings Plan and appointed Nichols Kaster as co-class counsel. Plaintiffs alleged that Defendants breached their fiduciary duties to the Plan.

In *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 8:15-cv-01614, 2017 WL 2655678 (C.D. Cal. June 15, 2017), the district court certified a class of current and former participants in the Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan and appointed Nichols Kaster as class

**JA240**

counsel. Plaintiffs alleged that defendants improperly managed plan assets and breached their fiduciary duties.

In *Mayfield-Dillard v. Direct Home Health Care, Inc.*, No. 0:16-cv-3489, 2017 WL 945087 (D. Minn. Mar. 10, 2017), the district court granted Plaintiffs' motion for conditional certification, certifying a group of home health care workers who challenged Defendant's practice of paying straight-time only, for overtime hours worked.

In *McQueen v. Chevron*, No. C 16-02089, 2017 WL 8948943 (N.D. Cal. Feb. 21, 2017), the Court granted conditional certification of an FLSA collective for well site managers and drill site managers who performed services for Chevron throughout the country, rejecting Chevron's arguments that the various intermediary staffing companies and differing contractual terms put the workers on different footing.

In *Tamez v. BHP Billiton Petroleum (Americas), Inc.*, No. 5:15-cv-330, 2015 WL 7075971 (W.D. Tex. Oct. 5, 2015), the court granted plaintiffs' motion for conditional certification, conditionally certifying a class of employees alleging violations of the overtime wage provisions of the Fair Labor Standards Act by a multinational corporation that produces major commodities including oil and gas.

In *Miller v. Fleetcor Technologies Operating Co., LLC*, 118 F. Supp. 3d 1351 (N.D. Ga. 2015), the court denied defendant's motion for decertification, agreeing with plaintiffs that each individual claim and the case as a whole should be kept together, allowing plaintiffs to move forward as a collective group.

In *Pearsall-Dineen v. Freedom Mortgage Corp.*, No. 13-cv-06836-JEI-JS, 2014 WL 2873878 (D. N.J. June 25, 2014), the court conditionally certified the Fair Labor Standards Act overtime case as a collective action. The judge's order authorized notice of the lawsuit to be disseminated to all mortgage underwriters who worked for Freedom Mortgage in the last three years, providing them the opportunity to join the lawsuit and to assert their overtime claims against the defendant for failing to pay them overtime hours.

In *Ellsworth v. U.S. Bank, N.A.*, No. C 12-2506-LB, 2014 WL 2734953 (N.D. Cal. June 13, 2014), the court issued a broad class certification ruling on behalf of plaintiff-borrowers who were force-placed with flood insurance. In its order, the court certified multi-state classes of borrowers spanning forty different states to pursue claims against U.S. Bank for breach of their mortgage agreements stemming from U.S. Bank's force-placed insurance practices. In addition, the court separately certified classes of borrowers in California and New Mexico to pursue claims against U.S. Bank and its force-placed insurance vendor, ASIC, for unjust enrichment, unfair business practices, and/or breach of the covenant of good faith and fair dealing.

In *Arnett v. Bank of America, N.A.*, No. 3:11-cv-01372-SI (D. Or. Apr. 17, 2014), the court preliminarily approved a $31 million settlement for approximately 625,000 class members, the largest common fund settlement ever negotiated in a case involving force-placed flood insurance.

In *Ernst v. DISH Network, LLC*, No. 12-8794-LGS (S.D.N.Y. July 23, 2013), the court appointed Nichols Kaster as interim class counsel for the putative class with claims against Defendant Sterling Infosystems, Inc., finding that Nichols Kaster had "demonstrated it is able fairly and adequately to represent the interests of the putative class."

In *Gustafson v. BAC Home Loan Services, LP*, No. 8:11-cv-00915 (C.D. Cal. Feb. 27, 2013), Judge Josephine Staton Tucker appointed Nichols Kaster as co-lead interim class counsel for multiple putative classes in a force-placed insurance case against Bank of America and other defendants.

In *Spar v. Cedar Towing & Auction, Inc.*, Case No. 27-CV-11-24993 (Minn. Dist. Ct., Oct. 16, 2012), Nichols Kaster won class certification and was appointed class counsel for a class of approximately six thousand Minneapolis consumers who plaintiffs alleged had been charged illegal towing fees by defendant.

## | Denial of Motions to Dismiss

In *Carmen v. Health Carousel, LLC*, No. 1:20-cv-313 (DRC) (S.D. Ohio June 17, 2021), the court denied a healthcare recruiting company's motion to dismiss and strike class allegations of labor trafficking.

In *Fain v. Crouch*, No. 3:20-0740 (RCC) (D. W. Va. May 19, 2021), the court denied defendants' motion to dismiss and strike class allegations that defendants discriminated against and violated the rights of transgender people by failing to provide gender confirming health care coverage.

In *Padilla v. Caliper Building Systems, LLC et al.*, No. 20-cv-00658 (SRN/KMM) (D. MN, Sep. 21, 2020) the court denied defendant's motion to dismiss, holding that construction laborers working for a framing subcontractor through a labor broker plausibly alleged facts supporting joint employer status under federal and state law.

In *Jane Doe 1 et al v. Independent School District 31*, No. 20-cv-226(SRN/LIB) (D. MN, August 14, 2020) the court denied defendant's motion to dismiss, finding that plaintiffs pled sufficient facts to support plausible Title IX, Section 1983, negligence, negligent supervision, and negligent retention claims. Specifically, the court found that the complaint plausibly alleged a duty of care arising from a special relationship between the school district and plaintiffs, taking into account the elevated status of the school official who sexually exploited plaintiffs, the egregiousness of the sexual exploitation that occurred on district-owned devices, and the fact that the district had clear notice. Further, the court found that plaintiffs plausibly alleged that the district's own conduct created a foreseeable risk of injury to plaintiffs and that the district owed them a duty to prevent the sexual harassment and bullying faced by plaintiffs after the school official's arrest. Additionally, the court held that the complaint plausibly alleged that the district acted with deliberate indifference, resulting in a hostile education environment and peer harassment under Title IX and Section 1983. Finally, plaintiffs sufficiently alleged a pattern of constitutional violations that put the district on notice that "its employees' responses to recurring sex discrimination were insufficient to protect Plaintiffs' constitutional rights."

JA242

In *Intravaia v. National Rural Electric Cooperative Association*, No. 1:19-CV-973, 2020 WL 58276 (E.D. Va. Jan. 2, 2020), the court denied defendants' motion to dismiss in full, holding plaintiffs adequately alleged breaches of fiduciary duty and prohibited transactions under ERISA relating to the administration of the National Rural Electric Cooperative Association's 401(k) plan.

In *Reetz v. Lowe's Companies, Inc.*, No. 518CV00075, 2019 WL 4233616 (W.D.N.C. Sept. 6, 2019), the court denied defendants' motion to dismiss in substantial part, holding plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the Lowe's 401(k) plan.

In *Karpik v. Huntington Bancshares Inc.*, No. 2:17-CV-1153, 2019 WL 7482134 (S.D. Ohio Sept. 26, 2019), the court denied defendants' motion to dismiss in substantial part and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management and monitoring of Huntington Bank's 401(k) plan.

In *Belt v. P.F. Chang's*, No. 18-cv-03831 (E.D. Pa. Aug. 15, 2019), the court denied defendant's motion for judgment on the pleadings, holding that the DOL's new interpretation of the FLSA was unreasonable and not subject to deference, confirming that Plaintiffs had stated a claim for minimum wage violations due to P.F. Chang's failing to pay its servers the full minimum wage when they performed related yet untipped labor, such as side work, for more than 20% of their time in a workweek.

In *Nelsen v. Principal Global Investors Trust Co.*, No. 4:18-cv-00115 (S.D. Iowa, Jan. 24, 2019), the court denied defendants' motion to dismiss in substantial part, holding plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of Principal's collective investment trusts.

In *In re M&T Bank Corp. ERISA Litig.*, No. 16-cv-375, 2018 WL 4334807 (W.D.N.Y. Sept. 11, 2018), the court denied defendants' motion to dismiss in substantial part, holding plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the M&T Bank Corporation Retirement Savings Plan.

In *Velazquez v. Massachusetts Fin. Servs. Co.*, 320 F. Supp. 3d 252 (D. Mass. 2018), the court denied defendants' motion to dismiss in substantial part and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the Massachusetts Financial Services Company MFSavings Retirement Plan and the Massachusetts Financial Services Company Defined Contribution Plan.

In *Beach v. JP Morgan Chase Bank*, No. 1:17-cv-00563 (S.D.N.Y. Mar. 28, 2018), the court denied defendants' motion to dismiss in substantial part and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA.

In *Wildman v. American Century Serv., LLC*, 237 F. Supp. 3d 902 (W.D. Mo. 2017), the court denied defendants' motion to dismiss, finding that plaintiffs adequately alleged breaches of fiduciary duty and prohibited transactions by defendants in connection with the American Century Retirement Plan.

JA243

In *Johnson v. Fujitsu Technology Business of America, Inc.*, 250 F. Supp. 3d 460 (N.D. Cal. April 11, 2017), the court denied defendants' motions to dismiss, and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the Fujitsu Group Defined Contribution and 401(k) Plan.

In *Moreno v. Deutsche Bank Americas Holding Corp.*, 1:15-cv-09936, 2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016), the court denied defendants' motion to dismiss in substantial part and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the Deutsche Bank Matched Savings Plan.

In *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 8:15-cv-01614, 2016 WL 4507119 (C.D. Cal. Aug. 5, 2016), the court denied defendants' motion to dismiss in substantial part and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan.

In *Bowers v. BB&T Corporation*, No. 1:15-cv-732-CCE-JEP (M.D.N.C. Apr. 18, 2016), the court denied defendant's motion to dismiss, finding that plaintiff's allegations regarding Employment Retirement Income Security Act ("ERISA") violations related to defendant's management of plaintiffs' 401(k) Savings Plans are sufficient for litigation to move forward.

In *Brotherston v. Putnam Investments, LLC*, No. 1:15-cv-13825, 2016 WL 1397427 (D. Mass. Apr. 7, 2016), the court denied defendant's motion to dismiss, finding that plaintiff's allegations regarding Employment Retirement Income Security Act ("ERISA") violations related to defendant's management of plaintiffs' 401(k) Savings Plans are sufficient for litigation to move forward.

In *Johnson v. Casey's Gen. Stores, Inc.*, 116 F. Supp. 3d 944 (W.D. Mo. 2015), the court denied defendant's motion to dismiss, finding that plaintiff's allegations regarding Fair Credit Reporting Act violations and the willfulness of defendant's conduct sufficient for litigation to move forward.

In *Lengel v. HomeAdvisor, Inc.*, 102 F. Supp. 3d 1202 (D. Kan. 2015), the court denied defendant's motion to dismiss, finding that plaintiff's allegations regarding Fair Credit Report Act violations and the willfulness of defendant's conduct sufficient for litigation to move forward.

In *Holmes v. Bank of America, N.A.*, No. 3:12-cv-00487, 2013 WL 2317722 (W.D.N.C. May 28, 2013), the court denied four motions to dismiss plaintiffs' claims regarding force-placed insurance and allowing the case to proceed.

In *Walls v. JPMorgan Chase Bank, N.A.*, No. 3:11-cv-00673, 2012 WL 3096660 (W.D. Ky. July 30, 2012), a case regarding force-placed flood insurance, the court denied defendant's motion to dismiss, stating that the plaintiff's mortgage agreement did not explicitly provide that the lender's flood insurance requirement could change at will and that Kentucky contracts contain provisions which can impose limits on discretion afforded by a contract, thus rejecting defendant's interpretation of plaintiff's mortgage agreement for purposes of the motion.

## | Defeat of Motions to Compel Arbitration

In *Doll House, Inc. v. Tapia*, Nos. 5D16-4235, 5D16-4455 (Fla. DCA Nov. 21, 2017), the Florida District Court of Appeal for the Fifth District affirmed per curium a trial court ruling denying defendant's motion to compel arbitration.  The court of appeals found that the parties never formed a binding agreement, and alternatively that the agreement at issue was unconscionable and therefore unenforceable.

In *Payne v. WBY, Inc.*, 141 F. Supp. 3d 1344 (N.D. Ga. 2015) the court denied defendant's motion to compel arbitration of opt-in plaintiffs in an FLSA conditionally certified collective action. The court held that the defendant's alleged posting of an arbitration agreement on a bulletin board in the breakroom without additional notice to workers of its existence, its terms, or its binding nature was insufficient to establish an offer or acceptance of its terms.

# Nichols Kaster Attorneys

## | Partner Biographies

James H. Kaster is a Civil Trial Law Specialist who has tried well over 100 cases to verdict or decision.  He has also handled many significant cases on appeal, including a successful case in front of the United States Supreme Court (*Kasten v. Saint-Gobain Performance Plastics Corp.*). He was ranked by Chambers USA as number one among plaintiffs' employment lawyers in Minnesota, was named Lawyer of the Year by Best Lawyers in 2012, and 2016, and has been listed by Super Lawyers of Minnesota as one of the top 10 lawyers in the State.  Jim's success in the courtroom includes earning many million dollar and multi-million dollar recoveries for plaintiffs.  Jim is also a frequent lecturer before local, state, and national organizations on damage recovery and trial skills. He was selected as a Fellow of the American College of Trial Lawyers, a premier professional trial organization in America whose membership is limited to 1% of the trial lawyers in any state or province. He was also selected to be a member of the College of Labor and Employment Lawyers.  *Education*: B.A. Marquette University 1976, J.D. Marquette University 1979.

Lucas J. Kaster is a skilled and seasoned trial lawyer focused on aggressive advocacy, creative solutions, and responsiveness to clients. As a member of Nichols Kaster's individual rights team, Lucas represents clients in a wide-range of employment matters, including harassment, retaliation and discrimination claims. Lucas also represents clients in civil rights claims, such as police misconduct and prisoner rights.  Over his career, Lucas has tried many cases to verdict or decision. Most recently, Lucas represented a South Dakota law enforcement officer in a retaliation and sexual harassment lawsuit that resulted in a $1.2 million jury verdict. In a separate lawsuit, Lucas represented four golf course employees who were subject to harassment and retaliation in a court trial that resulted in a plaintiff's verdict and treble damages under the Minnesota Human Rights Act ("MHRA"). Lucas uses this unique trial experience to drive litigation strategy and provide his clients the best possible representation. Lucas is also an experienced appellate advocate. In 2018, Lucas successfully argued before the Ninth

**JA245**

Circuit Court of Appeals in *Michael Frost v. BNSF Railway Co.*, 9:15-cv-000124–DWM. The Ninth Circuit's decision addressed a hotly debated subject under the Federal Railway Safety Act ("FRSA"). The question before the Court was whether the honest belief instruction was proper because the FRSA's contributing factor standard required plaintiffs to separately prove discriminatory intent. In the opinion, the Ninth Circuit definitively held that there is no requirement that FRSA plaintiffs separately prove discriminatory intent, and thus the instruction was error.   Due to his experience, Lucas is a well-respected and sought-after speaker. Lucas is a frequent presenter at the ABA's Labor and Employment and Employment Rights and Responsibilities conferences. In February 2019, Lucas also spoke at the College of Labor and Employment Lawyer's Regional Program for the 4th and 11th Circuits in Charleston, South Carolina. Lucas participated in a three-member panel titled: *The #MeToo Movement One Year Later: Where Are We Now?* Lucas is a member Twin Cities Diversity in Practice's Emerging Leaders Group and a contributor to Nichols Kaster's training and marketing committees.   *Education:* B.A. Villanova University 2004, J.D. Marquette University Law School 2011.

Paul J. Lukas is one of the co-leaders of the firm's ERISA Class Action Team. Mr. Lukas also has extensive experience litigating class and collective actions and has tried over 50 cases over the course of his career. Mr. Lukas has been recognized by his peers as one of "The Best Lawyers in America" and is frequently named to the Minnesota Super Lawyers list. He also has had many publications and speaking engagements about issues and strategies for plaintiff class action lawyers and the plaintiffs' bar. *Education*: B.A. St. John's University 1988, J.D. William Mitchell College of Law 1991.

Brandon T. McDonough is a member of Nichols Kaster's ERISA litigation team where he represents current and former employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and general mismanagement.  Prior to joining the firm, Brandon practiced plaintiffs-side consumer and civil rights law. *Education:* B.A. University of Chicago 2007, J.D. University of Minnesota Law School 2012 *cum laude.*

Steven Andrew Smith has been named "Lawyer of the Year" for Employment Law in Minneapolis by Best Lawyers for 2021 and 2022, named "Attorney of the Year" twice by Minnesota Lawyer for his work protecting employees' rights, named one of "The Best Lawyers in America" for the last eight years, named to the Minnesota Super Lawyers "Top 100" list five times, and named to the Minnesota Super Lawyers list for 20 consecutive years.  In 2020, Steve was elected as a Fellow of the College of Labor and Employment Lawyers. Steve was honored by the Minnesota Chapter of the National Employment Lawyers Association as the recipient of the 2014 Karla Wahl Dedicated Advocacy Award. The Award is given to recipients "for their ceaseless and courageous efforts" to protect and advance the rights of Minnesota employees. Steve was also the recipient of the 2011 Distinguished Pro Bono Service Award from the United States District Court for the District of Minnesota, was selected for the Merit Selection Panel regarding the Re-Appointment of U.S. Magistrate Judge Arthur J. Boylan (D. Minn. 2012), was further recognized in 2014 by the United States District Court and Chief Judge Michael J. Davis for his involvement in the Pro Se Project, a project by the United States District Court of Minnesota for assisting individuals representing themselves in federal court, and has received the Martindale Hubble AV Preeminent rating. Steve's trial experience includes trials to verdict in sexual

**JA246**

harassment, whistleblower, reprisal/retaliation, commission, contract, gender discrimination, marital status discrimination, disability, and wage and hour claims. Steve has also litigated several notable cases having substantial effect on employees' rights under state and federal employment laws. Steve is often invited to lecture on employment issues both nationally and locally. He has also authored a number of articles on employment law issues such as sexual harassment in the workplace. *Education*: B.A. Concordia College 1990, J.D. William Mitchell College of Law 1995 *cum laude*.

Michele R. Fisher is a managing partner, and Chair of the Firm's Business Development and Marketing Groups, which originate class and collective actions and market the firm. She has dedicated her career to litigating wage and hour cases in an aggressive, creative, and strategic manner. She is one of the leaders of a practice group that has been described as a "powerhouse" for mass wage and hour litigation and arbitration. Michele has the experience, resources, and staff to take on any company regardless of size. She has handled several jury trials and arbitrations in her fight for employee rights and prides herself on the firm's reputation as a leader in national wage and hour class and collective action litigation. Michele has litigated hundreds of class and collective actions involving positions such as home health aides, loan officers, retail salespersons, oil and gas workers, assistant managers, field service engineers, call center representatives, exotic dancers, inside sales representatives, restaurant workers, insurance adjusters, property specialists, property managers, installers, service technicians, and road construction laborers. She is additionally admitted to practice before the United States Court of Federal Claims.

Michele is active in several organizations. She is a Co-Chair and faculty member of the Practicing Law Institute's Wage & Hour Litigation and Compliance conference, and the Co-Chair of the ABA Labor and Employment Law Section's Annual Conference Planning Committee. She has served as the Co-Chair of the ABA Labor and Employment Law Section's Federal Labor Standards Legislation Committee, Co-Editor-in-Chief of the ABA Labor and Employment Law Section's Federal Labor Standards Legislation Committee FLSA Midwinter Report, the Co-Chair of the ABA Labor and Employment Law Section's Revenue and Partnership Development Committee, Track Coordinator for the ABA Labor and Employment Law Section's annual conference, an editorial board member for BNA's the Fair Labor Standards Act Treatise, and a chapter editor for BNA's Wage and Hour Laws: A State-by-State Survey. She is a Fellow in the College of Labor and Employment Lawyers, has been named to the Best Lawyers, Super Lawyers, Top Women Attorneys, Lawyers of Distinction, and Rising Star lists repeatedly, is a member of the Top 10 Wage and Hour Lawyers, Top 100 National Trial Lawyers, Top 100 High Stakes Litigators, and LawDragon 500 Leading Plaintiff Employment Lawyers. Michele volunteers as an attorney for a foster child through the Children's Law Center. She also created and administers arbitratorrater.com. *Education*: B.A. St. Cloud State University 1997, J.D. William Mitchell College of Law 2000.

Matthew H. Morgan is a managing partner at the Firm and a Minnesota State Bar Association Civil Trial Specialist. Much of Matt's career has focused on litigating class and collective actions on behalf of individuals seeking minimum wage and overtime pay and fighting discrimination. Recently, Matt first-chaired a nineteen-day age discrimination class action trial on behalf of nearly 1000 people against the federal government. Matt has been recognized as a Super Lawyer every year since 2014,

**JA247**

and has been named to the Who's Who in Employment Law by Minnesota Law and Politics. Matt formerly served as an adjunct faculty member at William Mitchell College of Law (now Mitchell Hamline) teaching representation skills to first-year students and advanced advocacy to second- and third-year students. Matt is a frequent lecturer at legal seminars, focusing on litigation-related topics including trials and taking 30(b)(6) depositions. *Education*: B.A. University of Minnesota 1996, J.D. William Mitchell College of Law 2000.

Rachhana T. Srey is a Partner at Nichols Kaster, PLLP who has extensive litigation experience, primarily dedicating her legal practice to national wage and hour complex class and collective action employment litigation. She has been a zealous advocate for thousands of employees over her 14-year career, representing a wide variety of workers in many industries including those who work in healthcare, insurance, financial services, communications, retail, manufacturing, and security industries as well as federal sector employees. Rachhana's exceptional case management and advocacy skills, dedication to her clients, strong work ethic and outgoing personality have earned her the respect of her clients and of her colleagues in the legal community. Rachhana has tried several wage and hour cases, most notably obtaining a jury verdict that was upheld by the Sixth Circuit in favor of a group of nearly three hundred cable installers. In addition to her wage and hour practice, Rachhana is also currently litigating a large age discrimination class case venued at the EEOC. She is active in several organizations, holding leadership positions in a few. Rachhana is currently the Co-Chair of the National Employment Lawyer Association's ("NELA") Wage & Hour Committee and Practice Group and the Co-Chair of the Association of Justice's ("AAJ") Wage & Hour Litigation Group. She is also an active Board Member of Mid-Minnesota Legal Aid. Rachhana is often invited to speak nationally and locally on a wide range of topics including class and collective action litigation strategies, wage and hour litigation, discovery issues, recent developments in the law, and age and gender discrimination. *Education*: B.A. University of Minnesota 2000, J.D. William Mitchell College of Law 2004 *cum laude*.

Matthew C. Helland is an experienced and tenacious litigator who has fought for workers' and consumers' rights throughout his career. Matt serves as the managing partner of Nichols Kaster's San Francisco office, where he focuses his practice on class and collective wage and hour cases filed in California and throughout the country. Handling both large class actions and individual matters throughout this career, Matt has developed a record of success in significant and complex litigation. Matt litigates each of his cases with the same zealous advocacy and passionate protection of his clients' rights, whether the case involves millions of dollars and thousands of clients, or thousands of dollars and one individual. In addition to representing workers across the country in wage and hour actions, Matt has also handled cases involving WARN Act violations, breach of contract, and severance negotiations. Matt is licensed in both California and Minnesota. Matt is an active volunteer at Workers' Rights Clinics through Legal Aid Work, where he supervises student attorneys in providing legal assistance to low wage workers. While attending the University of Minnesota Law School, Matt was a staff member and Managing Tribute Editor of the University of Minnesota Journal of Global Trade. He also participated in the Child Advocacy Clinic, representing the interests of children as a student attorney in both Family and Juvenile Court. *Education*: B.A. Rhodes College 2002 *magna cum laude*, J.D. University of Minnesota Law School 2005 *magna cum laude*.

David E. Schlesinger David Schlesinger is an experienced attorney who has been recognized for the quality of his work for employees. He is an MSBA Certified Employment Law Specialist who has been selected as a Super Lawyer for the last seven years. He teaches Law in Practice at the University of Minnesota Law School and is the former president of the Minnesota Chapter of the National Employment Lawyers Association. David has successfully litigated a wide variety of employment claims, including several significant cases involving gender discrimination, cases under the Americans with Disabilities Act, and many other claims. His practice also includes an emphasis on the intersection of employment and business disputes, including litigation of breach of fiduciary duty and minority shareholder claims. He has effectively defended employees from non-compete and trade secret claims brought by their former employers. *Education*: B.A. Mary Washington College 2001 *cum laude*, J.D. University of Minnesota Law School 2006 *cum laude*.

Anna P. Prakash is one of the leaders of the firm's Civil Rights and Impact Litigation practice group. Her practice focuses on complex class and multi-plaintiff actions on behalf of protected groups. Over the course of her time at the firm, Anna has led the firm's National Consumer Class Action practice group, been a member of the firm's National Wage & Hour practice group, and authored and argued class and individual appeals. She fights for her clients, brings a high level of skill and intellect to the fight, and has achieved success for her clients in state and federal courts around the country, including and as referenced above: the summary judgment victories in *Huff*, *Hart*, and *Clincy*; the successful appeal in *Bible v. United Student Aid Funds*; class certification in *MacDonald v. CashCall, Inc.*; considerable settlements in each of those cases; the defeat of motions to dismiss and strike class allegations in *Carmen* and *Fain*; and the trial verdict in *FTS*. Anna is also involved in numerous professional organizations. She serves on the Board of Directors of the People's Parity Project, as well as the Board of Directors of the Public Justice Foundation, a nationwide organization supporting high-impact lawsuits to combat injustice. Anna is also a member of Twin Cities Diversity and Practice's Professional Development Committee, the employee-side co-chair of the American Bar Association's Occupational Safety and Health Committee, and a member of the Nominating Committee for the National Association of Consumer Advocates. Anna previously served on the Board of Directors of Standpoint, an organization that exists to serve domestic and sexual violence survivors and professionals working within the justice system in Minnesota, and is also a past board member of the Minnesota Chapter of the National Employment Lawyers' Association. She is a frequent speaker at national legal seminars and an adjunct professor of legal writing at the University of Minnesota Law School. *Education*: B.A. University of Michigan 2002, J.D. Cornell Law School 2005.

Rebekah L. Bailey is a tireless advocate dedicated to civil rights and social justice. She has helped tens of thousands of employees and consumers recover millions of dollars primarily in complex class and collective actions across the country. Rebekah has worked on the firm's wage and hour team and was a founding member of the consumer practice area as well as the firm's civil rights and impact litigation group. Rebekah has been recognized as a Minnesota Super Lawyer every year since 2014. Over the years, she has served on numerous trial and arbitration teams, successfully first-chairing her first bench trial. Rebekah has achieved several affirmative summary judgment determinations and certification

**JA249**

decisions, including in *Rego*, *Dunham-Sunde*, *Henderson*, *Vaughan*, *Spar*, and *Norris-Wilson*, mentioned above. Rebekah leads the firm's e-discovery committee. She has spoken at national seminars on various topics, including electronic discovery, class litigation, arbitration, equal pay, and various wage and hour issues. Rebekah is a practical instructor for the University of Minnesota's Law & Practice course. She is a member of the District of Minnesota's Federal Practice Committee, and a board member for the Complex Litigation eDiscovery Forum. She is very involved in the ABA's Labor and Employment Law section. She serves as the employee vice chair of the section's treatise committee; she is an associate editor for the FLSA Committee's Mid-Winter Report; and she serves as a FLSL liaison to the ABA/LEL CLE Coordinating & Resources Committee. *Education*: B.S. Grand Valley State University 2004 *magna cum laude*, J.D. University of Minnesota Law School 2008 *magna cum laude*.

Reena I. Desai is a partner at Nichols Kaster, PLLP, in the firm's Minneapolis office. She is a skilled and meticulous litigator, who has represented thousands of employees in class and collective actions to recover unpaid overtime, minimum wages, commissions, and other types of compensation. Reena has also advocated for employees in cases involving race, age and disability discrimination. She is a board member of a legal non-profit and frequently speaks at legal seminars and conferences across the country. Reena has dedicated the majority of her career to helping employees combat wage theft and recover unpaid overtime compensation, minimum wages, and other unpaid compensation. She has represented employees in a variety of industries, including investigators, home health care workers, loan officers, mortgage underwriters, field service technicians, sales representatives, and restaurant workers. Reena has also litigated discrimination cases on both a class and individual level, advocating for employees whose employers have discriminated against them because of their age, race or disability. Reena has been asked to share her knowledge and experience with her peers, serving as a speaker at several national conferences. She has lectured on topics including wage and hour litigation, electronic discovery issues, attorney-client privilege and mediation/settlement. Reena also serves on the Board of Directors for the Minnesota Justice Foundation, a legal non-profit in Minnesota, and has been named a Rising Star by Minnesota Super Lawyers every year since 2014. *Education*: B.A. George Washington University 2002 *magna cum laude*, J.D. University of Minnesota Law School 2007 *cum laude*.

Robert L. Schug is a partner on Nichols Kaster's Civil Rights and Impact Litigation team. Robert has more than a decade of experience litigating cases through trial in both court and arbitration. He has represented employees across the country on a variety of issues, including race, gender, and disability discrimination, employee misclassification, unpaid overtime, and unpaid wages. Robert previously served as Director of Litigation at the Impact Fund, a nationally recognized non-profit law firm in Berkeley, California devoted to achieving social justice through large scale impact litigation. He has been recognized as a Rising Star by Northern California and Minnesota Super Lawyers. He is licensed in California and Minnesota. *Education:* B.S. Middle Tennessee State University 2003 *summa cum laude*; J.D. William Mitchell College of Law 2006 *summa cum laude*.

Brock J. Specht is partner on Nichols Kaster's ERISA litigation team. He represents retirees in lawsuits against some of the country's largest corporations, holding these companies accountable when

**JA250**

they fail to deal fairly and honestly with their employees and customers. His recent cases have led to the recovery of millions of dollars in retirement benefits for thousands of participants in 401(k) plans nationwide. Prior to joining the firm, Brock worked with a major Twin Cities law firm, and as a law clerk for two judges on the Minnesota Court of Appeals. Brock also has worked as a Special Assistant State Public Defender, *pro bono*, and as an Adjunct Professor of Law at the University of St. Thomas School of Law. *Education*: B.A. University of Minnesota 2002, J.D. University of St. Thomas School of Law 2007 *magna cum laude*.

## | Associate Biographies

Ben J. Bauer is a member of Nichols Kaster's ERISA litigation team where he represents employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and general mismanagement. Prior to joining the firm, Ben clerked for Judge Tom Fraser in Hennepin County District Court. During law school, he interned for the Minnesota Department of Human Rights, the ACLU of Minnesota, and earned the Law School Public Service Award. Prior to law school, Ben taught 7th grade English in Tulsa, Oklahoma and continued to work in schools while completing his law degree in Mitchell Hamline's night program. **Education:** B.A., St. John's University, 2011, *magna cum laude*, J.D., Mitchell Hamline School of Law, 2017, *magna cum laude*.

Caroline E. Bressman is a member of the firm's national wage and hour litigation team where she fiercely advocates for workers' rights. Caroline is dedicated to furthering social justice and equity in the workplace on behalf of employees challenging their employers' unfair practices. Caroline is a contributing editor to the Fair Labor Standards Act Midwinter Report of the ABA Section of Labor and Employment Law. During law school, Caroline served as a staffer, and subsequently Symposium Articles Editor, for the *Minnesota Law Review* and clerked for a nonprofit legal and policy advocacy organization focused on addressing gender inequality. Caroline was also the recipient of the ABA-Bloomberg BNA Award for Excellence in Health Law. *Education:* B.A. St. Olaf College 2015 *magna cum laude*, J.D. University of Minnesota Law School 2018 *cum laude*.

Daniel S. Brome worked with the California Labor Commissioner while in law school and served as the Editor-in-Chief of the Berkeley Journal of Employment and Labor Law, and as Director of the Workers' Rights Clinic. After law school, Daniel worked with a California law firm representing workers and unions in arbitrations and litigation. Daniel continues pursuing his passion for employment law at Nichols Kaster, working with the firm's national wage and hour team out of the San Francisco office. *Education:* B.A. Princeton University 2005, J.D. University of California Berkeley School of Law 2011.

Grace Chanin is a member of Nichols Kaster's ERISA litigation team where she represents employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and general mismanagement. Prior to joining the firm, Grace clerked for Judge Connolly, Judge Larkin, and Judge Bjorkman at the Minnesota Court of Appeals. She graduated *magna cum laude* from the Mitchell Hamline School of Law and received three separate CALI awards for her work as the top-performing student in a class. During law school, she was a member of

**JA251**

the Mitchell Hamline law review, worked as a law clerk for a Minneapolis business law firm, and received the Law School Public Service Award for her work as a pro bono law clerk at a top Minneapolis law firm. *Education:* B.A., Minnesota State University 2012 *magna cum laude*, J.D. Mitchell Hamline School of Law 2018 *magna cum laude*

H. Clara Coleman **is a member of Nichols Kaster's National Wage and Hour litigation Team where she** fights for employees' right to hard-earned wages. Prior to joining Nichols Kaster, Clara served an Attorney-Advisor to the Honorable Christopher Larsen at the U.S. Department of Labor, Office of Administrative Law Judges in San Francisco where she collaborated with ALJ Larsen to manage and decide employment-related matters. Clara also focused on the advancement of workers' rights throughout law school. She advocated for employees in her two clerkship positions at plaintiff-side employment firms, and represented a wage and hour client as a student-attorney for the Public Justice Advocacy Clinic. *Education:* B.A., Loyola University Maryland, *summa cum laude*; J.D., George Washington University School of Law, *with honors*.

Patricia C. Dana is a member of Nichols Kaster's ERISA litigation team where she represents current and former employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and general mismanagement. Prior to joining Nichols Kaster, she clerked for Justice Anne McKeig on the Minnesota Supreme Court. During law school, she was an editor of the *University of St. Thomas Law Journal*, worked as a law clerk at Mid-Minnesota Legal Aid, clerked for Judge Michael Browne in Hennepin County District Court, and received the Judge Earl R. Larson Award for excellence in the study of federal law and practice. Prior to law school, Patty represented Medicare and Medicaid recipients in administrative appeals at The Legal Aid Society in New York. *Education:* B.A., Carleton College, *cum laude*; J.D., University of St. Thomas, *summa cum laude*.

Charles A. Delbridge is a member of Nichols Kaster's Civil Rights and Impact Litigation Team where Charlie focuses on class actions on behalf of employees, consumers, and other protected groups. Charlie's cases challenge discrimination of all types, fraud, and other unfair practices. He has nearly a decade of experience as a civil litigator across a broad range of substantive practice areas. Charlie has been recognized as a "Minnesota Rising Star" by *Super Lawyers* magazine, and an "Up & Coming Attorney" by *Minnesota Lawyer*. He is active in professional organizations, having served as a member of the Board of Directors of both the Minnesota State Bar Association and Minnesota Continuing Legal Education. *Education:* B.A. University of Wisconsin-Madison 2003, J.D. William Mitchell College of Law 2006 *magna cum laude*.

Laura A. Farley is a member of Nichols Kaster's individual rights litigation team and is dedicated to protecting the rights of current and former employees who face a wide-range of employment-related issues, including discrimination, harassment, retaliation, minority shareholder, and contract disputes. Prior to joining Nichols Kaster, Laura worked as an associate for a Minneapolis litigation firm, focusing on minority shareholder, employment, and contract disputes. During law school, Laura was on the Executive Board of the *Minnesota Law Review*, the board of the Women's Legal Student Association, and volunteered with the Advocates for Human Rights. Prior to attending law school, Laura worked for a

**JA252**

Fortune 100 company in business-to-business sales supporting operations and logistics in small businesses. *Education:* B.A. University of St. Thomas 2010 *magna cum laude*, J.D. University of Minnesota Law School 2015.

Kate Fisher is a Case Development Attorney for the Nichols Kaster's Civil Rights and Impact Litigation Practice Group. In this role, she investigates new cases and works with other members of the Group to advance litigation. Kate formerly served as an Associate Attorney for the firm's Individual Practice Group, where she represented employees in a wide range of employment-related matters, including but not limited to, allegations of discrimination, harassment, retaliation, violations of the Family and Medical Leave Act, and whistleblower claims. In addition to her practice, Kate has also served as an Adjunct Professor at St. Thomas Law School and Mitchell Hamline School of Law. *Education*: B.A. College of St. Catherine 2006 *summa cum laude*; J.D. University of St. Thomas School of Law 2011 *cum laude*.

Matthew A. Frank was named a 2017 Minnesota Lawyer of the Year. Matt attended the University of Michigan Law School as a Clarence Darrow Scholar. At graduation, he received the Robert S. Feldman Award for outstanding work in labor and employment law. Prior to joining Nichols Kaster in 2016, Matt clerked for the Hon. Susan N. Burke in Hennepin County District Court and practiced plaintiffs' employment law at another Twin Cities firm. Matt is part of Nichols Kaster's individual rights team. *Education:* B.A. University of Colorado Boulder 2002 *summa cum laude*, Philosophy Ph.D. (ABD) University of Minnesota, J.D. University of Michigan Law School 2013 *cum laude*.

Melanie A. Johnson is a member of Nichols Kaster's Civil Rights and Impact Litigation team. Prior to joining the firm, Melanie clerked for Judge Matthew E. Johnson at the Minnesota Court of Appeals. During law school, she served as a managing editor of the *Minnesota Law Review*, student director of the Child Advocacy and Juvenile Justice Clinic, research assistant in the ara of juvenile law, and board member of the student chapter of the Minnesota Justice Foundation. She received the Mondal Hall Engagement Award in 2019.*Education:* B.A University of Oregon 2010 *magna cum laude*, J.D. University of Minnesota Law School 2019 *cum laude*.

Kayla M. Kienzle is a member of Nichols Kaster's National Wage and Hour Litigation Team where she advocates on behalf of workers seeking unpaid wages in class and collective actions across the country. Kayla is also a contributing author to the ABA Fair Labor Standards Act Midwinter Report. Prior to joining the firm, Kayla clerked for the Honorable John R. Rodenberg and the Honorable Michelle A. Larkin at the Minnesota Court of Appeals. During law school, she served as Submissions Editor for the University of St. Thomas Law Journal and as President of the Women Law Students Association. She also worked as a law clerk at the Hennepin County Public Defender's Office and a legal intern at the United States Department of Justice, Office of Justice Programs, Office for Civil Rights. Prior to attending law school, Kayla worked in retail management. *Education*: B.A., Iowa State University, J.D., University of St. Thomas School of Law, *cum laude*.

JA253

Michelle L. Kornblit is a member of Nichols Kaster's individual rights practice group and assists employees with a wide-range of claims, including discrimination, harassment, retaliation and whistleblower protection. Michelle has been dedicated to employee rights and challenging unfair employment practices her entire career. While in law school, Michelle interned with an Administrative Law Judge of the U.S. Equal Employment Opportunity Commission, and with the Women's Rights Project of the American Civil Liberties Union. Prior to joining Nichols Kaster, Michelle was an associate with a leading employment litigation firm in New York, representing employees in individual, multi-party and class action cases. *Education:* B.A. New York University 2010 *cum laude*, J.D. Benjamin N. Cardozo School of Law 2014 *cum laude*.

Jennifer K. Lee is a member of the firm's national class-action ERISA team. She is a skilled litigator who has dedicated her legal career to advocating on behalf of the vulnerable. As a member of Nichols Kaster's ERISA practice, she is proud to represent employees whose hard-earned retirement savings have been squandered due to excessive fees, imprudent investments, and employer self-dealing. Through class action litigation, Jenny has helped recover tens of millions of dollars in retirement savings for her clients. Prior to joining Nichols Kaster, Jenny worked as Pro Bono Counsel at a national law firm, a staff attorney with the American Civil Liberties Union's national office in New York, and as an associate at the corporate law firm Cravath, Swaine and Moore in New York City. During law school, Jenny served as Editor-in-Chief of the *University of Chicago Legal Forum* and interned for New York's Legal Aid Society's Prisoners' Rights Project, Planned Parenthood Federation of America, and the ACLU of Illinois. *Education*: B.A. Yale University 2010 *cum laude*, J.D. University of Chicago Law School 2006 with honors.

Neil Pederson has been practicing law with the firm since October 2017. Prior to that, he clerked for the Honorable Karen A. Janisch in Hennepin County State District Court. His practice has focused on national class action employment discrimination litigation and national wage and hour class and collective action litigation. He has represented hundreds, if not thousands, of workers who have been discriminated against or who are seeking to recover lost wages, including overtime pay and minimum wages, through collective, class, and hybrid actions. Since he started at Nichols Kaster, Neil has worked on multiple class and collective actions, involving positions such as railroad workers, home health aides, delivery drivers, oil field workers, and nurses. Neil has handled managing discovery and filing class certification and other motions in these cases. In addition to being a litigation associate at the firm, Neil also works with its Business Development Group, which originates class and collective actions. Neil is also a contributing editor to the ABA Section of Labor and Employment Law's Fair Labor Standards Act Midwinter Report. Neil volunteers as an attorney for the Mid-Minnesota Legal Aid's Housing Section. *Education:* B.A. University of Minnesota 2007 *summa cum laude*, Political Science Ph.D. work University of Chicago 2008-2010, J.D. William Mitchell College of Law 2015 *summa cum laude*.

Chloe A. Raimey is a member of Nichols Kaster's Civil Rights and Impact Litigation group. Prior to joining Nichols Kaster, she clerked for Justice Anne McKeig on the Minnesota Supreme Court. During law school, Chloe served as the editor-in-chief of the *University of St. Thomas Law Journal*, worked as a litigation law clerk for the League of Minnesota Cities, interned with the Advocates for Human

**JA254**

Rights, and represented consumers in Chapter 7 bankruptcy proceedings. Prior to law school, Chloe gained additional writing experience as well as employee benefits knowledge as a communications specialist with a focus on human resources topics. *Education:* B.A. University of Florida 2008 *summa cum laude*, J.D. University of St. Thomas School of Law 2016 *magna cum laude*.

Nicole J. Schladt is a member of Nichols Kaster's Civil Rights and Impact Litigation group. Prior to joining Nichols Kaster, Nicole served as a judicial law clerk for the Honorable Susan M. Robiner in Minnesota's Fourth Judicial District. During her time in law school, Nicole co-founded Emory LGBTQ Legal Services (ELLS), an organization created to provide pro bono legal assistance to members of Atlanta's queer community. Her work with ELLS led to her receiving the 2018 Marion Luther Brittain Award, Emory University's highest student honor, as well as the 2018 National LGBT Bar Association Student Leadership Award. Nicole's academic research prior to law school explored the intersections of international human rights law, feminist theory, and international politics. *Education:* B.A. University of Kentucky 2014 summa cum laude, M. Phil. University of Cambridge 2015, J.D. Emory University School of Law 2018 *with honors.*

Jacob T. Schutz is a member of Nichols Kaster's ERISA litigation team where he represents current and former employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and general mismanagement. In law school, Jacob was an editor of the ABA Journal of Labor & Employment Law and published an article on the association provision of the Americans with Disabilities Act. Prior to joining Nichols Kaster, he was an associate in a firm acting as general counsel for Taft–Hartley employee benefit funds. *Education:* B.A. University of Pennsylvania 2010, J.D. University of Minnesota Law School 2013 *magna cum laude.*

Mark E. Thomson is a member of Nichols Kaster's ERISA team where he represents current and former employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and general mismanagement. Prior to joining Nichols Kaster, he clerked for Justice David Lillehaug and Justice Anne McKeig on the Minnesota Supreme Court. During law school, Mark was an editor of the *Harvard Civil Rights-Civil Liberties Law Review* and interned with the Consumer Financial Protection Bureau, the National Consumer Law Center, and the Massachusetts Attorney General's Office. *Education*: B.A. University of Minnesota 2011 *summa cum laude*, J.D. Harvard Law School 2016.

| Staff Attorney and Of Counsel Biographies

Laura A. Baures is a staff attorney dedicated to fighting for employees and applicants who have been discriminated against for unlawful reasons including on the bases of their age, disability, race, color, national origin, religion, and sex. In addition, she helps employees pursue their fair and equal wages owed in the eyes of the law. Her work focuses primarily on representing classes fighting against discrimination. Laura has experience in both federal and private sector matters. During law school, Laura won the MSBA Labor and Employment Law Section Law Student Award in Labor Law. Laura participated in the AAJ Regional Trial Competition, was president of the Women Law Students Association, and volunteered for over 100 hours through the Minnesota Justice Foundation working as

**JA255**

certified student attorney for the Washington County Public Defender's Office and at Eldercare Rights Alliance. She also completed an externship with the Honorable Gail Chang Bohr at Minnesota's Second Judicial District. Before law school, Laura worked for a local company that provides residential care for people with disabilities where she discovered her passion for employment law. *Education:* B.A. University of Wisconsin – Eau Claire *cum laude*, J.D. William Mitchell College of Law.

Carl F. Engstrom is of counsel and a subject matter expert on Nichols Kaster's ERISA Litigation Team.  As a founding member of the ERISA litigation group, Carl has been counsel of record in every case brought by the group since its inception in 2015.  In that time, the ERISA litigation group has negotiated settlements totaling approximately $80 million on behalf of retirement plan participants shortchanged by excessive fees and imprudent retirement plan investments. Before joining Nichols Kaster, Carl clerked for judges at both the Minnesota Court of Appeals and Hennepin County District Court.  Prior to entering the legal profession, he spent six years working as a financial advisor, providing retirement and investment advice to hundreds of clients, and earning the Certified Financial Planner™ designation. *Education*:  B.A. Harvard College 1998, J.D. University of Minnesota Law School 2012 *magna cum laude.*

.

JA256

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

    *Plaintiffs*,

  v.

WILLIAM CROUCH, *et al.*,

    *Defendants.*

CIVIL ACTION NO. 3:20-cv-00740

HON. ROBERT C. CHAMBERS, JUDGE

**DECLARATION OF AVATARA SMITH-CARRINGTON IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Avatara Smith-Carrington, declare as follows:

1.  I am a Staff Attorney with Lambda Legal Defense and Education Fund, Inc.

("Lambda Legal"), and counsel for Plaintiffs in this litigation. I have practiced law since 2019,

and have maintained a full-time practice in civil rights issues for lesbian, gay, bisexual, and

transgender people since then. I am licensed to practice law in the State of Maryland, and am

practicing before this Court as a Visiting Attorney in accordance with the requirements of Local

Rule of Civil Procedure 83.6. I submit this declaration in support of Plaintiffs' Motion for Class

Certification. I make this declaration of my own personal knowledge, and, if called as a witness,

I could and would testify competently to the matters stated herein.

2.  Lambda Legal is committed to the vigorous, effective, and efficient prosecution

of the interests of Plaintiffs and the proposed class (the "Class").

3.  Based on my co-representation of Plaintiffs in this matter with the law firms of

The Employment Law Center, PLLC ("ELC") and Nichols Kaster, PLLP ("NK"), it is my belief

that the attorneys of ELC and NK are likewise committed to the vigorous, effective, and efficient

**JA257**

prosecution of this matter.

4.    Since the filing of the complaint in this action, Lambda Legal, ELC, and NK (collectively, "Plaintiffs' counsel") have dedicated many hours to the investigation and research of Plaintiffs' claims, motion practice, written discovery, and fact and expert depositions.

5.    Lambda Legal has dedicated, and will continue to commit, substantial resources to the representation of the Class.

6.    Plaintiffs' counsel have agreed to act jointly as Class counsel, if the Court so designates them.

I.    **Experience of Lambda Legal**

7.    ***Lambda Legal's experience with civil rights cases on behalf of transgender people.***  Lambda Legal has extensive experience in the law surrounding the civil rights of transgender people.  Lambda Legal is the oldest and largest legal organization committed to achieving full recognition of the civil rights of LGBT people and everyone living with HIV through impact litigation, education, and public policy work.  Lambda Legal has been party counsel and counsel for *amici curiae* in numerous constitutional and civil rights law challenges seeking equal treatment for transgender people.  Lambda Legal's work to secure equal treatment and dignity for transgender people has included:

A.    Representing transgender individuals facing healthcare discrimination, *Kadel v. Folwell*, No. 19-cv-00272 (M.D.N.C.); *C.P. v. Blue Cross Blue Shield of Illinois*, No. 20-cv-06145-RJB (W.D. Washington); *Fain v. Crouch*, No. 3:20-cv-00740 (S.D. W.Va.); *Fletcher v. State of Alaska*, 443 F. Supp. 3d 1024, 1026 (D. Alaska 2020); *Simonson v. Oswego Cty.*, No. 5:17-cv-01309-MAD-DEP (N.D.N.Y.); *Conforti v. St. Joseph's Healthcare System*, No. 2:17-cv-

**JA258**

00050 (D.N.J.); *Esquivel v. State of Oregon*, No. 11C17487 (Or. Cir. Ct. 2011); *Lawrence v. Cobert*, No. 510-2014-00396X (E.E.O.C.).

B.       Representing transgender athletes and students denied access to participation in scholastic sports, *B.P.J. v. West Virginia State Board of Education*, No. 21-cv-00316 (S.D. W.Va.); *L.E. v. Lee*, No. 21-cv-00835 (M.D. Tenn.); *Hecox v. Little*, No. 20-35813 (9th Cir.) (*amicus*).

C.       Representing transgender soldiers and prospective enlistees challenging the President's ban on their open service in the military and seeking access to gender-confirming healthcare, *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019).

D.       Representing transgender students seeking access to restrooms matching their gender identity, *Adams v. St. Johns County School District*, No. 18-13592 (11th Cir.); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267 (W.D. Pa. 2017); *Carcaño v. McCrory*, 315 F.R.D. 176 (M.D.N.C. 2016).

E.       Representing school administrators as *amici curiae*, along with colleagues at Pillsbury, Winthrop, Shaw, Pittman, LLP ("Pillsbury"), in cases involving transgender students' access to sex-separated facilities, *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017); *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016), *cert. granted in part*, 137 S. Ct. 369, 196 L. Ed. 2d 283 (2016), *and vacated and remanded*, 137 S. Ct. 1239, 197 L. Ed. 2d 460 (2017); *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 870 (S.D. Ohio 2016).

F.       Representing transgender employees facing anti-transgender job discrimination, *Roberts v. Clark Cty, Sch. Dist.*, 215 F. Supp. 3d 1001 (D. Nev. 2016) (*amicus*);

**JA259**

*Chavez v. Credit Nation Auto Sales*, 49 F. Supp. 3d 1163, 1168 (N.D. Ga. 2014), *aff'd in part, rev'd in part sub nom. Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883 (11th Cir. 2016) (*amicus*); *Glenn v. Brumby*, 663 F.3d 1312, 1314 (11th Cir. 2011); *Lopez v. River Oaks Imaging & Diagnostic Group, Inc.*, 542 F. Supp. 2d 653 (S.D. Tex. 2008).

G.    Representing transgender prisoners denied basic respect for their gender identity, *Yoakam v. Virginia Dep't of Corrections*, No. 3:21-cv-31 (W.D. Va.); *Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015); *Hicklin v. Precynthe*, No. 4:16-CV-01357-NCC, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018).

H.    Representing transgender people seeking the ability to correct their identity documents, *Corbitt v. Taylor*, No. 21-10486 (11th Cir.) (*amicus*); *Fowler v. Stitt*, No. 22-cv-00115-GFK-SH (N.D. Okla.); *Campos v. Cohen*, No. 21-cv-00880 (M.D.N.C.); *Gore v. Lee*, No. 19-cv-00328 (M.D. Tenn.); *Ray v. McCloud*, 507 F. Supp. 3d 925, 929 (S.D. Ohio 2020); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327 (D.P.R. 2018); *F.V. v. Barron*, 286 F. Supp. 3d 1131 (D. Idaho 2018).

8.    Lambda Legal's work on behalf of transgender people also is integrally tied to Lambda Legal's 45-year history of advancing sex and sexual orientation anti-discrimination doctrines on behalf of the LGBT community, which has led to Lambda Legal's involvement as party counsel, and on behalf of *amici curiae*, in leading Supreme Court cases addressing the rights of LGBT people.  *See Bostock v. Clayton County,* 140 S. Ct. 1731 (2020) (*amicus*); *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) (party counsel); *United States v. Windsor*, 133 S. Ct. 2675 (2013) (*amicus*); *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661 (2010) (*amicus*); *Lawrence v. Texas*, 539 U.S. 558 (2003) (party counsel); *Romer v. Evans*, 517 U.S. 620 (1996) (party counsel).

**JA260**

9.    *Lambda Legal's experience with class action cases.*    Lambda Legal also has experience handling both putative and certified class action suits, including *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014) (counsel for plaintiff-intervenor class); *Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011) (counsel for plaintiff class certified in subsequent proceedings); *Thornton v. Comm'r of Soc. Sec.*, No. C18-1409JLR, 2020 WL 5494891 (W.D. Wash. Sept. 11, 2020) (counsel for plaintiff class); *Ely v. Saul*, No. 18-cv-0557, 2020 WL 2744138 (D. Ariz. May 27, 2020), appeal dismissed (Nov. 2, 2021) (counsel for plaintiff class); *Being v. Crum*, No. 3:19-cv-00060 (D. Alaska filed March 4, 2019) (counsel for putative plaintiff class); *Birchfield v. Armstrong*, No. 4:15-cv-00615, 2017 WL 1433032, at *1 (N.D. Fla. Mar. 23, 2017) (counsel for plaintiff class); *Torres v. Rhoades*, No. 3:15-cv-00288-bbc (N.D. Ill. filed May 13, 2015) (counsel for putative plaintiff class); *Inniss v. Aderhold*, No. 1:14-cv-01180-WSD (N.D. Ga. filed April 22, 2014) (counsel for putative plaintiff class); *Lee v. Orr*, No. 1:13–cv–08719, 2014 WL 683680 (N.D. Ill. Feb. 21, 2014) (counsel for plaintiff class); *East v. Blue Cross & Blue Shield of La.*, No. 3:14-CV-00115 (M.D. La. filed Feb. 20, 2014) (counsel for putative plaintiff class).

## II.    Experience of Counsel in this Case

10.    I, Avatara Smith-Carrington graduated from the University of Maryland Francis King Carey School of Law in 2019, and I have practiced law continuously since that time.  I have worked full-time at Lambda Legal on civil rights cases for the LGBT community and people living with HIV since 2019.  In addition to serving as lead counsel in this case, I also am counsel in, most relevant here, *B.P.J. v. West Virginia State Board of Education*, No. 21-cv-00316 (S.D. W.Va.), a federal lawsuit challenging West Virginia's law banning girls and women who are transgender from participating in school sports and *Campos v. Cohen*, No. 21-cv-00880

**JA261**

(M.D.N.C.), a federal lawsuit challenging North Carolina's policy requiring transgender people to have undergone "sex reassignment surgery" in order to obtain an accurate birth certificate. A true and correct copy of my resume is attached hereto as Exhibit A.

11.    Tara L. Borelli graduated from the University of California, Berkeley School of Law in 2001, and has practiced law continuously since that time, including at the Los Angeles office of Proskauer Rose, LLP and the Seattle law firm of Newman & Newman, LLP (now, Newman DuWors, LLP). Ms. Borelli has worked full-time at Lambda Legal on civil rights cases for the LGBT community since 2006. Ms. Borelli has worked on an extensive number of cases involving equal treatment for transgender people, including most relevant here: serving as lead counsel in *Fletcher v. State of Alaska*, 443 F. Supp. 3d 1024, 1026 (D. Alaska 2020), in which she secured summary judgment for the plaintiff and eliminated the exclusion for gender-confirming surgical care in the Alaska state employee health plan; serving as lead counsel in *Kadel v. Folwell*, No. 19-cv-00272 (M.D.N.C.), challenging the blanket exclusion of gender-confirming care in the North Carolina state employee health plan; serving as counsel in *Being v. Crum*, No. 3:19-CV-00060-HRH (D. Alaska), a federal lawsuit and putative class action that secured removal of the exclusion of coverage for gender-confirming care in the State of Alaska's Medicaid program; and serving as lead counsel in *Adams v. St. Johns County School District*, No. 18-13592 (11th Cir.), securing judgment after a trial on behalf of a young transgender man seeking equal access to boys' restrooms at school. Ms. Borelli also was co-counsel in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), which helped secure access to gender-confirming care for transgender service members and established that heightened scrutiny applies to discrimination based on transgender status.

6

**JA262**

12.     In addition, among the putative and certified class action cases listed above, Ms. Borelli has been counsel in *Bostic v. Schaefer*; *Diaz v. Brewer*; *Ely v. Saul*; *Thornton v. Comm'r of Soc. Sec.*; *Being v. Crum*; *Birchfield v. Armstrong*; and *Inniss v. Aderhold*. A true and correct copy of Ms. Borelli's resume is attached hereto as Exhibit B.

13.     Carl S. Charles graduated from the University of Denver Sturm College of Law in Denver, Colorado in 2013, and has practiced law continuously since that time. Mr. Charles has practiced civil rights law at several nonprofit legal advocacy groups and government entities, including the Jon L. Stryker and Slobodan Randjelovic LGBT & HIV Project at the American Civil Liberties Union, the New York City Commission on Human Rights, A Better Balance, and Lambda Legal. Mr. Charles has worked full-time at Lambda Legal on civil rights cases for the LGBT community since 2019. Mr. Charles has worked on several cases involving equal treatment for transgender people, including most relevant here: serving as lead counsel in *Being v. Crum*, No. 3:19-CV-00060-HRH (D. Alaska), a federal lawsuit and putative class action challenging the State of Alaska's Medicaid program's exclusion of coverage for gender confirming care; counsel in *B.P.J. v. West Virginia State Board of Education*, No. 21-cv-00316 (S.D. W.Va.), a federal lawsuit challenging West Virginia's law banning girls and women who are transgender from participating in school sports; and counsel in *Kadel et al. v. Folwell et al.*, No. 19-cv-00272 (M.D.N.C.), a federal lawsuit challenging North Carolina's State Employee Health Insurance Plan's exclusion of coverage for gender affirming care for state employees and their dependents. A true and correct copy of his resume is attached hereto as Exhibit C.

14.     Sasha Buchert graduated from Willamette Law School in 2005 and has practiced law since 2007. Ms. Buchert has maintained a full-time practice in civil rights issues for lesbian, gay, bisexual, and transgender people since 2013. Prior to joining Lambda Legal, full-time, in

**JA263**

2017, Ms. Buchert practiced civil rights law at the Transgender Law Center.  Ms. Buchert has

worked on several cases involving equal treatment for transgender people, including most

relevant here: *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir.

2017), a federal challenge to a school policy in Kenosha, Wisconsin prohibiting students from

using restrooms in accordance with their gender identity; *Karnoski v. Trump*, 926 F.3d 1180 (9th

Cir. 2019), a federal challenge to a ban imposed by the Department of Defense prohibiting

transgender people from enlisting, denying healthcare or living openly as transgender; *Gore v.

Lee*, No. 19-cv-00328 (M.D. Tenn.), a federal challenge to the State of Tennessee's policy of

denying birth certificate amendments of gender on birth certificates issued in the state; *Yoakam

v. Virginia Dep't of Corrections*, No. 3:21-cv-31 (W.D. Va.); *L.E. v. Lee*, No. 3:21-cv-835 (M.D.

Tenn), a federal challenge to the State of Tennessee's ban on the participation of transgender

students in sex-specific sports in middle school and high school.  A true and correct copy of her

resume is attached hereto as Exhibit D.

15.     Nora Huppert graduated from Columbia Law School in 2019 and has practiced

law continuously since that time.  Ms. Huppert has worked on several cases involving equal

treatment for transgender people, including most relevant here: *Being v. Crum*, No. 3:19-CV-

00060-HRH (D. Alaska); *F.V. v. Jeppesen*, 477 F. Supp. 3d 1144 (D. Idaho 2020); and *Chandler

v. Cal. Dep't of Corrs. & Rehab.*, 1:21-CV-01657-NE-HBK (E.D. Cal.) (representing Proposed

Intervenors).  A true and correct copy of her resume is attached hereto as Exhibit E.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated:  May 31, 2022

_____
Avatara Smith-Carrington

8

**JA264**

# AVATARA
# SMITH-
# CARRINGTON

asmith-carrington@lambdalegal.org ✉
www.linkedin.com/in/avatara-smith-
carrington 🔗
*Licensed to Practice in Maryland*

## EXPERIENCE

### Staff Attorney | Lambda Legal Defense and Education Fund
09.2019 – PRESENT

- Handling all aspects of litigation including, but not limited to, client and case development, legal research, pleadings, motions practice, written discovery, depositions, expert witness work, administrative work, settlement negotiation, and amicus work. Maintaining issue area leadership and expertise, engaging stakeholders, collaborating with other movement organizations, and pursuing opportunities that specifically address and remedy inequities and disparities in both law and policy for TLGBQIA Black, Indigenous and People of Color ("BIPOC") and BIPOC living with HIV.
- Current casework includes serving as lead counsel in *Fain v. Crouch*, a federal lawsuit challenging West Virginia's blanket exclusion of coverage for gender-confirming care in its state health insurance plans; counsel in *B.P.J. v. West Virginia Board of Education*, a federal lawsuit challenging West Virginia's law banning girls and women who are transgender from participating in school sports; counsel in *Campos v. Cohen*, a federal lawsuit challenging North Carolina's policy requiring transgender people to have undergone "sex reassignment surgery" in order to obtain an accurate birth certificate; and counsel in *The Diversity Center v. Trump*, a federal lawsuit challenging the Trump administration's Executive Order on Combating Race and Sex Stereotyping that prohibits federal contractors and grantees from conducting workplace diversity trainings or engaging in grant-funded work that explicitly acknowledges and addresses the existence and persistence of structural racism and sexism in the United States.
- Member of the legal team that secured the release of two asylum seekers living with HIV whose detention at an ICE detention facility in eastern Texas placed them in grave danger of illness and/or death from COVID-19.
- Within my first year as the former Tyron Garner Memorial Law Fellow, I secured a settlement against a multiple employer trust providing employee benefits on behalf of a nonbinary person whose plan excluded coverage for gender confirming care. The settlement agreement included compensatory damages; removal of the exclusion from the plan; inclusion of an express statement that gender confirming care is covered for all plan participants; and the provision of notice on the insurer's website of the policy change to all plan participants.

### Researcher | Institute for Technology Law & Policy at Georgetown Law
01.2020 – 06.2020

- As a Researcher on the Institute's project on algorithmic fairness and disability rights, I explored, analyzed, and provided written work on the use of risk and threat assessments in the K-12 setting.

1

**JA265**

### Linda Kennedy Fellow in Advocacy | Homeless Persons Representation Project
09.2018 – 05.2019
- Engaged in community-led, strategic policy advocacy aimed at funding the Ending Youth Homelessness Act and drafted policy recommendations for State agencies and nongovernmental entities that promote an end to homelessness in the state of Maryland.

### Research Assistant to Professor. Taunya L. Banks | Francis King Carey School of Law
05.2018 – 07.2019
- Researched, analyzed, and drafted memoranda pertaining to hostile work environment jurisprudence in both conventional tort law and constitutional law with an emphasis on remedies available for employees experiencing race- and/or gender-based verbal harassment in the workplace.

### Intern | Whitman-Walker Health
05.2018 – 08.2018
- Researched and drafted memoranda, compliance guidelines, and informed consent forms to ensure competent and informed care for transgender, nonbinary and/or gender-nonconforming adolescents seeking medical interventions for gender-confirming purposes.

### Intern | FreeState Justice
09.2017 – 05.2018
- Conducted legal research and drafted policy materials as part of a comprehensive advocacy model that encompasses community outreach and education.

### Case Alert Author | ABA Standing Committee on Federal Judicial Improvements' Media Alerts Project
08.2017 – 01.2018
- Drafted and edited case summaries on recent decisions issued by the United States Court of Appeals for the Fourth Circuit for publication on the American Bar Association's digital platform.

### Access to Justice Tech Fellow | Maryland Volunteer Lawyers Service
05.2017 – 08.2017
- Retrieved and compiled judicial data using Structured Query Language to assist attorneys with various data-driven impact litigation projects.

## EDUCATION

### Juris Doctor | University of Maryland Francis King Carey School of Law
MAY 2019
Honors & Activities: Maryland Law Review, Associate Editor; Rose Zetzer Fellow; CALI Excellence for the Future Award (Advanced Legal Research); CALI Excellence for the Future Award (Citizenship Seminar); Co-Chair, OutLaw; Community Service Chair, Black Law Students Association

### Bachelor of Arts | Rutgers, The State University of New Jersey
MAY 2015

2

**JA266**

## PROFESSIONAL ACTITIVITES

- 2020-Present | Board Member | Transgender Education Network of Texas
- 2019-Present | Advisory Board Member | Kairos Fellowship
- 2018-2019 | Student Member to the Executive Board of Directors | FreeState Justice

## SELECTED PRESENTATIONS AND PANELS

2021 | American Bar Association, Young Lawyers Division | "The Lawyer's Role in Social Movements"

2021 | The LGBTQ+ Project at Indiana University Maurer School of Law | "Let's Talk About Gender: Racialization & Liberation in LGBT Rights Work"

2021 | Silicon Flatirons Center at University of Colorado Law School| "Categories of Control: The Regulation of Sexuality & Gender"

2021 | Law for Black Lives| "Black History is Now: Building the Power of Black Lead Movements"

2020 | ACLU of Texas | "Empowering Trans Voters in Texas"

2020 | Nelson Mullins Riley & Scarborough LLP | "Beyond Bostock: Protections and Barriers for the LGBTQ+ Community"

2020 | Texas Child Protection Services | "Disproportionality Series: LGBTQ and Race Equity"

2020 | Outten & Golden LLP | "Employment Discrimination and the Transgender Community"

2020 | Fried, Frank, Harris, Shriver & Jacobson LLP | Michael R. Diehl Civil Rights Forum "Pride Was a Riot: Reflecting on the History and Progress of the LGBTQ+ Movement"

2020 | State Bar of Texas Annual Meeting - Diversity Forum | "The Promises of the 15th and 19th Amendments in the Wake of Shelby, Voter Suppression, and Disenfranchisement: How You Can Secure Reform"

2020 | Columbia University in the City of New York | Lavender Graduation Keynote Speaker

2020 | Creating Change | "Policing of the Sex Trade: Advocacy Skills for Local, State, and Federal Policy Change"

2020 | Creating Change | "Texas Trans Kids: Creative Strategies for Advancing Trans Rights"

2020 | Creating Change | Day-Long Policing Institute

2019 | Resource Center | "LGBT Workers and the Supreme Court: What You Need to Know and What You Can Do"

## SELECTED PUBLICATIONS AND MEDIA CREDITS

2021 | "Texas governor orders investigation of 'pornographic' books in schools" | Courthouse News

2021 | "In Pursuit of Trans Liberation" | American Constitution Society, Broken Law Podcast

2021 | "'Children will die': Transgender advocates warn about risks as more states consider banning gender-affirming care for kids" | USA Today

2021 | "How AI lets bigots and trolls flourish while censoring LGBTQ+ voices" | Mic

2020 | "Donald Trump executive order banning diversity training blocked by federal judge" | USA Today

2020 | "The Legal Discrimination Still Keeping LGBTQ People Out of Work" | Bloomberg

3

**JA267**

# TARA L. BORELLI

**Pronouns: she/hers**

## Lambda Legal:
### making the case for equality



## CONTACT



Tel: 470-225-5341
Fax: 404-506-9320



tborelli@lambdalegal.org



1 West Court Square,
Ste. 105
Decatur, GA 30030



www.lambdalegal.org

## EDUCATION

**UNIVERSITY OF CALIFORNIA**
Berkeley, J.D., 2001

**UNIVERSITY OF CALIFORNIA**
Davis, B.A., 1998

## BAR ADMISSIONS

Georgia

Washington

California

 **PROFILE SUMMARY** 

Tara Borelli is Senior Counsel in the Southern Regional Office of Lambda Legal Defense and Education Fund, Inc., the oldest and largest national legal organization committed to achieving full recognition of the civil rights of LGBTQ people and people with HIV. Her work focuses on bringing test cases to advance equality and liberty for LGBTQ people.

 **EXPERIENCE** 

**L.E. v. Lee,** No. 3:21-cv-00835 (M.D. Tenn.)
Counsel in challenge to state law banning transgender students from interscholastic sports.

**B.P.J. v. West Virginia State Bd. of Educ.,** No. 2:21-cv-11111 (S.D.W.V.)
Counsel in challenge to state law banning all transgender girls from interscholastic sports.

**Fain v. Crouch,** No. 3:20-cv-00740 (S.D.W.V.) (putative class action)
Counsel in challenge to discriminatory exclusions of gender-confirming health care in state employee and Medicaid health plans.

**Kadel v. Folwell,** No. 1:19-cv-00272 (M.D.N.C.)
Counsel for North Carolina state employees and dependents denied access to gender-confirming health care under state employee insurance plan.

**Adams v. St. Johns Cty. Sch. Dist., Fla.,** 968 F.3d 1286 (11th Cir. 2020)
Counsel for transgender boy seeking the right to use the boys' restroom at his high school.

**Gore v. Lee,** No. 3:19-cv-00328 (M.D. Tenn.)
Counsel in challenge to Tennessee statute prohibiting transgender people from obtaining accurate birth certificates.

**Lawrence v. Rigas,** No. 510-2014-00396X (E.E.O.C.)
Counsel for transgender retiree in federal sector EEO proceedings seeking non-discriminatory access to health insurance coverage under Title VII.

# TARA L. BORELLI



**COURT ADMISSIONS**

U.S. Supreme Court

U.S. Court of Appeals for the Fourth Circuit

U.S. Court of Appeals for the Ninth Circuit

U.S. Court of Appeals for the Eleventh Circuit

U.S. Court of Appeals for the D.C. Circuit

U.S. Court of Appeals for the Federal Circuit

U.S. District Court for the Central, Southern, and Northern Districts of California

U.S. District Court for the Western District of Washington

U.S. District Court for the Northern District of Georgia

U.S. District Court for the Northern District of Florida

Supreme Court of Georgia

Georgia Court of Appeals

Superior Court of DeKalb County, State of Georgia

 **EXPERIENCE, CONT'D …** 

**Ely v. Saul,** No. 4:18-cv-00557, 2020 WL 2744138 (D. Ariz. May 27, 2020) (class action)
**Colosimo v. Saul,** No. 1:18-cv-00170 (W.D.N.C.)
**Gonzales v. Saul,** No. 1:18-cv-00603 (D.N.M.)
Counsel in suits securing access to Social Security benefits for same-sex spousal survivors blocked from qualifying by unconstitutional marriage laws. *Ely* was certified as a class action, and declared the denial of benefits unconstitutional.

**Thornton v. Comm'r of Social Security,** No. 2:18-cv-01409, 2020 WL 5494891 (W.D. Wash. Sept. 11, 2020) (class action)
Counsel in class action lawsuit securing access to Social Security benefits for unmarried same-sex survivors blocked from qualifying by unconstitutional marriage laws.

**Grimm v. Gloucester Cty. Sch. Bd.,** 972 F.3d 586 (4th Cir. 2020)
**Parents for Privacy v. Barr,** 949 F.3d 1210 (9th Cir. 2020)
**Doe v. Boyertown Area Sch. Dist.,** 897 F.3d 518 (3d Cir. 2018)
**Whitaker v. Kenosha Unified Sch. Dist.,** 858 F.3d 1034 (7th Cir. 2017)
**Highland v. U.S. Dep't of Educ.,** 208 F. Supp. 3d 850 (S.D. Ohio 2016)
Counsel for amici curiae school administrators explaining why policies inclusive of transgender students are critical to uphold educators' obligation to treat all students equally.

**Rolfingsmeyer v. OPM,** No. 20-1735 (Fed. Cir.)
Counsel for amici curiae supporting a surviving spouse of a federal employee blocked from a survivor's annuity by unconstitutional marriage laws; the case was resolved.

**Mize v. Pompeo,** 482 F. Supp. 3d 1317 (N.D. Ga. 2020)
Local counsel in successful challenge to the U.S. State Department's refusal to recognize the citizenship of a married same-sex couple's daughter.

**Being v. Crum,** No. 3:19-cv-00060 (D. Ak.) (putative class action)
Counsel in putative class action challenging exclusion of transition-related care in Alaska's Medicaid program; resulted in a settlement agreement eliminating the exclusion and awarding damages to plaintiffs.



# TARA L. BORELLI



**Gender and Sexuality Alliance v. Spearman,** No. 2:20-00847, 2020 WL 1227345 (D.S.C. March 11, 2020)
Counsel in challenge resulting in consent decree declaring South Carolina anti-LGBTQ curriculum law unconstitutional and barring its enforcement.

**Fletcher v. Alaska,** 443 F. Supp. 3d 1024 (D. Alaska 2020)
Counsel in case securing summary judgment on Title VII claim for transgender woman denied gender-confirming surgery by state employer.

**Karnoski v. Trump**, 926 F.3d 1180 (9th Cir. 2019)
Counsel in challenge to ban on open military service by transgender people; resulted in Ninth Circuit ruling that discrimination against transgender people receives heightened scrutiny.

**Carcaño v. Cooper,** No. 1:16-cv-236, 2019 WL 3302208 (M.D.N.C. July 23, 2019)
Counsel in case challenging North Carolina's H.B. 2, which targeted transgender people for discriminatory treatment in sex-separated facilities; secured consent decree ensuring nondiscriminatory access to public facilities.

**Birchfield v. Armstrong,** No. 4:15-cv-00615, 2017 WL 1433032 (N.D. Fla. March 23, 2017) (class action)
Counsel in class action case holding that State of Florida must provide corrected death certificates to same-sex widows and widowers who had been denied recognition of their marriage.

**Carson v. Heigel,** No. 3:16-cv-00045, 2017 WL 624803 (D.S.C. Feb. 15, 2017)
Counsel in suit holding that South Carolina's refusal to recognize same-sex spouses on birth certificates violates the Fourteenth Amendment.

**Lively v. Fletcher Hospital, Inc., D/B/A Park Ridge Health**, No. 1:16-CV-00031 (W.D.N.C. 2016)
Counsel in Title VII case challenging denial of spousal health coverage to employee's same-sex spouse; the matter was resolved.

**Hall v. BNSF Ry. Co.,** No. 13-cv-2160, 2014 WL 4719007 (W.D. Wash. Sept. 22, 2014)
Counsel for amicus curiae supporting successful opposition to motion to dismiss complaint in challenge to employer's discriminatory denial of same-sex spousal health coverage.

**Sevcik v. Sandoval,** *consolidated for decision with* **Latta v. Otter**, 771 F.3d 496 (9th Cir. 2014)
Counsel in federal constitutional challenge that secured the freedom to marry for same-sex couples in Nevada and throughout the Ninth Circuit.

**Inniss v. Aderhold,** No. 1:14-cv-01180 (N.D. Ga. 2014)
Counsel in federal putative class action; secured judgment declaring Georgia's ban on marriage for same-sex couples unconstitutional.



# TARA L. BORELLI



**E X P E R I E N C E ,   C O N T ' D   …**

**Bostic v. Schaefer,** 760 F.3d 352 (4th Cir. 2014)
Counsel for intervenor plaintiff class, certified in **Harris v. Rainey**, 299 F.R.D. 486 (W.D. Va. 2013), in case that secured access to marriage for same-sex couples in Virginia and throughout the Fourth Circuit.

**GlaxoSmithKline v. Abbott Laboratories,** 740 F.3d 471 (9th Cir. 2014)
Counsel for amici curiae arguing that sexual orientation-based peremptory strikes warrant heightened constitutional scrutiny and violate the federal Equal Protection Clause under *Batson v. Kentucky*, 476 U.S. 79 (1986), which the court held in its decision.

**United States v. Windsor,** 133 S. Ct. 2675 (2013)
Counsel for amici curiae arguing that Section 3 of the federal Defense of Marriage Act ("DOMA") required meaningful constitutional scrutiny.

**Diaz v. Brewer,** 656 F.3d 1008 (9th Cir. 2011)
Counsel in federal class action suit that protected domestic partner health coverage for Arizona state employees after the legislature voted to strip that coverage from lesbians and gay men.

**Golinski v. U.S. Office of Personnel Management,** 824 F. Supp. 2d 968 (N.D. Cal. 2012)
Counsel for plaintiff challenging DOMA; obtained district court ruling that DOMA is unconstitutional, and that classifications based on sexual orientation are entitled to heightened constitutional review.

**Esquivel v. State of Oregon**, No. 11C17487 (Or. Cir. Ct. 2011)
Counsel in a first-of-its-kind lawsuit deploying state anti-discrimination law to obtain insurance coverage for a transgender public employee denied transition-related care; resulted in settlement removing restrictions on transition-related care for all transgender employees of the State of Oregon.

**Young v. Abercrombie**, No. 10-1-1621-07 (Haw. Cir. Ct. 2010)
Counsel in a challenge seeking civil unions for same-sex couples in Hawaii, which the legislature approved in 2011 after Lambda Legal filed its lawsuit.

**Munson v. Del Taco, Inc.,** 46 Cal. 4th 661 (2009)
Counsel for amici curiae HIV service providers throughout California, successfully arguing that California's public accommodations law does not impose a separate intent requirement for individuals who have proven a violation of the Americans with Disabilities Act.

**Strauss v. Horton**, 46 Cal. 4th 364 (2009)
Counsel for petitioners in writ of mandate involving California's Prop. 8; the court ruled that the 18,000 same-sex couples who married before Prop. 8's enactment remain validly married.

**P a g e |  4**



# TARA L. BORELLI



## E X P E R I E N C E ,   C O N T ' D   …

**Cal. Educ. Comm. v. Schwarzenegger**, No. 07-02246 (S.D. Cal. 2008)
**Cal. Educ. Comm. v. Schwarzenegger**, No. 37-2008-00077546 (Cal. Super. Ct. San Diego 2008)
**Cal. Educ. Comm. v. O'Connell**, No. 34-2008-00026507 (Cal. Super. Ct. Sacramento 2009)
Counsel for proposed intervenor and amici curiae seeking to defend California laws that protect lesbian, gay, bisexual and transgender students; after initial proceedings in each case, defendants voluntarily dismissed all challenges.

**Ellis v. Arriaga**, 162 Cal. App. 4th 1000 (Cal. App. 4th 2008)
Counsel in appeal confirming that registered domestic partners have the same rights and responsibilities as different-sex spouses under California state law.

**deGroen v. City of Bellevue**, No. 07-2-12286-9 (Wash. Super. Ct. 2007)
Counsel for plaintiff city employees seeking domestic partner health coverage; resulted in a city policy change granting the relief sought in the suit.



## R E C O G N I T I O N   A N D   A W A R D S

**Distinguished Service to the Community Award,** Georgia Stonewall Bar Association (2021)
**Barry Goldwater Human Rights Award**, Equality Arizona (2013)
**Top 100 Lawyers in California**, *Daily Journal* (2012)
**Top Women Lawyers of 2012**, *Daily Journal* (2012)
**2012 Legal Service Award**, Bay Area Lawyers for Individual Freedom (2012)
**Honoree**, EEOC San Francisco District Office LGBT Pride Celebration (2012), for work on *Golinski v. OPM*
**Certificates of Recognition** presented by the California State Assembly (2012) and California State Senate (2012), for work on *Golinski v. OPM*
**Best Lesbian, Gay, Bisexual and Transgender (LGBT) Lawyers Under the Age of 40 Award**, National LGBT Bar Association (2011)
**Chancellor's Community Service Award**, University of California, Berkeley (2001)



## P R O F I L E D

"Top 100 Lawyers in California," *Daily Journal* (September 12, 2012)
"Tara Borelli Is A Valued Lambda Legal Team Member," LawCrossing.com (June 8, 2012)
"Top Women Lawyers of 2012," Tara L. Borelli, *Daily Journal* (May 9, 2012)

JA272



# TARA L. BORELLI

 **OTHER RELEVANT EMPLOYMENT** 

**Newman DuWors LLP**, then Newman & Newman, LLP, Seattle, Washington (2005-2006)
Contract attorney and associate at law firm with an emphasis on intellectual property litigation.

**Break the Cycle**, Los Angeles, California (2003-2005)
Senior Staff Attorney with a focus on assisting young adult survivors of domestic violence with restraining order and family law proceedings.

**Proskauer Rose LLP**, Los Angeles, California (2001-2003)
Associate in the Litigation Department.

 **APPOINTMENTS** 

**Gay & Lesbian Medical Association** (2013, 2011)
Member of the Gay & Lesbian Medical Association's ("GLMA") Conference Peer-Review Committee, which reviews and evaluates workshop proposals for GLMA's Annual Conference.

**The Joint Commission** (Sept. 2010 – Oct. 2011)
Member of Expert Advisory Panel for publication, "The Joint Commission:  Advancing Effective Communication, Cultural Competence, and Patient- and Family-Centered Care for the Lesbian, Gay, Bisexual, and Transgender (LGBT) Community:  A Field Guide," released Oct. 2011.

**Mautner Project, National Lesbian Health Organization** (March 2010 – March 2011)
Member of the Mautner Project's Technical Advisory Council.

**LifeWorks Mentoring**, now with the L.A. Gay & Lesbian Center (Dec. 2007 – Dec. 2008)
Member of the Board of Directors and Program Committee Chair.

 **COMMUNITY ENGAGEMENT** 

**Nelson, Mullins, Riley & Scarborough LLP**, "Third Annual Pride Seminar: Housing, Healthcare, and Education in the Covid-19 Pandemic," October 8, 2021 (virtual)
Participated in firm's third annual pride seminar regarding the effect of the Covid-19 pandemic on access to resources for the LGBTQ community.

**Eversheds Sutherland**, "Trends in LGBTQ+ Rights Litigation," June 29, 2021 (virtual)
Provided CLE regarding cutting edge developments in impact litigation for the LGBTQ community.

**Page | 6**



# TARA L. BORELLI

 **C O M M U N I T Y   E N G A G E M E N T ,   C O N T ' D   …** 

**Nelson, Mullins, Riley & Scarborough LLP**, "Beyond Bostock: Protections and Barriers for the LGBTQ+ Community," October 8, 2020 (virtual)
Participated in panel discussion regarding challenges and opportunities for the LGBTQ opportunity after the Supreme Court's landmark ruling in *Bostock v. Clayton County*.

**LGBTQ+ Lawyers Association of Los Angeles**, August 20, 2020 (virtual)
Provided CLE course regarding the Eleventh Circuit's ruling in *Adams v. St. Johns County School Board*, and the status of protections for transgender students throughout the country.

**Grady Health System Gender Center**, May 4, 2020 (virtual)
Provided presentation to medical providers who serve the Grady Health System Gender Center in Atlanta, Georgia health care protections for transgender people, and related impact litigation.

**Merrill Lynch**, March 12, 2020, Chattanooga, Tennessee
Provided presentation regarding Lambda Legal's work to Merrill Lynch employees, with a focus on the organization's impact litigation in the South.

**Vanderbilt Law School**, "Social Justice and the Legal Profession," October 21, 2019, Nashville, Tennessee
Participated in panel discussion discussing public interest lawyering to enforce *Obergefell v. Hodges*, and advancing LGBT rights.

**Osborn Maledon, P.A.**, "Transgender Students:  Bathrooms and Beyond," April 18, 2019, Phoenix, Arizona
Provided presentation to clients of the firm's education law practice about developments in the law regarding transgender students.

**State Bar of Georgia**, Institute of Continuing Legal Education, Family Law Issues for the Modern Family, "Surveying the Landscape of Current Legal Cases Relevant to Your Transgender Client," March 14, 2019, Atlanta, Georgia
Provided CLE course reviewing current legal issues facing families with transgender children.

**Stonewall National Education Project**, Plenary, "Looking Ahead: Where We Are in the Courts Towards Achieving Trans Equity in Schools," March 5, 2019, Boca Raton, Florida
Participated in plenary panel discussion of status of federal legal protections for transgender students.

**Virginia Equality Bar Association**, "How Transgender Litigation is Shaping Sex Discrimination Law," October 26, 2018, webinar
Provided CLE presentation regarding the way in which sex discrimination jurisprudence is being shaped by cases on behalf of transgender plaintiffs.

**Voices for Trans Youth Campaign**, "Legal Rights Workshop," March 24, 2018, Knoxville, Tennessee
Participated in panel discussion regarding the status of federal protections for transgender youth.



# TARA L. BORELLI

 **COMMUNITY ENGAGEMENT, CONT'D …** 

**State Bar of Georgia**, Institute of Continuing Legal Education, Family Law Issues for the Modern Family, March 15, 2018, Atlanta, Georgia
Provided update on family-law related impact cases seeking to implement *Obergefell v. Hodge*'s mandate of equal access to marriage.

**Morehouse College**, April 19, 2018, Atlanta, Georgia
Provided lecture to sociology course on civil rights and social movements, as illustrated by the LGBT advocacy movement.

**Eversheds Sutherland**, "Transgender Rights," June 29, 2017, Atlanta, Georgia
Participated in panel broadcast to Eversheds Sutherland's offices across the country regarding the state of transgender rights and litigation developments.

**Emory University School of Law**, OUTLaw Conference, "State of the Union," January 14, 2017, Atlanta, Georgia
Participated in panel discussion focusing on the state of marriage equality after *Obergefell v. Hodges*, and ongoing efforts to implement that landmark ruling.

**National Organization of Lawyers for Education Associations**, "Transgender Student Rights: Cutting Edge Legal Developments & Best Practices," October 6, 2016, Boston, Massachusetts
Provided session on the current state of legal protections for transgender students, and best practices for supporting them in schools.

**Vanderbilt Law School**, "Practicing Public Interest Law in the South Conference," September 10, 2016, Nashville, Tennessee
Participated in panel discussion regarding public interest career pathways to LGBTQ+ advocacy.

**White & Case LLP**, "Civil Rights Roundtable," June 15, 2016, Miami, Florida
Participated in panel discussion regarding recent legal developments in cases involving the LGBT community, gender equity, and racial equality.

**Georgia State University College of Law**, March 9, 2016, Atlanta, Georgia
Provided guest lecture on the strategy behind the marriage equality victory in *Obergefell v. Hodges*.

**U.S. Equal Employment Opportunity Commission, Select Task Force on the Study of Harassment in the Workplace**, December 7, 2015, Washington, D.C.
Provided testimony regarding dynamics unique to harassment based on sexual orientation and gender identity in the workplace.

**Bryan Cave LLP**, Retreat for LGBT Attorneys, October 24, 2014, Washington D.C.
Speaker for firm reception regarding the state of marriage equality litigation, and the role of private law firms in such litigation across the country.



# TARA L. BORELLI

 **C O M M U N I T Y   E N G A G E M E N T ,   C O N T ' D   …** 

**American Association for Justice**, "Same Sex Marriage—Changing Laws, Societal Needs, and the Impact on Marriage, Divorce and Child Custody," July 20, 2013, San Francisco, California
Panel discussion analyzing the effect of *United States v. Windsor*, *Hollingsworth v. Perry*, and other national developments on family law issues for same-sex couples.

**Anti-Defamation League**, "State of the Union:  Marriage Equality Cases at the Supreme Court," April 4, 2013, Los Angeles, California
CLE course analyzing the March 26 and 27, 2013 oral arguments the Supreme Court held in *United States v. Windsor* and *Hollingsworth v. Perry*.

**Sheppard Mullin Richter & Hampton LLP**, Retreat for LGBT Attorneys, Oct. 19, 2012, Los Angeles, California
CLE course reviewing trends in litigation surrounding marriage equality, Section 3 of DOMA, and health coverage for domestic partners and transgender employees.

**State Bar of Texas Annual Meeting**, "Breaking News: Updates on DOMA and Beyond," June 15, 2012, Houston, Texas (via teleconference)
CLE course on developing litigation and jurisprudence surrounding the federal "Defense of Marriage Act," and marriage equality litigation for same-sex couples.

**Morrison & Foerster, LLP**, "LGBT Legal Update: Is the Door Closing on DOMA?" December 6, 2011, San Francisco, California
Panel discussion analyzing legal challenges across the country to Section 3 of DOMA.

**Irell & Manella, LLP**, December 6, 2010, Los Angeles, California
Panel discussion analyzing the U.S. Ninth Circuit Court of Appeals oral arguments in *Perry v. Brown*, the federal marriage equality challenge to California's Proposition 8.

**Davis Wright Tremaine, LLP and Microsoft Corporation**, "Marriage, Democracy, The First Amendment and Federalism," October 25, 2010, Seattle and Redmond, Washington
Panel discussions at the law firm of Davis Wright Tremaine, LLP and the Microsoft Corporation campus regarding marriage equality and free speech developments in Washington and the U.S. Supreme Court.

**Gay & Lesbian Medical Association**, September 22-23, 2010, San Diego, California
Workshop entitled "Legal Trends in Fighting Health Care Discrimination:  Eliminating Insurance Barriers for LGBT People and People with HIV," and led a luncheon discussion reviewing recent relationship recognition developments for same-sex couples.

**Lesbian and Gay Psychotherapy Association of Los Angeles**, "Civil Rights Litigation Update," June 27, 2010, Beverly Hills, California
Continuing education course for mental health professionals regarding marriage equality litigation across the country.



# TARA L. BORELLI

 **COMMUNITY ENGAGEMENT, CONT'D …** 

**University of Southern California**, Transgender Studies Class, November 4, 2009, Los Angeles, California
Participated in a panel discussing best practices in representation of and advocacy for transgender adolescents.

**Equality Hawaii**, "Family Equality Coalition Community Forum:  Legal Perspectives on the Equality Movement," August 13, 2009, Honolulu, Hawaii
Panel discussing the evolving relationship recognition landscape nationally for same-sex couples, and Hawaii's unique contribution to that movement.  The panel included Hawaii Supreme Court Justice Levinson (Ret.), who authored *Baehr v. Lewin*, which launched the modern marriage equality movement.

**Southern California Lambda Medical Association Banquet**, Keynote Address, June 15, 2008, Los Angeles, California
Keynote address regarding the California Marriage Cases and litigation relating to healthcare fairness, including legal considerations relating to the intersection of state civil rights laws and physicians' religious objections.

**Washington Appellate Judges' Conference**, "Update on Marriage Litigation, Legislation and the State of Same Sex Unions," April 7, 2008, Hood Canal, Washington
Forum for Washington appellate judges regarding the status of marriage litigation for same-sex couples and recent legislative changes to registered domestic partnership in Washington.

**American Academy of Matrimonial Lawyers**, "Custody Litigation with Same-Sex Couples and Domestic Partnership Update," March 21, 2008, Seattle, Washington
CLE course regarding relationship recognition protections for same-sex couples nationally, and recent legislative changes to registered domestic partnership in Washington.

**Annual Southern California Employment Round Table**, "Transgender Discrimination – Understanding a Very Complex Topic," Nov. 8, 2007, Los Angeles, California
CLE course regarding employment protections in California for transgender people and developments in Title VII cases involving transgender plaintiffs nationally.

**MCLE Course**, "Update on Marriage Litigation/Legislation and the State of Same Sex Unions," Oct. 16, 2007, Seattle, Washington
CLE course about relationship recognition for same-sex couples, developments in domestic partnership laws in California and Washington, and issues raised by cross-jurisdiction actions for dissolution of same-sex relationships.

**Press Conference** Announcing the Filing of Amicus Curiae Brief by 63 Asian American Organizations in the "In Re Marriage Cases" California Marriage Equality Case Before the California Supreme Court, Sept. 26, 2007, Los Angeles, California
Provided comments on behalf of the party counsel and clients in the California marriage equality case recognizing the historic and uniquely authoritative amicus curiae brief filed by a coalition of Asian American advocacy organizations.



# TARA L. BORELLI

 **COMMUNITY ENGAGEMENT, CONT'D …** 

**Medical Student Training**, USC Keck School of Medicine, "An Introduction to Culturally Competent Healthcare for Lesbian, Gay, and Bisexual Patients," Sept. 10, 2007; Sept. 18, 2006, Los Angeles, California
Provided training about disparate health outcomes for LGBT patients, and culturally sensitive practices for medical care providers treating LGBT patients.

**MCLE Course**, "Volunteer Attorney Educator Training:  Domestic Violence and the Law," Sept. & Oct. 2003, March 2004, January 2005, Los Angeles, California
CLE course about dynamics of domestic violence experienced by teens, preventive strategies, and laws related to mandated reporting.

**In-Service Training**, Youth Organizations Understanding Today's Health Risks Conference, "Transgendered & Intersex Youth and Domestic Violence," April 30, 2004, Los Angeles, California
Training about unique dynamics experienced by transgender and intersex youth in abusive relationships, and legal and non-legal remedies for youth seeking protection from an abusive partner.

**Legislative Testimony**, May 8, 2003, Sacramento, California
Legislative testimony before a hearing of the California Assembly Select Committee on Domestic Violence regarding proposed legislation Senate Bill 874.  Testified about issues raised by current status of legislation providing habeas relief for women who have been battered.

# CARL S. CHARLES

404.897.1880 Ext. 6235 | CCharles@lambdalegal.org

## EDUCATION

**University of Denver Sturm College of Law**, Denver, CO
J.D., December 2013
Honors:      Skadden Fellow Class of 2014; Most Outstanding Evening Student; Evening Division
                Class Rank No. 7; Rocky Mountain Legal Diversity Merit Scholarship Recipient.
Activities:    University of Denver College of Law OUTLaws Co-President; Student Bar
                Association Evening Division Vice President.

**University of Northern Colorado**, Greeley, CO
B.A. in English (Emphasis Secondary Education), December 2006
Honors:      Dean's List, 2002-2003, Awarded for 4.0 G.P.A.

## EXPERIENCE

**Lambda Legal,** Atlanta, GA                                        February 2019 to Present
*Senior Attorney*
Advocate for LGBTQ people and people living with HIV through litigation, policy advocacy, and public education. Pursue complex litigation strategies using federal constitutional and statutory employment law. Engage in complaint drafting, client interviews, drafting of client declarations, retaining and interviewing expert witnesses, drafting, filing and oral argument of both procedural and dispositive motions and other briefs, discovery practice, including taking and defending expert witness and client depositions. Lead settlement negotiations and case mediation.

**A Better Balance,** New York, NY                              July 2018 to February 2019
*Staff Attorney*
Serve as legal counsel for state and federal legislative campaigns advocating for paid sick time and paid family and medical leave for workers. Draft municipal, state, and federal legislation to present to lawmakers at their respective levels of government. Review and analyze other municipal, state, and federal legislation, and existing legal landscape in each relevant jurisdiction. Review and interpret relevant case law, monitor recently filed and pending litigation for impacts on draft legislation. Provide legal analysis in answer to complex questions of state and municipal employment and labor law.

      **Lambda Legal,** New York, NY                                   June 2017 to July 2018
*Transgender Rights Project Fellow*
Serve as legal counsel in a variety of cases seeking legal remedies for discrimination against transgender people using city, state, or federal policies or laws. Initiate litigation using state and federal anti-discrimination law on behalf of transgender people experiencing discrimination in employment, healthcare, education and state custody. Spearhead plaintiff search and complaint drafting, shepherd plaintiff employment complaints through regional EEOC offices, respond to and prepare discovery requests, engage in motions practice, assist in preparations for trial and participate in settlement negotiations.

**NYC Commission on Human Rights,** New York, NY              August 2016 to May 2017
*Staff Attorney, Law Enforcement Bureau*
Enforcing and upholding the New York City Human Rights Law, the most comprehensive municipal anti-discrimination law. Meet with potential victims/complainants at intake meetings, investigate individual factual allegations, draft and serve complaints on defendants, dual file employment claims with the EEOC regional office, make recommendations to the Commissioner about the strength of cases and whether they should be referred to the Office of Administrative Trials and Hearings for further adjudication, settled between the parties, or dismissed. Maintain a case load of approximately 65 cases which included allegations of discrimination across a wide variety of protected classes and in various settings but focused primarily upon employment discrimination.

**American Civil Liberties Union,** New York, NY                    September 2014 to August 2016
*LGBT & HIV Project Skadden Legal Fellow and Staff Attorney*
Draft state and federal district court complaints challenging discrimination based on sex and transgender status and engage in fact investigation in support of claims of discrimination. Conduct interviews of service providers, watch criminal and juvenile court proceedings (when not closed to the public), and interview youth while working with their case workers, social workers, or legal aid attorneys to learn about how and where discrimination may have occurred. Provided legal research, legal memo drafting, draft brief writing in other cases that the ACLU LGBT & HIV Project was litigating or preparing to litigate and other potential matters regarding transgender people's right to access public accommodations, including restrooms, free from discrimination. Provide continuing legal education trainings to attorneys primarily practicing employment law in New York State, California, and Pennsylvania through conferences focused on the provision of legal services to LGBT people.

## BAR and COURT ADMISSIONS

Massachusetts, New York
E.D.N.Y, S.D.N.Y, Second Circuit Court of Appeals, Fourth Circuit Court of Appeals, Ninth Circuit Court of Appeals, Eleventh Circuit Court of Appeals

# Sasha J. Buchert

1776 K Street, N.W., 8th Floor, Washington DC, 20006 | (202) 804-6245 ext. 7595 | sbuchert@lambdalegal.org

---

**PROFESSIONAL EXPERIENCE, LEGAL:**

**Lambda Legal**, *Senior Attorney*, 2017 – Present

- Conducted extensive federal and state legislative and policy efforts on a wide range of issues including judicial nominations, criminal justice reform policy and health care initiatives.
- Built extensive relationships with congressional offices and oversight committees, commented on a wide range of administrative rules, reviewed and edited state and federal legislation, led our day-to-day work on reviewing judicial nominations and managed numerous opposition campaigns. Worked closely with numerous coalitions. Helped lead a team that sent out a weekly email amplifying recent regulatory, legislative and litigation developments. Worked closely with litigation teams to disseminate information about impending regulations and congressional activity. Helped prepare members of congress for numerous hearings. Testified on behalf of Lambda Legal before the U.S. House of Representatives Education and Labor Subcommittee on Civil and Human Services. Contributed to publications such as the international Trans Legal Mapping Report and Trans Bodies Trans Selves.
- Spearheaded successful legislative campaigns in California and in D.C.
- Provided extensive media appearances on behalf of LGBTQ people, including video appearances on CSPAN, CNN, BBC, PBS NewsHour, Vox, and Newsy. Wrote numerous op-eds for a wide range of publications, including for Fox News, Them, USA Today, and Out.com, and radio appearances on NPR and many other outlets.
- Litigated cases expanding and solidifying federal civil rights protections for LGBTQ people, including a lawsuit challenging the ban on open transgender military service, a challenge to a discriminatory birth certificate policy in Tennessee, challenges to rulemaking by the U.S. Health and Human Services Agency, and other litigation. I have deposed two experts and have defended a client in a deposition. I have worked on numerous legal briefs.

**Transgender Law Center**, *Staff Attorney*, 2014 – 2017

- Spearheaded state legislation that reduced barriers to identity documents and criminal justice reform on behalf of transgender and gender nonconforming people.
- Conducted key litigation that helped advance the clarification that sex discrimination protections encompass protections for LGBTQ people and expanded protections for transgender prisoners.

**Basic Rights Oregon**, *Communications Manager*, 2012-2014

- Helped develop effective messaging on marriage equality and transgender health care.
- Managed the organization's social media platforms.
- Educated members of the legislature on issues relating to transgender people.
- Served as a member of the Legal Advisory Committee for the organization that helped to inform the organization's strategic planning.

**EDUCATION:**

- Willamette Law School, Juris Doctorate.
- Portland State University, Bachelor of Arts, Master of Arts in English Literature.

**ADDITIONAL:**

- First openly transgender person to be appointed to an Oregon state board (served as Chair on the Oregon State Hospital Advisory Board).
- Served proudly in the United States Marine Corps.

# NORA HUPPERT (she/her)

65 E. Wacker Pl., Suite 2000, Chicago, IL 60601    nhuppert@lambdalegal.org

**ADMISSIONS**
Admitted in California and Illinois.
Admitted to the Ninth, Tenth, and Eleventh Circuit Courts of Appeals.

**EDUCATION**
**COLUMBIA LAW SCHOOL,** New York, NY
Juris Doctor, May 2019
    Honors:    Harlan Fiske Stone honors (2017-2018 & 2018-2019)
                  Allan Morrow Sexuality and Gender Law Prize
    Activities:  *Columbia Journal of Law and Social Problems* (articles editor)
    Publication: "The Illinois Millionaire's Exemption and the Utility of Campaign Contribution Limits,"
                  (COLUM. J.L. & SOC. PROBS., 2019)
    Association: National Trans Bar Association (member)

**FRANKLIN & MARSHALL COLLEGE**, Lancaster, PA
Bachelor of Arts in Government, *cum laude*, May 2014

**EXPERIENCE**
**Lambda Legal**
*Staff Attorney, Chicago, IL*                          Sept. 2021 – present
*Renberg Fellow, Los Angeles, CA*                Sept. 2019 – Sept. 2021
Responsible for developing and executing impact litigation advancing LGBT rights. Engaged in litigation that halted enforcement of Idaho's 2020 anti-transgender birth certificate law. Participated in litigation challenging exclusion of gender-confirming care in Alaska Medicaid health plan. Represented transgender employee in EEOC proceedings. Drafted complaints, various motions, demand letters, declarations, and interviewed potential plaintiffs in various LGBTQ+ rights cases. Assisted in drafting amicus briefs, including in immigration matters. Represented Lambda Legal on coalition that drafted and advocated for SB132, which enacted housing protections for trans people incarcerated in California. Helped to obtain consent decree enjoining South Carolina anti-LGBT curriculum law.

**Transgender Rights Project, Lambda Legal**            New York, NY
*Legal Intern*                                  Spring 2019
Conducted legal research and drafted research memos.

**Sexuality and Gender Law Clinic, Columbia Law School**   New York, NY
*Clinic Student*                              Spring 2019
Represented trans asylee in seeking asylum.  Assisted in research project into New York Family Court system in partnership with Bronx Defenders.

**New York City Campaign Finance Board**            New York, NY
*Legal Intern*                                Summer 2018
Conducted legal research and drafted memoranda for staff. Assisted in drafting filings in Board's enforcement and collections proceedings in state court.

**Criminal Appeals Externship, Center for Appellate Litigation**  New York, NY
*Extern*                                   Spring Term 2018

Drafted and edited appellant's brief in a criminal appeal.  Argued the appeal at oral argument before an Appellate Term panel in March 2019.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST
VIRGINIA HUNTINGTON DIVISION

CHRISTOPHER FAIN and SHAUNTAE
ANDERSON; individually and on behalf of
all others similarly situated,

                *Plaintiffs,*

        v.                                          CIVIL ACTION NO. 3:20-cv-00740
                                                    HON. ROBERT C. CHAMBERS

WILLIAM CROUCH, *et al.*,

                *Defendants.*

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiffs Christopher Fain and

Shauntae Anderson (collectively, "Plaintiffs"), on behalf of themselves and the proposed class,

respectfully move the Court for summary judgment on all claims, seeking declaratory and

permanent injunctive relief on their claims under the Equal Protection Clause of the Fourteenth

Amendment, U.S. Const. amend. XIV; Section 1557 ("Section 1557") of the Patient Protection

and Affordable Care Act ("ACA" or "Affordable Care Act"), 42 U.S.C. § 18116[1]; and the

Comparability and Availability requirements of the federal Medicaid Act, 42 U.S.C. §§

1396a(a)(10)(A)-(B).

Plaintiffs seek a judgment as to liability on their claims that Defendants' enforcement of

the exclusion of gender-confirming care for transgender West Virginia Medicaid participants

---

[1] In light of *Cummings v. Premier Rehab Keller, P.L.L.C.*, No. 20-219, 2022 WL 1243658 (U.S. Apr. 28, 2022), Plaintiffs no longer seek damages in their individual capacities under the Affordable Care Act. Accordingly, the only relief Plaintiffs request in this case is declaratory and injunctive relief and no damages issues remain for trial.

constitutes unlawful discrimination based on sex and transgender status in violation of the Equal

Protection Clause and Section 1557 of the ACA. Defendants' exclusion of gender-confirming

care also violates Medicaid's Comparability and Availability requirements. Plaintiffs respectfully

request that this Court issue a declaratory judgment finding that Defendants' enforcement of the

exclusion violates the rights of Plaintiffs and all others similarly situated under the Equal

Protection Clause, Section 1557 of the ACA, and Medicaid's Comparability and Availability

requirements, and permanently enjoin Defendants, their agents, employees, successors, and all

others acting in concert with them, from enforcing the exclusion for gender-confirming care.

Dated: May 31, 2022

Respectfully submitted,

/s/ Walt Auvil
Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058 | Fax: 304-485-6344
auvil@theemploymentlawcenter.com

Anna P. Prakash, MN Bar No. 0351362*
Nicole J. Schladt, MN Bar No. 0400234*
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4700
Minneapolis, MN 55402
Phone: 612-256-3200 | Fax: 612-338-4878
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, OR Bar No. 070686*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
Phone: 202-804-6245 | Fax: 202-429-9574
sbuchert@lambdalegal.org

Attorneys for Plaintiffs
* Admitted Pro Hac Vice

Avatara Smith-Carrington, MD Bar*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
Phone: 214-219-8585 | Fax: 214-481-9140
asmithcarrington@lambdalegal.org

Tara L. Borelli, GA Bar No. 265084*
Carl Charles, NY Bar No. 5427026*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: 470-225-5341
Facsimile: 404-506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Nora Huppert, CA Bar No. 330552*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Phone: 312-663-4413 | Fax: 312-663-4307
nhuppert@lambdalegal.org

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

        *Plaintiffs*,

      v.

WILLIAM CROUCH, *et al.*,

        *Defendants*.

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document, and any attachments, were served

electronically on May 31, 2022 on the following counsel for Defendants in this case:

<div align="center">

Lou Ann S. Cyrus (WVSB # 6558)
Roberta F. Green (WVSB #6598)
Caleb B. David (WVSB #12732)
Kimberly M. Bandy (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953, Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com, rgreen@shumanlaw.com
cdavid@shumanlaw.com, kbandy@shumanlaw.com

</div>

*Attorneys for Defendants William Crouch; Cynthia Beane; and West Virginia Department of
Health and Human Resources, Bureau for Medical Services*

Dated: May 31, 2022

Respectfully submitted,

s/ Walt Auvil
Walt Auvil, WV Bar No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-3058
auvil@theemploymentlawcenter.com

**JA286**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

    *Plaintiffs,*

  v.

WILLIAM CROUCH, *et al.*,

    *Defendants.*

CIVIL ACTION NO. 3:20-cv-00740

HON. ROBERT C. CHAMBERS, JUDGE

## DECLARATION OF CHRISTOPHER FAIN

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.  My name is Christopher Fain. I am a plaintiff in the above-captioned action. I have actual knowledge of the matters stated in this declaration.

2.  I have agreed to be a class representative in this case because I want to see my state provide coverage for gender-confirming care to transgender people, regardless of our sex and transgender status. We all deserve equal treatment within West Virginia's Medicaid program. I have kept in close contact with my counsel throughout my involvement in this case. In joining this case, continuing to participate in the case, and communicating with my counsel, I have had the proposed class's best interests in mind.

3.  I am 46 years old. I was born in West Virginia and have lived in West Virginia for the majority of my life. I currently live in Huntington, West Virginia.

4.  I have been enrolled as a Medicaid participant for most of my adult life.

5.  I am a transgender man. I was incorrectly designated female at birth; my gender identity is male.

1

CFAIN0009602

6.    I experience gender dysphoria related to the disconnect between my primary and secondary sex characteristics and my gender identity.

7.    I have been aware of my gender identity since a young age. During the early years of my life, I remember several instances during which I tried to communicate my understanding of my gender identity to my parents, family, and friends. These attempts to share my gender identity with my father, however, were not well received.

8.    At age three, my brother was born. The birth of my brother helped me understand that I would never develop the physical characteristics that aligned with my gender identity on my own.

9.    At or around age nine, when I was provided with information about puberty and sex because I was in the early stages of puberty, I demanded to know why my body would go through these changes. I was angry about growing breasts and bewildered by my period. By age twelve, I confronted my mother, yet again, with the fact that I felt like a boy.

10.    As I got older, I behaved like a boy and wore male clothing. Unfortunately, these attempts to live in a manner that was aligned with my gender identity led to ongoing physical and verbal abuse from my father. In response to these actions, I was instructed to wear make-up and jewelry, women's clothing, and women's shoes.

11.    For many years, I delayed my transition out of fear that discrimination and stigma against transgender people would prevent me from being able to support my own family. After separating from my husband, I was a single parent and the primary caregiver for my children, and I could not risk losing employment due to discrimination. Delaying access to gender-confirming care, however, took an enormous toll on me and became unsustainable so eventually I came out to my family.

2

CFAIN0009603

12.     My children are incredibly supportive of me.  Although my mother passed away only a few months into my medical transition, she was very reassuring and understood that I needed to live my life as the man I know myself to be.

13.     On April 6, 2018, I obtained a legal name change to reflect my gender identity through a West Virginia court order.  Shortly thereafter, I updated my name to reflect my male gender identity on my Social Security account.  In August 2021, I updated my name on my West Virginia driver's license.

14.     In or around June 2018, I began counseling at Marshall University to help address the distress I was feeling.  It was around this time that I was diagnosed with gender dysphoria.

15.     In or around February 2019, my health care provider recommended that I begin hormone replacement therapy to alleviate my gender dysphoria by aligning my physical characteristics with my gender identity.

16.     I began hormone replacement therapy on or around March 2019.

17.     Since development during puberty, I have been uncomfortable with the size of my chest.  To avoid being incorrectly identified as female and to reduce the severe distress and embarrassment I feel over the presence of my large and typically-female appearing breasts I often wear a binder, and slouch and hunch my shoulders and back.

18.     Wearing a binder for prolonged periods of time, however, often chafes my skin, sometimes creates deep sores, and leads to difficulty breathing.  But to help manage my gender dysphoria, I sometimes wear a binder five to six days a week for up to 16 hours at a time.  There are days when wearing a binder is so painful that I cannot wear it at all.  On those days, I bundle myself up in multiple layers of clothes to hide the fact that I'm not wearing a binder and attempt to ease my own distress.  When I am physically unable to wear a binder, my dysphoria is intense

3

CFAIN0009604

and I often feel confused and anxious because of how much I am aware of my breasts while trying to focus on other things, such as my work-related tasks.

19.     I require a bilateral mastectomy as medically necessary care to treat my gender dysphoria.  Having access to this vital and medically necessary care would alleviate the overwhelming distress I feel, eliminate the need for my ongoing use of a binder, and ease the physical discomfort I am in due to years of slouching and hunching to conceal my large chest.

20.     As a Medicaid participant, I receive coverage through the Managed Care Organization Unicare.  I am aware that there is an exclusion in the state Medicaid Plan that bans the gender-confirming surgical care I need.  As a result, I am forced to delay this urgently-needed care to treat my gender dysphoria.  Medicaid's refusal to cover this medically necessary care, increases my symptoms of gender dysphoria and causes me emotional hardship and deeply impacts my self-esteem.  I am incapable of forming close emotional and physical connections because of the presence of my breasts.  I feel physically sick when I hug my family and friends because I become aware of my breast tissue.

21.     The idea of dying with breasts is horrifying to me.  It is incredibly uncomfortable and unbearable living in this world with breasts because it means I am forced to exist in a body that is not aligned with my gender identity.  I have to force myself to get up and function every day even though the surgical care that I need, care that is medically necessary, is inaccessible to me.  It is exhausting, and at times overwhelming.

22.     Having access to gender-confirming surgical care means that I will finally be able to walk with my shoulders straight, head held high, and not have to live with the fear and distress that my chest gives away my birth-assigned sex.

4

Confidential
**JA290**

CFAIN0009605

23.    I am only in the middle years of my life; however, it is important to me that I be able to live a happy, healthy, and complete life for my family.  I want to be able to see my grandchildren graduate from high school and feel confident when I put on that tie for their ceremonies.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: April  27 , 2022

Christopher Fain

5

Confidential
**JA291**

CFAIN0009606

Subscribed and sworn before me, a Notary Public in and for the _County of Cabell,_ State of

_West Virginia_, this _27th_ day of _April_ , 2022.


_____

Signature of Notary


OFFICIAL SEAL
NOTARY PUBLIC, STATE OF WEST VIRGINIA
John F. Leaberry
729 Ninth Avenue
Huntington WV 25701
My Commission Expires 03/29/2027

6

Confidential
CFAIN0009607

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| CHRISTOPHER FAIN, *et al.*, individually and on behalf of all others similarly situated, | CIVIL ACTION NO. 3:20-cv-00740 |
| *Plaintiffs*, | HON. ROBERT C. CHAMBERS, JUDGE |
| v. | |
| WILLIAM CROUCH, *et al.*, | |
| *Defendants*. | |

## DECLARATION OF SHAUNTAE ANDERSON

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.     My name is Shauntae Tamara Anderson.[1] I am a plaintiff in the above-captioned action.  I have actual knowledge of the matters stated in this declaration.

2.     I have agreed to be a class representative in this case because I want to help make the system better for all transgender Medicaid participants in West Virginia who are being or would be denied gender-confirming care.  I have kept in close contact with my counsel throughout my involvement in this case.  In joining this case, continuing to participate in the case, and communicating with my counsel, I have had the proposed class's best interests in mind.

3.     I am 45 years old and I live in Charleston, West Virginia.  I was born in West Virginia and have lived in West Virginia for the vast majority of my life.

4.     I have been enrolled as a Medicaid participant since 2019.

---

[1] Since the filing of the First Amended Class Action Complaint in this matter, ECF No. 140, I have changed my legal name to Shauntae Tamara Anderson.

1

CFAIN0009534

5.    I am a woman who is also transgender.  Although I was incorrectly designated male at birth, my gender identity is female.

6.    I experience gender dysphoria related to the disconnect between my primary and secondary sex characteristics and my gender identity.

7.    As a child, I never felt "right" in my body.  I was incredibly shy and was uncomfortable being raised and socialized as a boy.  But for much of my childhood and into early adulthood, I was forced to suppress my gender identity due to family disapproval and societal stigma.

8.    Around the age of six, I started using my mother's makeup and playing with my sister's toys.  In or around ninth grade, I started to socially transition at school by dressing in a more typically feminine manner and wearing makeup.

9.    In 2010, I began to medically transition.  Although I lacked access to health insurance for gender-confirming care, my need to transition was so urgent that I was forced to self-treat.  I began taking estrogen in the form of birth control pills to help feminize my appearance.  While birth control pills are not remotely adequate as a substitute for hormone replacement therapy, my gender dysphoria was so severe that even a modest feminizing effect helped relieve some of my distress.

10.    I subsequently served time in federal prison.  While incarcerated, I continued the process of socially transitioning, and began a formal medical transition in consultation with and under the care of medical professionals.

11.    During my time in the custody of the Bureau of Prisons, I updated my status within the Bureau of Prison's system to not only reflect my transgender identity but also ensure that I would be recognized and treated as a woman for the purpose of security checks.  Additionally, I was evaluated by medical professionals and received approval to wear typically feminine undergarments as part of my transition.

2

12.    I began counseling to help address my gender dysphoria, and was diagnosed with gender dysphoria.

13.    While I was incarcerated, I advocated for access to gender-confirming care for several years.

14.    In or around 2019, my health care providers recommended that I begin hormone replacement therapy to alleviate my gender dysphoria by further aligning my physical characteristics with my gender identity.  I began hormone replacement therapy, in the form of estradiol pills and spironolactone, in or around May 2019.  I was not, however, able to access gender-confirming surgery.

15.    As a Medicaid participant, I receive coverage through the MCO Aetna Better Health of West Virginia.  I understand, however, that there is an exclusion in the state Medicaid Plan that bans the gender-confirming surgical care I need.  As a result I have no access to this surgery, which increases my symptoms of gender dysphoria and causes me a great deal of anguish.  The type of hurt that I experience due to the distress I feel is a pain I do not want others to have to deal with.  I have spent too much of my time in tears and there have been a lot of sleepless nights worrying about whether I will ever get the care that I need.

16.    To try to reduce the severe distress and embarrassment over the presence of my typically male-appearing features, I often employ the use of shapewear, like push-up bras, to help with further feminizing my body.  These coping techniques, however, are not adequate to treat my gender dysphoria and do not alleviate my need for surgery.

17.    I need surgery to help treat my ongoing gender dysphoria related to my genitals and breasts.  The agonizing distress I experience negatively impacts my life day in and day out.  I particularly experience such distress when I get dressed and when I use the restroom.  When I use the

3

CFAIN0009536

restroom, I am often reminded of the fact that there are aspects of my physical body that do not feel right. While bathing and grooming myself, I make sure to not spend too much time looking at my body because it hurts to see a reflection of myself that does not match my gender identity. Additionally, I am forced to painfully arrange and hide my genitals as much as possible to ensure that they are not visible in the clothing I wear.

18.    I need gender-confirming surgery, including but not limited to vaginoplasty and breast reconstruction surgery. My physical and mental wellbeing has suffered without access to this surgical care. I lie awake at night, sometimes in tears, thinking about how grueling it is to deal with the constant ache of having significant parts of my body misaligned with my gender identity. Additionally, because I have not had surgery to remove my hormone-producing gonads, I need to take higher doses of estrogen to try to counterbalance the testosterone my body produces. I understand that higher doses of estrogen can have side effects and I experience hot flashes and fatigue. My body constantly feels out of step with itself and at my age, it takes a lot out of me physically. Gender-confirming surgery would ensure that I could lower my dose of estrogen and alleviate my gender dysphoria.

19.    The ability to access gender-confirming surgery that can help further align my physical self with my gender identity is also a matter of personal safety. Not being able to fully align my body with my identity makes it more likely that others recognize that I am transgender, which can be unsafe. I have experienced hostility in the past when certain people in public discovered my transgender identity. For example, once while traveling by bus, someone announced to others sitting near me, "that's a damn man." I endured dirty looks for the rest of the ride and constant anxiety that they might escalate to further harassment or even violence. Because transgender people are still widely stigmatized, the risk of being involuntarily outed in my ordinary life is frightening. The effort

4

CFAIN0009537

it takes to try to counteract this risk is exhausting. Every day, I check myself several times before I go out. I feel like everything about my appearance has to be perfect because if I am not seen as the woman that I am, I may be harassed or worse.

20. At times my spirit feels broken. The emotional toll of being denied surgery, and the gender dysphoria it causes, tears me apart. I would not wish this feeling on anyone else in the world. That is why I am a plaintiff in this lawsuit, because I hope that other Medicaid participants will not have to suffer like this in the future.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: April  19 , 2022

Shauntae Anderson

5

Confidential
**JA297**

CFAIN0009538

Subscribed and sworn before me, a Notary Public in and for the _Charleston_ , State of
_WV_ , this 19 day of _April_ , 2022.

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Cecil L. Terry, III
3501 MacCorkle Ave SE
Charlestown, WV 25304
My Commission Expires April 17, 2025

Signature of Notary

6

CFAIN0009539

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually
and on behalf of all others similarly situated,

   *Plaintiffs*,

  v.

WILLIAM CROUCH, *et al.*,

   *Defendants*.

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

**DECLARATION OF WALT AUVIL**

 I, Walt Auvil, do hereby declare as follows:

 1. I am more than 18 years of age, have personal knowledge of the facts set forth herein, and am otherwise competent to testify to the matters set forth herein.

 2. I am an attorney with and owner of The Employment Law Center, PLLC, and counsel for Plaintiffs in this matter. I submit this declaration in support of Plaintiffs' motions for summary judgment.

 3. Attached to this declaration are true and correct copies of the documents listed in the table below. Entries in the table indicate where documents have been excerpted, or have had highlighting applied to indicate the relevant portions of the document.

 4. Sensitive, protected, and/or irrelevant information has been redacted on certain pages of the attached exhibits in accordance with Federal Rule of Civil Procedure

1

**JA299**

5.1(a) and Local Rule of Civil Procedure 5.2.1.(a), with black boxes placed over the redacted text.

| Exhibit | Description |
|---------|-------------|
| 1 | Defs.' Rsps. to Pls.' First Set Reqs. for Admis., Aug. 27, 2021 |
| 2 | Defs.' Respon. to Pls.' First Set of Interrogs., Aug. 27, 2021 |
| 3 | Defs.' Respon. to Pls.' Second Set of Interrogs., Oct. 25, 2021 |
| 4 | Defs.' 1st Suppl. Respon. to Pls.' First Set of Interrogs., Nov. 30, 2021 |
| 5 | Defs.' Second Suppl. Respon. to Pls.' Second Set of Interrogs., Nov. 30, 2021 |
| 5(a) | Defs.' Ninth Suppl. Respon. to Pls.' First Reqs. for Produc., March 25, 2022 |
| 6 | Excerpt of Dep. Tr. of Pltf. Christopher Fain |
| 7 | Excerpt of Dep. Tr. of Pltf. Shauntae Anderson |
| 8 | Excerpt of Dep. Tr. of Secretary Bill J. Crouch |
| 9 | Excerpt of Dep. Tr. of Commissioner Cynthia Beane |
| 10 | Excerpt of Dep. Tr. of Dr. James Becker |
| 11 | Excerpt of Dep. Tr. of Frederick Lewis |
| 12 | Excerpt of Dep. Tr. of Becky Manning |
| 13 | Excerpt of Dep. Tr. of Brian Thompson |
| 14 | Excerpt of Dep. Tr. of Sarah Young |
| 15 | Excerpt of Dep. Tr. of Dr. Dan H. Karasic, M.D. |
| 16 | Expert Rep. of Dan H. Karasic, M.D. (redacted) |
| 17 | Expert Rebuttal Rep. of Dan H. Karasic, M.D. |
| 18 | Excerpt of Dep. Tr. of Dr. Loren S. Schechter, M.D. |
| 19 | Expert Rep. of Loren S. Schechter, M.D. |

**JA300**

| Exhibit | Description |
|---------|-------------|
| 20 | Expert Rebuttal Rep. of Loren S. Schechter, M.D. |
| 21 | Excerpt of Dep. Tr. of Dr. Johanna Olson-Kennedy, M.D., M.S. |
| 22 | Expert Rebuttal Rep. of Dr. Johanna Olson-Kennedy, M.D., M.S. |
| 23 | Excerpt of Bureau of Medical Services Manual, Ch. 100, CFAIN0001650 – 0001662, with yellow highlighting applied to relevant portions |
| 24 | Excerpt of Bureau of Medical Services Manual, Ch. 519, with yellow highlighting applied to relevant portions |
| 25 | Aetna, The Health Plan, and UniCare Composite Ex., excerpted with yellow highlighting applied to relevant portions |
| 26 | InterQual Composite Ex., DHHRBMS015368 – 015415 |
| 27 | Bureau of Medical Services, "Medicaid 101 An Overview of West Virginia's Medicaid Program," CFAIN0009542 – 0009561 |
| 28 | Medicaid.gov, "Mandatory & Optional Medicaid Benefits," DHHRBMS016220 – 23 |
| 29 | Excerpt of State Fiscal Year 2021 Model Purchase of Service Provider Agreement between West Virginia and Aetna Better Health of W.V., DHHRBMS001121 – 001194, with yellow highlighting applied to relevant portions |
| 30 | Excerpt of State Fiscal Year 2021 Model Purchase of Service Provider Agreement between West Virginia and UniCare W.V., DHHRBMS001682 – 001755, with yellow highlighting applied to relevant portions |
| 31 | Excerpt of State Fiscal Year 2021 Model Purchase of Service Provider Agreement between West Virginia and The Health Plan, DHHRBMS002212 - 002285, with yellow highlighting applied to relevant portions |
| 32 | Email re: "[External] gender dysphoria question," Oct. 13, 2020, DHHRBMS012318 |
| 33 | Cost of Care Composite Ex., DHHSBMS012441, DHHSBMS0124989, and DHHSBMS015463, excerpted and with yellow highlighting applied to relevant portions |

3

**JA301**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 31st day of May, 2022.        /s/ Walt Auvil
                                          Walt Auvil

**JA302**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

**CHRISTOPHER FAIN; ZACHARY**
**MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

| | |
|---|---|
| **Plaintiffs,** | **Civil Action No. 3:20-cv-00740**<br>**Hon. Robert C. Chambers, Judge** |

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA**
**DEPARTMENT OF HEALTH AND HUMAN**
**RESOURCES, BUREAU FOR MEDICAL**
**SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE**
**HEALTH PLAN OF WEST VIRGINIA, INC.**

> **Exhibit**
> **21**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR**
**ADMISSIONS TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND**
**WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,**
<u>**BUREAU FOR MEDICAL SERVICES**</u>

**REQUESTS FOR ADMISSIONS**

1. Admit that Gender-Confirming Care can be medically necessary care for the treatment of
   gender dysphoria.

   **RESPONSE:** Upon information and belief, experts may differ in opinion as to whether
   gender-confirming care is medically necessary, both in general and with respect to a
   particular patient. This Request is admitted with the understanding that this area of
   treatment continues to evolve.

**JA303**

2. Admit that Defendants partially or fully cover counseling and/or therapy for some diagnoses not related to Gender-Confirming Care.

**RESPONSE**: Admitted.

3. Admit that Defendants partially or fully cover mastectomy, breast reduction surgery, and chest reconstruction surgery for sone diagnoses not related to Gender-Confirming Care.

**RESPONSE**: Admitted.

4. Admit that Defendants partially or fully cover hysterectomy and oophorectomy surgical procedures for some diagnoses not related to Gender-Confirming Care.

**RESPONSE**: Admitted.

5. Admit that Defendants partially or fully cover vaginoplasty procedures for some diagnoses not related to Gender-Confirming Care.

**RESPONSE**: Admitted.

6. Admit that Defendants partially or fully cover orchiectomy, penectomy, and /or phalloplasty procedures for some diagnoses not related to Gender-Confirming Care.

**RESPONSE**: Admitted.

7. Admit that the Medicaid Plan only covers care that is medically necessary.

**RESPONSE**: Admitted. However, these Defendants deny any suggestion that Medicaid covers all care that is medically necessary.

8. Admit that the Medicaid Plan has covered all hormone therapy for the treatment of gender dysphoria from November 2017 to the present.

**RESPONSE**: It is admitted upon information and belief that from November 2017 to the present, coverage for hormone therapy has not been denied on the basis that it is for treatment of gender dysphoria. Upon information and belief, "hormone therapy for the treatment of gender dysphoria" may broadly involve several separate medications, doses, and formulations, and it is possible that coverage has been denied on other criteria, therefore, it cannot be admitted or denied that "all" such therapy has been covered.

2

**JA304**

**WILLIAM CROUCH,
CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,**

**By counsel**

/s/ Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA305**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY MARTELL;** and **BRIAN MCNEMAR,** Individually and on behalf of all others similarly situated,

        **Plaintiffs,**

**Civil Action No. 3:20-cv-00740**
**Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as Cabinet Secretary of the West Virginia Department Of Health and Human Resources; **CYNTHIA BEANE,** in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; **WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES; TED CHEATHAM,** in his official Capacity as Director of the West Virginia Public Employees Insurance Agency; and **THE HEALTH PLAN OF WEST VIRGINIA, INC.**

        **Defendants.**

## CERTIFICATE OF SERVICE

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of Health and Human Resources, by counsel, and do hereby certify that on the 27th day of August, 2021, a true and exact copy of **DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES** was served on counsel via electronic means as follows:

**JA306**

Walt Auvil (WVSB#190)
**Counsel for Plaintiffs**
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
**Counsel for Plaintiffs**
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lamdalegal.org

Tara L. Borelli, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
**Counsel for Ted Cheatham**
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

**JA307**

Stuart A. McMillan (WVSB#6352)
***Counsel for The Health Plan of West Virginia, Inc.***
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV 25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
***Counsel for The Health Plan of West Virginia, Inc.***
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV 26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
***Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services***
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

6

**JA308**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

            **Plaintiffs,**

            **Civil Action No. 3:20-cv-00740**
            **Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

> **Exhibit**
> Ex 0002

**DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND
WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
<u>BUREAU FOR MEDICAL SERVICES</u>**

**INTERROGATORIES**

1.  Identify all persons with involvement in, or knowledge of, the creation, review, and
    maintenance of the Exclusion of coverage for Gender-Confirming Care in the Health Plans
    offered through West Virginia's Medicaid Program.

    **RESPONSE: Objection. All persons having "knowledge of" any exclusion is overly
    broad and burdensome and could entail countless people inside and outside of the
    Defendant WVDHHR. Knowledge of the creation of any exclusion by the individual
    Managed Care Organizations, as well as review and maintenance of any such
    exclusion, would be with the individual MCOs.**

**JA309**

**Without waiving these objections, the following individuals have been involved in the process of determining whether coverage is excluded:**

**Dr. James Becker, Medical Director, West Virginia Bureau for Medical Services**

**Jennifer J. Myers, Director of Professional Services, Bureau for Medical Services**

**Tanya Cyrus, Chief Quality and Integrity Officer, Bureau for Medical Services**

**Carrie Mallory, Program Manager, Bureau for Medical Services**

**Karen Burgess, Certified Coder, Office of Program Integrity**

**Cynthia Shelton, former Director of Operations, Bureau for Medical Services.**

2. Describe in detail the factual basis for each governmental interest that Defendants contend supports the Exclusion.

   **RESPONSE: These Defendants state that they provide coverage that is mandated for coverage by the Centers for Medicare and Medicaid Services (CMS). These defendants are constrained by budgetary/cost considerations.**

3. Identify and describe in detail every instance in which a Health Plan offered through West Virginia's Medicaid Program provides partial or full coverage for Gender-Confirming Care of any kind, including but not limited to counseling and/or therapy, hormone therapy, or surgery. Include in you answer the coverage criteria for such care and the date such coverage began.

   **RESPONSE: Objection. This question seeking "every instance" is overly broad and burdensome. Without waiving the objection, with respect to any gender-confirming care that it is requested through the Managed Care Organizations, these Defendants are not in possession of this information. This question would best be directed to the individual MCOs regarding any care requested through them.**

   **Upon information and belief, counseling is a covered service. These defendants would not necessarily know the reason for counseling and whether it was related to gender-confirming care or some other reason.**

   **To the extent that this Request includes hormone therapy, these defendants object to this question on the basis it is not calculated to lead to the discovery of admissible evidence due to the fact the Plaintiff's claim regarding hormones has been voluntarily dismissed.**

2

**JA310**

Further, without waiving the objection, with regard to hormone therapy, these Defendants do not have a database where they keep track of the information in the manner requested. The data is not kept in a manner which would allow them to identify which patients have requested hormone therapy for gender confirming care. Information is tracked by the medication or drug requested, not the diagnosis or reason for the request. Upon information and belief, there are no gender edits for most estrogen and testosterone containing products, so coverage would not be denied on the basis that the hormone therapy was sought as part of gender-confirming care.

With respect to pharmacy services, please see BMS Provider Manual Chapter 518 Pharmacy Services that can be accessed online at:

https://dhhr.wv.gov/bms/Provider/Documents/Manuals/Chapter_518_Pharmacy_Services%20.pdf

and the most recently updated Preferred Drug List with Prior Authorization Criteria that can be accessed online at:

https://dhhr.wv.gov/bms/BMS%20Pharmacy/Documents/Preferred%20Drug%20List/2021/WV%20PDL%202021.Q3b%20v11.pdf.

Please note that to the extent that the Provider Manual states in section 518.4 that "Other drugs may be limited in quantity, duration, or based on gender. The information regarding these drug products and their limitations is available on the BMS website[,]" the "Drug Limits" list available online was last updated June 1, 2016, and does not reflect the removal of the gender edit for most estrogen and testosterone containing products.

4. Identify all conditions, diagnostic codes, or instances where coverage for hormone therapy is available under the Health Plans offered through West Virginia's Medicaid Program. Include in that identification:
   a. Diagnostic code(s);
   b. Procedure code(s);
   c. Medical necessity criteria.

RESPONSE: These defendants object to this question on the basis it is not calculated to lead to the discovery of admissible evidence due to the fact the Plaintiff's claim regarding hormones has been voluntarily dismissed. Without waiving this objection please see BMS Provider Manual Chapter 518 Pharmacy Services that can be accessed online at:

https://dhhr.wv.gov/bms/Provider/Documents/Manuals/Chapter_518_Pharmacy_Services%20.pdf

3

**JA311**

and the most recently updated Preferred Drug List with Prior Authorization Criteria that can be accessed online at:

https://dhhr.wv.gov/bms/BMS%20Pharmacy/Documents/Preferred%20Drug%20List/2021/WV%20PDL%202021.Q3b%20v11.pdf.

Please note that to the extent that the Provider Manual states in section 518.4 that "Other drugs may be limited in quantity, duration, or based on gender. The information regarding these drug products and their limitations is available on the BMS website[,]" the "Drug Limits" list available online was last updated June 1, 2016, and does not reflect the removal of the gender edit for most estrogen and testosterone containing products.

5. Identify all conditions, diagnostic codes, or instances where coverage for mastectomy, breast reduction surgery, and chest reconstruction surgery is available under the Health Plans offered through West Virginia's Medicaid Program. Include in that identification:

    d. Diagnostic code(s);
    e. Procedure code(s);
    f. Medical necessity criteria.

RESPONSE: With respect to any such care requested or provided through the Managed Care Organizations, these Defendants are not in possession of this information. This question would best be directed to the individual MCOs.

Please see BMS Provider Manual Chapter 519.16 Surgical Services that can be accessed online at:

https://dhhr.wv.gov/bms/Provider/Documents/Manuals/Chapter%20519%20Practitioner%20Services/Policy_519.16_Surgical_Services.pdf.

6. Describe in detail the factual basis for the decision to no longer exclude coverage for hormone therapy as treatment for gender dysphoria in the Health Plans offered through West Virginia's Medicaid Program.

RESPONSE:  Upon information and belief, in or around 2017 it came to the attention of then-Pharmacy Director that claims were being denied based on gender edits that were in place for estrogen and testosterone containing products. After consulting with the Medical Director, a decision was made to remove the gender edits so that the hormone therapy would not be denied on the basis of gender.

4

**JA312**

7. Identify all persons, including but not limited to persons affiliated with the Rational Drug Therapy Program, who have been involved in the decision to provide coverage for hormone therapy as treatment for gender dysphoria.

**RESPONSE:  Upon information and belief, former Pharmacy Director Vicki Cunningham and Medical Director Dr. James Becker were involved in removal of the gender edit.**

> **WILLIAM CROUCH,**
> **CYNTHIA BEANE, and**
> **WEST VIRGINIA DEPARTMENT OF**
> **HEALTH AND HUMAN RESOURCES,**
> **BUREAU FOR MEDICAL SERVICES,**
>
> **By counsel**

/s/ Lou Ann S. Cyrus
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

5

**JA313**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

               **Plaintiffs,**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

               **Defendants.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

<u>**CERTIFICATE OF SERVICE**</u>

    Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of

Health and Human Resources, by counsel, and do hereby certify that on the 27th day of August,

2021, a true and exact copy of **DEFENDANTS RESPONSE TO PLAINTIFF'SFIRST SET**

**OF INTERROGATORIES TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE,**

**AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,**

**BUREAU FOR MEDICAL SERVICES** was served on counsel via electronic means as follows:

6

**JA314**

Walt Auvil (WVSB#190)
**Counsel for Plaintiffs**
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
**Counsel for Plaintiffs**
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA  90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lamdalegal.org

Tara L. Borelli, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
**Counsel for Ted Cheatham**
517 9th Street, P.O. Box 1704
Huntington, WV  25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

**JA315**

Stuart A. McMillan (WVSB#6352)
**Counsel for The Health Plan of West Virginia, Inc.**
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV 25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
**Counsel for The Health Plan of West Virginia, Inc.**
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV 26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/Lou Ann S. Cyrus
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
**Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services**
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

8

**JA316**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

               **Plaintiffs,**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.,**

               **Defendants.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SECOND SET OF
INTERROGATORIES TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE,
AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
<u>BUREAU FOR MEDICAL SERVICES</u>**

**INTERROGATORIES**

8. Identify all conditions, diagnostic codes, or instances where coverage for hysterectomy
and/or oophorectomy surgical procedures is available under the Health Plans offered
through West Virginia's Medicaid Program.  Include in that identification:

**JA317**

a.  Diagnostic code(s);

b.  Procedure code(s);

c.  Medical necessity criteria.

**RESPONSE: Objection, this Interrogatory seeks information regarding procedures for which Plaintiff Fain is not seeking relief. Therefore, this request is not relevant, is not proportional to the matters in issue, and is outside the scope of permissible discovery. Without waiving this objection, multiple factors go into the review of any particular request, including past medical history, surgical history, and diagnosis. In addition, we have requested documents which are used as part of the review process and these will be supplemented upon receipt.**

9.  Identify all conditions, diagnostic codes, or instances where coverage for vaginoplasty procedures is available under the Health Plans offered through West Virginia's Medicaid Program.  Include in that identification:

a.  Diagnostic code(s);

b.  Procedure code(s);

c.  Medical necessity criteria.

**RESPONSE: Objection, this Interrogatory seeks information regarding  procedures for which Plaintiff Fain is not seeking relief. Therefore, this request is not relevant, is not proportional to the matters in issue, and is outside the scope of permissible discovery. Without waiving this objection, multiple factors go into the review of any particular request, including past medical history, surgical history, and diagnosis.**

2

**JA318**

10. Identify all conditions, diagnostic codes, or instances where coverage for orchiectomy, penectomy, and/or phalloplasty procedures is available under the Health Plans offered through West Virginia's Medicaid Program. Include in that identification:

    a. Diagnostic code(s);

    b. Procedure code(s);

    c. Medical necessity criteria.

**RESPONSE: Objection, this Interrogatory seeks information regarding procedures for which Plaintiff Fain is not seeking relief. Therefore, this request is not relevant, is not proportional to the matters in issue, and is outside the scope of permissible discovery. Without waiving this objection, multiple factors go into the review of any particular request, including past medical history, surgical history, and diagnosis.**

11. Taking necessary steps to comply with applicable privacy laws, for each year since 2016 through the present identify the number of Health Plan participants who have submitted one or more claims with a diagnosis code for Gender Dysphoria or Gender Incongruence. This includes, but is not limited to, the following diagnosis: F64.0, Transsexualism (ICD-10-CM); F64.2, Gender identity disorder of childhood (ICD-10-CM); F64.8, Other gender identity disorders (ICD-10-CM); F64.9, Gender identity disorder, unspecified(ICD-10-CM); HA60, Gender incongruence of adolescence or adulthood (ICD-11); and HA61, Gender incongruence of childhood (ICD-11).

**RESPONSE: Upon information and belief:**

3

**JA319**

**2016   30 members**
**2017   50 members**
**2018   243 members**
**2019   439 members**
**2020   602 members**
**2021 (through 9/30)  686 members.**

**WILLIAM CROUCH,**
**CYNTHIA BEANE, and**
**WEST VIRGINIA DEPARTMENT OF**
**HEALTH AND HUMAN RESOURCES,**
<u>**BUREAU FOR MEDICAL SERVICES,**</u>
**By counsel**

<u>/s/Kimberly M. Bandy</u>
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA320**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others similarly situated,

    **Plaintiffs,**         **Civil Action No. 3:20-cv-00740**
                      **Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as Cabinet Secretary of the West Virginia Department Of Health and Human Resources; **CYNTHIA BEANE,** in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; **WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES; TED CHEATHAM,** in his official Capacity as Director of the West Virginia Public Employees Insurance Agency; and **THE HEALTH PLAN OF WEST VIRGINIA, INC.**

    **Defendants.**

## CERTIFICATE OF SERVICE

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of Health and Human Resources, by counsel, and do hereby certify that on the 25th day of October, 2021, a true and exact copy of **DEFENDANTS' RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES** was served on counsel via electronic means as follows:

<div align="center">5</div>

<div align="center">

**JA321**

</div>

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1 West Court Square, Suite 105
Decatur, GA 300030
(404) 897-1880
(404) 506-9320 (fax)
ccharles@lambdalegal.org

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
*Counsel for Ted Cheatham*
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

**JA322**

Stuart A. McMillan (WVSB#6352)
**_Counsel for The Health Plan of West Virginia, Inc._**
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV  25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
**_Counsel for The Health Plan of West Virginia, Inc._**
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV  26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
**_Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services_**
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

7

**JA323**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL; BRIAN MCNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES,** individually and on
behalf of all others similarly situated,

        **Plaintiffs,**

        **Civil Action No. 3:20-cv-00740**
        **Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

**DEFENDANTS' FIRST SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET
OF INTERROGATORIES TO DEFENDANTS WILLIAM CROUCH, CYNTHIA
BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL SERVICES**

**INTERROGATORIES**

5. Identify all conditions, diagnostic codes, or instances where coverage for mastectomy,
   breast reduction surgery, and chest reconstruction surgery is available under the Health
   Plans offered through West Virginia's Medicaid Program. Include in that identification:
   a. Diagnostic code(s);
   b. Procedure code(s);
   c. Medical necessity criteria.

**JA324**

SUPPLEMENTAL RESPONSE: Without waiving any objection, please see Exhibits 50, 51, 52, 53, 54, 55, 56, and 57, Bates Numbers DHHRBMS002754 – DHHRBMS002784, which are used as part of the review process.

a.     Diagnostic code(s):  Below is a sample listing.  This is not an all-inclusive listing.  Approval is based on many factors other than the diagnosis such as medical history, previous treatment, severity of diagnosis, and combination of other symptoms and conditions.

| | | |
|---|---|---|
| C50.01 | C50.312 | C50.619 |
| C50.11 | C50.319 | C50.821 |
| C50.012 | C50.32 | C50.822 |
| C50.019 | C50.321 | C50.911 |
| C50.02 | C50.322 | C50.929 |
| C50.021 | C50.329 | N64.81 |
| C50.11 | C50.41 | N60.2 |
| C50.111 | C50.411 | Q83.1 |
| C50.112 | C50.412 | N60.2 |
| C50.119 | C50.419 | N60.09 |
| C50.12 | C50.421 | N64.9 |
| C50.2 | C50.422 | Q83.8 |
| C50.211 | C50.429 | N64.51 |
| C50.212 | C50.511 | N60.32 |
| C50.219 | C50.512 | N60.39 |
| C50.22 | C50.519 | N64.82 |
| C50.221 | C50.521 | N60.01 |
| C50.222 | C50.522 | C79.81 |
| C50.229 | C50.529 | Z41.1 |
| C50.31 | C50.611 | Z76.89 |
| C50.311 | C50.612 | N62 |

b.     Procedure code(s):  19160, 19162, 19180, 19182, 19200, 19240, 19301, 19302, 19303, 19304, 19305, 19306, 19307, 19340, 19342, 19357, 19361, 19364, 19366, 19367, 19368, 19369, 11920, 11921, 11922, 19350, 15200, 15877, 19318.

c.     Medical necessity criteria. Medically Necessary Services – Services and supplies that are appropriate and necessary for the symptoms, diagnosis, or treatment of an illness. They are provided for the diagnosis or direct care of an illness within the standards of good practice and not for the convenience of the plan, member, caregiver, or provider. The appropriate level of care can be safely provided and the most efficient and cost effective services/supplies to meet the member's need.  For outpatient surgical procedures that require prior authorization, the surgeon must request prior authorization via the Utilization Management Contractor's (UMC) web-based portal. Nationally accredited, evidence-based, medically appropriate criteria, such as InterQual, or other medical appropriateness criteria approved by BMS, are utilized for reviewing medical necessity of services requested.

**JA325**

WILLIAM CROUCH,
CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,

By Counsel

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

3

**JA326**

USCA4 Appeal: 22-1927    Doc: 20-1    Filed: 10/31/2022    Pg: 347 of 610

Case 3:20-cv-00740   Document 250-7   Filed 05/31/22   Page 5 of 7 PageID #: 1721
Case 3:20-cv-00740   Document 167   Filed 11/30/21   Page 1 of 3 PageID #: 1138

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL; BRIAN MCNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES,** individually and on
behalf of all others similarly situated,

      **Plaintiffs,**

           Civil Action No. 3:20-cv-00740
           Hon. Robert C. Chambers, Judge

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

      **Defendants.**

## CERTIFICATE OF SERVICE

I, Kimberly M. Bandy, counsel for Defendants William Crouch, Cynthia Beane and West
Virginia Department of Health and Human Resources, do hereby certify that on the 30th day of
November, 2021, a true and exact copy of **DEFENDANTS' FIRST SUPPLEMENTAL
RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANTS
WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES** was served
upon counsel via electronic means as follows:

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
(404) 506-9320 (fax)
ccharles@lambdalegal.org

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
*Counsel for Jason Haught*
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

USCA4 Appeal: 22-1927     Doc: 20-1     Filed: 10/31/2022     Pg: 349 of 610

Case 3:20-cv-00740   Document 250-7   Filed 05/31/22   Page 7 of 7 PageID #: 1723
Case 3:20-cv-00740   Document 167   Filed 11/30/21   Page 3 of 3 PageID #: 1140

Stuart A. McMillan (WVSB#6352)
**Counsel for The Health Plan of West Virginia, Inc.**
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV  25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
**Counsel for The Health Plan of West Virginia, Inc.**
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV  26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
**Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services**
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL; BRIAN MCNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES,** individually and on
behalf of all others similarly situated,

**Plaintiffs,**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.,**

**Defendants.**

**DEFENDANTS' SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFF'S SECOND
SET OF INTERROGATORIES TO DEFENDANTS WILLIAM CROUCH, CYNTHIA
BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL SERVICES**

**INTERROGATORIES**

8.  Identify all conditions, diagnostic codes, or instances where coverage for hysterectomy

and/or oophorectomy surgical procedures is available under the Health Plans offered

through West Virginia's Medicaid Program.  Include in that identification:

a.  Diagnostic code(s);

b.  Procedure code(s);

c.  Medical necessity criteria.

**SUPPLEMENTAL RESPONSE:**

a.  **Diagnostic code(s):  Below is a sample listing of the approved diagnoses since 2016.  This is not an all-inclusive listing.  Approval is based on many factors other than the diagnosis such as medical history, previous treatment, severity of diagnosis, and combination of other symptoms and conditions.**

| | | |
|---|---|---|
| C48.2 | N81.10 | N87.9 |
| C50.919 | N81.2 | N88.2 |
| C53.0 | N81.3 | N92.0 |
| C53.9 | N81.4 | N92.1 |
| C54.1 | N81.5 | N92.4 |
| C55 | N81.6 | N92.6 |
| C79.60 | N81.89 | N93.8 |
| C79.62 | N81.9 | N93.9 |
| C79.82 | N82.0 | N94.10 |
| D06.1 | N83,521 | N94.6 |
| D06.9 | N83.00 | N94.89 |
| D07.39 | N83.02 | N95.0 |
| D22.72 | N83.11 | N95.9 |
| D25.1 | N83.12 | N99.4 |
| D25.2 | N83.20 | N99.83 |
| D25.9 | N83.201 | N99.89 |
| D26.1 | N83.202 | O00.001 |
| D27.1 | N83.209 | O00.101 |
| D36.9 | N83.225 | O00.80 |
| D39.10 | N83.291 | O02.0 |
| D39.11 | N83.292 | O03.9 |
| D82.1 | N83.511 | O72.1 |
| N13.30 | N83.512 | O72.2 |
| N39.3 | N83.521 | Q51.4 |
| N70.03 | N83.53 | R10.2 |
| N70.11 | N83.581 | R10.31 |
| N70.93 | N83.6 | R19.00 |
| N72 | N83.8 | R19.03 |
| N73.6 | N84.0 | R19.04 |
| N80.0 | N84.1 | R93.8 |
| N80.3 | N85.2 | Z15.02 |
| N80.9 | N87.1 | Z31.84 |

b.      Procedure code(s): CPT 58150-58294 and 58661 and 58943.

c.      Medical necessity criteria: Medically Necessary Services – Services and supplies that are appropriate and necessary for the symptoms, diagnosis, or treatment of an illness. They are provided for the diagnosis or direct care of an illness within the standards of good practice and not for the convenience of the plan, member, caregiver, or provider. The appropriate level of care can be safely provided and the most efficient and cost effective services/supplies to meet the member's need.  For outpatient surgical procedures that require prior authorization, the surgeon must request prior authorization via the Utilization Management Contractor's (UMC) web-based portal. Nationally accredited, evidence-based, medically appropriate criteria, such as InterQual, or other medical appropriateness criteria approved by BMS, are utilized for reviewing medical necessity of services requested.

9.  Identify all conditions, diagnostic codes, or instances where coverage for vaginoplasty procedures is available under the Health Plans offered through West Virginia's Medicaid Program.  Include in that identification:

   a.  Diagnostic code(s);

   b.  Procedure code(s);

   c.  Medical necessity criteria.

**SUPPLEMENTAL RESPONSE:**

a.      Diagnostic code(s):  We have had no claims or approvals for these services.

b.      Procedure code(s): 57335, 57291, and 57292.

c.      Medical necessity criteria. Medically Necessary Services – Services and supplies that are appropriate and necessary for the symptoms, diagnosis, or treatment of an illness. They are provided for the diagnosis or direct care of an illness within the standards of good practice and not for the convenience of the plan, member, caregiver, or provider. The appropriate level of care can be safely provided and the most efficient and cost effective services/supplies to meet the member's need.  For outpatient surgical procedures that require prior   authorization, the surgeon must request prior authorization via the Utilization Management Contractor's (UMC) web-based portal. Nationally accredited, evidence-based, medically appropriate criteria, such   as InterQual, or other medical appropriateness criteria approved by BMS, are utilized for   reviewing medical necessity of services requested.

3

**JA332**

10. Identify all conditions, diagnostic codes, or instances where coverage for orchiectomy, penectomy, and/or phalloplasty procedures is available under the Health Plans offered through West Virginia's Medicaid Program. Include in that identification:

    a.  Diagnostic code(s);

    b.  Procedure code(s);

    c.  Medical necessity criteria.

**SUPPLEMENTAL RESPONSE:**

    **a.**   **Diagnostic code(s):  Below is a sample listing of the approved diagnoses since 2016.  This is not an all-inclusive listing.  Approval is based on many factors other than the diagnosis such as medical history, previous treatment, severity of diagnosis, and combination of other symptoms and conditions.**

| | |
|---|---|
| C61 | N49.3 |
| C62.91 | N50.0 |
| K40.30 | N50.819 |
| K40.31 | N50.82 |
| M72.6 | N50.9 |
| N36.9 | Q53.10 |
| N43.3 | Q53.112 |
| N44.00 | Q53.20 |
| N44.02 | Q55.23 |
| N45.4 | Q55.64 |
| N47.1 | S31.30XA |
| N47.5 | S31.31XA |
| N48.83 | S31.33XA |
| N49.1 | S39.840A |
| N49.2 | S39.94XA |

    **b.**   **Procedure code(s): CPT: 54520 and 54690, 54125, 53410-53430; 55899; 55175 and 55180 and 56805.**

    **c.**   **Medical necessity criteria. Medically Necessary Services – Services and supplies that are appropriate and necessary for the symptoms, diagnosis, or treatment of an illness. They are provided for the diagnosis or direct care of an illness within the standards of good practice and not for the convenience of the plan, member, caregiver, or provider. The appropriate level of care can be safely provided and the most efficient and cost effective services/supplies to meet the member's need.  For outpatient surgical procedures that require prior authorization, the surgeon must request prior authorization via the Utilization**

4

**JA333**

Management Contractor's (UMC) web-based portal. Nationally accredited, evidence-based, medically appropriate criteria, such as InterQual, or other medical appropriateness criteria approved by BMS, are utilized for reviewing medical necessity of services requested.

WILLIAM CROUCH,
CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,
By counsel

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA334**

USCA4 Appeal: 22-1927      Doc: 20-1      Filed: 10/31/2022      Pg: 355 of 610

Case 3:20-cv-00740   Document 250-8   Filed 05/31/22   Page 7 of 9 PageID #: 1730
Case 3:20-cv-00740   Document 168   Filed 11/30/21   Page 1 of 3 PageID #: 1141

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY MARTELL; BRIAN MCNEMAR, SHAWN ANDERSON a/k/a SHAUNTAE ANDERSON; and LEANNE JAMES,** individually and on behalf of all others similarly situated,

               Plaintiffs,

v.

**WILLIAM CROUCH,** in his official capacity as Cabinet Secretary of the West Virginia Department Of Health and Human Resources; **CYNTHIA BEANE,** in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; **WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES; JASON HAUGHT,** in his official Capacity as Director of the West Virginia Public Employees Insurance Agency; and **THE HEALTH PLAN OF WEST VIRGINIA, INC.**

               Defendants.

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

## CERTIFICATE OF SERVICE

I, Kimberly M. Bandy, counsel for Defendants William Crouch, Cynthia Beane and West Virginia Department of Health and Human Resources, by counsel, and do hereby certify that on the 30th day of November, 2021, a true and exact copy of **DEFENDANTS' SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,**

**JA335**

USCA4 Appeal: 22-1927    Doc: 20-1    Filed: 10/31/2022    Pg: 356 of 610

Case 3:20-cv-00740   Document 250-8   Filed 05/31/22   Page 8 of 9 PageID #: 1731
Case 3:20-cv-00740   Document 168   Filed 11/30/21   Page 2 of 3 PageID #: 1142

**BUREAU FOR MEDICAL SERVICES** was served upon counsel via electronic means as follows:

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1 West Court Square, Suite 105
Decatur, GA 300030
(404) 897-1880
(404) 506-9320 (fax)
ccharles@lambdalegal.org

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
*Counsel for Jason Haught*
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
eweed@oxleylawwv.com

7

**JA336**

Stuart A. McMillan (WVSB#6352)
*Counsel for The Health Plan of West Virginia, Inc.*
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV  25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
*Counsel for The Health Plan of West Virginia, Inc.*
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV  26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
*Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services*
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

**CHRISTOPHER FAIN,** and
**SHAWN  ANDERSON,**
a/k/a Shauntae Anderson,
individually and on behalf of all others
similarly situated,

        **Plaintiffs,**

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; and **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES,**

        **Defendants.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge



**DEFENDANTS' NINTH SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET
OF REQUESTS FOR PRODUCTION TO DEFENDANTS WILLIAM CROUCH,
CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND
HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES**

**DOCUMENT REQUESTS**

2.  All documents relating to Plaintiff' s communications, injuries, requests for coverage, requests for prior authorization, requests for reimbursement and/or complaints regarding coverage for Gender-Confirming Care through the West Virginia Medicaid Program.  This Request includes but is not limited to:

        a.   All communications to and from Plaintiff relating to coverage for Gender-Confirming Care;

**JA338**

    b. All Documents and communications regarding Plaintiff's requests for Gender-Confirming Care, including but not limited to communications among Defendants, and/or the employees, entities, agents, representatives, contractors, vendors, and/or consultants of Defendants and/or West Virginia Department of Health and Human Resources, Bureau of Medical Services;

    c. All Documents and communications relating to consideration or processing by third-party administrators, contractors, and/or vendors of requests for Gender-Confirming Care by Plaintiff.

**SUPPLEMENTAL RESPONSE: Pursuant to the Protective Order,** *see* **Member Notes (pharmacy) for Plaintiff Anderson, attached as Exhibit 172 (Bates No. DHHRBMS021560 - 21562).**

3. Taking necessary steps to comply with applicable privacy laws and making all necessary redactions to protect any personal health information. Documents in electronic, delimited, and importable format (e.g., excel spreadsheet) sufficient to show number of individuals who have requested coverage for Gender-Confirming Care, the number of claims each individual has made for Gender-Confirming Care, whether those claims were approved or denied, the factual reasons for each decision, and whether any denials were based in whole or in part on the Exclusion.

**SUPPLEMENTAL RESPONSE:** *See* **hormones data, attached as Exhibit 173 (Bates No. DHHRBMS021563).**

**JA339**

6.   All Documents and communications relating to the Exclusion and/or Gender-Confirming Care considered by the individuals responsible for adopting and/or maintaining the Exclusion in the Health Plans.  Please identify the responsive Documents by Bates number.  This includes, but is not limited to:

> a.   Documents and communications regarding the safety or efficacy of Gender-Confirming Care;
>
> b.   Documents and communications regarding the medical necessity of Gender-Confirming Care; and
>
> c.   Documents and communications regarding the cost of Gender-Confirming Care.

**SUPPLEMENTAL RESPONSE:  Upon information and belief, *see* the following documents that have previously been produced as part of Exhibit 86:  DHHRBMS012313-012314;   DHHRBMS012318;    DHHRBMS012322-012323;    DHHRBMS012333; DHHRBMS012338;    DHHRBMS012434-012447;    DHHRBMS012483-012501; DHHRBMS012648-012653;   DHHRBMS012665-012668;   DHHRBMS012711-012823; DHHRBMS013523-013524;   DHHRBMS015304;   and   DHHRBMS015453-15489.   The following documents are designated CONFIDENTIAL:  DHHRBMS012649-012653 and DHHRBMS012714-12823.**

3

**JA340**

9.  Documents sufficient to identify the circumstances in which hormone therapy is covered through the West Virginia Medicaid Program, including but not limited to Diagnostic Codes, Procedure Codes, contracts, Health Plans, clinical guidelines and/or criteria, medical necessity criteria, and pre/prior authorization requirements and procedures where applicable.

**SUPPLEMENTAL RESPONSE:** *See* **Limits 2022 Preferred Drug List, attached as Exhibit 174 (Bates No. DHHRBMS021564 – 21581).**

15.  The Rational Drug Therapy Program's criteria for coverage of hormone therapy for transgender and non-transgender West Virginia Medicaid participants.

**SUPPLEMENTAL RESPONSE: Upon information and belief,** *see* **RDTP Email Correspondence and Attachments, marked as Exhibit 175 (Bates No. DHHRBMS021582 – 21620).**

18. Documents that Defendants intend to use as exhibits at deposition, summary judgment, or trial, or that may be used to refresh the recollection of a witness at depositions or trial.

**SUPPLEMENTAL RESPONSE:  *See*  Exhibits 176 to 187 (Bates No. DHHRBMS021621 - 21691), which represent materials that may be referred to by Brandon Lewis in connection with his anticipated testimony on Topic 14 in the Second Amended 30(b) Notice.**

4

**JA341**

24. To the extent not requested above, all Documents that Defendants may rely upon to support their defenses against Plaintiff's claims in this action.

**SUPPLEMENTAL RESPONSE:** *See* **Gender Edit Information 2010, attached as Exhibit 188 (Bates No. DHHRBMS021692 - 21700), and Gender Edit Information 2011, attached as Exhibit 189 (DHHRBMS021701 - 21709).**

<div align="right">

**WILLIAM CROUCH,
CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,**

**By counsel**

</div>

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esq. (WVSB #6558)
Roberta F. Green, Esq. (WVSB #6598)
Caleb B. David, Esq. (WVSB #12732)
Kimberly M. Bandy, Esq. (WVSB #10081)
Counsel for William Crouch, Cynthia Beane, and
West Virginia Department of Health and Human
Resources, Bureau for Medical Services
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA342**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**CHRISTOPHER FAIN,** and
**SHAWN  ANDERSON,**
a/k/a Shauntae Anderson,
individually and on behalf of all others
similarly situated,

                 **Plaintiffs,**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; and **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES,**

                 **Defendants.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

<u>**CERTIFICATE OF SERVICE**</u>

      Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of

Health and Human Resources, by counsel, and do hereby certify that on the 25th day of March,

2022, a true and exact copy of **DEFENDANTS' NINTH SUPPLEMENTAL RESPONSE TO**

**PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANTS**

**WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF**

**HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES** was served

on counsel via electronic means as follows:

**JA343**

USCA4 Appeal: 22-1927    Doc: 20-1    Filed: 10/31/2022    Pg: 364 of 610

Case 3:20-cv-00740   Document 250-9   Filed 05/31/22   Page 8 of 9 PageID #: 1740
Case 3:20-cv-00740   Document 227   Filed 03/25/22   Page 2 of 3 PageID #: 1425

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com


Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com


Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org


Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org


Nora Huppert, Visiting Attorney
65 E. Wacker Pl, Suite 2000
Chicago, IL 60601
*Counsel for Plaintiffs*
(312) 663-4413
(312) 663-4307
nhuppert@lambdalegal.org


Carl. S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lamdalegal.org


Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org

**JA344**

USCA4 Appeal: 22-1927     Doc: 20-1          Filed: 10/31/2022      Pg: 365 of 610

Case 3:20-cv-00740   Document 250-9   Filed 05/31/22   Page 9 of 9 PageID #: 1741
Case 3:20-cv-00740   Document 227   Filed 03/25/22   Page 3 of 3 PageID #: 1426

/s/Kimberly M. Bandy
 Lou Ann S. Cyrus, Esq. (WVSB #6558)
Roberta F. Green, Esq. (WVSB #6598)
Caleb B. David, Esq. (WVSB #12732)
Kimberly M. Bandy, Esq. (WVSB #10081)
*Counsel for William Crouch, Cynthia Beane,
and West Virginia Department of Health and
Human Resources, Bureau for Medical Services*
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

CONFIDENTIAL

```
                                              Page 1

1            IN THE UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
3                   HUNTINGTON DIVISION
4
5    CHRISTOPHER FAIN,
     SHAWN ANDERSON,
6    a/k/a Shauntae Anderson;
     individually and on behalf of all
7    others similarly situated,
8                     Plaintiffs,
9
     v.                  Civil Action No. 3:20-cv-00740
10                       Hon. Robert C. Chambers, Judge
11
     WILLIAM CROUCH, in his
12   official capacity as
     Cabinet Secretary of the
13   West Virginia Department Of
     Health and Human Resources;
14   CYNTHIA BEANE, in her official
     capacity as Commissioner for the
15   West Virginia Bureau for Medical
     Services; and WEST VIRGINIA
16   DEPARTMENT OF HEALTH AND HUMAN
     RESOURCES, BUREAU FOR MEDICAL
17   SERVICES,
18                     Defendants.
19
20      VIDEOTAPED ZOOM DEPOSITION OF CHRISTOPHER FAIN
21          On the 28th day of April 2022, beginning at
     approximately 10:00 a.m., via Zoom, before, Melanie
22   Smith, Court Reporter and Notary Public, appeared
     CHRISTOPHER FAIN, Witness, who being by me first duly
23   sworn, gave his oral deposition in the causes pursuant
     to notice of counsel and for the respective parties as
24   hereinafter set forth.
```

CONFIDENTIAL

```
                                                    Page 2

 1    APPEARANCES:
 2
              ON BEHALF OF THE PLAINTIFFS:
 3            ANNA P. PRAKASH, VISITING ATTORNEY
              NICHOLS KASTER, PLLP
 4            IDS CENTER, 80 SOUTH 8TH STREET
              SUITE 4600
 5            MINNEAPOLIS, MN  55402
              (612) 256-3200
 6            aprakash@nka.com
 7
              ON BEHALF OF THE PLAINTIFFS:
 8            WALT AUVIL, ESQ.
              THE EMPLOYMENT LAW CENTER, PLLC
 9            1208 MARKET STREET
              PARKERSBURG, WV  26101-4323
10            (304) 485-3058
              auvil@theemploymentlawcenter.com
11
12            ON BEHALF OF THE PLAINTIFFS:
              AVATARA SMITH CARRINGTON, VISITING ATTORNEY
13            LAMBDA LEGAL DEFENSE AND
              EDUCATION FUND, INC.
14            3500 OAK LAWN AVENUE, SUITE 500
              DALLAS, TEXAS  75219-6722
15            (214) 219-8585
              asmithcarrington@lambdalegal.org
16
17            ON BEHALF OF THE PLAINTIFFS:
              TARA L. BORELLI, VISITING ATTORNEY
18            LAMBDA LEGAL DEFENSE AND
              EDUCATION FUND, INC.
19            158 WEST PONCE DE LEON AVE., SUITE 105
              DECATUR, GA  30030
20            tborelli@lambdalegal.org
21
22
23
24
```

CONFIDENTIAL

```
 1   APPEARANCES (cont'd)

 2

             ON BEHALF OF THE DEFENDANTS:
 3           LOU ANN S. CYRUS, ESQ.
             KIMBERLY M. BANDY, ESQ.
 4           SHUMAN MCCUSKEY SLICER PLLC
             P.O. BOX 3953
 5           CHARLESTON, WV  25339
             (304) 345-1400
 6           lcyrus@shumanlaw.com
             kbandy@shumanlaw.com
 7

 8           ALSO PRESENT:
             ANDREW BAKER
 9           (VIDEOGRAPHER)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

# DEPOSITION OF CHRISTOPHER FAIN

Case 3:20-cv-00740   Document 250-10   Filed 05/31/22   Page 5 of 17 PageID #: 1746

CONFIDENTIAL

Page 10

1      Q.  Okay.  And in this case, your case, based upon

2   having a vagina, you were identified as female at birth;

3   is that correct?

4              MS. PRAKASH:  Objection.  Form.

5              THE WITNESS:  I was assigned female at

6   birth.

7   BY MS. CYRUS:

8      Q.  Okay.  But you identify as male; correct?

9      A.  Yes.

10     Q.  Okay.  Therefore, do you consider yourself to

11  be a transgender male?

12     A.  Yes, I am transgender male.

14

15     Q.  What is your age?

16     A.  I'm 46.

17     Q.  And where do you currently reside?

18     A.  Huntington, West Virginia.

19     Q.  Does anyone live with you?

20     A.  No.

21     Q.  What is your marital status?

22     A.  Divorced.

23     Q.  And how many times have you been married?

24     A.  Once.

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 31

1    A.  Right.  Well, it happened -- it happened in

2  phases because I tried it twice before, but yes, 2017.

3    Q.  Okay.  Did you begin taking male hormones at

4  some point?

5    A.  Yes.

6    Q.  And when was that?

7    A.  March of 2019.

8    Q.  Okay.  There was a letter that was produced

9  yesterday regarding your hormones --

10    A.  Yes.

11  ████  ██████████████████████████████████████████████

12  ████████████████████  ████████████████████████████

13  ████  ██████

14    MS. PRAKASH:  Can I -- Lou Ann, you're

15  holding up a document and it looks like you're

16  attempting to show it to the witness.

17    MS. CYRUS:  Oh, sorry.  No, I'm not.

18  Actually, it's not even the one I was referring to.

19  Sorry.  I just moved this out of the way.

20  BY MS. CYRUS:

21    Q.  Yeah.  Is that -- was that the -- as far as you

22  know, that was -- was that the first time it was

23  recommended that you take male hormones?

24    A.  Yes, that was the first time a professional

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 32

1  recommended hormones to me, and surgery.

2      Q.  Okay.  And did you -- did you give that

3  letter -- well, first of all, when you obtained that

4  letter in June of 2018, were you insured by any entity?

5      A.  Medicaid.

6      Q.  Okay.  So you were insured by Medicaid when you

7  got that letter?

8      A.  Yes.

9      Q.  Okay.  When did you become insured by Medicaid?

10      A.  On and off throughout my adult life, but since

11  2016, 2000- -- yeah, 2016 this last time, but yeah, most

12  of my adult life.

13      Q.  Did you undergo any counseling before you

14  started male hormones?

15      A.  I had six months of counseling before that

16  letter was given to me.

17      Q.  And did you give that letter to anyone with

18  Medicaid after you received it?

19      A.  No.  I took it to my primary care physician.

20  ██  ████████████████████████████████████████

21  ████

22  ██  ████████████

23      Q.  And then did your primary care physician do

24  anything with that?

**JA351**

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 33

1          MS. PRAKASH:  Objection.  Foundation.

2          THE WITNESS:  She started the process of

3    referring me to an endocrinologist.

4    BY MS. CYRUS:

5          Q.  Then did you go to an endocrinologist?

6          A.  Yes.

7    ████   ████████████████

8    ████   ███████████

9    ████   ██████   █████████████████████████████

10   ████   ████

11   ████   ██████   █████████████████████████████

12   ████████

13   ████   ██████

14          Q.  Was your understanding that the purpose of the

15   male hormones was for some -- a type of

16   gender-confirming care?

17          MS. PRAKASH:  Objection to form.

18          THE WITNESS:  Yes.  That's what sex

19   hormones are for.  Mine are for masculinization, yes.

20   BY MS. CYRUS:

21          Q.  And you started taking those in March of 2019?

22          A.  Yes.

23          Q.  Are you familiar with the term

24   "gender-confirming surgical procedures"?

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 81

1   transgender health care?

2          MS. PRAKASH:  Objection.  Document speaks

3   for itself.  Vague as to "Did you say."  Go ahead.

4          THE WITNESS:  This was how I worded it to

5   Brigitte, yes.

6   BY MS. CYRUS:

7     Q.  And that was not a correct statement; is that

8   right?

9          MS. PRAKASH:  Objection.  Form.  Argumentative.

10  Go ahead.

11         THE WITNESS:  It's very obvious that this

12  was what was being written at the moment; however, I

13  think you're again playing with semantics.

14  BY MS. CYRUS:

15    Q.  But it is not accurate to say there is a

16  blanket refusal for all transgender health care; is it?

17         MS. PRAKASH:  Objection.  Form.

18         THE WITNESS:  No, it would not be entirely

19  accurate because again, as I've pointed out over and

20  over again, I get therapy and I get hormones.  However,

21  I want top surgery, and therefore I need, just like

22  everybody else in the state of West Virginia like me,

23  needs to have the exclusion struck down.

24  BY MS. CYRUS:

**DEPOSITION OF CHRISTOPHER FAIN**

Case 3:20-cv-00740   Document 250-10   Filed 05/31/22   Page 10 of 17 PageID #: 1751

CONFIDENTIAL

Page 82

1  ████████████████████████████████

2  ████████████████████████████

3  ████████████████████████████████████

4  ██████

5  ████████████████████████████████

6  ████████████████

7   BY MS. CYRUS:

8        Q.  Regarding your diagnosis of gender dysphoria,

9   what does that condition mean to you?

10           MS. PRAKASH:  Objection.  Form.  Go ahead.

11           THE WITNESS:  It's difficult to describe

12   what it means to you to have something riding around

13   inside of you that -- it's like living in a machine

14   because you learn not to pay attention to your body.

15   But gender dysphoria is -- is horrific and it's painful

16   and it's disorienting and it makes you want to hide.

17   That's what gender dysphoria is like, and often that's

18   what it means.

19   BY MS. CYRUS:

20        Q.  If I were to --

21        A.  It --

22        Q.  I'm sorry.  Go ahead.

23        A.  It cuts -- it cuts your life in half.

24        Q.  If I were to ask you what -- to describe for me

## DEPOSITION OF CHRISTOPHER FAIN

Case 3:20-cv-00740   Document 250-10   Filed 05/31/22   Page 11 of 17 PageID #: 1752

CONFIDENTIAL

Page 83

1   the symptoms you experience that you believe are gender

2   dysphoria, would your answer be the same as what you

3   just said or would you have other things you would add?

4       A.  I would --

5          MS. PRAKASH:  Object to form.

6          THE WITNESS:  I would go in and describe

7   the symptoms.  Is that something that you actually need?

8   BY MS. CYRUS:

9       Q.  Yes.  I just didn't want to ask you to repeat

10  yourself.  What -- can you describe for me what symptoms

11  you experience that you believe are gender dysphoria?

12      A.  I experience severe pain in my breasts.  I

13  experience stomach and heart anxiety, palpitations and

14  tightenings.  I experience trembling.  I experience

15  hostility and fear.

16      Q.  Okay.  Are there certain procedures you believe

17  you need to treat your gender dysphoria?

18      A.  Yes.

19      Q.  Okay.  And what do you believe you need to

20  treat it?

21      A.  I believe top surgery is necessary.

22      Q.  Okay.  And, when you refer to top surgery, what

23  is it that you would anticipate would happen?

24      A.  The complete removal of my breast tissue and

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 84

1    remodeling of my nipples so that they would be placed in

2    a better place, a better position on any chest.

3        Q.  Okay.  So would that be a mastectomy and some

4    sort of reconstruction?

5            MS. PRAKASH:  Objection to form.  Go ahead.

6            THE WITNESS:  Yeah.  Yes.

7    BY MS. CYRUS:

8        Q.  Okay.  And you -- have you obtained a letter

9    from a doctor recommending you have a mastectomy?

10       A.  Yes, two letters.

11       Q.  Okay.  When did you obtain the first letter?

12       A.  In November of 2018.

13       Q.  Now, is that the one where you were referred --

14   recommended to have the hormones?

15       A.  And further on the surgery.

16       Q.  Okay.  Did you ever provide a copy of the

17   November letter to anyone with Medicaid or UniCare?

18       A.  Yes.  My doctor, my primary care physician, was

19   given a copy when she made -- before she made the

20   referral for hormones.

21       Q.  Okay.  But my question was:  Did you ever give

22   a copy of the November 2018 letter to either Medicaid or

23   UniCare?

24       A.  I'm pretty sure that the letter has to be

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL



Page 91

```
1     A.  No.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19     Q.  Okay.  Assuming you were to have a mastectomy,
20   how do you believe that would affect your gender
21   dysphoria, if at all?
22     A.  Well, it would greatly alleviate it.
23     Q.  Okay.  Do you -- do you believe it would fully
24   alleviate it?
```

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 127

1    Q.  Okay.  What about your birth certificate, has

2    it been changed?

3    A.  No.  I have not worked at getting that changed

4    yet because for the most part my birth certificate is

5    not important in my daily life.  So it's not something I

6    get asked for, so I don't really think about it.  But,

7    yes, I intend to have it changed, or amended, I should

8    say.

9    Q.  Okay.  And then you say -- in 14, paragraph 14,

10   you say you started counseling at Marshall University in

11   or around June of 2018; is that right?

12   A.  Yes.

13   Q.  Okay.  Okay.  And in paragraph 17 and 18 you

14   talk about wearing a binder; is that right?

15   A.  Yes.

16   Q.  Okay.  How long have you been wearing a binder,

17   approximately?

18   A.  From age 13 until 18 I wore it on and off most

19   days.  Back then they didn't have them for sale on the

20   market.  I made my own.  I did not wear a binder between

21   age 18 and 30.  And then I picked up a binder and wore

22   it on again and -- you know, on and off again until

23   about 2015, and then with my back problems I couldn't do

24   anything at all.

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 128

1              But, once I reached the point where I could

2      put things on overtop of my head again, I started

3      wearing an official binder, the ones on the market now,

4      and that was in 2017.  And I have not worn anything even

5      resembling a bra since mid 2017.

6          Q.  Okay.  And, if you'll go to paragraph 19, you

7      say you require a bilateral mastectomy as medically

8      necessary to care and treat your gender dysphoria, and

9      it's my understanding and you go on to talk about, that

10     would eliminate your need for the binder; is that right?

11         A.  That's absolutely true, yes.

12         Q.  Okay.  And, again, that's the only procedure

13     that you're seeking at this time?

14         A.  Yes.

15         Q.  Okay.  In No. 20 you say your Medicaid -- as a

16     Medicaid participant you receive coverage through the

17     managed care organization UniCare, which we've talked

18     about, and you say you are aware there is an exclusion

19     in the state Medicaid plan that bans the

20     gender-confirming surgery care you need; is that right?

21         A.  That's true.

22         Q.  Okay.  Have you had some instance where you

23     felt like you needed to drop this lawsuit for some

24     reason?

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 134

1    CERTIFICATION OF COURT REPORTER AND NOTARY PUBLIC

2

3            I, Melanie Smith, Court Reporter and Notary

4    Public, duly Commissioned and qualified, do hereby

5    certify that the foregoing deposition was duly taken by

6    me and before me at the time and place and for the

7    purpose specified in the caption hereof, the said

8    witness having been by me first duly sworn.

9

10           I do further specify that the said

11   deposition was correctly taken by me in Stenotype and

12   that the same was reduced to computer print by me or

13   under my direct supervision.

14

15           I further certify that I am neither

16   attorney or counsel for, nor related to or employed by,

17   any of the parties to the action in which this

18   deposition is taken, and further that I am not a

19   relative or employee of any attorney or counsel employed

20   by the parties hereto, or financially interested in the

21   action.

22

23           I certify that the attached transcript

24   meets the requirements set forth within article twenty-

Page 135

1   seven, chapter forty-seven of the West Virginia Code.

2

3           Before completion of the deposition, review

4   of the transcript { X } was {   } was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed are

7   appended hereto.

8

9           Given under my hand this 11th day of May,

10  2022.

11

12          My Commission expires February 13, 2026.

13

14          _____

15          Melanie E. Smith

16

17

18

19

20

21

22

23

24

**JA361**

```
                                              Page 1
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   HUNTINGTON DIVISION
 3    CHRISTOPHER FAIN,
      SHAWN ANDERSON,
 4    a/k/a Shauntae Anderson;
      individually and on behalf of all others
 5    similarly situated,
 6              Plaintiffs,
 7    v.                      Civil Action No. 3:20-cv-00740
 8    WILLIAM CROUCH, in his official capacity as
      Cabinet Secretary of the West Virginia
 9    Department of Health and Human Resources;
      CYNTHIA BEANE, in her official capacity as
10    Commissioner for the West Virginia Bureau for
      Medical Services; and WEST VIRGINIA
11    DEPARTMENT OF HEALTH AND HUMAN
      RESOURCES, BUREAU FOR MEDICAL
12    SERVICES;
13              Defendants.
14      VIDEOTAPED DEPOSITION OF SHAUNTAE ANDERSON
15
           On the 22nd day of April 2022, beginning at
16    approximately 10:00 a.m., via Zoom Conference, West
      Virginia before me, Magdalena Szczerba, Court
17    Reporter and Notary Public, appeared SHAUNTAE
      ANDERSON, Witness, who being by me first duly
18    sworn, gave her oral deposition in the causes
      pursuant to notice of counsel and for the
19    respective parties as hereinafter set forth.  Said
      deposition is to be used for purposes of discovery
20    and for any and all other purposes permitted by the
      Federal Rules State of West Virginia Rules of Civil
21    Procedure.
22
23
24
```

```
                                                    Page 2
 1                     APPEARANCES:
 2    On behalf of the Plaintiffs:
 3         Walt Auvil, Esquire
           auvil@theemploymentlawcenter.com
 4         THE EMPLOYMENT LAW CENTER, PLLC
           1208 Market Street
 5         Parkersburg, WV  26101
 6         Sasha Buchert, Esquire
           sbuchert@lambdalegal.org
 7         LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
           1776 K Street, N.W. 8th Floor
 8         Washington, D.C. 20006-2304
 9         Anna P. Prakash, Esquire
           aprakash@nka.com
10         Nicole J. Schladt, Esquire
           nschladt@nka.com
11         NICHOLS KASTER, PLLP
           IDS Center, 80 South 8th Street
12         Suite 4600
           Minneapolis, MN  55402
13         612 256-3200
14         Avatara Smith-Carrington, Esquire
           asmithcarrington@lambdalegal.org
15         LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
           3500 Oak Lawn Avenue, Suite 500
16         Dallas, TX  75219-6722
           214-219-8585
17
           Tara L. Borelli, Esquire
18         tborelli@lambdalegal.org
           LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
19         158 West Ponce De Leon Avenue, Suite 105
           Decatur, GA  30030
20
21
22
23
24
```

```
                                                    Page 3

1              APPEARANCES (Continued)

2    On behalf of the Defendants:

3         Lou Ann Cyrus, Esquire
          Kimberly M. Bandy, Esquire

4         lycrus@shumanlaw.com
          SHUMAN, MCCUSKEY & SLICER, PLLC

5         1411 Virginia Street, Suite 200
          Charleston, WV  25339

6         304 345-1400

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 16



```
 1        Q.   So I was going to ask you:  Are you a
 2   transgender female, do you disagree with that?  Do
 3   you not agree you're a transgender female?
 4        A.   I agree --
 5             MS. BUCHERT:  Objection to form.
 6   BY MS. CYRUS:
 7        Q.   I'm sorry.  I didn't hear your answer.
 8        A.   I'm a transwoman, yes.
 9
10
11
12
13
14
15
16
17
18
19
20
21        Q.   And what is your age?
22        A.   I'm 45.
23        Q.   Where do you currently live?
24        A.   Charleston, West Virginia.
```

**DEPOSITION OF SHAUNTAE ANDERSON**



Page 133

12  BY MS. CYRUS:

13      Q.   I'm going to turn your attention to

14  another topic, to the Medicaid plan.  Do you know

15  when you became a Medicaid recipient?

16      A.   On or around 2019.

17      Q.   What prompted you to sign up with

18  Medicaid, if you know?

19      A.   When I got to the halfway house, they sent

20  us to a free clinic to get a physical.  At that

21  time, they asked us if you had any insurance or you

22  wanted to try to apply for Medicaid, and that's

23  what I did.

24      Q.   Do you know when you first became eligible

## DEPOSITION OF SHAUNTAE ANDERSON

Page 147

1   can be detrimental to my health, so that's why they

2   haven't stopped it.  I don't know the specific

3   reasons why, but I do know that it can cause blood

4   clots which can lead to your death.

5   BY MS. CYRUS:

6       Q.   Do you know that your hormone therapy is

7   actually covered under Medicaid?

8           MS. BUCHERT:  Objection.

9           THE WITNESS:  I haven't received a bill

10  yet, so I assume that it is covered by my Medicaid.

11  BY MS. CYRUS:

12      Q.   And you've been getting that -- getting

13  those hormones since you signed up on Medicaid in

14  2019 up to the present; is that right?

15      A.   I mean, 2019 when I was in prison, I left

16  from prison with hormones on a hormone regimen.

17  They just continued it when I got transitioned into

18  the outside world.

19      Q.   So let me ask you:  What is your

20  understanding of what this lawsuit is about?

21          MS. BUCHERT:  Objection to form.

22          THE WITNESS:  My understanding is that I

23  have insurance that doesn't cover anything that's

24  medically necessary for me to continue the quality

## DEPOSITION OF SHAUNTAE ANDERSON

Page 164

```
1          My question is about counseling and
2   hormone replacement therapy, that's correct.
3          A.   But if you're going to talk about
4   something you need to discuss it all.  That would
5   not make -- that would make that statement still
6   factual, would it not --
7          Q.   Do you have any -- do you have any reason
8   to dispute the testimony that both counseling and
9   hormone replacement therapy are covered by Medicaid
10  for its participants even the transgender ones?
11            MS. BUCHERT:  Objection to form.
12            THE WITNESS:  I can't speak for everybody
13  else.  I can only speak for myself.
14  BY MS. CYRUS:
15         Q.   And based upon your own experience, that
16  is a true statement, both your counseling and
17  hormone replacement therapy are covered by
18  Medicaid; is that right?
19            MS. BUCHERT:  Objection to form.
20            THE WITNESS:  To my knowledge, yes.
21  BY MS. CYRUS:
22         Q.   Is it your understanding that you have
23  been diagnosed with gender dysphoria?
24         A.   Yes.
```

## DEPOSITION OF SHAUNTAE ANDERSON

Page 165

1        Q.    What -- and I'm finished with the exhibit

2    for the moment.

3              What does that condition mean to you?

4              MS. BUCHERT:   Objection to form.

5              THE WITNESS:   I'm not a doctor so I can't

6    put it into technical terms but --

7    BY MS. CYRUS:

8        Q.    I don't need you to.

9        A.    But as far as myself, it's just what I've

10   always known my whole life that my outward

11   appearance does not reflect my inward appearance,

12   who I am on the inside, who I've always been.

13       Q.    Does that have some impact on you?

14       A.    A great deal of impact.

15       Q.    That's what I'm trying to get at.   What is

16   the impact on you?   Can you describe for me

17   symptoms that you experience that you believe are

18   gender dysphoria?

19             MS. BUCHERT:   Objection to form.

20             THE WITNESS:   Not being able to be my

21   authentic self, to have to live a lie, to have to

22   be -- to be something that someone else says I'm

23   supposed to be.   To let somebody else make the

24   decisions about my life and about my care.   It's

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 166

1    hurtful.

2    BY MS. CYRUS:

3        Q.    Is there somebody who is mocking you now?

4            MS. BUCHERT:  Objection to form.

5            THE WITNESS:  Everywhere I go.  I live in

6    a state full of people that are not always

7    receptive of people of being transgender.  That's

8    why I try to live as stealth as possible.

9    BY MS. CYRUS:

10       Q.    Are there certain procedures that you

11   believe you need that will treat your gender

12   dysphoria?

13           MS. BUCHERT:  Objection to form.

14           THE WITNESS:  Just the treatment that is

15   prescribed and that's all the cosmetic that's

16   considered medically necessary treatment.

17   BY MS. CYRUS:

18       Q.    And what -- I'm sorry.

19       A.    Go ahead.

20       Q.    No.  I was going to say what is that?  Can

21   you tell me specifically what the treatment is that

22   you're referring to?

23           MS. BUCHERT:  Objection to form.

24           THE WITNESS:  Gender confirmation,

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 167

1    whatever else that I would need, whatever a doctor

2    thinks would give me the best quality of life.

3    BY MS. CYRUS:

4        Q.    And are you able to be more specific

5    beyond just gender confirmation?  Are there

6    specific procedures that you believe you need that

7    are medically necessary to treat your gender

8    dysphoria?

9            MS. BUCHERT:  Objection to form.

10           THE WITNESS:  There are other procedures

11   that -- it's not that -- not just what I believe,

12   it's what a whole list of doctors believe and know

13   to be true.  I mean, but me specifically, a breast

14   augmentation is one of them.

15   BY MS. CYRUS:

16       Q.    And is that the only one?

17           MS. BUCHERT:  Objection to form.

18           THE WITNESS:  No.  But it was -- I mean, I

19   could go on for hours about things of that nature

20   but I'm not.

21   BY MS. CYRUS:

22       Q.    I had an understanding that you were at

23   least initially saying you believed you needed

24   breast augmentation and vaginoplasty?

## DEPOSITION OF SHAUNTAE ANDERSON

Page 168

1      A.   Yes, from my understanding when you asked

2   the line of questioning, vaginoplasty was -- we

3   already knew that that's what I wanted.  That

4   was -- I do want -- let me go on the record and say

5   that a vaginoplasty, which is gender confirmation

6   surgery, and a breast augmentation, and not to be

7   limited to just those two things but ...

8      Q.   Believe me.  I'm not limiting you -- I'm

9   trying to find out what it is that you're seeking.

10          What is your -- I don't know if you want

11   to call it a wish list, but if you were to, you

12   know, have what you believe you need to treat your

13   gender dysphoria, what is it you're seeking it and

14   I had understood it would be a breast augmentation

15   and vaginoplasty; is that correct?

16          MS. BUCHERT:  Objection to form.

17          THE WITNESS:  That's correct.  And any

18   surgical care that a doctor would recommend for me

19   to have.

20   BY MS. CYRUS:

21      Q.   Has any doctor recommended you have breast

22   augmentation and vaginoplasty?

23      A.   No doctor has said these things on the

24   record because they know that Medicaid does not

Page 217

1    STATE OF WEST VIRGINIA, To-wit:
2         I, Magdalena Szczerba, a Notary Public and
     Registered Professional Reporter within and for the
3    State aforesaid, duly commissioned and qualified,
     do hereby certify that the videotaped deposition of
4    Shauntea Anderson was duly taken by me and before
     me at the time and place specified in the caption
5    hereof.
6         I do further certify that said proceedings were
     correctly taken by me in stenotype notes, that the
7    same were accurately transcribed out in full and
     true record of the testimony given by said witness.
8
          I further certify that I am neither attorney or
9    counsel for, nor related to or employed by, any of
     the parties to the action in which these
10   proceedings were had, and further I am not a
     relative or employee of any attorney or counsel
11   employed by the parties hereto or financially
     interested in the action.
12
          I certify that the attached transcript meets
13   the requirements set forth within article
     twenty-seven, chapter forty-seven of the West
14   Virginia Code.
15        My commission expires the 3rd day of July,
     2022.
16        Given under my hand and seal this 1st day of
     May, 2022.
17
18
     _____
19             Magdalena Szczerba
               Registered Professional Reporter
20             Notary Public
21
22
23
24

**JA373**

```
                                                    Page 1
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                  HUNTINGTON DIVISION

 4    ----------------------------------------------------

 5    Christopher Fain, individually and on behalf of all

 6    others similarly situated, et al.,

 7                   Plaintiffs,

 8       vs.                    CIVIL ACTION NO. 3:20-cv-00740

 9    William Crouch, et al.,

10                   Defendants.

11    ----------------------------------------------------

12

13

14        REMOTE DEPOSITION OF SECRETARY BILL J. CROUCH

15

16

17

18    DATE:   March 17, 2022

19    TIME:   10:30 a.m. CST

20    PLACE:  Veritext Virtual Videoconference

21

22

23

24    REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25    JOB NUMBER:  5096130
```

```
                                                  Page 2
 1                      APPEARANCES

 2

 3   On Behalf of the Plaintiffs (Via Videoconference):

 4         TARA L. BORELLI, ESQ.

 5         Lambda Legal Defense and Education Fund, Inc.

 6         158 West Ponce De Leon Ave., Suite 105

 7         Decatur, Georgia  30030

 8         470.225.5341

 9         tborelli@lambdalegal.org

10

11         AVATARA SMITH-CARRINGTON, ESQ.

12         Lambda Legal Defense and Education Fund, Inc.

13         3500 Oak Lawn Avenue, Suite 500

14         Dallas, Texas  75219

15         214.219.8585

16         asmithcarrington@lambdalegal.org

17

18         NICOLE J. SCHLADT, ESQ.

19         Nichols Kaster PLLP

20         80 South 8th Street, Suite 4700

21         Minneapolis, Minnesota  55402-2224

22         612.256.3291

23         nschladt@nka.com

24

25
```

```
                                                    Page 3

 1          WALT AUVIL, ESQ.

 2          The Employment Law Center, PLLC

 3          1208 Market Street

 4          Parkersburg, West Virginia  26101

 5          304.485.3058

 6          auvil@theemploymentlawcenter.com

 7

 8     On Behalf of Defendants William Crouch; Cynthia Beane;

 9     and West Virginia Department of Health and Human

10     Resources, Bureau for Medical Services (Via

11     Videoconference):

12          KIMBERLY M. BANDY, ESQ.

13          LOU ANN S. CYRUS, ESQ.

14          Shuman McCuskey Slicer, PLLC

15          1411 Virginia Street East, Suite 200

16          Charleston, West Virginia  25301

17          304.345.1400

18          kbandy@shumanlaw.com

19          lcyrus@shumanlaw.com

20

21

22

23

24

25
```

```
                                              Page 4

 1   On Behalf of Defendant Jason Haught (Via

 2   Videoconference):

 3        ERIC D. SALYERS, ESQ.

 4        Oxley Rich Sammons, PLLC

 5        517 Ninth Street, Suite 1000

 6        Huntington, West Virginia  25701

 7        304.522.1138

 8        esalyers@oxleylawwv.com

 9

10

11

12

13

14

15

16     NOTE:  The original deposition transcript will be

17   delivered to Nicole Schladt, Esq., as the taking

18   attorney.

19

20

21

22

23

24

25
```

## DEPOSITION OF BILL J. CROUCH

Page 11

1     Q.  Great.  Glad that we established that.  And, Mr.

2  Secretary, do you use he/him pronouns?

3     A.  No, I do not.

4     Q.  What pronouns do you use?

5     A.  I've never been asked that.  For me?

6     Q.  For you, yes.  If I wanted to refer to you like

7  Bill went to the store, instead of saying Bill, would I

8  say he went to the store?

9     A.  Yes, that would be fine.

10     Q.  Great.  Thanks.  And you are the Cabinet

11  Secretary of West Virginia Department of Health and

12  Human Resources, is that correct?

13     A.  That is correct, yes.

14     Q.  How do you refer to the West Virginia Department

15  of Health and Human Resources, because I know that's

16  quite a mouthful?

17     A.  How do I refer to them?

18     Q.  Do you have a short terminology for that, like

19  WVDHHR or DHHR?

20     A.  DHHR, yes.

21     Q.  Great.  So if I use DHHR today, you'll know that

22  I'm talking about the full West Virginia Department of

23  Health and Human Resources?

24     A.  I will, yes.

25     Q.  Great.  That will save us both a few words

## DEPOSITION OF BILL J. CROUCH

Page 12

1   today.

2       A.  All right, good.

3       Q.  And you were appointed Cabinet Secretary in

4   January 2017, is that right?

5       A.  That is correct, yes.

6       Q.  And you were appointed by Governor Jim Justice

7   of West Virginia?

8       A.  That is correct.

9       Q.  And you held the position for a little over five

10  years then, is that right?

11      A.  That is correct.

12      Q.  And, Mr. Secretary, what are your job duties as

13  Cabinet Secretary of DHHR?

14      A.  DHHR is a provider of, of funds and services and

15  a safety net for individuals, vulnerable individuals

16  throughout the state.  So we have a 7 and a half billion

17  dollar budget, we have over 6,000 employees, we have

18  over 150 programs.  So I try to make sure that the

19  funding that comes in from the federal government or

20  through the state legislature is pushed out

21  appropriately to those folks in communities who need

22  those funds to provide services.

23          We also provide some direct services such as CPS

24  and APS, Child Protective Services and Adult Protective

25  Services to those children and vulnerable adults who

## DEPOSITION OF BILL J. CROUCH

Page 13

1    need protection, who need intervention at times.  I also

2    operate seven facilities in the state, one acute care

3    facility, two psychiatric hospitals, and four long-term

4    care facilities are operated out of DHHR.  So it's a

5    broad range of services.  The Medicaid program is under

6    DHHR, we have six bureaus, so provide quite a range of

7    services for folks out there.

8        Q.  And you just mentioned that you have a

9    $6 billion budget, is that split between state and

10   federal funding?

11       A.  It's a 7 and a half billion dollar budget, 6,000

12   employees, and yes, that is split between state dollars

13   and federal dollars.  The majority of that is federal

14   money coming in, I believe that's about 4 and a half

15   billion to $5 billion in federal funding.

16       Q.  Great.

17       A.  It's closer, probably closer to 5 and a half

18   billion of that is federal dollars.  The bulk of that

19   comes through various programs in the federal

20   government, CMS, SAMHSA, HRSA funding, so we get a

21   variety of funds from a variety of sources.  We actually

22   have 154 different funding, federal funding streams that

23   come into the Department.

24       Q.  Can you tell me what CMS stands for?

25       A.  Center for Medicare/Medicaid.

## DEPOSITION OF BILL J. CROUCH

Page 14

1      Q.  And how about you mentioned something, SAMHSA

2   perhaps?

3      A.  SAMHSA is the, I actually have a huge document

4   giving acronyms, sometimes I forget those, but SAMHSA is

5   the, I'm trying to think of the actual name, but it's

6   the organization at the federal level that provides

7   funding for substance abuse disorder and for mental

8   health services, I'll think of it in just a second, but

9   that is the federal agency that provides funding for

10   those services to states.

11      Q.  And did you also mention HRSA?

12      A.  Yes, that's Health Services Research

13   Administration I believe that provides funding as well,

14   a variety of different funding.  They have historically

15   handled more primary care type community services.  And

16   of course CMS provides funding for our hospitals through

17   Medicaid funding.

18      Q.  And, Mr. Secretary, you yourself, what does your

19   role look like in general with overseeing all of the

20   programs that you just mentioned?

21      A.  My role -- and SAMHSA by the way is the

22   Substance Abuse & Mental Health Services for the state,

23   to clear that up.  My role is going to be kind of being

24   the conductor I guess of the orchestra, making sure that

25   again that funding that comes into the state gets pushed

## DEPOSITION OF BILL J. CROUCH

Page 34

1  come back and get started again.

2      A.  Thank you.

3          (A break was taken at 11:16 a.m.)

4  BY MS. SCHLADT:

5      Q.  I want to start with some questions following up

6  on some of the testimony you already gave, Mr.

7  Secretary, and specifically I'm interested in going

8  through the five bureaus of DHHR.  So to make this go

9  faster and to aid memory, although you likely already

10  have these memorized, I'm going to read all five out as

11  far as I understand them and you can let me know if they

12  sound accurate, okay?

13      A.  Certainly.

14      Q.  So the five bureaus under DHHR are the Bureau

15  for Behavioral Health & Health Facilities, the Bureau

16  for Child Support Enforcement, the Bureau for Children &

17  Families, the Bureau for Public Health, and the Bureau

18  for Medical Services, is that correct?

19      A.  No, not exactly.

20      Q.  Good thing I asked.

21      A.  Yeah, there have been some changes to that.  The

22  Bureau for Behavioral Health now stands alone, the

23  facilities have been pulled out of those, out of that

24  bureau and operate directly from my office, so that's

25  changed.  And then the Bureau of Children & Families was

## DEPOSITION OF BILL J. CROUCH

Page 35

1    actually split, is still in the process of being

2    finalized, but was split to the Bureau of Social

3    Services and the Bureau of Family Assistance, so there

4    are really six now.

5        Q.   Okay.  So it was split to the Bureau of Social

6    Services and the Bureau of Family Assistance, is that

7    correct?

8        A.   Correct.

9        Q.   Okay.  I'd like to quickly go through each of

10   these and just learn high level a little bit about what

11   each bureau does, if that's okay.  So the Bureau for

12   Behavioral Health, what is encompassed by that Bureau's

13   work?

14       A.   That's the Bureau that primarily pushes those

15   federal dollars for mental health services throughout

16   the state.  So that is a program that focuses on

17   supporting our regional behavioral health centers,

18   comprehensive behavioral health centers throughout the

19   state and make sure that all of those providers out

20   there that receive funding, whether they're group homes

21   for IDD patients or for forensic individuals who have

22   come through the court system, forensic patients receive

23   that funding and that they operate the way they should.

24       Q.   And you mentioned that the Health Facilities

25   aspect of what the Bureau was formerly called now

## DEPOSITION OF BILL J. CROUCH

Page 38

```
 1   is that right?
 2       A.   That's correct.
 3       Q.   And what does their work encompass?
 4       A.   That's the Medicaid agency for the state of West
 5   Virginia that really makes sure that those federal
 6   Medicaid dollars are spent according to CMS guidelines
 7   and requirements.
 8       Q.   Okay.  Thanks for running through those with me
 9   quickly.  I think the bulk of our conversation for the
10   rest of the day will be focused on the Bureau for
11   Medical Services and DHHR more generally, but to the
12   extent any answers of yours moving forward need to
13   reference other Bureaus, if you could just let me know
14   that you're talking about those, that will be helpful,
15   okay?
16       A.   Certainly.
17       Q.   So transitioning to your role as Cabinet
18   Secretary of DHHR, how would you describe your role in
19   determining and/or offering healthcare coverage to West
20   Virginia Medicaid participants?
21       A.   I try to tell all our commissioners they should
22   run their programs.  I'm not a micromanager, but I
23   certainly have to make sure that things are being done
24   in an appropriate way, in a proper manner.  I mean, part
25   of the role is making sure that every program we have,
```

**JA384**

## DEPOSITION OF BILL J. CROUCH

Page 39

```
1    not just Bureau of Medical Services, meets the
2    requirements and the mandates under the federal
3    guidelines.  So if we don't do that we jeopardize
4    funding coming from the feds, so that's one of the
5    primary reasons is making sure that our commissioners
6    are staying focused on that.  But I'm not a
7    micromanager, I tell them all that, they should run
8    their programs.
9        Q.  And how often do you interact with Commissioner
10   Beane during your day-to-day?
11       A.  Day-to-day, it varies.  We just finished up a
12   legislative session, so it may be a little bit more.
13   But weekly, I have a weekly meeting of commissioners and
14   office directors, and that's gotten cancelled quite a
15   few times these last few weeks, but that's probably been
16   the most interaction I have with any commissioner,
17   unless there's a problem.
18           I have been communicating probably once or twice
19   a week with Commissioner Beane over a couple of issues
20   that have popped up, but once a week is probably,
21   probably even a little bit more than, probably once a
22   week maybe on average.
23       Q.  And when you are communicating with her is that
24   typically via email or phone or a variety of ways of
25   communicating?
```

## DEPOSITION OF BILL J. CROUCH

Page 40

```
 1      A.  A variety, yes.
 2      Q.  Okay.  But you do call her and you do email her,
 3   is that right?
 4      A.  Sure, certainly.
 5      Q.  So as far as your role in relation to the
 6   Medicaid program, I understand that West Virginia Code
 7   Section 929(a)(1) states that, "The Cabinet Secretary is
 8   responsible for developing a managed care system to
 9   monitor the services provided by the Medicaid program to
10   individual clients."  Does that sound accurate to you
11   based on what you know?
12      A.  Yes, there are a great number of places in the
13   statute where the Secretary has the overall authority,
14   certainly.
15      Q.  And what does developing a managed care system
16   to monitor services provided by the Medicaid program,
17   what does that look like practically for you in your
18   role?
19      A.  Well, we did that several years ago, I don't
20   think we've redid that for a while, and usually in state
21   government a very large contract like that gets bid out,
22   we accept proposals, go through a very fairly elaborate
23   process to make sure that those decisions are made in
24   the best interest of the state, best interest of the
25   people of West Virginia.  So we want to make sure that
```

## DEPOSITION OF BILL J. CROUCH

Page 41

1  we get applicants who can provide those services in a

2  very adequate way and provide quality services to our

3  residents, we're serving hundreds of thousands of people

4  in West Virginia through that program.

5          As I recall, it's been several years since we

6  have rebid that, there's usually a bidding process that

7  allows for renewals on those bids.  So the issue of the

8  MCO's and what they do is left to the commissioner for

9  the most part.  I was certainly part of the process

10  before and was comfortable that we did that in the right

11  way.

12      Q.  So when you say you rebid that, are you

13  referring to calling for bids from managed care

14  organizations or MCO's to help administer the Medicaid

15  program?

16      A.  Yes.

17      Q.  Okay.  And another --

18      A.  Well, let me, if I can.  When you say administer

19  the Medicaid program, that's the commissioner, that's

20  the state function.  So the MCO's really make sure that

21  the services are provided to the clients out there.  So

22  when you said MCO's oversee, maybe I misheard you,

23  oversee the Medicaid, the administration, that's really

24  the Bureau and the commissioner.

25      Q.  Okay.  I appreciate that clarification.  I may

## DEPOSITION OF BILL J. CROUCH

Page 42

1    have misspoke, and either way it's good to have that on

2    the record.  So West Virginia Code Section 926 Sub 12

3    states that, "The Cabinet Secretary is authorized to

4    prepare and submit state plans which meet the

5    requirements of federal laws, rules governing federal

6    state assistance."  Does that sound accurate as one of

7    your job roles as Cabinet Secretary?

8         A.  That sounds accurate, yes.

9         Q.  And what does that particular piece look like

10   practically for you in your role, preparing and

11   submitting state plans which meet the requirements of

12   federal law?

13        A.  Well, again, that's a function of the

14   commissioner and her staff.  The changes we've made to

15   the state plan through state plan amendments, they of

16   course run through me and I give an ultimate sign-off on

17   those, but those state plan amendments and changes are

18   done at the Bureau itself, not directly here at the

19   Cabinet Office.  I'm not trying to say that it's not my

20   responsibility, under the statute I certainly have to

21   review those and make sure I agree with those.

22        Q.  And how often are those state plans prepared and

23   submitted?

24        A.  Not too often.  We made a couple of changes in

25   the last year or two because of COVID in terms of how we

## DEPOSITION OF BILL J. CROUCH

Page 49

```
 1      Q.  No problem.  MCO's, I'm just trying to get an
 2   idea of the MCO structure.
 3      A.  Okay.
 4      Q.  So I know of Mountain Health Trust, UniCare
 5   Health Plan of West Virginia, Incorporated, The Health
 6   Plan, Aetna Better Health of West Virginia, and then I'm
 7   not sure if this counts as an MCO or not, but The
 8   Rational Drug Therapy Program.  Have I missed any MCO's
 9   or is there anything about those that you wouldn't
10   describe them as MCO's, for example?
11      A.  I don't believe the last one you mentioned is an
12   actual MCO, but that sounds like a pretty good list.  I
13   can't recall any others at this point.
14      Q.  Okay.  And then just so that I'm clear, I think
15   you testified to this already, but the Medicaid program
16   through Commissioner Beane and the DHHR, they have a
17   process of bidding by which these MCO's are chosen and
18   then the MCO's provide the services to the patients
19   based on the Medicaid programs, guidelines of what's
20   covered or not, does that sound accurate?
21      A.  That sounds accurate, yes.
22      Q.  Okay.  What is DHHR's role in establishing
23   eligibility standards for Medicaid providers?
24      A.  Eligibility standards.  I'm not sure, I'm not
25   sure what you mean by that, eligibility standards.
```

## DEPOSITION OF BILL J. CROUCH

Page 53

```
1      A.  I think so, yes.

2      Q.  What do you know about the exclusion?

3      A.  I didn't know much until recently.  Again, this

4   had not been brought to my attention, I was not aware

5   there was an exclusion.  I do understand now after our

6   folks did some digging trying to see what that exclusion

7   was or when that exclusion took place, it was well

8   before my tenure began in this position.  So I do

9   understand that surgery is excluded.  Is that what

10  you're referring to?

11     Q.  Sure.  So the exclusion I'm referring to is the

12  exclusion of gender confirming care as I've described

13  it.  You just referenced this, but it sounds, I'll just

14  ask, do you know how the exclusion was developed?

15     A.  I do not, I do not.

16     Q.  Do you have any understanding of when it was

17  developed?

18     A.  I was told it was somewhere around 2004, 2006,

19  somewhere in that era.  No one seems to know any more

20  detail than that, I certainly don't know any more detail

21  than that.

22     Q.  Do you know why the exclusion is maintained

23  today?

24     A.  I do not.

25     Q.  Why don't West Virginia Medicaid health plans
```

**DEPOSITION OF BILL J. CROUCH**

                                                          Page 56

1      Q.  Okay.  Sorry about that, I think it's good for

2   us all to be on the same page though.  Do you believe

3   excluding gender confirming care from West Virginia's

4   Medicaid plans to the extent it is excluded is in

5   compliance with federal law?

6              MS. CYRUS:  Object, calls for a legal

7   conclusion.  But if you know, you can answer.

8      A.  My understanding, we have a set of mandatory

9   required services according to CMS and we provide all of

10  the services that are mandatory under CMS through the

11  Medicaid program, they're required.

12             We have a huge number of services that are not

13  required, hearing aids, eyeglasses are good examples of

14  services that are not required but are seen by many to

15  be necessary in terms of their health.  So we provide

16  all the mandatory.

17             We have additional services we provide,

18  primarily through waiver programs for our IDD

19  population, for our aged population.  So we provide

20  everything that's required under Medicaid and some

21  optional programs that through the years, long, long

22  period of time years, have been developed as a part of

23  the West Virginia state plan.  So I hope that answers

24  your question.

25     Q.  Do you view gender confirming care as optional

## DEPOSITION OF BILL J. CROUCH

Page 60

```
 1          So we're looking to possibly be in the red as I
 2     recall in 2024, which the lag is because the number
 3     changes, the match changes depending upon how the state
 4     does.  If the state is doing well economically, and West
 5     Virginia is doing well right now, then the match goes
 6     down because the federal approach to this is you're
 7     going to need less money if the state is doing well
 8     financially.  So we're looking at a very difficult time
 9     here I'm afraid in the next few years.  The governor has
10     said our budget will be flat for the next three years,
11     we will not increase our budget.  So I have concerns
12     about the Medicaid budget right now, we're going to work
13     through that as we need to.
14          But back to the issue of additional services.
15     I'm very concerned in terms of the budget adding to the
16     Medicaid budget at this point for anything.  It's a
17     difficult time looking forward with regard to Medicaid,
18     although again, the states still want financially.
19     Q.  You mentioned waiver services in your last
20     answer, what are those?
21     A.  Those are optional Medicaid services.  I'm
22     sorry, maybe I wasn't clear on that.  When you asked
23     what those optional services were, those waiver, what we
24     call waiver services are optional services that are not
25     required under the Medicaid program.
```

## DEPOSITION OF BILL J. CROUCH

Page 64

1        A.  No, I have not.

2        Q.  Have you ever consulted with an expert on care

3    for transgender people?

4        A.  No, I have not.

5        Q.  Are you aware of any research or analysis within

6    the Department regarding providing access to gender

7    confirming care for West Virginia Medicaid participants?

8        A.  No, I am not.

9        Q.  Have you had any internal discussions with staff

10    about the issue of gender confirming care?

11        A.  About the issue?

12        Q.  Mm-hmm.

13        A.  Only with the commissioner in preparation for

14    this deposition.

15        Q.  Okay.  Have you ever spoken with representatives

16    of any other Medicaid program about gender confirming

17    care?

18        A.  No, I have not.

19        Q.  Have you personally conducted any research about

20    the cost of providing gender confirming care?

21        A.  No, I have not.

22        Q.  Are you aware of any research within the

23    Department regarding the cost of providing gender

24    confirming care?

25        A.  No, I am not.

**DEPOSITION OF BILL J. CROUCH**

Page 65

1      Q.  Have you done any other work with respect to

2   this issue of gender confirming care beyond what I just

3   asked about?

4      A.  No, I have not.

5      Q.  Have you been involved in any litigation or

6   complaints related to the denial of gender confirming

7   care other than this case?

8      A.  No, I have not been.

9      Q.  Has the Department?

10          MS. CYRUS:  I'm going to object to the form

11   of the question.  If you know you can answer.

12      A.  I don't think so.  I think I would have known

13   about that and been involved in that, but I don't recall

14   any, no.

15      Q.  Are you aware of legislation or lobbying

16   surrounding the exclusion or coverage for medical care

17   for trans people?

18      A.  No, I am not.

19      Q.  Have you personally conducted any research or

20   analysis regarding the legality of the exclusion?

21      A.  No, I have not.

22      Q.  Are you aware of any research or analysis within

23   the Department regarding the legality of the exclusion?

24      A.  No, I'm not.

25      Q.  Okay.  I'm going to switch gears here a little

Page 71

1                    REPORTER'S CERTIFICATE
2

3

STATE OF MINNESOTA    )
4                            ) ss.
COUNTY OF WASHINGTON )

5

6      I hereby certify that I reported the Zoom deposition
of Secretary Bill J. Crouch on the 17th day of March
7  2022, and that the witness was by me first duly sworn to
tell the whole truth;

8

       That the testimony was transcribed by me and is a
9  true record of the testimony of the witness;
10     That the cost of the original has been charged to
the party who noticed the deposition, and that all
11 parties who ordered copies have been charged at the same
rate for such copies;

12

       That I am not a relative or employee or attorney or
13 counsel of any of the parties, or a relative or employee
of such attorney or counsel;

14

       That I am not financially interested in the action
15 and have no contract with the parties, attorneys, or
persons with an interest in the action that affects or
16 has a substantial tendency to affect my impartiality;
17     That the right to read and sign the deposition by
the witness was reserved.

18

       WITNESS MY HAND AND SEAL THIS 17th day of March
19 2022.
20

21

22           _Kelley E. Zilles_
23     _____
24     Kelley E. Zilles, RPR
       Notary Public, Washington County, Minnesota
25     My commission expires 1-31-2025

```
                                                       Page 1

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                     HUNTINGTON DIVISION

4      ----------------------------------------------------

5    Christopher Fain, individually and on behalf of all

6    others similarly situated, et al.,

7                  Plaintiffs,

8       vs.                    CIVIL ACTION NO. 3:20-cv-00740

9    William Crouch, et al.,

10                 Defendants.

11     ----------------------------------------------------

12

13

14      REMOTE DEPOSITION OF COMMISSIONER CYNTHIA BEANE

15

16

17   DATE:   March 29, 2022

18   TIME:   8:00 a.m. CST

19   PLACE:  Veritext Virtual Videoconference

20

21

22

23

24   REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25   JOB NUMBER:  5096149
```

```
                                                Page 2
 1                          APPEARANCES

 2

 3    On Behalf of the Plaintiffs (Via Videoconference):

 4           CARL CHARLES, ESQ.

 5           TARA L. BORELLI, ESQ.

 6           Lambda Legal Defense and Education Fund, Inc.

 7           158 West Ponce De Leon Ave., Suite 105

 8           Decatur, Georgia   30030

 9           470.225.5341

10           ccharles@lambdalegal.org

11           tborelli@lambdalegal.org

12

13           AVATARA SMITH-CARRINGTON, ESQ.

14           Lambda Legal Defense and Education Fund, Inc.

15           3500 Oak Lawn Avenue, Suite 500

16           Dallas, Texas   75219

17           214.219.8585

18           asmithcarrington@lambdalegal.org

19

20           NICOLE J. SCHLADT, ESQ.

21           Nichols Kaster PLLP

22           80 South 8th Street, Suite 4700

23           Minneapolis, Minnesota   55402-2224

24           612.256.3291

25           nschladt@nka.com
```

```
                                                      Page 3

 1          WALT AUVIL, ESQ.

 2          The Employment Law Center, PLLC

 3          1208 Market Street

 4          Parkersburg, West Virginia  26101

 5          304.485.3058

 6          auvil@theemploymentlawcenter.com

 7

 8    On Behalf of Defendants William Crouch; Cynthia Beane;

 9    and West Virginia Department of Health and Human

10    Resources, Bureau for Medical Services (Via

11    Videoconference):

12          KIMBERLY M. BANDY, ESQ.

13          LOU ANN S. CYRUS, ESQ.

14          Shuman McCuskey Slicer, PLLC

15          1411 Virginia Street East, Suite 200

16          Charleston, West Virginia  25301

17          304.345.1400

18          kbandy@shumanlaw.com

19          lcyrus@shumanlaw.com

20

21

22

23    NOTE:  The original deposition transcript will be

24    delivered to Tara Borelli, Esq., as the taking attorney.

25
```

**DEPOSITION OF CYNTHIA BEANE**

Page 13

1      A.  Yes.

2      Q.  We'll also be discussing managed care

3   organizations today.  What is a managed care

4   organization?

5      A.  Managed care organization is an insurance

6   organization that Medicaid uses to help manage our

7   population and the clients enroll into the managed care

8   organization to, to administer their benefits.

9      Q.  If I refer to a managed care organization by the

10  abbreviation MCO, will you know what I mean?

11     A.  Yes.

12     Q.  We'll also be talking today about the exclusion

13  of care in the West Virginia Medicaid program for

14  transgender people.  Are you familiar with the exclusion

15  being challenged in this case?

16     A.  Yes.

17     Q.  What's your understanding of that exclusion?

18     A.  We only exclude the surgery.  We cover other

19  transgender services such as the hormones, the

20  counseling that we do, it excludes the transgender

21  surgery.

22     Q.  If I refer to that as exclusion throughout the

23  day today, will you know what I mean?

24     A.  Yes, if you say exclusion of transgender

25  services, I'm going to assume you're talking about the

## DEPOSITION OF CYNTHIA BEANE

Page 14

```
 1   surgery.
 2        Q.  Thank you.  I'm also going to ask you questions
 3   today about medical treatment that transgender people
 4   receive for the purpose of treating gender dysphoria.
 5   If I refer to that as gender confirming care or gender
 6   affirming care, will you understand what I'm referring
 7   to?
 8        A.  Yes.
 9        Q.  We're here to take your deposition in two
10   capacities, the first is your deposition as an
11   individually named defendant in this case, do you
12   understand that?
13        A.  Yes.
14        Q.  Second we're here to take a deposition of an
15   organizational representative for BMS, do you understand
16   that?
17        A.  Yes.
18        Q.  And you've been designated as the organizational
19   representative to give testimony on certain topics that
20   we're going to discuss today.  Do you understand that
21   you've been designated for particular topics?
22        A.  I do.
23        Q.  I'll do my best to make clear when I'm asking
24   you questions in your individual capacity versus your
25   organizational representative capacity or both.  If that
```

## DEPOSITION OF CYNTHIA BEANE

Page 15

1   distinction is important to your answers, will you agree

2   to clarify that for me?

3       A.  Yes.

4       Q.  In this next set of questions I'll be asking

5   about your professional background for purposes of your

6   individual testimony and as an organizational

7   representative for BMS.  What is your current job title?

8       A.  I'm the commissioner for the Bureau of Medical

9   Services.

10      Q.  How long have you held that position?

11      A.  I've been in this position fully appointed since

12  2017 and before that I was acting commissioner for a

13  couple years.

14      Q.  Did you begin serving as acting commissioner in

15  approximately July 2014?

16      A.  Yeah, I guess I did.

17      Q.  Okay.  LinkedIn is a helpful thing.  You

18  mentioned being appointed to this role.  Let's start

19  with your acting commissioner role beginning in 2014.

20  Were you appointed as acting commissioner?

21      A.  At the time the commissioner had left abruptly

22  and I was a deputy commissioner and I was asked to take

23  the acting role and I did so.

24      Q.  Who asked you to take that role?

25      A.  Deputy Secretary Jeremiah Samples.

## DEPOSITION OF CYNTHIA BEANE

Page 16

1      Q.  And then in 2017 you became the commissioner.

2  Were you appointed to the role of commissioner in 2017?

3      A.  Appointed probably is not maybe the correct word

4  I should have used.  I was asked to take the role fully

5  in 2017 by then Secretary Crouch and to come out of the

6  acting role.  And the significance of that was it's

7  whether or not you're covered by Civil Service.  And so

8  at the time when the commissioner had left abruptly

9  before we were, we get new governors every four years,

10  and so I was kind of like not sure if I wanted to take

11  it knowing that there was a possibility I would not be

12  the chosen commissioner in a year and a half or so.

13      Q.  I see.  And so when you were asked to become

14  commissioner by Secretary Crouch you agreed in 2017?

15      A.  Yes.

16      Q.  And you referred to the prior commissioner

17  leaving abruptly.  Can you confirm that that didn't have

18  anything to do with the subject of this case?

19      A.  That had nothing to do with the subject of this

20  case.

21      Q.  Prior to becoming commissioner have you held

22  other roles within BMS or DHHR?

23      A.  Yes.  I have been with the Department since

24  2000.  Prior to becoming the acting commissioner I was

25  deputy commissioner and then for a number of years prior

## DEPOSITION OF CYNTHIA BEANE

Page 17

1    to that I was what we call a program manager 2 which I

2    was over several programs here in our home and community

3    based areas and different policy areas.  And when I

4    first came to Medicaid I managed several grants for

5    Medicaid and before I came to Medicaid I was with the

6    department, but it was the Department of Behavioral

7    Health Services.  That's kind of my history at the

8    department.

9        Q.  That's helpful.  Thank you.  I would like to see

10   if we can put approximate time frames, this isn't a

11   memory test, and so just do your best to remember the

12   time frames, but if we can establish just a rough

13   chronology for those roles.  Is it most helpful to go

14   backwards in time or is it more --

15       A.  Probably backwards since we've already gotten

16   like the commissioner down.  So I was acting till 2017,

17   I think I was probably asked to be acting around the

18   2014 area.  Prior to that I would have been deputy, so

19   deputy at least probably three years maybe, I think

20   2010, 2011 to 2014 I was deputy.  And then, and then I

21   was program manager for about a year, year and a half,

22   so that would have taken us to maybe 2009, 2008.  And

23   then I was, like I said, I was over some grants for

24   about a year and then prior to that I was at the Bureau

25   for Behavioral Health from like 2000 to 2007 I think.

**DEPOSITION OF CYNTHIA BEANE**

Page 31

1      Q.   And have any of the mediations that you've

2    participated in been related to the subject of this

3    lawsuit?

4      A.   No, they have not.

5      Q.   Let me make one clarification.  When I say

6    relating to the subject of this lawsuit, what I mean is

7    relating to care for transgender people.  Do your

8    answers remain the same with that clarification?

9      A.   My answer would remain the same.

10      Q.   I'd like to turn to some additional questions

11    that will relate to both your individual capacity as a

12    named defendant in this case and as an organizational

13    representative for BMS, is that agreeable?

14      A.   Yes.

15      Q.   What responsibilities fall within your role as

16    commissioner of BMS?

17      A.   So as commissioner of BMS I'm over a large

18    number of state employees that administer the Medicaid

19    program and we have to assure that the budgets are

20    adequate, the policies, the services, access to

21    services, and administer our state plan and administer

22    our waiver programs and assure our policies and

23    procedures are meeting federal guidelines.  I also have

24    to be able to communicate all of our services with our

25    stakeholders and be available for legislative requests

## DEPOSITION OF CYNTHIA BEANE

Page 32

1  and be the spokesperson for Medicaid services in West

2  Virginia.

3      Q.  Is it fair to say that you administer the

4  Medicaid program?

5      A.  Yes.

6      Q.  Do you recall any other duties or

7  responsibilities in your current role?

8      A.  I believe the answer I gave are a very broad

9  brush of all the things that I do here at Medicaid, you

10  know, all the leadership reports to me and there are

11  several different divisions under that and lots of

12  nuances when it comes to Medicaid, but yes, I make sure

13  we're administering the Medicaid program.  Medicaid is a

14  state and federal partnership.  West Virginia has a very

15  good rate when it comes to what our federal match is,

16  and so I make sure that we are not putting that federal

17  match at risk.

18      Q.  How do you perform the function of making sure

19  that the federal match is not being put at risk?

20      A.  Pretty much we follow CMS guidelines.  If CMS

21  directs us to do something, they mandate us to do

22  something, we make sure that we do it.  We update our

23  state plan as needed.  If we are to add a service, if

24  the legislature gives us additional monies to add a

25  service, we make sure before we do that that we have

## JA405

## DEPOSITION OF CYNTHIA BEANE

Page 33

1    CMS's permission to do it before we are collecting the

2    match for the services.

3        Q.  Who do you report to?

4        A.  I report to Deputy Secretary Samples and

5    Secretary Crouch.

6        Q.  Are there any others that you report to?

7        A.  Those two gentlemen are it.

8        Q.  Let me make sure that I get the name of the,

9    Secretary Crouch, can you repeat the other, the title

10   and the name of the other individual?

11       A.  Deputy Secretary Jeremiah Samples and Secretary

12   Crouch, Bill Crouch.

13       Q.  Thank you.  How often do you report on your work

14   to Secretary Crouch?

15       A.  Secretary Crouch has meetings, they've been a

16   little bit different since COVID just because things

17   just got kind of crazy busy with the pandemic, but he

18   has like weekly leadership meetings where all the

19   commissioners are there.  But then of course if I need

20   something from Secretary Crouch, for example, yesterday

21   I needed to make sure he signed something and so I, you

22   know, called him and, you know, made sure that he saw

23   that on his desk and signed it.  So the formal meetings,

24   about once a week.

25       Q.  And how often do you report on your work to

## DEPOSITION OF CYNTHIA BEANE

Page 34

1    Deputy Secretary Samples?

2        A.   Deputy Secretary Samples is also in those

3    leadership commissioner meetings as well and then Deputy

4    Secretary Samples is probably a little bit more in the

5    weeds with regards to some of the day-to-day services

6    just because, you know, that's his role to be more in

7    the weeds than the secretary with regards to some of the

8    day-to-day services.  And so I would say I talk to

9    Deputy Secretary Samples at least weekly.

10       Q.   Thank you.  How many people work for BMS?

11       A.   So currently we have about 85 positions filled,

12   but we have a number of vacancies right now as well.

13       Q.   Do you have an approximate sense of how many

14   vacancies you have?

15       A.   Probably about 20.

16       Q.   How many BMS employees do you supervise?

17       A.   Five direct supervision.

18       Q.   Okay.  And how many BMS employees report

19   directly to you?

20       A.   That's five report directly to me that I have

21   direct supervision over.

22       Q.   And what are the titles and names of those five

23   individuals?

24       A.   Becky Manning, she's my deputy of finance; Sarah

25   Young, she's my deputy of policy; Fred Lewis, he's my

## DEPOSITION OF CYNTHIA BEANE

Page 35

1    deputy of my managed care units and department of

2    integrity and pharmacy; Riley Romeo is my general

3    counsel; and Kim O'Brien is my assistant to the

4    commissioner, kind of support staff.

5         Q.  And what are the responsibilities of Ms.

6    Manning?

7         A.  She's my deputy of finance, she's the one who's

8    in charge of our six-year budget, anything financial

9    goes through the finance department.  Her department is

10   making sure that, you know, claims are getting paid, the

11   systems are working with regards to that and payments

12   are going out accordingly and anything finance related.

13        Q.  And what are the responsibilities of Ms. Young?

14        A.  She is my deputy commissioner of policy, she has

15   all the different policy units, whether it be, you know,

16   inpatient to outpatient to home and community based and

17   also is currently over some of our systems information

18   as well, meaning like our claims systems and different

19   systems.  And then, and then she also helps assist with

20   the human resources area, even though we have another

21   manager that reports to her and that helps with that as

22   well.

23        Q.  And what are the responsibilities of Mr. Lewis?

24        A.  He is over our quality units, our department of

25   integrity units, our pharmacy units, and our managed

## DEPOSITION OF CYNTHIA BEANE

```
                                                    Page 36
 1    care units.

 2        Q.  Are you aware that you have an online biography

 3    on the BMS Website?

 4        A.  I'm aware that something is up there, yes.

 5        Q.  All right.  Give me a moment to get our first

 6    exhibit marked.

 7        A.  It's been quite a while since I've read it, so.

 8        Q.  That tends to happen with biographies.

 9        A.  Am I supposed to be pulling up something or

10    doing something?

11        Q.  No.

12             MS. BORELLI:  Actually, let's go off the

13    record briefly.

14                  (A break was taken at 8:46 a.m.)

15                  (Exhibit 1 marked for identification.)

16    BY MS. BORELLI:

17        Q.  All right.  Commissioner Beane, please click on

18    the marked exhibits folder in Exhibit Share and open the

19    document that has been marked as Plaintiff's Exhibit 1.

20    Let me know when you're able to open the document.

21        A.  So after, my apologies, I'm clicking on the

22    folder that says marked exhibits, it doesn't appear that

23    anything is happening.  Should I click this downward

24    button?

25             MS. CYRUS:  I'm not seeing anything either,
```

## DEPOSITION OF CYNTHIA BEANE

Page 37

```
 1   Tara.
 2              MS. BORELLI:  All right.  Let's go off the
 3   record again.
 4              (A break was taken at 8:48 a.m.)
 5   BY MS. BORELLI:
 6      Q.  Commissioner Beane, please take a moment to
 7   review this document.
 8      A.  Okay.
 9      Q.  Is this on the BMS Website?
10      A.  Yes, I believe it is.
11      Q.  I'm going to read from the paragraph at the
12   bottom of the first page.  It states that you have, "Led
13   policy implementation or changes under the Affordable
14   Care Act (ACA) which enable approximately 165,000 West
15   Virginians to have healthcare coverage."  Did I read
16   that correctly?
17      A.  You did.
18      Q.  Is that an accurate description of your
19   responsibilities?
20      A.  Yes.
21      Q.  And if I refer to the ACA, will you understand
22   that I'm referring to the Affordable Care Act?
23      A.  Yes.
24      Q.  Does the sentence that I read from your
25   biography mean that BMS made policy changes to comply
```

## DEPOSITION OF CYNTHIA BEANE

Page 38

1    with the ACA?

2        A.  Yes.

3        Q.  What changes do you recall being implemented to

4    comply with the ACA?

5        A.  There was a requirement with the ACA around an

6    alternative benefit plan, what your benefit plan was

7    going to be through your expansion calculation.  There

8    was also mandated coverage in the ACA around your

9    tobacco cessation program and to assure that you were

10   offering full coverage of tobacco cessation, both the,

11   the pharmacist from a pharmacy benefit of tobacco

12   cessation as well as the counseling.

13       Q.  Apart from the alternative benefits for

14   expansion and the tobacco cessation, were there any

15   other changes that you recall being implemented to

16   comply with the ACA?

17       A.  There were lots of systems changes that we had

18   to make to comply with the ACA so we could enroll

19   individuals with the expanded benefit of enrolling

20   individuals at a different poverty level, up to 165

21   percent of the poverty level versus where we were prior,

22   that's what has caused the major expansion.  Those are

23   the broader brush areas in expanding for the ACA.

24       Q.  And as we discussed, your biography states that

25   you led policy implementation for changes under the

## JA411

## DEPOSITION OF  CYNTHIA BEANE

Page 39

1    Affordable Care Act, ACA.  What kind of work did you do

2    to lead policy implementation for changes under the ACA?

3         A.  One of the key areas that I was in charge of was

4    getting our alternative benefit plan approved by CMS.

5    So in your alternative benefit plan you had to decide

6    whether your benefit plan was going to mirror your state

7    plan for your expansion adults or look a little bit

8    differently, and still make the requirements that CMS

9    required for the alternative benefit plan.  So and then

10   our state did use some co-pays for alternative benefit

11   in our expansion and we added some co-pays as well.

12        Q.  And what was your role in implementing the

13   changes you just described?

14        A.  So I along with consultants that we use, Cole

15   Barry Dunn and myself had weekly calls with CMS and went

16   over our alternative benefit state plan and to assure

17   what we were submitting was meeting all the requirements

18   of the ACA.  And then after having several weekly calls

19   around the alternative benefit plan, we did a formal

20   submission and received approval from CMS around our

21   benefits.

22        Q.  And did you have any kind of unique role in the

23   work that you just described?

24        A.  Unique in meaning how, like I'm not sure if I

25   understand your question.

**DEPOSITION OF CYNTHIA BEANE**

Page 40

```
1      Q.  Let me rephrase.  Were you ultimately
2   responsible for the work that you just described,
3   implementing those policy changes under the ACA?
4      A.  Yes.
5      Q.  Your biography also refers to enabling
6   approximately 165,000 West Virginians to have healthcare
7   coverage through Medicaid.  Are those West Virginians
8   covered by Medicaid expansion under the ACA?
9      A.  Correct.
10     Q.  Can you explain what Medicaid expansion is?
11     A.  So expansion is what I was talking about and
12  these are the individuals that would have the
13  alternative benefit plan.  These are adults 19 through
14  64 and your financial eligibility is raised prior to
15  that.  Adults are, I don't know recall our exact federal
16  poverty level that we had, you know, after expansion.  I
17  believe, and I might have this wrong, I think it's
18  165 percent now the federal poverty level, it's been a
19  long time since I looked at it, but I believe it's 165,
20  we go up to 165 percent of the federal poverty level for
21  expansion adults.
22     Q.  So is it fair to say then that prior to the ACA
23  there were certain poverty level requirements to qualify
24  for Medicaid and after the ACA, the poverty level
25  requirements were raised so that individuals or families
```

**DEPOSITION OF CYNTHIA BEANE**

Page 41

1    could have more income and still qualify for Medicaid,

2    is that a fair description?

3        A.  Fair description.

4        Q.  Okay.  How many total participants are there in

5    West Virginia Medicaid?

6        A.  Currently our totals are continuing to go up.

7    Because we are under the pandemic requirements we are

8    not able to, during the pandemic you're not allowed to

9    dis-enroll anybody off the Medicaid rolls.  And

10   typically on Medicaid you have turn where people turn

11   off yearly, you know, they don't turn in their paperwork

12   or they might, you know, seek employment and no longer

13   meet that federal poverty level guideline or for a

14   number of reasons they might fall off our rolls.  During

15   the pandemic you are not allowed to take anybody off

16   your rolls, even if they no longer qualify.  So last

17   time I looked our numbers are up to around 615,000.

18   Typically we're around, prior to the pandemic around

19   520,000, 525,000, there's always some fluctuation.

20       Q.  And the 615,000 figure that you just mentioned,

21   does that include the 165,000 current participants

22   covered through Medicaid expansion under the ACA?

23       A.  That would include our expansion of adults as

24   well.  So when you say 165,000, it's always a rolling

25   kind of number, you know, people come on, they come off.

**JA414**

**DEPOSITION OF CYNTHIA BEANE**

Page 45

```
 1   example, we don't cover hearing aids, we make sure that
 2   those codes are not covered.  And we also, the MCO's
 3   know that that is not a covered benefit as well, so they
 4   will not cover it.  However, the MCO's have the
 5   authority to cover additional services that are not in
 6   our benefit if they choose to cover them as a value
 7   added service.
 8      Q.  If Medicaid began covering gender affirming care
 9   in the future, would you oversee in any capacity the
10   implementation of that policy?
11          MS. CYRUS:  Object to the extent it calls
12   for speculation.  But if you know, you can answer.
13      A.  So we do cover gender affirming care with
14   regards to counseling and hormone therapy, we just don't
15   cover the surgery.
16      Q.  And if the West Virginia Medicaid program were
17   to begin covering gender affirming surgery in the
18   future, would you have any oversight over that policy
19   change?
20          MS. CYRUS:  Same objection.  But you can
21   answer if you know.
22      A.  If we would cover in the future then I would
23   review the policy before it went up for public comment
24   and then, and then, you know, approve the policy and
25   then confirm with CMS whether or not it would require a
```

**JA415**

## DEPOSITION OF CYNTHIA BEANE

Page 46

1    state plan change before we began the coverage.

2        Q.  Thank you.  This paragraph also states that you

3    ensure compliance with federal regulations.  Do your

4    responsibilities in that capacity include ensuring

5    compliance with the Affordable Care Act?

6        A.  Yes.

7        Q.  Do your responsibilities also include ensuring

8    compliance with the Medicaid Act?

9        A.  Yes.

10       Q.  Okay.  I'm at a potential breaking point, but

11   would be happy to keep going if you would like to

12   continue.  Commissioner Beane, would you like a break or

13   would you like to press on for a while?

14       A.  I'm fine for a little while.  Probably in about

15   a half hour my coffee will start calling, so I can

16   probably go for a little while longer.

17       Q.  Great, let's do that.  I'd now like to turn to

18   your testimony in your capacity as the organizational

19   representative for BMS.  At what point were you notified

20   that you would be giving testimony as BMS's

21   organizational representative?

22       A.  I can't remember the day that, I mean, I

23   honestly don't remember the date that we were notified

24   of the suit, whenever the suit came up and I was

25   notified, I don't remember the date.

## DEPOSITION OF  CYNTHIA BEANE

Page 58

1      Q.   Great.  And we will deal with them again as they

2   come up today.  Let's go back to the same exhibit,

3   Plaintiff's Exhibit 2, and please scroll to Page 3 for

4   me, and in particular look for Topic 3 at the top of the

5   page.

6      A.   Yes.

7      Q.   Thank you.  Topic 3 is, "Your choice to

8   participate in the Medicaid program."  Did I read that

9   correctly?

10     A.   You did.

11     Q.   Are you prepared to testify about this topic?

12     A.   Yes.

13     Q.   With respect to Topic 3 specifically, what did

14  you do to prepare to testify today?

15     A.   I just recognize the history of the Medicaid

16  program and then my work experience and knowledge helps

17  me prepare for Topic 3.

18     Q.   Thank you.  When was BMS originally formed as an

19  agency?

20     A.   West Virginia has participated in the Medicaid

21  program since its inception, and that was a little over

22  50 years ago.  So Medicaid has been in West Virginia

23  since Medicaid was offered as a federal/state

24  partnership.

25     Q.   And when was BMS formed as an agency, was it

## DEPOSITION OF CYNTHIA BEANE

Case 3:20-cv-00740   Document 250-13   Filed 05/31/22   Page 24 of 69 PageID #: 1818

Page 59

1  formed when West Virginia began participating in

2  Medicaid approximately 50 years ago?

3  A.  I do not know the exact year that the Bureau for

4  Medical Services was called a bureau on its own.  My

5  assumption might be that it was soon after they started

6  participating in the Medicaid program.

7  Q.  And you said that West Virginia has been

8  participating since the inception of the Medicaid

9  program.  My understanding is that the Social Security

10  Act title authorizing Medicaid was enacted in 1965.

11  Does 1965 sound like the approximate year or time frame

12  that West Virginia began participating in Medicaid?

13  A.  Yes.

14  Q.  Do you know why West Virginia initially decided

15  to participate in the Medicaid program?

16  A.  To serve our most vulnerable citizens and be a

17  part of the federal/state partnership with regards to

18  covering healthcare.

19  Q.  Why does West Virginia currently participate in

20  the Medicaid program?

21  A.  To serve our most vulnerable citizens and to

22  take advantage of the federal/state partnership of

23  assuring healthcare access to the most vulnerable West

24  Virginians.

25  Q.  And do those reasons also apply to transgender

## DEPOSITION OF CYNTHIA BEANE

Page 60

```
1   people?
2        A.  Yes.
3        Q.  I'd like to go ahead and introduce our next
4   exhibit.  I'll let you know when to click on the folder
5   to pull it up.
6                  (Exhibit 3 marked for identification.)
7        Q.  All right.  Commissioner Beane, if you click on
8   the marked exhibits folder you should be able to open
9   the document that has been marked now as Plaintiff's
10  Exhibit 3.  Let me know when you've had an opportunity
11  to open that document.
12       A.  I have it open.
13       Q.  You can see the title on the first page that
14  says, "Medicaid 101"?
15       A.  Yes.
16       Q.  Do you recognize this document?
17       A.  Yes, I do.
18       Q.  Is this a publication of BMS?
19       A.  Yes.
20       Q.  Please turn to Page 3 as indicated in the lower
21  left-hand corner of the document.
22       A.  I'm there.
23       Q.  I'm going to read the first paragraph on that
24  page, please read along with me, "State Medicaid
25  programs are often seen as low-hanging fruit when
```

## DEPOSITION OF CYNTHIA BEANE

Page 61

1   financially strapped states are forced to make budget

2   cuts, however, thanks to the FMAP" --

3       A.  Wait, hold on, I'm sorry, I don't know where

4   you're at.  Okay, I'm sorry, I was at a different part

5   of the page.  I'm with you now.

6       Q.  Okay.  Perfect.  I'm going to start again just

7   for clarity, "State Medicaid programs are often seen as

8   low-hanging fruit when financially strapped states are

9   forced to make budget cuts, however, thanks to the

10  FMAP" --

11          MS. BORELLI:  And for the court reporter,

12  that's an abbreviation, an acronym that is F-M-A-P.

13      Q.  "However, thanks to the FMAP, Medicaid spending

14  acts as a tremendous financial boom for the state.  The

15  Kaiser Commission on Medicaid and the uninsured recently

16  compiled findings from 20 million different studies

17  examining the economic impact of Medicaid spending and

18  found that in all studies examined Medicaid spending had

19  a positive impact on local economies.  These studies

20  also found that Medicaid spending generates economic

21  activity within the state by providing jobs, personal

22  income and state tax revenues.  While most state

23  government expenditures reallocate spending from one

24  sector to another, Medicaid is one of the few state

25  government spending opportunities that guarantee to pull

## DEPOSITION OF CYNTHIA BEANE

Page 62

```
1    in money from outside the state and directly benefit the
2    local economy."  Did I read that correctly?
3         A.  Yes, you did.
4         Q.  Does that accurately describe the benefits of
5    participating in Medicaid?
6         A.  That is one of the benefits of participating in
7    the Medicaid program.
8         Q.  What are the other benefits of participating in
9    the Medicaid program?
10        A.  It provides access to healthcare to individuals
11   who otherwise would have no healthcare.
12        Q.  Are there any other benefits you can think of?
13        A.  Those are the two big ones.
14        Q.  Does West Virginia decide on an annual basis to
15   continue participating in Medicaid?
16        A.  There is no annual attestation or anything to
17   CMS around participating, we just continue our
18   participation.
19        Q.  Does West Virginia have to take any steps on an
20   annual basis to continue its participation?
21        A.  We have to consistently report and do all the
22   things that CMS requests us to do in order to continue
23   our participation in the Medicaid program, and
24   accounting for funds is one of the big reports that we
25   do.
```

## DEPOSITION OF CYNTHIA BEANE

Page 68

```
1      Q.  And does the Medicaid plan outline policies to
2   ensure the state Medicaid program receives matching
3   federal funds through CMS?
4      A.  Yes.  So the state plan not only has the policy
5   pages, but it also has like the financial pages with
6   each state plan as well that kind of outlines what the
7   predicted costs will be and sometimes, sometimes it will
8   have actually the rates or sometimes it will just be a
9   rate methodology.
10     Q.  Just to make sure I clarify one more
11  abbreviation for the record because I can't recall if we
12  have previously, does the abbreviation CMS refer to the
13  United States Centers for Medicare and Medicaid
14  Services?
15     A.  Yes.
16     Q.  Does the Medicaid plan outline how the Medicaid
17  program is implemented in West Virginia?
18     A.  Yes, it gives you a broad outline of
19  implementation, but then we also have policy manuals
20  that give you a more detailed view.  If you're a
21  provider, more than likely you're going to look at the
22  policy manual and be able to see versus the state plan
23  just because how it's laid out, the policy being more
24  directed towards what providers need to know with
25  regards to, you know, how to bill, you know, what codes
```

## JA422

**DEPOSITION OF CYNTHIA BEANE**

Page 69

```
 1   are covered and some more of the details are in the
 2   policy manuals.  The state plan gives you the authority
 3   to be able to publish those details.
 4        Q.   And are those policy manuals considered to be
 5   part of the state plan or are they considered to be
 6   separate documents?
 7        A.   They're separate, but they have to follow your
 8   state plan, meaning I can't have a policy manual for us
 9   to cover acupuncture because I don't have a state plan
10   saying that I'm approved to cover acupuncture.
11        Q.   Does BMS prepare the Medicaid plan?
12        A.   Yes, we prepare the state plans.
13        Q.   And did you approve the Medicaid plan?
14        A.   I have not approved every state plan because, as
15   I said, they're historical.  So, for example, before I
16   came to BMS, inpatient hospitalization is a state plan
17   that has been there for years and so, but as we update
18   or make changes, those would be the things that I would
19   be approving.
20        Q.   And does Secretary Crouch also approve those
21   updates or changes to the Medicaid plan?
22        A.   Once we do a state plan, which would require a
23   public notice, public comment, we also go through our
24   medical advisory council, they are advisory in nature,
25   but we give the state plans to them and they take a
```

**JA423**

## DEPOSITION OF CYNTHIA BEANE

Page 74

1      Q.   When the Medicaid program began covering hormone

2    therapy for gender confirming care, did that require a

3    change to the Medicaid plan?

4      A.   That did not require a change because we already

5    covered those drugs.   This removed the gender edit.

6      Q.   I see.   So because hormone therapy was already

7    covered for non-transgender people, allowing coverage

8    for gender confirming care didn't require a change to

9    the Medicaid plan, is that correct?

10            MS. CYRUS:   Object to the form of the

11    question.   But you can answer, go ahead.

12      A.   We have a pharmacy benefit and so we already

13    cover, you know, all those medications in our pharmacy

14    benefit, it was just a simple removing an edit based on

15    gender, and the pharmacy benefit is already approved by

16    CMS.

17      Q.   And when the gender edit was removed so that, so

18    that hormone therapy could be received for gender

19    affirming care, did that require approval from CMS?

20      A.   No, because we were already approving, we

21    already had approval to cover that medication, we just

22    removed the gender edit.

23      Q.   And a follow-up question to our discussion a

24    little bit earlier.   What happens when West Virginia

25    Medicaid wants to initiate a plan, a change to the

## DEPOSITION OF CYNTHIA BEANE

Page 79

1  for West Virginia Medicaid participants, your

2  organizational structure, including its units, divisions

3  and departments."  Did I read that correctly?

4      A.  Yes.

5      Q.  Are you prepared to testify about this topic?

6      A.  Yes.

7      Q.  With respect to Topic 15 specifically, what did

8  you do to prepare to testify today?

9      A.  I just went over in my head the organizational

10  chart.

11      Q.  And you testified that Medicaid is a joint

12  federal and state program, correct?

13      A.  Correct.

14      Q.  Can you explain what that means?

15      A.  Meaning that all of our dollars are matched by

16  the federal match.  And so right now our match due to

17  the pandemic is around 81 percent, so, you know, you can

18  look at it for every $0.19 that the state of West

19  Virginia puts in, the federal government puts in $0.81.

20  Typically our match is around this, you know, 74, 75, so

21  it's like a 3 to 1 match.

22      Q.  That's helpful.  Is BMS a single state agency

23  authorized to administer the Medicaid program in West

24  Virginia?

25      A.  Yes.

## DEPOSITION OF CYNTHIA BEANE

Page 81

```
 1      Q.  Does BMS serve any other purpose?
 2      A.  Other than to enact the Medicaid program, no.
 3      Q.  And would you describe BMS as having a mission?
 4      A.  Yes.
 5      Q.  And how would you describe the mission of BMS?
 6      A.  The mission of BMS, and this is probably not
 7  going to totally match the mission statement that's
 8  online if you're going to pull it up later, but the
 9  mission of BMS is to assure quality healthcare and
10  access to healthcare to West Virginians and to be good
11  stewards of the state dollar and be good stake, and be a
12  good partner with all our stakeholders.
13      Q.  Does West Virginia Medicaid offer coverage on a
14  fee for service basis?
15      A.  We do.
16      Q.  What does that mean?
17      A.  So the Medicaid program right now, about
18  85 percent of all of our members are with a managed care
19  organization, meaning that managed care organization
20  that they sign up for and they get to choose which one
21  they want will help them with their benefits, will help
22  assist them, will pay their claims and will make sure
23  that they have access to all the Medicaid services and
24  help them with access if they have problems like finding
25  a doctor or something like that.
```

## DEPOSITION OF CYNTHIA BEANE

Page 82

```
 1        And then our long-term care services and some of
 2   our other services, our pharmacy services, is carved out
 3   in a fee for service environment.  A fee for service
 4   environment is an environment of Medicaid where you go
 5   to the doctor and Medicaid simply pays that claim on a
 6   fee for service basis.  If you're in managed care what a
 7   Medicaid agency does is we have actuarially sound rates
 8   that we pay the managed care companies, like a per
 9   member per month rate in order to manage all your care
10   and then they have to pay the claim on more of the fee
11   for service basis or whatever arrangement they have made
12   with that provider.
13      Q.  Is it fair to say then that fee for service care
14   results in the medical provider being paid directly by
15   the state?
16      A.  Yes.  The fee for service care, your contract is
17   directly with the Medicaid agency and your claim is
18   being paid through our fiscal agent right now is
19   Gainwell.
20      Q.  Whereas for members who are enrolled in an MCO,
21   their medical providers get paid through the MCO, is
22   that correct?
23      A.  Correct.
24      Q.  And does the state enter contracts with those
25   MCO's to provide Medicaid benefits to participants
```

**JA427**

## DEPOSITION OF CYNTHIA BEANE

Page 83

1  enrolled through the MCO?

2      A.  We do.

3      Q.  And are those contracts entered annually?

4      A.  Yes.

5      Q.  Is Mountain Health Trust the name of West

6  Virginia's, a West Virginia Medicaid's managed care

7  program?

8      A.  Yes.

9      Q.  So Mountain Health Trust is distinct from fee

10  for service, correct?

11     A.  Yes.

12     Q.  And the MCO's within the managed care program

13  include UniCare, The Health Plan of West Virginia, and

14  Aetna Better Health of West Virginia, correct?

15     A.  Yes.

16     Q.  Are there any other MCO's besides the three that

17  I've just named?

18     A.  We only have the three MCO's currently.

19     Q.  You testified that BMS enters into contracts

20  with the MCO's to provide care to Medicaid participants,

21  correct?

22     A.  Correct.

23     Q.  Do those contracts require the MCO's to exclude

24  gender affirming care?

25              MS. CYRUS:  Object to the form of the

## DEPOSITION OF CYNTHIA BEANE

Page 84

1   question.  But you can answer.

2       A.  I do not believe that it requires them to

3   exclude it, however, it would not be considered in their

4   rate.  And so one of the things with managed care is a

5   managed care company can choose to cover things that are

6   not necessarily in the Medicaid benefit, meaning managed

7   care companies can cover things that we don't cover.

8           So, for example, at one time one of the managed

9   care companies, and they might still be doing this, I

10  honestly can't remember, was covering eyeglasses.  We

11  currently don't cover eyeglasses for people with like

12  farsighted, nearsighted, we refer them to, you know,

13  other areas like a Lions Club or something like that for

14  coverage.  And so one of the MCO's at one time was

15  advertising that that was like one of their value added

16  services, so, you know, choose us as your managed care

17  company and here's an additional service that we might

18  be able to provide you.

19      Q.  Are you aware of any MCO's offering as

20  additional services outside of their Medicaid

21  reimbursable care gender affirming surgery?

22      A.  I do not believe so.

23      Q.  I'm going to have us take a moment now to look

24  at our next exhibit.  So if you can click on the marked

25  exhibits folder and open the document that has been

**DEPOSITION OF CYNTHIA BEANE**

Page 88

1    surgery would not be considered in that rate, but once I

2    give that money over to the MCO and they have that $400

3    a month, they have to cover all the benefits that are

4    required, but if they want to cover additional benefits

5    that we don't cover here, they wouldn't be penalized

6    other than it's not in their current rate, they would

7    have to say they're going to do it based on their

8    management of the program.

9         Q.  So in other words, BMS will not cover what this

10   document refers to as sex transformation procedures,

11   correct?

12             MS. CYRUS:  Object to the question.  But go

13   ahead.

14        A.  Correct.

15        Q.  And if the MCO's did want to cover that care,

16   specifically gender affirming surgery, they would have

17   to come up with their own money to do so, is that

18   correct?

19        A.  Yes.  It would, it would be within the rates

20   that we give them, but it would not constitute what,

21   what the actuaries use to bill their rate.

22        Q.  Let me make sure I'm understanding what you're

23   saying.  So let me go back to first principles.  I think

24   I heard you say gender affirming surgery is a noncovered

25   service for BMS, correct?

## DEPOSITION OF CYNTHIA BEANE

Page 89

```
 1      A.  Correct.
 2      Q.  And so when BMS negotiates with the MCO's for
 3  the amount of money that they will receive from BMS to
 4  cover all of the required care, that calculation does
 5  not include any money to cover gender affirming
 6  surgeries, correct?
 7      A.  Correct.
 8      Q.  And if the MCO's wanted to cover gender
 9  affirming surgeries, they would need to come up with
10  their own money, correct?
11      A.  Yes, they would use their own money.  So can I
12  give like an example --
13      Q.  Sure.
14      A.  -- what this would be?  So I'm going to use like
15  two examples.  So we don't cover acupuncture, it's not a
16  benefit in our state plan that we cover, it would not be
17  in the rates.  But let's say the MCO saw a benefit and
18  covered acupuncture, that if we cover acupuncture we're
19  not going to have to do as many back surgeries and in
20  the long run it's going to be a cost-saving to us, which
21  in the end a managed care company is going to look at
22  that financial obligation in their businesses, so
23  they're going to try to make as much money as they can
24  with regards to still providing the services they have
25  to provide, but also any cost savings that they have up
```

## JA431

**DEPOSITION OF CYNTHIA BEANE**

Case 3:20-cv-00740   Document 250-13   Filed 05/31/22   Page 38 of 69 PageID #: 1832

Page 90

1   to a certain point then they can use as profit.  So if

2   they determine that by covering acupuncture, even though

3   it's not something that is in our rate, will benefit us

4   and actually save us money, they can do that.

5        So for gender affirming care the assumption

6   would be, perhaps, I don't know, if they wanted to cover

7   the surgery and maybe this person wouldn't require as

8   much counseling later, then they might decide to do

9   that.  I do not believe any of them have.

10       Q.  Correct.  So to your knowledge none of the MCO's

11   are in fact covering gender affirming surgery using

12   their own funds?

13       A.  Correct.

14       Q.  Okay.  Why does the exclusion that we reviewed

15   together refer to hormone therapy when West Virginia

16   Medicaid provides access to that care?

17       A.  I believe that that was a historical thing that

18   was in there at one time.  Our MCO's did cover the

19   pharmacy benefit, they have not covered our pharmacy

20   benefit for a number of years now, and so I just believe

21   it's something in the, it's a very long contract that

22   just wasn't caught when we were renewing the contracts

23   and had them signed off year after year.

24       Q.  That's helpful.  What I'd like to do is really

25   quickly see if we can establish that there are similar

**DEPOSITION OF CYNTHIA BEANE**

Page 93

1   once you've familiarized yourself with what it is?

2       A.  It appears to be the contract with The Health

3   Plan.

4       Q.  So this is the 2021 BMS contract with The Health

5   Plan, correct?

6       A.  Correct.

7       Q.  Sorry, was that a yes?

8       A.  Yes.  I'm sorry, I said correct.  Can you all

9   hear me again, am I mumbling?

10      Q.  Every once in a while the volume gets lower,

11  which I do as well, so we'll both try and speak up.  But

12  thank you, Commissioner Beane.  So we just reviewed

13  three contracts I believe all dated 2021.  Are there

14  contracts in place right now for the year 2022 with

15  Aetna, UniCare and The Health Plan?

16      A.  I'm sure there are.  There's usually a delay in

17  signatures, so, but of course we have contracts.

18      Q.  And would those contracts contain the same

19  provisions that we reviewed in the 2021 Aetna contract

20  providing that BMS will not cover gender affirming

21  surgery?

22      A.  I believe so.

23      Q.  Apart from the fee for service option, the

24  managed care option, those are two -- let me say that

25  again more clearly.  Apart from the fee for service

## DEPOSITION OF CYNTHIA BEANE

Page 101

1    through the EPSDT request?

2        A.  Correct.

3        Q.  We talked I think earlier about FMAP, and let's

4    just review that again briefly to make sure that we

5    understand what it is.  What is the Federal Medical

6    Assistance Percentage?

7        A.  It is the match rate, meaning the percentage of

8    federal dollar that we get with regards to what the

9    state rate is.  So when we talked earlier, and I'm

10   rounding, but we're usually around this percentage, it's

11   usually like a 3 to 1.  But it does vary, you know,

12   sometimes it's 74.19 one year, sometimes it might be

13   75.20, you know, so it's around that usually for West

14   Virginia Medicaid.

15           There are times when the FMAP is different.  The

16   FMAP for the expansion population is a 90/10 FMAP

17   according to -- and that was in the ACA.  So when we

18   first expanded that was actually at 100 percent and it

19   went down at 30 years and it levels out at a 90/10 match

20   for your expansion population.  But right now because of

21   the pandemic in general I'm around an 81 percent of FMAP

22   because there's an enhanced FMAP right now due to the

23   pandemic and the inability, it's to help pay for all the

24   extra people that are on the Medicaid rolls that are not

25   screened off.

## DEPOSITION OF CYNTHIA BEANE

Page 110

1   the document has the Bates stamp DHHRBMS020685.  Do you

2   see that?

3       A.  Yes.

4       Q.  And do you recognize this document?

5       A.  Yes.

6       Q.  Does it appear to be a table showing the monthly

7   number of Medicaid members for 2022?

8       A.  Yes.

9       Q.  And does this appear to be formatted in a

10  similar table to the one that we just reviewed?

11      A.  Yes.

12      Q.  And does this table indicate that in March of

13  2022 there were a total number of 628,825 Medicaid

14  members?

15      A.  Yes.

16      Q.  And based on the numbers that you just reviewed,

17  your best estimate of the current number of Medicaid

18  participants is still 615,000 approximately, is that

19  correct?

20      A.  It looks like I was a little off, it's 628.

21      Q.  So 628.  And I recognize we're still in the

22  month of March, I'm not sure if there's much fluctuation

23  within a month or not, but is the number in this chart

24  for March of 2022, to your knowledge does that remain

25  accurate for the approximate number of total Medicaid

**JA435**

**DEPOSITION OF CYNTHIA BEANE**

Page 131

```
 1      Q.  Okay.  Let me pause just a moment.  Okay.  And
 2   do you see below that a request No. 1 that reads,
 3   "Identify all persons with involvement in or knowledge
 4   of the creation, review and maintenance of the exclusion
 5   of coverage for gender confirming care in the health
 6   plans offered through West Virginia's Medicaid program"?
 7            MS. CYRUS:  Let me state an objection on
 8   the record to the extent that she has not been
 9   designated to testify to that interrogatory as a 30(b)
10   witness, but of course you can ask her as a fact
11   witness.
12            MS. BORELLI:  Thank you, Lou Ann.
13      Q.  Did I read that correctly?
14      A.  Yes.
15      Q.  And if you scroll to Page 2, do you see that
16   you've been identified as somebody knowledgeable on that
17   topic?
18      A.  Yes.
19      Q.  When was the exclusion first created?
20      A.  I do not know when it was first created.  I know
21   that it has been here ever since I've been at Medicaid
22   and I believe in researching all this I think the
23   earliest we found it was maybe in a policy back in 2004.
24      Q.  Okay.  Do you know why the exclusion was
25   created?
```

**DEPOSITION OF CYNTHIA BEANE**

Page 132

1    A.  I do not know, I wasn't here.  I think it's, I

2  think it's in a policy manual listed with a bunch of

3  different exclusions.

4    Q.  Are you aware of anyone who would know why the

5  exclusion was created?

6    A.  There is no one here that would know.  Our

7  turnover in staff does not allow for people to have been

8  here that long pretty much, but no, I don't know anybody

9  that would know.

10    Q.  So you aren't familiar with the process that led

11  to the creation of the exclusion?

12    A.  I'm not.

13    Q.  And are you familiar with what might have been

14  considered at the time the exclusion was created?

15    A.  I don't know.  It would just be speculation that

16  they were just going down a list of services that were

17  not covered at the time.

18    Q.  And has BMS reviewed whether to maintain the

19  exclusion since it was created?

20    A.  I'm sorry, I can't hear your question.

21    Q.  Has BMS reviewed whether to maintain the

22  exclusion since it was created?

23    A.  We have not reviewed that particular policy.

24    Q.  So can you then tell me a little bit about how

25  exclusions work.  Do exclusions remain in the Medicaid

## DEPOSITION OF CYNTHIA BEANE

Page 137

1     Q. So just before a break we were having a

2 technical issue with the document that was introduced as

3 Plaintiff's Exhibit 15. We think we have resolved the

4 issue by uploading a duplicate of the same document,

5 which should now be in your exhibits folder as

6 Plaintiff's 16. So the record will reflect that the

7 documents are the same and that exhibit appears twice as

8 15 and 16 because of this technical issue.

9         Commissioner Beane, are you now able to open up

10 what's marked as Plaintiff's Exhibit 16?

11     A. I have opened it.

12     Q. Please take a moment to review the document and

13 let me know when you are done.

14     A. I've looked at it.

15     Q. Have you seen this document before?

16     A. I have.

17     Q. Did you review it in connection with your

18 testimony as BMS's organizational representative today?

19     A. I did.

20     Q. You've been designated to testify about the

21 response to interrogatory No. 2. Please turn to Page 2

22 of the document. In approximately the middle of the

23 page you'll see text that reads, "No. 2, describe in

24 detail the factual basis for each governmental interest

25 that defendants contend supports the exclusion." Did I

## DEPOSITION OF CYNTHIA BEANE

Page 138

1    read that correctly?

2        A.  You did.

3        Q.  And the response reads, "These defendants state

4    that they provide coverage that is mandated for coverage

5    by the Centers of Medicare and Medicaid Services (CMS).

6    These defendants are constrained by budgetary/cost

7    considerations."  Did I read that correctly?

8        A.  You did.

9        Q.  And are you prepared to testify about this

10   interrogatory as the organizational representative for

11   BMS?

12       A.  I am.

13       Q.  With respect to interrogatory 2 specifically,

14   what did you do to prepare to testify today?

15       A.  I went back and made sure we didn't have a SHO

16   letter, a State Health Officer letter, mandating us to

17   cover the service and, and reviewed our budget to make

18   sure that, well, to make sure that I was aware of when

19   we were going into our budget deficient.

20       Q.  So referring to the response to interrogatory 2

21   that I read a moment ago, is that an accurate

22   description of the governmental interest in the

23   exclusion?

24       A.  I'm sorry, what?

25       Q.  Were you having trouble hearing me or is it that

## DEPOSITION OF CYNTHIA BEANE

Page 139

1    you would --

2        A.  Can you say the question again, I was having

3    trouble hearing you.

4        Q.  No problem.  I'll repeat.  Referring again to

5    the response to interrogatory 2 that I read a moment

6    ago, is that an accurate description of the governmental

7    interest in the exclusion?

8        A.  Yes, we have no mandate from CMS to provide the

9    coverage.

10       Q.  And does that response to interrogatory 2

11   constitute a complete description of all of the

12   governmental interest being claimed in the exclusion, it

13   does, correct?

14       A.  Correct.

15       Q.  What is the factual basis for the statement in

16   response to interrogatory 2 that defendants, "Provide

17   coverage that is mandated for coverage by the Centers

18   for Medicare and Medicaid Services"?  Let me repeat,

19   what is the factual basis for that assertion?

20       A.  So Medicaid has mandated coverages that CMS

21   assured that we have state plans for and that we are

22   covering those services.  And so if there's a service

23   that they are mandating all 50 states and territories to

24   cover that not all 50 states and territories are

25   covering, they will send out what's called the State

## JA440

## DEPOSITION OF CYNTHIA BEANE

Page 140

```
1   Health Officer letter and it will direct us to add that

2   coverage.

3        Q.  I think you said a moment ago that you looked to

4   see if there was a SHO letter, I assume that's the

5   abbreviation S-H-O, correct?

6        A.  Correct.

7        Q.  And that abbreviation refers to State Health

8   Officer letter?

9        A.  Correct.

10       Q.  And a SHO letter is a letter that's sent by CMS,

11  is that correct?

12       A.  Correct.

13       Q.  And you said a SHO letter might be sent if

14  there's a mandated service that a state Medicaid program

15  is not covering, correct?

16       A.  Correct.  So the most recent example that we

17  have of that, which is fairly recent because sometimes

18  you can go quite a while without having it, is the

19  medication assisted treatment services.  Every state is

20  mandated to cover all forms of MAT services, and so if

21  your state was not previously covering all those

22  services, you had to do a state plan.  Or if you were

23  covering these services but they were not outlined

24  correctly in your state plan, you had to revise your

25  state plan to assure CMS that you were covering those
```

## DEPOSITION OF CYNTHIA BEANE

Page 141

1   services without any kind of restrictions that would not

2   allow individuals to receive those MAT services.

3       Q.  And did you just use the abbreviation MAT?

4       A.  Yeah, that's medication assisted treatment

5   services, it's services for persons who are with

6   substance use disorder.

7       Q.  Understood.  So you said in connection with

8   preparing to testify as the organizational

9   representative today you looked to see if CMS had sent a

10  SHO letter to BMS about gender affirming surgery, is

11  that correct?

12      A.  Correct.

13      Q.  And did you find any such letter?

14      A.  I did not.

15      Q.  Are there any other facts that you're aware of

16  that support the governmental interest, which is again,

17  to quote, "Defendants state that they provide coverage

18  that's mandated for coverage by CMS," are there any

19  other facts that support that governmental interest?

20      A.  I cannot find any directive from CMS telling me

21  I have to cover this service.  If there was, we would

22  have to cover the service or lose billions of dollars,

23  and we would not be able to put that at risk.

24      Q.  Understood.  And are there any other facts that

25  you're aware of that are related to that interest?

## DEPOSITION OF CYNTHIA BEANE

Page 142

1     A.  Not that I'm aware of.

2     Q.  So I think you testified earlier that counseling

3  is covered for treatment of gender dysphoria through the

4  Medicaid program, is that right?

5     A.  Correct.

6     Q.  Do you have knowledge of why counseling is

7  covered for gender dysphoria?

8     A.  We do not have a restriction on the diagnosis

9  code of why you might seek counseling, it might be for

10 situational depression, it might be for schizophrenia,

11 it could be for gender dysphoria, it could be for a

12 variety of reasons.

13    Q.  And who made the decision to allow coverage for

14 counseling even if the only diagnosis code for the

15 counseling is gender dysphoria, was it BMS that decided

16 to do that?

17    A.  BMS has decided not to edit based on diagnosis

18 for counseling, meaning if your doctor, your therapist

19 thinks you need some counseling because of whatever

20 reason, we don't have an edit that says you can only get

21 counseling for these five diagnoses.  You can receive

22 counseling initially for any diagnosis.

23       What will come into play is if you're going to

24 counseling and you've been going for a few months and

25 there's no progress and you want to continue to go to

**JA443**

## DEPOSITION OF CYNTHIA BEANE

Page 144

1    A.  No, because our state plan is written for

2  counseling.  I'd have to go back to review it, but I

3  think it's any kind of behavioral health diagnosis.  We

4  don't have it specified out with regard to what kind of

5  behavioral health diagnosis you might have.

6    Q.  And are there any restrictions ongoing using the

7  federal funding that West Virginia Medicaid receives to

8  pay for counseling received for a diagnosis of gender

9  dysphoria?

10    A.  No, we receive FMAP for that.

11    Q.  So you can use those matching federal dollars to

12  provide counseling for gender dysphoria, correct?

13    A.  Yes.  All of our counseling is a behavioral

14  health service that is matched by the federal

15  government.

16    Q.  And as we discussed earlier, hormone therapy for

17  the treatment of gender dysphoria is covered through the

18  Medicaid program, correct?

19    A.  Correct.

20    Q.  BMS previously excluded coverage of hormone

21  therapy for gender dysphoria, is that right?

22    A.  You are correct.

23    Q.  And when did BMS first exclude coverage for

24  hormone therapy?

25    A.  I do not know when we first did it.  I believe

## DEPOSITION OF CYNTHIA BEANE

Page 145

1    we took the edit off in 2017.

2        Q.  Does it ring a bell if I ask whether BMS would

3    have first started excluding coverage in 2011?

4        A.  Is that when the MCO's had the pharmacy benefit?

5        Q.  I'm not sure of the answer to that, and it

6    sounds like that doesn't ring a bell.  So I think your

7    testimony is you are unsure when the edit first, or when

8    hormone therapy was first excluded for gender dysphoria,

9    but a decision was made in 2017 to allow coverage for

10   hormone therapy for gender dysphoria, correct?

11       A.  Correct.

12       Q.  And do you have knowledge of why hormone therapy

13   is covered for gender dysphoria?

14       A.  I believe the pharmacy director at the time, I

15   think then it was Vicki Cunningham, recognized some of

16   the denial of the claims and, and worked with the team

17   to remove the edit.

18       Q.  And who was the decision-maker about providing

19   that coverage?

20       A.  She would have asked me like is it okay if I do

21   this.

22       Q.  And did you approve when she asked that

23   question?

24       A.  I did.

25       Q.  Did BMS have to approve the change to begin

## DEPOSITION OF CYNTHIA BEANE

Page 146

1    covering hormone therapy for gender dysphoria?

2        A.  We did not have to do a state plan for that.

3        Q.  And why did you not have to get BMS approval to

4    do a state plan for coverage of hormone therapy for

5    gender dysphoria?

6            MS. CYRUS:  Objection, asked and answered.

7    But you can answer again.

8        A.  We were already covering hormones, so it was

9    just resubmitting the edit.

10       Q.  And are there any restrictions on using the

11   federal funding that West Virginia Medicaid receives to

12   pay for hormone therapy for gender dysphoria?

13       A.  No.

14       Q.  So BMS can use the federal funding it receives

15   to help pay for hormone therapy for gender dysphoria,

16   correct?

17       A.  Yes.

18       Q.  We're going to go ahead and introduce our next

19   exhibit and I will tell you when it's loaded.

20           (Exhibit 17 marked for identification.)

21       Q.  Okay.  Go ahead and click on that folder and I

22   believe you should see what's been marked as Plaintiff's

23   Exhibit 17.

24       A.  I see it.

25       Q.  Great.  Please take a moment to review this

**DEPOSITION OF CYNTHIA BEANE**

Page 150

1            MS. CYRUS:  Object, calls for speculation.

2    If you know, you can answer.

3        A.  I mean, people get hysterectomies all the time

4    and so, you know, if it's a female requesting a

5    hysterectomy, depending on what the doctor put on the

6    prior authorization, there could be a number of reasons,

7    and that might be one of the reasons in addition to

8    other reasons that they are getting a hysterectomy.

9        Q.  And has BMS ever had any communication with CMS

10   about gender affirming surgeries?

11       A.  Not that I'm aware of.

12       Q.  So BMS has never inquired whether expanding

13   access to surgeries that are already covered for other

14   diagnoses would be approved for purposes of treating

15   gender dysphoria?

16            MS. CYRUS:  Object to the form of the

17   question.  But you can answer.

18       A.  Not that I'm aware of.

19       Q.  Is puberty delaying treatment for gender

20   dysphoria ever covered through the Medicaid program?

21       A.  I don't believe we've ever covered it, but I

22   can't tell you 100 percent.  I mean, I do not think

23   we've covered it.

24       Q.  But it might be covered through the EPSDT

25   process, correct?

## DEPOSITION OF CYNTHIA BEANE

Page 151

```
 1      A.  Maybe.

 2      Q.  And just to clarify, so have you ever covered

 3   puberty delaying treatment or the treatment for

 4   precocious puberty?

 5      A.  I'm sorry, what?

 6      Q.  Have you ever covered puberty delaying treatment

 7   for precocious puberty?

 8           MS. CYRUS:  Object to the form of the

 9   question.  If you know, you can answer.

10      A.  I don't know if I know that answer, I don't know

11   if I know what that even means.

12      Q.  Okay.  Give me just one moment to look over my

13   notes.  All right.  We're going to introduce our next

14   exhibit.  I will let you know when it's loaded.

15           (Exhibit 18 marked for identification.)

16      Q.  All right.  Go ahead and click on the exhibits

17   folder and you should see a document marked as

18   Plaintiff's Exhibit 18.  Let me know when you've had a

19   moment to open the document and familiarize yourself

20   with it.

21      A.  I have familiarized myself with it.

22      Q.  In the lower right-hand corner the first page of

23   the document has a Bates stamp DHHRBMS012319.  Do you

24   see that?

25      A.  It's 319, did you say 311?
```

## DEPOSITION OF CYNTHIA BEANE

Page 152

1    Q.  If I did, I misspoke, it should be

2  DHHRBMS012319, is that correct?

3    A.  Yes.

4    Q.  Do you recognize this document?

5    A.  Yes.

6    Q.  And what is it?

7    A.  It's an email trail around a specific case of a

8  request for I believe it was an 11-year-old who wanted

9  to delay puberty.

10    Q.  Okay.  Please go to Page 2 of the pdf, and that

11  should be Bates stamped DHHRBMS012320.  Do you see that?

12    A.  Yes.

13    Q.  And do you see an email from Dr. James Becker

14  dated October 7, 2020?

15    A.  Yes.

16    Q.  He states, "Cindy, I'm still considering the

17  appeal that is on my desk today.  I was able to review

18  the recommendations of the American Academy of

19  Pediatrics in regard to treatment of TGD.  They do

20  support the use of medication to delay pubertal

21  development.  The guidelines is filled with precautions

22  about side effects and possible future consequences.

23  They make the point that the effect of these medications

24  is reversible if the medication is stopped.  They argue

25  that this approach may give providers and counselors a

## JA449

## DEPOSITION OF CYNTHIA BEANE

Page 153

1   chance to ensure that the patient is fully committed to

2   this change and understands what they are choosing.  I

3   think on the basis of that information, I am inclined to

4   approve the treatment with a host of warnings about

5   provider responsibility for monitoring safety and

6   efficacy."  Did I read that correctly?

7       A.  Yes.

8       Q.  Referring again to that page, did you respond

9   the same day to say, "Please hold on the approval and

10  let me discuss with leadership"?

11      A.  Correct.

12      Q.  Who were you referring to when you referenced

13  leadership in that email?

14      A.  My guess is I probably ran this by Deputy

15  Secretary Samples.

16      Q.  Do you think you might have conferred with

17  anyone else or likely just Deputy Secretary Samples?

18      A.  I remember this case being discussed with Deputy

19  Secretary Samples and then we also had a call on this

20  case with Dr. Becker and internal individuals here at

21  BMS, I believe Jennifer Myers was on the call, and then

22  I also think we discussed it in our leadership team

23  which consisted of the people on this email along with

24  Brad is not on the email, but he would have been on the

25  leadership team when Dr. Becker brought it up.

## DEPOSITION OF CYNTHIA BEANE

Page 154

1    Q.  So it sounds like one of the consultations that

2    you would have done was with Deputy Secretary Samples,

3    is that correct?

4    A.  Correct.

5    Q.  And do you recall what he said when you

6    consulted with him?

7    A.  I don't recall.  I'm pretty sure I outreached

8    and just asked him his thoughts and I don't recall that

9    he gave an answer either way.  He probably pushed it

10   back in our court as to make the decision.

11   Q.  And then it sounds like it was also discussed

12   with what you described as the leadership team, is that

13   correct?

14   A.  Correct.

15   Q.  And that included the people that are on this

16   email chain.

17   A.  So Dr. Becker would bring issues like this to

18   the leadership team, and so it would be the three

19   deputies, Dr. Becker and Riley Romeo who is my general

20   counsel who makes up the BMS leadership team, and

21   myself.

22   Q.  And who are the three deputies?

23   A.  Fred Lewis, Sarah Young and Becky Manning.

24   Q.  And do you recall what the discussion was with

25   the leadership team about this particular case?

USCA4 Appeal: 22-1927    Doc: 20-1        Filed: 10/31/2022      Pg: 472 of 610

Page 155

1              MS. CYRUS:  I'm going to object to the

2      extent that if Riley Romeo was involved, and he's

3      general counsel for BMS and if he gave legal advice, I'm

4      going to object to attorney-client privilege.  But

5      beyond that, you can answer.

6          A.  Honestly, I don't recall what was all discussed

7      other than Dr. Becker probably brought it up as an issue

8      that we need to be figuring out what we're going to do

9      with this individual case that was laid on his desk.

10         Q.  And was a decision eventually made about this

11     individual case?

12         A.  Yes.

13         Q.  And do you recall who made the decision about

14     this case?

15         A.  I did.

16         Q.  And what was the, what was your decision about

17     this case?

18         A.  We did not cover -- I believe it ended up not

19     being a pharmaceutical, but a device perhaps, and we did

20     not cover, we did not cover the request to delay

21     puberty.

22         Q.  And when you made that decision, what was the

23     basis for your decision?

24         A.  Just the discussions with Dr. Becker and the

25     nurses and the concern about the age of the individual

**DEPOSITION OF CYNTHIA BEANE**

Page 161

1    A.  It's all about how we, how we do the eligibility

2  based on MAGI income, but different components of MAGI

3  income of what you can exclude and include in order for

4  individuals to be eligible for the expansion.

5    Q.  Thank you.  That's helpful.  Please scroll down

6  to Page 42 out of 45 of the pdf.

7    A.  My apologies, I didn't scroll down enough on the

8  first one, and so this is another, it starts another

9  letter here.  What page am I on here?  Sorry.  It's on

10  Page 19 started another letter.

11    Q.  That's helpful.  Thank you for the

12  clarification.  And scroll with me, if you will, to

13  Page 42 of the pdf.  And in case the system doesn't tell

14  you what page you're on as you scroll, you'll be looking

15  for a page that has a Bates ending with the numbers 220.

16    A.  Okay, I'm there.

17    Q.  And do you see a title at the -- actually, for

18  clarity, let me make sure I've got the complete Bates

19  stamp.  The complete Bates stamp on this page is

20  DHHRBMS016220.  Do you see a title at the top of the

21  page that says, "Mandatory and optional Medicaid

22  benefits"?

23    A.  I do.

24    Q.  Is that followed by a listing of mandatory

25  benefits?

USCA4 Appeal: 22-1927    Doc: 20-1    Filed: 10/31/2022    Pg: 474 of 610

## DEPOSITION OF CYNTHIA BEANE

Case 3:20-cv-00740   Document 250-13   Filed 05/31/22   Page 60 of 69 PageID #: 1854

Page 162

1    A.  It is.

2    Q.  And can you describe again what mandatory

3  benefits are?

4    A.  Those are benefits that CMS says you have to

5  cover this benefit in order to participate in the

6  Medicaid program.

7    Q.  And does this look to you like an accurate and

8  complete list of the mandatory benefits required by CMS?

9           MS. CYRUS:  Object to the form of the

10  question.  If you know, you can answer.

11    A.  It does, it looks like what's probably on CMS's

12  Website.

13    Q.  And then below that list do you see a list of

14  optional benefits?

15    A.  I do.

16    Q.  And these are optional benefits provided by BMS,

17  correct?

18    A.  By BMS?

19    Q.  Yes.

20    A.  No.  These are just optional benefits that the

21  state can choose to provide, these are not necessarily

22  West Virginia BMS optional benefits.

23    Q.  And you testified that BMS does provide a number

24  of optional benefits, correct?

25    A.  We do.

## DEPOSITION OF CYNTHIA BEANE

Page 163

1      Q.   Which benefits on this list do you recognize as

2   optional benefits that BMS provides?

3      A.   Well, we definitely provide prescription drugs.

4   The clinic services, I would have to look at how they're

5   defining that because we have a number of clinics, but I

6   would like to make sure that it's not a clinic that we

7   wouldn't cover, I'm not sure what the definition of that

8   is on this particular Website.

9          We do physical therapy, occupational therapy,

10   speech and hearing.  We do have respiratory care, we do

11   have a number of screening and preventative services, we

12   do cover podiatry.  We have a limited optometry benefit,

13   we have a limited adult dental benefit, we do not cover

14   eyeglasses, we do have a chiropractic service, we do

15   have private duty nursing, we do have personal care, we

16   do have hospice.

17          I would have to see the definition of this case

18   management, but we do have a targeted case management

19   service.  We do have ID services, we do have ICF, IMD

20   services.  We do not have 1915(i) services, we do not

21   have 1915(j) services, we do not have 1915(k) services.

22   I do not believe we have TB related services, I'm not

23   sure what those, I mean, I know what it is, but I'm not

24   sure of what services they're talking about there.  We

25   do cover inpatient psychiatric care for individuals that

## DEPOSITION OF CYNTHIA BEANE

Page 164

1  are 21, and we do have health home services.

2      Q.  And are you aware of any other optional services

3  that BMS provides that you haven't just listed?

4      A.  They do not have -- we have 1915(c) home and

5  community based waivers and I don't believe they have

6  the 1915(c) services on this list, and we also have a

7  1115 demonstration waiver for SUD, substance use

8  disorder services as well, and neither of those are on

9  this list.

10     Q.  Is counseling including counseling for gender

11 dysphoria, would that follow one of the services under

12 the mandatory list or under the optional list of

13 benefits?

14     A.  It would be both.  So our, under your mandatory

15 list you'll see federally qualified health centers.  Our

16 FQHC's also provide behavioral health and they receive a

17 separate encounter for behavioral health, so they could

18 be receiving those services under, the counseling under

19 the mandatory there.

20         And then under optional benefits, let's see,

21 where was that.  They would receive it mainly through

22 our diagnostic screening, preventative and rehab

23 services.  And so rehab services, a lot of your

24 behavioral health services are considered rehabilitative

25 in nature and they're under the rehab part of your state

**DEPOSITION OF CYNTHIA BEANE**

Page 167

1    many years ago, and we were sued and then after that we

2    did a state plan.  I don't recall, I wasn't in the

3    position I'm in now and so when that happened I don't

4    recall if it was a settlement or if we lost or, but I do

5    know we did a state plan to cover those surgeries.

6        Q.  And that meant that state plan had to be

7    approved by CMS, correct?

8        A.  Correct.

9        Q.  All right.  So just to clarify one more thing.

10   You said in preparing for your testimony today you were

11   looking at various documents by CMS and that were

12   transmitted to BMS, and you didn't see any documents

13   prohibiting or requiring coverage for gender confirming

14   care, correct?

15       A.  I do not believe there are any documents that

16   prohibit it, but I do not believe there are any

17   documents that mandate it either.

18       Q.  Okay.  So the decision to not cover the care

19   resides with BMS, correct?

20           MS. CYRUS:  Object to the form of the

21   question.

22       A.  Yes.

23       Q.  Was that correct?

24       A.  Correct.

25       Q.  All right.  I think we're going to turn now to

## DEPOSITION OF CYNTHIA BEANE

Page 169

1     Q.  Towards the bottom of the page you'll see text

2   that reads, "No. 7, admit that the Medicaid plan only

3   covers care that is medically necessary."  Did I read

4   that correctly?

5     A.  Correct.

6     Q.  And the response reads, "Response.  Admitted,

7   however, these defendants deny any suggestion that

8   Medicaid covers all care as medically necessary."  Did I

9   read that correctly?

10     A.  You are correct.

11     Q.  Are you prepared to testify about this request?

12     A.  Yes.

13     Q.  With respect to your request for admission

14   specifically, what did you do to prepare to testify

15   today?

16     A.  I'm familiar with what services we cover and do

17   not cover.

18     Q.  To make sure that I understand this response,

19   can you confirm that in order for care to be covered by

20   Medicaid it must be medically necessary?

21     A.  Yes, we cover medically necessary services.

22     Q.  In other words, if coverage is covered by

23   Medicaid, the care has been deemed medically necessary,

24   correct?

25     A.  Correct.

## DEPOSITION OF CYNTHIA BEANE

Page 170

1    Q.  And if the care is not medically necessary it

2    would not qualify for coverage under Medicaid, correct?

3    A.  Correct.  The one exception to that would be an

4    EPSDT 4-4 plus over on ameliorating the condition,

5    that's a little bit broader term of medically necessary.

6    But in the end it's still medically necessary to

7    ameliorate the condition, it's just a little bit

8    broader.

9    Q.  That's helpful.  Based on the exclusion for

10   gender affirming surgery from the Medicaid plan, is

11   gender affirming surgery excluded regardless of whether

12   it's medically necessary for a specific member?

13            MS. CYRUS:  Object to the form of the

14   question.  If you know, you can answer.

15   A.  We do not cover that surgery regardless of

16   whether or not there's a physician or a review team

17   saying it's medically necessary.

18   Q.  We can move on now to another exhibit.  So we'll

19   go ahead and look at it when it's ready.

20            (Exhibit 22 marked for identification.)

21   Q.  Okay.  Go ahead and click on the exhibit folder

22   and you should be able to open what's been marked as

23   Plaintiff's Exhibit 22.

24   A.  I have it open.

25   Q.  Please take a moment to review the document and

## DEPOSITION OF CYNTHIA BEANE

Page 179

1    Q.  You said the legislature rejected an opportunity

2    to provide blood pressure cuffs this session that would

3    have cost around $500,000?

4    A.  It was a little over 500,000, I can't remember

5    the exact number, Lou Ann, but it was 500 and change,

6    maybe 520, something like that.

7    Q.  Okay.  And what is the status of Medicaid's

8    budget, you made reference to it earlier?

9    A.  We currently have actually -- sorry, it's late

10   in the day.  We currently have a surplus, but we are

11   predicting that we will be in the red in two years from

12   now.

13   Q.  Okay.  And what does that mean that you will be

14   in the red in two years?

15   A.  We will have a budget deficit.

16   Q.  Would that indicate that BMS would have to cut

17   existing services?

18            MS. BORELLI:  Object to form.

19   A.  We would either have to cut existing services or

20   receive additional appropriations from the legislature

21   to continue services of this.

22   Q.  Based on the existing budget, would Medicaid

23   have to add funds to cover transgender surgeries?

24            MS. BORELLI:  Object to form.

25   A.  We would have to add dollars in order to cover

## DEPOSITION OF CYNTHIA BEANE

Page 182

1  surgery was funded?

2          MS. CYRUS:  Object to the form of the

3  question.  If you know, you can answer.

4      A.  I'm sure once the SPA was approved, then it's

5  funded like our other medical services with the state

6  and federal match.

7      Q.  Have you ever performed research about the cost

8  of gender affirming surgery?

9      A.  I have not.

10     Q.  Have you ever reviewed research about the cost

11  of gender affirming surgery?

12     A.  I at one time asked Dr. Becker if he could look

13  into like how much the states that are covering this,

14  how much their spend was, but I don't recall ever

15  receiving anything from him with regards to it.

16     Q.  Are you aware of anyone else within BMS who has

17  researched the cost of gender affirming surgery?

18     A.  Not that I'm aware of.

19     Q.  And is there anything you considered related to

20  the cost of gender affirming surgery that we haven't

21  discussed?

22     A.  I don't believe so.

23     Q.  All right.  I think those are all the questions

24  we have for the moment, preserving our right to ask

25  further questions if Lou Ann has additional questions

## DEPOSITION OF CYNTHIA BEANE

```
                                                    Page 183
 1    for you now.
 2              MS. CYRUS:  I don't have any further
 3    questions and we will have her read.
 4                   (Proceedings concluded for the day at
 5                   2:21 p.m., 03-29-2022)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**JA462**

```
                                                    Page 184

 1                    REPORTER'S CERTIFICATE
 2

 3
     STATE OF MINNESOTA    )
 4                         ) ss.
     COUNTY OF WASHINGTON )
 5

 6        I hereby certify that I reported the Zoom deposition
     of Commissioner Cynthia Beane on the 29th day of March
 7   2022, and that the witness was by me first duly sworn to
     tell the whole truth;
 8

          That the testimony was transcribed by me and is a
 9   true record of the testimony of the witness;
10        That the cost of the original has been charged to
     the party who noticed the deposition, and that all
11   parties who ordered copies have been charged at the same
     rate for such copies;
12

          That I am not a relative or employee or attorney or
13   counsel of any of the parties, or a relative or employee
     of such attorney or counsel;
14

          That I am not financially interested in the action
15   and have no contract with the parties, attorneys, or
     persons with an interest in the action that affects or
16   has a substantial tendency to affect my impartiality;
17        That the right to read and sign the deposition by
     the witness was reserved.
18

          WITNESS MY HAND AND SEAL THIS 29th day of March
19   2022.
20

21
22           Kelley E. Zilles
23   _____
24           Kelley E. Zilles, RPR
             Notary Public, Washington County, Minnesota
25           My commission expires 1-31-2025
```

```
                                                          Page 1

 1               IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                      HUNTINGTON DIVISION

 4     ----------------------------------------------------

 5     Christopher Fain, individually and on behalf of all

 6     others similarly situated, et al.,

 7                  Plaintiffs,

 8        vs.                    CIVIL ACTION NO. 3:20-cv-00740

 9     William Crouch, et al.,

10                  Defendants.

11     ----------------------------------------------------

12

13

14          REMOTE DEPOSITION OF DR. JAMES BECKER

15

16

17     DATE:   March 30, 2022

18     TIME:   7:00 a.m. CST

19     PLACE:  Veritext Virtual Videoconference

20

21

22

23

24     REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25     JOB NUMBER:  5096167
```

```
                                                         Page 2
 1                         APPEARANCES

 2

 3    On Behalf of the Plaintiffs (Via Videoconference):

 4         CARL CHARLES, ESQ.

 5         TARA L. BORELLI, ESQ.

 6         Lambda Legal Defense and Education Fund, Inc.

 7         158 West Ponce De Leon Ave., Suite 105

 8         Decatur, Georgia   30030

 9         470.225.5341

10         ccharles@lambdalegal.org

11         tborelli@lambdalegal.org

12

13         AVATARA SMITH-CARRINGTON, ESQ.

14         Lambda Legal Defense and Education Fund, Inc.

15         3500 Oak Lawn Avenue, Suite 500

16         Dallas, Texas   75219

17         214.219.8585

18         asmithcarrington@lambdalegal.org

19

20         NICOLE J. SCHLADT, ESQ.

21         Nichols Kaster PLLP

22         80 South 8th Street, Suite 4700

23         Minneapolis, Minnesota   55402-2224

24         612.256.3291

25         nschladt@nka.com
```

Page 3

1    On Behalf of Defendants William Crouch; Cynthia Beane;

2    and West Virginia Department of Health and Human

3    Resources, Bureau for Medical Services (Via

4    Videoconference):

5          KIMBERLY M. BANDY, ESQ.

6          LOU ANN S. CYRUS, ESQ.

7          Shuman McCuskey Slicer, PLLC

8          1411 Virginia Street East, Suite 200

9          Charleston, West Virginia  25301

10         304.345.1400

11         kbandy@shumanlaw.com

12         lcyrus@shumanlaw.com

13

14

15

16

17

18      NOTE:  The original deposition transcript will be

19   delivered to Attorney Smith, Esq., as the taking

20   attorney.

21

22

23

24

25

## DEPOSITION OF DR. JAMES BECKER

Page 19

1    Q.  Okay.  So, Dr. Becker, we're going to talk a

2  little bit about your background, okay?

3    A.  Yes.

4    Q.  Dr. Becker, you are the medical director of BMS

5  at the West Virginia Department of Health and Human

6  Resources, correct?

7    A.  That's correct.

8    Q.  All right.  And what responsibilities fall under

9  your role within BMS?

10    A.  It's quite a long list, but I'll try to tell you

11  the things that I concentrate on predominantly.

12    Q.  Okay.

13    A.  So I've been there for 14 years and over the

14  14 years my obligations and responsibilities have

15  evolved a little.  Part of my work involves review of

16  coverage decisions for any number of medical treatments

17  or diagnostics.  And so I spend quite a bit of my time

18  actually reviewing coverage codes and talking about

19  medical evidence as it relates to these codes.

20      I also have responsibility for interaction with

21  the medical providers who are enrolled in our system.  I

22  spend a fair amount of time on the phone talking to

23  them, explaining our policies, trying to get their

24  participation and get them involved in some of our

25  special projects that we do.

## DEPOSITION OF DR. JAMES BECKER

Page 20

```
1          I also review pharmacy and pharmacy cases.
2   Pharmacy appeals come to me with great regularity.  We
3   cover about a million prescriptions each month and so
4   there will be some that need to be reviewed, so they do
5   come to me.  I have interaction with other agencies like
6   CMS, I have interaction with various support groups that
7   state Medicaid programs rely on, things like the
8   Medicaid Medical Director Network, ASTHO, which is the
9   State Health Officers Organization, a variety of those
10  kind of agencies.  So as you can tell, it's highly
11  variable.
12      Q.  Okay.
13      A.  And it's grown.  When I first began the only
14  obligation I had when I first began working for Medicaid
15  was to, was to look at files regarding surgical
16  procedures that didn't match normal codes, and that's
17  still a part of my job, but it's not much of a job.
18      Q.  I understand that.  And so just a quick
19  follow-up on that.  So you said that you've been with
20  BMS for 14 years, am I correct?
21      A.  That's correct.
22      Q.  And have you been with BMS in your capacity now,
23  so as the medical director for 14 years?
24      A.  Yes.
25      Q.  Okay.  Dr. Becker, who is your direct
```

## DEPOSITION OF DR. JAMES BECKER

Case 3:20-cv-00740   Document 250-14   Filed 05/31/22   Page 7 of 30 PageID #: 1870

Page 21

1  supervisor?

2      A.  My direct supervisor would be Commissioner

3  Beane.

4      Q.  Okay.  And how often do you report to her on

5  your work?

6      A.  At least weekly.

7      Q.  Okay.

8      A.  And often more than that.  I am onsite in the

9  office, officially I'm there two days a week, and then I

10  do some work by telehealth or, you know, on the

11  computer.  And so when I'm there my office is two doors

12  down from her office and it's very easy for me to walk

13  by and talk to her or see her when I get a cup of coffee

14  or something like that, so we regularly converse.

15      Q.  I understand.  Do you have standing meetings

16  with Commissioner Beane?

17      A.  I do, every, every Monday afternoon would be the

18  typical schedule and it would be a meeting for about an

19  hour, hour and a half to go over any issues that we

20  have.

21      Q.  Got it.  Thank you for that.  Dr. Becker, does

22  anyone report to you?

23      A.  Because the way that my position is structured

24  there, I don't have real responsibility for overseeing a

25  lot of people.  I don't have anyone who directly reports

## DEPOSITION OF DR. JAMES BECKER

Page 22

```
 1   to me whose time sheet I sign off on or anything like
 2   that, but there is a group that is a policy team that
 3   meets with me every Wednesday morning.  And so while I
 4   don't have direct responsibility for any of them, they
 5   all work in their own units, they do report to me every
 6   Wednesday morning on issues that we need to make
 7   decisions about.
 8       Q.  Okay.  Who's part of the, I guess who makes up
 9   the policy team that indirectly reports or has those
10   meetings with you?
11       A.  Well, Jennifer Myers is probably one of the key
12   people, Carrie Mallory is a key person, Stacy Hanshaw,
13   Virginia Evans, Richard Ernest, Garland Holley.  Do you
14   want me to do an exhaustive list?  It's about 12 or 13
15   people.
16       Q.  That's helpful.  Thank you for that, Dr. Becker.
17   Who are the other team members in your specific
18   department?
19       A.  Excuse me, I think I missed the question, did
20   you say who are?
21       Q.  Yes.
22       A.  Depends.  I had a nurse practitioner until
23   recently and she has resigned, retired, and we had a
24   psychologist and he has resigned.  So I think I would
25   have to report today, I don't have anyone.
```

## DEPOSITION OF DR. JAMES BECKER

Page 23

1    Q.  Okay.  So is it fair to say then that there were
2  nurse practitioners and at least a psychologist within
3  BMS who regularly met with you?
4    A.  Yes, definitely.
5    Q.  Thank you.  And who were those people?
6    A.  They would have been Paula Hamady, she's a nurse
7  practitioner, Ken Devlin, who's a psychologist.
8    Q.  Okay.
9    A.  They specifically met with me.  And on the
10  periphery I have a psychiatrist whom we've contracted
11  with to deal with adult, to deal with child and
12  adolescent psychiatric issues, his name is Kelly Melvin,
13  Dr. Melvin.  And we have a family practitioner who helps
14  with our pharmacy reviews, her name is Hyla Harvey.  Dr.
15  Harvey does most of the difficult pharmacy reviews now.
16    Q.  Okay.  I do not think I caught the last name
17  of -- you said Dr. Harvey?  I mean the first name of Dr.
18  Harvey.
19    A.  Hyla, H-Y-L-A.
20    Q.  Dr. Becker, have you held a previous job with
21  BMS other than medical director?
22    A.  No, I have not.
23    Q.  Okay.  Dr. Becker, we're going to talk about
24  some of your other current positions, okay?
25    A.  Sounds fine to me.

## DEPOSITION OF DR. JAMES BECKER

Page 31

1  seminar there, no.  I've had, I've had some of these

2  workshops that I've attended, but as far as just formal

3  enroll, pay tuition, take a class, get a grade, have a

4  transcript, no, I can't really identify anything.

5     Q.  Okay.  Dr. Becker, we're here to take a

6  deposition of an organizational representative for BMS,

7  do you understand that?

8     A.  Say that again, you broke up there.

9     Q.  Sure, no problem.  We're here to take a

10 deposition of an organizational representative for BMS,

11 do you understand that?

12    A.  Yes, I do understand.

13    Q.  And you have been designated to give testimony

14 as the organizational representative for BMS on certain

15 topics that we'll discuss today, do you understand that?

16    A.  Yes, I do.

17    Q.  When were you notified that you would be giving

18 testimony as the organizational representative for BMS

19 on some of the topics plaintiffs have identified?

20    A.  I was probably notified four or five months ago

21 when there was a question in a request that had come to

22 our legal unit and I was, I was told that they might ask

23 me to testify to one or two of the questions.

24    Q.  Okay.  What did you do to prepare to testify

25 today as the organizational representative?

## DEPOSITION OF DR. JAMES BECKER

Page 46

1    Q.  Okay.

2    A.  So I agree with her, it probably was 2004.

3    Q.  Okay.  Why was it, to the best of your

4  knowledge, why was the exclusion created?

5    A.  I don't know that I can speak to that, but my

6  personal impression is that it arose principally out of

7  the pharmacy questions about administering medications

8  that seemed like they were not aligned with the person's

9  gender.  So we had some restrictions on what medications

10  we allow people to receive and we put some edits in

11  place to try to regulate that.

12        For instance, we don't expect, we don't expect

13  men to fill prescriptions for birth control pills, and

14  so a gender edit gets in place for that.  Or if there's

15  a mismatch between hormones that we expect to see in use

16  or, you know, drugs that might be unsafe, we have edits

17  to try to restrict the exposure of a potentially unsafe

18  situation.  So I think that was the real reason that

19  things were developed in that respect.

20    Q.  What was considered when the exclusion was

21  originally adopted?

22    A.  I did not have a part in that, so I can't

23  answer.

24    Q.  Okay.  Dr. Becker, as the organizational

25  representative for BMS are you aware of whether the

## DEPOSITION OF DR. JAMES BECKER

Page 47

1    decision to maintain the exclusion was ever revisited?

2        A.  I'm not aware.

3        Q.  Okay.  Dr. Becker, BMS continues to maintain the

4    exclusion today, correct?

5        A.  You're referring to the surgical exclusion?

6        Q.  Mm-hmm, yes.

7        A.  Yes, we do.

8        Q.  Dr. Becker, as the organizational representative

9    for BMS can you explain why BMS has decided to maintain

10   the exclusion today?

11           MS. BANDY:  I just want to place an

12   objection that some of the designated topics were

13   addressed by Sarah Young.  I mean, to the extent that

14   it's encompassed within Exhibit 1 of the

15   interrogatories, he can answer, but I just want to place

16   that objection.

17           ATTORNEY SMITH:  Noted.

18       Q.  You can answer.

19       A.  So the way that coverage decisions are made is

20   based on medical necessity.  And CMS identifies medical

21   necessity as, it's a difficult, it's a difficult

22   definition, but it's a legal construct that guides the

23   decision for coverage based on evidence of effectiveness

24   and safety for the procedures requested.  And so in the

25   sense that surgical procedures have not been included as

## DEPOSITION OF DR. JAMES BECKER

Page 52

1   A.  I do or would, I don't recall having reviewed

2   any.

3   Q.  Because BMS does not cover surgical care for

4   treatment of gender dysphoria, the appeal would be

5   denied or claim not paid, correct?

6   A.  That's correct.

7   Q.  And the appeal would be denied regardless of

8   medical necessity, correct?

9   A.  Well, that is not necessarily true.  If the case

10  involves medical necessity for the surgery, it would get

11  reviewed, but it will probably get an initial denial

12  from the contractor who handles those requests for prior

13  authorization.  There is a process in place for cases to

14  come to a higher level of appeal.  And so the provider

15  who is, who has determined that this is a necessary

16  procedure can come back around with another request and

17  ask for a higher level appeal and consideration.

18  Q.  So to confirm, you never reviewed, you never

19  reviewed an appeal regarding surgical appeal?

20  A.  I don't recall ever reviewing an appeal for

21  surgical care.

22  Q.  And to go back to your last answer for the

23  question before, that higher level appeal would need to

24  be denied, correct?

25  A.  It would likely be denied.

## DEPOSITION OF DR. JAMES BECKER

Page 56

1    may have been a typo.  GD refers to gender dysphoria.

2        Q.  You state that you would be inclined to approve

3    the treatment, correct?

4        A.  I do, I said I do support the use of medication,

5    or they do, referring to the Academy of Pediatrics, they

6    do.  And then later I said I think on the basis of the

7    information that I'm inclined to approve the treatment

8    with a host of warnings to the provider about provider

9    responsibility for monitoring safety and efficacy.

10       Q.  Why did you review the recommendations of the

11   American Academy of Pediatrics?

12       A.  It was one of the, it was one of the guidelines

13   that seemed to take on the subject of delaying the onset

14   of puberty reliably.  The Academy of Pediatrics is

15   highly respected and it was my feeling that that was a

16   good place to start in getting advice about using a

17   medication of this type off label.

18       Q.  This research was undertaken by you to aid in

19   determining whether to approve the treatment, correct?

20       A.  That's correct.

21       Q.  Dr. Becker, it was later determined that this

22   care would not be covered for this participant, correct?

23       A.  That's correct.

24       Q.  Who ultimately made that decision?

25       A.  The medication that was requested is delivered

## DEPOSITION OF DR. JAMES BECKER

Page 58

```
1    care approved?
2         A.  I don't know because they have, the MCO's have
3    their own medical directors and when it comes to the
4    medical questions, medical coverage questions, they,
5    they make the decisions.  So it came in as a pharmacy
6    appeal incorrectly, and even though I was in favor of
7    it, the decision would be made by the MCO.
8         Q.  Let's return to the American Academy of
9    Pediatrics recommendation that you reviewed.
10        A.  Yes.
11        Q.  What do you recall about that recommendation?
12        A.  I just, I don't have it in front of me and I
13   wouldn't have memorized it.  So I do remember that it
14   seemed to have a good and clear description of gender
15   dysphoria and the challenge of treating gender dysphoria
16   in young patients, and I do remember that it had a
17   fairly clear statement about the potential benefit of
18   halting the development of pubertal changes and the use
19   of GnRH agents as a possible option for that.
20            I do recall also that it cautioned that they
21   likely should not be used for more than a few years and
22   that, and that led me to assume that we would be talking
23   about coverage for potentially two years for this
24   individual and then some decision has to be made about
25   other lines of treatment.  And it was a well documented
```

## DEPOSITION OF DR. JAMES BECKER

Page 59

1    publication, it was clear to me and, you know, that was

2    the basis for my decision.

3        Q.  Did the American Academy of Pediatrics recommend

4    coverage of puberty delaying treatment be available in

5    at least some cases?

6        A.  I think they did, yes.

7        Q.  Dr. Becker, if a participant has a diagnosis of

8    precocious puberty would BMS approve the use of Vantas

9    for that condition?

10       A.  Yes, we would.

11       Q.  Just not for the treatment of gender dysphoria,

12   correct?

13       A.  Correct.  At least it would be approved for

14   gender dysphoria.  If the patient -- well, let's put it

15   this way.  If this patient had been traditional Medicaid

16   and we were making the decision about coverage of

17   medical cost, my recommendation would have been this is

18   appropriate with proper precautions and we'll go ahead

19   and cover, that would be my recommendation.  You can see

20   that in the subsequent trail here of the email.

21       Q.  All right.

22       A.  And that's, it's available, hormone therapy is

23   available with proper indication.

24       Q.  I'm going to introduce another exhibit.

25              (Exhibit 4 marked for identification.)

**DEPOSITION OF DR. JAMES BECKER**

Page 60

1      Q.  Okay.  I believe you should see what has been

2   marked as Exhibit 0004.

3      A.  Yes, I do.

4      Q.  Okay.  I'm showing Dr. Becker what has been

5   marked as Exhibit 0004 titled, "Defendants' ninth

6   supplemental response to plaintiffs' first set of

7   requests for production to Defendants William Crouch,

8   Cynthia Beane and West Virginia Department of Health and

9   Human Resources, Bureau for Medical Services."  Dr.

10  Becker, you have been designated to testify about the

11  response to request for production 6.  Please take a

12  moment to review this document, specifically Page 3.  Do

13  you recognize this document?

14     A.  Yes, I do.

15     Q.  Did you review this document in connection with

16  your testimony as the organizational representative for

17  BMS today?

18     A.  I have.

19     Q.  On Page 3 you'll see text that reads, "All

20  documents and communications relating to the exclusion

21  and/or gender confirming care considered by the

22  individuals responsible for adopting and/or maintaining

23  the exclusion in the health plans.  Please identify the

24  responsive documents by Bates number, this includes but

25  is not limited to, A, documents and communications

**DEPOSITION OF DR. JAMES BECKER**

Case 3:20-cv-00740   Document 250-14   Filed 05/31/22   Page 18 of 30 PageID #: 1881

Page 61

1  regarding the safety or efficacy of gender confirming

2  care; B, documents and communications regarding the

3  medical necessity of gender confirming care; and C,

4  documents and communications regarding the costs of

5  gender confirming care."  Did I read that correctly?

6      A.  Yes, you did.

7      Q.  And are you aware that counsel identified you as

8  the organizational representative to testify about

9  documents produced by BMS in response to request for

10  production 6?

11      A.  Yes.

12      Q.  Are you prepared to testify about this response?

13      A.  Yes, I think so.

14      Q.  With respect to request for production 6

15  specifically, what did you do to prepare to testify

16  today?

17      A.  I have reviewed the various documents and

18  research relationships that we had established asking

19  for information to help guide us on the issues of gender

20  dysphoria, gender transitions and the way we apply and

21  other states apply policies.

22      Q.  Please look at that page again while I read the

23  response to request for production 6, "Supplemental

24  response.  Upon information and belief seen in the

25  following documents that have previously been produced

## DEPOSITION OF DR. JAMES BECKER

Page 62

1   as part of Exhibit 86, DHHRBMS012313 through 012314;

2   DHHRBMS012318; DHHRBMS012322 through 012323;

3   DHHRBMS012333; DHHRBMS012338; DHHRBMS012434 through

4   012447; DHHRBMS012483 through 012501; DHHRBMS012648

5   through 012653; DHHRBMS012665 through 012668;

6   DHHRBMS012711 through 012823; DHHRBMS013523 through

7   013524; DHHRBMS015304; and DHHRBMS015453 through 1589.

8   The following documents are designated confidential,

9   DHHRBMS012649 through 012653; and DHHRBMS012714 through

10  12823."  Did I read that correctly?

11       A.  I think you did.  That was really pretty good

12  that you got through that, that's quite a list.

13       Q.  Yeah, it's a long list.  To your knowledge is

14  this list of documents and communications considered by

15  the individuals responsible for adopting and maintaining

16  the exclusion correct?

17       A.  To my knowledge it is.

18       Q.  To your knowledge is this list of documents and

19  communications considered by the individuals responsible

20  for adopting and maintaining the exclusion complete?

21       A.  To my knowledge, it is.

22       Q.  Okay.  I am going to introduce another exhibit.

23            (Exhibit 5 marked for identification.)

24            ATTORNEY SMITH:  Unfortunately, Kelley, I

25  think I mistakenly must have just pressed introduce

**DEPOSITION OF DR. JAMES BECKER**

Page 67

1    Q.  I will represent to you this corresponds to the

2    third range of Bates numbers identified in response to

3    RFP6.  Do you recall that we discussed this document

4    earlier today?

5    A.  Yes, I do.

6    Q.  This email chain was written in connection with

7    puberty delaying treatment, correct?

8    A.  Yes, that is correct.

9    Q.  And no other forms of gender affirming care such

10   as surgery, correct?

11   A.  That is right.

12   Q.  This email chain was created with reference to

13   review of an appeal of a denial of coverage, correct?

14   A.  Yes, that is correct.

15   Q.  This email chain was not part of a process of

16   considering whether to remove the exclusion from the

17   Medicaid program, correct?

18   A.  When you say remove the exclusion, you're

19   suggesting remove exclusion for surgical?

20   Q.  Yes.

21   A.  No, it was not.

22   Q.  Did BMS review the Endocrine Society guidelines

23   in connection with this email chain?

24   A.  Yes, ultimately we did.

25   Q.  In your review of the Endocrine Society

## DEPOSITION OF DR. JAMES BECKER

Page 68

1    guidelines in connection with this email chain, what do

2    you recall?

3        A.   All I recall is that the Endocrine Society also

4    considered delaying the onset of puberty as an

5    appropriate form of treatment for individuals in the

6    diagnosis of gender identity disorder.

7        Q.   Okay.  I am going to introduce another exhibit.

8             (Exhibit 6 marked for identification.)

9        Q.   Dr. Becker, do you see what has been marked as

10   Exhibit 0006?

11       A.   Yes, I do.

12       Q.   I am showing Dr. Becker what has been marked as

13   Exhibit 0006, it is an email with the subject, "Gender

14   dysphoria."  In the lower right-hand corner the document

15   is Bates stamped DHHRBMS012333.  Do you see that?

16       A.   Yes, I've got it.

17       Q.   Okay.  I will represent to you that this

18   corresponds to the fourth range of Bates numbers

19   identified in response to RFP6.  Please take a moment to

20   review this email.  Do you recognize this email?

21       A.   Yes, I do, that's the further discussion of the

22   case that we had been discussing regarding Vantas.

23       Q.   Please turn to the first full paragraph where it

24   reads, "That is why it's such a difficult decision.  The

25   provider quotes guidelines from the Endocrine Society

## DEPOSITION OF DR. JAMES BECKER

Page 72

1  the ninth Bates range identified in RFP6.  Please take a

2  moment to review this email.  Do you recognize this

3  email?

4      A.  Yes, I do.  I think I was involved in the

5  beginning of the discussion and then it got away from me

6  a little bit, but yes.

7      Q.  Okay.  Please scroll down to the page with the

8  Bates stamp DHHRBMS012666 where it reads, "Unfortunately

9  Jim and I discussed this case today before I saw your

10  email.  I did determine that this isn't coverable

11  through pharmacy services because Vantas is a medical

12  claim, it requires surgical implementation.  We were in

13  favor of approving their request, however."  Did I read

14  that correctly?

15      A.  You did.  I'm having a little difficulty moving

16  the page up here, for some reason my computer doesn't

17  want to do that.

18      Q.  Okay.

19      A.  There we go.

20      Q.  Okay.

21      A.  Okay, now I got back to it.  So let me make

22  sure.  "Unfortunately Jim and I discussed the case today

23  before I saw your email."  Yes, okay, I've seen it and

24  reviewed it a couple of times.

25      Q.  Okay.  I will read it again just to make sure

**JA484**

## DEPOSITION OF DR. JAMES BECKER

Page 73

1    that I conveyed the portion correctly.

2        A.  Okay.

3        Q.  "Unfortunately Jim and I discussed this case

4    today before I saw your email.  I did determine that

5    this isn't coverable through pharmacy services because

6    Vantas is a medical claim that requires surgical

7    implementation.  We were in favor of approving their

8    request, however."  Did I read that correctly?

9        A.  Yes, you did.

10       Q.  If Vantas was coverable through pharmacy

11   services would it have been approved?

12       A.  It would have.

13       Q.  And you were in favor of approving this care,

14   correct?

15       A.  Yes, I thought it was appropriate care based on

16   what I saw in the guidelines.

17       Q.  I'm going to introduce another exhibit.

18           (Exhibit 8 marked for identification.)

19       Q.  Do you see what has been marked as Exhibit 0008?

20       A.  Let me refresh the page here.  For some reason

21   when I go to refresh it switches pages.  Okay.  I'm

22   getting some kind of error on this Veritext.  Instead of

23   giving me a little arrow that I can move around with,

24   it's giving me a line and -- there's the arrow.  Okay, I

25   just got it back.  Whatever it was, it's fixed.

## DEPOSITION OF DR. JAMES BECKER

Page 74

1     Q.  Okay.

2     A.  We won't question it.  Okay, now I have 8.

3     Q.  Okay.  I am showing Dr. Becker what has been

4  marked as Exhibit 0008, it is an email with the subject,

5  "Gender dysphoria question."  In the lower right-hand

6  corner the document is Bates stamped DHHRBMS012318.  Do

7  you see that?

8     A.  I do.

9     Q.  I will represent to you that this corresponds to

10 the second Bates range identified in response to RFP6.

11 Please take a moment to review this email.

12    A.  So I've reviewed it.

13    Q.  Do you recognize this email?

14    A.  I do.

15    Q.  Please look at the paragraph where it reads,

16 "We've held off on approving the Vantas implant for this

17 child getting treated at UPMC.  Based on conversations

18 with several experts, it is a standard of care."  Did I

19 read that correctly?

20    A.  Yes, you did.

21    Q.  Who are the experts you referred to in this

22 email?

23    A.  Well, Dr. Yoost, and I don't think I can recall,

24 I spoke to somebody in endocrine at West Virginia

25 University, but I don't have the name and I didn't put

## DEPOSITION OF DR. JAMES BECKER

Page 75

1    the name in there.  I don't think I, I don't really

2    recall it, but I probably could resurrect it if needed.

3        Q.  Okay.  And just to confirm, those were the only

4    two experts you spoke with?

5        A.  Those are the two, yes.

6        Q.  Turning back to the body of your email, what did

7    you mean by a standard of care?

8        A.  Standard of care is a designation of certain

9    medical care as meeting the criteria to be considered

10   excellent healthcare and appropriate healthcare.  If

11   something falls under the standard we rarely recognize

12   it because the person doesn't do as well or doesn't

13   respond.  But the standard of care is kind of a broad

14   definition, we know it when we see it and we all strive

15   to deliver care that meets the standard of care.

16       Q.  Please look at the last line in the paragraph

17   that says, "If this child had a diagnosis of precocious

18   puberty, we would allow use of this medicine for that

19   condition."  Did I read that correctly?

20       A.  Yes, you did.

21       Q.  And I believe you stated this earlier, but just

22   to confirm, West Virginia Medicaid covers treatment for

23   precocious puberty?

24       A.  That's correct.

25       Q.  What is the average age of a patient who might

## DEPOSITION OF DR. JAMES BECKER

Page 119

1    admission 1 accurately describes the position of BMS on

2    the medical necessity of treatment for gender dysphoria,

3    correct?

4        A.  That's correct.

5        Q.  The last sentence of the response to request for

6    admission 1 states, "This request is admitted with the

7    understanding that this area of treatment continues to

8    evolve."  Please scroll down to Page 4.  Are you on

9    Page 4?

10       A.  I'm getting there.

11       Q.  Okay.

12       A.  Page 4.

13       Q.  Okay.  Do you see the date August 27, 2021 on

14   that page?

15       A.  Oh, okay.  There it is on the text, yes, on the

16   27th day of August 2021.

17       Q.  Okay.  Since this response was served on

18   August 27, 2021 has anything about the science evolved?

19       A.  None that I'm aware of.

20       Q.  I'm going to introduce another exhibit.

21           (Exhibit 18 marked for identification.)

22       Q.  Doctor, are you familiar with InterQual?

23       A.  Yes, I am.

24       Q.  Okay.  Do you see Exhibit 0018?  And it also

25   might be at the top again of the marked exhibits folder.

## DEPOSITION OF DR. JAMES BECKER

Page 120

1      A.   Yeah, I've got the document.

2      Q.   Okay.  So this is an InterQual sheet with the

3   subset, "Gender affirmation surgery and requested

4   service vaginoplasty for gender affirmation surgery."

5   InterQual criteria is nationally accredited criteria for

6   determining medical necessity for procedures, correct?

7            MS. BANDY:  Object to the form.

8      A.   Yes, it is.

9      Q.   I'm sorry, I didn't catch your answer, Dr.

10  Becker?

11     A.   Yes, it is, that's what we use it for.

12     Q.   Okay.  What is the importance of using

13  nationally accredited criteria?

14     A.   Well, it creates consistency in standard.

15     Q.   Does BMS use InterQual?

16     A.   BMS does use InterQual and InterQual is used by

17  our contractor for reviewing requests for surgery.

18     Q.   And who is your contractor for reviewing

19  requests for surgery?

20            MS. BANDY:  Object to form.

21     A.   The contractor would be Kepro.

22     Q.   Okay.  How does BMS use InterQual criteria?

23            MS. BANDY:  Object to form.

24     A.   InterQual criteria is one of the documents, one

25  of the standards that we review against in determining

## DEPOSITION OF DR. JAMES BECKER

Page 121

1   necessity for prior authorization.

2       Q.   InterQual is used on the fee for service side of

3   Medicaid, correct?

4           MS. BANDY:  Object to form and object to

5   the line of questioning, that it's not within the topic

6   areas designated.

7       Q.   You can answer.

8       A.   Yes, it does get used on the fee for service

9   side.

10      Q.   How is InterQual criteria factored into decision

11  making regarding whether care is medically necessary?

12          MS. BANDY:  Object to form.

13      A.   In my experience with it, it's used as one of

14  the indicators that the requested service has been

15  reviewed and meets some standards.  My role sometimes is

16  in deciding where InterQual doesn't really apply.  So I

17  do get, I do get cases in which there are disputes based

18  on incorrect application of InterQual, just for your

19  information is one, one of the things that we subscribe

20  to and rely on.

21      Q.   What are some cases where InterQual criteria

22  would not apply?

23          MS. BANDY:  Object to form.

24      A.   Typically InterQual criteria don't apply when

25  the diagnosis is wrong.  And so cases that come to me at

## DEPOSITION OF DR. JAMES BECKER

Page 124

1    Q.   And hormone replacement therapy can be treatment

2    for gender dysphoria, correct?

3    A.   Yes, it can.

4    Q.   Is it fair to say then that BMS recognizes that

5    at least some forms of gender confirming care, which can

6    include hormone replacement therapy, can be medically

7    necessary care for treatment of gender dysphoria?

8    A.   Yes, that's true.

9    Q.   Okay.  I would like to take a break, but while

10   we're on a break, Dr. Becker, could you start gathering

11   the materials that you said you reviewed?

12   A.   I will, I will make a call.  Like I say, I'm not

13   in the office, I'll call and try to get my folks to

14   gather that.

15        MS. BANDY:  And can I just ask for a

16   clarification of the request that prompted the, the

17   request that you are trying to look at those documents,

18   just so I know what the request was?

19        ATTORNEY SMITH:  Okay.  It was in

20   connection to Topic 12 and Dr. Becker essentially stated

21   that there were materials that he reviewed, but couldn't

22   remember what exactly the names or titles of those

23   materials were.  So that's the reason for this request.

24        MS. BANDY:  Was there a specific question

25   that he was responding to at the time, do you know?

## JA491

Page 130

1                    REPORTER'S CERTIFICATE

2

3

STATE OF MINNESOTA      )

4                       ) ss.

COUNTY OF WASHINGTON )

5

6        I hereby certify that I reported the Zoom deposition
    of Dr. James Becker on the 30th day of March 2022, and

7    that the witness was by me first duly sworn to tell the
    whole truth;

8

         That the testimony was transcribed by me and is a

9    true record of the testimony of the witness;

10       That the cost of the original has been charged to
    the party who noticed the deposition, and that all

11   parties who ordered copies have been charged at the same
    rate for such copies;

12

         That I am not a relative or employee or attorney or

13   counsel of any of the parties, or a relative or employee
    of such attorney or counsel;

14

         That I am not financially interested in the action

15   and have no contract with the parties, attorneys, or
    persons with an interest in the action that affects or

16   has a substantial tendency to affect my impartiality;

17       That the right to read and sign the deposition by
    the witness was reserved.

18

         WITNESS MY HAND AND SEAL THIS 30th day of March

19   2022.

20

21

22       _Kelley E Zilles_

23   _____

24       Kelley E. Zilles, RPR
         Notary Public, Washington County, Minnesota

25       My commission expires 1-31-2025

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
3       _____
                                          |
4    CHRISTOPHER FAIN, individually        |
     and on behalf of all others          |
5    similarly situated,                   |
                                          |
6              Plaintiffs,                 |    Case No.
                                          |  3:20-cv-00740
7    vs.                                   |
                                          |
8    WILLIAM CROUCH, et al.,               |
                                          |
9              Defendants.                 |
     _____    |
10
11              REMOTE 30(b)(6) DEPOSITION OF
12       WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
             RESOURCES, BUREAU FOR MEDICAL SERVICES
13
         by and through their corporate representative
14
                      FREDERICK LEWIS
15
16
17    DATE:       April 4, 2022
18    TIME:       9:00 a.m. (Eastern)
19    PLACE:      Veritext Virtual Videoconference
20
21
22
23
24    JOB NO.:      MW 5129863
      PAGES:        1 to 136
25    REPORTED BY:   Merilee Johnson, RDR, CRR, CRC, RSA
```

```
                                                        Page 2

 1                A P P E A R A N C E S
          (All appearing remotely via videoconference)
 2
      ON BEHALF OF THE PLAINTIFFS:
 3
      NICHOLS KASTER, PLLP
 4    BY:   Anna P. Prakash, Esq.
            Nicole J. Schladt, Esq.
 5          4700 IDS Center
            80 South Eighth Street
 6          Minneapolis, Minnesota 55402
            Phone:  (612) 256-3200
 7          Email:  APrakash@nka.com
            Email:  NSchladt@nka.com
 8
      -and-
 9
      LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
10    BY:   Tara L. Borelli, Esq.
            158 West Ponce De Leon Avenue
11          Suite 105
            Decatur, Georgia 30030
12          Phone:  (470) 225-5341
            Email:  TBorelli@LambdaLegal.org
13
      -and-
14
      LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
15    BY:   Avatara Smith-Carrington, Esq.
            3500 Oak Lawn Avenue
16          Suite 500
            Dallas, Texas 75219
17          Phone:  (214) 219-8585
            Email:  ASmithCarrington@LambdaLegal.org
18
19    ON BEHALF OF DEFENDANTS WILLIAM CROUCH, CYNTHIA
      BEANE, and WEST VIRGINIA DEPARTMENT OF HEALTH AND
20    HUMAN RESOURCES BUREAU FOR MEDICAL SERVICES:
21    SHUMAN McCUSKEY SLICER, PLLC
      BY:   Kimberly M. Bandy, Esq.
22          Lou Ann S. Cyrus, Esq.
            1411 Virginia Street East
23          Suite 200
            Charleston, West Virginia 25301
24          Phone:  (304) 345-1400
            Email:  KBandy@ShumanLaw.com
25          Email:  LCyrus@ShumanLaw.com
```

```
                                                      Page 3

 1                  A P P E A R A N C E S
                         (Continued)

 2

 3     ON BEHALF OF DEFENDANT JASON HAUGHT:

 4     THE EMPLOYMENT LAW CENTER, PLLC

       BY:    Walt Auvil, Esq.

 5            1208 Market Street

              Parkersburg, West Virginia 26101

 6            Phone:  (304) 485-3058

              Email:  Auvil@TheEmploymentLawCenter.com

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## DEPOSITION OF FREDERICK LEWIS

```
                                                    Page 6
 1              (PROCEEDINGS, 04/04/2022, 9:00 a.m.)
 2                    FREDERICK LEWIS,
 3      duly sworn, was examined and testified as follows:
 4                      EXAMINATION
 5    BY MS. PRAKASH:
 6        Q.   Good morning, Mr. Lewis.  My name is Anna
 7    Prakash.  I am one of the lawyers that is
 8    representing Christopher Fain and Shauntae Anderson
 9    in this lawsuit.  I am an attorney with the law
10    firm of Nichols Kaster in Minneapolis.  And my
11    pronouns are she/her.
12              I'm going to be asking you some questions
13    today and the one rule that I want you to really
14    remember is that if you don't understand what I am
15    asking, can you please ask me to clarify?
16        A.   I sure can.
17        Q.   Okay.  Great.  And if you answer my
18    question, I'm going to assume that you understood
19    it.  Does that make sense?
20        A.   Yes.
21        Q.   Okay.  Great.
22        A.   Fair enough.
23        Q.   Can you state your full name for the
24    record?
25        A.   Frederick Samuel Lewis.
```

**JA496**

## DEPOSITION OF FREDERICK LEWIS

```
                                                    Page 7

 1        Q.   Great.  And do you go by Fred?

 2        A.   I go by Fred.  Thank you.

 3        Q.   And, Fred, do you have -- do you use he/him

 4   pronouns?

 5        A.   Yes.

 6        Q.   Okay.  And you understand, Mr. Lewis, that

 7   you're designated to testify today on behalf of the

 8   West Virginia Bureau for Medical Services, right?

 9        A.   I do.

10        Q.   Okay.  And you are designated with respect

11   to certain topics.  One of them is the relationship

12   with Mountain Health Trust, UniCare, The Health

13   Plan, Aetna, and the Rational Drug Therapy Program.

14   Does that sound right to you?

15        A.   Yes.

16        Q.   Okay.  And are you prepared to testify

17   about that today?

18        A.   I believe so.

19        Q.   Okay.  And then you are also designated to

20   testify about the decision to stop excluding

21   hormone therapy from coverage in 2017 and the

22   Bureau's experience covering and/or denying

23   coverage for hormone therapy before and after 2017.

24   Does that sound right to you?

25        A.   Yes.
```

**DEPOSITION OF FREDERICK LEWIS**

Page 8

1    Q.   And are you prepared to testify about that
2    today?
3    A.   I believe so, yes.
4    Q.   Great.  And then you are also designated to
5    testify about certain discovery responses, written
6    responses, that were submitted on behalf of the
7    Bureau for Medical Services.  Do you recall being
8    designated for that?
9    A.   Yes.
10   Q.   Okay.  And are you prepared to talk about
11   that today?
12   A.   Yes.
13   Q.   Great.  So I understand that you are the
14   deputy commissioner of Plan Management and
15   Integrity at the West Virginia Bureau for Medical
16   Services; is that right?
17   A.   That's correct.
18   Q.   Okay.  And the "Plan" in your title refers
19   to the West Virginia State Medicaid Plan?
20   A.   It refers to the MCOs that we contract
21   with.
22   Q.   Okay.
23   A.   Arguably, it could be the state Medicaid
24   Plan too.  I have always related it to the MCOs.
25   We called them plans.

## DEPOSITION OF FREDERICK LEWIS

Page 9

1      Q.   I see.  And the MCOs are managed care

2    organizations?

3      A.   Yes.

4      Q.   Bureau for Medical Services I'm going to

5    refer to as "BMS" today so if I say that, will you

6    understand what I mean?

7      A.   Yes.

8      Q.   Okay.  Great.  And how long have you been

9    the deputy commissioner at BMS?

10     A.   Today, I am 10 days shy of four years.

11     Q.   And though you referenced the MCOs in

12   describing what the "Plan" in your title refers to,

13   are you familiar with the operation of the West

14   Virginia Medicaid Plan?

15     A.   I am, for the most part.  There's still

16   areas I'm learning.  I came from outside of

17   Medicaid, but I think I've learned a lot in the

18   last four years.  So I'm going to give you my best

19   and if I don't know, I'll tell you.

20     Q.   Great.  And BMS is within the West Virginia

21   Department of Health and Human Resources, correct?

22     A.   Correct.

23     Q.   And that is a state agency, the Department

24   of Health and Human Resources is?

25     A.   Yes.

## JA499

## DEPOSITION OF FREDERICK LEWIS

Case 3:20-cv-00740   Document 250-15   Filed 05/31/22   Page 9 of 22 PageID #: 1902

```
                                              Page 10
 1        Q.    BMS is responsible for the administration
 2   of West Virginia's Medicaid program?
 3        A.    Yes.
 4        Q.    Mountain Health Trust is the managed care
 5   program for West Virginia Medicaid, right?
 6        A.    That's correct.  It also is the umbrella
 7   for CHIP participants.
 8        Q.    And you referenced MCOs earlier.  Enrollees
 9   in West Virginia Medicaid who are also in the
10   managed care program of Mountain Health Trust need
11   to sign up with an MCO; is that right?
12        A.    That's correct.
13        Q.    And there are three of them:  Aetna Better
14   Health of West Virginia, The Health Plan, and
15   UniCare; is that right?
16        A.    That's right.
17        Q.    And how would you describe the role of
18   those three MCOs with respect to West Virginia
19   Medicaid?
20        A.    They all are here to manage the Medicaid
21   membership that has been placed in their custody,
22   and that happens through the -- through the
23   members' election to participate with whichever one
24   of those they may choose.  And if they don't
25   choose, there's an auto selection criteria.
```

**DEPOSITION OF FREDERICK LEWIS**

Page 11

1          The MCOs are here to manage the healthcare

2     of their members within the parameters of the state

3     program and consistent with federal and state law

4     and regulations and the contract.

5          Q.    And that's the contract between BMS and the

6     MCOs?

7          A.    Correct.

8          Q.    You mentioned auto selection criteria.  If

9     a member doesn't elect one of the MCOs, can you

10    describe what happens with respect to auto

11    selection criteria?

12         A.    It's basically an eeny meeny miny moe.  We

13    have an enrollment broker that is a neutral party

14    that will -- they have a computer logic that

15    basically distributes these members evenly around

16    all of these plans, trying to keep family units

17    together.

18          So that's the reason it's maybe not just

19    strictly, you know, directing each sequential

20    member to a different plan and continuing, you

21    know, in a circular fashion.  They try to keep

22    family units together.

23         Q.    Got it.  What's the name of the enrollment

24    broker?

25         A.    It's called Maximus.

**JA501**

**DEPOSITION OF FREDERICK LEWIS**

Page 27

1    Q.    And are you the person at BMS who is in

2    charge of contracting with the consulting

3    actuaries?

4    A.    I'm one of them.  I feel like I share this

5    with Becky Manning, the Deputy of Finance.  We have

6    overlap in this area.  But, yeah, Becky and I are

7    over this contract.  I think I actually signed the

8    SOWs this time around.

9    Q.    And do you know if BMS has ever asked or --

10   asked for or received from the actuaries any

11   calculations on how much it would cost to provide

12   surgery as a treatment for gender dysphoria?

13   A.    We have not asked for that in my time here.

14   Q.    Are you aware of BMS asking for it at any

15   point in time prior to you coming to the agency?

16   A.    I am not aware.  I'm not aware of a lot of

17   things, though, so...

18   Q.    All right.  So I understand that the MCOs

19   must follow coverage limitations required by

20   Medicaid and can't use Medicaid dollars to

21   authorize noncovered care.  Is that right?

22   A.    I think they could use Medicaid dollars as

23   long as, you know, they're coming from profit or

24   something.  But that's right.  We're not

25   providing -- we're not providing funding to them

## DEPOSITION OF FREDERICK LEWIS

Page 28

1    for the purpose of providing anything more than

2    what is basically our -- what we recognize as our

3    base level bene- -- our fee-for-service benefit is

4    sort of the guiding issue.

5        Q.   Okay.  And so that -- just so I'm clear,

6    that benefit does not include surgical care for the

7    purpose of treating gender dysphoria, correct?

8        A.   Correct.

9        Q.   Okay.  And so the MCOs could not use

10   Medicaid dollars for the purpose of treating

11   gender -- surgical care for the purpose of treating

12   gender dysphoria, correct?

13       A.   They could, as a value-add benefit, which

14   means, you know, they -- it's not our expectation

15   that they will pay for it, but, you know, maybe

16   they have a marketing strategy or something:  They

17   want to differentiate their plan from the others by

18   providing a benefit -- a benefit that wouldn't

19   otherwise be covered.  They could do that, but it

20   would be from -- it would not be something we have

21   built into that capitation, that budget, as you'd

22   say --

23       Q.   Okay.

24       A.   -- for them to pay for.  It would be coming

25   from their managed care savings, for example.  When

**DEPOSITION OF FREDERICK LEWIS**

```
                                              Page 68
 1        Q.   Okay.  And is anybody in the room with you

 2   right now?

 3        A.   I've been by myself all day.

 4        Q.   All right.  Thank you.

 5             So I understand that hormone therapy for --

 6   as a treatment for gender dysphoria was not always

 7   covered for West Virginia Medicaid participants.

 8   Is that right?

 9        A.   I have the same understanding, yes.

10        Q.   Okay.  And I understand that that changed

11   in November of 2017; is that right?

12        A.   Yes.  Well -- yes.  I think it was the 7th

13   of 2017.  I'm sorry.  November 7, 2017, or

14   thereabouts.

15        Q.   So on or around that date, hormone therapy

16   as the treatment for gender dysphoria started being

17   covered for West Virginia Medicaid participants,

18   right?

19        A.   Correct.

20        Q.   Okay.  And that was across all three of the

21   MCOs, right?

22        A.   Well, by then, the pharmacy benefit was a

23   fee-for-service benefit, so, yes, correct.  And it

24   would have also encompassed the fee-for-service

25   population outside of managed care too.
```

**DEPOSITION OF FREDERICK LEWIS**

Page 76

1   therapy?

2        A.    No.

3        Q.    But at some point in time, a member's sex

4   was considered or their gender marker was

5   considered when making a determination for hormone

6   therapy with respect to treatment for gender

7   dysphoria, right?

8        A.    Correct.  Correct.

9        Q.    Okay.  And do you know why that was?

10       A.    I do not.

11       Q.    And do you know who made the determination

12   that that gender marker should be considered for

13   the purpose of hormone therapy as a treatment for

14   gender dysphoria?

15       A.    That would have been the former director,

16   Peggy -- and I may think of her name before we're

17   done here today.  I hope I do.  I've met her.

18   She's very nice.  I just can't think -- I can see

19   her face.  I just can't think of her name -- her

20   last name.  I apologize.  I think it's in the

21   record somewhere -- in the documentation here

22   somewhere.

23       Q.    And in 2017, when the gender edit was

24   removed, who made the decision to remove it?

25       A.    And that was the director at the time,

## DEPOSITION OF FREDERICK LEWIS

```
                                          Page 77

 1   Vicki Cunningham, in consultation with the medical

 2   director, Jim Becker.  And I don't know if --

 3   again, that -- all of this predates me and my

 4   involvement here.

 5           I don't know if it came up through the

 6   leadership structure of BMS or not.  I think it was

 7   just decided by Vicki, who had some conversations

 8   with the medical director, Jim Becker.  And I know

 9   that from conversations I've had with Vicki

10   concerning this action.

11       Q.   Did those conversations take place in the

12   presence of your counsel?

13       A.   No.

14       Q.   Okay.  What did you and Vicki discuss?

15       A.   We talked about why -- I just asked her

16   why -- what was the justification for the decision,

17   you know, what -- I just wanted to know what she

18   could tell me about the history of this whole

19   thing.

20           Some of the same questions you've asked me

21   about how did we come to the decision to put the

22   edits there and then why did we remove them.  And

23   really, the most meaningful thing I got from it

24   was, she related to me her experience before coming

25   to BMS -- which she worked for HealthRight; she was
```

## DEPOSITION OF FREDERICK LEWIS

```
                                             Page 78
 1    a pharmacist for HealthRight, which provides
 2    charity care here in the Charleston area.
 3            And she worked with some folks that had
 4    gender dysphoria and were just distraught and
 5    they -- you know, they couldn't get access to
 6    hormone therapy, they couldn't get access to
 7    surgery.
 8            And she thought that this -- our
 9    understanding of how these hormones work and how
10    this therapy can be administered was far enough
11    along that she was comfortable with it.  She spoke
12    with Dr. Becker and they both felt like we could do
13    more -- Dr. Becker may be able to tell -- he may
14    not even remember this conversation.  This is how
15    it came to me from Vicki.
16            She felt that there -- we can at least do
17    this much.  If we're not going to provide the
18    surgery, we can at least provide access to this
19    therapy and it may help these folks.  And so it --
20    it's a story of compassion, and that's how the edit
21    was turned off for these instances.
22       Q.   Is there something that was a catalyst for
23    the change to happen in November of 2017?
24       A.   She said that we've been fielding -- we've
25    been getting calls about, you know, what's the
```

## JA507

## DEPOSITION OF FREDERICK LEWIS

Page 79

1    criteria?  What's the -- you know, why -- you know,

2    why are you -- why is it this way?  And she felt

3    like we didn't have good answers.

4           And so maybe there were some calls at the

5    time, but she indicated that it was always

6    something we were being asked about.  And so that

7    was a big part of it.

8       Q.   And were those questions coming from

9    members?

10      A.   Coming from members and maybe providers as

11   well.

12      Q.   Did Vicki handle those calls or did

13   somebody else?

14      A.   I don't know.  We didn't get into -- I

15   think she probably handled some, but I don't know

16   for sure.

17      Q.   And so I think you described it as

18   compassion, which I appreciate.  Why didn't that

19   compassion extend to surgical care for gender

20   dysphoria?

21      A.   I don't know the answer to that.

22      Q.   Do you know if Vicki ever raised that

23   question with anybody at BMS?

24      A.   I don't.

25      Q.   Have you ever raised that question with

## DEPOSITION OF FREDERICK LEWIS

Page 113

```
 1    same level of concern to our fee-for-service
 2    members if we try to collect it through the
 3    enrollment broker.
 4            So that's another challenge for me, is
 5    ideally we would ask these questions through the
 6    application process so that we would have the
 7    answers for all of our members, not just those in
 8    managed care.
 9            MS. PRAKASH:  Okay.  Can we go off the
10    record, please.
11            (Break:  12:29 p.m. to 12:45 p.m.)
12    BY MS. PRAKASH:
13      Q.   So, Mr. Lewis, can you describe to me what
14    your job duties are as deputy commissioner of plan
15    management and integrity at BMS?
16      A.   Yeah.  I oversee four different areas of --
17    within Medicaid.  One being the Office of Pharmacy
18    Services, as we've been discussing.  The other
19    being the Center for Managed Care.  And then the
20    Office of Program Integrity is one of my areas.
21    And the Office of Quality Management.
22      Q.   Okay.  What does the Office for Program
23    Integrity do?
24      A.   So that office oversees the spending of
25    Medicaid funds to ensure that it's for bona fide
```

**DEPOSITION OF FREDERICK LEWIS**

Page 114

1    members for bona fide purposes.  They look for

2    fraud; they look for overpayments.  Broadly,

3    overpayment, it can be a lot of things, but these

4    are -- I mean, any kind of upcoding or a

5    provider -- a scheme, duplicate claims that may

6    have been submitted.  These sorts of things.  They

7    look for all of that.

8         Q.    Do they oversee any coverage

9    determinations?

10        A.    They don't oversee coverage determinations.

11        Q.    And what does the Office for Quality

12   Management do?

13        A.    That's the office I was telling you about

14   that was originally created to complete certain

15   measures, to maintain the measures.  But we are

16   trying to change the focus of that office and get

17   the staffing up to be able to provide for

18   continuous quality improvement to the quality of

19   our care for our members, and then provide for

20   health equity as well.

21             And I have a vacant -- I have two people

22   there that have been traditionally the staff when

23   they've only been about producing the measures.  I

24   have two vacate positions.  One for a nurse and one

25   is the director -- going to be the director of the

## DEPOSITION OF FREDERICK LEWIS

Page 115

```
 1   office, that I'm trying to get filled so that we
 2   can move forward with this bigger vision for that
 3   office.
 4        Q.   Does that office, the Office of Quality
 5   Management, deal with coverage determinations at
 6   all?
 7        A.   A little bit.  So one of the things I have
 8   been doing is working with the External Quality
 9   Review Organization on -- for managed care.  And
10   the EQRO is looking at denials a bit and so they're
11   involved in receiving and kind of overseeing that
12   contract work with the EQRO.
13        Q.   What -- are you saying "Kepro"?  I'm not
14   sure I totally heard the last part.
15        A.   E-Q-R-O.  EQRO.  External Quality Review
16   Organization.  I'm sorry.  We are terrible about
17   using acronyms.
18        Q.   No, that's okay.
19        A.   My apologies.
20             The External Quality Review Organization is
21   called Qlarant and the Office of Quality Management
22   is engaged with Qlarant in overseeing their
23   contract work in that capacity.  But -- you know,
24   one of the things they look at is the -- they call
25   it GAD.  It's grievances, appeals, and denials.  So
```

## DEPOSITION OF FREDERICK LEWIS

Page 116

```
 1    they do some statistical work for us around that
 2    and -- that's probably about as close as I can get.
 3         Q.    Okay.  And when they are looking at
 4    grievances and denials, are they looking to make
 5    sure that those are consistent with BMS standards?
 6         A.    I believe so.  And CMS standards as well.
 7         Q.    Got it.  Are they looking at whether there
 8    should be any changes made to the standards?
 9         A.    That, I'm not sure.
10         Q.    Who would know that?
11         A.    Tanya Cyrus.
12         Q.    What's --
13         A.    She is -- she is over the Office of Program
14    Integrity and the Office of Quality Management and
15    reports to me.
16         Q.    Who else reports to you?
17         A.    That's basically it.  So Brian Thompson,
18    the pharmacy director; Susan Hall, the chief of
19    managed care; and Tanya Cyrus, the chief of quality
20    and integrity.
21         Q.    And --
22         A.    I used to have a secretary.  That position
23    is vacate still.  I mean, it was a shared position,
24    so I have three people.  Direct reports.
25         Q.    Okay.  And who do you report to?
```

Page 136

REPORTER'S CERTIFICATE

1

2

STATE OF MINNESOTA    )
                      ) ss.
3

COUNTY OF HENNEPIN    )

4

        I hereby certify that I reported the remote
5    deposition of FREDERICK LEWIS, on April 4, 2022,
     via Veritext Virtual Videoconference, and that the
6    witness was by me first duly affirmed to tell the
     whole truth;

7

        That the testimony was transcribed by me and
8    is a true record of the testimony of the witness;
9        That the cost of the original has been
     charged to the party who noticed the deposition,
10   and that all parties who ordered copies have been
     charged at the same rate for such copies;

11

        That I am not a relative or employee or
12   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;

13

        That I am not financially interested in the
14   action and have no contract with the parties,
     attorneys, or persons with an interest in the
15   action that affects or has a substantial tendency
     to affect my impartiality;

16

        That the right to read and sign the
17   deposition by the witness was preserved.

18

        WITNESS MY HAND AND SEAL THIS 12th day of
19   April, 2022.

20

21

22

23

24   Merilee S. Johnson, RDR, CRR, CRC, RSA
     Notary Public, Hennepin County, Minnesota
25   My commission expires January 31, 2026

```
                                              Page 1
 1           IN THE UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3    _____
                                         |
 4   CHRISTOPHER FAIN, individually      |
     and on behalf of all others         |
 5   similarly situated,                 |
                                         |
 6           Plaintiffs,                 |    Case No.
                                         | 3:20-cv-00740
 7   vs.                                 |
                                         |
 8   WILLIAM CROUCH, et al.,             |
                                         |
 9           Defendants.                 |
     _____ |
10
11            REMOTE 30(b)(6) DEPOSITION OF
12      WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
13          RESOURCES, BUREAU FOR MEDICAL SERVICES

13      by and through their corporate representative
14
                      BECKY MANNING
15
16
17    DATE:       April 12, 2022
18    TIME:       9:59 a.m. (Eastern)
19    PLACE:      Veritext Virtual Videoconference
20
21
22
23
24    JOB NO.:     MW MW 5096193
      PAGES:       1 to 85
25    REPORTED BY:   Merilee Johnson, RDR, CRR, CRC, RSA
```

```
                                                Page 2

 1                  A P P E A R A N C E S
              (All appearing remotely via videoconference)
 2
 3    ON BEHALF OF THE PLAINTIFFS:
 4    NICHOLS KASTER, PLLP
      BY:    Nicole J. Schladt, Esq.
 5           Anna P. Prakash, Esq.
             4700 IDS Center
 6           80 South Eighth Street
             Minneapolis, Minnesota 55402
 7           Phone:  (612) 256-3200
             Email:  NSchladt@nka.com
 8           Email:  APrakash@nka.com
 9    -and-
10    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
      BY:    Tara L. Borelli, Esq.
11           158 West Ponce De Leon Avenue
             Suite 105
12           Decatur, Georgia 30030
             Phone:  (470) 225-5341
13           Email:  TBorelli@LambdaLegal.org
14    -and-
15    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
      BY:    Avatara Smith-Carrington, Esq.
16           3500 Oak Lawn Avenue
             Suite 500
17           Dallas, Texas 75219
             Phone:  (214) 219-8585
18           Email:  ASmithCarrington@LambdaLegal.org
19    ON BEHALF OF DEFENDANTS WILLIAM CROUCH, CYNTHIA
      BEANE, and WEST VIRGINIA DEPARTMENT OF HEALTH AND
20    HUMAN RESOURCES BUREAU FOR MEDICAL SERVICES:
21    SHUMAN McCUSKEY SLICER PLLC
      BY:    Kimberly M. Bandy, Esq.
22           Lou Ann S. Cyrus, Esq.
             1411 Virginia Street East
23           Suite 200
             Charleston, West Virginia 25301
24           Phone:  (304) 345-1400
             Email:  KBandy@ShumanLaw.com
25           Email:  LCyrus@ShumanLaw.com
```

USCA4 Appeal: 22-1927    Doc: 20-1    Filed: 10/31/2022    Pg: 536 of 610

```
                                              Page 3

 1                   A P P E A R A N C E S
                           (Continued)
 2

 3     ON BEHALF OF DEFENDANT JASON HAUGHT:

 4     THE EMPLOYMENT LAW CENTER, PLLC
       BY:    Walt Auvil, Esq.
 5            1208 Market Street
              Parkersburg, West Virginia 26101
 6            Phone:  (304) 485-3058
              Email:  Auvil@TheEmploymentLawCenter.com
 7

 8     ALSO APPEARED:

 9            Nicholas Guillory, Law Fellow

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**DEPOSITION OF BECKY MANNING**

```
                                                    Page 11
 1        A.    Yes.
 2        Q.    Okay.
 3        A.    Those two are interchangeable.
 4        Q.    Great.  So if I use "BMS," you'll also know
 5   what I'm referring to?
 6        A.    Yes.
 7        Q.    And, Ms. Manning, I know you're the deputy
 8   commissioner.  Are you, more specifically, the
 9   deputy commissioner of Finance?
10        A.    Finance and Administration.
11        Q.    And you've held this position since
12   January of 2021; is that right?
13        A.    That's correct.
14        Q.    What are your job duties as deputy
15   commissioner of Finance and Administration?
16        A.    I report directly to Commissioner Beane.
17   And I'm responsible for overseeing the financial
18   unit, which also includes purchasing, cash
19   management.  Our chief financial officer -- I have
20   one direct report, which is our chief financial
21   officer.  And then under her is our accounts
22   payable, our accounts receivable, cash management,
23   and purchasing.
24        Q.    And who is the chief financial officer?
25        A.    Mandy Carpenter.
```

**DEPOSITION OF BECKY MANNING**

Page 12

1      Q.   And I understand that you've been with DHHR

2   for over 20 years; is that right?

3      A.   That's correct.

4      Q.   Okay.  So we're going to go through a few

5   of your previous roles at the department.  So prior

6   to being deputy commissioner, is it true that you

7   were chief financial officer for West Virginia

8   Medicaid?

9      A.   Yes.

10      Q.   And did you hold that position from

11   June 2018 to January 2021?

12      A.   Yes.

13      Q.   What were your job duties as chief

14   financial officer?

15      A.   I oversaw directly the supervision and work

16   of budget preparation, director -- I oversaw the

17   work of the director of purchasing, cash receipts,

18   expenses, accounts payable, and accounts

19   receivable.

20      Q.   And prior to being chief financial officer

21   for West Virginia Medicaid, is it true that you

22   were the deputy director of Office of Human

23   Resource Management?

24      A.   That's correct.

25      Q.   And did you hold that job position from

**DEPOSITION OF BECKY MANNING**

Page 13

1    June 2015 to June 2018?

2        A.   That's correct.

3        Q.   What were your job duties in that role?

4        A.   There were five units within the -- like

5    the division of Human Resource Management.  It's

6    more like an office or support service for the

7    DHHR.  And so I -- it was my responsibility to

8    oversee those five sections.

9        Q.   Okay.  And prior to being deputy director

10   of the Office of Human Resource Management, were

11   you the director of Budgets for DHHR?

12       A.   That's correct.

13       Q.   And did you hold that position from

14   November 2013 to June 2015?

15       A.   That's correct.

16       Q.   What were your job duties as the director

17   of Budgets for DHHR?

18       A.   I helped support each of the bureaus under

19   DHHR prepare their budget, monitor their budget and

20   their expenses.  I helped prepare fiscal notes

21   from, like, proposed legislation and worked with

22   the legislature.  I also worked with our chief

23   budget officer to finalize budgets, six-year

24   projections, and any reconciliations that might be

25   needed.

**JA519**

**DEPOSITION OF BECKY MANNING**

Page 14

1       Q.   And prior to being director of Budgets,
2    were you the director of Financial Services for the
3    Bureau for Public Health?
4       A.   Yes.
5       Q.   And did you hold that job from October 2007
6    to November 2013?
7       A.   Yes.
8       Q.   What were your job duties in that role?
9       A.   To support all of the offices within the
10   Bureau for Public Health as related to their
11   financial means:  budgeting, grant support,
12   financial reports, p-card, travel, accounts
13   payable, accounts receivable.
14      Q.   Prior to that, were you the director of
15   Financial Services for the Bureau for Behavioral
16   Health and Health Facilities?
17      A.   Correct.
18      Q.   And did you hold that role from August 2004
19   to October 2007?
20      A.   That's correct.
21      Q.   Were your job duties similar to the ones
22   you were just describing as director of Financial
23   Services for the Bureau for Public Health?
24      A.   Yes.
25      Q.   Okay.  And then prior to that, were you an

**DEPOSITION OF BECKY MANNING**

Page 15

1    accountant in the Office of Behavioral Health?

2         A.   Yes, that's correct.

3         Q.   And were you an accountant from March 2002

4    to August 2004?

5         A.   That's correct.

6         Q.   What were your job duties as an accountant

7    in the Office of Behavioral Health?

8         A.   Behavioral Health has a lot of grants, so

9    it was my responsibility to prepare those grant

10   agreements and work with DHHR Finance.

11        Q.   Have you ever held any other positions,

12   other than the ones we just went through, within

13   the Department?

14        A.   No.

15        Q.   Is your highest degree a master of business

16   administration from Marshall University?

17        A.   It is.

18        Q.   And you graduated in 2003?

19        A.   That's correct.

20        Q.   Do you also have a bachelor of science and

21   accounting from Concord University?

22        A.   That's correct.

23        Q.   And you graduated from there in 2000?

24        A.   That's correct.

25        Q.   Okay.  Ms. Manning, we're going to shift

## DEPOSITION OF BECKY MANNING

                                                        Page 17

 1        A.   Yes, ma'am.

 2        Q.   Now, Ms. Manning, you're here today to --

 3   excuse me.  Let me start that over.

 4             I'm here today to take a deposition of an

 5   organizational representative for BMS.  Do you

 6   understand that?

 7        A.   Yes, ma'am.

 8        Q.   And you've been designated as the

 9   organizational representative to give testimony on

10   certain topics that we're going to discuss today.

11             Do you understand that you've been

12   designated for particular topics?

13        A.   Yes, ma'am.

14        Q.   I believe you just answered this, but were

15   you notified that you would be giving testimony as

16   BMS's organizational representative in

17   October 2021?

18        A.   Yes, ma'am.

19        Q.   Was that the first time you were notified

20   that you would be giving testimony?

21        A.   Yes, ma'am.

22        Q.   Now we're going to use Exhibit Share for

23   the first time so it always takes a little bit

24   longer the first time.

25        A.   Okay.

**JA522**

**DEPOSITION OF BECKY MANNING**

Page 24

1   following that.

2           Do you see that?

3       A.   Yes, ma'am.

4       Q.   Ms. Manning, you've been designated to

5   testify about Topic 2.  And Topic 2 reads, "Your

6   receipt of federal and/or state funds, including

7   funds from the U.S. Department of Health and Human

8   Services, and all representations made to the

9   federal and/or state government in the course of

10  securing such funds."

11          Did I read that correctly?

12      A.   Yes, ma'am.

13      Q.   Can you confirm that you're prepared to

14  discuss this topic as the organizational

15  representative for BMS?

16      A.   Yes, ma'am, I am.

17      Q.   How is West Virginia Medicaid funded?

18      A.   We were funded in partnership with the

19  Centers for Medicare and Medicaid Services, which

20  is a federal agency.  We are funded through general

21  revenue appropriated from the state legislature and

22  we are funded through -- like tax dollars, directly

23  given to Medicaid from provider taxes and managed

24  care tax.

25      Q.   And what percentage of West Virginia

**DEPOSITION OF BECKY MANNING**

Page 25

1    Medicaid's funding comes from the federal

2    government?

3         A.   The percentages are based upon

4    expenditures.  So overall, it's an average of about

5    80 percent.

6         Q.   And from which agencies within the federal

7    government does that funding come?

8         A.   The funding comes from the Centers for

9    Medicare and Medicaid Services, also known as CMS.

10   So if I just say "CMS" in the future, that's what

11   I'm referring to.

12        Q.   Great.  And that's exactly what I was going

13   to ask you next so you read my mind.

14             Do you receive any money or does

15   West Virginia Medicaid receive any funding from the

16   U.S. Department of Health and Human Services?

17        A.   CMS falls under Department of Health and

18   Human Services.

19        Q.   Are there any other federal agencies from

20   which West Virginia Medicaid receives funds other

21   than HHS and CMS underneath that?

22        A.   No.

23        Q.   What percentage of West Virginia Medicaid's

24   funding comes from the State of West Virginia?

25        A.   Approximately 20 percent.

**JA524**

**DEPOSITION OF BECKY MANNING**

Page 27

```
 1        A.    Yes.

 2        Q.    What services were those?

 3        A.    Substance use disorder and the other one

 4   has the acronym of the MOM model, maternal opioid

 5   misuse.

 6        Q.    Does the West Virginia Medicaid program

 7   have an annual budget?

 8        A.    Yes, ma'am.

 9        Q.    What is its annual budget?

10        A.    It fluctuates between years, but it can

11   range anywhere from $4.5 to $5.1 billion.

12        Q.    What does that number reflect exactly?

13        A.    It reflects state and federal dollars of

14   expenditures for medical expenses for Medicaid

15   members that are both in fee-for-service population

16   and managed care.

17        Q.    Can you summarize how the budget is

18   determined each year?

19        A.    It's based upon how much, working with the

20   actuaries, BMS Finance thinks we will need for the

21   current services that we are required to provide

22   based upon utilization, number of members, and any

23   trend applied to that by our actuaries were changes

24   for economic factors.

25        Q.    So of that fluctuating $4.5 to $5.1 billion
```

**DEPOSITION OF BECKY MANNING**

Page 31

1      A.   That's correct.

2      Q.   So I'm going to pull up what I believe to

3   be the six-year projection to see if it's the

4   document you're talking about.  So I will do that

5   now.  Give me a moment to mark it.

6            (Exhibit 2 was marked for

7            identification.)

8      Q.   I'm marking this Exhibit as BM0002.  It

9   should be in your folder.

10      A.   Okay.

11      Q.   Is this the document that you were

12   referring to, Ms. Manning, that would be helpful to

13   look at?

14      A.   This one starts with 2002.  So if you

15   wanted the budget for 2002, we can -- we can start

16   with this one.  If you wanted 2001, we might want

17   to start with maybe one of the CMS quarterly

18   reports.

19      Q.   Ms. Manning, do you mean 2022?

20      A.   Yeah.  I think you wanted 2022, the total

21   budget, I can give you that from this one.  I can

22   give you that from this six-year projection.

23      Q.   Sure.  Can you tell me what the projected

24   budget or what you're referring to as total budget

25   is for 2022?

**DEPOSITION OF BECKY MANNING**

Page 32

1      A.   Sure.  The total projected budget for 2022

2   is the first line that has an "E" -- I keep wanting

3   to point.  I don't know if you can see my mouse

4   when I hover over the screen.  But it has an

5   estimated expenditures of $5,490,588,806.

6      Q.   Okay.  And that 5 billion number, that is

7   the projected budget for 2022?

8      A.   Correct.  When this document was published,

9   '22 was not updated with final numbers yet.

10  Because we have what is called run-out.  So it

11  usually takes six months or more for claims to run

12  out and for us to update these projections.

13     Q.   Okay.  So is there a more recent projection

14  for 2022's budget than this one?

15     A.   No.  This is the most up-to-date version we

16  have.

17     Q.   Okay.  And I understand that by looking at

18  this projection, you're not able to tell what the

19  annual budget was in 2020 or 2021; is that correct?

20     A.   Correct.

21     Q.   Okay.  We may come back to 2020 and 2021.

22  I'm going to try to avoid pulling up documents and

23  the pause that that creates until --

24     A.   Okay.

25     Q.   -- a little bit later in the day, so I may

**DEPOSITION OF BECKY MANNING**

Page 41

1  purposes.

2          Because, as you can see for 2022 and 2023,

3  the very last line shows that Medicaid has a

4  surplus for those years, the $343 million, the very

5  last line, and the $117 million.  Those funds are

6  used to save -- to save money for future years when

7  things don't look as positive.

8          For example, if you look at 2024, we are

9  set to hit our first -- what we term as our

10  Medicaid cliff, when we will be in the negative

11  situation.  Meaning if we still cover the services

12  that we are required to cover at the current rates

13  that we cover them, with the current membership

14  enrollment, we will be at a negative situation of

15  $128.3 million.

16      Q.   And to be clear, that $128 million number

17  under 2024 on the spreadsheet we're looking at,

18  that is the bottom line of where the budget would

19  look if everything is as the estimates are entered

20  here?

21      A.   This would assume that we do not receive

22  any future funding cuts or future funding cash

23  injections for Medicaid.  We have also made

24  assumptions within our budget about utilization

25  membership trend.

**DEPOSITION OF BECKY MANNING**

Page 44

1  the state doesn't have it, we wouldn't get it.

2      Q.   What happens if West Virginia Medicaid

3  doesn't receive all of the money it requests from

4  the state.

5      A.   We will have to make decisions about what

6  will be cut and where.

7      Q.   Has that had to happen during your tenure

8  at DHHR?

9      A.   Not during my tenure, no.  And one of the

10  things to keep in mind is that we received an

11  additional 6.2 in FMAP from the federal government

12  with the public health emergency, so that was able

13  to provide some additional relief to states who

14  were currently struggling and to cover those

15  members that we cannot take off the Medicaid roles

16  and so that people would have healthcare during the

17  public health emergency.

18      Q.   And what does FMAP stand for?

19      A.   Federal Matching Participation.  It's the

20  amount we get from the federal government that --

21  when we put up against state funds, that we get in

22  return for our state dollar.

23      Q.   And you mentioned you received an

24  additional 6.2.

25      A.   Mm-hmm.

**DEPOSITION OF BECKY MANNING**

Page 49

1    reasons for covering or not covering a service that

2    West Virginia Medicaid could cover?

3         A.   From a financial standpoint.

4         Q.   So you're -- oh, go ahead.

5         A.   The reason that I might look at those

6    reasons and the reasons that someone else might

7    look at that are different.  I'll look at that

8    from, Can we afford it?  I think it's other

9    people's responsibility to determine:  Is that

10   within the scope?  Is that within policy?  Is that

11   within CMS guidelines?

12             It is my responsibility to say, if we do

13   this, can we afford this?  Is it something that we

14   can support in an ongoing basis?  What does this do

15   to our budget as a Medicaid agency?

16        Q.   Okay.  So --

17        A.   Because --

18        Q.   Oh, go ahead.

19        A.   One of the things that you have to contend

20   when you ask CMS for a service, to cover a service,

21   is that you have the funding.

22        Q.   Okay.  I'm going to pull up another

23   document so give me just a second to do that.  I'm

24   going to mark this document as Exhibit BM0003.

25        A.   Okay.

**DEPOSITION OF BECKY MANNING**

```
                                          Page 50
 1        Q.    And it should be popping up in your folder
 2   shortly.
 3              (Exhibit 3 was marked for
 4              identification.)
 5        A.    Okay.  I have it.
 6        Q.    This document is titled Defendants'
 7   Response to Plaintiff's First Set of
 8   Interrogatories to Defendants William Crouch,
 9   Cynthia Beane, and West Virginia Department of
10   Health and Human Resources, Bureau for Medical
11   Services.
12              Did I read that correctly?
13        A.    Yes.
14        Q.    Please take a moment to review this
15   document and let me know when you're ready to move
16   on.  I've got a couple questions about it.
17        A.    (Reviewing document.)
18        Q.    Also, I'm realizing now it's a fairly long
19   document and so to the extent we'll be talking
20   about it, I'm going to direct your attention to
21   page 2 and number 2.  So I'm not sure if you were
22   reviewing the full thing because that's what I
23   asked or not.
24        A.    (Reviewing document.)  Okay.  I'm ready.
25        Q.    Do you recognize this document?
```

**DEPOSITION OF BECKY MANNING**

Page 51

```
 1        A.   I do.
 2        Q.   Is this document a copy of Defendants'
 3   Responses to Plaintiff's First Set of
 4   Interrogatories?
 5        A.   It is.
 6        Q.   So I directed your attention to page 2
 7   where you'll see text that reads as follows:
 8   Number 2, "Describe in detail the factual basis for
 9   each governmental interest that defendants contend
10   supports the exclusion.
11        "Response:  These defendants state that
12   they provide coverage that is mandated for coverage
13   by the Centers for Medicare and Medicaid Services
14   (CMS).  These defendants are constrained by
15   budgetary/cost considerations."
16        Did I read that text accurately?
17        A.   Yes.
18        Q.   So the second sentence there states that
19   BMS is constrained by budgetary/cost
20   considerations.  Does that response describe what
21   you were just explaining to me?
22        A.   Yes, ma'am.
23        Q.   Okay.  Do you agree with that response?
24        A.   I do.
25        Q.   As the organizational representative, can
```

**DEPOSITION OF BECKY MANNING**

Page 57

1    equivalent, the Department of Personnel puts out

2    the cost that we'll use for each pay grade type so

3    that's not a sub- -- you know, it's not a

4    subjective cost.  It wouldn't be what I wanted to

5    pay them.

6              So they give us the -- like the type of

7    position and then the market salary that we would

8    use for the purpose of fiscal notes and then the

9    benefit percentages.  So that way each agency

10   within state government is using apples-to-apples

11   comparisons.

12       Q.   Has BMS priced out the cost of providing

13   gender affirming care?

14       A.   I have not.  In order to do that, I would

15   need a list of codes that I would be pricing.

16       Q.   So are you saying that you personally

17   haven't researched the cost of providing gender

18   affirming care?

19       A.   Correct.

20       Q.   Do you know of anybody else at BMS who has

21   researched the cost of providing gender affirming

22   care?

23       A.   I do not.

24       Q.   If you wanted to get a list of codes

25   related to gender affirming care, could you do

**DEPOSITION OF BECKY MANNING**

Page 62

1      Q.   Are you aware of Dr. Becker pricing out

2    codes related to gender affirming care?

3      A.   I can't speak for Dr. Becker and what

4    Dr. Becker has done.  I can only speak for, like,

5    what projects I know, that when I have a question,

6    that he has a team of people that work on that sort

7    of stuff.

8      Q.   So sitting here today as the organizational

9    representative, you are not aware or have knowledge

10   of Dr. Becker looking at codes related to gender

11   affirming care and pricing them out; is that

12   correct?

13     A.   Correct.  And I can't -- I mean, I can't

14   speak for Dr. Becker.

15     Q.   Okay.  I want to turn your attention

16   briefly to the exhibit we had up marked BM0003.

17     A.   Okay.

18     Q.   And we were looking at page 2, the response

19   to number 2.  Do you have that up?

20     A.   I do.

21     Q.   As the organizational representative for

22   BMS, are you aware of any other governmental

23   interest supporting the exclusion that were not

24   identified in defendants' discovery responses here

25   on this exhibit?

**DEPOSITION OF BECKY MANNING**

Page 63

1        A.   (Reviewing document.)  I'm not aware.  No.

2        Q.   Okay.  Let's turn back to the very first

3   exhibit, BM0001, or Plaintiffs' Second Amended

4   Notice of 30(b)(6) Deposition, and I'm going to ask

5   you to turn to page 4, please.

6             You've been designated to testify about

7   Requests for Production 7 and 27 under Topic 18.

8   Do you see Topic 18 at the bottom of page 4?

9        A.   Yes, ma'am.

10        Q.   And Topic 18 reads, "All interrogatory

11   requests, requests for admission, and requests for

12   production of documents directed to defendants

13   William Crouch, Cynthia Beane, and West Virginia

14   Department of Health and Human Resources,

15   Bureau for Medical Services, and any discovery

16   responses, responsive documents, filings, or

17   productions, by or on behalf of defendants

18   William Crouch, Cynthia Beane, and West Virginia

19   Department of Health and Human Resources,

20   Bureau for Medical Services."

21             Did I read that correctly?

22        A.   Yes, ma'am.

23        Q.   Are you aware that as part of testifying

24   about the discovery responses in Topic 18, Counsel

25   for BMS designated you as the organizational

Page 85

1                    REPORTER'S CERTIFICATE
2

STATE OF MINNESOTA    )
3                     ) ss.
COUNTY OF HENNEPIN    )

4

            I hereby certify that I reported the remote
5    deposition of BECKY MANNING, on April 12, 2022, via
     Veritext Virtual Videoconference, and that the
6    witness was by me first duly affirmed to tell the
     whole truth;

7

            That the testimony was transcribed by me and
8    is a true record of the testimony of the witness;
9            That the cost of the original has been
     charged to the party who noticed the deposition,
10   and that all parties who ordered copies have been
     charged at the same rate for such copies;

11

            That I am not a relative or employee or
12   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;

13

            That I am not financially interested in the
14   action and have no contract with the parties,
     attorneys, or persons with an interest in the
15   action that affects or has a substantial tendency
     to affect my impartiality;

16

            That the right to read and sign the
17   deposition by the witness was preserved.

18

            WITNESS MY HAND AND SEAL THIS 20th day of
19   April, 2022.

20
21
22
23
                    _____
24           Merilee S. Johnson, RDR, CRR, CRC, RSA
             Notary Public, Hennepin County, Minnesota
25           My commission expires January 31, 2026

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

**JA536**

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                  HUNTINGTON DIVISION

4    ----------------------------------------------------

5    Christopher Fain, individually and on behalf of all

6    others similarly situated, et al.,

7              Plaintiffs,

8      vs.               CIVIL ACTION NO. 3:20-cv-00740

9    William Crouch, et al.,

10             Defendants.

11   ----------------------------------------------------

12

13

14          REMOTE DEPOSITION OF BRIAN THOMPSON

15

16

17

18   DATE:   April 13, 2022

19   TIME:   8:00 a.m. CST

20   PLACE:  Veritext Virtual Videoconference

21

22

23

24   REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25   JOB NUMBER:  5128144

```
                                                    Page 2
 1                        APPEARANCES

 2

 3    On Behalf of the Plaintiffs (Via Videoconference):

 4          TARA L. BORELLI, ESQ.

 5          Lambda Legal Defense and Education Fund, Inc.

 6          158 West Ponce De Leon Ave., Suite 105

 7          Decatur, Georgia  30030

 8          470.225.5341

 9          tborelli@lambdalegal.org

10

11          AVATARA SMITH-CARRINGTON, ESQ.

12          Lambda Legal Defense and Education Fund, Inc.

13          3500 Oak Lawn Avenue, Suite 500

14          Dallas, Texas  75219

15          214.219.8585

16          asmithcarrington@lambdalegal.org

17

18          ANNA PRAKASH, ESQ.

19          Nichols Kaster PLLP

20          80 South 8th Street, Suite 4700

21          Minneapolis, Minnesota  55402-2224

22          612.256.3291

23          aprakash@nka.com

24

25
```

```
                                                    Page 3

 1        WALT AUVIL, ESQ.

 2        The Employment Law Center, PLLC

 3        1208 Market Street

 4        Parkersburg, West Virginia   26101

 5        304.485.3058

 6        auvil@theemploymentlawcenter.com

 7

 8   On Behalf of Defendants William Crouch; Cynthia Beane;

 9   and West Virginia Department of Health and Human

10   Resources, Bureau for Medical Services (Via

11   Videoconference):

12        KIMBERLY M. BANDY, ESQ.

13        Shuman McCuskey Slicer, PLLC

14        1411 Virginia Street East, Suite 200

15        Charleston, West Virginia   25301

16        304.345.1400

17        kbandy@shumanlaw.com

18

19

20

21

22     NOTE:  The original deposition transcript will be

23   delivered to Attorney Smith, Esq., as the taking

24   attorney.

25
```

# DEPOSITION OF BRIAN THOMPSON

Page 13

```
1   being challenged?

2       A.  I believe so, yes.

3       Q.  Okay.  And what is your understanding of that

4   exclusion?

5       A.  My understanding is that we, we do not pay for,

6   we do not cover the medical part of this, the surgeries,

7   but we do cover hormone therapy.

8       Q.  Okay.  So if I refer to the exclusion throughout

9   today you'll understand what I mean?

10      A.  Yes, from a broad standpoint, yes.

11      Q.  Okay.  So, Mr. Thompson, you are the director of

12  pharmacy services of BMS at the West Virginia Department

13  of Health and Human Resources, correct?

14      A.  Correct.

15      Q.  All right.  And what responsibilities fall under

16  your role within BMS?

17      A.  So I'm expected to make policy regarding

18  pharmaceutical coverage, I manage the budget for the

19  pharmacy department and I have staff that configure

20  benefits for certain drugs and I also make policy around

21  exceptions to our criteria.  In those cases a lot of

22  times things are used off label, which we are given some

23  leeway as to how, how to choose to cover as a state.

24      Q.  Got it.  And who is your direct supervisor?

25      A.  Fred Lewis.
```

## DEPOSITION OF BRIAN THOMPSON

Page 21

1   list and I remember seeing, you know, there was a lot of

2   exhibits.

3       Q.  Okay.

4       A.  I think I have seen this one, yes.

5       Q.  Okay.  And have you been told that you've been

6   designated to speak as the organizational representative

7   of BMS in response to certain topics contained in this

8   deposition notice?

9       A.  Yes, yeah.

10      Q.  Okay, great.  So we'll come back to this

11  document throughout the day as we get through each

12  topic, but I just wanted to show it to you, okay?

13      A.  Okay.  I thought the one I saw had my name on it

14  too.

15      Q.  Let's see.  So this is interesting, this is the

16  one that doesn't actually have your name on it.  Okay.

17  All right.  I'm going to pull up the right one that has

18  your name on it.  Actually, if it's okay, can we take a

19  quick five-minute break.

20      A.  Sure.

21      Q.  Great.  Thank you very much, I'll be right back.

22              ATTORNEY SMITH:  Kelley, can we go off the

23  record.

24              (A break was taken at 8:20 a.m.)

25              ATTORNEY SMITH:  All right.  So I am going

# DEPOSITION OF BRIAN THOMPSON

Page 22

1    to introduce another exhibit.

2              (Exhibit 2 marked for identification.)

3    BY ATTORNEY SMITH:

4       Q.  Okay.  Mr. Thompson, if you refresh your page

5    for Exhibit Share you should see a new exhibit, it will

6    have the Exhibit Number BT0002.

7       A.  Yep, I see it.

8       Q.  Great, okay.  I have just introduced plaintiffs'

9    second amended notice of 30(b)(6) deposition, Exhibit

10   Number BT0002.  If you want to take a minute to review

11   this document as well, Mr. Thompson, please feel free to

12   do so.

13      A.  Okay.

14      Q.  Okay.  So do you recognize this document?

15      A.  Yes.

16      Q.  And do you see your name at No. 10?

17      A.  I do.

18      Q.  Okay, great.  So this is the document that we

19   will come back to throughout the rest of the day and

20   specifically as we discuss each topic, okay?

21      A.  Okay.

22      Q.  All right.  As an organizational representative

23   did you meet with any Medicaid participants who are

24   transgender to prepare for today?

25      A.  No, I have several acquaintances that are

## DEPOSITION OF BRIAN THOMPSON

Page 33

1   prior authorization forms is there a field that collects

2   information regarding diagnosis?

3       A.  Yeah, yes.  So some drugs have specific prior

4   authorization forms designed to help the flow of

5   questions for that drug, but we have a general PA form

6   which can be used for any drug, anything that you're

7   using off label or whatever and there is a little spot

8   where you put in what it's being used for and also what

9   you previously used for treatment of whatever you're

10  asking it for.

11      Q.  Okay.  And just to confirm what I think I heard

12  you say earlier, if a patient required hormone

13  replacement therapy for treatment of gender dysphoria

14  only, they would receive treatment for that hormone

15  replacement therapy, correct?

16      A.  Oh, definitely, yes.

17      Q.  Okay.  BMS sometimes covers puberty delaying

18  care for the treatment of gender dysphoria, correct?

19      A.  Yes, we have.  It's a little bit more, there's a

20  little bit more safety concern when you're dealing with

21  children because there are long-term effects from

22  delaying puberty.  So every case with something like

23  this is always going to be reviewed by the medical

24  director for safety.

25      Q.  Okay.  And who is the medical director?

## DEPOSITION OF BRIAN THOMPSON

Page 37

1    Q.  But you said that puberty delaying coverage

2    could conceivably be covered through EPSDT, is that

3    correct?

4    A.  I say that only because I've always been told

5    that anything could get approved through EPSDT if you

6    could defend why it was medically necessary.

7    Q.  Okay.

8    A.  But the other thing you have to remember is with

9    EPSDT it's not really necessary if they have full

10   Medicaid and it's already something we cover, it's

11   generally used for those things that we don't already

12   cover or for children that don't have full Medicaid.

13   Q.  You testified earlier that requests for puberty

14   delaying treatment are subject to a review process,

15   correct?

16   A.  Yeah.  Well, every drug is subject to some sort

17   of drug utilization review, whether it's automatic or

18   electronic edits or because it requires a prior

19   authorization.  And in those cases they would require

20   prior authorization just because a lot of those are

21   injectable if you're talking about the delaying, they're

22   typically injectable, long-acting injectable agents.

23   Q.  Does that mean that under the right

24   circumstances puberty delaying treatment could be

25   approved to treat gender dysphoria?

## DEPOSITION OF BRIAN THOMPSON

Page 38

1      A.  Yes, I would say so.

2      Q.  I'm going to introduce another exhibit.

3           (Exhibit 4 marked for identification.)

4      Q.  All right.  Do you see what has been marked as

5  Exhibit BT0004?

6      A.  Let me refresh.  Yep, I have it.

7      Q.  Okay.  I'm showing you what has been marked as

8  Exhibit BT0004, it is an email with a subject, "Gender

9  dysphoria."  In the lower right-hand corner of the

10  document is Bates stamped DHHRBMS012665.  Do you see

11  that?

12      A.  I do.

13      Q.  Okay.  Please take a moment to review this

14  email.

15      A.  Yes.

16      Q.  Okay.

17      A.  This is the one I was referring to, yes.

18      Q.  So you recognize this email, correct?

19      A.  Yes.

20      Q.  Okay.  So please scroll down to the page with

21  the Bates stamp DHHRBMS012666.

22      A.  Okay.

23      Q.  All right.  I am going to read a portion of that

24  email, it says, "Unfortunately Jim and I discussed this

25  case today before I saw your email.  I did determine

## DEPOSITION OF BRIAN THOMPSON

Page 48

1   Please take a moment to review this email.  And just so

2   you know, it's pretty much the first three pages.

3        A.  Yeah, I recall seeing this.

4        Q.  Okay.  So you recognize this email?

5        A.  I do.

6        Q.  Okay.  I'm going to direct your attention to the

7   message in the middle of the chain on Page 2, you'll see

8   the Bates number at the bottom DHHRBMS021583.

9        A.  Okay.

10       Q.  Okay.  So it reads, "Thank you.  It is fine to

11  override the edit when hormones are prescribed for

12  transgender members."  Did I read that correctly?

13       A.  You did, yes.

14       Q.  Okay.  Who's the email from?

15       A.  That is from Vickie Cunningham who was the

16  director of pharmacy at the time and it's sent to the

17  director of Rational Drug Therapy Program at the time to

18  Stephen Small.

19       Q.  Okay.  Is the edit being discussed in the email

20  the gender edit that we've discussed?

21       A.  That's what I was about to say, I can't say from

22  the text that they're talking about a gender edit, but

23  that would be my assumption that that's what they're

24  talking about.

25       Q.  Okay.  And the removal of the gender edit allows

## DEPOSITION OF BRIAN THOMPSON

Page 49

1    for the coverage of pharmaceuticals for treatment of

2    gender dysphoria, correct?

3        A.  Yes.  So there are, as I said before, there are

4    reasons to have gender edits for safety purposes.  You

5    would typically not want to give testosterone to say a

6    woman of child bearing age because it could cause harm

7    to the pregnancy, so there is a reason to have a gender

8    edit.  This looks to me that Vickie was telling them

9    that in cases where there was gender dysphoria that she

10   is approving the general coverage of gender dysphoria

11   with hormone therapy.

12       Q.  You testified a little bit earlier that there

13   can be gender edits and specifically that they can vary

14   in terms of what state and federal policies I believe,

15   do you remember that?

16       A.  I think I misspoke when I said federal.  I meant

17   the national database that we use, First Databank,

18   sometimes sends I believe, and I don't know which drugs

19   they put gender edits on, but I believe they do send

20   information saying this drug should not be used in

21   females, this one should not be used in males because

22   there are, there are differences.

23           Sometimes inherently if you're using a drug that

24   say affects testosterone, like I said, you can affect

25   pregnancies, so that would not be considered safe.  But

Page 99

1                      REPORTER'S CERTIFICATE
2
3

STATE OF MINNESOTA     )
4                             ) ss.
COUNTY OF WASHINGTON )
5
6       I hereby certify that I reported the Zoom deposition
  of Brian Thompson on the 13th day of April 2022, and
7  that the witness was by me first duly sworn to tell the
  whole truth;
8
        That the testimony was transcribed by me and is a
9  true record of the testimony of the witness;
10      That the cost of the original has been charged to
  the party who noticed the deposition, and that all
11 parties who ordered copies have been charged at the same
  rate for such copies;
12
        That I am not a relative or employee or attorney or
13 counsel of any of the parties, or a relative or employee
  of such attorney or counsel;
14
        That I am not financially interested in the action
15 and have no contract with the parties, attorneys, or
  persons with an interest in the action that affects or
16 has a substantial tendency to affect my impartiality;
17      That the right to read and sign the deposition by
  the witness was reserved.
18
        WITNESS MY HAND AND SEAL THIS 13th day of April
19 2022.
20
21
22
23
  _____
24      Kelley E. Zilles, RPR
        Notary Public, Washington County, Minnesota
25      My commission expires 1-31-2025

```
                                                    Page 1
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                   HUNTINGTON DIVISION

 4    ----------------------------------------------------

 5    Christopher Fain, individually and on behalf of all

 6    others similarly situated, et al.,

 7                 Plaintiffs,

 8       vs.                  CIVIL ACTION NO. 3:20-cv-00740

 9    William Crouch, et al.,

10                 Defendants.

11    ----------------------------------------------------

12

13

14             REMOTE DEPOSITION OF SARAH YOUNG

15

16

17    DATE:   March 11, 2022

18    TIME:   8:00 a.m. CST

19    PLACE:  Veritext Virtual Videoconference

20

21

22

23

24    REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25    JOB NUMBER:  5096099
```

```
                                              Page 2

 1                     APPEARANCES

 2

 3  On Behalf of the Plaintiffs (Via Videoconference):

 4         CARL CHARLES, ESQ.

 5         TARA L. BORELLI, ESQ.

 6         Lambda Legal Defense and Education Fund, Inc.

 7         158 West Ponce De Leon Ave., Suite 105

 8         Decatur, Georgia   30030

 9         470.225.5341

10         ccharles@lambdalegal.org

11         tborelli@lambdalegal.org

12

13         AVATARA SMITH-CARRINGTON, ESQ.

14         Lambda Legal Defense and Education Fund, Inc.

15         3500 Oak Lawn Avenue, Suite 500

16         Dallas, Texas   75219

17         214.219.8585

18         asmithcarrington@lambdalegal.org

19

20         NICOLE J. SCHLADT, ESQ.

21         Nichols Kaster PLLP

22         80 South 8th Street, Suite 4700

23         Minneapolis, Minnesota   55402-2224

24         612.256.3291

25         nschladt@nka.com
```

Page 3

1        WALT AUVIL, ESQ.

2        The Employment Law Center, PLLC

3        1208 Market Street

4        Parkersburg, West Virginia  26101

5        304.485.3058

6        auvil@theemploymentlawcenter.com

7

8  On Behalf of Defendants William Crouch; Cynthia Beane;

9  and West Virginia Department of Health and Human

10 Resources, Bureau for Medical Services (Via

11 Videoconference):

12       KIMBERLY M. BANDY, ESQ.

13       LOU ANN S. CYRUS, ESQ.

14       Shuman McCuskey Slicer, PLLC

15       1411 Virginia Street East, Suite 200

16       Charleston, West Virginia  25301

17       304.345.1400

18       kbandy@shumanlaw.com

19       lcyrus@shumanlaw.com

20

21

22

23

24

25

```
                                               Page 4

 1    On Behalf of Defendant Jason Haught (Via

 2    Videoconference):

 3         ERIC D. SALYERS, ESQ.

 4         Oxley Rich Sammons, PLLC

 5         517 Ninth Street, Suite 1000

 6         Huntington, West Virginia  25701

 7         304.522.1138

 8         esalyers@oxleylawwv.com

 9

10

11

12    NOTE:  The original deposition transcript will be

13    delivered to Carl Charles, Esq., as the taking attorney.

14

15

16

17

18

19

20

21

22

23

24

25
```

## DEPOSITION OF SARAH YOUNG

Page 14

```
 1            (Exhibit 1 marked for identification.)

 2       Q.  Okay.  So hopefully you can see there in the

 3   marked exhibits folder what has been marked as Exhibit

 4   PL0001.  Do you see that there?

 5       A.  I do, yes.

 6       Q.  Okay.

 7            MR. CHARLES:  Kelley, I'm showing the

 8   witness what has been marked as Exhibit 0001, it's a

 9   copy of a document entitled, "Bureau for Medical

10   Services policy manual, Chapter 100."

11       Q.  Please take as much time as you need to look at

12   the document and I will wait until you tell me you've

13   sufficiently reviewed it.

14       A.  I am familiar with the document.

15       Q.  Okay.  Thank you, thank you.  I just don't want

16   to, throughout the day I will say take a moment, but

17   what I mean by that is take the sufficient moments you

18   need to review it.

19       A.  Thank you.

20       Q.  Okay.  Do you recognize this document?

21       A.  I do, yes.

22       Q.  And what is this document?

23       A.  This is a chapter of our provider manual, it's

24   available on our Website, and it is a guiding document

25   for services that we cover and billing instructions for
```

# DEPOSITION OF SARAH YOUNG

Page 15

```
 1    providers.  It is not all inclusive and I believe
 2    there's a disclaimer at the bottom that says to that
 3    effect, but this is our general information chapter.
 4        Q.  Thank you.  Do you have any reason to believe
 5    this is not a true and correct copy of that document?
 6        A.  It appears to be the same one that we have on
 7    our Website.
 8        Q.  Thank you.  Okay.  So now if you would, please,
 9    turn to Page 10 of this document.  The page numbers are
10    in blue at the bottom right-hand corner, the text is a
11    little bit, it's kind of small there in the bottom
12    right-hand corner.
13        A.  Okay, sorry.
14        Q.  No, no, take your time.
15            MS. BANDY:  Is there a Bates number on
16    that?  That might be helpful.
17            MR. CHARLES:  Yes, sorry.  So it's
18    CFAIN001661.
19            MS. BANDY:  Okay, we got it.
20    BY MR. CHARLES:
21        Q.  Okay.  Ms. Young, do you see in the middle of
22    the page the numbers 1661?
23        A.  Yes.
24        Q.  And the title, "General noncovered services"?
25        A.  Yes.
```

## DEPOSITION OF SARAH YOUNG

Page 16

1      Q.  Okay.  So if you would just read along with me,
2  I'm going to read aloud, but if you'll just follow
3  along, please.  Underneath that heading, "The West
4  Virginia Medicaid program does not cover certain
5  services and items regardless of medical necessity."
6  Did I read that correctly?
7      A.  Yes.
8      Q.  Okay.  And then some examples are identified
9  below.  I'm not going to read all of those examples, I'm
10  going to continue to the next page where that list
11  continues.  Just let me know when you're on the next
12  page.
13      A.  I am.
14      Q.  Okay.  And then the third bullet from the top,
15  do you see what that bullet is?
16      A.  I do.
17      Q.  And could you just read that out loud for me?
18      A.  "Transsexual surgery."
19      Q.  Okay.  Thank you very much.  So I'm going to put
20  that document away for a moment and introduce another
21  document.
22              (Exhibit 2 marked for identification.)
23      Q.  Okay.  Do you see what has been marked as
24  Exhibit PL0002?
25      A.  Yes.

## DEPOSITION OF SARAH YOUNG

Page 28

```
1      Q.  Okay.  Can you just tell me what it -- well,
2   sorry.  Take a minute to look at it, please, first.
3      A.  Okay.
4      Q.  Thank you.  And then can you just tell me what
5   this document is?
6      A.  It appears to be the Aetna Better Health of West
7   Virginia member handbook.
8      Q.  And for which plan year, please?
9      A.  2020 to 2021.
10     Q.  Okay.  And can you tell me what, to the extent
11  you know, what Mountain Health Trust - Medicaid means
12  there at the bottom?
13     A.  Mountain Health Trust is the name of our managed
14  care program.
15     Q.  Okay.  So the managed care program oversees the
16  managed care organizations, is that right?
17     A.  Yeah, it's an all encompassing term.  You'll
18  hear it referred to as the Mountain Health Trust plan
19  or, it's to differentiate between fee for service and
20  managed care.
21     Q.  Oh, that's helpful.  Okay.  So fee for service
22  does not fall under the Mountain Health Trust?
23     A.  Correct.
24     Q.  Okay.  Thank you for that.
25          MR. CHARLES:  Again, Kim, turning to
```

## DEPOSITION OF SARAH YOUNG

Page 34

1   organization, Ms. Young.  Can you tell me what your job

2   title is, please?

3       A.  Deputy commissioner of policy and operations.

4       Q.  Okay.  And what responsibilities fall under your

5   role within BMS?

6       A.  Under the policy side I have staff who oversee

7   all of the coverage policies that we have, that also

8   includes our eligibility policy.  And on the operation

9   side I have oversight of all of the technical systems

10  that we use to manage the program.

11      Q.  Can you tell me what technical systems you

12  oversee, that seems like a big bucket of work, can you

13  just say a little bit more of what you mean by that?

14      A.  It is.  We have the Medicaid managed information

15  system, you may see it referred to as MMIS, that is our

16  claims processing system.  Within that we have our

17  provider enrollment documents or files as well.  I do

18  not see the, oversee the member eligibility system, but

19  our staff do have input into the Medicaid portion of

20  that system.  There are various other systems that we

21  oversee that touch on member eligibility as well.

22      Q.  So there's another individual who specifically

23  oversees eligibility, right, that formally falls under

24  someone else, is that correct?

25      A.  The policy for member eligibility falls under?

**DEPOSITION OF SARAH YOUNG**

Page 35

```
 1      Q.  No, I'm sorry, not the policy.  I'm looking
 2   at -- sorry.  There's a director of Medicaid
 3   eligibility, so I guess what I'm asking is like what is
 4   the difference between what you just said and that
 5   person's role?
 6      A.  So the employee at BMS who is the director of
 7   member eligibility, she reports to me.
 8      Q.  Oh, I see.  Okay.  And can you just tell me who
 9   that is so I don't have to keep referring to them by
10   their title?
11      A.  Anita Hayes.
12      Q.  Thank you.  Okay.  So she reports to you?
13      A.  Correct.
14      Q.  Are there, can you tell me the other directors
15   that you oversee?
16      A.  Sure.  Do you want names and titles?
17      Q.  Yeah, please.
18      A.  Okay.  Anita is my director of Member
19   Eligibility; Jennifer Myers is the director of Provider
20   Services -- oh, I'm sorry, we change our titles often.
21      Q.  I think she's Professional Services, right?
22      A.  Thank you, yes, yes.  And I have Brandon Lewis
23   is our Medicaid Enterprise Systems director; I have
24   Marcus Canaday who is the director of our Money Follows
25   the Person program; Randall Hill who is director of our
```

## DEPOSITION OF SARAH YOUNG

Page 36

1   Home and Community Services Based program, and Cynthia

2   Parsons who was director of our Behavioral Health and

3   Long-Term Care Services.  I believe that is everyone.

4       Q.  That's quite the list.  Okay.  Thank you very

5   much for that.  So then who do you directly report to?

6       A.  Commissioner Cindy Beane.

7       Q.  Okay.  And just in a sort of general way, do you

8   have a formal structure for how often you report to

9   Commissioner Beane, you know, I'm not referring here to

10  informal communications you might have with her, I'm

11  just speaking, you know, do you have a monthly, you

12  know, formal reporting structure or a quarterly

13  structure, something of that nature?

14      A.  We have a weekly leadership team meeting to

15  which we escalate issues that the commissioner or the

16  other deputies are not already aware of, but there is a

17  lot of informal escalation of issues.

18      Q.  That makes sense.  Thank you.  How long have you

19  been in your role as deputy commissioner for policy and

20  operations?

21      A.  Officially I was interim for a number of years,

22  I believe official was 2016 or 2017.

23      Q.  If you had to ballpark your interim years, could

24  you give me just a rough estimate?

25      A.  I believe it started in 2014.

## DEPOSITION OF SARAH YOUNG

```
                                                    Page 37
 1      Q.  That works.  Thank you.  And were you employed
 2   with BMS before you started as the interim director?
 3      A.  Yes, I was.
 4      Q.  And what was your position within BMS before
 5   that?
 6      A.  I came to BMS in 2012 and at that time I was in
 7   the position of assistant to the commissioner, and then
 8   at some point I was promoted to a director position
 9   before becoming interim deputy.
10      Q.  Okay.  So you were assistant to the commissioner
11   beginning in 2012.  Can you just tell me briefly what
12   that, what your duties were therein?
13      A.  Sure.  I ensured that the commissioner was aware
14   of issues that were not escalated to her in other ways.
15   And at that time I also oversaw the Medicaid expansion
16   duties, the state plan amendments and the policies
17   around that.
18      Q.  And before your position as assistant to the
19   commissioner, were you also employed in some capacity
20   with BMS or were you with a different organization?
21      A.  I was still with DHHR, but not with BMS, I was
22   with a different Bureau.
23      Q.  And what Bureau was that?
24      A.  At the time it was called Bureau For Children &
25   Families.
```

## DEPOSITION OF SARAH YOUNG

Page 39

```
1   additional schooling beyond your bachelor degree?
2        A.  I do have hours towards a master degree, but I
3   have not completed the master's.
4        Q.  And when you complete those hours do you have to
5   do it through a particular institution or how is that
6   credentialed, if you can just say briefly?
7        A.  It's not through my employment, but I was taking
8   hours remotely through West Virginia University.
9        Q.  Okay, I see.  And at some point it could be that
10  you'll acquire sufficient hours to confer a master's
11  degree, is that how that would work?
12       A.  Generally, yes.
13       Q.  Okay.  So as you sort of likely put together,
14  because I just jumped right into things, your deposition
15  is that of an organizational representative for BMS.  Do
16  you understand that?
17       A.  I do, yes.
18       Q.  Okay.  So I'm, you know, not asking you the
19  person, Ms. Young, I'm asking you the BMS representative
20  questions today.  And so your counsel has designated you
21  to give testimony as the organizational representative
22  for BMS on certain topics, do you understand that?
23       A.  Yes.
24       Q.  Okay.  Do you recall when you were notified that
25  you'd be giving this testimony today as an
```

## DEPOSITION OF SARAH YOUNG

Page 59

```
 1      A.  That's my understanding, yes.
 2      Q.  Okay.  Thank you.  And are you aware of, as of
 3  right now of any managed care organizations doing that
 4  for gender confirming care, so using a bucket not, not
 5  West Virginia Medicaid designated funds for the coverage
 6  of gender confirming care?
 7      A.  Not that I'm aware of, no.
 8      Q.  Okay.  Will providers who are contracted and
 9  eligible within the requirements we talked about for
10  West Virginia Medicaid receive reimbursement for gender
11  confirming care that they provide to West Virginia
12  Medicaid recipients who are transgender?
13      A.  Let me make sure I understand.  They will be
14  reimbursed for covered services.  If they are billing
15  for a gender confirming procedure that is not covered,
16  they will not be reimbursed for that procedure.
17      Q.  Okay.  So as a specific example, would a
18  provider who submits for reimbursement be reimbursed for
19  billing for counseling, for example, for gender
20  dysphoria for someone who receives West Virginia
21  Medicaid coverage?
22      A.  Yes, they would, that is a covered service.
23      Q.  Okay.  And what about gender confirming
24  hormones?
25      A.  Hormone therapy is a covered service.
```

## DEPOSITION OF SARAH YOUNG

Case 3:20-cv-00740   Document 250-18   Filed 05/31/22   Page 16 of 32 PageID #: 1968

Page 60

1    Q.  Okay.  And what about gender confirming surgical

2    procedures?

3    A.  That is not a covered service.

4    Q.  Okay.  So then just backing up a little bit, Ms.

5    Young.  So on the provider side of determining benefits,

6    how does BMS or West Virginia Medicaid, I guess I can,

7    sorry, I can just say BMS, how does BMS determine

8    benefits on the provider side year-to-year?

9    A.  So big picture speaking, it's based on the

10   covered services for members.  And then based on the

11   covered service we drill down to the codes that are

12   specific to those individual services, and then further

13   drill down to the type of practitioner or provider that

14   is eligible to provide that in West Virginia.  Or based

15   on, I'm sorry, based on our West Virginia policies, we

16   do have out of state providers, but we do drill down to

17   that specific type of provider.  And then there are, so

18   there's different codes that come out each year and

19   they're evaluated to see if it falls within that process

20   that I explained.

21   Q.  Okay.  And do those determinations reflect

22   consideration of Center for Medicare and Medicaid

23   Services requirements?

24   A.  Yes.  So the Center for Medicare, Medicaid

25   Services dictates, which are mandatory services, and we

## DEPOSITION OF SARAH YOUNG

Page 65

1    A.  Yeah, it's a big question because I think we

2    were aware on a personal and a professional level as to

3    what was going on and we were approached by a number of

4    state providers, members, different advocacy groups or

5    different interested parties.  There was specific

6    funding that was made available around that time as

7    well, so it was getting a lot of attention and obviously

8    we were being asked to do what we could to address it as

9    well.

10    Q.  Thank you for that.  So for a change like that

11    which, I mean, tell me if this is right, you said that

12    was a larger system change in the benefit structure for

13    both enrollees and providers.  Do you recall that CMS

14    had to be consulted about that change?

15    A.  Yes.

16    Q.  Okay.

17    A.  Yeah, specifically this type of authorization.

18    We were aware of at least one other state at the time

19    that had requested for the authority to do something

20    like this.  This demonstration waiver is a very lengthy

21    process and CMS was involved from the very beginning of

22    conceptualizing it through public comment and approving

23    the actual application for the waiver.

24    Q.  I see.  And so thinking about CMS's role

25    specifically as it relates to gender confirming care, to

## DEPOSITION OF SARAH YOUNG

Page 66

1   your knowledge does CMS require that gender confirming

2   care be excluded from any state Medicaid plan?

3        A.   Not that I'm aware of.

4        Q.   Okay.  And are you aware of any other state

5   Medicaid plans that include or provide coverage for

6   gender confirming care?  And I should say, I know this

7   is tricky, but you the representative of BMS, not you,

8   Ms. Sarah Young, in your personal capacity.

9        A.   And I apologize, I don't, I have not done

10  research on what other states cover and the degree to

11  which they do cover.

12       Q.   Okay.  And have you seen any discussion of that

13  specific nature come through emails from other members

14  in the leadership team?

15       A.   Regarding other states?

16       Q.   Other states, yes, yes, mm-hmm.

17       A.   Not that I recall.

18       Q.   Okay.  And then when the Bureau for Medical

19  Services undertook the change to cover hormone therapy,

20  do you know if CMS was consulted in that change?

21       A.   My understanding of that is that we had always

22  covered the hormone therapy until a change was made at

23  some point, and I don't know when that was, that change

24  was made that we didn't cover it.  So then when the

25  change was made it was basically reverting back to the

## DEPOSITION OF SARAH YOUNG

Page 72

1    regardless.

2        Q.  Got it.  Okay.  Thank you.  And then sort of

3    zooming out again, if BMS excludes a particular service,

4    are the MCO's required to abide by that exclusion?

5        A.  Yes, if they are reimbursing out of their

6    Medicaid money.

7        Q.  Okay.  Sorry, Ms. Young, give me just a second.

8    How are you doing, Ms. Young, would you like a break now

9    or would you like to continue for about another

10   20 minutes and then we break for lunch?

11       A.  I can continue.

12       Q.  Okay.  Thank you.  So if you would look back

13   again at the marked exhibits, the most recent one that

14   we had open there, the second amended notice of

15   deposition.  We're still on Page 2.  Oh, no, I'm sorry,

16   we're on Page 3, if you would, and I'm looking at topic

17   No. 5.  Do you see it up there?

18       A.  Yes, it begins with, "Your efforts to

19   administer."

20       Q.  It does.  Could you just finish reading the rest

21   of that topic for me, please.

22       A.  "Your efforts to administer the Medicaid program

23   in West Virginia and/or affirm your compliance with the

24   Medicaid Act and the Patient Protection and Affordable

25   Care Act."

# DEPOSITION OF SARAH YOUNG

Page 75

1  that reimbursement is available to providers who provide

2  those services to our members.  We provide member

3  education, provider education, we have a number of

4  documents on our Website to guide those policies and

5  procedures, and we contract with a number of systems and

6  vendors that help us operationalize those policies.

7      Q.  That was a nice succinct job for what I

8  understand to be a very large undertaking.  So it's fair

9  to say then that BMS oversees all matters pertaining to

10  Medicaid recipients' access to West Virginia Medicaid

11  services?

12      A.  Yes.

13      Q.  Okay.  Does BMS establish a process for

14  individuals to apply for West Virginia Medicaid

15  eligibility?

16      A.  We do in partnership with a sister Bureau who

17  actually does the application processing.

18      Q.  Oh, I think you mentioned that earlier.  What is

19  the name of that Bureau?

20      A.  The original name was Bureau For Children &

21  Families, I believe their current name is Bureau for

22  Family Assistance.

23      Q.  Okay.  And that is not housed within BMS?

24      A.  No, it is under the umbrella of DHHR, it is

25  separate and distinct from BMS.

## DEPOSITION OF SARAH YOUNG

Page 103

1  interrogatories to Defendants William Crouch, Cynthia

2  Beane and West Virginia Department of Health and Human

3  Resources, Bureau for Medical Services interrogatories."

4  Did I read that correctly?

5      A.  Yes.

6      Q.  Okay.  So if you'll scroll down to what is

7  numbered Page 3, please.

8      A.  Okay.

9      Q.  I'm looking at No. 11 there.  If you'll just

10  follow along, I'll read this one, although I suspect

11  you're going to be better at knowing codes than I am,

12  but I'll give it a shot.  "Taking necessary steps to

13  comply with applicable privacy laws for each year since

14  2016 through the present, identify the number of health

15  plan participants who have submitted one or more claims

16  with a diagnosis code for gender dysphoria or gender

17  incongruence.  This includes, but is not limited to, the

18  following diagnoses:  F64.0, transsexualism (ICD-10-CM);

19  F64.2, gender identity disorder of childhood

20  (ICD-10-CM); F64.8, other gender identity disorders

21  (ICD-10-CM); F64.9, gender identity disorder,

22  unspecified (ICD-10-CM); HA60, gender incongruence of

23  adolescence or adulthood (ICD-11); and HA61, gender

24  incongruence of childhood (ICD-11)."  Did I read that

25  mostly correctly?

## DEPOSITION OF SARAH YOUNG

Page 104

1      A.  You did, yes.

2      Q.  I'm sorry, I need to technically ask you, did I

3   read that completely correctly?

4      A.  Yes.

5      Q.  Okay.  Thank you.  So the response begins on

6   Page 3 and says there, "Upon information and belief,"

7   and then continues to Page 4 there at the top.  Can you

8   just read to me the years and the corresponding number

9   of members, please.

10      A.  2016, 30 members; 2017, 50 members; 2018, 243

11   members; 2019, 439 members; 2020, 602 members; 2021

12   through 9/30, 686 members."

13      Q.  Thank you.  So quickly, let me go back to this

14   request here.  I just want to make sure we have a shared

15   understanding.  So this is, plaintiffs asked defendants

16   to identify the number of health plan participants who

17   have submitted one or more claims with a diagnosis code

18   for gender dysphoria or gender incongruence, do you

19   understand that part of the request?

20      A.  I do, yes.

21      Q.  Good, thank you.  So then let's just look at the

22   number for 2021, please, and that's through September, I

23   understand that to be September 30th of 2021.  Is that

24   how you understand that date reference there?

25      A.  Yes, I would too, yes.

## DEPOSITION OF SARAH YOUNG

Page 109

```
 1   Technologies.
 2        Q.  Okay.  And does BMS have, does BMS have access
 3   to Gainwell and Kepro?  I guess what I mean is, the way
 4   you described the MCO's is that they have their own
 5   similar process, but it's separate and run through their
 6   systems.  Is it accurate then to say that fee for
 7   service is under BMS and BMS does sort of provide
 8   oversight and management and can access both Gainwell
 9   and Kepro as necessary?
10        A.  Yes, that's correct.
11        Q.  Okay.  All right.  As far as you're aware, are
12   there other vendors that BMS works with to understand
13   and utilize accurate criteria in evaluating costs for
14   reimbursement?
15        A.  I believe that there are other vendors on the
16   pharmacy side.
17        Q.  Okay.
18        A.  And they may have another person to speak to
19   that.  On the medical side we do engage consultants from
20   time to time, we have a project management contract, so
21   they might do research for us and help us with
22   researching various topics.  But offhand, I can't think
23   of another contracted entity that helps with the medical
24   evaluation.
25        Q.  Sure.  Let me just ask you about the one I'm
```

## JA570

## DEPOSITION OF SARAH YOUNG

Page 110

1   aware of.  Are you familiar with InterQual?

2       A.  Yes.

3       Q.  And is that, what is InterQual, as you

4   understand it?

5       A.  As I understand at a very high level, InterQual

6   criteria is a nationally accredited criteria for

7   determining medical necessity for procedures and that is

8   the criteria that our contractor Kepro uses.

9       Q.  Oh, okay.  And do you know if the MCO's use

10  InterQual as well for those criteria for assessing

11  medical necessity?

12      A.  I don't know which specific criteria they use.

13  I would believe that their contract states that they

14  must use a nationally accredited criteria.

15      Q.  Okay.  What's the importance of using a

16  nationally accredited criteria for those indicia?

17      A.  I think it speaks to the validity and the

18  quality of the product that it is nationally accredited.

19  It's not a homegrown made-up process, it's something

20  that is readily available and has been peer reviewed and

21  all the things that might go into their accreditation.

22      Q.  Thank you.  Do you know how long, again,

23  estimate, ballpark is fine, do you have a sense of how

24  long Kepro has been using InterQual?  And let's focus,

25  I'm sorry, just on your tenure, I don't expect you to

## DEPOSITION OF SARAH YOUNG

Case 3:20-cv-00740   Document 250-18   Filed 05/31/22   Page 25 of 32 PageID #: 1977

Page 111

1    answer beyond that.

2        A.  Sure.  I'm not aware of them using another

3    criteria.

4        Q.  Okay.

5        A.  I've only ever heard of the InterQual criteria.

6        Q.  Okay.  Let me, I'm just going to introduce

7    another exhibit here, if you'll give me just one moment.

8            (Exhibit 12 marked for identification.)

9        Q.  So, Ms. Young, there should be an exhibit now in

10   the marked exhibits folder labeled PL0012.

11       A.  I can see it.

12       Q.  Okay.  I'm guessing not, but have you seen this

13   document before?

14       A.  No, I don't believe so.

15       Q.  Okay.  If you would please just take a, it's

16   only, it's basically three pages, if you'll take just a

17   quick minute and just review it to your satisfaction and

18   then I've just got a couple of questions.

19           MS. CYRUS:  Are there Bates numbers on

20   that?

21           MR. CHARLES:  No.  I think it was in the

22   production that came -- it is not Bates stamped, no.

23           MS. CYRUS:  Okay.  Thank you.

24       A.  Okay.

25       Q.  Okay.  So what is this document?

## DEPOSITION OF SARAH YOUNG

Page 115

1    a couple parts of this last paragraph, so bear with me.

2    "InterQual procedures criteria," do you see that there?

3         A.  Yes.

4         Q.  Okay.  "InterQual procedures criteria are

5    derived from the systematic continuous review and

6    critical appraisal of the most current evidence based

7    literature and include input from our independent panel

8    of clinical experts.  To generate the most appropriate

9    recommendations, a comprehensive literature review of

10   the clinical evidence was conducted."  Did I read those

11   two sentences accurately?

12        A.  Yes.

13        Q.  Okay.  Thank you.  I'm going to introduce a

14   couple more exhibits here related to InterQual, if you'd

15   just give me one moment.  Okay.  So looking at this

16   information from InterQual and in the context of what

17   you shared about what Kepro contracts with InterQual

18   for, did BMS consider the recommendations included in

19   InterQual's medical necessity criteria when determining

20   that coverage for transsexual surgery or for sex

21   transformation were not included in West Virginia

22   Medicaid?

23        A.  I can't speak to the practice when the decision

24   was put in policy in 2004, but I can say that since then

25   we would have not, we would have not reviewed the

**DEPOSITION OF SARAH YOUNG**

Page 116

1    criteria for noncovered services.

2        Q.  Okay.

3        A.  So I would imagine InterQual criteria includes

4    every single possible procedure that could be performed

5    and we would only have contracted with Kepro to review

6    the criteria for covered services.

7        Q.  Okay.  So in terms of the scope of this topic as

8    it refers to denials of coverage, I know we've talked a

9    number of times about what coverage isn't provided under

10   the West Virginia Medicaid plan.  Do you know or are you

11   aware of any instances where BMS has ever communicated

12   with a managed care organization regarding denials for

13   surgical procedures for the treatment of gender

14   dysphoria when it's otherwise medically indicated?  Let

15   me rephrase, I'm sorry, I made that a little

16   complicated.

17          So are you aware of a time where an MCO or, I

18   mean, obviously a person working for the managed care

19   organization has reached out to BMS to say, you know, we

20   have this person, this procedure is medically indicated

21   for them, we understand this limitation in the coverage,

22   what should we do, are you aware of any instances of

23   that kind of request coming from an MCO?

24       A.  Not off the top of my head.  I mean, we do

25   receive a number of inquiries, you know, to confirm what

## DEPOSITION OF SARAH YOUNG

Page 143

1      A.  Again, I considered everything that we have

2  written on the topic and I was aware that other

3  individuals on the leadership team were aware of this

4  and, you know, in the absence of anyone saying that this

5  is illegal or against regulations, I believe it to be

6  legal.

7      Q.  Okay.  So were you able to find any research

8  that was done by BMS about the legality of the exclusion

9  of gender confirming care in West Virginia Medicaid?

10      A.  No, nothing specific to this.

11      Q.  So are you aware of any research that was

12  undertaken to support the particular coverage decision?

13      A.  No, it was honestly more the absence of any

14  guidance or notification from CMS that I found to speak

15  to the legality of it.

16      Q.  Okay.  Let me back up just a little bit.  From

17  the previous topic that we were discussing, you were not

18  able to find, don't know of any reasons why the

19  exclusion was developed?

20      A.  Correct.

21      Q.  Okay.  And you also were not able to find and

22  are not aware of any, what was considered I guess in

23  making the decision to include that exclusion in the

24  Medicaid manuals we were discussing?

25      A.  Correct.

## DEPOSITION OF SARAH YOUNG

Page 164

1   over 600,000 individuals, and so as I spoke, the limited

2   budget that we have, we have to ensure that it will

3   cover the benefits that we have promised and outlined in

4   our policies that we do cover.  So the addition of

5   anything extra or anything on top of that is what limits

6   us, you know, we have to be able to do what we said we

7   were going to do.

8       Q.  Sure.  And has BMS done research about the cost

9   of providing gender affirming service in West Virginia

10  Medicaid?

11      A.  Not that I'm aware of.

12      Q.  Sorry, can we go back.  You said there was a

13  match that happened.  Can you just, as you've been doing

14  such a generous job of today, explain generally to me

15  what that refers to?

16      A.  Sure.  So each state is allocated a federal

17  match based on a bunch of factors, but basically the

18  economics of the state.  So states that are the poorer

19  states get a greater match.  I believe the bottom is

20  50/50, so prosperous states get a 50 percent match on

21  the state dollars.  So our budget, the amount of claims

22  that we have to reimburse or capitation that we have to

23  pay on a monthly basis we are required, generally

24  speaking let's say our match is 75 percent, so we would

25  be required to pay 25 percent of that and we can draw

## DEPOSITION OF SARAH YOUNG

Page 169

1    for the treatment of gender dysphoria, that claim would

2    not be denied by BMS solely on the basis that it was for

3    the treatment of gender confirming care?

4        A.   Correct.

5        Q.   Okay.  So for those, for that particular coding,

6    the gender dysphoria coding of those visits is accepted,

7    not rejected by BMS West Virginia Medicaid?

8        A.   Correct.

9        Q.   Okay.  And as far as you know, does BMS cover

10   office visits related to gender confirming care?

11       A.   Can you be specific as to the type of office.

12       Q.   Sure.  So, for example, I know this is tricky,

13   but I'm asking about the office visits to an

14   endocrinologist, not for the purpose of prescribing

15   hormones, but for the purpose of monitoring, blood work,

16   kidney, kidney and liver testing, thyroid.  Would those

17   kind of medical visits, again, I'm trying not to get

18   into what the other witness is going to talk about,

19   would those visits be covered under the existing policy?

20       A.   Yes.

21       Q.   Okay.  And as far as you're aware, Ms. Young,

22   has BMS in its administration of West Virginia Medicaid

23   provided any partial or total coverage for any surgical

24   procedure for the treatment of gender dysphoria?

25       A.   Not that I'm aware of.

# DEPOSITION OF SARAH YOUNG

Page 170

1    Q.  Okay.  But as you said earlier today, if the

2    diagnostic code was something different, given other

3    variables we've discussed, it has the potential to be

4    covered?

5    A.  Correct, yes.

6    Q.  Okay.

7         (Exhibit 19 marked for identification.)

8    Q.  I'm going to introduce a couple of documents.

9    There should be another exhibit there in the shared

10   folder.

11        MR. CHARLES:  And this will be marked,

12   Kelley, as Plaintiff's Exhibit 0019.

13   Q.  So as a part of your testimony in topic 18, you

14   have been designated to testify in regard to BMS's

15   response to request for production No. 2, and that is

16   included on this document that I'm showing you right

17   now.  Do you have it in front of you?

18   A.  I do, yes.

19   Q.  Okay.  And do you have that same

20   understanding -- sorry, I should be asking you.  Do you

21   understand that you've been designated to testify about

22   request for production No. 2?

23   A.  Yes.

24   Q.  Okay.  So I'll just read this, "Defendants'

25   seventh supplemental response to plaintiffs' first set

Page 187

```
1                    REPORTER'S CERTIFICATE
2
3
    STATE OF MINNESOTA    )
4                         ) ss.
    COUNTY OF WASHINGTON )
5
6        I hereby certify that I reported the Zoom deposition
    of Sarah Young on the 11th day of March 2022, and that
7   the witness was by me first duly sworn to tell the whole
    truth;
8
         That the testimony was transcribed by me and is a
9   true record of the testimony of the witness;
10       That the cost of the original has been charged to
    the party who noticed the deposition, and that all
11  parties who ordered copies have been charged at the same
    rate for such copies;
12
         That I am not a relative or employee or attorney or
13  counsel of any of the parties, or a relative or employee
    of such attorney or counsel;
14
         That I am not financially interested in the action
15  and have no contract with the parties, attorneys, or
    persons with an interest in the action that affects or
16  has a substantial tendency to affect my impartiality;
17       That the right to read and sign the deposition by
    the witness was reserved.
18
         WITNESS MY HAND AND SEAL THIS 11th day of March
19  2022.
20
21
22           Kelley E. Zilles
23          _____
24           Kelley E. Zilles, RPR
             Notary Public, Washington County, Minnesota
25           My commission expires 1-31-2025
```

Veritext Legal Solutions



**In the Matter of:**

CHRISTOPHER FAIN

vs

WILLIAM CROUCH, et al.

DR. DAN KARASIC

*April 15, 2022*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN; ZACHARY
MARTELL; BRIAN McNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES, individually and on
behalf of all others similarly situated,

          Plaintiffs,

vs.          Civil Action No. 3:20-cv-00740

WILLIAM CROUCH, in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
CYNTHIA BEANE, in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT, in his official
capacity as Director of the West Virginia
Public Employees Insurance Agency; and
THE HEALTH PLAN OF WEST VIRGINIA, INC.,

          Defendants.

"CONFIDENTIAL"
VIDEOTAPED DEPOSITION OF DR. DAN KARASIC
BY VIDEO CONFERENCE

_____

     The videotaped deposition of Dr. Dan
Karasic was taken on April 15, 2022,
at 12:02 p.m., at 5010 Dempsey Drive,
Cross Lanes, West Virginia.

_____

ELITE COURT REPORTING, LLC
5010 Dempsey Drive
Cross Lanes, West Virginia  25313
(304) 415-1122

Martha Fourney, CSR

Confidential

Page 2

```
 1           A P P E A R A N C E S

 2

      Caleb B. David
 3    Attorney at Law
      Shuman McCuskey Slicer, PLLC
 4    1141 Virginia Street, East, Suite 200
      Charleston, West Virginia  25301
 5    (By video conference)

 6

      Walt Auvil
 7    Attorney at Law
      The Employment Law Center, PLLC
 8    1208 Market Street
      Parkersburg, West Virginia  26101
 9    (By video conference)

10

      Avatara Smith-Carrington
11    Attorney at Law
      Lambda Legal Defense and Education Fund
12    3500 Oak Lawn Avenue, Suite 500
      Dallas, Texas  75219-6722
13    (By video conference)

14

      Tara L. Borelli
15    Attorney at Law
      Lambda Legal Defense and Educational Fund
16    1 West Court Square, Suite 105
      Decatur, Georgia  30030
17    (By video conference)

18

19

20

21

22

23

24
```

## DEPOSITION OF DR. DAN H. KARASIC, M.D.

Confidential

Page 8

```
 1   gender-related conditions?

 2         ATTORNEY SMITH:  Object to form.

 3     A.   So I just was -- I thought about that

 4   and looked at patients that I saw over a couple

 5   of days, and about two-thirds of my private

 6   practice patients are transgender.

 7     Q.   Do all of those patients who are

 8   transgender treat with you for gender dysphoria

 9   or gender incongruence?

10         ATTORNEY SMITH:  Object to form.

11     A.   No.  Many of them are transgender but

12   are seeing me for -- for example, mood and

13   anxiety disorders or other psychiatric

14   conditions.

15     Q.   And I think that from reading your

16   report there is a difference between someone

17   having a transgender identity and someone

18   having gender dysphoria; is that correct?

19         ATTORNEY SMITH:  Object to form.

20     A.   Yes.

21     Q.   Can you explain what that difference

22   is?

23     A.   Sure.  So being transgender is an

24   identity.  It's how someone identifies.  And
```

## DEPOSITION OF DR. DAN H. KARASIC, M.D.

Confidential

Page 9

```
 1   gender dysphoria is used both to describe a

 2   symptom, but also to describe a DSM-5 disorder

 3   of gender dysphoria.

 4       Q.   Is there a difference between gender

 5   dysphoria as a symptom and gender dysphoria as

 6   a diagnosis?

 7           ATTORNEY SMITH:  Object to form.

 8       A.   Yes.  The DSM diagnosis requires that

 9   the person be -- the distress that somebody is

10   experiencing from gender dysphoria be

11   clinically significant or affecting social or

12   occupational -- causing social or occupational

13   impairment.

14       Q.   Does clinical significance mean that

15   it's causing those social or occupational

16   impairments?

17       A.   So it can be social or occupational

18   impairment, or it can be so much distress that

19   you go to the doctor.  So that's what's

20   clinically significant.

21       Q.   So there are patients who experience

22   gender dysphoria as a symptom, but do not have

23   the clinical significance that rises to the

24   level of a DSM-5 diagnosis; is that correct?
```

**DEPOSITION OF DR. DAN H. KARASIC, M.D.**

Confidential

Page 18

```
 1    M.D.  Do you have Exhibit 1 in front of you?

 2    A.   Yes.

 3    Q.   I'm looking at page 5, paragraph 21.

 4  And I'll read the first sentence, Gender

 5  identity is a person's deeply felt, inherent

 6  sense of being a girl, woman or female, a man

 7  or male, a blend of male or female or an

 8  alternative gender.

 9         And that is citing to the American

10  Psychological Association, 2015.

11    A.   Yes.

12    Q.   And the next sentence says, Gender

13  identity does not always align with sex

14  assigned at birth.  Gender identity, which has

15  biological bases, is not a product of external

16  influence and not subject to voluntary change.

17         First, did I read that correctly?

18    A.   Yes.

19    Q.   Okay.  So when you were talking about

20  cultural psychiatry and taking into

21  consideration the experience of individuals

22  with transgender identities, you talked about

23  some external things, such as rejection from

24  family, peers, school, health experiences.
```

**DEPOSITION OF DR. DAN H. KARASIC, M.D.**

Confidential

Page 19

```
 1              And I'm asking if you can explain to me

 2      the difference between those external

 3      influences and the internal sense of self that

 4      you have stated as the definition of a gender

 5      identity?

 6              ATTORNEY SMITH:  Object to form.

 7      A.    Sure.  So as described in this

 8      definition from the American Psychological

 9      Association, gender identity is an internal

10      sense of self.  Societal discrimination is --

11      or rejection is people's reactions to someone's

12      perceived identity.  So, you know, there is an

13      internal experience that a transgender person

14      has as well as, you know, an experience in

15      society.

16      Q.    And I think that I'm understanding you

17      correctly.  What my real question here is, is I

18      guess about the reasons that gender identity

19      exists at all.  Can you explain what actually

20      forms gender identity?

21              ATTORNEY SMITH:  Object to form.

22      A.    So the -- there isn't a simple answer

23      in terms of what forms a gender identity.  You

24      know, people know that there are biological
```

**DEPOSITION OF DR. DAN H. KARASIC, M.D.**

Confidential

Page 20

1    underpinnings.  And there have been sometimes

2    interesting differences that illuminate what

3    forms gender identity.  Somebody with complete

4    androgen insensitivity for example is XY in

5    terms of their chromosome, but assigned female

6    at birth.  And they may not even know that

7    their chromosomally XY until they go to a

8    fertility doctor in adulthood.

9            So what we have -- I'd say we have

10   ideas of components, but it certainly -- part

11   of our ongoing learning experience of all the

12   different factors that lead to someone's

13   particular gender identity.

14   Q.   What percentage of transgender

15   individuals have that androgen -- is it --

16   instability, was that the word you used?

17            ATTORNEY SMITH:  Object to form.

18   A.   Complete androgen insensitivity.  Most

19   of those people do not identify as transgender.

20   Most people with complete androgen

21   insensitivity identify as female.  And it -- so

22   that's a case where somebody is chromosomally

23   XY, but their cells don't have androgen

24   receptors.  And so the presence of androgens

## DEPOSITION OF DR. DAN H. KARASIC, M.D.

Confidential

Page 49

1    bipolar disorder.

2         So those are examples certainly where,

3    you know, mental disorder would preclude

4    gender-affirming care at least until it was --

5    until or unless it could be treated so they

6    were able to give informed consent.

7    Q.   Again, if I'm understanding correctly,

8    it's not that someone with bipolar disorder,

9    that means that they can't have

10   gender-affirming care?  It's that their bipolar

11   disorder has to be stable before they're

12   provided gender-affirming care?

13        ATTORNEY SMITH:  Object to form.

14   A.   Yes.  And in Standards of Care 7, it's

15   listed as being, you know -- well controlled is

16   the adjective that they use.  But the

17   importance is that they -- that they're able to

18   give informed consent, that they're able to

19   participate in care in terms of aspects of what

20   is well controlled.

21   Q.   And since you just mentioned it, I'll

22   ask you a question.  The Standards of Care,

23   that's a bit of a misnomer, isn't it?

24        ATTORNEY SMITH:  Object to form.

## DEPOSITION OF DR. DAN H. KARASIC, M.D.

Case 3:20-cv-00740   Document 250-19   Filed 05/31/22   Page 11 of 12 PageID #: 1995

Confidential

Page 50

```
 1     A.    Was that a question?

 2     Q.    Yes.

 3     A.    Well --

 4           ATTORNEY SMITH:  Object to form.

 5     A.    -- I think if we look historically that

 6     WPATH and its predecessor organization

 7     established the Standards of Care as standards

 8     of care for the field.  I think that they've

 9     also been described as practice guidelines.

10     Q.    I don't think anyone will disagree that

11     they're practice guidelines.  But just saying

12     we publish the Standards of Care probably

13     doesn't mean that it is the standard of care

14     and that if someone does not comply with that

15     that they're committing malpractice, right?

16           ATTORNEY SMITH:  Object to form.

17     A.    So I think there is still -- there's

18     still a belief that they are trying to set

19     standards of care as well as practice

20     guidelines.  And within the standards of care,

21     there certainly is a flexibility and deference

22     to clinical judgment.

23           So it's not something that is -- well,

24     I don't remember exactly how you put it.  But I
```

Confidential

Page 182

1          I, Martha Fourney, Certified Court

2    Reporter and Notary Public, do hereby certify

3    that the foregoing deposition of the

4    above-named witness, was duly taken by me in

5    machine shorthand, was recorded via Zoom, and

6    that the same were accurately written out in

7    full and reduced to computer transcription.

8          I further certify that I am neither

9    attorney or counsel for, nor related to or

10   employed by, any of the parties to the action

11   in which this deposition is taken, nor do I

12   have a financial interest in the action.

13

14

15

16   My commission expires May 27, 2022

17

18   _____

19   Martha Fourney
     Certified Court Reporter/Notary Public

20

21

22

23

24