# NO. 22-1927

In The

# United States Court Of Appeals
## For The Fourth Circuit

**CHRISTOPHER FAIN; SHAUNTAE ANDERSON,**
**individually and on behalf of all others similarly situated,**

*Plaintiffs - Appellees,*

v.

**WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the**
**West Virginia Department of Health and Human Resources; CYNTHIA BEANE,**
**in her official capacity as Commissioner for the West Virginia Bureau for**
**Medical Services; WEST VIRGINIA DEPARTMENT OF HEALTH AND**
**HUMAN RESOURCES, Bureau for Medical Services,**

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

_____

**JOINT APPENDIX – Volume III of VI**
**(Pages 1076 – 1532)**

_____

| | | |
|---|---|---|
| Kimberly M. Bandy | Tara L. Borelli | Carl S. Charles |
| Lou Ann S. Cyrus | LAMBDA LEGAL DEFENSE & | LAMBDA LEGAL DEFENSE & |
| Caleb B. David | EDUCATION FUND, INC. | EDUCATION FUND, INC. |
| Roberta F. Green | 1 West Court Square | 120 Wall Street |
| SHUMAN MCCUSKEY | Suite 105 | Suite 105 |
| SLICER PLLC | Decatur, GA 3003 | New York, NY 10005 |
| P. O. Box 3953 | (470) 225-5341 | (404) 897-1880 |
| Charleston, WV 25339 | | |
| (304) 345-1400 | | |
| | | |
| *Counsel for Appellants* | *Counsel for Appellees* | *Counsel for Appellees* |
| | | |
| Anna P. Prakash | Nora W. Huppert | Avatara A. Smith-Carrington |
| NICHOLS KASTER, LLP | LAMBDA LEGAL DEFENSE & | LAMBDA LEGAL DEFENSE & |
| 4700 IDS Center | EDUCATION FUND, INC. | EDUCATION FUND, INC. |
| 80 South 8th Street | 65 East Wacker Place | 1776 K Street, NW |
| Minneapolis, MN 55402 | Suite 2000 | 8th Floor |
| (612) 256-3200 | Chicago, IL 60613 | Washington, DC 20006 |
| | (847) 345-2094 | (202) 804-6245 |
| | | |
| *Counsel for Appellees* | *Counsel for Appellees* | *Counsel for Appellees* |

**<u>TABLE OF CONTENTS</u>**
**Volume I of VI**

Page

**District Court Docket Sheet [3:20-cv-00740]**...................................................JA1

**Class Action Complaint**
　　　filed November 12, 2020 (DE1) ...........................................JA36

**Defendants' Memorandum of Law in Support of Motion for Partial Dismissal of Plaintiffs' Class Action Complaint**
　　　filed January 11, 2021 (DE25).............................................JA75

**<u>Exhibits</u> to**
**Motion to Dismiss**
　　　filed February 2, 2021 (DE32):

　　　A.　　**Affidavit of Angela Wowczuk**
　　　　　　sworn February 2, 2021(DE32-1) ....................................JA94

　　　B.　　**Affidavit of Brian Thompson**
　　　　　　sworn February 1, 2021 (DE32-2) ...................................JA98

　　　C.　　**Affidavit of UniCare Health Plan of West Virginia, Inc.**
　　　　　　sworn January 29, 2021 (DE32-3) .................................JA100

**Memorandum Opinion and Order**
**Denying Defendant Cheatham's Motion to Dismiss the Complaint and Defendants William Crouch, Cynthia Beane, and the West Virginia Department of Health and Human Resources, Bureau for Medical Services' Motion for Partial Dismissal of Plaintiffs' Class Action Complaint and Motion to Dismiss and granting Plaintiffs' Motion for Leave to file a Sur-Reply**
　　　filed May 19, 2021(DE57)...................................................JA101

i

**First Amended Class Action Complaint**
    **filed October 28, 2021 (DE140)** .......................................... JA117

**Defendants' Answer to Plaintiff's**
**First Amended Class Action Complaint**
    **filed November 12, 2021 (DE151)** ...................................... JA162

**Certificate of Service for the**
**Expert Disclosure Report of Dan H. Karasic, M.D.**
    **filed January 14, 2022 (DE182)** ........................................... JA210

**Plaintiffs' Motion for Class Certification**
**Pursuant to Fed. R. Civ. P. 23**
**With Attachments,**
    **filed May 31, 2022 (DE248)** ................................................. JA212

    **Attachments:**

    1.    **Declaration of the Employment Law Center, PLLC**
            **dated May 31, 2022 (DE248-1)** ..................................... JA215

    2.    **Declaration of Nicole J. Schladt in Support of**
          **Plaintiffs' Motion for Class Certification,**
          **With Exhibit A**
            **dated May 31, 2022 (DE248-2)** ..................................... JA217

          A.    **Nichols Kaster, PLLP Firm Resume (DE248-3)** ......... JA220

**Attachments** **to**
**Plaintiffs' Motion for Class Certification**
**Pursuant to Fed. R. Civ. P. 23**
      **filed May 31, 2022 (DE248), Continued:**

3.      **Declaration of Avatara Smith-Carrington in Support of**
         **Plaintiffs' Motion for Class Certification,**
         **With Exhibits A – E**
             **dated May 31, 2022 (DE248-4)** ......................**JA257**

       A.      **Resume of Avatara Smith-Carrington (DE248-5)** ....**JA265**

       B.      **Resume of Tara L. Borelli (DE248-6)** ..........................**JA268**

       C.      **Resume of Carl S. Charles (DE248-7)** ..........................**JA279**

       D.      **Resume of Sasha J. Buchert (DE248-8)** .......................**JA281**

       E.      **Resume of Nora Huppert (DE248-9)** ...........................**JA282**

**Plaintiffs' Motion for Summary Judgment,**
**With Attachments,**
      **filed May 31, 2022 (DE250)** ..................................................**JA284**

      **Attachments:**

     A.      **Declaration of Christopher Fain**
             **sworn April 27, 2022 (DE250-1)** ....................................**JA287**

     B.      **Declaration of Shauntae Anderson**
             **sworn April 19, 2022 (DE250-2)** ....................................**JA293**

<u>Exhibits </u>to
 Plaintiffs' Motion for Summary Judgment,
        filed May 31, 2022 (DE250), Continued:

C.    Declaration of Walt Auvil,
      With Exhibits
              sworn May 31, 2022 (DE250-3) .....................................JA299

      1.    Defendants' Response to Plaintiff's
            First Set of Requests for Admissions
                    dated August 27, 2021 (DE250-4).......................JA303

      2.    Defendants' Response to Plaintiff's
            First Set of Interrogatories
                    dated August 27, 2021 (DE250-5).......................JA309

      3.    Defendants' Response to Plaintiff's
            Second Set of Interrogatories
                    dated October 25, 2021 (DE250-6) .....................JA317

      4.    Defendants' First Supplemental Response to
            Plaintiff's First Set of Interrogatories
                    dated November 30, 2021 (DE250-7) ................JA324

      5.     Defendants' Second Supplemental Response to
            Plaintiff's Second Set of Interrogatories
                    dated November 30, 2021(DE250-8) .................JA330

       5(a).  Defendants' Ninth Supplemental Response to
            Plaintiff's First Set of Requests for Production
                    dated March 25, 2022 (DE250-9) ........................JA338

Exhibits to
C.    Declaration of Walt Auvil,
       sworn May 31, 2022 (DE250-3), Continued:

6.    Redacted Excerpt of Deposition of
       Christopher Fain
             taken April 28, 2022 (DE250-10) ........................JA346

7.    Excerpt of Deposition of Shauntae Anderson
             taken April 22, 2022 (DE250-11) ........................JA362

8.    Excerpt of Deposition of Secretary Bill J. Crouch
             taken March 17, 2022(DE250-12) ......................JA374

9.    Excerpt of Deposition of
       Commissioner Cynthia Beane
             taken March 29, 2022 (DE250-13) .....................JA396

10.   Excerpt of Deposition of Dr. James Becker
             taken March 30, 2022 (DE250-14) .....................JA464

11.   Excerpt of Deposition of Frederick Lewis
             taken April 14, 2022 (DE250-15) .......................JA493

12.   Excerpt of Deposition of Becky Manning
             taken April 12, 2022 (DE250-16) ........................JA514

13.   Excerpt of Deposition of Brian Thompson
             taken April 13, 2022 (DE250-17) ........................JA537

14.   Excerpt of Deposition of Sarah Young
             taken March 11, 2022 (DE250-18) .....................JA549

15.   Excerpt of Deposition of Dr. Dan H. Karasic, M.D.
             taken April 15, 2022 (DE250-19) ........................JA580

# TABLE OF CONTENTS
## Volume II of VI

Page

**Exhibits** to
C.  **Declaration of Walt Auvil,**
   **sworn May 31, 2022 (DE250-3), Continued:**

16.  **Expert Report of Dan H. Karasic, M.D.**
     **(public version, portions redacted)**
       **dated January 13, 2022 (DE250-20)** ................... JA591

17.  **Expert Rebuttal Report of Dan H. Karasic, M.D.**
       **dated March 17, 2022 (DE250-21)** ..................... JA645

18.  **Excerpt of Deposition of**
     **Dr. Loren S. Schechter, M.D.**
       **taken March 28, 2022 (DE250-22)** ..................... JA683

19.  **Expert Report of Loren S. Schechter, M.D.**
       **dated January 8, 2022 (DE250-23)** ..................... JA690

20.  **Expert Rebuttal Report of**
     **Loren S. Schechter, M.D.**
       **dated March 17, 2022 (DE250-24)** ..................... JA774

21.  **Excerpt of Deposition of**
     **Dr. Johanna Olson-Kennedy, M.D., M.S.**
       **taken April 25, 2022 (DE250-25)** ..................... JA867

22.  **Expert Rebuttal Report of**
     **Dr. Johanna Olson-Kennedy, M.D., M.S.**
       **dated March 17, 2022 (DE250-26)** ..................... JA872

**Exhibits** to

C.    **Declaration of Walt Auvil,**
      **sworn May 31, 2022 (DE250-3), Continued:**

23.   **Excerpt of Bureau for Medical Services**
      **Manual, Chapter 100**
      **undated (DE250-27) ..............................................JA931**

24.   **Excerpt of Bureau for Medical Services**
      **Manual, Chapter 519**
      **undated (DE250-28) ..............................................JA936**

25.   **Aetna, The Health Plan, and UniCare**
      **Composite Exhibit, Excerpted**
      **undated (DE250-29) ..............................................JA944**

26.   **InterQual Composite Exhibit**
      **dated April 2021 (DE250-30) ..............................JA967**

27.   **Bureau for Medical Services, "Medicaid 101 An**
      **Overview of West Virginia's Medicaid Program"**
      **undated (DE250-31) ...........................................JA1015**

28.   **Medicaid.gov, "Mandatory &**
      **Optional Medicaid Benefits"**
      **visited November 23, 2021 (DE250-32)...........JA1035**

29.   **Excerpt of State Fiscal Year 2021 Model Purchase**
      **of Service Provider Agreement Between**
      **West Virginia and Aetna Better Health of W.V.**
      **dated May 6, 2021 (DE250-33) ..........................JA1039**

<u>**Exhibits**</u> **to**

C.    **Declaration of Walt Auvil,**
       **sworn May 31, 2022 (DE250-3), Continued:**

30.    **Excerpt of State Fiscal Year 2021 Model Purchase**
       **of Service Provider Agreement Between West**
       **Virginia and UniCare W.V.**
              **dated May 6, 2021 (DE250-34)** ..........................JA1043

31.    **Excerpt of State Fiscal Year 2021 Model Purchase**
       **of Service Provider Agreement between West**
       **Virginia and The Health Plan**
              **dated April 21, 2021 (DE250-35)** ......................JA1047

32.    **Email re: "[External] Gender Dysphoria Question"**
              **dated October 13, 2020 (DE250-36)** .................JA1051

33.    **Cost of Care Composite Exhibit, Excerpted**
              **dated January 2019 (DE250-37)** ........................JA1052

# <u>TABLE OF CONTENTS</u>
## Volume III of VI

Page

**Defendants' Motion for Summary Judgment,
With Exhibits,**

    filed May 31, 2022 (DE252)..................................................................JA1076

<u>Exhibits:</u>

1.    **Excerpts of Deposition of Sarah Young,
     With Exhibits**
          taken March 11, 2022 (DE252-1)..................................JA1083

2.    **Excerpts of Deposition of Secretary Bill Crouch**
          taken March 17, 2022 (DE252-2)..................................JA1163

3.    **Excerpts of Deposition of
     Commissioner Cynthia Beane, With Exhibits**
          taken March 29, 2022 (DE252-3)..................................JA1173

4.    **Redacted Excerpts of Deposition of
     Shauntae Anderson**
          taken April 22, 2022 (DE252-4)..................................JA1291

5.    **Redacted Excerpts of Deposition of
     Christopher Fain**
          taken April 28, 2022 (DE252-5)..................................JA1322

6.    **Redacted Affidavit of Jennifer Myers**
          sworn April 29, 2022 (DE252-6)..................................JA1370

7.    **Excerpts of Deposition of Brian Thompson,
     With Exhibits**
          taken April 13, 2022 (DE252-7)..................................JA1378

ix

<u>Exhibits</u> to

**Defendants' Motion for Summary Judgment,**
   **filed May 31, 2022 (DE252), Continued:**

8.    **Excerpts of Deposition of Dr. Dan Karasic,**
      **With Exhibits,**
         **taken April 15, 2022 (DE252-8)**...................................JA1408

9.    **Excerpts of Deposition of Dr. James Becker**
         **taken March 30, 2022 (DE252-9)**.................................JA1448

10.   **Excerpts of Deposition of Frederick Lewis**
         **taken April 4, 2022 (DE252-10)**...................................JA1453

12.   **Excerpts of Deposition of Becky Manning,**
      **With Exhibits**
         **taken April 12, 2022 (DE252-12)**.................................JA1468

14.   **Excerpts of Deposition of Jennifer Myers,**
      **With Exhibits**
         **taken April 8, 2022 (DE252-14)** ..................................JA1498

# TABLE OF CONTENTS
## Volume IV of VI

Page

**Exhibits to**
**Defendants' Motion for Summary Judgment,**
   **filed May 31, 2022 (DE252), Continued:**

15A.  Deposition of Loren S. Schechter, M.D.,
      With Exhibits
            taken March 28, 2022 (DE252-15)...............................JA1533

15C.  Certificate of Service for the Expert Rebuttal Report of
      Loren S. Schechter, M.D.
            filed March 18, 2022 (DE252-17) ................................JA1762
      Littman Article Entitled "Individuals Treated for
      Gender Dysphoria with Medical and/or Surgical
      Transition Who Subsequently Detransitioned: A Survey
      of 100 Detransitioners"
            dated October 19, 2021 (DE252-17)............................JA1764

16.   Excerpts of Deposition of
      Johanna Olson-Kennedy, M.D., With Exhibits
            taken April 25, 2022 (DE252-18) ...............................JA1781

17.   Affidavit of Sarah Young
            dated May 27, 2022 (DE252-19) ..................................JA1818

18A.  Excerpts of Deposition of Dr. Stephen Levine
            taken April 27, 2022 (DE252-20)..................................JA1821

18B.  Vandenbussche, "Detransition-Related Needs and
      Support: A Cross-Sectional Online Survey"
            undated (DE252-21)......................................................JA1833

**Plaintiffs' Motion to Exclude Expert
Testimony of Stephen B. Levine, M.D.,
With Exhibits,**

> filed May 31, 2022 (DE254) ..............................................................JA1853

**<u>Exhibits:</u>**

1.   **Declaration of Carl S. Charles**

> sworn May 31, 2022 (DE254-1) ...................................JA1856

A.   **Expert Disclosure Report of
Dr. Stephen B. Levine, M.D.**

> dated February 18, 2022 (DE254-2).................JA1860

B.   **Excerpt of Deposition of Dr. Stephen Levine Fain**

> taken April 27, 2022 (DE254-3) ........................JA1957

C.   **Excerpt of Deposition of Dr. Stephen Levine,
in relation to *Kadel v. N.C. State Health Plan for
Teachers and State Employees***

> taken September 10, 2021 (DE254-4) ..............JA2007

D.   **Excerpt from Transcript of the Bench Trial in
*Soneeya v. Turco*, Bench Trial Day 1,**

> dated April 8, 2019 (DE254-5) ..........................JA2066

E.   **Excerpt Deposition of Cynthia Beane**

> taken March 29, 2022 (DE254-6) ......................JA2068

F.   **Excerpt of Deposition of Dr. Stephen Levine
in Relation to *Claire v. Florida Department of
Management Services***

> taken December 21, 2020 (DE254-7) ...............JA2073

<u>Exhibits</u> **to**

1. **Declaration of Carl S. Charles**
   **sworn May 31, 2022 (DE254-1), Continued**

   G. **Dahlen,** *et al.* **Article "International Clinical**
      **Practice Guidelines for Gender Minority/Trans**
      **People: Systematic Review and Quality**
      **Assessment"**
         **visited April 26, 2022 (DE254-8) ...................... JA2085**

   H. **Statement of Marci L. Bowers, M.D., "Dear**
      **Colleagues, Clients and Friends"**
         **undated (DE254-9) ............................................. JA2096**

   I. **Printout from the Cass Review website**
      **"About the Review" page**
         **undated (DE254-10) ........................................... JA2099**

   J. **Excerpt of Expert Rebuttal Report of Dr. Johanna**
      **Olson-Kennedy, M.D., M.S.**
         **dated March 17, 2022 (DE254-11) .................... JA2102**

   K. **Excerpt from the Published Ph.D. Thesis,**
      **"On Gender Dysphoria" Written by**
      **Cecilia Dhejne, Ph.D.**
         **dated March 31, 2017 (DE254-12) .................... JA2107**

   L. **Dhejne,** *et al.* **Article "Long-Term Follow-Up of**
      **Transsexual Persons Undergoing Sex**
      **Reassignment Surgery: Cohort Study in Sweden"**
         **dated February 2011(DE254-13) ....................... JA2111**

**Exhibits** to

1.    **Declaration of Carl S. Charles**
               **sworn May 31, 2022 (DE254-1), Continued**

       M.    **Simonsen,** *et al.* **Article "Long-Term Follow-Up of**
             **Individuals Undergoing Sex-Reassignment**
             **Surgery: Somatic Morbidity and Cause of Death"**
                  **dated March 2016 (DE254-14)** ......................... JA2119

# TABLE OF CONTENTS
## Volume V of VI

Page

**Exhibits** to

1.  **Declaration of Carl S. Charles**
    **sworn May 31, 2022 (DE254-1Continued**

   N.   **Excerpt from the Diagnostic and Statistical**
        **Manual of Mental Disorders, Version 5**
        **undated (DE254-15)** ..........................................JA2129

   O.   **Excerpt of Deposition of Dan Karasic, M.D.**
        **taken April 15, 2022 (DE254-16)** ......................JA2138

   P.   **InterQual Criteria Sheets for Gender-Confirming**
        **Surgeries (Hysterectomy and Phalloplasty)**
        **dated April 2021 (DE254-17)** ...........................JA2143

   Q.   **Littman Article "Correction: Parent Reports of**
        **Adolescents and Young Adults Perceived to**
        **Show Signs of a Rapid Onset of Gender**
        **Dysphoria"**
        **dated March 19, 2019 (DE254-18)** ...................JA2159

   R.   **Bauer,** *et al.* **Article "Do Clinical Data from**
        **Transgender Adolescents Support the**
        **Phenomenon of 'Rapid-Onset Gender**
        **Dysphoria'?"**
        **undated (DE254-19)** ..........................................JA2164

   S.   **Defendants' Response to Plaintiff's**
        **Second Set of Interrogatories**
        **filed October 25, 2021 (DE254-20)** ...................JA2170

Exhibits to
1.    Declaration of Carl S. Charles
            sworn May 31, 2022 (DE254-1Continued

      T.    Excerpt of Deposition of Dr. Stephen Levine
            in relation to *B.P.J. v. West Virginia*
            *State Board of Education*
                taken March 30, 2022 (DE254-21) ....................JA2177

Plaintiffs' Memorandum of Law in Support of Motion to Exclude
Expert Testimony of Stephen B. Levine, M.D.
        filed May 31, 2022 (DE255).............................................................JA2187

Order
Granting Joint Motion to File Exhibits Under Seal
        filed June 1, 2022 (DE256)................................................................JA2211

Corrected Stipulation of Plaintiffs and Defendants
        filed June 10, 2022 (DE258).............................................................JA2212

Defendants' Response in Opposition to
Plaintiffs' Motion for Class Certification
        filed June 14, 2022 (DE259).............................................................JA2217

Defendants' Response to Plaintiffs' Motion to Exclude
Expert Testimony of Stephen B. Levine, M.D.,
With Exhibit,
        filed June 14, 2022 (DE260).............................................................JA2241

      A.    de Vries, *et al*. "Young Adult Psychological Outcome
            After Puberty Suppression and Gender Reassignment"
                visited October 7,2016 (DE260-1) ...............................JA2265

**Exhibits** to
**Defendants' Response in Opposition to**
**Plaintiffs' Motion for Summary Judgment**
        **filed June 14, 2022 (DE261):**

   19A.  **Defendants' Third Supplemental Response to**
          **Plaintiff's First Set of Requests for Production**
                 **filed November 30, 2021 (DE261-1)...........................JA2276**
          **InterQual Composite Exhibit**
                 **dated October 2021 (DE261-1)....................................JA2281**

   19B.  **InterQual Composite Exhibit**
                 **dated October 2021 (DE261-2)...................................JA2351**

**Exhibits** to
**Plaintiffs' Opposition to Motion for Summary Judgment**
        **filed June 14, 2022 (DE262):**

   1.   **Supplemental Declaration of Walt Auvil,**
        **With Exhibits 34 & 35**
                 **dated June 14, 2022 (DE262-1) ....................................JA2416**

        34.   **InterQual, 2012.2 Procedures Adult Criteria,**
              **Reduction Mammoplasty, Male (DE262-2) .............JA2418**

        35.   **InterQual, 2021 Reduction Mammoplasty,**
              **Male (Adolescent) (DE262-3) .....................................JA2422**

Plaintiffs' Reply Memorandum of Law in Support of Motion to
Exclude Expert Testimony of Stephen B. Levine, M.D.,
With Exhibits,
    filed June 21, 2022 (DE266)...............................................................JA2428

Exhibits:

    1.    Declaration of Carl. S. Charles,
        With Exhibit U
            sworn June 21, 2022 (DE266-1) ...................................JA2452

        U.    Excerpt of Deposition of
           Dr. Johanna Olson-Kennedy
              taken April 25, 2022 (DE266-2) ........................JA2454

Reporter's Transcript of Proceedings Before
The Honorable Robert C. Chambers,
    on July 13, 2022 (DE269) ..................................................................JA2464

Memorandum Opinion and Order
Granting Plaintiffs' Motion for Class Certification
    filed August 2, 2022 (DE270)............................................................JA2552

Memorandum Opinion and Order
Granting Plaintiffs' Motion for Summary Judgment and
Denying Defendants' Motion for Summary Judgment
    filed August 2, 2022 (DE271)............................................................JA2562

Judgment Order
    filed August 17, 2022 (DE273)..........................................................JA2592

Defendants' Notice of Appeal
    filed August 31, 2022 (DE277)..........................................................JA2594

## <u>TABLE OF CONTENTS</u>
### Volume VI of VI – Under Seal

Page

Ex. A:     Expert Disclosure Report of Dan H. Karasic, M.D.
            dated January 13, 2022 (DE257)..................................JA2598

Ex. B:     Affidavit of Jennifer Myers
            sworn April 29, 2022 (DE257-1)..................................JA2652

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN,** *et al.*,
            *Plaintiffs,*                          **Civil Action No. 3:20-cv-00740**
                                                   **Hon. Robert C. Chambers, Judge**
v.

**WILLIAM CROUCH,** *et al.*,
            *Defendants.*

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**NOW COME** Defendants William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services, by counsel Lou Ann S. Cyrus, Roberta F. Green, Caleb B. David, Kimberly M. Bandy, and the firm of Shuman McCuskey Slicer PLLC, and, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, hereby respectfully submit their Motion for Summary Judgment on all claims asserted against them by Plaintiffs, along with their supporting memorandum of law.

Defendants are entitled to summary judgment for each of Plaintiffs' claims. Count I of Plaintiffs' Amended Complaint asserts a claim for alleged deprivation of rights in violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs' equal protection claim fails for several reasons. First, Plaintiffs have not been treated differently from others similarly situated to them. Second, Plaintiffs have failed to proffer any evidence of intentional or purposeful discrimination. Third, even if Plaintiffs can demonstrate some disparate treatment based on diagnosis, Defendants' classification survives rational basis review because the State's policy is rationally related to its interests in providing coverage consistent with CMS mandates and in conserving financial resources. Finally, if the Court determines that intermediate scrutiny applies to Plaintiffs' claim, Defendants' classification survives intermediate scrutiny because the

**JA1076**

classification serves an important governmental purpose. Therefore, Defendants are entitled to summary judgment as a matter of law.

In Count II, Plaintiffs seek declaratory and injunctive relief against all Defendants and compensatory damages against Medicaid for violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116. Plaintiffs' claims under the ACA fail as a matter of law. Defendants have not created a classification that discriminates based on gender identity. Instead, Defendants provide coverage to transgender individuals to the same extent that they provide coverage to cisgender individuals. Plaintiffs' claim is based upon Medicaid not covering gender-affirming surgeries; however, the ACA and its accompanying regulations do not require Medicaid to cover any particular procedure or treatment. Therefore, Defendants are entitled to summary judgment as a matter of law.

In Count III, Plaintiffs seek declaratory and injunctive relief against Defendants Crouch and Beane for violation of the Medicaid Act's Availability Requirements, 42 U.S.C. § 1396a(a)(10)(A). Plaintiffs claim that Medicaid's policy not covering gender-affirming surgery eliminates mandatory Medicaid coverage and renders medically necessary services unavailable. Plaintiffs' claim fails as a matter of law. The Medicaid Act does not require Defendants to cover gender-affirming surgeries, and its accompanying regulations permit a State Medicaid plan to place limits on services even if those services are required to be covered. Even if gender-affirming care falls into one of the mandatory covered service categories, State plans are permitted to place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures. Here, Medicaid has placed appropriate limits on gender-affirming care by providing coverage for most gender-affirming care and designating as non-covered gender-affirming surgeries, which Medicaid is permitted to do based on considerations such as medical necessity

2

**JA1077**

and on utilization management considerations. Therefore, Plaintiffs' claim fails as a matter of law, and Defendants are entitled to summary judgment.

Count IV seeks declaratory and injunctive relief against Defendants Crouch and Beane for violation of the Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B). Plaintiffs allege that Defendants provide comparable services to cisgender beneficiaries while they do not provide those services to transgender beneficiaries. Plaintiffs' claim fails as a matter of law. The Medicaid Act and its accompanying regulations prohibit three types of discrimination: (1) against the categorically needy, (2) among the categorically needy, and (3) among the medically needy. Plaintiffs' allegations do not describe discrimination in any of these manners. Plaintiffs appear to be alleging that Defendants discriminate "among the categorically needy" by not providing coverage for gender-affirming surgery. Defendant do not, however, provide coverage for gender-affirming surgery to any Medicaid beneficiaries. Additionally, there is no requirement in the Medicaid Act that compels a state to provide a treatment for all diagnoses if the treatment is provided for any diagnosis. Therefore, Plaintiffs' claim fails as a matter of law, and Defendants are entitled to summary judgment.

Finally, Plaintiffs lack standing to bring any of their claims. Neither has submitted a claim for and been denied gender-affirming care by Medicaid. Neither has submitted a claim for gender-affirming surgery. Mr. Fain testified that he is not willing to undergo surgery until he has kicked his smoking habit, which has not yet occurred. Ms. Anderson has never had a treating physician find that she requires gender-affirming surgery to treat her gender dysphoria. Thus, neither Plaintiff has established a concrete and particularized injury that is actual or imminent. Therefore, both Plaintiffs lack standing, and Defendants are entitled to summary judgment.

In support of their Motion, Defendants submit the following exhibits, which are referred to within the Memorandum of Law by their respective Exhibit numbers:

Exhibit 1, Deposition of Sarah Young; with redactions;

Exhibit 2, Deposition of Bill Crouch;

Exhibit 3, Deposition of Cynthia Beane;

Exhibit 4, Deposition of Shauntae Anderson with redactions;

Exhibit 5, Deposition of Christopher Fain with redactions;

Exhibit 6, Affidavit of Jennifer Myers redacted version;

Exhibit 7, Deposition of Brian Thompson;

Exhibit 8, Deposition of Dan Karasic, M.D. with redactions;

Exhibit 9, Deposition of Dr. James Becker;

Exhibit 10, Deposition of Fred Lewis;

Exhibit 11, Report of Dr. Stephen Levine;

Exhibit 12, Deposition of Becky Manning;

Exhibit 13, Defendants' First Supp. Response to Plaintiff's First Set of Interrogatories;

Exhibit 14, Deposition of Jennifer Myers;

Exhibit 15, Deposition of Dr. Schechter;

Exhibit 16, Deposition of Dr. Olson-Kennedy;

Exhibit 17, Affidavit of Sarah Young;

Exhibit 18, Deposition of Dr. Stephen Levine.

For these and other reasons more fully set forth in the accompanying memorandum of law, William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services respectfully request that this Court grant summary judgment in their

JA1079

favor on all claims advanced by Plaintiffs. These Defendants seek any and all further relief deemed

appropriate by the Court.

**WILLIAM CROUCH, CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,**

**By counsel**

/s/ Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA1080**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN** and **SHAUNTAE
ANDERSON;** individually and on behalf of all
others similarly situated,

          *Plaintiffs,*                    **Civil Action No. 3:20-cv-00740**
                                          **Hon. Robert C. Chambers, Judge**

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; and **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES,**

          *Defendants.*

## CERTIFICATE OF SERVICE

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of
Health and Human Resources Bureau for Medical Services, by counsel, and do hereby certify that
on the 31st day of May, 2022, a true and exact copy of "**DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**" was served on counsel via electronic means as follows:

Walt Auvil (WVSB#190)
***Counsel for Plaintiffs***
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com
Tara L. Borelli, Visiting Attorney
***Counsel for Plaintiffs***

Lambda Legal Defense and Education Fund,
Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Sasha Buchert, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor

**JA1081**

Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
65 E. Wacker Pl, Suite 2000
Chicago, IL  60601
(312) 663-4413
(312) 663-4307
nhuppert@lambdalegal.org
Carl. S. Charles, Visiting Attorney
***Counsel for Plaintiffs***

Lambda Legal Defense and Education Fund,
Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lamdalegal.org

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
***Counsel for Plaintiffs***
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

/s/ Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
***Counsel for William Crouch, Cynthia Beane, and
West Virginia Department of Health and Human
Resources, Bureau for Medical Services***
Shuman McCuskey Slicer PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA1082**

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                        HUNTINGTON DIVISION

4    ----------------------------------------------------------

5    Christopher Fain, individually and on behalf of all

6    others similarly situated, et al.,

7                 Plaintiffs,

8        vs.                   CIVIL ACTION NO. 3:20-cv-00740

9    William Crouch, et al.,

10                Defendants.

11   ----------------------------------------------------------

12

13

14            REMOTE DEPOSITION OF SARAH YOUNG

15

16

17   DATE:   March 11, 2022

18   TIME:   8:00 a.m. CST

19   PLACE:  Veritext Virtual Videoconference

20

21

22

23

24   REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25   JOB NUMBER:  5096099

Page 2

1                    APPEARANCES

2

3    On Behalf of the Plaintiffs (Via Videoconference):

4         CARL CHARLES, ESQ.

5         TARA L. BORELLI, ESQ.

6         Lambda Legal Defense and Education Fund, Inc.

7         158 West Ponce De Leon Ave., Suite 105

8         Decatur, Georgia  30030

9         470.225.5341

10        ccharles@lambdalegal.org

11        tborelli@lambdalegal.org

12

13        AVATARA SMITH-CARRINGTON, ESQ.

14        Lambda Legal Defense and Education Fund, Inc.

15        3500 Oak Lawn Avenue, Suite 500

16        Dallas, Texas  75219

17        214.219.8585

18        asmithcarrington@lambdalegal.org

19

20        NICOLE J. SCHLADT, ESQ.

21        Nichols Kaster PLLP

22        80 South 8th Street, Suite 4700

23        Minneapolis, Minnesota  55402-2224

24        612.256.3291

25        nschladt@nka.com

Page 3

```
1        WALT AUVIL, ESQ.
2        The Employment Law Center, PLLC
3        1208 Market Street
4        Parkersburg, West Virginia  26101
5        304.485.3058
6        auvil@theemploymentlawcenter.com
7
8   On Behalf of Defendants William Crouch; Cynthia Beane;
9   and West Virginia Department of Health and Human
10  Resources, Bureau for Medical Services (Via
11  Videoconference):
12       KIMBERLY M. BANDY, ESQ.
13       LOU ANN S. CYRUS, ESQ.
14       Shuman McCuskey Slicer, PLLC
15       1411 Virginia Street East, Suite 200
16       Charleston, West Virginia  25301
17       304.345.1400
18       kbandy@shumanlaw.com
19       lcyrus@shumanlaw.com
20
21
22
23
24
25
```

JA1085

Page 4

1    On Behalf of Defendant Jason Haught (Via

2    Videoconference):

3         ERIC D. SALYERS, ESQ.

4         Oxley Rich Sammons, PLLC

5         517 Ninth Street, Suite 1000

6         Huntington, West Virginia  25701

7         304.522.1138

8         esalyers@oxleylawwv.com

9

10

11

12   NOTE:  The original deposition transcript will be

13   delivered to Carl Charles, Esq., as the taking attorney.

14

15

16

17

18

19

20

21

22

23

24

25

**JA1086**

# DEPOSITION OF SARAH YOUNG

Page 34

1    organization, Ms. Young.  Can you tell me what your job

2    title is, please?

3         A.  Deputy commissioner of policy and operations.

4         Q.  Okay.  And what responsibilities fall under your

5    role within BMS?

6         A.  Under the policy side I have staff who oversee

7    all of the coverage policies that we have, that also

8    includes our eligibility policy.  And on the operation

9    side I have oversight of all of the technical systems

10   that we use to manage the program.

11        Q.  Can you tell me what technical systems you

12   oversee, that seems like a big bucket of work, can you

13   just say a little bit more of what you mean by that?

14        A.  It is.  We have the Medicaid managed information

15   system, you may see it referred to as MMIS, that is our

16   claims processing system.  Within that we have our

17   provider enrollment documents or files as well.  I do

18   not see the, oversee the member eligibility system, but

19   our staff do have input into the Medicaid portion of

20   that system.  There are various other systems that we

21   oversee that touch on member eligibility as well.

22        Q.  So there's another individual who specifically

23   oversees eligibility, right, that formally falls under

24   someone else, is that correct?

25        A.  The policy for member eligibility falls under?

**DEPOSITION OF SARAH YOUNG**

Page 62

1    be weekly to go over as new codes are introduced or new,

2    if there's a change in a scope of practice for a

3    practitioner then they would evaluate the codes that are

4    associated with that additional scope of practice if

5    it's within our confines of covered services.

6          Q.   Okay.  And let me zoom out from the specific and

7    just say, or just rather ask, does BMS make changes

8    without the West Virginia legislature necessarily

9    mandating it to do so?

10         A.   Yes, we do.

11         Q.   Okay, okay.  And those changes that BMS makes

12   independent of the legislature, does CMS have to approve

13   those, so do those changes necessarily, if they include

14   the required, if those changes include what CMS mandates

15   for coverage, does CMS necessarily have to approve those

16   changes?

17         A.   Depending on the scope I guess of the change,

18   yes.  If we added a service that was not previously

19   covered, if we added it or added limitations to a

20   service that we currently cover, they would have to

21   review and possibly approve the act.  There may be a

22   much minor scale change that we've made that doesn't

23   require their approval.  I think it depends on the scope

24   and how substantial of a service change it is.

25         Q.   Okay.  And then on the enrollee side of

**DEPOSITION OF SARAH YOUNG**

Page 65

1    A.  Yeah, it's a big question because I think we

2    were aware on a personal and a professional level as to

3    what was going on and we were approached by a number of

4    state providers, members, different advocacy groups or

5    different interested parties.  There was specific

6    funding that was made available around that time as

7    well, so it was getting a lot of attention and obviously

8    we were being asked to do what we could to address it as

9    well.

10    Q.  Thank you for that.  So for a change like that

11    which, I mean, tell me if this is right, you said that

12    was a larger system change in the benefit structure for

13    both enrollees and providers.  Do you recall that CMS

14    had to be consulted about that change?

15    A.  Yes.

16    Q.  Okay.

17    A.  Yeah, specifically this type of authorization.

18    We were aware of at least one other state at the time

19    that had requested for the authority to do something

20    like this.  This demonstration waiver is a very lengthy

21    process and CMS was involved from the very beginning of

22    conceptualizing it through public comment and approving

23    the actual application for the waiver.

24    Q.  I see.  And so thinking about CMS's role

25    specifically as it relates to gender confirming care, to

**DEPOSITION OF SARAH YOUNG**

Page 66

1  your knowledge does CMS require that gender confirming
2  care be excluded from any state Medicaid plan?
3      A.  Not that I'm aware of.
4      Q.  Okay.  And are you aware of any other state
5  Medicaid plans that include or provide coverage for
6  gender confirming care?  And I should say, I know this
7  is tricky, but you the representative of BMS, not you,
8  Ms. Sarah Young, in your personal capacity.
9      A.  And I apologize, I don't, I have not done
10  research on what other states cover and the degree to
11  which they do cover.
12      Q.  Okay.  And have you seen any discussion of that
13  specific nature come through emails from other members
14  in the leadership team?
15      A.  Regarding other states?
16      Q.  Other states, yes, yes, mm-hmm.
17      A.  Not that I recall.
18      Q.  Okay.  And then when the Bureau for Medical
19  Services undertook the change to cover hormone therapy,
20  do you know if CMS was consulted in that change?
21      A.  My understanding of that is that we had always
22  covered the hormone therapy until a change was made at
23  some point, and I don't know when that was, that change
24  was made that we didn't cover it.  So then when the
25  change was made it was basically reverting back to the

## DEPOSITION OF SARAH YOUNG

Page 72

1  regardless.

2    Q.  Got it.  Okay.  Thank you.  And then sort of

3  zooming out again, if BMS excludes a particular service,

4  are the MCO's required to abide by that exclusion?

5    A.  Yes, if they are reimbursing out of their

6  Medicaid money.

7    Q.  Okay.  Sorry, Ms. Young, give me just a second.

8  How are you doing, Ms. Young, would you like a break now

9  or would you like to continue for about another

10  20 minutes and then we break for lunch?

11    A.  I can continue.

12    Q.  Okay.  Thank you.  So if you would look back

13  again at the marked exhibits, the most recent one that

14  we had open there, the second amended notice of

15  deposition.  We're still on Page 2.  Oh, no, I'm sorry,

16  we're on Page 3, if you would, and I'm looking at topic

17  No. 5.  Do you see it up there?

18    A.  Yes, it begins with, "Your efforts to

19  administer."

20    Q.  It does.  Could you just finish reading the rest

21  of that topic for me, please.

22    A.  "Your efforts to administer the Medicaid program

23  in West Virginia and/or affirm your compliance with the

24  Medicaid Act and the Patient Protection and Affordable

25  Care Act."

**JA1091**

## DEPOSITION OF SARAH YOUNG

Page 74

1    A.   Yes.  I think we've called it the PPACA, but I

2    believe it's the same thing, yes.

3    Q.   That's a new one, I have not heard that one.  We

4    use ACA and I know, you know, often the general public

5    it's ObamaCare, but tell me again what you call it?

6    A.   The PPACA, just add the P's in there.

7    Q.   Okay.  I'll go with the ACA for today, if you'll

8    indulge me, but that's a good one, I'm going to remember

9    that.  So returning to this topic, is it correct to say

10   that BMS is the entity that administers the Medicaid

11   program in West Virginia?

12   A.   Yes, we are the single state authorized to,

13   single state agency authorized to administer the

14   program.

15   Q.   And is that authorization, does that originate

16   in the state code of West Virginia, to your knowledge?

17   A.   I believe it's in the state code and it's also

18   designated in our state Medicaid plan.

19   Q.   Okay.  Thank you.  How would you describe what

20   BMS does to administer the West Virginia Medicaid

21   program?

22   A.   Sure.  So we base all of our policies and

23   procedures within the confines of the federal

24   regulation, the state code, state laws, and we ensure

25   that the covered services are available to members and

JA1092

**DEPOSITION OF SARAH YOUNG**

Page 75

1  that reimbursement is available to providers who provide

2  those services to our members. We provide member

3  education, provider education, we have a number of

4  documents on our Website to guide those policies and

5  procedures, and we contract with a number of systems and

6  vendors that help us operationalize those policies.

7     Q. That was a nice succinct job for what I

8  understand to be a very large undertaking. So it's fair

9  to say then that BMS oversees all matters pertaining to

10  Medicaid recipients' access to West Virginia Medicaid

11  services?

12     A. Yes.

13     Q. Okay. Does BMS establish a process for

14  individuals to apply for West Virginia Medicaid

15  eligibility?

16     A. We do in partnership with a sister Bureau who

17  actually does the application processing.

18     Q. Oh, I think you mentioned that earlier. What is

19  the name of that Bureau?

20     A. The original name was Bureau For Children &

21  Families, I believe their current name is Bureau for

22  Family Assistance.

23     Q. Okay. And that is not housed within BMS?

24     A. No, it is under the umbrella of DHHR, it is

25  separate and distinct from BMS.

JA1093

**DEPOSITION OF SARAH YOUNG**

Page 76

1    Q.  Okay.  So in conjunction with that sister

2    Bureau, BMS reviews applications for West Virginia

3    Medicaid coverage and either grants or denies them, is

4    that accurate?

5        A.  In conjunction with the sister Bureau, yes.

6        Q.  Okay.  And does BMS maintain a list of West

7    Virginia Medicaid recipients to track enrollment numbers

8    in the program?

9        A.  The eligibility system provides those reports

10   and we have a number of reports that are available on

11   our Website to track enrollment, yes.

12       Q.  Okay.  Does BMS disseminate plan benefit and

13   enrollment information to West Virginia Medicaid

14   recipients?

15       A.  We have a guide, it's called "Your Guide to

16   Medicaid" that's available on our Website.  Again, with

17   there being a fee for service population and a managed

18   care population, that guide is very general for both.

19   And then the managed care organizations are responsible

20   for disseminating information to their members.

21       Q.  So who disseminates that information to West

22   Virginia Medicaid recipients who are fee for service

23   rather than MCO, rather than managed care members?

24       A.  The Bureau does.

25       Q.  Okay.

JA1094

**DEPOSITION OF SARAH YOUNG**

Page 77

1      A.  Through that guide to Medicaid, yes.

2      Q.  So it has separate information available for the

3  fee for service recipients?

4      A.  It does, yes.

5      Q.  Okay.  And does BMS oversee all matters relating

6  to providers who accept West Virginia Medicaid

7  recipients as patients?  Or I should say -- well, let me

8  see what you say to that question and then I can

9  rephrase it if I need to.

10     A.  Within our purview.  So we would oversee

11 everything regarding our rules and regulations and our

12 conditions for reimbursement, yes.

13     Q.  Okay.  Right.  So you said BMS does cover

14 establishing provider reimbursement rates?

15     A.  Yes.

16     Q.  Okay.  Does BMS oversee all of the fiduciary

17 responsibilities related to the West Virginia Medicaid

18 program?

19     A.  Yes.  In conjunction with DHHR, like I said

20 earlier, there's a separate finance division under DHHR

21 that assists with that as well.  But yes, under that

22 umbrella agency and within BMS we are responsible for

23 that.

24     Q.  Okay.  How much of the state, how much of the

25 budgetary responsibilities for the administration of

**JA1095**

## DEPOSITION OF SARAH YOUNG

Page 78

1  West Virginia Medicaid falls in BMS's bucket of work?

2      A.  I can only ballpark it.

3      Q.  That's completely fine.

4      A.  It would be at least 75 to 80 percent I would

5  assume.  I'm not day-to-day in the financial part of

6  that, that's not under my division, but it is the bulk

7  of the work.

8      Q.  Okay.  So the bulk of the work would fall to BMS

9  for constructing budgets and sort of understanding how

10  the various earmarked monies are distributed, is that

11  fair to say?

12      A.  Yes, I believe so.

13      Q.  Okay.  And is BMS the agency responsible for

14  managing the amount of federal dollars, so that would be

15  monies coming from CMS to the various programs and

16  constituents within West Virginia Medicaid?

17      A.  Yes.  We are responsible for claiming of the

18  federal dollars that comes into the Bureau, yes.

19      Q.  Okay.  And does BMS oversee benefits for

20  providers and enrollees that are both included and

21  excluded?

22      A.  Let me make sure I understand.  So we oversee

23  all covered services and we maintain noncovered, the

24  services that are not covered are not reimbursed.  Does

25  that answer?

**DEPOSITION OF SARAH YOUNG**

Page 79

1    Q. I think so. But I guess what I mean is, there's

2 no other agency making those determinations or

3 maintaining that information, right, that is BMS's sole

4 purview?

5    A. Yes, correct. And again, unless dictated by

6 another entity to add a service or to recover something,

7 those decisions are at our level.

8    Q. Okay. Perfect. And then we touched on this,

9 but let me just understand or just ask more

10 specifically, BMS also determines which benefits to

11 enrollees are available under the MCO, that is the

12 Mountain Health Trust, and which benefits are available

13 under the fee for service coverage, right?

14    A. Correct, yes.

15    Q. Okay. So let's talk a little bit about BMS's

16 efforts to ensure compliance with the Medicaid Act.

17 What do you generally understand that the Medicaid Act

18 requires of BMS in its administration of West Virginia

19 Medicaid?

20    A. My understanding is the Act requires certain

21 services to be covered, it requires certain individuals,

22 meaning certain circumstances to be eligible for the

23 program, and it may also dictate which type of providers

24 are able to do certain services. Generally speaking, I

25 think that's what it covers.

## DEPOSITION OF SARAH YOUNG

Page 80

1    Q.  Okay.  Are you aware of any annual compliance
2  obligations for BMS with regard to the Medicaid Act?
3    A.  Again, our Medicaid state plan forms our basis
4  for the program.  There are, like I said, there are some
5  annual rate changes, I'm not aware of an annual review
6  of that whole plan though.
7    Q.  Okay.  Are you aware or has anyone communicated
8  to you what might happen if BMS is found to not be in
9  compliance with the Medicaid Act?
10   A.  Sure.  If there is something that's been brought
11 to our attention usually CMS will either contact us for
12 more information or there will be what they call our
13 state health officer letter that is sent from CMS to the
14 various state Medicaid agencies that will either clarify
15 how something is to be done or will provide a change
16 that needs to be made.
17   Q.  So it's fair to say that CMS will give you all a
18 heads-up before any adverse action is taken against the
19 plan?
20   A.  Correct, yes.
21   Q.  Okay.  And can you think of a time that's
22 happened in your tenure where you've gotten a notice
23 from CMS that an adjustment needs to be made?
24   A.  Sure.  As I said earlier, we have the 1115
25 demonstration waiver, and so we added some medication

**DEPOSITION OF SARAH YOUNG**

Page 81

1  assisted treatment coverage of that and it was an

2  optional service and it was authorized through that

3  waiver.  Within the last, I believe the last year or so

4  CMS made that a mandatory service.  So they sent out a

5  state health officer letter to all the states and each

6  state had to review their state plan coverage of that

7  service and they dictated what information needed to be

8  included, how the service was to be covered, and then we

9  had to submit a state plan amendment to come into

10  compliance with that requirement.

11      Q.  All right.  And then in your tenure have things

12  ever moved beyond the state health officer letter

13  posture?  So I guess what I mean by that is, have you

14  ever gotten, has BMS ever received a state health

15  officer letter that they have ignored or not complied

16  with, in your tenure?

17      A.  Not intentionally that I'm aware of.

18      Q.  Okay.

19      A.  There may be things that we've missed, but

20  again, I'm not aware of that.

21      Q.  Sure.  Are you aware of the comparability

22  requirement within the Medicaid Act?

23      A.  Are you referring to like parity?

24      Q.  It's a related provision, yeah.  Let me

25  rephrase, sorry, let me rephrase.  What do you

**JA1099**

**DEPOSITION OF SARAH YOUNG**

Page 82

1  understand to be a comparability requirement of the

2  Medicaid Act as it relates to BMS's administration of

3  West Virginia Medicaid?

4      A.  I'm afraid I might need a little more context,

5  comparability to?

6      Q.  So I'm referring to a provision within the

7  Medicaid Act that's referred to as the comparability

8  requirement, and my question is just do you have an

9  understanding of that requirement, and if so, what is

10 it?

11     A.  I apologize, not off the top of my head, I don't

12 recall what that states.

13     Q.  Nothing to apologize for.  And then how about

14 are you aware of the availability requirement within the

15 Medicaid Act, and if so, what is your awareness or

16 understanding of that requirement?

17     A.  Again, without reviewing the document, I'm

18 sorry, I can't speak to that.

19     Q.  All right.  No problem.  To your knowledge has

20 BMS ever been audited for its compliance with either of

21 those provisions?

22     A.  Generally speaking, there have been times when

23 we have been asked to confirm that we have a certain

24 type of policy or coverage, I believe that would fall

25 under the, loosely under an audit.  I think that, I'm

**DEPOSITION OF SARAH YOUNG**

Page 83

```
 1   not aware of an official audit that I've been involved
 2   in.
 3        Q.  Okay.  And then moving over to the PPACA, see, I
 4   got it, okay, moving over to the Patient Protection and
 5   Affordable Care Act, can you just tell me generally what
 6   you understand to be BMS's obligations under that act as
 7   it relates to the administration of West Virginia
 8   Medicaid?
 9        A.  Sure.  So our largest portion of that was the
10   Medicaid expansion, that was a huge undertaking that
11   expanded Medicaid coverage to previously uncovered or
12   noncovered childless adults of certain ages.  And with
13   that states had to come up with an alternative benefit
14   plan for that coverage group.  Ours very closely
15   resembles our what might be referred to as regular or
16   nonexpansion benefit group.  There were a few
17   differences in, you know, service limits on a
18   chiropractic benefit, but the Act dictated coverage of I
19   believe it was eight or nine essential health benefits
20   that had to be in that alternative benefit plan.
21        Q.  I don't suppose you recall what those eight or
22   nine essential benefits are?  If not, I'm sorry, I know
23   it probably sounds like you're back in school, but any
24   of them that you recall would be fine.
25        A.  Yeah, in our state plan it specifically called
```

**DEPOSITION OF SARAH YOUNG**

Page 84

1    out each one of them, that there are what, by name what

2    you'd consider essential health benefits.  So coverage

3    to medical services, coverage, I believe, like I said,

4    there's chiropractic services, there's, you know, any

5    number of basic health services.

6         Q.  Okay.  So thinking about what the Act requires

7    of BMS, are there things that the Bureau does on an

8    annual basis to ensure compliance with its understanding

9    of its obligations under the Act?

10        A.  So I wouldn't say that there's a specific

11   activity on an annual basis that is geared towards this,

12   but we have oversight by, you know, CMS and by any

13   number of agencies that are, that have a vested interest

14   in the administration of the plan.  So anything that is,

15   obviously you mentioned earlier an audit, anything that

16   is brought to our attention as being out of compliance

17   we would take action to correct.

18        Q.  Have you, again, referring to BMS, to your

19   knowledge has BMS received any communications from the

20   Federal Department of Health and Human Services about

21   its administration of West Virginia Medicaid?

22        A.  I can't think of anything specifically.

23        Q.  Okay.  Are you aware of Section 1557 of the

24   Affordable Care Act?

25        A.  Without seeing it, I don't know what that

**DEPOSITION OF SARAH YOUNG**

1    section is.

2       Q.  Okay.  So then is it, let me ask then, does

3    anything jump out at you in your tenure in your current

4    role as specific actions BMS has taken to comply with

5    Section 1557 of the ACA?

6       A.  Without seeing that section, I couldn't respond

7    to that.

8       Q.  Okay.  All right.  Let me pause here briefly.

9               (Discussion held off the record.)

10              (Lunch break taken from 10:59 a.m. to

11              11:35 a.m.)

12                  AFTERNOON SESSION

13    BY MR. CHARLES:

14       Q.  So when we left off speaking before the lunch

15    break we were talking about topic No. 5 and we had just

16    started discussing what you understand to be BMS's

17    obligations and efforts to comply with the Patient

18    Protection and Affordable Care Act.  So I'm going to

19    introduce an exhibit here.

20              (Exhibit 9 marked for identification.)

21       Q.  So you should see that populate in the marked

22    exhibit folder.  Just let me know when you see that, Ms.

23    Young.

24       A.  It's 0009?

25       Q.  Yes, I apologize, it's marked PL0009, yes.

**JA1103**

## DEPOSITION OF SARAH YOUNG

Page 86

1   Thank you.

2           MR. CHARLES:  So, Kelley, I'm showing the

3   witness what has been marked as Plaintiff's

4   Exhibit 0009.

5      Q.  Just very quickly, Ms. Young, do you know if

6   you've seen this before?

7      A.  Yes, I have.

8      Q.  Okay.  Do you need to take a minute to review

9   it?

10     A.  If you would speak to any specifics I would.

11     Q.  Sure.  I'll call your attention to a couple of

12  sections, but if you say you recall seeing it, then

13  we'll leave it there and I can just direct you to the

14  sections.  So can you just tell me the title of this

15  document, please?

16     A.  Sure.  Section 1557 of the Affordable Care Act.

17          MR. CHARLES:  And so the witness is

18  reviewing Plaintiff's Exhibit 0009, which is a slide

19  deck of, "State operations technical assistance call."

20     Q.  And, Ms. Young, can you just read me the date

21  there at the bottom of the first slide.

22     A.  July 19, 2016.

23     Q.  Great.  Was this the point in time where you

24  were still an interim director or were you formally the

25  director or deputy director at this point in time?

**DEPOSITION OF SARAH YOUNG**

Page 87

1    A.  I believe this was still when I was in an

2  interim position.

3    Q.  Okay.  But just for the benefit of the record,

4  even as an interim deputy director -- well, sorry, let

5  me back up.  As an interim deputy director were your

6  responsibilities virtually the same as they are now in

7  your formal role?

8    A.  They are, yes.

9    Q.  Okay.  Thank you.  Okay.  So do you recall, Ms.

10  Young, if you were on the state operations technical

11  assistance call?

12    A.  I do not recall this one specifically.  There

13  were a series of, again, we abbreviated it to SOTA

14  calls, we like to do that, but I don't specifically

15  recall this one.

16    Q.  Okay.  But is it fair to say that you do attend

17  SOTA calls regularly in your duties?

18    A.  I did.  They've stopped this particular series,

19  but yes, it's something I would do when available or I

20  would have specific staff attend for me.

21    Q.  And what was the purpose or benefit behind

22  having a member of your staff or you yourself attend

23  these briefings?

24    A.  So this was one of the ways that the federal

25  government communicates the specific requirements to us

**DEPOSITION OF SARAH YOUNG**

Page 88

1  in a better method than maybe the federal regulations

2  have things stated in, you know, generally how to

3  operationalize things or call attention to specific

4  parts of the Act.

5      Q.  Okay.  So let's turn quickly to, it doesn't have

6  to be quickly, but if you would please scroll down, and

7  the page numbers are located in the lower right-hand

8  corner, so let's just start at Page No. 2.

9      A.  Okay.

10     Q.  And that first bullet point, can you just read

11  that to me, please.

12     A.  Sure.  "Section 1557 prohibits discrimination

13  based on race, color, national origin, sex, age or

14  disability in health programs and activities that

15  receive federal funds."

16     Q.  Thank you.  And now that, I mean, does this

17  description of Section 1557, does this sufficiently

18  recall to your mind what that section of the ACA is

19  about?

20     A.  It does.  Earlier out of context I didn't

21  recognize it by the name, but the summary does, yes.

22     Q.  Okay.  So would you then say having, you know,

23  having this material in front of you now, can you recall

24  other times in your tenure as deputy commissioner that

25  you may have come across this Section 1557 referenced in

JA1106

**DEPOSITION OF SARAH YOUNG**

Page 98

1  government?

2       A.  Yes.  I would have expected it to be in that

3  state health officer format, the letter.

4       Q.  Okay.

5       A.  Maybe as an attachment, but with some more

6  guiding information for the state agencies.

7       Q.  I see.  Okay.  And is this the kind of

8  information that BMS would consider in its efforts to

9  ensure compliance with PPACA and other federal laws

10 regarding healthcare?

11      A.  Yes.  We would consult with CMS for guidance on

12 how to ensure that we are in compliance with this, but

13 yes.

14      Q.  Okay, great.  All right.  Give me just a moment

15 here.  So, Ms. Young, if you would in the marked exhibit

16 folder please return to that deposition notice again,

17 it's two exhibits previous, so it's 08 is the number.

18 Just let me know when you've toggled to that.

19      A.  Okay.

20      Q.  So then on Page 3 of that notice you'll see

21 topic 8 about a third from the bottom of the page.  Do

22 you see topic 8 there?

23      A.  I do, yes.

24      Q.  Okay.  And go ahead, would you please, and read

25 topic 8.

**DEPOSITION OF SARAH YOUNG**

Page 99

1      A.  "Healthcare coverage and/or denials through

2  Medicaid for transgender West Virginians generally and

3  Christopher Fain and Shauntae Anderson specifically."

4      Q.  Okay.  Thank you.  So you have been designated

5  to testify about topic 8, which you just read into the

6  record, but only as to medical claims and not

7  pharmaceutical claims, is that your understanding for

8  today's testimony?

9      A.  Yes.

10     Q.  Okay.  And are you prepared to testify about

11  this topic today?

12     A.  Yes.

13     Q.  Okay.  And with respect to this topic

14  specifically, how did you prepare to testify about this

15  topic today?

16     A.  I reviewed our policies and when I spoke with

17  Jennifer Myers we spoke to what information was

18  available in the member file in our claims processing

19  system.

20     Q.  Great.  Did that discussion with Jennifer Myers

21  happen in the same discussion that we talked about

22  earlier today in your preparation generally for your

23  testimony?

24     A.  Yes.

25     Q.  Okay.  Thank you.  Because counsel has not

**JA1108**

## DEPOSITION OF SARAH YOUNG

Page 100

1  designated you as the witness to talk about

2  pharmaceutical care, my questions won't be oriented to

3  that, so that's why I'm reformulating my question here.

4  So does BMS provide coverage for gender confirming

5  medical care for transgender people who are West

6  Virginia Medicaid participants?

7      A.  We do not cover gender confirming surgery.  We

8  do cover counseling for any reason.

9      Q.  Okay.  Do you know if BMS provides coverage for

10  other medical care for transgender West Virginia

11  Medicaid recipients which is not surgery or counseling?

12      A.  Are you asking about general services?

13      Q.  Yeah.

14      A.  Yeah, our system does not designate whether an

15  individual is transgender, so all services that are

16  available to all members are available to all members.

17  There's no designation as a specific benefit or package

18  for transgender versus non-transgender, it's not in our

19  system or policies.

20      Q.  I see.  Okay.  So let me clarify a little bit.

21  To your knowledge do non-transgender members access

22  coverage through West Virginia Medicaid for gender

23  affirming care?

24          MS. BANDY:  I'm just going to object to the

25  extent that that's, I mean, gender confirming care could

**DEPOSITION OF SARAH YOUNG**

Page 109

1  Technologies.

2      Q.  Okay.  And does BMS have, does BMS have access

3  to Gainwell and Kepro?  I guess what I mean is, the way

4  you described the MCO's is that they have their own

5  similar process, but it's separate and run through their

6  systems.  Is it accurate then to say that fee for

7  service is under BMS and BMS does sort of provide

8  oversight and management and can access both Gainwell

9  and Kepro as necessary?

10     A.  Yes, that's correct.

11     Q.  Okay.  All right.  As far as you're aware, are

12 there other vendors that BMS works with to understand

13 and utilize accurate criteria in evaluating costs for

14 reimbursement?

15     A.  I believe that there are other vendors on the

16 pharmacy side.

17     Q.  Okay.

18     A.  And they may have another person to speak to

19 that.  On the medical side we do engage consultants from

20 time to time, we have a project management contract, so

21 they might do research for us and help us with

22 researching various topics.  But offhand, I can't think

23 of another contracted entity that helps with the medical

24 evaluation.

25     Q.  Sure.  Let me just ask you about the one I'm

**DEPOSITION OF SARAH YOUNG**

Page 110

1    aware of.  Are you familiar with InterQual?

2        A.  Yes.

3        Q.  And is that, what is InterQual, as you

4    understand it?

5        A.  As I understand at a very high level, InterQual

6    criteria is a nationally accredited criteria for

7    determining medical necessity for procedures and that is

8    the criteria that our contractor Kepro uses.

9        Q.  Oh, okay.  And do you know if the MCO's use

10   InterQual as well for those criteria for assessing

11   medical necessity?

12       A.  I don't know which specific criteria they use.

13   I would believe that their contract states that they

14   must use a nationally accredited criteria.

15       Q.  Okay.  What's the importance of using a

16   nationally accredited criteria for those indicia?

17       A.  I think it speaks to the validity and the

18   quality of the product that it is nationally accredited.

19   It's not a homegrown made-up process, it's something

20   that is readily available and has been peer reviewed and

21   all the things that might go into their accreditation.

22       Q.  Thank you.  Do you know how long, again,

23   estimate, ballpark is fine, do you have a sense of how

24   long Kepro has been using InterQual?  And let's focus,

25   I'm sorry, just on your tenure, I don't expect you to

**DEPOSITION OF SARAH YOUNG**

Page 111

1    answer beyond that.

2    A.  Sure.  I'm not aware of them using another

3    criteria.

4    Q.  Okay.

5    A.  I've only ever heard of the InterQual criteria.

6    Q.  Okay.  Let me, I'm just going to introduce

7    another exhibit here, if you'll give me just one moment.

8            (Exhibit 12 marked for identification.)

9    Q.  So, Ms. Young, there should be an exhibit now in

10   the marked exhibits folder labeled PL0012.

11   A.  I can see it.

12   Q.  Okay.  I'm guessing not, but have you seen this

13   document before?

14   A.  No, I don't believe so.

15   Q.  Okay.  If you would please just take a, it's

16   only, it's basically three pages, if you'll take just a

17   quick minute and just review it to your satisfaction and

18   then I've just got a couple of questions.

19           MS. CYRUS:  Are there Bates numbers on

20   that?

21           MR. CHARLES:  No.  I think it was in the

22   production that came -- it is not Bates stamped, no.

23           MS. CYRUS:  Okay.  Thank you.

24   A.  Okay.

25   Q.  Okay.  So what is this document?

**JA1112**

## DEPOSITION OF SARAH YOUNG

Page 112

1       A.  So it appears that Jennifer Myers had reached

2   out to Kepro and asked them criteria for a number of

3   services and they have provided the, it looks like,

4   yeah, at the top it says this is the InterQual criteria,

5   or it's got the trademark.

6       Q.  Right.  Okay.  Have you seen, do you see in the

7   blue text there there's six different SmartSheets

8   listed, do you know what a SmartSheet is?

9       A.  I do not.

10      Q.  Okay.  So then scrolling down here, on the first

11  page there's a sentence that begins, "This criteria

12  subset," do you see that sentence?  It's a quarter of

13  the way up from the bottom of the page.

14      A.  I do, yes.

15      Q.  Okay.  So I'm just going to read this aloud, if

16  you'll follow along, "This criteria subset covers

17  primary genital and chest procedures for patients

18  undergoing gender affirmation surgery, or GAS, including

19  single and multistage procedures.  The criteria set does

20  not cover revisional procedures for GAS."  Did I read

21  that correctly, Ms. Young?

22      A.  Yes.

23      Q.  Okay.  Thank you.  On the second page there, the

24  fourth paragraph on Page 2 begins, "Delaying treatment

25  for."  Let me know when you found that paragraph.

# DEPOSITION OF SARAH YOUNG

Page 113

1    A.  Okay.

2    Q.  So I'll read it aloud again, "Delaying treatment

3    for those with gender dysphoria is not a reasonable

4    treatment option.  This can lead to negative

5    consequences such as delay or arrest in emotional,

6    social or intellectual development.  Isolating one's

7    self from family and friends, being excluded from

8    society, becoming a victim of bullying and self-harm all

9    may be seen when there's an impediment or interruption

10   in care.  Some individuals, notably adolescents, may

11   develop psychiatric issues including anxiety, depression

12   and suicidal ideation."  And sorry, let me pause here.

13   Did I read that correctly?

14   A.  Yes.

15   Q.  Okay.  And then the subsequent paragraph

16   beginning with, "Guidelines agree."  It says,

17   "Guidelines agree that gender affirmation surgical

18   intervention is appropriate for individuals 18 years of

19   age or older as the procedures are irreversible.

20   However, behavioral health counseling and hormone

21   therapy may be used to treat individuals who have been

22   diagnosed with gender dysphoria at an earlier age.  The

23   sooner the diagnosis is made and treatment options are

24   discussed, the more successful the individual is when

25   transitioning."  Did I read that paragraph correctly as

JA1114

**DEPOSITION OF SARAH YOUNG**

Page 114

1   well?

2       A.  Yes.

3       Q.  Okay.  And then beginning with the paragraph

4   beginning with, "InterQual," and it has a little

5   trademark mark.  It says, "InterQual content contains,"

6   do you do see that paragraph?

7       A.  Yes.

8       Q.  Okay.  "InterQual content contains numerous

9   references to gender.  Depending on the context, these

10  references may refer to either genotypic or phenotypic

11  gender.  At the individual patient level a variety of

12  factors including, but not limited to, gender identity

13  and gender affirmation via surgery or hormonal

14  manipulation may affect the applicability of some

15  InterQual criteria.  This is most often the case with

16  genetic testing and procedures that assume the presence

17  of gender specific anatomy.  With these considerations

18  in mind, all references to gender and InterQual have

19  been reviewed and modified where appropriate.  InterQual

20  users should carefully consider issues related to

21  patient genotype and anatomy, especially for transgender

22  individuals when appropriate."  Did I read that

23  paragraph correctly?

24      A.  Yes.

25      Q.  Okay.  And then finally, I'm just going to read

**DEPOSITION OF SARAH YOUNG**

1   a couple parts of this last paragraph, so bear with me.

2   "InterQual procedures criteria," do you see that there?

3       A.  Yes.

4       Q.  Okay.  "InterQual procedures criteria are

5   derived from the systematic continuous review and

6   critical appraisal of the most current evidence based

7   literature and include input from our independent panel

8   of clinical experts.  To generate the most appropriate

9   recommendations, a comprehensive literature review of

10  the clinical evidence was conducted."  Did I read those

11  two sentences accurately?

12      A.  Yes.

13      Q.  Okay.  Thank you.  I'm going to introduce a

14  couple more exhibits here related to InterQual, if you'd

15  just give me one moment.  Okay.  So looking at this

16  information from InterQual and in the context of what

17  you shared about what Kepro contracts with InterQual

18  for, did BMS consider the recommendations included in

19  InterQual's medical necessity criteria when determining

20  that coverage for transsexual surgery or for sex

21  transformation were not included in West Virginia

22  Medicaid?

23      A.  I can't speak to the practice when the decision

24  was put in policy in 2004, but I can say that since then

25  we would have not, we would have not reviewed the

**DEPOSITION OF SARAH YOUNG**

Page 116

1    criteria for noncovered services.

2        Q.  Okay.

3        A.  So I would imagine InterQual criteria includes

4    every single possible procedure that could be performed

5    and we would only have contracted with Kepro to review

6    the criteria for covered services.

7        Q.  Okay.  So in terms of the scope of this topic as

8    it refers to denials of coverage, I know we've talked a

9    number of times about what coverage isn't provided under

10   the West Virginia Medicaid plan.  Do you know or are you

11   aware of any instances where BMS has ever communicated

12   with a managed care organization regarding denials for

13   surgical procedures for the treatment of gender

14   dysphoria when it's otherwise medically indicated?  Let

15   me rephrase, I'm sorry, I made that a little

16   complicated.

17          So are you aware of a time where an MCO or, I

18   mean, obviously a person working for the managed care

19   organization has reached out to BMS to say, you know, we

20   have this person, this procedure is medically indicated

21   for them, we understand this limitation in the coverage,

22   what should we do, are you aware of any instances of

23   that kind of request coming from an MCO?

24       A.  Not off the top of my head.  I mean, we do

25   receive a number of inquiries, you know, to confirm what

**JA1117**

**DEPOSITION OF SARAH YOUNG**

Page 117

1  the policy is, I don't recall a specific conversation
2  though.
3      Q.  Okay.  And excluding hormone therapy, are you
4  aware of BMS providing coverage for gender confirming
5  medical care for Mr. Fain?  He's one of the plaintiffs
6  in this case.
7      A.  I've seen the claims that have been collected
8  and provided as part of our evidence and that's what I'm
9  aware of.
10     Q.  And in what you've seen have there been, have
11  there been payment or reimbursement I guess is what I
12  mean for, you know, some of his claims related to gender
13  confirming medical care?
14     A.  Not anything related to surgery.
15     Q.  Okay.
16     A.  Nothing related to surgery that I'm aware of.
17     Q.  Okay.  Anything related to counseling that
18  you're aware of?
19     A.  I'd have to see the list of claims, but it is a
20  covered service, so if it was requested, then it would
21  be covered.
22     Q.  Okay.  And then are you aware of any denials of
23  medical claims for reimbursement for Mr. Fain for gender
24  confirming medical care?
25     A.  Not for surgery, I'm not aware of any denials.

**DEPOSITION OF SARAH YOUNG**

Page 118

1    Q. Okay. I'm guessing the answer is the same, it

2  would be helpful to see the list, but in the knowledge

3  you have presently, has BMS provided coverage for Mr.

4  Fain's preventative medical care?

5    A. Again, to the extent that it's a covered

6  service.

7    Q. Okay. That's fine. Thank you. That you are

8  aware of, has BMS provided coverage for any gender

9  confirming medical care for Ms. Anderson, she's the

10  other purported class representative and named plaintiff

11  in this case, we haven't talked about her yet, but are

12  you aware of any coverage for gender affirming medical

13  care for her?

14    A. There hasn't been any surgery covered, if this

15  is an ongoing service. If there are counseling claims

16  for that reason it would have been covered.

17    Q. Would BMS cover a medical visit associated with

18  gender confirming care? So, for example, if a

19  transgender West Virginia Medicaid recipient went to see

20  their endocrinologist for blood work, lab work related

21  to, you know, regular maintenance of hormonal levels,

22  would such a medical visit be included in coverage in

23  West Virginia Medicaid?

24    A. Yes, I believe it would.

25    Q. Okay. And to your knowledge has BMS as the

**DEPOSITION OF SARAH YOUNG**

Page 119

1    administrator of West Virginia Medicaid denied any

2    medical claims for Ms. Anderson related to gender

3    confirming care?

4        A.  Not that I'm aware of.

5            MR. CHARLES:  Kelley, can we go off the

6    record.

7            (A break was taken at 12:53 p.m.)

8    BY MR. CHARLES:

9        Q.  Ms. Young, if you would, let's return again to

10   marked Exhibit 8.  That's again the second amended

11   notice of the 30(b)(6) deposition.  And let me know when

12   you're there.

13       A.  Okay.

14       Q.  And we'll be on Page 3, at the bottom of Page 3,

15   No. 10.  Just let me know when you see that.

16       A.  Okay.

17       Q.  All right.  And if you would please just read

18   No. 10, and there's just one sentence of No. 10 that

19   goes onto the next page.

20       A.  "Your policies, practices and procedures related

21   to the exclusion including, but not limited to, how the

22   exclusion is developed, approved and maintained."

23       Q.  Thank you.  And so do you understand that you've

24   been designated to testify as to this topic today?

25       A.  Yes.

**JA1120**

**DEPOSITION OF SARAH YOUNG**

Page 120

1    Q.  And are you prepared to do so?

2    A.  Yes.

3    Q.  Okay.  And again, with respect to this topic

4    specifically, can you please tell me what you did to

5    prepare for today?

6    A.  Sure.  So I considered what might all fall into

7    the policies, practices and procedures and reviewed the

8    policies.

9    Q.  So in those preparations can you tell me what

10   you, what did you determine to be policies related to

11   the exclusion?

12   A.  The policy that we reviewed in Chapter 100

13   simply states the exclusion.

14   Q.  Okay.  Thank you.  And what about practices,

15   what did you, based on your expertise and knowledge what

16   qualifies as practices related to the exclusion?

17   A.  Yeah.  So in my conversations with Jennifer

18   Myers we identified the diagnosis codes that would be

19   related and some of the procedure codes that could be

20   related to that as far as practices and procedures

21   because that would be the basis for it.

22   Q.  And I don't think I've asked you yet, although

23   you've mentioned it, so let's, what are the, what codes

24   specifically did you review with Ms. Myers?

25   A.  The diagnosis codes in the F64 series.  And I

**JA1121**

## DEPOSITION OF SARAH YOUNG

Page 138

1    Q.  Okay.  Let's go back to the other half of this

2    topic.  So the other part of this topic says, let me

3    just read the topic again to you, "Your policies,

4    practices and procedures related to the exclusion

5    including, but not limited to, how the exclusion is

6    developed, approved and maintained."  I asked you

7    earlier what, if anything, you had done to prepare for

8    this topic.  Did you do anything specifically to prepare

9    to testify about how the exclusion is developed,

10    approved or maintained?

11    A.  Like I said, I looked at the policy based on the

12    date of the policy, I wasn't privy to or able to find

13    anything regarding why it was created, I wasn't able to

14    find anything about when that was added or what the

15    basis of it was.

16    Q.  Okay.  Do you know how the exclusion itself was

17    developed within the Medicaid manual that we looked at

18    at the beginning of the day?

19    A.  Not other than how the manuals are maintained

20    probably the way that they are.  I wasn't able to find

21    any notes or drafts or recorded discussions regarding

22    adding, you know, when that language was added and I

23    couldn't find any earlier versions of the policy.

24    Q.  Okay.  So the only policy that you're aware of

25    is as it exists in the Medicaid manual that we reviewed?

**JA1122**

**DEPOSITION OF SARAH YOUNG**

Page 139

1      A.  Yes.

2      Q.  Okay.  And I remember we looked at the 2012

3   archived version, but you said there is an updated

4   version on the Website that is from 2013 you said?

5      A.  I believe the Chapter 519 has a more recent

6   revision that's included in the list of chapters in the

7   current policy manual.

8      Q.  Okay.

9      A.  The Chapter 100 that we reviewed is the exact

10  same version that's available today.

11     Q.  You mean on the Website?

12     A.  Yes.

13     Q.  You said the archive was from 5/19, okay.  So

14  you said that's the earliest iteration you can find of

15  that language in West Virginia Medicaid BMS promulgated

16  documentation?

17     A.  Yes, I did.  As to what I have access to, we

18  have a paper copy of all the manuals up to a certain

19  date, and so I pulled the book for that Chapter 100 and

20  all that's in that book is that exact copy that's

21  online.

22     Q.  Okay.

23     A.  For whatever reason any earlier versions were

24  not kept in that book, if there was an earlier version.

25     Q.  Okay.  But you said to your knowledge the

**DEPOSITION OF SARAH YOUNG**

Page 140

1    exclusion did exist before that version, you just

2    weren't able to find the documentation that showed that?

3        A.  If there was an earlier version, I can't tell

4    from the information that's listed in the change log for

5    100 that says what was specifically added in that

6    change.

7        Q.  Okay.

8        A.  It could have been a previous version.  There's

9    nothing that indicates the level of specificity as to

10   what was added in those changes.

11       Q.  I see.  Okay.  Thank you.  So generally

12   speaking, do you know when the exclusion was originally

13   developed?

14       A.  I do not.  That policy is the earliest version

15   that I can find where it appears.

16       Q.  Okay.  And since the Chapter 519 and

17   Chapter 100, does BMS do anything actively to maintain

18   the exclusion or is it just that year-to-year it doesn't

19   change and so that's all that's done as maintenance?

20       A.  Yeah, I think year-to-year it doesn't change.

21   Until now it has not been challenged legally, so it has

22   been maintained.

23       Q.  Okay.  And so were you able to find any

24   information about how it was developed, if it was

25   developed with anyone outside of BMS?

**JA1124**

**DEPOSITION OF SARAH YOUNG**

Page 141

1    A.  No, I couldn't find anything.

2    Q.  Okay.  With regard to those manuals in

3  particular, does BMS have to do anything year-over-year

4  to reauthorize them, do you know what I mean, like is it

5  required that sort of Cynthia Beane or somebody

6  similarly situated sort of rubber stamps those manuals

7  each year?

8    A.  So I'll say ideally each manual would be

9  reviewed by the specific program manager for that area

10  to see if anything has changed.  I'll admit that, you

11  know, there's a lot going on all the time, so that

12  doesn't always happen.  But any time that something, we

13  are aware that something has changed we will go to see

14  what we have written about that policy or procedure and

15  review it to see if it needs to be changed.

16        We have, as I mentioned, those waivers, they're

17  reauthorized on a regular basis.  And so there's changes

18  to the programs that have to be, that are authorized

19  that have to be rewritten into those policies.  Our goal

20  is to review them on a regular basis, but unfortunately

21  it doesn't always happen.

22    Q.  Okay.  So is it safe to say that unless there's

23  a, unless there's an affirmative change, members or

24  other parties reviewing those materials should just

25  assume they are updated because -- well, sorry, let me

**DEPOSITION OF SARAH YOUNG**

Page 142

1   end my question there.  Like if something needs to be

2   revised it will be, but absent that happening, that is

3   the most accurate documentation?

4       A.  Yes.  The effective date is the date that we

5   made the policies on that page effective, to the extent

6   that we do have the disclaimer that it's not all

7   encompassing of everything.

8       Q.  Okay.  Let me introduce another document here.

9   Let's actually return to Exhibit 8, the deposition

10  notice again.

11      A.  Okay.

12      Q.  So then looking at the notice on Page 4 at topic

13  13.  Just let me know when you're there.

14      A.  Okay.

15      Q.  And then if you would go ahead please and just

16  read topic 13.

17      A.  "Any research, consideration and/or analysis by

18  or on behalf of you regarding the legality of the

19  exclusion."

20      Q.  Great.  Thank you.  And you've been designated

21  to testify about this topic.  Are you prepared to do so?

22      A.  Yes.

23      Q.  And once again, can you tell me what, if

24  anything, you specifically did to testify about this

25  topic?

**DEPOSITION OF SARAH YOUNG**

Page 143

1    A.  Again, I considered everything that we have

2    written on the topic and I was aware that other

3    individuals on the leadership team were aware of this

4    and, you know, in the absence of anyone saying that this

5    is illegal or against regulations, I believe it to be

6    legal.

7        Q.  Okay.  So were you able to find any research

8    that was done by BMS about the legality of the exclusion

9    of gender confirming care in West Virginia Medicaid?

10       A.  No, nothing specific to this.

11       Q.  So are you aware of any research that was

12   undertaken to support the particular coverage decision?

13       A.  No, it was honestly more the absence of any

14   guidance or notification from CMS that I found to speak

15   to the legality of it.

16       Q.  Okay.  Let me back up just a little bit.  From

17   the previous topic that we were discussing, you were not

18   able to find, don't know of any reasons why the

19   exclusion was developed?

20       A.  Correct.

21       Q.  Okay.  And you also were not able to find and

22   are not aware of any, what was considered I guess in

23   making the decision to include that exclusion in the

24   Medicaid manuals we were discussing?

25       A.  Correct.

JA1127

## DEPOSITION OF SARAH YOUNG

Page 160

1   about some of these requests?

2       A.  Yes, I'm aware.

3       Q.  Okay.  So let's start with you have been, as a

4   part of addressing topic 18, one of the responses from

5   BMS that you've been designated to testify about is

6   interrogatory No. 2.  And I'm going to introduce that so

7   that you know what I'm talking about, so give me just a

8   moment.

9               (Exhibit 18 marked for identification.)

10      Q.  So in your marked exhibits folder you should be

11  seeing what has been marked as Plaintiff's Exhibit 0018.

12      A.  Yes.

13      Q.  Okay.  And I'll read that title, "Defendants'

14  response to plaintiffs' first set of interrogatories to

15  Defendants William Crouch, Cynthia Beane and West

16  Virginia Department of Health and Human Resources,

17  Bureau for Medical Services."  Did I read that

18  correctly?

19      A.  Yes.

20      Q.  And then if you would please scroll down to

21  Page 2 and No. 2.  So this is one of the interrogatories

22  you've been designated to testify about today.  So would

23  you please just read No. 2 in its entirety, it's just

24  there in the middle of the page, both the request and

25  the response, please.

**JA1128**

**DEPOSITION OF SARAH YOUNG**

Page 161

1      A.  "Describe in detail the factual basis for each

2   governmental interest that defendants contend supports

3   the exclusion.  Response:  These defendants state that

4   they provide coverage that is mandated for coverage by

5   the Centers for Medicare/Medicaid Services (CMS).  These

6   defendants are constrained by budgetary/cost

7   considerations."

8      Q.  All right.  Thank you.  And before I introduce

9   this, had you seen this document before?

10     A.  Yes.

11     Q.  Okay, great.  And did you do anything

12  specifically to prepare to testify about interrogatory

13  No. 2 today?

14     A.  Not more than read it.

15     Q.  Okay.  But you are prepared to provide testimony

16  about this interrogatory?

17     A.  Yes.

18     Q.  Okay, great.  So based on this response, what do

19  you understand to be the governmental interest that BMS

20  maintains supports the exclusion?

21     A.  The Centers for Medicare and Medicaid Services.

22     Q.  Okay.  And what are the factual basis for that

23  assertion?

24     A.  As I've discussed earlier, the program is

25  mandated and is overseen by the CMS in that they

**DEPOSITION OF SARAH YOUNG**

Page 162

1  maintain the Code of Federal Regulations and approve our

2  state plan and state plan amendments.

3      Q.  Okay.  Does CMS mandate the exclusion of gender

4  affirming care, as far as you know?

5      A.  They list mandatory services and optional

6  services.  To my knowledge it is not specifically

7  addressed.

8      Q.  Okay.  But to your knowledge it's not listed as

9  a service that must be excluded?

10     A.  Correct, it is not listed as a, what you said,

11  I'm sorry.

12     Q.  That's okay.  A must be excluded or a mandatory

13  exclusion I guess would be an easier way to say that?

14     A.  Correct, yes.

15     Q.  So beyond that is there, is there another

16  factual basis or any other factual basis in response to

17  that government interest?

18     A.  I think the fact that CMS does not mandate that

19  we cover the service is our basis for excluding it as

20  well.

21     Q.  Okay.  Sorry, I just want to make sure, that's

22  it for the factual basis for that interest?

23     A.  I believe so, yes.

24     Q.  Okay.  And then for the second governmental

25  interest that BMS contends supports maintaining the

**JA1130**

**DEPOSITION OF SARAH YOUNG**

Page 163

1　exclusion, can you just tell me what that is?

2　　A.  You're referring to the budgetary and cost

3　considerations?

4　　Q.  Yeah, that's the other governmental interest BMS

5　identifies?

6　　A.  It appears so, yes.

7　　Q.  Okay.  And so what then is the factual basis for

8　that governmental interest?

9　　A.  So we receive a match on our state funds, so the

10　program is only allocated so many funds from different

11　sources by the legislature, so we only have so many

12　state dollars that can then be matched with the federal

13　dollars.  So obviously there is a limit to what we can

14　cover, we have to be able to pay for it, so that would

15　be the, the constraints and considerations.

16　　Q.  Okay.  Can you point to facts about the BMS

17　budget that require maintenance of the exclusions

18　specifically, other than just what you stated generally

19　about the general obligations?

20　　A.  I'm sorry, can you ask it one more time.

21　　Q.  Sure.  So are there any facts, are there any

22　more specific facts than just sort of the general

23　overview you provided about the budget, about BMS's

24　budget that require the maintenance of the exclusion?

25　　A.  Generally speaking, our current membership is

**JA1131**

## DEPOSITION OF SARAH YOUNG

Page 164

1  over 600,000 individuals, and so as I spoke, the limited

2  budget that we have, we have to ensure that it will

3  cover the benefits that we have promised and outlined in

4  our policies that we do cover.  So the addition of

5  anything extra or anything on top of that is what limits

6  us, you know, we have to be able to do what we said we

7  were going to do.

8      Q.  Sure.  And has BMS done research about the cost

9  of providing gender affirming service in West Virginia

10  Medicaid?

11      A.  Not that I'm aware of.

12      Q.  Sorry, can we go back.  You said there was a

13  match that happened.  Can you just, as you've been doing

14  such a generous job of today, explain generally to me

15  what that refers to?

16      A.  Sure.  So each state is allocated a federal

17  match based on a bunch of factors, but basically the

18  economics of the state.  So states that are the poorer

19  states get a greater match.  I believe the bottom is

20  50/50, so prosperous states get a 50 percent match on

21  the state dollars.  So our budget, the amount of claims

22  that we have to reimburse or capitation that we have to

23  pay on a monthly basis we are required, generally

24  speaking let's say our match is 75 percent, so we would

25  be required to pay 25 percent of that and we can draw

**DEPOSITION OF SARAH YOUNG**

Page 165

1  down on the 75 percent to match that amount.  Does that

2  make sense?

3      Q.  I think so.  So you can spend, let's say you

4  have $25 from the state of West Virginia and 75 from the

5  federal government, is that sort of it, like you can use

6  25 West Virginia dollars and 75 federal dollars to pay

7  for that $100 Medicaid bill?

8      A.  Right, if something cost $100, our obligation

9  would be $25 of that.

10     Q.  Okay.  So it takes into consideration the, you

11 know, sort of not being an economist here, it takes into

12 consideration the relative wealth or GDP of a state and

13 what dollars are able to be allocated by that state's

14 Medicaid program in its match determination?

15     A.  Basically speaking, yes.

16     Q.  Okay.  All right.  I got the basics.  So we

17 talked about the budget and meeting the obligations of

18 the 600,000 West Virginia Medicaid members and the

19 obligation to be able to pay for what you said of those

20 claims you will pay for.  Are there any additional facts

21 related to costs that you know of that require the

22 agency to maintain the exclusion?

23     A.  Not that I can think of.

24     Q.  Okay.  So then are there any other government

25 interests that BMS contends support its maintenance of

JA1133

## DEPOSITION OF SARAH YOUNG

Page 166

1  the exclusion?

2      A.  None that are listed in the response.  Is that

3  what you're asking?

4      Q.  Yeah.  And I think, yes, in the response or are

5  you aware of any other governmental interest?

6      A.  None that I'm aware of.

7      Q.  All right.  So let's return to that exhibit we

8  were just on, Exhibit 18, and look at No. 3 there on

9  Page 2.

10      A.  Okay.

11      Q.  All right.  And I'll go ahead and read that,

12  "Identify and describe in detail every instance in which

13  a health plan offered through West Virginia's Medicaid

14  program provides partial or full coverage for gender

15  confirming care of any kind including, but not limited

16  to, counseling and/or therapy, hormone therapy or

17  surgery.  Include in your answer the coverage criteria

18  for such care and the date such coverage began."  First

19  of all, did I read that correctly?

20      A.  Yes.

21      Q.  Okay.  And are you aware that BMS has designated

22  you as the organizational representative to testify

23  about their response to this request?

24      A.  Yes.

25      Q.  And you are designated to respond to this

## DEPOSITION OF SARAH YOUNG

Page 167

1    request as to medical claims including counseling and/or

2    therapy and surgery, but there's a different witness

3    designated for pharmaceutical care, is that your

4    understanding?

5        A.  Yes.

6        Q.  Okay.  So then I'll just read a little bit of

7    the response here because much of it is relevant to that

8    other witness' testimony.  So, "Response:  Objection.

9    This question seeking every instance is overly broad and

10   burdensome.  Without waiving the objection with respect

11   to any gender confirming care that it has requested

12   through the managed care organizations, these defendants

13   are not in possession of this information.  This

14   question would be best directed to the individual MCO's

15   regarding any care requested through them.  Upon

16   information and belief, counseling is a covered service.

17   These defendants would not necessarily know the reason

18   for counseling and whether it was related to gender

19   confirming care or some other reason."  Did I read that

20   correctly?

21       A.  Yes.

22       Q.  All right.  So in administering West Virginia

23   Medicaid, does BMS cover medically necessary healthcare?

24       A.  Yes, within the constraints of our policies.

25       Q.  So is it correct to say then that if West

**DEPOSITION OF SARAH YOUNG**

Page 168

1  Virginia Medicaid, I'm sorry, if in its administration

2  of West Virginia Medicaid BMS provides coverage for

3  healthcare, then that healthcare has been deemed

4  medically necessary?

5      A.  If I understand correctly, our criteria for

6  covering, our criteria for approving request for covered

7  services is based on whether or not it meets medical

8  necessity.

9      Q.  Yeah, I think I asked that question in a double

10  negative, so let me try to ask it again.  BMS would not

11  reimburse for a service that while covered has not been

12  determined to be medically necessary?

13      A.  Correct, that did not meet their requirements.

14      Q.  Yes.  So I guess in a plainer way of what I'm

15  asking is, if a given procedure could be determined to

16  be included in the coverage, but if the patient or the

17  provider, if it has not been assessed to be medically

18  necessary, then that doesn't fall within what BMS would

19  cover?

20      A.  Correct.

21      Q.  Okay.  Sorry, I was sure there was some easier

22  way to ask that, but I couldn't figure it out, so thank

23  you for your patience.  Okay.  So as we just reviewed in

24  the response to that interrogatory request, counseling

25  is a covered service.  So if that therapy was undertaken

**JA1136**

**DEPOSITION OF SARAH YOUNG**

Page 169

1  for the treatment of gender dysphoria, that claim would
2  not be denied by BMS solely on the basis that it was for
3  the treatment of gender confirming care?
4      A.  Correct.
5      Q.  Okay.  So for those, for that particular coding,
6  the gender dysphoria coding of those visits is accepted,
7  not rejected by BMS West Virginia Medicaid?
8      A.  Correct.
9      Q.  Okay.  And as far as you know, does BMS cover
10 office visits related to gender confirming care?
11     A.  Can you be specific as to the type of office.
12     Q.  Sure.  So, for example, I know this is tricky,
13 but I'm asking about the office visits to an
14 endocrinologist, not for the purpose of prescribing
15 hormones, but for the purpose of monitoring, blood work,
16 kidney, kidney and liver testing, thyroid.  Would those
17 kind of medical visits, again, I'm trying not to get
18 into what the other witness is going to talk about,
19 would those visits be covered under the existing policy?
20     A.  Yes.
21     Q.  Okay.  And as far as you're aware, Ms. Young,
22 has BMS in its administration of West Virginia Medicaid
23 provided any partial or total coverage for any surgical
24 procedure for the treatment of gender dysphoria?
25     A.  Not that I'm aware of.

1                    REPORTER'S CERTIFICATE

2

3

STATE OF MINNESOTA     )

4                      ) ss.

COUNTY OF WASHINGTON )

5

6     I hereby certify that I reported the Zoom deposition
of Sarah Young on the 11th day of March 2022, and that

7 the witness was by me first duly sworn to tell the whole
truth;

8

      That the testimony was transcribed by me and is a

9 true record of the testimony of the witness;

10     That the cost of the original has been charged to
the party who noticed the deposition, and that all

11 parties who ordered copies have been charged at the same
rate for such copies;

12

      That I am not a relative or employee or attorney or

13 counsel of any of the parties, or a relative or employee
of such attorney or counsel;

14

      That I am not financially interested in the action

15 and have no contract with the parties, attorneys, or
persons with an interest in the action that affects or

16 has a substantial tendency to affect my impartiality;

17     That the right to read and sign the deposition by
the witness was reserved.

18

      WITNESS MY HAND AND SEAL THIS 11th day of March

19 2022.

20

21

22         _Kelley E. Zilles_

23         _____

24         Kelley E. Zilles, RPR
           Notary Public, Washington County, Minnesota

25         My commission expires 1-31-2025

Page 190

1        DEPOSITION REVIEW
              CERTIFICATION OF WITNESS

2

3        ASSIGNMENT REFERENCE NO: 5096099
         CASE NAME: Fain, Christopher Et Al. v. Crouch, William Et Al.
         DATE OF DEPOSITION: 3/11/2022

4        WITNESS' NAME: Sarah Young

5        In accordance with the Rules of Civil

Procedure, I have read the entire transcript of

6    my testimony or it has been read to me.

7        I have listed my changes on the attached

Errata Sheet, listing page and line numbers as

8    well as the reason(s) for the change(s).

9        I request that these changes be entered

as part of the record of my testimony.

10

         I have executed the Errata Sheet, as well

11   as this Certificate, and request and authorize

that both be appended to the transcript of my

12   testimony and be incorporated therein.

13   04-07-2022              Sarah K. Young

Date                    Sarah Young

14

         Sworn to and subscribed before me, a

15   Notary Public in and for the State and County,

the referenced witness did personally appear

16   and acknowledge that:

17       They have read the transcript;

They have listed all of their corrections

18           in the appended Errata Sheet;

They signed the foregoing Sworn

19           Statement; and

Their execution of this Statement is of

20           their free act and deed.

21   I have affixed my name and official seal

22   this 7th day of April, 20 22.

23        Kimberly M. O'Brien

Notary Public

24

         July 28, 2026

25   Commission Expiration Date

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Kimberly Michelle O'Brien
WV DHHR Bureau for Medical Services
350 Capitol St. Rm 251, Charleston, WV 25301
My Commission Expires July 28, 2026

Veritext Legal Solutions

www.veritext.com                                              888-391-3376

**JA1139**

Page 191

1                              ERRATA SHEET

                 VERITEXT LEGAL SOLUTIONS MIDWEST

2                        ASSIGNMENT NO: 5096099

3     PAGE/LINE(S) /          CHANGE          /REASON

4     pg 36/line 2 / who "was" changed to who "is" / correction, staff is still in this role

5     pg 38/line 38 / attended a different college for the fall semester of '92 then tranferred to WVU for

6         spring semester beginning January '93 / clarification

7     pg 56/line 20 / change "OARM" to "OAMR" / correction

8     pg 102/lines 2-4 / clarify that answer is specific to gender confirming medical procedures, like surgery.

9         This does not apply to counseling, as there is not an edit on the diagnosis code. / clarification

10    pg 105/lines 9-10 / clarify that the report did not ask for claims for gender confirming care.  It only

11        asked for the "number of health plan participants who have submitted one or more claims with

12        a diagnosis code for gender dysphoria or gender incongruence." The report is based on diagnosis

13        codes and not procedure codes. / clarification

14    pg 108/line 12 / change "incoming assets" to "income or assets" / correction

15    pg 130/line 13 / change we had covered it "with our" to we had covered it "without" / correction

16    pg 158/line 6 / change "thousands" to "hundreds"

17

18

19
      04-07-2022                    _Sarah K. Young_
20    Date                          Sarah Young

21    SUBSCRIBED AND SWORN TO BEFORE ME THIS 7th

22    DAY OF _____April_____, 20 22 .

23    _Kimberly M O'Brien_
      Notary Public

                                        OFFICIAL SEAL
                                        NOTARY PUBLIC
                                        STATE OF WEST VIRGINIA
                                        Kimberly Michelle O'Brien
24                                      WV DHHR Bureau for Medical Services
                                        350 Capitol St, Rm 251, Charleston, WV 25301
                                        My Commission Expires July 28, 2026

      _July 28, 2026_
25    Commission Expiration Date

                     Veritext Legal Solutions

JA1140




**Exhibit 0001**

### CHAPTER 100– GENERAL INFORMATION
### CHANGE LOG

| Replace | Title | Change Date | Effective Date |
|---|---|---|---|
| Sections: 110, 121, 150, 151, 152, 153, 160, 161, 170, 180, 191 | Various | 12/02/04 | 01/01/05 |
| Section 140 | Manual Updates | 12/02/04 | 01/01/05 |
| Section 153 | Other Contact Information | 12/02/04 | 01/01/05 |
| | Medicaid Managed Care | 12/02/04 | 01/01/05 |
| Section 161 | General Non-Covered Services | 12/02/04 | 01/01/05 |

### CHAPTER 100– GENERAL INFORMATION
### 12/2/2004
#### Sections: 110, 121, 150, 151, 152, 153, 160, 161, 170, 180, 191

**Introduction:** The terms beneficiary and recipient have been replaced by member throughout the entire manual.

**Directions:** Replace the pages containing these sections.

**Change:** Replace current sections with the updated ones.

#### Section 140

**Introduction:** The manual update process has undergone some changes. Also the contact phone numbers in this section have changed.

**Directions:** Replace the page containing this section.

**Change:** Replace old phone numbers with the new ones.

#### Section 153

**Introduction:** Some of the contact phone numbers in this section have changed because of the change in contractors.

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001650

USCA4 Appeal: 22-1927    Doc: 20-3    Filed: 10/31/2022    Pg: 87 of 477




**Directions:** Replace the page containing this section.

**Change:** Replace old phone numbers with the new ones.

**Introduction:** Added wording related to PCCM Program.

**Directions:** Replace the page containing this section.

**Change:** Add PCCM Program.

### Section 161

**Introduction:** Removed Gastric By-pass from the section since this surgery is now a covered service under certain conditions.

**Directions:** Replace the page containing this section.

**Change:** Delete gastric by-pass as a non-covered service.

Department of Health and Human Resources                Change Log Chapter 100: General Information Page 2
Revised January 1, 2005                                                          September 1, 2003
          DISCLAIMER: This manual does not address all the complexities of Medicaid policies
          and procedures, and must be supplemented with all State and Federal Laws and
          Regulations.

CFAIN0001651

**JA1142**

USCA4 Appeal: 22-1927    Doc: 20-3    Filed: 10/31/2022    Pg: 88 of 477




## CHAPTER 100—GENERAL INFORMATION
### TABLE OF CONTENTS

**TOPIC**                                                                 **PAGE NO.**

100 Introduction ............................................................................................................. 2

110 Medicaid Program Overview ...................................................................................... 2

120 Purpose of the Manual .............................................................................................. 3

121 Organization of the Manual ...................................................................................... 3

130 Other Resource Information ....................................................................................... 3

140 Manual Updates ........................................................................................................ 4

150 Written or Phone Inquiries ......................................................................................... 4

151 Voice Response System ............................................................................................ 4

152 Contacting Provider Services .................................................................................... 5

153 Other Contacts .......................................................................................................... 6

160 Covered Services ...................................................................................................... 9

161 General Non-Covered Services ............................................................................... 10

170 Relationship to Medicare ........................................................................................ 11

180 Out-of-State Services .............................................................................................. 11

190 Fraud and Abuse ..................................................................................................... 12

191 Confidentiality ......................................................................................................... 13

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and
procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001652

**JA1143**

USCA4 Appeal: 22-1927    Doc: 20-3    Filed: 10/31/2022    Pg: 89 of 477




## CHAPTER 100–GENERAL INFORMATION

**100    INTRODUCTION**

This chapter provides a general overview of the Medicaid Program and organization of the provider manuals. It includes general information regarding the legal basis of Medicaid in West Virginia (WV), its relationship to other programs (for example, Children with Special Health Care Needs), provider telephone contact information, a general description of covered and non-covered services, its relationship to the Medicare Program, and basic information on reimbursement for out-of-state providers.

**110    MEDICAID PROGRAM OVERVIEW**

Congress established the Medicaid Program under Title XIX of the Social Security Act of 1965. Title XVIII of the Social Security Act of 1965 created Medicare. Title XIX created the Medicaid Program to provide access to health care for certain low-income individuals and families. Medicaid is funded and administered through a cooperative state-federal partnership. Nationally, the Centers for Medicare & Medicaid Services (CMS), operating within the U.S. Department of Health and Human Services (DHHS), provide federal financial assistance to the states, establishes minimal program requirements, and provides regulatory oversight. Although there are broad federal requirements for Medicaid, states have a wide degree of flexibility to design and administer their programs within federal guidelines. These guidelines are in the Code of Federal Regulations, Title 42, Sub-part C.

The WV Medicaid Program is administered pursuant to regulations promulgated under Title XIX of the Social Security Act, as amended. State administrative authority for the Medicaid Program is provided pursuant to Chapter 9 of the West Virginia Code. The Bureau for Medical Services (BMS) in the Department of Health and Human Resources (DHHR) is the single state agency responsible for administering the Medicaid Program in WV.

The mission of the WV Medicaid Program is to provide access to appropriate health care for Medicaid-eligible individuals. In its administration of the program, BMS strives to assure access to appropriate, medically necessary and quality health care services for all members while maintaining accountability for the use of resources.

BMS establishes eligibility standards for Medicaid providers, determines benefits, sets payment rates, and reimburses providers. BMS also coordinates with other entities in DHHR to develop and implement Medicaid-related programs and services. In particular, BMS contracts with the Office of Families and Children to determine eligibility for Medicaid. BMS monitors and tracks program information related to member eligibility, service utilization, program expenditures, fraud and abuse, and financial management.

BMS maintains the WV Medicaid State Plan and files amendments to the plan with the appropriate regulatory authorities. If BMS identifies the need for major change to the Medicaid State Plan, the Medical Services Fund Advisory Council, appointed by the Commissioner, reviews the change and makes appropriate recommendations to BMS prior to implementation.

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001653

**JA1144**

USCA4 Appeal: 22-1927    Doc: 20-3    Filed: 10/31/2022    Pg: 90 of 477




**120    PURPOSE OF THE MANUAL**

WV Medicaid provider manuals contain detailed information about the WV Medicaid Program. The manuals document and communicate current policy requirements applicable to Medicaid-covered services as provided by specific provider types.

The following information is included:

- General and specific provider information
- Service delivery requirements
- Provider participation requirements
- Covered services, exclusions, and limitations
- Reimbursement and billing instructions.

All Medicaid providers, BMS employees and contractors, and other interested parties are encouraged to familiarize themselves with the content of applicable manuals by types of services.

**121    ORGANIZATION OF THE MANUAL**

The WV Medicaid provider manuals are organized consistently for all providers and services. The following is a listing of the organization and format of each manual:

- **Cover Page** – The cover page identifies the types of services included in the manual.

- **Table of Contents** – The table of contents follows the cover page. Chapter titles, chapter subtopics, and appendices are identified and labeled to facilitate information retrieval.

- **Chapter Titles** – There are a minimum of seven chapters in each manual. The right corner of the page header identifies whether the information contained in the chapter applies to all or specific providers.

The Chapter Titles are:

- Chapter 100 General Information
- Chapter 200 Definitions
- Chapter 300 Provider Participation Requirements
- Chapter 400 Member Eligibility
- Chapter 500s Covered Services, Limitations, and Exclusions
- Chapter 600 Reimbursement Methods
- Chapter 800 General Administration

**130    OTHER RESOURCE INFORMATION**

The manuals summarize the description and administration of the WV Medicaid Program. BMS makes every attempt to ensure that the information contained in the provider manuals is concise and reliable as of the date of issuance. Compliance with all applicable WV state laws, regulations, and administrative guidelines, as well as applicable federal laws and regulations, is required. Specifically, you must consider the content in this manual, along with applicable federal and state laws and regulations, when determining actions or interpreting guidelines.

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001654

USCA4 Appeal: 22-1927     Doc: 20-3     Filed: 10/31/2022     Pg: 91 of 477




## 140    MANUAL UPDATES

BMS will distribute new, revised, or clarified information, as applicable to all or specific manuals, using the Medicaid Provider Manual Update process. The update notification from BMS will include information related to the manual change and identification of the actual section number(s) to replace or add to the manual by chapter, appendix, or attachment. Updates may be communicated by letter or posted on BMS' website (www.wvdhhr.org/bms).

Retaining, filing, and understanding the WV Medicaid Program Instructions and manual revisions are your responsibility. If any information is not clear or not understood, please call the Medicaid Provider Services at either of these numbers:

- (304) 348-3360
- (888) 483-0793

BMS maintains mailing lists of all providers and other interested parties who receive program instructions. To ensure that you receive all mailings or emails, it is essential that you notify BMS in writing of mail/email addresses or any type of health care or business organizational change. Refer to Chapter 300 for additional information on your responsibility for reporting changes.

## 150    WRITTEN OR PHONE INQUIRIES

Questions regarding the Medicaid Program including service, coverage, provider participation, member eligibility, prior authorizations, claims inquiries, or billing procedures may be addressed in writing or by telephone. Additional information is available on the DHHR website (www.wvdhhr.org/bms

## 151    VOICE RESPONSE SYSTEM

WV Medicaid's Voice Response System is an automated Provider Inquiry System. It is a quick and easy way to verify member eligibility and obtain Medicaid accounts-payable information. For the Voice Response System, call 1-888-483-0793.

Information on the Voice Response System is available 24 hours a day, 7 days a week. Your 10-digit Medicaid Provider number is required to access the system. Call and follow the voice prompts to:

- **Obtain recent accounts payable information**

Enter the 10-digit Medicaid provider number and select **Option 1**. The Voice Response System will provide cumulative payment information. This information can assist you in managing your receivables. It provides the amount and date of the reimbursement and the amount of the accounts payable (approved but not released for payment) as of the date of the inquiry. The Voice Response System does not provide specific claim information. For claim specific information, call the Provider services Unit.

- **Verify member eligibility**

Enter the 10-digit Medicaid provider number and select **Option 2**. Enter the member's Medicaid ID number from the Medicaid ID card and follow the prompts. The Voice Response System should be used each time a member requests service.

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001655

**JA1146**

 

When the member's ID number is not available, you can follow the voice prompts and use the member's social security number or a combination of the member's last name and date of birth.

Request the Medicaid ID card from the member with each office visit and verify the effective dates, provider restrictions, managed care information, and other insurance information on the member's Medicaid ID card. Obtain the Medicaid Member Number from the ID card (MAID #) and call the Voice Response System to verify eligibility. Members enrolled in the Medicaid Health Maintenance Organization (HMO) program Mountain Health Trust (MHT) have the name and telephone number of the HMO on their ID cards. Members enrolled in the Medicaid Primary Care Case Management (PCCM) Physician Assured Access System (PAAS) managed care programs have their Primary Care Physician's name on their ID cards.

Verification of a member's eligibility does not guarantee payment for the services you provide. The services you provide, in addition to verification of the member's eligibility, must be:

1.  Determined to be medically necessary

2.  A covered Medicaid service

3.  Prior authorized or approved when applicable

4.  Referred or approved by the PAAS primary care provider (PCP) or HMO when applicable

5.  Billed to the HMO for medical services provided to members enrolled in MHT

6.  Properly documented in your office or facility medical records including, but not limited to, items one through four above, as applicable.

Additional information on your responsibility as a participating provider for verifying member eligibility is covered in Chapter 400.

## 152   CONTACTING PROVIDER SERVICES

BMS ensures that provider services and support services are made available through their fiscal agent organization. To obtain general information or make a general or specific inquiry regarding denied claims, claims status, accounts payable, program coverage, member eligibility, billing procedures, managed care issues, Electronic Data Interchange (EDI) training, or Electronic Funds Transfer (EFT) issues, call:

- (304) 348-3360
- (888) 483-0793

Provider Services Representatives are available Monday - Friday excluding state holidays from 8 a.m. to 5 p.m. Charleston providers should use the local provider services number. Provider Services staff will respond to requests during the call whenever possible. Occasionally, calls may be referred to another state agency for assistance. When the inquiry cannot be answered during the call, the representative will take the request and follow up appropriately at a later time. Consider the complexity of the request when waiting for the response. The response to the inquiry may be in writing or by telephone and may identify that further research and time is necessary to respond to the initial request.

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001656

**JA1147**




EDI technical support is available to answer your inquiries related to: software issues, transmission difficulties, EDI enrollment procedures, claim format issues, EDI testing procedures, and rejected reports. To obtain technical support on electronic claims, excluding Pharmacy Point-of-Sale (POS), call 1-888-483-0793.

To obtain technical information regarding Medicaid's Pharmacy (POS) Program, call 1-888-483-0801. For technical support on electronic remittance vouchers, call Monday - Friday 8 a.m. to 6 p.m. at 1-888-483-0793. You may also access the EDI provider website, www.edihelpdesk@unisys.com, for additional information.

## 153    OTHER CONTACTS

Other important telephone numbers available for use by Medicaid providers are listed below:

- **Provider Enrollment**

  For information and requirements regarding participation in the WV Medicaid Program as a provider, contact the Provider Enrollment. Any change to information supplied in your provider enrollment application must be sent to BMS in writing. This includes changes to addresses, group affiliations, specialty services, telephone numbers, tax ID, Medicare provider numbers, etc.

- **Inpatient Admission Approval And Prior Authorization**

  To obtain inpatient hospital pre-certification and prior authorization of services, call 1-800-982-6334.

  This telephone number will connect you with the utilization management services manager for the WV Medicaid Program, including hospital pre-certification and prior authorization of applicable services. (Note: For HMO enrolled members, follow the respective HMO's admission approval and prior authorization requirements.)

  Pre-service review and prior authorization is performed for the following services:

  - General and Acute Inpatient Hospital Services
  - Organ Transplant Services
  - Psychiatric Inpatient Facilities and Psychiatric Residential Treatment Facilities
  - Inpatient Medical Rehabilitation Services
  - Intensive Medical Case Management
  - Home Health Services exceeding calendar year limits
  - Certain Durable Medical Equipment (DME), Orthotics and Prosthetics Services, and Medical Supplies
  - Speech Therapy
  - Physical Therapy and Occupational Therapy exceeding calendar year limits
  - Private Duty Nursing Services
  - Nursing Visits for Home IV Services
  - Outpatient Partial Hospitalization Services
  - Chiropractic Services exceeding calendar year limits
  - Nursing Facility Services
  - Aged and Disabled Waiver Services

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001657

**JA1148**

USCA4 Appeal: 22-1927     Doc: 20-3     Filed: 10/31/2022     Pg: 94 of 477




- Home-based Community Services
- Certain General Dental Services
- Certain Vision Care Services
- Children with Special Health Care Needs
- Mentally Retarded (MR)/Developmentally Disabled (DD) Waiver Services
- Intermediate Care Facility (ICF)/Mentally Retarded (MR) Services.

In addition, you must obtain prior authorization on members who have exhausted their service limits. All services that require prior authorization are identified in the applicable provider manual that addresses the services.

- **Behavioral Health Services**

You may obtain prior authorization for behavioral health clinic and rehabilitation services by calling American Psychiatric Systems (APS) Healthcare at 1-800-343-9663.

Prior authorization of behavioral health services provided by private practitioners is obtained from BMS. All services that require prior authorization are identified.

- **Audits and Settlements**

To obtain information regarding audits and cost settlements, call:

| | |
|---|---|
| Hospital | 1-304-558-0460 |
| Nursing Facility | 1-304-558-0460 |

If you need information regarding the payment of audits and cost settlements, call 1-304-558-1700.

- **Pharmacy Help Desk**

To obtain both procedural and technical information regarding the Prescription Drug Program, call 1-800-847-3859.

- **Rational Drug Therapy Program**

To obtain procedures, prior authorizations, and information regarding the Prescription Drug Prior Authorization Process, call or fax:

| | |
|---|---|
| Call | 1-800-847-3859 |
| Fax | 1-800-531-7787 |

- **Third Party Liability/Coordination of Benefits(TPL/COB)**

To ask questions regarding commercial insurance and Medicare applicability to Medicaid member claim reimbursement, call 1-304-558-1700 or visit www.wvrecovery.com.

Medicaid is always "the payer of last resort." BMS, in conjunction with its subcontractors, conducts coordination of benefits, third party liability identification, cost avoidance activities, and recovery functions for the WV Medicaid Program, and maintenance of compliance with federal regulations.

- **Medicaid Managed Care**

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001658

**JA1149**

 

The BMS contracts with an Enrollment Broker to inform Medicaid members about managed care. The enrollment broker enrolls applicable members in either the HMO or PCCM programs. The HMO and the PCCM (PAAS) programs are known as the Mountain Health Trust (MHT) program.

The enrollment broker assists eligible members in selecting a managed care program and a primary provider of their choice. BMS assists providers who have managed care member assignment issues. For assistance on managed care assignment questions for the MHT Program, call the enrollment broker at 1-800-449-8466.

- **Department of Health and Human Resources (DHHR) Offices**

  To refer a member for Medicaid coverage or obtain information regarding policies related to member eligibility call your local DHHR office. These telephone numbers vary by geographic area. Use your local telephone directory, State Government section, to find the telephone number of the local DHHR office.

- **Medicaid Related Programs**

  The Office of Maternal, Child and Family Health (OMCFH) of the Bureau of Public Health has a toll free telephone number for information about specific health and Medicaid-related programs. To obtain information related to the programs below, call 1-800-642-8522 or 1-800-642-9704.

  - Children Specialty Care (CSC) Program
  - WV Birth to Three Program
  - Women, Infants, and Children Nutrition Program (WIC)
  - Family Planning Program
  - Breast and Cervical Cancer Diagnosis and Treatment Fund
  - Right From the Start Program (RFTS)
  - Ryan White Fund
  - Early & Periodic Screening, Diagnosis, & Treatment (EPSDT) (HealthCheck) Program
  - Children's Dentistry Services.

  These toll free telephone services are available weekdays between 8:30 a.m. and 5:00 p.m. except holidays. The lines are staffed by registered nurses and licensed social workers that serve as the initial service coordinator for children, families, and professionals seeking information on the services offered. They can also offer instructions on how to apply for programs.

- **Medicaid Waivers**

  WV's Medicaid website contains additional information that includes, but is not limited to, information on the BMS organization, Medicaid Program Instructions and policies, Resource Based Relative Value Scale (RBRVS) with specific reimbursement issues, general information related to the Health Insurance Portability and Accountability Act (HIPAA), and specific information related to pharmacy services. You are encouraged to routinely access and view new information posted on the BMS website (www.wvdhhr.org/bms).

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001659

 

The Centers for Medicaid and Medicare Services is also an excellent resource to use in conjunction with the above WV website. The Centers for Medicaid and Medicare Services website is located at www.cms.gov.

## 160   COVERED SERVICES

The WV Medicaid Program pays for medically-necessary, covered health services, as well as certain waiver services that are provided to eligible members by Medicaid providers. The fact that a provider prescribes, recommends, or approves medical care does not in itself make the care medically necessary or a covered service. The following is a general listing of services covered by the WV Medicaid Program:

- Aged and Disabled Waiver Services
- Behavioral Health Clinic and Rehabilitation Services
- Chiropractic Services
- Dental Services for Children
- Durable Medical Equipment (DME) and Medical Supplies
- Early & Periodic Screening, Diagnosis & Treatment Program (EPSDT) – also known as HealthCheck
- Family Planning Services
- Free Standing Ambulatory Surgery Services
- Home Health Services
- Hospice Care Services
- Intermediate Care Facility Services for the Mentally Retarded (ICF/MR)
- Inpatient Hospital Services, Acute care
- Inpatient Psychiatric Services for individuals under age 21
- Inpatient Rehabilitation Services for individuals under age 21
- Mentally Retarded/Developmentally Disabled Waiver Services (MR/DD)
- Nurse Practitioner Services
- Nurse Midwife Services
- Nursing Facility Services
- Occupational Therapy Services
- Optometry Services
- Orthotic/Prosthetic Services
- Outpatient Hospital Services
- Personal Care Services
- Pharmacy Services
- Physical Therapy Services
- Physician Services
- Podiatrist Services
- Private Duty Nursing Services
- Psychiatric Services
- Psychological Services
- Rural Health Clinic Services and Federally Qualified Health Center Services

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001660

**JA1151**




- Speech and Hearing Services
- Transportation Services
- Vision Services.

Certain services are covered only for specific categories of eligible members. All covered Medicaid services, both traditional and special services, must be medically necessary, may be limited in scope, i.e., specific number of units of services, and may be subject to prior authorization.

BMS contracts with West Virginia Medical Institute (WVMI) for the review and approval of all hospital inpatient services for Medicaid members. However, physicians, acute care hospitals, rehab hospitals for members under age 21 only, and psychiatric hospitals for members under 21 only, must obtain prior authorization before admission of the patient. For documented emergencies, the patient may be admitted, but the request for prior authorization must be made to WVMI within 24 hours or the first working day after admission.

Refer to appropriate the applicable provider manual for specific provider policy and billing instructions for each of these covered services.

**161    GENERAL NON-COVERED SERVICES**

The WV Medicaid Program does not cover certain services and items regardless of medical necessity.

Some examples are identified below:

- Acupuncture
- Artificial insemination, in vitro fertilization, infertility services, or sterilization reversal
- Autopsy
- Christian Science services
- Cosmetic surgery services
- Dental services for members 21 years of age and over (except for treatment of fractures of mandible and maxilla and biopsy), removal of cysts and tumors, and emergency extractions
- Drugs for weight gain or loss, hair growth, fertility, cosmetic use, and those considered investigational or unproven
- Duplicate services
- Equipment or supplies which are primarily for patient comfort and/or family or caretaker convenience (Note: One mobility item is covered in a five-year period.)
- Experimental or investigational/research services or drugs
- Inpatient psychiatric services for individuals between 22 and 65 years of age, except acute care admissions
- Optometry services for individuals over age 21, except the first pair of glasses after cataract surgery
- Personal comfort and convenience items or services, whether on an inpatient or outpatient basis, such as television, telephone, barber or beauty service, guest services, and similar incidental services and supplies, even when prescribed by a physician
- Radial Keratotomy; Lasik surgery

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001661

USCA4 Appeal: 22-1927　　Doc: 20-3　　Filed: 10/31/2022　　Pg: 98 of 477

 

- Services rendered outside the scope of a provider's license
- Sterilization for individuals under age 21
- Transsexual surgery
- Fees for missed appointments*
- Fees to copy medical records
- Weight loss programs or drugs for weight loss
- Services rendered by students as part of their clinical or academic training.

\* Enrolled providers cannot bill Medicaid members for missed appointments.

The above list is illustrative only. It should not be construed as a complete or exhaustive list of excluded items or services.

Refer to Chapter 400 for additional information on member responsibilities for payment, and appicable provider manuals for specific covered and non-covered services.

The "WV Works" Program covers dental and optometry services for certain eligible adult Medicaid members. Please note: Not all Medicaid-eligible members are eligible for enrollment in the "WV Works" Program. Contact the local DHHR office for questions regarding specific benefits and possible coverage for patients.

## 170    RELATIONSHIP TO MEDICARE

Medicaid covers medically necessary health services furnished to individuals who meet specific income, resource, and eligibility standards. Medicare is a federal program that offers health insurance coverage to individuals 65 years of age or older, to those who have received social security disability benefits for 24 consecutive months, to those who have end-stage renal disease, to those on advanced life support, and to other eligible individuals, as specified by other provisions of the Social Security Act.

WV Medicaid covers the applicable co-insurance and deductible amounts, not to exceed Medicaid's allowable payment, for services covered by Medicare Parts A and B for all eligible Medicaid members who are also entitled to Medicare benefits. The Medicaid Program may also provide payment for services not covered by Medicare.

A member with both Medicare and Medicaid coverage is identified as "dual eligible." Medicaid reimburses secondary to Medicare. If a Medicare Supplemental policy exists in addition to Medicare and Medicaid coverage, Medicaid is the third-party payer subsequent to Medicare and Medicare Supplemental payments. Medicaid is always the payer of last resort.

Refer to Chapter 300 for more specific provider information on the Medicare program and its relationship to WV Medicaid, including Medicare provider numbers as part of your Medicaid participation responsibilities.

For information related to claim submission procedures for services rendered to a "dual eligible" member, refer to Chapter 300.

## 180    OUT-OF-STATE SERVICES

Non-emergency, out-of-state services provided to WV Medicaid members routinely require prior authorization from the BMS Out-of-State Unit, Bureau for Medical Services. For HMO members, follow the respective HMO prior-authorization requirements. If applicable, contact BMS at 1-304-558-1700.

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001662

**JA1153**

 

The following are exceptions to this policy:

1. Services provided by WV Medicaid-enrolled border providers
2. Services provided by out-of-state providers who are enrolled as in-state providers
3. Services for WV Medicaid-eligible children who have been placed in foster homes outside WV.

A physician practicing in WV, who determines it necessary to refer a Medicaid member out-of-state for outpatient physician services should submit a request to the BMS Out-of-State Unit. Information that must be provided in the request is as follows:

1. Reason for the out-of-state referral
2. Patient's diagnosis
3. Expected treatment
4. Whether or not treatment is available within WV (services available within the state are not covered outside the state)
5. Other pertinent information.

Payment to out-of-state physicians is made at the same reimbursement rate as payment to in-state physicians. Under Federal law, the Medicaid Program prohibits balance billing by all providers, regardless of location. All out-of-state providers' claims for providing non-emergency medical services will deny unless:

1. The provider is enrolled as a "border" provider
2. The provider is enrolled as an "in-state" provider
3. The services have been prior authorized.

Emergency out-of-state Medicaid-covered services are eligible for Medicaid reimbursement. The documentation provided with the claim must clearly indicate that an emergency situation existed. The emergency room patient record must be submitted with the claim.

Refer to Chapter 300 for additional information regarding out-of-state providers.

## 190    FRAUD AND ABUSE

Fraud is defined as an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to either the person or another. In particular, any provider that acts intentionally and with knowledge to deceive or misrepresent information used in Medicaid administrative processes, and the deception or misrepresentation results in some unauthorized benefit to him/her or another, commits fraud. It also includes any act that constitutes fraud under applicable federal or WV state law.

Abuse is defined as provider practices that are inconsistent with sound fiscal business or medical practices and result in an unnecessary cost to the Medicaid Program. It also includes reimbursement for services that are not medically necessary or that fail to meet professionally recognized standards for health care. In particular, any provider that acts in a repetitive manner to cause unnecessary costs for the Medicaid Program is considered abusive of the Medicaid Program.

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001663




Examples of activities that constitute fraudulent practices or abuse of the Medicaid Program are identified in Chapter 800, General Administration. A person is subject to prosecution by federal and state authorities when any actions identified during the Medicaid administrative process is determined to be fraudulent or abusive.

It is recommended that 42 U.S.C. §1320a-7a, 42 U.S.C. §1320a-7B, and 42 U.S.C. §1320 a-7 be reviewed by appropriate provider office staff. These codes contain information related to fines and exclusions that can be imposed upon persons and/or entities convicted of submitting false or fraudulent claims to federal or state medical programs.

### 191    CONFIDENTIALITY

Information you obtain from BMS or any other DHHR bureau regarding Medicaid members' eligibility, health history, health care services, or any other personal information, is to remain strictly confidential and shall not be disclosed for any purpose other than those directly concerned with Medicaid administrative requirements.

DISCLAIMER: This manual does not address all the complexities of Medicaid policies and procedures, and must be supplemented with all State and Federal Laws and Regulations.

CFAIN0001664

**JA1155**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

               **Plaintiffs,**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge



Exhibit
PL0019
SY

**DEFENDANTS' SEVENTH SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST
SET OF REQUESTS FOR PRODUCTION TO DEFENDANTS WILLIAM CROUCH,
CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND
HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES**

**DOCUMENT REQUESTS**

2. All documents relating to Plaintiff's communications, injuries, requests for coverage,

requests for prior authorization, requests for reimbursement and/or complaints regarding

coverage for Gender-Confirming Care through the West Virginia Medicaid Program. This

Request includes but is not limited to:

    a.   All communications to and from Plaintiff relating to coverage for Gender-Confirming Care;

    b.   All Documents and communications regarding Plaintiff's requests for Gender-Confirming Care, including but not limited to communications among Defendants, and/or the employees, entities, agents, representatives, contractors, vendors, and/or consultants of Defendants and/or West Virginia Department of Health and Human Resources, Bureau of Medical Services;

    c.   All Documents and communications relating to consideration or processing by third-party administrators, contractors, and/or vendors of requests for Gender-Confirming Care by Plaintiff.

**SUPPLEMENTAL RESPONSE: See documents received from Aetna, marked as Exhibit 125, regarding Plaintiff Anderson. The undersigned bates numbered the pdf documents using the number assigned by Aetna as FAI0000000578 to FAI0000000603. All materials are CONFIDENTIAL.**

4.   All Documents and communications relating to the Exclusion, including but not limited to:

    a.   All Documents and communications relating to the decision to maintain the Exclusion in the Health Plans in any plan year.

    b.   All Documents and communications relating to the decision to permit coverage for hormone therapy for the purpose of treating gender dysphoria.

    c.   All Document and communications relating to evaluating, examining, analyzing, and/or considering the Exclusion in any way.

**SUPPLEMENTAL RESPONSE: See BMS Policy Manual, Chapter 100, attached as Exhibit 123 (Bates No. DHHRBMS020639 – 20653).**

17. Documents obtained from third parties as a result of authorizations, releases and/or subpoenas relating to the subject matter of this lawsuit.

**SUPPLEMENTAL RESPONSE:   See Exhibit 125, which consists of documents provided by Aetna regarding Plaintiff Anderson.   See also documents provided by Unicare regarding Plaintiff Fain, previously produced and marked as Exhibits 93 and 94.**

20. All communications related to legislation and/or lobbying surrounding the Exclusion and/or coverage for medical care for transgender people and gender dysphoria.

**SUPPLEMENTAL RESPONSE: These Defendants are not aware of any responsive documents.**

23. All Documents which Defendants considered, relied upon, or intend to rely upon, in answering each interrogatory and each request for admission in this action.

**SUPPLEMENTAL RESPONSE:   See BMS Policy Manual, Chapter 200, attached as Exhibit 124, (Bates No. DHHRBMS020654-20683).**

24. To the extent not requested above, all Documents that Defendants may rely upon to support their defenses against Plaintiff's claims in this action.

**SUPPLEMENTAL RESPONSE:  See all documents produced in this matter.**

> **WILLIAM CROUCH,**
> **CYNTHIA BEANE, and**
> **WEST VIRGINIA DEPARTMENT OF**
> **HEALTH AND HUMAN RESOURCES,**
> **BUREAU FOR MEDICAL SERVICES,**
>
> **By counsel**

3

**JA1158**

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA1159**

Case 3:20-cv-00740 Document 252-13 Filed 05/09/22 Page 1 of 3 PageID #: 13449

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL; and BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

                **Plaintiffs,**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

                **Defendants.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

## CERTIFICATE OF SERVICE

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of
Health and Human Resources, by counsel, and do hereby certify that on the 9th day of March,
2022, a true and exact copy of **DEFENDANTS' SEVENTH SUPPLEMENTAL RESPONSE
TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANTS
WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES** was served
on counsel via electronic means as follows:

**JA1160**

Walt Auvil (WVSB#190)
**Counsel for Plaintiffs**
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
**Counsel for Plaintiffs**
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA  90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lamdalegal.org

Tara L. Borelli, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
**Counsel for Jason Haught**
517 9th Street, P.O. Box 1704
Huntington, WV  25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

/s/Kimberly M. Bandy
 Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
***Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services***
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

7

Case 3:20-cv-00740  Document 252-2  Filed 05/31/22  Page 1 of 42 PageID #: 3452

```
                                                    Page 1

 1           IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                  HUNTINGTON DIVISION

 4    --------------------------------------------------

 5   Christopher Fain, individually and on behalf of all

 6   others similarly situated, et al.,

 7               Plaintiffs,

 8     vs.              CIVIL ACTION NO. 3:20-cv-00740

 9   William Crouch, et al.,

10               Defendants.

11    --------------------------------------------------

12

13

14      REMOTE DEPOSITION OF SECRETARY BILL J. CROUCH

15

16

17

18   DATE:   March 17, 2022

19   TIME:   10:30 a.m. CST

20   PLACE:  Veritext Virtual Videoconference

21

22

23

24   REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25   JOB NUMBER:  5096130
```

JA1163

```
                                                  Page 2
 1                          APPEARANCES

 2

 3    On Behalf of the Plaintiffs (Via Videoconference):

 4          TARA L. BORELLI, ESQ.

 5          Lambda Legal Defense and Education Fund, Inc.

 6          158 West Ponce De Leon Ave., Suite 105

 7          Decatur, Georgia  30030

 8          470.225.5341

 9          tborelli@lambdalegal.org

10

11          AVATARA SMITH-CARRINGTON, ESQ.

12          Lambda Legal Defense and Education Fund, Inc.

13          3500 Oak Lawn Avenue, Suite 500

14          Dallas, Texas  75219

15          214.219.8585

16          asmithcarrington@lambdalegal.org

17

18          NICOLE J. SCHLADT, ESQ.

19          Nichols Kaster PLLP

20          80 South 8th Street, Suite 4700

21          Minneapolis, Minnesota  55402-2224

22          612.256.3291

23          nschladt@nka.com

24

25
```

**JA1164**

Page 3

1      WALT AUVIL, ESQ.

2      The Employment Law Center, PLLC

3      1208 Market Street

4      Parkersburg, West Virginia  26101

5      304.485.3058

6      auvil@theemploymentlawcenter.com

7

8  On Behalf of Defendants William Crouch; Cynthia Beane;

9  and West Virginia Department of Health and Human

10  Resources, Bureau for Medical Services (Via

11  Videoconference):

12      KIMBERLY M. BANDY, ESQ.

13      LOU ANN S. CYRUS, ESQ.

14      Shuman McCuskey Slicer, PLLC

15      1411 Virginia Street East, Suite 200

16      Charleston, West Virginia  25301

17      304.345.1400

18      kbandy@shumanlaw.com

19      lcyrus@shumanlaw.com

20

21

22

23

24

25

**JA1165**

Page 4

```
 1   On Behalf of Defendant Jason Haught (Via
 2   Videoconference):
 3        ERIC D. SALYERS, ESQ.
 4        Oxley Rich Sammons, PLLC
 5        517 Ninth Street, Suite 1000
 6        Huntington, West Virginia  25701
 7        304.522.1138
 8        esalyers@oxleylawwv.com
 9
10
11
12
13
14
15
16      NOTE:  The original deposition transcript will be
17   delivered to Nicole Schladt, Esq., as the taking
18   attorney.
19
20
21
22
23
24
25
```

JA1166

# DEPOSITION OF BILL J. CROUCH

Page 10

1   like in normal conversation we have a tendency to use

2   mm-hmm or huh-un to answer questions.  If in the event

3   you do that I may follow up and ask you for a yes or no,

4   and that is likely not because I don't understand what

5   you're saying, but because we just need to have a clear

6   record.  Is that fair?

7       A.  That is fair.

8       Q.  And then sometimes there's a tendency for people

9   to talk over each other.  It seems like this morning we

10  aren't going to have a problem based on how things are

11  going already this morning, but in the event we end up

12  talking over each other on accident then I might have to

13  repeat myself or Kelley here might have to jump in and

14  get us, attempt to get us to stop talking over each

15  other.  Is that okay?

16      A.  Great.

17      Q.  Okay.  And so that finishes up my ground rules

18  here and I think we can launch into a couple of

19  questions about your background.  Mr. Secretary, can you

20  state your full name for the record, please.

21      A.  Bill J. Crouch.

22      Q.  And is your first name William?

23      A.  No, it is not.

24      Q.  It's actually Bill?

25      A.  It is Bill.

**JA1167**

## DEPOSITION OF BILL J. CROUCH

1    Q. Great. Glad that we established that. And, Mr.
2  Secretary, do you use he/him pronouns?
3    A. No, I do not.
4    Q. What pronouns do you use?
5    A. I've never been asked that. For me?
6    Q. For you, yes. If I wanted to refer to you like
7  Bill went to the store, instead of saying Bill, would I
8  say he went to the store?
9    A. Yes, that would be fine.
10    Q. Great. Thanks. And you are the Cabinet
11  Secretary of West Virginia Department of Health and
12  Human Resources, is that correct?
13    A. That is correct, yes.
14    Q. How do you refer to the West Virginia Department
15  of Health and Human Resources, because I know that's
16  quite a mouthful?
17    A. How do I refer to them?
18    Q. Do you have a short terminology for that, like
19  WVDHHR or DHHR?
20    A. DHHR, yes.
21    Q. Great. So if I use DHHR today, you'll know that
22  I'm talking about the full West Virginia Department of
23  Health and Human Resources?
24    A. I will, yes.
25    Q. Great. That will save us both a few words

DEPOSITION OF BILL J. CROUCH

Page 12

1   today.

2       A.  All right, good.

3       Q.  And you were appointed Cabinet Secretary in

4   January 2017, is that right?

5       A.  That is correct, yes.

6       Q.  And you were appointed by Governor Jim Justice

7   of West Virginia?

8       A.  That is correct.

9       Q.  And you held the position for a little over five

10  years then, is that right?

11      A.  That is correct.

12      Q.  And, Mr. Secretary, what are your job duties as

13  Cabinet Secretary of DHHR?

14      A.  DHHR is a provider of, of funds and services and

15  a safety net for individuals, vulnerable individuals

16  throughout the state.  So we have a 7 and a half billion

17  dollar budget, we have over 6,000 employees, we have

18  over 150 programs.  So I try to make sure that the

19  funding that comes in from the federal government or

20  through the state legislature is pushed out

21  appropriately to those folks in communities who need

22  those funds to provide services.

23          We also provide some direct services such as CPS

24  and APS, Child Protective Services and Adult Protective

25  Services to those children and vulnerable adults who

JA1169

Page 71

1                       REPORTER'S CERTIFICATE
2
3
  STATE OF MINNESOTA    )
4                       ) ss.
  COUNTY OF WASHINGTON )
5
6       I hereby certify that I reported the Zoom deposition
  of Secretary Bill J. Crouch on the 17th day of March
7  2022, and that the witness was by me first duly sworn to
  tell the whole truth;
8
        That the testimony was transcribed by me and is a
9  true record of the testimony of the witness;
10      That the cost of the original has been charged to
  the party who noticed the deposition, and that all
11 parties who ordered copies have been charged at the same
  rate for such copies;
12
        That I am not a relative or employee or attorney or
13 counsel of any of the parties, or a relative or employee
  of such attorney or counsel;
14
        That I am not financially interested in the action
15 and have no contract with the parties, attorneys, or
  persons with an interest in the action that affects or
16 has a substantial tendency to affect my impartiality;
17      That the right to read and sign the deposition by
  the witness was reserved.
18
        WITNESS MY HAND AND SEAL THIS 17th day of March
19 2022.
20
21
22
23
24      Kelley E. Zilles, RPR
        Notary Public, Washington County, Minnesota
25      My commission expires 1-31-2025

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

**JA1170**

Page 74

1                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS

2

         ASSIGNMENT REFERENCE NO: 5096130
3        CASE NAME: Fain, Christopher Et Al. v. Crouch, William Et Al.
         DATE OF DEPOSITION: 3/17/2022
4        WITNESS' NAME: Secretary Bill J. Crouch
5             In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7             I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9             I request that these changes be entered
    as part of the record of my testimony.

10

              I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  April 26, 2022            _____
    Date                      Secretary Bill J. Crouch

14

              Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18            in the appended Errata Sheet;
         They signed the foregoing Sworn
19            Statement; and
         Their execution of this Statement is of
20            their free act and deed.
21       I have affixed my name and official seal
22  this   26th   day of   April           , 20 2022.
23       _____
         Notary Public

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
G Elizabeth Jarrett
2744 Daniels Avenue
South Charleston WV 25303
My Commission Expires June 13, 2026

June 13, 2026
_____
Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

**JA1171**

Page 75

1                          ERRATA SHEET
                VERITEXT LEGAL SOLUTIONS MIDWEST
2                     ASSIGNMENT NO: 5096130
3      PAGE/LINE(S) /          CHANGE          /REASON

| 4 | Page 18 / Line 1 | rates (not rights) | Wrong word |
| 5 | Page 19 / Line 1 | 93-641 | Hyphen needed |
| 6 | Page 28 / Line 11 | Mars Hill College (not Marshall) | Wrong word |
| 7 | Page 40 / Line 20 | re-bid (not redid) | Wrong word |
| 8 | Page 43 / Line 23 | LOCHHRA (Not LCRA) | Incorrect acronym |
| 9 | Page 43 / Line 25 | LOCHHRA  "   " | "     " |
| 10 | Page 44 / Lines 4, 6, 7, 8, 16, 17 | LOCHHRA  "   " | "     " |
| 11 | Page 45 / Line 22 | LOCHHRA  "   " | "     " |
| 12 | Page 46 / Lines 3 & 7 | LOCHHRA  "   " | "     " |
| 13 | Page 46 / Line 24 | recipients (not clinics) | Wrong word |
| 14 | Page 60 / Line 18 | well (not want) | Wrong word |
| 15 | Page 61 / Line 21 | LOCHHRA | Incorrect acronym |

16      _____
17      _____
18      _____
19

         April 26, 2022                       Bio J Crouch
20      Date                    Secretary Bill J. Crouch
21      SUBSCRIBED AND SWORN TO BEFORE ME THIS   26th
22      DAY OF   April              , 20 22        .
23                  A Elm
                    Notary Public

         OFFICIAL SEAL
         NOTARY PUBLIC
         STATE OF WEST VIRGINIA
         G Elizabeth Jarrett
         2744 Daniels Avenue
         South Charleston WV 25303      June 13, 2026
         My Commission Expires June 13, 2026
25                     Commission Expiration Date

**JA1172**

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                     HUNTINGTON DIVISION

 4     ------------------------------------------------

 5     Christopher Fain, individually and on behalf of all

 6     others similarly situated, et al.,

 7                   Plaintiffs,

 8        vs.                    CIVIL ACTION NO. 3:20-cv-00740

 9     William Crouch, et al.,

10                   Defendants.

11     ------------------------------------------------

12

13

14        REMOTE DEPOSITION OF COMMISSIONER CYNTHIA BEANE

15

16

17     DATE:   March 29, 2022

18     TIME:   8:00 a.m. CST

19     PLACE:  Veritext Virtual Videoconference

20

21

22

23

24     REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25     JOB NUMBER:  5096149
```

**JA1173**

```
                                              Page 2
 1                        APPEARANCES

 2

 3    On Behalf of the Plaintiffs (Via Videoconference):

 4          CARL CHARLES, ESQ.

 5          TARA L. BORELLI, ESQ.

 6          Lambda Legal Defense and Education Fund, Inc.

 7          158 West Ponce De Leon Ave., Suite 105

 8          Decatur, Georgia  30030

 9          470.225.5341

10          ccharles@lambdalegal.org

11          tborelli@lambdalegal.org

12

13          AVATARA SMITH-CARRINGTON, ESQ.

14          Lambda Legal Defense and Education Fund, Inc.

15          3500 Oak Lawn Avenue, Suite 500

16          Dallas, Texas  75219

17          214.219.8585

18          asmithcarrington@lambdalegal.org

19

20          NICOLE J. SCHLADT, ESQ.

21          Nichols Kaster PLLP

22          80 South 8th Street, Suite 4700

23          Minneapolis, Minnesota  55402-2224

24          612.256.3291

25          nschladt@nka.com
```

```
                                                Page 3
 1        WALT AUVIL, ESQ.

 2        The Employment Law Center, PLLC

 3        1208 Market Street

 4        Parkersburg, West Virginia   26101

 5        304.485.3058

 6        auvil@theemploymentlawcenter.com

 7

 8   On Behalf of Defendants William Crouch; Cynthia Beane;

 9   and West Virginia Department of Health and Human

10   Resources, Bureau for Medical Services (Via

11   Videoconference):

12        KIMBERLY M. BANDY, ESQ.

13        LOU ANN S. CYRUS, ESQ.

14        Shuman McCuskey Slicer, PLLC

15        1411 Virginia Street East, Suite 200

16        Charleston, West Virginia   25301

17        304.345.1400

18        kbandy@shumanlaw.com

19        lcyrus@shumanlaw.com

20

21

22

23   NOTE:  The original deposition transcript will be

24   delivered to Tara Borelli, Esq., as the taking attorney.

25
```

JA1175

**DEPOSITTON OF CYNTHTA BEANE**

Page 15

1  distinction is important to your answers, will you agree

2  to clarify that for me?

3      A.  Yes.

4      Q.  In this next set of questions I'll be asking

5  about your professional background for purposes of your

6  individual testimony and as an organizational

7  representative for BMS.  What is your current job title?

8      A.  I'm the commissioner for the Bureau of Medical

9  Services.

10     Q.  How long have you held that position?

11     A.  I've been in this position fully appointed since

12  2017 and before that I was acting commissioner for a

13  couple years.

14     Q.  Did you begin serving as acting commissioner in

15  approximately July 2014?

16     A.  Yeah, I guess I did.

17     Q.  Okay.  LinkedIn is a helpful thing.  You

18  mentioned being appointed to this role.  Let's start

19  with your acting commissioner role beginning in 2014.

20  Were you appointed as acting commissioner?

21     A.  At the time the commissioner had left abruptly

22  and I was a deputy commissioner and I was asked to take

23  the acting role and I did so.

24     Q.  Who asked you to take that role?

25     A.  Deputy Secretary Jeremiah Samples.

**JA1176**

## DEPOSITION OF CYNTHIA BEANE

Page 16

1    Q.  And then in 2017 you became the commissioner.

2    Were you appointed to the role of commissioner in 2017?

3    A.  Appointed probably is not maybe the correct word

4    I should have used.  I was asked to take the role fully

5    in 2017 by then Secretary Crouch and to come out of the

6    acting role.  And the significance of that was it's

7    whether or not you're covered by Civil Service.  And so

8    at the time when the commissioner had left abruptly

9    before we were, we get new governors every four years,

10   and so I was kind of like not sure if I wanted to take

11   it knowing that there was a possibility I would not be

12   the chosen commissioner in a year and a half or so.

13   Q.  I see.  And so when you were asked to become

14   commissioner by Secretary Crouch you agreed in 2017?

15   A.  Yes.

16   Q.  And you referred to the prior commissioner

17   leaving abruptly.  Can you confirm that that didn't have

18   anything to do with the subject of this case?

19   A.  That had nothing to do with the subject of this

20   case.

21   Q.  Prior to becoming commissioner have you held

22   other roles within BMS or DHHR?

23   A.  Yes.  I have been with the Department since

24   2000.  Prior to becoming the acting commissioner I was

25   deputy commissioner and then for a number of years prior

JA1177

## DEPOSITTON OF CYNTHTA BEANE

Page 32

1  and be the spokesperson for Medicaid services in West

2  Virginia.

3      Q.  Is it fair to say that you administer the

4  Medicaid program?

5      A.  Yes.

6      Q.  Do you recall any other duties or

7  responsibilities in your current role?

8      A.  I believe the answer I gave are a very broad

9  brush of all the things that I do here at Medicaid, you

10  know, all the leadership reports to me and there are

11  several different divisions under that and lots of

12  nuances when it comes to Medicaid, but yes, I make sure

13  we're administering the Medicaid program.  Medicaid is a

14  state and federal partnership.  West Virginia has a very

15  good rate when it comes to what our federal match is,

16  and so I make sure that we are not putting that federal

17  match at risk.

18      Q.  How do you perform the function of making sure

19  that the federal match is not being put at risk?

20      A.  Pretty much we follow CMS guidelines.  If CMS

21  directs us to do something, they mandate us to do

22  something, we make sure that we do it.  We update our

23  state plan as needed.  If we are to add a service, if

24  the legislature gives us additional monies to add a

25  service, we make sure before we do that that we have

## DEPOSITION OF CYNTHTA BEANE

Page 33

1    CMS's permission to do it before we are collecting the

2    match for the services.

3        Q.  Who do you report to?

4        A.  I report to Deputy Secretary Samples and

5    Secretary Crouch.

6        Q.  Are there any others that you report to?

7        A.  Those two gentlemen are it.

8        Q.  Let me make sure that I get the name of the,

9    Secretary Crouch, can you repeat the other, the title

10   and the name of the other individual?

11       A.  Deputy Secretary Jeremiah Samples and Secretary

12   Crouch, Bill Crouch.

13       Q.  Thank you.  How often do you report on your work

14   to Secretary Crouch?

15       A.  Secretary Crouch has meetings, they've been a

16   little bit different since COVID just because things

17   just got kind of crazy busy with the pandemic, but he

18   has like weekly leadership meetings where all the

19   commissioners are there.  But then of course if I need

20   something from Secretary Crouch, for example, yesterday

21   I needed to make sure he signed something and so I, you

22   know, called him and, you know, made sure that he saw

23   that on his desk and signed it.  So the formal meetings,

24   about once a week.

25       Q.  And how often do you report on your work to

JA1179

## DEPOSITTON OF CYNTHTA BEANE

Page 53

```
 1   meet with any mental health providers who provide any
 2   care to transgender people, even if they do not
 3   specialize in that care?
 4       A.  Not to prepare for this.
 5       Q.  And as the organizational representative did you
 6   meet with any medical providers who provide any care to
 7   transgender people, even if they don't specialize in
 8   providing that care?
 9       A.  Not to, I have not met with them to prepare for
10   this.
11       Q.  You also mentioned reviewing expert testimony in
12   connection with preparing to testify as the
13   organizational representative.  Do you recall the name
14   of the expert whose report you reviewed?
15       A.  I honestly do not recall the name, but it is,
16   I'm assuming it is an exhibit that you probably already
17   have, but I honestly don't remember the name of the
18   doctor, it's just escaping me.
19       Q.  Was it Dr. Steven Levine, by any chance?
20       A.  Yes.
21       Q.  And did you read any other expert materials from
22   the case to prepare for your testimony as organizational
23   representative today?
24       A.  I did not.
25       Q.  And when was the first time that you reviewed
```

## DEPOSITTON OF CYNTHTA BEANE

Page 54

1    the report of Dr. Steven Levine?

2        A.  Last week.

3        Q.  Okay.  Have you ever spoken with Dr. Levine?

4        A.  I have not.

5        Q.  Does BMS have one or more medical directors?

6        A.  One.

7        Q.  And who is that medical director?

8        A.  Dr. Becker.

9        Q.  Are there any other medical professionals, for

10   example, nurse practitioners within BMS?

11       A.  Yes, we have several nurses that work for BMS.

12      Q.  And did you speak with any of those nurses in

13   order to prepare to testify as the organizational

14   representative today?

15       A.  I have not spoke to them, but some of them have

16   pulled some of the information that I think is being

17   used as different exhibits in evidence.

18       Q.  And did you review that information that they

19   pulled?

20       A.  Yes, I reviewed some of the exhibits, yes.

21       Q.  All right.  I'd like to ask you actually a quick

22   follow-up question.  Do you remember which ones you

23   reviewed?

24       A.  Which -- well, I remember we had a pull with

25   regards to how many individuals with gender dysmorphia

## DEPOSITTON OF CYNTHTA BEANE

Page 71

1        So as the state plan evolves and as you have

2    more money in order to offer additional healthcare

3    services and as healthcare has changed in the last

4    50 years as well, different state plans become

5    submitted.  So the state plan will have pages from

6    literally the 1970s and '80s if you look at our state

7    plan to most recent pages in the 2000s.  And so as we

8    add services that were not thought of 50 years ago, so

9    we add new additional state plan pages.

10       Q.  And are the pages in the state plan that you're

11    referring to which bear different dates, are those

12    different pages generally organized by the service

13    provider?

14       A.  Yeah, so they're, they're like, the state plan

15    has pages, like the 419 pages are more your service

16    pages, then there are a different section for financial

17    pages, and then there are some other sections when

18    they're really talking about some of the eligibility

19    pages.  And then they'll have different pages for like

20    your, for the most recent with the ACA, your alternative

21    benefit plans and those pages.  So it's all there, it's

22    a very thick convoluted document, I'm not going to

23    sugarcoat it.

24       Q.  And changes are periodically made to the

25    Medicaid plan, correct?

## DEPOSITTON OF CYNTHTA BEANE

Page 72

1    A.  Yes.

2    Q.  What kinds of circumstances would lead to a

3    change in the Medicaid plan?

4    A.  If we were to add a service, if CMS would

5    mandate a service.  So our most recent state plan

6    changes that we made, CMS has recently said states will

7    cover all forms of medication assisted treatment, they

8    directed us on where in the state plan they wanted that,

9    and so we had to submit a new state plan amendment to

10   assure compliance with MAT services.

11   Q.  And you just started describing this, but can

12   you walk me through the process for how changes are made

13   to the Medicaid plan?

14   A.  Okay.  So we'll just stick with that since I

15   started with it.  So for that particular example we got

16   a State Health Officer letter that said you must cover,

17   you know, these services and they must be spelled out in

18   your state plan, then we drafted the state plan.  We

19   typically, you don't have to do this, but we have a

20   fairly positive relationship with our federal partner,

21   so what we do is we'll share the draft with them before

22   the formal submission so we can kind of get off the

23   record kind of feedback from them if, you know, if

24   something is in the wrong place or, you know, or if it's

25   a preprint and they want us to use a specific format,

JA1183

## DEPOSITTON OF CYNTHTA BEANE

Page 73

1  something like that.

2          And then after that back and forth and then, you

3  know, they seem to like what we've got and we're assured

4  that it's ready to go, then we'll have what we call like

5  a medical fund advisory council.  Typically those

6  typically have met once a quarter before the pandemic.

7  Once the pandemic happened everything kind of went crazy

8  and we weren't meeting with that group.  But typically

9  during normal times when there's not a pandemic that

10  group would review the state plan, we would have to put

11  the state plan up for public comment, and then after

12  that it routes over to the secretary and then for his

13  sign-off, governor's sign-off and submission.

14      Q.  Thank you.  So do all changes to the Medicaid

15  plan require CMS approval?

16      A.  Yes, yes.  In order to get the federal match,

17  because they're not going to give you federal match for

18  services if they haven't approved.

19      Q.  And who would you describe as having the

20  authority to negotiate these changes to the state plan

21  with CMS?

22      A.  That would be my office.

23      Q.  Okay.  And does that include you as well

24  individually?

25      A.  Yes, yes.

JA1184

## DEPOSITION OF CYNTHTA BEANE

1      A.   Yes.

2      Q.   Does this appear to be an attached copy of the

3   2021 model purchase of service provider agreement

4   between BMS and Aetna?

5      A.   Yes.

6      Q.   Please scroll now down to Page 65 of the

7   document, that's Page 73 of the pdf, Page 65 based on

8   the document's internal numbering.

9      A.   I'm on 65 internal number.

10      Q.   And you should see a Bates number in the lower

11   right-hand corner that reads DHHRBMS001193.  Do you see

12   that?

13      A.   I do.

14      Q.   Towards the bottom of the page is a heading that

15   reads, "1.4, noncovered services," do you see that?

16      A.   Yes.

17      Q.   Right below that it says, "MCO's are not

18   permitted to provide Medicaid excluded services that

19   include, but are not limited to, the following."  Do you

20   see that?

21      A.   Yes.

22      Q.   And if you scroll to the next page.  Let me know

23   if you see a Bates stamp DHHRBMS001194, do you see that?

24      A.   Yes.

25      Q.   And do you see language on that page that says,

## DEPOSITTON OF CYNTHTA BEANE

Page 87

1  "No. 6, sex transformation procedures and hormone

2  therapy associated with sex transformation procedures"?

3     A.  Yes.

4     Q.  Does this indicate that BMS's contract with

5  Aetna requires Aetna to exclude gender affirming care?

6     A.  It is excluded as far as a service that is

7  considered in your rates.

8     Q.  Can you explain what that means?

9     A.  So, for example, No. 1 says, "All nonmedically

10 necessary services."  We know that MCO's sometimes

11 provide services that are not medically necessary, but

12 it might be an incentive.  So they might give you a $20

13 gift card if you went to all of your well checks or you

14 had your baby do all of your well checks.  That's not,

15 that's not a medically necessary service, but we allow

16 the MCO's to do those value added services.

17    Q.  And so does that indicate that if the MCO's

18 cover this care, gender affirming care, they will not

19 receive any reimbursement from the Medicaid program?

20    A.  It means that that service was not in their

21 rates.  So when we do the rates for the MCO's we have

22 our benefits and what we cover.  This is a service we

23 don't cover.  So when the actuaries look at all the

24 history and everything in their rates and they come up

25 with an adult member gets a $400 a month PMPM, that

## DEPOSITTON OF CYNTHTA BEANE

Page 88

1 surgery would not be considered in that rate, but once I

2 give that money over to the MCO and they have that $400

3 a month, they have to cover all the benefits that are

4 required, but if they want to cover additional benefits

5 that we don't cover here, they wouldn't be penalized

6 other than it's not in their current rate, they would

7 have to say they're going to do it based on their

8 management of the program.

9      Q.  So in other words, BMS will not cover what this

10 document refers to as sex transformation procedures,

11 correct?

12           MS. CYRUS:  Object to the question.  But go

13 ahead.

14      A.  Correct.

15      Q.  And if the MCO's did want to cover that care,

16 specifically gender affirming surgery, they would have

17 to come up with their own money to do so, is that

18 correct?

19      A.  Yes.  It would, it would be within the rates

20 that we give them, but it would not constitute what,

21 what the actuaries use to bill their rate.

22      Q.  Let me make sure I'm understanding what you're

23 saying.  So let me go back to first principles.  I think

24 I heard you say gender affirming surgery is a noncovered

25 service for BMS, correct?

JA1187

DEPOSITTON OF CYNTHTA BEANE

```
                                             Page 89

  1        A.   Correct.

  2        Q.   And so when BMS negotiates with the MCO's for

  3   the amount of money that they will receive from BMS to

  4   cover all of the required care, that calculation does

  5   not include any money to cover gender affirming

  6   surgeries, correct?

  7        A.   Correct.

  8        Q.   And if the MCO's wanted to cover gender

  9   affirming surgeries, they would need to come up with

 10   their own money, correct?

 11        A.   Yes, they would use their own money.  So can I

 12   give like an example --

 13        Q.   Sure.

 14        A.   -- what this would be?  So I'm going to use like

 15   two examples.  So we don't cover acupuncture, it's not a

 16   benefit in our state plan that we cover, it would not be

 17   in the rates.  But let's say the MCO saw a benefit and

 18   covered acupuncture, that if we cover acupuncture we're

 19   not going to have to do as many back surgeries and in

 20   the long run it's going to be a cost-saving to us, which

 21   in the end a managed care company is going to look at

 22   that financial obligation in their businesses, so

 23   they're going to try to make as much money as they can

 24   with regards to still providing the services they have

 25   to provide, but also any cost savings that they have up
```

## DEPOSITTON OF CYNTHTA BEANE

Page 90

1    to a certain point then they can use as profit.  So if

2    they determine that by covering acupuncture, even though

3    it's not something that is in our rate, will benefit us

4    and actually save us money, they can do that.

5          So for gender affirming care the assumption

6    would be, perhaps, I don't know, if they wanted to cover

7    the surgery and maybe this person wouldn't require as

8    much counseling later, then they might decide to do

9    that.  I do not believe any of them have.

10    Q.   Correct.  So to your knowledge none of the MCO's

11    are in fact covering gender affirming surgery using

12    their own funds?

13    A.   Correct.

14    Q.   Okay.  Why does the exclusion that we reviewed

15    together refer to hormone therapy when West Virginia

16    Medicaid provides access to that care?

17    A.   I believe that that was a historical thing that

18    was in there at one time.  Our MCO's did cover the

19    pharmacy benefit, they have not covered our pharmacy

20    benefit for a number of years now, and so I just believe

21    it's something in the, it's a very long contract that

22    just wasn't caught when we were renewing the contracts

23    and had them signed off year after year.

24    Q.   That's helpful.  What I'd like to do is really

25    quickly see if we can establish that there are similar

**DEPOSITTON OF CYNTHTA BEANE**

Page 110

1  the document has the Bates stamp DHHRBMS020685.  Do you

2  see that?

3      A.  Yes.

4      Q.  And do you recognize this document?

5      A.  Yes.

6      Q.  Does it appear to be a table showing the monthly

7  number of Medicaid members for 2022?

8      A.  Yes.

9      Q.  And does this appear to be formatted in a

10  similar table to the one that we just reviewed?

11      A.  Yes.

12      Q.  And does this table indicate that in March of

13  2022 there were a total number of 628,825 Medicaid

14  members?

15      A.  Yes.

16      Q.  And based on the numbers that you just reviewed,

17  your best estimate of the current number of Medicaid

18  participants is still 615,000 approximately, is that

19  correct?

20      A.  It looks like I was a little off, it's 628.

21      Q.  So 628.  And I recognize we're still in the

22  month of March, I'm not sure if there's much fluctuation

23  within a month or not, but is the number in this chart

24  for March of 2022, to your knowledge does that remain

25  accurate for the approximate number of total Medicaid

## DEPOSITTON OF CYNTHTA BEANE

Page 134

1    Q.  Topic 11 reads, "Any governmental interest that

2    you contend supports the exclusion and their factual

3    bases."  Did I read that correctly?

4    A.  You did.

5    Q.  Are you prepared to testify about this topic?

6    A.  I am.

7    Q.  And with respect to Topic 11 specifically, what

8    did you do to prepare to testify today?

9    A.  Made sure we didn't have any directive from CMS

10   directing us to cover the service.

11   Q.  And when you did that review did you find

12   anything from CMS directing BMS not to cover gender

13   affirming surgery?

14   A.  I didn't find anything telling us that it was a

15   mandatory service.

16   Q.  And did you find anything telling BMS to exclude

17   the care?

18   A.  No.

19   Q.  My understanding from your counsel is that you

20   would be addressing Topic 11 as it relates to CMS, while

21   your colleague Becky Manning will address the request as

22   it relates to the budget.  Is that your understanding as

23   well?

24   A.  That I'm going to address it as it relates to

25   CMS, yeah, sure, yes.

JA1191

**DEPOSITTON OF CYNTHTA BEANE**

Page 135

1    Q.  And you also have been designated to give

2    testimony as the organizational representative for the

3    discovery request on the same topic.  So I want to turn

4    to that next, and for the sake of efficiency I'll ask

5    you questions about these related topics at the same

6    time.  Is that agreeable?

7    A.  Yes.

8    Q.  All right.  Give us a moment to load the next

9    exhibit and I will tell you when it's available.

10           (Exhibit 15 marked for identification.)

11    Q.  All right.  Go ahead and click on the exhibit

12    folder and you should see what has been marked as

13    Plaintiff's Exhibit 15.  Let me know once you've had a

14    chance to open and review the document.

15    A.  Is this in a pdf?  The computer is like asking

16    me what to open it in, or is it Word?

17           MS. CYRUS:  Yeah, I got the same message.

18    Is it Adobe?

19           MS. BORELLI:  You know what, I'm having the

20    same issue myself.  Given that we've been going not

21    quite an hour, why don't we go ahead and take a break

22    and we'll resolve the exhibit issue on our end and then

23    we can come back and talk about it further, how does

24    that sound?

25           MS. CYRUS:  Sure.  By the way, so while I

**JA1192**

## DEPOSITION OF CYNTHIA BEANE

Page 136

1   said that, I did click on Adobe and it did open it, if

2   it's plaintiffs' response to first set of

3   interrogatories, if that's what it is, Exhibit 15, it

4   did open it, just FYI.

5            MS. BORELLI:  Okay.

6   BY MS. BORELLI:

7      Q.  Commissioner Beane, are you able to do the same

8   thing?

9      A.  Okay.  Mine opened down here on my laptop for

10   some reason, I can't get my mouse down there.  Hold on.

11            MS. CYRUS:  That's weird.

12      A.  Why did it not open up there.

13      Q.  It downloaded directly on my laptop as well.

14   I'm not sure what about the file format caused it to do

15   that, but are you able to view it as a downloaded file

16   on your laptop?

17      A.  Let me see if it will let me.  Hold on.  I can't

18   get the mouse to go over here to the laptop screen, why

19   can't I do that.

20      Q.  All right.

21            MS. BORELLI:  How about this, let's go off

22   the record and go ahead and take that break.

23          (A break was taken at 12:27 p.m.)

24          (Exhibit 16 marked for identification.)

25   BY MS. BORELLI:

**JA1193**

## DEPOSITTON OF CYNTHTA BEANE

Page 137

1      Q.  So just before a break we were having a
2   technical issue with the document that was introduced as
3   Plaintiff's Exhibit 15.  We think we have resolved the
4   issue by uploading a duplicate of the same document,
5   which should now be in your exhibits folder as
6   Plaintiff's 16.  So the record will reflect that the
7   documents are the same and that exhibit appears twice as
8   15 and 16 because of this technical issue.
9          Commissioner Beane, are you now able to open up
10   what's marked as Plaintiff's Exhibit 16?
11      A.  I have opened it.
12      Q.  Please take a moment to review the document and
13   let me know when you are done.
14      A.  I've looked at it.
15      Q.  Have you seen this document before?
16      A.  I have.
17      Q.  Did you review it in connection with your
18   testimony as BMS's organizational representative today?
19      A.  I did.
20      Q.  You've been designated to testify about the
21   response to interrogatory No. 2.  Please turn to Page 2
22   of the document.  In approximately the middle of the
23   page you'll see text that reads, "No. 2, describe in
24   detail the factual basis for each governmental interest
25   that defendants contend supports the exclusion."  Did I

## DEPOSITTON OF CYNTHTA BEANE

Page 138

1    read that correctly?

2        A.  You did.

3        Q.  And the response reads, "These defendants state

4    that they provide coverage that is mandated for coverage

5    by the Centers of Medicare and Medicaid Services (CMS).

6    These defendants are constrained by budgetary/cost

7    considerations."  Did I read that correctly?

8        A.  You did.

9        Q.  And are you prepared to testify about this

10   interrogatory as the organizational representative for

11   BMS?

12       A.  I am.

13       Q.  With respect to interrogatory 2 specifically,

14   what did you do to prepare to testify today?

15       A.  I went back and made sure we didn't have a SHO

16   letter, a State Health Officer letter, mandating us to

17   cover the service and, and reviewed our budget to make

18   sure that, well, to make sure that I was aware of when

19   we were going into our budget deficient.

20       Q.  So referring to the response to interrogatory 2

21   that I read a moment ago, is that an accurate

22   description of the governmental interest in the

23   exclusion?

24       A.  I'm sorry, what?

25       Q.  Were you having trouble hearing me or is it that

## DEPOSITTON OF CYNTHTA BEANE

Page 139

1    you would --

2        A.  Can you say the question again, I was having

3    trouble hearing you.

4        Q.  No problem.  I'll repeat.  Referring again to

5    the response to interrogatory 2 that I read a moment

6    ago, is that an accurate description of the governmental

7    interest in the exclusion?

8        A.  Yes, we have no mandate from CMS to provide the

9    coverage.

10       Q.  And does that response to interrogatory 2

11   constitute a complete description of all of the

12   governmental interest being claimed in the exclusion, it

13   does, correct?

14       A.  Correct.

15       Q.  What is the factual basis for the statement in

16   response to interrogatory 2 that defendants, "Provide

17   coverage that is mandated for coverage by the Centers

18   for Medicare and Medicaid Services"?  Let me repeat,

19   what is the factual basis for that assertion?

20       A.  So Medicaid has mandated coverages that CMS

21   assured that we have state plans for and that we are

22   covering those services.  And so if there's a service

23   that they are mandating all 50 states and territories to

24   cover that not all 50 states and territories are

25   covering, they will send out what's called the State

**JA1196**

## DEPOSITTON OF CYNTHTA BEANE

Page 140

1  Health Officer letter and it will direct us to add that

2  coverage.

3    Q.  I think you said a moment ago that you looked to

4  see if there was a SHO letter, I assume that's the

5  abbreviation S-H-O, correct?

6    A.  Correct.

7    Q.  And that abbreviation refers to State Health

8  Officer letter?

9    A.  Correct.

10    Q.  And a SHO letter is a letter that's sent by CMS,

11  is that correct?

12    A.  Correct.

13    Q.  And you said a SHO letter might be sent if

14  there's a mandated service that a state Medicaid program

15  is not covering, correct?

16    A.  Correct.  So the most recent example that we

17  have of that, which is fairly recent because sometimes

18  you can go quite a while without having it, is the

19  medication assisted treatment services.  Every state is

20  mandated to cover all forms of MAT services, and so if

21  your state was not previously covering all those

22  services, you had to do a state plan.  Or if you were

23  covering these services but they were not outlined

24  correctly in your state plan, you had to revise your

25  state plan to assure CMS that you were covering those

## DEPOSITTON OF CYNTHTA BEANE

Page 141

1  services without any kind of restrictions that would not

2  allow individuals to receive those MAT services.

3      Q.  And did you just use the abbreviation MAT?

4      A.  Yeah, that's medication assisted treatment

5  services, it's services for persons who are with

6  substance use disorder.

7      Q.  Understood.  So you said in connection with

8  preparing to testify as the organizational

9  representative today you looked to see if CMS had sent a

10  SHO letter to BMS about gender affirming surgery, is

11  that correct?

12      A.  Correct.

13      Q.  And did you find any such letter?

14      A.  I did not.

15      Q.  Are there any other facts that you're aware of

16  that support the governmental interest, which is again,

17  to quote, "Defendants state that they provide coverage

18  that's mandated for coverage by CMS," are there any

19  other facts that support that governmental interest?

20      A.  I cannot find any directive from CMS telling me

21  I have to cover this service.  If there was, we would

22  have to cover the service or lose billions of dollars,

23  and we would not be able to put that at risk.

24      Q.  Understood.  And are there any other facts that

25  you're aware of that are related to that interest?

## DEPOSITTON OF CYNTHTA BEANE

Page 142

1    A.  Not that I'm aware of.

2    Q.  So I think you testified earlier that counseling

3    is covered for treatment of gender dysphoria through the

4    Medicaid program, is that right?

5    A.  Correct.

6    Q.  Do you have knowledge of why counseling is

7    covered for gender dysphoria?

8    A.  We do not have a restriction on the diagnosis

9    code of why you might seek counseling, it might be for

10   situational depression, it might be for schizophrenia,

11   it could be for gender dysphoria, it could be for a

12   variety of reasons.

13   Q.  And who made the decision to allow coverage for

14   counseling even if the only diagnosis code for the

15   counseling is gender dysphoria, was it BMS that decided

16   to do that?

17   A.  BMS has decided not to edit based on diagnosis

18   for counseling, meaning if your doctor, your therapist

19   thinks you need some counseling because of whatever

20   reason, we don't have an edit that says you can only get

21   counseling for these five diagnoses.  You can receive

22   counseling initially for any diagnosis.

23       What will come into play is if you're going to

24   counseling and you've been going for a few months and

25   there's no progress and you want to continue to go to

## DEPOSITTON OF CYNTHTA BEANE

Page 168

1    another exhibit.  So we'll go ahead and get that marked

2    and I will tell you when it's available.

3              (Exhibit 21 marked for identification.)

4        Q.  And just to set the stage for this, so I'm

5    essentially returning now to Topic 18 in the plaintiffs'

6    30(b)(6) deposition notice.  This is the topic we

7    reviewed earlier today which relates to certain

8    discovery requests.  So I'll now be asking you about

9    some additional discovery requests pursuant to that

10   Topic 18.

11             All right.  Go ahead and click on the exhibit

12   folder and you should be able to open Plaintiff's

13   Exhibit 21.  Let me know when you've had a chance to

14   review that document.

15       A.  I've reviewed it, I've seen it.

16       Q.  You've seen this document before?

17       A.  Yes.

18       Q.  Did you review it in connection with your

19   testimony as BMS's organizational representative today?

20       A.  Yes.

21       Q.  You've been designated to testify about the

22   response to request for admission 7 pursuant to Topic 18

23   in the 30(b)(6) notice of deposition.  Please turn to

24   Page 2 so we can review it together.

25       A.  Okay.

**JA1200**

**DEPOSITION OF CYNTHIA BEANE**

Page 169

1    Q.   Towards the bottom of the page you'll see text

2    that reads, "No. 7, admit that the Medicaid plan only

3    covers care that is medically necessary."  Did I read

4    that correctly?

5    A.   Correct.

6    Q.   And the response reads, "Response.  Admitted,

7    however, these defendants deny any suggestion that

8    Medicaid covers all care as medically necessary."  Did I

9    read that correctly?

10   A.   You are correct.

11   Q.   Are you prepared to testify about this request?

12   A.   Yes.

13   Q.   With respect to your request for admission

14   specifically, what did you do to prepare to testify

15   today?

16   A.   I'm familiar with what services we cover and do

17   not cover.

18   Q.   To make sure that I understand this response,

19   can you confirm that in order for care to be covered by

20   Medicaid it must be medically necessary?

21   A.   Yes, we cover medically necessary services.

22   Q.   In other words, if coverage is covered by

23   Medicaid, the care has been deemed medically necessary,

24   correct?

25   A.   Correct.

JA1201

# DEPOSITION OF CYNTHIA BEANE

Page 178

1  look at the Medicaid budget and see that it's a

2  $4.5 billion budget, and even if every individual that

3  we've identified in the suit requested the surgery, how

4  much would that really cost in such a large budget.  But

5  even this session we had a bill to cover blood pressure

6  cuffs for individuals with uncontrolled blood pressure.

7  And so we have, so when bills go through our legislature

8  you have to do a fiscal note.  And so our state share of

9  that coverage was going to be right around $500,000 and

10  it fell due to the fiscal note, the legislature didn't

11  want to increase the Medicaid budget at all.  So we have

12  to be very aware of where our budget is at all times and

13  knowing that our deficit is coming, we are not spending

14  any extra dollars if at all possible.

15          MS. BORELLI:  I just want to object to this

16  line of questioning because in the communications sent

17  to plaintiffs' counsel it was communicated to us that a

18  different witness would be addressing the budgetary

19  interests that have been invoked by defendants in

20  support of the exclusion, so I would object to this

21  entire line of questioning.

22          MS. CYRUS:  Sure.  And I'm asking her this

23  as a fact witness since you designated it for purposes

24  of both and I think it completes her testimony, but the

25  objection is noted.

JA1202

## DEPOSITTON OF CYNTHTA BEANE

Page 179

```
1        Q.  You said the legislature rejected an opportunity
2    to provide blood pressure cuffs this session that would
3    have cost around $500,000?
4        A.  It was a little over 500,000, I can't remember
5    the exact number, Lou Ann, but it was 500 and change,
6    maybe 520, something like that.
7        Q.  Okay.  And what is the status of Medicaid's
8    budget, you made reference to it earlier?
9        A.  We currently have actually -- sorry, it's late
10   in the day.  We currently have a surplus, but we are
11   predicting that we will be in the red in two years from
12   now.
13       Q.  Okay.  And what does that mean that you will be
14   in the red in two years?
15       A.  We will have a budget deficit.
16       Q.  Would that indicate that BMS would have to cut
17   existing services?
18              MS. BORELLI:  Object to form.
19       A.  We would either have to cut existing services or
20   receive additional appropriations from the legislature
21   to continue services of this.
22       Q.  Based on the existing budget, would Medicaid
23   have to add funds to cover transgender surgeries?
24              MS. BORELLI:  Object to form.
25       A.  We would have to add dollars in order to cover
```

**JA1203**

## DEPOSITTON OF CYNTHTA BEANE

Page 180

1  it ongoing.  We have a surplus this year, but for it to

2  be ongoing services, because services don't end, they're

3  not one-time services, we would have to add dollars.

4      Q.  Okay.  And does Medicaid have funds to add those

5  dollars ongoing?

6          MS. BORELLI:  Object to form.

7      A.  We do not have the extra funds for that right

8  now, no.

9      Q.  Okay.  Now let me ask you this, if CMS were to

10  mandate the coverage of the transgender surgeries, do

11  you know whether CMS would then provide some federal

12  dollars to assist with those surgeries?

13          MS. BORELLI:  Object to form.

14      A.  They would provide the FMAP which we've

15  discussed which is like the 3 to 1 match, you know,

16  because it would be a mandated service and it's a

17  partnership, so typically, you know, we'll come up with

18  a quarter, they'll give us the 75.

19      Q.  So if CMS mandated coverage for the transgender

20  surgery, it's your understanding that CMS would provide

21  75 percent of the cost of that and the state would only

22  pay a quarter of that?

23          MS. BORELLI:  Object to form.

24      A.  Correct, and that's based on our FMAP.

25      Q.  All right.  Thank you.  That's all the questions

1                    REPORTER'S CERTIFICATE
2

3

STATE OF MINNESOTA    )
4                           ) ss.
COUNTY OF WASHINGTON )

5

6      I hereby certify that I reported the Zoom deposition
of Commissioner Cynthia Beane on the 29th day of March
7   2022, and that the witness was by me first duly sworn to
tell the whole truth;

8

       That the testimony was transcribed by me and is a
9   true record of the testimony of the witness;
10      That the cost of the original has been charged to
the party who noticed the deposition, and that all
11   parties who ordered copies have been charged at the same
rate for such copies;

12

       That I am not a relative or employee or attorney or
13   counsel of any of the parties, or a relative or employee
of such attorney or counsel;

14

       That I am not financially interested in the action
15   and have no contract with the parties, attorneys, or
persons with an interest in the action that affects or
16   has a substantial tendency to affect my impartiality;
17      That the right to read and sign the deposition by
the witness was reserved.

18

       WITNESS MY HAND AND SEAL THIS 29th day of March
19   2022.
20

21

22

23   _____
24      Kelley E. Zilles, RPR
Notary Public, Washington County, Minnesota
25   My commission expires 1-31-2025

**JA1205**

Page 186

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 5096149
CASE NAME: Fain, Christopher Et Al. v. Crouch, William Et Al.
DATE OF DEPOSITION: 3/29/2022
WITNESS' NAME: Commissioner Cynthia Beane
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have made no changes to the testimony
as transcribed by the court reporter.

05/04/2022

Date          Commissioner Cynthia Beane

Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
    Statement; and
Their execution of this Statement is of
    their free act and deed.

I have affixed my name and official seal
this 4th day of May , 2022 .

Notary Public

July 28, 2026

Commission Expiration Date

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Kimberly Michelle O'Brien
WV DHHR Bureau for Medical Services
350 Capitol St, Rm 251, Charleston, WV 25301
My Commission Expires July 28, 2026

Veritext Legal Solutions
www.veritext.com            888-391-3376

**JA1206**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

        **Plaintiffs,**

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge



Exhibit 07

**DEFENDANTS' EIGHTH SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET
OF REQUESTS FOR PRODUCTION TO DEFENDANTS WILLIAM CROUCH,
CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND
HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES**

**DOCUMENT REQUESTS**

1. Documents sufficient to show the total annual number of West Virginia Medicaid
participants.

**SUPPLEMENTAL RESPONSE:** *See* **Managed Care and Fee for Service Monthly
Enrollment Report 2021, attached as Exhibit 126, (Bates No. DHHRBMS020684), and**

**JA1207**

Managed Care and Fee for Service Monthly Enrollment 2022 (through March), attached as Exhibit 127, (Bates No. DHHRBMS020685).


7. If Defendants contend that the Exclusion of Gender-Confirming Care is supported by any governmental interest not encompassed in the Requests above, all Documents supporting that contention.

**SUPPLEMENTAL RESPONSE:** *See* budget-related documents attached as Exhibits 128 to 171, Bates Nos. DHHRBMS020686 - DHHRBMS021559. Exhibit 171 is an updated version of the six year projection previously produced as Exhibit 85.

> WILLIAM CROUCH,
> CYNTHIA BEANE, and
> WEST VIRGINIA DEPARTMENT OF
> HEALTH AND HUMAN RESOURCES,
> BUREAU FOR MEDICAL SERVICES,
>
> By counsel

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA1208**

USCA4 Appeal: 22-1927     Doc: 20-3      Filed: 10/31/2022     Pg: 154 of 477

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

    **Plaintiffs,**

**Civil Action No. 3:20-cv-00740**
**Hon. Robert C. Chambers, Judge**

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

    **Defendants.**

### CERTIFICATE OF SERVICE

  Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of
Health and Human Resources, by counsel, and do hereby certify that on the 22nd day of March,
2022, a true and exact copy of **DEFENDANTS' EIGHTH SUPPLEMENTAL RESPONSE TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANTS
WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES** was served
on counsel via electronic means as follows:

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lambdalegal.org

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
*Counsel for Jason Haught*
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

/s/Kimberly M. Bandy
 Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
*Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and
Human Resources, Bureau for Medical Services*
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA1211**

Case 3:20-cv-00740   Document 252-3   Filed 05/31/22   Page 125 of 240 PageID #: 3618

CONFIDENTIAL

## West Virginia Medicaid
### Managed Care and Fee for Service
### Monthly Report 2021

| Managed Care | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aetna Better Health of WV | 156,874 | 158,680 | 154,992 | 161,014 | 162,627 | 163,703 | 164,655 | 165,405 | 166,161 | 167,391 | 168,354 | 169,308 |
| The Health Plan | 107,994 | 109,485 | 106,440 | 111,926 | 112,953 | 113,955 | 115,228 | 116,085 | 116,909 | 118,230 | 119,141 | 120,196 |
| Unicare | 174,119 | 176,084 | 171,940 | 178,867 | 180,488 | 181,514 | 182,632 | 183,469 | 184,292 | 185,591 | 186,665 | 187,788 |
| Total | 438,987 | 444,249 | 433,372 | 451,807 | 456,068 | 459,172 | 462,515 | 464,959 | 467,362 | 471,212 | 474,160 | 477,292 |
| | | | | | | | | | | | | |
| Mountain Health Promise | 24,070 | 21,051 | 24,162 | 24,591 | 25,269 | 25,419 | 25,533 | 25,689 | 26,063 | 26,459 | 26,862 | 27,108 |
| | | | | | | | | | | | | |
| Fee For Service | 110,816* | 111,602* | 126,289* | 112,976* | 111,301* | 111,640* | 111,288* | 112,643 | 114,753 | 114,352 | 114,576 | 114,291 |
| | | | | | | | | | | | | |
| Total | 573,873 | 576,902 | 583,823 | 589,374 | 592,638 | 596,231 | 599,336 | 603,291 | 608,178 | 612,022 | 615,598 | 618,691 |

*During the COVID-19 crisis, WV Medicaid has allowed individuals who were eligible in March 2020 to remain covered, even if ineligible, to help prevent any gaps in care,
The increase in enrollment is not attributed solely to new applicants, but due to multiple policy changes made during this time.



Exhibit
08

EXHIBIT
126

DHHRBMS020684

Case 3:20-cv-00740 Document 252-3 Filed 05/31/22 Page 1 of 2 PageID #: 3619

CONFIDENTIAL

| Managed Care | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aetna Better Health of WV | 170,450 | 171,280 | 171,965 | | | | | | | | | |
| The Health Plan | 121,163 | 121,976 | 122,834 | | | | | | | | | |
| Unicare | 188,894 | 189,815 | 190,699 | | | | | | | | | |
| Total | 480,507 | 483,071 | 485,498 | | | | | | | | | |
| Mountain Health Promise | 27,310 | 27,583 | 28,018 | | | | | | | | | |
| FeeForService | 114,072 | 115,215 | 115,309 | | | | | | | | | |
| Total | 621,889 | 625,869 | 628,825 | | | | | | | | | |

*During the COVID-19 crisis, WV Medicaid has allowed individuals who were eligible in March 2020 to remain covered even if ineligible, to help prevent any gaps in care. The increase in enrollment is not attributed solely to new applicants but due to multiple policy changes made during this time.

Exhibit 09

EXHIBIT 127

DHHRBMS020685

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL;BRIAN MCNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES,** individually and on
behalf of all others similarly situated,



**Plaintiffs,**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

**Defendants.**

**DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL
SERVICES' THIRD SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND
SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS**

**DOCUMENT REQUESTS**

27 [sic]. To the extent not already produced, Documents sufficient to indicate the number

of claims submitted annually involving the diagnosis and/or treatment of gender dysphoria, the

number of such claims that were denied, and whether the denials were based in whole or in part

on the Exclusion.

1

**JA1214**

**SUPPLEMENTAL RESPONSE:**

Please see the spreadsheet attached that is Exhibit 95, Bates No. DHHRBMS016178, containing claims for Diagnoses codes: F64.0, F64.2, F64.8 and F64.9. Please note that, for all "MCO" claims as reflected in column "A," an entry of "denied" in column "X" simply means that such claim was presented to the MCO, and BMS does not have information about the outcome of that claim, and it would need to be obtained from the particular MCO. BMS only has outcomes for claims that are "fee for service," as indicated as "FFS" in column "A."

WILLIAM CROUCH,
CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,

By counsel

/s/ *Lou Ann S. Cyrus*
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

2

**JA1215**

Case 3:20-cv-00740   Document 192   Filed 02/03/22   Page 1 of 3 PageID #: 1292

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

                    **Plaintiffs,**

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

                    **Defendants.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

## CERTIFICATE OF SERVICE

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of
Health and Human Resources, by counsel, and do hereby certify that on the 3rd day of February,
2022, a true and exact copy of **DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE,
AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES' THIRD SUPPLEMENTAL RESPONSES TO
PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
AND THINGS** was served on counsel via electronic means as follows:

3

**JA1216**

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
(404) 506-9320 (fax)
ccharles@lamdalegal.org

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
*Counsel for Jason Haught*
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

4

**JA1217**

Stuart A. McMillan (WVSB#6352)
*Counsel for The Health Plan of West Virginia, Inc.*
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV 25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
*Counsel for The Health Plan of West Virginia, Inc.*
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV 26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/ Lou Ann S. Cyrus
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
*Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services*
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

5

**JA1218**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN,**
**SHAWN ANDERSON,**
a/k/a Shauntae Anderson,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; and **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES,**

Defendants.

Exhibit
14

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

**DEFENDANTS' SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES TO DEFENDANTS WILLIAM CROUCH,
CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND
HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES**

**INTERROGATORIES**

1. Identify all persons with involvement in, or knowledge of, the creation, review, and
   maintenance of the Exclusion of coverage for Gender-Confirming Care in the Health Plans
   offered through West Virginia's Medicaid Program.

   **SUPPLEMENTAL RESPONSE:**   Without waiving prior objections, and in addition
   to the individuals previously disclosed, these defendants state as follows:

**JA1219**

Cynthia Beane, Commissioner for the Bureau for Medical Services;

Sarah Young, Deputy Commissioner for Policy Coordination and Operations; and

Brian Thompson, Director of Pharmacy Services

> WILLIAM CROUCH,
> CYNTHIA BEANE, and
> WEST VIRGINIA DEPARTMENT OF
> HEALTH AND HUMAN RESOURCES,
> BUREAU FOR MEDICAL SERVICES,
>
> By counsel

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esq. (WVSB #6558)
Roberta F. Green, Esq. (WVSB #6598)
Caleb B. David, Esq. (WVSB #12732)
Kimberly M. Bandy, Esq. (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

2

**JA1220**

Case 3:20-cv-00740   Document 226   Filed 03/25/22   Page 1 of 3 PageID #: 1421

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

**CHRISTOPHER FAIN,**
**SHAWN ANDERSON,**
a/k/a Shauntae Anderson,
individually and on behalf of all others
similarly situated,

                    **Plaintiffs,**                         **Civil Action No. 3:20-cv-00740**
                                                            **Hon. Robert C. Chambers, Judge**

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; and **WEST VIRGINIA**
**DEPARTMENT OF HEALTH AND HUMAN**
**RESOURCES, BUREAU FOR MEDICAL**
**SERVICES,**

                    **Defendants.**

### CERTIFICATE OF SERVICE

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of

Health and Human Resources, by counsel, and do hereby certify that on the 25th day of March,

2022, a true and exact copy of *Defendants' Second Supplemental Response To Plaintiff's First*

*Set Of Interrogatories To Defendants William Crouch, Cynthia Beane, And West Virginia*

*Department Of Health And Human Resources, Bureau For Medical Services* was served on

counsel via electronic means as follows:

**JA1221**

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
65 E. Wacker Pl, Suite 2000
Chicago, IL 60601
*Counsel for Plaintiffs*
(312) 663-4413
(312) 663-4307
nhuppert@lambdalegal.org

Carl S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lambdalegal.org

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org

Case 3:20-cv-00740   Document 252-3   Filed 05/31/22   Page 144 of 240 PageID #: 3637

Case 3:20-cv-00740   Document 226   Filed 03/25/22   Page 3 of 3 PageID #: 1423

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
*Counsel for William Crouch, Cynthia Beane,
and West Virginia Department of Health and
Human Resources, Bureau for Medical Services*
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA1223**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others similarly situated,



Exhibit
19

            **Plaintiffs,**

**Civil Action No. 3:20-cv-00740**
**Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; **CYNTHIA BEANE,** in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; **WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES; TED CHEATHAM,** in his official Capacity as Director of the West Virginia Public Employees Insurance Agency; and **THE HEALTH PLAN OF WEST VIRGINIA, INC.**

**DEFENDANTS FIFTH SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES**

**DOCUMENT REQUESTS**

2. All documents relating to Plaintiff's communications, injuries, requests for coverage, requests for prior authorization, requests for reimbursement and/or complaints regarding coverage for Gender-Confirming Care through the West Virginia Medicaid Program. This Request includes but is not limited to:

**JA1224**

a.  All communications to and from Plaintiff relating to coverage for Gender-Confirming Care;

b.  All Documents and communications regarding Plaintiff's requests for Gender-Confirming Care, including but not limited to communications among Defendants, and/or the employees, entities, agents, representatives, contractors, vendors, and/or consultants of Defendants and/or West Virginia Department of Health and Human Resources, Bureau of Medical Services;

c.  All Documents and communications relating to consideration or processing by third-party administrators, contractors, and/or vendors of requests for Gender-Confirming Care by Plaintiff.

**SUPPLEMENTAL RESPONSE:**

**Please see documents obtained from Unicare regarding plaintiff, Christopher Fain which include an Excel Spreadsheet, marked as Exhibit 93, Bates No. DHHRBMS016080, and documents marked as Exhibit 94, Bates No. DHHRBMS016081 -016177.  Please note, two Excel Spreadsheets were provided by Unicare that contained PHI for other participants which could not be redacted, and therefore, it is not being provided. The spreadsheets are titled, "West Virginia Member Claims—01/01/2016 through Current, Diagnosis F640 through F649 in any position" identified as "102721_Gender Dysphoria claims," and "West Virginia Member Claims—01/01/2016 through Current, Diagnosis F640 through F649 in any position" identified as "102721_Gender Dysphoria claim lines."  This information can be obtained by Plaintiffs directly from Unicare.**

3. Taking necessary steps to comply with applicable privacy laws and making all necessary

2

**JA1225**

redactions to protect any personal health information.  Documents in electronic, delimited, and importable format (e.g., excel spreadsheet) sufficient to show number of individuals who have requested coverage for Gender-Confirming Care, the number of claims each individual has made for Gender-Confirming Care, whether those claims were approved or denied, the factual reasons for each decision, and whether any denials were based in whole or in part on the Exclusion.

**SUPPLEMENTAL RESPONSE:**

**Please see the Excel spreadsheet marked Exhibit 95, Bates No. DHHRBMS016178, containing claims for Diagnoses codes: F64.0, F64.2, F64.8 and F64.9. Please note that, for all "MCO" claims as reflected in column "A," an entry of "denied" in column "X" simply means that such claim was presented to the MCO, and BMS does not have information about the outcome of that claim, and it would need to be obtained from the particular MCO. BMS only has outcomes for claims that are "fee for service," as indicated as "FFS" in column "A."**

7. If Defendants contend that the Exclusion of Gender-Confirming Care is supported by any governmental interest not encompassed in the Requests above, all Documents supporting that contention.

**SUPPLEMENTAL RESPONSE: Please see information and communications from CMS regarding mandatory coverage, which does not include gender-confirming care, marked as Exhibit 96, Bates No. DHHRBMS016179 - 016223.**

> **WILLIAM CROUCH,**
> **CYNTHIA BEANE, and**
> **WEST VIRGINIA DEPARTMENT OF**
> **HEALTH AND HUMAN RESOURCES,**
> **BUREAU FOR MEDICAL SERVICES,**
>
> **By counsel**

3

**JA1226**

Case 3:20-cv-00740   Document 252-3   Filed 05/31/22   Page 164 of 240 PageID #: 3657

*/s/ Lou Ann S. Cyrus*
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

4

**JA1227**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

**CHRISTOPHER FAIN; ZACHARY**
**MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

             **Plaintiffs,**                    **Civil Action No. 3:20-cv-00740**
                                           **Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA**
**DEPARTMENT OF HEALTH AND HUMAN**
**RESOURCES, BUREAU FOR MEDICAL**
**SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE**
**HEALTH PLAN OF WEST VIRGINIA, INC.**

             **Defendants.**

## CERTIFICATE OF SERVICE

     Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of
Health and Human Resources, by counsel, and do hereby certify that on the 3rd day of February,
2022, a true and exact copy of **DEFENDANTS FIFTH SUPPLEMENTAL RESPONSE TO**
**PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANTS**
**WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF**
**HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES** was served
on counsel via electronic means as follows:

5

Walt Auvil (WVSB#190)
***Counsel for Plaintiffs***
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
***Counsel for Plaintiffs***
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl S. Charles, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lambdalegal.org

Tara L. Borelli, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
***Counsel for Ted Cheatham***
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

**JA1229**

Stuart A. McMillan (WVSB#6352)
*Counsel for The Health Plan of West Virginia, Inc.*
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV 25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
*Counsel for The Health Plan of West Virginia, Inc.*
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV 26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

7

JA1230

*/s/ Lou Ann S. Cyrus*

Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
***Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services***
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

8

**JA1231**

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-26-12
Baltimore, Maryland  21244-1850



CENTERS FOR MEDICARE & MEDICAID SERVICES
CENTER FOR MEDICAID & CHIP SERVICES

SHO # 19-003

**Re: Changes to Modified Adjusted Gross
Income (MAGI)-based Income
Methodologies**

August 22, 2019

Dear State Health Official:

The purpose of this letter is to provide guidance to explain several legislative changes to the
modified adjusted gross income (MAGI)-based methodologies used for determining Medicaid
and CHIP eligibility.  These changes stem from the following pieces of legislation: the Tax Cuts
and Jobs Act (Pub. L. No. 115-97, "TCJA"), enacted on December 22, 2017; the Bipartisan
Budget Act of 2018 (Pub. L. No. 115-123, "BBA of 2018"), enacted on February 9, 2018; and
the Helping Ensure Access for Little Ones, Toddlers, and Hopeful Youth by Keeping Insurance
Delivery Stable Act (Pub. L. No. 115-120, "HEALTHY KIDS Act"), enacted on January 22,
2018.  This guidance provides states with information on how to implement these legislative
requirements, consistent with titles XIX and XXI of the Social Security Act ("Act"), for
individuals whose financial eligibility is determined using MAGI-based methodologies.

**Background**

Section 1902(e)(14) of the Act requires that state Medicaid agencies generally use "modified
adjusted gross income" and "household income," as defined at section 36B(d)(2) of the Internal
Revenue Code of 1986 (the IRC) to determine Medicaid eligibility.  Section 2107(e)(1)(H) of the
Act requires that MAGI and household income also be used to determine eligibility for the
Children's Health Insurance Program (CHIP).  For purposes of Medicaid and CHIP eligibility,
we refer to these definitions collectively as "MAGI-based methodologies."  MAGI-based
methodologies for Medicaid and CHIP are implemented in the regulations at 42 CFR 435.603
and 457.315, respectively.[1]

In general, the calculation of MAGI-based income includes all taxable earned and unearned
income minus certain expenses such as student loan interest or IRA contributions that are
deductible in determining an individual's adjusted gross income (AGI) for federal income tax
purposes.  Three items must be added to adjusted gross income to determine an individual's
MAGI (i.e., *modified* AGI): non-taxable foreign earned income, tax-free interest, and non-
taxable Social Security benefits.  There are a few discrete ways in which MAGI-based

---

[1] Certain individuals are exempt from application of MAGI-based financial methodologies.  Generally, these include
individuals whose eligibility is being determined on the basis of being age 65 or older, living with a disability or
blindness or needing long-term services and supports; and individuals for whom the state does not apply an income
test.  A more detailed description of individuals for whom MAGI-based methodologies do not apply can be found in
regulations at 42 CFR 435.603(j).

EXHIBIT
96

DHHRBMS016179

**JA1232**

Page 2 – State Health Official

methodologies used for Medicaid and CHIP differ from the definition of MAGI and household income in the IRC. For example, MAGI-based methodologies for treatment of irregular income received as a lump sum is different than the treatment of lump sum income under section 36B of the IRC. These differences are set forth in regulations at 42 CFR 435.603(e).

Identifying the members of an individual's household is important to determine the individual's total household income and family size. Under 42 CFR 435.603(f), for individuals intending to file a tax return as well as the individuals they claim as tax dependents, the MAGI-based household generally consists of the tax filer and his or her tax dependents. For individuals who are not tax filers or tax dependents, "non-filer" rules set forth in 42 CFR 435.603(f)(3) are used to determine the MAGI-based household. Under the non-filer rules, an individual's household generally consists of the family members, if living with the individual: the individual; the individual's spouse, if married; the individual's children (including step children); and, if the individual is a child, his/her parent(s) and sibling(s). The non-filer rules also are used for children and tax dependents in certain living situations, as described in 42 CFR 435.603(f)(2)(i)-(iii).

Once the composition of an individual's household has been established, additional rules are applied to determine whose income is counted in household income. Generally, the income of a tax dependent in a household is not counted unless it is expected that the dependent will be required to file a federal tax return – i.e., the income of the dependent is at or above the tax-filing thresholds for tax dependents under the IRC. Under regulations at 42 CFR 435.603(d)(2), the income of children in non-filing households also generally is excluded from household income unless a child's income meets the federal tax filing threshold.[2]

The TCJA, the BBA of 2018 and the HEALTHY KIDS Act each amended the Act as well as tax rules under the IRC in several ways, which impact the MAGI-based methodologies for Medicaid and CHIP. The following discussion explains the changes brought about by these new laws.

**Changes to Tax Filing Thresholds**

In 2017, a single tax dependent under age 65 and not blind met the federal tax filing threshold if he or she had $6,350 or more of gross income or $1,050 or more of unearned income. Gross income includes both earned and unearned income. This meant that, generally, for a child with unearned income below $1,050 and gross income below $6,350, none of the child's income would be included in determining household income. In contrast, all of the income of a child with unearned income equal to or greater than $1,050 or total gross income equal to or greater than $6,350 generally would be counted in household income.

---

[2] Under MAGI-based methods, a child's income is always counted when the child is the only person in his/her MAGI-based household (or is living with his/her sibling(s)), regardless of whether or not the child's income exceeds the filing threshold. For example, the child's income is counted in the case of a child living with his or her grandparent(s) and neither parent is living with them nor claiming the child as a tax dependent. 42 CFR 435.603(d)(1)

DHHRBMS016180

USCA4 Appeal: 22-1927     Doc: 20-3     Filed: 10/31/2022     Pg: 179 of 477

Page 3 – State Health Official

The TCJA modified the tax filing threshold for most individuals. For tax year 2018, single tax dependents who are under age 65 and not blind must file a federal tax return if any of the following apply for the tax year:[3]

1. Unearned income is more than $1,050;
2. Earned income is more than $12,000;
3. Gross income is more than the larger of –
   a. $1,050; or
   b. Earned income (up to $11,650) plus $350.

Further, the filing threshold is increased for tax dependents who are age 65 or older or who are blind. For tax year 2018, single tax dependents who are age 65 or older and/or who are blind must file a federal tax return if any of the following apply for the tax year:

1. Unearned income is more than $2,650 ($4,250 if 65 or older and blind);
2. Earned income is more than $13,600 ($15,200 if 65 or older and blind);
3. Gross income is more than the larger of –
   a. $2,650 ($4,250 if 65 or older and blind); or
   b. Earned income (up to $11,650) plus $1,950 ($3,550 if 65 or older and blind).

Attachment A includes a table comparing the 2017 and 2018 tax filing thresholds. The IRS updates the standard deduction and filing thresholds annually for inflation.

**Impact on Household Composition**

For years prior to 2018, tax filers were allowed a deduction for each of their personal exemptions, including their tax dependents. The TCJA reduced the personal exemption deduction amount to $0 for tax years 2018 through 2025, meaning that tax filers will no longer claim a deduction for their tax dependents on their federal tax return. Although taxpayers will no longer claim personal exemption deductions, they must still claim their dependents on their tax return by putting the name and Social Security Number of the dependent on the return to be eligible for certain tax benefits such as the dependent care credit and the premium tax credit for the child's health insurance coverage. Claiming dependents also remains relevant for determining household composition under the MAGI-based methodologies used by Medicaid and CHIP. Thus, there is no change to the rules governing household composition under 42 CFR 435.603(f) for purposes of making MAGI-based eligibility determinations.[4]

**Changes to Countable Income**

In addition to the changes noted above, the BBA of 2018 and TCJA made several changes to the taxability of certain items, which similarly impact MAGI-based methodologies.

---

[3] See IRS Publication 501, Table 2. https://www.irs.gov/pub/irs-pdf/p501.pdf.
[4] See: https://www.irs.gov/pub/irs-drop/n-18-84.pdf.

DHHRBMS016181

Page 4 -- State Health Official

Counting of Qualified Lottery and Gambling Winnings in MAGI-based Methods

Under 42 CFR 435.603(e)(1) of the current regulations describing the MAGI-based methodologies, non-recurring income received as a lump sum is generally counted (if it is taxable) as income only in the month received; if not spent, the money converts to savings, which is a resource.[5]  Section 53103 of the BBA of 2018 supersedes this regulatory rule in the case of "qualified lottery winnings" and "qualified lump sum income" (i.e., gambling) of $80,000 or greater.  Specifically, section 53103, which added paragraph (K) to section 1902(e)(14) of the Act, requires that covered lottery and gambling winnings of $80,000 or greater, which are received in a single payout, be counted not only in the month received, but over a period of up to 120 months.  The statute provides a formula for determining this period, depending on the amount of the winnings.  States must apply this formula to qualified lottery or gambling winnings received beginning on or after January 1, 2018.

*Qualified Lottery Winnings.*  Under section 1902(e)(14)(K)(v) of the Act, the term "qualified lottery winnings" is defined as "winnings from a sweepstakes, lottery, or pool" described in section 4402 of the IRC (which generally requires that these particular activities be conducted by a state agency or under the authority of state law), or winnings from "a lottery operated by a multistate or multijurisdictional lottery association."  Multijurisdictional lotteries include those that include multiple entities of government.

While lottery winners generally have a choice between receiving a single payment or an annuity that pays out in installments over a period of time (often in annual payments over 20 or 30 years), the definition of "qualified lottery winnings" in section 1902(e)(14)(K)(v) by its own terms applies to the single payout option.  Lottery winnings paid out in installments are not required to be considered "qualified lottery winnings" under the statute, and we do not think that interpreting the term to include such winnings would be consistent with the purpose of the statute.  In our analysis of the potential impact of the formula for qualified lottery winnings on an annuity paid in installments, we found through many permutations of winnings that some individuals could have winnings counted for a shorter time and others for a longer time under the formula as compared to existing MAGI-based income counting.  Due to the complexity of various lotteries, payment amounts and scenarios, and in the absence of rulemaking to implement this law, at this time we are not interpreting the definition of "qualified lottery winnings" beyond the plain language of the statute.  Therefore, lottery winnings paid out in installments would be treated the same as other types of recurring income under 42 CFR 435.603(e).[6]

With respect to non-cash prizes, like a car or boat, the statute does not clearly specify whether such prizes are considered "qualified lottery winnings" under section 1902(e)(14)(K)(v) of the Act.  As an example, the winner of a sweepstakes may be awarded a boat, which is appraised at a value of $110,000.  Unlike a cash prize, however, a non-cash prize like the boat will begin to depreciate immediately.  Depending on the length of time that elapses between receipt and sale

---

[5] There is one exception to this rule in the case of beneficiaries who receive lump sum income in a state that has elected the option to use projected annual household income for current beneficiaries under 42 CFR 435.603(h)(2).
[6] To address the fluctuations in monthly income of a lottery winner receiving annual annuity payments, under MAGI-based rules at 42 CFR 435.603(h)(3), states currently may elect an option to account for "reasonably predictable future income" by prorating lottery payments over a 12-month period to determine an average current monthly income for Medicaid and CHIP.

DHHRBMS016182

Page 5 – State Health Official

of the item, the fair market value could be considerably less than the original appraised value. Therefore, we believe that non-cash prizes should continue to be counted as lump sum income in the month in which they are received and not counted as "qualified lottery winnings".

*Qualified Lump Sum Income.*  Section 1902(e)(14)(K)(vi) of the Act defines "qualified lump sum income" as "income that is received as a lump sum from monetary winnings from gambling." Under this statute, the Secretary has discretion to define "gambling," except that the activities described in 18 U.S.C 1955(b)(4) must be included in the definition.  These activities include: betting pools; wagers placed through bookmakers; slot machines; roulette wheels; dice tables; lotteries; and bolita or numbers games, or the selling of chances therein.  The Secretary will consider other activities proposed by one or more states to be included in the definition of gambling.  Absent a determination by the Secretary that inclusion of other activities in the definition of gambling is appropriate, states may not include any other activities.  Because the statute specifically defines qualified lump sum income as "*monetary* winnings from gambling" (emphasis added), non-cash prizes are not counted as qualified lump sum income for the purposes of section 1902(e)(14)(K) of the Act

*Formula for Counting Qualified Winnings.*  For qualified winnings from lotteries or gambling activities occurring on or after January 1, 2018, states must count the winnings according to the following formula:

Winnings less than $80,000 are counted in the month received;
- Winnings of $80,000 but less than $90,000 are counted as income over two months, with an equal amount counted in each month; and
- For every additional $10,000 one month is added to the period over which total winnings are divided, in equal installments, and counted as income.

The maximum period of time over which winnings may be counted is 120 months, which would apply for winnings of $1,260,000 and above.  A table showing the amount of monthly income attributed to increasing amounts of qualified winnings and the number of months over which the winnings is counted appears in Attachment B.

*Treatment of Winnings for Other Household Members.*  Under section 53103(b)(2) of the BBA of 2018, the requirement to count qualified lottery and gambling winnings in household income over multiple months applies only to the individuals receiving the winnings.  The determination of household income for other members of the individual's household are not affected.  Thus, for example, the total amount of qualified lottery or gambling winnings of a spouse or parent continues to count only in the month received in determining the eligibility of the other spouse and children.

*Verification of lottery and gambling winnings.*  Under regulations at 42 CFR 435.940 through 435.952 and 457.380, states may accept self-attestation or require other verification of lottery and gambling winnings.  If a state requires other verification, per regulations at 42 CFR 435.952(c), the agency must first access available electronic data sources (such as a state lottery winner database, if available) and may accept self-attestation of lottery and gambling winnings before requesting documentation from the individual.

DHHRBMS016183

**JA1236**

USCA4 Appeal: 22-1927    Doc: 20-3    Filed: 10/31/2022    Pg: 182 of 477

Page 6 – State Health Official

*Hardship exemption.* Section 1902(e)(14)(K)(iii) of the Act requires that states establish an "undue medical or financial hardship" exemption, through a procedure and based on a standard established by the state, in accordance with guidance provided by the Secretary, for individuals impacted by the new treatment of lottery and gambling winnings. Pending further guidance from the Secretary, states should develop a procedure and establish a reasonable standard for this hardship exemption.

*State responsibilities to ineligible applicants and beneficiaries.* Applicants and beneficiaries affected by the counting of lottery or gambling winnings maintain the ability to request a determination on a non-MAGI basis, as described at 42 CFR 435.911. Individuals determined financially ineligible for Medicaid or CHIP due to lottery or gambling winnings also have the right to purchase health coverage through a Qualified Health Plan (QHP) on the Exchange and, if eligible, claim a premium tax credit (PTC) for such purchase. Section 1902(e)(14)(K)(iv) of the Act addresses certain state responsibilities to such applicants and beneficiaries, related to notices and technical assistance. The Act specifies that the state agency provide notice to affected individuals of the date on which the lottery or gambling winnings no longer will be counted for the purpose of Medicaid or CHIP eligibility. States also must notify affected individuals of the hardship exemption. In addition, the Act requires states to "inform the individual of the individual's opportunity to enroll in" a QHP on the Exchange, which states meet through implementation of notices regulations at 42 CFR 435.917, 435.1200(e) and 457.340(e).

Section 1902(e)(14)(K)(iv)(II) requires states to "provide technical assistance to the individual seeking to enroll in" a QHP. Consistent with coordination regulations at 42 CFR 435.1200(e) and 42 CFR 457.350(i), the state agency takes appropriate action to transfer the electronic account of an individual financially ineligible for Medicaid or CHIP to the Exchange.[7] Inasmuch as the existing account transfer procedures that states use under the coordination regulations afford individuals needed assistance and provide the opportunity to enroll in appropriate coverage, such existing procedure satisfy the requirement to provide technical assistance.

### MAGI Exclusion of Parent Mentor Compensation

Section 3004 of the HEALTHY KIDS Act extended the outreach and enrollment grant program for children who are eligible for, but not enrolled in, Medicaid or CHIP. Section 2113(f)(1)(E) of the Act provides that national, state, local, or community-based public or nonprofit private organizations that use parent mentors, are eligible to receive such grants. A "parent mentor," defined in section 2113(f)(5) of the Act, is a parent or guardian of a Medicaid or CHIP-eligible child who is "trained to assist families with children who have no health insurance coverage with respect to improving the social determinants of the health of such children."

---

[7] Qualified lottery and gambling winnings are subject to federal income taxation in the year received. Because PTC for subsidized purchase of a QHP is based on taxable income during the tax year, if the amount of winnings results in individuals losing Medicaid or CHIP eligibility and their household income, including the lottery or gambling winnings, exceeds the income limit for PTC (400 percent of the federal poverty level (FPL)), those individuals will not qualify for a subsidized health plan for the year in which the winnings are received. However, because section 1902(e)(14)(K) of the Act applies only to MAGI-based methods for Medicaid and CHIP, such winnings will not be counted in subsequent years for purposes of eligibility for the PTC for purchase of coverage through the Exchange.

DHHRBMS016184

Page 7 – State Health Official

In order to protect parent mentors from losing eligibility for Medicaid, section 3004 of the HEALTHY KIDS Act amends section 1902(e)(14) of the Act to exclude parent mentor compensation from their MAGI-based household income. New paragraph (J) provides that "[a]ny nominal amount received by an individual as compensation, including a stipend, for participation as a parent mentor" in a grant-funded program under section 2113 of the Act "shall be disregarded for purposes of determining income eligibility of such individual for medical assistance." The disregard of parent mentor income applies only in the case of parent mentors working with a grantee organization under section 2113 of the Act.

Nominal amounts paid as a stipend to a parent mentor are excluded from income. For payments received as wages or other compensation, states have discretion to determine the threshold of a "nominal amount." CMS will alert states if a grant is awarded under section 2113 of the Act in which the grantee plans to use parent mentors. We will be available to work with those states and grantees to establish a process for applicants and beneficiaries to identify parent mentor income that is not counted in determining eligibility under section 1902(e)(14)(J) of the Act.

Alimony Received

Prior to enactment of the TCJA, alimony as defined in IRC section 71 was considered taxable income to the recipient. Section 11051 of the TCJA modified the alimony rules. Under the TCJA, alimony payments under separation or divorce agreements finalized after December 31, 2018, or pre-existing agreements modified after December 31, 2018, are not included in the income of the recipient. For individuals with alimony agreements finalized on or before December 31, 2018, alimony continues to be included in the income of the recipient for the duration of the agreement unless or until the agreement is modified. Treatment of alimony paid is discussed below. The treatment of child support is unchanged: child support is not included in the income of the recipient and thus not counted in MAGI-based income.

Discharged Student Loan Debt

Student loan debt that is discharged, forgiven or cancelled is generally treated as taxable income to the borrower, and therefore the amount of discharged debt is included in MAGI-based income.[8] However, section 11031 of the TCJA amended section 108(f) of the IRC to provide an exception for tax years 2018 through 2025 in cases of discharged debt on account of the death or permanent and total disability of the student. Under the amendment, discharged student loan debt is not included in income (and not counted in the MAGI-based income) of a borrower if the debt is discharged on account of the death or the permanent and total disability of the student. (The borrower and the student may or may not be the same person.) Student loan debt discharged under the foregoing circumstances is not counted as income in determining household income for other members of the borrower's household.

**Changes to Deductions**

---

[8] A notable exception is the Public Service Loan Forgiveness program and certain teacher loan/healthcare loan forgiveness programs, which do not lead to taxable income (26 USC 108(f)(1)).

DHHRBMS016185

Page 8 – State Health Official

As noted above, certain deductions are allowed under the IRC in determining adjusted gross income, upon which MAGI is based.  The TCJA eliminated several of these deductions.

Moving Expenses

Section 11049 of the TCJA, amending section 217 of the IRC, eliminated the deduction for qualified moving expenses for tax years 2018 through 2025.  Moving expenses, including expenses incurred by the individual as well as reimbursements from an employer, should no longer be deducted in calculating MAGI.  This change does not apply to active duty members of the military who are ordered to move or change duty station.

Alimony Paid

Under the TCJA, alimony payments under separation or divorce agreements finalized after December 31, 2018, or pre-existing agreements modified after December 31, 2018, are not deductible by the payer.  For individuals with alimony agreements finalized on or before December 31, 2018, alimony payments continue to be deductible.  Child support payments remain non-deductible.

Tuition and Fees Deduction

The payment of tuition and fees for qualified education expenses for postsecondary education had been an allowable deduction.  Amounts paid for these expenses for the taxpayer, spouse or tax dependent typically could be deducted in computing adjusted gross income.  Section 40203 of the BBA of 2018 amended section 222(e) of the IRC to eliminate this deduction, effective January 1, 2018. Such tuition and fees paid are no longer deductible in calculating MAGI, effective January 1, 2018.

The tuition and fees deduction is separate and distinct from the exclusion of scholarships, awards or fellowships used solely for educational purposes from MAGI for purposes of Medicaid and CHIP eligibility.  This exclusion, which also applies for determining MAGI under the IRC, remains in effect under the Medicaid regulations at 42 CFR 435.603(e)(2) and CHIP regulations at 42 CFR 457.315.

**State Requirement to Report Enrollment in MEC**

Under Section 6055 of the IRC, states are required to provide Medicaid and CHIP beneficiaries with IRS Form 1095-B, indicating that the beneficiary had minimum essential coverage (MEC) for the tax year.  States also must provide this information to the IRS.  Under section 5000A of the IRC, individuals not enrolled in MEC and not exempt are subject to a "shared responsibility payment."  The TCJA reduced the shared responsibility payment to $0 beginning in tax year 2019.  However, it did not eliminate the requirement for states to furnish Form 1095-B or to provide information about Medicaid and CHIP enrollment to IRS.  Therefore, states must continue to send Forms 1095-B for Medicaid and CHIP coverage for tax year 2019 and beyond. If there is any change to these reporting requirements, CMS will communicate the changes to states.

DHHRBMS016186

Page 9 – State Health Official

**Operational Considerations**

In order to implement the changes to MAGI-based methods described in this letter, states may need to make updates to eligibility policies and procedures and changes to eligibility systems logic.  In addition, states will need to be able to collect the relevant application information in order to make accurate Medicaid and CHIP determinations.  Capturing the information may involve changes to applications and other forms, additional instructions or help text, or new application questions.  In order to implement needed systems changes, and in accordance with 42 CFR 433.112(b)(14), states may request enhanced 90 percent federal financial participation for eligibility technology investments funded through an approved Advanced Planning Document.  CMS remains available to provide technical assistance to states on implementation of such changes to ensure that states are able to make the changes as soon as possible.

We hope this information will be helpful.  Questions and comments about the changes to MAGI-based methodologies discussed in this bulletin may be directed to Stephanie Kaminsky, Director, Division of Medicaid Eligibility Policy, CMCS, at Stephanie.Kaminsky@cms.hhs.gov. Requests for technical assistance on revisions to the state's application and renewal processes needed to implement the changes to MAGI-based methodologies may be directed to Jessica Stephens, Director, Division of Enrollment Policy and Operations, CMCS, at Jessica.Stephens@cms.hhs.gov.

Sincerely,


Calder Lynch
Deputy Administrator and Director


Enclosures

cc:

National Association of Medicaid Directors

National Academy for State Health Policy

National Governors Association

American Public Human Services Association

Association of State Territorial Health Officials

Council of State Governments

National Conference of State Legislatures


DHHRBMS016187

Page 10 – State Health Official

Academy Health

DHHRBMS016188

Case 3:20-cv-00740   Document 252-3   Filed 05/31/22   Page 179 of 240 PageID #: 3672

Page 11 – State Health Official

**Attachment A –**
**Tax Filing Thresholds**

| | 2017 Tax Filing Thresholds | 2018 Tax Filing Thresholds |
|---|---|---|
| Personal Exemption Amount | $4,050[9] | $0 |
| Standard Deduction for most people[10] | $6,350 (gross) - single | $12,000 (gross) - single[11] |
| Tax filing threshold for single tax dependent[12] | $1,050 unearned; or $6,350 earned; or Gross income is more than the larger of: <ul><li>$1,050; or</li><li>Earned income (up to $6,000) plus $350</li></ul> | $1,050 unearned; or $12,000 earned; or Gross income is more than the larger of: <ul><li>$1,050; or</li><li>Earned income (up to $11,650) plus $350</li></ul> |
| Tax dependents > 65 or blind | $2,600 unearned; or $7,900 earned; or Gross income is more than the larger of: <ul><li>$2,600; or</li><li>Earned (up to $6,000) plus $1,900</li></ul> | $2,650 unearned; or $13,600 earned; or Gross income is more than the larger of: <ul><li>$2,650; or</li><li>Earned income (up to $11,650) plus $1,950</li></ul> |
| Tax dependent > 65 and blind | $4,150 unearned; or $9,450 earned; or Gross income is more than the larger of: <ul><li>$4,150; or</li><li>Earned (up to $6,000) plus $3,450</li></ul> | $15,200 earned $4,250 unearned income Gross income is more than the larger of: <ul><li>$4,250; or</li><li>Earned income (up to $11,650) plus $3,550</li></ul> |

---

[9] See IRS Pub 17, Chapter 3; and Pub 501.
[10] For individuals who are under age 65, not blind, not head of household and no one else can claim individual as a dependent. See IRS Pub 17, Table 20-1 (2017) and Table 21-1 (2018); and IRS Pub 501, Table 6.
[11] To be increased annually for inflation. See Internal Revenue Bulletin 2018-10 (March 5, 2018).
[12] For individuals under age 65 and not blind. See IRS Pub 501, Table 2.

DHHRBMS016189

Page 12 – State Health Official

**Attachment B –**
**Lottery and Gambling Winnings:**
**Months over which Income is Counted by Income Increment**

| From $ | Up To $ | # Months Counted for Medicaid |
|---|---|---|
| 1 | 79,999 | 1 |
| 80,000 | 89,999 | 2 |
| 90,000 | 99,999 | 3 |
| 100,000 | 109,999 | 4 |
| 110,000 | 119,999 | 5 |
| 120,000 | 129,999 | 6 |
| 130,000 | 139,999 | 7 |
| 140,000 | 149,999 | 8 |
| 150,000 | 159,999 | 9 |
| 160,000 | 169,999 | 10 |
| 170,000 | 179,999 | 11 |
| 180,000 | 189,999 | 12 |
| 190,000 | 199,999 | 13 |
| 200,000 | 209,999 | 14 |
| 210,000 | 219,999 | 15 |
| 220,000 | 229,999 | 16 |
| 230,000 | 239,999 | 17 |
| 240,000 | 249,999 | 18 |
| 250,000 | 259,999 | 19 |
| 260,000 | 269,999 | 20 |
| 270,000 | 279,999 | 21 |
| 280,000 | 289,999 | 22 |
| 290,000 | 299,999 | 23 |
| 300,000 | 309,999 | 24 |
| 310,000 | 319,999 | 25 |
| 320,000 | 329,999 | 26 |
| 330,000 | 339,999 | 27 |
| 340,000 | 349,999 | 28 |
| 350,000 | 359,999 | 29 |
| 360,000 | 369,999 | 30 |
| 370,000 | 379,999 | 31 |
| 380,000 | 389,999 | 32 |
| 390,000 | 399,999 | 33 |
| 400,000 | 409,999 | 34 |
| 410,000 | 419,999 | 35 |

| From $ | Up To $ | # Months Counted for Medicaid |
|---|---|---|
| 420,000 | 429,999 | 36 |
| 430,000 | 439,999 | 37 |
| 440,000 | 449,999 | 38 |
| 450,000 | 459,999 | 39 |
| 460,000 | 469,999 | 40 |
| 470,000 | 479,999 | 41 |
| 480,000 | 489,999 | 42 |
| 490,000 | 499,999 | 43 |
| 500,000 | 509,999 | 44 |
| 510,000 | 519,999 | 45 |
| 520,000 | 529,999 | 46 |
| 530,000 | 539,999 | 47 |
| 540,000 | 549,999 | 48 |
| 550,000 | 559,999 | 49 |
| 560,000 | 569,999 | 50 |
| 570,000 | 579,999 | 51 |
| 580,000 | 589,999 | 52 |
| 590,000 | 599,999 | 53 |
| 600,000 | 609,999 | 54 |
| 610,000 | 619,999 | 55 |
| 620,000 | 629,999 | 56 |
| 630,000 | 639,999 | 57 |
| 640,000 | 649,999 | 58 |
| 650,000 | 659,999 | 59 |
| 660,000 | 669,999 | 60 |
| 670,000 | 679,999 | 61 |
| 680,000 | 689,999 | 62 |
| 690,000 | 699,999 | 63 |
| 700,000 | 709,999 | 64 |
| 710,000 | 719,999 | 65 |
| 720,000 | 729,999 | 66 |
| 730,000 | 739,999 | 67 |
| 740,000 | 749,999 | 68 |
| 750,000 | 759,999 | 69 |
| 760,000 | 769,999 | 70 |

DHHRBMS016190

Case 3:20-cv-00740   Document 252-3   Filed 05/31/22   Page 181 of 240 PageID #: 3674

Page 13 – State Health Official

| From $ | Up To $ | # Months Counted for Medicaid |
|---|---|---|
| 770,000 | 779,999 | 71 |
| 780,000 | 789,999 | 72 |
| 790,000 | 799,999 | 73 |
| 800,000 | 809,999 | 74 |
| 810,000 | 819,999 | 75 |
| 820,000 | 829,999 | 76 |
| 830,000 | 839,999 | 77 |
| 840,000 | 849,999 | 78 |
| 850,000 | 859,999 | 79 |
| 860,000 | 869,999 | 80 |
| 870,000 | 879,999 | 81 |
| 880,000 | 889,999 | 82 |
| 890,000 | 899,999 | 83 |
| 900,000 | 909,999 | 84 |
| 910,000 | 919,999 | 85 |
| 920,000 | 929,999 | 86 |
| 930,000 | 939,999 | 87 |
| 940,000 | 949,999 | 88 |
| 950,000 | 959,999 | 89 |
| 960,000 | 969,999 | 90 |
| 970,000 | 979,999 | 91 |
| 980,000 | 989,999 | 92 |
| 990,000 | 999,999 | 93 |
| 1,000,000 | 1,009,999 | 94 |
| 1,010,000 | 1,019,999 | 95 |
| 1,020,000 | 1,029,999 | 96 |
| 1,030,000 | 1,039,999 | 97 |

| From $ | Up To $ | # Months Counted for Medicaid |
|---|---|---|
| 1,040,000 | 1,049,999 | 98 |
| 1,050,000 | 1,059,999 | 99 |
| 1,060,000 | 1,069,999 | 100 |
| 1,070,000 | 1,079,999 | 101 |
| 1,080,000 | 1,089,999 | 102 |
| 1,090,000 | 1,099,999 | 103 |
| 1,100,000 | 1,109,999 | 104 |
| 1,110,000 | 1,119,999 | 105 |
| 1,120,000 | 1,129,999 | 106 |
| 1,130,000 | 1,139,999 | 107 |
| 1,140,000 | 1,149,999 | 108 |
| 1,150,000 | 1,159,999 | 109 |
| 1,160,000 | 1,169,999 | 110 |
| 1,170,000 | 1,179,999 | 111 |
| 1,180,000 | 1,189,999 | 112 |
| 1,190,000 | 1,199,999 | 113 |
| 1,200,000 | 1,209,999 | 114 |
| 1,210,000 | 1,219,999 | 115 |
| 1,220,000 | 1,229,999 | 116 |
| 1,230,000 | 1,239,999 | 117 |
| 1,240,000 | 1,249,999 | 118 |
| 1,250,000 | 1,259,999 | 119 |
| 1,260,000 | or higher | 120 |

DHHRBMS016191

**JA1244**

Page 14 – State Health Official

**Attachment C –**
**Frequently Asked Questions:**
**Changes to Modified Adjusted Gross Income (MAGI)-based Income Methodologies**

**Lottery and Gambling Winnings**

**Q1.    Can you provide some examples of how lottery and gambling winnings would impact individual applicants and beneficiaries?**

**A1.**    Consider the following examples:

1.  Sally is enrolled in Medicaid with MAGI-based household income of $1,200 per month. She is single and has no dependents. On New Year's Eve 2018, Sally wins $192,000 playing roulette. How do Sally's gambling winnings impact her MAGI-based income and eligibility for Medicaid?
    a.  Using the chart in Attachment B, we see that Sally's winnings of $192,000 are counted in her MAGI-based income for 13 months, including the month in which she receives the winnings. So they are counted in December 2018 through December 2019.
    b.  An equal amount of $14,769 is counted in each month ($192,000/13 months = $14,769 per month).
    c.  Sally's MAGI-based monthly income for December 2018 through December 2019 is $15,969 ($14,769 gambling winnings + $1,200 other MAGI-based income) assuming no changes to her other MAGI-based income.
    d.  Because Sally's income exceeds the state's MAGI-based income standard, the agency would provide Sally with a notice alerting her that she is no longer eligible for Medicaid and her coverage will be terminated following the advance notice period. The notice will also tell Sally that beginning January 1, 2020, her gambling winnings will no longer be counted in her MAGI-based income.
    e.  The Medicaid agency will transfer Sally's account to the Exchange. Because she is losing eligibility for Medicaid, she qualifies for a special enrollment period and the Exchange will determine if she is eligible for advanced payments of the premium tax credit.

2.  Joe is a single individual who has no dependents. He earns $700 per month and has no other income or deductions. Joe wins a scratch-off ticket paying out $50,000 on May 15, 2019. The following month, Joe applies for Medicaid. How do his lottery winnings impact his MAGI-based income and eligibility for Medicaid?
    a.  Using the chart in Attachment B, we see that Joe's lottery winnings are counted in MAGI-based methods for only one month. Because his winnings are less than $80,000, they are counted only in the month received. So the full amount of $50,000 is counted in May of 2019.
    b.  When Joe applies for Medicaid in June, his MAGI-based income will be $700 and that will be used to determine his financial eligibility for Medicaid.

DHHRBMS016192

**JA1245**

Page 15 – State Health Official

**Q2.** **How do lottery and gambling winnings received by parents impact their children's eligibility for Medicaid?**

**A2.** The changes to section 1902(e)(14) of the Act made by the Bipartisan Budget Act of 2018 (Pub. L. No. 115-123, "BBA of 2018") only impact the MAGI-based household income of the individuals who themselves receive the lottery or gambling winnings. Therefore, when determining Medicaid eligibility for a child who lives with a parent, the parent's qualified lottery or gambling winnings would be treated the same as any other lump sum income received and included in the child's MAGI-based income only in the month received, as described at 42 CFR 435.603(e)(1). Consider the following example.

Justine is a single parent who lives with her son, Oscar, who is age 7. Justine and Oscar have monthly MAGI-based income of $2,000 from Justine's job. On April 14, 2019, Justine submits a Medicaid application for Oscar. The following week Justine wins the state lottery and receives a lump sum payment of $755,000. How do Justine's lottery winnings impact Oscar's MAGI-based income and eligibility for Medicaid?

For the month of April, Oscar's MAGI-based household income will be calculated as $755,000 in lottery winnings, plus $2,000 in the other MAGI-based income, for a total monthly income of $757,000 for a family of two. For the month of May, Oscar's MAGI-based income will be $2,000. Justine's lottery winnings would count toward Oscar's MAGI-based income only in the month of April. If Justine applies for Medicaid, using the chart in Attachment B, her winnings of $755,000 would be counted in her MAGI-based income for 69 months (or, 5 years and 9 months), beginning in the month in which she receives the winnings. That is, Justine's winnings would be counted in her MAGI-based income in April 2019 through December 2024. An equal amount of $10,942 would be counted in each month ($755,000/69 months = $10,942 per month).

**Q3.** **Do winnings from any state count under the lottery and gambling winnings methodology?**

**A3.** Yes. Lottery and gambling winnings are treated the same regardless of the state in which they were won. The methodology in section 1902(e)(14)(K) of the Act applies to winnings an individual receives from any state.

**Q4.** **How are multiple instances of gambling winnings counted under the lottery and gambling winnings methodology?**

**A4.** If a Medicaid or CHIP applicant or beneficiary wins monetary winnings from gambling multiple times, the lottery and gambling winnings methodology is applied separately to each instance of winning. Where the amount of months over which winnings are counted overlap, those months are counted concurrently (each instance beginning and ending as per the formula) and the countable income attributed to each month is added together for each month.

DHHRBMS016193

Page 16 – State Health Official

**Q5.** **Are gambling losses subtracted from gambling winnings for the purposes of the lottery and gambling winnings methodology?**

**A5.** No. Although there are circumstances in which gambling losses may be deducted from income for the purpose of federal income taxes, gambling losses are not deducted from winnings for the purposes of the lottery and gambling winnings methodology under MAGI-based income methodologies for Medicaid and CHIP.

**Q6.** **How should the "gap-filling" rule at 42 CFR 435.603(i) apply to individuals whose income is counted under the lottery and gambling winnings methodology?**

**A6.** The Medicaid "gap-filling" rule at 42 CFR 435.603(i), promulgated in March 2012, was designed to prevent a potential gap in coverage for low-income individuals caused by the slight differences in the MAGI methodologies used for purposes of premium tax credit (PTC) eligibility and the MAGI-based methodologies used for purposes of Medicaid and CHIP eligibility. Under the gap-filling rule, if an individual's MAGI-based monthly household income for purposes of Medicaid eligibility is above the applicable Medicaid income standard and the individual's MAGI-based annual household income for purposes of PTC eligibility is under 100 percent of the FPL (and ineligible for a PTC due to too little income) the state is required to apply the MAGI methodologies generally used for purposes of PTC eligibility in determining the individual's eligibility for Medicaid.

The different treatment of lottery and gambling winnings under the MAGI methodologies for PTC eligibility versus the MAGI-based methodologies used for Medicaid and CHIP may result in a situation in which an individual's household income for purposes of PTC eligibility in a given year will be under 100 percent FPL, but his or her income applying MAGI-based methodologies (for purposes of Medicaid and CHIP eligibility) will be over the Medicaid and CHIP eligibility thresholds. If applied in this situation, the gap filling rule would result in approval of Medicaid or CHIP eligibility in the year after receipt of the winnings. If applying the lottery and gambling methodology would result in income over the Medicaid eligibility standard, applying the gap-filling rule and determining such an individual eligible would not be consistent with the intended result under the BBA of 2018. We believe that the new statutory provision supersedes the regulatory policy in this situation. Thus, we have determined that states should not apply the gap-filling regulation at 42 CFR 435.603(i) if doing so would result in a determination contrary to the determination reached after applying the lottery and gambling methodology added at section 1902(e)(14)(K) of the Act by the BBA.

**Q7.** **Are states required to keep a record of individuals found ineligible for a period of time due to lottery or gambling winnings?**

**A7.** Per regulations at 42 CFR 431.17 and 435.914(a), states are required to maintain case records on each applicant and beneficiary containing, among other things, facts essential to supporting the agency's denial or termination of eligibility. States are expected to follow their standard recordkeeping protocol when an individual is denied or terminated

DHHRBMS016194

Page 17 – State Health Official

due to lottery or gambling winnings, including the period of time such records are maintained. States are not required to establish a separate process specific to individuals denied or terminated from coverage due to lottery or gambling winnings.

When an individual previously denied or terminated from coverage subsequently reapplies for coverage, states typically are able to identify the individual's previous application or enrollment in the state's program. Some states may have ready access to the record of the individual's prior winnings, and such states would be expected to take this information into account in processing the individual's new application. Other states may want to establish a process to maintain a record of the monthly amount of winnings of former applicants and beneficiaries to be counted as income as well as the duration for which that amount is counted.

### Other Questions

Below we answer frequently asked questions which are not related to the lottery and gambling winnings methodology discussed in this letter.

**Q8.  Now that alimony payments are treated differently under MAGI-based methodologies depending on the date that the agreement was consummated or last revised, how can states verify the date of execution of separation or divorce agreements that include provision for alimony?**

**A8.  **Under the general verification regulations at 42 CFR 435.945(a) and 435.952(c), states have the flexibility to accept attestation of the date of the finalization or modification of a separation or divorce agreement or to require paper documentation, provided that electronic verification is not available or is inconsistent with the individual's attestation.

**Q9.  Does the change to the treatment of alimony affect or render obsolete the mandatory eligibility group for extended Medicaid due to increased collection of spousal support (42 CFR 435.115)?**

**A9.  **No.  The discussion of including alimony in income relates only to MAGI-based methods, and not to any particular MAGI-based eligibility group.  In particular, the group for extended Medicaid eligibility based on the increased collection of spousal support remains in effect as described under 42 CFR 435.115.

As noted in the SHO letter, if a separation or divorce agreement (or a modification to a pre-existing agreement) was finalized after December 31, 2018, the alimony payments under the agreement would not be counted in MAGI income and an increase would not trigger the four-month extension of Medicaid eligibility.  However, if a separation or divorce agreement was finalized on or before December 31, 2018 (and is not modified thereafter), the alimony payments under the agreement must be included in the income of the recipient.  In circumstances in which such alimony income meets the definition of "spousal support" under title IV-D of the Act, and the recipient has an increased collection of such support (e.g., through a scheduled increase, payment of arrears, or

DHHRBMS016195

Page 18 – State Health Official

through new collection on an existing support obligation) through the IV-D agency, the family may qualify for the four-month extension of Medicaid eligibility group under 42 CFR 435.115.

Spousal support that does not meet the IRS definition of alimony is not included in income and therefore an increased collection of such support would not trigger the extension under 42 CFR 435.115. The five requirements for spousal support to be alimony are:

1. Payment must be in cash;
2. Payment is received by (or on behalf of) a spouse under a divorce or separation agreement;
3. The divorce or separation instrument does not designate such payment as a payment not includable in gross income and not allowable as a deduction;
4. The payee spouse and the payer spouse are not members of the same household at the time such payment is made; and
5. There is no liability to make any such payment (in cash or property) as a substitute for such payments after the death of the payee spouse.

DHHRBMS016196

JA1249

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid
Services 7500 Security Boulevard, Mail
Stop S2-26-12
Baltimore, Maryland 21244-1850



**SHO# 20-005**

**RE: Mandatory Medicaid State
Plan Coverage of Medication-
Assisted Treatment**

December 30, 2020

Dear State Health Official:

The Centers for Medicare & Medicaid Services (CMS) is issuing the following guidance about section 1006(b) of the Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment (SUPPORT) for Patients and Communities Act (herein referred to as the SUPPORT Act) (Pub. L. No. 115-271). To increase access to medication-assisted treatment (MAT) for opioid use disorders (OUD), section 1006(b) of the SUPPORT Act requires states to provide Medicaid coverage of certain drugs and biological products, and related counseling services and behavioral therapy.[1] This State Health Official Letter (SHO Letter) also describes available opportunities for increasing treatment options for substance use disorders (SUD) generally. CMS encourages states to consider these opportunities when implementing the mandatory MAT coverage under section 1006(b) of the SUPPORT Act. The new required benefit is limited to the use of MAT for the treatment of OUD, and thus this SHO Letter is generally focused on that topic, not on treatment services for other SUDs, including alcohol use disorders.

Background

Section 1006(b) of the SUPPORT Act, signed into law on October 24, 2018, amends section 1902(a)(10)(A) of the Social Security Act (the Act) to require state Medicaid plans to include coverage of MAT for all eligible to enroll in the state plan or waiver of state plan. Section 2601 of the Continuing Appropriations Act, 2021 and other Extensions Act, Pub. L. No. 116-159, amended the SUPPORT Act to specify that the rebate requirements in section 1927 shall apply to any MAT drug or biological described under the mandatory benefit to the extent that the MAT drug or biological is a covered outpatient drug. (More information on section 2601 is in the section below entitled, "MAT Drug Coverage and Section 1927 Manufacturer Rebates.") Section 1006(b) also adds a new paragraph 1905(a)(29) to the Act to add the new required benefit to the definition of "medical assistance" and to specify that the new required benefit will be in effect for the period beginning October 1, 2020, and ending September 30, 2025.

In addition, section 1006(b) adds section 1905(ee)(1) to the Act to define MAT, for purposes of the new required coverage, as:

> . . . all drugs approved under section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355), including methadone, and all biological products licensed under section

[1] SUPPORT for Patients and Communities Act, Pub. L. No. 115–271 (2018), https://www.congress.gov/115/plaws/publ271/PLAW-115publ271.pdf.

DHHRBMS016197

Page 2 – State Health Official

351 of the Public Health Service Act (42 U.S.C. 262) to treat opioid use disorders; and[,]
. . . with respect to the provision of such drugs and biological products, counseling
services and behavioral therapy.

CMS interprets section 1905(ee)(1) of the Act to require that states include as part of the new
mandatory benefit all forms of drugs and biologicals that the Food and Drug Administration
(FDA) has approved or licensed for MAT to treat OUD.  Currently, the FDA has approved the
following drugs used for MAT to treat OUD: methadone, buprenorphine, and naltrexone.[2]  Only
those formulations of drugs or biologicals that are approved or licensed by the FDA for MAT to
treat OUD must be covered under the new mandatory Medicaid benefit.  There are currently no
FDA-licensed biological products to treat OUD.[3]

**Medication-Assisted Treatment**

While states are required to cover all drugs and biologicals approved or licensed by the FDA
used for MAT to treat OUD under the new mandatory benefit, various considerations affect
which medication should be provided to a particular patient.[4]

- Methadone is a long-acting synthetic opioid agonist medication with a long history of use
  in treatment of OUD in adults.  Methadone is indicated for the detoxification treatment of
  opioid addiction as well as maintenance treatment of opioid addiction in conjunction with
  appropriate social and medical services.[5]

  Methadone for treatment of OUD must be administered by an Opioid Treatment Program
  (OTP).  Currently, solid (non-dispersible) and dispersible tablets, as well as the liquid
  concentrate, are labeled for use in such outpatient OUD therapy. These products cannot
  be dispensed from a pharmacy for the purpose of treating OUD. OTPs must have a
  current, valid certification from the Substance Abuse and Mental Health Services
  Administration (SAMHSA) and be accredited by an independent, SAMHSA-approved
  accrediting body.[6]  Effective January 1, 2020, the Medicare program began covering and
  reimbursing OUD treatment services furnished by an OTP.[7]

---

[2] U.S. Food and Drug Administration (FDA). Information about Medication-Assisted Treatment (MAT). FDA web
site. https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-treatment-mat;
Substance Abuse and Mental Health Services Administration (SAMHSA).  Medication-Assisted Treatment.
SAMHSA website. https://www.samhsa.gov/medication-assisted-treatment
[3] "Information about Medication-Assisted Treatment (MAT)," U.S. Food and Drug Administration, last modified
February 14, 2019, https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-
treatment-mat.
[4] SAMHSA. Office of the Surgeon General. Facing Addiction in America: The Surgeon General's Report on
Alcohol, Drugs, and Health. Washington (DC). U.S. Department of Health and Human Services.  2016 Nov.
Chapter 4, Early Intervention, Treatment, and Management of Substance Use Disorders.  Available from:
https://www.ncbi.nlm.nih.gov/books/NBK424859/.
[5] FDA. Dolophine Highlights of Prescribing Information.
https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/006134s045lbl.pdf
[6] SAMHSA. Certification of Opioid Treatment Programs. SAMHSA website.
https://www.samhsa.gov/medication-assisted-treatment/opioid-treatment-programs.
[7] SUPPORT Act, Section 2005, Medicare Coverage of Certain Services Furnished by Opioid Treatment Programs.
See also CMCS Informational Bulletin, "Guidance to State Medicaid Agencies on Dually Eligible Beneficiaries
Receiving Medicare Opioid Treatment Services Effective January 1, 2020" (Dec. 17, 2019),
https://www.medicaid.gov/sites/default/files/Federal-Policy-Guidance/Downloads/cib121719.pdf

DHHRBMS016198

Page 3 – State Health Official

- Buprenorphine is a synthetic opioid medication that acts as a partial agonist, blocking and only weakly activating the opioid receptor, thus blunting the euphoric effects of other opioids for the treatment of OUD.[8]

  Buprenorphine is currently available in several dosage forms, including an oral dissolvable film, sublingual tablet, and injection.  It is available as a single ingredient or in combination with naloxone, an antagonist (or blocker) of opioid receptors to prevent attempted misuse by injection.  For more information on the FDA approved medications for treatment of OUDs, see SAMHSA's Treatment Improvement Protocol 63 as well as the FDA web site: https://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm600092.htm.[9]

  Long-acting buprenorphine injections are a route of administration that may help to improve patient adherence, may reduce the risk of accidental exposures, theft, or deliberate misuse, and may reduce risks associated with office visits during the COVID-19 pandemic.[10]  Sublocade is a once-monthly injection designed to deliver buprenorphine at sustained levels of medication throughout the month.[11]

- Naltrexone is a synthetic opioid antagonist – it blocks opioids from binding to receptors and is FDA-approved for the prevention of relapse to opioid dependence, following opioid detoxification.  Naltrexone is well-tolerated following detoxification.  It has no potential for abuse, and it is not addictive.[12]  Long-acting injectable naltrexone is FDA-approved with recommended dosing once every four weeks[13] for maintenance of abstinence.[14]  Naltrexone can be prescribed by any clinician who is licensed in the state to prescribe medications.[15,16]

---

[8] FDA.  Subutex Highlights of Prescribing Information. https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/020732s018lbl.pdf
[9] SAMHSA, Treatment Improvement Protocol: Medications for Opioid Use Disorder, May 2020. https://store.samhsa.gov/product/TIP-63-Medications-for-Opioid-Use-Disorder-Full-Document/PEP20-02-01-006
[10] Volkow ND.  Collision of the COVID-19 and Addiction Epidemics.  Ann Intern Med. 2020; 173(1):61-62. doi:10.7326/M20-1212
[11] Crist, Richard C et al.  Pharmacogenetics of Opioid Use Disorder Treatment.  *CNS drugs.*  2018; vol. 32 (4): 305-320.  doi:10.1007/s40263-018-0513-9.
[12] National Institute on Drug Abuse. (2018, January 17).  Principles of Drug Addiction Treatment: A Research-Based Guide (Third Edition). https://www.drugabuse.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/evidence-based-approaches-to-drug-addiction-treatment/pharmacotherapies.
[13] FDA.  ReVia Highlights of Prescribing Information. https://www.accessdata.fda.gov/drugsatfda_docs/label/2013/018932s017lbl.pdf
[14] Tanum L, Solli KK, Latif ZE, Benth JŠ, Opheim A, Sharma-Haase K, Krajci P, Kunøe N.  Effectiveness of Injectable Extended-Release Naltrexone vs Daily Buprenorphine-Naloxone for Opioid Dependence: A Randomized Clinical Noninferiority Trial.  JAMA Psychiatry. 2017 Dec 1;74(12):1197-1205. doi: 10.1001/jamapsychiatry.2017.3206. Erratum in: JAMA Psychiatry. 2018 Mar 14;75(5):530. PMID: 29049469; PMCID: PMC6583381.
[15] SAMHSA.  Naltrexone.  SAMHSA website. https://www.samhsa.gov/medication-assisted-treatment/treatment/naltrexone.
[16] We note that in addition to the MAT drugs listed here that are required to be covered for management of opioid dependency under the new benefit at section 1905(a)(29) of the Act, states that provide optional coverage of prescribed drugs under section 1905(a)(12) must do so consistent with sections 1902(a)(54) and 1927, which require coverage of all drugs and biologicals that satisfy the definition of a covered outpatient drug at sections 1927(k)(2)-(4), if the manufacturer has a national drug rebate agreement in effect. In that some medications not defined as MAT

DHHRBMS016199

Page 4 – State Health Official

To address the full scope of patients' treatment needs, section 1905(ee)(1) defines the required MAT benefit as including counseling services and behavioral therapy related to the drugs and biologicals covered under the new mandatory benefit.  While states have flexibility to specify which counseling services and behavioral therapy they will include in the new mandatory benefit, states that already cover MAT successfully often cover a range of effective behavioral health services for beneficiaries with OUD receiving MAT, including the following:

- Individual/Group Therapy generally helps patients identify treatment goals and potential solutions to problems that cause emotional stress; seeks to restore communication and coping skills; strengthens self-esteem; and promotes behavior change and optimal mental health.  Cognitive behavioral therapy is a type of therapy that has been shown to be successful in treating individuals with OUD.

- Peer Support Services are typically understood to be services in which a qualified peer support provider (also called a recovery coach or peer recovery support specialist) assists individuals with their recovery from substance use disorders, including OUD.  Peer support services can also be offered in relation to co-occurring mental disorders and OUD.  Services can include counseling on coping with symptoms and navigating early stages of the recovery process; modeling appropriate behavior, skills, and communication; engagement with a supportive community of recovering peers; and helping the person access community resources.  CMS has issued guidance that addresses requirements for peer support providers.[17]

- Crisis Intervention Services are typically provided to immediately reduce or eliminate the risk of physical or emotional harm.  Services can include evaluation, triage, and access to services; and treatment to effect symptom reduction, harm reduction, and/or safe transition of individuals in acute crisis to the appropriate level of care for stabilization.

**MAT Provider Landscape**

Section 3502 of the Drug Addiction Treatment Act of 2000[18] amended the Controlled Substances Act (CSA) to permit qualified physicians to receive a waiver of the CSA's separate registration requirements for prescribing and dispensing certain opioid medications, such as buprenorphine, to treat OUD.  Because of concerns about the lack of access to OUD treatment, Congress expanded the types of practitioners who are eligible for a waiver to prescribe and dispense buprenorphine to treat OUD.  The Comprehensive Addiction and Recovery Act of 2016 allowed nurse practitioners and physician assistants to qualify for a waiver.[19]  Additionally,

---

may be used to assist in short or long-term treatment success for beneficiaries with OUD, such as medications to treat opioid withdrawal symptoms, CMS would encourage states to focus on optimal patient outcomes in decisions that impact coverage and access.

[17] https://www.medicaid.gov/Federal-Policy-Guidance/downloads/SMD081507A.pdf.

[18] Children's Health Act of 2000, Section 3501, Drug Addiction Treatment Act of 2000, Pub. L. No. 106-310, 114 Stat. 1101 (2000). https://www.govinfo.gov/content/pkg/PLAW-106publ310/pdf/PLAW-106publ310.pdf.

[19] Comprehensive Addiction and Recovery Act of 2016, Section 303, Medication-assisted Treatment for Recovery from Addiction, Pub. L. No. 114–198, 130 Stat. 69, (2016). https://www.congress.gov/114/plaws/publ198/PLAW-114publ198.pdf

DHHRBMS016200

Page 5 – State Health Official

section 3201 of the SUPPORT Act[20] extends eligibility for prescribing buprenorphine for the treatment of OUD to clinical nurse specialists, certified registered nurse anesthetists, and certified nurse midwives until October 1, 2023.

Section 3201 of the SUPPORT Act also expands the eligibility of certain physicians and other qualifying practitioners to treat up to 100 patients in the first year of waiver receipt if they satisfy one of the following two conditions found in regulation:[21]

> 1) The physician holds a board certification in addiction medicine or addiction psychiatry by the American Board of Preventive Medicine or the American Board of Psychiatry and Neurology; or
>
> 2) The practitioner provides MAT in a "qualified practice setting." A qualified practice setting is one that:
>    a. Provides professional coverage for patient medical emergencies during hours when the practitioner's practice is closed;
>    b. Provides access to case-management services for patients including referral and follow-up services for programs that provide, or financially support, the provision of services such as medical, behavioral, social, housing, employment, educational, or other related services;
>    c. Uses health information technology systems such as electronic health records in accordance with practice setting requirements;
>    d. Registers for their state prescription drug monitoring program where operational and in accordance with federal and state law; and
>    e. Accepts third-party payment for costs in providing health services, including written billing, credit, and collection policies and procedures, or federal health benefits.

After one year at the 100-patient limit, physicians and qualifying other practitioners who meet the above criteria can apply to increase their patient limit to 275.[22]

**Current MAT State Plan Coverage**

Currently, all state Medicaid programs cover some form of buprenorphine and extended-release naltrexone for treatment of OUD. In addition, most states also cover some form of the counseling and behavioral therapies that are necessary to provide evidence-based MAT. Methadone is indicated for use as part of an MAT protocol for treating OUD, but also for pain management. When used for treating OUD, methadone can only be administered by OTPs, which must be certified by SAMHSA and registered with the Drug Enforcement Administration (DEA).[23] OTPs must be licensed in the state in which they operate and accredited by a

---

[20] SUPPORT Act, Section 3201, Allowing for More Flexibility with Respect to Medication-Assisted Treatment for Opioid Use Disorders.
[21] 21 U.S.C. 823(g)(2)(B)(II)(bb) – (cc); Medication Assisted Treatment for Opioid Use Disorders, 42 C.F.R. 8.610, 42 C.F.R. 8.615.
[22] 21 U.S.C. 823(g)(2)(B)(II)(dd); Medication Assisted Treatment for Opioid Use Disorders, 42 C.F.R. 8.610 – 655.
[23] We note that in contrast, when methadone is used for the treatment of pain, it can be dispensed from pharmacies, which are not able to dispense methadone for OUD unless they are also certified as OTPs.

DHHRBMS016201

Page 6 – State Health Official

SAMHSA-approved accrediting body.[24]  Additionally, federal regulations at 42 C.F.R. part 8 impose standards governing, for example, required services, staff credentials, patient admission criteria, and patient confidentiality criteria.[25]  In a report on the use of medications to treat OUD in the 50 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, SAMHSA found that methadone is covered for MAT to treat OUD by Medicaid in 42 of the 53 states and territories included in the report.[26]

### Institution for Mental Diseases (IMD) Exclusion
Frequently, MAT-related counseling and behavioral therapy are provided on-site at clinics and health centers where buprenorphine and/or naltrexone are dispensed.  Primary care providers who prescribe MAT drugs often partner with local substance use disorder treatment or mental health care agencies to connect individuals to counseling.  Federal regulation requires patients who receive treatment in an OTP to receive access to[27] medical, counseling, vocational, educational, and other assessment and treatment services, in addition to prescribed medication.[28]  Medications for MAT, as well as the counseling and behavioral therapies, can also be furnished in inpatient and residential settings such as psychiatric hospitals, inpatient units, or residential treatment programs, including in IMDs, but Medicaid coverage is generally not available unless the setting is not an IMD or an exception to the IMD exclusion applies, as discussed below.

An IMD is defined in section 1905(i) of the Act as a "hospital, nursing facility, or other institution of more than 16 beds, that is primarily engaged in providing diagnosis, treatment, or care of persons with mental diseases, including medical attention, nursing care, and related services."  Under section 1905(a) of the Act, there is a general prohibition on Medicaid payment for any services provided to any individual under age 65 who resides in an IMD.  This is commonly known as the "IMD exclusion."  The IMD exclusion applies to any care or services provided inside or outside of the facility or hospital to a Medicaid beneficiary residing in an IMD, unless an exception to the IMD exclusion applies.  As specifically relevant here, MAT and counseling and behavioral therapies provided in an IMD would not be covered by Medicaid unless an exception to the IMD exclusion applies.

Currently, there are several exceptions to the IMD exclusion and other authorities that permit short-term stays in IMDs.  First, Medicaid payment is permitted for inpatient hospital services, nursing facility services, and intermediate care facility services provided in IMDs to individuals age 65 and older.[29]  Second, Medicaid payment is permitted for inpatient psychiatric hospital services for individuals under age 21, sometimes referred to as the "psych under 21 benefit," furnished by a psychiatric hospital, a general hospital with a psychiatric program that meets the applicable Conditions of Participation, or an accredited psychiatric facility that meets certain requirements, commonly referred to as a "Psychiatric Residential Treatment Facility."[30]

[24] SAMHSA. Medicaid Coverage of Medication-Assisted Treatment for Alcohol and Opioid Use Disorders and of Medication for the Reversal of Opioid Overdose. HHS Publication No. SMA-18-5093, page 39.
[25] 42 C.F.R. 8.12.
[26] SAMHSA. HHS Publication No. SMA-18-5093, page 39. Published November, 2018
[27] SAMHSA, Treatment Improvement Protocol: Medications for Opioid Use Disorder, May 2020. https://store.samhsa.gov/product/TIP-63-Medications-for-Opioid-Use-Disorder-Full-Document/PEP20-02-01-006
[28] 42 C.F.R 8.12(f)
[29] 42 C.F.R. 440.140
[30] 42 C.F.R. 440.160

DHHRBMS016202

Page 7 – State Health Official

Third, section 1012 of the SUPPORT Act, entitled "Help for Moms and Babies," added a new limited exception to the IMD exclusion. For more information, see the CMCS Informational Bulletin, "State Guidance for the New Limited Exception to the IMD Exclusion for Certain Pregnant and Postpartum Women, July 26, 2019."[31] Fourth, section 5052 of the SUPPORT Act, entitled, "State option to provide Medicaid coverage for certain individuals with substance use disorders who are patients in certain institutions for mental diseases," amended the IMD exclusion and established a new section 1915(l) of the Act. This provision permits states to cover a state plan option to provide services to Medicaid beneficiaries age 21 through 64 who have at least one SUD diagnosis and reside in an eligible IMD. The period of this state plan option is from October 1, 2019 through September 30, 2023. For more information, see State Medicaid Director Letter (SMDL) # 19-0003, Re: Implementation of Section 5052 of the SUPPORT for Patients and Communities Act – State Plan Option under Section 1915(l) of the Social Security Act, November 6, 2019.[32]

Other authorities that permit short-term stays in IMDs include section 1115 demonstrations. CMS announced a section 1115 demonstration initiative where states can receive federal financial participation (FFP) for the continuum of services to treat addictions to opioids or other substances, including services provided to beneficiaries residing in IMDs. For more information, see section 1115 SUD Demonstrations, SMDL # 17-003, Re: Strategies to Address the Opioid Epidemic, November 1, 2017.[33] Finally, states may receive FFP for monthly capitation payments for beneficiaries age 21 through 64 receiving SUD treatment in an IMD for a short-term stay of no more than 15 days during the period of the monthly capitation payment so long as criteria identified in the managed care regulation are met.[34]

### SUPPORT Act Section 1006(b) Coverage

Section 1006(b) of the SUPPORT Act requires states to begin implementing MAT as a mandatory Medicaid state plan benefit for categorically needy populations for the 5-year period beginning October 1, 2020. Under the definition of the new mandatory benefit at section 1905(ee)(1) of the Act, states are required to cover all drugs approved under section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355), including methadone, and all biological products licensed under section 351 of the Public Health Service Act (42 U.S.C. 262) to treat OUDs. CMS interprets the statute to require coverage of all forms of the drugs and biologicals that the FDA has approved or licensed for treatment of OUD. States are also required to cover counseling services and behavioral therapies associated with provision of the required drug and biological coverage.

### Exception for Provider Shortage

Section 1905(ee)(2) of the Act provides that states may be excused from the mandatory coverage requirement if, before the requirement takes effect on October 1, 2020, the state "certifies to the satisfaction of the Secretary that implementing such provisions statewide for all individuals eligible to enroll in the State plan (or waiver of the State plan) would not be feasible by reason of

---

[31] https://www.medicaid.gov/federal-policy-guidance/downloads/cib072619-1012.pdf.
[32] https://www.medicaid.gov/federal-policy-guidance/downloads/smd19003.pdf.
[33] https://www.medicaid.gov/federal-policy-guidance/downloads/smd17003.pdf.
[34] 42 C.F.R. 438.6(e)

DHHRBMS016203

Page 8 – State Health Official

a shortage of qualified providers of medication-assisted treatment, or facilities providing such treatment, that will contract with the State or a managed care entity with which the State has a contract under section 1903(m) or under section 1905(t)(3)."

In CMS's view, the purpose of the new requirement is to increase access to MAT to treat OUD for Medicaid beneficiaries, and this can only be accomplished by increasing the enrollment in Medicaid of OTPs and other MAT providers and practitioners. CMS therefore expects states to conduct provider outreach and enrollment as they prepare to meet the new requirements. As discussed above, because methadone for treatment of OUD can only be provided in OTPs, states that do not already enroll OTPs as Medicaid providers will be expected to take action to do so. Additionally, if a state has MAT providers operating in the state that are not currently enrolled in the Medicaid program, states are expected to permit any willing and qualified provider to become a Medicaid provider for the newly required MAT benefit, so that beneficiaries may receive these services from the qualified and willing provider of their choice, consistent with section 1902(a)(23) of the Act and 42 C.F.R. 431.51.

CMS expects a state seeking the exception under section 1905(ee)(2) to document in its exception request that it has made a good faith effort toward enrolling providers of MAT for the Medicaid fee-for-service program, Medicaid managed care organizations (MCOs), and primary care case managers (PCCMs). Such documentation would include information about state review of MCO demonstrations of adequate capacity to furnish services under 42 C.F.R. 438.207; state standards for uniform credentialing policies that MCOs must use in accordance with 42 C.F.R. 438.214(b); and MCO policies and procedures for credentialing and re-credentialing network providers, required under 42 C.F.R. 438.214. A state requesting an exception should conduct a detailed accounting of the current MAT providers in the state, both those that are enrolled in the Medicaid program and those that are not, and should detail in its exception request the process that the state has undertaken to contract with MAT providers (and/or to encourage that MAT providers contract with the state's Medicaid MCOs and/or PCCMs) and the reasons why the providers are not willing to enroll.

We recognize that there may be state-specific administrative challenges with providing CMS with the information necessary for the Secretary to determine that the state has satisfactorily certified to the existence of a shortage of providers, especially in light of the fact that this guidance is being issued after October 1, 2020, the effective date of the new MAT coverage requirement. Therefore, CMS will not require states seeking this exception to have submitted a request for the exception before October 1, 2020. Instead, CMS will accept state requests for this exception on or before January 14, 2021. The request for the exception should be submitted at the same time as a request for flexibility under section 1135 of the Act with respect to state plan amendment (SPA) submission and notice timelines (as described further below). If a state is not granted an exception based on a shortage of providers or facilities, then the state will need to submit a SPA, and requesting flexibility with respect to SPA submission and notice timelines could help the state to safeguard a SPA effective date of October 1, 2020 if the exception request is denied. For further detail, please refer to the "SPA Submission Requirements and Opportunity to Request Section 1135 Flexibility With Respect to SPA Submission and Notice Timelines" section below.

DHHRBMS016204

Page 9 – State Health Official

CMS remains committed to providing technical assistance to states and other stakeholders in understanding the mandatory MAT benefit and developing implementation approaches that result in the provision of Medicaid services in a manner compliant with program requirements.

States that seek an exception based on a shortage of providers or facilities should submit their request on or before January 14, 2021 to the Regional SPA/Waiver mailbox that is currently used for Medicaid SPA submissions. If the state is participating in the pilot for the new "One CMS Portal," the request for the exception based on a shortage of providers or facilities should be submitted via the portal. The information detailed below should be included with the request, which should include the state's certification that it cannot come into compliance with the new requirement due to a shortage of providers. States may, but are not required to, use the following format.

_____ [Insert name of state] certifies that implementing the MAT benefit specified in section 1905(a)(29) of the Act is not feasible due to a shortage of qualified providers or facilities that will enroll in the state Medicaid program or contract with a Medicaid managed care organization (MCO) or Primary Care Case Manager to furnish one or more of the required MAT benefit components, and requests an exception from the requirement to provide this benefit for this reason.

The state's request should include all of the following information:

   a. A description of the state's current qualified provider and facility status, including the number, type, and location of qualified providers and facilities that furnish MAT.
   b. A brief description of the process that the state has undertaken to contract with all qualified MAT providers and facilities and reasons why the providers did not contract with the state or a managed care organization or Primary Care Case Manager.
   c. For all Medicaid MCOs in the state, the written policies and procedures for selection and retention of network providers required by 42 C.F.R. 438.214, and copies of the assurances of adequate capacity and supporting documentation required by 42 C.F.R. 438.207(b), along with the state's certification and supporting documentation required by 438.207(d).
   d. A description of the unmet need caused by the shortage of qualified providers or facilities among eligible children and adults whom the state identifies as individuals with OUD who could benefit from MAT.
   e. A description of the state's plan to enroll additional qualified providers or facilities to ensure that all individuals eligible for MAT under the state plan (or a waiver of the state plan) are able to access it, and the date when the state thinks it will resolve the qualified provider or facilities shortage.

All exceptions approved under section 1905(ee)(2) will be for the full five-year period that the new MAT benefit is required. However, if a state decides to come into compliance with the MAT benefit requirement after receiving an exception under section 1905(ee)(2), CMS will be available to provide technical assistance to the state.

DHHRBMS016205

**JA1258**

Page 10 – State Health Official

**Extension of Compliance Deadline Due to Legislative Delay**

Section 1006(b)(4)(B) of the SUPPORT Act (which was not codified in any provision of the Social Security Act) provides for an "exception" to the October 1, 2020 effective date of the new MAT benefit "for state legislation." Essentially, this provision provides for an extension to the required start date of the new coverage requirement if the only reason the state cannot come into compliance by October 1, 2020 is due to lack of state legislation that is needed to meet the requirement. Not all states will be able to seek this extension, because it depends on the timing of the state's first regular legislative session that began after the date of enactment of the SUPPORT Act (October 24, 2018). If the Secretary of Health and Human Services determines that state legislation is needed to bring the state plan into compliance with the new coverage requirement, the Secretary will not consider the state to be out of compliance with the new coverage requirement solely on the basis of a failure to enact the required state legislation before the first day of the first calendar quarter beginning after the close of the first regular session of the state's legislature that begins after October 24, 2018. If a state's first regular legislative session beginning after October 24, 2018 was the calendar year that began on January 1, 2019 and ended on December 31, 2019, the state would not be able to seek this extension because it would have had only until December 31, 2019 to enact any required legislation, and the first day of the first calendar quarter that begins after that date is January 1, 2020 – well before October 1, 2020.

If, however, a state's first regular legislative session beginning after October 24, 2018 does not end until on or after October 1, 2020, and the Secretary determines that legislation was necessary to meet the new coverage requirement, but the necessary legislative authorization was not obtained, the state could seek to delay compliance with the new coverage requirement until the first day of the first calendar quarter after the legislative session ends. Such a state is expected to come into compliance with the new coverage requirement by the first day of the first calendar quarter after the end of the legislative session, unless the exception in section 1905(ee)(2) applies. If a state has a two-year legislative session, each year of the session shall be considered to be a separate regular session of the state legislature for purposes of this extension. This means that a state would not have a longer extension if it has a two-year legislative session; such a state is treated like a state with a one-year legislative session, and any applicable extension ends on the first day of the first calendar quarter following the end of the first year of the two-year session.

CMS will grant an extension based on legislative delay only if a legislative delay is the only reason that a state cannot meet the requirement, and only when the first regular legislative session that began after October 24, 2018 ends on or after October 1, 2020, as discussed above. States should submit requests for the legislative delay extension on or before January 14, 2021 to the Regional SPA/Waiver mailbox that is currently used for Medicaid SPA submissions. If the state is participating in the pilot for the new "One CMS Portal," the request for the legislative delay extension should be submitted via the portal. The request should include documentation to support that the state's first regular legislative session that began after October 24, 2018 did not end until on or after October 1, 2020, that state legislation is needed to come into compliance with the new coverage requirement, and that the legislative delay is the only reason the state cannot come into compliance as of October 1, 2020. States are encouraged to submit a request for flexibility under section 1135 of the Act with respect to SPA submission and notice timelines,

DHHRBMS016206

**JA1259**

Page 11 – State Health Official

as discussed below under "SPA Submission Requirements and Opportunity to Request Section 1135 Flexibility With Respect to SPA Submission and Notice Timelines," at the same time as the request for the legislative delay extension, in order to help safeguard a SPA effective date of October 1, 2020 if the state's request for a legislative delay extension is not granted. States may, but are not required to, use the following format for their legislative delay extension submission:

_____ [Insert name of state] requests an exception based on the need for legislative authority to cover the benefit described in section 1905(a)(29) of the Social Security Act, and submits documentation to support that the state's first regular legislative session that began after October 24, 2018 will not end until on or after October 1, 2020. [Describe the documentation that is attached or that accompanies the request and include information about the state's legislative calendar so CMS can determine the state's compliance date.]

States that are granted an extension due to legislative delay will still need to follow the SPA submission requirements below and submit a SPA consistent with the extended compliance deadline.

### SPA Submission Requirements and Opportunity to Request Section 1135 Flexibility With Respect to SPA Submission and Notice Timelines

SPA effective date requirements outlined at 42 C.F.R. 430.20 provide for an effective date retroactive to the first day of the quarter in which the SPA was submitted. In addition, the public notice requirements at 42 C.F.R. 447.205 require states to publish notice of proposed changes in methods and standards for setting payment rates for services before the proposed effective date of the change. Accordingly, under these rules, states have only until December 31, 2020 to submit a SPA establishing coverage or payment for the new MAT benefit that would take effect October 1, 2020. Additionally, any SPA setting payment rates for the new benefit could take effect only after the state issues public notice of the proposed payment changes. Thus, states would have had to publish notice of their payment rate changes by September 30, 2020, for changes to take effect October 1, 2020.

CMS is aware that most states have been unable to submit a SPA for the new MAT benefit that meets these submission and notice timing requirements because they have had to focus almost exclusively on responding to the COVID-19 pandemic throughout much of 2020. At the same time, the opioid crisis has only been exacerbated by the COVID-19 pandemic. During the COVID-19 public health emergency (PHE), disruptions in treatment have resulted in a resurgence of relapses and fatal overdoses among individuals with OUD.[35]

Consequently, in order to help ensure that beneficiaries can access coverage for the new MAT benefit effective retroactively to October 1, 2020, CMS is giving states the opportunity to request that CMS exercise its section 1135 authority to modify the regulatory deadlines associated with SPA submission and public notice for coverage and payment SPAs for the new MAT benefit while the COVID-19 PHE is still in effect.[36] CMS strongly recommends that states submit these

---

[35] https://qz.com/1889798/covid-19-is-making-the-opioid-crisis-much-worse/
[36] Section 1135 authority permits the Secretary to temporarily waive or modify certain Medicare, Medicaid, and Children's Health Insurance Program (CHIP) requirements during a PHE, in order to ensure, to the maximum extent feasible, that sufficient health care items and services are available to meet the needs of individuals enrolled in those programs.

DHHRBMS016207

Page 12 - State Health Official

requests on or before January 14, 2021. Specifically, if responding to the COVID-19 pandemic has delayed a state's ability to submit a coverage or payment SPA for the new MAT benefit or provide public notice of payment rate changes related to the new MAT benefit under the time frames set forth at 42 C.F.R. 430.20 and 447.205, the state may request flexibility regarding the timing of the SPA public notice and submission process for these SPAs, so that it can submit SPAs adding coverage and payment for the new mandatory MAT benefit at section 1905(a)(29) of the Act in the first quarter of 2021 that would be effective October 1, 2020. If a state does not submit a request for section 1135 flexibility as described herein and submits a SPA after December 31, 2020 to add the new mandatory MAT benefit, then the SPA's effective date would be on (or sometime after) January 1, 2021, beneficiaries might not be able to access all available MAT coverage before that date, and the state would not be in timely compliance with the new coverage requirement.

CMS will provide states with this flexibility only if they meet the following conditions. First, all state requests for modification of the deadlines for MAT SPA submission and public notice under section 1135 must be submitted and approved during the COVID-19 PHE, and all MAT SPAs must be submitted on or before March 31, 2021. Second, states must solicit and should consider public comments and comments received through tribal consultation before finalizing the SPAs that will take effect. States must conduct tribal consultation if required under section 1902(a)(73)(A) before submission of their MAT SPAs, even if CMS approves a modification under section 1135 of the 42 C.F.R. 447.205 notice timelines. Additionally, CMS strongly recommends that states conduct any public notice required under 42 C.F.R. 447.205 before submitting their MAT SPAs, even if CMS approves a modification under section 1135 of the timeline for that notice. If states have had to put in place interim coverage or rate policies for the new MAT benefit while preparing their SPAs for submission and finalizing them for approval, they would be expected to give effect to the rates and coverage policies that are ultimately approved retroactive to the effective date of October 1, 2020. States seeking these section 1135 flexibilities should submit a letter to Jackie Glaze at Jackie.Glaze@cms.hhs.gov by January 14, 2021. In addition to a statement explaining that the state's response to the COVID-19 pandemic has delayed its ability to submit coverage and/or payment SPAs for the new MAT benefit according to the regulatory SPA submission and notice timelines, the letter should include the following language (as applicable):

Request for Modifications under Section 1135

> Pursuant to section 1135(b)(5) and/or 1135(b)(1)(C) of the Act, the state Medicaid agency requests modification of SPA submission requirements at 42 C.F.R. 430.20, in order to submit a SPA implementing section 1905(a)(29) of the Act by March 31, 2021 that would take effect on October 1, 2020.

> Pursuant to section 1135(b)(5) and/or 1135(b)(1)(C) of the Act, the state Medicaid agency requests modification of the public notice time frames set forth at 42 C.F.R. 447.205, in order to obtain an effective date of October 1, 2020 for its SPA implementing statewide methods and standards for setting payment rates for the benefit described at section 1905(a)(29) of the Act. The state will issue public notice as soon as possible, and in no event later than February 28, 2021.

DHHRBMS016208

Page 13 – State Health Official

With respect to SPA submissions related to coverage and payment for the new MAT benefit, states should take the following steps.

States should submit an amendment to their Medicaid state plans (including to Alternative Benefit Plans, if applicable), no later than December 31, 2020 (or March 31, 2021, if CMS has approved section 1135 flexibility as discussed above) after having conducted public notice and tribal consultation, as needed, to cover, under the new mandatory benefit at section 1905(a)(29) of the Act, all FDA-approved or licensed drugs and biologicals used for MAT to treat OUD, as well as all forms of the drugs and biologicals approved or licensed by the FDA for MAT to treat OUD, and associated counseling services and behavioral therapies. States should submit their SPAs to the Regional SPA/Waiver mailbox that is currently used for other Medicaid SPA submissions. If a state is participating in the pilot for the new "One CMS Portal," the SPA should be submitted via the portal.

States that already use existing Medicaid authorities to cover items and services that will now be covered under the new mandatory MAT benefit, including FDA-approved or licensed drugs and biologicals used for MAT to treat OUD, and associated counseling services and behavioral therapies, are expected to submit a SPA to move their coverage of these items and services to a new page in their Medicaid state plans for the new mandatory benefit at section 1905(a)(29) of the Act.

In addition to submitting SPAs to add the mandatory MAT benefit to the state plan, states will need to propose associated changes to the payment section of the state plan. States will need to submit a new Attachment 4.19-B page for the mandatory benefit at section 1905(a)(29) that describes the rate-setting methodology used to pay for the services covered under the mandatory MAT benefit. The rate-setting methodology for the new MAT benefit must be consistent with section 1902(a)(30)(A) of the Act, which requires Medicaid payments to be "consistent with efficiency, economy, and quality of care" and to be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." States may include all medical service costs associated with furnishing the MAT benefit services to Medicaid beneficiaries (such as salaries, fringe benefits, supplies, and equipment) in their rate-setting methodology for the new MAT benefit, and the methodology must be a comprehensive description within the state plan consistent with 42 C.F.R. 430.10. As states have a variety of options to choose from in how they pay for MAT services, CMS is available to provide assistance to states as they develop SPA proposals. We encourage states to reach out to their state lead in the Medicaid and CHIP Operations Group for technical assistance.

As with any SPA submission, CMS expects states to comply with all SPA requirements that are not waived or modified, including those found in 42 C.F.R. 440.200, et seq., and to provide information on the source of the non-federal share of the service payments and information on the rate-setting methodology. Specific guidance related to SPA submission procedures may be found on the Medicaid.gov web page.

DHHRBMS016209

Page 14 – State Health Official

**MAT Drug Coverage and Section 1927 Manufacturer Rebates**
CMS interprets section 1905(ee)(1) of the SUPPORT Act to require that states include as part of
the new mandatory benefit all forms of drugs and biologicals that the FDA has approved or
licensed for MAT to treat OUD.  More specifically, under the new mandatory MAT benefit,
states are required to cover such FDA approved or licensed drugs and biologicals used for
indications for MAT to treat OUD.

Statutory amendments were made to the original language at sections 1905(a)(29) and 1905(ee)
by Section 2601 of the Continuing Appropriations Act, 2021 and Other Extensions Act (Pub. L.
No. 116-159) to specify that the rebate requirements in section 1927 shall apply to any MAT
drugs or biologicals described under the mandatory benefit at section 1905(ee)(1)(A), that are
furnished as medical assistance under sections 1905(a)(29) and section 1902(a)(10)(A), and are
covered outpatient drugs, as that term is defined at section 1927(k)(2).  In determining whether
such a MAT drug or biological satisfies the definition of a covered outpatient drug, such MAT
drugs or biologicals are deemed prescribed drugs for such purposes.  More specifically, these
amendments ensure that MAT drugs and biologicals can be included in the Medicaid Drug
Rebate Program (MDRP).  Additionally, for MAT drugs or biologicals that are also covered
outpatient drugs, the amendments also ensure a state's ability to seek section 1927 rebates and
apply drug utilization management mechanisms (such as preferred drug lists and prior approval),
and establish a manufacturer's obligation to pay appropriate rebates and comply with all
applicable drug product and drug pricing reporting and payment of rebates.  The change in law is
effective as if included in the enactment of the SUPPORT Act, which was October 24, 2018.

CMS expects that most manufacturers of MAT drugs and biologicals currently have in effect a
rebate agreement with the Secretary and pay rebates to states for all drugs and biologicals that
meet the definition of covered outpatient drug (COD) in section 1927(k) of the Act, and if not,
that manufacturers of these drugs and biologicals will likely enter into a rebate agreement with
the Secretary and pay rebates to states.  Should an FDA-approved MAT drug or biological for
OUD not meet the definition of a covered outpatient drug, or if the drug is a covered outpatient
drug, but the manufacturer does not have a rebate agreement in effect with the Secretary, the
state would still be required to cover the drug or biological under the MAT mandatory benefit,
and the drug or biological would be eligible for FFP, but not rebates.  States could subject MAT
drugs or biologicals that are not covered outpatient drugs to prior approval or other utilization
management mechanisms under 42 C.F.R. 440.230 as described below, including in order to
prioritize coverage of those drugs that are covered outpatient drugs, but the state still must
provide coverage for MAT drugs that are not covered outpatient drugs if they are medically
indicated for the beneficiary, consistent with 42 C.F.R. 440.230(b).

**State Use of Utilization Management Mechanisms**
As a reminder, states may use utilization management controls to promote the efficient delivery
of care and to control costs.[37]  States can use the Section 1927 utilization management
mechanisms for MAT drugs used for OUD that are covered outpatient drugs, such as

---

[37] Medicaid and CHIP Payment and Access Commission's (MACPAC) October 2019, Report to Congress:
Utilization Management of Medication-Assisted Treatment in Medicaid, https://www.macpac.gov/wp-
content/uploads/2019/10/Report-to-Congress-Utilization-Management-of-Medication-Assisted-Treatment-in-
Medicaid.pdf

DHHRBMS016210

Page 15 – State Health Official

encouraging the use of generic products, creating a preferred drug list, or choosing to implement prior authorization to manage drug classes that may require additional monitoring.

For MAT drugs that are covered outside of a rebate agreement, or would be covered outpatient drugs, except that they are subject to the limiting definition at section 1927(k)(3) (e.g. those that are paid as part of a bundle), states may use the utilization management mechanisms authorized under 42 C.F.R. 440.230. In these cases, states may propose limits on the amount, duration, and scope of these drugs under the MAT benefit, including to encourage the use of the most cost-effective MAT drugs and biologicals.

### Support to States for Increasing SUD Treatment Options

Well-supported scientific evidence demonstrates that treatment for substance use disorders – including inpatient, residential, and outpatient treatment – is cost-effective compared with no treatment.[38] Existing Medicaid authorities, as well as new opportunities afforded by the SUPPORT Act, are available to help states expand their SUD service continuum, which can include MAT.

Section 1115 demonstration projects – In November 2017, CMS announced a section 1115 initiative that affords states the opportunity to receive federal financial participation (FFP) for expenditures on the continuum of services to treat SUD, including expenditures on treatment while Medicaid enrollees are residing in residential treatment facilities that are IMDs. Such expenditures can generally not be federally matched under Medicaid due to the IMD exclusion. As part of this initiative, states may develop innovative approaches to inpatient and residential care for individuals with SUDs that are expected to supplement and coordinate with community-based care to provide a robust continuum of care in the state. Participating states are required to ensure residential settings included in these demonstrations are either offering beneficiaries access to MAT on-site or facilitating beneficiaries' access to MAT off-site.[39]

Section 1003 of the SUPPORT Act – Section 1003 requires the Secretary to conduct a demonstration project to increase Medicaid SUD provider capacity. In 2019, CMS awarded planning grants to 15 states to conduct an assessment of SUD treatment and recovery needs of the state. The planning grants may also support activities to recruit, train, and provide technical assistance for providers; to improve reimbursement; and to expand the number or treatment capacity of Medicaid providers. Up to five of the states that received planning grants will be selected to implement demonstrations and receive enhanced federal reimbursement for increases in Medicaid SUD treatment and recovery services expenditures. For more information on this demonstration project, and the 15 states that were awarded planning grants, see the Medicaid.gov web page.[40]

Section 1006(a) of the SUPPORT Act – Section 1006(a) of the SUPPORT Act permits CMS to extend, at state request, the period of 90% federal match from eight to 10 fiscal year quarters for

---

[38] Office of the Surgeon General, *Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health.* Washington, DC: HHS, November 2016. Chapter 4, Early Intervention, Treatment, and Management of Substance Use Disorders. https://addiction.surgeongeneral.gov/sites/default/files/surgeon-generals-report.pdf.
[39] SMDL # 17-003, Re: Strategies to Address the Opioid Epidemic, November 1, 2017, https://www.medicaid.gov/federal-policy-guidance/downloads/smd17003.pdf.
[40] https://www.medicaid.gov/medicaid/benefits/bhs/support-act-provider-capacity-demos/index.html

DHHRBMS016211

Page 16 -- State Health Official

health home services provided to SUD-eligible individuals under a SUD-focused Medicaid health home SPA approved on or after October 1, 2018. The Medicaid health home state plan option (authorized under section 1945 of the Act) promotes coordination of primary and acute physical and behavioral health services and long-term services and supports. Specific guidance related to the health home Medicaid state plan option, including guidance on health home services, health home providers, state reporting, and developing payment methodologies, can be found on the Medicaid.gov web page.[41] Information on section 1006(a) of the SUPPORT Act is also available in the policy guidance tab on the Medicaid.gov web page.[42]

Section 7181 of the SUPPORT Act – Section 7181 of the SUPPORT Act reauthorized and modified the "State and Tribal Response to the Opioid Crisis" grants established under section 1003 of the 21st Century Cures Act. Section 7181 requires the grants to be awarded to Indian tribes in addition to states and territories. This provision also expands the types of activities that grants may support to include the establishment of prescription drug monitoring programs and training for health care practitioners in preventing diversion of controlled substances. It also emphasizes flexibility with use of funds by permitting resources to be directed "in accordance with local needs related to substance use disorders."[43]

Section 7181 authorizes $500 million for each of Fiscal Years 2019-2021, which would remain available until expended. It authorizes a set-aside of up to 15% for states with the highest age-adjusted rate of drug overdose death based on the ordinal ranking of states according to the Centers for Disease Control and Prevention (CDC)[44]. SAMHSA will provide state agencies and Indian tribes with technical assistance on grant application and submission procedures, award management activities, and enhancing outreach and direct support to rural and underserved communities and providers in addressing the opioid crisis.

Telehealth – HHS developed materials to help clarify how clinicians can use telemedicine as a tool to expand buprenorphine-based MAT for OUD treatment under current DEA regulations. This information includes a clinical practice example that is consistent with applicable DEA and HHS administered authorities. It is hoped that the materials help expand providers' ability to prescribe MAT to patients, including remote patients under certain circumstances. This information can be found on the HHS.gov web page.[45]

Telehealth could be especially helpful in supporting access to buprenorphine in rural areas, where there may be a smaller number of waivered providers able to prescribe buprenorphine for the treatment of OUD in settings other than federally regulated opioid treatment programs.[46]

---

[41] https://www.medicaid.gov/medicaid/ltss/health-homes/index.html.
[42] CMCS Informational Bulletin, Guidance for States on the Availability of an Extension of the Enhanced Federal Medical Assistance Percentage (FMAP) Period for Certain Medicaid Health Homes for Individuals with Substance Use Disorders (SUD), May 7, 2019, https://www.medicaid.gov/sites/default/files/Federal-Policy-Guidance/Downloads/cib050719.pdf.
[43] https://www.govinfo.gov/content/pkg/PLAW-115publ271/html/PLAW-115publ271.htm
[44] https://www.cdc.gov/drugoverdose/data/statedeaths.html
[45] https://www.hhs.gov/opioids/sites/default/files/2018-09/hhs-telemedicine-hhs-statement-final-508compliant.pdf.
[46] U.S. Department of Health and Human Services. Telemedicine and Prescribing Buprenorphine for the Treatment of Opioid Use Disorder. DHHS web site. September 2018. https://www.hhs.gov/blog/2018/09/18/using-telemedicine-combat-opioid-epidemic.html.

DHHRBMS016212

Page 17 – State Health Official

CMS also released a State Medicaid Director Letter (SMDL) in June 2018, "Leveraging Medicaid Technology to Address the Opioid Crisis,"[47] that includes a section on how states can leverage telehealth technologies to improve access to SUD treatment. This SMDL also discusses the potential availability of enhanced federal funding to support telehealth-enabling technologies. Additionally, consistent with section 1009(b)(1) of the SUPPORT Act, CMS issued guidance on federal Medicaid reimbursement for services to treat SUD furnished via telehealth, including in School-Based Health Centers.[48] Services discussed in this guidance include assessment, MAT, counseling, medication management, and medication adherence with prescribed medication regimes.

**Conclusion**

MAT is an effective, comprehensive, and evidence-based treatment that is integral to addressing the nation's opioid crisis. Section 1006(b) of the SUPPORT Act amended the Social Security Act to require states to cover MAT for all eligible to enroll in the state plan or waiver of state plan. The new mandatory MAT benefit includes all FDA-approved drugs and licensed biologicals used for MAT to treat OUD, as well as associated counseling and behavioral therapies. CMS interprets the statute to require coverage of all forms of drugs and biologicals approved or licensed by the FDA for use as MAT to treat OUD. CMS is available to provide technical assistance and looks forward to working with states to ensure Medicaid beneficiaries with OUD receive the services they need. If you have any questions, please contact Kirsten Jensen, Director of the Division of Benefits and Coverage, at Kirsten.Jensen@cms.hhs.gov.

Sincerely,

/s/

Anne Marie Costello
Acting Deputy Administrator and Director

cc:   State Mental Health Directors
      State Substance Use Directors
      State Opioid Treatment Authorities
      State Budget Officers
      State Pharmacy Directors
      National Association of Medicaid Directors
      National Association of State Mental Health Program Directors
      National Association of State Alcohol and Drug Abuse Directors
      Association of State and Territorial Health Officials
      National Association of State Budget Officers
      National Conference of State Legislatures

---

[47] https://www.medicaid.gov/federal-policy-guidance/downloads/smd18006.pdf.
[48] CMCS Informational Bulletin, April 2, 2020. Rural Health Care and Medicaid Telehealth Flexibilities, and Guidance Regarding Section 1009 of the Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment (SUPPORT) for Patients and Communities Act (Pub. L. 115-271), entitled Medicaid Substance Use Disorder Treatment via Telehealth. https://www.medicaid.gov/sites/default/files/Federal-Policy-Guidance/Downloads/cib040220.pdf

DHHRBMS016213

**JA1266**

Page 18 – State Health Official

*Disclaimer Language*: *The contents of this document do not have the force and effect of law and are not meant to bind the public in any way, unless specifically incorporated into a contract. This document is intended only to provide clarity to the public regarding existing requirements under the law.*

DHHRBMS016214

**JA1267**

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard Mailstop S2-26-12
Baltimore, Maryland 21244-1850



SHO# 21-003

**RE: Medicaid and CHIP Coverage
and Reimbursement of COVID-19
Testing under the American
Rescue Plan Act of 2021 and
Medicaid Coverage of Habilitation
Services**

August 30, 2021

Dear State Health Official:

The Centers for Medicare & Medicaid Services (CMS) is issuing this guidance on Medicaid and
Children's Health Insurance Program (CHIP) coverage and reimbursement of COVID-19 testing
under the American Rescue Plan Act of 2021 (ARP) (Pub. L. No. 117-2). Additionally, CMS is
issuing this guidance to clarify that, only during the COVID-19 public health emergency (PHE),
states may cover habilitation services provided to children under section 1915(c) and section
1915(i) of the Social Security Act (the Act) to facilitate the delivery of remote learning if the
habilitation services are not available through the local educational agency, and the individuals
are enrolled in a section 1915(c) waiver and/or 1915(i) program.

CMS will apply the interpretations of statute in this guidance on a prospective basis beginning
with the date of issuance of this letter.

**Mandatory COVID-19 Testing Coverage under the American Rescue Plan Act of 2021**

*Overview*

CMS interprets the ARP to require state Medicaid and CHIP programs to cover a broad array of
COVID-19 testing, including all types of U.S. Food & Drug Administration (FDA)-authorized
COVID-19 tests, without cost-sharing obligations, for a period of time that begins March 11,
2021, and generally extends beyond the end of the COVID-19 PHE. In meeting these ARP
requirements, states must continue to apply normal third-party liability rules and may continue to
apply utilization management techniques, as further described later in this letter.[1]

*ARP Sections 9811 and 9821*

The ARP was enacted on March 11, 2021 and included COVID-19 testing coverage mandates
specific to Medicaid and CHIP. Section 9811(a) of the ARP added a new mandatory Medicaid

---

[1] Use of the term "state" in this letter includes the territories, as applicable.
The contents of this document do not have the force and effect of law and are not meant to bind the public in any way, unless specifically
incorporated into a contract. This document is intended only to provide clarity to the public regarding existing requirements under the law.

DHHRBMS016215

benefit at section 1905(a)(4)(F) of the Act.  Section 9821 of the ARP added the same mandatory benefit for all CHIP enrollees at section 2103(c)(11)(B) of the Act.  Sections 1905(a)(4)(F) and 2103(c)(11)(B) of the Act require states to cover testing for COVID-19 for the period beginning on March 11, 2021, and ending on the last day of the first calendar quarter that begins one year after the last day of the COVID-19 emergency period described in section 1135(g)(1)(B) of the Act. In addition, section 9811(a)(2)(E) of the ARP amended the statutory language following section 1902(a)(10)(G) of the Act to require coverage of additional testing for COVID-19 for individuals eligible for the optional Medicaid eligibility group described at section 1902(a)(10)(A)(ii)(XXIII) of the Act (the group CMS previously referred to as the "optional COVID-19 testing group").[2]

ARP sections 9811 and 9821 also amended sections 1916, 1916A, and 2103(e)(2) of the Act to specify that states cannot impose cost-sharing with respect to the COVID-19 testing coverage required under the ARP and described in sections 1905(a)(4)(F) and 2103(c)(11)(B).  ARP section 9811(a)(5) also amended section 1937(b) of the Act to require states to include the same COVID-19 testing coverage in Medicaid alternative benefit plans, without any deduction, cost-sharing, or similar charge.

CMS interprets the amendments made by sections 9811 and 9821 of the ARP to require states to cover both diagnostic and screening tests for COVID-19 (which includes their administration), consistent with the Centers for Disease Control and Prevention (CDC) definitions of diagnostic and screening testing for COVID-19 and its recommendations for who should receive diagnostic and screening tests for COVID-19.  CMS is aligning its interpretation of these ARP amendments with applicable CDC recommendations because the CDC recommendations provide a national reference point for who should be tested during the COVID-19 pandemic and evolve as science evolves.[3]  CMS interprets these amendments to require states to cover, without cost sharing, all diagnostic and screening testing that would be consistent with the CDC recommendations.  This includes, for example, coverage of screening testing to return to school or work or to meet travel requirements.  CMS is available for technical assistance as states design their testing coverage policy and as the COVID-19 pandemic evolves.

An individualized test result must be obtained for both diagnostic and screening testing covered under the amendments made by sections 9811 and 9821 of the ARP to support a Medicaid or CHIP claim.  Additionally, all types of FDA-authorized COVID-19 tests must be covered under CMS's interpretation of the ARP COVID-19 testing coverage requirements, including, for example, "point of care" or "home" tests that have been provided to a Medicaid or CHIP beneficiary by a qualified Medicaid or CHIP provider of COVID-19 tests.  Home tests include those where a specimen is collected at home and then sent to a clinical laboratory or other certified testing site for testing, and those that are entirely performed at home, meaning the test system includes the ability to perform the test without involvement of a laboratory.  States have

---

[2] Under section 1902(a)(10)(A)(ii)(XXIII) of the Act and the statutory language following section 1902(a)(10)(G) of the Act, states can provide coverage to the optional COVID-19 group (previously referred to as the optional COVID-19 testing group) only through the last day of the COVID-19 PHE. No federal financial participation is available for any state expenditures on benefits for this group, including coverage of COVID-19 testing, after the PHE ends.

[3] See, e.g., https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/sars-cov2-testing-strategies.html.

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way, unless specifically incorporated into a contract. This document is intended only to provide clarity to the public regarding existing requirements under the law.

DHHRBMS016216

discretion to condition coverage of a home test on a prescription as part of their utilization management (some FDA-authorized home tests require a prescription). As states establish utilization management techniques, including possible prescription conditions, they are encouraged to do so in ways that do not establish arbitrary barriers to accessing COVID-19 testing coverage, but that do facilitate linking the reimbursement of a covered test to an eligible Medicaid or CHIP beneficiary.

Finally, states may apply medical necessity criteria and other amount, duration, and scope parameters to COVID-19 testing covered under section 1905(a)(4)(F) of the Act and the other amendments made by section 9811 of the ARP, as they may do for all Medicaid services, as a utilization management control, provided that the benefit is sufficient to reasonably achieve its purpose (consistent with 42 CFR § 440.230(b)). States may also apply utilization controls to the COVID-19 testing covered in CHIP under section 2103(c)(11)(B), consistent with 42 CFR § 457.490.

### Screening Testing in Schools

Schools can be Medicaid providers of COVID-19 screening testing covered under section 1905(a)(4)(F) and the other amendments made by section 9811 of the ARP. The vast majority of schools that render school-based services covered by Medicaid are reimbursed via a methodology associated with a Certified Public Expenditure (CPE) that requires reconciliation to actual cost via a uniform cost report. If the school obtains and administers a COVID-19 test and the state plan payment methodology is reconciled to cost, the cost of the test could be recorded on a cost report as a medical supply, and any accompanying cost of administering the test, such as the salary of the administering nurse, etc., would also be recorded in the cost report.

Section 1902(a)(30)(A) of the Act requires states to "assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the [Medicaid state] plan at least to the extent that such care and services are available to the general population in the geographic area." If the state plan payment methodology is a rate for school-based services, the cost of the test and any cost associated with administering the test should be factored into the rate. If the school contracts with an outside entity to administer the test, the school, not the outside entity, would be considered the billing provider of the test under Medicaid. If the state plan payment methodology is reconciled to cost, the contractual rate negotiated between the school and the outside entity would be recorded as contracted services in the provider's uniform cost report. If the state plan payment methodology is a rate, the above-contracted cost should be factored into the rate.

While there is no prohibition on Medicaid qualified providers billing for Medicaid covered services and items provided to Medicaid beneficiaries that may be provided free of charge to the general public, there may be sources of federal funding that are also available to cover the cost of testing in schools, which could potentially duplicate Medicaid payments. To avoid such duplication, states should ensure that Medicaid payments are appropriately considered along with other available sources of federal funds or revenue that may be used to fund testing in schools.

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way, unless specifically incorporated into a contract. This document is intended only to provide clarity to the public regarding existing requirements under the law.

3

DHHRBMS016217

**JA1270**

All third-party payer provisions continue to apply, and we remind states of the existence of additional funding streams for COVID-19 testing reimbursement not typically available.[4]

As indicated above, states may implement utilization management techniques in the coverage of screening testing in schools.

### State Plan Amendments

States will need to submit Medicaid state plan amendments (SPAs) to add testing coverage and reimbursement as required under the ARP, including under the new mandatory benefit at section 1905(a)(4)(F) of the Act. CMS will provide additional information on submission of Medicaid SPAs to reflect ARP changes. CMS is available for technical assistance on SPA development.

States will also need to submit CHIP SPAs pursuant to CMS requirements at 42 CFR § 457.60(a). States will need to indicate that they are providing testing coverage without cost sharing, in accordance with the requirements of section 2103(c)(11)(B) and 2103(e)(2) of the Act. CMS will provide additional information on submission of CHIP SPAs to reflect ARP changes.

### Medicaid Coverage of Individuals with Disabilities Education Act (IDEA) Services during Remote Learning

As discussed in State Health Official (SHO) letter 21-001, under the Individuals with Disabilities Education Act (IDEA), children with disabilities are eligible to receive educational and related services that will help them achieve their educational goals, as documented in the child's individualized education program (IEP) or, for infants and toddlers (children under age three), the individualized family service plan (IFSP). These educational services can help children with disabilities achieve their educational goals. Medicaid reimbursement is available for covered services that are included in the child's IEP and IFSP provided to eligible beneficiaries by qualified Medicaid providers.[5] States also have the option to cover Medicaid services furnished to eligible Medicaid beneficiaries in the school setting if the children are determined to need those services, the services are furnished by qualified Medicaid providers, and the services meet all of the requirements set forth in the State Medicaid Director Letter 14-006.[6] Typically, however, under section 1915(c) and section 1915(i) of the Act, states must not cover habilitation

---

[4] Third party liability provisions are found in section 1902(a)(25) of the Act and 42 CFR Part 433, Subpart D.

[5] There are a few exceptions to the general rule that Medicaid is the payer of last resort and these exceptions generally relate to federally administered health programs. For a federally administered program to be an exception to the Medicaid payer of last resort rule, the statute creating the program must expressly state that the other program pays only for claims not covered by Medicaid; or, is allowed, but not required, to pay for health care items or services. As indicated by section 1903(c) of the Act, Parts B and C of the Individuals with Disabilities Education Act (IDEA) is one example of this exception to the payer of last resort rule.

[6] State Medicaid Director Letter 14-006, Medicaid Payment for Services Provided without Charge (Free Care), issued December 15, 2014, https://www.medicaid.gov/federal-policy-guidance/downloads/smd-medicaid-payment-for-services-provided-without-charge-free-care.pdf.

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way, unless specifically incorporated into a contract. This document is intended only to provide clarity to the public regarding existing requirements under the law.

4

DHHRBMS016218

services[7] in the school setting if the services are otherwise available to the individual through a local educational agency.

CMS is clarifying that, in light of the unique circumstances presented by the COVID-19 PHE where students are relying on remote learning in whole or in part, states may cover habilitation services provided to children under section 1915(c) and section 1915(i) to facilitate the delivery of remote learning if the habilitation services are not available through the local educational agency, and the individuals are enrolled in a section 1915(c) waiver and/or 1915(i) program. For example, schools may be unable to deploy personnel to meet the needs of each individual child participating in remote education. CMS recognizes the significant advances in vaccination rates across the country, including for school-aged children eligible to be vaccinated. As schools return to in-person learning, CMS expects habilitation services will be available through local educational agencies and no longer eligible for coverage under Medicaid.

However, *to the extent necessary given local conditions*, states may choose to avail themselves of this flexibility where services are, in fact, not available through the local educational agency. Local educational agencies must prioritize use of funding available in the ARP, prior to indicating an inability to provide covered habilitation services. This flexibility is available prospectively from the issuance of this guidance. If applicable, states will need to submit an Appendix K application, disaster-related SPA, or 1115 application to implement this flexibility.

CMS notes that states must also continue to provide medically necessary services authorized under section 1905(a), in accordance with Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) responsibilities.

<u>Conclusion</u>

This guidance describes Medicaid and CHIP coverage and reimbursement of COVID-19 testing under the ARP, and habilitation services during the COVID-19 PHE. As previously stated, CMS will apply the interpretations of statute in this guidance for both COVID-19 testing and habilitation services on a prospective basis beginning with the date of issuance of this letter. Please contact Kirsten Jensen at Kirsten.Jensen@cms.hhs.gov for additional information on COVID-19 testing and Ralph Lollar at Ralph.Lollar@cms.hhs.gov for additional information on habilitation services.

Sincerely,



Daniel Tsai
Deputy Administrator and Director

[7] Defined at section 1915(c)(5) as "services designed to assist individuals in acquiring, retaining and improving the self-help, socialization, and adaptive skills necessary to reside successfully in home and community-based settings."

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way, unless specifically incorporated into a contract. This document is intended only to provide clarity to the public regarding existing requirements under the law.

DHHRBMS016219

Mandatory & Optional Medicaid Benefits | Medicaid

U.S. flag U.S. flagAn official website of the United States government

# Medicaid.gov
Keeping America Healthy

MENU

Home › Medicaid › Benefits › Mandatory & Optional Medicaid Benefits

# Mandatory & Optional Medicaid Benefits

This page outlines mandatory Medicaid benefits, which states are required to provide under federal law, and optional benefits that states may cover if they choose.

## Mandatory Benefits

- Inpatient hospital services
- Outpatient hospital services
- EPSDT: Early and Periodic Screening, Diagnostic, and Treatment Services
- Nursing Facility Services
- Home health services
- Physician services
- Rural health clinic services
- Federally qualified health center services
- Laboratory and X-ray services
- Family planning services
- Nurse Midwife services
- Certified Pediatric and Family Nurse Practitioner services
- Freestanding Birth Center services (when licensed or otherwise recognized by the state)
- Transportation to medical care
- Tobacco cessation counseling for pregnant women

## Optional Benefits

- Prescription Drugs
- Clinic services
- Physical therapy

DHHRBMS016220

Mandatory & Optional Medicaid Benefits | Medicaid

- Occupational therapy
- Speech, hearing and language disorder services
- Respiratory care services
- Other diagnostic, screening, preventive and rehabilitative services
- Podiatry services
- Optometry services
- Dental Services
- Dentures
- Prosthetics
- Eyeglasses
- Chiropractic services
- Other practitioner services
- Private duty nursing services
- Personal Care
- Hospice
- Case management
- Services for Individuals Age 65 or Older in an Institution for Mental Disease (IMD)
- Services in an intermediate care facility for Individuals with Intellectual Disability
- State Plan Home and Community Based Services- 1915(i)
- Self-Directed Personal Assistance Services- 1915(j)
- Community First Choice Option- 1915(k)
- TB Related Services
- Inpatient psychiatric services for individuals under age 21
- Other services approved by the Secretary[*]
- Health Homes for Enrollees with Chronic Conditions – Section 1945

*This includes services furnished in a religious nonmedical health care institution, emergency hospital services by a non-Medicare certified hospital, and critical access hospital (CAH).

DHHRBMS016221

## Mandatory & Optional Medicaid Benefits



Twitter YouTube

A federal government managed website by the
Centers for Medicare & Medicaid Services.
7500 Security Boulevard Baltimore, MD 21244

DHHRBMS016222

USCA4 Appeal: 22-1927    Doc: 20-3    Filed: 10/31/2022    Pg: 221 of 477

Case 3:20-cv-00740   Document 252-3   Filed 05/31/22   Page 213 of 240 PageID #: 3706
Mandatory & Optional Medicaid Benefits | Medicaid

# Centers for Medicare & Medicaid Services

DHHRBMS016223

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

**CHRISTOPHER FAIN; ZACHARY**
**MARTELL; and BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

> Exhibit
> 22

                                      **Plaintiffs,**          Civil Action No. 3:20-cv-00740
                                                               Hon. Robert C. Chambers, Judge

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA**
**DEPARTMENT OF HEALTH AND HUMAN**
**RESOURCES, BUREAU FOR MEDICAL**
**SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE**
**HEALTH PLAN OF WEST VIRGINIA, INC.**

---

**DEFENDANTS RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR**
**PRODUCTION TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND**
**WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,**
**BUREAU FOR MEDICAL SERVICES**

**DOCUMENT REQUESTS**

1. Documents sufficient to show the total annual number of West Virginia Medicaid

   participants.

   **RESPONSE: Reports have been requested.**

2.  All documents relating to Plaintiff's communications, injuries, requests for coverage, requests for prior authorization, requests for reimbursement and/or complaints regarding coverage for Gender-Confirming Care through the West Virginia Medicaid Program. This Request includes but is not limited to:

   a.  All communications to and from Plaintiff relating to coverage for Gender-Confirming Care;

   b.  All Documents and communications regarding Plaintiff's requests for Gender-Confirming Care, including but not limited to communications among Defendants, and/or the employees, entities, agents, representatives, contractors, vendors, and/or consultants of Defendants and/or West Virginia Department of Health and Human Resources, Bureau of Medical Services;

   c.  All Documents and communications relating to consideration or processing by third-party administrators, contractors, and/or vendors of requests for Gender-Confirming Care by Plaintiff.

**RESPONSE: Upon entry of an appropriate Protective Order, these Defendants can produce an excel spreadsheet with the pharmacy claims detail for Christopher Fain. Any communications to or from Mr. Fain's Managed Care Organization would not be in the possession of these Defendants.**

3.  Taking necessary steps to comply with applicable privacy laws and making all necessary redactions to protect any personal health information. Documents in electronic, delimited, and importable format (e.g., excel spreadsheet) sufficient to show number of individuals who have requested coverage for Gender-Confirming Care, the number of claims each

2

**JA1278**

individual has made for Gender-Confirming Care, whether those claims were approved or denied, the factual reasons for each decision, and whether any denials were based in whole or in part on the Exclusion.

**RESPONSE: Any requests made for gender-confirming care to Managed Care Organizations would not be in the possession of these Defendants.**

**Upon information and belief, counseling is a covered service. However, the data is not kept in a manner which would allow these Defendants to identify which patients have requested counseling for gender confirming care. These defendants would not necessarily know the reason for counseling and whether it was related to gender-confirming care or some other reason. Therefore, these Defendants are unable to further respond to this Request as stated.**

**Similarly, with respect to hormone therapy, upon information and belief hormone therapy is not denied on the basis that it is for gender-confirming care. However, the data is not kept in a manner which would allow these Defendants to identify which patients have requested hormone therapy for gender confirming care. These defendants would not necessarily know the reason for hormone therapy and whether it was related to gender-confirming care or some other reason. Therefore, these Defendants are unable to further respond to this Request as stated.**

4. All Documents and communications relating to the Exclusion, including but not limited to:

   a. All Documents and communications relating to the decision to maintain the Exclusion in the Health Plans in any plan year.

3

**JA1279**

     b.  All Documents and communications relating to the decision to permit coverage for hormone therapy for the purpose of treating gender dysphoria.

     c.  All Document and communications relating to evaluating, examining, analyzing, and/or considering the Exclusion in any way.

**RESPONSE: Upon information and belief:**

**a.    These Defendants are conducting a search for any responsive documents;**

**b.    Please see Exhibit 1. (Bates No. DHHRBMS000001-5), relating to the removal of the gender edit for most estrogen and testosterone containing products;**

**c.    These Defendants are conducting a search for any responsive documents.**

5.  All Documents and communications relating to gender dysphoria, transgender people, and/or Gender-Confirming Care.

**RESPONSE: Objection to the scope of the request to the extent that it requests all documents and communications relating to gender dysphoria, transgender people, and/or Gender-Confirming Care throughout the Bureau of Medical Services. Without waiving this objection, these defendants are conducting a search for any responsive documents. A search of communications of Dr. James Becker, Medical Director, Jennifer J. Myers, Director of Professional Services, and Tanya Cyrus, for the terms "gender dysphoria," "transgender people" and "Gender-Confirming Care" is being requested through the Office of Technology.**

4

**JA1280**

6. All Documents and communications relating to the Exclusion and/or Gender-Confirming Care considered by the individuals responsible for adopting and/or maintaining the Exclusion in the Health Plans. Please identify the responsive Documents by Bates number. This includes, but is not limited to:

    a. Documents and communications regarding the safety or efficacy of Gender-Confirming Care;

    b. Documents and communications regarding the medical necessity of Gender-Confirming Care; and

    c. Documents and communications regarding the cost of Gender-Confirming Care.

**RESPONSE: These defendants are conducting a search for any responsive documents. These Defendants would not be in possession of responsive information related to exclusions contained in Managed Care Organization plans.**

7. If Defendants contend that the Exclusion of Gender-Confirming Care is supported by any governmental interest not encompassed in the Requests above, all Documents supporting that contention.

**RESPONSE: These Defendants are unaware of any responsive documents.**

8. Documents sufficient to identify the circumstances in which counseling and/or therapy is covered through the West Virginia Medicaid Program, including but not limited to Diagnostic Codes, Procedure Codes, contracts, Health Plans, clinical guidelines and/or

5

**JA1281**

criteria, medical necessity criteria, and pre/prior authorization requirements and procedures where applicable.

**RESPONSE: Please see BMS Provider Manual Chapter 519.22 that can be accessed online at:**

**https://dhhr.wv.gov/bms/Provider/Documents/Manuals/Chapter%20519%20Practit ioner%20Services/Policy_519.22_Mental_Health_Counseling_and_Substance_Abus e_Treatment_2018%20update_final.pdf.**

9. Documents sufficient to identify the circumstances in which hormone therapy is covered through the West Virginia Medicaid Program, including but not limited to Diagnostic Codes, Procedure Codes, contracts, Health Plans, clinical guidelines and/or criteria, medical necessity criteria, and pre/prior authorization requirements and procedures where applicable.

**RESPONSE: Please see BMS Provider Manual Chapter 518 Pharmacy Services that can be accessed online at:**

**https://dhhr.wv.gov/bms/Provider/Documents/Manuals/Chapter_518_Pharmacy_Se rvices%20.pdf**

**and the most recently updated Preferred Drug List with Prior Authorization Criteria that can be accessed online at:**

**https://dhhr.wv.gov/bms/BMS%20Pharmacy/Documents/Preferred%20Drug%20Li st/2021/WV%20PDL%202021.Q3b%20v11.pdf.**

**Please note that to the extent that the Provider Manual states in section 518.4 that "Other drugs may be limited in quantity, duration, or based on gender. The information regarding these drug products and their limitations is available on the BMS website[,]" the "Drug Limits" list available online was last updated June 1, 2016, and does not reflect the removal of the gender edit for most estrogen and testosterone containing products.**

6

**JA1282**

10. Documents sufficient to identify the circumstances in which orchiectomy, penectomy, vaginoplasty, hysterectomy, phalloplasty, mammoplasty, breast reconstruction surgery, and/or mastectomy are covered through the West Virginia Medicaid Program, including but not limited to Diagnostic Codes, Procedure Codes, contracts, health plans, clinical guidelines and/or criteria, medical necessity criteria, and pre/prior authorization requirements and procedures where applicable.

**RESPONSE: Please see BMS Provider Manual Chapter 519.16 Surgical Services that can be accessed online at:**

**https://dhhr.wv.gov/bms/Provider/Documents/Manuals/Chapter%20519%20Practit ioner%20Services/Policy_519.16_Surgical_Services.pdf.**

11. All Documents and communications relating to the Exclusion and/or Gender-Confirming Care in relationship to the federal Medicaid Act, 42 U.S.C. Sections 139a(a)(10)(A)-(B) and/or any regulation promulgated thereunder.

    a. With the exception of Documents and communications protected by attorney-client privilege, this Request includes, but is not limited to, all Documents and communications relating to the legal requirements of the federal Medicaid Act, 42 U.S.C. Sections 1396a(a)(10)(A)-(B) and/or any regulation promulgated thereunder with respect to the Exclusion and/or Gender-Confirming Care.

**RESPONSE: These Defendants are not aware of any responsive documents.**

7

**JA1283**

12. All Documents and communications relating to the Exclusion and/or Gender-Confirming Care in relationship to Section 1557 of the Patient Protection and Affordable Care Act and/or any regulation promulgated thereunder.

    a. With the exception of Documents and communications protected by attorney-client privilege, this request includes, but is not limited to, all Documents and communications relating to the legal requirements if Section 1557 of the Patient Protection and Affordable Care Act and/or any regulation promulgated thereunder with respect to the Exclusion and/or Gender-Confirming Care.

**RESPONSE: These Defendants are not aware of any responsive documents.**

13. Documents sufficient to show all steps taken by Defendants and/or West Virginia Department of Health and Human Resources, Bureau for Medical Services to comply with any and all requirements of the federal Medicaid Act, 42 U.S.C. Sections 1396a(a)(10)(A)-(B), whether or not related to Gender-Confirming Care.

**RESPONSE: This request is vague and does not describe the documents requested with sufficient particularity, and is overly broad and burdensome.**

14. Documents sufficient to show all steps taken by Defendants to comply with any and all requirements of Section 1557 of the Patient Protection and Affordable Care Act, whether of not related to Gender-Confirming Care.

**RESPONSE: Objection. This request is vague and does not describe the documents requested with sufficient particularity, and is overly broad and burdensome.**

**JA1284**

15. The Rational Drug Therapy Program's criteria for coverage of hormone therapy for transgender and non-transgender West Virginia Medicaid participants.

**RESPONSE: These Defendants are conducting a search for any responsive documents.**

16. All statements of witnesses or potential witnesses or persons interviewed in connection with this lawsuit.

**RESPONSE: Please see Affidavits of Brian Thompson, Angela Wowczuk and Tadd Haynes, Exhibit 2, (Bates No. DHHRBMS000006-12).**

17. Documents obtained from third parties as a result of authorizations, releases and/or subpoenas relating to the subject matter of this lawsuit.

**RESPONSE: These Defendants are not aware of any responsive documents.**

18. Documents that Defendants intend to use as exhibits at deposition, summary judgment, or trial, or that may be used to refresh the recollection of a witness at depositions or trial.

**RESPONSE: Exhibits have not yet been determined. These Defendants reserve the right to use any documents or materials produced in discovery by any party.**

19. All Documents relating to audits, advice, and/or communications from any government office relating to the Exclusion.

**RESPONSE: These Defendants are not aware of any responsive documents.**

9

**JA1285**

20. All communications related to legislation and/or lobbying surrounding the Exclusion and/or coverage for medical care for transgender people and gender dysphoria.

**RESPONSE: These Defendants are conducting a search for any responsive documents.**

21. All Documents that Defendants may identify in their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(ii).

**RESPONSE: Please see Exhibit 1 to these responses, and the documents referenced by links to online sources. Please see Unicare Health Plan of West Virginia, Inc., Handbook attached as Exhibit 3, (Bates No. DHHRBMS000013-106). Additionally, upon entry of an appropriate Protective Order, these Defendants can produce an excel spreadsheet with the pharmacy claims detail for Christopher Fain.**

22. All documents upon which Defendants considered, relied upon, or intend to rely upon, in support of their admissions and/or denials of any of the allegations contained in the Complaint.

**RESPONSE:  Please see the Medicaid State Plan available online at:**

**https://dhhr.wv.gov/bms/CMS/SMP/Pages/WV-State-Medicaid-Plan.aspx.**

10

**JA1286**

23. All Documents which Defendants considered, relied upon, or intend to rely upon, in answering each interrogatory and each request for admission in this action.

**RESPONSE: Please see Exhibits 1 and 2 to these responses.**

24. To the extent not requested above, all Documents that Defendants may rely upon to support their defenses against Plaintiff's claims in this action.

**RESPONSE: These Defendants are conducting a search for any additional documents.**

                                    **WILLIAM CROUCH,**
                                    **CYNTHIA BEANE, and**
                                    **WEST VIRGINIA DEPARTMENT OF**
                                    **HEALTH AND HUMAN RESOURCES,**
                                    **BUREAU FOR MEDICAL SERVICES,**

                                    **By counsel**

/s/ Lou Ann S. Cyrus
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA1287**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

              **Plaintiffs,**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

              **Defendants.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

## CERTIFICATE OF SERVICE

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of
Health and Human Resources, by counsel, and do hereby certify that on the 27th day of August,
2021, a true and exact copy of **DEFENDANTS RESPONSE TO PLAINTIFF'S FIRST SET
OF REQUESTS FOR PRODUCTION TO DEFENDANTS WILLIAM CROUCH,
CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL SERVICES** was served on counsel via electronic
means as follows:

12

**JA1288**

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com


Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com


Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org


Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org


Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA  90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org


Carl. S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lamdalegal.org


Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org


Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
*Counsel for Ted Cheatham*
517 9th Street, P.O. Box 1704
Huntington, WV  25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

**JA1289**

Stuart A. McMillan (WVSB#6352)
*Counsel for The Health Plan of West Virginia, Inc.*
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV 25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
*Counsel for The Health Plan of West Virginia, Inc.*
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV 26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/Lou Ann S. Cyrus
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
*Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services*
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

14

**JA1290**

Page 1

1         IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2              HUNTINGTON DIVISION
3  CHRISTOPHER FAIN,
   SHAWN ANDERSON,
4  a/k/a Shauntae Anderson;
   individually and on behalf of all others
5  similarly situated,
6           Plaintiffs,
7  v.                 Civil Action No. 3:20-cv-00740
8  WILLIAM CROUCH, in his official capacity as
   Cabinet Secretary of the West Virginia
9  Department of Health and Human Resources;
   CYNTHIA BEANE, in her official capacity as
10 Commissioner for the West Virginia Bureau for
   Medical Services; and WEST VIRGINIA
11 DEPARTMENT OF HEALTH AND HUMAN
   RESOURCES, BUREAU FOR MEDICAL
12 SERVICES;
13           Defendants.
14    VIDEOTAPED DEPOSITION OF SHAUNTAE ANDERSON
15
16      On the 22nd day of April 2022, beginning at
   approximately 10:00 a.m., via Zoom Conference, West
   Virginia before me, Magdalena Szczerba, Court
17 Reporter and Notary Public, appeared SHAUNTAE
   ANDERSON, Witness, who being by me first duly
18 sworn, gave her oral deposition in the causes
   pursuant to notice of counsel and for the
19 respective parties as hereinafter set forth.  Said
   deposition is to be used for purposes of discovery
20 and for any and all other purposes permitted by the
   Federal Rules State of West Virginia Rules of Civil
21 Procedure.
22
23
24

**JA1291**

```
                                                    Page 2
 1                      APPEARANCES:
 2    On behalf of the Plaintiffs:
 3        Walt Auvil, Esquire
          auvil@theemploymentlawcenter.com
 4        THE EMPLOYMENT LAW CENTER, PLLC
          1208 Market Street
 5        Parkersburg, WV  26101
 6        Sasha Buchert, Esquire
          sbuchert@lambdalegal.org
 7        LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
          1776 K Street, N.W. 8th Floor
 8        Washington, D.C. 20006-2304
 9        Anna P. Prakash, Esquire
          aprakash@nka.com
10        Nicole J. Schladt, Esquire
          nschladt@nka.com
11        NICHOLS KASTER, PLLP
          IDS Center, 80 South 8th Street
12        Suite 4600
          Minneapolis, MN  55402
13        612 256-3200
14        Avatara Smith-Carrington, Esquire
          asmithcarrington@lambdalegal.org
15        LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
          3500 Oak Lawn Avenue, Suite 500
16        Dallas, TX  75219-6722
          214-219-8585
17
          Tara L. Borelli, Esquire
18        tborelli@lambdalegal.org
          LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
19        158 West Ponce De Leon Avenue, Suite 105
          Decatur, GA  30030
20
21
22
23
24
```

**JA1292**

Page 3

1              APPEARANCES (Continued)

2    On behalf of the Defendants:

3        Lou Ann Cyrus, Esquire

         Kimberly M. Bandy, Esquire

4        lycrus@shumanlaw.com

         SHUMAN, MCCUSKEY & SLICER, PLLC

5        1411 Virginia Street, Suite 200

         Charleston, WV   25339

6        304 345-1400

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**JA1293**

## DEPOSITION OF SHAUNTAE ANDERSON

Page 133

12    BY MS. CYRUS:

13        Q.    I'm going to turn your attention to

14    another topic, to the Medicaid plan.  Do you know

15    when you became a Medicaid recipient?

16        A.    On or around 2019.

17        Q.    What prompted you to sign up with

18    Medicaid, if you know?

19        A.    When I got to the halfway house, they sent

20    us to a free clinic to get a physical.  At that

21    time, they asked us if you had any insurance or you

22    wanted to try to apply for Medicaid, and that's

23    what I did.

24        Q.    Do you know when you first became eligible

## DEPOSITION OF SHAUNTAE ANDERSON

Page 141

1    you then start getting your hormones through

2    Medicaid or through, you know, a program that was

3    under Medicaid?

4        A.   When I first signed up for Medicaid, I was

5    still under the Bureau of Prisons so they had to

6    pay for it.

7        Q.   Was there a point when you were no longer

8    under the Bureau of Prisons but then you were just

9    strictly under Medicaid?

10       A.   Yes.

11       Q.   At that point, did you seek to have your

12   hormones for gender confirming care paid by

13   Medicaid or a program that would be under Medicaid?

14       A.   Yes, I did.

15       Q.   And was that -- were those approved and

16   covered?

17       A.   The first -- my first time I went to the

18   pharmacy, it was not covered and I had to pay out

19   of pocket.

20       Q.   Do you know why it was not covered the

21   first time you went?

22       A.   From my understanding, it had something to

23   do about when it was filled or something of that

24   nature.

**JA1295**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 142

1    Q.   Was a timing issue?

2    A.   I believe so.

3    Q.   As far as you know, has there ever been a

4    denial of your gender confirming hormones by

5    Medicaid based on the fact that you are

6    transgender?

7         MS. BUCHERT:  Objection to form.

8         THE WITNESS:  To my knowledge, no.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**JA1296**

## DEPOSITION OF SHAUNTAE ANDERSON

Page 143

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11      Q.   You might need to give a spelling of that,
12  but anyway.
13           So as far as you know, does Medicaid pay
14  for your visits?
15           Are you looking at something there?  Are
16  you Googling?
17      A.   No.
18      Q.   I thought you were trying to help us find
19  the name.
20      A.   No.  My screen timed out.
21      Q.   Sorry.
22      A.   You're fine.  Can you read the question?
23
24
```

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 144

```
1
2
3
4
5
6        ·
7
8
9    BY MS. CYRUS:
10       Q.   I see.
11            And you've had other -- you've had medical
12   visits?
13            Have you had medical visits for gender
14   confirming care since you've been on Medicaid?
15            MS. BUCHERT:  Objection to form.
16            THE WITNESS:  Honestly, I'm -- I can't
17   answer that question, but I can say this, I am a
18   woman.  I see an OBGYN just like any other woman.
19   BY MS. CYRUS:
20
21
22       Q.   Is he the one who prescribes your gender
23   confirming hormones?
24       A.   He continued the hormones that I was
```

**JA1298**

## DEPOSITION OF SHAUNTAE ANDERSON

Page 145

1    already on from the Bureau of Prisons, yes.

2        Q.   As far as you know, does Medicaid pay for

3    your visits to Dr. Patton?

4        A.   To my knowledge, yes.

5        Q.   So to your knowledge, have you had any

6    claims for medical care, whether it's gender

7    confirming or not, not paid by Medicaid for the

8    basis that you're transgender?

9            MS. BUCHERT:  Objection to form.

10           THE WITNESS:  I don't know.  I haven't

11   received any bills.  If it is, I don't know.

12   BY MS. CYRUS:

13       Q.   So if there had been a denial, you were

14   not aware of it?

15           There is no -- in other words -- let me

16   restate that.

17           There is no denial of any of claim you've

18   made with Medicaid for the basis that you're

19   transgender that you're aware of?

20           MS. BUCHERT:  Objection to form.

21   BY MS. CYRUS:

22       Q.   Is that right?

23       A.   I can't really answer that question

24   because it's a little -- I don't quite understand

**JA1299**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 146

1    what you're saying.  I'm sorry.

2        Q.   That's okay.  No.  That's fine.

3             I'm trying to find out, as far as you

4    know, has Medicaid denied one of -- a claim that

5    you've made for some sort of care and said they

6    aren't going to pay it because you're transgender

7    or you have a transgender diagnosis?

8             MS. BUCHERT:  Objection to form.

9             THE WITNESS:  To my knowledge, I don't

10   have -- I've never had any claims denied.

11   BY MS. CYRUS:

12       Q.   That was my knowledge as well, but I

13   wanted to make sure your information matches what

14   my understanding is.

15       A.   But I will say this though, the reason I

16   had no -- I can't say why, no more than you can.

17       Q.   I think we actually have information in

18   this case.  It's probably more than what you have.

19   But at any rate, you've already testified you're

20   not aware of my denial where they've said you can't

21   have some either treatment or a drug because you're

22   transgender; is that right?

23            MS. BUCHERT:  Objection to form.

24            THE WITNESS:  To stop my hormone therapy

**JA1300**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 147

```
 1   can be detrimental to my health, so that's why they
 2   haven't stopped it.  I don't know the specific
 3   reasons why, but I do know that it can cause blood
 4   clots which can lead to your death.
 5   BY MS. CYRUS:
 6       Q.   Do you know that your hormone therapy is
 7   actually covered under Medicaid?
 8           MS. BUCHERT:  Objection.
 9           THE WITNESS:  I haven't received a bill
10   yet, so I assume that it is covered by my Medicaid.
11   BY MS. CYRUS:
12       Q.   And you've been getting that -- getting
13   those hormones since you signed up on Medicaid in
14   2019 up to the present; is that right?
15       A.   I mean, 2019 when I was in prison, I left
16   from prison with hormones on a hormone regimen.
17   They just continued it when I got transitioned into
18   the outside world.
19       Q.   So let me ask you:  What is your
20   understanding of what this lawsuit is about?
21           MS. BUCHERT:  Objection to form.
22           THE WITNESS:  My understanding is that I
23   have insurance that doesn't cover anything that's
24   medically necessary for me to continue the quality
```

**JA1301**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 148

1   of life that I should have, not just me but anyone

2   in my situation.

3   BY MS. CYRUS:

4       Q.   And when you say it doesn't cover anything

5   that's medically necessary, what are you referring

6   to?

7           MS. BUCHERT:  Objection to form.

8           THE WITNESS:  What I'm referring to is any

9   of the confirmation procedures that are not

10  considered cosmetic but medially necessary for a

11  person like myself.

12  BY MS. CYRUS:

13      Q.   So you're referring to surgeries; is that

14  right?

15      A.   Not --

16          MS. BUCHERT:  Objection.

17          THE WITNESS:  -- not limited to that.

18  BY MS. CYRUS:

19      Q.   What else is it that you believe is not

20  covered besides surgeries or gender confirming

21  surgery?

22      A.   I'm sorry.  Can you repeat that again?

23      Q.   Yes.

24          What is it that you believe is not covered

**JA1302**

## DEPOSITION OF SHAUNTAE ANDERSON

Page 149

1   by Medicaid besides gender confirming surgery?

2           MS. BUCHERT:  Objection to form.

3           THE WITNESS:  You mean like a

4   vaginoplasty.

5   BY MS. CYRUS:

6       Q.   Right.  That be would be surgery.  Right.

7           I heard you say that nothing is covered

8   for gender confirming care.  So let's back up.  We

9   just talked about Medicaid covers your hormones for

10  gender confirming care; is that right?

11      A.   They cover my hormones.  I'm not sure -- I

12  can't sit here and say that it's for gender

13  confirming care.

14      Q.   You're getting estrogen female hormones,

15  right?

16      A.   Yes, just like any other woman who has low

17  estrogen would get estrogen hormones to supplement

18  that.

19      Q.   Exactly.

20           So you agree you get estrogen regardless

21  of the fact that you are transgender, right?

22           MS. BUCHERT:  Objection to form.

23           THE WITNESS:  But you said that it has

24  something to do with gender confirming, that's not

**JA1303**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 150

1    gender confirming.

2    BY MS. CYRUS:

3        Q.   So you don't consider your female hormones

4    to be gender confirming?

5        A.   Do you -- you were the one that asked the

6    question, but I'm trying to get you to understand

7    that it's -- hormones are for any woman.  It

8    doesn't have to be specifically for gender

9    confirming.

10       Q.   Are you taking female hormones for any

11   other reason, to your knowledge, besides the fact

12   that you're transgender?

13           MS. BUCHERT:  Objection to form.

14           THE WITNESS:  I'm taking them because I

15   have low estrogen.

16   BY MS. CYRUS:

17       Q.   Do you believe you would be taking them if

18   you were not transgender?

19           MS. BUCHERT:  Objection to form.

20           THE WITNESS:  I'm not a doctor.  I can't

21   say what they would prescribe to me or not

22   prescribe.

23   BY MS. CYRUS:

24       Q.   But you did say you're taking them because

**JA1304**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 151

1  you're a woman; is that right?

2      A.   I'm taking them because I have low

3  estrogen.

4      Q.   Do you know whether your estrogen level

5  would be low for a male?

6          MS. BUCHERT:  Objection to form.

7          THE WITNESS:  No.  I just know that at

8  this point my estrogen level is where it needs to

9  be the last time I had labs.

10 BY MS. CYRUS:

11     Q.   Speaking of that, Medicaid also pays for

12 your labs to check your estrogen levels; is that

13 right?

14         MS. BUCHERT:  Objection to form.

15         THE WITNESS:  Just like they do for anyone

16 else.

17 BY MS. CYRUS:

18     Q.   Sure enough.

19         Do they -- they also pay for, we talked

20 about, your psychological, psychiatric visits,

21 correct?  They pay for that?

22         MS. BUCHERT:  Objection to form.

23         THE WITNESS:  Yes.

24 BY MS. CYRUS:

**JA1305**

## DEPOSITION OF SHAUNTAE ANDERSON

Page 161

1          MS. BUCHERT:  Objection to form.

2          THE WITNESS:  To my understanding, I just

3    know that I receive -- that they continue my

4    hormone therapy from prison.  So, you know, no one

5    has ever explained anything else to me about it.

6    BY MS. CYRUS:

7      Q.   But you have an understanding that

8    Medicaid is paying for your hormone replacement

9    therapy, correct?

10          MS. BUCHERT:  Objection to form.

11          THE WITNESS:  I understand that I have not

12    received a bill, so unless they -- so I haven't

13    received a bill so I assume they are.

14    BY MS. CYRUS:

15      Q.   I don't know whether -- I don't know that

16    it would include, you were actually receiving

17    counseling.  You said you were seeing a

18    psychiatrist.  Do you -- have you received

19    counseling that you submitted to Medicaid?

20      A.   My psych counseling is covered by

21    Medicaid.

22      Q.   So you are having both counseling and

23    hormone replacement therapy covered by Medicaid; is

24    that right?

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 162

1    A.   Yes.

2    Q.   So it's -- this statement is not accurate

3    to the extent it says, The exclusions all

4    categorically deny transgender people coverage for

5    gender confirming care.  Gender confirming care

6    includes, but is not limited to, counseling,

7    hormone replacement therapy and surgical care?

8         MS. BUCHERT:  Objection to form.

9         THE WITNESS:  Actually the statement is

10   correct.  Think about --

11   BY MS. CYRUS:

12   Q.   How is --

13   A.   How is it correct?  Just because I'm

14   included because I do get counseling and I do get

15   hormone therapy that may or may not be covered by

16   Medicaid.  There are people, other trans people who

17   don't get either one.

18   Q.   What is the basis of that statement that

19   you just made?

20   A.   What is the basis of that statement?  The

21   basis of that statement is from seeing on social

22   media people's posts concerning these things saying

23   that they are asking where to go, who to see,

24   what -- because the places that they -- they

**JA1307**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 163

1    haven't been able to find the right person to do
2    anything.
3        Q.   Are you aware of anyone who has been --
4    who is transgender who has been denied their
5    hormone replacement therapy by Medicaid in
6    West Virginia?
7            MS. BUCHERT:  Objection to form.
8            THE WITNESS:  No one personally.
9    BY MS. CYRUS:
10       Q.   Are you aware of anyone who is a Medicaid
11   participant who's been denied counseling in West
12   Virginia for being transgender?
13       A.   No.  No one personally, no.
14       Q.   And if the testimony in this case is that
15   both counseling and hormone replacement therapy are
16   covered by Medicaid for its participants regardless
17   of being transgender and, in fact, it covers those
18   things for transgender participants, do you have
19   any reason to dispute that?
20           MS. BUCHERT:  Objection to form.
21           THE WITNESS:  You're leaving out the
22   surgical care.
23   BY MS. CYRUS:
24       Q.   I am.  That's right.

**JA1308**

## DEPOSITION OF SHAUNTAE ANDERSON

Page 164

1           My question is about counseling and
2    hormone replacement therapy, that's correct.
3       A.    But if you're going to talk about
4    something you need to discuss it all.  That would
5    not make -- that would make that statement still
6    factual, would it not --
7       Q.    Do you have any -- do you have any reason
8    to dispute the testimony that both counseling and
9    hormone replacement therapy are covered by Medicaid
10   for its participants even the transgender ones?
11          MS. BUCHERT:  Objection to form.
12          THE WITNESS:  I can't speak for everybody
13   else.  I can only speak for myself.
14   BY MS. CYRUS:
15      Q.    And based upon your own experience, that
16   is a true statement, both your counseling and
17   hormone replacement therapy are covered by
18   Medicaid; is that right?
19          MS. BUCHERT:  Objection to form.
20          THE WITNESS:  To my knowledge, yes.
21   BY MS. CYRUS:
22      Q.    Is it your understanding that you have
23   been diagnosed with gender dysphoria?
24      A.    Yes.

**JA1309**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 165

1    Q.   What -- and I'm finished with the exhibit
2  for the moment.
3          What does that condition mean to you?
4          MS. BUCHERT:  Objection to form.
5          THE WITNESS:  I'm not a doctor so I can't
6  put it into technical terms but --
7  BY MS. CYRUS:
8    Q.   I don't need you to.
9    A.   But as far as myself, it's just what I've
10 always known my whole life that my outward
11 appearance does not reflect my inward appearance,
12 who I am on the inside, who I've always been.
13   Q.   Does that have some impact on you?
14   A.   A great deal of impact.
15   Q.   That's what I'm trying to get at.  What is
16 the impact on you?  Can you describe for me
17 symptoms that you experience that you believe are
18 gender dysphoria?
19         MS. BUCHERT:  Objection to form.
20         THE WITNESS:  Not being able to be my
21 authentic self, to have to live a lie, to have to
22 be -- to be something that someone else says I'm
23 supposed to be.  To let somebody else make the
24 decisions about my life and about my care.  It's

**JA1310**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 166

1  hurtful.

2  BY MS. CYRUS:

3  Q.  Is there somebody who is mocking you now?

4  MS. BUCHERT:  Objection to form.

5  THE WITNESS:  Everywhere I go.  I live in

6  a state full of people that are not always

7  receptive of people of being transgender.  That's

8  why I try to live as stealth as possible.

9  BY MS. CYRUS:

10  Q.  Are there certain procedures that you

11  believe you need that will treat your gender

12  dysphoria?

13  MS. BUCHERT:  Objection to form.

14  THE WITNESS:  Just the treatment that is

15  prescribed and that's all the cosmetic that's

16  considered medically necessary treatment.

17  BY MS. CYRUS:

18  Q.  And what -- I'm sorry.

19  A.  Go ahead.

20  Q.  No.  I was going to say what is that?  Can

21  you tell me specifically what the treatment is that

22  you're referring to?

23  MS. BUCHERT:  Objection to form.

24  THE WITNESS:  Gender confirmation,

**JA1311**

## DEPOSITION OF SHAUNTAE ANDERSON

Page 167

1    whatever else that I would need, whatever a doctor

2    thinks would give me the best quality of life.

3    BY MS. CYRUS:

4        Q.    And are you able to be more specific

5    beyond just gender confirmation?  Are there

6    specific procedures that you believe you need that

7    are medically necessary to treat your gender

8    dysphoria?

9            MS. BUCHERT:  Objection to form.

10           THE WITNESS:  There are other procedures

11   that -- it's not that -- not just what I believe,

12   it's what a whole list of doctors believe and know

13   to be true.  I mean, but me specifically, a breast

14   augmentation is one of them.

15   BY MS. CYRUS:

16       Q.    And is that the only one?

17           MS. BUCHERT:  Objection to form.

18           THE WITNESS:  No.  But it was -- I mean, I

19   could go on for hours about things of that nature

20   but I'm not.

21   BY MS. CYRUS:

22       Q.    I had an understanding that you were at

23   least initially saying you believed you needed

24   breast augmentation and vaginoplasty?

**JA1312**

## DEPOSITION OF SHAUNTAE ANDERSON

Page 168

1     A.   Yes, from my understanding when you asked
2   the line of questioning, vaginoplasty was -- we
3   already knew that that's what I wanted.   That
4   was -- I do want -- let me go on the record and say
5   that a vaginoplasty, which is gender confirmation
6   surgery, and a breast augmentation, and not to be
7   limited to just those two things but ...
8     Q.   Believe me.   I'm not limiting you -- I'm
9   trying to find out what it is that you're seeking.
10          What is your -- I don't know if you want
11   to call it a wish list, but if you were to, you
12   know, have what you believe you need to treat your
13   gender dysphoria, what is it you're seeking it and
14   I had understood it would be a breast augmentation
15   and vaginoplasty; is that correct?
16          MS. BUCHERT:   Objection to form.
17          THE WITNESS:   That's correct.   And any
18   surgical care that a doctor would recommend for me
19   to have.
20   BY MS. CYRUS:
21     Q.   Has any doctor recommended you have breast
22   augmentation and vaginoplasty?
23     A.   No doctor has said these things on the
24   record because they know that Medicaid does not

## DEPOSITION OF SHAUNTAE ANDERSON

Page 169

1   cover it, and they know what kind of distress that
2   would cause me to even talk about it.
3       Q.   How do you know that that's why no doctor
4   has said that on the record?
5            MS. BUCHERT:  Objection to form.
6            THE WITNESS:  Because they've all mirrored
7   the same thing when we've had these conversations.
8   It's not covered by Medicaid.
9   BY MS. CYRUS:
10      Q.   So you've discussed --
11      A.   So there is no sense in them discussing it
12  any further.
13      Q.   So you have discussed with physicians the
14  fact that breast augmentation and vaginoplasty
15  would not be covered by Medicaid?
16           MS. BUCHERT:  Objection to form.
17           THE WITNESS:  No.  The doctors have
18  discussed with me that it's not covered.  So there
19  is nothing that they can do about it.
20  BY MS. CYRUS:
21
22
23
24

**JA1314**

## DEPOSITION OF SHAUNTAE ANDERSON

Page 170

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14   BY MS. CYRUS:
15       Q.   Do you know if any of your medical records
16   say that?
17           MS. BUCHERT:   Objection to form.
18           THE WITNESS:   To my knowledge, no.
19   BY MS. CYRUS:
20       Q.   So have you ever made a claim with
21   Medicaid requesting that it or one of the MCOs,
22   your MCO, pay for you to have breast augmentation
23   and vaginoplasty?
24       A.   No, I have not.
```

**JA1315**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 171

1    Q.    Have you ever made a claim for any other

2  type of gender confirming surgery through Medicaid?

3    A.    No, I have not.

4    Q.    So assuming you were -- let's just assume

5  that you were to have breast augmentation and

6  vaginoplasty, how do you believe those procedures

7  would affect your gender dysphoria?

8          MS. BUCHERT:  Objection to form.

9          THE WITNESS:  It would make me feel closer

10 to being complete -- to feel a lot better about

11 especially aesthetic wise when I go out into

12 public, how people -- you know, how I'm perceived

13 and that would continue to help me live as stealth

14 as possible and to live happily as a woman.

15 BY MS. CYRUS:

16   Q.    When you say those would help you be

17 closer to being complete, are you referring to

18 being a complete woman?

19   A.    Yes.

20         MS. BUCHERT:  Objection to form.

21 BY MS. CYRUS:

22   Q.    If you have breast augmentation and

23 vaginoplasty, do believe your gender dysphoria will

24 be gone completely?

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

**JA1316**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 197

1  2010 you began to medically transition, and you

2  lacked health -- access to health insurance for

3  gender confirming care but you still had a need to

4  transition that was so urgent you were forced to

5  self treat.  So in 2010 we talked about, that was

6  during one of the windows when you were not

7  incarcerated, correct?

8      A.    Yes.

9      Q.    And the self-treating is take estrogen,

10  which we talked about.  And then you went to

11  prison, paragraph ten, and continued your process.

12  And in prison you, number 11, you talk about how

13  you updated your status to reflect your transgender

14  identity.  You were treated as a woman for purposes

15  of security checks.  And evaluated by medical

16  professionals and you got approval to wear

17  typically feminine undergarments as part of your

18  transition.  We've talked about all of that in this

19  case; is that right?

20      A.    Yes, we have.

21      Q.    I just don't want to belabor anything or

22  go back over.  I just make to want sure we've

23  covered everything that you're saying here.

24          Page 3 you started -- 12, you began

**JA1317**

**DEPOSITION OF SHAUNTAE ANDERSON**

Page 198

1   counseling and were diagnosed with gender

2   dysphoria.  And I'm assuming that refers to the

3   time when you were incarcerated, correct?

4           MS. BUCHERT:  Objection to form.

5           THE WITNESS:  Yes.

6   BY MS. CYRUS:

7       Q.   And then while you were incarcerated you

8   advocated for access to gender confirming care for

9   several years.  And then in around 2019 is when you

10  had the recommendation for the hormone replacement

11  therapy and you started that around May of 2019.

12          You said you were not, however, able to

13  access gender confirming surgery.  And your earlier

14  testimony was that was because you hadn't met the

15  criteria; is that correct?

16      A.   Yes.  With the passing of the Bureau of

17  Prisons form for caring for transgender people, I

18  would have to meet the criteria.  I had not been on

19  hormone therapy long enough.

20          MS. BUCHERT:  And, Shauntae, I'm going to

21  instruct you to take all the time (inaudible) this

22  document.  We're going through it pretty quickly

23  and I'm having (inaudible) through.  I known we've

24  been doing this for a while but I just think it's

Page 217

1    STATE OF WEST VIRGINIA, To-wit:
2        I, Magdalena Szczerba, a Notary Public and
     Registered Professional Reporter within and for the
     State aforesaid, duly commissioned and qualified,
3    do hereby certify that the videotaped deposition of
4    Shauntea Anderson was duly taken by me and before
     me at the time and place specified in the caption
5    hereof.
6        I do further certify that said proceedings were
     correctly taken by me in stenotype notes, that the
7    same were accurately transcribed out in full and
     true record of the testimony given by said witness.
8
         I further certify that I am neither attorney or
9    counsel for, nor related to or employed by, any of
     the parties to the action in which these
10   proceedings were had, and further I am not a
     relative or employee of any attorney or counsel
11   employed by the parties hereto or financially
     interested in the action.
12
         I certify that the attached transcript meets
13   the requirements set forth within article
     twenty-seven, chapter forty-seven of the West
14   Virginia Code.
15       My commission expires the 3rd day of July,
     2022.
16       Given under my hand and seal this 1st day of
     May, 2022.
17
18

19                    ———————————————————
                      Magdalena Szczerba
                      Registered Professional Reporter
20                    Notary Public
21
22
23
24

Veritext Legal Solutions

JA1319

USCA4 Appeal: 22-1927   Doc: 20-3   Filed: 10/31/2022   Pg: 265 of 477

Page 220

```
 1                    DEPOSITION REVIEW
                    CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 5200149
 3      CASE NAME: Fain, Christopher Et Al. v. Crouch, William Et Al.
        DATE OF DEPOSITION: 4/22/2022
 4      WITNESS' NAME: Shauntae Anderson
 5           In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
 6      my testimony or it has been read to me.
 7           I have listed my changes on the attached
        Errata Sheet, listing page and line numbers as
 8      well as the reason(s) for the change(s).
 9           I request that these changes be entered
        as part of the record of my testimony.
10
             I have executed the Errata Sheet, as well
11      as this Certificate, and request and authorize
        that both be appended to the transcript of my
12      testimony and be incorporated therein.
13      05-24-2022
        Date                       Shauntae Anderson
14
             Sworn to and subscribed before me, a
15      Notary Public in and for the State and County,
        the referenced witness did personally appear
16      and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18              in the appended Errata Sheet;
            They signed the foregoing Sworn
19              Statement; and
            Their execution of this Statement is of
20              their free act and deed.
21           I have affixed my name and official seal
22      this  24th  day of  May           , 20 22 .
23
             Notary Public
24
        03/25/2026
25      Commission Expiration Date
```

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Jeremy Ryan Young
The UPS Store
3501 MacCorkle Ave SE
Charleston WV 25304
My Commission Expires March 25, 2026

**JA1320**

Page 221

```
1                        ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                  ASSIGNMENT NO: 5200149
3      PAGE/LINE(S) /        CHANGE        /REASON
       Page 11, Line 3: "port" should be "part" Typographical error
4
       Page 154, Line 17: "woman" should be "women" Typographical error
5
       Page 180, Line 15: "woman" should be "women" Typographical error
6

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

       05-24-2022                    Shauntae Anderson
20     Date                          Shauntae Anderson

21     SUBSCRIBED AND SWORN TO BEFORE ME THIS 24th

22     DAY OF _____May_____ , 20 22 .

23

24                      Notary Public

       OFFICIAL SEAL
       NOTARY PUBLIC
       STATE OF WEST VIRGINIA
       Jeremy Ryan Young
       The UPS Store
       3601 MacCorkle Ave SE
       Charleston WV 25304            03/25/2026
       My Commission Expires March 25, 2026
25                      Commission Expiration Date
```

JA1321

Case 3:20-cv-00740   Document 252-5   Filed 05/31/22   Page 1 of 40 PageID #: 3792

CONFIDENTIAL

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                       HUNTINGTON DIVISION
 4
 5   CHRISTOPHER FAIN,
     SHAWN ANDERSON,
 6   a/k/a Shauntae Anderson;
     individually and on behalf of all
 7   others similarly situated,
 8                         Plaintiffs,
 9
     v.                          Civil Action No. 3:20-cv-00740
10                               Hon. Robert C. Chambers, Judge
11
     WILLIAM CROUCH, in his
12   official capacity as
     Cabinet Secretary of the
13   West Virginia Department Of
     Health and Human Resources;
14   CYNTHIA BEANE, in her official
     capacity as Commissioner for the
15   West Virginia Bureau for Medical
     Services; and WEST VIRGINIA
16   DEPARTMENT OF HEALTH AND HUMAN
     RESOURCES, BUREAU FOR MEDICAL
17   SERVICES,
18                         Defendants.
19
20      VIDEOTAPED ZOOM DEPOSITION OF CHRISTOPHER FAIN
21          On the 28th day of April 2022, beginning at
     approximately 10:00 a.m., via Zoom, before, Melanie
22   Smith, Court Reporter and Notary Public, appeared
     CHRISTOPHER FAIN, Witness, who being by me first duly
23   sworn, gave his oral deposition in the causes pursuant
     to notice of counsel and for the respective parties as
24   hereinafter set forth.
```

**JA1322**

CONFIDENTIAL

Page 2

```
1    APPEARANCES:
2
          ON BEHALF OF THE PLAINTIFFS:
3         ANNA P. PRAKASH, VISITING ATTORNEY
          NICHOLS KASTER, PLLP
4         IDS CENTER, 80 SOUTH 8TH STREET
          SUITE 4600
5         MINNEAPOLIS, MN  55402
          (612) 256-3200
6         aprakash@nka.com
7
          ON BEHALF OF THE PLAINTIFFS:
8         WALT AUVIL, ESQ.
          THE EMPLOYMENT LAW CENTER, PLLC
9         1208 MARKET STREET
          PARKERSBURG, WV  26101-4323
10        (304) 485-3058
          auvil@theemploymentlawcenter.com
11
12        ON BEHALF OF THE PLAINTIFFS:
          AVATARA SMITH CARRINGTON, VISITING ATTORNEY
13        LAMBDA LEGAL DEFENSE AND
          EDUCATION FUND, INC.
14        3500 OAK LAWN AVENUE, SUITE 500
          DALLAS, TEXAS  75219-6722
15        (214) 219-8585
          asmithcarrington@lambdalegal.org
16
17        ON BEHALF OF THE PLAINTIFFS:
          TARA L. BORELLI, VISITING ATTORNEY
18        LAMBDA LEGAL DEFENSE AND
          EDUCATION FUND, INC.
19        158 WEST PONCE DE LEON AVE., SUITE 105
          DECATUR, GA  30030
20        tborelli@lambdalegal.org
21
22
23
24
```

**JA1323**

CONFIDENTIAL

Page 3

```
1    APPEARANCES (cont'd)
2
             ON BEHALF OF THE DEFENDANTS:
3            LOU ANN S. CYRUS, ESQ.
             KIMBERLY M. BANDY, ESQ.
4            SHUMAN MCCUSKEY SLICER PLLC
             P.O. BOX 3953
5            CHARLESTON, WV  25339
             (304) 345-1400
6            lcyrus@shumanlaw.com
             kbandy@shumanlaw.com
7
8            ALSO PRESENT:
             ANDREW BAKER
9            (VIDEOGRAPHER)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

JA1324

1       MS. PRAKASH:  Objection.  Foundation.

2       THE WITNESS:  She started the process of

3 referring me to an endocrinologist.

4 BY MS. CYRUS:

5    Q.  Then did you go to an endocrinologist?

6    A.  Yes.

7

8

9

10

11

12

13

14    Q.  Was your understanding that the purpose of the

15 male hormones was for some -- a type of

16 gender-confirming care?

17       MS. PRAKASH:  Objection to form.

18       THE WITNESS:  Yes.  That's what sex

19 hormones are for.  Mine are for masculinization, yes.

20 BY MS. CYRUS:

21    Q.  And you started taking those in March of 2019?

22    A.  Yes.

23    Q.  Are you familiar with the term

24 "gender-confirming surgical procedures"?

JA1325

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 52

1  boss?

2      A.  No.

3      Q.  Okay.  Did you then suffer nightmares and

4  disturbed sleep because of these work confrontations?

5      A.  Yes.

6      Q.  Okay.  Are those types of things still going on

7  where you work, either at the liquor store or at the

8  university or at the school?

9          MS. PRAKASH:  Objection.  Form.

10          THE WITNESS:  They happen about 25 to 35

11  percent of the time at the store.  For the most part, my

12  regulars don't slip.  My voice sometimes will slip.

13  When I was wearing a mask, I was misgendered nine times

14  out of ten.  It became very stressful and

15  anxiety-producing to hear that all day.  So I made a

16  conscious decision to take my mask off and work without

17  it in order to be properly gendered.

18          So that dropped down to only about 20 to 35

19  percent of the people still having issues with it, but

20  it's not rudeness, it's just perception.

21  BY MS. CYRUS:

22      Q.  Okay.  Did you have a hysterectomy?

23      A.  Yes.

24      Q.  Okay.  When was that?

**JA1326**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 53

```
1       A.   Fall of 2018.

2

3

4       Q.   And so it was -- the surgery was not related to

5   you being transgender?

6       A.   No.

7

8

9

10

11

12

13      Q.   Okay.  And did insurance -- did you have

14  insurance that paid for your hysterectomy?

15      A.   Yes.

16      Q.   And what insurance was that?

17      A.   That was Medicaid.

18      Q.   So Medicaid paid for your hysterectomy in 2018?

19      A.   Yes.

20

21

22

23

24
```

**JA1327**

**DEPOSITION OF CHRISTOPHER FAIN**

CONFIDENTIAL



Page 54

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    Q.  Now, have you -- did you also have surgery on

24    your back as well?

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 55

1    A.   Yes.   I had surgery on my -- on my upper back

2  and neck.

3    Q.   And when was that?

4    A.   June the 1st of this year.

5    Q.   So 2021?

6    A.   Yeah, 2021.

7    Q.   Okay.   And did Medicaid pay for that?

8    A.   No.

9    Q.   Okay.   Did you have any insurance coverage for

10  that?

11    A.   No.   Medicaid denied everything to do with it.

12    Q.   Do you know why it was denied?

13    A.   They were recommending a procedure that would

14  have left me with a lot less mobility and my surgeon

15  absolutely would not work with that.   She insisted that

16  it had to be a disc replacement instead of a fusion.

17  However, Medicaid was not going to pay for a disc

18  replacement, so they didn't.

19    Q.   So I see, there was an -- there was an offer to

20  pay for some type of surgery for your back, just not the

21  one that you preferred; is that right?

22    A.   I wouldn't call it a preference.   I would call

23  it the one that left me with the most amount of mobility

24  at 46 years old.

**JA1329**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 56

```
1        Q.  When you say Medicaid denied it, do you have

2   any indication that Medicaid denied that surgery because

3   of your being transgender?

4        A.  No.

5        Q.  Okay.  After -- now, there's a reference to

6   your records that after you had a surgery nurses

7   referred to you as female.  Do you -- let me ask you:

8   Did that happen after your back surgery or your

9   hysterectomy or something else?

10        MS. PRAKASH:  Objection.  Form.  And I'll

11   just note again none of these purported records are

12   being shown to Mr. Fain.  Go ahead.

13        THE WITNESS:  I do however know exactly

14   what's being discussed.  After spine surgery, yes, while

15   in horrendous pain and unable to handle it, and

16   disoriented from drugs, I was subjected to a number of

17   nurses in the entryway of my room consistently referring

18   to me as "she" and "her."  And, when I called out about

19   it and said, "Look, I can hear you," one of them laughed

20   and said, "Yes, we know."

21   BY MS. CYRUS:

22        Q.  Did they change their behavior then after you

23   called them out?

24        A.  No.
```

**JA1330**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 57

1      Q.  Okay.  Did you report that to anybody at the
2   hospital or complain?
3      A.  My anxiety levels soared through the roof to
4   the point where I went into the start of cardiac arrest.
5      Q.  And, after you obviously made it through your
6   cardiac arrest, did you ever report that incident to the
7   hospital or to any administration?
8      A.  Oh, yes, yes, everybody on that floor got to
9   hear about it because I was very loud and angry.
10      Q.  Did you file a formal complaint, if you know?
11      A.  I chose not to file a formal complaint.
12   Instead, I wrote on the form that I was given they ought
13   to consider, you know, some cultural sensitivity
14   training.
15      Q.  Did you have a transphobic experience with your
16   primary care physician?
17          MS. PRAKASH:  Objection.  Form.
18          THE WITNESS:  At one time, yes, and it was
19   the reason why I switched to Kim Neely.
20   BY MS. CYRUS:
21      Q.  Okay.  And what was the transphobic experience?
22      A.  I had an incident with the receptionist at a
23   Valley Health office.
24      Q.  Okay.

**JA1331**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 58

1    A.  Oh, would you like me to tell you about that?

2    Q.  Sure.

3    A.  She looked and acted like she could crawl up a

4  wall backwards to get away from me when I told her I

5  needed to change my name and gender markers on my files.

6  She looked absolutely horrified, and this is a woman

7  I've known for at least a decade.

8    Q.  Did you -- did you make any type of formal

9  complaint against the doctor's office as a result of

10  that?

11    A.  I called the number on the back of my insurance

12  card that was listed as the actual like Valley Health

13  office for filing complaints, but at that point the

14  numbers apparently had changed, the telephone numbers

15  had changed because instead of getting ahold of like

16  anybody to formally lodge a complaint with, I ended up

17  getting ahold of Kim Neely's nurse.

18        I had called Kim's office, and after

19  explaining everything to this nurse, she pulled up --

20  she had pulled up my records while we were talking and

21  she was like, "So can I set you an appointment?"  I

22  switched doctors while trying to, you know, formally

23  complain.

24        MS. PRAKASH:  Lou Ann, we've been going for

**JA1332**

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 59

1  about an hour.  Can we take a break?

2         MS. CYRUS:  Yeah, I was exactly going to

3  say that, so absolutely.  Let's go ahead and do that.

4  We'll come back in ten minutes?

5         MS. PRAKASH:  That sounds good.

6         MS. CYRUS:  okay.  Thank you.

7         MS. PRAKASH:  Uh-huh.

8         VIDEOGRAPHER:  This is the end of Media

9  Unit No. 1.  We are off the record at 11:05 a.m.

10        (Short recess.)

11        VIDEOGRAPHER:  This is the beginning of

12  Media Unit No. 2.  We are on the record at 11:15 a.m.

13  BY MS. CYRUS:

14    Q.  Okay.  Mr. Fain, earlier I made a note that you

15  said you think you've been on Medicaid off and on for a

16  number of years.  Is that right?

17    A.  Yes, that is correct.

18    Q.  Okay.  And I made a note about 2016.  Was that

19  when you most recently became a Medicaid participant?

20    A.  That's the one I can remember the best because

21  when I injured my back I needed to go apply for

22  insurance, make sure I had insurance.

23    Q.  So your injury to your back is what prompted

24  you to sign up on Medicaid at that time?

**JA1333**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 60

1      A.   Yes.  I had been without insurance for a while.

2      Q.   Okay.  And how did you know you were eligible

3  for Medicaid?

4      A.   Because I was working a minimum-wage job at 20

5  hours a week.

6      Q.   Okay.  And I take it when you signed up for

7  Medicaid you had no health insurance coverage?

8      A.   That's absolutely true, yes.

9      Q.   Okay.  Do you know what MCO stands for?

10     A.   No.

11     Q.   Okay.  Do you know what a managed care

12  organization is?

13     A.   Sort of.

14     Q.   Okay.  When you signed up for Medicaid, were

15  you required to pick, and it's called a managed care

16  organization?  Do you know -- do you know if that's

17  accurate, that you were required to do that?

18         MS. PRAKASH:  Objection.  Foundation.

19         THE WITNESS:  I don't know and I -- or

20  don't remember.  I just know that I applied and they

21  sent cards, they sent my insurance cards to me in the

22  mail.  That's I think the first time I'd saw UniCare

23  written on anything.

24  BY MS. CYRUS:

**JA1334**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 61

1      Q.  That's what I was going to ask you, about

2  UniCare.  Do you know what UniCare's role is with regard

3  to Medicaid?

4      A.  No.

5      Q.  Okay.  Do you know what UniCare's role is with

6  regard to you and your Medicaid coverage?

7      A.  No.

8      Q.  So it sounds like you did not pick UniCare?

9      A.  I don't remember picking one.

10     Q.  Okay.  Do you remember whether you reviewed the

11  Medicaid manual in connection with signing up on

12  Medicaid?

13     A.  I remember being sent a manual that I read,

14  well, that I looked through after receiving Medicaid.

15     Q.  So after you were already enrolled you took a

16  look at the manual you received?

17     A.  Yes.

18     Q.  Okay.  So did you look into whether Medicaid

19  covered gender-confirming care before signing up?

20     A.  No.

21     Q.  Okay.  Did you talk with anyone with Medicaid

22  about what gender-confirming care was covered by

23  Medicaid in connection with signing up?

24     A.  No.

**JA1335**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 62

1    Q.  Okay.  So, when you signed up for Medicaid, did

2    you have any understanding of what -- of whether

3    Medicaid covered any gender-confirming care or not?

4        A.  No.

5        Q.  So, when you signed up for Medicaid, I take it

6    you didn't have any understanding that it covered

7    hormones for gender-confirming care?

8        A.  No.

9        Q.  Okay.  Do you have an understanding now that

10   Medicaid does cover hormones for gender-confirming care?

11       A.  Yes.

12       Q.  Okay.  When did you learn that?

13       A.  After realizing that my endocrinologist wasn't

14   billing Medicaid and that was the reason why I was still

15   paying for my hormones, and that was when I was informed

16   that that was something that Medicaid was supposed to be

17   paying for.

18       Q.  Okay.  So, when you first started getting the

19   hormones, were they paid by Medicaid, or no?

20       A.  The first prescription, when it went through,

21   yes, it was paid by Medicaid.  In the immediate after

22   that something went down in my doctor's office, they

23   stopped communicating with Medicaid, and suddenly I am

24   paying full price for hormones, even though my labs and

**JA1336**

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 63

1   doctors' visits were still covered.

2      Q.  Okay.  I was going to ask you that.  So you had

3   to have lab work done as part of taking your

4   gender-confirming hormones and those were covered by

5   Medicaid?

6      A.  Yes.

7      Q.  And your visits to your doctor, your

8   endocrinologist who was prescribing the hormones, those

9   were covered; correct?

10     A.  Yes.

11     Q.  Okay.  And how did that ultimately -- if it

12  ultimately got straightened out, how did it get

13  straightened out, if you know?

14     A.  It got straightened out through I communicated

15  with the supervisor at the clinic and I switched

16  doctors, but it was actually the pharmacist who

17  reminded -- who pointed out that if I'd been covered

18  once I should definitely be covered.  So I switched

19  doctors and got that straightened out and never had a

20  problem with it again.

21     Q.  Okay.  So, when you discussed it with the

22  pharmacist, the fact that the it was not being -- the

23  hormones were not being paid, the pharmacist said if you

24  were covered previously it should still be covered?

**JA1337**

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 64

1      A.   Yes.

2      Q.   Okay.  So no pharmacist told you that the

3   hormones were not covered by Medicaid; is that right?

4      A.   That's true.

5      Q.   Okay.  So what is your understanding of what

6   this lawsuit is about?

7      A.   This lawsuit is to -- let me find words to

8   describe this.  This lawsuit is to gain

9   gender-confirming surgical insurance through Medicaid --

10     Q.   Okay.  So do you -- I'm sorry.  Go ahead.

11     A.   -- and to have that exemption lifted so that

12  other procedures are possible beyond hormones.

13     Q.   Okay.  So do you have an understanding that

14  there is an exclusion in the Medicaid plan that's at

15  issue, specifically for what's called transexual

16  surgery?

17        MS. PRAKASH:  Objection.  Form.  You can

18  answer.

19        THE WITNESS:  Yes.

20  BY MS. CYRUS:

21     Q.   Okay.  And do you understand that the exclusion

22  does not categorically deny transgender people all

23  coverage for gender-confirming care?

24        MS. PRAKASH:  Objection.  Form.  You can

**JA1338**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 65

1    answer.

2        THE WITNESS:  I don't think I've read that

3    deep into it.

4    BY MS. CYRUS:

5        Q.  Okay.  Well, gender-confirming care includes

6    counseling or therapy; is that right?

7        A.  Yes.

8        Q.  And yours, for transgender purposes, has been

9    covered --

10       A.  Yes.

11       Q.  -- by Medicaid; is that right?

12       A.  Yes.

13       Q.  Okay.  And do you agree that hormone therapy,

14   hormone replacement therapy, is also part of

15   gender-confirming care?

16       A.  Yes.

17       Q.  Okay.  And that -- your hormone replacement

18   therapy has been, and is being, covered by Medicaid?

19       A.  Yes.

20       Q.  Okay.  And are you aware that the lawsuit that

21   was filed on your behalf alleges that Medicaid

22   excludes -- it's a categorical denial for all

23   transgender coverage for gender-confirming care?

24       MS. PRAKASH:  Objection.  Misstates the

JA1339

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 66

```
 1   record in this case.  Foundation.  You can answer.
 2          THE WITNESS:  I'm pretty sure that it's not
 3   saying anything about all gender-confirming care.  As
 4   far as I know, the lawsuit's specific to
 5   gender-confirming surgical care.
 6   BY MS. CYRUS:
 7     Q.  Okay.  Have you -- so you've actually looked at
 8   the lawsuit that was filed on your behalf in this
 9   matter?
10          MS. PRAKASH:  Objection.  Asked and
11   answered.
12          THE WITNESS:  Yes.
13   BY MS. CYRUS:
14     Q.  Okay.  Now, were you aware there was an
15   amendment to the original lawsuit?
16     A.  Yes.
17     Q.  Okay.  All right.  And do you remember whether
18   you -- so you looked at the -- well, you looked at the
19   lawsuit before it was filed on your behalf?
20     A.  I'm sorry, I don't understand the question.
21     Q.  Yes.  I'm just asking -- and I asked you if you
22   looked at the lawsuit that was filed in this matter on
23   your behalf, and I understood you to say yes, you did,
24   and I'm asking did you look at it before it was filed.
```

**JA1340**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 67

1      A.  Yes.

2      Q.  Okay.  We're going to go ahead and mark our

3   first exhibit.  Do you have double monitors there in

4   front of you?

5      A.  Yes.

6      Q.  Okay.  And I will let you know when that is

7   loaded.  Okay, so if you click on the marked exhibits,

8   we've marked as Exhibit No. 1 --

9      A.  Okay.

10     Q.  -- a pleading that was -- it's the First

11  Amended Class Action Complaint, filed on 10/28/21.

12          (Exhibit No. 1 identified for the record.)

13  BY MS. CYRUS:

14     Q.  Do you see that?

15     A.  Yes.

16     Q.  Okay.  All right.  Is this -- do you know

17  whether this is the lawsuit that you've looked at?

18     A.  I'm looking at this document.  Yes.

19     Q.  Okay.  All right.  So, just looking at

20  paragraph No. 1, it starts out, "This case is about

21  discrimination in health care and employment."

22  Plaintiffs bring this suit to challenge discrimination

23  under West Virginia state health insurance plans that

24  deprive transgender people of essential, and sometimes

JA1341

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 68

1  life-saving, health care."  Is that right?

2      A.  True, yes.

3      Q.  Okay.  And then it says, "These state health

4  plans facially, and categorically, exclude coverage for

5  health care that transgender people require."  Is that

6  right?

7      A.  Yes.

8          MS. PRAKASH:  Objection.  Lou Ann, are you

9  asking if you are reading this correctly or are you

10  asking whether the sentence is accurate?  I'm not sure

11  what your question is.

12         MS. CYRUS:  Okay.  Thank you.  I'm just

13  asking if I'm reading it accurately.

14         MS. PRAKASH:  Okay.  So then I will just

15  object as duplicative, redundant, kind of a waste of

16  time because the document is in the record and states

17  what it states.  But go ahead.

18  BY MS. CYRUS:

19     Q.  And then it goes on to say, "The exclusions in

20  the state health plans described in paragraphs 63 and 66

21  use antiquated and improper language, but their

22  targeting of transgender people on explicitly sex-based

23  terms is unmistakable."  Is that what it says?

24     A.  Yes.

**JA1342**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 69

1    Q.  Okay.  Then it says, "The exclusions all

2  categorically deny transgender people coverage for

3  gender-confirming care."  Is that correct?  It does say

4  that; correct?

5    A.  Yes.

6    Q.  Okay.  And then it defines, "Gender-confirming

7  care includes, but is not limited to, counseling,

8  hormone replacement therapy, and surgical care."  Is

9  that correct?  It says that?

10    A.  Yes.

11    Q.  Okay.  And, in this instance, the exclusion

12  that is at issue for West Virginia Medicaid does not

13  categorically deny transgender people coverage for

14  gender-confirming care as far as you understand;

15  correct?

16        MS. PRAKASH:  Objection.  The question

17  mischaracterizes the purpose of the complaint, also

18  calls for a legal conclusion.  Go ahead.

19        THE WITNESS:  It says a lot about different

20  types of gender-confirming care, but gender-confirming

21  care involves surgery as well.  And, as far as I know,

22  this lawsuit is about the surgery, you know, lifting

23  those exclusions totally.  There's no point in giving

24  someone only half of what they need.

**JA1343**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 70

```
1   BY MS. CYRUS:
2       Q.  Well, the allegation in the lawsuit is that
3   there's an exclusion that categorically denies
4   transgender people coverage for gender-confirming care,
5   including, but not limited, to counseling, hormone
6   replacement therapy and surgical care; correct?
7           MS. PRAKASH:  Objection.  Misstates
8   document.  Go ahead.
9               THE WITNESS:  That is -- that does very
10  much misstate what this says.
11  BY MS. CYRUS:
12      Q.  Okay.  You tell me then what you believe this
13  says.
14          MS. PRAKASH:  Objection.  Calls for a legal
15  conclusion.  Go ahead.
16          THE WITNESS:  Well, it lists what
17  gender-confirming care is and then it confirms it, and
18  then it says, "Accordingly, as used herein, gender-
19  confirming care includes the care denied pursuant to
20  each of these -- of those exclusions."
21          The exclusions that we are asking to have
22  lifted have nothing to do with the ones that are already
23  allowed.  It has to do with the ones that are not
24  allowed.
```

**JA1344**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 71

1    BY MS. CYRUS:

2       Q.  There is no exclusion for coverage for your

3    gender-confirming counseling; is that right?

4          MS. PRAKASH:  Objection.  Asked and

5    answered.

6          THE WITNESS:  Counseling is not surgery.

7    BY MS. CYRUS:

8       Q.  My question is:  There is no exclusion for

9    gender-confirming care in the form of counseling; is

10   that right?

11         MS. PRAKASH:  Objection.  Asked and

12   answered.  You can answer again.

13         THE WITNESS:  That is correct, my therapy

14   is covered.

15   BY MS. CYRUS:

16      Q.  Okay.  And there is no exclusion for your

17   hormone replacement therapy that is gender-confirming

18   care; correct?

19      A.  That is correct.

20         MS. PRAKASH:  Object.  Asked and answered.

21         THE WITNESS:  That is -- that is correct.

22   BY MS. CYRUS:

23      Q.  And, to the extent this document suggests that

24   there is an exclusion for counseling and hormone

**JA1345**

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 72

1  replacement therapy as part of gender-confirming care,

2  that is not accurate; correct?

3       MS. PRAKASH:  Objection to form, also

4  hypothetical.  But go ahead, Christopher.

5       THE WITNESS:  Could you point out to me

6  where it specifically says denial about -- I mean point

7  out exactly what you are trying to say to me.

8  BY MS. CYRUS:

9     Q.  I'm asking you about the last sentence on page

10  1, where it says, "The exclusions all categorically deny

11  transgender people coverage for gender-confirming care.

12  Gender-confirming care includes, but is not limited to,

13  counseling, hormone replacement therapy, and surgical

14  care."

15         The question is:  Doesn't this document

16  indicate there's an exclusion that categorically denies

17  transgender folks coverage for counseling, hormone

18  replacement therapy and surgical care, among others?

19       MS. PRAKASH:  So same objection to form, to

20  misstating the document, to calling for a legal

21  conclusion.  But you can answer, Christopher.

22       THE WITNESS:  I refer to my lawyers.  I

23  can't follow what's being asked.

24  BY MS. CYRUS:

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 73

1      Q.  Well, I'm asking -- so you're not able to

2   follow what's being asked?

3      A.  No?

4      Q.  Is that your answer?

5      A.  No, I can't follow what you're actually trying

6   to point out here.

7      Q.  But you certainly don't dispute that there is

8   not an exclusion in Medicaid for counseling or hormone

9   replacement therapy; is that right?

10        MS. PRAKASH:  Objection.  Asked and

11  answered numerous times.  You can answer again.

12        THE WITNESS:  There's no exclusion for

13  those types of care, no.

14  BY MS. CYRUS:

15     Q.  And, to your knowledge, has Medicaid or one

16  of -- or UniCare ever denied payment for your therapy,

17  for seeing a psychiatrist or psychologist as part of

18  your gender-confirming care?

19     A.  As far as I know, no.

20     Q.  To your knowledge, has Medicaid or UniCare ever

21  denied a claim for hormone therapy on the basis that you

22  were transgender?

23     A.  No, not that I know of.

24     Q.  Are you aware of any denial of a claim you made

**JA1347**

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 74

1  that was a denial by Medicaid or UniCare on the basis

2  that you are transgender?

3          MS. PRAKASH:  Objection.  Form.

4          THE WITNESS:  No, there's been no direct

5  denial, yeah, no.

6  BY MS. CYRUS:

7    Q.  Would it be fair to say there is not a blanket

8  refusal for all transgender health care by Medicaid?

9          MS. PRAKASH:  Objection.  Form.

10          THE WITNESS:  According to the book itself,

11  it says all transgender care.

12  BY MS. CYRUS:

13    Q.  Okay.  What book says all transgender care?

14    A.  The actual medical insurance book that I was

15  sent --

16    Q.  Is that --

17    A.  -- by Medicaid.

18    Q.  By Medicaid?

19    A.  Yeah, actually the UniCare, the UniCare book

20  actually has it in there, "all transgender care."

21    Q.  But, in your experience, you are aware that you

22  have coverage for everything you've submitted; is that

23  right?

24          MS. PRAKASH:  Objection.  Vague.

**JA1348**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 75

1      THE WITNESS:  Yeah, for everything that's

2   been submitted.

3   BY MS. CYRUS:

4      Q.  Okay.  So it would not be accurate to say

5   Medicaid has a blanket refusal for all transgender

6   health care; is that correct?

7      MS. PRAKASH:  Objection.  Asked and

8   answered.  Christopher, you can answer this question,

9   but, Lou Ann, I think you are debating semantics at this

10  point, and I think the witness has answered thoroughly.

11  Christopher, go ahead.

12      THE WITNESS:  Regardless of what is de

13  facto being practiced, the allowance for hormones and

14  therapy and things like that, which by the way I'm

15  pretty sure it doesn't cover voice therapy, but that

16  would be interesting to see if it does, it does however

17  state in the manual all transexual surgeries and

18  procedures.

19  BY MS. CYRUS:

20      Q.  Well, I'm not --

21      A.  And that has nothing to do with hormones and

22  therapy.  That is surgery.

23      Q.  When you say, "That has nothing to do with

24  hormones and therapy, that is surgery," what is that

**JA1349**

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 76

1  that you're referring to?

2     A.  The refusal in the manual refers specifically

3  to transexual surgeries.

4     Q.  Correct.  And, therefore, isn't it true it

5  would not be accurate to say Medicaid has a blanket

6  refusal for all transgender health care?

7        MS. PRAKASH:  Objection.  Asked and

8  answered numerous times.  And, Counsel, I will -- I will

9  state for the record that we have made representations

10  to the Court, you have made representations to the

11  Court, and the Court has in fact issued orders that talk

12  about the scope of this case, and so I am unclear why

13  you are hammering on this point when the witness has

14  thoroughly answered your question, and any argument you

15  have can be made based on the record in this case that

16  exists or on the papers.  But, Christopher, you can

17  answer again.

18        THE WITNESS:  No, I'm done answering this

19  question.

20        MS. PRAKASH:  Well, I mean you have to

21  answer her again, but you can give her the same answer,

22  unless your answer has changed.

23        MS. CYRUS:  Well, I didn't get the answer.

24  You objected the last time I asked the question and then

**JA1350**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 77

```
 1   I did not hear him answer the question.  I think he gave

 2   a non-responsive response.  So that's why I asked it

 3   again.

 4   BY MS. CYRUS:

 5      Q.  My question is:  Isn't it true it is not

 6   accurate to say Medicaid has a blanket refusal for all

 7   transgender health care?

 8          MS. PRAKASH:  Same objections.  Go ahead.

 9          THE WITNESS:  Repeat the question again.

10   BY MS. CYRUS:

11      Q.  Isn't it true that it is not accurate to say

12   Medicaid has a blanket refusal for all transgender

13   health care?

14          MS. PRAKASH:  Same objections.  Go ahead.

15          THE WITNESS:  That's a really twisty way of

16   asking that question.  Could you ask that more simply,

17   please?

18   BY MS. CYRUS:

19      Q.  Medicaid does not have a blanket refusal for

20   all transgender health care; is that correct?

21          MS. PRAKASH:  Same objection.

22          THE WITNESS:  According to its manual, it

23   does.

24   BY MS. CYRUS:
```

**JA1351**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 78

1    Q.  According to your experience, is that accurate?

2         MS. PRAKASH:  Same objection.

3         THE WITNESS:  I'm pretty sure I answered

4    this before.  I get therapy, I get hormones, but I'm

5    denied surgery.

6    BY MS. CYRUS:

7    Q.  And, in fact, the manual, the Medicaid manual,

8    excludes transexual surgery only; correct?

9    A.  Yes, and that's why this lawsuit exists.

10   Q.  So the Medicaid manual does not exclude these

11   other items aside from transexual surgery; correct?

12        MS. PRAKASH:  Objection to form.

13        THE WITNESS:  To be absolutely certain, I

14   would have to read -- to look at the manual again.  But,

15   like I said, I get therapy and hormones, but I'm denied

16   surgery.

17   BY MS. CYRUS:

18   Q.  Have you ever told anyone that Medicaid has a

19   blanket refusal for all transgender health care?

20        MS. PRAKASH:  Objection.  Vague.

21   BY MS. CYRUS:

22   Q.  If you did say that, that would not be

23   accurate, certainly not based on your experience;

24   correct?

**JA1352**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 79

1        MS. PRAKASH:  Objection.  Hypothetical.  Go
2    ahead.
3        THE WITNESS:  I don't understand why you
4    keep using "blanket refusal" because obviously, you
5    know, there's not a blanket exclusion, obviously, even
6    though it says directly in the manual that they don't.
7    Obviously I'm getting hormones and therapy, so obviously
8    Medicaid and UniCare are paying for this.  However, we
9    are arguing against exclusion against surgery.
10   BY MS. CYRUS:
11     Q.  So obviously there's no blanket refusal for all
12   transgender health care; correct?
13        MS. PRAKASH:  Objection.  Form.
14        THE WITNESS:  I've already answered you on
15   this.
16   BY MS. CYRUS:
17     Q.  I'm sorry, did you say correct?
18     A.  I have already answered you.
19     Q.  Okay.  Well, I want to make sure I heard your
20   answer.  I didn't hear --
21     A.  I think I said yes a few times too, but yes.
22     Q.  Okay.  I think we're going to go ahead and mark
23   our next exhibit.
24        Okay, it should be there for you.  We've

**JA1353**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 80

1    marked as Exhibit 2 to your deposition a document that

2    was produced by -- on your behalf in this case that is

3    Bates stamped CFAIN0004767.

4             (Exhibit No. 2 identified for the record.)

5    BY MS. CYRUS:

6        Q.  Do you recognize what this document is?

7        A.  It's a chat transcript.

8

9

10

11

12

13       Q.  Okay.  And this -- according to this, if the

14   timing is accurate, this chat took place on June 10,

15   2021.  Is that right?

16       A.  Yes.

17       Q.  Okay.  And, if you go down to the bottom, the

18   next-to-the-last comment by you, 6/10/2021 at 2:02 p.m.,

19   you said, "Well, the top surgery is what I'm suing the

20   state of West Virginia for.  They won't cover it because

21   they have a blanket refusal for all transgender health

22   care."  Did I read that right?

23       A.  Yes.

24       Q.  Did you say there was a blanket refusal for all

**JA1354**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 81

```
 1   transgender health care?
 2          MS. PRAKASH:  Objection.  Document speaks
 3   for itself.  Vague as to "Did you say."  Go ahead.
 4          THE WITNESS:  This was how I worded it to
 5   Brigitte, yes.
 6   BY MS. CYRUS:
 7      Q.  And that was not a correct statement; is that
 8   right?
 9          MS. PRAKASH:  Objection.  Form.  Argumentative.
10   Go ahead.
11          THE WITNESS:  It's very obvious that this
12   was what was being written at the moment; however, I
13   think you're again playing with semantics.
14   BY MS. CYRUS:
15      Q.  But it is not accurate to say there is a
16   blanket refusal for all transgender health care; is it?
17          MS. PRAKASH:  Objection.  Form.
18          THE WITNESS:  No, it would not be entirely
19   accurate because again, as I've pointed out over and
20   over again, I get therapy and I get hormones.  However,
21   I want top surgery, and therefore I need, just like
22   everybody else in the state of West Virginia like me,
23   needs to have the exclusion struck down.
24   BY MS. CYRUS:
```

**JA1355**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 82

7  BY MS. CYRUS:

8      Q.  Regarding your diagnosis of gender dysphoria,

9  what does that condition mean to you?

10         MS. PRAKASH:  Objection.  Form.  Go ahead.

11         THE WITNESS:  It's difficult to describe

12  what it means to you to have something riding around

13  inside of you that -- it's like living in a machine

14  because you learn not to pay attention to your body.

15  But gender dysphoria is -- is horrific and it's painful

16  and it's disorienting and it makes you want to hide.

17  That's what gender dysphoria is like, and often that's

18  what it means.

19  BY MS. CYRUS:

20      Q.  If I were to --

21      A.  It --

22      Q.  I'm sorry.  Go ahead.

23      A.  It cuts -- it cuts your life in half.

24      Q.  If I were to ask you what -- to describe for me

JA1356

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 83

1  the symptoms you experience that you believe are gender

2  dysphoria, would your answer be the same as what you

3  just said or would you have other things you would add?

4     A.  I would --

5       MS. PRAKASH:  Object to form.

6       THE WITNESS:  I would go in and describe

7  the symptoms.  Is that something that you actually need?

8  BY MS. CYRUS:

9     Q.  Yes.  I just didn't want to ask you to repeat

10  yourself.  What -- can you describe for me what symptoms

11  you experience that you believe are gender dysphoria?

12     A.  I experience severe pain in my breasts.  I

13  experience stomach and heart anxiety, palpitations and

14  tightenings.  I experience trembling.  I experience

15  hostility and fear.

16     Q.  Okay.  Are there certain procedures you believe

17  you need to treat your gender dysphoria?

18     A.  Yes.

19     Q.  Okay.  And what do you believe you need to

20  treat it?

21     A.  I believe top surgery is necessary.

22     Q.  Okay.  And, when you refer to top surgery, what

23  is it that you would anticipate would happen?

24     A.  The complete removal of my breast tissue and

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 84

1    remodeling of my nipples so that they would be placed in

2    a better place, a better position on any chest.

3        Q.  Okay.  So would that be a mastectomy and some

4    sort of reconstruction?

5            MS. PRAKASH:  Objection to form.  Go ahead.

6            THE WITNESS:  Yeah.  Yes.

7    BY MS. CYRUS:

8        Q.  Okay.  And you -- have you obtained a letter

9    from a doctor recommending you have a mastectomy?

10       A.  Yes, two letters.

11       Q.  Okay.  When did you obtain the first letter?

12       A.  In November of 2018.

13       Q.  Now, is that the one where you were referred --

14   recommended to have the hormones?

15       A.  And further on the surgery.

16       Q.  Okay.  Did you ever provide a copy of the

17   November letter to anyone with Medicaid or UniCare?

18       A.  Yes.  My doctor, my primary care physician, was

19   given a copy when she made -- before she made the

20   referral for hormones.

21       Q.  Okay.  But my question was:  Did you ever give

22   a copy of the November 2018 letter to either Medicaid or

23   UniCare?

24       A.  I'm pretty sure that the letter has to be

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 85

1    submitted by the doctor with the referral.

2        Q.  Okay.  Do you know if you had a doctor who

3    submitted that letter, the 11/18 letter, to Medicaid?

4        A.  I have no idea whether or not it was submitted.

5        Q.  Okay.  And do you have a more recent letter

6    that has recommended mastectomy?

7        A.  Yes.

8        Q.  Okay.  We're going to mark -- we've marked your

9    next exhibit and you can open it.  You can go ahead and

10   open the next one.

11       A.  All right.

12          MS. PRAKASH:  Hey, Lou Ann, just for

13   planning purposes, I'd like to take a break after you're

14   done with this exhibit.

15          MS. CYRUS:  okay.  Sure.

16          THE WITNESS:  Okay, I've got the letter

17   open.

18          (Exhibit No. 3 identified for the record.)

19

20

21

22

23

24

**JA1359**

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

1

2

3

4

5

6      Q.   Okay.   And, if you go back to the first page,

7  it has, "Visited on:  2021 June 10th."  So this was --

8  is it your understanding this was -- and at the very --

9  right below that it says, "CC Surgical Candidacy Letter,

10  June 10, 2021."  Correct?

11      A.   Yes.

12      Q.   So it's your understanding this letter was

13  issued on June 10th of 2021?

14      A.   Yes.

15      Q.   Do you know, has this letter, to your

16  knowledge, been provided to either Medicaid or UniCare?

17      A.   No.

18      Q.   Okay.   And do you know why not?

19      A.   Because I have not approached my primary care

20  physician yet for a referral for top surgery.

21

22

23

24

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 87

1

2

3

4

5

6    Q.   Okay.  So you gave her a copy of the letter,

7    but you haven't asked her to I guess take whatever next

8    steps there might be so that this gets requested to

9    Medicaid or UniCare?

10   A.   Yes.

11   Q.   Okay.  And why have you not done that?

12   A.   I have had medical issues that we've been

13   handling with my back that I wanted to take care of that

14   and make sure everything was okay there before I said

15   let's talk to a surgeon for referral to get top surgery.

16   Q.   So, from your perspective, would it be fair to

17   say even if the surgery were covered by Medicaid, as of

18   today you're not prepared to go forward and have it?

19      MS. PRAKASH:  Objection.  Mischaracterizes

20   testimony.  Go ahead.

21      THE WITNESS:  Oh, I'm more than ready.

22   They've already fixed what was wrong with my back, so

23   yeah, I'm actually ready.  I just haven't gone to the

24   doctor about this yet.

**JA1361**

# DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 88

1  BY MS. CYRUS:

2      Q.  And so, if you are ready, why haven't you gone

3  to the doctor about it?

4      A.  Because I'm in the process of quitting smoking

5  so that I will better my chances of healing correctly.

6      Q.  Has any doctor told you that prior to having

7  the top surgery you need to quit smoking?

8      A.  Oh, yes.  I had quit smoking for a long time

9  and I picked them up again out of anxiety.  So, until I

10  have completely kicked the habit, I am not willing to

11  risk it.  However, I'm seeing a doctor that is preparing

12  to take that next step with medication.

13      Q.  Medication to stop -- help you stop smoking?

14      A.  Yes.

15      Q.  Okay.  So you're not willing to have the

16  surgery until you've stopped smoking; is that right?

17          MS. PRAKASH:  Object to form.

18          THE WITNESS:  Not until I know for certain

19  that I'll be okay, but yeah, I can quit smoking any

20  time, it's whether or not I can handle the cravings

21  afterwards.  But, yes, I could actually lay them down

22  today and go have surgery tomorrow if I needed to.

23  BY MS. CYRUS:

24      Q.  Is it -- is it fair to say then you have not

**JA1362**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 89

```
1    been -- as of today you've never been denied a claim
2    with Medicaid or UniCare requesting that they pay for
3    you to have a mastectomy?
4        A.  No.
5        Q.  Okay.  No, that's not true, or, no, you haven't
6    been denied?
7        A.  I have not been denied.  However, I was under
8    the impression that that wouldn't be necessary.
9        Q.  What wouldn't be necessary?
10       A.  I already know that I'll be denied.
11       Q.  You haven't actually gone through the process
12   and submitted a claim that has been denied; is that
13   correct?
14       A.  No, but --
15           MS. PRAKASH:  Objection.  Asked and
16   answered.  Go ahead.
17           THE WITNESS:  -- it seems pointless to go
18   and ask my doctor to do something when we both know the
19   result will be a denial.
20   BY MS. CYRUS:
21       Q.  Okay.  Have you -- have you considered moving
22   to another state that its Medicaid might cover this
23   surgery?
24       A.  No.
```

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 111

1  was a question about your dosage that had caused your

2  prescriptions not to be filled?

3      A.  Yeah.

4      Q.  Okay.  And then did you -- when that situation

5  was happening, were you under the impression that your

6  hormones were not covered?

7      A.  That was sort of the impression I had gotten

8  from just the way my doctor was behaving about it.  She

9  said that Medicaid wouldn't approve, so I just took it

10  as said, and that, from what I understand, was not what

11  was going on there.  That was entirely on her part and

12  the part of her staff.  Yeah, I believed that it was not

13  approved.

14      Q.  In other words, that it was not covered?

15      A.  Yeah, that it was not covered.

16      Q.  Okay.  But, after that was brought to your

17  attention, I take it you were able to work with the

18  doctor's office, or some doctor, and get the question

19  answered and get your medication going again?

20      A.  Exactly.  They were able to call in and handle

21  the question that was being asked about the dosage

22  because all of it kicked on a dosage.

23      Q.  Correct.

24      A.  And, for some reason, she and her nurses would

**JA1364**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 112

```
1   not communicate with Medicaid and explain why that
2   dosage was necessary.
3       Q.  Okay.  If you go to box 17 -- no, I'm sorry,
4   18, the next one down --
5       A.  Okay.
6       Q.  -- you noted, "Well, just unfriended a family
7   member after some horrific anti-transgender BS."  And
8   that looks like -- is that 4/11/19?
9       A.  Yeah, yeah, 4/11/19.
10      Q.  Yeah.  What was that about?
11      A.  That is my cousin's wife, and she was part of
12  conversation on Facebook that I was reading and it
13  turned pretty anti-transgender and I started to
14  withdraw, and then she got involved in the conversation
15  and it upset me, it upset me that her attitude was is
16  that:  So what if I -- you know, if someone transgender
17  needed therapy or hormones when she couldn't even get
18  her teeth fixed.  And my attitude was apples are not
19  oranges.
20      Q.  Okay.  And then you have, "I deserve affordable
21  health care just like you, and if your insurance doesn't
22  cover your teeth, that has nothing to do with me getting
23  hormones."  What -- what was that about?
24      A.  That's what that was about.
```

**JA1365**

## DEPOSITION OF CHRISTOPHER FAIN

CONFIDENTIAL

Page 128

```
 1            But, once I reached the point where I could
 2   put things on overtop of my head again, I started
 3   wearing an official binder, the ones on the market now,
 4   and that was in 2017.  And I have not worn anything even
 5   resembling a bra since mid 2017.
 6       Q.  Okay.  And, if you'll go to paragraph 19, you
 7   say you require a bilateral mastectomy as medically
 8   necessary to care and treat your gender dysphoria, and
 9   it's my understanding and you go on to talk about, that
10   would eliminate your need for the binder; is that right?
11       A.  That's absolutely true, yes.
12       Q.  Okay.  And, again, that's the only procedure
13   that you're seeking at this time?
14       A.  Yes.
15       Q.  Okay.  In No. 20 you say your Medicaid -- as a
16   Medicaid participant you receive coverage through the
17   managed care organization UniCare, which we've talked
18   about, and you say you are aware there is an exclusion
19   in the state Medicaid plan that bans the
20   gender-confirming surgery care you need; is that right?
21       A.  That's true.
22       Q.  Okay.  Have you had some instance where you
23   felt like you needed to drop this lawsuit for some
24   reason?
```

**JA1366**

CONFIDENTIAL

Page 134

1    CERTIFICATION OF COURT REPORTER AND NOTARY PUBLIC

2

3         I, Melanie Smith, Court Reporter and Notary

4    Public, duly Commissioned and qualified, do hereby

5    certify that the foregoing deposition was duly taken by

6    me and before me at the time and place and for the

7    purpose specified in the caption hereof, the said

8    witness having been by me first duly sworn.

9

10        I do further specify that the said

11   deposition was correctly taken by me in Stenotype and

12   that the same was reduced to computer print by me or

13   under my direct supervision.

14

15        I further certify that I am neither

16   attorney or counsel for, nor related to or employed by,

17   any of the parties to the action in which this

18   deposition is taken, and further that I am not a

19   relative or employee of any attorney or counsel employed

20   by the parties hereto, or financially interested in the

21   action.

22

23        I certify that the attached transcript

24   meets the requirements set forth within article twenty-

1    seven, chapter forty-seven of the West Virginia Code. Page 135

2

3            Before completion of the deposition, review

4    of the transcript { X } was {   } was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed are

7    appended hereto.

8

9            Given under my hand this 11th day of May,

10   2022.

11

12            My Commission expires February 13, 2026.

13            *Melanie E. Smith*

14            _____

15            Melanie E. Smith

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

Page 137

1              DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 5200225
3     CASE NAME: Fain, Christopher Et Al. v. Crouch, William Et Al.
      DATE OF DEPOSITION: 4/28/2022
4     WITNESS' NAME: Christopher Fain
5        In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7        I have made no changes to the testimony
   as transcribed by the court reporter.
8
      5-23-2022              Christopher Fain
9     Date                   Christopher Fain
10       Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
            Statement; and
14       Their execution of this Statement is of
            their free act and deed.
15
      I have affixed my name and official seal
16
   this 23rd day of May, 2022.
17
                            Elizabeth A. Cross
18    Notary Public
19       5/3/27
      Commission Expiration Date
20
21                OFFICIAL SEAL
                  NOTARY PUBLIC
22            STATE OF WEST VIRGINIA
                Elizabeth Ann Cross
23               The UPS Store
                  729 9th Ave.
24            Huntington WV 25701
        My Commission Expires May 3, 2027
25

              Veritext Legal Solutions

www.veritext.com                              888-391-3376

**JA1369**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN,** and
**SHAWN ANDERSON,**
a/k/a Shauntae Anderson;
individually and on behalf of all others
similarly situated,

                    **Plaintiffs,**                                          Civil Action No. 3:20-cv-00740
                                                                             Hon. Robert C. Chambers, Judge

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; and **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES,**

                    **Defendants.**

### AFFIDAVIT OF JENNIFER MYERS

STATE OF WEST VIRGINIA,

COUNTY OF ___Kanawha___

I, Jennifer Myers, duly sworn, make oath upon my knowledge as follows:

1.      I currently serve as the Director of Professional Services for the West Virginia

Bureau for Medical Services (WVBMS).

2.      I have reviewed the claim information available to WVBMS as of January 28, 2022,

contained in the Medicaid Management Information System ("MMIS") for Plaintiff Christopher

Fain which has been produced in discovery in this matter. I have identified several medical claims

with the documented primary diagnosis of F64.0, "Transsexualism," F64.8, "Other gender identity

Page **1** of **8**

EXHIBIT
191

DHHRBMS021712

**JA1370**

disorders," Z79.890, "Hormone replacement therapy," or Z87.890, "Personal history of sex reassignment."

    3.    Each of these claims has been paid, as set forth below.

DHHRBMS021713

**JA1371**

DHHRBMS021714

JA1372

DHHRBMS021715

JA1373

    4.    I have reviewed the claim information available to WVBMS as of January 27, 2022, contained in the Medicaid Management Information System ("MMIS") for Plaintiff Shauntae Anderson which has been produced in discovery in this matter. I have identified several medical claims with the documented primary diagnosis of F64.0, "Transsexualism," F64.1, "Dual role transvestism," F64.9, "Gender identity disorder, unspecified," or Z87.890, "Personal history of sex reassignment."

    5.    Each of these claims has been paid, as set forth below.

DHHRBMS021716

DHHRBMS021717

JA1375

DHHRBMS021718

**JA1376**

AND FURTHER AFFIANT SAYETH NOT.

Jennifer Myers
Director of Professional Services
West Virginia Bureau for Medical Services

Sworn and subscribed to before me this _29th_ day of April, 2022.

My commission expires: _April 7, 2024_

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
ROBIN MARTIN
1411 VIRGINIA ST. E., STE 290
CHARLESTON, WV 25301
My Commission Expires April 07, 2024

[SEAL]

NOTARY PUBLIC

DHHRBMS021719

**JA1377**

Case 3:20-cv-00740   Document 252-7   Filed 05/31/22   Page 1 of 210 PageID #: 3840

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                    HUNTINGTON DIVISION

4    ------------------------------------------------------

5    Christopher Fain, individually and on behalf of all

6    others similarly situated, et al.,

7                   Plaintiffs,

8       vs.                    CIVIL ACTION NO. 3:20-cv-00740

9    William Crouch, et al.,

10                  Defendants.

11   ------------------------------------------------------

12

13

14           REMOTE DEPOSITION OF BRIAN THOMPSON

15

16

17

18   DATE:   April 13, 2022

19   TIME:   8:00 a.m. CST

20   PLACE:  Veritext Virtual Videoconference

21

22

23

24   REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25   JOB NUMBER:  5128144

```
                                                        Page 2
 1                          APPEARANCES

 2

 3     On Behalf of the Plaintiffs (Via Videoconference):

 4          TARA L. BORELLI, ESQ.

 5          Lambda Legal Defense and Education Fund, Inc.

 6          158 West Ponce De Leon Ave., Suite 105

 7          Decatur, Georgia  30030

 8          470.225.5341

 9          tborelli@lambdalegal.org

10

11          AVATARA SMITH-CARRINGTON, ESQ.

12          Lambda Legal Defense and Education Fund, Inc.

13          3500 Oak Lawn Avenue, Suite 500

14          Dallas, Texas  75219

15          214.219.8585

16          asmithcarrington@lambdalegal.org

17

18          ANNA PRAKASH, ESQ.

19          Nichols Kaster PLLP

20          80 South 8th Street, Suite 4700

21          Minneapolis, Minnesota  55402-2224

22          612.256.3291

23          aprakash@nka.com

24

25
```

**JA1379**

Page 3

1      WALT AUVIL, ESQ.

2      The Employment Law Center, PLLC

3      1208 Market Street

4      Parkersburg, West Virginia  26101

5      304.485.3058

6      auvil@theemploymentlawcenter.com

7

8   On Behalf of Defendants William Crouch; Cynthia Beane;

9   and West Virginia Department of Health and Human

10  Resources, Bureau for Medical Services (Via

11  Videoconference):

12      KIMBERLY M. BANDY, ESQ.

13      Shuman McCuskey Slicer, PLLC

14      1411 Virginia Street East, Suite 200

15      Charleston, West Virginia  25301

16      304.345.1400

17      kbandy@shumanlaw.com

18

19

20

21

22      NOTE:  The original deposition transcript will be

23  delivered to Attorney Smith, Esq., as the taking

24  attorney.

25

JA1380

# DEPOSITION OF BRIAN THOMPSON

Page 28

1  and some of them we can create and customize according

2  to our needs.

3      Q.  Okay.  And, let's see.  I'm going to read the

4  response that was provided to this interrogatory.  So if

5  you start at the top of Page 3, I will read a section of

6  that response, okay?

7      A.  Okay.

8      Q.  Okay.  So, "Further without waiving the

9  objection with regard to hormone therapy, these

10  defendants do not have a database where they keep track

11  of the information in the manner requested.  The data is

12  not kept in a manner which would allow them to identify

13  which patients have requested hormone therapy for gender

14  confirming care.  Information is tracked by the

15  medication or drug requested, not the diagnosis or

16  reason for the request.  Upon information and belief,

17  there are no gender edits for most estrogen and

18  testosterone containing products, so coverage would not

19  be denied on the basis that the hormone therapy was

20  sought as part of gender confirming care."  Did I read

21  that correctly?

22      A.  You did.

23      Q.  Okay.  And then, let's see.  So just to confirm,

24  BMS covers hormone replacement therapy for treatment of

25  gender dysphoria, correct?

## DEPOSITION OF BRIAN THOMPSON

Page 29

1    A.  Yes.  I think it would be more accurate to say

2  that we don't restrict it.  We would never, for

3  instance, if testosterone is run through, we would never

4  know what it was being used for unless a human being

5  told us what it was being used for.  There's not a

6  diagnosis requirement when you enter a claim at a retail

7  pharmacy that would stop it.  It might get stopped for

8  some other reason at which case then you would have a

9  conversation and find out what it's being used for.

10    Q.  Okay.  So just to make sure that I understand

11  what you're describing, so essentially, and correct me

12  if I'm wrong, the diagnosis would not stop the claim,

13  but there are other data points that could?

14    A.  Yeah, like those edits that I was talking about,

15  if you try to fill it too early.  A lot of injectables

16  are only stopped because they are an injectable because

17  of the nature, it's just a little bit more of a concern

18  for safety when you're injecting something as opposed to

19  giving somebody pills that you can discontinue the pills

20  mid therapy.  If you inject it, you know, there's

21  nothing you can do until they metabolize the drug, so.

22  So in the conversation of, if you do have a conversation

23  about say testosterone or whatever, we do not restrict

24  according to gender dysphoria, if we are made aware

25  that's why it's being used, there is no restriction for

**JA1382**

# DEPOSITION OF BRIAN THOMPSON

Page 30

1   that, no policy for that.

2       Q.   Okay.  And does that apply, or does that include

3   both estrogen and testosterone, so talking about hormone

4   replacement therapy broadly, does that when you narrow

5   it down include estrogen and testosterone?

6       A.   It does, yes.

7       Q.   And does that include any other hormones?

8       A.   Yeah, if it's -- so all of these, so the use of

9   testosterone and estrogen in various other drugs that

10  are typically used in gender confirming care, they are

11  all off label use right now, the FDA hasn't approved

12  those.  So there's not, there's not a policy around, so

13  I guess what I'm saying is that with off label use they

14  often require discussion about why it's being used,

15  about the proper dosing and the proper frequency of use.

16  So there is no, like there are no edits that would stop

17  those from going through for various diagnoses.

18       The only time that we would even become aware of

19  why it would be used would be if there's some other

20  reason that the drug stops.  Estrogens don't get stopped

21  a lot because of birth control, things like that,

22  they're oral.  Testosterones get stopped a little bit

23  more because they are very common used injectables, so

24  they are stopped just simply because they're an

25  injectable.

JA1383

## DEPOSITION OF BRIAN THOMPSON

Page 82

```
 1   that you might have to go to the doctor's office to get
 2   them to inject or to administer, so for their own
 3   members they're responsible for making those coverage
 4   decisions.  But if we cover it, they're supposed to
 5   provide some way of covering it as well.  They might
 6   have different policies around it, but they have to
 7   provide some way of getting something that we cover by
 8   contract, is my understanding.
 9       Q.  Understood.  And are there any reasons why
10   coverage for hormone replacement therapy for treatment
11   of gender dysphoria would be denied?
12       A.  Other than safety, no, I can't, for that
13   specific diagnosis, I can't imagine, you know, from a
14   pharmacy standpoint why we would.
15       Q.  And has BMS ever denied coverage for Mr. Fain's
16   hormone replacement therapy?
17       A.  There was one, when I looked at the profile
18   there was one denial.  There was several edits that
19   prevented it from paying because it required, I think
20   there was, it might have been a pregnancy, I can't
21   remember all the edits that have fired, but in general
22   every time, they called Rational Drug three times, got
23   two approvals, there was one denial, and that was simply
24   because they were trying to use it every five days and
25   it was supposed to be used every seven days, so as soon
```

**JA1384**

**DEPOSITION OF BRIAN THOMPSON**

Page 83

1  as they clarified that, it got paid.  So I would say no,

2  we did not deny it for gender dysphoria.

3      Q.  Okay.  And has BMS ever denied coverage for Ms.

4  Anderson's hormone replacement therapy?

5      A.  No.  There were some edits that prevented the

6  claim from going through initially, I think most of

7  those were like early refills, things like that, and I

8  think there was maybe an injectable at one point, but

9  no.  And I would also add that on both of these patients

10 none of their claims for estrogen or testosterone ever

11 made it up to us for review, they were always approved

12 eventually at Rational Drug level.

13     Q.  Understood.  And you have already gone through

14 the breakdown of the review process, so.

15              (Exhibit 12 marked for identification.)

16     Q.  I've just introduced another exhibit, but before

17 I turn to this, Mr. Thompson, just to make sure, are you

18 looking at anything else on your screen other than

19 Exhibit Share?

20     A.  No, I'm just looking at the exhibits that you

21 have pulled up.

22     Q.  Okay.  So do you see what has been marked as

23 BT0012?

24     A.  Sixth supplement to plaintiffs?

25     Q.  Yes.

**JA1385**

Page 99

1                    REPORTER'S CERTIFICATE
2
3
STATE OF MINNESOTA      )
4                       ) ss.
COUNTY OF WASHINGTON )
5
6       I hereby certify that I reported the Zoom deposition
of Brian Thompson on the 13th day of April 2022, and
7  that the witness was by me first duly sworn to tell the
whole truth;
8
        That the testimony was transcribed by me and is a
9  true record of the testimony of the witness;
10      That the cost of the original has been charged to
the party who noticed the deposition, and that all
11  parties who ordered copies have been charged at the same
rate for such copies;
12
        That I am not a relative or employee or attorney or
13  counsel of any of the parties, or a relative or employee
of such attorney or counsel;
14
        That I am not financially interested in the action
15  and have no contract with the parties, attorneys, or
persons with an interest in the action that affects or
16  has a substantial tendency to affect my impartiality;
17      That the right to read and sign the deposition by
the witness was reserved.
18
        WITNESS MY HAND AND SEAL THIS 13th day of April
19  2022.
20
21
22
23      _Kelley E Zilles_
_____
24      Kelley E. Zilles, RPR
        Notary Public, Washington County, Minnesota
25      My commission expires 1-31-2025

Page 102

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 5128144
 3      CASE NAME: Fain, Christopher Et Al. v. Crouch, William Et Al.
        DATE OF DEPOSITION: 4/13/2022
 4      WITNESS' NAME: Brian Thompson
 5      In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7      I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9      I request that these changes be entered
     as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13      5-18-2022         Brian Thompson
     Date                 Brian Thompson
14
15      Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18          in the appended Errata Sheet;
        They signed the foregoing Sworn
19          Statement; and
        Their execution of this Statement is of
20          their free act and deed.
21   I have affixed my name and official seal
22   this 18th day of May, 20 22.
23      Kimberly M O'Brien
     Notary Public
24      July 28, 2026
25   Commission Expiration Date
```

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Kimberly Michelle O'Brien
WV DHHR Bureau for Medical Services
350 Capitol St, Rm 251, Charleston, WV 25301
My Commission Expires July 28, 2026

Veritext Legal Solutions

JA1387

Page 103

1           ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2           ASSIGNMENT NO: 5128144

3   PAGE/LINE(S) /        CHANGE        /REASON

4   p.14 / 14-15   "looks for outstanding & unusual claims to help us
5   manage fraud & waste." By unusual I mean excessive·
6   quantities or claims billed to Medicaid 1st when the member
7   ~already~ had ~primary~ ~unreported~ primary insurance. / Clarification
8   p.15 / 17     "... ~even~ ~in the~ inpatient pharmacy" / Clarification
9   p.15 / 25     "considered the Heart Hospital" / Clarification
10  p.35/12-13    EPSDT is not required for children. — It is
11  / & 23    a benefit that provides comprehensive & preventative
12          health care services for children under age 21 who
13          are enrolled in Medicaid. The EPSDT ~benefit~ benefit can cover
14          medically necessary services not normally
15          covered under Medicaid. / Clarification &
16                              Correction
17  p.67 / 13   Hepatic "B" —→ Should be Hepatitic C / Correction
18  p.73 / 10   ~to~ "POs" folder —→ Should be "PA folder" / Correction

19

20  __5-18-2022__                __Brian Thompson__
    Date                 Brian Thompson
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS __18th__
22  DAY OF __May_____, 20 __22__ .
23       __Kimberly M O'Brien_____
         Notary Public
24
       __July 28, 2026___
25  Commission Expiration Date

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Kimberly Michelle O'Brien
WV DHHR Bureau for Medical Services
350 Capitol St, Rm 251, Charleston, WV 25301
My Commission Expires July 28, 2026

Page 103

1        ERRATA SHEET

    VERITEXT LEGAL SOLUTIONS MIDWEST

2        ASSIGNMENT NO: 5128144

3   PAGE/LINE(S) /        CHANGE        /REASON

4   p. 76 / ~~blah~~ 3-5  "And so the data that he would

5   have been accessing was probably at least 2 months

6   old or so ...."              / Correction.

7   p. 78   pharmacogentically —→ "Pharmacokinetically"    Spelling Correction

8

9

10

11

12

13

14

15

16

17

18

19

20   5-18-2022                    Brian Thompson
     Date            Brian Thompson

21   SUBSCRIBED AND SWORN TO BEFORE ME THIS  18th

22   DAY OF  May                   , 20  22  .

23         Kimberly M O'Brien
         Notary Public

24

25      July 28, 2026
     Commission Expiration Date

**JA1389**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

|  |  |
|---|---|
| **Plaintiffs,** | **Civil Action No. 3:20-cv-00740**<br>**Hon. Robert C. Chambers, Judge** |

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

> **Exhibit
> BT 0007**

**DEFENDANTS' FIRST SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET
OF REQUESTS FOR PRODUCTION TO DEFENDANTS WILLIAM CROUCH,
CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND
HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES**

**DOCUMENT REQUESTS**

8. Documents sufficient to identify the circumstances in which counseling and/or therapy is
   covered through the West Virginia Medicaid Program, including but not limited to Diagnostic
   Codes, Procedure Codes, contracts, Health Plans, clinical guidelines and/or criteria, medical
   necessity criteria, and pre/prior authorization requirements and procedures where applicable.

**SUPPLEMENTAL RESPONSE: Please see BMS Provider Manual Chapter 519.22, attached as Exhibit 4, beginning with Bates Number DHHRBMS000107.**

9. Documents sufficient to identify the circumstances in which hormone therapy is covered through the West Virginia Medicaid Program, including but not limited to Diagnostic Codes, Procedure Codes, contracts, Health Plans, clinical guidelines and/or criteria, medical necessity criteria, and pre/prior authorization requirements and procedures where applicable.

**SUPPLEMENTAL RESPONSE: Please see BMS Provider Manual Chapter 518 Pharmacy Services, attached as Exhibit 5, beginning with Bates Number DHHRBMS000109, and the most recently updated Preferred Drug List with Prior Authorization Criteria, attached as Exhibit 6, beginning with Bates Number DHHRBMS000145.**

**Please note that to the extent that the Provider Manual states in section 518.4 that "Other drugs may be limited in quantity, duration, or based on gender. The information regarding these drug products and their limitations is available on the BMS website[,]" the "Drug Limits" list available online was last updated June 1, 2016, and does not reflect the removal of the gender edit for most estrogen and testosterone containing products.**

10. Documents sufficient to identify the circumstances in which orchiectomy, penectomy, vaginoplasty, hysterectomy, phalloplasty, mammoplasty, breast reconstruction surgery, and/or mastectomy are covered through the West Virginia Medicaid Program, including but not limited to Diagnostic Codes, Procedure Codes, contracts, health plans, clinical guidelines and/or criteria, medical necessity criteria, and pre/prior authorization requirements and procedures where applicable.

**SUPPLEMENTAL RESPONSE: Please see BMS Provider Manual Chapter 519.16 Surgical Services, attached as Exhibit 7, beginning with Bates Number DHHRBMS000199.**

2

**JA1391**

22. All documents upon which Defendants considered, relied upon, or intend to rely upon, in

support of their admissions and/or denials of any of the allegations contained in the Complaint.

**SUPPLEMENTAL RESPONSE:  Please see the Medicaid State Plan, attached as Exhibit 8, beginning with Bates Number DHHRBMS000203, and the online table of contents, attached as Exhibit 9, beginning with Bates Number DHHRBMS001003.**

**WILLIAM CROUCH,
CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,**

**By counsel**

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

**Plaintiffs,**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

**Defendants.**

### CERTIFICATE OF SERVICE

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of
Health and Human Resources, by counsel, and do hereby certify that on the 13th day of October,
2021, a true and exact copy of **DEFENDANTS' FIRST SUPPLEMENTAL RESPONSE TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANTS
WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES** was served
on counsel via electronic means as follows:

4

**JA1393**

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA  90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lamdalegal.org

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
*Counsel for Ted Cheatham*
517 9th Street, P.O. Box 1704
Huntington, WV  25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

Stuart A. McMillan (WVSB#6352)
**Counsel for The Health Plan of West Virginia, Inc.**
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV 25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
**Counsel for The Health Plan of West Virginia, Inc.**
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV 26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
**Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services**
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

6

**JA1395**

**Exhibit**
BT 0011

|      | Males on estrogen | Females on Testosterone (Including Oxandrolone) | Females on testosterone (Excluding Oxandrolone) |
|------|-------------------|--------------------------------------------------|--------------------------------------------------|
| 2012 | 1                 | 4                                                | 0                                                |
| 2013 | 2                 | 5                                                | 0                                                |
| 2014 | 2                 | 2                                                | 0                                                |
| 2015 | 2                 | 6                                                | 0                                                |
| 2016 | 0                 | 4                                                | 1                                                |
| 2017 | 19                | 20                                               | 14                                               |
| 2018 | 39                | 48                                               | 41                                               |
| 2019 | 44                | 65                                               | 56                                               |
| 2020 | 61                | 79                                               | 71                                               |
| 2021 | 114               | 139                                              | 121                                              |



EXHIBIT
173

DHHRBMS021563

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

**Exhibit
BT 0012**

        **Plaintiffs,**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

**Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge**

**DEFENDANTS' SIXTH SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET
OF REQUESTS FOR PRODUCTION TO DEFENDANTS WILLIAM CROUCH,
CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND
HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES**

**DOCUMENT REQUESTS**

2. All documents relating to Plaintiff's communications, injuries, requests for coverage,

requests for prior authorization, requests for reimbursement and/or complaints regarding

coverage for Gender-Confirming Care through the West Virginia Medicaid Program.  This

Request includes but is not limited to:

1

**JA1397**

    a.   All communications to and from Plaintiff relating to coverage for Gender-Confirming Care;

    b.   All Documents and communications regarding Plaintiff's requests for Gender-Confirming Care, including but not limited to communications among Defendants, and/or the employees, entities, agents, representatives, contractors, vendors, and/or consultants of Defendants and/or West Virginia Department of Health and Human Resources, Bureau of Medical Services;

    c.   All Documents and communications relating to consideration or processing by third-party administrators, contractors, and/or vendors of requests for Gender-Confirming Care by Plaintiff.

**SUPPLEMENTAL RESPONSE:  See attached excel spreadsheet with claim information for hormones for Plaintiffs Fain and Anderson, attached as Exhibit 97, Bates No. DHHRBMS016224. With regard to Plaintiff Fain, see the attached audio recording regarding request for approval for medication, attached as Exhibit 98, Bates No. DHHRBMS016225; West Virginia Controlled Substance Report from Board of Pharmacy records, attached as Exhibit 99, Bates No. DHHRBMS016226-16228; and Member Notes attached as Exhibit 100, Bates No. DHHRBMS016229-16230. All materials are CONFIDENTIAL.**

4.  All Documents and communications relating to the Exclusion, including but not limited to:

    a.   All Documents and communications relating to the decision to maintain the Exclusion in the Health Plans in any plan year.

    b.   All Documents and communications relating to the decision to permit coverage for hormone therapy for the purpose of treating gender dysphoria.

2

**JA1398**

c. All Document and communications relating to evaluating, examining, analyzing, and/or considering the Exclusion in any way.

**SUPPLEMENTAL RESPONSE: See attached West Virginia Model Member Handbook, attached as Exhibit 105, Bates No. DHHRBMS016291-16320.**

24. To the extent not requested above, all Documents that Defendants may rely upon to support their defenses against Plaintiff's claims in this action.

**SUPPLEMENTAL RESPONSE:   See the attached 2019-2020 Aetna Member Handbook attached as Exhibit 101, DHHRBMS016231-16278; See email with subject: Enrollment Data – Health Equity/ SDOH Accreditation, attached as Exhibit 102, Bates No. DHHRBMS016279-16283 ;  email with subject: Enrollment Data - Health Equity / SDOH Accreditation, attached as Exhibit 103, Bates No. DHHRMBS016284-16287; and email with subject: Health Equity Follow Up, attached as Exhibit 104, Bates No. DHHRBMS016288-16290; Please note, confidential attorney/client privileged communication redacted.**

WILLIAM CROUCH, CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,
By counsel

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esq. (WVSB #6558)
Roberta F. Green, Esq. (WVSB #6598)
Caleb B. David, Esq. (WVSB #12732)
Kimberly M. Bandy, Esq. (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL; and BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

        **Plaintiffs,**

                                        Civil Action No. 3:20-cv-00740
                                        Hon. Robert C. Chambers, Judge

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

        **Defendants.**

### CERTIFICATE OF SERVICE

    Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of Health and Human Resources, by counsel, and do hereby certify that on the 24th day of February, 2022, a true and exact copy of **DEFENDANTS' SIXTH SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES** was served on counsel via electronic means as follows:

**JA1400**

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058; (304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200; (612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245; (202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585; (214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
(213) 382-7600; (213) 351-6050
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lamdalegal.org

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
*Counsel for Jason Haught*
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
eweed@oxleylawwv.com

**JA1401**

USCA4 Appeal: 22-1927     Doc: 20-3      Filed: 10/31/2022     Pg: 347 of 477

Case 3:20-cv-00740   Document 252-7   Filed 05/31/22   Page 205 of 210 PageID #: 4044
Case 3:20-cv-00740   Document 208   Filed 02/24/22   Page 3 of 3 PageID #: 1362

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esq. (WVSB #6558)
Roberta F. Green, Esq. (WVSB #6598)
Caleb B. David, Esq. (WVSB #12732)
Kimberly M. Bandy, Esq. (WVSB #10081)
*Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and
Human Resources, Bureau for Medical Services*
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

6

JA1402

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**CHRISTOPHER FAIN; ZACHARY
MARTELL;BRIAN MCNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES,** individually and on
behalf of all others similarly situated,

            **Plaintiffs,**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

            **Defendants.**

**Civil Action No. 3:20-cv-00740**
**Hon. Robert C. Chambers, Judge**

> **Exhibit**
> **BT 0017**

**DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL
SERVICES' SECOND SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND
SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS**

**DOCUMENT REQUESTS**

    25.    To the extent not already produced, all Documents related to Plaintiff Christopher

Fain, and proposed Plaintiff Shauntae Anderson.

**SUPPLEMENTAL RESPONSE: Please see three excel spreadsheets regarding Plaintiff**

**Fain's medical information attached as Exhibit 87, 88, and 89, Bates Nos.**

**DHHRBMS016069; DHHRBMS016070 and DHHRBMS016071, respectively. Additionally,**

1

**JA1403**

please see other patient information regarding Plaintiff Fain, attached as Exhibit 90, Bates No. DHHRBMS016072-16077.

With regard to Plaintiff Anderson, please see two excel spreadsheets with medical information, attached as Exhibits 91 and 92, Bates No. DHHRBMS016078 and DHHRBMS016079.

WILLIAM CROUCH,
CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,

By counsel

/s/ Caleb B. David
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

2

**JA1404**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others similarly situated,

**Plaintiffs,**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

**v.**

**WILLIAM CROUCH,** in his official capacity as Cabinet Secretary of the West Virginia Department Of Health and Human Resources; **CYNTHIA BEANE,** in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; **WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES; JASON HAUGHT,** in his official Capacity as Director of the West Virginia Public Employees Insurance Agency; and **THE HEALTH PLAN OF WEST VIRGINIA, INC.**

**Defendants.**

### CERTIFICATE OF SERVICE

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of Health and Human Resources, by counsel, and do hereby certify that on the 1st day of February, 2022, a true and exact copy of **DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES' SECOND SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS** was served on counsel via electronic means as follows:

3

**JA1405**

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
(404) 506-9320 (fax)
ccharles@lamdalegal.org

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
*Counsel for Jason Haught*
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

4

**JA1406**

Stuart A. McMillan (WVSB#6352)
*Counsel for The Health Plan of West*
*Virginia, Inc.*
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV 25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
*Counsel for The Health Plan of West*
*Virginia, Inc.*
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV 26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com


/s/ Caleb B. David
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
*Counsel for William Crouch, Cynthia Beane, and*
*West Virginia Department of Health and Human*
*Resources, Bureau for Medical Services*
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA1407**

**In the Matter of:**

CHRISTOPHER FAIN

vs

WILLIAM CROUCH, et al.

DR. DAN KARASIC

April 15, 2022



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN; ZACHARY
MARTELL; BRIAN McNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES, individually and on
behalf of all others similarly situated,

        Plaintiffs,

vs.        Civil Action No. 3:20-cv-00740

WILLIAM CROUCH, in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
CYNTHIA BEANE, in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT, in his official
capacity as Director of the West Virginia
Public Employees Insurance Agency; and
THE HEALTH PLAN OF WEST VIRGINIA, INC.,

        Defendants.

"CONFIDENTIAL"
VIDEOTAPED DEPOSITION OF DR. DAN KARASIC
BY VIDEO CONFERENCE

The videotaped deposition of Dr. Dan
Karasic was taken on April 15, 2022,
at 12:02 p.m., at 5010 Dempsey Drive,
Cross Lanes, West Virginia.

ELITE COURT REPORTING, LLC
5010 Dempsey Drive
Cross Lanes, West Virginia 25313
(304) 415-1122

Martha Fourney, CSR

Confidential

```
 1          A P P E A R A N C E S

 2
    Caleb B. David
 3  Attorney at Law
    Shuman McCuskey Slicer, PLLC
 4  1141 Virginia Street, East, Suite 200
    Charleston, West Virginia  25301
 5  (By video conference)

 6
    Walt Auvil
 7  Attorney at Law
    The Employment Law Center, PLLC
 8  1208 Market Street
    Parkersburg, West Virginia  26101
 9  (By video conference)

10
    Avatara Smith-Carrington
11  Attorney at Law
    Lambda Legal Defense and Education Fund
12  3500 Oak Lawn Avenue, Suite 500
    Dallas, Texas  75219-6722
13  (By video conference)

14
    Tara L. Borelli
15  Attorney at Law
    Lambda Legal Defense and Educational Fund
16  1 West Court Square, Suite 105
    Decatur, Georgia  30030
17  (By video conference)

18

19

20

21

22

23

24
```

Elite Court Reporting, LLC
DR. DAN KARASIC, 04/15/2022

**JA1410**

**DEPOSITION OF DR. DAN KARASIC**

Confidential

Page 8

```
 1   gender-related conditions?
 2         ATTORNEY SMITH:  Object to form.
 3     A.   So I just was -- I thought about that
 4   and looked at patients that I saw over a couple
 5   of days, and about two-thirds of my private
 6   practice patients are transgender.
 7     Q.   Do all of those patients who are
 8   transgender treat with you for gender dysphoria
 9   or gender incongruence?
10         ATTORNEY SMITH:  Object to form.
11     A.   No.  Many of them are transgender but
12   are seeing me for -- for example, mood and
13   anxiety disorders or other psychiatric
14   conditions.
15     Q.   And I think that from reading your
16   report there is a difference between someone
17   having a transgender identity and someone
18   having gender dysphoria; is that correct?
19         ATTORNEY SMITH:  Object to form.
20     A.   Yes.
21     Q.   Can you explain what that difference
22   is?
23     A.   Sure.  So being transgender is an
24   identity.  It's how someone identifies.  And
```

**JA1411**

**DEPOSITION OF DR. DAN KARASIC**

Confidential

Page 9

1    gender dysphoria is used both to describe a

2    symptom, but also to describe a DSM-5 disorder

3    of gender dysphoria.

4        Q.    Is there a difference between gender

5    dysphoria as a symptom and gender dysphoria as

6    a diagnosis?

7            ATTORNEY SMITH:    Object to form.

8        A.    Yes.    The DSM diagnosis requires that

9    the person be -- the distress that somebody is

10   experiencing from gender dysphoria be

11   clinically significant or affecting social or

12   occupational -- causing social or occupational

13   impairment.

14       Q.    Does clinical significance mean that

15   it's causing those social or occupational

16   impairments?

17       A.    So it can be social or occupational

18   impairment, or it can be so much distress that

19   you go to the doctor.    So that's what's

20   clinically significant.

21       Q.    So there are patients who experience

22   gender dysphoria as a symptom, but do not have

23   the clinical significance that rises to the

24   level of a DSM-5 diagnosis; is that correct?

Elite Court Reporting, LLC
DR. DAN KARASIC, 04/15/2022

**JA1412**

## DEPOSITION OF DR. DAN KARASIC

Confidential

Page 10

1          ATTORNEY SMITH:  Object to form.

2     A.    Yes.  In that -- we assume so, in that

3    there's a fairly decent percentage of people,

4    maybe one in 200 in large health surveys, who

5    identify as transgender.  So maybe one in 200.

6          Perhaps one in a thousand, according to

7    a paper I reference Zhang, are in clinical care

8    for gender dysphoria.  So we assume that there

9    are people who experience gender dysphoria but

10   don't go to the doctor for it.

11    Q.    Okay.  So there are - based on the

12   numbers that you just quoted to me - one in 200

13   identify as transgender, one in a thousand are

14   treating for gender dysphoria.  So that's -- if

15   I'm doing quick math correctly -- approximately

16   one-fifth of transgender individuals are

17   seeking treatment for gender dysphoria?

18          ATTORNEY SMITH:  Object to form.

19    A.    It's never been exactly teased out that

20   way.

21    Q.    Okay.

22    A.    But we assume that that's so because

23   there are fewer people who are actually going

24   to the doctor.  And to get a diagnosis of

Elite Court Reporting, LLC
DR. DAN KARASIC, 04/15/2022

**JA1413**

## DEPOSITION OF DR. DAN KARASIC

1  gender dysphoria, you would need to go to the

2  doctor.

3     Q.   Now, your patient population -- the

4  two-thirds of your patients who are

5  transgender -- of those two-thirds, are you

6  able to break it down between children,

7  adolescents and adults?

8          ATTORNEY SMITH:  Object to form.

9     A.   Yes.  I actually -- at the same time, I

10  looked at a few days of patients.  It broke

11  down to -- about a third of my patients were

12  patients that I had started seeing in

13  adolescence in my private practice.  So some of

14  them may have turned 18 -- might have been --

15  may be legal adults by now.

16          About a third were adults when they

17  came into my private practice.  And then the

18  other third were cisgender.  So just an

19  approximate breakdown of a few days of patients

20  that I looked at.

21     Q.   I'll ask you a few more questions about

22  your background.  I noticed in your report,

23  in -- in your initial report -- the first

24  report that you did, in paragraph six, you say

**DEPOSITION OF DR. DAN KARASIC**

1  getting gender-affirming care?

2     Q.  No.  No, not that.

3        I'm asking if there is a methodology or

4  a treatment plan that can assist individuals

5  with managing the symptoms of gender dysphoria

6  separate from receiving hormone therapy or

7  surgical therapy?

8        ATTORNEY SMITH:  Object to form.

9     A.  So there's not a specific psychiatric

10  treatment to cause relief from gender

11  dysphoria.

12     Q.  So when you are seeing patients with

13  gender dysphoria, you are generally assisting

14  them -- or providing therapy for other

15  conditions, like depression and anxiety.  What

16  else are you doing for those patients with

17  gender dysphoria?

18        ATTORNEY SMITH:  Object to form.

19     A.  Sure.  So I do work with them in terms

20  of exploring their identity and their symptoms

21  of gender dysphoria.  I try to leave it to the

22  patient to steer the ship in terms of whether

23  or not -- or when they might get

24  gender-affirming care.

## DEPOSITION OF DR. DAN KARASIC

Confidential

Page 37

1          Sometimes people know they want

2    gender-affirming care, but they can't get it at

3    that time for example.  Somebody living at home

4    with parents or otherwise dependent on another

5    person might be an example where they might

6    need to postpone that.

7          So I'm certainly working with the

8    symptoms of gender dysphoria as -- among the

9    symptoms that the person is experiencing

10   without there being a specific psychiatric

11   treatment for gender dysphoria.

12   Q.    So on the -- you just mentioned

13   gender-affirming care and -- how is it

14   determined whether a patient needs or -- I'll

15   just use the word "needs."  Whether a patient

16   needs gender-affirming care, hormone therapy or

17   surgical therapy?

18          ATTORNEY SMITH:  Object to form.

19   A.    Sure.  So in practice -- first of all,

20   there are some differences.  There are

21   differences between adolescents seeking

22   gender-affirming care and adults.  And

23   practices also -- I think a difference between

24   when someone is exploring their gender identity

Elite Court Reporting, LLC
DR. DAN KARASIC, 04/15/2022

**JA1416**

## DEPOSITION OF DR. DAN KARASIC

Confidential

Page 38

1   or unsure of the kind of gender-affirming care

2   they might want or if or when they might want

3   it.

4        And then there are other people who for

5   example have lived in the gender in which they

6   identify for extended periods of time, where

7   gender identity and what they want to do about

8   it is not really in question.  I think there's

9   a whole range of approaches depending on the

10  patient.

11     Q.   Let's start with adults.  The two

12  plaintiffs in this case are adults.

13     A.   Uh-huh.

14     Q.   How do you determine whether -- well,

15  let me just start over here.

16        So if you were going to recommend a

17  course of treatment for a patient -- I assume

18  that there has to be indications for that

19  course of treatment, correct?

20        ATTORNEY SMITH:  Object to form.

21     A.   Yes.  So I think that certainly the

22  presence of a diagnosis of gender dysphoria

23  where somebody has had persistent and prominent

24  in some ways distress related to their gender

## DEPOSITION OF DR. DAN KARASIC

Confidential

Page 39

1   dysphoria.  And of course having the capacity

2   to consent for care.  I think those are

3   essential factors for an adult seeking

4   hormones.

5       Q.   So not all adults who are diagnosed

6   with gender dysphoria undergo hormonal or

7   surgical treatment, correct?

8            ATTORNEY SMITH:  Object to form.

9       A.   Yes.  As I said, we presume that

10  because of differences in statistics between

11  how many people are in clinical care and how

12  many people identify as transgender --

13  presumably many of the people who identify as

14  transgender, you know, aren't coming to me.

15  And so they may -- they may have some level of

16  distress that is not severe enough that they

17  need relief from transitioning.

18      Q.   So how is there a determination whether

19  someone's level of distress is severe enough to

20  require those medical or surgical treatments?

21           ATTORNEY SMITH:  Object to form.

22      A.   So I think that a good guide is the

23  DSM-5 diagnosis.  Clinically significant

24  distress, social and occupational impairment so

Elite Court Reporting, LLC
DR. DAN KARASIC, 04/15/2022

**JA1418**

## DEPOSITION OF DR. DAN KARASIC

Confidential

Page 40

1    that the distress of gender dysphoria is

2    significantly affecting their life.

3          ATTORNEY SMITH:  Caleb, not to

4    interrupt you -- we've been going for a

5    little bit -- for an hour now.  Can we go

6    ahead and take a break for a minute?

7          MR. DAVID:  Absolutely.  You want to

8    take five minutes?

9          ATTORNEY SMITH:  Yes.  That works.

10         VIDEOGRAPHER:  We are going off the

11   record at 1300.

12               (Break in proceedings.)

13         VIDEOGRAPHER:  We are back on the

14   record at 1306.

15   BY MR. DAVID:

16   Q.  Doctor, before we took a break, I was

17   asking some questions about how the

18   determination is made that someone's distress

19   from gender dysphoria rises to the level of

20   needing medical or surgical treatment.  You

21   referred me to the DSM-5 and the discussion on

22   clinical -- clinically significant distress.

23   Is that where we were?

24         ATTORNEY SMITH:  Object to form.

## DEPOSITION OF DR. DAN KARASIC

Confidential

Page 41

1    A.    Yes.

2    Q.    Okay.  Is there a diagnostic test to

3  determine whether someone's stress (sic) is

4  clinically significant?

5         ATTORNEY SMITH:  Object to form.

6    A.    Whether someone's distress is

7  clinically significant?

8    Q.    Yes.

9    A.    So that is determined in the course of

10  psychiatric evaluation; not by a specific

11  distress test, but using the clinical judgment

12  of the clinician.

13    Q.    So we had broken this down -- because I

14  had asked you a very broad question.  And you

15  said that it would be different for adults,

16  adolescents and children.  So let me ask you --

17  adolescents, how do you determine whether that

18  individual requires or needs medical or

19  surgical therapy for gender dysphoria?

20         ATTORNEY SMITH:  Object to form.

21    A.    Sure.  So we -- if I am going by my

22  clinical practice and that of a child in the

23  Adolescent Gender Center at UCSF, we -- as well

24  as I think guidance from WPATH, we agree that

Elite Court Reporting, LLC
DR. DAN KARASIC, 04/15/2022

**JA1420**

**DEPOSITION OF DR. DAN KARASIC**

Confidential

Page 42

1   adolescents require more evaluation -- a

2   longer-term evaluation, especially if just

3   presenting with gender dysphoria in

4   adolescence.  So it's typically not the work

5   that I do, although there have been times when

6   I have.  But it's typically not the work that I

7   do because it's -- I will typically refer them

8   to some of my psychotherapist colleagues to

9   meet with the adolescent over time and to make

10   a determination in terms of whether -- along

11   with the patient, along with the patient's

12   parents.  There is a -- they can come to an

13   agreement in terms of what is or isn't to be

14   done next.

15   Q.   Why do you refer those patients to

16   psychotherapist colleagues rather than make

17   that determination yourself?

18   ATTORNEY SMITH:  Object to form.

19   A.   So I have limited time.  I had limited

20   time when I was at a UCFS faculty member.  And

21   I have limited time now, and so -- and this is

22   often a time-intensive process.

23   So I have had -- at times there have

24   been, you know, adolescents where I have done

Elite Court Reporting, LLC
DR. DAN KARASIC, 04/15/2022

**JA1421**

**DEPOSITION OF DR. DAN KARASIC**

Confidential

Page 43

1  that work.  But typically I will refer them to

2  psychotherapists who do that work as a regular

3  thing in their practice and have the time to

4  devote to that individual for psychotherapy, to

5  do that work.

6      Q.   And if you know, what is the purpose of

7  the psychotherapy that is provided to those

8  adolescents?

9          ATTORNEY SMITH:   Object to form.

10     A.   Sure.  So it depends on the adolescent.

11 But it can be to help them explore -- not only

12 their identity, but whether or not they want to

13 take steps -- if we're talking specifically in

14 the context of gender-affirming care -- whether

15 or not that is a next step for them.

16          And so that's work done with a

17 therapist getting to know their client and

18 getting to know the client's parents and

19 assessing the degree of distress and the

20 persistence of that distress that might be

21 relieved by gender-affirming care.

22     Q.   Okay.  So do you treat children?  And

23 when I say children, I mean people younger than

24 adolescents.  Do you provide psychiatric

Elite Court Reporting, LLC
DR. DAN KARASIC, 04/15/2022

**JA1422**

**DEPOSITION OF DR. DAN KARASIC**

Confidential

Page 44

1    treatment for gender dysphoria to children?

2        ATTORNEY SMITH:  Object to form.

3    A.   No.

4    Q.   So in your practice, have you

5    recommended to adolescents that they undergo

6    medical therapy, so hormonal therapy?

7        ATTORNEY SMITH:  Object to form.

8    A.   So I would say that it is -- I would

9    say that we let the adolescent bring that up

10   first, and then explore it as opposed to, for

11   example, my pushing forward with any particular

12   direction for that adolescent.

13       So the adolescent might bring up

14   that -- you know, having distress where they

15   want a particular intervention.  As I said,

16   typically, I'll refer them to a therapist to

17   work with them more intensively before making a

18   recommendation to -- for example, call the

19   Child and Adolescent Center at UCSF.

20   Q.   So if a patient brings up a potentially

21   medical or surgical transition, do you always

22   refer that patient out to a separate gender

23   clinic?

24       ATTORNEY SMITH:  Object to form.

## DEPOSITION OF DR. DAN KARASIC

Page 137

1   you know, it seems clear from a clinical exam.

2      Q.   Are you aware of any other DSM-5

3   diagnosis that is treated surgically?

4         ATTORNEY SMITH:  Object to form.

5      A.   I cannot think of another DSM-5

6   diagnosis that is treated surgically.

7      Q.   Okay.  If you can, flip to your expert

8   rebuttal report which has been marked as

9   Exhibit 2 to your deposition.  There are a few

10   things -- and I promise we're not going to go

11   through this paragraph by paragraph.  But there

12   are a few things that I wanted to ask you

13   about.  And the first is in paragraph 15 of

14   Exhibit 2.  Are you there?

15      A.   Yes.  I'm there.

16      Q.   And I'll go ahead and read it.  In an

17   American prospective study of 104 transgender

18   and nonbinary youth, treatment with puberty

19   blockers or hormones was associated with

20   60 percent less moderate to severe depression,

21   and 73 percent less suicidal ideation over 12

22   months compared to youth not treated.  And you

23   say Tordoff, et al., 2022.

24         Did I read that correctly?

**JA1424**

Confidential

Page 182

1          I, Martha Fourney, Certified Court

2     Reporter and Notary Public, do hereby certify

3     that the foregoing deposition of the

4     above-named witness, was duly taken by me in

5     machine shorthand, was recorded via Zoom, and

6     that the same were accurately written out in

7     full and reduced to computer transcription.

8          I further certify that I am neither

9     attorney or counsel for, nor related to or

10    employed by, any of the parties to the action

11    in which this deposition is taken, nor do I

12    have a financial interest in the action.

13

14

15

16    My commission expires May 27, 2022

17

18    _____

19    Martha Fourney
      Certified Court Reporter/Notary Public

20

21

22

23

24

Case 3:20-cv-00740   Document 252-8   Filed 05/31/22   Page 49 of 349 PageID #: 4098

SIGNATURE/ERRATA SHEET

I, DAN KARASIC, hereby certify I have
read the foregoing transcript and that the same is
a true and accurate transcription of my testimony,
except as noted below:

PAGE:   LINE:   CHANGE:              REASON FOR CHANGE:

See Attachment A.

DAN KARASIC

STATE OF ___VIRGINIA_____

COUNTY OF _____NORFOLK_____

Subscribed and sworn to before me this

__6__ day of _____May_____, 2022.

Notary Public

> KETSIA MCCLEASE
> Electronic Notary Public
> Commonwealth of Virginia
> Registration No. 327724
> My Commission Expires Apr 30, 2023

My Commission Expires: _____04/30/2023_____

This notarial act was performed online by way of two-way audio/video communication technology.

**JA1426**

**ATTACHMENT A**

**Errata Sheet**

Fain, et al. v. Crouch, et al.
Dan Karasic, MD

| Page | Line | Correction |
|------|------|------------|
| 19 | 23 | "gender identity" not "a gender identity" |
| 21 | 2-3 | "develops" not "develops as" |
| 30 | 1 | "across" not "cross" |
| 33 | 16 | "they're coming" not "coming" |
| 41 | 22-23 | "that of the Child and Adolescent Gender Center," not "that of a child in the Adolescent Gender Center" |
| 75 | 21 | "as a term" not "as to term" |
| 87 | 1 | "the study" not "my study" |
| 126 | 10 | "orchiectomy" not "oophorectomy" |
| 126 | 13 | "orchiectomy" not "oophorectomy" |
| 126 | 17 | "orchiectomy" not "oophorectomy" |
| 158-9 | 24-1 | "Child and Adolescent Gender Center" not "Child and Adolescents Gender Clinic" |
| 167 | 8-9, 14 | "inter-rater" not "interrater" |
| 168 | 5, 9, 16, 24 | "inter-rater" not "interrater" |
| 179 | 21 | "is" not "he did" |

Dan Karasic

State of ____Virginia____

County of ____Norfolk____

Subscribed and sworn to before me this ____6____ day of May 2022.

____Ketsia McClease____
Notary Public

KETSIA MCCLEASE
Electronic Notary Public
Commonwealth of Virginia
Registration No. 327724
My Commission Expires Apr 30, 2023

My Commission Expires: ____04/30/2023____

This notarial act was performed online by way of two-way audio/video communication technology.

**JA1427**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*,
individually and on behalf of all others
similarly situated,

    *Plaintiffs*,

    v.

WILLIAM CROUCH, *et al.*,

    *Defendants*.

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

**CERTIFICATE OF SERVICE**

I hereby certify that the EXPERT DISCLOSURE REPORT OF DAN H. KARASIC,

M.D. was served electronically on the 18th day of March, 2022 on the following counsel for

Defendants in the above-captioned case:

Lou Ann S. Cyrus (WVSB # 6558)
Roberta F. Green (WVSB #6598)
Caleb B. David (WVSB #12732)
Kimberly M. Bandy (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953, Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

*Attorneys for Defendants William Crouch;
Cynthia Beane; and West Virginia
Department of Health and Human Resources,
Bureau for Medical Services*

Eric D. Salyers (WVSB #13042)
Perry W. Oxley (WVSB # 7211)
David E. Rich (WVSB #9141)
Christopher K. Weed (WVSB #13868)
OXLEY RICH SAMMONS, PLLC
P.O. Box 1704
517 9th Street, Suite 1000
Huntington, West Virginia 25718
Phone: (304) 522-1138
Fax: (304) 522-9528
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

*Attorneys for Defendant Jason Haught*

1

**JA1428**

Dated: March 18, 2022                    Respectfully submitted,

s/ Walt Auvil
Walt Auvil, WV Bar No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-3058
auvil@theemploymentlawcenter.com

2

**JA1429**



532    Sexual and Gender Identity Disorders

## 302.82   Voyeurism

The paraphiliac focus of Voyeurism involves the act of observing unsuspecting individuals, usually strangers, who are naked, in the process of disrobing, or engaging in sexual activity. The act of looking ("peeping") is for the purpose of achieving sexual excitement, and generally no sexual activity with the observed person is sought. Orgasm, usually produced by masturbation, may occur during the voyeuristic activity or later in response to the memory of what the person has witnessed. Often these individuals have the fantasy of having a sexual experience with the observed person, but in reality this rarely occurs. In its severe form, peeping constitutes the exclusive form of sexual activity. The onset of voyeuristic behavior is usually before age 15 years. The course tends to be chronic.

---

■ **Diagnostic criteria for 302.82 Voyeurism**

A.  Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving the act of observing an unsuspecting person who is naked, in the process of disrobing, or engaging in sexual activity.

B.  The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

---

## 302.9   Paraphilia Not Otherwise Specified

This category is included for coding Paraphilias that do not meet the criteria for any of the specific categories. Examples include, but are not limited to, telephone scatologia (obscene phone calls), necrophilia (corpses), partialism (exclusive focus on part of body), zoophilia (animals), coprophilia (feces), klismaphilia (enemas), and urophilia (urine).

---

## Gender Identity Disorders

### Gender Identity Disorder

*Diagnostic Features*

There are two components of Gender Identity Disorder, both of which must be present to make the diagnosis. There must be evidence of a strong and persistent cross-gender identification, which is the desire to be, or the insistence that one is, of the other sex

(Criterion A). This cross-gender identification must not merely be a desire for any perceived cultural advantages of being the other sex. There must also be evidence of persistent discomfort about one's assigned sex or a sense of inappropriateness in the gender role of that sex (Criterion B). The diagnosis is not made if the individual has a concurrent physical intersex condition (e.g., androgen insensitivity syndrome or congenital adrenal hyperplasia) (Criterion C). To make the diagnosis, there must be evidence of clinically significant distress or impairment in social, occupational, or other important areas of functioning (Criterion D).

In boys, the cross-gender identification is manifested by a marked preoccupation with traditionally feminine activities. They may have a preference for dressing in girls' or women's clothes or may improvise such items from available materials when genuine articles are unavailable. Towels, aprons, and scarves are often used to represent long hair or skirts. There is a strong attraction for the stereotypical games and pastimes of girls. They particularly enjoy playing house, drawing pictures of beautiful girls and princesses, and watching television or videos of their favorite female characters. Stereotypical female-type dolls, such as Barbie, are often their favorite toys, and girls are their preferred playmates. When playing "house," these boys role-play female figures, most commonly "mother roles," and often are quite preoccupied with female fantasy figures. They avoid rough-and-tumble play and competitive sports and have little interest in cars and trucks or other nonaggressive but stereotypical boy's toys. They may express a wish to be a girl and assert that they will grow up to be a woman. They may insist on sitting to urinate and pretend not to have a penis by pushing it in between their legs. More rarely, boys with Gender Identity Disorder may state that they find their penis or testes disgusting, that they want to remove them, or that they have, or wish to have, a vagina.

Girls with Gender Identity Disorder display intense negative reactions to parental expectations or attempts to have them wear dresses or other feminine attire. Some may refuse to attend school or social events where such clothes may be required. They prefer boy's clothing and short hair, are often misidentified by strangers as boys, and may ask to be called by a boy's name. Their fantasy heroes are most often powerful male figures, such as Batman or Superman. These girls prefer boys as playmates, with whom they share interests in contact sports, rough-and-tumble play, and traditional boyhood games. They show little interest in dolls or any form of feminine dress up or role-play activity. A girl with this disorder may occasionally refuse to urinate in a sitting position. She may claim that she has or will grow a penis and may not want to grow breasts or to menstruate. She may assert that she will grow up to be a man. Such girls typically reveal marked cross-gender identification in role-play, dreams, and fantasies.

Adults with Gender Identity Disorder are preoccupied with their wish to live as a member of the other sex. This preoccupation may be manifested as an intense desire to adopt the social role of the other sex or to acquire the physical appearance of the other sex through hormonal or surgical manipulation. Adults with this disorder are uncomfortable being regarded by others as, or functioning in society as, a member of their designated sex. To varying degrees, they adopt the behavior, dress, and mannerisms of the other sex. In private, these individuals may spend much time cross-dressed and working on the appearance of being the other sex. Many attempt to pass in public as the other sex. With cross-dressing and hormonal treatment (and for males, electrolysis), many individuals with this disorder may pass convincingly as the other sex. The sexual activity of these individuals with same-sex partners is generally constrained by the preference that their partners neither see nor touch their genitals. For some males who

534    Sexual and Gender Identity Disorders

present later in life, (often following marriage), sexual activity with a woman is accompanied by the fantasy of being lesbian lovers or that his partner is a man and he is a woman.

In adolescents, the clinical features may resemble either those of children or those of adults, depending on the individual's developmental level, and the criteria should be applied accordingly. In a younger adolescent, it may be more difficult to arrive at an accurate diagnosis because of the adolescent's guardedness. This may be increased if the adolescent feels ambivalent about cross-gender identification or feels that it is unacceptable to the family. The adolescent may be referred because the parents or teachers are concerned about social isolation or peer teasing and rejection. In such circumstances, the diagnosis should be reserved for those adolescents who appear quite cross-gender identified in their dress and who engage in behaviors that suggest significant cross-gender identification (e.g., shaving legs in males). Clarifying the diagnosis in children and adolescents may require monitoring over an extended period of time.

Distress or disability in individuals with Gender Identity Disorder is manifested differently across the life cycle. In young children, distress is manifested by the stated unhappiness about their assigned sex. Preoccupation with cross-gender wishes often interferes with ordinary activities. In older children, failure to develop age-appropriate same-sex peer relationships and skills often leads to isolation and distress, and some children may refuse to attend school because of teasing or pressure to dress in attire stereotypical of their assigned sex. In adolescents and adults, preoccupation with cross-gender wishes often interferes with ordinary activities. Relationship difficulties are common and functioning at school or at work may be impaired.

### Specifiers

For sexually mature individuals, the following specifiers may be noted based on the individual's sexual orientation: **Sexually Attracted to Males, Sexually Attracted to Females, Sexually Attracted to Both, and Sexually Attracted to Neither.** Males with Gender Identity Disorder include substantial proportions with all four specifiers. Virtually all females with Gender Identity Disorder will receive the same specifier—Sexually Attracted to Females—although there are exceptional cases involving females who are Sexually Attracted to Males.

### Recording Procedures

The assigned diagnostic code depends on the individual's current age: if the disorder occurs in childhood, the code 302.6 is used; for an adolescent or adult, 302.85 is used.

### Associated Features and Disorders

**Associated descriptive features and mental disorders.**    Many individuals with Gender Identity Disorder become socially isolated. Isolation and ostracism contribute to low self-esteem and may lead to school aversion or dropping out of school. Peer ostracism and teasing are especially common sequelae for boys with the disorder. Boys with Gender Identity Disorder often show marked feminine mannerisms and speech patterns.

The disturbance can be so pervasive that the mental lives of some individuals revolve only around those activities that lessen gender distress. They are often preoccupied with appearance, especially early in the transition to living in the opposite sex role. Relationships with one or both parents also may be seriously impaired. Some males with Gender Identity Disorder resort to self-treatment with hormones and may very rarely perform their own castration or penectomy. Especially in urban centers, some males with the disorder may engage in prostitution, which places them at high risk for human immunodeficiency virus (HIV) infection. Suicide attempts and Substance-Related Disorders are commonly associated.

Children with Gender Identity Disorder may manifest coexisting Separation Anxiety Disorder, Generalized Anxiety Disorder, and symptoms of depression. Adolescents are particularly at risk for depression and suicidal ideation and suicide attempts. In adults, anxiety and depressive symptoms may be present. Some adult males have a history of Transvestic Fetishism as well as other Paraphilias. Associated Personality Disorders are more common among males than among females being evaluated at adult gender clinics.

**Associated laboratory findings.**   There is no diagnostic test specific for Gender Identity Disorder. In the presence of a normal physical examination, karyotyping for sex chromosomes and sex hormone assays are usually not indicated. Psychological testing may reveal cross-gender identification or behavior patterns.

**Associated physical examination findings and general medical conditions.** Individuals with Gender Identity Disorder have normal genitalia (in contrast to the ambiguous genitalia or hypogonadism found in physical intersex conditions). Adolescent and adult males with Gender Identity Disorder may show breast enlargement resulting from hormone ingestion, hair denuding from temporary or permanent epilation, and other physical changes as a result of procedures such as rhinoplasty or thyroid cartilage shaving (surgical reduction of the Adam's apple). Distorted breasts or breast rashes may be seen in females who wear breast binders. Postsurgical complications in genetic females include prominent chest wall scars, and in genetic males, vaginal strictures, rectovaginal fistulas, urethral stenoses, and misdirected urinary streams. Adult females with Gender Identity Disorder may have a higher than expected likelihood of polycystic ovarian disease.

### Specific Age and Gender Features

Females with Gender Identity Disorders generally experience less ostracism because of cross-gender interests and may suffer less from peer rejection, at least until adolescence. In child clinic samples, there are approximately five boys for each girl referred with this disorder. In adult clinic samples, men outnumber women by about two or three times. In children, the referral bias toward males may partly reflect the greater stigma that cross-gender behavior carries for boys than for girls.

### Prevalence

There are no recent epidemiological studies to provide data on prevalence of Gender Identity Disorder. Data from smaller countries in Europe with access to total population statistics and referrals suggest that roughly 1 per 30,000 adult males and 1 per 100,000 adult females seek sex-reassignment surgery.

536     Sexual and Gender Identity Disorders

### Course

For clinically referred children, onset of cross-gender interests and activities is usually between ages 2 and 4 years, and some parents report that their child has always had cross-gender interests. Only a very small number of children with Gender Identity Disorder will continue to have symptoms that meet criteria for Gender Identity Disorder in later adolescence or adulthood. Typically, children are referred around the time of school entry because of parental concern that what they regarded as a "phase" does not appear to be passing. Most children with Gender Identity Disorder display less overt cross-gender behaviors with time, parental intervention, or response from peers. By late adolescence or adulthood, about three-quarters of boys who had a childhood history of Gender Identity Disorder report a homosexual or bisexual orientation, but without concurrent Gender Identity Disorder. Most of the remainder report a heterosexual orientation, also without concurrent Gender Identity Disorder. The corresponding percentages for sexual orientation in girls are not known. Some adolescents may develop a clearer cross-gender identification and request sex-reassignment surgery or may continue in a chronic course of gender confusion or dysphoria.

In adult males, there are two different courses for the development of Gender Identity Disorder. The first is a continuation of Gender Identity Disorder that had an onset in childhood or early adolescence. These individuals typically present in late adolescence or adulthood. In the other course, the more overt signs of cross-gender identification appear later and more gradually, with a clinical presentation in early to mid-adulthood usually following, but sometimes concurrent with, Transvestic Fetishism. The later-onset group may be more fluctuating in the degree of cross-gender identification, more ambivalent about sex-reassignment surgery, more likely to be sexually attracted to women, and less likely to be satisfied after sex-reassignment surgery. Males with Gender Identity Disorder who are sexually attracted to males tend to present in adolescence or early adulthood with a lifelong history of gender dysphoria. In contrast, those who are sexually attracted to females, to both males and females, or to neither sex tend to present later and typically have a history of Transvestic Fetishism. If Gender Identity Disorder is present in adulthood, it tends to have a chronic course, but spontaneous remission has been reported.

### Differential Diagnosis

Gender Identity Disorder can be distinguished from simple **nonconformity to stereotypical sex role behavior** by the extent and pervasiveness of the cross-gender wishes, interests, and activities. This disorder is not meant to describe a child's nonconformity to stereotypic sex-role behavior as, for example, in "tomboyishness" in girls or "sissyish" behavior in boys. Rather, it represents a profound disturbance of the individual's sense of identity with regard to maleness or femaleness. Behavior in children that merely does not fit the cultural stereotype of masculinity or femininity should not be given the diagnosis unless the full syndrome is present, including marked distress or impairment.

**Transvestic Fetishism** occurs in heterosexual (or bisexual) men for whom the cross-dressing behavior is for the purpose of sexual excitement. Aside from cross-dressing, most individuals with Transvestic Fetishism do not have a history of childhood cross-gender behaviors. Males with a presentation that meets full criteria for Gender Identity Disorder as well as Transvestic Fetishism should be given both diagnoses. If gender dysphoria is present in an individual with Transvestic Fetishism but full criteria

Gender Identity Disorder    537

for Gender Identity Disorder are not met, the specifier With Gender Dysphoria can be used.

The category **Gender Identity Disorder Not Otherwise Specified** can be used for individuals who have a gender identity problem with a **concurrent congenital intersex condition** (e.g., androgen insensitivity syndrome or congenital adrenal hyperplasia).

In **Schizophrenia**, there may rarely be delusions of belonging to the other sex. Insistence by a person with a Gender Identity Disorder that he or she is of the other sex is not considered a delusion, because what is invariably meant is that the person feels like a member of the other sex rather than truly believes that he or she is a member of the other sex. In very rare cases, however, Schizophrenia and severe Gender Identity Disorder may coexist.

---

### ■ Diagnostic criteria for Gender Identity Disorder

A. A strong and persistent cross-gender identification (not merely a desire for any perceived cultural advantages of being the other sex).

In children, the disturbance is manifested by four (or more) of the following:

(1) repeatedly stated desire to be, or insistence that he or she is, the other sex

(2) in boys, preference for cross-dressing or simulating female attire; in girls, insistence on wearing only stereotypical masculine clothing

(3) strong and persistent preferences for cross-sex roles in make-believe play or persistent fantasies of being the other sex

(4) intense desire to participate in the stereotypical games and pastimes of the other sex

(5) strong preference for playmates of the other sex

In adolescents and adults, the disturbance is manifested by symptoms such as a stated desire to be the other sex, frequent passing as the other sex, desire to live or be treated as the other sex, or the conviction that he or she has the typical feelings and reactions of the other sex.

B. Persistent discomfort with his or her sex or sense of inappropriateness in the gender role of that sex.

In children, the disturbance is manifested by any of the following: in boys, assertion that his penis or testes are disgusting or will disappear or assertion that it would be better not to have a penis, or aversion toward rough-and-tumble play and rejection of male stereotypical toys, games, and activities; in girls, rejection of urinating in a sitting position, assertion that she has or will grow a penis, or assertion that she does not want to grow breasts or menstruate, or marked aversion toward normative feminine clothing.

*(continued)*

---

538    Sexual and Gender Identity Disorders

☐ **Diagnostic criteria for Gender Identity Disorder** (continued)

In adolescents and adults, the disturbance is manifested by symptoms such as preoccupation with getting rid of primary and secondary sex characteristics (e.g., request for hormones, surgery, or other procedures to physically alter sexual characteristics to simulate the other sex) or belief that he or she was born the wrong sex.

C. The disturbance is not concurrent with a physical intersex condition.

D. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

*Code* based on current age:
302.6    Gender Identity Disorder in Children
302.85   Gender Identity Disorder in Adolescents or Adults

*Specify* if (for sexually mature individuals):
**Sexually Attracted to Males**
**Sexually Attracted to Females**
**Sexually Attracted to Both**
**Sexually Attracted to Neither**

## 302.6   Gender Identity Disorder Not Otherwise Specified

This category is included for coding disorders in gender identity that are not classifiable as a specific Gender Identity Disorder. Examples include

1. Intersex conditions (e.g., androgen insensitivity syndrome or congenital adrenal hyperplasia) and accompanying gender dysphoria
2. Transient, stress-related cross-dressing behavior
3. Persistent preoccupation with castration or penectomy without a desire to acquire the sex characteristics of the other sex

## 302.9   Sexual Disorder Not Otherwise Specified

This category is included for coding a sexual disturbance that does not meet the criteria for any specific Sexual Disorder and is neither a Sexual Dysfunction nor a Paraphilia. Examples include

1. Marked feelings of inadequacy concerning sexual performance or other traits related to self-imposed standards of masculinity or femininity
2. Distress about a pattern of repeated sexual relationships involving a succession of lovers who are experienced by the individual only as things to be used
3. Persistent and marked distress about sexual orientation

JA1437

LGBT Health
Volume 8, Number 2, 2021
© Mary Ann Liebert, Inc.
DOI: 10.1089/lgbt.2020.0272

# Reliability and Clinical Utility of Gender Identity-Related Diagnoses: Comparisons Between the ICD-11, ICD-10, DSM-IV, and DSM-5

Annelou L.C. de Vries, MD, PhD,[1] Titia F. Beek, MA,[2] Karlien Dhondt, MD, PhD,[3]
Henrica C.W. de Vet, PhD,[4] Peggy T. Cohen-Kettenis, PhD,[2]
Thomas D. Steensma, PhD,[2] and Baudewijntje P.C. Kreukels, PhD[2]

## Abstract

*Purpose:* The World Health Organization general assembly approved the 11th revision of the International Classification of Diseases (ICD) in 2019 which will be implemented in 2022. Gender identity-related diagnoses were substantially reconceptualized and removed from the mental health chapter so that the distress criterion is no longer a prerequisite. The present study examined reliability and clinical utility of gender identity-related diagnoses of the ICD-11 in comparison with the Diagnostic and Statistical Manual of Mental Disorders (DSM)-5, ICD-10, and DSM-IV.

*Methods:* Sixty-four health care providers assessed six videos of two children, two adolescents, and two adults referred for gender incongruence. Each provider rated one pair of videos with three of the four classification systems (ICD-11, DSM-5, ICD-10, and DSM-IV-TR). This resulted in 72 ratings for the adolescent and adult diagnoses and 59 ratings for the children's diagnoses.

*Results:* Interrater agreement rates for each instrument ranged from 65% to 79% for the adolescence/adulthood diagnoses and from 67% to 94% for the childhood diagnoses and were comparable regardless of the system used. Only agreement rates for ICD-11 were significantly better than those for DSM-5 for both age categories. Clinicians evaluated all four systems as convenient and easy to use.

*Conclusion:* In conclusion, both classification systems (DSM and ICD) and both editions (DSM-IV and DSM-5 and ICD-10 and ICD-11) of gender identity-related diagnoses seem reliable and convenient for clinical use.

Keywords: classification, DSM, gender dysphoria, gender incongruence, ICD, reliability, utility

## Introduction

On May 25th 2019, the World Health Organization's general assembly approved the 11th revision of the International Classification of Diseases (ICD), including a reconceptualization of the gender identity-related diagnoses.[1] Fifty years ago, a diagnostic category describing the incongruence between one's experienced and assigned gender was introduced in the two most broadly used (mental) health classification systems, the ICD of the World Health Organization (WHO) and the Diagnostic and Statistical Manual of Mental Disorders (DSM) of the American Psychiatric Association (APA).[2,3] In the ICD-9 and the ICD-10 at the time, the term Transsexualism was used for the gender identity-related diagnosis.[4] The DSM-III diagnostic term for adults was also Transsexualism (DSM-III).[5] This term was first changed to Gender Identity Disorder (GID, DSM-IV) and subsequently to Gender Dysphoria (GD) in the most recent version of the DSM, the DSM-5.[6,7] The ICD-11 Working Group on the Classification of Sexual Disorders and Sexual Health proposed the term Gender Incongruence (GI), a universal term with no reference to emotional stress.[8–10]

Departments of [1]Child and Adolescent Psychiatry and [2]Medical Psychology, Center of Expertise on Gender Dysphoria, Amsterdam University Medical Centers, Location VUmc, Amsterdam, The Netherlands.
[3]Center for Sexology and Gender, Pediatric Gender Clinic, Ghent University Hospital, Ghent, Belgium.
[4]Department of Epidemiology and Biostatistics, Amsterdam Public Health Research Institute, Amsterdam University Medical Centers, Location VUmc, Amsterdam, The Netherlands.

Downloaded by 68.9.118.115 from www.liebertpub.com at 04/05/21. For personal use only.

USCA4 Appeal: 22-1927    Doc: 20-3    Filed: 10/31/2022    Pg: 384 of 477

Downloaded by 68.9.118.115 from www.liebertpub.com at 04/05/21. For personal use only.

Since its introduction into the classification systems, there have always been controversies around the gender identity-related diagnoses.[11] Because medical gender affirmative interventions are not (yet) needed in prepubertal children, in particular the childhood diagnosis is considered unnecessary by some to allow for access to health care.[12–14] Yet, clinicians working in other contexts claim that a childhood diagnosis for gender incongruence is still necessary to provide appropriate care.[15,16] The diagnosis for adolescents and adults has also been criticized.[13] Most importantly, gender incongruence by itself is considered not a mental disorder, but one of many possible expressions of gender diversity.[10,17,18] To assure access to care, while revising the DSM-IV, the diagnosis was retained in the DSM-5, but in a separate chapter away from conditions such as sexual dysfunctions and paraphilia. In the ICD-11, the diagnosis is entirely removed from the mental health disorders chapter and placed in a separate chapter named "Conditions related to Sexual Health." This shift is to improve transgender persons' human rights and health status by avoiding the combined stigmatization that is still associated with being transgender as well as with having a psychiatric disorder.[8,9,18]

Classification systems in general have proven to be of great value in that a criteria-based approach to diagnosis has markedly improved identification of disorders and diseases.[19] Classification may serve as an important and helpful tool for communication for researchers, policy makers, and clinicians so that when they refer to certain features, they mean the same thing.[20] While revising the classification systems, the diagnostic criteria should have a good interrater reliability.[21] Therefore, in successive revisions of the DSM and ICD, field studies have been performed to test the degree of agreement between clinicians on diagnostic categorization of the most prevalent conditions.[22,23]

Gender identity-related diagnostic criteria have never been formally part of the field trials, neither for the DSM-5 nor for previous DSM versions or for the various ICD editions. Only the diagnostic criteria for the childhood diagnosis have been examined in one DSM-III interrater reliability study that used parent reported chart information of gender-referred children.[24]

While preparing the 11th version of the ICD Mental Health Chapter, the WHO put a particular focus on clinical utility, that is, accuracy of description, ease of use, and feasibility of the classification system.[25,26] With regard to the gender identity-related diagnoses, the ICD-11 field studies so far have taken place in low and middle-income countries.[27–29] How they would be experienced in high-income countries with a long tradition of providing transgender care is unknown at present.

While in most studies the ICD is the main classification system used, the DSM is recommended in North America and some other countries. Making a comparison between both systems is of interest especially with regard to the gender identity-related diagnoses, due to the reconceptualization and placement outside of the mental health chapter and deletion of distress as an inherent characteristic of gender incongruence.

The aim of the current study was to test the interrater reliability of the gender identity-related diagnostic categories in a high-income country specialty setting according to current guidelines (ICD-11 and DSM-5) and their previous versions

(ICD-10 and DSM-IV). Further, we aimed to study similarities and differences between clinical judgments according to ICD-10, ICD-11, DSM-IV, and DSM-5, with a specific focus on the differences with the reconceptualized GI (ICD-11) diagnosis. A last aim of the present study was to assess the clinical utility of the diagnoses by asking the participating health care providers about their experiences with the different systems and editions.

## Method

### Setting

The WHO published a draft of the proposed ICD-11 to receive input on the proposed structure and diagnostic criteria.[30,31] The Center of Expertise on Gender Dysphoria (CEGD) of the Amsterdam University Medical Centers, location VUmc in the Netherlands and the Department of Sexology and Gender Problems (DSGP) of Ghent University Hospital in Belgium have been offering gender-affirming treatment since the 1970s. The WHO encouraged these specialized clinics to perform field studies on gender incongruence. The present study was part of a larger project, which was financially supported by three Dutch Ministries (Foreign Affairs; Health, Welfare and Sport; and Education, Culture and Science).[14,17]

The study was approved by the VUmc Medical Ethics Committee and all interviewed persons (and/or their parents depending on age) gave informed consent for use of the video material for this study.

### Participants

In total, 64 health care providers participated in the study during one of six sessions that were organized. Some health care providers were specialized in health care related to gender identity/incongruence and some were not. Mental health professionals (psychologists (in training) and psychiatrists (in training)) specialized in gender incongruence were recruited from the CEGD and the DSGP. Health care providers not specialized in transgender health care were recruited during two meetings, one for psychiatry residents specializing in child and adolescent psychiatry and one for team members of a consultative liaison psychiatry service (psychiatrists (in training), psychologists, psychiatric nurses, and medical students).

### Procedure

Between December 2014 and June 2015, six sessions for video rating were organized. Each test session had a similar structure and took about 1 hour: a researcher gave a short introduction to the study. This introduction was also provided as one written page before the different sets of diagnostic criteria that were to be rated. Voluntary participation and confidentiality were explained to be secured. Informed consent was signed for each participating health care provider. Two videos were presented and assessed using three of the four different instruments (for convenience reasons making the session not longer than 1 hour); every participant scored in random order the ICD-11 guidelines and the DSM-5 criteria, and a 3rd set of indicators (either the ICD-10 or the DSM-IV). After that, a few general questions about the use of the instruments and a number of background questions had to be answered. Participants watched one of the following

USCA4 Appeal: 22-1927    Doc: 20-3    Filed: 10/31/2022    Pg: 385 of 477

Case 3:20-cv-00740   Document 252-8   Filed 05/31/22   Page 342 of 349 PageID #: 4391

Downloaded by 68.9.118.115 from www.liebertpub.com at 04/05/21. For personal use only.

three pairs of videos: adolescent 1 and adult 2; adolescent 2 and adult 1; and child 1 and child 2.

For the adolescent and adult diagnoses, there were 72 ratings in total (of 37 different raters) on ICD-11 and DSM-5, 39 ratings (20 raters) on ICD-10, and 34 ratings (17 raters) on DSM-IV. For the children's diagnoses, 59 ratings (30 raters) were collected on ICD-11 and DSM-5, 32 ratings on ICD-10 (16 raters), and 27 ratings on DSM-IV (14 raters).

### Materials

Videos. In total, six diagnostic interviews by a psychologist/psychiatrist (two psychologists, one psychiatrist) were recorded of a person referred to the CEGD. Two individuals were adults, two were adolescents, and two were children. Some background information of each person is available from the authors. In all age categories, an effort was made to select one person without diagnostic difficulties and one person with a more complex gender development history and presentation.

Classification indicators. We used score sheets based on eight (four for adolescents/adults and four for children) classification systems: WHO's ICD-10 (Transsexualism) and the proposed guidelines of ICD-11 (Gender Incongruence) and the APA's DSM-IV-TR (Gender Identity Disorder) and DSM-5 (Gender Dysphoria). Participants had to decide whether indicators were present or not and, based on these indicators, whether the diagnoses were applicable to the persons in the video. When available, official Dutch versions of the Classifications were used. For ICD-11,[31] translations were not yet available and the research team translated the guidelines into Dutch. This translation was not created by the WHO.

Questions regarding utility of classification systems. Two questions were asked to assess the experienced clarity of the diagnostic indicators (answer options on a 5 point scale; 1 = very unclear, 2 = unclear, 3 = neutral, 4 = clear, and 5 = very clear) and the certainty with which a rater thought they made the correct decision (diagnosis present/absent, answer options on a 5 point scale; 1 = very unsure, 2 = unsure, 3 = neutral, 4 = sure, and 5 = very sure). Also, raters were asked which of the instruments they thought was most convenient to use, and which they felt helped them best to

come to a correct diagnosis. For each classification system it was asked whether it was easy to use (answer options yes, no, or no opinion).

### Analyses

Agreement between raters was calculated by dividing the total number of raters assessing a classification (present) by the total number of ratings. Agreement percentages were chosen for clinical interpretation and due to the large number of raters for each case.[32,33] Chi-square statistics were performed to examine if the agreement between the raters on presence or absence of a diagnosis differed between the respective instruments with a significance set at $p < 0.05$. One-way analyses of variance (ANOVA) were performed to compare mean clarity and certainty scores between instruments. Chi-square statistics were also used to examine whether clinical utility (convenience, ability to diagnose, and ease of use) was assessed differently between the instruments. All analyses were performed for the child and adolescent/adult videos separately.

### Results

#### Adolescent/adult diagnoses

In Table 1, the agreement between the raters is presented on the presence/absence of a diagnosis according to the four instruments. For all adolescent and adult videos, a majority of raters decided a diagnosis was present. The agreement between the raters was always agreement on the presence of a diagnosis. To see if the number of persons who received a diagnosis differed across instruments, the agreement rates between the respective instruments were compared. Only the ICD-11 and DSM-5 raters were significantly different from each other (75.71% vs. 67.65%, $\chi^2 = 10.58$, $p = 0.001$).

Table 2 shows the presence/absence of each indicator of the ICD-11 GI diagnosis.[31] Table 3 shows the presence/absence of each indicator of the DSM-5 GD diagnosis.[7] The agreement between raters on the presence/absence of each indicator of the respective other classification systems ICD-10 and DSM-IV are available from the authors. Agreement was lowest on the DSM-5 subindicators, "A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender that is different from one's assigned gender)" (43/67, 64.18%) and

TABLE 1. AGREEMENT BETWEEN RATERS ON THE PRESENCE OF A DIAGNOSIS ACCORDING TO FOUR DIFFERENT CLASSIFICATION SYSTEMS

| | Instrument | Observations N | Diagnosis present and agreement rate N | $\chi^2$ between instrument comparison | | |
| | | | | ICD-11 $\chi^2$ p | DSM-5 $\chi^2$ p | ICD-10 $\chi^2$ p |
|---|---|---|---|---|---|---|
| Adolescents/ Adults | ICD-11 | 70 | 53/75.71% | | | |
| | DSM-5 | 68 | 46/67.65% | 10.578; 0.001* | | |
| | ICD-10 | 38 | 30/78.95% | 0.145; 0.703 | 1.534; 0.216 | |
| | DSM-IV-TR | 31 | 20/64.52% | 1.345; 0.246 | 0.094; 0.759 | 1.782; 0.182 |
| Childhood | ICD-11 | 56 | 50/89.29% | | | |
| | DSM-5 | 58 | 39/67.24% | 8.087; 0.004* | | |
| | ICD-10 | 32 | 30/93.75% | 0.491; 0.483 | 0.491; 0.483 | |
| | DSM-IV-TR | 26 | 20/76.92% | 2.1723; 0.141 | 0.805; 0.369 | 3.416; 0.0645 |

*Significant difference at $p < 0.05$.
ICD, International Classification of Diseases; DSM, Diagnostic and Statistical Manual of Mental Disorders.

136                                                                                        DE VRIES ET AL.

TABLE 2. AGREEMENT BETWEEN RATERS FOR EACH VIDEO PER INDICATOR AND THE DECISION
ON THE PRESENCE OF A DIAGNOSIS ACCORDING TO THE ICD-11 FOR ADOLESCENTS/ADULTS

| | | Adolescent 1 | | Adolescent 2 | | Adult 1 | | Adult 2 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | n = 14 | % | n = 23 | % | n = 22 | % | n = 13 | % | n = 72 | % |
| | | | | | | *Agreement raters* | | | | | |
| A1 | A strong dislike or discomfort with one's primary and/or secondary sex characteristics (in adolescents, anticipated secondary sex characteristics) due to their incongruity with the experienced gender. | 11/14 | | 22/23 | | 22/22 | | 7/13* | | 62/72 | 86.11% |
| A2 | A strong desire to be rid of some or all of one's primary and/or secondary sex characteristics (in adolescents, anticipated secondary sex characteristics) due to their incongruity with the experienced gender. | 12/14 | | 23/23 | | 22/22 | | 7/13 | | 64/72 | 88.89% |
| A3 | A strong desire to have the primary and/or secondary sex characteristics of the experienced gender. | 13/14 | | 21/23 | | 16/22 | | 10/13 | | 60/72 | 83.33% |
| A4 | A strong desire to be treated (to live and be accepted) as a person of the experienced gender. | 14/14 | | 19/21 | | 15/21 | | 8/13 | | 56/69 | 81.16% |
| A total | A marked incongruence between the individual's experienced gender and the assigned sex, as manifested by at least two of the above. | 14/14 | | 22/23 | | 21/22 | | 10/13 | | 67/72 | 93.06% |
| B | The experienced gender incongruence must have been continuously present for at least several months. | 14/14 | | 22/23 | | 22/22 | | 12/13 | | 70/72 | 97.22% |
| C | The diagnosis cannot be assigned prior to the onset of puberty. | 7/14 | | 17/23 | | 22/22 | | 13/13 | | 59/72 | 81.94% |
| Total | Do you consider the person to fulfil all indicators (A, B, and C)? | 9/13 | 69.2% | 14/22 | 63.6% | 21/22 | 95.5% | 9/13 | 69.2% | 53/70 | 75.71% |

Reprinted with permission from the World Health Organization. (2014).[31] ICD-11 beta draft, downloaded November 19, 2014 from http://apps.who.int/classifications/icd11/browse/l-m/en#/.

* = most people agreed the criterion was not present (in all other cases, most raters agreed that the criterion was present).

"The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning" (48/70, 68.57%), and on the DSM–IV indicators, "Belief that he or she was born the wrong sex" (22/32, 68.75%) and "The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning" (24/32, 75.00%). The lowest agreement rate of the ICD-10 subindicators was 84.62% (33/39, "Not a symptom of another mental disorder, such as schizophrenia").

*Childhood diagnoses*

Table 1 also shows the agreement between the raters regarding the four childhood diagnoses according to the different classification systems, ICD-11, ICD-10, DSM-5, and DSM-IV. For both childhood videos, a majority of raters decided a diagnosis was present. Thus, the agreement between the raters was always agreement that a diagnosis was present. To see if

the number of raters who assessed a diagnosis to be present differed across instruments, the agreement rates between the respective instruments were compared. Only the ICD-11 and DSM-5 rates were significantly different from each other (89.29% vs. 67.24%, $\chi^2 = 8.08$, $p = 0.004$).

Table 4 shows the agreement between raters of the presence/absence of each indicator of the ICD-11 GI diagnosis.[31] Table 5 shows the agreement between raters of the presence/absence of each indicator of the DSM-5 GD diagnosis.[7] The agreement between raters on the presence/absence of each indicator of the respective other classification systems ICD-10 and DSM-IV are available from the authors. Agreement was lowest on the DSM-5 subindicators "A strong dislike of one's sexual anatomy" (40/57, 70.18%) and "The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning" (41/56, 73.21%), and on the DSM–IV indicators, "The disturbance is not concurrent with a physical intersex condition" (17/27, 62.96%) and

Downloaded by 68.9.118.115 from www.liebertpub.com at 04/05/21. For personal use only.

Downloaded by 68.9.118.115 from www.liebertpub.com at 04/05/21. For personal use only.

TABLE 3.  AGREEMENT BETWEEN RATERS FOR EACH VIDEO PER CRITERION AND THE DECISION ON THE PRESENCE OF A DIAGNOSIS ACCORDING TO THE DSM-5 FOR ADOLESCENTS/ADULTS

| | | Adolescent 1 | Adolescent 2 | Adult 1 | Adult 2 | Total | |
| | | n = 14 | n = 23 | n = 22 | n = 13 | n = 72 | % |
| | | | Agreement raters | | | | |
| A | A marked incongruence between one's experienced/expressed gender and one's assigned gender of at least 6 months duration as manifested by at least two of the following: | 14/14 | 23/23 | 22/22 | 10/13 | 69/72 | 95.83% |
| A1 | A marked incongruence between one's experienced/expressed gender and one's primary and/or secondary sex characteristics (or in younger adolescents, the anticipated secondary sex characteristics). | 14/14 | 22/23 | 21/22 | 10/13 | 67/72 | 93.06% |
| A2 | A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in younger adolescents, a desire to prevent the anticipated secondary sex characteristics). | 14/14 | 23/23 | 22/22 | 8/13* | 67/72 | 93.06% |
| A3 | A strong desire for the primary and/or secondary sex characteristics of the other gender. | 12/14 | 23/23 | 15/22 | 9/13 | 59/72 | 81.94% |
| A4 | A strong desire to be of the other gender (or some alternative gender that is different from one's assigned gender). | 14/14 | 23/23 | 19/22 | 8/13 | 64/72 | 88.89% |
| A5 | A strong desire to be treated as the other gender (or some alternative gender that is different from one's assigned gender). | 14/14 | 21/23 | 12/21 | 7/13 | 54/71 | 76.06% |
| A6 | A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender that is different from one's assigned gender). | 13/14 | 11/21 | 11/21 | 8/11* | 43/67 | 64.18% |
| B | The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. | 8/14* | 15/22 | 18/21 | 7/13 | 48/70 | 68.57% |

Specify if:
    With a disorder of sex development (e.g., a congenital adrenogenital disorder such as E25.0 congenital adrenal hyperplasia or E34.50 androgen insensitivity syndrome).
    Coding note: Code the disorder of sex development as well as gender dysphoria.
Specify if:
    Posttransition: The individual has transitioned to full-time living in the desired gender (with or without legalization of gender change) and has undergone (or is preparing to have) at least one cross-sex medical procedure or treatment regimen—namely, regular cross-sex hormone treatment or gender reassignment surgery confirming the desired gender (e.g., penectomy, vaginoplasty in a natal male; mastectomy or phalloplasty in a natal female).

| Total | Do you consider both the A and B criterion to be present in the video? | 7/13 (53.8%) | 14/21 (66.7%) | 18/21 (85.7%) | 7/13 (53.8%) | 46/68 | 67.65% |

Reprinted with permission from the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, (Copyright © 2013). American Psychiatric Association. All Rights Reserved.[7]
* = most people agreed the criterion was not present (in all other cases, most raters agreed that the criterion was present).

137

**JA1442**

Downloaded by 68.9.118.115 from www.liebertpub.com at 04/05/21. For personal use only.

138                                                                                                          DE VRIES ET AL.

TABLE 4.  AGREEMENT BETWEEN RATERS FOR EACH VIDEO PER INDICATOR AND THE DECISION
ON THE PRESENCE OF A DIAGNOSIS ACCORDING TO THE ICD-11 FOR CHILDREN

|  |  | Child 1 | | Child 2 | | Total | |
|---|---|---|---|---|---|---|---|
|  |  | n = 29 | % | n = 30 | % | n = 59 | % |
| A1 | A strong desire on the child's part to be a different gender than the assigned sex, or insistence that he or she is a gender different from one's assigned gender. | 29/29 |  | 30/30 |  | 59/59 | 100% |
| A2 | A strong dislike on the child's part of his or her sexual anatomy or anticipated secondary sex characteristics and/or a strong desire for the primary and/or anticipated secondary sex characteristics that match the experienced gender. For example, a child assigned at birth as a boy says he wants to be rid of his penis or a child assigned at birth as a girl says she does not want to develop breasts when she grows up. | 22/29 |  | 29/30 |  | 51/59 | 86.44% |
| A3 | Make-believe or fantasy play, toys, games, or activities and playmates that are typical of the experienced gender rather than the assigned sex. Gender incongruent children assigned as boys reject typically "masculine" toys, games, and activities and avoid rough-and-tumble play. Gender incongruent children assigned as girls reject "feminine" toys, games, and activities and like rough-and-tumble play. | 28/29 |  | 30/30 |  | 58/59 | 98.31% |
| A total | In pre-pubertal children, a marked incongruence between the child's experienced/expressed gender and the child's assigned sex as manifested by all of the above indicators. | 22/28 |  | 29/29 |  | 51/57 | 89.47% |
| B | The incongruence must have persisted for about 2 years. | 22/27 |  | 30/30 |  | 52/57 | 91.23% |
| C | The diagnosis can only be assigned to children before puberty. | 26/27 |  | 27/28 |  | 53/55 | 96.36% |
| Total | Do you consider the person to fulfil all indicators (A, B, and C)? | 20/26 | 76.92% | 30/30 | 100% | 50/56 | 89.29% |

Reprinted with permission from the World Health Organization. (2014).[31] ICD-11 beta draft, downloaded November 19, 2014 from http://apps.who.int/classifications/icd11/browse/l-m/en#/

"The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning" (20/26, 76.92%). The lowest agreement rate of the ICD-10 subindicators was 87.10% (27/31, "A profound disturbance of the normal gender identity; mere tomboyishness in girls or girlish behavior in boys is not sufficient").

*Clinical utility*

Table 6 shows which of the different classification systems raters found most convenient to use and with which system they felt most able to make a correct diagnosis and if the classification system was considered easy to use.

Clarity.   No significant differences were found between the mean clarity-scores of all instruments for the adolescent/adult diagnoses. Scores were 3.63 (standard deviation [SD] 0.76) for the ICD-10, 3.74 (SD 1.01) for the ICD-11, 3.81 (SD 0.91) for the DSM-IV-TR, and 3.83 (SD 0.89) for the DSM-5. For the childhood diagnoses, they were 3.27 (SD 1.03), 3.55 (SD 0.87), 3.90 (SD 0.67), and 3.93 (SD 0.69) for the ICD-10, ICD-11, DSM-IV-TR, and DSM-5, respectively. Post hoc comparisons revealed that differences existed in percentages that chose an instru-

ment as most convenient to use with the exception of the comparison between the ICD-10 and ICD-11 as well as between the DSM-IV-TR and the DSM-5.

Certainty.   No significant differences were found for mean certainty scores (regarding coming to a diagnosis), which were 3.25 (SD 1.2) for the ICD-10, 3.58 (SD 1.08) for the ICD-11, 3.37 (SD 1.12) for the DSM-5, and 3.4 (SD 1.07) for the DSM-IV-TR diagnoses of adolescents/adults, and were 3.75 (SD 1.08), 3.64 (SD 1.06), 3.46 (SD 1.09), and 3.77 (SD 0.99) respectively, for the childhood diagnoses.

Ease of use.   The majority of the participants (74.3%–84.2%) considered the respective systems easy to use for the adolescent/adult diagnoses. For the childhood diagnoses, these percentages were somewhat lower (ranging from 46.7% to 85.7%). See Table 6. There were no significant between-instrument differences with regard to ease of use.

**Discussion**

With substantial to almost perfect agreement rates of 75% (53 of 70 raters agree) for the adult/adolescent diagnosis and 89% (50 of 56 raters agree) for the childhood diagnosis,

**JA1443**

Case 3:20-cv-00740   Document 252-8   Filed 05/31/22   Page 346 of 349 PageID #: 4395

TABLE 5.  AGREEMENT BETWEEN RATERS FOR EACH VIDEO PER CRITERION AND THE DECISION ON THE PRESENCE OF A DIAGNOSIS ACCORDING TO THE DSM-5 FOR CHILDREN

Downloaded by 68.9.118.15 from www.liebertpub.com at 04/05/21. For personal use only.

| | | Child 1 n=29 | Child 2 n=30 | Total n=59 | % |
|---|---|---|---|---|---|
| A | A marked incongruence between one's experienced/expressed gender and one's assigned gender of at least 6 months duration as manifested by at least six of the following (one of which must be Criterion A1). | 22/28 | 30/30 | 52/58 | 89.66% |
| A1 | A strong desire to be of the other gender or an insistence that one is the other gender (or some alternative gender that is different from one's assigned gender). | 27/28 | 30/30 | 57/58 | 98.28% |
| A2 | In boys (assigned gender), a strong preference for cross-dressing or simulating female attire; or in girls (assigned gender), a strong preference for wearing only typical masculine clothing and a strong resistance to the wearing of typical feminine clothing. | 29/29 | 30/30 | 59/59 | 100% |
| A3 | A strong preference for cross-gender roles in make-believe play or fantasy play. | 25/28 | 25/26 | 50/54 | 92.59% |
| A4 | A strong preference for the toys, games or activities stereotypically used or engaged in by the other gender. | 23/29 | 30/30 | 53/59 | 89.83% |
| A5 | A strong preference for playmates of the other gender. | 29/29 | 28/29 | 57/58 | 98.28% |
| A6 | In boys (assigned gender), a strong rejection of typically masculine toys, games, and activities and a strong avoidance of rough-and-tumble play; or in girls (assigned gender), a strong rejection of typically feminine toys, games, and activities. | 22/28 | 30/30 | 52/58 | 89.66% |
| A7 | A strong dislike of one's sexual anatomy. | 15/27 | 25/30 | 40/57 | 70.18% |
| A8 | A strong desire for the physical sex characteristics that match one's experienced gender. | 15/28 | 30/30 | 45/58 | 77.59% |
| B | The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. | 16/26 | 25/30 | 41/56 | 73.21% |

Specify if:
   With a disorder of sex development (e.g., a congenital adrenogenital disorder such as E25.0 congenital adrenal hyperplasia or E34.50 androgen insensitivity syndrome).
   Coding note: Code the disorder of sex development as well as gender dysphoria.
Specify if:
   Posttransition: The individual has transitioned to full-time living in the desired gender (with or without legalization of gender change) and has undergone (or is preparing to have) at least one cross-sex medical procedure or treatment regimen—namely, regular cross-sex hormone treatment or gender reassignment surgery confirming the desired gender (e.g., penectomy, vaginoplasty in a natal male; mastectomy or phalloplasty in a natal female).

| Total | Do you consider both A and B criterion to be present in the video? | 15/29  (51.72%) | 24/29  (82.76%) | 39/58 | 67.24% |
|---|---|---|---|---|---|

Reprinted with permission from the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, (Copyright © 2013). American Psychiatric Association. All Rights Reserved.[7]

139

**JA1444**

140 DE VRIES ET AL.

Table 6. Clinical Utility of Classification Systems: Frequencies and Percentages of Positive Responses

| | Which classification system did you think was most convenient to use? | | | | | Comparison between different instruments |
|---|---|---|---|---|---|---|
| Classification used | ICD-10 | ICD-11 | DSM-5 | DSM-IV-TR | No preference – no opinion | $X_i^2\ p$ |
| Adolescent/adult: | 4/18 (22.2%) | 7/33 (21.2%) | 13/33 (39.4%) | 6/15 (40.0%) | 3/33 (9.1%) | 3.81; 0.283 |
| Childhood: | 2/13 (15.4%) | 3/24 (12.5%) | 12/24 (50.0%) | 6/11 (54.5%) | 1/24 (4.17%) | 11.99; 0.007* |
| | Which classification system enabled you best to make a correct diagnosis? | | | | | |
| Adolescent/adult: | 1/18 (5.6%) | 5/32 (15.6%) | 15/32 (46.9%) | 5/14 (35.7%) | 6/32 (18.8%) | 8.49; 0.037^ |
| Childhood: | 0/12 (0.0%) | 4/24 (16.7%) | 8/24 (33.3%) | 5/12 (41.7%) | 7/24 (29.2%) | 1.68; 0.432# |
| | Would the classification system be easy to use in practice? (percentage answering yes) | | | | | |
| Adolescent/adult: | 16/19 (84.2%) | 27/34 (79.4%) | 26/35 (74.3%) | 13/16 (81.3%) | | 0.83; 0.843 |
| Childhood: | 7/15 (46.7%) | 19/29 (65.5%) | 20/29 (69.0%) | 12/14 (85.7%) | | 5.07; 0.166 |

*Significant difference between classification instruments; post hoc comparisons revealed that differences existed in percentages that chose an instrument as most convenient to use with the exception of the comparison between the ICD-10 and ICD-11 as well as between the DSM-IV-TR and the DSM-5.

^Significant difference between classification instruments; post hoc comparisons revealed that differences existed between the instruments on ability to make a correct diagnosis when comparing between the ICD-10 and DSM-5, ICD-10 and DSM-IV-TR, as well as between ICD-11 and DSM-5.

#Only comparison between ICD-11, DSM-5, and DSM-IV-TR; ICD-10 = 0.

the interrater agreement of both the adult/adolescent and childhood diagnoses can be considered good for the ICD-11.[34] Agreement for the DSM-5 diagnosis was lower, but still considered substantial with agreement rates of 67% (46 of 68 raters agree) for the adult/adolescent diagnosis and 67% (39 of 58 raters agree) for the childhood diagnosis.[34]

These findings are in line with the only other reliability study of the childhood DSM-III Gender Identity Disorder diagnosis that found a high interrater agreement reliability, although with a different design.[24] In that study, two raters independently agreed in 34 of 36 cases with regard to the A criterion (expressed desire to be the other gender) and in 28 of 31 cases for the B criterion (anatomical dysphoria, only assessed in the birth assigned boys). These high agreement rates give confidence that the gender identity diagnoses can reliably be given independent of the system (ICD or DSM) used.

When comparing the different classification systems and editions, the interrater reliability of the ICD-11 diagnoses was not different from earlier versions of the ICD and DSM, but only differed from the DSM-5. An important difference between the ICD-11 and the DSM-5 with regard to gender identity-related diagnoses is the absence of the distress/impairment requirement in the ICD-11. When looking at the agreement rates for every indicator sepa-

rately, the lower agreement rate for the DSM-5 stemmed mainly from the lower agreement clinicians had with that specific criterion (Tables 3 and 5). Other field studies in lower-income countries (Mexico, South Africa, and Lebanon) interviewed transgender adults and found that experienced distress was more strongly connected with (harsh) social contexts, social rejection, and violence than to gender incongruence.[27–29] The finding adds evidence to justifying the positioning of GI outside the ICD-11 mental health chapter.

With regard to utility (i.e., its goodness of fit, accuracy of description, and feasibility), many health care providers from this Dutch/Belgium sample picked the DSM classifications as most convenient to use and most enabling to make a correct diagnosis compared to the ICD. The preference for the DSM is probably due to the fact that in the Netherlands and Belgium, the DSM is the main system used. In ease of use, clarity, and felt certainty while making a diagnosis, there were no differences between the four systems. This provides confidence that both systems have the chance to be implemented faithfully and consistently.[35]

*Limitations*

The study has several limitations that should be addressed. First, for determining reliability and agreement rates, the

Downloaded by 68.9.118.115 from www.liebertpub.com at 04/05/21. For personal use only.

**JA1445**

Downloaded from www.liebertpub.com at 04/05/21. For personal use only.

relatively small number of assessed cases was a limitation. For feasibility reasons, we could only include six cases of three age groups. A future study should use a more heterogeneous sample of cases, including a better balance between different genders (e.g., also incorporating nonbinary and gender fluid identities).

The study was further limited by the fact that video-recorded specialist clinical interviews were rated, which could lead to interviewers guiding the raters by probing or pausing in a certain direction and causing undue high agreement.[9]

Importantly, this study was performed in a specialized transgender clinic setting with a long history of care and research. Whether the findings are also true in other contexts, where it is less likely that health care workers are highly educated and specialized, is yet unknown.

In this regard, it is important to note that in comparison with other field trials, for example, ICD-11 and DSM 5, that aimed to get large enough (also for relatively rare conditions) representative patient samples in general clinical settings using usual clinical interviews,[22,23] the current study followed a different design. Because the aim of the study was to investigate reliability and utility in a specialty setting, as it is often organized in high income countries, the results may not be generalizable to other settings. The selected patient sample was therefore, in contrast to other field studies, more homogeneous, making power analyses or providing confidence intervals of little use. We therefore choose to report on agreement rates. In addition, compared to other field studies, the study made use of a much larger sample of raters for each case, a mix of transgender health care specialists and nonspecialists, although most of the raters were mental health specialists skilled in detecting distress. This high number of raters was another reason to report agreement rates and no kappa statistics, as other field studies do.[22,23,32,33] Other future studies could focus on patients presenting to nonspecialty non mental health settings; for example, endocrinology, surgery, or other medical specialties that provide medical care to more heterogeneous gender diverse populations, possibly with less distress. This would ensure more generalizability, although the probable still low prevalence rates of GI/GD would make a design comparable to other field studies a challenge.

**Conclusion**

In conclusion, the present study showed that the interrater agreement rates for gender identity-related diagnoses can be considered good or very good, regardless of the classification system that was used (ICD-10, ICD-11, DSM-IV-TR, or DSM-5), both for the adolescence/adulthood diagnosis and for the childhood diagnoses. The revisions in the ICD-11 and in the DSM-5 did not change these agreement rates. Clinicians further assessed the utility of the various classification systems as easy to use and few differences between the former, current, and proposed ICD and DSM classifications existed with regard to the ability to make a correct diagnosis. Future work should assess whether these results are generalizable to other settings and should also show whether the reconceptualization of the ICD-11 is helpful in solving controversies and diminishing stigma around gender identity-related diagnoses.

**Author Disclosure Statement**

No competing financial interests exist.

**Funding Information**

This study was supported by funding from three Dutch Ministries (Foreign Affairs; Health, Welfare and Sport; Education, Culture and Science).

**References**

1. World Health Organization: *International Statistical Classification of Diseases and Related Health Problems.* 11th ed. 2019. Available at https://icd.who.int/Accessed September 9, 2020.
2. Drescher J: Queer diagnoses revisited: The past and future of homosexuality and gender diagnoses in DSM and ICD. Int Rev Psychiatry 2015;27:386–395.
3. Beek TF, Cohen-Kettenis PT, Kreukels BPC: Gender incongruence/gender dysphoria and its classification history. Int Rev Psychiatry 2016;28:5–12.
4. World Health Organization: International Statistical Classification of Diseases and Related Health Problems, 10th edition. (ICD-10). Geneva, Switzerland: World Health Organization, 1992.
5. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, 3rd ed. (DSM-III). Washington, DC: American Psychiatric Association, 1980.
6. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, 4th ed. (DSM-IV). Washington, DC: American Psychiatric Association, 1994.
7. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders. 5th ed. (DSM-V). Arlington, VA: American Psychiatric Association Publishing, 2013.
8. Drescher J, Cohen-Kettenis P, Winter S: Minding the body: Situating gender identity diagnoses in the ICD-11. Int Rev Psychiatry 2012;24:568–577.
9. Reed GM, Drescher J, Krueger RB, et al.: Disorders related to sexuality and gender identity in the ICD-11: Revising the ICD-10 classification based on current scientific evidence, best clinical practices, and human rights considerations. World Psychiatry 2016;15:205–221.
10. Meyer-Bahlburg HFL: From mental disorder to iatrogenic hypogonadism: Dilemmas in conceptualizing gender identity variants as psychiatric conditions. Arch Sex Behav 2010;39:461–476.
11. Drescher J, Cohen-Kettenis PT, Reed GM: Gender incongruence of childhood in the ICD-11: Controversies, proposal, and rationale. Lancet Psychiatry 2016;3:297–304.
12. Winter S, Ehrensaft D, Pickstone-Taylor S, et al.: The psycho-medical case against a gender incongruence of childhood diagnosis. Lancet Psychiatry 2016;3:404–405.
13. Vance Jr SR, Cohen-Kettenis PT, Drescher J, et al.: Opinions about the *DSM* gender identity disorder diagnosis: Results from an international survey administered to organizations concerned with the welfare of transgender people. Int J Transgend 2010;12:1–14.
14. Beek TF, Cohen-Kettenis PT, Bouman WP, et al.: Gender incongruence of childhood: Clinical utility and stakeholder agreement with the World Health Organization's proposed ICD-11 criteria. PLoS One 2017;12:e0168522.
15. Jokić-Begić N, Altabas V, Antičević V, et al.: Croatia needs a gender incongruence diagnosis for prepubertal children. Arch Sex Behav 2017;46:2507–2508.

**142**                                                                                               **DE VRIES ET AL.**

Downloaded by 68.9.118.115 from www.liebertpub.com at 04/05/21. For personal use only.

16. Khorashad BS, Talaei A, Bordbar MRF, et al.: Iranian gender-nonconforming children will not benefit from the omission of gender incongruence in children diagnosis. Arch Sex Behav 2017;46:2509–2510.

17. Beek TF, Cohen-Kettenis PT, Bouman WP, et al.: Gender incongruence of adolescence and adulthood: Acceptability and clinical utility of the World Health Organization's proposed ICD-11 criteria. PLoS One 2016;11:e0160066.

18. Stein DJ, Szatmari P, Gaebel W, et al.: Mental, behavioral and neurodevelopmental disorders in the ICD-11: An international perspective on key changes and controversies. BMC Med 2020;18:21.

19. Reed GM, Ayuso-Mateos JL: Towards a more clinically useful International World Health Organisation classification of mental disorders. Rev Psiquiatr Salud Ment 2011; 4:113–116.

20. Rutter M: Research review: Child psychiatric diagnosis and classification: Concepts, findings, challenges and potential. J Child Psychol Psychiatry 2011;52:647–660.

21. First MB: The importance of developmental field trials in the revision of psychiatric classifications. Lancet Psychiatry 2016;3:579–584.

22. Regier DA, Narrow WE, Clarke DE, et al.: DSM-5 field trials in the United States and Canada, Part II: Test-retest reliability of selected categorical diagnoses. Am J Psychiatry 2013;170:59–70.

23. Reed GM, Sharan P, Rebello TJ, et al.: The ICD-11 developmental field study of reliability of diagnoses of high-burden mental disorders: Results among adult patients in mental health settings of 13 countries. World Psychiatry 2018;17:174–186.

24. Zucker KJ, Finegan JK, Doering RW, Bradley SJ: Two subgroups of gender-problem children. Arch Sex Behav 1984; 13:27–39.

25. Reed GM, Roberts MC, Keeley J, et al.: Mental health professionals' natural taxonomies of mental disorders: Implications for the clinical utility of the ICD-11 and the DSM-5. J Clin Psychol 2013;69:1191–1212.

26. Reed GM, Rebello TJ, Pike KM, et al.: WHO's Global Clinical Practice Network for mental health. Lancet Psychiatry 2015;2:379–380.

27. Robles R, Fresán A, Vega-Ramírez H, et al.: Removing transgender identity from the classification of mental disorders: A Mexican field study for ICD-11. Lancet Psychiatry 2016;3:850–859.

28. Khoury B, El Khoury J, Fresán Orellana A, et al.: The ICD-11 classification of gender incongruence of adolescence and adulthood: Adequacy among transgender people in Lebanon. Cult Health Sex 2020;23:131–142.

29. Campbell MM, Fresán A, Addinall RM, et al.: Experiences of gender incongruence and the relationship between social exclusion, psychological distress, and dysfunction among South African transgender adults: A field-study for ICD-11. Ann Clin Psychiatry 2018;30:168–174.

30. Reed GM, First MB, Medina-Mora ME, et al.: Draft diagnostic guidelines for ICD-11 mental and behavioural disorders available for review and comment. World Psychiatry 2016;15:112–113.

31. World Health Organization: (2014). ICD-11 beta draft, downloaded November 19, 2014 from http://apps.who.int/classifications/icd11/browse/l-m/en#/

32. de Vet HCW, Mokkink LB, Terwee CB, et al.: Clinicians are right not to like Cohen's κ. BMJ 2013;346:f2125.

33. de Vet HCW, Mullender MG, Eekhout I: Specific agreement on ordinal and multiple nominal outcomes can be calculated for more than two raters. J Clin Epidemiol 2018;96:47–53.

34. Landis JR, Koch GG: The measurement of observer agreement for categorical data. Biometrics 1977;33:159–174.

35. First MB, Westen D: Classification for clinical practice: How to make ICD and DSM better able to serve clinicians. Int Rev Psychiatry 2007;19:473–481.

Address correspondence to:
*Annelou L.C. de Vries, MD, PhD*
*Department of Child and Adolescent Psychiatry*
*Center of Expertise on Gender Dysphoria*
*Amsterdam University Medical Centers, Location VUmc*
*PO Box 7057*
*1007 MB Amsterdam*
*The Netherlands*

*E-mail:* alc.devries@amsterdamumc.nl

Case 3:20-cv-00740   Document 252-9   Filed 05/31/22   Page 1 of 89 PageID #: 4399

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                   HUNTINGTON DIVISION

4    ---------------------------------------------------

5    Christopher Fain, individually and on behalf of all

6    others similarly situated, et al.,

7              Plaintiffs,

8     vs.              CIVIL ACTION NO. 3:20-cv-00740

9    William Crouch, et al.,

10             Defendants.

11   ---------------------------------------------------

12

13

14           REMOTE DEPOSITION OF DR. JAMES BECKER

15

16

17   DATE:   March 30, 2022

18   TIME:   7:00 a.m. CST

19   PLACE:  Veritext Virtual Videoconference

20

21

22

23

24   REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25   JOB NUMBER:  5096167

JA1448

Page 2

1                   APPEARANCES

2

3  On Behalf of the Plaintiffs (Via Videoconference):

4       CARL CHARLES, ESQ.

5       TARA L. BORELLI, ESQ.

6       Lambda Legal Defense and Education Fund, Inc.

7       158 West Ponce De Leon Ave., Suite 105

8       Decatur, Georgia   30030

9       470.225.5341

10      ccharles@lambdalegal.org

11      tborelli@lambdalegal.org

12

13      AVATARA SMITH-CARRINGTON, ESQ.

14      Lambda Legal Defense and Education Fund, Inc.

15      3500 Oak Lawn Avenue, Suite 500

16      Dallas, Texas   75219

17      214.219.8585

18      asmithcarrington@lambdalegal.org

19

20      NICOLE J. SCHLADT, ESQ.

21      Nichols Kaster PLLP

22      80 South 8th Street, Suite 4700

23      Minneapolis, Minnesota   55402-2224

24      612.256.3291

25      nschladt@nka.com

JA1449

Page 3

1　On Behalf of Defendants William Crouch; Cynthia Beane;

2　and West Virginia Department of Health and Human

3　Resources, Bureau for Medical Services (Via

4　Videoconference):

5　　　　KIMBERLY M. BANDY, ESQ.

6　　　　LOU ANN S. CYRUS, ESQ.

7　　　　Shuman McCuskey Slicer, PLLC

8　　　　1411 Virginia Street East, Suite 200

9　　　　Charleston, West Virginia　25301

10　　　304.345.1400

11　　　kbandy@shumanlaw.com

12　　　lcyrus@shumanlaw.com

13

14

15

16

17

18　　　NOTE:　The original deposition transcript will be

19　delivered to Attorney Smith, Esq., as the taking

20　attorney.

21

22

23

24

25

## DEPOSITION OF DR. JAMES BECKER

Page 20

1        I also review pharmacy and pharmacy cases.
2    Pharmacy appeals come to me with great regularity.  We
3    cover about a million prescriptions each month and so
4    there will be some that need to be reviewed, so they do
5    come to me.  I have interaction with other agencies like
6    CMS, I have interaction with various support groups that
7    state Medicaid programs rely on, things like the
8    Medicaid Medical Director Network, ASTHO, which is the
9    State Health Officers Organization, a variety of those
10   kind of agencies.  So as you can tell, it's highly
11   variable.
12        Q.  Okay.
13        A.  And it's grown.  When I first began the only
14   obligation I had when I first began working for Medicaid
15   was to, was to look at files regarding surgical
16   procedures that didn't match normal codes, and that's
17   still a part of my job, but it's not much of a job.
18        Q.  I understand that.  And so just a quick
19   follow-up on that.  So you said that you've been with
20   BMS for 14 years, am I correct?
21        A.  That's correct.
22        Q.  And have you been with BMS in your capacity now,
23   so as the medical director for 14 years?
24        A.  Yes.
25        Q.  Okay.  Dr. Becker, who is your direct

**JA1451**

Page 132

1    DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2

3    ASSIGNMENT REFERENCE NO: 5096167
     CASE NAME: Fain, Christopher, et al. v. Crouch, William
     DATE OF DEPOSITION: 3/30/2022
4    WITNESS' NAME: Dr. James Becker
5    In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7    I have made no changes to the testimony
     as transcribed by the court reporter.
8

9    Date                    Dr. James Becker
10   Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12

13   They have read the transcript;
     They signed the foregoing Sworn
14        Statement; and
     Their execution of this Statement is of
15        their free act and deed.

16   I have affixed my name and official seal
17   this ___ day of _____, 20__
18   Notary Public
19   Commission Expiration Date
20
21
22
23
24
25

Veritext Legal Solutions
www.veritext.com                                          888-391-3376

**JA1452**

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3     _____|
                                        |
 4   CHRISTOPHER FAIN, individually     |
     and on behalf of all others        |
 5   similarly situated,                |
                                        |
 6            Plaintiffs,               |    Case No.
                                        |  3:20-cv-00740
 7   vs.                                |
                                        |
 8   WILLIAM CROUCH, et al.,            |
                                        |
 9            Defendants.               |
     _____|
10
11            REMOTE 30(b)(6) DEPOSITION OF
12     WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
            RESOURCES, BUREAU FOR MEDICAL SERVICES
13
       by and through their corporate representative
14
                    FREDERICK LEWIS
15
16
17   DATE:      April 4, 2022
18   TIME:      9:00 a.m. (Eastern)
19   PLACE:     Veritext Virtual Videoconference
20
21
22
23
24   JOB NO.:      MW 5129863
     PAGES:        1 to 136
25   REPORTED BY:  Merilee Johnson, RDR, CRR, CRC, RSA
```

**JA1453**

```
 1                 A P P E A R A N C E S
             (All appearing remotely via videoconference)
 2
     ON BEHALF OF THE PLAINTIFFS:
 3
     NICHOLS KASTER, PLLP
 4   BY:   Anna P. Prakash, Esq.
           Nicole J. Schladt, Esq.
 5         4700 IDS Center
           80 South Eighth Street
 6         Minneapolis, Minnesota 55402
           Phone:  (612) 256-3200
 7         Email:  APrakash@nka.com
           Email:  NSchladt@nka.com
 8
     -and-
 9
     LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
10   BY:   Tara L. Borelli, Esq.
           158 West Ponce De Leon Avenue
11         Suite 105
           Decatur, Georgia 30030
12         Phone:  (470) 225-5341
           Email:  TBorelli@LambdaLegal.org
13
     -and-
14
     LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
15   BY:   Avatara Smith-Carrington, Esq.
           3500 Oak Lawn Avenue
16         Suite 500
           Dallas, Texas 75219
17         Phone:  (214) 219-8585
           Email:  ASmithCarrington@LambdaLegal.org
18
19   ON BEHALF OF DEFENDANTS WILLIAM CROUCH, CYNTHIA
     BEANE, and WEST VIRGINIA DEPARTMENT OF HEALTH AND
20   HUMAN RESOURCES BUREAU FOR MEDICAL SERVICES:
21   SHUMAN McCUSKEY SLICER, PLLC
     BY:   Kimberly M. Bandy, Esq.
22         Lou Ann S. Cyrus, Esq.
           1411 Virginia Street East
23         Suite 200
           Charleston, West Virginia 25301
24         Phone:  (304) 345-1400
           Email:  KBandy@ShumanLaw.com
25         Email:  LCyrus@ShumanLaw.com
```

**JA1454**

Page 3

1            A P P E A R A N C E S

              (Continued)

2

3   ON BEHALF OF DEFENDANT JASON HAUGHT:

4   THE EMPLOYMENT LAW CENTER, PLLC

    BY:     Walt Auvil, Esq.

5         1208 Market Street

         Parkersburg, West Virginia 26101

6         Phone:   (304) 485-3058

         Email:   Auvil@TheEmploymentLawCenter.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA1455

**DEPOSITION OF FREDERICK LEWIS**

Page 27

1    Q.   And are you the person at BMS who is in
2    charge of contracting with the consulting
3    actuaries?
4    A.   I'm one of them.  I feel like I share this
5    with Becky Manning, the Deputy of Finance.  We have
6    overlap in this area.  But, yeah, Becky and I are
7    over this contract.  I think I actually signed the
8    SOWs this time around.
9    Q.   And do you know if BMS has ever asked or --
10   asked for or received from the actuaries any
11   calculations on how much it would cost to provide
12   surgery as a treatment for gender dysphoria?
13   A.   We have not asked for that in my time here.
14   Q.   Are you aware of BMS asking for it at any
15   point in time prior to you coming to the agency?
16   A.   I am not aware.  I'm not aware of a lot of
17   things, though, so...
18   Q.   All right.  So I understand that the MCOs
19   must follow coverage limitations required by
20   Medicaid and can't use Medicaid dollars to
21   authorize noncovered care.  Is that right?
22   A.   I think they could use Medicaid dollars as
23   long as, you know, they're coming from profit or
24   something.  But that's right.  We're not
25   providing -- we're not providing funding to them

**JA1456**

## DEPOSITION OF FREDERICK LEWIS

Page 28

1    for the purpose of providing anything more than

2    what is basically our -- what we recognize as our

3    base level bene- -- our fee-for-service benefit is

4    sort of the guiding issue.

5        Q.    Okay.  And so that -- just so I'm clear,

6    that benefit does not include surgical care for the

7    purpose of treating gender dysphoria, correct?

8        A.    Correct.

9        Q.    Okay.  And so the MCOs could not use

10   Medicaid dollars for the purpose of treating

11   gender -- surgical care for the purpose of treating

12   gender dysphoria, correct?

13       A.    They could, as a value-add benefit, which

14   means, you know, they -- it's not our expectation

15   that they will pay for it, but, you know, maybe

16   they have a marketing strategy or something:  They

17   want to differentiate their plan from the others by

18   providing a benefit -- a benefit that wouldn't

19   otherwise be covered.  They could do that, but it

20   would be from -- it would not be something we have

21   built into that capitation, that budget, as you'd

22   say --

23       Q.    Okay.

24       A.    -- for them to pay for.  It would be coming

25   from their managed care savings, for example.  When

**JA1457**

**DEPOSITION OF FREDERICK LEWIS**

Page 29

```
1    you manage a member, you're going to identify some
2    services that -- you're going to avoid services,
3    first of all, because you're going to keep the
4    member healthier.  And you're going to be able to
5    manage the services and provide for those that are
6    medically necessary and not services that aren't
7    medically necessary.
8         So there are savings that come from all of
9    that.  That and profits -- you know, there's
10   profit-building with the capitation.  All of that
11   could be used by the MCO to pay for the value-add
12   service.
13        Does that make sense?
14   Q.  Well, let me ask you this:  Has any MCO --
15   any of the three that BMS contracts with, have any
16   of them used that -- those savings or created a
17   value-added benefit that is surgery for the
18   treatment of gender dysphoria?
19   A.  No, none of them have, to date, provided
20   for those dollars to be used for those surgeries,
21   to the best of my knowledge.
22   Q.  All right.  How would you describe
23   value-added benefit?  You've said that a few times
24   so I just want to know how you're defining that.
25   A.  It is a benefit that is not considered --
```

**JA1458**

## DEPOSITION OF FREDERICK LEWIS

Page 30

1   the cost of which is not considered in building the
2   capitation rate and a benefit that is not available
3   to the Medicaid fee-for-service population.  It's
4   sort of an extra.
5       Q.   Got it.  When you say, "Medicaid
6   fee-for-service," is that -- I guess I'm a little
7   bit confused because we talked about Mountain
8   Health Trust and the three MCOs and that sort of
9   managed care program.  When you're talking about
10  fee-for-service, are you still talking about that
11  or are you talking about something else?
12      A.   No, I'm talking about the non-Medicaid
13  part -- the nonmanaged care part of program.
14      Q.   Got it.
15      A.   When I say, "fee-for-service," I'm
16  typically talking about those members that are not
17  in Mountain Health Trust --
18      Q.   Got it.
19      A.   -- or Mountain Health Promise.
20      Q.   Okay.  So if we go back to the managed care
21  program, Mountain Health Trust, is it true that the
22  MCOs there cannot use Medicaid dollars to authorize
23  noncovered care?
24      A.   They could, but only to the extent they're
25  deriving those dollars from either their profit

**JA1459**

**DEPOSITION OF FREDERICK LEWIS**

Page 31

1　administrative savings or from -- or from managed

2　care savings, which is coming through, you know,

3　providing -- preventing disease, providing for

4　the -- whatever it takes, to keep their member

5　healthy.  But that's it.

6　　　　They could, in the technical sense, use

7　Medicaid dollars, but it would -- it would have to

8　come from one of those other sources for there to

9　be money available.

10　　Q.　I see.  And so I think I asked this

11　question with respect to -- and you answered with

12　respect to fee-for-service, but the same question

13　within the managed care program:  You're not aware

14　of any MCO using that extra money for the purpose

15　of covering surgery for the treatment of gender

16　dysphoria?

17　　A.　Yes, I am not aware of any of the plans

18　providing for the treatment of -- well, providing

19　for the treatment of -- for the surgery for these

20　members and it's not their -- it's -- since we

21　provide pharmacy on the -- and I'm going to use

22　"fee-for-service" in a different context this time.

23　Our pharmacy benefit is fee-for-service.

24　　Q.　Right.

25　　A.　It's carved out of managed care.

**JA1460**

## DEPOSITION OF FREDERICK LEWIS

1      Q.   Got it.

2      A.   Since we provide for that through the

3   fee-for-service program, that's not their

4   responsibility, either.

5      Q.   Okay.

6      A.   But I am not aware of an MCO providing for

7   surgery or providing for hormone therapy.  Doesn't

8   mean that it couldn't have happened somewhere.  You

9   know, maybe -- maybe there was a mastectomy that

10  was provided and -- but it's not -- it's not their

11  intent to provide for -- those services for that

12  purpose -- the surgical services for that purpose.

13     Q.   Got it.  Have you ever -- are you aware of

14  any of the MCOs pushing back against the exclusion

15  on coverage for surgery related to gender

16  dysphoria?

17     A.   No.

18     Q.   Are you aware of any of the MCOs raising

19  compliance concerns with respect to the lack of

20  coverage for surgical care related to gender

21  dysphoria?

22     A.   No.  And nor have we gotten such from CMS,

23  to the best of my knowledge.

24     Q.   When you say "CMS," that's the Center for

25  Medicaid Services?

**DEPOSITION OF FREDERICK LEWIS**

Page 110

1   part of that bigger conversation.  So here's Tadd
2   saying, "Here is what the people in our
3   organization think we need to do to collect this
4   other data and we absolutely have to get there."
5           I don't know that what Anthem is proposing
6   here is the end-all be-all, that this is exactly
7   how we need to collect it, but we need this or
8   something a lot like it.  And we're moving in this
9   direction.
10          But there's a lot of juggling here --
11  happening here and we have not yet had the meeting
12  that Tadd was propo- -- in fact, I don't know if
13  Cindy responded to this or not.  I was waiting for
14  her to respond since it was addressed to her.  But
15  I would like to have this meeting and move on with
16  the bigger conversation.
17          Right now, we collect gender in a binary
18  field.  It's male or female.  That's how it comes
19  from CMS.  And so I don't know if we could -- we
20  may have to ask CMS permission to change it and to
21  make some of these responses mandatory, but maybe
22  give an option to decline to say what race somebody
23  is, or ethnicity, give options for them.  I think
24  that's the sticking point.  But we're trying to
25  sort these things out so that we can move forward

**JA1462**

**DEPOSITION OF FREDERICK LEWIS**

Page 111

1   with it.

2          And we've -- we've had a vacancy in the

3   director's role for this office for an extended

4   time and we are currently struggling with that too.

5   So that's been a little bit of a factor for us,

6   frankly, as well.

7          Q.   In the second paragraph of that email,

8   there is a reference to members from Maximus.  Do

9   you know what that means?

10         A.   Maximus is our enrollment broker that we

11  talked about early in the call.

12         Q.   Got it.

13         A.   Maximus is administering, in addition to

14  their work as an enrollment broker, like a

15  seven-question social determinants of health

16  questionnaire.

17         And they're tracking that for us and

18  they're passing the data about our members on

19  social determinants on to the MCOs so the MCOs can

20  know that a member has food insecurity, or is

21  homeless, or whatever it might be, and take that

22  into account when they're helping to manage the

23  member's health.

24         Q.   Got it.  So --

25         A.   So Tadd is proposing that we add these

**JA1463**

## DEPOSITION OF FREDERICK LEWIS

Page 112

1   questions or these items to that social

2   determinants questionnaire that's being

3   administered by Maximus at that stage.

4       Q.   Do you know what the current questionnaire

5   administered by Maximus asks for?

6       A.   I've seen it.  But like I said, it -- well,

7   it's been a while.  It's been like seven social

8   determinants of health-type questions.  It was very

9   carefully crafted to try to maximize response rate,

10  but, I mean, it -- there's a question relating to

11  food security, a question relating to housing

12  security, one about employment.  I mean, things

13  like that.  And I can't recite off the top of my

14  head what they are.  I have it somewhere.

15      Q.   Does the current questionnaire ask about

16  gender identity?

17      A.   No, it does not.

18      Q.   How long has the current questionnaire been

19  in place?

20      A.   Two or three years.  Something like that.

21  And it was a new process when we implemented it.

22      Q.   Okay.  And it's implemented across all MCOs

23  through the broker?

24      A.   Yes.  And that's a disadvantage to this

25  approach in that we wouldn't be able to provide the

Page 136

1                       REPORTER'S CERTIFICATE
2
      STATE OF MINNESOTA    )
3                           ) ss.
      COUNTY OF HENNEPIN    )
4
5          I hereby certify that I reported the remote
      deposition of FREDERICK LEWIS, on April 4, 2022,
6      via Veritext Virtual Videoconference, and that the
      witness was by me first duly affirmed to tell the
7      whole truth;

8          That the testimony was transcribed by me and
9      is a true record of the testimony of the witness;
           That the cost of the original has been
10     charged to the party who noticed the deposition,
      and that all parties who ordered copies have been
11     charged at the same rate for such copies;

12         That I am not a relative or employee or
      attorney or counsel of any of the parties, or a
13     relative or employee of such attorney or counsel;

14         That I am not financially interested in the
      action and have no contract with the parties,
15     attorneys, or persons with an interest in the
      action that affects or has a substantial tendency
16     to affect my impartiality;

17         That the right to read and sign the
18     deposition by the witness was preserved.

19         WITNESS MY HAND AND SEAL THIS 12th day of
      April, 2022.
20
21
22
23         _____
24         Merilee S. Johnson, RDR, CRR, CRC, RSA
           Notary Public, Hennepin County, Minnesota
25         My commission expires January 31, 2026

JA1465

Page 139

1                    DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
2

3       ASSIGNMENT REFERENCE NO: 5129863
        CASE NAME: Fain, Christopher Et Al. v. Crouch, William El Al.
        DATE OF DEPOSITION: 4/4/2022
4       WITNESS' NAME: Frederick Lewis , 30(b)(6)
5           In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7           I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9           I request that these changes be entered
    as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  April 27, 2022              _____
    Date                        Frederick Lewis , 30(b)(6)
14
            Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18              in the appended Errata Sheet;
            They signed the foregoing Sworn
19              Statement; and
            Their execution of this Statement is of
20              their free act and deed.
21          I have affixed my name and official seal
22  this 27 day of april , 20 22.
23      _____
        Notary Public
24
        July 28, 2026
25  Commission Expiration Date

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Kimberly Michelle O'Brien
WV DHHR Bureau for Medical Services
350 Capitol St. Rm 251, Charleston, WV 25301
My Commission Expires July 28, 2026

Veritext Legal Solutions
www.veritext.com                                        888-391-3376

**JA1466**

Page 140

1          ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2            ASSIGNMENT NO: 5129863
3   PAGE/LINE(S) /        CHANGE        /REASON
4   23 /4  /  strike "plan" and insert "benefit design" in lieu thereof  /  clarity
5   24/23  / add "ADDENDUM: Rate cells typically represent an age band, gender,
6   eligibility type (TANF, Pregnant Women, Delivery Kick Payments, CSHCN,
7   SSI, Expansion), and region (North, East, South). Age bands for children 14 and
8   younger are not broken out by gender and for the SSI eligibility type, there is no
9   gender specificity in the rates for the <20 age band." / Supplementing response because
10  gender is even a more significant demographic in the identification of rate cells
11  than I recalled in the deposition.
12  73/6 and subsequent references / The former Office of Pharmacy Services
13  Director's name is Peggy King / Completeness
14  117/17  / "insurance" not "assurance" / Correction
15
16
17
18
19

    April 27, 2022
20  Date                    Frederick Lewis , 30(b)(6)
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS 27th
22  DAY OF April                , 20 22 .
23       Kimberly M O'Brien
         Notary Public

    OFFICIAL SEAL
    NOTARY PUBLIC
    STATE OF WEST VIRGINIA
    Kimberly Michelle O'Brien
    WV DHHR Bureau for Medical Services     July, 28, 2026
    350 Capitol St, Rm 251, Charleston, WV 25301
    My Commission Expires July 28, 2026     Commission Expiration Date

                Veritext Legal Solutions

**JA1467**

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3     _____
                                      |
 4   CHRISTOPHER FAIN, individually   |
     and on behalf of all others      |
 5   similarly situated,              |
                                      |
 6          Plaintiffs,               |   Case No.
                                      |   3:20-cv-00740
 7   vs.                              |
                                      |
 8   WILLIAM CROUCH, et al.,          |
                                      |
 9          Defendants.               |
     _____ |
10
11            REMOTE 30(b)(6) DEPOSITION OF
12      WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
            RESOURCES, BUREAU FOR MEDICAL SERVICES
13
        by and through their corporate representative
14
                     BECKY MANNING
15
16
17   DATE:       April 12, 2022
18   TIME:       9:59 a.m. (Eastern)
19   PLACE:      Veritext Virtual Videoconference
20
21
22
23
24   JOB NO.:      MW MW 5096193
     PAGES:        1 to 85
25   REPORTED BY:  Merilee Johnson, RDR, CRR, CRC, RSA
```

Page 2

```
1                    A P P E A R A N C E S
            (All appearing remotely via videoconference)
2
3     ON BEHALF OF THE PLAINTIFFS:
4     NICHOLS KASTER, PLLP
      BY:   Nicole J. Schladt, Esq.
5           Anna P. Prakash, Esq.
            4700 IDS Center
6           80 South Eighth Street
            Minneapolis, Minnesota 55402
7           Phone:  (612) 256-3200
            Email:  NSchladt@nka.com
8           Email:  APrakash@nka.com
9     -and-
10    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
      BY:   Tara L. Borelli, Esq.
11          158 West Ponce De Leon Avenue
            Suite 105
12          Decatur, Georgia 30030
            Phone:  (470) 225-5341
13          Email:  TBorelli@LambdaLegal.org
14    -and-
15    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
      BY:   Avatara Smith-Carrington, Esq.
16          3500 Oak Lawn Avenue
            Suite 500
17          Dallas, Texas 75219
            Phone:  (214) 219-8585
18          Email:  ASmithCarrington@LambdaLegal.org
19    ON BEHALF OF DEFENDANTS WILLIAM CROUCH, CYNTHIA
      BEANE, and WEST VIRGINIA DEPARTMENT OF HEALTH AND
20    HUMAN RESOURCES BUREAU FOR MEDICAL SERVICES:
21    SHUMAN McCUSKEY SLICER PLLC
      BY:   Kimberly M. Bandy, Esq.
22          Lou Ann S. Cyrus, Esq.
            1411 Virginia Street East
23          Suite 200
            Charleston, West Virginia 25301
24          Phone:  (304) 345-1400
            Email:  KBandy@ShumanLaw.com
25          Email:  LCyrus@ShumanLaw.com
```

**JA1469**

Page 3

1                    A P P E A R A N C E S
                         (Continued)

2

3    ON BEHALF OF DEFENDANT JASON HAUGHT:

4    THE EMPLOYMENT LAW CENTER, PLLC

     BY:    Walt Auvil, Esq.

5           1208 Market Street

            Parkersburg, West Virginia 26101

6           Phone:  (304) 485-3058

            Email:  Auvil@TheEmploymentLawCenter.com

7

8    ALSO APPEARED:

9           Nicholas Guillory, Law Fellow

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA1470

**DEPOSITION OF BECKY MANNING**

Page 41

1    purposes.

2            Because, as you can see for 2022 and 2023,

3    the very last line shows that Medicaid has a

4    surplus for those years, the $343 million, the very

5    last line, and the $117 million.  Those funds are

6    used to save -- to save money for future years when

7    things don't look as positive.

8            For example, if you look at 2024, we are

9    set to hit our first -- what we term as our

10   Medicaid cliff, when we will be in the negative

11   situation.  Meaning if we still cover the services

12   that we are required to cover at the current rates

13   that we cover them, with the current membership

14   enrollment, we will be at a negative situation of

15   $128.3 million.

16       Q.   And to be clear, that $128 million number

17   under 2024 on the spreadsheet we're looking at,

18   that is the bottom line of where the budget would

19   look if everything is as the estimates are entered

20   here?

21       A.   This would assume that we do not receive

22   any future funding cuts or future funding cash

23   injections for Medicaid.  We have also made

24   assumptions within our budget about utilization

25   membership trend.

**JA1471**

**DEPOSITION OF BECKY MANNING**

Page 42

1       For example, one of the biggest impacts to
2   our budget will be the unwinding of the public
3   health emergency where West Virginia saw a
4   significantly large amount of members come on to
5   the Medicaid rolls.  And we were waiting to see
6   what that unwinding will look like when we are
7   allowed to unenroll members who are no longer
8   Medicaid eligible.
9       Q.   Okay.  And so this $128 million deficit,
10  that is the amount of money that West Virginia
11  Medicaid believes it will --
12      A.   We will --
13      Q.   -- need -- oh, go ahead.
14      A.   Correct.  We will need that money from the
15  legislature in 2024 in order to be able to maintain
16  services at the current level, without cutting
17  services or rates to providers.
18      Q.   Okay.  And is that amount included -- if
19  you go back up to the 2024 column there, is that
20  amount included in the state match required to meet
21  expenditures or not?
22      A.   It is -- it is included that we will need
23  it.
24      Q.   Okay.  So that $128 million number, that is
25  part of the $1,167,000,000?

**DEPOSITION OF BECKY MANNING**

Page 43

```
 1        A.    Mm-hmm.  Yeah.
 2        Q.    Okay.
 3        A.    But if you look at the total match
 4   available from below, we don't have it.  So if you
 5   subtract the 1.1 -- the $1,167,772,000 minus
 6   $1,039,452,000, that's how you come up with our
 7   deficit.  Like we don't have it from below.
 8        Q.    Okay.  And so that's -- that's where you
 9   get the $128 million number at the bottom there?
10        A.    Yeah.  Yes, ma'am.
11        Q.    Okay.
12        A.    And these six-year projections assume that
13   in some way, shape, or form, that that negative is
14   taken care of by the end of the year.  That we
15   either make provider cuts, which is reducing rates;
16   we reduce benefits; one-time funding is given; and
17   that that deficit is not carried forward to future
18   years.
19        Q.    Does the agency always get as much money as
20   it requests from the legislature?
21        A.    No, there's no guarantee.  No.
22        Q.    Why would it not receive the full amount of
23   money requested?
24        A.    It's not available.  The appropriation is
25   based upon the amount taken in from taxes.  So if
```

## DEPOSITION OF BECKY MANNING

Page 44

1    the state doesn't have it, we wouldn't get it.

2        Q.   What happens if West Virginia Medicaid

3    doesn't receive all of the money it requests from

4    the state.

5        A.   We will have to make decisions about what

6    will be cut and where.

7        Q.   Has that had to happen during your tenure

8    at DHHR?

9        A.   Not during my tenure, no.  And one of the

10   things to keep in mind is that we received an

11   additional 6.2 in FMAP from the federal government

12   with the public health emergency, so that was able

13   to provide some additional relief to states who

14   were currently struggling and to cover those

15   members that we cannot take off the Medicaid roles

16   and so that people would have healthcare during the

17   public health emergency.

18       Q.   And what does FMAP stand for?

19       A.   Federal Matching Participation.  It's the

20   amount we get from the federal government that --

21   when we put up against state funds, that we get in

22   return for our state dollar.

23       Q.   And you mentioned you received an

24   additional 6.2.

25       A.   Mm-hmm.

**JA1474**

## DEPOSITION OF BECKY MANNING

Page 45

1    Q.  Was that $6.2 billion or million?

2    A.  It is -- I'm sorry.  It's 6.2 percent --

3    Q.  Okay.

4    A.  -- in addition to our current percentage of

5  74.18 percent.

6    Q.  Okay.  Got it.

7    Does the State of West Virginia perform any

8  audits on the DHHR BMS system?

9    A.  Yes.  We are audited by the single audit

10  and the consolidated -- it's known as the CAFR,

11  when they consolidate the audited financial

12  statements.

13    Q.  And if --

14    A.  We are considered a major -- major program.

15  So they do look at the Medicaid program in depth.

16    Q.  In exchange for state funding, does BMS

17  agree to any conditions?

18    A.  We agreed to provide healthcare, you know,

19  to -- to handle funds appropriately, to make the

20  maximum use of federal dollar.  We have federal

21  guidelines that we must follow.  We agree to follow

22  those.

23    Q.  Does the State of West Virginia impose any

24  kind of nondiscrimination obligations on BMS

25  related to the state funding of West Virginia

**DEPOSITION OF BECKY MANNING**

Page 46

1 Medicaid?

2    A.    That would not be my area of expertise.

3    Q.    Do you know whether West Virginia Medicaid

4 makes any other types of representations that we

5 haven't discussed already to receive state funding?

6    A.    Not that I'm aware of.

7    Q.    Okay.  I'm going to ask us to turn back to

8 the first exhibit, BM0001, which is Plaintiffs'

9 Second Amended Notice of 30(b)(6) Deposition.  If

10 you could pull that up, Ms. Manning, and scroll

11 down to page 4 for me and then let me know when

12 you're there.

13    A.    Okay.  I'm here.

14    Q.    Do you see Topic 11 at the top of the page?

15    A.    I do.

16    Q.    Topic 11 reads, "Any government interests

17 that you contend support the exclusion and their

18 factual bases."

19         Did I read that correctly?

20    A.    Yes, ma'am.

21    Q.    Can you confirm that you are prepared to

22 discuss this topic as the organizational

23 representative for BMS?

24    A.    I am.

25    Q.    Do you know what a governmental interest is

**JA1476**

## DEPOSITION OF BECKY MANNING

Page 47

1  for purposes of this deposition?

2      A.    I do.

3      Q.    What's your understanding of what a

4  governmental interest means?

5      A.    It is my understanding that governmental

6  interest is the fact that we pay for services as a

7  state agency.

8      Q.    So maybe I'm getting a little bit confused,

9  but you just testified that a governmental interest

10 means that you pay for services as a state agency.

11 What do you mean by that?

12     A.    We can only pay for services that we have

13 approval to pay for regardless of what we think as

14 individuals.  It's based upon the opinion -- not

15 opinion, but it's based upon what we are allowed to

16 do, based upon laws and facts, not personal views

17 and opinions.  So...

18          But we are held to the standards of, in

19 this case, CMS and the policies that we are given

20 to operate the Medicaid program.

21     Q.    In the context of Topic 11, what is a

22 governmental interest?

23          MS. BANDY:  I'll just object to the

24 fact that she's already answered that question.

25          But you can go ahead and answer.

**JA1477**

**DEPOSITION OF BECKY MANNING**

1    BY MS. SCHLADT:

2        Q.    Let me ask a different question.  Is it

3    fair to say that in the context of this topic, a

4    governmental interest is a reason?

5        A.    Like when I think of governmental interest,

6    I think of being a good steward with taxpayer

7    dollars, following rules, law and policy that have

8    been set before me.

9        Q.    So here, if we're looking at Topic 11, and

10   it states, as we already went over, "Any government

11   interests that you contend support the exclusion

12   and their factual bases," would you agree that that

13   topic would read similarly, if not the same, if we

14   replaced "government interest" with "reason"?  So

15   that it read, "Any reason that you contend support

16   the exclusion and their factual bases"?

17            MS. BANDY:  Let me just object to the

18   form of the question.  And also to the extent that

19   Commissioner Beane was also designated as a witness

20   on this topic, as well, and has already provided

21   testimony on this topic, but -- just --

22            But you can answer.

23       A.    Yes.  You could use "reason."  "Any

24   reason."

25       Q.    And would you agree with me that there are

**JA1478**

## DEPOSITION OF BECKY MANNING

Page 49

1    reasons for covering or not covering a service that

2    West Virginia Medicaid could cover?

3        A.    From a financial standpoint.

4        Q.    So you're -- oh, go ahead.

5        A.    The reason that I might look at those

6    reasons and the reasons that someone else might

7    look at that are different.  I'll look at that

8    from, Can we afford it?  I think it's other

9    people's responsibility to determine:  Is that

10   within the scope?  Is that within policy?  Is that

11   within CMS guidelines?

12           It is my responsibility to say, if we do

13   this, can we afford this?  Is it something that we

14   can support in an ongoing basis?  What does this do

15   to our budget as a Medicaid agency?

16       Q.    Okay.  So --

17       A.    Because --

18       Q.    Oh, go ahead.

19       A.    One of the things that you have to contend

20   when you ask CMS for a service, to cover a service,

21   is that you have the funding.

22       Q.    Okay.  I'm going to pull up another

23   document so give me just a second to do that.  I'm

24   going to mark this document as Exhibit BM0003.

25       A.    Okay.

## DEPOSITION OF BECKY MANNING

```
                                        Page 50
 1      Q.   And it should be popping up in your folder
 2   shortly.
 3              (Exhibit 3 was marked for
 4              identification.)
 5      A.   Okay.  I have it.
 6      Q.   This document is titled Defendants'
 7   Response to Plaintiff's First Set of
 8   Interrogatories to Defendants William Crouch,
 9   Cynthia Beane, and West Virginia Department of
10   Health and Human Resources, Bureau for Medical
11   Services.
12              Did I read that correctly?
13      A.   Yes.
14      Q.   Please take a moment to review this
15   document and let me know when you're ready to move
16   on.  I've got a couple questions about it.
17      A.   (Reviewing document.)
18      Q.   Also, I'm realizing now it's a fairly long
19   document and so to the extent we'll be talking
20   about it, I'm going to direct your attention to
21   page 2 and number 2.  So I'm not sure if you were
22   reviewing the full thing because that's what I
23   asked or not.
24      A.   (Reviewing document.)  Okay.  I'm ready.
25      Q.   Do you recognize this document?
```

**JA1480**

## DEPOSITION OF BECKY MANNING

Page 51

1      A.   I do.

2      Q.   Is this document a copy of Defendants'

3  Responses to Plaintiff's First Set of

4  Interrogatories?

5      A.   It is.

6      Q.   So I directed your attention to page 2

7  where you'll see text that reads as follows:

8  Number 2, "Describe in detail the factual basis for

9  each governmental interest that defendants contend

10  supports the exclusion.

11      "Response:  These defendants state that

12  they provide coverage that is mandated for coverage

13  by the Centers for Medicare and Medicaid Services

14  (CMS).  These defendants are constrained by

15  budgetary/cost considerations."

16      Did I read that text accurately?

17      A.   Yes.

18      Q.   So the second sentence there states that

19  BMS is constrained by budgetary/cost

20  considerations.  Does that response describe what

21  you were just explaining to me?

22      A.   Yes, ma'am.

23      Q.   Okay.  Do you agree with that response?

24      A.   I do.

25      Q.   As the organizational representative, can

**DEPOSITION OF BECKY MANNING**

Page 52

```
1   you describe how this governmental interest
2   supports the exclusion?
3       A.   We can't -- we cannot afford it.  At this
4   point, we will be struggling to provide for
5   services that we are already obligated to provide.
6   And by "obligated," I mean that we have -- we have
7   already committed to providing.
8       Q.   And when you say you cannot afford it, what
9   are you -- what does "it" mean?
10      A.   "It" means, like, whether it be at -- the
11  service at the current rate that we are currently
12  providing.  So in that sentence, "it" could be we
13  cannot afford the service at all, so we will no
14  longer be able to provide the service if it's
15  optional.
16           We would have to look at, will we keep
17  providing -- will Medicaid keep providing the
18  service in the future, if it's optional?  Will we
19  keep providing the service at a decreased rate by
20  the provider?  How will Medicaid maintain a
21  balanced budget in the future?
22      Q.   And so the decision whether BMS can afford
23  surgical services for gender affirming care, that
24  decision has been made for all such services,
25  right?
```

**JA1482**

## DEPOSITION OF BECKY MANNING

Page 53

1    A.    I can say that we are not adding new
2    services at this time without further appropriation
3    from our legislature.
4        Q.    And is the reason cost?
5        A.    Yes.
6        Q.    As the organizational representative, what
7    can you tell me about the factual basis for BMS's
8    reliance on budgetary or cost considerations to
9    support the exclusion?
10       A.    Okay.  We always have to look, when we are
11   providing a service, not just what it will cost in
12   the current year, but what it will cost in our
13   six-year projection, and is it something that we
14   can maintain.
15            So it's not necessarily whether we support
16   the idea or not or whether we think it would be
17   beneficial.  It's whether we can afford it from a
18   finance standpoint.
19            And I have two examples from legislative
20   session just recently.  We had two pieces of
21   legislation that normally, if, in the six-year
22   projection, we had been in a good place, it might
23   have been possible for us to say -- us being BMS --
24   to say we can absorb these costs because they are
25   minimal in our current budget.

**DEPOSITION OF BECKY MANNING**

1    And one was blood pressure cuffs for

2  individuals with uncontrolled hypertension.  We

3  looked to price this out because the department

4  wanted to be able to support this bill for health

5  of individuals.  We didn't want to -- if anything,

6  we wanted to stay neutral.

7    It is a well-known fact at the legislature:

8  If you attach a high cost to a fiscal note, that it

9  could be perceived that you're trying to kill the

10  bill with a fiscal note, especially if it's

11  something that in the past you might have said or

12  they perceived that you could cover within your own

13  budget.

14    So our hope was to stay budget neutral, but

15  it was not possible.  Even pricing the budget --

16  pricing out the blood pressure cuffs at the lowest

17  price, assuming that we found a vendor that could

18  provide blood pressure cuffs at $40, which was the

19  lowest price we found, and we limited our

20  population to only members who we felt, based upon

21  their condition, was uncontrollable.

22    That it wasn't temporary, it wasn't -- they

23  didn't have a condition to which they -- we felt

24  that it would resolve itself, and it would come

25  back under control.

**DEPOSITION OF BECKY MANNING**

1        The bill also said that we would provide

2  training and pay for that.  It also stated that we

3  would develop a database to bring back reporting.

4  So in order to stay within a balance-neutral

5  approach, to not say we will absorb it, we support

6  it, or we'll -- you know, we want to put a high

7  cost on there because we disagree, we still had to

8  put a price, but we said we'll work with our MCOs

9  to come out with value-based agreements and other

10  workarounds because we simply just couldn't afford

11  the blood pressure cuff alone and we would only be

12  paying approximately 25 percent of the cost of the

13  blood pressure cuff, of the $40.

14     Q.   So you mentioned pricing out the blood

15  pressure cuffs.  You also said you had two

16  examples.

17     A.   Mm-hmm

18     Q.   Did the blood pressure cuffs constitute

19  both of those examples?

20     A.   No.

21     Q.   Okay.  What was the second example?

22     A.   The second example -- that legislation

23  didn't pass because it had a cost on it, and the

24  governor wanted a flat budget.  The legislature

25  realized, too, even without putting it forward,

**DEPOSITION OF BECKY MANNING**

Page 56

1    that we didn't have money.

2           The second one was they wanted to pass

3    legislation around collecting and preparing

4    pregnancy termination data.  And they needed to

5    provide an FTE in order to do that, because we

6    don't have extra FTEs in order to provide -- you

7    know, just a person to say, okay, we already had

8    someone.

9           So the proposed legislation said that we

10   would collect the data, hire an FTE, and provide

11   the software to prepare the report.

12          We already have the data.  We already have

13   software that will prepare the report.  However, we

14   could not absorb the FTE within our current budget.

15   So it would still cost us approximately $75,000 for

16   the FTE salary, which is full-time equivalent for

17   one person, and their benefits to prepare those

18   reports and present them to the Legislative

19   Oversight Committee of Health and Human Resources.

20       Q.   So it sounds like you -- in both of these

21   examples, you priced out blood pressure cuffs and

22   then you obviously have a price for the cost of an

23   FTE salary and benefits, right?

24       A.   Correct.  And we are given those

25   salaries -- like, for example, for the full-time

**JA1486**

**DEPOSITION OF BECKY MANNING**

Page 57

1    equivalent, the Department of Personnel puts out

2    the cost that we'll use for each pay grade type so

3    that's not a sub- -- you know, it's not a

4    subjective cost.  It wouldn't be what I wanted to

5    pay them.

6            So they give us the -- like the type of

7    position and then the market salary that we would

8    use for the purpose of fiscal notes and then the

9    benefit percentages.  So that way each agency

10   within state government is using apples-to-apples

11   comparisons.

12       Q.   Has BMS priced out the cost of providing

13   gender affirming care?

14       A.   I have not.  In order to do that, I would

15   need a list of codes that I would be pricing.

16       Q.   So are you saying that you personally

17   haven't researched the cost of providing gender

18   affirming care?

19       A.   Correct.

20       Q.   Do you know of anybody else at BMS who has

21   researched the cost of providing gender affirming

22   care?

23       A.   I do not.

24       Q.   If you wanted to get a list of codes

25   related to gender affirming care, could you do

**JA1487**

Page 85

1                    REPORTER'S CERTIFICATE
2

STATE OF MINNESOTA    )
3                             ) ss.
COUNTY OF HENNEPIN    )
4
          I hereby certify that I reported the remote
5    deposition of BECKY MANNING, on April 12, 2022, via
     Veritext Virtual Videoconference, and that the
6    witness was by me first duly affirmed to tell the
     whole truth;
7
          That the testimony was transcribed by me and
8    is a true record of the testimony of the witness;
9         That the cost of the original has been
     charged to the party who noticed the deposition,
10   and that all parties who ordered copies have been
     charged at the same rate for such copies;
11
          That I am not a relative or employee or
12   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;
13
          That I am not financially interested in the
14   action and have no contract with the parties,
     attorneys, or persons with an interest in the
15   action that affects or has a substantial tendency
     to affect my impartiality;
16
          That the right to read and sign the
17   deposition by the witness was preserved.
18
          WITNESS MY HAND AND SEAL THIS 20th day of
19   April, 2022.
20
21
22
23   _____
     Merilee S. Johnson, RDR, CRR, CRC, RSA
24   Notary Public, Hennepin County, Minnesota
     My commission expires January 31, 2026
25

Veritext Legal Solutions

www.veritext.com                              888-391-3376

**JA1488**

Page 88

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS

2

3      ASSIGNMENT REFERENCE NO: 5096193
       CASE NAME: Fain, Christopher Et Al. v. Crouch, William Et Al.
       DATE OF DEPOSITION: 4/12/2022

4      WITNESS' NAME: Becky Manning , 30(b)(6)

5          In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7          I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as

8  well as the reason(s) for the change(s).

9          I request that these changes be entered
   as part of the record of my testimony.

10

11         I have executed the Errata Sheet, as well
   as this Certificate, and request and authorize

   that both be appended to the transcript of my

12  testimony and be incorporated therein.

13  *May 12, 2022*          *Becky Manning, 30(b)(6)*
   Date                    Becky Manning , 30(b)(6)

14

15         Sworn to and subscribed before me, a
   Notary Public in and for the State and County,

   the referenced witness did personally appear

16  and acknowledge that:

17         They have read the transcript;
           They have listed all of their corrections

18              in the appended Errata Sheet;
           They signed the foregoing Sworn

19              Statement; and
           Their execution of this Statement is of

20              their free act and deed.

21         I have affixed my name and official seal

22  this *12th* day of *May* , 20*22*.

23         *Kimberly M. O'Brien*
           Notary Public

24         *July 28, 2026*

25  Commission Expiration Date

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Kimberly Michelle O'Brien
WV DHHR Bureau for Medical Services
350 Capitol St, Rm 251, Charleston, WV 25301
My Commission Expires July 28, 2026



Page 89

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 5096193

PAGE/LINE(S) /        CHANGE        /REASON

Pg 59 Lines 6-8    'My answer was to gender affirming surgery

Since that is what is excluded from Medicaid coverage.

Pg 73 Lines 10-15    My answer was to gender affirming surgery since

that is what is excluded from Medicaid coverage.

Pg 75 Lines 18-21    my answer was as to gender affirming surgery

Since that is what is excluded from Medicaid coverage.

Pg 75 Lines 23    My answer was as to gender affirming surgery,

since that is what is excluded from Medicaid coverage.

Pg 76 Lines 1-9    My answer was as to gender affirming surgery,

since that is what is excluded from Medicaid coverage.

Page 80 Lines 12-19    My answer was as to gender affirming services

since that is what is excluded from Medicaid coverage

Pg 81 Line 12-18    My answer was as to gender affirming services,

since that is what is excluded from Medicaid.

coverage.


May 12-2022                Becky Manning, 30(b)(6)
Date                       Becky Manning , 30(b)(6)

SUBSCRIBED AND SWORN TO BEFORE ME THIS  12th

DAY OF  May              , 20 22  .

Kimberly M O'Brien
Notary Public

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Kimberly Michelle O'Brien
WV DHHR Bureau for Medical Services
350 Capitol St, Rm 251, Charleston, WV 25301
My Commission Expires July 28, 2026

July 28, 2026
Commission Expiration Date

**JA1490**

Case 3:20-cv-00740   Document 252-12   Filed 05/31/22   Page 53 of 89 PageID #: 4788

CONFIDENTIAL

**Bureau For Medical Services**
**SFY 2022 - 2027 Expenditure Estimate**

| | | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|
| Estimated Expenditures | 4| 5,400,588,806 | 5,056,882,591 | 5,164,506,745 | 5,276,879,398 | 5,384,046,580 | 5,516,281,471 |
| State Match Required to meet estimated expenditures | 4| 869,042,890 | 1,136,419,758 | 1,167,772,034 | 1,194,000,169 | 1,221,370,898 | 1,249,948,953 |
| Total State Match available (from below) | 4| 1,232,212,052 | 1,254,302,680 | 1,039,452,205 | 1,280,318,828 | 1,076,927,428 | 1,099,252,028 |

Provider Tax Estimate:

| Fiscal Year | Total (million $) | Prov Tax | Acute Care - Provider | Acute Care - Practitioner | MCO Tax |
|---|---|---|---|---|---|
| 2022 | 306,400,000 | 229,600,000 | 35,300,000 | 6,100,000 | 44,400,000 |
| 2023 | 317,400,000 | 228,800,000 | 36,000,000 | 6,300,000 | 45,700,000 |
| 2024 | 285,700,000 | 237,300,000 | 38,000,000 | 6,600,000 | 3,800,000 |
| 2025 | 292,000,000 | 246,000,000 | 39,400,000 | 6,800,000 | |
| 2026 | 303,300,000 | 255,300,000 | 40,900,000 | 7,100,000 | |
| 2027 | 314,700,000 | 265,000,000 | 42,400,000 | 7,300,000 | |

Green cells indicate estimated figures.





Exhibit
BM0002

EXHIBIT
171

DHHRBMS021558

3/16/2022 10:21 AM

**JA1491**

CONFIDENTIAL

Bureau For Medical Services
SFY 2022 - 2027 Expenditure Estimate

FOOTNOTES

SFY2022-SFY2027

a) The provider tax estimates reflect updated information supplied by the State Tax Department in Sept 2021. The amounts above exclude the administrative portion indicated in the Budget Bill (9090/8900). Assumes eligible acute care tax continues and includes est for MCO tax through expiration. If MCO tax is extended past SFY2023, revenues would be adjusted accordingly.

b) The Medicaid Trust Fund receives approximately $38M per year in receipts from the hospitals, special revenue appropriations, and interest.

c) FMAP – FFY2022 reflects a final FMAP rate of 74.65% as published in FFIS Issue Brief which is a 0.31% decrease from FFY2021, July 2020-March 2022 qtrs reflect increased FMAP of 6.2% due to COVID-19. FFY2023 reflects a FMAP rate of 74.62% per FFIS Issue Brief (a 0.66% decrease from FFY2022). SFY2024-SFY2027 reflect flat FMAP at FFY2023 FMAP. A 0.10% change in FMAP for a $3,780,000,000 (non-expansion) budget equates to $3.78M/mo.

d) If funding for deficit amount from prior year is not received, then the deficit in the following year will be higher. (Ex. If SFY2024 showed a deficit of $227.3M. If $227.3M of funding is not received for SFY2025, then the deficit for SFY2025 will be $227.3M plus the deficit showing in SFY2025.)

e) Scenario reflects 1% inflation used for SFY2024-SFY2027. 0% for Nursing Facilities and Prescribed Drugs

Prepared: 01/10/2022

DHHRBMS021559

3/16/2022 10:21 AM

Med Svcs 2022-2027 12/21/2021 Gov Rec w/est pand inc with MCO tax extended

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL;BRIAN MCNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES,** individually and on
behalf of all others similarly situated,

**Plaintiffs,**

**Civil Action No. 3:20-cv-00740**
**Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

**Defendants.**

## DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA
## DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL
## SERVICES'S FIRST SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
## OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

### DOCUMENT REQUESTS

27.    To the extent not already produced, all Documents relating to any governmental

interest that Defendants contend supports the Exclusion of Gender-Confirming Care.

**SUPPLEMENTAL RESPONSE:   Please see the attached budget and expenditure-related**

**documents, Exhibits 60 - 85, Bates Numbers DHHRBMS002863 – DHHRBMS012160.**

1

Exhibit
BM0010

**JA1493**

29.    All contracts, letters of agreement, and other memorialization of policies, practices,

and procedures as between you and the Rational Drug Therapy Program.

**SUPPLEMENTAL RESPONSE:  Please see Exhibits 58 and 59, Bates Numbered**

**DHHRBMS002785 – DHHRBMS002862.**

> **WILLIAM CROUCH,**
> **CYNTHIA BEANE, and**
> **WEST VIRGINIA DEPARTMENT OF**
> **HEALTH AND HUMAN RESOURCES,**
> **BUREAU FOR MEDICAL SERVICES,**
>
> **By counsel**

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY MARTELL;BRIAN MCNEMAR, SHAWN ANDERSON a/k/a SHAUNTAE ANDERSON; and LEANNE JAMES,** individually and on behalf of all others similarly situated,

         **Plaintiffs,**

v.

**WILLIAM CROUCH,** in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; **CYNTHIA BEANE,** in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; **WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES; JASON HAUGHT,** in his official Capacity as Director of the West Virginia Public Employees Insurance Agency; and **THE HEALTH PLAN OF WEST VIRGINIA, INC.**

         **Defendants.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

### CERTIFICATE OF SERVICE

I, Kimberly M. Bandy, counsel for Defendants William Crouch, Cynthia Beane and West Virginia Department of Health and Human Resources, do hereby certify that on the 30th day of November, 2021, a true and exact copy of **DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES' FIRST SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS** was served on counsel via electronic means as follows:

**JA1495**

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com


Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com


Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org


Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA  90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org


Carl. S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1 West Court Square, Suite 105
Decatur, GA  30030
(404) 897-1880
(404) 506-9320 (fax)
ccharles@lamdalegal.org


Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1 West Court Square, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org


Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
*Counsel for Jason Haught*
517 9th Street, P.O. Box 1704
Huntington, WV  25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

**JA1496**

Stuart A. McMillan (WVSB#6352)
*Counsel for The Health Plan of West
Virginia, Inc.*
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV 25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
*Counsel for The Health Plan of West
Virginia, Inc.*
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV 26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
*Counsel for William Crouch, Cynthia Beane, and
West Virginia Department of Health and Human
Resources, Bureau for Medical Services*
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

Page 1

1              IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                     HUNTINGTON DIVISION

3    _____

4    CHRISTOPHER FAIN, individually
     and on behalf of all others
     similarly situation, et al.,

5
                        Plaintiffs,
6
     vs.                          CIVIL NO. 3:20-cv-000740
7
     WILLIAM CROUCH, et al.,
8
                        Defendants.
9    _____

10

11

12             VIDEOCONFERENCE DEPOSITION OF
13                   JENNIFER MYERS
14         30(b)(6) Representative for Defendant
15    West Virginia Department of Health and Human Resources,
16               Bureau for Medical Services

17

18   DATE:   April 8, 2022
19   TIME:   7:58 a.m.
20   PLACE:  Charleston, West Virginia
21   (via videoconference)
22   JOB NO.:  MW 5096186

23

24

25   REPORTED BY: Dawn Workman Bounds, CSR

```
                                                    Page 2
 1                  A P P E A R A N C E S
 2             (ALL APPEARANCES VIA VIDEOCONFERENCE)
 3    ON BEHALF OF PLAINTIFFS:
 4         ANNA P. PRAKASH, ESQUIRE
           NICOLE J. SCHLADT, ESQUIRE
 5         Nichols Kaster, PLLP
           IDS Center, 80 South 8th Street
 6         Suite 4700
           Minneapolis, MN  55402
 7         612.256.3200
           aprakash@nka.com
 8         nschladt@nka.com
 9         AVATARA SMITH-CARRINGTON, ESQUIRE
           Lambda Legal Defense and Education Fund, Inc.
10         3500 Oak Lawn Avenue, Suite 500
           Dallas, Texas 75219
11         214.219.8585
           asmithcarrington@lambdalegal.org
12
           TARA L. BORELLI, ESQUIRE
13         Lambda Legal Defense and Education Fund, inc.
           158 West Ponce De Leon Avenue, Suite 105
14         Decatur, GA  30030
           470.225.5341
15         tborelli@lambdalegal.org.
16
           WALT AUVIL, ESQ.
17         The Employment Law Center, PLLC
           1208 Market Street
18         Parkersburg, West Virginia 26101
           304.485.3058
19         auvil@theemploymentlawcenter.com
20
21
22
23
24
25    (APPEARANCES CONTINUED ON NEXT PAGE)
```

**JA1499**

```
                                                    Page 3
 1    ON BEHALF OF DEFENDANTS WILLIAM CROUCH; CYNTHIA BEANE;
      and WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
 2    RESOURCES, BUREAU FOR MEDICAL SERVICES:
 3          KIMBERLY M. BANDY, ESQUIRE
            LOU ANN S. CYRUS, ESQUIRE
 4          Shuman McCuskey Slicer PLLC
            1411 Virginia Street East
 5          Suite 200 (25301)
            P.O. Box 3953
 6          Charleston, WV  25339-3953
            304.345.1400
 7          kbandy@shumanlaw.com
            lcyrus@shumanlaw.com
 8
 9
10
11
      NOTE: The original deposition transcript will be
12          delivered to Anna P. Prakash, Esq., as the taking
            attorney.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**JA1500**

**DEPOSITION OF JENNIFER MYERS**

Page 16

1    Q.   Any other way that you know of?

2    A.   There is a list that a provider can sign up for

3    to be personally -- personal e-mail to their e-mail

4    address if an update is done.

5    Q.   Okay.  And at the bottom of that page that

6    we're on, which is 199, there's a date.  It says revised

7    1-15-2016.

8         Do you know if there have been revisions

9    since that date?

10   A.   There have not.

11   Q.   Okay.  Could you scroll down to the next page

12   on covered services, and because there have not been

13   updates, I assume that that section is still accurate.

14   Is it?

15   A.   Yes.

16   Q.   And then the same for the prior authorization

17   section that starts at the bottom of that page and goes

18   into the next page, that is still accurate, right?

19   A.   Yes.

20   Q.   And then finally the noncovered services, which

21   are at the bottom of page 201, that is still accurate,

22   correct?

23   A.   Yes.

24   Q.   Okay.  On page 201, in the middle, there's a

25   note that says, "Mastectomy or related covered

**JA1501**

## DEPOSITION OF JENNIFER MYERS

1  reconstructive procedures will not require prior

2  authorization for individuals diagnosed with breast

3  cancer."

4              Do you see that?

5    A.  Yes.

6    Q.  Are there -- what are the other covered

7  reconstructive procedures that it is referring to here?

8    A.  I can't answer that.

9    Q.  Okay.  Do you know --

10    A.  That would be -- that would be a medical

11  decision, a medical, and that's just not within my

12  purview.

13    Q.  Okay.  And do you know whether mastectomy or

14  related covered procedures are covered for any reason

15  other than breast cancer?

16    A.  Not -- no, I do not know.

17    Q.  Okay.  Who would know that?

18    A.  Can you restate the question one more time?

19    Q.  Sure.  My question was whether mastectomy or

20  related reconstructive procedures are covered for any

21  reason other than breast cancer?

22    A.  It would -- a request would have to go through

23  the UM vendor, which is the utilization management vendor

24  which is Kepro.  They have a list they could review for

25  medical necessity to determine if that would be covered

**DEPOSITION OF JENNIFER MYERS**

Page 18

1    or not under our policy.

2       Q.   And does Kepro utilize guidelines from

3    InterQual?

4       A.   Yes.

5       Q.   So to the extent there are InterQual guidelines

6    that allow for mastectomy or other reconstructive

7    procedures, Kepro would be following those to determine

8    medical necessity?

9       A.   Yes.

10      Q.   But I understand that -- that surgical care for

11   the treatment of gender dysphoria is a noncovered

12   service; is that right?

13      A.   Yes, that's right.

14      Q.   Okay.  All right.  You can exit out of that

15   document.

16              (Exhibit No. 3 marked.)

17   BY MS. PRAKASH:

18      Q.   And I'm going to introduce another one, since

19   you're designated to talk about written responses, so

20   we're going to have a lot of exhibits to look through.

21              Sometimes it takes a little while for the

22   documents to load.  Thanks for your patience.  Okay.

23              So in the marked exhibits folder, you

24   should see Exhibit JM3.  Could you let me know when you

25   have that open, please?

**JA1503**

# DEPOSITION OF JENNIFER MYERS

1      A.    I have it open.

2      Q.    Okay.  And so these are BMS and William Crouch

3  and Cynthia Beane's First Supplemental Response to

4  Plaintiff's Second Set of Interrogatories; is that right?

5      A.    Yes.

6      Q.    Okay.  And Interrogatory 8 which starts on that

7  first page asks about conditions, diagnostic codes, or

8  instances where coverage for hysterectomies or

9  oophorectomies are available through Medicaid, including

10  diagnostic codes, procedure codes, and medical necessity.

11            Is that your understanding?

12      A.    Yes.

13      Q.    Then if you scroll to the second page, the

14  supplemental response says:  Without waiving any

15  objection, see Exhibits 10 through 26, Bates Numbered

16  DHHRBMS001009 through DHHRBMS001112, which are used as

17  part of the review process.

18            Do you see that?

19      A.    Yes.

20      Q.    Okay.  So if you scroll down, I have attached

21  the documents that correspond with those Bates numbers.

22  And I believe they start on page 6 of the pdf or -- 6 or

23  7 of the pdf.

24            So let me know when you're there.  The

25  top, just so -- well, actually the bottom number says

**DEPOSITION OF JENNIFER MYERS**

Page 20

1    DHHRBMS001009.

2         A.   I'm there.

3         Q.   Okay.  Great.

4              So is this an example of the InterQual

5    guidelines that Kepro would use to determine medical

6    necessity?

7         A.   Yes.

8         Q.   Okay.  I want to walk through this first one

9    just to better understand it.

10             So at the top it has a trademark that says

11   InterQual.  Can you tell me what InterQual is?

12        A.   InterQual is a nationally recognized UM

13   software, which is utilization management software, that

14   is -- can be purchased/leased to be used to determine

15   medical necessity.

16        Q.   And does BMS purchase that software?

17        A.   No.  It's purchased by the UM vendor Kepro.

18        Q.   Okay.  And Kepro has a contract with BMS,

19   correct?

20        A.   Yes.

21        Q.   Okay.  And then it says, "October 2021 Release

22   CP: Procedures" at the top.

23             I understand that to mean that these

24   guidelines were issued in October of 2021; is that

25   right?

## DEPOSITION OF JENNIFER MYERS

Page 21

1     A.   Yes.

2     Q.   Okay.  And do you know what CP procedures

3  means?

4     A.   No.

5     Q.   Okay.  And then the requested service lists

6  hysterectomy and a few other procedures, correct?

7     A.   Yes.

8     Q.   Okay.  Do you know how Kepro -- well, do you

9  know whether Kepro, fills out forms like this, whether in

10  paper or online or just refers to them?

11     A.   I do not know that.

12     Q.   Okay.  And then halfway down the page, it

13  references ICD-10 and CPT.

14          Do you know what those references are to?

15     A.   Yes.

16     Q.   Okay.  And what are they references to?

17     A.   ICD-10 is a diagnosis code and CPT is the

18  procedure code.

19     Q.   Okay.  And does BMS utilize those specific

20  codes with respect to insurance coverage determinations?

21     A.   Yes.

22     Q.   Okay.  And then a little further down the page

23  there are instructions.  And it looks like it's basically

24  asking the reader to choose which -- to answer those

25  questions to determine medical necessity; is that right?

**JA1506**

## DEPOSITION OF JENNIFER MYERS

1     A.   That's my understanding.

2     Q.   Okay.  And does anybody at BMS go over these

3  with Kepro, or is it entirely left to Kepro?

4     A.   It's entirely left to Kepro.

5     Q.   Okay.  And is there somebody at BMS that's in

6  charge of overseeing Kepro to make sure that they're

7  following these guidelines correctly?

8     A.   Yes, that would be all of the supervisors at

9  BMS.

10    Q.   And which department are those supervisors in?

11    A.   We -- medical would fall under Sarah Young.

12    Q.   Okay.  And how many supervisors are there that

13  fall into that category?

14    A.   Approximately seven.

15    Q.   Okay.  And do you know their names?

16    A.   Yes.

17    Q.   Could you list them out, please?

18    A.   Okay.  Jennifer Myers, Cynthia Parsons, Randy

19  Hill, Brian Thompson, Brandon Lewis.

20    Q.   Is that seven?  I wasn't keeping track.

21    A.   No, I think that's five.

22    Q.   Okay.  If you remember the others, will you

23  tell me when they come to you?

24    A.   Yes.

25    Q.   Okay.  And you listed yourself, right?

## DEPOSITION OF JENNIFER MYERS

Page 23

1      A.   Yes.

2      Q.   So can you tell me what you do to oversee Kepro

3  to make sure they're following these guidelines

4  correctly?

5      A.   I review monthly reports that are -- they're

6  actually summary reports.  And then if requested, I will

7  request -- I will request additional information from

8  them to dig down deeper into reviews.

9      Q.   And when you say "if requested," who makes the

10  request?

11      A.   I request through Kepro.

12      Q.   I see.  And what would cause you to make a

13  request?

14      A.   Usually it would be led by either a provider

15  inquiry that would make me question something, or an

16  inquiry from our fiscal processor which is at this time

17  Gainwell.  If they see -- sometimes they may bring

18  something to my attention that they think is possibly

19  incorrect.

20      Q.   And has that ever happened in either of those

21  instances with respect to insurance cover -- coverage for

22  gender-confirming care?

23      A.   No.

24      Q.   Okay.  Can you keep scrolling, please, to the

25  next page.  At the top it says notes and then there's a

**JA1508**

## DEPOSITION OF JENNIFER MYERS

Page 24

1  numbered list of paragraphs?

2      A.   Yes, I'm there.

3      Q.   Okay.  So just for the record, I'm on page

4  DHHRBMS001011.

5          And could you please take a minute to read

6  to yourself that first paragraph, and just let me know

7  when you're ready to talk about it.

8      A.   Okay, I'm finished.

9      Q.   Thank you.  That third sentence in that

10 paragraph says, "At the individual patient level, a

11 variety of factors, including, but not limited to, gender

12 identity and gender affirmation via surgery or hormonal

13 manipulation, may affect the applicability of some

14 InterQual criteria."

15         Do you know how those factors affect the

16 applicability of InterQual criteria?

17     A.   No.

18     Q.   And is that something that anybody at BMS would

19 know?

20     A.   No, I don't believe so.

21     Q.   And is that something someone at Kepro would

22 know?

23     A.   Possibly.

24     Q.   And if somebody at Kepro were to know that,

25 what do you think that person's job title would be?

**JA1509**

# DEPOSITION OF JENNIFER MYERS

Page 25

1      A.   Clinical reviewer.

2      Q.   Okay.  And are there specific clinical

3  reviewers that you work with?

4      A.   No.

5      Q.   Approximately how many clinical reviewers does

6  BMS work with at Kepro?

7      A.   I'm not -- I don't know.

8      Q.   Okay.  And in your oversight of Kepro's

9  application of the InterQual guidelines, have you ever

10  had reason to question or ask whether Kepro is taking

11  into account the information in Note 1 here?

12      A.   No.

13      Q.   Okay.  And then there are several, several -

14  more than a hundred - more pages, and they -- they're --

15  they encompass the Bates range or the page number range

16  that defendants identified in their written response,

17  which, again, is 1009 through 1112.

18          And you are welcome to scroll through

19  these, but I understand that all of these are InterQual

20  guidelines that Kepro would utilize.

21          And my question to you is going to be:  Is

22  that your understanding?  And you can take as much time

23  as you want to answer.

24      A.   Yes, that is my understanding also.

25      Q.   All right.  Thank you.

**JA1510**

## DEPOSITION OF JENNIFER MYERS

Page 26

1          And then do you know whether InterQual has

2     guidelines for similar procedures as those identified

3     here with respect to hysterectomy and oophorectomy that

4     are used for the treatment of gender dysphoria?

5          A.    I believe that they do.

6          Q.    Okay.  And in its work for BMS, does Kepro

7     utilize those guidelines?

8          A.    No.

9          Q.    And why is that?

10         A.    Because it's not a covered service under BMS.

11         Q.    Okay.  All right.  You can exit out of that

12     document.

13              And just back on the question of

14     InterQual, the guidelines whether or not key point --

15     sorry -- Kepro utilizes them are meant to determine

16     medical necessity, right?

17         A.    Yes.

18         Q.    Okay.  So I'm going to introduce another

19     exhibit.

20              (Exhibit No. 4 marked.)

21     BY MS. PRAKASH:

22         Q.    So it should appear in the marked folder as

23     JM4.

24         A.    I have it open.

25         Q.    Great.  So these are Defendants' Second

**JA1511**

## DEPOSITION OF JENNIFER MYERS

Page 27

1    Supplemental Response to Plaintiffs' Second Set of

2    Interrogatories to Defendants Crouch, Beane, and BMS.

3              Do you agree with me on that?

4         A.   Yes.

5         Q.   Okay.  So Interrogatory 8 we already -- we just

6    talked about with respect to the last exhibit.

7              But this one has a supplemental response.

8    So if you scroll down to the second page, there is a list

9    of diagnostic codes.  Do you see that?

10        A.   Yes.

11        Q.   Okay.  So in the response itself it says,

12   "Below is a sample listing of the approved diagnoses

13   since 2016."  And then it goes on.

14             But can you tell me what sample listing

15   means in this context?

16        A.   Yes.  This would not be an all-inclusive list.

17        Q.   Okay.  Do you know what is missing or how it

18   was determined that certain things would be excluded?

19        A.   There wasn't actually anything excluded.

20   What -- there was no good way to come up with a list of

21   approved diagnoses because a lot of it is determined by

22   medical history, previous treatment, the severity and the

23   combination of other symptoms and conditions.

24             So what I did to get this list is take the

25   procedure codes, put them in the system at Gainwell to

## DEPOSITION OF JENNIFER MYERS

Page 28

1    run a report for any diagnosis that we had on file that

2    was approved for the procedures.

3        Q.   I see.  And so these codes that appear on page

4    2 of this exhibit are codes -- diagnostic codes for which

5    a corresponding procedure was approved by BMS; is that

6    right?

7        A.   Yes.

8        Q.   Okay.  And do you know where these codes come

9    from?  Like is there a universal system or are they

10   specific to BMS?  Could you just help me out with that?

11       A.   No, there's a universal system and it's the

12   ICD-10 codes, and it's used around the world.

13       Q.   Okay.  And then if you scroll to the third

14   page, procedure codes are listed there starting with CPT.

15               What does CPT mean?

16       A.   I don't know.

17       Q.   Okay.  And then how did BMS determine that

18   these are the procedure codes that are responsive to the

19   request?

20       A.   CPT is also a universally known coding system,

21   and we -- BMS utilizes the Optimum software for coding;

22   and it's basically an online version where you can put in

23   the name of a procedure, and it will tell you the

24   corresponding CPT codes for that procedure.

25       Q.   Okay.  And so in this instance in responding to

**JA1513**

**DEPOSITION OF JENNIFER MYERS**

Page 29

1   this request, you would have put in hysterectomy and

2   oophorectomy, right?

3       A.   Yes.

4       Q.   Great.  And then none of the codes that are on

5   page 2 for diagnoses would be for gender dysphoria,

6   right?

7       A.   Correct.

8       Q.   Okay.  And let's see...

9            Part C on page 3 talks about medical

10  necessity.

11           How does BMS determine what needs prior

12  authorization versus what is just automatically covered?

13      A.   Most surgeries -- any inpatient surgery needs

14  prior authorization.  Outpatient surgeries are

15  determine -- director --

16           THE REPORTER:  I didn't hear the whole --

17  the end of the answer.

18  BY MS. PRAKASH:

19      Q.   Could you just start that answer again, please.

20      A.   Sure.  Basically everything goes through the

21  medical director and he determines if a PA is required or

22  not.

23      Q.   Is that the medical director at BMS?

24      A.   Yes.

25      Q.   And -- but -- but that determination is not

**JA1514**

## DEPOSITION OF JENNIFER MYERS

Page 30

1    made each time that there is an outpatient surgery,

2    right?

3         A.    No.    The medical director will determine the --

4    if -- based on the code, not based on the patient.

5         Q.    I see.

6         A.    So -- okay.

7         Q.    So -- so that sounds like a one-time

8    determination, though, because the codes don't change; is

9    that right?

10        A.    It can be, unless a provider requests a review,

11   then it will go back to the medical director with

12   whatever information they submit with it that they

13   consider it to be -- not need a PA.  So it can be

14   reviewed additionally.

15        Q.    Got it.  So if you keep scrolling down,

16   Interrogatory 9 asks the same questions but with respect

17   to vaginoplasty.  Do you see that?

18        A.    Yes.

19        Q.    And then the supplemental response about

20   diagnostic codes says:  We have no claims or approvals

21   for this service?

22               What does that mean?

23        A.    I used the same procedure for each of the

24   different procedures to get the diagnostic codes, but we

25   don't have any -- we, as in Medicaid, do not have any

**JA1515**

**DEPOSITION OF JENNIFER MYERS**

Page 31

```
 1   claims or requests for those codes, at least since 2016,
 2   which is as far back as I went.
 3        Q.   And when you say you have no claims or
 4   approvals, that includes denials, right?
 5        A.   Correct.
 6        Q.   So there have been no denials or approvals?
 7        A.   Correct, yes.
 8        Q.   Got it.
 9             Okay.  And then I have, if you scroll down
10   to page 10 -- sorry -- Interrogatory 10 on page 4, it
11   asks the same questions with respect to different
12   procedures, right?
13        A.   Yes.
14        Q.   And the same process for coming up with these
15   responses that you testified to with respect to the
16   previous two interrogatories was used with respect to
17   Interrogatory 10, right?
18        A.   Yes.
19        Q.   Thank you.  Okay.  Back out of that document.
20             (Nicole Schladt enters the Zoom room.)
21        Q.   Okay.  If you refresh the marked exhibits
22   folder, JM5 should be in there now.
23             (Exhibit No. 5 marked.)
24        A.   Okay.  I'm in.
25   BY MS. PRAKASH:
```

**JA1516**

**DEPOSITION OF JENNIFER MYERS**

Page 32

```
 1       Q.   Okay.  And this says Defendants' Response to
 2   Plaintiffs' Second Set of Interrogatories to Defendants'
 3   Crouch, Beane, and BMS.
 4             Is that what you understand this to be?
 5       A.   Yes.
 6       Q.   So I'd like you to scroll down to page 3 which
 7   is Interrogatory 11.  It starts at the bottom of that
 8   page.
 9       A.   Okay.  I'm there.
10       Q.   Okay.  And so this asks to identify the number
11   of health plan participants who have submitted one or
12   more claims with a diagnosis code for gender dysphoria or
13   gender incongruence, and then lists those specific
14   diagnoses that are included in this request.
15             The response says upon information and
16   belief, and then on page 4 lists numbers per year.
17             Do you know why the response starts with
18   upon information and belief?
19       A.   No.
20       Q.   And do you have any doubt that these numbers
21   are accurate?
22       A.   I do not.
23       Q.   Okay.  And do you know where these numbers were
24   pulled from?
25       A.   I pulled the numbers from the Gainwell system.
```

**JA1517**

**DEPOSITION OF JENNIFER MYERS**

Page 33

```
 1        Q.   Okay.  And how did you go about doing that?
 2        A.   I ran a report for all claims with the listed
 3   diagnosis codes that were listed in the number 11, and
 4   then I excluded duplicate members and just used the
 5   unique number of members for each year.
 6        Q.   Okay.  If you could answer one more question
 7   about this.
 8             Are these numbers all approved claims, or
 9   all claims, whether they were approved or denied, or
10   how -- what do these numbers represent?
11        A.   They are all claims approved or denied.
12        Q.   Okay.  If you wanted to, you would be able to
13   use the system to separate out the numbers of denied
14   versus approved claims, right?
15        A.   I could separate it out for the fee-for-service
16   claims.
17        Q.   Okay.  And what about the claims that fall
18   under managed care?
19        A.   That would need to be requested from the
20   managed care company.
21        Q.   Okay.  Why is it that BMS doesn't have access
22   to that?
23        A.   We -- I don't know why we don't have access to
24   their systems.
25        Q.   Okay.  But you would agree with me that none of
```

**JA1518**

## DEPOSITION OF JENNIFER MYERS

Page 34

1    the numbers listed here represent approvals for surgical

2    procedures, right?

3        A.    I can't guarantee that.

4        Q.    Well, are you aware of any instance in which

5    surgical procedures have been approved for any of the

6    diagnoses listed in Interrogatory 11?

7        A.    Can you repeat the question?

8        Q.    Are you aware of any instance in which surgical

9    procedures have been approved for any of the diagnoses in

10   Interrogatory 11?

11       A.    No, I'm not aware of any.

12       Q.    Okay.  And so it's fair to say that the numbers

13   that are listed in response to Interrogatory 11 do not

14   include approvals for surgical care, right?

15       A.    Again, I can't guarantee that.

16       Q.    Why can't you?

17       A.    Can I explain?

18       Q.    Yes.

19       A.    Okay.  When the report was pulled, it was

20   pulled based on the diagnosis code, in the diagnosis code

21   that was billed on the claim.

22            A diagnosis -- one of the diagnosis codes

23   listed in number 11 could be on the claim, but not be

24   actually completely related to the service.  So I can't

25   guarantee that there was not a claim that was submitted

**JA1519**

## DEPOSITION OF JENNIFER MYERS

Page 35

1  for surgery, any type of surgery, that had a diagnosis of

2  gender dysphoria as a diagnosis that was not the primary

3  diagnosis.

4      Q.   I see.  Okay.  So it may be that surgery was

5  approved for a diagnoses that is not listed in

6  Interrogatory 11, but the patient had that diagnosis in

7  addition to something else?

8      A.   Correct.

9      Q.   Got it.  Okay.  Thank you.  You can exit out of

10  that document.

11           Okay.  If you refresh the marked exhibits

12  folder, you should have JM6 in there.  Just let me know

13  when you've got that open.

14           (Exhibit No. 6 marked.)

15      A.   Okay.  It's open.

16  BY MS. PRAKASH:

17      Q.   This is -- it looks like the third supplement

18  response.  It's just some of the interrogatories that

19  we've been looking at, specifically Interrogatory 11,

20  right?

21      A.   Yes.

22      Q.   And then on the second page of this document,

23  it refers us to an e-mail from Aetna and two attachments,

24  right, in the supplemental response?

25      A.   Yes.

**JA1520**

## DEPOSITION OF JENNIFER MYERS

Page 60

1      A.   Yes.

2      Q.   Okay.  And with respect to medical necessity

3   criteria for the services that are listed in number 10,

4   those criteria would be reflected in the InterQual

5   guidelines that Kepro uses in its work for BMS, right?

6      A.   Yes.

7      Q.   And I think you testified earlier that Kepro

8   doesn't utilize the guidelines for the diagnosis of

9   gender-affirming care with respect to surgical services;

10  is that right?

11     A.   Correct, yes.

12     Q.   Okay.  And then if you bear with me, I will

13  introduce the next written response.

14          (Exhibit No. 12 marked.)

15  BY MS. PRAKASH:

16     Q.   It's a little bit larger, so it's taking some

17  time.  Okay.  It should appear in the marked exhibits

18  folder now as JM12.

19     A.   I have it.

20     Q.   Great.  And this, at least the beginning of it,

21  appears to be Defendants' Third Supplemental Response to

22  Plaintiffs' First Set of Requests for Production.

23          Do you agree?

24     A.   Yes.

25     Q.   Okay.  And if you go to number 10, which is on

JA1521

## DEPOSITION OF JENNIFER MYERS

Page 61

1   the second page of that document, we just looked at that

2   specific request, but this is a supplemental response.

3               And that supplemental response references

4   Bates numbers DHHRBMS001009 through BMS -- sorry --

5   through DHHRBMS001112 as well as another set of Bates

6   numbers which is DHHRBMS002754 through 2784.

7               Do you see that?

8       A.   Yes.

9       Q.   Okay.  And the first set 1009 through 1112 were

10  the InterQual guidelines that we looked at earlier.

11              So I have attached those to this exhibit,

12  but I would like to go to the second set of Bates numbers

13  that start with 2754, and I believe that's page 110 of

14  the pdf.

15              I know that requires a lot of scrolling.

16  Just let me know when you're there.

17      A.   Okay.  Okay, I'm there.

18      Q.   Okay.  Are these -- well, so on this first

19  page, 2754, these are also InterQual guidelines, correct?

20      A.   Yes.

21      Q.   And these would be utilized by Kepro for BMS,

22  correct?

23      A.   Yes.

24      Q.   Okay.  And they would be utilized in the same

25  way that we discussed with respect to the first set of

**JA1522**

**DEPOSITION OF JENNIFER MYERS**

Page 62

1    InterQual guidelines that we looked at earlier; is that

2    right?

3        A.   Yes.

4        Q.   And just so I'm clear - and you can take as

5    much time as you need - the remainder of this exhibit

6    that goes all the way through page 2784 are InterQual

7    guidelines that Kepro would utilize in its work for BMS?

8             And just a yes or no on that is fine.  And

9    take some time to scroll through so that you're sure.

10       A.   Yes.

11       Q.   Okay.  So please exit out of that.  And I will

12   introduce another exhibit.

13            (Exhibit No. 13 marked.)

14   BY MS. PRAKASH:

15       Q.   In the marked  exhibits folder, Exhibit JM13

16   should appear.  Please let me know when you've got that.

17       A.   Yes, I have it up.

18       Q.   Okay.  So this is an e-mail that was sent to

19   you as well as a couple people at Kepro, right?

20            Just for --

21       A.   Yes.  Yes.

22       Q.   And for the record, the Bates number on this

23   document is DHHRBMS015365 through 391.

24            And it looks like the e-mail came from

25   Karen Wilkinson.  Who is that?

**JA1523**

# DEPOSITION OF JENNIFER MYERS

Page 63

1      A.   She is a team leader at Kepro.

2      Q.   Okay.  And it looks like -- and you can scroll

3  down and look -- that she is -- actually, let's do this.

4           Can we scroll to page 15367, which should

5  be the third page of that exhibit.

6      A.   I'm there.

7      Q.   Okay.  And partway near the top of the page but

8  partway down starts an e-mail from you to Emily Proctor,

9  Karen Wilkinson and Alicia Perry at Kepro, right?

10     A.   Uh-huh.  Yes.

11     Q.   And there you're requesting criteria for

12 certain procedures, right?

13     A.   Yes.

14     Q.   Okay.  And why did you make that request?

15     A.   It was requested in the interrogatories.

16     Q.   Okay.  And so you made that request for the

17 purpose of responding to discovery in this case?

18     A.   Yes.

19     Q.   And in response, if you scroll up, it -- to the

20 very top of that exhibit, so back to the first page,

21 which is 15365, it looks like what Karen sent you, if you

22 look at the first part of that e-mail right under the

23 attachments, it looks like she sent you the InterQual

24 guidelines for gender affirmation surgery, right?

25     A.   Correct.

**DEPOSITION OF JENNIFER MYERS**

Page 64

1     Q.   If you scroll down, I've included that

2   attachment, which starts with Bates label 15368.

3                Can you let me know when you're there?

4     A.   I'm there.

5     Q.   Okay.  And from that page down, these look like

6   InterQual guidelines for gender affirmation surgery.

7                Do you agree with that?

8     A.   Yes.

9     Q.   Okay.  These are InterQual guidelines for

10  gender affirmation surgery that Kepro had, correct?

11    A.   Yes.

12    Q.   And I think you testified earlier that

13  guidelines such as these for gender affirmation surgery

14  would not be utilized by Kepro in its work for BMS,

15  right?

16    A.   Correct.

17    Q.   So do you know why Kepro had access to these

18  guidelines?

19    A.   Kepro has clients other than West Virginia

20  Medicaid.

21    Q.   I see.  Okay.

22                And the purpose of these guidelines is to

23  determine medical necessity for various procedures,

24  right?

25    A.   Yes.

**JA1525**

Page 76

```
 1                  REPORTER'S CERTIFICATE
 2   STATE  OF  MINNESOTA   )
                            ) ss.
 3   COUNTY OF  HENNEPIN    )
 4        I hereby certify that I remotely reported the
     videoconference deposition via Zoom of JENNIFER MYERS
 5   30(b)(6) Representative for Defendant West Virginia
     Department of Health and Human Resources, Bureau for
 6   Medical Services on the 8th day of April, 2022, in
     Charleston, West Virginia, and that the witness was by me
 7   first duly sworn to tell the whole truth;
 8        That the testimony was transcribed by me and is
     a true record of the testimony of the witness;
 9
          That the cost of the original has been charged
10   to the party who noticed the deposition, and that all
     parties who ordered copies have been charged at the same
11   rate for such copies;
12        That I am not a relative or employee or
     attorney or counsel of any of the parties, or a relative
13   or employee of such attorney or counsel;
14        That I am not financially interested in the
     action and have no contract with the parties, attorneys,
15   or persons with an interest in the action that affects or
     has a substantial tendency to affect my impartiality;
16
          That the right to read and sign the deposition
17   by the witness was not waived.
18        WITNESS MY HAND AND SEAL THIS 22nd day of
     April, 2022.
19
20
21
22
23        _____
          Dawn Workman Bounds, CSR 6129
24        Notary Public, Hennepin County, Minnesota
          My commission expires January 31, 2024
25
```

**JA1526**

Page 78

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2
          ASSIGNMENT REFERENCE NO: 5096186
 3        CASE NAME: Fain, Christopher Et Al. v. Crouch, William Et Al.
          DATE OF DEPOSITION: 4/8/2022
 4        WITNESS' NAME: Jennifer Myers
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have made no changes to the testimony
     as transcribed by the court reporter.
 8
 9   Date                   Jennifer Myers
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
                Statement; and
14        Their execution of this Statement is of
                their free act and deed.
15
          I have affixed my name and official seal
16
     this 13th day of May              , 2022.
17
18   Notary Public
19
     Commission Expiration Date
20
21
22
23
24
25
```

Veritext Legal Solutions

**JA1527**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL; BRIAN MCNEMAR; SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES,** individually and on
behalf of all others similarly situated,

                **Plaintiffs,**

v.

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.,**

                **Defendants.**

**Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge**

**DEFENDANTS' THIRD SUPPLEMENTAL RESPONSE TO PLAINTIFF'S SECOND
SET OF INTERROGATORIES TO DEFENDANTS WILLIAM CROUCH, CYNTHIA
BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL SERVICES**

**INTERROGATORIES**

11.    Taking necessary steps to comply with applicable privacy laws, for each year since

2016 through the present identify the number of Health Plan participants who have submitted one

or more claims with a diagnosis code for Gender Dysphoria or Gender Incongruence.  This

**Exhibit
JM 6**

**JA1528**

includes, but is not limited to, the following diagnosis:  F64.0, Transsexualism (ICD-10-CM); F64.2, Gender identity disorder of childhood (ICD-10-CM); F64.8, Other gender identity disorders (ICD-10-CM);  F64.9,  Gender  identity  disorder,  unspecified(ICD-10-CM);  HA60,  Gender incongruence of adolescence or adulthood (ICD-11); and HA61, Gender incongruence of childhood (ICD-11).

SUPPLEMENTAL RESPONSE: Please see email from Aetna and two attachments, including a spreadsheet and a copy of Plaintiff's Second Set of Interrogatories to Defendants Williams Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services, Exhibit 106, Bates Numbered DHHRBMS016321- 16331, and Exhibit 107, Bates Numbered DHHRBMS016332.

WILLIAM CROUCH,
CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,
By counsel

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA1529**

Case 3:20-cv-00740   Document 252-14   Filed 05/31/22   Page 84 of 134 PageID #: 4914
Case 3:20-cv-00740   Document 209   Filed 02/24/22   Page 1 of 3 PageID #: 1363

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY
MARTELL; BRIAN MCNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES,** individually and on
behalf of all others similarly situated,

                **Plaintiffs,**

                                      **Civil Action No. 3:20-cv-00740**
                                      **Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

                **Defendants.**

### CERTIFICATE OF SERVICE

      Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of

Health and Human Resources, by counsel, and do hereby certify that on the 24th day of February

2022, a true and exact copy of **DEFENDANTS' THIRD SUPPLEMENTAL RESPONSE TO**

**PLAINTIFF'S SECOND SET OF INTERROGATORIES TO DEFENDANTS WILLIAM**

**CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH**

**AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES** was served on counsel

via electronic means as follows:

**JA1530**

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com


Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com


Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org


Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA  90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org


Carl. S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA  300030
(404) 897-1880
(404) 506-9320 (fax)
ccharles@lambdalegal.org


Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA  30030
tborelli@lambdalegal.org


Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
*Counsel for Jason Haught*
517 9th Street, P.O. Box 1704
Huntington, WV  25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

**JA1531**

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esq. (WVSB #6558)
Roberta F. Green, Esq. (WVSB #6598)
Caleb B. David, Esq. (WVSB #12732)
Kimberly M. Bandy, Esq. (WVSB #10081)
*Counsel for William Crouch, Cynthia Beane, and
West Virginia Department of Health and Human
Resources, Bureau for Medical Services*
SHUMAN McCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com