## NO. 22-1927

In The

# United States Court Of Appeals
### For The Fourth Circuit

**CHRISTOPHER FAIN; SHAUNTAE ANDERSON,**
**individually and on behalf of all others similarly situated,**

*Plaintiffs - Appellees,*

v.

**WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; CYNTHIA BEANE, in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, Bureau for Medical Services,**

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

———————————

**JOINT APPENDIX – Volume V of VI**
**(Pages 2129 – 2597)**

———————————

Kimberly M. Bandy
Lou Ann S. Cyrus
Caleb B. David
Roberta F. Green
SHUMAN MCCUSKEY
  SLICER PLLC
P. O. Box 3953
Charleston, WV  25339
(304) 345-1400

*Counsel for Appellants*

Tara L. Borelli
LAMBDA LEGAL DEFENSE &
  EDUCATION FUND, INC.
1 West Court Square
Suite 105
Decatur, GA  3003
(470) 225-5341

*Counsel for Appellees*

Carl S. Charles
LAMBDA LEGAL DEFENSE &
  EDUCATION FUND, INC.
120 Wall Street
Suite 105
New York, NY  10005
(404) 897-1880

*Counsel for Appellees*

Anna P. Prakash
NICHOLS KASTER, LLP
4700 IDS Center
80 South 8th Street
Minneapolis, MN  55402
(612) 256-3200

*Counsel for Appellees*

Nora W. Huppert
LAMBDA LEGAL DEFENSE &
  EDUCATION FUND, INC.
65 East Wacker Place
Suite 2000
Chicago, IL 60613
(847) 345-2094

*Counsel for Appellees*

Avatara A. Smith-Carrington
LAMBDA LEGAL DEFENSE &
  EDUCATION FUND, INC.
1776 K Street, NW
8th Floor
Washington, DC  20006
(202) 804-6245

*Counsel for Appellees*

# TABLE OF CONTENTS
## Volume I of VI

Page

**District Court Docket Sheet [3:20-cv-00740]**.................................................JA1

**Class Action Complaint**
        filed November 12, 2020 (DE1) ..........................................................JA36

**Defendants' Memorandum of Law in Support of Motion for Partial Dismissal of Plaintiffs' Class Action Complaint**
        filed January 11, 2021 (DE25).............................................................JA75

**Exhibits to**
**Motion to Dismiss**
        filed February 2, 2021 (DE32):

        **A.     Affidavit of Angela Wowczuk**
                    sworn February 2, 2021(DE32-1)....................................JA94

        **B.     Affidavit of Brian Thompson**
                    sworn February 1, 2021 (DE32-2)...................................JA98

        **C.     Affidavit of UniCare Health Plan of West Virginia, Inc.**
                    sworn January 29, 2021 (DE32-3) .................................JA100

**Memorandum Opinion and Order**
**Denying Defendant Cheatham's Motion to Dismiss the Complaint and Defendants William Crouch, Cynthia Beane, and the West Virginia Department of Health and Human Resources, Bureau for Medical Services' Motion for Partial Dismissal of Plaintiffs' Class Action Complaint and Motion to Dismiss and granting Plaintiffs' Motion for Leave to file a Sur-Reply**
        filed May 19, 2021(DE57)....................................................................JA101

First Amended Class Action Complaint
     filed October 28, 2021 (DE140) ..........................................................JA117

Defendants' Answer to Plaintiff's
First Amended Class Action Complaint
     filed November 12, 2021 (DE151)......................................................JA162

Certificate of Service for the
Expert Disclosure Report of Dan H. Karasic, M.D.
     filed January 14, 2022 (DE182)............................................................JA210

Plaintiffs' Motion for Class Certification
Pursuant to Fed. R. Civ. P. 23
With Attachments,
     filed May 31, 2022 (DE248)..................................................................JA212

     <u>Attachments</u>:

    1.    Declaration of the Employment Law Center, PLLC
         dated May 31, 2022 (DE248-1) ......................................JA215

    2.    Declaration of Nicole J. Schladt in Support of
        Plaintiffs' Motion for Class Certification,
        With Exhibit A
         dated May 31, 2022 (DE248-2) ......................................JA217

        A.    Nichols Kaster, PLLP Firm Resume (DE248-3).........JA220

**Attachments to**
**Plaintiffs' Motion for Class Certification**
**Pursuant to Fed. R. Civ. P. 23**
    **filed May 31, 2022 (DE248), Continued:**

3.    **Declaration of Avatara Smith-Carrington in Support of Plaintiffs' Motion for Class Certification, With Exhibits A – E**
    **dated May 31, 2022 (DE248-4)** ...................................... JA257

    A.    **Resume of Avatara Smith-Carrington (DE248-5)** .... JA265

    B.    **Resume of Tara L. Borelli (DE248-6)** .......................... JA268

    C.    **Resume of Carl S. Charles (DE248-7)** ......................... JA279

    D.    **Resume of Sasha J. Buchert (DE248-8)** ...................... JA281

    E.    **Resume of Nora Huppert (DE248-9)** ........................... JA282

**Plaintiffs' Motion for Summary Judgment, With Attachments,**
    **filed May 31, 2022 (DE250)** ................................................. JA284

    **Attachments:**

    A.    **Declaration of Christopher Fain**
    **sworn April 27, 2022 (DE250-1)** .................................. JA287

    B.    **Declaration of Shauntae Anderson**
    **sworn April 19, 2022 (DE250-2)** .................................. JA293

<u>Exhibits</u> to
 Plaintiffs' Motion for Summary Judgment,
        filed May 31, 2022 (DE250), Continued:

C.    Declaration of Walt Auvil,
      With Exhibits
              sworn May 31, 2022 (DE250-3) ....................................JA299

      1.    Defendants' Response to Plaintiff's
            First Set of Requests for Admissions
                  dated August 27, 2021 (DE250-4)......................JA303

      2.    Defendants' Response to Plaintiff's
            First Set of Interrogatories
                  dated August 27, 2021 (DE250-5)......................JA309

      3.    Defendants' Response to Plaintiff's
            Second Set of Interrogatories
                  dated October 25, 2021 (DE250-6) ....................JA317

      4.    Defendants' First Supplemental Response to
            Plaintiff's First Set of Interrogatories
                  dated November 30, 2021 (DE250-7) ...............JA324

      5.     Defendants' Second Supplemental Response to
            Plaintiff's Second Set of Interrogatories
                  dated November 30, 2021(DE250-8) ................JA330

     5(a).  Defendants' Ninth Supplemental Response to
            Plaintiff's First Set of Requests for Production
                  dated March 25, 2022 (DE250-9) .......................JA338

<u>Exhibits</u> to

C. **Declaration of Walt Auvil,**
        **sworn May 31, 2022 (DE250-3), Continued:**

    6.    **Redacted Excerpt of Deposition of**
        **Christopher Fain**
            **taken April 28, 2022 (DE250-10)** ........................JA346

    7.    **Excerpt of Deposition of Shauntae Anderson**
            **taken April 22, 2022 (DE250-11)** ........................JA362

    8.    **Excerpt of Deposition of Secretary Bill J. Crouch**
            **taken March 17, 2022(DE250-12)** ......................JA374

    9.    **Excerpt of Deposition of**
        **Commissioner Cynthia Beane**
            **taken March 29, 2022 (DE250-13)** ......................JA396

    10.    **Excerpt of Deposition of Dr. James Becker**
            **taken March 30, 2022 (DE250-14)** ......................JA464

    11.    **Excerpt of Deposition of Frederick Lewis**
            **taken April 14, 2022 (DE250-15)** ........................JA493

    12.    **Excerpt of Deposition of Becky Manning**
            **taken April 12, 2022 (DE250-16)** ........................JA514

    13.    **Excerpt of Deposition of Brian Thompson**
            **taken April 13, 2022 (DE250-17)** ........................JA537

    14.    **Excerpt of Deposition of Sarah Young**
            **taken March 11, 2022 (DE250-18)** ......................JA549

    15.    **Excerpt of Deposition of Dr. Dan H. Karasic, M.D.**
            **taken April 15, 2022 (DE250-19)** ........................JA580

**<u>TABLE OF CONTENTS</u>**
**Volume II of VI**

**Page**

**<u>Exhibits</u> to**
C.    **Declaration of Walt Auvil,**
          **sworn May 31, 2022 (DE250-3), Continued:**

  16.    **Expert Report of Dan H. Karasic, M.D.**
         **(public version, portions redacted)**
             **dated January 13, 2022 (DE250-20)** ...................JA591

  17.    **Expert Rebuttal Report of Dan H. Karasic, M.D.**
             **dated March 17, 2022 (DE250-21)** ......................JA645

  18.    **Excerpt of Deposition of**
         **Dr. Loren S. Schechter, M.D.**
             **taken March 28, 2022 (DE250-22)** ......................JA683

  19.    **Expert Report of Loren S. Schechter, M.D.**
             **dated January 8, 2022 (DE250-23)** ......................JA690

  20.    **Expert Rebuttal Report of**
         **Loren S. Schechter, M.D.**
             **dated March 17, 2022 (DE250-24)** ......................JA774

  21.    **Excerpt of Deposition of**
         **Dr. Johanna Olson-Kennedy, M.D., M.S.**
             **taken April 25, 2022 (DE250-25)** ........................JA867

  22.    **Expert Rebuttal Report of**
         **Dr. Johanna Olson-Kennedy, M.D., M.S.**
             **dated March 17, 2022 (DE250-26)** ......................JA872

**Exhibits** to

C.    **Declaration of Walt Auvil,**
        **sworn May 31, 2022 (DE250-3), Continued:**

23.    **Excerpt of Bureau for Medical Services**
        **Manual, Chapter 100**
            **undated (DE250-27) ..............................................JA931**

24.    **Excerpt of Bureau for Medical Services**
        **Manual, Chapter 519**
            **undated (DE250-28) ..............................................JA936**

25.    **Aetna, The Health Plan, and UniCare**
        **Composite Exhibit, Excerpted**
            **undated (DE250-29) ..............................................JA944**

26.    **InterQual Composite Exhibit**
            **dated April 2021 (DE250-30) ..............................JA967**

27.    **Bureau for Medical Services, "Medicaid 101 An**
        **Overview of West Virginia's Medicaid Program"**
            **undated (DE250-31) ...........................................JA1015**

28.    **Medicaid.gov, "Mandatory &**
        **Optional Medicaid Benefits"**
            **visited November 23, 2021 (DE250-32)...........JA1035**

29.    **Excerpt of State Fiscal Year 2021 Model Purchase**
        **of Service Provider Agreement Between**
        **West Virginia and Aetna Better Health of W.V.**
            **dated May 6, 2021 (DE250-33).........................JA1039**

vii

<u>**Exhibits**</u> **to**

C.    **Declaration of Walt Auvil,**
       **sworn May 31, 2022 (DE250-3), Continued:**

30.    **Excerpt of State Fiscal Year 2021 Model Purchase of Service Provider Agreement Between West Virginia and UniCare W.V.**
       **dated May 6, 2021 (DE250-34)** ..........................JA1043

31.    **Excerpt of State Fiscal Year 2021 Model Purchase of Service Provider Agreement between West Virginia and The Health Plan**
       **dated April 21, 2021 (DE250-35)** ......................JA1047

32.    **Email re: "[External] Gender Dysphoria Question"**
       **dated October 13, 2020 (DE250-36)** .................JA1051

33.    **Cost of Care Composite Exhibit, Excerpted**
       **dated January 2019 (DE250-37)** ........................JA1052

## <u>TABLE OF CONTENTS</u>
## Volume III of VI

Page

**Defendants' Motion for Summary Judgment,**
**With Exhibits,**

    filed May 31, 2022 (DE252) .................................................................. JA1076

<u>Exhibits:</u>

1.    **Excerpts of Deposition of Sarah Young,**
        **With Exhibits**
            taken March 11, 2022 (DE252-1) ................................. JA1083

2.    **Excerpts of Deposition of Secretary Bill Crouch**
            taken March 17, 2022 (DE252-2) ................................. JA1163

3.    **Excerpts of Deposition of**
        **Commissioner Cynthia Beane, With Exhibits**
            taken March 29, 2022 (DE252-3) ................................. JA1173

4.    **Redacted Excerpts of Deposition of**
        **Shauntae Anderson**
            taken April 22, 2022 (DE252-4) ................................. JA1291

5.    **Redacted Excerpts of Deposition of**
        **Christopher Fain**
            taken April 28, 2022 (DE252-5) ................................. JA1322

6.    **Redacted Affidavit of Jennifer Myers**
            sworn April 29, 2022 (DE252-6) ................................. JA1370

7.    **Excerpts of Deposition of Brian Thompson,**
        **With Exhibits**
            taken April 13, 2022 (DE252-7) ................................. JA1378

ix

**<u>Exhibits</u> to**

**Defendants' Motion for Summary Judgment,**
**    filed May 31, 2022 (DE252), Continued:**

8.     **Excerpts of Deposition of Dr. Dan Karasic,**
        **With Exhibits,**
           **taken April 15, 2022 (DE252-8)...................................JA1408**

9.     **Excerpts of Deposition of Dr. James Becker**
           **taken March 30, 2022 (DE252-9)................................JA1448**

10.   **Excerpts of Deposition of Frederick Lewis**
           **taken April 4, 2022 (DE252-10)..................................JA1453**

12.   **Excerpts of Deposition of Becky Manning,**
        **With Exhibits**
           **taken April 12, 2022 (DE252-12)................................JA1468**

14.   **Excerpts of Deposition of Jennifer Myers,**
        **With Exhibits**
           **taken April 8, 2022 (DE252-14) .................................JA1498**

## TABLE OF CONTENTS
### Volume IV of VI

Page

**Exhibits to**
**Defendants' Motion for Summary Judgment,**
   **filed May 31, 2022 (DE252), Continued:**

15A.  Deposition of Loren S. Schechter, M.D.,
      With Exhibits
             taken March 28, 2022 (DE252-15).............................JA1533

15C.  Certificate of Service for the Expert Rebuttal Report of
      Loren S. Schechter, M.D.
             filed March 18, 2022 (DE252-17) ................................JA1762
      Littman Article Entitled "Individuals Treated for
      Gender Dysphoria with Medical and/or Surgical
      Transition Who Subsequently Detransitioned: A Survey
      of 100 Detransitioners"
             dated October 19, 2021 (DE252-17)............................JA1764

16.   Excerpts of Deposition of
      Johanna Olson-Kennedy, M.D., With Exhibits
             taken April 25, 2022 (DE252-18) ................................JA1781

17.   Affidavit of Sarah Young
             dated May 27, 2022 (DE252-19) ..................................JA1818

18A.  Excerpts of Deposition of Dr. Stephen Levine
             taken April 27, 2022 (DE252-20).................................JA1821

18B.  Vandenbussche, "Detransition-Related Needs and
      Support: A Cross-Sectional Online Survey"
             undated (DE252-21).......................................................JA1833

xi

**Plaintiffs' Motion to Exclude Expert
Testimony of Stephen B. Levine, M.D.,
With Exhibits,**

    **filed May 31, 2022 (DE254)** ................................................................JA1853

**<u>Exhibits:</u>**

1.     **Declaration of Carl S. Charles**

       **sworn May 31, 2022 (DE254-1)** ...................................JA1856

    A.   **Expert Disclosure Report of
Dr. Stephen B. Levine, M.D.**

         **dated February 18, 2022 (DE254-2)**..................JA1860

    B.   **Excerpt of Deposition of Dr. Stephen Levine Fain**

         **taken April 27, 2022 (DE254-3)** ........................JA1957

    C.   **Excerpt of Deposition of Dr. Stephen Levine,
in relation to *Kadel v. N.C. State Health Plan for
Teachers and State Employees***

         **taken September 10, 2021 (DE254-4)** ..............JA2007

    D.   **Excerpt from Transcript of the Bench Trial in
*Soneeya v. Turco*, Bench Trial Day 1,**

         **dated April 8, 2019 (DE254-5)** ..........................JA2066

    E.   **Excerpt Deposition of Cynthia Beane**

         **taken March 29, 2022 (DE254-6)** ......................JA2068

    F.   **Excerpt of Deposition of Dr. Stephen Levine
in Relation to *Claire v. Florida Department of
Management Services***

         **taken December 21, 2020 (DE254-7)** ...............JA2073

<u>**Exhibits**</u> **to**

1.    **Declaration of Carl S. Charles**
          **sworn May 31, 2022 (DE254-1), Continued**

    G.    **Dahlen,** *et al.* **Article "International Clinical**
          **Practice Guidelines for Gender Minority/Trans**
          **People: Systematic Review and Quality**
          **Assessment"**
                  **visited April 26, 2022 (DE254-8) ...................... JA2085**

    H.    **Statement of Marci L. Bowers, M.D., "Dear**
          **Colleagues, Clients and Friends"**
                  **undated (DE254-9) ............................................... JA2096**

    I.    **Printout from the Cass Review website**
          **"About the Review" page**
                  **undated (DE254-10) ........................................... JA2099**

    J.    **Excerpt of Expert Rebuttal Report of Dr. Johanna**
          **Olson-Kennedy, M.D., M.S.**
                  **dated March 17, 2022 (DE254-11) .................... JA2102**

    K.    **Excerpt from the Published Ph.D. Thesis,**
          **"On Gender Dysphoria" Written by**
          **Cecilia Dhejne, Ph.D.**
                  **dated March 31, 2017 (DE254-12) .................... JA2107**

    L.    **Dhejne,** *et al.* **Article "Long-Term Follow-Up of**
          **Transsexual Persons Undergoing Sex**
          **Reassignment Surgery: Cohort Study in Sweden"**
                  **dated February 2011(DE254-13) ....................... JA2111**

<u>Exhibits</u> to

1.    Declaration of Carl S. Charles
            sworn May 31, 2022 (DE254-1), Continued

      M.    Simonsen, *et al*. Article "Long-Term Follow-Up of
            Individuals Undergoing Sex-Reassignment
            Surgery: Somatic Morbidity and Cause of Death"
                dated March 2016 (DE254-14) ..........................JA2119

## TABLE OF CONTENTS
## Volume V of VI

Page

**Exhibits to**

1. **Declaration of Carl S. Charles**
   **sworn May 31, 2022 (DE254-1Continued**

   N. **Excerpt from the Diagnostic and Statistical**
   **Manual of Mental Disorders, Version 5**
   **undated (DE254-15) ..........................................JA2129**

   O. **Excerpt of Deposition of Dan Karasic, M.D.**
   **taken April 15, 2022 (DE254-16) ......................JA2138**

   P. **InterQual Criteria Sheets for Gender-Confirming**
   **Surgeries (Hysterectomy and Phalloplasty)**
   **dated April 2021 (DE254-17) ...........................JA2143**

   Q. **Littman Article "Correction: Parent Reports of**
   **Adolescents and Young Adults Perceived to**
   **Show Signs of a Rapid Onset of Gender**
   **Dysphoria"**
   **dated March 19, 2019 (DE254-18) ....................JA2159**

   R. **Bauer,** *et al*. **Article "Do Clinical Data from**
   **Transgender Adolescents Support the**
   **Phenomenon of 'Rapid-Onset Gender**
   **Dysphoria'?"**
   **undated (DE254-19) ..........................................JA2164**

   S. **Defendants' Response to Plaintiff's**
   **Second Set of Interrogatories**
   **filed October 25, 2021 (DE254-20) ...................JA2170**

<u>Exhibits</u> to
1.    Declaration of Carl S. Charles
             sworn May 31, 2022 (DE254-1Continued

      T.    Excerpt of Deposition of Dr. Stephen Levine
            in relation to *B.P.J. v. West Virginia*
            *State Board of Education*
                   taken March 30, 2022 (DE254-21) ....................JA2177

Plaintiffs' Memorandum of Law in Support of Motion to Exclude
Expert Testimony of Stephen B. Levine, M.D.
      filed May 31, 2022 (DE255)...............................................................JA2187

Order
Granting Joint Motion to File Exhibits Under Seal
      filed June 1, 2022 (DE256)..................................................................JA2211

Corrected Stipulation of Plaintiffs and Defendants
      filed June 10, 2022 (DE258).................................................................JA2212

Defendants' Response in Opposition to
Plaintiffs' Motion for Class Certification
      filed June 14, 2022 (DE259)................................................................JA2217

Defendants' Response to Plaintiffs' Motion to Exclude
Expert Testimony of Stephen B. Levine, M.D.,
With Exhibit,
      filed June 14, 2022 (DE260)................................................................JA2241

      A.    de Vries, *et al*. "Young Adult Psychological Outcome
            After Puberty Suppression and Gender Reassignment"
                   visited October 7,2016 (DE260-1) ...............................JA2265

**Exhibits** **to**
**Defendants' Response in Opposition to**
**Plaintiffs' Motion for Summary Judgment**
     **filed June 14, 2022 (DE261):**

    **19A.** **Defendants' Third Supplemental Response to**
         **Plaintiff's First Set of Requests for Production**
            **filed November 30, 2021 (DE261-1)...........................JA2276**
         **InterQual Composite Exhibit**
            **dated October 2021 (DE261-1)....................................JA2281**

    **19B.** **InterQual Composite Exhibit**
            **dated October 2021 (DE261-2)...................................JA2351**

**Exhibits** **to**
**Plaintiffs' Opposition to Motion for Summary Judgment**
     **filed June 14, 2022 (DE262):**

    **1.** **Supplemental Declaration of Walt Auvil,**
       **With Exhibits 34 & 35**
           **dated June 14, 2022 (DE262-1) ....................................JA2416**

        **34.** **InterQual, 2012.2 Procedures Adult Criteria,**
            **Reduction Mammoplasty, Male (DE262-2) .............JA2418**

        **35.** **InterQual, 2021 Reduction Mammoplasty,**
            **Male (Adolescent) (DE262-3) ....................................JA2422**

Plaintiffs' Reply Memorandum of Law in Support of Motion to
Exclude Expert Testimony of Stephen B. Levine, M.D.,
With Exhibits,
 filed June 21, 2022 (DE266)...............................................................JA2428

Exhibits:

 1. Declaration of Carl. S. Charles,
  With Exhibit U
   sworn June 21, 2022 (DE266-1) ...................................JA2452

  U. Excerpt of Deposition of
   Dr. Johanna Olson-Kennedy
    taken April 25, 2022 (DE266-2) ........................JA2454

Reporter's Transcript of Proceedings Before
The Honorable Robert C. Chambers,
 on July 13, 2022 (DE269) ...................................................................JA2464

Memorandum Opinion and Order
Granting Plaintiffs' Motion for Class Certification
 filed August 2, 2022 (DE270)............................................................JA2552

Memorandum Opinion and Order
Granting Plaintiffs' Motion for Summary Judgment and
Denying Defendants' Motion for Summary Judgment
 filed August 2, 2022 (DE271)............................................................JA2562

Judgment Order
 filed August 17, 2022 (DE273).........................................................JA2592

Defendants' Notice of Appeal
 filed August 31, 2022 (DE277).........................................................JA2594

## <u>TABLE OF CONTENTS</u>
### Volume VI of VI – Under Seal

Page

Ex. A:    **Expert Disclosure Report of Dan H. Karasic, M.D.**
**dated January 13, 2022 (DE257)**..................................JA2598

Ex. B:    **Affidavit of Jennifer Myers**
**sworn April 29, 2022 (DE257-1)**.................................JA2652

xix



# Gender Dysphoria

In this chapter, there is one overarching diagnosis of gender dysphoria, with separate developmentally appropriate criteria sets for children and for adolescents and adults. The area of sex and gender is highly controversial and has led to a proliferation of terms whose meanings vary over time and within and between disciplines. An additional source of confusion is that in English "sex" connotes both male/female and sexuality. This chapter employs constructs and terms as they are widely used by clinicians from various disciplines with specialization in this area. In this chapter, *sex* and *sexual* refer to the biological indicators of male and female (understood in the context of reproductive capacity), such as in sex chromosomes, gonads, sex hormones, and nonambiguous internal and external genitalia. Disorders of sex development denote conditions of inborn somatic deviations of the reproductive tract from the norm and/or discrepancies among the biological indicators of male and female. *Cross-sex* hormone treatment denotes the use of feminizing hormones in an individual assigned male at birth based on traditional biological indicators or the use of masculinizing hormones in an individual assigned female at birth.

The need to introduce the term *gender* arose with the realization that for individuals with conflicting or ambiguous biological indicators of sex (i.e., "intersex"), the lived role in society and/or the identification as male or female could not be uniformly associated with or predicted from the biological indicators and, later, that some individuals develop an identity as female or male at variance with their uniform set of classical biological indicators. Thus, *gender* is used to denote the public (and usually legally recognized) lived role as boy or girl, man or woman, but, in contrast to certain social constructionist theories, biological factors are seen as contributing, in interaction with social and psychological factors, to gender development. *Gender assignment* refers to the initial assignment as male or female. This occurs usually at birth and, thereby, yields the "natal gender." *Gender-atypical* refers to somatic features or behaviors that are not typical (in a statistical sense) of individuals with the same assigned gender in a given society and historical era; for behavior, *gender-nonconforming* is an alternative descriptive term. *Gender reassignment* denotes an official (and usually legal) change of gender. *Gender identity* is a category of social identity and refers to an individual's identification as male, female, or, occasionally, some category other than male or female. *Gender dysphoria* as a general descriptive term refers to an individual's affective/cognitive discontent with the assigned gender but is more specifically defined when used as a diagnostic category. *Transgender* refers to the broad spectrum of individuals who transiently or persistently identify with a gender different from their natal gender. *Transsexual* denotes an individual who seeks, or has undergone, a social transition from male to female or female to male, which in many, but not all, cases also involves a somatic transition by cross-sex hormone treatment and genital surgery (*sex reassignment surgery*).

*Gender dysphoria* refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender. Although not all individuals will experience distress as a result of such incongruence, many are distressed if the desired physical interventions by means of hormones and/or surgery are not available. The current term is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity per se.

# Gender Dysphoria

## Diagnostic Criteria

### Gender Dysphoria in Children                                      302.6 (F64.2)

A.  A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least six of the following (one of which must be Criterion A1):

1.  A strong desire to be of the other gender or an insistence that one is the other gender (or some alternative gender different from one's assigned gender).
2.  In boys (assigned gender), a strong preference for cross-dressing or simulating female attire; or in girls (assigned gender), a strong preference for wearing only typical masculine clothing and a strong resistance to the wearing of typical feminine clothing.
3.  A strong preference for cross-gender roles in make-believe play or fantasy play.
4.  A strong preference for the toys, games, or activities stereotypically used or engaged in by the other gender.
5.  A strong preference for playmates of the other gender.
6.  In boys (assigned gender), a strong rejection of typically masculine toys, games, and activities and a strong avoidance of rough-and-tumble play; or in girls (assigned gender), a strong rejection of typically feminine toys, games, and activities.
7.  A strong dislike of one's sexual anatomy.
8.  A strong desire for the primary and/or secondary sex characteristics that match one's experienced gender.

B.  The condition is associated with clinically significant distress or impairment in social, school, or other important areas of functioning.

*Specify* if:

**With a disorder of sex development** (e.g., a congenital adrenogenital disorder such as 255.2 [E25.0] congenital adrenal hyperplasia or 259.50 [E34.50] androgen insensitivity syndrome).

**Coding note:** Code the disorder of sex development as well as gender dysphoria.

### Gender Dysphoria in Adolescents and Adults                        302.85 (F64.1)

A.  A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1.  A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
2.  A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
3.  A strong desire for the primary and/or secondary sex characteristics of the other gender.
4.  A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
5.  A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
6.  A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

Gender Dysphoria                                                            **453**

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

*Specify* if:

**With a disorder of sex development** (e.g., a congenital adrenogenital disorder such as 255.2 [E25.0] congenital adrenal hyperplasia or 259.50 [E34.50] androgen insensitivity syndrome).

**Coding note:** Code the disorder of sex development as well as gender dysphoria.

*Specify* if:

**Posttransition:** The individual has transitioned to full-time living in the desired gender (with or without legalization of gender change) and has undergone (or is preparing to have) at least one cross-sex medical procedure or treatment regimen—namely, regular cross-sex hormone treatment or gender reassignment surgery confirming the desired gender (e.g., penectomy, vaginoplasty in a natal male; mastectomy or phalloplasty in a natal female).

## Specifiers

The posttransition specifier may be used in the context of continuing treatment procedures that serve to support the new gender assignment.

## Diagnostic Features

Individuals with gender dysphoria have a marked incongruence between the gender they have been assigned to (usually at birth, referred to as *natal gender*) and their experienced/expressed gender. This discrepancy is the core component of the diagnosis. There must also be evidence of distress about this incongruence. Experienced gender may include alternative gender identities beyond binary stereotypes. Consequently, the distress is not limited to a desire to simply be of the other gender, but may include a desire to be of an alternative gender, provided that it differs from the individual's assigned gender.

Gender dysphoria manifests itself differently in different age groups. Prepubertal natal girls with gender dysphoria may express the wish to be a boy, assert they are a boy, or assert they will grow up to be a man. They prefer boys' clothing and hairstyles, are often perceived by strangers as boys, and may ask to be called by a boy's name. Usually, they display intense negative reactions to parental attempts to have them wear dresses or other feminine attire. Some may refuse to attend school or social events where such clothes are required. These girls may demonstrate marked cross-gender identification in role-playing, dreams, and fantasies. Contact sports, rough-and-tumble play, traditional boyhood games, and boys as playmates are most often preferred. They show little interest in stereotypically feminine toys (e.g., dolls) or activities (e.g., feminine dress-up or role-play). Occasionally, they refuse to urinate in a sitting position. Some natal girls may express a desire to have a penis or claim to have a penis or that they will grow one when older. They may also state that they do not want to develop breasts or menstruate.

Prepubertal natal boys with gender dysphoria may express the wish to be a girl or assert they are a girl or that they will grow up to be a woman. They have a preference for dressing in girls' or women's clothes or may improvise clothing from available materials (e.g., using towels, aprons, and scarves for long hair or skirts). These children may role-play female figures (e.g., playing "mother") and often are intensely interested in female fantasy figures. Traditional feminine activities, stereotypical games, and pastimes (e.g., "playing house"; drawing feminine pictures; watching television or videos of favorite female characters) are most often preferred. Stereotypical female-type dolls (e.g., Barbie) are often favorite toys, and girls are their preferred playmates. They avoid rough-and-tumble play and competitive sports and have little interest in stereotypically masculine toys (e.g., cars, trucks). Some may pretend not to have a penis and insist on sitting to urinate. More

rarely, they may state that they find their penis or testes disgusting, that they wish them removed, or that they have, or wish to have, a vagina.

In young adolescents with gender dysphoria, clinical features may resemble those of children or adults with the condition, depending on developmental level. As secondary sex characteristics of young adolescents are not yet fully developed, these individuals may not state dislike of them, but they are concerned about imminent physical changes.

In adults with gender dysphoria, the discrepancy between experienced gender and physical sex characteristics is often, but not always, accompanied by a desire to be rid of primary and/or secondary sex characteristics and/or a strong desire to acquire some primary and/or secondary sex characteristics of the other gender. To varying degrees, adults with gender dysphoria may adopt the behavior, clothing, and mannerisms of the experienced gender. They feel uncomfortable being regarded by others, or functioning in society, as members of their assigned gender. Some adults may have a strong desire to be of a different gender and treated as such, and they may have an inner certainty to feel and respond as the experienced gender without seeking medical treatment to alter body characteristics. They may find other ways to resolve the incongruence between experienced/expressed and assigned gender by partially living in the desired role or by adopting a gender role neither conventionally male nor conventionally female.

## Associated Features Supporting Diagnosis

When visible signs of puberty develop, natal boys may shave their legs at the first signs of hair growth. They sometimes bind their genitals to make erections less visible. Girls may bind their breasts, walk with a stoop, or use loose sweaters to make breasts less visible. Increasingly, adolescents request, or may obtain without medical prescription and supervision, hormonal suppressors ("blockers") of gonadal steroids (e.g., gonadotropin-releasing hormone [GnRH] analog, spironolactone). Clinically referred adolescents often want hormone treatment and many also wish for gender reassignment surgery. Adolescents living in an accepting environment may openly express the desire to be and be treated as the experienced gender and dress partly or completely as the experienced gender, have a hairstyle typical of the experienced gender, preferentially seek friendships with peers of the other gender, and/or adopt a new first name consistent with the experienced gender. Older adolescents, when sexually active, usually do not show or allow partners to touch their sexual organs. For adults with an aversion toward their genitals, sexual activity is constrained by the preference that their genitals not be seen or touched by their partners. Some adults may seek hormone treatment (sometimes without medical prescription and supervision) and gender reassignment surgery. Others are satisfied with either hormone treatment or surgery alone.

Adolescents and adults with gender dysphoria before gender reassignment are at increased risk for suicidal ideation, suicide attempts, and suicides. After gender reassignment, adjustment may vary, and suicide risk may persist.

## Prevaience

For natal adult males, prevalence ranges from 0.005% to 0.014%, and for natal females, from 0.002% to 0.003%. Since not all adults seeking hormone treatment and surgical reassignment attend specialty clinics, these rates are likely modest underestimates. Sex differences in rate of referrals to specialty clinics vary by age group. In children, sex ratios of natal boys to girls range from 2:1 to 4.5:1. In adolescents, the sex ratio is close to parity; in adults, the sex ratio favors natal males, with ratios ranging from 1:1 to 6.1:1. In two countries, the sex ratio appears to favor natal females (Japan: 2.2:1; Poland: 3.4:1).

## Development and Course

Because expression of gender dysphoria varies with age, there are separate criteria sets for children versus adolescents and adults. Criteria for children are defined in a more con-

crete, behavioral manner than those for adolescents and adults. Many of the core criteria draw on well-documented behavioral gender differences between typically developing boys and girls. Young children are less likely than older children, adolescents, and adults to express extreme and persistent anatomic dysphoria. In adolescents and adults, incongruence between experienced gender and somatic sex is a central feature of the diagnosis. Factors related to distress and impairment also vary with age. A very young child may show signs of distress (e.g., intense crying) only when parents tell the child that he or she is "really" not a member of the other gender but only "desires" to be. Distress may not be manifest in social environments supportive of the child's desire to live in the role of the other gender and may emerge only if the desire is interfered with. In adolescents and adults, distress may manifest because of strong incongruence between experienced gender and somatic sex. Such distress may, however, be mitigated by supportive environments and knowledge that biomedical treatments exist to reduce incongruence. Impairment (e.g., school refusal, development of depression, anxiety, and substance abuse) may be a consequence of gender dysphoria.

**Gender dysphoria without a disorder of sex development.**   For clinic-referred children, onset of cross-gender behaviors is usually between ages 2 and 4 years. This corresponds to the developmental time period in which most typically developing children begin expressing gendered behaviors and interests. For some preschool-age children, both pervasive cross-gender behaviors and the expressed desire to be the other gender may be present, or, more rarely, labeling oneself as a member of the other gender may occur. In some cases, the expressed desire to be the other gender appears later, usually at entry into elementary school. A small minority of children express discomfort with their sexual anatomy or will state the desire to have a sexual anatomy corresponding to the experienced gender ("anatomic dysphoria"). Expressions of anatomic dysphoria become more common as children with gender dysphoria approach and anticipate puberty.

Rates of persistence of gender dysphoria from childhood into adolescence or adulthood vary. In natal males, persistence has ranged from 2.2% to 30%. In natal females, persistence has ranged from 12% to 50%. Persistence of gender dysphoria is modestly correlated with dimensional measures of severity ascertained at the time of a childhood baseline assessment. In one sample of natal males, lower socioeconomic background was also modestly correlated with persistence. It is unclear if particular therapeutic approaches to gender dysphoria in children are related to rates of long-term persistence. Extant follow-up samples consisted of children receiving no formal therapeutic intervention or receiving therapeutic interventions of various types, ranging from active efforts to reduce gender dysphoria to a more neutral, "watchful waiting" approach. It is unclear if children "encouraged" or supported to live socially in the desired gender will show higher rates of persistence, since such children have not yet been followed longitudinally in a systematic manner. For both natal male and female children showing persistence, almost all are sexually attracted to individuals of their natal sex. For natal male children whose gender dysphoria does not persist, the majority are *androphilic* (sexually attracted to males) and often self-identify as gay or homosexual (ranging from 63% to 100%). In natal female children whose gender dysphoria does not persist, the percentage who are *gynephilic* (sexually attracted to females) and self-identify as lesbian is lower (ranging from 32% to 50%).

In both adolescent and adult natal males, there are two broad trajectories for development of gender dysphoria: early onset and late onset. *Early-onset gender dysphoria* starts in childhood and continues into adolescence and adulthood; or, there is an intermittent period in which the gender dysphoria desists and these individuals self-identify as gay or homosexual, followed by recurrence of gender dysphoria. *Late-onset gender dysphoria* occurs around puberty or much later in life. Some of these individuals report having had a desire to be of the other gender in childhood that was not expressed verbally to others. Others do not recall any signs of childhood gender dysphoria. For adolescent males with late-onset gender dysphoria, parents often report surprise because they did not see signs of gender

dysphoria during childhood. Expressions of anatomic dysphoria are more common and salient in adolescents and adults once secondary sex characteristics have developed.

Adolescent and adult natal males with early-onset gender dysphoria are almost always sexually attracted to men (androphilic). Adolescents and adults with late-onset gender dysphoria frequently engage in transvestic behavior with sexual excitement. The majority of these individuals are gynephilic or sexually attracted to other posttransition natal males with late-onset gender dysphoria. A substantial percentage of adult males with late-onset gender dysphoria cohabit with or are married to natal females. After gender transition, many self-identify as lesbian. Among adult natal males with gender dysphoria, the early-onset group seeks out clinical care for hormone treatment and reassignment surgery at an earlier age than does the late-onset group. The late-onset group may have more fluctuations in the degree of gender dysphoria and be more ambivalent about and less likely satisfied after gender reassignment surgery.

In both adolescent and adult natal females, the most common course is the early-onset form of gender dysphoria. The late-onset form is much less common in natal females compared with natal males. As in natal males with gender dysphoria, there may have been a period in which the gender dysphoria desisted and these individuals self-identified as lesbian; however, with recurrence of gender dysphoria, clinical consultation is sought, often with the desire for hormone treatment and reassignment surgery. Parents of natal adolescent females with the late-onset form also report surprise, as no signs of childhood gender dysphoria were evident. Expressions of anatomic dysphoria are much more common and salient in adolescents and adults than in children.

Adolescent and adult natal females with early-onset gender dysphoria are almost always gynephilic. Adolescents and adults with the late-onset form of gender dysphoria are usually androphilic and after gender transition self-identify as gay men. Natal females with the late-onset form do not have co-occurring transvestic behavior with sexual excitement.

**Gender dysphoria in association with a disorder of sex development.**    Most individuals with a disorder of sex development who develop gender dysphoria have already come to medical attention at an early age. For many, starting at birth, issues of gender assignment were raised by physicians and parents. Moreover, as infertility is quite common for this group, physicians are more willing to perform cross-sex hormone treatments and genital surgery before adulthood.

Disorders of sex development in general are frequently associated with gender-atypical behavior starting in early childhood. However, in the majority of cases, this does not lead to gender dysphoria. As individuals with a disorder of sex development become aware of their medical history and condition, many experience uncertainty about their gender, as opposed to developing a firm conviction that they are another gender. However, most do not progress to gender transition. Gender dysphoria and gender transition may vary considerably as a function of a disorder of sex development, its severity, and assigned gender.

## Risk and Prognostic Factors

**Temperamental.**    For individuals with gender dysphoria without a disorder of sex development, atypical gender behavior among individuals with early-onset gender dysphoria develops in early preschool age, and it is possible that a high degree of atypicality makes the development of gender dysphoria and its persistence into adolescence and adulthood more likely.

**Environmental.**    Among individuals with gender dysphoria without a disorder of sex development, males with gender dysphoria (in both childhood and adolescence) more commonly have older brothers than do males without the condition. Additional predisposing

factors under consideration, especially in individuals with late-onset gender dysphoria (adolescence, adulthood), include habitual fetishistic transvestism developing into autogynephilia (i.e., sexual arousal associated with the thought or image of oneself as a woman) and other forms of more general social, psychological, or developmental problems.

**Genetic and physiological.**   For individuals with gender dysphoria without a disorder of sex development, some genetic contribution is suggested by evidence for (weak) familiality of transsexualism among nontwin siblings, increased concordance for transsexualism in monozygotic compared with dizygotic same-sex twins, and some degree of heritability of gender dysphoria. As to endocrine findings, no endogenous systemic abnormalities in sex-hormone levels have been found in 46,XY individuals, whereas there appear to be increased androgen levels (in the range found in hirsute women but far below normal male levels) in 46,XX individuals. Overall, current evidence is insufficient to label gender dysphoria without a disorder of sex development as a form of intersexuality limited to the central nervous system.

In gender dysphoria associated with a disorder of sex development, the likelihood of later gender dysphoria is increased if prenatal production and utilization (via receptor sensitivity) of androgens are grossly atypical relative to what is usually seen in individuals with the same assigned gender. Examples include 46,XY individuals with a history of normal male prenatal hormone milieu but inborn nonhormonal genital defects (as in cloacal bladder exstrophy or penile agenesis) and who have been assigned to the female gender. The likelihood of gender dysphoria is further enhanced by additional, prolonged, highly gender-atypical postnatal androgen exposure with somatic virilization as may occur in female-raised and noncastrated 46,XY individuals with 5-alpha reductase-2 deficiency or 17-beta-hydroxysteroid dehydrogenase-3 deficiency or in female-raised 46,XX individuals with classical congenital adrenal hyperplasia with prolonged periods of non-adherence to glucocorticoid replacement therapy. However, the prenatal androgen milieu is more closely related to gendered behavior than to gender identity. Many individuals with disorders of sex development and markedly gender-atypical behavior do not develop gender dysphoria. Thus, gender-atypical behavior by itself should not be interpreted as an indicator of current or future gender dysphoria. There appears to be a higher rate of gender dysphoria and patient-initiated gender change from assigned female to male than from assigned male to female in 46,XY individuals with a disorder of sex development.

## Culture-Related Diagnostic Issues

Individuals with gender dysphoria have been reported across many countries and cultures. The equivalent of gender dysphoria has also been reported in individuals living in cultures with institutionalized gender categories other than male or female. It is unclear whether with these individuals the diagnostic criteria for gender dysphoria would be met.

## Diagnostic Markers

Individuals with a somatic disorder of sex development show some correlation of final gender identity outcome with the degree of prenatal androgen production and utilization. However, the correlation is not robust enough for the biological factor, where ascertainable, to replace a detailed and comprehensive diagnostic interview evaluation for gender dysphoria.

## Functional Consequences of Gender Dysphoria

Preoccupation with cross-gender wishes may develop at all ages after the first 2–3 years of childhood and often interfere with daily activities. In older children, failure to develop age-typical same-sex peer relationships and skills may lead to isolation from peer groups and to distress. Some children may refuse to attend school because of teasing and harass-

ment or pressure to dress in attire associated with their assigned sex. Also in adolescents and adults, preoccupation with cross-gender wishes often interferes with daily activities. Relationship difficulties, including sexual relationship problems, are common, and functioning at school or at work may be impaired. Gender dysphoria, along with atypical gender expression, is associated with high levels of stigmatization, discrimination, and victimization, leading to negative self-concept, increased rates of mental disorder comorbidity, school dropout, and economic marginalization, including unemployment, with attendant social and mental health risks, especially in individuals from resource-poor family backgrounds. In addition, these individuals' access to health services and mental health services may be impeded by structural barriers, such as institutional discomfort or inexperience in working with this patient population.

## Differential Diagnosis

**Nonconformity to gender roles.**   Gender dysphoria should be distinguished from simple nonconformity to stereotypical gender role behavior by the strong desire to be of another gender than the assigned one and by the extent and pervasiveness of gender-variant activities and interests. The diagnosis is not meant to merely describe nonconformity to stereotypical gender role behavior (e.g., "tomboyism" in girls, "girly-boy" behavior in boys, occasional cross-dressing in adult men). Given the increased openness of atypical gender expressions by individuals across the entire range of the transgender spectrum, it is important that the clinical diagnosis be limited to those individuals whose distress and impairment meet the specified criteria.

**Transvestic disorder.**   Transvestic disorder occurs in heterosexual (or bisexual) adolescent and adult males (rarely in females) for whom cross-dressing behavior generates sexual excitement and causes distress and/or impairment without drawing their primary gender into question. It is occasionally accompanied by gender dysphoria. An individual with transvestic disorder who also has clinically significant gender dysphoria can be given both diagnoses. In many cases of late-onset gender dysphoria in gynephilic natal males, transvestic behavior with sexual excitement is a precursor.

**Body dysmorphic disorder.**   An individual with body dysmorphic disorder focuses on the alteration or removal of a specific body part because it is perceived as abnormally formed, not because it represents a repudiated assigned gender. When an individual's presentation meets criteria for both gender dysphoria and body dysmorphic disorder, both diagnoses can be given. Individuals wishing to have a healthy limb amputated (termed by some *body integrity identity disorder*) because it makes them feel more "complete" usually do not wish to change gender, but rather desire to live as an amputee or a disabled person.

**Schizophrenia and other psychotic disorders.**   In schizophrenia, there may rarely be delusions of belonging to some other gender. In the absence of psychotic symptoms, insistence by an individual with gender dysphoria that he or she is of some other gender is not considered a delusion. Schizophrenia (or other psychotic disorders) and gender dysphoria may co-occur.

**Other clinical presentations.**   Some individuals with an emasculinization desire who develop an alternative, nonmale/nonfemale gender identity do have a presentation that meets criteria for gender dysphoria. However, some males seek castration and/or penectomy for aesthetic reasons or to remove psychological effects of androgens without changing male identity; in these cases, the criteria for gender dysphoria are not met.

## Comorbidity

Clinically referred children with gender dysphoria show elevated levels of emotional and behavioral problems—most commonly, anxiety, disruptive and impulse-control, and de-

pressive disorders. In prepubertal children, increasing age is associated with having more behavioral or emotional problems; this is related to the increasing non-acceptance of gender-variant behavior by others. In older children, gender-variant behavior often leads to peer ostracism, which may lead to more behavioral problems. The prevalence of mental health problems differs among cultures; these differences may also be related to differences in attitudes toward gender variance in children. However, also in some non-Western cultures, anxiety has been found to be relatively common in individuals with gender dysphoria, even in cultures with accepting attitudes toward gender-variant behavior. Autism spectrum disorder is more prevalent in clinically referred children with gender dysphoria than in the general population. Clinically referred adolescents with gender dysphoria appear to have comorbid mental disorders, with anxiety and depressive disorders being the most common. As in children, autism spectrum disorder is more prevalent in clinically referred adolescents with gender dysphoria than in the general population. Clinically referred adults with gender dysphoria may have coexisting mental health problems, most commonly anxiety and depressive disorders.

# Other Specified Gender Dysphoria

## 302.6 (F64.8)

This category applies to presentations in which symptoms characteristic of gender dysphoria that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for gender dysphoria. The other specified gender dysphoria category is used in situations in which the clinician chooses to communicate the specific reason that the presentation does not meet the criteria for gender dysphoria. This is done by recording "other specified gender dysphoria" followed by the specific reason (e.g., "brief gender dysphoria").

An example of a presentation that can be specified using the "other specified" designation is the following:

**The current disturbance meets symptom criteria for gender dysphoria, but the duration is less than 6 months.**

# Unspecified Gender Dysphoria

## 302.6 (F64.9)

This category applies to presentations in which symptoms characteristic of gender dysphoria that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for gender dysphoria. The unspecified gender dysphoria category is used in situations in which the clinician chooses *not* to specify the reason that the criteria are not met for gender dysphoria, and includes presentations in which there is insufficient information to make a more specific diagnosis.

**JA2137**



**In the Matter of:**

CHRISTOPHER FAIN

vs

WILLIAM CROUCH, et al.

DR. DAN KARASIC

*April 15, 2022*

5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN; ZACHARY
MARTELL; BRIAN McNEMAR, SHAWN
ANDERSON a/k/a SHAUNTAE ANDERSON;
and LEANNE JAMES, individually and on
behalf of all others similarly situated,

        Plaintiffs,

vs.           Civil Action No. 3:20-cv-00740

WILLIAM CROUCH, in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
CYNTHIA BEANE, in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; JASON HAUGHT, in his official
capacity as Director of the West Virginia
Public Employees Insurance Agency; and
THE HEALTH PLAN OF WEST VIRGINIA, INC.,

        Defendants.

"CONFIDENTIAL"
VIDEOTAPED DEPOSITION OF DR. DAN KARASIC
BY VIDEO CONFERENCE

_____

The videotaped deposition of Dr. Dan
Karasic was taken on April 15, 2022,
at 12:02 p.m., at 5010 Dempsey Drive,
Cross Lanes, West Virginia.

_____

ELITE COURT REPORTING, LLC
5010 Dempsey Drive
Cross Lanes, West Virginia  25313
(304) 415-1122

Martha Fourney, CSR

Confidential

Page 2

```
 1          A P P E A R A N C E S

 2

     Caleb B. David
 3   Attorney at Law
     Shuman McCuskey Slicer, PLLC
 4   1141 Virginia Street, East, Suite 200
     Charleston, West Virginia  25301
 5   (By video conference)

 6

     Walt Auvil
 7   Attorney at Law
     The Employment Law Center, PLLC
 8   1208 Market Street
     Parkersburg, West Virginia  26101
 9   (By video conference)

10

     Avatara Smith-Carrington
11   Attorney at Law
     Lambda Legal Defense and Education Fund
12   3500 Oak Lawn Avenue, Suite 500
     Dallas, Texas  75219-6722
13   (By video conference)

14

     Tara L. Borelli
15   Attorney at Law
     Lambda Legal Defense and Educational Fund
16   1 West Court Square, Suite 105
     Decatur, Georgia  30030
17   (By video conference)

18

19

20

21

22

23

24
```

Elite Court Reporting, LLC
DR. DAN KARASIC, 04/15/2022

**JA2140**

Confidential

```
                                                                Page 3
 1                   I N D E X

 2
          Witness
 3
               Dr. Dan Karasic
 4

 5        Examination

 6           by Mr. David        Page 05

 7
          Exhibits
 8
             Number 1           Page 17
 9           Number 2           Page 17
             Number 3           Page 27
10           Number 4           Page 54
             Number 5           Page 79
11           Number 6           Page 138
             Number 7           Page 149
12           Number 8           Page 156
             Number 9           Page 163
13

14

15

16

17

18

19

20        Reporter's Certification      Page 182
21        Errata Sheet/Signature Page   Enclosed

22

23

24
```

Elite Court Reporting, LLC
DR. DAN KARASIC, 04/15/2022

**JA2141**

## DEPOSITION OF DAN KARASIC, M.D.

Confidential

Page 108

```
1      A.    Yes.  I'm familiar with the process to
2   get to gender incongruence by the World Health
3   Organization for ICD.  But the United States,
4   in terms of ICD adoption, is way behind the
5   rest of the world.  So we only -- we were using
6   ICD-9 which was adopted by -- you know, was
7   created around 1975, up until just a few years
8   ago.  And then we moved to ICD-10 while they
9   were already working on its replacement.
10          So just our CMS - Center for Medicare
11   and Medicaid Services - it is just very slow in
12   new adoption of -- and so they have their own
13   ICD CM, which is the American -- it's the
14   ICD-10-CM, which is the American version of the
15   ICD that's in use here.  I don't know whether
16   I'll still be in practice when ICD-11 is
17   adopted -- or alive, when the ICD-11 is adopted
18   in the United States.
19      Q.    Okay.  So it sounds like it might not
20   matter for practical purposes in the United
21   States anytime soon.  But under ICD-11, for
22   gender incongruence -- if I'm understanding
23   that diagnostic code correctly, there is no
24   requirement of clinically significant distress
```

Elite Court Reporting, LLC
DR. DAN KARASIC, 04/15/2022

InterQual®

## 2021, Apr. 2021 Release CP:Procedures

**Subset:** [5, 6, 7, 8] Gender Affirmation Surgery

**Requested Service:**    Hysterectomy for Gender Affirmation Surgery

**Age:**    Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | |
| | NPI/ID #: | | Signature: | | | Date: | |
| Servicing: | Vendor/Facility: | | | | Phone #: | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization: | / / | to   / / |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Primary gender affirmation surgery

    1. Strong and persistent cross-gender identification ≥ 6 months
      ☐ A) Yes
      ☐ B) No

> • If option Yes selected, then go to question 2
> • No other options lead to the requested service

    2. Choose all that apply:
      ☐ A) Marked incongruence between experienced or expressed gender and primary or secondary sex characteristics
      ☐ B) Strong desire to not have current primary or secondary sex characteristics because of the incongruence with experienced or expressed gender
      ☐ C) Strong desire to have primary or secondary sex characteristics of the other gender
      ☐ D) Strong desire to be the other gender or an alternative gender
      ☐ E) Strong desire to be treated as the other gender
      ☐ F) Strong confidence that typical feelings and reactions are of the other gender
      ☐ G) Other clinical information (add comment)

> • If 2 or more options A, B, C, D, E or F selected and option G not selected, then go to question 3
> • No other options lead to the requested service

## JA2143

InterQual®                                          **2021, Apr. 2021 Release CP:Procedures**
                                                    **Gender Affirmation Surgery**
                                            **Hysterectomy for Gender Affirmation Surgery**

*Primary gender affirmation surgery (continued...)*

3. Choose all that apply:
- ☐ A) Clinically significant distress or impairment in social or occupational or other important areas of functioning
- ☐ B) Clinically significant increased risk of suffering
- ☐ C) Other clinical information (add comment)

> • If 1 or more options A or B selected and option C not selected, then go to question 4
> • No other options lead to the requested service

4. Gender affirmation surgery, Choose one:
- ☐ A) Female-to-male surgery, genital
- ☐ B) Female-to-male surgery, other
- ☐ C) Male-to-female surgery, genital
- ☐ D) Male-to-female surgery, other
- ☐ E) Other clinical information (add comment)

> • If option A selected, then go to question 5
> • No other options lead to the requested service

5. Choose all that apply:
- ☐ A) Referrals from two behavioral health specialists clearing patient for gender affirmation surgery
- ☐ B) Persistent and well-documented gender dysphoria
- ☐ C) Capacity to make fully informed decisions and to consent
- ☐ D) No psychiatric disorder by history or psychiatric disorder controlled
- ☐ E) Other clinical information (add comment)

> • If the number of options selected is 4 and option E not selected, then go to question 6
> • No other options lead to the requested service

6. Choose all that apply:
- ☐ A) Cross-sex hormone therapy ≥ 12 months or hormone therapy contraindicated
- ☐ B) Lived ≥ 12 months in gender role congruent with gender identity
- ☐ C) Other clinical information (add comment)

> • If the number of options selected is 2 and option C not selected, then the rule is satisfied; you may stop here
> • No other options lead to the requested service

## Reference

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

## Notes:

**1:**

InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**

Delaying treatment for those with gender dysphoria is not a reasonable treatment option. This can lead to negative consequences, such as delay or arrest in emotional, social, or intellectual development. Isolating oneself from family and friends, being excluded from society, becoming a victim of bullying and self-harm all may be seen when there is an impediment or interruption in care. Some individuals, notably adolescents, may develop psychiatric issues including anxiety, depression, and suicidal ideation (Fisher et al., J Endocrinol Invest 2014, 37: 675-87; Royal College of Psychiatrists, Good practice guidelines for the assessment and treatment of adults with gender dysphoria. 2013; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**3:**

Guidelines agree that gender affirmation surgical intervention is appropriate for individuals 18 years of age or older, as these procedures are irreversible; however, behavioral health counseling and hormone therapy may be used to treat individuals who have been diagnosed with gender dysphoria at an earlier age. The sooner the diagnosis is made and treatment options are discussed, the more successful the individual is when transitioning (Hembree et al., Endocr Pract 2017, 23: 1437; Moreno-Perez and Esteva De Antonio, Endocrinologia y Nutricion 2012, 6: 367-82; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112; Hembree, Child Adolesc Psychiatr Clin N Am 2011, 20: 725-32).

**4:**

According to the American Psychiatric Association, the Diagnostic and Statistical Manual of Mental Disorders defines gender dysphoria as a condition where sex assigned at birth is incongruent with experienced or desired gender, resulting in distress and suffering. Distress must persist for at least six months and result in a desire to change (American Psychiatric Association, The Diagnostic and Statistical Manual of Mental Disorders: DSM-5. 2013; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112). Transgender persons are described as someone whose gender identity, behavior or expression, is not typical of that assigned at birth, including those who are gender dysphoric. In the United States, approximately 0.6%, or 1.4 million adults identify as transgender individuals. The prevalence is similar worldwide and has doubled in the last decade (Flores et al., How many adults identify as Transgender in the United States? 2016).

Therapeutic options for gender dysphoria or transgender individuals include psychotherapy, hormonal treatment, and gender affirmation surgery (GAS). Dressing, acting, or speaking consistent with the correct gender, taking hormones, changing one's name, and surgical intervention are possible activities carried out to identify with the correct gender. Some transgender individuals do not define themselves as conforming to the gender binary (male or female) and may also use terms such as gender non-conforming, pangender, agender, bigender, polygender, gender fluid, gender queer, or gender neutral. This will impact their treatment choices (Royal College of Psychiatrists, Good practice guidelines for the assessment and treatment of adults with gender dysphoria. 2013). GAS is a treatment option for gender dysphoria and is often the final stage of transition. GAS is not a single procedure, but part of a complex process involving multiple medical, psychiatric, and surgical modalities working in conjunction with each other to assist the candidate for gender affirmation achieve successful outcomes. Before undertaking GAS, candidates need to undergo important medical and psychological evaluations to confirm that surgery is the most appropriate treatment choice. Procedures vary significantly from female-to-male and male-to-female and are generally comprised of a series of primary and secondary sex character changes, chest reconstruction, facial alterations and voice-modification. After working with a transgender care team, a surgical plan is tailored to the individual's needs to relieve gender dysphoria. Treatment standardization in this population is not possible as clinical presentations and symptoms will vary significantly with each individual. A specialized, multidisciplinary transgender care team may include, but is not limited to, practitioners in primary care, behavioral health, speech and language therapy, dermatology, endocrinology, urology, gynecology, and plastic surgery. Collaborative care, joint participation in goal setting along with regular follow-up is crucial (Royal College of Psychiatrists, Good practice guidelines for the assessment and treatment of adults with gender dysphoria. 2013; Moreno-Perez and Esteva De Antonio, Endocrinologia y Nutricion 2012, 6: 367-82; Coleman, The World Professional

**InterQual®**                                    **2021, Apr. 2021 Release CP:Procedures**
                                                  **Gender Affirmation Surgery**
                                   **Hysterectomy for Gender Affirmation Surgery**

Association for Transgender Health. 2011, 7: 1-112).

**5:**

Although there are many publications on gender affirmation surgery (GAS), most articles are observational case studies, have less than 30 participants, do not have strong evidence, or are focused on surgical technique. There is a paucity of published evidence that is adequately powered or designed to allow definitive conclusions on safety and efficacy of the individual surgical procedures. Surgical technique and observational case studies represent the largest body of evidence. Future research is needed to improve patient selection, surgical procedure selection and patient outcome.

Statistics around GAS are primarily estimations. Private facilities are not mandated to report this data; there are variations on how surgical procedures are staged and many of the procedures are identified as simply cosmetic, therefore making data collection difficult. In addition, the complexity and various reconstructive scenarios distinguishing procedures with multiple stages from revisional affirmation surgery is not truly accounted for. Although estimates vary, the American Society of Plastic Surgeons stated that there was a 155% increase in gender affirmation surgeries in 2017, approximating over 8,300 facial, body contouring and sex surgeries (American Society of Plastic Surgeons, 2017 Plastic Surgery Statistics Report. 2018).

**6:**

These criteria include the following procedures:

Bilateral Mastectomy
Breast Augmentation
Clitoroplasty
Gender Confirmation Surgery
Gender Reassignment Surgery
Hysterectomy
Intersex Surgery
Labiaplasty
Male Chest Contouring
Metoidioplasty
Orchiectomy
Ovariectomy
Penectomy
Penile Prosthesis
Permanent Hair Removal
Phalloplasty
Salpingo-oophorectomy
Scrotoplasty
Sex Reassignment Surgery
Transgender Surgery
Transsexual Surgery
Urethroplasty
Vaginoplasty
Vulvoplasty

**7:**

InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**8:**

This is a procedure that can be performed for either medically necessary or cosmetic purposes. The criteria as written are intended solely for use in determining the medical appropriateness of this procedure and do not cover this procedure when performed for cosmetic reasons.

**9:**
Prior to surgical intervention for gender affirmation, gender dysphoria must be present as outlined by the Diagnostic and Statistical Manual of Mental Disorders. If a pronounced distress between the assigned gender at birth and the gender that is desired persists for at least six months, and there is significant distress in social or occupational settings, the diagnosis of gender dysphoria can be made. It is accompanied by marked incongruence between experienced or expressed gender and sex characteristics, strong desire to be an alternate gender, strong desire to be treated as the other gender, to not have or to change assigned sex characteristics, or having strong confidence that typical feelings are of the other gender (American Psychiatric Association, The Diagnostic and Statistical Manual of Mental Disorders: DSM-5. 2013). InterQual® consultants agree that the Diagnostic and Statistical Manual of Mental Disorders is the most widely accepted for the diagnosis of gender dysphoria.

**10:**
The most common female-to-male (FtM) genital procedures include hysterectomy, ovariectomy, salpingo-oophorectomy, metoidioplasty, phalloplasty, penile prosthesis, scrotoplasty, and urethroplasty. Permanent hair removal can be done prior to a number of genital surgeries.

The most common FtM chest procedures are mastectomy and male chest contouring. There are also various body contouring, facial and voice modification surgeries (Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**11:**
Surgical risks in female-to-male (FtM) genital and breast surgeries include, but are not limited to, infection, unsightly scarring, nipple necrosis, contour irregularities, urinary tract stenosis, fistulas, necrosis of neophallus, micropenis, and incapacity to stand while urinating. FtM genital surgery has been less successful than male-to-female genital surgery because of the difficulty creating a functional and aesthetic penis from smaller clitoral tissue (Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**12:**
The most common male-to-female (MtF) genital procedures include orchiectomy, penectomy, clitoroplasty, labiaplasty, urethroplasty, vaginoplasty, and vulvoplasty.

The most common MtF chest procedure is breast augmentation. Permanent hair removal can be done prior to a number of genital surgeries. There are also various body contouring, facial and voice modification surgeries that may be appropriate MtF procedures (Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**13:**
Some surgical risks in male-to-female genital and breast augmentation surgeries include, but are not limited to, infection, capsular fibrosis, partial necrosis of the vagina or labia, fistulas from the bladder or bowel into the vagina, stenosis of the urethra, the vagina being too short or small for coitus, anorgasmia, lower urinary tract infection from a shortened urethra, and dysfunctional bladder (Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**14:**
Therapy is intended to explore gender concerns, assess the intensity of and help alleviate gender dysphoria, assist in determining appropriate subsequent steps in treatment, assess existing mental health concerns, and evaluate outcomes of interventions (Fisher et al., J Endocrinol Invest 2014, 37: 675-87; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112). A behavioral health specialist must document persistent gender dysphoria, the ability to make fully informed decisions, and assure there are no active psychiatric disorders to impede decision making or interfere with successful postoperative care (Moreno-Perez and Esteva De Antonio, Endocrinologia y Nutricion 2012, 6: 367-82; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112). The individual should be assessed before surgery and demonstrate an understanding of the procedure, surgical options, and potential risks and outcomes. The patient should be aware of the risk of sterility as a result of hormone therapy and gender affirmation surgery. Discussions regarding fertility preservation options prior to these interventions, as well as ongoing oncological risk monitoring, are necessary (Hembree et al., Endocr

Pract 2017, 23: 1437; Wylie et al., Lancet 2016, 388: 401-11; American Psychological, Am Psychol 2015, 70: 832-64; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112). There is no recommended length of therapy or number of sessions an individual must attend or complete preceding surgery. It is however, strongly suggested that transgender individuals have access to therapy throughout the process as it can be a supportive adjunct to gender affirming surgery (Deutsch M. B., Center of Excellence for Transgender Health 2016, 2 ed; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**15:**
It is required that individuals seeking chest or breast surgery, to treat gender dysphoria, submit one referral letter from a behavioral health specialist to the surgeon stating psychotherapy requisites have been met. Surgeons generally require two referral letters before proceeding with genital surgery. It is recommended that at least one of the behavioral health professionals submitting a letter should have a doctoral degree (e.g., Ph.D., M.D., Ed.D., D.Sc., D.S.W., Psy.D) or a master's level degree in a clinical behavioral science field (e.g., M.S.W., L.C.S.W., Nurse Practitioner, Advanced Practice Nurse, Licensed Professional Councilor, Marriage and Family Therapist). Since there is not a standardized letter format outlining specific content that needs to be communicated between the behavioral health specialist and surgeon, letter writing varies. Often, referrals will include diagnostic criteria of gender dysphoria from the Diagnostic and Statistical Manual of Mental Disorders, standards of care met from The World Professional Association for Transgender Health, the individual's duration and compliance with therapy, as well as an understanding of procedures, individual readiness and consent. Typically, an explanation that the criteria for surgery have been met and a brief description of the clinical rationale for supporting the individual's request for surgery are also recorded. Ideally, the mental health professional should document willingness to coordinate care with the primary and surgical care team (Deutsch M. B., Center of Excellence for Transgender Health 2016, 2 ed; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**16:**
A significant number of gender dysphoric patients have a history of diagnosed or undiagnosed psychopathology including substance abuse, post-traumatic stress disorder, mood disorders, and anxiety. Although no specific conditions are exclusionary, all patients should be screened to ensure stability and a complete understanding of the procedure and postoperative follow-up. Depression may occur anytime throughout the transition process and individuals are encouraged to continue with psychotherapy during and after transition as needed (Deutsch M. B., Center of Excellence for Transgender Health 2016, 2 ed; Dhejne et al., Int Rev Psychiatry 2016, 28: 44-57; Royal College of Psychiatrists, Good practice guidelines for the assessment and treatment of adults with gender dysphoria. 2013; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**17:**
Symptoms or behaviors are considered to be controlled when they have responded to therapeutic and/or pharmacologic interventions.

**18:**
Surgical intervention should not be performed until the patient is 18 years or older. Hormone therapy, however, may begin sooner if not contraindicated. Guidelines suggest pubertal suppression can begin at Tanner stage 2 as better outcomes are seen when initiated with puberty. These guidelines do not agree on an age to begin cross-sex hormone therapy, but do agree that cross-sex hormone therapy should be taken for at least 12 months prior to genital surgery and female-to-male (FtM) mastectomy, and male chest contouring. For best results in male-to-female (MtF) breast augmentation surgery, some guidelines suggest at least 2 years of cross-sex hormone therapy because breasts continue to grow during this time, while others agree 12 months is sufficient (Hembree et al., Endocr Pract 2017, 23: 1437; Deutsch M. B., Center of Excellence for Transgender Health 2016, 2 ed; Fisher et al., J Endocrinol Invest 2014, 37: 675-87; Moreno-Perez and Esteva De Antonio, Endocrinologia y Nutricion 2012, 6: 367-82; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112; Hembree, Child Adolesc Psychiatr Clin N Am 2011, 20: 725-32).

Pubertal suppressing hormones halt gonadotropin secretion and lead to gradual regression of development of sex characteristics. Girls breasts will not continue to grow and will reduce in size, and menstruation will stop. Boys will experience a cessation in virilization and decreased testicular volume. The effects of these hormones are fully reversible. If the patient has surpassed puberty, cross-sex hormone therapy can begin. Cross-sex hormone therapy leads to the development of opposing sex characteristics and is only partially reversible. In FtM patients, the aim of cross-sex hormone therapy is to cause gradual clitoral enlargement, vaginal atrophy, fat redistribution, voice deepening, facial and body hair growth, suppress menses as well as increase libido, muscle mass and height. The goal for MtF individuals is to reduce height, decrease libido, grow breasts, redistribute body fat, decrease muscle mass, and soften the skin (Hembree et al., Endocr Pract 2017, 23: 1437).

**InterQual®**                                               **2021, Apr. 2021 Release CP:Procedures**
**Gender Affirmation Surgery**
**Hysterectomy for Gender Affirmation Surgery**

A systematic review reports that hormonal treatment improves depression, self-esteem, anxiety, personality-related psychopathology, and higher emotional quality of life in both FtM and MtF patients. This review also suggests improved body uneasiness in MtF. Many individuals do not continue with affirmation surgery if hormone therapy and other lifestyle changes have significantly decreased gender dysphoria (Costa and Colizzi, Neuropsychiatr Dis Treat 2016, 12: 1953-66).

**19:**
Living in the preferred gender role congruent with gender identity is a key component to successful transition prior to irreversible genital intervention. A minimum of twelve months is required to experience life events and incorporate transition in different personal and social settings. External response is observed and allows the individual to experience everyday life as the gender they identify with. Continuous living in the correct gender role must be documented by a behavioral health specialist (Royal College of Psychiatrists, Good practice guidelines for the assessment and treatment of adults with gender dysphoria. 2013; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**20:**
I/O Setting:
Bilateral Mastectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Clitoroplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Hysterectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Intersex Surgery - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Metoidioplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Ovariectomy/Salpingo-oophorectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Phalloplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Scrotoplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Urethroplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Vaginoplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
All others - Outpatient

**InterQual®**                                    **2021, Apr. 2021 Release CP:Procedures**
**Gender Affirmation Surgery**
**Hysterectomy for Gender Affirmation Surgery**

---

**ICD-10-CM (circle all that apply):** F64.0, F64.1, F64.2, F64.8, F64.9, Z87.890, Other _____

**ICD-10-PCS (circle all that apply):** 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UT97ZL, 0UT97ZZ, 0UT98ZL, 0UT98ZZ, 0UT9FZL, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC7ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58180, 58260, 58262, 58275, 58290, 58291, 58541, 58542, 58543, 58544, 58552, 58553, 58554, 58570, 58571, 58572, 58573, Other _____

---

**JA2150**

InterQual®

## 2021, Apr. 2021 Release CP:Procedures

**Subset:** [1, 2, 3, 6, 7, 8] Gender Affirmation Surgery

**Requested Service:**    Phalloplasty for Gender Affirmation Surgery

**Age:**    Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: | |
|---|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | | Weight: | | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | | |
| | NPI/ID #: | | Signature: | | | | Date: | |
| Servicing: | Vendor/Facility: | | | | Phone #: | | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization: | / /   to   / / | | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Primary gender affirmation surgery

> [1] Strong and persistent cross-gender identification ≥ 6 months
> ☐ A) Yes
> ☐ B) No
>
> | • If option Yes selected, then go to question 2 |
> | • No other options lead to the requested service |

> [2] Choose all that apply:
> ☐ A) Marked incongruence between experienced or expressed gender and primary or secondary sex characteristics
> ☐ B) Strong desire to not have current primary or secondary sex characteristics because of the incongruence with experienced or expressed gender
> ☐ C) Strong desire to have primary or secondary sex characteristics of the other gender
> ☐ D) Strong desire to be the other gender or an alternative gender
> ☐ E) Strong desire to be treated as the other gender
> ☐ F) Strong confidence that typical feelings and reactions are of the other gender
> ☐ G) Other clinical information (add comment)
>
> | • If 2 or more options A, B, C, D, E or F selected and option G not selected, then go to question 3 |
> | • No other options lead to the requested service |

**InterQual®**                                                        **2021, Apr. 2021 Release CP:Procedures**
**Gender Affirmation Surgery**
**Phalloplasty for Gender Affirmation Surgery**

---

*Primary gender affirmation surgery (continued...)*

---

3. Choose all that apply:
- ☐ A) Clinically significant distress or impairment in social or occupational or other important areas of functioning
- ☐ B) Clinically significant increased risk of suffering
- ☐ C) Other clinical information (add comment)

> • If 1 or more options A or B selected and option C not selected, then go to question 4
> • No other options lead to the requested service

4. Gender affirmation surgery, Choose one:
- ☐ A) Female-to-male surgery, genital
- ☐ B) Female-to-male surgery, other
- ☐ C) Male-to-female surgery, genital
- ☐ D) Male-to-female surgery, other
- ☐ E) Other clinical information (add comment)

> • If option A selected, then go to question 5
> • No other options lead to the requested service

5. Choose all that apply:
- ☐ A) Referrals from two behavioral health specialists clearing patient for gender affirmation surgery
- ☐ B) Persistent and well-documented gender dysphoria
- ☐ C) Capacity to make fully informed decisions and to consent
- ☐ D) No psychiatric disorder by history or psychiatric disorder controlled
- ☐ E) Other clinical information (add comment)

> • If the number of options selected is 4 and option E not selected, then go to question 6
> • No other options lead to the requested service

6. Choose all that apply:
- ☐ A) Cross-sex hormone therapy ≥ 12 months or hormone therapy contraindicated
- ☐ B) Lived ≥ 12 months in gender role congruent with gender identity
- ☐ C) Other clinical information (add comment)

> • If the number of options selected is 2 and option C not selected, then the rule is satisfied; you may stop here
> • No other options lead to the requested service

---

**Reference**

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

---

**InterQual®**                                                                    2021, Apr. 2021 Release CP:Procedures
**Gender Affirmation Surgery**
**Phalloplasty for Gender Affirmation Surgery**

## Notes:

**1:**

InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**

Delaying treatment for those with gender dysphoria is not a reasonable treatment option. This can lead to negative consequences, such as delay or arrest in emotional, social, or intellectual development. Isolating oneself from family and friends, being excluded from society, becoming a victim of bullying and self-harm all may be seen when there is an impediment or interruption in care. Some individuals, notably adolescents, may develop psychiatric issues including anxiety, depression, and suicidal ideation (Fisher et al., J Endocrinol Invest 2014, 37: 675-87; Royal College of Psychiatrists, Good practice guidelines for the assessment and treatment of adults with gender dysphoria. 2013; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**3:**

Guidelines agree that gender affirmation surgical intervention is appropriate for individuals 18 years of age or older, as these procedures are irreversible; however, behavioral health counseling and hormone therapy may be used to treat individuals who have been diagnosed with gender dysphoria at an earlier age. The sooner the diagnosis is made and treatment options are discussed, the more successful the individual is when transitioning (Hembree et al., Endocr Pract 2017, 23: 1437; Moreno-Perez and Esteva De Antonio, Endocrinologia y Nutricion 2012, 6: 367-82; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112; Hembree, Child Adolesc Psychiatr Clin N Am 2011, 20: 725-32).

**4:**

According to the American Psychiatric Association, the Diagnostic and Statistical Manual of Mental Disorders defines gender dysphoria as a condition where sex assigned at birth is incongruent with experienced or desired gender, resulting in distress and suffering. Distress must persist for at least six months and result in a desire to change (American Psychiatric Association, The Diagnostic and Statistical Manual of Mental Disorders: DSM-5. 2013; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112). Transgender persons are described as someone whose gender identity, behavior or expression, is not typical of that assigned at birth, including those who are gender dysphoric. In the United States, approximately 0.6%, or 1.4 million adults identify as transgender individuals. The prevalence is similar worldwide and has doubled in the last decade (Flores et al., How many adults identify as Transgender in the United States? 2016).
Therapeutic options for gender dysphoria or transgender individuals include psychotherapy, hormonal treatment, and gender affirmation surgery (GAS). Dressing, acting, or speaking consistent with the correct gender, taking hormones, changing one's name, and surgical intervention are possible activities carried out to identify with the correct gender. Some transgender individuals do not define themselves as conforming to the gender binary (male or female) and may also use terms such as gender non-conforming, pangender, agender, bigender, polygender, gender fluid, gender queer, or gender neutral. This will impact their treatment choices (Royal College of Psychiatrists, Good practice guidelines for the assessment and treatment of adults with gender dysphoria. 2013). GAS is a treatment option for gender dysphoria and is often the final stage of transition. GAS is not a single procedure, but part of a complex process involving multiple medical, psychiatric, and surgical modalities working in conjunction with each other to assist the candidate for gender affirmation achieve successful outcomes. Before undertaking GAS, candidates need to undergo important medical and psychological evaluations to confirm that surgery is the most appropriate treatment choice. Procedures vary significantly from female-to-male and male-to-female and are generally comprised of a series of primary and secondary sex character changes, chest reconstruction, facial alterations and voice-modification. After working with a transgender care team, a surgical plan is tailored to the individual's needs to relieve gender dysphoria. Treatment standardization in this population is not possible as clinical presentations and symptoms will vary significantly with each individual. A specialized, multidisciplinary transgender care team may include, but is not limited to, practitioners in primary care, behavioral health, speech and language therapy, dermatology, endocrinology, urology, gynecology, and plastic surgery. Collaborative care, joint participation in goal setting along with regular follow-up is crucial (Royal College of Psychiatrists, Good practice guidelines for the assessment and treatment of adults with gender dysphoria. 2013; Moreno-Perez and Esteva De Antonio, Endocrinologia y Nutricion 2012, 6: 367-82; Coleman, The World Professional

**JA2153**

**InterQual®**                                                    **2021, Apr. 2021 Release CP:Procedures**
**Gender Affirmation Surgery**
**Phalloplasty for Gender Affirmation Surgery**

Association for Transgender Health. 2011, 7: 1-112).

**5:**

Although there are many publications on gender affirmation surgery (GAS), most articles are observational case studies, have less than 30 participants, do not have strong evidence, or are focused on surgical technique. There is a paucity of published evidence that is adequately powered or designed to allow definitive conclusions on safety and efficacy of the individual surgical procedures. Surgical technique and observational case studies represent the largest body of evidence. Future research is needed to improve patient selection, surgical procedure selection and patient outcome.

Statistics around GAS are primarily estimations. Private facilities are not mandated to report this data; there are variations on how surgical procedures are staged and many of the procedures are identified as simply cosmetic, therefore making data collection difficult. In addition, the complexity and various reconstructive scenarios distinguishing procedures with multiple stages from revisional affirmation surgery is not truly accounted for. Although estimates vary, the American Society of Plastic Surgeons stated that there was a 155% increase in gender affirmation surgeries in 2017, approximating over 8,300 facial, body contouring and sex surgeries (American Society of Plastic Surgeons, 2017 Plastic Surgery Statistics Report. 2018).

**6:**

These criteria include the following procedures:

Bilateral Mastectomy
Breast Augmentation
Clitoroplasty
Gender Confirmation Surgery
Gender Reassignment Surgery
Hysterectomy
Intersex Surgery
Labiaplasty
Male Chest Contouring
Metoidioplasty
Orchiectomy
Ovariectomy
Penectomy
Penile Prosthesis
Permanent Hair Removal
Phalloplasty
Salpingo-oophorectomy
Scrotoplasty
Sex Reassignment Surgery
Transgender Surgery
Transsexual Surgery
Urethroplasty
Vaginoplasty
Vulvoplasty

**7:**

InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**8:**

**JA2154**

This is a procedure that can be performed for either medically necessary or cosmetic purposes. The criteria as written are intended solely for use in determining the medical appropriateness of this procedure and do not cover this procedure when performed for cosmetic reasons.

**9:**
Prior to surgical intervention for gender affirmation, gender dysphoria must be present as outlined by the Diagnostic and Statistical Manual of Mental Disorders. If a pronounced distress between the assigned gender at birth and the gender that is desired persists for at least six months, and there is significant distress in social or occupational settings, the diagnosis of gender dysphoria can be made. It is accompanied by marked incongruence between experienced or expressed gender and sex characteristics, strong desire to be an alternate gender, strong desire to be treated as the other gender, to not have or to change assigned sex characteristics, or having strong confidence that typical feelings are of the other gender (American Psychiatric Association, The Diagnostic and Statistical Manual of Mental Disorders: DSM-5. 2013). InterQual® consultants agree that the Diagnostic and Statistical Manual of Mental Disorders is the most widely accepted for the diagnosis of gender dysphoria.

**10:**
The most common female-to-male (FtM) genital procedures include hysterectomy, ovariectomy, salpingo-oophorectomy, metoidioplasty, phalloplasty, penile prosthesis, scrotoplasty, and urethroplasty. Permanent hair removal can be done prior to a number of genital surgeries.

The most common FtM chest procedures are mastectomy and male chest contouring. There are also various body contouring, facial and voice modification surgeries (Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**11:**
Surgical risks in female-to-male (FtM) genital and breast surgeries include, but are not limited to, infection, unsightly scarring, nipple necrosis, contour irregularities, urinary tract stenosis, fistulas, necrosis of neophallus, micropenis, and incapacity to stand while urinating. FtM genital surgery has been less successful than male-to-female genital surgery because of the difficulty creating a functional and aesthetic penis from smaller clitoral tissue (Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**12:**
The most common male-to-female (MtF) genital procedures include orchiectomy, penectomy, clitoroplasty, labiaplasty, urethroplasty, vaginoplasty, and vulvoplasty.

The most common MtF chest procedure is breast augmentation. Permanent hair removal can be done prior to a number of genital surgeries. There are also various body contouring, facial and voice modification surgeries that may be appropriate MtF procedures (Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**13:**
Some surgical risks in male-to-female genital and breast augmentation surgeries include, but are not limited to, infection, capsular fibrosis, partial necrosis of the vagina or labia, fistulas from the bladder or bowel into the vagina, stenosis of the urethra, the vagina being too short or small for coitus, anorgasmia, lower urinary tract infection from a shortened urethra, and dysfunctional bladder (Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**14:**
Therapy is intended to explore gender concerns, assess the intensity of and help alleviate gender dysphoria, assist in determining appropriate subsequent steps in treatment, assess existing mental health concerns, and evaluate outcomes of interventions (Fisher et al., J Endocrinol Invest 2014, 37: 675-87; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112). A behavioral health specialist must document persistent gender dysphoria, the ability to make fully informed decisions, and assure there are no active psychiatric disorders to impede decision making or interfere with successful postoperative care (Moreno-Perez and Esteva De Antonio, Endocrinologia y Nutricion 2012, 6: 367-82; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112). The individual should be assessed before surgery and demonstrate an understanding of the procedure, surgical options, and potential risks and outcomes. The patient should be aware of the risk of sterility as a result of hormone therapy and gender affirmation surgery. Discussions regarding fertility preservation options prior to these interventions, as well as ongoing oncological risk monitoring, are necessary (Hembree et al., Endocr

Pract 2017, 23: 1437; Wylie et al., Lancet 2016, 388: 401-11; American Psychological, Am Psychol 2015, 70: 832-64; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112). There is no recommended length of therapy or number of sessions an individual must attend or complete preceding surgery. It is however, strongly suggested that transgender individuals have access to therapy throughout the process as it can be a supportive adjunct to gender affirming surgery (Deutsch M. B., Center of Excellence for Transgender Health 2016, 2 ed; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**15:**
It is required that individuals seeking chest or breast surgery, to treat gender dysphoria, submit one referral letter from a behavioral health specialist to the surgeon stating psychotherapy requisites have been met. Surgeons generally require two referral letters before proceeding with genital surgery. It is recommended that at least one of the behavioral health professionals submitting a letter should have a doctoral degree (e.g., Ph.D., M.D., Ed.D., D.Sc., D.S.W., Psy.D) or a master's level degree in a clinical behavioral science field (e.g., M.S.W., L.C.S.W., Nurse Practitioner, Advanced Practice Nurse, Licensed Professional Councilor, Marriage and Family Therapist). Since there is not a standardized letter format outlining specific content that needs to be communicated between the behavioral health specialist and surgeon, letter writing varies. Often, referrals will include diagnostic criteria of gender dysphoria from the Diagnostic and Statistical Manual of Mental Disorders, standards of care met from The World Professional Association for Transgender Health, the individual's duration and compliance with therapy, as well as an understanding of procedures, individual readiness and consent. Typically, an explanation that the criteria for surgery have been met and a brief description of the clinical rationale for supporting the individual's request for surgery are also recorded. Ideally, the mental health professional should document willingness to coordinate care with the primary and surgical care team (Deutsch M. B., Center of Excellence for Transgender Health 2016, 2 ed; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**16:**
A significant number of gender dysphoric patients have a history of diagnosed or undiagnosed psychopathology including substance abuse, post-traumatic stress disorder, mood disorders, and anxiety. Although no specific conditions are exclusionary, all patients should be screened to ensure stability and a complete understanding of the procedure and postoperative follow-up. Depression may occur anytime throughout the transition process and individuals are encouraged to continue with psychotherapy during and after transition as needed (Deutsch M. B., Center of Excellence for Transgender Health 2016, 2 ed; Dhejne et al., Int Rev Psychiatry 2016, 28: 44-57; Royal College of Psychiatrists, Good practice guidelines for the assessment and treatment of adults with gender dysphoria. 2013; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**17:**
Symptoms or behaviors are considered to be controlled when they have responded to therapeutic and/or pharmacologic interventions.

**18:**
Surgical intervention should not be performed until the patient is 18 years or older. Hormone therapy, however, may begin sooner if not contraindicated. Guidelines suggest pubertal suppression can begin at Tanner stage 2 as better outcomes are seen when initiated with puberty. These guidelines do not agree on an age to begin cross-sex hormone therapy, but do agree that cross-sex hormone therapy should be taken for at least 12 months prior to genital surgery and female-to-male (FtM) mastectomy, and male chest contouring. For best results in male-to-female (MtF) breast augmentation surgery, some guidelines suggest at least 2 years of cross-sex hormone therapy because breasts continue to grow during this time, while others agree 12 months is sufficient (Hembree et al., Endocr Pract 2017, 23: 1437; Deutsch M. B., Center of Excellence for Transgender Health 2016, 2 ed; Fisher et al., J Endocrinol Invest 2014, 37: 675-87; Moreno-Perez and Esteva De Antonio, Endocrinologia y Nutricion 2012, 6: 367-82; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112; Hembree, Child Adolesc Psychiatr Clin N Am 2011, 20: 725-32).

Pubertal suppressing hormones halt gonadotropin secretion and lead to gradual regression of development of sex characteristics. Girls breasts will not continue to grow and will reduce in size, and menstruation will stop. Boys will experience a cessation in virilization and decreased testicular volume. The effects of these hormones are fully reversible. If the patient has surpassed puberty, cross-sex hormone therapy can begin. Cross-sex hormone therapy leads to the development of opposing sex characteristics and is only partially reversible. In FtM patients, the aim of cross-sex hormone therapy is to cause gradual clitoral enlargement, vaginal atrophy, fat redistribution, voice deepening, facial and body hair growth, suppress menses as well as increase libido, muscle mass and height. The goal for MtF individuals is to reduce height, decrease libido, grow breasts, redistribute body fat, decrease muscle mass, and soften the skin (Hembree et al., Endocr Pract 2017, 23: 1437).

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 49 of 489

Case 3:20-cv-00740    Document 254-17    Filed 05/31/22    Page 16 of 17 PageID #: 7781

InterQual®                                                                2021, Apr. 2021 Release CP:Procedures
**Gender Affirmation Surgery**
**Phalloplasty for Gender Affirmation Surgery**

A systematic review reports that hormonal treatment improves depression, self-esteem, anxiety, personality-related psychopathology, and higher emotional quality of life in both FtM and MtF patients. This review also suggests improved body uneasiness in MtF. Many individuals do not continue with affirmation surgery if hormone therapy and other lifestyle changes have significantly decreased gender dysphoria (Costa and Colizzi, Neuropsychiatr Dis Treat 2016, 12: 1953-66).

**19:**
Living in the preferred gender role congruent with gender identity is a key component to successful transition prior to irreversible genital intervention. A minimum of twelve months is required to experience life events and incorporate transition in different personal and social settings. External response is observed and allows the individual to experience everyday life as the gender they identify with. Continuous living in the correct gender role must be documented by a behavioral health specialist (Royal College of Psychiatrists, Good practice guidelines for the assessment and treatment of adults with gender dysphoria. 2013; Coleman, The World Professional Association for Transgender Health. 2011, 7: 1-112).

**20:**
I/O Setting:
Bilateral Mastectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Clitoroplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Hysterectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Intersex Surgery - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Metoidioplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Ovariectomy/Salpingo-oophorectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Phalloplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Scrotoplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Urethroplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
Vaginoplasty - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting.
All others - Outpatient

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 50 of 489

Case 3:20-cv-00740   Document 254-17   Filed 05/31/22   Page 17 of 17 PageID #: 7782

**InterQual®**

**2021, Apr. 2021 Release CP:Procedures**
**Gender Affirmation Surgery**
**Phalloplasty for Gender Affirmation Surgery**

**ICD-10-CM (circle all that apply):** F64.0, F64.1, F64.2, F64.8, F64.9, Z87.890, Other _____

**CPT® (circle all that apply):** 55899, Other _____

**JA2158**

## Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria

Lisa Littman

Published: March 19, 2019 • https://doi.org/10.1371/journal.pone.0214157

### Notice of republication

After publication of this article [1], questions were raised that prompted the journal to conduct a post-publication reassessment of the article, involving senior members of the journal's editorial team, two Academic Editors, a statistics reviewer, and an external expert reviewer. The post-publication review identified issues that needed to be addressed to ensure the article meets *PLOS ONE*'s publication criteria. Given the nature of the issues in this case, the *PLOS ONE* Editors decided to republish the article, replacing the original version of record with a revised version in which the author has updated the Title, Abstract, Introduction, Discussion, and Conclusion sections, to address the concerns raised in the editorial reassessment. The Materials and methods section was updated to include new information and more detailed descriptions about recruitment sites and to remove two figures due to copyright restrictions. Other than the addition of a few missing values in Table 13, the Results section is unchanged in the updated version of the article. The Competing Interests statement and the Data Availability statement have also been updated in the revised version. The original version of the published article is appended to this Correction as S1 File.

This Correction Notice serves to provide additional clarifications and context for the article in response to questions raised during the post-publication review of this work.

### Emphasis that this is a study of parental observations which serves to develop hypotheses

This study of parent observations and interpretations serves to develop the hypotheses that rapid-onset gender dysphoria is a phenomenon and that social influences, parent-child conflict, and maladaptive coping mechanisms may be contributing factors for some individuals. Rapid-onset gender dysphoria (ROGD) is not a formal mental health diagnosis at this time. This report did not collect data from the adolescents and young adults (AYAs) or clinicians and therefore does not validate the phenomenon. Additional research that includes AYAs, along with consensus among experts in the field, will be needed to determine if what is described here as rapid-onset gender dysphoria (ROGD) will become a formal diagnosis. Furthermore, the use of the term, rapid-onset gender dysphoria should be used cautiously by clinicians and parents to describe youth who appear to fall into this category. The term should not be used in a way to imply that it explains the experiences of all gender dysphoric youth nor should it be used to stigmatize vulnerable individuals. This article has been revised to better reflect that these parent reports provide information that can be used to develop hypotheses about factors that may contribute to the onset and/or expression of gender dysphoria among this demographic group.

Because this is a study of parent reports, there is some information about the AYAs that the parents would not have access to and the answers might reflect parent perspectives. Examples where parent answers reflect their perspective of the AYA include answers concerning the child's mental well-being, the parent-child relationship, and whether the child has high expectations about transitioning. However, it is also important to note that there are other survey items where the parent would have direct access to information about their child and that those answers reflect items that can be directly observed. Examples of this type include age, natal sex, diagnoses given by medical providers in the presence of the parent, directly observed behaviors of the child and the child's friend group, school performance, whether the child has dropped out or required a leave of absence from school, has been unable to hold a job, whether the child went to a clinic, or received treatment. Readers are reminded to keep in mind that this is a study of parent report and consideration of what information parents may or may not have access to is an important element of the findings.

### Questions on whether the article describes adolescent-onset gender dysphoria or if it describes something new

There is some controversy over whether what is described as rapid onset of gender dysphoria, particularly in natal females, falls under the existing definition of late-onset or adolescent-onset gender dysphoria or whether it represents a new kind of development or presentation. This controversy might be a false dichotomy because both might be true. Although recent observations of adolescents and young adults who are predominantly natal female having a sudden onset of gender dysphoria symptoms beginning during or after puberty might technically fall under the existing definitions and criteria for adolescent and adult gender dysphoria [2], the substantial change in the demographics of patients presenting for care, the inversion of the sex ratio with disproportionate increase in adolescent natal females [3–5], and the new phenomenon of natal females exhibiting adolescent-onset and late-onset gender dysphoria [6–8] signal that something new may be happening as well. These changes may indicate that there are new etiologies leading to gender dysphoria and it is unclear, particularly without research about these new populations, whether gender dysphoria in this context has the same outcomes, desistence and persistence rates, and response to treatment as the gender dysphorias that have been previously studied.

### Expanded discussion of qualitative analyses

Because this is a descriptive, exploratory study into a new topic with very little existing data, the addition of the qualitative analysis of two questions in addition to the quantitative analysis allowed for a greater depth of information to be used in the development of hypotheses. A grounded theory approach was selected as the strategy of choice for handling the qualitative data. There were two reviewers consisting of a professor with a PhD degree and expertise in qualitative methods (MM) [9] and the author (LL) who holds an MD and MPH degree, and has published both qualitative and quantitative research papers [10–11]. Each reviewer independently read and re-read the open-text responses in an iterative process to identify major themes arising from the data. Once each reviewer independently listed major themes and coded the open-text responses according to those themes, both reviewers compared notes to collaboratively revise and refine the major themes identified. Once an agreed-upon final list of themes was developed, attention was turned back to the data to code the open-text response with the final list of themes. After this task was completed, LL selected salient quotes to reflect each major theme, shared the quotes with MM, and both discussed collaboratively until agreement for the final list of major themes and associated quotes was reached. The incorporation of both the qualitative and quantitative analysis allowed for a more vivid picture of parent perspectives about the friendship group dynamics and behaviors and clinician interactions than could have been obtained from just one type of analysis.

## Clarification of study design, methods, and related limitations

As mentioned in the article, the study design of this research falls under descriptive research: as such, it did not assign an exposure, there were no comparison groups, and the study's output was hypothesis-generating rather than hypothesis-testing [12]. Descriptive studies often represent a first inquiry into an area of research and the findings of descriptive studies are used to generate new hypotheses that can be tested in subsequent research [12–13]. Because of the known limitations of descriptive studies, claims about causal associations cannot be made [12], and there were none made in the article. The conclusions of the current study are that the findings raise certain hypotheses and that more research is needed. Simple descriptive metrics to describe the quantitative characteristics of a sample in a descriptive study are the appropriate measures to use in this study. Additionally, because the data were collected at one point in time, no claims of cause and effect can be made.

All research methods have advantages and limitations. Obtaining information from parents (and guardians) about the health and well-being of children and adolescents is an established method of research [14]. Parental report, used elsewhere and in this study, offers the advantages of collecting data from adults who are knowledgeable about the child, who are able and willing to complete research activities such as detailed surveys, and who can provide details that are not available by other methods. Limitations of parental report include information that parents may not be aware of and parental biases. Anonymous surveys, used elsewhere and in this study, are advantageous for topics that might be stigmatized and can allow participants to be more honest in their responses but introduce the limitation that the researcher cannot verify the identity and experiences of the participants. The use of targeted recruitment and convenience samples, used elsewhere and in this study, offers the benefit of connecting with hard-to-reach populations but introduces limitations associated with selection bias that can subsequently be addressed by further studies. For the current study, selection bias may have resulted in findings that are more positive or more negative than would be found in a larger and less self-selected population. Subsequent studies should address these issues.

## Updated Information about recruitment

Concerns were raised that this study only posted links to the recruitment information on selected sites that are viewed as being unsupportive of transition. However, announcements about the study included requests to distribute the recruitment information and link, and because information about where the participants encountered the announcement was not collected, it is not known which populations were ultimately reached. It has come to light that a link to the recruitment information and research survey was posted on a private Facebook group perceived to have a pro-gender-affirming perspective during the first week of the recruitment period (via snowball sampling). This private Facebook group is called "Parents of Transgender Children" and has more than 8,000 members. This means that parents participating in this research may have viewed the recruitment information from one of at least four sites with varied perspectives. Specifically, three of the sites that posted recruitment information expressed cautious or negative views about medical and surgical interventions for gender dysphoric adolescents and young adults and cautious or negative views about categorizing gender dysphoric youth as transgender. And, one of the sites that posted recruitment information is perceived to be pro-gender-affirming. The rest of the Correction notice will refer to recruitment from the four sites that are known to have posted the survey in the first week of recruitment: 4thwavenow, transgendertrend, Youth Trans Critical Professionals, and Parents of Transgender Children.

## Parental approaches to gender dysphoria and views on medical interventions

To oversimplify parental approaches as simply "accepting" or "rejecting" misrepresents the range of responses and complexity of approaches that parents take when addressing the needs of their gender dysphoric children. Parental approaches are complex and cover many variables. For example, one parental approach might be to affirm the child as a person, support gender nonconformity, support gender exploration, support mental health evaluation and treatment as needed, support the exploration of potential underlying causes for the dysphoria while expressing caution about medical interventions. Another approach might be to affirm the child's newly declared gender identity, support gender nonconformity, support a liberal approach to medical intervention while expressing caution about mental health evaluation and caution about the exploration of potential underlying causes for the dysphoria. To categorize the former as "rejecting" and the latter as "accepting" would be inaccurate.

This study recruited participants based on whether participants thought their child exhibited a sudden or rapid onset of gender dysphoria beginning during or after puberty and did not recruit based on parental beliefs about what types of approaches toward gender dysphoric AYAs are best. Although one of the sites posting recruitment information might be considered to hold a pro-gender affirming perspective and three sites might be considered to hold a cautious or even negative perspective about medical or surgical interventions, the site where a participant first heard about the study may not be an accurate reflection of their beliefs and whether they endorse or disagree with the content of the websites. Data about where participants first heard about this study were not collected. Future studies should seek a wider array of websites to post recruitment information, recruit from clinicians with varied approaches to gender dysphoria, and ask specific questions about parental beliefs regarding their approach to their child's gender dysphoria, including: whether parents support or don't support gender exploration, gender nonconformity, mental health

evaluation and treatment, exploration of potential underlying causes for dysphoria, non-heterosexual sexual identity, and whether they hold a liberal, cautious or negative view about the use of medical and surgical interventions for gender dysphoric youth. Exploration about what types of affirmation are endorsed by parents including affirmation of the child as a person and affirmation of the child's gender identity would also be valuable.

## Expanded discussion about limitations and biases

Regarding the reporting of gender dysphoria, an absence of childhood gender dysphoria and whether the AYA was gender dysphoric at the time of survey completion were based on parent report of whether certain indicators of gender dysphoria were observed prior to puberty or at the time of the survey. These determinations were not diagnoses made by clinicians. Three of the indicators listed in the DSM-5 include information that a parent might not have access to (unless the child told them directly) [2], and therefore answers based on parent perceptions may not accurately reflect the experiences or traits of the AYAs themselves. However, the other five indicators include readily observable behaviors and preferences that would seem difficult for a parent not to notice such as: strong preference or strong resistance to wearing certain kinds of clothing; strong preference or strong rejection of specific toys, games and activities; and strong preference for playmates of the other gender [2]. It is possible that a parent could have ignored some of these indicators, though other people in the child's life may have observed them. To improve the reliability of this measure, future studies should include evaluation from clinicians with input from parents, AYAs and from third party informants such as teachers, pediatricians, mental health professionals, babysitters, and other family members who knew the youth during childhood to verify the whether the readily observable behaviors and preferences were present or absent during childhood.

For a clinician to make a diagnosis of gender dysphoria in childhood, a child would need to exhibit at least six of the eight indicators. Given that 97.6% of the participants reported 2 or fewer readily observable indicators, even if hypothetically all participants incorrectly under-reported all three of the subtler indicators, 97.6% would still have fewer than six indicators. So, although no clinical evaluation was performed and a clear presence or absence of a diagnosis cannot be verified, given the reports of the easily observed behaviors and preferences, it can be said that it would be very unlikely for these AYAs to have met criteria for childhood gender dysphoria if they had seen a clinician for an evaluation.

There is expected variation in how objective parents can be about their own children. Some individual biases may limit the objectivity of parents. This descriptive study was not designed to explore or measure the objectivity of participants. Participants may have first learned about this study from one of four (or more) sites described previously where recruitment information was posted. It is possible that exposure to websites that take a cautious or negative approach to transition during adolescence and young adulthood and exposure to websites that take a pro-gender-affirming approach might influence how parents report about their children's experiences. There have not been any studies to determine if parents who seek information from online sites in general, don't seek information from online sites, or seek information from specific online sites, including the four sites noted for this study, differ in their ability to provide objective assessments of their children. However, if there were an excess of participants who, compared to other parents who take surveys reporting on their children, were less able to be objective about their children, it could limit some of the findings of the study, particularly for findings that are more interpretive rather than the findings that are more concrete.

The research survey did not specifically ask whether parents supported their AYAs' exploration of gender identity, so whether and what numbers of participants supported their child's exploration of gender identity is unknown. However, if there were an excess of parents who did not support the exploration of gender identity, it could potentially result in higher reports of declining mental health. The parents' perception that their child's mental health and the parent-child relationship were worse after the child announced a transgender-identification could be due to several variables such as conflict between parent and child, maladaptive coping mechanisms, or worsening psychiatric issues unrelated to gender. The trajectories for adolescent-onset gender dysphoria are not well understood and additional research is desperately needed.

There are many ways that parents can provide support for their child which include: affirming them as a unique and valuable person and as a loved member of the family; supporting their emotional and financial needs; supporting them in pursuing their interests; supporting them to develop the skills needed for self-sufficiency; supporting their choices of gender nonconforming clothing and interests; supporting their exploration of their identity; and supporting them in their critical thinking skills. Parental support is multifaceted and should not be oversimplified into a binary of whether a parent agrees or disagrees with a specific medical course. This study was not designed to measure different types of support provided by parents or levels of support. If there were an excess of parents who were unsupportive of their children, it might affect some of these initial findings. The nature and extent of parental support—including the many different ways that parents can support their children in becoming healthy, self-sufficient adults—is well worth further study.

## Clarification of Fig 1

The purpose of Fig 1 was to provide the reader with a quick sense of what kinds of advice can be found and shared on Reddit and Tumblr. One example includes an excerpt from a publicly available Tumblr blog that posted a list of purported indirect signs of gender dysphoria. This excerpt is indeed an example of advice that can be found on Tumblr. Note, however, that the excerpted Tumblr post itself does not reflect the full content of the original blog it refers to, nor does the excerpt in Fig 1. The original blog is titled, "'That was dysphoria?' 8 signs and symptoms of indirect gender dysphoria" [15].

## Discussion of the ICD-11 change from "gender dysphoria" to "gender incongruence"

The ICD-11 will go into effect in January 2022, and, with this change, the new diagnosis of "gender incongruence" will replace "gender dysphoria." Because the current descriptive, exploratory study raises hypotheses about factors that may contribute to the onset and/or expression of gender dysphoria and concludes that more research is needed, it is unlikely that the change in diagnostic criteria will appreciably change the conclusion of the study, although the terminology may become outdated.

## Supporting information

**JA2161**

**S1 File.** PDF of the original article version that was published on August 16, 2018 (two figures removed due to copyright restrictions).
https://doi.org/10.1371/journal.pone.0214157.s001
(PDF)

## References

1. Littman L. Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLoS ONE. 2018; 13(8): e0202330. https://doi.org/10.1371/journal.pone.0202330 pmid:30114286
   View Article • PubMed/NCBI • Google Scholar

2. American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders (Fifth ed.). Arlington, VA: American Psychiatric Publishing; 2013.

3. Zucker KJ. Epidemiology of gender dysphoria and transgender identity. Sex Health. 2017 Oct; 14 (5):404–411. pmid:28838353
   View Article • PubMed/NCBI • Google Scholar

4. Aitken MA, Steensma TD, Blanchard R, VanderLaan DP, Wood H, Fuentes A, et al. Evidence for an altered sex ratio in clinic-referred adolescents with gender dysphoria, J Sex Med. 2015; 12:756–763. pmid:25612159
   View Article • PubMed/NCBI • Google Scholar

5. de graaf NM, Giovanardi G, Zitz C, Carmichael P. Sex Ratio in Children and Adolescents Referred to the Gender Identity Development Service in the UK (2009–2016). Archives of Sexual Behavior. 2018; 47:1301–1304 pmid:29696550
   View Article • PubMed/NCBI • Google Scholar

6. Zucker KJ, Bradley SJ, Owen-Anderson A, Kibblewhite SJ, Wood H, Singh D, Choi K. Demographics, Behavior Problems, and Psychosexual Characteristics of Adolescents with Gender Identity Disorder or Transvestic Fetishism, Journal of Sex & Marital Therapy. 2012; 38:2, 151–189.
   View Article • Google Scholar

7. Steensma TD, Kreukels BPC, de Vries ALC, Cohen-Kettenis PT. Gender identity development in adolescence. Hormones and Behavior. 2013; 64: 288–297. pmid:23998673
   View Article • PubMed/NCBI • Google Scholar

8. Bonfatto M, Crasnow E. Gender/ed identities: an overview of our current work as child psychotherapists in the Gender Identity Development Service, Journal of Child Psychotherapy. 2018; 44:1, 29–46.
   View Article • Google Scholar

9. Moore M. Grounded Theory. In: Goodley D, Lawthom R, Clough P, and Moore MResearching Life Stories: Method, Theory and Analyses in a Biographical Age. London: RoutledgeFalmer; 2004. pp 118–121.

10. Littman LL, Zarcadoolas C and Jacobs AR, Introducing abortion patients to a culture of support: a pilot study, Archives of Women's Mental Health. 2009; 12(6):419–431 pmid:19672677
    View Article • PubMed/NCBI • Google Scholar

11. Littman LL, Jacobs A, Negron R, Shochet T, Gold M, Cremer M. Beliefs about abortion risks in women returning to the clinic after their abortions: a pilot study. Contraception. 2014; 90(1):19–22. pmid:24792143
    View Article • PubMed/NCBI • Google Scholar

12. Grimes D A., Schulz K. F. An overview of clinical research: the lay of the land. The Lancet. 2002;359(9300):57–61.
    View Article • Google Scholar

13. Grimes DA, Schulz KF. Descriptive studies: what they can and cannot do. Lancet. 2002; 359:145–9. pmid:11809274
    View Article • PubMed/NCBI • Google Scholar

14. Child and Adolescent Health Measurement Initiative. Fast Facts: 2017 National Survey of Children's Health. Data Resource Center for Child and Adolescent Health, supported by Cooperative Agreement U59MC27866 from the U.S. Department of Health and Human Services, Health Resources and Services Administration's Maternal and Child Health Bureau (HRSA MCHB), 2018. Available from: https://www.childhealthdata.org/docs/default-source/default-document-library/2017-nsch-fast-facts_final60ba3af3c0266255aab2ff00001023b1.pdf?sfvrsn=659c5817_0 Revised 26 Sept 2018.

15. Jones Z. "That was dysphoria?" 8 signs and symptoms of indirect gender dysphoria. Sept 10 2013. Available at: https://genderanalysis.net/articles/that-was-dysphoria-8-signs-and-symptoms-of-indirect-gender-dysphoria/
    View Article • Google Scholar

**Citation:** Littman L (2019) Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLoS ONE 14(3): e0214157. https://doi.org/10.1371/journal.pone.0214157

**Published:** March 19, 2019

JA2162

**Copyright:** © 2019 Lisa Littman. This is an open access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.



BRIEF REPORTS

www.jpeds.com • **THE JOURNAL OF PEDIATRICS**



# Do Clinical Data from Transgender Adolescents Support the Phenomenon of "Rapid Onset Gender Dysphoria"?

Greta R. Bauer, PhD, MPH[1], Margaret L. Lawson, MD, MSc, FRCPC[2], and Daniel L. Metzger, MD, FAAP, FRCPC[3], for the Trans Youth CAN! Research Team*

Although emergence of gender dysphoria at puberty is long established, a distinct pathway of rapid onset gender dysphoria was recently hypothesized based on parental data. Using adolescent clinical data, we tested a series of associations that would be consistent with this pathway, however, our results did not support the rapid onset gender dysphoria hypothesis. *(J Pediatr 2022;243:224-7).*

Puberty has long been understood as one period when gender dysphoria often first emerges.[1] Although most transgender (trans) older adolescents and adults report needing gender-affirming medical care (hormones and/or surgeries), and also report having been aware of their gender at young ages,[2] only a small proportion receive gender-affirming care as adolescents. Use of hormonal suppression with a gonadotropic-releasing hormone agonist, and hormones such as estrogen and testosterone therapies in trans and gender-diverse adolescents is supported by the American Academy of Pediatrics, the Pediatric Endocrine Society, the Endocrine Society, and the World Professional Association for Transgender Health.[1,3-5] Referrals to adolescent gender clinics have increased internationally, particularly among those assigned female at birth.[6-9]

In 2018, a phenomenon of rapid onset gender dysphoria was hypothesized as a distinct pathway involving social contagion among youth vulnerable due to mental or neurodevelopmental disorders,[10-12] raising public concerns regarding potential for later regret following gender-affirming medical care. This discussion has occurred primarily in the context of data from a single online parental survey.[10,11] Although this parental study has generated controversy,[13] methodologic and social critique,[12,14,15] and calls for additional research,[16,17] its hypotheses have not yet been tested on data from youth themselves. Specifically, rapid onset gender dysphoria is hypothesized as a phenomenon in youth with gender dysphoria emerging at or after puberty, socially influenced through peer contagion, and with contributing factors including poor mental health, neurodevelopmental disabilities, parent-child conflict, and maladaptive coping strategies.[10,11]

If the rapid onset gender dysphoria hypothesis indeed characterizes a distinct clinical phenomenon, and these youth access referrals for hormone suppression or gender-affirming hormones, then we would expect to see differentiation within clinical samples between those with more-recent (ie, rapid-onset) vs more-remote knowledge regarding their gender. Based on the published hypothesis,[10] we would expect more recent gender knowledge to be associated with self-reported mental health measures, mental health and neurodevelopmental disability diagnoses, behaviors consistent with maladaptive coping (eg, self-harm), support from online and/or transgender friends but not parents, and lesser gender dysphoria. We aim to test these hypotheses.

## Methods

Baseline data (2017-2019) from the Trans Youth CAN! Cohort included pubertal/postpubertal adolescents age <16 years attending a first referral visit for hormone suppression or gender-affirming hormones at 10 Canadian medical clinics that provide specialized gender-affirming care to adolescents through a range of different care models. Ethics approval was received from all study sites. Years gender was known was missing for 1 participant (excluded), for a final sample of n = 173. Methods and measures are described in detail elsewhere.[18]

Self-reported measures were obtained from baseline interviewer-administered adolescent surveys,[19] and diagnoses from baseline clinical records.[20] Recent gender knowledge was coded by subtracting age in years from age adolescents self-reported they "realized your gender was different from what other people called you." As ages were whole numbers, a difference of 1 could indicate <1 year to just under 2 years. Values ≤1 were coded as recent gender knowledge, with an alternate definition (values ≤2) for sensitivity analysis. Mental health symptoms were assessed with the Overall Anxiety Severity and Impairment Scale,[21] the Modified Depression Scale,[22] and the Kessler-6 scale for psychological distress.[23] Mental health diagnoses extracted from chart included anxiety, depression, personality disorder, eating disorder, and neurodevelopmental disorder diagnoses

From the [1]Epidemiology and Biostatistics, Schulich School of Medicine and Dentistry, Western University, London, Canada; [2]Division of Endocrinology and Metabolism, Department of Pediatrics, Children's Hospital of Eastern Ontario, University of Ottawa, Ottawa, Canada; and [3]Division of Endocrinology, Department of Pediatrics, BC Children's Hospital, University of British Columbia, Vancouver, Canada

*List of additional members of the Trans Youth CAN! Study Group is available at www.jpeds.com (Appendix).

Funded by the Canadian Institutes of Health Research (MOP-148641 [to G.B.]). Canadian Institutes of Health Research played no role in the design, conduct, writing, or submission decisions for this study. The authors declare no conflicts of interest.

0022-3476/© 2021 The Author(s). Published by Elsevier Inc. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).
https://doi.org/10.1016/j.jpeds.2021.11.020

included autism, obsessive compulsive disorder, or attention deficit hyperactivity disorder. Gender dysphoria symptoms were assessed using the Trans Youth CAN! Gender Distress Scale.[24] Self-reported mental health behaviors included self-harm, substance use, and suicidal behavior. Three measures captured social connections to online and trans communities: having gender-supportive online friends was coded if adolescents reported online friends who knew their gender and were "very supportive," and having online or trans friends as general sources of support was indicated in checklist items. Parental support was coded if youth indicated all biological/step/foster parents were "very supportive" of their gender identity or expression.

Statistical analyses were conducted using SAS v 9.4.1 (SAS Institute, Inc), weighted to account for clinics' different recruitment periods due to staggered start dates, to improve generalizability.[18] For analyses of associations between recency of gender knowledge and hypothesized correlates, a series of multiple regressions was conducted, with recency as the independent variable of interest, controlling for age and sex assigned at birth. Linear regressions were used for continuous dependent variables (eg, psychometric scales). For dichotomous dependent variables, modified Poisson regression with robust variance estimation was used.[25] As "rapid-onset" has not been precisely defined, we conducted a sensitivity analysis repeating these analyses using the alternate (value ≤2) definition of recent gender knowledge.

## Results

Recency of gender knowledge is presented in the **Figure**, results of hypothesized associations (recency value ≤ 1) in **Table I**, and

variable means and frequencies in **Table II** (available at www.jpeds.com). Controlling for age and sex assigned at birth, recent gender knowledge was not significantly associated with depressive symptoms, psychological distress, past diagnoses with mental health issues or neurodevelopmental disorders, gender dysphoria symptoms, self-harm, past-year suicide attempt, having gender-supportive online friends, general support from online friends or transgender friends, or gender support from parents. Recent gender knowledge was associated with lower scores on anxiety severity/impairment (b = −3.272; 95% CI −5.172, −1.373), and lower prevalence of marijuana use (prevalence ratio = 0.11; 95% CI 0.02, 0.82), counter to hypothesized directions of effect. For sensitivity analysis using the alternate (value ≤2) definition of recent gender knowledge, we found all results substantively the same in statistical significance and direction of effect, except past-year marijuana use, which now only approached statistical significance ($P = .0677$).

## Discussion

We did not find support within a clinical population for a new etiologic phenomenon of rapid onset gender dysphoria during adolescence. Among adolescents under age 16 years seen in specialized gender clinics, associations between more recent gender knowledge and factors hypothesized to be involved in rapid onset gender dysphoria were either not statistically significant, or were in the opposite direction to what would be hypothesized. This putative phenomenon was posited based on survey data from a convenience sample of parents recruited from websites,[10] and may represent the perceptions or experiences of those parents, rather than of



**Figure.** Recency of gender knowledge among adolescents age <16 years referred to Canadian clinics for hormone suppression or gender-affirming hormones (n = 173). Age at which knew gender was different was subtracted from current age in years; thus, "2 years" could range from more than 1 year to less than 3 years. Lighter gray represents recent gender knowledge in this analysis, with a sensitivity analysis also including the patterned bar.

JA2165

**Table I.** Associations between short-term awareness of gender and variables hypothesized to be associated with rapid-onset gender dysphoria, controlling for age and sex assigned at birth

| Dependent variables | B* | SE | P | PR* | 95% CI† |
|---|---|---|---|---|---|
| Mental health scales | | | | | |
| Anxiety severity/impairment (OASIS) | −3.272 | 0.961 | .0008 | | (−5.172, −1.373) |
| Depressive symptoms (MDS) | −1.276 | 0.845 | .1328 | | (−2.944, 0.392) |
| Psychological distress (K6) | −1.156 | 1.060 | .2771 | | (−3.248, 0.936) |
| Record of diagnosis with mental health disorder‡ | −0.509 | 0.315 | .1059 | 0.60 | (0.32, 1.11) |
| Record of diagnosis with neurodevelopmental disorder§ | 0.066 | 0.362 | .8563 | 1.07 | (0.52, 2.17) |
| Gender dysphoria/distress (TYC-GDS) | −0.193 | 0.122 | .1139 | | (−0.434, 0.047) |
| Mental health related behaviors | | | | | |
| Self-harm, past year | −0.052 | 0.191 | .7833 | 0.95 | (0.65, 1.38) |
| Marijuana use, past year | −2.178 | 1.010 | .0310 | 0.11 | (0.02, 0.82) |
| Past-year suicide attempt | −0.592 | 0.785 | .4505 | 0.55 | (0.12, 2.58) |
| Social connection indicators¶ | | | | | |
| Reports having online friends supportive of gender | −0.050 | 0.157 | .7505 | 0.95 | (0.70, 1.29) |
| Indicates online friends as source of general support | −0.223 | 0.286 | .4366 | 0.80 | (0.46, 1.40) |
| Indicates trans friends as source of general support | −0.049 | 0.298 | .1016 | 0.61 | (0.34, 1.10) |
| All parents supportive of gender identity/expression | −0.004 | 0.202 | .9836 | 1.00 | (0.67, 1.48) |

*B, beta regression; K6, Kessler-6 Scale MDS, Modified Depression Scale; OASIS, Overall Anxiety Severity and Impairment Scale; PR, prevalence ratio; TYC-GDS, Trans Youth CAN! Gender Distress Scale.*

*Estimates adjusted for age in years and sex assigned at birth.
†95% CIs for betas (for linear regressions) or PRs (for modified Poisson regressions).
‡Extracted from medical record: any diagnosis from clinic or referrer of anxiety, depression, personality disorder, eating disorder. Personality disorder diagnoses were uncommon (n = 2) and no youth had a record of eating disorder diagnosis.
§Extracted from medical record: any diagnosis from clinic or referrer of attention deficit hyperactivity disorder, obsessive compulsive disorder, or autism.
¶Hypothesized by other authors based on a survey of parents recruited from websites generally unsupportive of gender-affirming care.[10]

adolescents, particularly those who may enter into clinical care. Similar analyses should be replicated using additional clinical and community data sources. Our finding of lower anxiety severity/impairment scores in adolescents with more recent gender knowledge suggests the potential for longstanding experiences of gender dysphoria (or their social complications) playing a role in development of anxiety, which could also be explored in future research. ∎

*The Trans Youth CAN! Study Team thank the trans youth and their families who have generously shared their time and experience with us. We acknowledge the contribution of the local site teams to participant recruitment, in particular the team of research assistants involved in data collection.*

Submitted for publication Aug 31, 2021; last revision received Oct 8, 2021; accepted Nov 10, 2021.

Reprint requests: Greta R. Bauer, PhD, MPH, Epidemiology and Biostatistics, Western Centre for Public Health and Family Medicine, 1465 Richmond St N, London, ON N6G 2M1. E-mail: gbauer@uwo.ca

## References

1. World Professional Association for Transgender Health. Standards of care for the health of transsexual, transgender, and gender nonconforming people (7th version) [Internet]. 2012. Accessed May 30, 2021. https://www.wpath.org/publications/soc
2. Scheim AI, Bauer GR. Sex and gender diversity among transgender persons in Ontario, Canada: results from a respondent-driven sampling survey. J Sex Res 2015;52:1-14.
3. Rafferty J, AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness. Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. Pediatrics 2018;142:e20182162.
4. Lopez X, Marinkovic M, Eimicke T, Rosenthal SM, Olshan JS. Statement on gender-affirmative approach to care from the Pediatric Endocrine Society Special Interest Group on Transgender Health. Curr Opin Pediatr 2017;29:475-80.
5. Hembree WC, Cohen-Kettenis PT, Gooren L, Hannema SE, Meyer WJ, Murad MH, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an Endocrine Society Clinical Practice guideline. J Clin Endocrinol Metab 2017;102:3869-903.
6. Spack NP, Edwards-Leeper L, Feldman HA, Leibowitz S, Mandel F, Diamond DA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. Pediatrics 2012;129:418-25.
7. Chen M, Fuqua J, Eugster EA. Characteristics of referrals for gender dysphoria over a 13-year period. J Adolesc Health 2016;58:369-71.
8. Wiepjes CM, Nota NM, de Blok CJM, Klaver M, de Vries ALC, Wensing-Kruger SA, et al. The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): trends in prevalence, treatment, and regrets. J Sex Med 2018;15:582-90.
9. Aitken M, Steensma TD, Blanchard R, VanderLaan DP, Wood H, Fuentes A, et al. Evidence for an altered sex ratio in clinic-referred adolescents with gender dysphoria. J Sex Med 2015;12:756-63.
10. Littman L. Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLoS One 2018;2018;13:e0202330.
11. Littman L. Correction: parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLoS One 2019;14:e0214157.
12. Costa AB. Formal comment on: parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLoS One 2019;14:e0212578.
13. Wadman M. 'Rapid onset' of transgender identity ignites storm. Science 2018;361:958-9.
14. Ashley F. A critical commentary on "rapid-onset gender dysphoria." Social Rev 2020;68:779-99.
15. Restar AJ. Methodological critique of Littman's (2018) parental-respondents accounts of "rapid-onset gender dysphoria." Arch Sex Behav 2020;49:61-6.
16. Hutchinson A, Midgen M, Spiliadis A. In support of research into rapid-onset gender dysphoria. Arch Sex Behav 2020;49:79-80.

JA2166

April 2022                                                                                    BRIEF REPORTS

17. Zucker KJ. Adolescents with gender dysphoria: reflections on some contemporary clinical and research issues. Arch Sex Behav 2019;48:1983-92.
18. Bauer GR, Pacaud D, Couch R, Metzger DL, Gale L, Gotovac S, et al. Transgender youth referred to clinics for gender-affirming medical care in Canada. Pediatrics 2021;148:e2020047266.
19. Trans Youth CAN! Research Team. Trans Youth CAN! Baseline youth survey (English) [Internet]. 2017. Accessed June 30, 2020. https://transyouthcan.ca/wp-content/uploads/2018/04/Youth-Baseline-Survey.pdf
20. Trans Youth CAN! Baseline case report form [Internet]. 2017. Accessed June 30, 2020. https://transyouthcan.ca/wp-content/uploads/2019/03/Case-Report-Form-COMBINED-Baseline-Clean-Jan22.2018.pdf
21. Campbell-Sills L, Norman SB, Craske MG, Sullivan G, Lang AJ, Chavira DA, et al. Validation of a brief measure of anxiety-related severity and impairment: the Overall Anxiety Severity and Impairment Scale (OASIS). J Affect Disord 2009;112:92-101.
22. Dunn EC, Johnson RM, Green JG. The Modified Depression Scale (MDS): a brief, no-cost assessment tool to estimate the level of depressive symptoms in students and schools. School Ment Health 2012;4:34-45.
23. Kessler RC, Andrews G, Colpe LJ, Hiripi E, Mroczek DK, Normand S-LT, et al. Short screening scales to monitor population prevalences and trends in nonspecific psychological distress. Psychol Med 2002;32:959-76.
24. Bauer G, Churchill S, Ducharme J, Feder S, Gillis L, Gotovac S, et al. Trans Youth CAN! Gender Distress Scale (TYC-GDS) [Internet]. 2021. Accessed July 9, 2021. https://transyouthcan.ca/wp-content/uploads/2021/04/Gender-Distress-Scale-vSHARE_EN-2021.pdf
25. Zou G. A modified Poisson regression approach to prospective studies with binary data. Am J Epidemiol 2004;159:702-6.
26. Government of Canada SC. Visible minority of person [Internet]. 2015. Accessed May 29, 2021. https://www23.statcan.gc.ca/imdb/p3Var.pl?Function=DEC&Id=45152

---

### 50 Years Ago in THE JOURNAL OF PEDIATRICS

## What Changed the Prognosis of Juvenile Dermatomyositis?

Sullivan DB, Cassidy JT, Petty RE, Burt A. Prognosis in childhood dermatomyositis. J Pediatr 1972;80:555-63.

The addition of systemic corticosteroids to the treatment of juvenile dermatomyositis played a pivotal role in changing the outcome of this disease. This commentary published 50 years ago summarized the demographic, clinical, laboratory, pathology, treatment, and outcome of 18 children with dermatomyositis seen between 1960 and 1969 in a single center. The medical treatment consisted of systemic corticosteroids with tapering over 2 years. In a previous classic report from 1964,[1] on which we wrote a commentary in 2014,[2] only 33% were treated with corticosteroids. The outcomes were grim: one-third died, another one-third remained crippled, and only one-third recovered completely. However, in this study merely 8 years later, no deaths from dermatomyositis were recorded. Seventeen of the 18 children were functionally independent after treatment, but 8 of 18 developed calcinosis. Four patients had residual skin scaring, 4 developed mild joint contractures, and 6 had muscle atrophy. It is important to note that most of the cases in this series (13/18) were mild and monophasic, and only 5 patients had dyspnea or dysphagia indicative of a more severe disease, thus contributing to the good prognosis.

Modern aggressive therapy includes corticosteroid-sparing medications. Methotrexate is given as first-line treatment together with corticosteroids. Other medications for severe or chronic disease include intravenous immunoglobulin, calcineurin inhibitors, cyclophosphamide, and biologic modifiers (rituximab and tumor necrosis factor inhibitors). Janus kinase inhibitors have shown promise. Overall, mortality has decreased to 2.5%. However, even today, between 30% and 40% of the patients manifest a chronic disease course with functional impairments and develop calcinosis, and they require long-term immunosuppressive therapy with many potential complications.[3] Thus, despite the improvement in prognosis, there is a still a long way to optimize treatment of this rare disease. Precision medicine, using specific myositis autoantibodies and analysis of immune pathways in individual patients, may further improve the outcome of our patients.[3] In addition, early diagnosis and treatment are key!

**Limor Ashkenazi, MD**
**Philip J. Hashkes, MD, MSc**
Pediatric Rheumatology Unit
Shaare Zedek Medical Center
Jerusalem, Israel

#### References

1. Bitnum S, Daeschner CW, Travis LB, Dodge WF, Hopps HC. Dermatomyositis. J Pediatr 1964;64:101-31.
2. Hashkes PJ. 50 years ago in the Journal of Pediatrics: dermatomyositis. J Pediatr 2014;164:375.
3. Pachman LM, Khojah AM. Advances in juvenile dermatomyositis: myositis specific antibodies aid in understanding disease heterogeneity. J Pediatr 2018;195:16-27.

## Appendix

### Additional members of the Trans Youth CAN! Study Group Members

Joseph Bonifacio, MD, FRCPC, Adolescent Medicine, St. Michael's Hospital, Unity Health Toronto, Toronto, Ontario

Robert Couch, MSc, MD, FRCPC, Division of Pediatric Endocrinology, Department of Pediatrics, Stollery Children's Hospital, University of Alberta, Edmonton, Alberta

Jennifer Ducharme, PhD, C.Psych, Department of Clinical Health Psychology, Max Rady College of Medicine, Rady Faculty of Health Sciences, University of Manitoba, Winnipeg, Manitoba

Stephen Feder, MDCM, MPH, CCFP, Division of Adolescent Medicine, Department of Pediatrics, Children's Hospital of Eastern Ontario, University of Ottawa, Ottawa, Ontario

Lorraine Gale, MSW, Trans Youth CAN! Study Team, Toronto, Ontario

Shuvo Ghosh, MD, FAAP, Department of Pediatrics, Montreal Children's Hospital, McGill University Health Centre, Montreal, Quebec

Sandra Gotovac, PhD, Epidemiology and Biostatistics, Schulich School of Medicine and Dentistry, Western University, London, Ontario

Natasha Johnson, MD, FRCPC, Division of Adolescent Medicine, Department of Pediatrics, McMaster University, McMaster Children's Hospital, Hamilton, Ontario

Carys Massarella, MD, FRCPC, St. Joseph's Healthcare, Hamilton, Ontario

Arati Mokashi, MD, FRCPC, Department of Pediatrics, Division of Endocrinology, Dalhousie University; IWK Health Centre, Halifax, Nova Scotia

Danièle Pacaud, MD, FRCPC, Alberta Children's Hospital, Department of Pediatrics, Cumming School of Medicine, University of Calgary, Calgary, Alberta

Mark Palmert, MD, PhD, Division of Endocrinology, The Hospital for Sick Children, Departments of Pediatrics and Physiology, University of Toronto, Toronto, Ontario

Joe Raiche, MD, FRCPC, Foothills Medical Centre, Department of Psychiatry, Cumming School of Medicine, University of Calgary, Calgary, Alberta

Annie Pullen Sansfaçon, PhD, School of Social Work, University of Montreal, Montreal, Quebec

Elizabeth Saewyc, PhD, RN, jFSAHM, FCAHS, FAAN, FCAN, School of Nursing, University of British Columbia, Vancover, British Columbia

Kathy Nixon Speechley, PhD, Departments of Pediatrics and Epidemiology and Biostatistics. Schulich School of Medicine and Dentistry, Western University, London, Ontario

Robert Stein, MDCM, FRCPC, Division of Pediatric Endocrinology, London Health Sciences Centre, Schulich School of Medicine & Dentistry, London, Ontario

Françoise Susset, PsyD, Meraki Health Centre, Montreal, Quebec

Julia Temple Newhook, PhD, Department of Gender Studies, Memorial University, St. John's, Newfoundland and Labrador

Ashley Vandermorris, MD, MSc, FRCPC, Division of Adolescent Medicine, Department of Pediatrics, The Hospital for Sick Children, Toronto, Ontario

John Vandermeulen, MD, FRCPC, Division of Adolescent Medicine, Department of Pediatrics, McMaster University, McMaster Children's Hospital, Hamilton, Ontario

**Table II.** Weighted frequencies or means for sociodemographic and study variables (n = 173)

| Variables | Value |
|---|---|
| Age, n (%$_{weighted}$) | |
|   10-11 y | 17 (8.5) |
|   12-13 y | 37 (22.6) |
|   14-15 y | 119 (68.9) |
| Ethnoracial background,* n (%$_{weighted}$) | |
|   Indigenous | 33 (18.4) |
|   Nonindigenous visible minority† | 10 (6.6) |
|   Nonindigenous white | 128 (75.0) |
| Immigration background, n (%$_{weighted}$) | |
|   1 or more immigrant parent | 126 (28.7) |
|   No immigrant parents | 44 (71.3) |
| Living environment, n (%$_{weighted}$) | |
|   City | 87 (55.2) |
|   Suburb | 59 (33.9) |
|   Rural | 27 (10.9) |
| Gender identity, n (%$_{weighted}$) | |
|   Male or primarily a boy | 125 (75.7) |
|   Female or primarily a girl | 32 (15.9) |
|   Nonbinary‡ | 14 (8.3) |
| Mental health scales, mean$_{weighted}$ (SD) | |
|   Anxiety severity/impairment (OASIS) | 8.842 (4.548) |
|   Depressive symptoms (MDS) | 15.077 (4.030) |
|   Psychological distress (K6) | 10.746 (5.100) |
| Record of diagnosis with mental health disorder,§ n (%$_{weighted}$) | 92 (51.6) |
| Record of diagnosis with neurodevelopmental disorder,¶ n (%$_{weighted}$) | 44 (25.9) |
| Gender dysphoria/distress (TYC-GDS), mean$_w$ (SD) | 4.048 (0.557) |
| Mental health related behaviors, n (%$_{weighted}$) | |
|   Self-harm, past year | 110 (67.9) |
|   Marijuana use, past year | 29 (20.0) |
|   Past-year suicide attempt | 24 (16.9) |
| Social connection indicators,** n (%$_{weighted}$) | |
|   Reports having online friends supportive of gender | 109 (69.9) |
|   Indicates online friends as source of general support | 79 (49.3) |
|   Indicates trans friends as source of general support | 92 (55.8) |
| All parents supportive of gender identity/expression | 109 (61.8) |

*K6*, Kessler-6 Scale; *MDS*, Modified Depression Scale; *OASIS*, Overall Anxiety Severity and Impairment Scale; *TYC-GDS*, Trans Youth CAN! Gender Distress Scale.

*Coded to match Statistics Canada categories of Indigenous, visible minority, and white. Nonwhite, nonindigenous ethnoracial backgrounds were indicated by the following numbers of participants: 6 Black Canadian or African American, 2 Black African, 4 Latin American, 4 East Asian, 1 Indo-Caribbean, 3 Black Caribbean, 1 Middle Eastern, and 1 Southeast Asian (participants could indicate more than 1).

†The Canadian government defines visible minorities as "persons, other than Aboriginal peoples, who are non-Caucasian in race or nonwhite in color."[26]

‡Response option was "nonbinary or something other than male or female."

§Extracted from medical record: any diagnosis from clinic or referrer of anxiety, depression, personality disorder, eating disorder. Personality disorder diagnoses were uncommon (n = 2) and no youth had a record of eating disorder diagnosis.

¶Extracted from medical record: any diagnosis from clinic or referrer of attention deficit hyperactivity disorder, obsessive compulsive disorder, or autism.

**Hypothesized by other authors based on a survey of parents.[10]

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

|  |  |
|---|---|
| **Plaintiffs,** | Civil Action No. 3:20-cv-00740 |
|  | Hon. Robert C. Chambers, Judge |

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.,**

**Defendants.**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SECOND SET OF
INTERROGATORIES TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE,
AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES**

**INTERROGATORIES**

8. Identify all conditions, diagnostic codes, or instances where coverage for hysterectomy
and/or oophorectomy surgical procedures is available under the Health Plans offered
through West Virginia's Medicaid Program. Include in that identification:

**JA2170**

     a.  Diagnostic code(s);

     b.  Procedure code(s);

     c.  Medical necessity criteria.

**RESPONSE: Objection, this Interrogatory seeks information regarding procedures for which Plaintiff Fain is not seeking relief. Therefore, this request is not relevant, is not proportional to the matters in issue, and is outside the scope of permissible discovery. Without waiving this objection, multiple factors go into the review of any particular request, including past medical history, surgical history, and diagnosis. In addition, we have requested documents which are used as part of the review process and these will be supplemented upon receipt.**

9. Identify all conditions, diagnostic codes, or instances where coverage for vaginoplasty procedures is available under the Health Plans offered through West Virginia's Medicaid Program.  Include in that identification:

     a.  Diagnostic code(s);

     b.  Procedure code(s);

     c.  Medical necessity criteria.

**RESPONSE: Objection, this Interrogatory seeks information regarding  procedures for which Plaintiff Fain is not seeking relief. Therefore, this request is not relevant, is not proportional to the matters in issue, and is outside the scope of permissible discovery. Without waiving this objection, multiple factors go into the review of any particular request, including past medical history, surgical history, and diagnosis.**

**JA2171**

10. Identify all conditions, diagnostic codes, or instances where coverage for orchiectomy, penectomy, and/or phalloplasty procedures is available under the Health Plans offered through West Virginia's Medicaid Program.  Include in that identification:

    a.  Diagnostic code(s);

    b.  Procedure code(s);

    c.  Medical necessity criteria.

**RESPONSE: Objection, this Interrogatory seeks information regarding procedures for which Plaintiff Fain is not seeking relief. Therefore, this request is not relevant, is not proportional to the matters in issue, and is outside the scope of permissible discovery. Without waiving this objection, multiple factors go into the review of any particular request, including past medical history, surgical history, and diagnosis.**

11. Taking necessary steps to comply with applicable privacy laws, for each year since 2016 through the present identify the number of Health Plan participants who have submitted one or more claims with a diagnosis code for Gender Dysphoria or Gender Incongruence. This includes, but is not limited to, the following diagnosis:  F64.0, Transsexualism (ICD-10-CM); F64.2, Gender identity disorder of childhood (ICD-10-CM); F64.8, Other gender identity disorders (ICD-10-CM); F64.9, Gender identity disorder, unspecified(ICD-10-CM); HA60, Gender incongruence of adolescence or adulthood (ICD-11); and HA61, Gender incongruence of childhood (ICD-11).

**RESPONSE: Upon information and belief:**

3

**JA2172**

2016    30 members
2017    50 members
2018    243 members
2019    439 members
2020    602 members
2021 (through 9/30)  686 members.


                                    WILLIAM CROUCH,
                                    CYNTHIA BEANE, and
                                    WEST VIRGINIA DEPARTMENT OF
                                    HEALTH AND HUMAN RESOURCES,
                                    <u>BUREAU FOR MEDICAL SERVICES,</u>
                                    By counsel


<u>/s/Kimberly M. Bandy</u>
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com


4

**JA2173**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**CHRISTOPHER FAIN; ZACHARY
MARTELL;** and **BRIAN MCNEMAR,**
Individually and on behalf of all others
similarly situated,

           **Plaintiffs,**                    **Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department Of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES; TED CHEATHAM,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE
HEALTH PLAN OF WEST VIRGINIA, INC.**

           **Defendants.**

**<u>CERTIFICATE OF SERVICE</u>**

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of

Health and Human Resources, by counsel, and do hereby certify that on the 25th day of October,

2021, a true and exact copy of **DEFENDANTS' RESPONSE TO PLAINTIFF'S SECOND

SET OF INTERROGATORIES TO DEFENDANTS WILLIAM CROUCH, CYNTHIA

BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN

RESOURCES, BUREAU FOR MEDICAL SERVICES** was served on counsel via electronic

means as follows:

5

**JA2174**

Walt Auvil (WVSB#190)
**Counsel for Plaintiffs**
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
**Counsel for Plaintiffs**
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA 300030
(404) 897-1880
(404) 506-9320 (fax)
ccharles@lambdalegal.org

Tara L. Borelli, Visiting Attorney
**Counsel for Plaintiffs**
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
**Counsel for Ted Cheatham**
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

Stuart A. McMillan (WVSB#6352)
**Counsel for The Health Plan of West
Virginia, Inc.**
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV  25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
**Counsel for The Health Plan of West
Virginia, Inc.**
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV  26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
**Counsel for William Crouch, Cynthia Beane, and
West Virginia Department of Health and Human
Resources, Bureau for Medical Services**
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA2176**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF WEST VIRGINIA
 3                    CHARLESTON DIVISION
 4
 5    _____
      B.P.J. by her next friend and)
 6    mother, HEATHER JACKSON,      )
                                    )
 7              Plaintiff,          )
                                    )
 8      vs.                         )   No. 2:21-cv-00316
                                    )
 9    WEST VIRGINIA STATE BOARD OF  )
      EDUCATION, HARRISON COUNTY    )
10    BOARD OF EDUCATION, WEST      )
      VIRGINIA SECONDARY SCHOOL     )
11    ACTIVITIES COMMISSION, W.     )
      CLAYTON BURCH in his official )
12    capacity as State            )
      Superintendent, DORA STUTLER,)
13    in her official capacity as   )
      Harrison County              )
14    Superintendent, and THE STATE)
      OF WEST VIRGINIA,             )
15                                  )
                Defendants,         )
16                                  )
      LAINEY ARMISTEAD,             )
17                                  )
            Defendant-Intervenor.)
18    _____)
19              VIDEOTAPED DEPOSITION OF
                    STEPHEN LEVINE
20            Wednesday, March 30, 2022
                    Volume I
21
22
23    Reported by:
      ALEXIS KAGAY
24    CSR No. 13795
      Job No. 5122884
25    PAGES 1 - 289


                                        Page 1
```

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
 4
 5    _____
                                    )
 6    B.P.J. by her next friend and)
      mother, HEATHER JACKSON,      )
 7                                  )
              Plaintiff,            )
 8                                  )  No. 2:21-cv-00316
         vs.                        )
 9                                  )
      WEST VIRGINIA STATE BOARD OF )
10    EDUCATION, HARRISON COUNTY    )
      BOARD OF EDUCATION, WEST      )
11    VIRGINIA SECONDARY SCHOOL     )
      ACTIVITIES COMMISSION, W.     )
12    CLAYTON BURCH in his official)
      capacity as State            )
13    Superintendent, DORA STUTLER,)
      in her official capacity as  )
14    Harrison County              )
      Superintendent, and THE STATE)
15    OF WEST VIRGINIA,            )
                                    )
16              Defendants,         )
                                    )
17    LAINEY ARMISTEAD,            )
                                    )
18          Defendant-Intervenor.)
      _____)
19
20          Remote videotaped deposition of
21    STEPHEN LEVINE, Volume I, taken on behalf of Plaintiff,
22    with all participants appearing remotely, beginning at
23    9:09 a.m. and ending at 5:46 p.m. on Wednesday,
24    March 30, 2022, before ALEXIS KAGAY, Certified
25    Shorthand Reporter No. 13795.
```

Page 2

```
 1   APPEARANCES (via Zoom Videoconference):

 2

 3   For The Plaintiff B.P.J.:

 4      COOLEY

 5      BY:  KATELYN KANG

 6      BY:  VALERIA M. PELET DEL TORO

 7      BY:  ANDREW BARR

 8      BY:  KATHLEEN HARTNETT

 9      BY:  JULIE VEROFF

10      BY:  ELIZABETH REINHARDT

11      BY:  ZOE HELSTROM

12      Attorneys at Law

13      500 Boylston Street

14      14th Floor

15      Boston, Massachusetts 02116-3740

16      617.937.2305

17      KKang@Cooley.com

18      VPeletDelToro@Cooley.com

19      ABarr@Cooley.com

20      KHartnett@cooley.com

21      JVeroff@Cooley.com

22      ZHolstrom@Cooley.com

23

24

25
```

Page 3

```
 1    APPEARANCES (Continued):

 2

 3   For Plaintiff:

 4      LAMBDA LEGAL

 5      BY:  SRUTI SWAMINATHAN

 6      BY:  MAIA ZELKIND

 7      Attorneys at Law

 8      120 Wall Street

 9      Floor 19

10      New York, New York 10005-3919

11      SSwaminathan@lambdalegal.org

12      MZelkind@lambdalegal.org

13

14

15   For the Intervenor:

16      ALLIANCE DEFENDING FREEDOM

17      BY:  ROGER BROOKS

18      BY:  LAWRENCE WILKINSON

19      Attorneys at Law

20      1000 Hurricane Shoals Road, NE 30043

21      RBrooks@adflegal.org

22      LWilkinson@adflegal.org

23

24

25
```

                                                  Page 4

```
1    APPEARANCES (Continued):

2

3

4    For the State of West Virginia:

5       WEST VIRGINIA ATTORNEY GENERAL

6       BY:  DAVID TRYON

7       Attorney at Law

8       112 California Avenue

9       Charleston West Virginia 25305-0220

10      681.313.4570

11      David.C.Tryon@wvago.gov

12

13

14   For West Virginia Board of Education and Superintendent

15   Burch, Heather Hutchens as general counsel for the

16   State Department of Education:

17      BAILEY & WYANT, PLLC

18      BY:  KELLY MORGAN

19      Attorney at Law

20      500 Virginia Street

21      Suite 600

22      Charleston, West Virginia 25301

23      KMorgan@Baileywyant.com

24

25
```

Page 5

```
 1    APPEARANCES (Continued):

 2

 3    For defendants Harrison County Board of Education and

 4    Superintendent Dora Stutler:

 5        STEPTOE & JOHNSON PLLC

 6        BY:  SUSAN L. DENIKER

 7        Attorney at Law

 8        400 White Oaks Boulevard

 9        Bridgeport, West Virginia 26330

10        304.933.8154

11        Susan.Deniker@Steptoe-Johnson.com

12

13

14    For West Virginia Secondary School Activities

15    Commission:

16        SHUMAN MCCUSKEY SLICER

17        BY:  SHANNON ROGERS

18        Attorney at Law

19        1411 Virginia Street E

20        Suite 200

21        Charleston, West Virginia 25301-3088

22        SRogers@Shumanlaw.com

23

24

25
```

                                                    Page 6

```
 1   APPEARANCES (Continued):

 2

 3   For West Virginia Secondary School Activities

 4   Commission:

 5       SHUMAN MCCUSKEY SLICER

 6       BY:  ROBERTA GREEN

 7       Attorney at Law

 8       1411 Virginia Street E

 9       Suite 200

10       Charleston, West Virginia 25301-3088

11       RGreen@Shumanlaw.com

12

13

14

15   Also Present:

16       MITCH REISBORD - VERITEXT CONCIERGE

17

18   Videographer:

19       KIMBERLEE DECKER

20

21

22

23

24

25
```

                                                    Page 7

## DEPOSITION OF STEPHEN LEVINE

```
 1          Q   Why don't you give me your estimate of how

 2   many prepubertal children you've ever seen as patients,

 3   and then we can ask more questions.

 4          A   I would say a handful.  Six.

 5          Q   And how many of those -- of those            11:15:35

 6   approximately six did you see more than one time?

 7          A   I can't recall one.

 8          Q   And then I'll ask the same question about

 9   adolescents, which I'll mean minors from puberty

10   through being a minor.                                  11:16:00

11          How many adolescent patients have you had in

12   your career, approximately?

13          A   50.

14          Q   And how many of those have you seen more than

15   once?                                                   11:16:14

16          A   Most.

17          Q   And were most of those, of the adolescent

18   patients you've seen, late adolescence?

19          A   No.

20          Q   Turning back to your CV, you list yourself --  11:16:27

21   you're listed as a clinical professor at Case Western

22   Reserve University School of Medicine; correct?

23          A   Yes.

24          Q   Do you work at Case Western Reserve University

25   School of Medicine full-time?                           11:16:51
```

Page 87

## DEPOSITION OF STEPHEN LEVINE

Case 3:20-cv-00740   Document 254-21   Filed 05/31/22   Page 10 of 11 PageID #: 7813

```
 1    three months because I'm part of a committee to plan
 2    the curriculum on sexuality and gender.
 3            Speaking of education, the university --
 4    other -- other institutions also asked me to teach
 5    about this subject.  And on August -- on April 7th, I'm    12:07:39
 6    going to Akron to teach -- or virtually I'm going to
 7    teach a three -- a two-and-a-half-hour seminar.
 8            And I forgot to mention to you before, and I'd
 9    like you to hear this, that when you were questioning
10    me about my credentials or not having a certificate    12:07:57
11    about -- in child psychiatry, you should know, I forgot
12    to tell you that Cleveland Clinic, department of child
13    psychiatry, and the University Hospitals, the
14    department of child psychiatry, sends residents to be
15    with me as part of their training in child development    12:08:18
16    and child clinical issues, child and adolescent
17    clinical issues.
18            So I think -- I just forgot to mention that.
19       Q   Are you familiar with the University
20    Hospitals' LGBTQ and gender care program?    12:08:48
21       A   I'm aware that it exists, yes.
22       Q   Have you ever talked to any clinicians in that
23    practice?
24       A   No one has ever talked to me in that practice.
25    The only time I have interaction with them is when --    12:09:00
```

                                                        Page 113

**DEPOSITION OF STEPHEN LEVINE**

1    if I present grand rounds, some of those people ask me

2    a question.   But they've never consulted me whatsoever

3    in the formation of their clinic and in the ongoing

4    work of their clinic.

5           Although, Cleveland Clinic has a very similar     12:09:20

6    program, and they have called me up and -- for some

7    advice sometimes.

8           But my -- my, quote, own University Hospitals'

9    place I don't really think has any people from child

10   psychiatry in it, but I'm not sure because they have     12:09:38

11   kept me away.

12       Q   What do you mean they have kept you away?

13       A   Just what I explained.   They have never

14   communicated with me.   It is -- you know, other people

15   know me as being published in this area.   You know, I    12:09:54

16   think I've written 20 articles on this -- you know, I

17   have 20 or so publications in this area.   You would

18   think that they would invite me or consult with me or

19   ask me questions, but I think they recognized that they

20   are part of what is called affirmative care and what I    12:10:18

21   would say, rapidly affirmative care, and -- and they

22   sense that I'm not so interested in rapid, that -- that

23   I believe that -- that I have long believed that people

24   who have this kind of dilemma need some patient time in

25   talking about this matter.                                12:10:45

                                                    Page 114

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN and SHAUNTAE
ANDERSON; individually and on behalf of all
others similarly situated,

|  |  |
|---|---|
| *Plaintiffs*, | CIVIL ACTION NO. 3:20-cv-00740 |
|  | HON. ROBERT C. CHAMBERS |
| v. |  |
| WILLIAM CROUCH, *et al.*, |  |
| *Defendants*. |  |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE
EXPERT TESTIMONY OF STEPHEN B. LEVINE, M.D.**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   LEGAL STANDARD ................................................................................... 1

III.  ARGUMENT ................................................................................................. 3

   A.   Many Of Dr. Levine's Opinions Will Not Help the Trier of Fact Because They Support Plaintiffs' Position.......................................................................................... 4

   B.   Certain Opinions Of Dr. Levine Have No Relevance To This Case Because They Address Issues Beyond The Scope Of The Dispute Or Have Already Been Addressed By The Fourth Circuit........................................................................................................ 6

   C.   Dr. Levine's Opinions That Do Not Support Plaintiffs' Position Are Methodologically Unreliable and Unsupported by Science or Medicine................................................. 8

      1.   Dr. Levine's Assertion that the WPATH SOC and Endocrine Society Guidelines Are Not the Authoritative Treatment Protocols for Gender Dysphoria Is Wrong. ...................... 9

      2.   Dr. Levine's Opinions That Gender-Confirming Care Is Inadequate, Risky, and Without Lasting Benefit are Inaccurate and Unsupported. ............................................. 11

      3.   Dr. Levine's Opinions About Gender Dysphoria "Naturally Resolving" in Transgender Children and Adolescents Are Not Based In Fact. ................................................ 12

      4.   Dr. Levine's Assertion that "Rapid Onset Gender Dysphoria," as a Cause of Gender Dysphoria or the Concept of "Detransition" Justifies Denying Treatment to Transgender WV Medicaid Recipients Who Need It Is Unsupported By Scientific Evidence. ............... 14

   D.   Dr. Levine Is Not Qualified To Offer Opinions About the Cost of Gender-Confirming Care, Or About Puberty-Delaying Treatment, Or the Treatment of Pre-Pubescent Transgender Children Generally ................................................................................. 16

   E.   Dr. Levine's Report, Opinions, And Testimony Lack Probative Value And Are Thus Inadmissible Under Federal Rule Of Evidence 403................................................. 20

IV.  CONCLUSION ............................................................................................. 20

i

JA2188

## I.    INTRODUCTION

The issue in this case is whether Defendants' policy of not providing insurance coverage for gender-confirming surgical care (the "Exclusion")[1] violates the Equal Protection Clause, Section 1557 ("Section 1557") of the Patient Protection and Affordable Care Act ("ACA" or "Affordable Care Act"), and the Medicaid Act's Comparability and Availability Requirements. Yet, Defendants have put forward an expert, Dr. Stephen Levine, whose opinions other federal courts have resoundingly dismissed. Moreover, Dr. Levine has not and cannot opine on the actual issue in this case. His opinions are (1) irrelevant because they are largely aligned with the relief Plaintiffs seek; (2) fail to create any material disputes of fact because the relevance of his opinions are outside the scope of the issue in this case and, regardless, cover topics the Fourth Circuit has already addressed; and (3) are unreliable, not based on scientific methodology, and devoid of probative value, thus risking unfair prejudice, confusion, undue delay and needless presentation of cumulative evidence. The Court should exclude Dr. Levine's opinions.[2]

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on a trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). The party offering the expert carries the burden of establishing admissibility by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*,

---

[1] To the extent Defendants omit coverage for other gender-confirming care, that is also part of the Exclusion. For example, as to puberty-delaying treatment, while Defendants have denied this care at least once, BMS's Medical Director agrees that it is "standard of care" for gender dysphoria, and Defendants have previously covered it. *See* Pls.' SJ Mem. at Pt. II(C), n.38.

[2] Expert Disclosure of Stephen B. Levine, M.D., signed February 18, 2022, is attached as Exhibit A to the concurrently filed Declaration of Carl S. Charles ("Charles Decl.").

1

259 F.3d 194, 199 (4th Cir. 2001). But "[t]he district court is the gatekeeper. It is an important

role: 'Expert witnesses have the potential to be both powerful and quite misleading [;]" the court

must "ensure that any and all scientific testimony … is not only relevant, but reliable." *Tyree v.*

*Bos. Sci. Corp.*, 54 F. Supp. 3d 501, 516 (S.D.W. Va. 2014), *as amended* (Oct. 29, 2014) citing

*Cooper*, 259 F.3d at 199.

In determining whether the proposed expert is qualified, a trial court considers their "full

range of experience and training." *Belk, Inc. v. Meyer Corp., U.S.,* 679 F.3d 146, 162 (4th Cir.

2012), *as amended* (May 9, 2012) (cleaned up). If the purported expert lacks the knowledge, skill,

experience, training or education on the issue for which the opinion is proffered, the trial court

must exclude the expert. *See, e.g., Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th

Cir. 1989); *Mod. Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 537 (M.D.N.C.

2019) (Biggs, J.), *aff'd*, 842 F. App'x 847 (4th Cir. 2021); *Tyree,* 54 F. Supp. 3d at 561. Even if

the expert is deemed qualified, the trial court must consider the relevancy of the expert's testimony

as "a precondition to admissibility." *Sardis,* 10 F.4th at 282 (cleaned up). Simply put, "if an opinion

is not relevant to a fact at issue, Daubert requires that it be excluded." *Id*. at 281.

If deemed relevant, the trial court will inquire if the opinion is reliable, which focuses on

"the principles and methodology" employed by the expert to assess whether it is "based on

scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Id*. at 281,

290 (cleaned up). When evaluating reliability, a court considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory
> has been subjected to peer review and publication; (3) the known or potential rate
> of error of the particular scientific technique; and (4) whether the technique is
> generally accepted in the scientific community.

*Id*.; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-150 (1999); *Daubert,* 509

U.S. at 593-94. While trial courts have "broad latitude" to determine reliability, they must engage

in the gatekeeping process and not simply "delegate the issue to the jury." *Sardis*, 10 F.4th at 281. Even when an expert relies upon their experience and training in forming opinions, "[p]roposed testimony must be supported by appropriate validation—i.e., 'good grounds' based on what is known." *Tyree,* 54 F. Supp. 3d at 526 (citing *Daubert* 509 U.S. at 590). An expert cannot purport to have "considered the scientific literature" in forming their opinions but be unable to provide scientific support for some opinions. *Id*. Even though an expert "has experience, he must still base his opinions on a reliable, scientific method." *Id*. ("[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method.").

Finally, because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it…[T]he judge in weighing possible prejudice against probative force under Rule 403…exercises *more* control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595 (cleaned up) (emphasis added). As such, "the importance of [the] gatekeeping function cannot be overstated." *Sardis*, 10 F.4th at 283 (cleaned up).

## III.    ARGUMENT

As a preliminary matter, Plaintiffs note other federal courts' decisive dismissal of Dr. Levine's opinions about transgender people and the treatment of gender dysphoria. This began several years ago with the holding in *Norsworthy v. Beard*, that "the Court gives very little weight to the opinions of Levine, whose report misrepresents the Standards of Care; overwhelmingly relies on generalizations about gender dysphoric prisoners, rather than an individualized assessment of Norsworthy; contains illogical inferences; and admittedly includes references to a fabricated anecdote." 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015). This holding was echoed in *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125-1126 (D. Idaho 2018) (vacated in part on other grounds in *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019)) (holding that Dr. Levine

"is considered an outlier in the field of gender dysphoria" and gave "virtually no weight" to his opinions).

Dr. Levine's opinions were further diminished in *Hecox v. Little,* where the Court dismissed his opinion that "gender-affirming policies… are… harmful to transgender individuals," and instead "accept[ed] Plaintiffs' evidence regarding the harm forcing transgender individuals to deny their gender identity can cause." 479 F. Supp. 3d 930, 977 n.33 (D. Idaho 2020). And in just the last year alone, two more federal courts strongly discounted his proffered testimony by granting preliminary injunction motions against laws banning gender-confirming medical care and participation in school athletics, respectively, despite his testimony supporting those laws. *Brandt v. Rutledge*, 551 F. Supp. 3d 882 (E.D. Ark. 2021); *B. P. J.* v. *W. Va. State Bd. of Educ*., 550 F. Supp. 3d 347 (S.D.W. Va. 2021). Against this backdrop, the deficiencies in Dr. Levine's opinions discussed below are all the more striking.

> ### A.    Many Of Dr. Levine's Opinions Will Not Help the Trier of Fact Because They Support Plaintiffs' Position.

Nearly all of Dr. Levine's opinions will not help the "trier of fact to understand the evidence or to determine a fact in issue," because, with very limited exception, he simply does not oppose the relief Plaintiffs seek. *Nease*, 848 F.3d 219, 229 (4th Cir. 2017) (cleaned up). For that reason, Dr. Levine's opinions do not "fit" with the facts relevant to resolving Plaintiffs' claims. *Bourne v. E.I. DuPont de Nemours & Co.*, 85 F. App'x 964, 966 (4th Cir. 2004).

Overwhelmingly, Dr. Levine's opinions and testimony are not contrary to the relief Plaintiffs seek in this case: that WV Medicaid participants with gender dysphoria receive coverage for gender-confirming surgery. Charles Decl., Ex. B at 86:25-87:19; 87:14-22; Ex. at C at 66:21-67:3; 69:18-70:2. Indeed, Dr. Levine testified that in just the last seven months, he has provided several letters of approval for gender-confirming surgeries for transgender people incarcerated at

4

**JA2192**

Framingham, a correctional institution in Massachusetts. Charles Decl. Ex. B at 84:4-85:4. Dr. Levine has previously written similar letters for surgery in accordance with the medical community's widely accepted and authoritative guidance for transgender care, World Professional Association of Transgender Health ("WPATH") Standards of Care ("SOC"). Charles Decl., Ex. B. at 139:14-19; Ex. C at 55:13-17; 56:2-5; 112:16-21; 176:8-16; Ex. D at 1-100:15-22. He also recently testified that he does not provide such letters unless he has sufficiently informed his patients of possible risks and received a reasonable assurance that they understand. Charles Decl., Ex. C at 176: 8-16; 225:24-226:17. In fact, for almost fifty years, Dr. Levine's clinical practice has generally adhered to the WPATH SOC. Charles Decl. Ex. B at 136:8-11.  And, as the WPATH's former Chairman of the SOC Committee, Dr. Levine helped to write Version 5 of the SOC, recognized his own writing in Version 7, and asked if he could help draft the forthcoming Version 8. Charles Decl., Ex. A at ¶67; Ex. B at 147:12-149:18. He testified at deposition in this case, and under oath previously, that he "is not advocating denying endocrine treatment or surgical treatment" to transgender people, a position he described as "draconian."[3]

Dr. Levine testified at deposition that he is not offering *any* opinions in this case about whether Defendants should have an exclusion in their Medicaid program for coverage of gender-confirming surgery. Charles Decl. Ex. B at 86:25-87:19. He also testified that he does not feel his

---

[3] Charles Decl., Ex. B 88:10-13; Ex. C at 73:4-7 ("Q: Is the worrisomeness about a patient's future health, is that a reason to ban all medical care for gender dysphoria? A: Absolutely not."); 84:21-85:1 ("Q: Given all those concerns you have, is that a reason to deny all medical interventions to people with gender dysphoria? A: No …."); 85:4-11 ("Q: Are those concerns you raised justifications in your mind for denying medical interventions to people who have gender dysphoria? A: You know, I'm not advocating denying endocrine treatment or surgical treatment."); 152:1-6 ("Q: Do you think because that study showed that some people committed suicide after gender affirming surgery that no patient should be able to access gender affirming surgery? A: That would be illogical"); 154:3-5 ("Q: But you're not recommending total bans on gender affirming surgery? A: I'm not recommending total bans."); 160:23-25 ("I did not say that gender affirming treatment in general should be stopped. I've never said that.").

5

**JA2193**

"expertise extends to how the insurance industry works and how governments and legislatives work," nor "does he consider himself an expert" on whether Defendants' Exclusion should exist. Charles Decl., Ex. B at 87:14-22. These admissions contradict one of Dr. Levine's "key opinions" in his report, i.e., whether West Virginia's Medicaid Program should cover gender-confirming surgery, fundamentally undermining his credibility. Charles Decl., Ex. A at ¶10; Ex. B at 74:12-19. At bottom, Dr. Levine has repeatedly testified that he does not support banning gender-confirming medical care including surgery, which is the heart of Defendants' Exclusion.  His opinions in this regard are thus consistent with the relief Plaintiffs seek and will not assist the trier of fact.

**B.    Certain Opinions Of Dr. Levine Have No Relevance To This Case Because They Address Issues Beyond The Scope Of The Dispute Or Have Already Been Addressed By The Fourth Circuit.**

Dr. Levine's opinions fail to create any material disputes of fact because the relevance of Defendants' binding admissions refute his opinions. For example, Dr. Levine proposes to offer the opinion that "the biology of the person remains as defined by his (XY) or her (XX) chromosomes, including cellular, anatomic and physiologic characteristics..." Charles Decl., Ex. A at ¶18. But this case is simply a dispute asking whether a state Medicaid plan's categorical exclusion of gender-confirming care for transgender Medicaid participants that is covered for cisgender Medicaid participants discriminates based on sex and transgender status. The Court need not resolve questions about whether it is "biologically attainable" for transgender people to become "complete men or women," or whether sex is a binary concept. *Id*. at ¶17. The Court here need only decide whether Defendants can deny the same kinds of treatments to transgender Medicaid participants that it affords to cisgender Medicaid participants. Defendants' own Rule 30(b)(6) witness, Commissioner Cynthia Beane, testified that individuals enrolled in the Medicaid Program

can, she assumes, change their sex identification marker in Medicaid records. Charles Decl., Ex. E at 119:17-120:11. Therefore, even Defendants take no position on the issues in Dr. Levine's report about the etiology of sex, and instead use participants' self-reported gender identity as evidence of sex designation for the purposes of WV Medicaid enrollment and coverage.

Dr. Levine also offers the opinion, supported only by anecdotal narrative articles, that "gender exploratory" therapy can and has led to a resolution of gender dysphoria. Charles Decl. Ex. A at ¶37. But Commissioner Beane also testified that she was aware of the concept of "conversion therapy" and that no one, including transgender children, should be subjected to "that therapy." Charles Decl. Ex. E at 157:14-23. Significantly, Dr. Levine admits in his report that "quality evidence proving long-term effectiveness of psychotherapy interventions" such as those he advocates "is missing." *Id.* at ¶160. Defendants thus disagree with Dr. Levine's opinion, rendering it irrelevant, and he further admits it has no scientific basis.

Dr. Levine's opinions also do not help this Court because Fourth Circuit precedent informs review of the relevant issues. *See Grimm v. Gloucester Cnty. Sch. Bd.* 972 F.3d 586, 595 (4th Cir. 2020); *Kadel v. N. C. State Health Plan for Tchrs. and State Emps.*, 12 F.4th 422, 427 (4th Cir. 2021). His attempts to disparage the credibility of the WPATH and diminish the SOC as ideological and unscientific are directly contrary to the Fourth Circuit's reasoning in *Grimm*:

> Fortunately, we now have modern accepted treatment protocols for gender dysphoria. Developed by the World Professional Association for Transgender Health (WPATH), the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (7th Version 2012) (hereinafter "WPATH Standards of Care") represent the consensus approach of the medical and mental health community, Br. of Medical Amici 13, and have been recognized by various courts, including this one, as the authoritative standards of care, *see De'lonta v. Johnson*, 708 F.3d 520, 522–23 (4th Cir. 2013); *see also Edmo*, 935 F.3d at 769; *Keohane v. Jones*, 328 F. Supp. 3d 1288, 1294 (N.D. Fla. 2018), *vacated sub nom. Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257 (11th Cir. 2020). "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups."

*Edmo*, 935 F.3d at 769 (quoting *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125 (D. Idaho 2018)).

*Grimm*, 972 F.3d at 595-596. Further irreconcilable with available data and the consensus of the medical community, Dr. Levine suggests that the "high burden of mental illness" may be a "result" and/or "cause" of being transgender. Charles Decl., Ex. A at ¶35. The Fourth Circuit disagrees, reasoning that: "Being transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Grimm*, 972 F.3d at 594 (cleaned up); *see also Kadel*, 12 F.4th at 427. Dr. Levine has previously testified at deposition that he believes that gender dysphoria, or being transgender, is a "product of other things," including possibly familial sexual abuse, distress over "their body changing," growing up in a single-parent home, or having an autism diagnosis. Charles Decl., Ex. C. at 154:5-8; 235:23-25; 137:10-13; 235:20-22; 235:17-20. The Fourth Circuit has also found that "[j]ust like being cisgender, being transgender is natural and is not a choice." *Kadel*, 12 F.4th at 427 (quoting *Grimm*, 972 F.3d at 594). Dr. Levine has previously admitted to practicing, and currently advocates for, the use of psychotherapy to "alleviate" gender dysphoria while withholding medical care,[4] but the Fourth Circuit has acknowledged that "mental health practitioners' attempts to convert transgender people's gender identity to conform with their sex assigned at birth did not alleviate dysphoria, but rather caused shame and psychological pain." *Grimm*, 972 F.3d at 595. Essentially, Fourth Circuit precedent renders much of Dr. Levine's testimony irrelevant to this case.

### C.    Dr. Levine's Opinions That Do Not Support Plaintiffs' Position Are Methodologically Unreliable and Unsupported by Science or Medicine.

Expert testimony should only be admitted if its methodology is sufficiently reliable. *Sardis*, 10 F.4th at 281. Dr. Levine's opinions fall far short of each prong of this reliability standard. Dr.

---

[4] Charles Decl., Ex. A at ¶37, ¶90

Levine admitted in his report and at deposition in this and other recent cases that theories upon which he relies lack *any* scientific support and have not been tested or subjected to peer review or publication. Charles Decl., Ex. A at ¶37, ¶160; Ex. B at 140:12-143:2, 145:19-25; Ex. C at 109:20-25; 116:4-7; 122:8-124:22; 131:11-132:1; 200:11-201:25. Even putting the *Daubert* reliability factors aside, although Dr. Levine claims his "experience" is sufficient foundation for his opinions, he fails to address how this purported experience leads to his conclusions and how such experience is reliably applied to the facts here. *See*, *e.g*., *Cooper,* 259 F.3d at 200 (affirming the exclusion of an expert because he "asserted what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method."); *Tyree,* 54 F. Supp. 3d at 526 (excluding an expert witness when the only support offered for an opinion was clinician's experience and not any reliable data); *SAS Inst., Inc. v. World Programming Ltd.,* 125 F. Supp. 3d 579, 589; *see also Nat'l Ass'n. for Rational Sexual Offense L. v. Stein*, No. 17-CV-53, 2021 WL 736375, at *3 (M.D.N.C. Feb. 25, 2021) (excluding expert where offering party failed to establish how expert's "experience leads to his conclusions nor how those experiences have been reliably applied to the facts").

      1.    **Dr. Levine's Assertion that the WPATH SOC and Endocrine Society Guidelines Are Not the Authoritative Treatment Protocols for Gender Dysphoria Is Wrong.**

Chief among Dr. Levine's many unreliable opinions is his assertion that the widely-accepted and utilized WPATH SOC and Endocrine Society Guidelines ("ESG") are not the authoritative treatment protocols for gender dysphoria. Seemingly contradicting *himself*, Dr. Levine has repeatedly testified, however, that he generally adheres to the WPATH SOC in his own clinical practice. Charles Decl., Ex. B at 136:8-11; Ex. C at 55:13-17; 56:2-5; 112:16-21; 176:8-16; 225:24-226:17; Ex. F at 29:10-18; 37:2-13; 47:22-49:3; 103:11-19. Nevertheless, Dr. Levine

9

**JA2197**

attempts to undermine WPATH SOC by misrepresenting sources in his report and failing to include contrary information—undermining the admissibility and reliability of his opinions.

First, Dr. Levine alleges that the SOC are "very low quality and unfit tools for clinical decision-making," identifying one article by Dahlen et al. – but nowhere in that article does it characterize the WPATH SOC that way. Charles Decl., Ex. A at ¶21; Ex. G. The article concludes that the SOC are due for an update and acknowledges that evaluations of clinical practice guidelines in other medical areas including cancer, diabetes, pregnancy, and depression "tend to show room for improvement," and that "finding poor quality CPGs is not confined to this area of healthcare." Charles Decl., Ex. G at 8. In the same paragraph and without evidence, Dr. Levine makes a similar assertion about the ESG for treating gender dysphoria. Charles Decl., Ex. A at ¶21. Dr. Levine's report also mischaracterized the ESG's explanation of its "strong" versus "weak" recommendations related to gender-confirming care, something he admitted at deposition that he had no support for, reflected his own editorializing, and was not a quote from the Endocrine Society. *Id.* at ¶104; Charles Decl., Ex. B at 174:10-175:17

Second, Dr. Levine quotes from a *blog post* which mischaracterized comments from the incoming president of WPATH, Dr. Marci Bowers. Charles Decl., Ex. A at ¶23. Wholly absent from Dr. Levine's report was any acknowledgment of Dr. Bower's subsequent public statement released on her website that her comments were "taken out of context and used to cast doubt upon trans care," and her hope that those comments "will not be excerpted to weaponize ongoing attacks upon transgender persons." Charles Decl. Ex. H at 2. Third, Dr. Levine makes sweeping and inaccurate statements about WPATH SOC that other countries' protocols related to the treatment of gender dysphoria in transgender youth is evidence of a shift away from the WPATH SOC. Charles Decl., Ex. A at ¶¶22, 49. But again, Dr. Levine misrepresents even the content of non-peer

10

**JA2198**

reviewed, non-scientific sources he uses to support this opinion. Both posts he cites to for this contention are from an advocacy group's website and plainly admit *in the text of the posts* that both Finland and Sweden allow youth to access medical interventions for the treatment of gender dysphoria, a fact Dr. Levine admitted at deposition. Ex. B at 106:4-108:8. Dr. Levine also acknowledged that the United Kingdom's Cass Review, which is currently underway, begins from the premise that some youth do experience gender dysphoria and will need clinical support and medical interventions, which are not prohibited in their health system. Charles Decl., Ex I; Ex. B at 191:20-192:16. Overwhelmingly, Dr. Levine's methodology and evidence for his opinions about the WPATH SOC do not meet the burden under *Daubert* or related standards articulated by this court for admissibility of expert witness testimony.

> **2.      Dr. Levine's Opinions That Gender-Confirming Care Is Inadequate, Risky, and Without Lasting Benefit are Inaccurate and Unsupported.**

Dr. Levine alleges that gender-confirming care is experimental, risky, and without lasting benefit. Charles Decl., Ex. A at ¶¶23, 39, 51, 118-122 This opinion cannot satisfy the reliability standard because Dr. Levine authorizes this care for his own patients and either ignores studies contrary to his belief or distorts their findings beyond the authors' explicit intentions or design. Significantly, he omits recent studies demonstrating that medical treatments for transgender adolescents and adults have favorable outcomes across many measures. Charles Decl., Ex. J. at ¶55. A plethora of studies also show that trans people experience pervasive stigma and discrimination, resulting in health disparities. But Dr. Levine omits any reference to those studies and instead implies that receiving gender-confirming care *causes* those disparities, such as increased risk of suicide and suicide attempts, relying most heavily on two articles which do not support this assertion. Charles Decl., Ex. A at ¶119-124. First, he relies on a study by Cecilia Dhejne, a scholar in the field who has publicly and specifically said Dr. Levine's assertion is a

mischaracterization of her work. Charles Decl., Ex. K at 65. Her study also does not support his assertion because *the study itself* states it is not designed to "address whether sex reassignment is an effective treatment or not." Charles Decl., Ex. L at 2. And when confronted at a recent deposition, he admitted the study design created a serious limitation in drawing any conclusions about the efficacy of the care. Charles Decl., Ex. C at 156:7-11. Dr. Levine makes similar implications in his report about the second study, Simonsen et al., suggesting that the article demonstrates higher death rates among people who received gender-confirming surgery. But again, the article states precisely the opposite, that "the present study design does not allow for determination of causal relations between HT (hormone therapy) and SRS (sex reassignment surgery) and somatic morbidity or mortality." Charles Decl., Ex. M at e65-e66.

Ultimately, Dr. Levine fails to cite any literature that supports this belief, and regardless, he confirmed that this should not prevent Plaintiffs or the class from receiving the relief they seek. When asked recently if he believes that because a study showed that some people committed suicide *no patient* should be able to access gender-confirming surgery, Dr. Levine responded, "that would be illogical." Charles Decl., Ex. C at 151:25-152:6. And when asked if all the concerns he has are justifications for denying medical interventions to all people with gender dysphoria, he responded "I'm not advocating denying endocrine treatment or surgical treatment." *Id*. at 85:4-11.

### 3. Dr. Levine's Opinions About Gender Dysphoria "Naturally Resolving" in Transgender Children and Adolescents Are Not Based In Fact.

Another unreliable opinion presented by Dr. Levine is that "the majority" of pre-pubescent children diagnosed with gender dysphoria will, absent intervention, cease to be transgender (or "desist") by adulthood. Charles Decl., Ex. A at ¶90. This opinion is unreliable and methodologically unsound for several reasons. First, Dr. Levine recently conceded that some

**JA2200**

children are and will continue to be transgender and that as they progress into adolescence and adulthood, and that they would need medical care that he has, and would, authorize. Charles Decl., Ex. C. at 173:7-15; 137:14-23; 173:22-174:5; 53:16-54:7. Second, for this opinion, Dr. Levine cites to three articles that share the same core methodological flaw: they discuss studies that only include children whose gender non-conforming behavior was diagnosed under the obsolete and overly broad diagnostic criteria for "Gender Identity Disorder in Children" of the Diagnostic Statistical Manuals ("DSM") III, III-R, IV, and IV-R. Charles Decl., Ex. A at ¶90 nn.130-132. Under these sweeping, outdated diagnostic criteria, and the thinly veiled anti-gay attitudes of many clinicians at the time who viewed being gay as a disorder, most of the children diagnosed with Gender Identity Disorder in Children were not actually transgender but were gay or bisexual. Because of the years of initial visits in the study samples (1952-2008) none of these children were diagnosed under the diagnostic criteria for "Gender Dysphoria in Children," contained within the current and authoritative DSM-V, released in 2013, which requires "a strong desire to be of the other gender or an insistence that one is the other gender" and "clinically significant distress or impairment in social, school, or other important areas of functioning." Charles Decl., Ex. N at 452. Therefore, the "desistance rates" from the studies upon which Dr. Levine bases his opinion reflect children who, while they might have exhibited cross gender behaviors, would not satisfy the current diagnostic criteria and were likely not even transgender, or suffering from gender dysphoria. This clear implication undercuts other of Dr. Levine's conclusions but most importantly underscores that Dr. Levine cannot be established as a reliable expert because he manipulates available research and "cite[s] papers that do not provide the support asserted." *Tyree*, 54 F. Supp. 3d at 520 (cleaned up).

Dr. Levine also attempts to undercut the validity of the authoritative and widely used

13

diagnostic criteria for gender dysphoria in the DSM V. Charles Decl., Ex. A at ¶86. Without any evidence, Dr. Levine characterizes the International Classifications of Diseases Version 11 ("ICD-11") as a "diagnostic category [sic]," "which is expected to supersede DSM-V in determining eligibility for transgender interventions." *Id*. Setting aside that Dr. Levine again provides no citation or scientific proof of this assertion, the truth is that the ICD-11 has not even been adopted in the United States. Charles Decl., Ex. O at 108:10-18. Dr. Levine's claim that the "conflict" between the two precludes being able to determine medical necessity is an exercise in fiction. Indeed, the screening tool that BMS uses to determine medical necessity has issued policies clearly indicating when this care is medically indicated. Charles Decl., Ex. P. Such hypothetical and scientifically unsupported ideas cannot be the basis for reliable expert testimony.

> **4.      Dr. Levine's Assertion that "Rapid Onset Gender Dysphoria," as a Cause of Gender Dysphoria or the Concept of "Detransition" Justifies Denying Treatment to Transgender WV Medicaid Recipients Who Need It Is Unsupported By Scientific Evidence.**

A stark example of Dr. Levine's opinions failing to meet methodological reliability is his assertion that the untested and scientifically unsupported hypothesis of "rapid onset gender dysphoria" justifies denying Medicaid coverage of medical interventions to Plaintiffs and the proposed class. Charles Decl., Ex. A at ¶79. "While hypothesis is essential in the scientific community because it leads to advances in science, speculation in the courtroom cannot aid the fact finder in making a determination ...." *Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672, 684 (M.D.N.C. 2003). Just seven months ago, the only article Dr. Levine could name regarding "rapid onset gender dysphoria" was withdrawn and republished with a significant correction that Dr. Levine confessed he had not read. Charles Decl., Ex. C at 116:22-117:9. The correction admitted that: "rapid onset gender dysphoria is not a formal mental health diagnosis," "the report did not collect data from adolescents and young adults or clinicians and therefore does not validate

14

the phenomenon," and "the use of the term, 'rapid onset gender dysphoria' should be used cautiously by clinicians and parents to describe youth." Charles Decl., Ex. Q at 1. Indeed, several months later, Dr. Levine does not cite to any new peer reviewed sources or studies that establish evidence of such a phenomenon, but instead to *one* article merely suggesting research should be performed. Charles Decl. Ex. A at ¶79. Despite this, at deposition Dr. Levine attempted to conflate an increased number of transgender young people presenting to clinics for care with the theory of "rapid onset gender dysphoria" and asserted, without evidence, it is not a hypothesis but "a fact," that he "assumes everyone understands [this] is true." Charles Decl. Ex. B at 151:18-152:6, 152:22-153:5. When pressed to provide peer-reviewed articles, sources, or studies as scientific support he referenced presentations without title or date, admitted he could not remember the names of "authors from Europe" but asserted it had been documented by "DiAngelo and Clayton in Australia." To date, the *only* peer-reviewed study that interrogates this hypothesis using adolescent clinical data "did not support the ROGD hypothesis." Charles Decl., Ex. R at 1.

Similarly, when confronted at deposition about his opinion that there is "evidence that *a growing number* of young people regret transition and wish to reverse it," Dr. Levine admitted he lacked any scientific support for such an opinion. Charles Decl., Ex. A at ¶79; Ex. B at 158:8-159:2; 160:25-161:9; 163:9-24. Dr. Levine did not point to his own experience as a basis and conceded three times that the sources he cited in his report did not provide relevant evidence. *Id*. Even if Dr. Levine had relied on his own experience for this opinion, "a reliable expert would not … misstate the findings of others, make sweeping statements without support, and cite papers that do not provide the support asserted." *Tyree*, 54 F. Supp. 3d at 520 (cleaned up).

Seven months ago, when confronted about the same "detransition subreddit" that Dr. Levine cites in his report here, he admitted he had no evidence that *even one* of the then 16,000

members of the subreddit had actually "detransitioned." Charles Decl., Ex. C at 200:6-201:25. Nothing has changed in the intervening months except that now Dr. Levine concedes in his report that "it would be wrong to assert that each of the members have detransitioned." Charles Decl., Ex. A at ¶91. Despite this concession, he asserts without citation or evidence that "it is reasonable to assume that many are considering it, and many have accomplished some degree of it." *Id*. Why Dr. Levine believes it is "reasonable" for an expert witness to make unsupported assumptions is unclear, but this does not pass *Daubert* muster. Given that these hypotheses about "rapid onset gender dysphoria" and ideas about "detransition" are entirely unverified or unsupported, Dr. Levine cannot claim that they use any reliable methodology. His reliance on his own *ipse dixit* fails to establish a basis upon which to assert this opinion.

### D.    Dr. Levine Is Not Qualified To Offer Opinions About the Cost of Gender-Confirming Care, Or About Puberty-Delaying Treatment Or the Treatment of Pre-Pubescent Transgender Children Generally.

Although Dr. Levine opines about the cost of gender-confirming care, he admits that—whatever his skills may be— "economic analysis is not one of them. Others must be relied upon to answer the question." Charles Decl. Ex. A at ¶55. Dr. Levine's candid admission that he is unqualified to render this opinion alone should disqualify it, but his analytical errors end all doubt.

Dr. Levine begins his analysis by stating that "the data already show that the numbers of individuals seeking transgender interventions on West Virginia Medicaid increased from 30 individuals in 2016, to 686 individuals through the end of September in 2021." Charles Decl. Ex. A ¶54. He relies on a discovery response by Defendants providing those figures, suggesting that this increase over a 5-year period supports his ideas about a "rapid rise in transgender identification, especially among youth." Charles Decl. Ex. A at ¶53. But he makes two fatal omissions.

First, he fails to disclose that the increase may be because West Virginia Medicaid began covering hormone therapy for gender-affirming care in 2017, one year into that period, as described in Plaintiffs' motion for summary judgment. Accordingly, this supplies no reliable basis to infer a "rapid rise in transgender identification."

Second, Defendants were asked in Plaintiffs' Second Set of Interrogatories to "identify the number of Health Plan participants who have submitted one or more claims with a diagnosis code for Gender Dysphoria or Gender Incongruence." Charles Decl. Ex. S at ¶11. Significantly, Defendants did not specify, and Dr. Levine does not purport to know, how many claims were for services like psychotherapy and hormone replacement therapy, and which were for services barred by the Exclusion. To this point, Dr. Levine admitted at deposition that not only does he not know which of the 686 Medicaid participants need which kinds of "interventions", but he also does not know which participants need surgery. Charles Decl. Ex. B at 213:20-25; 212:15-17.

Dr. Levine also provides no evidence of how many of the 686 participants claims are from youth or adults. But he suggests, without evidence or any basis upon which to opine, that "the majority" of transgender people will choose to undergo medical interventions, and that the proportion will increase "when such interventions are provided at no cost to the patient" or, as he implies, if WV Medicaid removes the Exclusion. Charles Decl., Ex. A at ¶53. Similarly, and without evidence or scientific methodology used to reach this conclusion, Dr. Levine wildly suggests that "as many as 30,000 West Virginia youth could be identifying as transgender." *Id*. at ¶54. What this has to do with West Virginia's Exclusion of gender-confirming surgery and its cost is murky at best and is certainly an opinion that should be excluded from testimony before this court. At bottom, Dr. Levine disclaimed at deposition that he was offering any opinions about how

17

**JA2205**

the WV Medicaid program is subsidized by the federal government, about the cost of puberty blockers under the West Virginia Medicaid Program, or about the cost of surgical care for the treatment of gender dysphoria under the West Virginia Medicaid Program. Charles Decl. Ex. B at 211:17-21; 210:13-19; 211:6-10. The Court should accept Dr. Levine's own admissions that he is neither qualified to opine, nor opining about, the cost of gender-confirming care, and exclude such testimony as unfounded and irrelevant.

Dr. Levine also offers unsupported personal beliefs about the impact of puberty delaying treatment, for which he lacks clinical, and as his report admits, scientific evidence. Charles Decl. Ex. A at ¶132. Without citation, Dr. Levine raises the specter of puberty delaying medication causing transgender children "diminished sexual response," and extrapolates his unsupported opinion even further to suggest that youth will experience "social, psychosocial, and interpersonal impacts" of "not being in puberty for 2-5 years." *Id*. at ¶131, 132, 134. But Dr. Levine admits he lacks published data for these theories which, "have not been systematically studied." *Id*. at ¶132, ¶135. In fact, Dr. Levine's only consistent citations for these opinions are two of his own publications, which do not contain research, studies, or data that he has collected or analyzed. *Id*. at nn. 207, 208, 211, 213, 215. Dr. Levine again suggests that it is "reasonable to assume" that puberty delaying treatments "increase the adolescent's sense of isolation otherness or being an outsider." *Id*. at ¶136. Contrary to Dr. Levine's suggestion, unsupported assumptions are not an acceptable basis for expert testimony by this Court and fall far short of the standard for reliability.

Unsurprisingly, this is the norm for Dr. Levine's proffered opinions in other cases. He recently testified that puberty delaying treatment should not be available to any transgender adolescents because in the cases he has seen, such treatment was "like a treatment for the mother's pathology, not for the child." Charles Decl., Ex. C at 184:25-185:2. If it were up to Dr. Levine, he

**JA2206**

would "consider banning puberty blocking hormones even for children who have been cross-gender identified for four years to give them a chance to desist." Charles Decl., Ex. C at 186:20-25. Even Dr. Levine acknowledges the unscientific nature of this opinion, as he recently admitted he does not know where it comes from or "to what extent it's from my politics, or from my being a parent or a doctor, I don't know." Charles Decl., Ex. C at 187:20-24.

Dr. Levine has also repeatedly admitted at depositions for the last year—as he must—that he has no experience performing research or publishing studies about pre-pubescent transgender children, and virtually no experience administering psychiatric treatment to them. Charles Decl., Ex. A at ¶5; Ex. B at 26:10-13; Ex. C at 23:1-8. When asked whether he has treated any children with gender dysphoria, he admitted, "I have only on rare occasion personally treated or directly or indirectly treated a child." Charles Decl. Ex. B at 28:23-29:6; 62:6-14. Dr. Levine also confirmed his testimony from March 30, 2022, that over the course of his nearly 50-year career, he had only seen an estimated six pre-pubertal children, and not for more than one visit. Charles Decl., Ex. T at 87:1-7. When asked about more recent experience treating children with gender dysphoria, Dr. Levine confirmed his testimony from seventh months ago was correct and that in the intervening months he had not treated any children. Charles Decl., Ex. B at 77:24-78:6; Ex. C at 51:14-18; 52:14-22. When asked if Dr. Levine had helped to develop guidelines for the treatment of transgender children or adolescents with gender identity issues he responded "the answer is no." Charles Decl., Ex. B at 51:10-16. Dr. Levine is not recognized as an expert in providing treatment to transgender children by his private employer who by his own admission does not refer children to him as patients, nor by the University Hospitals' LGBTQ and Gender Care Program--the Cleveland hospital affiliated with Case Western Reserve University Medical School where Dr. Levine is a clinical professor—which he previously admitted did not consult with him as part of

its formation or their ongoing work. Charles Decl., Ex. T at 113:19-114:4. He does not write or research about providing treatment to transgender children, nor does he deliver any psychiatric care to them in his day-to-day practice. Dr. Levine is not qualified under the *Daubert* standards to offer opinions on matters relating to the care of transgender children, and he cannot use his personal beliefs as methodologically reliable evidence.

### E.    Dr. Levine's Report, Opinions, And Testimony Lack Probative Value And Are Thus Inadmissible Under Federal Rule Of Evidence 403.

Finally, the Court should exclude evidence if its introduction will result in unfair prejudice, confusion of the issues, or result in misleading testimony. Fed. R. Evid. 403. As noted above, Dr. Levine offers no opinions on any factual dispute in this case, and, in any event, the opinions he offers are irrelevant and unreliable. Consideration of his testimony would waste time and create confusion. The testimony would also result in prejudice, as the testimony seeks to sow confusion about the veracity of Plaintiffs' gender identity, gender dysphoria diagnosis, and other experiences—issues unrelated to whether the WV Medicaid Program can deny coverage of the same kinds of treatments to transgender people that it provides cisgender people. Accordingly, Dr. Levine's testimony fails to satisfy the requirements of Fed. R. of Evid. 403 and should be excluded.

## IV.    CONCLUSION

Plaintiffs respectfully request that this Court grant the instant motion and exclude all of Dr. Levine's purported expert testimony as inadmissible under *Daubert* and the Rules of Evidence.

Dated: May 31, 2022

/s/ Walt Auvil
Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058 | Fax: 304-485-6344
auvil@theemploymentlawcenter.com

Anna P. Prakash, MN Bar No. 0351362*
Nicole J. Schladt, MN Bar No. 0400234*
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4700
Minneapolis, MN 55402
Phone: 612-256-3200 | Fax: 612-338-4878
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, OR Bar No. 070686*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
Phone: 202-804-6245 | Fax: 202-429-9574
sbuchert@lambdalegal.org

*Attorneys for Plaintiffs*

* Admitted Pro Hac Vice

Respectfully submitted,

Avatara Smith-Carrington, MD Bar*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
Phone: 214-219-8585 | Fax: 214-481-9140
asmithcarrington@lambdalegal.org

Tara L. Borelli, GA Bar No. 265084*
Carl Charles, NY Bar No. 5427026*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: 470-225-5341 | Fax: 404-506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Nora Huppert, CA Bar No. 330552*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Phone: 312-663-4413 | Fax: 312-663-4307
nhuppert@lambdalegal.org

21

**JA2209**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

     *Plaintiffs*,

   v.

WILLIAM CROUCH, *et al.*,

     *Defendants.*

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, and any attachments, were served

electronically on May 31, 2022 on the following counsel for Defendants in this case:

Lou Ann S. Cyrus (WVSB # 6558)
Roberta F. Green (WVSB #6598)
Caleb B. David (WVSB #12732)
Kimberly M. Bandy (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953, Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com, rgreen@shumanlaw.com
cdavid@shumanlaw.com, kbandy@shumanlaw.com

*Attorneys for Defendants William Crouch; Cynthia Beane; and West Virginia Department of
Health and Human Resources, Bureau for Medical Services*

Dated: May 31, 2022

Respectfully submitted,

s/ Walt Auvil
Walt Auvil, WV Bar No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-3058
auvil@theemploymentlawcenter.com

22

**JA2210**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

     *Plaintiffs*,

  v.

WILLIAM CROUCH, *et al.*,

     *Defendants*.

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

**ORDER GRANTING JOINT MOTION TO FILE EXHIBITS UNDER SEAL**

The Parties, through counsel, filed a Joint Motion to File Exhibits Under Seal in the above-captioned matter to protect sensitive personal identifying information, personal health information, and other confidential information. The Court finds that Plaintiffs' personal identifying information, personal health information, and other confidential information should not be in the public realm.

Having considered the Parties' Joint Motion, IT IS HEREBY ORDERED that the Parties' Joint Motion to Seal is GRANTED and that paragraphs 47-93 of the Exhibit A and paragraphs 3(a)-(v) and 5(a)-(q) of the Exhibit B to the Parties' motion are ACCEPTED UNDER SEAL.

Dated:   06/01/2022

                           Honorable Robert C. Chambers
                           U.S. District Court Judge

**JA2211**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

CIVIL ACTION NO. 3:20-cv-00740

HON. ROBERT C. CHAMBERS, JUDGE

*Plaintiffs*,

v.

WILLIAM CROUCH, *et al.*,

*Defendants.*

## CORRECTED STIPULATION OF PLAINTIFFS AND DEFENDANTS

Pursuant to Local Rule of Civil Procedure 11.2, Plaintiffs and Defendants hereby stipulate as follows:

1.      This stipulation corrects and supersedes the stipulation between the parties entered on the docket in this case at ECF No. 228, and the parties hereby withdraw the stipulation entered at ECF No. 228.

2.      On March 30, 2022, Dr. James Becker provided deposition testimony on certain topics in this case as an organizational representative for the Department of Health and Human Resources, Bureau of Medical Services, pursuant to Federal Rule of Civil Procedure 30(b)(6). Plaintiffs and Defendants enter this stipulation to clarify the testimony that Dr. Becker provided in that capacity.

3.      Defendants stipulate there are no documents of which they are aware that were considered in adopting and/or maintaining the Exclusion of gender-confirming care in the West Virginia Medicaid program.

4.      Defendants' response to Plaintiffs' Request for Production 6, which was served on

1

**JA2212**

Plaintiffs on March 25, 2022, and which was marked as Plaintiffs' Exhibit 4 during the deposition

of Dr. Becker as an organizational representative, provides the complete list of the materials

considered in connection with appeals of denials of coverage for Gender-Confirming care or

reviewed as background research by individuals who considered those appeals.

5.      The deposition testimony that Dr. Becker provided on March 30, 2022 regarding

other materials he considered, which were not identified in the responses to Request for

Production 6 in Plaintiffs' Exhibit 4 to this deposition, relates solely to materials Dr. Becker

considered while reviewing appeals of services denied for treatment of gender dysphoria or for

other reasons, but not for purposes of adopting and/or maintaining the Exclusion in the Health

Plans in the West Virginia Medicaid program.

* * *

2

**JA2213**

Dated: June 10, 2022

/s/ Walt Auvil
Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058 | Fax: 304-485-6344
auvil@theemploymentlawcenter.com

Anna P. Prakash, MN Bar No. 0351362*
Nicole J. Schladt, MN Bar No. 0400234*
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4700
Minneapolis, MN 55402
Phone: 612-256-3200 | Fax: 612-338-4878
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, OR Bar No. 070686*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
Phone: 202-804-6245 | Fax: 202-429-9574
sbuchert@lambdalegal.org

Respectfully submitted,

Avatara Smith-Carrington, MD Bar*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
Phone: 214-219-8585 | Fax: 214-219-4455
asmithcarrington@lambdalegal.org

Tara L. Borelli, GA Bar No. 265084*
Carl Charles, NY Bar No. 5427026*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: 470-225-5341
Facsimile: 404-506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Nora Huppert, CA Bar No. 330552*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Phone: 312-663-4413 | Fax: 312-663-4307
nhuppert@lambdalegal.org

*Attorneys for Plaintiffs*

* Admitted Pro Hac Vice

/s/ Kimberly M. Bandy
Lou Ann S. Cyrus (WVSB # 6558)
Roberta F. Green (WVSB #6598)
Caleb B. David (WVSB #12732)
Kimberly M. Bandy (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953, Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

*Attorneys for Defendants William Crouch; Cynthia Beane; and West Virginia Department of
Health and Human Resources, Bureau for Medical Services*

3

**JA2214**

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document on June 10, 2022 with the

Clerk of the Court using the CM/ECF system, which will send notification of filing, and a copy of

the same, to the following CM/ECF participants:

Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058 | Fax: 304-485-6344
auvil@theemploymentlawcenter.com

Anna P. Prakash, MN Bar No. 0351362*
Nicole J. Schladt, MN Bar No. 0400234*
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4700
Minneapolis, MN 55402
Phone: 612-256-3200 | Fax: 612-338-4878
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, OR Bar No. 070686*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
Phone: 202-804-6245 | Fax: 202-429-9574
sbuchert@lambdalegal.org

Avatara Smith-Carrington, MD Bar*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
Phone: 214-219-8585 | Fax: 214-219-4455
asmithcarrington@lambdalegal.org

Tara L. Borelli, GA Bar No. 265084*
Carl Charles, NY Bar No. 5427026*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: 470-225-5341
Facsimile: 404-506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Nora Huppert, CA Bar No. 330552*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Phone: 312-663-4413 | Fax: 312-663-4307
nhuppert@lambdalegal.org

*Attorneys for Plaintiffs*

/s/ Kimberly M. Bandy
Lou Ann S. Cyrus (WVSB # 6558)
Roberta F. Green (WVSB #6598)
Caleb B. David (WVSB #12732)
Kimberly M. Bandy (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953, Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

4

**JA2215**

*Attorneys for Defendants William Crouch; Cynthia Beane; and West Virginia Department of Health and Human Resources, Bureau for Medical Services*

Dated: June 10, 2022

s/ Walt Auvil
Walt Auvil, WV Bar No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-3058
auvil@theemploymentlawcenter.com

5

**JA2216**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN,** *et al.*,
            *Plaintiffs,*

                                 **Civil Action No. 3:20-cv-00740**
                                 **Hon. Robert C. Chambers, Judge**

v.

**WILLIAM CROUCH,** *et al.*,
            *Defendants.*

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Now come Defendants, by counsel, Lou Ann S. Cyrus, Roberta F. Green, Caleb B. David, Kimberly M. Bandy, and Shuman McCuskey Slicer PLLC, and respond in opposition to Plaintiffs' Motion for Class Certification (ECF Nos. 248, 249) ( "Class Motion") on the basis that the evidence as adduced in discovery has demonstrated the inappropriateness of these claims for class treatment and, therefore, the saliency of WVDHHR's initial arguments against class certification.

### Background.

In its Memorandum Opinion and Order,[1] this Court relied upon *Wal-Mart Stores, Inc., v. Dukes* in finding that "'plaintiff shows that the class members have suffered the same injury,' and that the common injury arises from 'a common contention.'"[2] The Court further stated that "Plaintiffs allege that the class members suffer from a common injury which arises from a general policy of discrimination: the denial of coverage for '[t]ranssexual surgery' in the WVDHHR Medicaid Policy Manual. *Compl.* ¶ 61. As alleged, this denial generally affects the proposed class, which includes '[a]ll transgender people who are or will be enrolled in West Virginia 'Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusions.' *Id.* at ¶ 108.[5]" In so finding, the Court held as follows:

       Based on this common contention, Plaintiffs have appropriately framed the

---

[1] ECF No. 57.
[2] ECF No. 57 at 11.

common questions as follows: (1) whether WVDHHR's Exclusion facially, and as applied to the proposed Class, violates the U.S. Constitution, the ACA, and the federal Medicaid Act; and (2) whether WVDHHR should be enjoined from enforcing the Exclusion and denying Mr. Fain and members of the proposed Medicaid Class coverage for and access to gender-confirming care. *See Compl.* ¶¶ 118-56. These questions are primarily legal and have the potential to relieve the common injury "in one stroke." *See Wal-Mart*, 564 U.S. at 350.

*      *      *

These claims are purely legal and require little to no fact development. Having failed to identify any ground upon which the Parties will be required to make particularized and individualized factual findings, WVDHHR's argument must be rejected. The Court denies WVDHHR's Motion for Partial Dismissal of Plaintiffs' Class Action Complaint (ECF No. 23) and Motion to Dismiss (ECF No. 32).[3]

Per the Court's holding, Plaintiffs have proceeded through discovery relative to, *inter alia,* the Class Claims, yet the course of that discovery has proven that the majority of gender-confirming care is indeed available to these Plaintiffs and was available even prior to and absent this litigation, despite Plaintiffs' erroneous assertion in both the Complaint and the First Amended Complaint to the contrary. Further, through discovery, Plaintiffs' experts have opined that the determinations of when and whether gender-confirming surgery is appropriate is a highly individualized determination, with multiple predicates to reaching any conclusion that such care is medically indicated and/or medically necessary. Indeed, where the Court's initial holding was based in part upon a "fail[ure] to identify any ground upon which the Parties will be required to make particularized and individualized factual findings," Plaintiffs' experts have demonstrated that the claims are inherently, inescapably, individualized, based in each individual's mental health and health background and condition. Indeed, Plaintiffs' expert Dan H. Karasic, M.D., dedicates almost sixty paragraphs of his expert report to particularizing just the mental health and psycho-social background of the proposed class representatives.[4] That evaluation does not include medical assessments or pre-surgical assessments. Each of Plaintiffs' experts relies upon and emphasizes

---

[3] ECF No. 57 at 11-12, 13.
[4] Expert Report of Dan H. Karasic, M.D. (ECF No. 250-20) at 15ff.

2

**JA2218**

the individual nature of the presentation and response. Therefore, Plaintiffs have identified the grounds upon which the Parties will be required to make particularized and individualized factual findings and allow for the mandated particularized and individualized defense. Plaintiff's Class Motion must be denied, as these claims are inherently poorly suited for class handling.

### Argument.

The parties agree that class action claims constitute a deviation from the general rule that litigation must be conducted by and on behalf of the individual named parties only[5] and that the deviation is justified only to the extent the class representatives possess, *inter alia,* the same interests and suffer the same injury as the proposed class members.[6] After all, pursuant to Rule 23, a plaintiff may bring suit on behalf of a class of individuals

> only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.[7]

A motion for class certification must be subjected to rigorous analysis, especially in the instance of medical claims such as these, which Plaintiffs' discovery has proven finally are not 'cohesive enough' to gain economies through class action and conversely are incohesive enough to mandate individualized defenses.[8] Because by Plaintiffs' case (as now fully demonstrated through discovery) the majority of the factual, and, therefore, legal questions both for Plaintiffs and Defendants are unique to each class member, Plaintiffs' Class Motion must be denied. Plaintiffs' discovery confirmed that a class of transgender individuals is too broad a category, as that process

---

[5] *Wal-Mart Stores, Inc., v. Dukes,* 564 U.S. 338, 349 (2011), *quoting Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979).
[6] *Dukes,* 564 U.S. at 349, *quoting East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (*quoting Schlessinger v. Reservists Comm. To Stop the War,* 418 U.S. 208 (1974)).
[7] Fed. R. Civ. P. 23(a).
[8] *Rhodes v. E.I. DuPont de Nemours & Co.,* 253 F.R.D. 365, 367, 370 (SD WV 2008).

### JA2219

and determination have been expressed by Plaintiffs' experts here.

Now, at the close of discovery, Plaintiffs' proposed class of "[a]ll transgender people who are or will be enrolled in West Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusions"[9] is unsupported by the facts and law of the case, as Plaintiffs' discovery has demonstrated that class treatment of those precise claims is inappropriate and unworkable. As demonstrated by Plaintiffs' retained experts, the availability of the relief Plaintiffs seek is limited to individuals who undergo particularized assessment and approval prior to being a potential treatment recipient. Thereafter, in mounting their defense to the class claim, Defendants would need to conduct the same sort of careful evaluation of each particularized assessment and approval, making this claim and this litigation inappropriate for class treatment.

**Plaintiffs have not established Numerosity.**

Plaintiffs do not meet the numerosity requirement. While Plaintiffs Fain and Anderson each assert that they seek gender-confirming surgery, Plaintiffs do not have any evidence that any other Medicaid beneficiary seeks gender-confirming surgery. Instead, Plaintiffs acknowledge that the record does not reveal the number of Medicaid participants who may seek gender-confirming surgery.[10] Because the policy at issue only potentially affects those individuals who are diagnosed with gender dysphoria, seeking gender-confirming surgery, are determined to be candidates for surgery, approved for surgery, and who actually submit a claim for such services to Medicaid, this is a much smaller group of people than all Medicaid members who have a transgender identity. The "class" based on the evidence is comprised of Mr. Fain and Ms. Anderson, the two individual Plaintiffs. Numerosity of class membership is completely absent.

---

[9] *First Amended Compl.* ¶108.
[10] ECF 255 at 19.

4

**JA2220**

Plaintiffs' characterization of the number of Medicaid members seeking gender-confirming care is also not entirely accurate. Plaintiffs allege that "the number of West Virginia Medicaid participants who submit claims related to a diagnosis of gender dysphoria alone exceeds 600 people annually."[11] However, as explained by the Medicaid employee that compiled the information, the number 686 captures all individuals who made claims for any reason during the first nine months of 2021 who also had a diagnosis code for one or more of the following: transsexualism, gender identity disorder of childhood, other gender identity disorders, or gender identity disorder, unspecified.[12] The number captured those who had made claims whether or not the transsexualism or gender identity disorder diagnosis was the primary diagnosis or the reason for the requested service.[13] Thus, 686 represents the number of members with a diagnosis related to gender dysphoria who made claims (not necessarily for gender-confirming care) during the first nine months of 2021.

Even assuming the claims were appropriate for class treatment (which they are not), Plaintiffs' discovery has proven that even the proposed class as initially crafted is unworkable. That is, while Plaintiffs continue in their efforts to certify a class populated by "[a]ll transgender people who are or will be enrolled in West Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusions,"[14] Plaintiffs' experts have opined that not all transgender people are affected by the policy. As Plaintiffs' experts have expressly stated, not all

---

[11] ECF No. 249 at 3.

[12] ECF No. 252-14 at 32-35.

[13] ECF 252-14, Tr. pp. 32-35.

[14] Plaintiffs have not demonstrated that Medicaid has any exclusion of coverage that pertains categorically to transgender individuals. All services that are considered covered services by Medicaid are covered for transgender participants to the same extent and based on the same criteria as cisgender participants. ECF 257-1 at 34, 100. No evidence has been adduced in discovery indicating that any covered services are denied to members on the basis of transgender identity. Plaintiffs' discovery indicates that the determination of services available and the determination of medical necessity are both individualized. ECF No. 182 at 15ff.

**JA2221**

transgender individuals are diagnosed with gender dysphoria. Plaintiffs' evidence is that there is a difference between a transgender identity and gender dysphoria.[15] Being transgender is an identity.[16] Gender dysphoria can result in a DSM-V disorder in some transgender individuals.[17] According to Plaintiffs' expert Dan Karasic, M.D., roughly one in 200 people identifies as transgender.[18] About one in a thousand is in clinical care for gender dysphoria.[19] Even though the numbers have not been precisely established [or established for West Virginia], only a fraction of individuals who identify as transgender actually receive care for gender dysphoria, according to Dr. Karasic.[20] Although Plaintiffs alleged in their First Amended Complaint that the Defendants herein had a "categorical exclusion" that denied coverage for "gender-confirming care," defined by Plaintiffs as "including but not limited to, counseling, hormone therapy, and surgical care," discovery established that several forms of gender-confirming care, including counseling and hormone therapy, and many others, are indeed covered by Medicaid, by and through its existing programs.[21] Further, through Plaintiffs' discovery, it was confirmed that any class made up of transgender individuals generally who are seeking the gender-confirming care not currently available would be overly broad. Plaintiffs' evidence is that the proposed class of transgender individuals is actually a group of differently situated persons who must be individually assessed and their propriety determined on a case-by-case basis prior to inclusion.[22] Per Plaintiffs' experts,

---

[15] ECF 252-8 at 8.

[16] ECF 252-8 at 8.

[17] ECF 252-8 at 8-9.

[18] ECF No. 252-8 at 10.

[19] (ECF No. 252-8 at 10..

[20] ECF No. 252-8 at 10-11.

[21] ECF No. 1 at 1-2; ECF No 140 at 1-2. *See also* Memorandum of Law in Support of Defendants' Motion for Summary Judgment (5.31.22) (ECF No. 253) at 2 stating that "[i]t is undisputed that Medicaid does not exclude, but in fact covers, psychiatric diagnostic evaluation, psychotherapy, psychological evaluation, counseling, office visits, hormones, and lab work as treatment related to gender-confirming care. (Ex. 4 pp. 142, 146, 151, 161-162, 164; Ex. 5 pp. 62-63, 65, 71, 73; Ex. 6; Ex.7 pp. 28-30; Ex. 1 pp. 168-169)."

[22] Expert Disclosure Report of Dan H. Kurasic (ECF No. 182) at ¶ 34, 41.

6

"[f]or a person to be diagnosed with [gender dysphoria], there must be a marked difference between the individual's expressed/experienced gender and their assigned sex at birth, present for at least six months."[23] Then, beyond the diagnosis, "for gender-confirming medical care, there is the additional safeguard of the assessment by a mental health professional, who, in addition to diagnosing gender dysphoria, also assesses capacity to consent and reviews the risks and benefits of treatment with the patient."[24]

**Plaintiffs have not established Commonality or Typicality.**

And as the law drives the class, so, too, the law drives the defenses, which are equally individualized and impossible to accomplish with any of the efficiencies that mitigate in favor of or would support class treatment (as opposed to individual claims).[25] Defendants must be allowed to raise individual affirmative defenses to whether Plaintiffs and any putative class members would qualify for the gender-confirming care they seek. For these reasons and those set out further below, Plaintiffs' Class Motion fails to meet the commonality and typicality requirements of Rule 23.

Beyond the fact that, in their First Amended Complaint, Plaintiffs particularized their claims to their precise diagnoses, their precise medical needs, and their precise claims histories,[26] Plaintiffs' experts have done likewise, even conducting detailed evaluations of the proposed Class Representatives, which evaluations were appended to the expert's report.[27] Indeed, the detailed, personalized assessments are affixed to the expert's opinions, inextricably bound as a portion of the support the expert provides here – the detailed, individualized assessments without which the

---

[23] Expert Rebuttal Report of Dr. Johanna Olson-Kennedy, M.D., M.S. (ECF No. 250-22) at ¶ 26.

[24] Expert Disclosure Report of Dan H. Kurasic (ECF No. 182) at ¶ 41.

[25] *Dukes,* 564 U.S. at 362, citing in pertinent part *Teamsters v. United States,* 431 U.S. 324, 361 (1977), for the proposition that a class cannot be certified if that certification precludes the defendant from litigating its defenses to individual claims.

[26] First Am. Compl. (ECF No. 140) at ¶¶ 75-156.

[27] Expert Disclosure Report of Dan H. Karasic (ECF No. 182) at 15ff.

**JA2223**

experts' opinions are incomplete.  Beyond that, it is important to note that Plaintiffs' discovery has been that the sole remaining gender-confirming care not currently available as such (gender-confirming surgery) mandates predicates: a more precise, particularized diagnosis than simply having a transgender identity and mental health assessments prior to any individual's being considered for the only gender-confirming care not currently provided by Defendants.[28] For these reasons, Plaintiffs' case reflects the reality that Rule 23 offers no economies to what must become multiple, separate determinations, joined only in the broadest sense. As clarified by the Supreme Court of the United States in *Wal-Mart Stores, Inc., v. Dukes,* if plaintiffs generalize their claims broadly enough, certainly any and all persons could qualify as class members so as to meet the commonality mandate.[29] However, "'[w]hat matters to class certification is not the raising of common 'questions'--even in droves--but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within a proposed class are what have the potential to impede the generation of common answers.'"[30] Finally, in *Dukes,* the Court found that even a close assessment of the millions of employment decisions made by Wal-Mart could not result in the answer to the question of 'why was I disfavored.'[31] In determining the propriety of class certification, the Court was searching for the 'glue' that would hold the members to the class; finally, the Court found that employment decisions are multifactorial, such that a related claim would not be workable as a class.[32]

Likewise here, the evaluations/interviews Plaintiffs' expert conducted of the proposed class representatives are lengthy and detailed, with 26 paragraphs of detailed social, psycho-social,

---

[28] *See* ECF No. 253 at 2.
[29] *Dukes,* 564 U.S. at 348.
[30] *Dukes,* 564 U.S. at 350, quoting Naguerenda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009).
[31] *Dukes,* 564 U.S. at 352.
[32] *See, e.g., Dukes,* 564 U.S. at 352.

psychological and physical history and assessment of Mr. Fain alone.[33] Plaintiffs' expert expends additional paragraphs on Ms. Anderson with the same sort of analysis. All of this rigorous, detailed assessment aside, none of these individuals has undergone the pre-surgical assessment and clearance mandated per the testimony of yet another of Plaintiffs' experts. Even assuming that the individuals were approved through this detailed mental healthcare process, the gender-confirming surgical procedures would need to be determined by healthcare professionals to be medically indicated and necessary for the Plaintiffs and/or for the putative class members through a series of evaluations[34] and, in fact, finally, are medically indicated and necessary to only the segment of gender dysphoric individuals approved through the individualized assessments that are a universal prerequisite for same, based upon the Standards of Care relied upon by Plaintiffs:

> [T]he [SOC] note that "[t]he number and sequence of surgical procedures may vary from patient to patient, according to their clinical needs." (Standards of Care at 58.) Evidence shows that while some transgender individuals do not require surgery, "for many others surgery is essential and medically necessary to alleviate their gender dysphoria.[35]

> The accepted protocols for the treatment of transgender people with gender dysphoria provide for mental-health assessments, including of co-occurring conditions; criteria for eligibility for each treatment; and an informed consent process before medical interventions are initiated.[36]

> Medical and surgical treatment interventions are determined by the care team (usually a medical and mental health professional) in collaboration with the patient, and the patient's family. These medical decisions are made by the care team in conjunction with the patient and the patient's family and consider the patient's social situation, the level of gender dysphoria, developmental stage, chronological age, existing medical conditions and other relevant factors.[37]

Therefore, even assuming that this Court were to find the scope of Defendants' coverages

---

[33] Expert Report of Dan H. Karasic, M.D. (ECF No. 250-20) at 15.
[34] *See, e.g.,* Expert Disclosure Report of Dan Karasic, MD (ECF No. 250-20) at ¶ 2; Expert Disclosure Report of Loren S. Schechter, MD (ECF No. 250-23) at ¶ 23.
[35] Expert Disclosure Report of Loren S. Schechter, MD (ECF No. 250-23) at ¶ 23 (partial).
[36] Expert Disclosure Report of Dan Karasic, MD (ECF No. 250-20) at ¶ 2 (partial).
[37] Expert Rebuttal Report of Johanna Olson-Kennedy, M.D., M.S. (ECF No. 250-26) at ¶ 39 (partial).

discriminatory and/or unconstitutional, a finding Defendants oppose, nonetheless, particularized determinations mitigate against use of the class form here. Determining class membership would require the detailed mental health and surgical healthcare assessments set out by Plaintiffs' experts for each putative class member – and Defendants would need to conduct the same particularized challenge in their defense.

As a matter of law, individualized claims necessitate individualized defenses, and the Defendants will have the right to raise any individual affirmative defenses they may have and to "'demonstrate that the individual applicant was denied an . . . opportunity for lawful reasons.'" *Dukes*, 564 U.S. at 366-67. The Supreme Court has considered ingenuous workarounds for accomplishing detailed discovery and providing the opportunity for detailed defenses when the class is large and has individualized and particularized situations. In *Dukes,* the Court of Appeals suggested just such a workaround to fast-track the detailed determination of defenses. Specifically, in recognition of the size of the class and the particularized assessment that could be indicated relative to the hiring decision-making process (which would need detailed discovery to demonstrate class inclusion and to provide opportunities for meaningful defense), the *Dukes* Appeals Court suggested Trial by Formula, where a "sample set of the class members would be selected, as to whom liability for sex discrimination and the backpay owing as a result would be determined in depositions supervised by a master." In disapproving of this shortcut, the Supreme Court stated as follows:

> We disapprove that novel project. Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b); see *Ortiz*, 527 U.S., at 845, 119 S. Ct. 2295, 144 L. Ed. 2d 715, a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims. And because the necessity of that litigation will prevent backpay from being 'incidental' to the classwide injunction, respondents' <u>class</u> could not be certified even assuming, *arguendo*, that 'incidental'

**JA2226**

monetary relief can be awarded to a 23(b)(2) class.[38]

Further, the class representatives do not possess, *inter alia,* the same interests and suffer the same injury as the proposed class members.[39]  As the Supreme Court of the United States has held,  class form is appropriate only where economical to combine the claims and that determination as to whether it is economical is a practical one – when a common injury can be addressed and resolved by a class litigation without doing damage to either. Here, the economies of the class form are unavailable, as particularized discovery would be necessary to determine the individualized facts relative to each class member. In *Dukes,* the Supreme Court recognized, *inter alia,* that, if plaintiffs generalize their claims broadly enough, certainly any and all persons could qualify as class members so as to meet the commonality mandate. The Supreme Court considered common questions that, finally, were generalized to the point that they no longer meaningfully constituted a basis of commonality: "Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get?"[40]  While all of the *Dukes* plaintiffs truly had these questions at the heart of their claims, the *Dukes* Court found the questions too broad to provide meaningful class inquiry or relief – and that the workaround proposed to fast-track discovery and defense was unacceptable. [41]

While the class is "[a]ll transgender people who are or will be enrolled in West Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusion," the procedures are only potentially medically necessary and therefore medically indicated in the

---

[38] *Dukes,* 564 U.S. at 367.
[39] ECF No. 25, relying in part on *Dukes,* 564 U.S. 338, 349 (2011), quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979), *East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (quoting *Schlessinger v. Reservists Comm. To Stop the War,* 418 U.S. 208 (1974)).
[40] *Dukes,* 564 U.S. at 349.
[41] *Dukes,* 564 U.S. at 349.

11

**JA2227**

instance of a diagnosis of gender dysphoria. [42] Therefore, while the Plaintiffs' class has been and remains now at the close of discovery 'transgender people,' Plaintiffs' experts only support a class that would be transgender persons with a diagnosis of gender dysphoria who seek gender-confirming surgery and qualify for such care. "For a person to be diagnosed with [gender dysphoria], there must be a marked difference between the individual's expressed/experienced gender and their assigned sex at birth, present for at least six months."[43] Then, beyond the diagnosis, "for gender-confirming medical care, there is the additional safeguard of the assessment by a mental health professional, who, in addition to diagnosing gender dysphoria, also assesses capacity to consent and reviews the risks and benefits of treatment with the patient."[44]

> The surgeon receives in writing one or more assessments of the patient's diagnosis and medical necessity of the care by one or more mental health professionals, as required for the relevant procedure under the Standards of Care. But that is only one step in the assessment for surgical interventions. The surgeon remains ultimately responsible for deciding whether a particular surgical intervention is medically indicated. The surgeon evaluates the patient and makes the final decision about whether it is safe and medically indicated to proceed. This includes an evaluation of the patient's understanding of the condition, their self-awareness, and their goals and expectations for the intervention. The surgeon also evaluates other health factors that would affect the patient's fitness for the surgery, and determines whether additional studies might be required, such as x-rays or laboratory work. The surgeon also typically obtains an assessment from their primary care physician about their overall health. In my own clinical practice, I have had occasion to decline to perform a requested intervention based on my exercise of professional judgment. [45]

In *Dukes,* the Supreme Court held that when a plaintiff seeks individualized relief, "'a district court must usually conduct additional proceedings . . . to determine the scope of individual relief.' *Teamsters, 431 U.S., at 361, 97 S. Ct. 1843, 52 L. Ed. 2d 396.* At this phase, the burden of proof will shift to the [defendant], but it will have the right to raise any individual affirmative

---

[42] Expert Disclosure Report of Loren S. Schechter, MD (ECF No. 250-23) at ¶ 21.
[43] Expert Rebuttal Report of Dr. Johanna Olson-Kennedy, MD, MS (ECF No. 250-26) at ¶ 26.
[44] Expert Disclosure Report of Dan H. Karasic, M.D. (ECF No. 250-20) at ¶ 41.
[45] Expert Rebuttal Report of Loren S. Schechter, M.D. (ECF No. 250-24) at 51.

12

**JA2228**

defenses it may have, and to 'demonstrate that the individual applicant was denied an . . . opportunity for lawful reasons.' *Id., at 362, 97 S. Ct. 1843, 52 L. Ed. 2d 396*."[46]  Relying upon the Rules Enabling Act's prohibition against interpreting any rule (here Rule 23) so as to "'abridge, enlarge or modify any substantive right,' *28 U.S.C. § 2072(b)*; see *Ortiz, 527 U.S., at 845, 119 S. Ct. 2295, 144 L. Ed. 2d 715*," the Supreme Court found that a class cannot be certified if that certification precludes the defendant from litigating its defenses to individual claims.

Here, based on the evidence adduced by Plaintiffs during discovery by and through each of the Plaintiffs' experts, Defendants must be allowed to raise individual affirmative defenses to whether Plaintiffs and any putative class members would have qualified for the gender-confirming care they seek. After all, even Plaintiff Fain concedes that he is not ready or willing to undergo gender-confirming surgery until he has "completely kicked" his smoking habit, and he is a smoker.[47]  Thus, even Mr. Fain's circumstance is particularized in that he is not currently in a position to undergo the surgery he desires based upon his stated understanding of the risks. Plaintiffs' experts and Mr. Fain's testimony both indicate that the coverage process, the process of determining medical necessity, and the process of determining whether the care is medically indicated all are highly individual. While that is the standard of care (as Plaintiffs suggest), it nonetheless renders the determination inappropriate for class treatment.

Further, the particularized, individualized course of Plaintiffs' discovery has proven germane the guidance of the United States District Court for the Northern District of West Virginia when it clarified that

> "[a] common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees. A question is not common, by contrast, if its resolution turns on a consideration of the individual

---

[46] *Dukes,* 564 U.S. at 366-67.
[47] ECF No. 252-5 at 87-88.

circumstances of each class member." "The common questions must be dispositive and over-shadow other issues."[48]

Plaintiffs' claims by necessity focus on mental health assessments, medical clearances, and coverage determinations – all under particularized policies and procedures. Plaintiffs' discovery has proven Plaintiffs' claims inherently poorly suited for class treatment in a post-*Dukes* world.[49]

Here, Plaintiffs' experts have demonstrated that Plaintiffs' claims by necessity will involve a particularized determination of each Plaintiff and putative plaintiff and will require careful and particularized determinations of the applicability of the care and coverage sought. Defendants must have the right to raise their individual affirmative defenses they have and must have the right to demonstrate whether each individual applicant was denied and/or would have been denied or will be denied or was never an appropriate applicant for coverage —all for lawful reasons.

**By their precise nature, Plaintiffs' claims mitigate against class treatment.**

The inefficiencies of class form also are demonstrated by the claims raised in Plaintiffs' First Amended Complaint[50] itself. Count I alleges violation of the Equal Protection Clause (EPC) of the 14th Amendment; Plaintiffs assert both facial and as-applied challenges. A facial challenge does not require class treatment, such that the Court need not consider whether the deviation from the general rule that litigation must be conducted by and on behalf of the individual named parties only would be unnecessary and unjustified.[51] An as-applied challenge would require 1) a request

---

[48] *Paulino v. Dollar Gen. Corp.,* 2014 U.S. Dist. LEXIS 64233 (3:12-CV-75) (ND WV 2014) (citations omitted).

[49] Further, in *General Telephone Co. of Southwest v. Falcon, 457 U.S. 147 (1982)*, the Court considered the "existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims."

[50] ECF No. 140.

[51] *Dukes,* 564 U.S. 338, 349 (2011), *quoting East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (*quoting Schlessinger v. Reservists Comm. To Stop the War,* 418 U.S. 208 (1974)), *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979).

14

**JA2230**

for coverage, 2) a denial of coverage, 3) a review of the reason for denial.[52] While the defense's expert has disputed whether the gender-confirming surgeries are ever medically necessary procedures,[53] Plaintiffs' experts agree that coverage should only be provided for medically necessary procedures and medical necessity is based upon history, physical examination, review of mental health assessments, basis for request for surgery, goals, expectations, and discussions with primary care and mental health providers.[54] These individualized assessments and determinations predominate over the putative class members' being "transgender," as the class definition requires, because being transgender does not entitle the class members to gender-confirming surgery. Indeed, not all transgender individuals are diagnosed with gender dysphoria and not all individuals diagnosed with gender dysphoria seek gender-confirming surgery and not all individuals who seek gender-confirming surgery meet the criteria Plaintiffs' experts opine are mandatory for a finding of medical necessity.[55] Therefore, Count I does not reach the requisite level to allow class claims to take the place of individualized claims as a matter of law and fact.

Count II alleges violation of Section 1557 of the Affordable Care Act (ACA), which prohibits discrimination on the basis of sex.[56] Again, Plaintiffs assert a facial challenge to Medicaid's policy and as-applied challenges on behalf of themselves and each member of the putative class. For all of the reasons set out relative to Count I, class treatment of Count II is unnecessary and/or inappropriate. However, whereas Count II no longer seeks compensatory damages, nonetheless, Defendants' decision-making may include a review of utilization control procedures, as discussed below. As a result, each Plaintiff and putative plaintiff will need to first

---

[52] *See, e.g. Lewis v. Thompson,* 252 F.3d 567 (2d Cir. 2001); *Cook v. Barry,* 718 F. Supp. 632 (S.D. OH 1989); *Hillspring Health Care Center v. Dungey,* 2018 U.S. Dist. Lexis 13317 (S.D. OH 2018).
[53] Expert Disclosure Report of Dr. Stephen B. Levine, M.D. (ECF No. 252-11) at 7.
[54] Deposition of Loren S. Schechter (3.8.22) (ECF NO. 252-15) at 194.
[55] *See, e.g.,* Expert Disclosure Report of Dan H. Karasic, M.D. (ECF No. 250-20) at 6ff.
[56] ECF No. 140.

**JA2231**

prove the medical necessity of the care and the availability of the care for that patient – along with the relevant costs. For example, Christopher Fain is a transgender man and only desires double mastectomy, not phalloplasty.[57] Shauntae Anderson is a transgender woman and seeks both mammoplasty and vaginoplasty,[58] but not all transgender women will seek these same procedures. Additionally, some individuals may seek any number of procedures, including electrolysis, facial feminization, chest masculinization, tracheal shave, hair implants, and so forth. Thus, an analysis of the medical necessity of each type of procedure for each individual claimant is required (along with the opportunity for a particularized defense of same) and predominates over the broad class-defining term of "transgender."

Count III alleges violation of the Medicaid Act's availability requirements.[59] "The Medicaid Act states, in relevant part, "[a] State plan for medical assistance must … (10) provide— (A) for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17), (21), (28), (29), and (30) of section 1905(a) [42 USCS § 1396d(a)] …." 42 U.S.C. § 1396a(a)(10)(A)."  While Plaintiffs' First Amended Complaint fails to identify which provision of Section 1396d they assert provides for gender-confirming surgery, regardless, "nothing in the statute suggests that participating States are required to fund every medical procedure that falls within the delineated categories of medical care." *Beal v. Doe*, 432 U.S. 438, 444 (1977). "Indeed, the statute expressly provides: 'A State plan for medical assistance must… include reasonable standards… for determining eligibility for and the extent of medical assistance under the plan which… are consistent with the objectives of this [Title]….' 42 U.S.C. § 1396a (a)(17) (1970 ed., Supp. V)." *Id.*[60] The Supreme Court's decision in *Beal* is consistent with the

---

[57] Deposition of Christopher Fain (ECF No. 250-10) at 128.
[58] Deposition of Shauntae Anderson (ECF No. 250-11) at 167-68.
[59] ECF No. 140.
[60] This language appears in the current version of 42 U.S.C. § 1396a(a)(17), although additional language

16

**JA2232**

Medicaid Act's accompanying regulations. The regulations set forth the criteria for availability:

  (a)   The plan must specify the amount, duration, and scope of each
service that it provides for—
        (1) The categorically needy; and
        (2) Each covered group of medically needy.
  (b) Each service must be sufficient in amount, duration, and scope to reasonably
        achieve its purpose.
  (c) The Medicaid agency may not arbitrarily deny or reduce the amount, duration,
        or scope of a required service under §§ 440.210 and 440.220 to an otherwise
        eligible beneficiary solely because of the diagnosis, type of illness, or condition.
  (d) **The agency may place appropriate limits on a service based on such criteria
        as medical necessity or on utilization control procedures.**[61]

Thus, the regulations expressly permit a State Medicaid plan to place limits on services even if

those services are required to be covered. *See Casillas v. Daines*, 580 F. Supp. 2d 235, 245-46

(S.D.N.Y. 2008) ("Thus, … § 1396a(a), permits a state plan to place 'appropriate limits' upon a

'service' regardless of an individual medical doctor's view of the appropriateness of the categorical

limitation.").  Therefore, Count III not only mandates particularized proof but also must allow for

a particularized defense – all of which mitigates against class treatment.

     Count IV alleges violation of the Medicaid Act's comparability requirements.[62]  If

Plaintiffs' interpretation of this law is correct, then Medicaid would be required to cover all

procedures for all people no matter the diagnosis. The Medicaid Act states, in relevant part,

     [a] State plan for medical assistance must … (10) provide … (B) that the medical
     assistance made available to any individual described in subparagraph (A)—
            (i) shall not be less in amount, duration, or scope than the medical assistance
            made available to any other such individual, and
            (ii) shall not be less in amount, duration, or scope than the medical assistance
            made available to individuals not described in subparagraph (A)[.][63]

Like the availability requirements, the comparability requirements of the Medicaid Act also have

---

has been added to this section of the statute.
[61] 42 C.F.R. § 440.230 (emphasis added).
[62] ECF No. 140.
[63] 42 U.S.C. § 1396a(a)(10)(B).

accompanying regulations:

> Except as limited in § 440.250—
> (a) The plan must provide that the services available to any categorically needy beneficiary under the plan are not less in amount, duration, and scope than those services available to a medically needy beneficiary; and
> (b) The plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all beneficiaries within the group:
>> (1) The categorically needy.
>> (2) A covered medically needy group.[64]

Thus, the plain language of the regulations prohibits three types of discrimination: (1) against the categorically needy, (2) among the categorically needy, and (3) among the medically needy.[65]

Here, Plaintiffs allege that Defendants violate the comparability requirements, presumably by discriminating among the categorically needy, because Defendants do not provide coverage for gender-confirming surgery "while the same or similar services and treatments are covered for cisgender Medicaid beneficiaries." Defendants do not cover gender-confirming surgeries for cisgender Medicaid beneficiaries; thus, Defendants assume that Plaintiffs are alleging that, because Defendants do provide coverage for mastectomy for patients with breast cancer, Medicaid is required to provide coverage for mastectomy for any and all diagnoses, including gender dysphoria. This allegation is not discrimination among categorically needy beneficiaries. Indeed, Plaintiffs have provided no evidence that mastectomy for breast cancer has been denied to any transgender individual. Rather, in Plaintiffs' view, any treatment that is reimbursable for one diagnosis must be a reimbursable treatment for a different diagnosis if it were deemed by the patient's doctor to be a medical necessity. While Defendants assert that gender-confirming care is

---

[64] 42 C.F.R. § 440.240.
[65] *See Schott v. Olszewski*, 401 F.3d 682, 686 (6th Cir. 2005) ("Under the Act, states must provide comparable medical assistance to all Medicaid recipients within each classification, so long as the medically needy do not receive greater benefits than the categorically needy (although the reverse is permitted).").

JA2234

covered in all but surgical instances and that the surgical care is not medically necessary,[66] nonetheless, to the extent that Plaintiffs prevail, these distinctions and determinations mitigate against class treatment, as Defendants must be allowed to raise particularized defenses to claims for services on, *inter alia,* these particularized grounds.

Further, the Medicaid Act causes of action require us again to look at every possible procedure that could be considered a "gender-confirming surgery" to determine whether that procedure 1) has been requested by a transgender individual with an associated indication of gender dysphoria, 2) has been provided to a cisgender individual for another indication, or 3) has some similarity with another procedure that could lend itself to a claim for lack of comparability between transgender and cisgender individuals. This individualized determination process would not only require Defendants to look at the putative class members' claims but also the claims of cisgender non-class members to determine whether other procedures have been requested and covered. For example, it is possible that Medicaid provided hair implants to a cisgender individual who was a burn victim. Defendants would be required to look at that individual's claim history to confirm claimant's gender identity, gender assigned at birth, and indication for the procedure. Then, Defendants would have to compare those findings to the hypothetical transgender woman who has male pattern baldness to determine whether the denial of her claim violates the Medicaid Act. Each of these processes would be allowed under the law as part of Defendants' particularized defense – all of them mitigating against class treatment.

**Plaintiffs have not established Adequacy of Representation.**

While not included in the Amended Complaint, Plaintiffs now argue that a policy of excluding puberty-delaying treatment would also violate the law and is "part of the Exclusion."

---

[66] Expert Disclosure Report of Dr. Stephen B. Levine, M.D. (ECF No. 252-11) at 7.

19

**JA2235**

(ECF 251 p. 8 FN 38). Plaintiffs have not presented any facts that an "exclusion" for puberty-delaying treatment exists, or the terms of any such "exclusion." Most importantly, the individual Plaintiffs have not sought and do not seek puberty-delaying treatment. They not only lack standing to assert such a challenge, but they also fail to adequately represent any potential class member who would potentially seek relief based upon any alleged policy regarding coverage for puberty-delaying treatment. The record is silent with respect to whether any such potential class members even exist, but if they did, Plaintiffs do not adequately represent their interests.

**Conclusion.**

Because Plaintiffs' experts have demonstrated unequivocally that the claims here mandate individualized, particularized assessments prior to determining that any Plaintiff and/or any putative class member would be appropriate to include, Plaintiffs have succeeded in proving that these claims cannot be proven on the basis of class. Further, because no substantive right can be compromised in the conversion to class, Defendants must be allowed to conduct discovery and develop defenses, all of which will be an individualized, particularized process. Plaintiffs' discovery has unequivocally identified grounds upon which the Parties will be required to make particularized and individualized factual findings and build factual defenses, such that Plaintiffs' Motion for Class Certification must be denied.

> **WILLIAM CROUCH, CYNTHIA BEANE, and WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES, By counsel**

<u>**/S/ Roberta F. Green**</u>
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953

20

**JA2236**

Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA2237**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN** and **SHAUNTAE ANDERSON;** individually and on behalf of all others similarly situated,

|  |  |
|---|---|
| *Plaintiffs,* | **Civil Action No. 3:20-cv-00740** |
|  | **Hon. Robert C. Chambers, Judge** |

v.

**WILLIAM CROUCH,** in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; **CYNTHIA BEANE,** in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; and **WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES,**

*Defendants.*

## CERTIFICATE OF SERVICE

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of Health and Human Resources Bureau for Medical Services, by counsel, and do hereby certify that on the 14th day of June, 2022, a true and exact copy of **"DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION"** was served on counsel via electronic means as follows:

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

**JA2238**

Sasha Buchert, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
65 E. Wacker Pl, Suite 2000
Chicago, IL  60601
(312) 663-4413
(312) 663-4307
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lamdalegal.org

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
***Counsel for Plaintiffs***
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

**JA2239**

/s/ Roberta F. Green
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
***Counsel for William Crouch, Cynthia Beane, and***
***West Virginia Department of Health and Human***
***Resources, Bureau for Medical Services***
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN,** *et al.*,

        *Plaintiffs,*

v.

**WILLIAM CROUCH,** *et al.*,

        *Defendants.*

        **Civil Action No. 3:20-cv-00740**
        **Hon. Robert C. Chambers, Judge**

### DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
### EXPERT TESTIMONY OF STEPHEN B. LEVINE, M.D.

NOW COME the Defendants, by counsel, Lou Ann S. Cyrus, Roberta F. Green, Caleb B. David, Kimberly M. Bandy, and Shuman McCuskey Slicer PLLC, and, for their Response to Plaintiffs' Motion to Exclude Expert Testimony of Stephen B. Levine, M.D., state as follows:

### INTRODUCTION AND SUMMARY OF ARGUMENTS

Plaintiffs have moved this Court to exclude all of Stephen B. Levine, M.D.'s opinions, not because he is unqualified to provide them but because his opinions allegedly lack probative value. Pls.' Mot. to Exclude, p. 20.[1] Plaintiffs also move to exclude certain opinions expressed by Dr. Levine in his report on various grounds. Plaintiffs oddly seek exclusion on the grounds that some of Dr. Levine's opinions align with Plaintiffs' own experts' opinions. Pls.' Mot. to Exclude, p. 4. Plaintiffs seek exclusion of certain opinions on relevancy grounds. Pls. 'Mot. to Exclude, p. 6. Plaintiffs seek exclusion of certain opinions because the medical literature their experts cite is inapposite to the medical literature cited by Dr. Levine. Pls.' Mot. to Exclude, p. 8. Finally, Plaintiffs seek exclusion of Dr. Levine's opinions regarding costs of gender-confirming care,

---

[1] It is impossible to determine from Plaintiffs' Motion whether Plaintiffs seek to exclude Dr. Levine's testimony in this case or his testimony from other cases. Dr. Levine only intends to offer the opinions disclosed in this civil action.

regarding puberty-delaying treatment, and regarding the treatment of pre-pubescent transgender children on the grounds that Dr. Levine is not qualified to offer opinions in these areas. Pls.' Mot. to Exclude, p. 16. Defendants will address each of Plaintiffs' arguments in turn; however, a brief analysis of Plaintiffs' burden of proof for each of their claims is required.

Plaintiffs have asserted four causes of action: (1) alleged violation of the Equal Protection Clause of the Fourteenth Amendment, (2) alleged violation of Section 1557 of the Affordable Care Act, (3) alleged violation of the Medicaid Act's availability requirements, and (4) alleged violation of the Medicaid Act's comparability requirements. Am. Compl. ¶¶ 157 – 195 (ECF 140). Regarding Plaintiffs' equal protection claim, to the extent the Court finds that Defendants' policy is subject to rational basis review, it is Plaintiffs' burden "to negate every conceivable basis which might support" the alleged unequal treatment. *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (additional citation omitted). This includes the basis of medical necessity. If intermediate scrutiny is applied to Plaintiffs' equal protection claim, the challenged classification must serve an important governmental purpose, and the means employed must be substantially related to that purpose. *U.S. v. Virginia*, 518 U.S. 515, 524, 532-33 (1996). Medical necessity may be an important governmental purpose. To prevail on their Section 1557 discrimination claim, Plaintiffs must prove that Defendants discriminated against them on the basis of sex rather than made a determination based on factors such as medical necessity.

To prevail on their claim for alleged violation of the Medicaid Act's availability requirements, Plaintiffs must prove that Defendants have failed to make available to them care that is required to be covered by the Act. 42 U.S.C. § 1396a(a)(10)(A). The regulations associated with the availability requirements permit an agency to place appropriate limits on a service based on criteria such as medical necessity or on utilization control procedures. 42 C.F.R. § 440.230(d).

2

**JA2242**

Finally, to prevail on their claim for alleged violation of the Medicaid Act's comparability requirements, Plaintiffs must prove that Defendants' policy discriminates among categorically needy beneficiaries. *See Schott v. Olszewski*, 401 F.3d 682, 686 (6th Cir. 2005) ("Under the Act, states must provide comparable medical assistance to all Medicaid recipients within each classification, so long as the medically needy do not receive greater benefits than the categorically needy (although the reverse is permitted)."). Because Plaintiffs' claim is based upon the argument that procedures such as mastectomy are covered for breast cancer but not for gender dysphoria, medical necessity is again a consideration that the jury must undertake.

Because each of Plaintiffs' causes of action requires the jury to consider policy motives and/or medical necessity, it is essential that the jury be provided expert testimony regarding the medical necessity of gender-affirming surgeries. Thus, it is important that the jury be provided with information explaining the etiology of gender dysphoria, diagnostic criteria for gender dysphoria, treatment modalities for gender dysphoria, the efficacy of those treatment modalities, and the risks, benefits, and alternatives of those treatment modalities. To assist the jury with these issues, Defendants have retained Stephen B. Levine, M.D., who thoroughly discusses and explains these issues in his expert report and in his deposition. *See generally* Levine Report (ECF 252-11); Levine Dep. (ECF 252-20 to 252-22).

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. Rule 702 states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;

3

**JA2243**

> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of
> the case.

Fed. R. Evid. 702. "Nothing in the text of this Rule establishes 'general acceptance' as an absolute prerequisite to admissibility." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987)). "These conventional devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." *Id.*

"Implicit in the text of Rule 702, the *Daubert* Court concluded, is a district court's gatekeeping responsibility to 'ensur[e] that an expert's testimony both rests on a <u>reliable</u> foundation and is <u>relevant</u> to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 597) (emphasis in original). "Relevant evidence, of course, is evidence that helps 'the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting *Daubert*, 509 U.S. at 591) (internal question marks omitted). "To be relevant under *Daubert*, the proposed expert testimony must have 'a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" *Id.* (quoting *Daubert*, 509 U.S. at 592).

"With respect to reliability, the district court must ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods.'" *Id.* (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). "*Daubert* offered a number of guideposts to help a district court determine if expert testimony is sufficiently reliable to be admissible. First,

**JA2244**

'a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.'" *Id.* (quoting *Daubert*, 509 U.S. at 593). "A second question to be considered by a district court is 'whether the theory or technique has been subjected to peer review and publication.'" *Id.* (quoting *Daubert*, 509 U.S. at 593). "Publication regarding the theory bears upon peer review; '[t]he fact of publication (or lack thereof) in a peer reviewed journal will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.'" *Id.* (quoting *Daubert*, 509 U.S. at 594). "[D]espite the displacement of *Frye*, 'general acceptance' is nonetheless relevant to the reliability inquiry." *Id.* (quoting *Daubert*, 509 U.S. at 594). "*Daubert's* list of relevant considerations is not exhaustive; indeed, the Court has cautioned that this 'list of specific factors neither necessarily nor exclusively applies to all experts or in every case,' and that a trial court has 'broad latitude' to determine whether these factors are 'reasonable measures of reliability in a particular case[.]'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 153, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)).

## <u>ARGUMENT</u>

Dr. Levine is eminently qualified to provide opinions regarding the issues germane to this case. Dr. Levine's testimony in this case is well-supported by the medical literature and by his education, training, experience, knowledge, and skill. Plaintiffs' arguments go to the weight of Dr. Levine's testimony, not its admissibility; therefore, Plaintiffs' Motion must be denied.

### I.    <u>Dr. Levine is qualified to testify regarding the issues germane to this case.</u>

Dr. Levine is eminently qualified to testify regarding the etiology of gender dysphoria, diagnostic criteria for gender dysphoria, treatment modalities for gender dysphoria, the efficacy of those treatment modalities, and the risks, benefits, and alternatives of those treatment modalities.

Dr. Levine is a clinical professor of psychiatry at Case Western Reserve University School of Medicine and a private clinician. Levine Report, ¶ 1 (ECF 252-11). Dr. Levine has been practicing psychiatry for nearly 50 years. Levine Report, ¶ 2 (ECF 252-11). Dr. Levine founded Case Western's Gender Identity Clinic in 1974 and has served as its Co-Director since that time. Levine Report, ¶ 3 (ECF 252-11). Dr. Levine has treated several dozens of patients with transgender identities. Levine Report, ¶ 3 (ECF 252-11). Dr. Levine was an early member of the Harry Benjamin International Gender Dysphoria Association, now known as the World Professional Association for Transgender Health ("WPATH"), and he served as the Chairman of the committee that developed the fifth version of WPATH's "Standards of Care." Levine Report, ¶ 3 (ECF 252-11). Dr. Levine is a Distinguished Life Fellow of the American Psychiatric Association and an inductee in the Case Western's Department of Psychiatry's Hall of Fame. Levine Report, ¶ 2 (ECF 252-11). Dr. Levine has served and continues to serve as a peer reviewer for dozens of journals. Levine Report, ¶ 4 (ECF 252-11). He has served as the editor of psychiatric textbooks, has authored books, and has published 180 articles and book chapters, 19 of which focus specifically on the issues relevant to this case. Levine Report, ¶ 4 (ECF 252-11). Dr. Levine is frequently invited to lecture to professional groups and organizations in the field of psychiatry and regarding the mental health professional's role in treating gender dysphoria. Levine Report, ¶ 6 (ECF 252-11).

Thus, there is no question that Dr. Levine is qualified as an expert by knowledge, skill, experience, training, and/or education. Because Dr. Levine possesses Rule 702's qualifications to opine regarding the etiology of gender dysphoria, diagnostic criteria for gender dysphoria, treatment modalities for gender dysphoria, the efficacy of those treatment modalities, and the risks, benefits, and alternatives of those treatment modalities, Dr. Levine must be permitted to provide testimony regarding the same so long as the other requirements of Rule 702 are met.

**JA2246**

As discussed in detail above, the issues upon which Dr. Levine opines are relevant to the elements of Plaintiffs' causes of action. Thus, Dr. Levine's opinions and specialized knowledge will help the trier of fact to understand the evidence and to determine facts in issue, namely the medical necessity of gender-affirming surgery. Dr. Levine's opinions are based on sufficient facts or data. Dr. Levine's opinions are supported by 242 citations to relevant medical literature, studies, and commentaries, as well as Dr. Levine's own education, training, experience, and knowledge, which includes nearly 50 years of clinical practice. Dr. Levine's opinions are the product of reliable principles and methods. In addition to his own education, training, experience, and knowledge, Dr. Levine relies upon peer-reviewed medical literature and systematic reviews of the literature to support his opinions. Finally, Dr. Levine has reliably applied the principles and methods to the facts of this case. Dr. Levine has synthesized the literature, studies, and commentaries to provide opinions regarding the medical necessity of gender-affirming surgery, which is a crucial fact in this case. Therefore, Dr. Levine's opinions generally meet the Rule 702 standard for admissibility. Defendants will address each of Plaintiffs' specific arguments regarding specific opinions in turn.

## II.   Dr. Levine's opinions are not supportive of Plaintiffs' claims; regardless, however, agreement on issues is not grounds for exclusion.

Plaintiffs claim that Dr. Levine's opinions are supportive of their claims for relief because Dr. Levine has provided "letters of approval for gender-confirming surgeries for transgender people incarcerated at Framingham, a correctional institution in Massachusetts." Pl.'s Mot. to Exclude, pp. 4 – 5. Dr. Levine's provision of "letters of approval" is irrelevant to the issues in this case and is not an admission of medical necessity. Dr. Levine opines in his report that "[t]he right to bodily autonomy via 'gender-affirming' hormonal and surgical interventions should not be confused with medical necessity." Levine Report, ¶ 10 (ECF 252-11). Dr. Levine explains, "An objective test for medical necessity of transgender interventions does not exist. The diagnosis is

self-generated by the patient and merely recorded by the clinician. The choice of interventions is

granted based on a patient's wish. In transgender healthcare, this is often wrongly equated with

medical necessity." Levine Report, ¶ 10 (ECF 252-11). This is consistent with Dr. Levine's

deposition testimony regarding the "letters of approval":

> Q.      And if you were treating a patient and determined that they understood the
> risks and you and the patient agreed the treatment would be – actually, let me back
> up, sorry. When you authorize medical interventions for transgender patients, Dr.
> Levine, you don't use the word medically necessary, right?
> A.      I generally do not.
> Q.      Is it correct to say that you use the word psychologically beneficial?
> A.      Yes, it may be psychologically beneficial.
> …
> Q.      Let me ask the question again. If you were treating a patient and determined
> that they understood the risks and you thought the treatment would be
> psychologically beneficial and you provided letters of authorization to them, you
> would want the patient then to be able to access the care, right?
> A.      If after getting the letter of authorization the patient still wanted to do it,
> then I had already said to the endocrinologist or the surgeon it's okay with me to
> go ahead, that I've done my due diligence in this case. But the reason I'm hesitating,
> Mr. Charles, is that I've had several experiences, more than several, where I write
> a letter of recommendation for a desired treatment and then the patient does not
> follow through as a reflection of ambivalence about what they're doing. So I don't
> want to say that if I wrote a letter of recommendation for a particular treatment that
> I would want him to have it. I would say that if the patient still wants to after they
> have the go-ahead from me who's worked with the patient for a long time, then
> they may go ahead and do it and they have my blessing. …
> …
> A.      … So the answer to your question is not, is that I would not strongly want
> the person to have that. I have already done my work, I've already written my letter,
> I've explained the patient's circumstances as far as I understand them to the
> endocrinologist or to the surgeon, and then what happens is determined by the
> patient and is, is determined by the doctor, the, you know, the consultant or the
> endocrinologist or the surgeon.

Levine Dep. 69:9 – 71:1 (ECF 252-20). Thus, Dr. Levine testified that he has provided letters of

approval based upon patients' bodily autonomy, desire for treatment, and that such treatment may

be psychologically beneficial for the patient. Dr. Levine specifically testified that he does not use

the phrase "medically necessary." Rather, he respects the patient's bodily autonomy and signs off

**JA2248**

on medical and surgical interventions if he has determined that the patient has the capacity to consent to the intervention and desires the intervention. This is no way supports Plaintiffs' claims for relief under the Equal Protection Clause, Section 1557 of the ACA, or the Medicaid Act and has no bearing upon whether West Virginia Medicaid is required by law to afford coverage for gender-affirming surgeries.

Plaintiffs also suggest that, because Dr. Levine does not hold himself out to be an insurance expert and is not advancing a non-medical opinion regarding whether Medicaid should or should not cover gender-affirming surgeries, his opinions will not assist the trier of fact. Pl.'s Mot. to Exclude, pp. 5 – 6. Dr. Levine is a psychiatrist who has opined on the medical necessity of medical and surgical treatment for a psychiatric condition with which Plaintiffs have been diagnosed and for which Plaintiffs seek insurance coverage. Dr. Levine is not required to have insurance expertise to testify regarding medical necessity. Dr. Levine is also not required to have a personal opinion on Medicaid's policy to testify regarding medical necessity.

In short, Dr. Levine's opinions regarding the etiology of gender dysphoria, diagnostic criteria for gender dysphoria, treatment modalities for gender dysphoria, the efficacy of those treatment modalities, and the risks, benefits, and alternatives of those treatment modalities will assist the trier of fact to understand the evidence and to determine facts in issue. Dr. Levine is not required to opine on every issue germane to this case, and agreements among Dr. Levine and Plaintiffs, to the extent any exist, do not preclude Dr. Levine's testimony. Therefore, Plaintiffs' Motion must be denied.

### III.     Dr. Levine's opinions are relevant and within the scope of this dispute, and the Fourth Circuit's factual findings in *Grimm* are irrelevant to the facts of this case and to Plaintiffs' Motion.

9

**JA2249**

Plaintiffs claim that certain of Dr. Levine's opinions have no relevance to Plaintiffs' claims and, therefore, must be excluded. Specifically, Plaintiffs seek to exclude as irrelevant Dr. Levine's opinion that "the biology of the person remains as defined by his (XY) or her (XX) chromosomes, including cellular, anatomic and physiologic characteristics…." Pl.'s Mot. to Exclude, p. 6. Plaintiffs claim that this partial sentence removed from context has no bearing on this case; however, in context, this opinion is relevant to the issue of medical necessity. Dr. Levine's report states as follows:

> Despite the increasing ability of hormones and various surgical procedures to reconfigure some male bodies to visually pass as female, or vice versa, the biology of the person remains as defined by his (XY) or her (XX) chromosomes, including cellular, anatomic, and physiologic characteristics and the particular disease vulnerabilities associated with that chromosomally defined sex. For instance, the XX (genetically female) individual who takes testosterone to stimulate certain male secondary sex characteristics will nevertheless remain unable to produce sperm and father children. Contrary to the assertions of certain members of the medical community, the aspiration of some trans individuals to become "a complete man" or "a complete woman" is not biologically attainable. It is possible for some individuals to "pass" unnoticed as the opposite gender that they aspire to be—**but with limitations, costs, and risks**.

Levine Report, ¶ 18 (internal citations omitted) (emphasis added). This opinion is, therefore, relevant as a basis for Dr. Levine's opinion that gender-affirming surgeries do not and cannot fully achieve the results desired by patients and come with limitations, costs, and risks, all of which informs the issue of medical necessity. Additionally, Plaintiffs' experts assert similar opinions regarding sex and gender identity. Karasic Report, ¶¶ 20-21 (ECF 250-20); Schechter Report, ¶¶ 18-19 (ECF 250-23); Olson-Kennedy Report, ¶¶ 18-20 (ECF 250-26). Thus, if Dr. Levine's opinions regarding biological sex are irrelevant, then Plaintiffs' experts' opinions regarding the same are likewise irrelevant.

Plaintiffs also seek to exclude Dr. Levine's opinion that "'gender exploratory' therapy can and has led to a resolution of gender dysphoria." Pls.' Mot. to Exclude, p. 7. Plaintiffs attempt to

**JA2250**

discredit Dr. Levine's opinion by claiming that it is supported only by "anecdotal narrative articles" and by likening psychotherapy to "conversion therapy." Pls.' Mot. to Exclude, p. 7. Plaintiffs' most recent attempt to make Dr. Levine a pariah is unfounded and is consistent with recent comments from the current president of WPATH, Dr. Marci Bowers, who stated, "There are definitely people [in WPATH] who are trying to keep out anyone who doesn't absolutely buy the party line that everything should be affirming, and that there's no room for dissent." Levine Report, ¶ 23 (ECF 252-11) (citation omitted). Plaintiffs are again demonstrating that there is no room for dissent and assert that, because Dr. Levine disagrees with them, he is labeled as a proponent of conversion therapy.

> Dr. Levine's report actually states,
>
> In a growing number of instances, especially among gender-dysphoric youth, proper therapeutic exploration has led to a resolution of gender dysphoria. It is true that quality evidence proving long-term effectiveness of psychotherapy interventions is missing—just as they are lacking for the hormonal and surgical interventions. However, Dr. Karasic's attempts to stigmatize gender-exploratory psychotherapy as "gender identity change efforts," or to stigmatize as "unethical" appear to be politically motivated to maintain his beliefs with little concern for the patient's long-term outcomes in mind. Such efforts will only serve to limit access to quality healthcare for the already struggling and vulnerable group of gender dysphoric patients.

Levine Report, ¶ 37 (internal citations omitted). Nowhere in Dr. Levine's report does he state that therapeutic exploration resolves transgender identity. Rather, he states that therapeutic exploration has resolved gender dysphoria, which is purportedly the goal of the surgical treatment for which Plaintiffs seek coverage. Dr. Levine's opinion is supported by not only his own clinical experience but also by peer-reviewed literature in the Journal of Infant, Child, and Adolescent Psychotherapy, the Metalogos Systemic Therapy Journal, the Journal of Child Psychotherapy, Clinical Child Psychology and Psychiatry, the International Journal of Psychoanalysis, and the Archives of Sexual Behavior. Levine Report, ¶ 37 (ECF 252-11). Plaintiffs are correct that Dr. Levine admits

**JA2251**

that psychotherapy, like medical and surgical interventions, is lacking in long-term evidence of results. Levine Report, ¶ 160 (ECF 252-11). Once again, however, Plaintiffs take a single sentence out of context and fail to cite to the rest of the paragraph:

> The results of alternative approaches, such as watchful waiting for children, or gender-psychotherapy, are likewise lacking in long-term evidence. However, **emerging evidence suggests that psychotherapy is a promising intervention for young people**. It should be noted that a key Finnish gender program recently announced that psychotherapy should be the first line of treatment for all gender dysphoric youth. **A growing list of European countries appear to be moving in the same direction**.

Levine Report, ¶ 160 (ECF 252-11) (internal citations omitted) (emphasis added). Thus, Dr. Levine recognizes that more research is required to fully understand the efficacy of psychotherapy as a treatment modality for gender dysphoria, but he also cites to peer-reviewed literature showing emerging evidence supportive of psychotherapy and a growing consensus supporting the use of psychotherapy as the first treatment modality for gender dysphoria.

Additionally, Plaintiffs attempt to conflate a transgender identity with gender dysphoria and to argue that, because the Fourth Circuit made certain findings in *Grimm*, Dr. Levine's opinions have no relevance. First, Fourth Circuit precedent is not found in factual findings. The District Court in *Grimm* admitted the submissions of *amici curiae* as "evidence of the views of the organizations that prepared them, and not as substantive evidence of the accuracy of such views." *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444, 455 (E.D. Va. 2019). The Fourth Circuit then quoted the *amici* briefs in the factual section of its opinion. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594-96 (4th Cir. 2020). Plaintiffs' quotes from *Grimm* are not holdings and lack any precedential value. Moreover, the *Daubert* Court recognized that "[s]cientific conclusions are subject to perpetual revision," and, as a result, "open debate is an essential part of both legal and scientific analyses." *Daubert*, 509 U.S. at 596-97. In reversing the Court of Appeals, the *Daubert*

Court noted that "[t]he inquiries of the District Court and the Court of Appeals focused almost exclusively on 'general acceptance,' as gauged by publication and the decisions of other courts." *Id.* at 597. Thus, *Daubert's* principles require the trial court to rely upon the factual record before it, not the "decisions of other courts." Therefore, Plaintiffs' Motion must be denied.

IV.    **Dr. Levine's opinions are methodologically reliable and supported by science and medicine.**

Plaintiffs claim that Dr. Levine "admitted" that his opinions lack any scientific support and have not been tested or subjected to peer review or publication. This is wildly inaccurate and misleading. Dr. Levine's opinions are supported by 242 citations to relevant medical literature, studies, and commentaries, as well as Dr. Levine's own education, training, experience, and knowledge, which includes nearly 50 years of clinical practice. Dr. Levine's opinions are the product of reliable principles and methods. In addition to his own education, training, experience, and knowledge, Dr. Levine relies upon peer-reviewed medical literature and systematic reviews of the literature to support his opinions. Finally, Dr. Levine has reliably applied the principles and methods to the facts of this case. Dr. Levine has synthesized the literature, studies, and commentaries to provide his opinions. Plaintiffs identify four specific opinions they claim are not reliable, and, without explanation, Plaintiffs claim that Dr. Levine's methodology is unreliable. Defendants will address each of Plaintiffs' specific arguments in turn.

1.    **Dr. Levine's opinions regarding WPATH's treatment guidelines are accurate and reliable.**

Plaintiffs take issue with Dr. Levine's accurate citations to medical literature and to WPATH's president's comments about the advocacy organization's refusal to consider opinions outside its core beliefs. First, Plaintiffs take issue with Dr. Levine's opinion that WPATH's "standards of care" are "very low quality and unfit tools for clinical decision-making[.]" Pls.' Mot.

13

**JA2253**

to Exclude, p. 10. Again, Plaintiffs leave out important context. Dr. Levine's report fully states,

"A recently published systematic review found the current WPATH SOC7 guidelines to be of very

low quality and unfit tools for clinical decision-making, noting 'incoherence' within the

recommendations." Levine Report, ¶ 21 (ECF 252-11). Dr. Levine cites directly to the systematic

review that noted incoherence within the recommendations. Levine Report, ¶ 21 (ECF 252-11).

The systematic review states,

> No statements were highlighted by the WPATH SOCv7 authors as key
> recommendations, and it proved impossible for all six reviewers independently
> performing data extraction to identify them. The total number of extracted
> recommendations ranged between 0 and 168 with little consistency or agreement
> on what passages were selected. **Some extracted statements might have been
> intended as recommendations or standards, but many were flexible,
> disconnected from evidence and could not be used by individuals or services
> to benchmark practice**. After discussion of this **incoherence** within WPATH
> SOCv7 and our inability therefore to compare recommendations across all [clinical
> practice guidelines], it was decided not to revisit inclusions post hoc but to abandon
> this protocol aim.

Levine Dep., Ex. SL10 (ECF 252-21) (emphasis added). Thus, Dr. Levine accurately and reliably

stated the findings of the article cited to in his report.

Plaintiffs also take issue with Dr. Levine's citation to a blog post that included comments

from Dr. Marci Bowers. Plaintiffs do not claim that Dr. Levine inaccurately cited to the blog post

or that the blog post inaccurately quoted Dr. Bowers. Rather, Plaintiffs argue Dr. Levine should

have also cited to a subsequent statement of Dr. Bowers. This has no bearing on whether Dr.

Bowers was accurately quoted and has no bearing on the admissibility of Dr. Levine's opinions.

Plaintiffs do not even attempt to explain how the failure to include other comments from Dr.

Bowers is exclusionary.

Plaintiffs further claim that Dr. Levine's opinions regarding foreign countries moving away

from WPATH's guidelines should be excluded. Again, Dr. Levine's report includes citations to

support his opinions. Levine Report, ¶ 22. Since his report, additional information has been published, including a statement from the Swedish National Board of Health and Welfare, which recommends restraint when it comes to hormone therapy, finds a lack of firm conclusions about the efficacy and safety of hormone and puberty-blocking treatments, and finds that the risks outweigh the benefits. Olson Kennedy Dep., Ex. 7 (ECF 252-18). Thus, again, while Plaintiffs may cross-examine Dr. Levine and present their own evidence, Plaintiffs lack any grounds for exclusion of Dr. Levine's opinions, which are based upon medical literature, government statements, and Dr. Levine's education, training, experience, and knowledge. Therefore, Plaintiffs' Motion must be denied.

### 2. Dr. Levine's opinions regarding gender-confirming care are reliable.

Plaintiffs claim that Dr. Levine's opinions that gender-confirming care is inadequate, risky, and without lasting benefit are inaccurate and unsupported. Plaintiffs specifically cite to Paragraphs 23, 39, 51, 55, and 118 through 124 of Dr. Levine's report as opinions that are not supported. Dr. Levine's report totals 161 paragraphs. Thus, Plaintiffs take issue with less than ten percent of Dr. Levine's opinions. Regardless, ample support is found throughout Dr. Levine's report. Paragraph 23 of Dr. Levine's Report discusses his own experience with WPATH and includes the previously discussed comments by Dr. Marci Bowers. There is no better source for Dr. Levine's own experience with WPATH than Dr. Levine. Thus, Plaintiffs' argument is unfounded. Paragraph 39 of Dr. Levine's Report rebuts Dr. Karasic's opinions regarding the Dutch Study and discusses the Dutch Study's failure to include the outcomes of several members of its study population in its statistical analysis. Dr. Levine does not invent the excluded members of the population; they are disclosed in the study's methodology section but not included in the statistical analysis. *See* de Vries ALC, et al., "Young Adult Psychological Outcome After Puberty

15

**JA2255**

Suppression and Gender Reassignment," *Pediatrics*, 2014, 134(4): 696-704, attached hereto as **Exhibit A**. Thus, Dr. Levine's opinion is based on the very same article as the opinion he was criticizing. Thus, Plaintiffs' argument is unfounded.

Paragraph 51 of Dr. Levine's Report disputes Dr. Karasic's analysis of the costs of medical and surgical interventions. Dr. Levine cites to six sources to support his opinions. Levine Report, ¶ 51 (ECF 252-11). Again, Plaintiffs may disagree with Dr. Levine's opinions and may disagree with the literature and other sources he cites, but that disagreement does not render Dr. Levine's opinions inadmissible. Paragraphs 118 through 124 provide opinions regarding the risks of complications associated with gender-affirming hormonal and surgical interventions. Levine Report, ¶¶ 118-124 (ECF 252-11). Dr. Levine's opinions in these seven paragraphs are supported by citations to nine separate publications in the literature. Plaintiffs do not identify any specific opinions in these seven paragraphs that should be excluded and do not identify any specific opinions that are allegedly unsupported. Thus, the record demonstrates that Dr. Levine's opinions are well-supported by the literature, and Plaintiffs have failed to specify opinions that are allegedly unsupported. Therefore, Plaintiffs' Motion must be denied.

**3.    Dr. Levine's opinions regarding desistance are based in fact and in the literature.**

Plaintiffs claim that Dr. Levine's opinions regarding desistance are not based in fact. Again, Plaintiffs attempt to mischaracterize his opinions in a fictional binary vacuum, stating that the opinions in his report are not based in fact because Dr. Levine "conceded" that some children persist in their transgender identity. Pls.' Mot. to Exclude, pp. 12 – 13. Dr. Levine's opinion is that "the majority (61-98%) of children who identify has transgender will reidentify with their sex before reaching maturity absent any interventions." Levine Report, ¶ 90 (citation omitted). Dr.

**JA2256**

Levine does not claim that no children persist in their transgender identity, and Plaintiffs' attempt to mischaracterize his opinions is unsupported.

Plaintiffs do not and cannot claim that Dr. Levine's opinions on this topic are unsupported. Rather, they claim that the literature cited to by Dr. Levine used prior versions of the DSM-V, so the literature is unreliable. While some of the literature cited to by Dr. Levine did indeed analyze treatment outcomes using diagnostic criteria from the DSM-IV, much of the literature cited to by Dr. Levine is from 2020 and 2021, representing the most recent available literature in the field. Levine Report, ¶ 90 (ECF 252-11). Additionally, there is literature examining the outcomes of using various diagnostic criteria on the same patients. That literature found significant overlap of the diagnostic criteria: "Interrater agreement rates for each instrument ranged from 65% to 79% for the adolescence/adulthood diagnoses and from 67% to 94% for the childhood diagnoses and were comparable regardless of the system used." Karasic Dep., Ex. 9, de Vries, et al., "Reliability and Clinical Utility of Gender Identity-Related Diagnoses: Comparisons Between the ICD-11, ICD-10, DSM-IV, and DSM-5," *LGBT Health*, Volume 8, No. 2, 2021 (ECF 252-8; PageID 4389). Thus, Dr. Levine's opinions, which rely upon medical literature from the last two years, are not unreliable simply because some of the literature analyzed data under the DSM-IV's diagnostic criteria. Indeed, there is no significant statistical difference in the diagnosis rates for individuals under the DSM-IV and DSM-V. Thus, Plaintiffs' argument is unfounded.

Plaintiffs also attempt to characterize Dr. Levine's opinions as an attempt to "undercut the validity" of the DSM-V. Dr. Levine has no opinions that claim that the DSM-V is invalid. Rather, he opines that the ICD-11 criteria do not include a criterion requiring clinically significant distress for diagnosis. Levine Report, ¶ 86. This is, of course, true. In the draft eighth version of WPATH's "Standards of Care," WPATH states, "One important reconceptualization in comparison to the

DSM-5 Gender Dysphoria classification is that distress is not a required indicator of the ICD-11 Gender Incongruence classification (WHO, 2019)." Olson-Kennedy Dep., Ex. 6 (ECF 252-18; PageID 5925). Thus, Dr. Levine's opinion does not attempt to undercut the validity of the DSM-V and, instead, is critical of the ICD-11, which WPATH is eager to adopt. Thus, there is no "hypothetical." The ICD-11 exists, and, while not yet used in the United States, is included in WPATH's still-forthcoming updated guidelines. Thus, Plaintiffs' argument is unfounded, and Plaintiffs' Motion must be denied.

### 3.   Dr. Levine's opinions regarding rapid-onset gender dysphoria and detransition are supported by the literature.

Plaintiffs claim that Dr. Levine has asserted an "unsupported hypothesis" regarding rapid-onset gender dysphoria. Dr. Levine's opinion is that WPATH's draft eighth version of their guidelines does not acknowledge rapid-onset gender dysphoria or detransition, both of which have been documented in the literature. Levine Report, ¶ 79 (ECF 252-11) (citing Hutchinson A, et al., "In Support of Research Into Rapid-Onset Gender Dysphoria," *Arch Sex Behav*. 2020;49(1)) (citing Vandenbussche E, "Detransition-Related Needs and Support: A Cross-Sectional Online Survey," *Journal of Homosexuality*, published online April 30, 2021) (citing Littman L, "Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners," *Arch Sex Behav*., published online October 19, 2021). Plaintiffs' expert Johanna Olson-Kennedy, M.D. testified that she has witnessed a change in her patient population from a majority of individuals assigned male at birth to a majority of individuals assigned female at birth and that this cohort of patients is currently being studied. Olson-Kennedy Dep. 55:8 – 57:12 (ECF 252-18). This is consistent with the Swedish National Board of Health and Welfare's February 2022 recommendations halting the use of hormone therapy for minors: "The National Board of Health and Welfare has previously

**JA2258**

presented statistics showing that the group of young people seeking care for gender dysphoria has increased sharply. Between 2008 and 2018, the number of new cases of diagnosed gender dysphoria multiplied. Particularly large was the increase among those aged 13 to 17 years and with registered sex female at birth." Olson-Kennedy Dep., Ex. 7 (ECF 252-18). This is precisely the phenomenon described by Dr. Levine in his report.

Additionally, regarding detransition, Dr. Levine cited to literature in his report to support that detransition occurs, and a growing number of individuals are coming out publicly to discuss their own detransition. Two of these individuals were acknowledged by Dr. Olson-Kennedy in her deposition. Olson-Kennedy Dep. 48:9 – 49:10. Dr. Levine did not "concede" in his deposition that he lacks scientific support for his opinion. Rather, he pointed to the literature cited in his report, which documented 337 individuals who had detransitioned. Levine Dep. 158:8 – 160:24. Dr. Levine did admit that the Littman article did not compare historical rates of detransition, but his "concessions" stopped there. Thus, Dr. Levine's opinions are supported by the literature. Plaintiffs' arguments are unfounded, and Plaintiffs' Motion must be denied.

**V.    Dr. Levine is qualified to offer opinions regarding puberty-delaying treatment and treatment of pre-pubescent children.**

Plaintiffs claim that Dr. Levine is unqualified to offer opinions regarding costs of care, puberty-delaying treatment, and treatment of pre-pubescent children. At the outset, it must be noted that neither Plaintiff is seeking puberty-delaying treatment, that neither Plaintiff is a pre-pubescent child, and that Plaintiffs are not adequate representatives of a class that includes pre-pubescent children and/or individuals seeking puberty-delaying treatment. Thus, Plaintiffs' experts' opinions regarding the same are entirely irrelevant to Plaintiffs' claims.

Regardless, Dr. Levine is qualified to offer opinions regarding puberty-delaying treatment and the treatment of pre-pubescent children. Plaintiffs' expert Dr. Karasic does not treat children

**JA2259**

at all, yet he purports to be qualified to offer opinions regarding the treatment of children. Karasic Dep. 43:22 – 44:3 (ECF 252-8). Plaintiffs posit, however, that, because Dr. Levine only rarely treats pre-pubescent children with gender dysphoria, he is not qualified. Dr. Levine has education, training, experience, and knowledge in the field of psychiatry and treating gender dysphoric children and relies upon peer-reviewed literature for his opinions. Dr. Levine's citations include his own published works as well as the work of others, including the 2017 Endocrine Society Guidelines. Levine Report, ¶¶ 132 – 139 (ECF 252-11). Plaintiffs' repeated attempts to discredit Dr. Levine through excerpts of out-of-context partial sentences is likewise unavailing. Dr. Levine only intends to offer the opinions disclosed in this case, and Plaintiffs have failed to establish that Dr. Levine is unqualified to offer those opinions or that his opinions are unreliable. Therefore, Plaintiffs' Motion must be denied.

Finally, Dr. Levine does not intend to offer opinions regarding the costs of procedures outside of the literature and sources included in his report. Dr. Levine's opinions regarding costs are directed at Dr. Karasic's financial analysis, which he is not qualified to perform, and its lack of inclusion of numerous costs. Dr. Levine disputes the cost analysis of Dr. Karasic but does not offer additional cost opinions.

**WHERFORE**, Defendants respectfully request that this Honorable Court deny Plaintiffs' Motion to Exclude Expert Testimony of Stephen B. Levine, M.D. Defendants request all other and further relief this Honorable Court deems just and proper.

**WILLIAM CROUCH, CYNTHIA BEANE, and WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES, By counsel,**

/s/ Caleb B. David
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)

20

**JA2260**

Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA2261**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

**CHRISTOPHER FAIN** and **SHAUNTAE ANDERSON;** individually and on behalf of all others similarly situated,

        *Plaintiffs,*

v.

**WILLIAM CROUCH,** in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; **CYNTHIA BEANE,** in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; and **WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES,**

        *Defendants.*

**Civil Action No. 3:20-cv-00740**
**Hon. Robert C. Chambers, Judge**

## CERTIFICATE OF SERVICE

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of Health and Human Resources Bureau for Medical Services, by counsel, and do hereby certify that on the 14th day of June, 2022, a true and exact copy of **"DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF STEPHEN B. LEVINE, M.D."** was served on counsel via electronic means as follows:

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

**JA2262**

Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
65 E. Wacker Pl, Suite 2000
Chicago, IL 60601

(312) 663-4413
(312) 663-4307
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lamdalegal.org

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

/s/ Caleb B. David
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
*Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services*
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com

cdavid@shumanlaw.com
kbandy@shumanlaw.com

24

**JA2264**

Case 3:20-cv-00740   Document 203-1   Filed 09/14/22   Page 1 of 11 PageID #: 7858

ARTICLE

# Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment

**AUTHORS:** Annelou L.C. de Vries, MD, PhD,[a] Jenifer K. McGuire, PhD, MPH,[b] Thomas D. Steensma, PhD,[a] Eva C.F. Wagenaar, MD,[a] Theo A.H. Doreleijers, MD, PhD,[a] and Peggy T. Cohen-Kettenis, PhD[a]

[a]Center of Expertise on Gender Dysphoria, VU University Medical Center, Amsterdam, Netherlands; and [b]Department of Human Development, Washington State University, Pullman, Washington

**KEY WORDS**
gender dysphoria, transgenderism, adolescents, psychological functioning, puberty suppression, longitudinal outcomes

**ABBREVIATIONS**
ABCL—Adult Behavior Checklist
ASR—Adult Self-Report
BDI—Beck Depression Inventory
BIS—Body Image Scale
CBCL—Child Behavior Checklist
CGAS—Children's Global Assessment Scale
CSH—cross-sex hormones
GD—gender dysphoria
GnRHa—gonadotropin-releasing hormone analogs
GRS—gender reassignment surgery
SHS—Subjective Happiness Scale
STAI—Spielberger's Trait Anxiety Scale
SWLS—Satisfaction With Life Scale
TPI—Spielberger's Trait Anger Scale
UGDS—Utrecht Gender Dysphoria Scale
YSR—Youth Self-Report

Dr de Vries conceptualized the study, clinically assessed the participants, drafted the initial manuscript, and reviewed and revised the manuscript; Dr McGuire conceptualized the study, planned and carried out the analyses, assisted in drafting the initial manuscript, and reviewed and revised the manuscript; Dr Steensma conceptualized the study, coordinated and supervised data collection, and reviewed and revised the manuscript; Dr Wagenaar coordinated and invited participants for assessments and reviewed and revised the manuscript; Drs Doreleijers and Cohen-Kettenis conceptualized the study and reviewed and revised the manuscript; and all authors approved the final manuscript as submitted.

Dr McGuire's current affiliation is Department of Family Social Science, College of Education and Human Development, St Paul, Minnesota.

www.pediatrics.org/cgi/doi/10.1542/peds.2013-2958

doi:10.1542/peds.2013-2958

Accepted for publication Jul 7, 2014

Address correspondence to Annelou L.C. de Vries, MD, PhD, Child and Adolescent Psychiatrist, Center of Expertise on Gender Dysphoria, VU University Medical Center, PO Box 7057, 1007 MB Amsterdam, Netherlands. E-mail: alc.devries@vumc.nl

*(Continued on last page)*



**WHAT'S KNOWN ON THIS SUBJECT:** Puberty suppression has rapidly become part of the standard clinical management protocols for transgender adolescents. To date, there is only limited evidence for the long-term effectiveness of this approach after gender reassignment (cross-sex hormones and surgery).



**WHAT THIS STUDY ADDS:** In young adulthood, gender dysphoria had resolved, psychological functioning had steadily improved, and well-being was comparable to same-age peers. The clinical protocol including puberty suppression had provided these formerly gender-dysphoric youth the opportunity to develop into well-functioning young adults.

## abstract

**BACKGROUND:** In recent years, puberty suppression by means of gonadotropin-releasing hormone analogs has become accepted in clinical management of adolescents who have gender dysphoria (GD). The current study is the first longer-term longitudinal evaluation of the effectiveness of this approach.

**METHODS:** A total of 55 young transgender adults (22 transwomen and 33 transmen) who had received puberty suppression during adolescence were assessed 3 times: before the start of puberty suppression (mean age, 13.6 years), when cross-sex hormones were introduced (mean age, 16.7 years), and at least 1 year after gender reassignment surgery (mean age, 20.7 years). Psychological functioning (GD, body image, global functioning, depression, anxiety, emotional and behavioral problems) and objective (social and educational/professional functioning) and subjective (quality of life, satisfaction with life and happiness) well-being were investigated.

**RESULTS:** After gender reassignment, in young adulthood, the GD was alleviated and psychological functioning had steadily improved. Well-being was similar to or better than same-age young adults from the general population. Improvements in psychological functioning were positively correlated with postsurgical subjective well-being.

**CONCLUSIONS:** A clinical protocol of a multidisciplinary team with mental health professionals, physicians, and surgeons, including puberty suppression, followed by cross-sex hormones and gender reassignment surgery, provides gender dysphoric youth who seek gender reassignment from early puberty on, the opportunity to develop into well-functioning young adults. *Pediatrics* 2014;134:1–9



EXHIBIT A

Downloaded from by guest on October 7, 2016

1

JA2265

Case 3:20-cv-00740    Document 20-4    Filed 00/14/22    Page 2 of 11 PageID #: 7869

Transgender adolescents experience an incongruence between their assigned gender and their experienced gender and may meet the Diagnostic and Statistical Manual of Mental Disorders 5 criteria for gender dysphoria (GD).[1] Fifteen years ago, pubertal delay was introduced as an aid in the treatment of a gender dysphoric adolescent.[2] Although not without debate, blocking pubertal development has rapidly become more widely available[3–7] and is now part of the clinical management guidelines for GD.[8–12]

Gonadotropin-releasing hormone analogs (GnRHa) are a putatively fully reversible[13] medical intervention intended to relieve distress that gender dysphoric adolescents experience when their secondary sex characteristics develop. A protocol designed by Cohen-Kettenis and Delemarre-van de Waal[14] (sometimes referred to as the "Dutch model")[4,7] considers adolescents, after a comprehensive psychological evaluation with many sessions over a longer period of time, eligible for puberty suppression, cross-sex hormones (CSH), and gender reassignment surgery (GRS) at the respective ages of 12, 16, and 18 years when there is a history of GD; no psychosocial problems interfering with assessment or treatment, for example, treatment might be postponed because of continuous moving from 1 institution to another or repeated psychiatric crises; adequate family or other support; and good comprehension of the impact of medical interventions.[12] Puberty suppression is only started after the adolescent actually enters the first stages of puberty (Tanner stages 2–3), because although in most prepubertal children GD will desist, onset of puberty serves as a critical diagnostic stage, because the likelihood that GD will persist into adulthood is much higher in adolescence than in the case of childhood GD.[15,16]

Despite the apparent usefulness of puberty suppression, there is only limited evidence available about the effectiveness of this approach. In the first cohort of adolescents who received GnRHa, we demonstrated an improvement in several domains of psychological functioning after, on average, 2 years of puberty suppression while GD remained unchanged.[16] The current study is a longer-term evaluation of the same cohort, on average, 6 years after their initial presentation at the gender identity clinic. This time, we were not only interested in psychological functioning and GD, but added as important outcome measures objective and subjective well-being (often referred to as "quality of life"), that is, the individuals' social life circumstances and their perceptions of satisfaction with life and happiness.[17–19] After all, treatment cannot be considered a success if GD resolves without young adults reporting they are healthy, content with their lives, and in a position to make a good start with their adult professional and personal lives.[20] Because various studies show that transgender youth may present with psychosocial problems,[21,22] a clinical approach that includes both medical (puberty suppression) and mental health support (regular sessions, treatment when necessary, see Cohen-Kettenis et al[12]) aims to improve long-term well-being in all respects.

In the present longitudinal study, 3 primary research questions are addressed. Do gender dysphoric youth improve over time with medical intervention consisting of GnRHa, CSH, and GRS? After gender reassignment, how satisfied are young adults with their treatment and how do they evaluate their objective and subjective well-being? Finally, do young people who report relatively greater gains in psychological functioning also report a higher subjective well-being after gender reassignment?

## METHODS

### Participants and Procedure

Participants included 55 young adults (22 transwomen [natal males who have a female gender identity] and 33 transmen [natal females who have a male gender identity]) of the first cohort of 70 adolescents who had GD who were prescribed puberty suppression at the Center of Expertise on Gender Dysphoria of the VU University Medical Center and continued with GRS between 2004 and 2011. These adolescents belonged to a group of 196 consecutively referred adolescents between 2000 and 2008, of whom 140 had been considered eligible for medical intervention and 111 were prescribed puberty suppression (see de Vries et al[16]). The young adults were invited between 2008 and 2012, when they were at least 1 year past their GRS (vaginoplasty for transwomen, mastectomy and hysterectomy with ovariectomy for transmen; many transmen chose not to undergo a phalloplasty or were on a long waiting list). Non-participation ($n = 15$, 11 transwomen and 4 transmen) was attributable to not being 1 year postsurgical yet ($n = 6$), refusal ($n = 2$), failure to return questionnaires ($n = 2$), being medically not eligible (eg, uncontrolled diabetes, morbid obesity) for surgery ($n = 3$), dropping out of care ($n = 1$), and 1 transfemale died after her vaginoplasty owing to a postsurgical necrotizing fasciitis. Between the 55 participants and the 15 nonparticipating individuals, Student's $t$ tests revealed no significant differences on any of the pretreatment variables. A similar lack of differences was found between the 40 participants who had complete data and the 15 who were missing some data.

Participants were assessed 3 times: pre-treatment (T0, at intake), during treatment (T1, at initiation of CSH), and post-treatment (T2, 1 year after GRS). See Table 1 for age at the different time points. The VU University Medical Center medical ethics committee approved the study, and all participants gave informed consent.

Downloaded from by guest on October 7, 2016

**TABLE 1** Age at Different Treatment Milestones and Intelligence by Gender

| Variable | All Participants[a] (N = 55) | | Transwomen (Natal Males) (N = 22) | Transmen (Natal Females) (N = 33) |
|---|---|---|---|---|
| | Mean (SD) | Range | Mean (SD) | Mean (SD) |
| Age, y | | | | |
| At assessment PreT | 13.6 (1.8) | 11.1–17.0 | 13.6 (1.8) | 13.7 (2.0) |
| At start of GnRHa | 14.9 (1.8) | 11.5–18.5 | 14.8 (2.0) | 14.9 (1.9) |
| At start of CSH | 16.7 (1.1) | 13.9–19.0 | 16.5 (1.3) | 16.8 (1.0) |
| At GRS | 19.2 (0.9) | 18.0–21.3 | 19.6 (0.9) | 19.0 (0.8) |
| At assessment PostT | 20.7 (1.0) | 19.5–22.8 | 21.0 (1.1) | 20.5 (0.8) |
| Full-scale intelligence[b] | 99.0 (14.3) | 70–128 | 97.8 (14.2) | 100.4 (14.3) |

PostT, post-treatment; PreT, pre-treatment..

[a] Comparisons between those who had complete data (n = 40) and those who had missing data on the CBCL/ABCL (n = 15) reveal no significant differences between the groups in age at any point in the study or in natal sex.

[b] WISC-R, the WISC-III, or the WAIS-III at first assessment, depending on age and time.[45–47]

## Measures

Time was the predominate independent variable. Other demographic characteristics were incorporated in some models, including, age, natal sex, Full Scale Intelligence, and parent marital status; where significantly different they are reported.

### Gender Dysphoria/Body Image

There was 1 indicator measuring GD (Utrecht Gender Dysphoria Scale [UGDS]) and 3 indicators measuring body image (Body Image Scale [BIS] with primary, secondary, and neutral subscales). Higher UGDS (12 items, 1–5 range, total score ranging from 12–60) total scores indicate higher levels of GD, for example, "I feel a continuous desire to be treated as a man/woman."[23] There are separate versions of the UGDS for males and females with mostly different items, permitting no gender difference analyses. BIS (30 items, 1–5 range) higher scores indicate more dissatisfaction with primary sex characteristics (important gender-defining body characteristics, eg, genitals, breasts), secondary sex characteristics (less obvious gender-defining features, eg, hips, body hair), and neutral (hormonally unresponsive) body characteristics (eg, face, height).[24] The male and the female BIS are identical except for the sexual body parts. The UGDS and the BIS of the natal gender were administered at T0 and T1. At T1, we chose the UGDS of the assigned gender, because no physical changes had occurred yet and some were still treated as their assigned gender. This way, however, decreased GD caused by social transitioning was not measured. At T2 young adults filled out the versions of their affirmed gender.

### Psychological Functioning

There were 10 indicators assessing psychological functioning. To assess global functioning, the Children's Global Assessment Scale (CGAS) was used.[25] The Beck Depression Inventory (BDI; 21 items, 0–3 range) indicates presence and severity of depressive symptoms.[26] Spielberger's Trait Anger (TPI) and Spielberger's Trait Anxiety (STAI; 10 and 20 items, respectively, 1–4 range) scales of the State-Trait Personality Inventory were administered to assess the tendency to respond with anxiety or anger, respectively, to a threatening or annoying situation.[27,28]

Behavioral and emotional problems were assessed by the total, internalizing, and externalizing T scores as well as clinical range scores for these 3 indices (T score >63) of the Child/Adult Behavior Checklist (CBCL at T0 and T1, ABCL at T2), the Youth/Adult Self-Report (YSR at T0 and T1, ASR at T2).[29–31] Items referring to GD in the CBCL/YSR and ABCL/ASR were scored as 0 (for more explanation, see Cohen-Kettenis et al[32]).

### Objective and Subjective Well-Being (T2 Only)

A self-constructed questionnaire was used to ask the young adults about their current life circumstances, such as living conditions, school and employment, and social support (objective well-being), and satisfaction with treatment (subjective well-being). Three instruments further assessed subjective well-being. To measure quality of life, the WHOQOL-BREF (quality of life measure developed by the World Health Organization) was administered (24 items, 4 domains: Physical Health, Psychological Health, Social Relationships, and Environment, 1–5 range with higher scores indicating better quality of life).[17] The Satisfaction With Life Scale (SWLS, 5 items, 5–35 range, 20 being neutral) was used to assess life satisfaction.[18] Higher scores on the Subjective Happiness Scale (SHS, 4 items, 7-point Likert scale, average score 1–7) reflect greater happiness.[19]

## Data Analyses

General Linear Models examined the repeated measures with an analysis of variance-based model, incorporating continuous and categorical predictors, and correcting for the unbalanced cell sizes. Linear and quadratic effects of the 14 indicators across 3 time points, with time as the within-subjects factor, and sex as a between-subjects factor in a second set of analyses are reported in Tables 2 and 3 and Fig 1. A linear effect signifies an overall change across T0 to T2. A quadratic effect signifies that the change was not continuous, such as when an indicator does not improve from T0 to T1 but improves from T1 to T2. It is possible to have both a significant linear and quadratic effect on the same

Downloaded from by guest on October 7, 2016

**3**

JA2267

**TABLE 2** Gender Dysphoria and Body Image of Adolescents at Intake (T0), While on Puberty Suppression (T1), and After Gender Reassignment (T2)

| | Nª | T0 | T1 | T2 | T0–T2 | Time | | Time × Sex | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | *t* test | Linear Effect | Quadratic Effect | Linear Effect | Quadratic Effect |
| | | Mean (SD) | Mean (SD) | Mean (SD) | *P* | *P* | | *P* | |
| UGDS | 33 | 53.51 (8.29) | 54.39 (7.70) | 15.81 (2.78) | <.001 | | | | |
| MtF | 11 | 47.07 (11.05) | 48.95 (10.80) | 17.27 (2.57) | <.001 | <.001 | <.001 | n/a | |
| FtM | 22 | 56.74 (3.74) | 57.11 (3.40) | 15.08 (2.64) | <.001 | <.001 | <.001 | n/a | |
| Body Image (BIS) | | | | | | | | | |
| Primary sex characteristics | 45 | 4.13 (0.59) | 4.05 (0.60) | 2.59 (0.82) | <.001 | <.001 | <.001 | .01 | .45 |
| MtF | 17 | 4.03 (0.68) | 3.82 (0.56) | 2.07 (0.74) | <.001 | | | | |
| FtM | 28 | 4.18 (0.53) | 4.13 (0.60) | 2.89 (0.71) | <.001 | | | | |
| Secondary sex characteristics | 45 | 2.73 (0.72) | 2.86 (0.67) | 2.27 (0.56) | <.001 | <.001 | <.001 | .10 | <.001 |
| MtF | 17 | 2.63 (0.60) | 2.34 (0.68) | 1.93 (0.63) | <.001 | | | | |
| FtM | 28 | 2.80 (0.72) | 3.18 (0.43) | 2.48 (0.40) | .05 | | | | |
| Neutral body characteristics | 45 | 2.35 (0.68) | 2.49 (0.53) | 2.23 (0.49) | .29 | .29 | .01 | .007 | .01 |
| MtF | 17 | 2.57 (0.70) | 2.29 (0.50) | 2.09 (0.56) | .014 | | | | |
| FtM | 28 | 2.21 (0.64) | 2.61 (0.52) | 2.32 (0.44) | .40 | | | | |

FtM, female to male transgender; MtF, male to female transgender; n/a, not applicable.

ª Participants who had complete data at all 3 waves were included. Some assessments were added to the study later, yielding fewer total participants for those scales.

indicator. Other potential between-subjects factors (age, total IQ, parental marital status) were examined but excluded owing to a lack of relationship with the 14 indicators at T0. The 1 exception, age predicting secondary sex characteristics, is described below in the findings. We compared T2 sample means to population norms for subjective well-being using 1-sample *t* tests from previously published validation studies. Finally, we examined T2 subjective well-being correlations with residual change scores from T0 to T2 on the 14 indicators (an indicator of who improved relatively more or less over time).

All measures used were self-reported, except the CGAS (attending clinician) and the CBCL/ASR (parents). Each participant was given all measures at each of 3 assessments. Numbers varied across indicators owing to the later inclusion of the YSR, CGAS, BDI, TPI, and STAI, yielding 8 persons who had missing data at T0 and a clinician error yielding missing data at T1 for 10 participants on the UGDS. Dutch versions were used (see de Vries et al[18]).

## RESULTS

### Gender Dysphoria and Body Satisfaction

Figure 1 and Table 2 show that GD and body image difficulties persisted through puberty suppression (at T0 and T1) and remitted after the administration of CSH and GRS (at T2) (significant linear effects in 3 of 4 indicators, and significant quadratic effects in all indicators). Time by sex interactions revealed that transwomen reported more satisfaction over time with primary sex characteristics than transmen and a continuous improvement in satisfaction with secondary and neutral sex characteristics. Transmen reported more dissatisfaction with secondary and neutral sex characteristics at T1 than at T0, but improvement in both from T1 to T2. Age was a significant covariate with secondary sex characteristics (the only significant demographic covariate with any outcome indicator in the study), indicating that older individuals were more dissatisfied at T0, but the age gap in body satisfaction narrowed over time (F(1, 42) = 8.18; *P* < .01).

### Psychological Functioning

As presented in Table 3, significant linear effects showed improvement over time in global functioning (CGAS), CBCL/ABCL total, internalizing and externalizing *T* scores, and YSR/ASR total and internalizing *T* scores. Quadratic effects revealed decreases from T0 to T1 followed by increases from T1 to T2 in depression and YSR/ASR internalizing *T* scores. Quadratic trends revealed decreases from T0 to T1, followed by increases from T1 to T2 in depression and YSR/ASR internalizing *T* scores. For all CBCL/ABCL and YSR/ASR indicators except YSR/ASR externalizing, the percentage in the clinical range dropped significantly (McNemar's test, *P* value <0.05) from T0 to T1, from T0 to T2, or from T1 to T2.

Over time, transmen showed reduced anger, anxiety, and CBCL/ABCL externalizing *T* scores, whereas transwomen showed stable or slightly more symptomatology on these measures. Transwomen improved in CBCL/ABCL total *T* scores in a quadratic fashion (all the improvement between T1 and T2),

**4** DE VRIES et al

Downloaded from by guest on October 7, 2016

ARTICLE

**TABLE 3** Psychological Functioning of Adolescents at Intake (T0), While on Puberty Suppression (T1), and After Gender Reassignment (T2)

| | $N^a$ | T0 | T1 | T2 | T0–T2 | Time | Time × Sex |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | t test | Linear Effect Quadratic Effect | Linear Effect Quadratic Effect |
| | | Mean (SD) | Mean (SD) | Mean (SD) | P | P | P |
| Global functioning (CGAS) | 32 | 71.13 (10.46) | 74.81 (9.86) | 79.94 (11.56) | <.001 | <.001 / .61 | .89 / .68 |
| MtF | 15 | 74.33 (7.53) | 78.20 (9.56) | 82.40 (8.28) | <.001 | | |
| FtM | 17 | 67.65 (11.87) | 70.65 (9.89) | 76.29 (14.48) | .02 | | |
| Depression (BDI) | 32 | 7.89 (7.52) | 4.10 (6.17) | 5.44 (8.40) | .21 | .23 / .04 | .66 / .49 |
| MtF | 12 | 4.73 (4.20) | 2.25 (3.54) | 3.38 (4.40) | .12 | | |
| FtM | 20 | 10.09 (8.34) | 5.05 (7.08) | 6.95 (9.83) | .32 | | |
| Anger (TPI) | 32 | 17.55 (5.72) | 17.22 (5.61) | 16.01 (5.28) | .20 | .15 / .52 | .04 / .12 |
| MtF | 12 | 14.17 (3.01) | 14.00 (3.36) | 5.58 (3.92) | .18 | | |
| FtM | 20 | 19.55 (5.96) | 19.25 (5.69) | 16.56 (6.06) | .05 | | |
| Anxiety (STAI) | 32 | 39.57 (10.53) | 37.52 (9.87) | 37.61 (10.39) | .45 | .42 / .47 | .05 / .52 |
| MtF | 12 | 31.87 (7.42) | 31.71 (8.36) | 35.83 (10.22) | .14 | | |
| FtM | 20 | 44.41 (9.06) | 41.59 (9.03) | 39.20 (10.53) | .12 | | |
| CBCL–ABCL | | | | | | | |
| Total $T$ score | 40 | 60.20 (12.66) | 54.70 (11.58) | 48.10 (9.30) | <.001 | <.001 / .68 | .25 / .03 |
| % Clinical | | $38_x$ | $20_y$ | $5_y$ | | | |
| MtF | 15 | 57.40 (12.76) | 49.67 (12.29) | 48.13 (12.58) | .002 | | |
| FtM | 25 | 61.88 (12.56) | 57.72 (10.23) | 48.08 (6.95) | <.001 | | |
| Int $T$ score | 40 | 60.83 (12.36) | 54.42 (10.58) | 50.45 (10.04) | <.001 | <.001 / .42 | .91 / .33 |
| % Clinical | | $30_x$ | $12.5_y$ | $10_y$ | | | |
| MtF | 15 | 59.40 (10.03) | 50.93 (11.15) | 48.73 (12.61) | <.001 | | |
| FtM | 25 | 61.68 (13.70) | 56.52 (9.86) | 51.48 (8.25) | <.001 | | |
| Ext $T$ score | 40 | 57.85 (13.73) | 53.85 (12.77) | 47.85 (8.59) | <.001 | <.001 / .43 | .19 / .12 |
| % Clinical | | $40_x$ | $25_x$ | $2.5_y$ | | | |
| MtF | 15 | 52.53 (14.11) | 47.87 (12.07) | 46.33 (10.95) | .10 | | |
| FtM | 25 | 61.04 (12.71) | 57.44 (12.01) | 48.76 (6.89) | <.001 | | |
| YSR-ASR | | | | | | | |
| Total $T$ score | 43 | 54.72 (12.08) | 49.16 (11.16) | 48.53 (9.46) | .005 | .005 / .07 | .28 / .75 |
| % Clinical | | $30_x$ | $14_{xy}$ | $7_y$ | | | |
| MtF | 17 | 50.65 (12.19) | 45.94 (12.24) | 47.24 (12.28) | .28 | | |
| FtM | 26 | 57.38 (11.47) | 51.27 (10.08) | 49.38 (7.21) | .01 | | |
| Int $T$ score | 43 | 55.47 (13.08) | 48.65 (12.33) | 50.07 (11.15) | .03 | .03 / .008 | .87 / .73 |
| % Clinical | | $30_x$ | $9.3_y$ | $11.6_{xy}$ | | | |
| MtF | 17 | 54.00 (12.31) | 47.59 (14.26) | 48.12 (12.54) | .04 | | |
| FtM | 26 | 56.42 (13.86) | 49.35 (11.13) | 51.35 (10.19) | .17 | | |
| Ext $T$ score | 43 | 52.77 (12.47) | 49.44 (9.59) | 49.44 (9.37) | .14 | .14 / .09 | .005 / .14 |
| % Clinical | | $21_x$ | $11.6_x$ | $7_x$ | | | |
| MtF | 17 | 46.00 (11.58) | 44.71 (9.53) | 50.24 (11.18) | .17 | | |
| FtM | 26 | 57.16 (11.14) | 52.54 (8.43) | 48.92 (8.18) | .006 | | |

FtM, female to male transgender; MtF, male to female transgender.

$_{xy}$ Percent clinical range, shared subscripts indicate no significant difference in values. In no case was an increase in percent in the clinical range significant from 1 time point to any other time point, indicating an overall decline or stability of clinical symptoms over time.

$^a$ Participants who had complete data at all 3 waves were included. Some assessments were added to the study later, yielding fewer total participants for those scales.

whereas transmen improved steadily across the 3 time points (linear effect only).

*Objective Well-Being*

At T2, the participants were vocationally similar to the Dutch population except they were slightly more likely to live with parents (67% vs 63%), and more likely, when studying, to be pursuing higher education (58% vs 31%).[33]

Families were supportive of the transitioning process: 95% of mothers, 80% of fathers, and 87% of siblings. Most (79%) young adults reported having 3 or more friends, were satisfied with their male (82%) and female peers (88%), and almost all (95%) had received support

from friends regarding their gender reassignment. After their GRS, many participants (89%) reported having been never or seldom called names or harassed. The majority (71%) had experienced social transitioning as easy.

*Subjective Well-Being*

None of the participants reported regret during puberty suppression, CSH

Downloaded from by guest on October 7, 2016

**JA2269**

Case 2:20-cv-00740  Document 200-1  Filed 06/04/21  Page 6 of 11 PageID #: 7883



Transwomen (n = 17)



Transmen (n = 28)

Eta Squared for Linear and Quadratic Effects
   (a) Primary sex characteristics
       Time: .79 ($P < .001$), .66 ($P < .001$),
       Time × sex: .14 ($P = .01$), .01 ($P = .45$).
   (b) Secondary sex characteristics
       Time: .31($P < .001$), .30 ($P < .001$),
       Time × sex: .06 ($P = .10$), .22 ($P < .001$)
   (c) Neutral body characteristics
       Time: .07($P < .001$), .09 ($P = .29$)
       Time × sex: .16 ($P = .007$), .15 ($P = .01$)

**FIGURE 1**
BIS[23] for transwomen and transmen at T0 (pretreatment, at intake), T1 (during treatment, at initiation of cross-gender hormones), and T2 (post-treatment, 1 year after GRS).

treatment, or after GRS. Satisfaction with appearance in the new gender was high, and at T2 no one reported being treated by others as their assigned gender. All young adults reported they were very or fairly satisfied with their surgeries.

Mean scores on WHOQOL-BREF, the SWLS, and the SHS are presented in Table 4, together with scores from large validation and reliability studies of these measures,[17,19,34] revealing similar scores in all areas except WHOQOL-Environment subdomain, which was higher for the participants than the norm. There were some differences across gender; transwomen scored higher than transmen on the SWLS (mean = 27.7; SD = 5.0 vs mean = 23.2; SD = 6.0; $t$ (52)

= 2.82; $P < .01$) and on the psychological subdomain of the WHOQOL (mean = 15.77; SD = 2.0 vs mean = 13.92; SD = 2.5; $t$ (53) = 2.95; $P < .01$).

*Correlations With Residual Change Scores*

The residual change scores of secondary sex characteristics, global functioning, depression, anger, anxiety, and YSR total, internalizing and externalizing from T0 to T2, were significantly correlated with the 6 T2 quality of life indicators. Most correlation coefficients were within the moderate to large magnitude (eg, 0.30–0.60), except depression, which was highly correlated (0.60–0.80) (see Table 5).

## DISCUSSION

Results of this first long-term evaluation of puberty suppression among transgender adolescents after CSH treatment and GRS indicate that not only was GD resolved, but well-being was in many respects comparable to peers.

The effectiveness of CSH and GRS for the treatment of GD in adolescents is in line with findings in adult transsexuals.[35,36] Whereas some studies show that poor surgical results are a determinant of postoperative psychopathology and of dissatisfaction and regret,[37,38] all young adults in this study were generally satisfied with their physical appearance and none regretted treatment. Puberty suppression had caused their bodies to

Downloaded from by guest on October 7, 2016

ARTICLE

**TABLE 4** Subjective Well-Being: Quality of Life, Satisfaction With Life, and Subjective Happiness Mean Scores With Scores From Validation Studies

| | N | Mean (SD) | Range | Validation Studies Scores Mean (SD) | Comparison P |
|---|---|---|---|---|---|
| WHOQOL[a] Physical | 55 | 15.22 (2.49) | 8.6–20.0 | 15.0 (2.9)[b] | .56 |
| WHOQOL Psychological | 55 | 14.66 (2.44) | 6.67–20.0 | 14.3 (2.8)[b] | .24 |
| WHOQOL Social Relations | 55 | 14.91 (2.35) | 9.3–20.00 | 14.5 (3.4)[b] | .18 |
| WHOQOL Environment | 55 | 15.47 (2.06) | 10.5–20.00 | 13.7 (2.6)[b] | <.001 |
| SWLS | 54 | 24.98 (6.0) | 9.0–35.0 | 26.18 (5.7)[c] | .16 |
| SHS | 54 | 4.73 (0.77) | 2.75–6.0 | 4.89 (1.1)[d] | .17 |

[a] WHOQOL, Bref, Skevington et al.[16]
[b] International field trial, ages 21 to 30 years, Skevington et al.[16]
[c] Dutch young adults, Arindell et al.[53]
[d] US Public College Students, Lyubomirsky[19]

not (further) develop contrary to their experienced gender.

Psychological functioning improved steadily over time, resulting in rates of clinical problems that are indistinguishable from general population samples (eg, percent in the clinical range dropped from 30% to 7% on the YSR/ASR[50]) and quality of life, satisfaction with life, and subjective happiness comparable to same-age peers.[17,19,54] Apparently the clinical protocol of a multidisciplinary team with mental health professionals, physicians, and surgeons gave these formerly gender dysphoric youth the opportunity to develop into well-functioning young adults. These individuals, of whom an even higher percentage than the general population were pursuing higher education, seem different from the

transgender youth in community samples with high rates of mental health disorders, suicidality and self-harming behavior, and poor access to health services.[21,22,39,40]

In this study, young adults who experienced relatively greater improvements in psychological functioning were more likely to also report higher levels of subjective postsurgical well-being. This finding suggests value to the protocol that involves monitoring the adolescents' functioning, physically and psychologically, over many years, and providing more support whenever necessary.

This clinic-referred sample perceived the Environmental subdomain (with items like "access to health and social care" and "physical safety and secu-

rity") of the WHOQOL-BREF as even better than the Dutch standardization sample.[17] Whereas in some other contexts transgender youth may experience gender-related abuse and victimization,[22,41,42] the positive results may also be attributable to supportive parents, open-minded peers, and the social and financial support (treatment is covered by health insurance) that gender dysphoric individuals can receive in the Netherlands.

Both genders benefitted from the clinical approach, although transwomen showed more improvement in body image satisfaction (secondary sex characteristics) and in psychological functioning (anger and anxiety). None of the transmen in this study had yet had a phalloplasty because of waiting lists or

**TABLE 5** Correlations Between Residual Change in Psychological Functioning Over Time and Young Adult Subjective Well-Being

| | WHOQOL BREF | | | | SWLS | SHS |
|---|---|---|---|---|---|---|
| | Physical | Psychological | Social | Environment | | |
| Gender dysphoria (UGDS) | 0.01 (.97) | 0.05 (.75) | −0.09 (.57) | −0.02 (.89) | 0.06 (.71) | 0.30 (.04) |
| Body image subscales (BIS) | | | | | | |
| Primary sex characteristics | −0.22 (.14) | −0.25 (.09) | −0.35 (.02) | −0.04 (.78) | −0.22 (.14) | −0.21 (.17) |
| Secondary sex characteristics | −0.39 (.006) | −0.45 (<.001) | −0.47 (<.001) | −0.34 (.02) | −0.35 (.02) | −0.26 (.08) |
| Neutral body characteristics | −0.21 (.16) | −0.27 (.07) | −0.15 (.32) | −0.28 (.06) | −0.26 (.08) | −0.16 (.28) |
| Psychological functioning | | | | | | |
| Global functioning (CGAS) | 0.60 (<.001) | 0.52 (.002) | 0.52 (.002) | 0.27 (.14) | 0.58 (<.001) | 0.50 (.004) |
| Depression (BDI) | −0.76 (<.001) | −0.72 (<.001) | −0.51 (.002) | −0.49 (.003) | −0.61 (<.001) | −0.77 (<.001) |
| Trait anger (TPI) | −0.37 (.03) | −0.18 (.31) | −0.22 (.20) | −0.29 (.09) | −0.33 (.07) | −0.35 (.05) |
| Trait anxiety (STAI) | −0.58 (<.001) | −0.64 (<.001) | −0.38 (.03) | −0.44 (.01) | −0.49 (.004) | −0.57 (<.001) |
| CBCL–ABCL | | | | | | |
| Total T score | −0.20 (.20) | −0.12 (.45) | −0.07 (.65) | −0.14 (.35) | −0.32 (.03) | −0.16 (.29) |
| Internalizing T score | −0.29 (.06) | −0.29 (.06) | −0.23 (.14) | −0.12 (.44) | −0.48 (<.001) | −0.36 (.02) |
| Externalizing T score | −0.13 (.40) | −0.05 (.75) | 0.16 (.29) | −0.20 (.19) | −0.15 (.36) | 0.00 (.99) |
| Youth Self Report (YSR–ASR) | | | | | | |
| Total T score | −0.53 (<.001) | −0.45 (.002) | −0.33 (.03) | −0.42 (.005) | −0.52 (<.001) | −0.55 (<.001) |
| Internalizing T score | −0.62 (<.001) | −0.61 (<.001) | −0.47 (<.001) | −0.40 (.007) | −0.66 (<.001) | −0.60 (<.001) |
| Externalizing T score | −0.23 (.13) | −0.10 (.53) | −0.07 (.67) | −0.37 (.02) | −0.22 (.15) | −0.35 (.02) |

P values are in parentheses.

Downloaded from by guest on October 7, 2016

JA2271

a desire for improved surgery techniques. This finding warrants further study of the specific concerns of young transmen.

Despite promising findings, there were various limitations. First, the study sample was small and came from only 1 clinic. Second, this study did not focus on physical side effects of treatment. Publications on physical parameters of the same cohort of adolescents are submitted or in preparation. A concurring finding exists in the 22-year follow-up of the well-functioning first case now at age 35 years who has no clinical signs of a negative impact of earlier puberty suppression on brain development, metabolic and endocrine parameters, or bone mineral density.[43] Third, despite the absence of pretreatment differences on measured indicators, a selection bias could exist between adolescents of the original cohort that participated in this study compared with nonparticipants.

Age criteria for puberty suppression and CSH are under debate, although they worked well for adolescents in the current study. Especially in natal females, puberty will often start before the age of 12 years. Despite the fact that developing evidence suggests that cognitive and affective cross-gender identification, social role transition, and age at assessment are related to persistence of childhood GD into adolescence, predicting individual persistence at a young age will always remain difficult.[44] The age criterion of 16 years for the start of CSH may be problematic especially for transwomen, as growth in height continues as long as cross-sex steroids are not provided (causing the growth plates to close). Therefore, psychological maturity and the capacity to give full informed consent may surface as the required criteria for puberty suppression and CSH[45] in cases that meet other eligibility criteria.

## CONCLUSIONS

Results of this study provide first evidence that, after CSH and GRS, a treatment protocol including puberty suppression leads to improved psychological functioning of transgender adolescents. While enabling them to make important age-appropriate developmental transitions, it contributes to a satisfactory objective and subjective well-being in young adulthood. Clinicians should realize that it is not only early medical intervention that determines this success, but also a comprehensive multidisciplinary approach that attends to the adolescents' GD as well as their further well-being and a supportive environment.

## ACKNOWLEDGMENTS

The authors thank the young adults and their parents for their repeated participation in this study over the years.

## REFERENCES

1. American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders, 5th ed. Washington, DC: American Psychiatric Association; 2013

2. Cohen-Kettenis PT, van Goozen SH. Pubertal delay as an aid in diagnosis and treatment of a transsexual adolescent. *Eur Child Adolesc Psychiatry.* 1998;7(4):246–248

3. Nakatsuka M. [Adolescents with gender identity disorder: reconsideration of the age limits for endocrine treatment and surgery.] *Seishin Shinkeigaku Zasshi.* 2012; 114(6):647–653

4. Zucker KJ, Bradley SJ, Owen-Anderson A, Singh D, Blanchard R, Bain J. Puberty-blocking hormonal therapy for adolescents with gender identity disorder: a descriptive clinical study. *J Gay Lesbian Ment Health.* 2010;15(1):58–82

5. Hewitt JK, Paul C, Kasiannan P, Grover SR, Newman LK, Warne GL. Hormone treatment of gender identity disorder in a cohort of children and adolescents. *Med J Aust.* 2012; 196(9):578–581

6. Olson J, Forbes C, Belzer M. Management of the transgender adolescent. *Arch Pediatr Adolesc Med.* 2011;165(2):171–176

7. Spack NP, Edwards-Leeper L, Feldman HA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics.* 2012;129(3): 418–425

8. Byne W, Bradley SJ, Coleman E, et al. Treatment of gender identity disorder. *Am J Psychiatry.* 2012;169(8):875–876

9. Adelson SL. Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *J Am Acad Child Adolesc Psychiatry.* 2012;51(9): 957–974

10. Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, et al. Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2009;94(9):3132–3154

11. Coleman E, Bockting W, Botzer M, et al. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *Int J Transgenderism.* 2012;13(4): 165–232

12. Cohen-Kettenis PT, Steensma TD, de Vries AL. Treatment of adolescents with gender dysphoria in the Netherlands. *Child Adolesc Psychiatr Clin N Am.* 2011;20(4):689–700

13. Thornton P, Silverman LA, Geffner ME, Neely EK, Gould E, Danoff TM. Review of outcomes after cessation of gonadotropin-releasing hormone agonist treatment of girls with precocious puberty. *Pediatr Endocrinol Rev Mar.* 2014;11(3):306–317

14. Delemarre-van de Waal HA, Cohen-Kettenis PT. Clinical management of gender identity disorder in adolescents: a protocol on psychological and paediatric endocrinology aspects. *Eur J Endocrinol.* 2006;155(suppl 1):S131–S137

15. Steensma TD, Biemond R, Boer FD, Cohen-Kettenis PT. Desisting and persisting gender dysphoria after childhood: a qualitative follow-up study. *Clin Child Psychol Psychiatry.* 2011;16(4):499–516

16. de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *J Sex Med.* 2011;8(8):2276–2283

17. Skevington SM, Lotfy M, O'Connell KA. The World Health Organization's WHOQOL-BREF

Downloaded from by guest on October 7, 2016

**JA2272**

quality of life assessment: psychometric properties and results of the international field trial. A report from the WHOQOL group. *Qual Life Res.* 2004;13(2):299–310

18. Diener E, Emmons RA, Larsen RJ, Griffin S. The Satisfaction With Life Scale. *J Pers Assess.* 1985;49(1):71–75

19. Lyubomirsky S, Lepper HS. A measure of subjective happiness: preliminary reliability and construct validation. *Soc Indic Res.* 1999;46(2):137–155

20. Koot HM. The study of quality of life: concepts and methods. In: Koot HM, Wallander JL, eds. *Quality of Life in Child and Adolescent Illness: Concepts, Methods and Findings.* London, UK: Harwood Academic Publishers; 2001:3–20

21. Carver PR, Yunger JL, Perry DG. Gender identity and adjustment in middle childhood. *Sex Roles.* 2003;49(3–4):95–109

22. Grossman AH, D'Augelli AR. Transgender youth: invisible and vulnerable. *J Homosex.* 2006;51(1):111–128

23. Steensma TD, Kreukels BP, Jurgensen M, Thyen U, De Vries AL, Cohen-Kettenis PT. The Urecht Gender Dysphoria Scale: a validation study. *Arch Sex Behav.* provisionally accepted

24. Lindgren TW, Pauly IB. A body image scale for evaluating transsexuals. *Arch Sex Behav.* 1975;4:639–656

25. Shaffer D, Gould MS, Brasic J, et al. A children's global assessment scale (CGAS). *Arch Gen Psychiatry.* 1983;40(11):1228–1231

26. Beck AT, Steer RA, Brown GK. *Manual for the Beck Depression Inventory-II.* San Antonio, TX: Psychological Corporation; 1996

27. Spielberger CD. *Manual for the State-Trait Anger Expression Inventory (STAXI).* Odessa, FL: Psychological Assessment Resources; 1988

28. Spielberger CD, Gorssuch RL, Lushene PR, Vagg PR, Jacobs GA. *Manual for the State-Trait Anxiety Inventory.* Palo Alto, CA: Consulting Psychologists Press, Inc; 1983

29. Achenbach TM. *Manual for the Youth Self-Report.* Burlington, VT: University of Vermont, Department of Psychiatry; 1991

30. Achenbach TM, Rescorla LA. Manual for the ASEBA Adult Forms & Profiles. Burlington, VT: University of Vermont, Research Center for Children, Youth, & Families; 2003

31. Achenbach TM, Edelbrock CS. *Manual for the Child Behavior Checklist and Revised Child Behavior Profile.* Burlington, VT: University of Vermont, Department of Psychiatry; 1983

32. Cohen-Kettenis PT, Owen A, Kaijser VG, Bradley SJ, Zucker KJ. Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: a cross-national, cross-clinic comparative analysis. *J Abnorm Child Psychol.* 2003;31(1):41–53

33. Statistics Netherlands. Landelijke Jeugdmonitor. In: Ministerie van Volksgezondheid, Wetenschap en Sport, ed. Den Haag, Heerlen: Tuijtel, Hardinxveld-Giessendam; 2012

34. Arrindell WA, Heesink J, Feij JA. The Satisfaction With Life Scale (SWLS): appraisal with 1700 healthy young adults in The Netherlands. *Pers Individ Dif.* 1999;26(5):815–826

35. Murad MH, Elamin MB, Garcia MZ, et al. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clin Endocrinol (Oxf).* 2010;72(2):214–231

36. Smith YL, Van Goozen SH, Kuiper AJ, Cohen-Kettenis PT. Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychol Med.* 2005;35(1):89–99

37. Ross MW, Need JA. Effects of adequacy of gender reassignment surgery on psychological adjustment: a follow-up of fourteen male-to-female patients. *Arch Sex Behav.* 1989;18(2):145–153

38. Lawrence AA. Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. *Arch Sex Behav.* 2003;32(4):299–315

39. Grossman AH, D'Augelli AR. Transgender youth and life-threatening behaviors. *Suicide Life Threat Behav.* 2007;37(5):527–537

40. Garofalo R, Deleon J, Osmer E, Doll M, Harper GW. Overlooked, misunderstood and at-risk: exploring the lives and HIV risk of ethnic minority male-to-female transgender youth. *J Adolesc Health.* 2006;38(3):230–236

41. Toomey RB, Ryan C, Diaz RM, Card NA, Russell ST. Gender-nonconforming lesbian, gay, bisexual, and transgender youth: school victimization and young adult psychosocial adjustment. *Dev Psychol.* 2010;46(6):1580–1589

42. McGuire JK, Anderson CR, Toomey RB, Russell ST. School climate for transgender youth: a mixed method investigation of student experiences and school responses. *J Youth Adolesc.* 2010;39(10):1175–1188

43. Cohen-Kettenis PT, Schagen SE, Steensma TD, de Vries AL, Delemarre-van de Waal HA. Puberty suppression in a gender-dysphoric adolescent: a 22-year follow-up. *Arch Sex Behav.* 2011;40(4):843–847

44. Steensma TD, McGuire JK, Kreukels BP, Beekman AJ, Cohen-Kettenis PT. Factors associated with desistence and persistence of childhood gender dysphoria: a quantitative follow-up study. *J Am Acad Child Adolesc Psychiatry.* 2013;52(6):582–590

45. Kreukels BP, Cohen-Kettenis PT. Puberty suppression in gender identity disorder: the Amsterdam experience. *Nat Rev Endocrinol.* 2011;7(8):466–472

46. Wechsler D. *Wechsler Intelligence Scale for Children: Manual.* 3rd ed. San Antonio, TX: The Psychological Corporation; 1997

47. Wechsler D. *Wechsler Adult Intelligence Scale (WAIS-III).* 3rd ed. Dutch version. Lisse, Netherlands: Swets and Zetlinger; 1997

48. Wechsler D, Kort W, Compaan EL, Bleichrodt N, Resing WCM, Schittkatte M. *Wechsler Intelligence Scale for Children (WISC-III).* 3rd ed. Lisse, Netherlands: Swets and Zettlinger; 2002

*(Continued from first page)*

PEDIATRICS (ISSN Numbers: Print, 0031-4005; Online, 1098-4275).

Copyright © 2014 by the American Academy of Pediatrics

**FINANCIAL DISCLOSURE:** The authors have indicated they have no financial relationships relevant to this article to disclose.

**FUNDING:** Supported by a personal grant awarded to the first author by the Netherlands Organization for Health Research and Development (ZonMw 100002028).

**POTENTIAL CONFLICT OF INTEREST:** The authors have indicated they have no potential conflicts of interest to disclose.

Downloaded from by guest on October 7, 2016

9

JA2273

**Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment**

Annelou L.C. de Vries, Jenifer K. McGuire, Thomas D. Steensma, Eva C.F. Wagenaar, Theo A.H. Doreleijers and Peggy T. Cohen-Kettenis

*Pediatrics*; originally published online September 8, 2014;
DOI: 10.1542/peds.2013-2958

| Updated Information & Services | including high resolution figures, can be found at: /content/early/2014/09/02/peds.2013-2958 |
|---|---|
| Citations | This article has been cited by 5 HighWire-hosted articles: /content/early/2014/09/02/peds.2013-2958#related-urls |
| Permissions & Licensing | Information about reproducing this article in parts (figures, tables) or in its entirety can be found online at: /site/misc/Permissions.xhtml |
| Reprints | Information about ordering reprints can be found online: /site/misc/reprints.xhtml |

PEDIATRICS is the official journal of the American Academy of Pediatrics. A monthly publication, it has been published continuously since 1948. PEDIATRICS is owned, published, and trademarked by the American Academy of Pediatrics, 141 Northwest Point Boulevard, Elk Grove Village, Illinois, 60007. Copyright © 2014 by the American Academy of Pediatrics. All rights reserved. Print ISSN: 0031-4005. Online ISSN: 1098-4275.



American Academy of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN™

Downloaded from by guest on October 7, 2016

JA2274

# PEDIATRICS®

## OFFICIAL JOURNAL OF THE AMERICAN ACADEMY OF PEDIATRICS

**Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment**
Annelou L.C. de Vries, Jenifer K. McGuire, Thomas D. Steensma, Eva C.F. Wagenaar, Theo A.H. Doreleijers and Peggy T. Cohen-Kettenis
*Pediatrics*; originally published online September 8, 2014;
DOI: 10.1542/peds.2013-2958

The online version of this article, along with updated information and services, is located on the World Wide Web at:
**/content/early/2014/09/02/peds.2013-2958**

PEDIATRICS is the official journal of the American Academy of Pediatrics. A monthly publication, it has been published continuously since 1948. PEDIATRICS is owned, published, and trademarked by the American Academy of Pediatrics, 141 Northwest Point Boulevard, Elk Grove Village, Illinois, 60007. Copyright © 2014 by the American Academy of Pediatrics. All rights reserved. Print ISSN: 0031-4005. Online ISSN: 1098-4275.



American Academy of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN™

Downloaded from by guest on October 7, 2016

JA2275

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY MARTELL; BRIAN MCNEMAR, SHAWN ANDERSON a/k/a SHAUNTAE ANDERSON; and LEANNE JAMES,** individually and on behalf of all others similarly situated,

**Plaintiffs,**

**v.**

**WILLIAM CROUCH,** in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; **CYNTHIA BEANE,** in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; **WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES; JASON HAUGHT,** in his official Capacity as Director of the West Virginia Public Employees Insurance Agency; and **THE HEALTH PLAN OF WEST VIRGINIA, INC.,**

**Defendants.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

## DEFENDANTS' THIRD SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA DEPARTMENT OF HEALTH AND <u>HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES</u>

### DOCUMENT REQUESTS

7.    If Defendants contend that the Exclusion of Gender-Confirming Care is supported by any governmental interest not encompassed in the Requests above, all Documents supporting that contention.

**Exhibit**
**JM 12**

**JA2276**

**SUPPLEMENTAL RESPONSE: Please see the attached budget and expenditure-related documents, Exhibits 60 - 85, Bates Numbers DHHRBMS002863 – DHHRBMS012160.**

10.    Documents sufficient to identify the circumstances in which orchiectomy, penectomy, vaginoplasty, hysterectomy, phalloplasty, mammoplasty, breast reconstruction surgery, and/or mastectomy are covered through the West Virginia Medicaid Program, including but not limited to Diagnostic Codes, Procedure Codes, contracts, health plans, clinical guidelines and/or criteria, medical necessity criteria, and pre/prior authorization requirements and procedures where applicable.

**SUPPLEMENTAL RESPONSE: Please see Exhibits 10 – 26, Bates Numbers DHHRBMS001009 – DHHRBMS001112, previously produced.  Additionally, please see Exhibits 50 – 57, Bates Numbers DHHRBMS002754 – DHHRBMS002784.**

> **WILLIAM CROUCH,**
> **CYNTHIA BEANE, and**
> **WEST VIRGINIA DEPARTMENT OF**
> **HEALTH AND HUMAN RESOURCES,**
> **BUREAU FOR MEDICAL SERVICES,**
>
> **By counsel**

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**CHRISTOPHER FAIN; ZACHARY**
**MARTELL; BRIAN MCNEMAR, SHAWN**
**ANDERSON a/k/a SHAUNTAE ANDERSON;**
**and LEANNE JAMES,** individually and on
behalf of all others similarly situated,

               **Plaintiffs,**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA**
**DEPARTMENT OF HEALTH AND HUMAN**
**RESOURCES, BUREAU FOR MEDICAL**
**SERVICES; JASON HAUGHT,** in his official
Capacity as Director of the West Virginia Public
Employees Insurance Agency; and **THE**
**HEALTH PLAN OF WEST VIRGINIA, INC.,**

               **Defendants.**

Civil Action No. 3:20-cv-00740
Hon. Robert C. Chambers, Judge

## CERTIFICATE OF SERVICE

    I, Kimberly M. Bandy, counsel for Defendants William Crouch, Cynthia Beane and West

Virginia Department of Health and Human Resources, do hereby certify that on the 30th day of

November, 2021, a true and exact copy of **DEFENDANTS' THIRD SUPPLEMENTAL**

**RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO**

**DEFENDANTS WILLIAM CROUCH, CYNTHIA BEANE, AND WEST VIRGINIA**

**DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL**

**SERVICES** was served on counsel via electronic means as follows:

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
*Counsel for Plaintiffs*
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
(213) 382-7600
(213) 351-6050
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA 300030
(404) 897-1880
(404) 506-9320 (fax)
ccharles@lambdalegal.org

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Perry W. Oxley (WVSB#7211)
David E. Rich (WVSB#9141)
Eric D. Salyers (WVSB#13042)
Christopher K. Weed (WVSB#13868)
Oxley Rich Sammons, PLLC
*Counsel for Jason Haught*
517 9th Street, P.O. Box 1704
Huntington, WV 25718-1704
(304) 522-1138
(304) 522-9528 (fax)
poxley@oxleylawwv.com
drich@oxleylawwv.com
esalyers@oxleylawwv.com
cweed@oxleylawwv.com

**JA2279**

Stuart A. McMillan (WVSB#6352)
**Counsel for The Health Plan of West Virginia, Inc.**
BOWLES RICE LLP
600 Quarrier Street
Charleston, WV 25301
(304) 347-1110
(304) 347-1746 (fax)
smcmillan@bowlesrice.com

Aaron C. Boone (WVSB#9479)
**Counsel for The Health Plan of West Virginia, Inc.**
BOWLES RICE LLP
Fifth Floor, United Square
501 Avery Street, P.O. Box 49
Parkersburg, WV 26102
(304) 420-5501
(304) 420-5587 (fax)
aboone@bowlesrice.com

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
**Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services**
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:** Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11]

**Requested Service:** Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis

**Age:** Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | |
| | NPI/ID #: | | Signature: | | | Date: | |
| Servicing: | Vendor/Facility: | | | | Phone #: | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization:  / /  to  / / | | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Endometriosis by laparoscopy

   1. Treatment within last year, Choose all that apply:
     ☐ A) GnRH agonist ≥ 8 weeks [12]
     ☐ B) Hormone therapy ≥ 8 weeks [13]
     ☐ C) Danazol ≥ 8 weeks [14]
     ☐ D) Other clinical information (add comment)

> • If 1 or more options A, B or C selected and option D not selected, then go to question 2
> • No other options lead to the requested service

   2. Continued symptoms after treatment [15]
     ☐ A) Yes
     ☐ B) No

> • If option Yes selected, then go to question 3
> • No other options lead to the requested service



EXHIBIT
10

**JA2281**

InterQual®                                                              2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis**

---

*Endometriosis by laparoscopy (continued...)*

---

3. Choose all that apply:

☐ A) Most recent cervical cytology normal or managed per guidelines [16]

☐ B) Pregnancy excluded by negative HCG or HCG planned prior to procedure or sterilization by history or patient not sexually active by history [17, 18, 19, 20]

☐ C) Other clinical information (add comment)

> • If the number of options selected is 2 and option C not selected, then the rule is satisfied; you may stop here [21]
>
> • No other options lead to the requested service

---

**Reference**

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

Licensed for use exclusively by KEPRO

**JA2282**

**InterQual®**                                                    **2021, Oct. 2021 Release CP:Procedures**

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

#### Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis

---

## Notes:

**1:**

InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**

InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**

Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**

Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**

Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

---

## JA2283

InterQual®                                                   2021, Oct. 2021 Release CP:Procedures

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

## JA2284

InterQual®                                                  2021, Oct. 2021 Release CP:Procedures

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

#### Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis

---

**12:**
The GnRH agonists include leuprolide, nafarelin, and goserelin. These compounds mimic the action of GnRH and, thereby, suppress the hormones produced by the ovary that stimulate endometrial growth.

**13:**
Medical therapy to treat symptoms of endometriosis may include combined contraceptive or progestin alone; their use is considered a first-line option (Brown and Farquhar, The Cochrane database of systematic reviews 2014, 3: CD009590). Depot medroxyprogesterone acetate, the progestin contraceptive implant, and the levonorgestrel intra-uterine system may also improve pain due to endometriosis (ACOG, Obstetrics and gynecology Practice Bulletin No. 110. 2010, 115: 206-218. Reaffirmed 2018).

**14:**
If symptoms do not respond to an oral contraceptive pill or GnRH agonist, then treatment with danazol or a progestin (e.g., depot medroxyprogesterone) is appropriate (Brown and Farquhar, Cochrane Database Syst Rev 2014: Cd009590).

**15:**
Symptoms of endometriosis include chronic recurrent pelvic pain, dysmenorrhea, infertility, and dyspareunia.

**16:**
Cervical cytology should be evaluated according to current screening protocols. Screening intervals and tests used (cervical cytology alone, high-risk human papillomavirus [hrHPV] testing alone, hrHPV and cytology together [co-testing]) will vary based on patient's age and risk factors. If the most recent cervical cytology is documented as normal, no further testing is needed. Any abnormalities detected during cervical cancer screening should be managed according to current guidelines. Management may include repeat testing, observation, surveillance, biopsy, ablation, or excisional treatment based on the identified level of risk for each patient (Redman et al., Eur J Obstet Gynecol Reprod Biol 2021, 256: 57-62; Perkins et al., J Low Genit Tract Dis 2020, 24: 102-31; US Preventative Services Task Force et al., JAMA 2018, 320: 674-86; Wentzensen et al., J Low Genit Tract Dis 2017, 21: 216-22).

**17:**
Pregnancy and related complications (e.g., ectopic pregnancy, incomplete abortion, inevitable abortion) must be excluded before performing this procedure.

**18:**
Pregnancy testing can be performed by measurement of either a serum or urine HCG and may be documented in the medical record by either the PCP, a gynecologist, or a surgeon.

**19:**
The documentation should include a history of sterilization (i.e., tubal ligation) without a subsequent pregnancy. These criteria do not include sterilization of a partner or alternate birth control methods (e.g., oral contraceptive pill use, intrauterine device insertion).

**20:**
Patients have varying definitions of sexual activity (e.g., number of partners, timing of most recent episode, frequency of sexual activity). Unless the provider can confirm on examination that the patient has never had sexual intercourse, whether a patient is sexually active or not is a matter of clinical judgment.

**21:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-oophorectomy (BSO) - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-oophorectomy (BSO) - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-oophorectomy (BSO) - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/-Bilateral Salpingo-oophorectomy (BSO) - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-oophorectomy (BSO) - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-oophorectomy (BSO) - Due to variations in practice, this procedure can

---

**InterQual®**                                                              2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis**

be performed in the inpatient or outpatient setting

**JA2286**

**InterQual®**                         2021, Oct. 2021 Release CP:Procedures

## Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis

---

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT27ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT77ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UT97ZL, 0UT97ZZ, 0UT98ZL, 0UT98ZZ, 0UT9FZL, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC7ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58180, 58260, 58262, 58263, 58290, 58291, 58292, 58541, 58542, 58543, 58544, 58550, 58552, 58553, 58554, 58570, 58571, 58572, 58573, 58575, Other _____

---

**JA2287**

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**   Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy (1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11)

**Requested Service:**   Hysterectomy + BSO for BRCA gene mutation

**Age:**   Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | |
| | NPI/ID #: | | Signature: | | | | Date: |
| Servicing: | Vendor/Facility: | | | | Phone #: | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization: | / / to / / | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. BRCA1 or BRCA2 gene mutation by genetic testing

There are no questions for the requested service

## Reference

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).



DHHRBMS001016

InterQual®                                                          2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy + BSO for BRCA gene mutation

---

## Notes:

**1:**

InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**

InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**

Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**

Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**

Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001017

**JA2289**

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 182 of 489

InterQual®    Case 3:20-cv-00740   Document 261-1   Filed 06/14/22   Page 16 of 76 PageID #: 8006
2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy + BSO for BRCA gene mutation**

---

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001018

**JA2290**

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 183 of 489

InterQual®                                                          2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy + BSO for BRCA gene mutation**

DHHRBMS001019

**JA2291**

InterQual®                                          2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy + BSO for BRCA gene mutation**

---

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT27ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT77ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UT97ZL, 0UT97ZZ, 0UT98ZL, 0UT98ZZ, 0UT9FZL, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC7ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58180, 58262, 58291, 58542, 58544, 58552, 58554, 58571, 58573, 58575, Other _____

DHHRBMS001020

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**   Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11]

**Requested Service:**   Hysterectomy +/- BSO or Bilateral Salpingectomy for Endocervical adenocarcinoma in situ

**Age:**   Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: | |
|---|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | | Weight: | | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | | |
| | NPI/ID #: | | Signature: | | | | Date: | |
| Servicing: | Vendor/Facility: | | | | Phone #: | | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization: | | / / to / / | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Endocervical adenocarcinoma in situ by biopsy

    There are no questions for the requested service

### Reference

   **Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

   **2nd** - Secondary review required. Criteria cannot be met.

   *Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

EXHIBIT
12

DHHRBMS001021

InterQual®                                                          2021, Oct. 2021 Release CP:Procedures
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Endocervical adenocarcinoma in situ**

---

## Notes:

**1:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**
Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**
Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**
Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001022

InterQual®                                                        2021, Oct. 2021 Release CP:Procedures

## Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- BSO or Bilateral Salpingectomy for Endocervical adenocarcinoma in situ

---

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001023

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 188 of 489

InterQual®                                          **2021, Oct. 2021 Release CP:Procedures**

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Endocervical adenocarcinoma in situ**

DHHRBMS001024

**InterQual®**                                                    2021, Oct. 2021 Release CP:Procedures
## Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- BSO or Bilateral Salpingectomy for Endocervical adenocarcinoma in situ

---

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT27ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT77ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZZ, 0UT94ZZ, 0UT97ZZ, 0UT98ZZ, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC7ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58260, 58262, 58263, 58290, 58291, 58292, 58550, 58552, 58553, 58554, 58570, 58571, 58572, 58573, 58575, Other _____

DHHRBMS001025

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:** Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy (1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11)

**Requested Service:** Hysterectomy + BSO for Endometrial cancer

**Age:** Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | |
| | NPI/ID #: | | Signature: | | | Date: | |
| Servicing: | Vendor/Facility: | | | Phone #: | | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization: / / to / / | | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

□ 10. Stage I or IA or IB endometrial cancer by pathology

There are no questions for the requested service

## Reference

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).



EXHIBIT
13

DHHRBMS001026

InterQual®                                        2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy + BSO for Endometrial cancer

---

## Notes:

**1:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**
Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**
Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**
Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001027

**JA2299**

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy + BSO for Endometrial cancer

6:
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

7:
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

8:
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

9:
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

10:
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

11:
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001028

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 193 of 489

**InterQual®** 2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy + BSO for Endometrial cancer

DHHRBMS001029

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 194 of 489

InterQual®    Case 3:20-cv-00740    Document 261-1    Filed 06/14/22    Page 28 of 76 PageID #: 8018    2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy + BSO for Endometrial cancer**

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZZ, 0UT94ZZ, 0UT98ZZ, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58552, 58554, 58571, 58573, 58575, Other _____

DHHRBMS001030

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**    Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy (1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11)

**Requested Service:**    Hysterectomy + BSO for Endometrial hyperplasia (postmenopausal)

**Age:**    Age ≥ 18

| | | | | | |
|---|---|---|---|---|---|
| Patient: | Name: | | DOB: | ID #: | GROUP #: |
| | Sex (circle): M / F | | Height: | Weight: | |
| Provider/PCP: | Name: | | Fax #: | Phone #: | |
| | NPI/ID #: | | Signature: | | Date: |
| Servicing: | Vendor/Facility: | | | Phone #: | |
| | Diagnosis/ICD: | | Service Date: | Authorization: / / to / / | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Endometrial hyperplasia with cellular atypia by biopsy or dilatation and curettage (D & C)

   1. Choose one:
     ☐ A) Premenopausal woman
     ☐ B) Postmenopausal woman (12)
     ☐ C) Other clinical information (add comment)

| |
|---|
| • If option B selected, then the rule is satisfied; you may stop here (13) |
| • No other options lead to the requested service |

### Reference

   **Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

   **2nd** - Secondary review required. Criteria cannot be met.

   *Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).



DHHRBMS001031

**JA2303**

InterQual®                                                                    2021, Oct. 2021 Release CP:Procedures

## Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy + BSO for Endometrial hyperplasia (postmenopausal)

## Notes:

**1:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**
Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**
Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**
Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001032

**JA2304**

InterQual®                                                    2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy + BSO for Endometrial hyperplasia (postmenopausal)**

---

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001033

**JA2305**

InterQual®                                    2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy + BSO for Endometrial hyperplasia (postmenopausal)**

**12:**
Hysterectomy with removal of both ovaries and fallopian tubes is usually performed in postmenopausal women because the risk for the development of ovarian cancer is higher than for premenopausal women.

**13:**
I/O Setting:
Hysterectomy, Abdominal, Total + Bilateral Salpingo-Oophorectomy (BSO) - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) + Bilateral Salpingo-Oophorectomy (BSO) - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Total (TLH) + Bilateral Salpingo-Oophorectomy (BSO) - Outpatient
Hysterectomy, Vaginal + Bilateral Salpingo-Oophorectomy (BSO) - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

DHHRBMS001034

InterQual®                                              2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy + BSO for Endometrial hyperplasia (postmenopausal)**

---

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT27ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT77ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZZ, 0UT94ZZ, 0UT97ZZ, 0UT98ZZ, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC7ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58262, 58263, 58291, 58292, 58552, 58554, 58571, 58573, 58575, Other _____

DHHRBMS001035

**JA2307**

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**   Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [(1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11)]

**Requested Service:**   Hysterectomy + BSO for Lynch II syndrome

**Age:**   Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | |
| | NPI/ID #: | | Signature: | | | Date: | |
| Servicing: | Vendor/Facility: | | | Phone #: | | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization:   / /   to   / / | | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Lynch II syndrome

     There are no questions for the requested service

## Reference

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).



EXHIBIT
15

DHHRBMS001036

InterQual®                                                     2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy + BSO for Lynch II syndrome

## Notes:

**1:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**
Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**
Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**
Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001037

**JA2309**

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 202 of 489

InterQual®    Case 3:20-cv-00740    Document 261-1    Filed 06/14/22    Page 36 of 76 PageID #: 8026    2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy + BSO for Lynch II syndrome

---

**6:**

Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**

These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**

Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**

I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**

For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**

Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001038

InterQual®                                                      **2021, Oct. 2021 Release CP:Procedures**

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy + BSO for Lynch II syndrome

DHHRBMS001039

InterQual®                                                          2021, Oct. 2021 Release CP:Procedures

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

#### Hysterectomy + BSO for Lynch II syndrome

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT70ZZ, 0UT74ZZ, 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UTC0ZZ, 0UTC4ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58571, 58573, 58575, Other _____

DHHRBMS001040

**JA2312**

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**   Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11]

**Requested Service:**   Hysterectomy + BSO for Suspected Ovarian or Tubal cancer

**Age:**   Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | |
| | NPI/ID #: | | Signature: | | | Date: | |
| Servicing: | Vendor/Facility: | | | Phone #: | | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization:   / /   to   / / | | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Choose one of the following options and continue to the appropriate section

☐ 10. Suspected ovarian cancer by imaging
☐ 20. Suspected tubal cancer by imaging

☐ 10. Suspected ovarian cancer by imaging

There are no questions for the requested service

☐ 20. Suspected tubal cancer by imaging

There are no questions for the requested service

## Reference

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).



EXHIBIT
16

DHHRBMS001041

**JA2313**

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy + BSO for Suspected Ovarian or Tubal cancer

---

## Notes:

**1:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**
Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**
Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**
Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001042

**JA2314**

InterQual®                                                    2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy + BSO for Suspected Ovarian or Tubal cancer**

---

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001043

**JA2315**

USCA4 Appeal: 22-1927    Doc: 20-5        Filed: 10/31/2022    Pg: 208 of 489

DHHRBMS001044

**JA2316**

InterQual®                                                                    2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy + BSO for Suspected Ovarian or Tubal cancer**

---

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT70ZZ, 0UT74ZZ, 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UTC0ZZ, 0UTC4ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58180, 58542, 58544, 58571, 58573, 58575, Other _____

DHHRBMS001045

**JA2317**

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**    Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11]

**Requested Service:**    Hysterectomy +/- BSO or Bilateral Salpingectomy for Abnormal uterine bleeding or Postmenopausal bleeding
**Age:**    Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | |
| | NPI/ID #: | | Signature: | | | Date: | |
| Servicing: | Vendor/Facility: | | | Phone #: | | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization:   /  /   to   /  / | | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Choose one of the following options and continue to the appropriate section

□ 10. Abnormal uterine bleeding in premenopausal woman
□ 20. Postmenopausal bleeding

□ 10. Abnormal uterine bleeding in premenopausal woman

1. Choose all that apply:
    □ A) Abnormal uterine bleeding [12]
    □ B) Vagina and cervix normal by physical examination
    □ C) Thyroid disease excluded by history or physical examination or testing [13]
    □ D) Most recent cervical cytology normal or managed per guidelines [14]
    □ E) Pregnancy excluded by negative human chorionic gonadotropin (HCG) or HCG planned prior to procedure or sterilization by history or patient not sexually active by history [15, 16, 17, 18]
    □ F) Imaging or hysteroscopy within last year negative for endometrial lesion [19]
    □ G) Other clinical information (add comment)

    | • If the number of options selected is 6 and option G not selected, then go to question 2 |
    |---|
    | • No other options lead to the requested service |



EXHIBIT
17

DHHRBMS001046

**JA2318**

InterQual®                                                  2021, Oct. 2021 Release CP:Procedures
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**
Hysterectomy +/- BSO or Bilateral Salpingectomy for Abnormal uterine bleeding or Postmenopausal bleeding

---

*Abnormal uterine bleeding in premenopausal woman (continued...)*

2. Choose one: [20]
   ☐ A) Age < 45
   ☐ B) Age ≥ 45

   | |
   |---|
   | • If option A selected, then go to question 3<br>• If option B selected, then go to question 6 |

3. Choose all that apply: [21]
   ☐ A) Bleeding interferes with ADLs
   ☐ B) Anemia by history
   ☐ C) Other clinical information (add comment)

   | |
   |---|
   | • If 1 or more options A or B selected and option C not selected, then go to question 4<br>• No other options lead to the requested service |

4. Treatment within last year, Choose all that apply:
   ☐ A) Hormone therapy [22]
   ☐ B) Tranexamic acid x3 consecutive cycles [23]
   ☐ C) Endometrial ablation or resection [24]
   ☐ D) Other clinical information (add comment)

   | |
   |---|
   | • If 1 or more options A, B or C selected and option D not selected, then go to question 5<br>• No other options lead to the requested service |

5. Continued bleeding after treatment
   ☐ A) Yes
   ☐ B) No

   | |
   |---|
   | • If option Yes selected, then the rule is satisfied; you may stop here [25]<br>• No other options lead to the requested service |

6. Endometrium normal within last year, Choose all that apply:
   ☐ A) By endometrial biopsy
   ☐ B) By hysteroscopy with dilatation and curettage  (D & C)
   ☐ C) Other clinical information (add comment)

   | |
   |---|
   | • If 1 or more options A or B selected and option C not selected, then go to question 7<br>• No other options lead to the requested service |

7. Choose all that apply: [21]
   ☐ A) Bleeding interferes with ADLs
   ☐ B) Anemia by history
   ☐ C) Other clinical information (add comment)

   | |
   |---|
   | • If 1 or more options A or B selected and option C not selected, then go to question 8<br>• No other options lead to the requested service |

DHHRBMS001047

**JA2319**

InterQual®                                    2021, Oct. 2021 Release CP:Procedures

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

Hysterectomy +/- BSO or Bilateral Salpingectomy for Abnormal uterine bleeding or Postmenopausal bleeding

*Abnormal uterine bleeding in premenopausal woman (continued...)*

8. Treatment within last year, Choose all that apply:
   ☐ A) Hormone therapy [22]
   ☐ B) Tranexamic acid x3 consecutive cycles [23]
   ☐ C) Endometrial ablation or resection [24]
   ☐ D) Other clinical information (add comment)

   > • If 1 or more options A, B or C selected and option D not selected, then go to question 9
   > • No other options lead to the requested service

9. Continued bleeding after treatment
   ☐ A) Yes
   ☐ B) No

   > • If option Yes selected, then the rule is satisfied; you may stop here [25]
   > • No other options lead to the requested service

☐ 20. Postmenopausal bleeding

1. Choose all that apply:
   ☐ A) Vagina and cervix normal by physical examination
   ☐ B) Most recent cervical cytology normal or managed per guidelines [14]
   ☐ C) Endometrium normal within last 3 months by biopsy and ultrasound
   ☐ D) Other clinical information (add comment)

   > • If the number of options selected is 3 and option D not selected, then go to question 2
   > • No other options lead to the requested service

2. Currently taking hormone replacement therapy [26]
   ☐ A) Yes
   ☐ B) No

   > • If option No selected, then the rule is satisfied; you may stop here [25]
   > • If option Yes selected, then go to question 3

3. Continued abnormal bleeding after, Choose one: [27]
   ☐ A) Change in hormone replacement therapy
   ☐ B) Discontinuation of hormone replacement therapy
   ☐ C) Other clinical information (add comment)

   > • If option A or B selected, then the rule is satisfied; you may stop here [25]
   > • No other options lead to the requested service

### Reference

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

DHHRBMS001048

**JA2320**

InterQual®                                                         2021, Oct. 2021 Release CP:Procedures
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Abnormal uterine bleeding or Postmenopausal bleeding

---

## Notes:

**1:**

InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**

InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**

Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**

Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**

Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001049

InterQual®                                                           **2021, Oct. 2021 Release CP:Procedures**

## Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- BSO or Bilateral Salpingectomy for Abnormal uterine bleeding or Postmenopausal bleeding

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001050

InterQual®                                                      **2021, Oct. 2021 Release CP:Procedures**

## Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- BSO or Bilateral Salpingectomy for Abnormal uterine bleeding or Postmenopausal bleeding

**12:**

Abnormal uterine bleeding includes menorrhagia (heavy and prolonged menses) and menometrorrhagia (heavy and prolonged bleeding during and between menses).

**13:**

Hypothyroidism or hyperthyroidism may cause a variety of menstrual irregularities such as menorrhagia (heavy and prolonged menses), amenorrhea (no menses), or oligomenorrhea (scant menses). Documentation to exclude a thyroid disorder as a cause of the bleeding may be performed at any time in the workup of the patient.

**14:**

Cervical cytology should be evaluated according to current screening protocols. Screening intervals and tests used (cervical cytology alone, high-risk human papillomavirus [hrHPV] testing alone, hrHPV and cytology together [co-testing]) will vary based on patient's age and risk factors. If the most recent cervical cytology is documented as normal, no further testing is needed. Any abnormalities detected during cervical cancer screening should be managed according to current guidelines. Management may include repeat testing, observation, surveillance, biopsy, ablation, or excisional treatment based on the identified level of risk for each patient (Redman et al., Eur J Obstet Gynecol Reprod Biol 2021, 256: 57-62; Perkins et al., J Low Genit Tract Dis 2020, 24: 102-31; US Preventative Services Task Force et al., JAMA 2018, 320: 674-86; Wentzensen et al., J Low Genit Tract Dis 2017, 21: 216-22).

**15:**

Pregnancy and related complications (e.g., ectopic pregnancy, incomplete abortion, inevitable abortion) must be excluded before performing this procedure.

**16:**

Pregnancy testing can be by measurement of either a serum or urine HCG and may be documented in the medical record by either the primary care physician, gynecologist, or surgeon.

**17:**

The documentation should include a history of sterilization (i.e., tubal ligation) without a subsequent pregnancy. These criteria do not include sterilization of a partner or alternate birth control methods (e.g., oral contraceptive pill use, intrauterine device insertion).

**18:**

Patients have varying definitions of sexual activity (e.g., number of partners, timing of most recent episode, frequency of sexual activity). Unless the provider can confirm on examination that the patient has never had sexual intercourse, whether a patient is sexually active or not is a matter of clinical judgment.

**19:**

Imaging studies (e.g., ultrasound, sonohysterogram) are performed to exclude a structural cause of the uterine bleeding. Direct examination by hysteroscopy can also evaluate and eliminate structural abnormalities.

**20:**

The incidence of endometrial cancer increases with age. Women over the age of 45 tend to have a worse prognosis and often have less differentiated, more advanced stage disease. Therefore, endometrial biopsy should be performed in women with abnormal uterine bleeding 45 years of age or older to exclude premalignant lesions, carcinoma, or other pathology that may cause bleeding (ACOG, Obstet Gynecol Practice Bulletin No. 128. 2012, 120: 197-206. Reaffirmed 2016; ACOG, Obstetrics and gynecology Practice Bulletin No. 136. 2013, 122: 176-185. Reaffirmed 2018). Biopsy may also be considered in women as young as 40 or in those whose bleeding does not improve with hormonal or other therapy (Singh et al., Journal of obstetrics and gynaecology Canada: JOGC 2013, 35: 473-9). If a hysterectomy is to be performed, the biopsy results will guide what type of surgery should be performed (ACOG, Obstetrics and gynecology Practice Bulletin No. 136. 2013, 122: 176-185. Reaffirmed 2018).

**21:**

Abnormal uterine bleeding is considered significant enough to warrant intervention when there is documented anemia by history (currently has anemia or has been treated for anemia related to the bleeding) or bleeding

DHHRBMS001051

InterQual®                                                2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral
Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Abnormal uterine bleeding or
Postmenopausal bleeding**

significantly impacts quality of life. The International Federation of Gynecology and Obstetrics classification system for abnormal uterine bleeding provides a framework to evaluate and manage this condition. This system helps identify the cause of bleeding as either structural (e.g., polyp, adenomyosis, leiomyoma, malignancy/hyperplasia) or unrelated to structure (e.g., coagulopathy, ovulatory dysfunction, endometrial, iatrogenic) and then formulate an individual plan of care (Kolhe, Int J Womens Health 2018, 10: 127-36).

**22:**
Hormone therapy to treat abnormal uterine bleeding includes cyclic or continuous combined oral contraceptive or progestin only hormone therapy (ACOG, Obstetrics and gynecology Practice Bulletin No. 110. 2010, 115: 206-218. Reaffirmed 2018; ACOG, Obstetrics and gynecology Practice Bulleting No. 136. 2013, 122: 176-185. Reaffirmed 2018; Singh et al., Journal of obstetrics and gynaecology Canada: JOGC 2013, 35: 473-9). Oral medication, a dermal patch, or vaginal ring may be used. The levonorgestrel releasing intrauterine system has been shown to significantly reduce bleeding and cramping, and may be considered a first-line treatment for women with heavy abnormal bleeding (ACOG, Obstetrics and gynecology Practice Bulletin No. 110. 2010, 115: 206-218. Reaffirmed 2018; Gupta et al., N Engl J Med 2013, 368: 128-37; Heliovaara-Peippo et al., American journal of obstetrics and gynecology 2013, 209: 535 e1- e14; Singh et al., Journal of obstetrics and gynaecology Canada: JOGC 2013, 35: 473-9). For those who cannot tolerate or did not have success on other therapies or who are not surgical candidates, danazol and GnRH agonists may be options (Singh et al., Journal of obstetrics and gynaecology Canada: JOGC 2013, 35: 473-9).

**23:**
Tranexamic acid is an antifibrinolytic taken during menstruation and has been shown to be an effective treatment to decrease heavy abnormal uterine bleeding and improve quality of life (Singh et al., Journal of obstetrics and gynaecology Canada: JOGC 2013, 35: 473-9).

**24:**
If medical therapy fails or is not an option for abnormal uterine bleeding, hysteroscopic endometrial resection or ablation may be performed as an alternative to hysterectomy (Fergusson et al., Cochrane Database Syst Rev 2019, 8: Cd000329; Obstet Gynecol Practice Bulletin No. 81 2007; 109(5): 1233-1248. Reaffirmed 2018).
Nonhysteroscopic techniques for endometrial ablation (e.g., thermal balloon, cryoablation, microwave, electrode ablation) have also been shown to be beneficial for the treatment of abnormal uterine bleeding (Fergusson et al., Cochrane Database Syst Rev 2019, 8: Cd000329; Singh et al., Journal of obstetrics and gynaecology Canada: JOGC 2013, 35: 473-9).

**25:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**26:**
The risks and benefits of long-term hormone replacement therapy use should be carefully considered for each patient, as the benefit changes with age, menopausal symptoms, comorbidities, and the presence of risk factors for adverse outcomes (e.g., stroke, coronary artery disease). Review of major studies, such as the Heart and Estrogen/Progestin Replacement Study Follow-Up (HERS) and the Women's Health Initiative (WHI), indicates the risk-benefit ratio for hormone therapy is most favorable if it is initiated closer to menopause. This benefit decreases in older women and in women who are more temporally removed from menopause (North American Menopause Society, Menopause 2017, 24: 728-53).

**27:**

DHHRBMS001052

**JA2324**

**InterQual®**                                    **2021, Oct. 2021 Release CP:Procedures**

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- BSO or Bilateral Salpingectomy for Abnormal uterine bleeding or Postmenopausal bleeding

Postmenopausal bleeding should always be investigated, as it could be a sign of endometrial cancer (American College of Obstetricians and Gynecologists, Obstet Gynecol 2018, 131: 945-6; ACOG, Obstetrics and gynecology ACOG Practice Bulletin No. 149, 2015, 125: 1006-26. Reaffirmed 2019; Khati et al., ACR Appropriateness Criteria((R)) Abnormal Vaginal Bleeding. 2014). Postmenopausal bleeding is defined as bleeding after 1 year of amenorrhea in a woman not receiving hormone replacement therapy or unexpected bleeding in patients receiving cyclic hormone therapy or bleeding after 1 year of continuous hormone therapy.

DHHRBMS001053

JA2325

**InterQual®**

2021, Oct. 2021 Release CP:Procedures

## Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- BSO or Bilateral Salpingectomy for Abnormal uterine bleeding or Postmenopausal bleeding

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT27ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT77ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UT97ZL, 0UT97ZZ, 0UT98ZL, 0UT98ZZ, 0UT9FZL, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC7ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58180, 58260, 58262, 58263, 58290, 58291, 58292, 58541, 58542, 58543, 58544, 58550, 58552, 58553, 58554, 58570, 58571, 58572, 58573, 58575, Other _____

DHHRBMS001054

**JA2326**

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**   Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11]

**Requested Service:**   Hysterectomy +/- BSO or Bilateral Salpingectomy for Adenomyosis or Fibroids
**Age:**   Age ≥ 18

| Patient: | Name: | | DOB: | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | Weight: | | |
| Provider/PCP: | Name: | Fax #: | | Phone #: | | |
| | NPI/ID #: | Signature: | | | Date: | |
| Servicing: | Vendor/Facility: | | | Phone #: | | |
| | Diagnosis/ICD: | Service Date: | | Authorization:   /  /   to   /  / | | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Choose one of the following options and continue to the appropriate section

☐ 10. Adenomyosis suspected by imaging
☐ 20. Fibroids by imaging in postmenopausal woman
☐ 30. Fibroids by imaging in premenopausal woman

☐ **10. Adenomyosis suspected by imaging**

   1. Choose one: [12]
     ☐ A) Abnormal bleeding [13]
     ☐ B) Pelvic or abdominal pain or discomfort and other etiologies excluded [14]
     ☐ C) Urinary frequency or urgency and other etiologies excluded
     ☐ D) Dyspareunia [15]
     ☐ E) Other clinical information (add comment)

> • If option A selected, then go to question 2
> • If option B, C or D selected, then go to question 4
> • No other options lead to the requested service



DHHRBMS001055

**JA2327**

InterQual®                                                    2021, Oct. 2021 Release CP:Procedures
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Adenomyosis or Fibroids

---

*Adenomyosis suspected by imaging (continued...)*

2. Choose all that apply: [16]
   ☐ A) Vagina and cervix normal by physical examination
   ☐ B) Pregnancy excluded by negative HCG or HCG planned prior to procedure or sterilization by history or patient not sexually active by history
   ☐ C) Other clinical information (add comment)

   > • If the number of options selected is 2 and option C not selected, then go to question 3
   > • No other options lead to the requested service

3. Choose all that apply: [17]
   ☐ A) Bleeding interferes with ADLs
   ☐ B) Anemia by history
   ☐ C) Other clinical information (add comment)

   > • If 1 or more options A or B selected and option C not selected, then go to question 4
   > • No other options lead to the requested service

4. Treatment within last year, Choose all that apply: [18]
   ☐ A) NSAIDs ≥ 8 weeks
   ☐ B) GnRH agonist ≥ 8 weeks [19]
   ☐ C) Hormone therapy ≥ 8 weeks
   ☐ D) Uterine artery embolization
   ☐ E) Other clinical information (add comment)

   > • If 1 or more options A, B, C or D selected and option E not selected, then go to question 5
   > • No other options lead to the requested service

5. Continued symptoms or findings after treatment
   ☐ A) Yes
   ☐ B) No

   > • If option Yes selected, then go to question 6
   > • No other options lead to the requested service

6. Choose all that apply:
   ☐ A) Most recent cervical cytology normal or managed per guidelines [20]
   ☐ B) Pregnancy excluded by negative HCG or HCG planned prior to procedure or sterilization by history or patient not sexually active by history [21, 22, 23, 24]
   ☐ C) Other clinical information (add comment)

   > • If the number of options selected is 2 and option C not selected, then the rule is satisfied; you may stop here [25]
   > • No other options lead to the requested service

---

☐ 20. Fibroids by imaging in postmenopausal woman

---

DHHRBMS001056

**JA2328**

InterQual®                                                    2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Adenomyosis or Fibroids

*Fibroids by imaging in postmenopausal woman (continued...)*

1. Choose all that apply: [26, 27]
   ☐ A) Uterine size doubled by ultrasound within 1 year
   ☐ B) Ureteral compression by imaging [28]
   ☐ C) Pelvic or abdominal pain or discomfort and other etiologies excluded
   ☐ D) Urinary frequency or urgency and other etiologies excluded
   ☐ E) Dyspareunia and other etiologies excluded [15]
   ☐ F) Other clinical information (add comment)

   | • If 1 or more options A, B, C or E selected and option F not selected, then go to question 2 |
   | • No other options lead to the requested service |

2. Most recent cervical cytology normal or managed per guidelines [20]
   ☐ A) Yes
   ☐ B) No

   | • If option Yes selected, then go to question 3 |
   | • No other options lead to the requested service |

3. Laparoscopic power morcellation planned with hysterectomy [29]
   ☐ A) Yes
   ☐ B) No

   | • If option No selected, then the rule is satisfied; you may stop here [25] |
   | • No other options lead to the requested service |

☐ 30. Fibroids by imaging in premenopausal woman [27]
1. Choose one: [27]
   ☐ A) Abnormal uterine bleeding with anemia by history or interferes with ADLs [13, 17]
   ☐ B) Uterine size doubled by ultrasound (US) within 1 year [30]
   ☐ C) Ureteral compression by imaging [28]
   ☐ D) Pelvic or abdominal pain or discomfort and other etiologies excluded
   ☐ E) Urinary frequency or urgency and other etiologies excluded
   ☐ F) Dyspareunia and other etiologies excluded [15]
   ☐ G) Other clinical information (add comment)

   | • If option A selected, then go to question 2 |
   | • If option B, C, D, E or F selected, then go to question 3 |
   | • No other options lead to the requested service |

2. Vagina and cervix normal by physical examination [31]
   ☐ A) Yes
   ☐ B) No

   | • If option Yes selected, then go to question 3 |
   | • No other options lead to the requested service |

DHHRBMS001057

InterQual®

2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Adenomyosis or Fibroids

*Fibroids by imaging in premenopausal woman (continued...)*

3. Choose all that apply:
   ☐ A) Most recent cervical cytology normal or managed per guidelines [20]
   ☐ B) Pregnancy excluded by negative HCG or HCG planned prior to procedure or sterilization by history or patient not sexually active by history [21, 22, 23, 24]
   ☐ C) Other clinical information (add comment)

   > • If the number of options selected is 2 and option C not selected, then go to question 4
   > • No other options lead to the requested service

4. Laparoscopic power morcellation planned with hysterectomy [32, 33]
   ☐ A) Yes
   ☐ B) No

   > • If option No selected, then the rule is satisfied; you may stop here [25]
   > • If option Yes selected, then go to question 5

5. Choose all that apply:
   ☐ A) No known or suspected malignancy by testing in tissue to be morcellated [34]
   ☐ B) Not a candidate for **en bloc** or intact tissue removal [35]
   ☐ C) Other clinical information (add comment)

   > • If the number of options selected is 2 and option C not selected, then go to question 6
   > • No other options lead to the requested service

6. Increased risk for uterine malignancy, Choose one:
   ☐ A) Pelvic irradiation by history
   ☐ B) Tamoxifen use by history
   ☐ C) Lynch ll syndrome
   ☐ D) Hereditary leiomyomatosis and renal cell cancer
   ☐ E) Childhood retinoblastoma by history
   ☐ F) Postmenopausal with fibroids by imaging [36]
   ☐ G) None of the above, more choices

   > • If option G selected, then go to question 7
   > • No other options lead to the requested service

7. Risks and benefits of morcellation discussed with patient [37]
   ☐ A) Yes
   ☐ B) No

   > • If option Yes selected, then the rule is satisfied; you may stop here [25]
   > • No other options lead to the requested service

**Reference**

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

DHHRBMS001058

**JA2330**

InterQual®                                          2021, Oct. 2021 Release CP:Procedures
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**
Hysterectomy +/- BSO or Bilateral Salpingectomy for Adenomyosis or Fibroids

---

## Notes:

**1:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**
Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**
Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**
Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001059

**JA2331**

InterQual®                                              2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Adenomyosis or Fibroids**

---

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001060

InterQual®                                                                    2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Adenomyosis or Fibroids

---

**12:**
There are no symptoms that are pathognomonic for adenomyosis and many of the symptoms are associated with other common gynecologic disorders (e.g., fibroids, abnormal uterine bleeding, endometriosis).

**13:**
Abnormal uterine bleeding includes menorrhagia (heavy and prolonged menses) and menometrorrhagia (heavy and prolonged bleeding during and between menses).

**14:**
The pain associated with adenomyosis is varied and includes cramping that may begin days or weeks prior to menses, dyspareunia, or dysuria.

**15:**
Dyspareunia is difficult or painful sexual intercourse.

**16:**
A history and laboratory assessment to evaluate vaginal bleeding can help exclude systemic conditions, coagulopathy, and medication or thyroid dysfunction, while the physical examination excludes vaginal or cervical causes of bleeding.

**17:**
Abnormal uterine bleeding is considered significant enough to warrant intervention when there is documented anemia by history (currently has anemia or has been treated for anemia related to the bleeding) or bleeding significantly impacts quality of life. The International Federation of Gynecology and Obstetrics classification system for abnormal uterine bleeding provides a framework to evaluate and manage this condition. This system helps identify the cause of bleeding as either structural (e.g., polyp, adenomyosis, leiomyoma, malignancy/hyperplasia) or unrelated to structure (e.g., coagulopathy, ovulatory dysfunction, endometrial, iatrogenic) and then formulate an individual plan of care (Kolhe, Int J Womens Health 2018, 10: 127-36).

**18:**
Although hysterectomy is an effective treatment for symptomatic adenomyosis, medical treatment options include progestin, the levonorgestrel intra-uterine system, GnRH agonists, and nonsteroidal anti-inflammatory drugs (ACOG, Obstetrics and gynecology Practice Bulletin No. 110. 2010, 115: 206-218. Reaffirmed 2018; Streuli et al., Expert opinion on pharmacotherapy 2014, 15: 2347-60). Surgical options include uterine artery embolization and uterine artery occlusion with partial resection (Nijenhuis et al., Cardiovascular and interventional radiology 2015, 38: 65-71; Liu et al., European journal of obstetrics, gynecology, and reproductive biology 2014, 176: 20-4; Smeets et al., Cardiovascular and interventional radiology 2012, 35: 815-9).

**19:**
The GnRH agonists include leuprolide, nafarelin, and goserelin. These compounds mimic the action of GnRH and, thereby, suppress the hormones produced by the ovary that stimulate endometrial growth.

**20:**
Cervical cytology should be evaluated according to current screening protocols. Screening intervals and tests used (cervical cytology alone, high-risk human papillomavirus [hrHPV] testing alone, hrHPV and cytology together [co-testing]) will vary based on patient's age and risk factors. If the most recent cervical cytology is documented as normal, no further testing is needed. Any abnormalities detected during cervical cancer screening should be managed according to current guidelines. Management may include repeat testing, observation, surveillance, biopsy, ablation, or excisional treatment based on the identified level of risk for each patient (Redman et al., Eur J Obstet Gynecol Reprod Biol 2021, 256: 57-62; Perkins et al., J Low Genit Tract Dis 2020, 24: 102-31; US Preventative Services Task Force et al., JAMA 2018, 320: 674-86; Wentzensen et al., J Low Genit Tract Dis 2017, 21: 216-22).

**21:**
Pregnancy and related complications (e.g., ectopic pregnancy, incomplete abortion, inevitable abortion) must be excluded before performing this procedure.

DHHRBMS001061

InterQual®                                                    2021, Oct. 2021 Release CP:Procedures
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Adenomyosis or Fibroids

---

**22:**
Pregnancy testing can be performed by measurement of either a serum or urine HCG and may be documented in the medical record by either the PCP, a gynecologist, or a surgeon.

**23:**
The documentation should include a history of sterilization (i.e., tubal ligation) without a subsequent pregnancy. These criteria do not include sterilization of a partner or alternate birth control methods (e.g., oral contraceptive pill use, intrauterine device insertion).

**24:**
Patients have varying definitions of sexual activity (e.g., number of partners, timing of most recent episode, frequency of sexual activity). Unless the provider can confirm on examination that the patient has never had sexual intercourse, whether a patient is sexually active or not is a matter of clinical judgment.

**25:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy- Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**26:**
If fibroids are associated with postmenopausal bleeding, see the "Postmenopausal bleeding" indication within this criteria subset.

**27:**
Common pelvic pressure symptoms associated with uterine fibroids include pain, pressure, dyspareunia, and urinary frequency or urgency. These symptoms must be directly attributed to uterine enlargement due to fibroids and other potential causes need to be excluded prior to surgical intervention.

**28:**
Ureteral compression may be seen at the time of ultrasound.

**29:**
Power morcellation, which causes intraperitoneal dissemination of myometrium, should never be done for fibroids in postmenopausal women because the incidence of cancer is higher in these women (American College of Obstetricians and Gynecologists, Obstet Gynecol 2019, 133: e238-e48; U.S. Food and Drug Administration (FDA), Updated Assessment of The Use of Laparoscopic Power Morcellators to Treat Uterine Fibroids, December 2017).

**30:**
Rapid growth of uterine fibroids alone in premenopausal women is not a reliable sign of malignant transformation. Uterine sarcoma is rare and the symptoms are similar to benign fibroids. Imaging and endometrial biopsy may help with the diagnosis, but it is often discovered postoperatively.

**31:**
Abnormal uterine bleeding due to vaginal, cervical, endometrial, or ovarian conditions may raise the suspicion of malignancy. Bleeding from conditions other than fibroids (e.g., polyps, malignancy) should be excluded prior to the procedure. Testing preprocedure to exclude other etiologies of bleeding may include evaluation for cervical pathology (e.g., Pap smear), imaging, and in some cases endometrial biopsy.

DHHRBMS001062

InterQual®                                                          2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Adenomyosis or Fibroids

---

**32:**

When performing a totally laparoscopic or vaginal procedure, it may be necessary to divide, or morcellate, the specimen to remove it. There is concern that morcellation may result in contamination of the wound, which can lead to upstaging of occult malignancy, iatrogenic endometriosis, or parasitic leiomyomata. The Food and Drug Administration (FDA) reports there is evidence for differences in disease recurrence and survival between women undergoing morcellation and those who do not (U.S. Food and Drug Administration (FDA), Updated Assessment of The Use of Laparoscopic Power Morcellators to Treat Uterine Fibroids, December 2017; Beckmann et al., Geburtshilfe und Frauenheilkunde 2015, 75: 148-64; Pereira et al., Journal of minimally invasive gynecology 2015, 22: 163-76; Siedhoff et al., American journal of obstetrics and gynecology 2015, 212: 591 e1-8; Singh et al., J Obstet Gynaecol Can 2015, 37: 68-81; Vilos et al., Journal of obstetrics and gynaecology Canada: JOGC 2015, 37: 157-81; American Association of Gynecologic Laparoscopists, Journal of minimally invasive gynecology AAGL practice report Morcellation 2014, 21: 517-30). Cohort studies and meta-analyses show a low prevalence of occult malignancy in hysterectomy and myomectomy specimens, including specimens that have undergone morcellation (Bojahr et al., Arch Gynecol Obstet 2015, 292(3): 665-72; Brohl et al., The Oncologist 2015, 20: 433-9; Lieng et al., Journal of minimally invasive gynecology 2015, 22: 410-4; Mahnert et al., Obstetrics and gynecology 2015, 125: 397-405; Singh et al., J Obstet Gynaecol Can 2015, 37: 68-81; Tan-Kim et al., American journal of obstetrics and gynecology 2015, 212: 594 e1-10; Wright et al., JAMA 2014, 312: 1253-5). Data regarding the risk of upstaging of occult malignancy are mixed (Beckmann et al., Geburtshilfe und Frauenheilkunde 2015, 75: 148-64; Bojahr et al., Arch Gynecol Obstet 2015, 292(3): 665-72; Pritts et al., Journal of minimally invasive gynecology 2015, 22: 26-33; George et al., Cancer 2014, 120: 3154-8). The American College of Obstetricians and Gynecologist and others maintains that, with proper evaluation and limiting morcellation to nonmalignant conditions, minimally invasive surgery continues to have a place in the treatment of fibroids (Brolmann et al., Gynecol Surg 2015, 12: 3-15; Singh et al., J Obstet Gynaecol Can 2015, 37: 68-81; ACOG, Power Morcellation and Occult Malignancy in Gynecologic Surgery: A Special Report. 2014). The FDA recommends against the use of laparoscopic power morcellators during myomectomy or hysterectomy when the tissue to be morcellated is known or suspected to contain malignancy, in women who are peri- or post-menopausal with uterine tissue that contains suspected fibroids, or in candidates for en bloc tumor resection or intact tissue removal by a vaginal, laparoscopic port, or mini-laparotomy approach (U.S. Food and Drug Administration (FDA), Updated Assessment of The Use of Laparoscopic Power Morcellators to Treat Uterine Fibroids, December 2017). Additional contraindications to morcellation include known or suspected malignancy, prophylactic surgery for high cancer risk genetic conditions, and history of therapy known to increase cancer risk, such as radiation or tamoxifen (Sizzi et al., Eur J Obstet Gynecol Reprod Biol 2018, 220: 30-8; U.S. Food and Drug Administration (FDA), Updated Assessment of The Use of Laparoscopic Power Morcellators to Treat Uterine Fibroids, December 2017; Beckmann et al., Geburtshilfe und Frauenheilkunde 2015, 75: 148-64; Singh et al., J Obstet Gynaecol Can 2015, 37: 68-81; American Association of Gynecologic Laparoscopists, Journal of minimally invasive gynecology AAGL practice report Morcellation 2014, 21: 517-30; American Urogynecologic Society, AUGS position statement on Power Morcellation 2014).

**33:**

The Food and Drug Administration safety warning addresses the risks associated with laparoscopic power morcellators that are inserted into the peritoneal cavity and not those that are inserted into the uterus via hysteroscope. These are considered different procedures with different risk profiles. There is no evidence that hysteroscopic morcellation results in the spread of malignant cells (U.S. Food and Drug Administration (FDA), Updated Assessment of The Use of Laparoscopic Power Morcellators to Treat Uterine Fibroids, December 2017; National Institute for Health and Clinical Excellence (NICE). Hysteroscopic morcellation of uterine leiomyomas (fibroids), June 2015).

**34:**

Prior to hysterectomy or myomectomy with morcellation, women should be evaluated for coexisting uterine or cervical malignancy. Preoperative evaluation for uterine sarcomas has limitations and cannot reliably detect unexpected cancers; however, suspected or known uterine cancer should not be removed by morcellation. In addition to cervical cytology, endometrial assessment may include tissue sampling, ultrasound, or MRI. CT and PET are less effective in differentiating between leiomyoma and uterine leiomyosarcoma (American College of Obstetricians and Gynecologists, Obstet Gynecol 2019, 133: e238-e48; Sizzi et al., Eur J Obstet Gynecol Reprod Biol 2018, 220: 30-8; U.S. Food and Drug Administration (FDA), Updated Assessment of The Use of Laparoscopic Power Morcellators to Treat Uterine Fibroids, December 2017).

**35:**

En bloc tissue removal or removing tissue as an intact specimen reduces the risk of dissemination and upstaging an

DHHRBMS001063

occult sarcoma. Routine use of laparoscopic power morcellators is not recommended when en bloc resection through a vaginal, laparoscopic, or mini-laparotomy approach is a viable option (U.S. Food and Drug Administration (FDA), Updated Assessment of The Use of Laparoscopic Power Morcellators to Treat Uterine Fibroids, December 2017; ACOG, Power Morcellation and Occult Malignancy in Gynecologic Surgery: A Special Report. 2014).

36:
Increased age is considered a risk factor for the development of uterine sarcoma. Therefore, peri- or postmenopausal women with uterine tissue containing fibroids should not undergo laparoscopic power morcellation (American College of Obstetricians and Gynecologists, Obstet Gynecol 2019, 133: e238-e48; U.S. Food and Drug Administration (FDA), Updated Assessment of The Use of Laparoscopic Power Morcellators to Treat Uterine Fibroids, December 2017).

37:
Patients should be counseled regarding the benefits, risks (including the potential for the spread of occult malignancy which may decrease survival), and alternatives when morcellation is planned (American College of Obstetricians and Gynecologists, Obstet Gynecol 2019, 133: e238-e48; U.S. Food and Drug Administration (FDA), Updated Assessment of The Use of Laparoscopic Power Morcellators to Treat Uterine Fibroids, December 2017; Vilos et al., Journal of obstetrics and gynaecology Canada: JOGC 2015, 37: 157-81).

DHHRBMS001064

**JA2336**

InterQual®                                                 **2021, Oct. 2021 Release CP:Procedures**

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

Hysterectomy +/- BSO or Bilateral Salpingectomy for Adenomyosis or Fibroids

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT27ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT77ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UT97ZL, 0UT97ZZ, 0UT98ZL, 0UT98ZZ, 0UT9FZL, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC7ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58180, 58260, 58262, 58263, 58290, 58291, 58292, 58541, 58542, 58543, 58544, 58550, 58552, 58553, 58554, 58570, 58571, 58572, 58573, 58575, Other _____

DHHRBMS001065

**JA2337**

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**   Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11]

**Requested Service:**   Hysterectomy +/- BSO or Bilateral Salpingectomy for Chronic abdominal or pelvic pain
**Age:**   Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Sex (circle): M / F | | Height: | | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | |
| | NPI/ID #: | | Signature: | | | Date: | |
| Servicing: | Vendor/Facility: | | | | Phone #: | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization:   / /   to   / / | | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Chronic abdominal or pelvic pain, unknown etiology

   1. Choose all that apply:
      ☐ A) History and physical examination nondiagnostic for etiology of pain
      ☐ B) CBC normal
      ☐ C) Urinalysis or urine culture normal
      ☐ D) Most recent cervical cytology normal or managed per guidelines [12]
      ☐ E) Pregnancy excluded by negative human chorionic gonadotropin (HCG) or HCG planned prior to procedure or sterilization by history or patient not sexually active by history [13, 14, 15, 16]
      ☐ F) Ultrasound within last year nondiagnostic for etiology of pain
      ☐ G) Other clinical information (add comment)

> • If the number of options selected is 6 and option G not selected, then go to question 2
> • No other options lead to the requested service

   2. Testing within last year nondiagnostic for etiology of pain, Choose all that apply:
      ☐ A) CT or MRI
      ☐ B) Diagnostic laparoscopy [17]
      ☐ C) Other clinical information (add comment)

> • If 1 or more options A or B selected and option C not selected, then go to question 3
> • No other options lead to the requested service



DHHRBMS001066

**InterQual®**                                                        **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral**
**Salpingectomy**
**Hysterectomy +/- BSO or Bilateral Salpingectomy for Chronic abdominal or pelvic**
**pain**

*Chronic abdominal or pelvic pain, unknown etiology (continued...)*

3. Treatment within last year, Choose all that apply: [18]
   ☐ A) NSAIDs ≥ 4 weeks
   ☐ B) Hormone therapy ≥ 8 weeks [19]
   ☐ C) GnRH agonist ≥ 8 weeks [20]
   ☐ D) Antibiotic treatment x1 course
   ☐ E) Other clinical information (add comment)

   > • If 1 or more options A, B, C or D selected and option E not selected, then go to question 4
   > • No other options lead to the requested service

4. Continued pain after treatment
   ☐ A) Yes
   ☐ B) No

   > • If option Yes selected, then the rule is satisfied; you may stop here **Ltd** **2nd** [21, 22, 23]
   > • No other options lead to the requested service

**Reference**

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

DHHRBMS001067

InterQual®                                                    **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Chronic abdominal or pelvic pain

---

## Notes:

**1:**

InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**

InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**

Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**

Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**

Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001068

InterQual®                                                          **2021, Oct. 2021 Release CP:Procedures**

## Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- BSO or Bilateral Salpingectomy for Chronic abdominal or pelvic pain

---

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications (incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001069

InterQual®                                              2021, Oct. 2021 Release CP:Procedures
                                        **Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral**
                                                                                  **Salpingectomy**
                                        Hysterectomy +/- BSO or Bilateral Salpingectomy for Chronic abdominal or pelvic
                                                                                              pain

---

**12:**
Cervical cytology should be evaluated according to current screening protocols. Screening intervals and tests used (cervical cytology alone, high-risk human papillomavirus [hrHPV] testing alone, hrHPV and cytology together [co-testing]) will vary based on patient's age and risk factors. If the most recent cervical cytology is documented as normal, no further testing is needed. Any abnormalities detected during cervical cancer screening should be managed according to current guidelines. Management may include repeat testing, observation, surveillance, biopsy, ablation, or excisional treatment based on the identified level of risk for each patient (Redman et al., Eur J Obstet Gynecol Reprod Biol 2021, 256: 57-62; Perkins et al., J Low Genit Tract Dis 2020, 24: 102-31; US Preventative Services Task Force et al., JAMA 2018, 320: 674-86; Wentzensen et al., J Low Genit Tract Dis 2017, 21: 216-22).

**13:**
Pregnancy and related complications (e.g., ectopic pregnancy, incomplete abortion, inevitable abortion) must be excluded before performing this procedure.

**14:**
Patients have varying definitions of sexual activity (e.g., number of partners, timing of most recent episode, frequency of sexual activity). Unless the provider can confirm on examination that the patient has never had sexual intercourse, whether a patient is sexually active or not is a matter of clinical judgment.

**15:**
The documentation should include a history of sterilization (i.e., tubal ligation) without a subsequent pregnancy. These criteria do not include sterilization of a partner or alternate birth control methods (e.g., oral contraceptive pill use, intrauterine device insertion).

**16:**
Pregnancy testing can be by measurement of either a serum or urine HCG and may be documented in the medical record by either the primary care physician, gynecologist, or surgeon.

**17:**
Diagnostic laparoscopy may be used in evaluating chronic pelvic pain to identify possible pathologic causes for the pain. Endometriosis is a common cause of pelvic pain and laparoscopy is used to diagnose and treat endometrial lesions. Laparoscopy can also diagnosis other gynecological pathology that may cause chronic pelvic pain such as adhesions and pelvic inflammatory disease (Yunker et al., Obstet Gynecol Surv 2012, 67: 417-25; Won and Abbott, Int J Womens Health 2010, 2: 263-77).

**18:**
Conservative or less invasive interventions should be tried prior to recommending hysterectomy for the treatment of chronic pelvic pain. Medications such as progesterone and GnRH agonists have shown benefit in decreasing pain, as has a multidisciplinary approach to pain management (Yunker et al., Obstet Gynecol Surv 2012, 67: 417-25). Presacral neurectomy and uterine nerve ablation are techniques that disrupt the nerves that carry pain stimuli to the pelvis. Although several studies have shown significant improvement in pain scores after treatment, the evidence to support these techniques in the treatment of pelvic pain is limited and therefore, these procedures cannot be recommended (Won and Abbott, Int J Womens Health 2010, 2: 263-77; Daniels et al., JAMA 2009; 302(9): 955-961; National Institute for Health and Clinical Excellence (NICE), Interventional procedure overview of laparoscopic uterine nerve ablation (LUNA) for chronic pelvic pain. February 2007, 26).

**19:**
Although there are few high quality studies, hormone therapy including progestin alone, combined estrogen and progestin, and GnRH agonists have been reported to improve noncyclic chronic pelvic pain (Brown and Farquhar, Cochrane Database Syst Rev 2014: Cd009590).

**20:**
The GnRH agonists include leuprolide, nafarelin, and goserelin. These compounds mimic the action of GnRH and, thereby, suppress the hormones produced by the ovary that stimulate endometrial growth.

DHHRBMS001070

InterQual®                                              2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Chronic abdominal or pelvic pain**

---

**21:**
Recommendations are designated as "Limited Evidence" based on one or more of the following:

• Research to date has not demonstrated this intervention's equivalence or superiority to the current standard of care.
• The balance of benefits and harms does not clearly favor this intervention.
• The clinical utility of this intervention has not been clearly established.
• The evidence is mixed, unclear, or of low quality.
• This intervention is not standard of care.
• New technology is still being investigated.

**22:**
The evaluation of chronic pain can be extensive and finding a cause of the pain may remain elusive. The process of elimination does not ensure that hysterectomy will resolve the pain and pain can persist even after a hysterectomy. Evidence is inconclusive and lacking in controlled trials in regard to the benefit of surgical intervention for chronic pelvic pain (Andrews et al., In: Noncyclic Chronic Pelvic Pain Therapies for Women: Comparative Effectiveness. 2012; Yunker et al., Obstet Gynecol Surv 2012, 67: 417-25). Therefore, requests for hysterectomy for chronic pelvic pain should be reviewed prior to approval.

**23:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- BSO or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- BSO or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- BSO or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- BSO or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- BSO or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- BSO or +/- Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

DHHRBMS001071

**JA2343**

**InterQual®**

2021, Oct. 2021 Release CP:Procedures

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

Hysterectomy +/- BSO or Bilateral Salpingectomy for Chronic abdominal or pelvic pain

---

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT27ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT77ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UT97ZL, 0UT97ZZ, 0UT98ZL, 0UT98ZZ, 0UT9FZL, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC7ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58180, 58260, 58262, 58263, 58290, 58291, 58292, 58541, 58542, 58543, 58544, 58550, 58552, 58553, 58554, 58570, 58571, 58572, 58573, 58575, Other _____

DHHRBMS001072

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:** Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11]

**Requested Service:** Hysterectomy +/- BSO or Bilateral Salpingectomy for CIN 2, CIN 2,3, or CIN 3 or Endometrial hyperplasia (premenopausal)

**Age:** Age ≥ 18

| Patient: | Name: | | DOB: | ID #: | | GROUP #: | |
|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | Weight: | | | |
| Provider/PCP: | Name: | Fax #: | | Phone #: | | | |
| | NPI/ID #: | Signature: | | | Date: | | |
| Servicing: | Vendor/Facility: | | | Phone #: | | | |
| | Diagnosis/ICD: | Service Date: | | Authorization: | / / | to / / | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Choose one of the following options and continue to the appropriate section

☐ 10. Cervical intra-epithelial neoplasia (CIN) 2, CIN 2,3, or CIN 3 by biopsy

☐ 20. Endometrial hyperplasia with cellular atypia by biopsy or dilatation and curettage (D & C)

☐ 10. Cervical intra-epithelial neoplasia (CIN) 2, CIN 2,3, or CIN 3 by biopsy

    1. Excisional procedure performed [12]
      ☐ A) Yes
      ☐ B) No

> • If option Yes selected, then go to question 2
> • No other options lead to the requested service

    2. Continued CIN 2, CIN 2,3, or CIN 3 by endocervical curettage (ECC) or biopsy ≥ 4 months post excisional procedure [13]
      ☐ A) Yes
      ☐ B) No

> • If option Yes selected, then the rule is satisfied; you may stop here [14]
> • No other options lead to the requested service

☐ 20. Endometrial hyperplasia with cellular atypia by biopsy or dilatation and curettage (D & C)



**EXHIBIT**

**20**

DHHRBMS001073

**InterQual®**                                              **2021, Oct. 2021 Release CP:Procedures**

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- BSO or Bilateral Salpingectomy for CIN 2, CIN 2,3, or CIN 3 or Endometrial hyperplasia (premenopausal)

*Endometrial hyperplasia with cellular atypia by biopsy or dilatation and curettage (D & C) (continued...)*

1. Choose one:
   ☐ A) Premenopausal woman
   ☐ B) Postmenopausal woman [15]
   ☐ C) Other clinical information (add comment)

   > • If option A selected, then the rule is satisfied; you may stop here [14]
   > • No other options lead to the requested service

### Reference

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

DHHRBMS001074

**JA2346**

InterQual®                                          **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for CIN 2, CIN 2,3, or CIN 3 or Endometrial hyperplasia (premenopausal)**

## Notes:

**1:**

InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**

InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**

Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**

Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**

Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001075

InterQual®                                          2021, Oct. 2021 Release CP:Procedures

## Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- BSO or Bilateral Salpingectomy for CIN 2, CIN 2,3, or CIN 3 or Endometrial hyperplasia (premenopausal)

**6:**

Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**

These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**

Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**

I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**

For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**

Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001076

InterQual®                                        2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for CIN 2, CIN 2,3, or CIN 3 or Endometrial hyperplasia (premenopausal)**

---

**12:**
Excisional procedures include laser conization, cold knife conization, loop electrosurgical excision procedure (LEEP), and loop electrosurgical conization and are performed to obtain a specimen from the transformation zone and endocervical canal for histopathological evaluation. One technique has not been proven to be superior to another (Martin-Hirsch et al., The Cochrane database of systematic reviews 2013, 12: CD001318).

**13:**
Cervical intra-epithelial neoplasia (CIN) 2, CIN 2,3, or CIN 3 are indications for hysterectomy if conservative excisional surgery fails. Retesting is done approximately 4 months after conservative treatment, as the cervix needs time to heal and continued inflammation can result in abnormal biopsy results. When future childbearing is desired or in younger women with CIN 2, continued conservative surgery may be repeated until the childbearing years end (American College of Obstetricians and Gynecologists, Obstet Gynecol 2013, 122: 1338-67. Reaffirmed 2018; Massad et al., J Low Genit Tract Dis 2013, 17: S1-S27).

**14:**
I/O Setting:
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**15:**
Hysterectomy with removal of both ovaries and fallopian tubes is usually performed in postmenopausal women because the risk for the development of ovarian cancer is higher than for premenopausal women.

DHHRBMS001077

**JA2349**

**InterQual®**

2021, Oct. 2021 Release CP:Procedures

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- BSO or Bilateral Salpingectomy for CIN 2, CIN 2,3, or CIN 3 or Endometrial hyperplasia (premenopausal)

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT27ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT77ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZZ, 0UT94ZZ, 0UT97ZZ, 0UT98ZZ, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC7ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58260, 58262, 58263, 58290, 58291, 58292, 58550, 58552, 58553, 58554, 58570, 58571, 58572, 58573, 58575, Other _____

DHHRBMS001078

**JA2350**

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**   Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11]

**Requested Service:**   Hysterectomy +/- BSO or Bilateral Salpingectomy for Gestational Trophoblastic disease

**Age:**   Age ≥ 18

| Patient: | Name: | | DOB: | ID #: | | GROUP #: | |
|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | Weight: | | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | |
| | NPI/ID #: | | Signature: | | | Date: | |
| Servicing: | Vendor/Facility: | | | | Phone #: | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization:   /  /   to   /  / | | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Gestational trophoblastic disease by imaging

1. Choose one: [12, 13, 14]
   ☐ A) Noninvasive hydatidiform mole by imaging
   ☐ B) Gestational trophoblastic neoplasia by testing [15]
   ☐ C) Other clinical information (add comment)

   > • If option B selected, then the rule is satisfied; you may stop here  [16]
   > • If option A selected, then go to question 2
   > • No other options lead to the requested service

2. Childbearing desired
   ☐ A) Yes
   ☐ B) No

   > • If option No selected, then the rule is satisfied; you may stop here  [16]
   > • No other options lead to the requested service

**Reference**

> **Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.
> **2nd** - Secondary review required. Criteria cannot be met.
> *Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

EXHIBIT
21

DHHRBMS001079

InterQual®                                                    **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral
Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Gestational Trophoblastic
disease

---

## Notes:

**1:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**
Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**
Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**
Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001080

**JA2352**

InterQual®                                                     2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Gestational Trophoblastic disease

---

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001081

InterQual®                                                          **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Gestational Trophoblastic disease

---

**12:**
The primary treatment option for hydatidiform mole is dilatation and curettage (D & C) for women who wish to preserve fertility. Hysterectomy is an alternative for older women or for those who do not wish to maintain fertility (Abu-Rustum et al., J Natl Compr Canc Netw 2019, 17: 1374-91). Post treatment HCG monitoring is indicated until levels return to normal. Postmolar gestational trophoblastic neoplasm is primarily diagnosed by HCG monitoring. Repeat D & C or hysterectomy can be considered (Abu-Rustum et al., J Natl Compr Canc Netw 2019, 17: 1374-91).

**13:**
Elevated HCG is present in all forms of gestational trophoblastic disease. Imaging, primarily transvaginal or abdominal ultrasound, is indicated during the initial diagnosis, staging, and risk assessment (Dudiak et al., J Am Coll Radiol 2019, 16: S348-s63).

**14:**
Staging and prognosis are combined in the international Federation of Gynecology and Obstetrics staging system. This system takes into account anatomic staging along with patient age, type of antecedent pregnancy, interval from gestational event, HCG, number and site of metastases, largest tumor, and previous chemotherapy to further develop a treatment plan (Abu-Rustum et al., J Natl Compr Canc Netw 2019, 17: 1374-91; Dudiak et al., J Am Coll Radiol 2019, 16: S348-s63). Staging is based on the location of the tumor and extent of metastasis: a stage I tumor is confined to the uterus, stage II involves other genital structures (e.g., ovary, tube, vagina, broad ligaments), stage III involves lung metastasis, and stage VI includes all other distant metastases (Abu-Rustum et al., J Natl Compr Canc Netw 2019, 17: 1374-91).

**15:**
While hydatidiform mole and choriocarcinoma typically develop from villous trophoblast, intermediate trophoblastic tumors (e.g., epithelioid and placental site trophoblastic tumors) may develop from extravillous trophoblast. These are relatively chemotherapy resistant; therefore, hysterectomy with lymph node dissection is preferred for localized disease (Abu-Rustum et al., J Natl Compr Canc Netw 2019, 17: 1374-91).

**16:**
 I/O Setting:
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient

DHHRBMS001082

**InterQual®**                                      **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral**
**Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Gestational Trophoblastic**
**disease**

---

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT70ZZ, 0UT74ZZ, 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTF0ZZ, 0UTF4ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58550, 58552, 58553, 58554, 58570, 58571, 58572, 58573, Other _____

DHHRBMS001083

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:** Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11]

**Requested Service:** Hysterectomy +/- BSO or Bilateral Salpingectomy for Postpartum uterine bleeding
**Age:** Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | |
| | NPI/ID #: | | Signature: | | | Date: | |
| Servicing: | Vendor/Facility: | | | | Phone #: | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization: | / / to / / | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Postpartum uterine bleeding ≤ 24 hours post delivery (urgent)

1. Choose all that apply: [12]
   ☐ A) Vaginal or vulvar or cervical laceration excluded by physical examination
   ☐ B) Uterine rupture excluded by physical examination or ultrasound [13]
   ☐ C) Failure of vigorous uterine massage to control bleeding
   ☐ D) Unsuccessful manual extraction of the placenta or manual extraction not indicated
   ☐ E) Dilatation and curettage (D&C) performed
   ☐ F) Unsuccessful balloon tamponade
   ☐ G) Other clinical information (add comment)

> • If the number of options selected is 6 and option G not selected, then go to question 2
> • No other options lead to the requested service

2. Choose all that apply: [14]
   ☐ A) Pitocin
   ☐ B) Methergine
   ☐ C) Prostaglandin
   ☐ D) Other clinical information (add comment)

> • If 2 or more options A, B or C selected and option D not selected, then go to question 3
> • No other options lead to the requested service



EXHIBIT
22

InterQual®                                    **2021, Oct. 2021 Release CP:Procedures**

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Postpartum uterine bleeding**

*Postpartum uterine bleeding ≤ 24 hours post delivery (urgent) (continued...)*

3. Continued bleeding after treatment
- ☐ A) Yes
- ☐ B) No

- If option Yes selected, then the rule is satisfied; you may stop here [15]
- No other options lead to the requested service

## Reference

`Ltd` - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

`2nd` - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

DHHRBMS001085

InterQual®                                                    **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral
Salpingectomy**
Hysterectomy +/- BSO or Bilateral Salpingectomy for Postpartum uterine bleeding

---

## Notes:

**1:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**
Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**
Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**
Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001086

**JA2358**

InterQual®                                                        2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Postpartum uterine bleeding**

---

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001087

InterQual®                                                    **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral**
**Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Postpartum uterine bleeding**

---

**12:**
Uterine massage, manual extraction of the placenta, uterine curettage, repair of any genital lacerations, and balloon tamponade are all techniques that are used to manage postpartum hemorrhage (American College of Obstetricians and Gynecologists, Obstet Gynecol 2017, 130: e168-e86. Reaffirmed 2019). Additional interventions that may be considered if the patient is stable include arterial ligation or embolization (American College of Obstetricians and Gynecologists, Obstet Gynecol 2017, 130: e168-e86. Reaffirmed 2019; Abdul-Kadir et al., Transfusion 2014, 54: 1756-68).

**13:**
Uterine rupture is defined as a disruption in the continuity of the uterine wall and the overlying visceral peritoneum. Uterine rupture may be associated with clinically significant uterine bleeding, fetal distress, or protrusion of the fetus or placenta into the abdominal cavity and results in a need for urgent cesarean delivery, uterine repair, or hysterectomy.

**14:**
Uterine atony is the most common cause of postpartum hemorrhage. It can be managed in most cases with intravenous, intramyometrial, intramuscular, or rectal uterotonic medications (e.g., pitocin, methergine, prostaglandin) which induce contractions and increase uterine muscle tone. The antifibrinolytic agent tranexamic acid may be another pharmacological option (American College of Obstetricians and Gynecologists, Obstet Gynecol 2017, 130: e168-e86. Reaffirmed 2019; Abdul-Kadir et al., Transfusion 2014, 54: 1756-68). Recombinant human factor VIIa may be effective in treating postpartum hemorrhage that does not improve with uterotonics (Lavigne-Lissalde et al., Journal of thrombosis and haemostasis: JTH 2015, 13: 520-9). It remains unclear as to the most effective fertility sparing treatment for postpartum hemorrhage that does not respond to uterotonics (American College of Obstetricians and Gynecologists, Obstet Gynecol 2017, 130: e168-e86. Reaffirmed 2019; Doumouchtsis et al., BJOG: an international journal of obstetrics and gynaecology 2014, 121: 382-8; Mousa et al., The Cochrane database of systematic reviews 2014, 2: CD003249).

**15:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient

DHHRBMS001088

**InterQual®**

**2021, Oct. 2021 Release CP:Procedures**

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Postpartum uterine bleeding

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT70ZZ, 0UT90ZL, 0UT90ZZ, 0UTC0ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58180, Other _____

DHHRBMS001089

**JA2361**

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**   Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11]

**Requested Service:**   Hysterectomy +/- BSO or Bilateral Salpingectomy for Uterine prolapse

**Age:**   Age ≥ 18

| Patient: | Name: | | DOB: | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | |
| | NPI/ID #: | | Signature: | | | Date: |
| Servicing: | Vendor/Facility: | | | Phone #: | | |
| | Diagnosis/ICD: | | Service Date: | Authorization: | / / to | / / |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Uterine prolapse

    1. Uterine prolapse by physical examination, Choose one: [12]
       ☐ A) Stage II or Grade 2
       ☐ B) Stage III or Grade 3
       ☐ C) Stage IV or Grade 4
       ☐ D) Other clinical information (add comment)

       | • If option A, B or C selected, then go to question 2 |
       • No other options lead to the requested service

    2. Choose all that apply: [13]
       ☐ A) Pelvic pressure by history
       ☐ B) Pelvic pain by history
       ☐ C) Stress incontinence by history
       ☐ D) Ulceration with bleeding or spotting by physical examination
       ☐ E) Vaginal splinting [14]
       ☐ F) Sexual dysfunction or dyspareunia or coital incontinence
       ☐ G) Other clinical information (add comment)



       • If 1 or more options A, B, C, D, E or F selected and option G not selected, then go to question 3
       • No other options lead to the requested service

DHHRBMS001090



**InterQual®**                                                    **2021, Oct. 2021 Release CP:Procedures**

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Uterine prolapse**

*Uterine prolapse (continued...)*

3. Choose all that apply:
   ☐ A) Most recent cervical cytology normal or managed per guidelines [15]
   ☐ B) Pregnancy excluded by negative HCG or HCG planned prior to procedure or sterilization by history or patient not sexually active by history [16, 17, 18, 19]
   ☐ C) Other clinical information (add comment)

   > • If the number of options selected is 2 and option C not selected, then the rule is satisfied; you may stop here [20]
   >
   > • No other options lead to the requested service

**Reference**

`Ltd` - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

`2nd` - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

DHHRBMS001091

InterQual®                                                  2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Uterine prolapse**

## Notes:

**1:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**
Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**
Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**
Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001092

**JA2364**

InterQual®                                                   2021, Oct. 2021 Release CP:Procedures
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Uterine prolapse

---

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001093

InterQual®                                                2021, Oct. 2021 Release CP:Procedures
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral**
**Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Uterine prolapse**

---

**12:**
There are multiple methods of measuring or evaluating pelvic organ prolapse. Two commonly used systems are the Baden-Walker system (grades 0 to 4) and pelvic organ prolapse-quantification (pelvic organ prolapse-Q stages 0 to IV). These systems measure the most distal portion of the prolapse during straining or a Valsalva maneuver. The Braden-Walker method is a clinical measurement of the 3 pelvic compartments. The pelvic organ prolapse-Q system is more complex and involves taking several measurements (American College Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2019, 134: e126-e42).
Braden-Walker system:
Grade 0 - Normal position, no prolapse
Grade 1 - Halfway decent to the hymen
Grade 2 - Descent to the hymen
Grade 3 - Descent halfway past the hymen
Grade 4 - Maximal possible descent for each site
Pelvic organ prolapse-quantification system:
Stage 0 - No prolapse
Stage I - > 1 cm above the hymen
Stage II - ≤ 1 cm proximal or distal to the plane of the hymen
Stage III - > 1 cm below the plane of the hymen but no further than 2 cm less than the total vaginal length
Stage IV - Complete eversion of the lower genital tract

**13:**
Treatment is only needed if the prolapse is causing symptoms related to bulging, pressure, sexual dysfunction, lower urinary tract dysfunction, or dysfunctional defecation. Symptoms are experienced by most women when the pelvic organ prolapse is at stage II, grade 2, or higher. Symptoms may be experienced by women who have stage I or grade 1 prolapse but are less common and surgery is rarely needed for that lower stage or grade (Committee on Practice Bulletins-Gynecology, Obstet Gynecol 2017, 130: e234-e50).

**14:**
Def: With vaginal splinting, the woman must place at least one finger in the vagina to assist a bowel movement.

**15:**
Cervical cytology should be evaluated according to current screening protocols. Screening intervals and tests used (cervical cytology alone, high-risk human papillomavirus [hrHPV] testing alone, hrHPV and cytology together [co-testing]) will vary based on patient's age and risk factors. If the most recent cervical cytology is documented as normal, no further testing is needed. Any abnormalities detected during cervical cancer screening should be managed according to current guidelines. Management may include repeat testing, observation, surveillance, biopsy, ablation, or excisional treatment based on the identified level of risk for each patient (Redman et al., Eur J Obstet Gynecol Reprod Biol 2021, 256: 57-62; Perkins et al., J Low Genit Tract Dis 2020, 24: 102-31; US Preventative Services Task Force et al., JAMA 2018, 320: 674-86; Wentzensen et al., J Low Genit Tract Dis 2017, 21: 216-22).

**16:**
Pregnancy and related complications (e.g., ectopic pregnancy, incomplete abortion, inevitable abortion) must be excluded before performing this procedure.

**17:**
Pregnancy testing can be performed by measurement of either a serum or urine HCG and may be documented in the medical record by either the PCP, a gynecologist, or a surgeon.

**18:**
The documentation should include a history of sterilization (i.e., tubal ligation) without a subsequent pregnancy. These criteria do not include sterilization of a partner or alternate birth control methods (e.g., oral contraceptive pill use, intrauterine device insertion).

**19:**
Patients have varying definitions of sexual activity (e.g., number of partners, timing of most recent episode, frequency of sexual activity). Unless the provider can confirm on examination that the patient has never had sexual intercourse, whether a patient is sexually active or not is a matter of clinical judgment.

DHHRBMS001094

**InterQual®**                                                    **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral**
**Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Uterine prolapse**

**20:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy -
Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral
Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy -
Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy -
Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in
practice, this procedure can be performed in the inpatient or outpatient setting

DHHRBMS001095

**JA2367**

**InterQual®**

**2021, Oct. 2021 Release CP:Procedures**

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Uterine prolapse**

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT27ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT77ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UT97ZL, 0UT97ZZ, 0UT98ZL, 0UT98ZZ, 0UT9FZL, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC7ZZ, 0UTC8ZZ, 0UTF0ZZ, 0UTF4ZZ, 0UTF7ZZ, 0UTF8ZZ, Other _____

**CPT® (circle all that apply):** 58180, 58260, 58262, 58263, 58270, 58290, 58291, 58292, 58294, 58541, 58542, 58543, 58544, 58550, 58552, 58553, 58554, 58570, 58571, 58572, 58573, Other _____

DHHRBMS001096

**JA2368**

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**   Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11]

**Requested Service:**   Hysterectomy +/- BSO or Bilateral Salpingectomy for Pelvic inflammatory disease (PID) or Tubo-ovarian abscess (TOA)

**Age:**   Age ≥ 18

| Patient: | Name: | | DOB: | | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | | |
| | NPI/ID #: | | Signature: | | | Date: | |
| Servicing: | Vendor/Facility: | | | | Phone #: | | |
| | Diagnosis/ICD: | | Service Date: | | Authorization: | / / to / / | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Choose one of the following options and continue to the appropriate section

☐ 10. Chronic pelvic inflammatory disease (PID)
☐ 20. Tubo-ovarian abscess (TOA) by imaging

☐ 10. Chronic pelvic inflammatory disease (PID)

   1. Choose all that apply:
     ☐ A) Pelvic pain
     ☐ B) Acute pelvic inflammatory disease (PID) ≥ 2 episodes by history and physical examination
     ☐ C) Infection documented ≥ 1 episode by positive culture
     ☐ D) Most recent cervical cytology normal or managed per guidelines [12]
     ☐ E) Human chorionic gonadotropin (HCG) negative or HCG planned prior to procedure [13, 14]
     ☐ F) Other clinical information (add comment)

> • If the number of options selected is 5 and option F not selected, then the rule is satisfied; you may stop here [15]
> • No other options lead to the requested service

☐ 20. Tubo-ovarian abscess (TOA) by imaging



DHHRBMS001097

**JA2369**

**InterQual®**                                                      **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral**
**Salpingectomy**
Hysterectomy +/- BSO or Bilateral Salpingectomy for Pelvic inflammatory disease
(PID) or Tubo-ovarian abscess (TOA)

---

*Tubo-ovarian abscess (TOA) by imaging (continued...)*

1. Ectopic pregnancy excluded by negative HCG [14]
   ☐ A) Yes
   ☐ B) No

   | |
   |---|
   | • If option Yes selected, then go to question 2<br>• No other options lead to the requested service |

2. Choose all that apply:
   ☐ A) Pelvic pain
   ☐ B) Abdominal tenderness
   ☐ C) Persistent adnexal mass
   ☐ D) Temperature > 100.4 F (38.0 C)
   ☐ E) WBC > normal
   ☐ F) Other clinical information (add comment)

   | |
   |---|
   | • If 1 or more options A, B, C, D or E selected and option F not selected, then go to question 3<br>• No other options lead to the requested service |

3. Worsening symptoms during IV antibiotic treatment [16]
   ☐ A) Yes
   ☐ B) No

   | |
   |---|
   | • If option Yes selected, then the rule is satisfied; you may stop here [15]<br>• No other options lead to the requested service |

---

**Reference**

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

DHHRBMS001098

**JA2370**

InterQual®                                                    **2021, Oct. 2021 Release CP:Procedures**

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Pelvic inflammatory disease (PID) or Tubo-ovarian abscess (TOA)

---

## Notes:

**1:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**
Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**
Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**
Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001099

InterQual®                                                    2021, Oct. 2021 Release CP:Procedures

## Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

### Hysterectomy +/- BSO or Bilateral Salpingectomy for Pelvic inflammatory disease (PID) or Tubo-ovarian abscess (TOA)

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001100

**InterQual®**  **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- BSO or Bilateral Salpingectomy for Pelvic inflammatory disease (PID) or Tubo-ovarian abscess (TOA)**

---

**12:**
Cervical cytology should be evaluated according to current screening protocols. Screening intervals and tests used (cervical cytology alone, high-risk human papillomavirus [hrHPV] testing alone, hrHPV and cytology together [co-testing]) will vary based on patient's age and risk factors. If the most recent cervical cytology is documented as normal, no further testing is needed. Any abnormalities detected during cervical cancer screening should be managed according to current guidelines. Management may include repeat testing, observation, surveillance, biopsy, ablation, or excisional treatment based on the identified level of risk for each patient (Redman et al., Eur J Obstet Gynecol Reprod Biol 2021, 256: 57-62; Perkins et al., J Low Genit Tract Dis 2020, 24: 102-31; US Preventative Services Task Force et al., JAMA 2018, 320: 674-86; Wentzensen et al., J Low Genit Tract Dis 2017, 21: 216-22).

**13:**
Pregnancy and related complications (e.g., ectopic pregnancy, incomplete abortion, inevitable abortion) must be excluded before performing this procedure.

**14:**
Pregnancy testing can be performed by measurement of either a serum or urine HCG and may be documented in the medical record by either the PCP, a gynecologist, or a surgeon.

**15:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- BSO or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- BSO or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- BSO or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- BSO or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- BSO or Bilateral Salpingectomy - Outpatient

**16:**
A course of antibiotic therapy should be tried before determining if an oophorectomy is necessary. Nonresponders who have persistent pain, fever, or leukocytosis may need surgical intervention (Rosen et al., Obstet Gynecol Surv 2009, 64: 681-9). Factors that predict the need for intervention beyond antibiotic therapy include large abscess size, high white blood cell count, older age, and increased parity (Greenstein et al., The Journal of reproductive medicine 2013, 58: 101-6).

DHHRBMS001101

**InterQual®**                                                     **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- BSO or Bilateral Salpingectomy for Pelvic inflammatory disease
(PID) or Tubo-ovarian abscess (TOA)

---

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UT98ZL, 0UT98ZZ, 0UT9FZL, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58180, 58541, 58542, 58543, 58544, 58550, 58552, 58553, 58554, 58570, 58571, 58572, 58573, 58575, Other _____

DHHRBMS001102

JA2374

InterQual®

## 2021, Oct. 2021 Release CP:Procedures

**Subset:**   Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy (1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11)

**Requested Service:**   Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis
**Age:**   Age ≥ 18

| Patient: | Name: | | DOB: | ID #: | | GROUP #: |
|---|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | Weight: | | |
| Provider/PCP: | Name: | | Fax #: | | Phone #: | |
| | NPI/ID #: | | Signature: | | | Date: |
| Servicing: | Vendor/Facility: | | | | Phone #: | |
| | Diagnosis/ICD: | | Service Date: | | Authorization:   /  /   to   /  / | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Endometriosis by laparoscopy

   1. Treatment within last year, Choose all that apply:
     ☐ A) GnRH agonist ≥ 8 weeks (12)
     ☐ B) Hormone therapy ≥ 8 weeks (13)
     ☐ C) Danazol ≥ 8 weeks (14)
     ☐ D) Other clinical information (add comment)

> • If 1 or more options A, B or C selected and option D not selected, then go to question 2
> • No other options lead to the requested service

   2. Continued symptoms after treatment (15)
     ☐ A) Yes
     ☐ B) No

> • If option Yes selected, then go to question 3
> • No other options lead to the requested service



EXHIBIT
25

DHHRBMS001103

**JA2375**

InterQual®                                                   **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral**
**Salpingectomy**
**Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis**

*Endometriosis by laparoscopy (continued...)*

3. Choose all that apply:
   ☐ A) Most recent cervical cytology normal or managed per guidelines [16]
   ☐ B) Pregnancy excluded by negative HCG or HCG planned prior to procedure or sterilization by history or patient not sexually active by history [17, 18, 19, 20]
   ☐ C) Other clinical information (add comment)

   • If the number of options selected is 2 and option C not selected, then the rule is satisfied; you may stop here [21]

   • No other options lead to the requested service

**Reference**

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

DHHRBMS001104

**JA2376**

InterQual®                                                   **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis

## Notes:

**1:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**2:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**
Whether to perform prophylactic oophorectomy at the time of hysterectomy done for benign disease in premenopausal women may be considered. There are no published randomized studies to support conservation or prophylactic removal of the ovaries, although observational studies suggest that surgical menopause may increase cardiovascular and overall mortality risk (Orozco et al., The Cochrane database of systematic reviews 2014, 7: CD005638). Generally, bilateral salpingo-oophorectomy (BSO) is recommended for women with BRCA1 or BRCA2 mutations or Lynch syndrome, for postmenopausal women, and for women who have invasive endometrial or ovarian carcinoma (National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: breast and ovarian (Version 3.2019). 2019; National Comprehensive Cancer Network, The NCCN clinical practice guidelines in oncology, genetic/familial high-risk assessment: colorectal (Version 3.2019). 2019). BSO may also be considered in women who have chronic pelvic pain, pelvic inflammatory disease, or endometriosis, although the risks of surgery should be balanced against the anticipated benefits. Ovarian retention should be considered for premenopausal women who do not have a genetic predisposition to ovarian cancer. Ovarian epithelial carcinoma may originate in cells from the fallopian tube. Therefore, salpingectomy without oophorectomy may be considered in low-risk women who undergo hysterectomy or other pelvic surgery for benign disease, which reduces the risk of ovarian cancer without the development of surgical menopause (American College of Obstetricians and Gynecologists, Obstet Gynecol 2019, 133: e279-e84; Society of Gynecologic Oncology, SGO Clinical Practice Statement: Salpingectomy for Ovarian Cancer Prevention 2013).

**4:**
Although robotic-assisted hysterectomy is being done, there are few prospective studies comparing robotic assisted to laparoscopic surgery for treating benign disease (ACOG, Obstetrics and Gynecology Committee Opinion No. 628. 2015, 125: 760-7. Reaffirmed 2017; Yu et al., Journal of surgical oncology 2013, 107: 653-8). A Cochrane review, however, demonstrated that robotic-assisted gynecologic surgery required more intraoperative time but reduced hospital stay when compared to laparoscopic surgery. There is no clear evidence to determine which surgery has the lowest complication rate (Liu et al., The Cochrane database of systematic reviews 2014, 12: CD011422). Robotic-assisted surgery can be performed as an outpatient surgery in some patients (Lawrie et al., Cochrane Database Syst Rev 2019, 4: Cd011422).

**5:**
Total laparoscopic hysterectomy (TLH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are then secured by the endoscopic route. The fundus is then divided and removed through the abdominal wall incisions.

DHHRBMS001105

**JA2377**

InterQual®                                                      2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis**

**6:**
Vaginal hysterectomy offers many advantages to the abdominal or laparoscopic approach including no abdominal incision, less pain, and quicker recovery; if technically feasible, it is the preferred surgical route (American College of Obstetricians and Gynecologists (ACOG), Obstet Gynecol 2017, 129: e155-e9; Sesti et al., Archives of Gynecology and Obstetrics 2014, 290: 485-91). The vaginal technique, however, can be limited in its ability to treat ovarian pathology in large uteri. The preoperative use of GnRH agonists may help shrink large uteri so that a vaginal hysterectomy can be performed (Elzaher et al., European Journal of Obstetrics, Gynecology, and Reproductive Biology 2013, 169: 326-30). Vaginal hysterectomy may be difficult to perform in nulliparous women, obese women, and women with a history of cesarean delivery.

**7:**
These criteria include the following procedures:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

**8:**
Laparoscopically assisted vaginal hysterectomy (LAVH) is performed by mobilization of the uterus and its upper pedicles laparoscopically; the uterine vessels are not secured by the endoscopic route. A vaginal hysterectomy is then performed.

**9:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting

**10:**
For cervical cancer stage I-IIA and endometrial cancer stage II, see the "Hysterectomy, Radical" criteria subset.

**11:**
Supracervical hysterectomy (subtotal hysterectomy) performed as an open or laparoscopic procedure has been thought to preserve sexual, bladder, and bowel function by minimizing disruption of the pelvic floor support and neurovascular supply when compared with total hysterectomy. However, there is inconsistent evidence to show there is an improvement or significant difference in surgical complications, incontinence rate, bladder function, or sexual function when subtotal hysterectomy is compared to total hysterectomy (Lethaby et al., Cochrane Database Syst Rev 2012, 4: CD004993). One 5-year follow-up study of a randomized controlled trial, however, did show higher rates of urinary incontinence and vaginal bleeding in women who had a supracervical hysterectomy compared with those who had a total hysterectomy (Andersen et al., BJOG: An International Journal of Obstetrics and Gynaecology 2015, 122: 851-7). Disadvantages of supracervical hysterectomy include cervical stump complications (e.g., bleeding, pain) and the small risk of developing cervical cancer in the cervical stump (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013). Supracervical hysterectomy may not be appropriate in women who have gynecological cancers, endometrial hyperplasia, or cervical dysplasia (ACOG, Obstet Gynecol 2007 Committee Opinion No. 388; 110(5): 1215-1217. Reaffirmed, 2013).

DHHRBMS001106

InterQual®                                                              2021, Oct. 2021 Release CP:Procedures

**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy**

**Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis**

---

**12:**
The GnRH agonists include leuprolide, nafarelin, and goserelin. These compounds mimic the action of GnRH and, thereby, suppress the hormones produced by the ovary that stimulate endometrial growth.

**13:**
Medical therapy to treat symptoms of endometriosis may include combined contraceptive or progestin alone; their use is considered a first-line option (Brown and Farquhar, The Cochrane database of systematic reviews 2014, 3: CD009590). Depot medroxyprogesterone acetate, the progestin contraceptive implant, and the levonorgestrel intra-uterine system may also improve pain due to endometriosis (ACOG, Obstetrics and gynecology Practice Bulletin No. 110. 2010, 115: 206-218. Reaffirmed 2018).

**14:**
If symptoms do not respond to an oral contraceptive pill or GnRH agonist, then treatment with danazol or a progestin (e.g., depot medroxyprogesterone) is appropriate (Brown and Farquhar, Cochrane Database Syst Rev 2014: Cd009590).

**15:**
Symptoms of endometriosis include chronic recurrent pelvic pain, dysmenorrhea, infertility, and dyspareunia.

**16:**
Cervical cytology should be evaluated according to current screening protocols. Screening intervals and tests used (cervical cytology alone, high-risk human papillomavirus [hrHPV] testing alone, hrHPV and cytology together [co-testing]) will vary based on patient's age and risk factors. If the most recent cervical cytology is documented as normal, no further testing is needed. Any abnormalities detected during cervical cancer screening should be managed according to current guidelines. Management may include repeat testing, observation, surveillance, biopsy, ablation, or excisional treatment based on the identified level of risk for each patient (Redman et al., Eur J Obstet Gynecol Reprod Biol 2021, 256: 57-62; Perkins et al., J Low Genit Tract Dis 2020, 24: 102-31; US Preventative Services Task Force et al., JAMA 2018, 320: 674-86; Wentzensen et al., J Low Genit Tract Dis 2017, 21: 216-22).

**17:**
Pregnancy and related complications (e.g., ectopic pregnancy, incomplete abortion, inevitable abortion) must be excluded before performing this procedure.

**18:**
Pregnancy testing can be performed by measurement of either a serum or urine HCG and may be documented in the medical record by either the PCP, a gynecologist, or a surgeon.

**19:**
The documentation should include a history of sterilization (i.e., tubal ligation) without a subsequent pregnancy. These criteria do not include sterilization of a partner or alternate birth control methods (e.g., oral contraceptive pill use, intrauterine device insertion).

**20:**
Patients have varying definitions of sexual activity (e.g., number of partners, timing of most recent episode, frequency of sexual activity). Unless the provider can confirm on examination that the patient has never had sexual intercourse, whether a patient is sexually active or not is a matter of clinical judgment.

**21:**
I/O Setting:
Hysterectomy, Abdominal, Supracervical +/- Bilateral Salpingo-oophorectomy (BSO) - Inpatient
Hysterectomy, Abdominal, Total +/- Bilateral Salpingo-oophorectomy (BSO) - Inpatient
Hysterectomy, Laparoscopically Assisted Vaginal (LAVH) +/- Bilateral Salpingo-oophorectomy (BSO) - Due to variations in practice, this procedure can be performed in the inpatient or outpatient setting
Hysterectomy, Laparoscopic, Supracervical +/-Bilateral Salpingo-oophorectomy (BSO) - Outpatient
Hysterectomy, Laparoscopic, Total (TLH) +/- Bilateral Salpingo-oophorectomy (BSO) - Outpatient
Hysterectomy, Vaginal +/- Bilateral Salpingo-oophorectomy (BSO) - Due to variations in practice, this procedure can

DHHRBMS001107

**JA2379**

**InterQual®**                                    **2021, Oct. 2021 Release CP:Procedures**
**Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral**
**Salpingectomy**
**Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis**

be performed in the inpatient or outpatient setting

DHHRBMS001108

**InterQual®**

**2021, Oct. 2021 Release CP:Procedures**

### Hysterectomy, +/- Bilateral Salpingo-Oophorectomy (BSO) or Bilateral Salpingectomy

#### Hysterectomy +/- Salpingo-Oophorectomy or Salpingectomy for Endometriosis

---

**ICD-10-CM (circle all that apply):** C54.0, C54.1, C54.2, C54.3, C54.8, C54.9, C56.1, C56.2, C56.3, C56.9, C57.00, C57.01, C57.02, C79.82, D06.0, D06.1, D06.7, D06.9, D25.0, D25.1, D25.2, D25.9, N70.01, N70.02, N70.03, N70.11, N70.12, N70.13, N70.91, N70.92, N70.93, N71.1, N71.9, N72, N73.1, N73.4, N73.8, N73.9, N80.0, N80.1, N80.2, N80.3, N80.4, N80.5, N80.6, N80.8, N80.9, N81.2, N81.3, N81.4, N85.00, N85.01, N85.02, N87.0, N87.1, N87.9, N92.1, N92.4, N92.5, N93.0, N93.1, N93.8, N93.9, N95.0, O01.0, O01.1, O01.9, O72.0, O72.1, O72.2, O72.3, R10.10, R10.11, R10.12, R10.13, R10.2, R10.30, R10.31, R10.32, R10.33, R10.811, R10.812, R10.813, R10.814, R10.815, R10.816, R10.817, R10.819, R10.821, R10.822, R10.823, R10.824, R10.825, R10.826, R10.827, R10.829, R10.83, R10.84, R10.9, R19.00, R19.01, R19.02, R19.03, R19.04, R19.05, R19.06, R19.07, R19.09, R93.5, Z14.8, Z15.01, Z15.02, Z15.04, Z15.09, Z15.89, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT27ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT77ZZ, 0UT78ZZ, 0UT7FZZ, 0UT90ZL, 0UT90ZZ, 0UT94ZL, 0UT94ZZ, 0UT97ZL, 0UT97ZZ, 0UT98ZL, 0UT98ZZ, 0UT9FZL, 0UT9FZZ, 0UTC0ZZ, 0UTC4ZZ, 0UTC7ZZ, 0UTC8ZZ, Other _____

**CPT® (circle all that apply):** 58150, 58152, 58180, 58260, 58262, 58263, 58290, 58291, 58292, 58541, 58542, 58543, 58544, 58550, 58552, 58553, 58554, 58570, 58571, 58572, 58573, 58575, Other _____

DHHRBMS001109

InterQual®

**2021, Oct. 2021 Release CP:Procedures**

**Subset:**   Salpingo-Oophorectomy, Bilateral or Oophorectomy, Bilateral [1, 2, 3]

**Requested Service:**   Salpingectomy-Oophorectomy, Bilateral

**Age:**   Age ≥ 18

| Patient: | Name: | DOB: | ID #: | GROUP #: |
|---|---|---|---|---|
| | Sex (circle): M / F | Height: | Weight: | |
| Provider/PCP: | Name: | Fax #: | Phone #: | |
| | NPI/ID #: | Signature: | | Date: |
| Servicing: | Vendor/Facility: | | Phone #: | |
| | Diagnosis/ICD: | Service Date: | Authorization:   /  /   to   /  / | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Stage IB ovarian cancer

    There are no questions for the requested service

**Reference**

    **Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

    **2nd** - Secondary review required. Criteria cannot be met.

    *Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).



EXHIBIT
26

**JA2382**

InterQual®                                                                  2021, Oct. 2021 Release CP:Procedures
**Salpingo-Oophorectomy, Bilateral or Oophorectomy, Bilateral**
**Salpingectomy-Oophorectomy, Bilateral**

## Notes:

**1:**

Emerging data suggest that ovarian epithelial carcinoma may originate in cells from the fallopian tube, not just the ovaries. Therefore, prophylactic salpingectomy may reduce the risk of ovarian cancer, and can be considered in women who undergo hysterectomy or other pelvic surgery for benign disease. Salpingectomy without oophorectomy allows for ovarian cancer risk reduction without the development of surgical menopause (American College of Obstetrics and Gynecologists, Obstet Gynecol 2019, 133: e279-e84). For criteria for prophylactic salpingectomy, see the "Salpingectomy" criteria subset.

**2:**

InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**3:**

InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**JA2383**

InterQual®                                                    2021, Oct. 2021 Release CP:Procedures
**Salpingo-Oophorectomy, Bilateral or Oophorectomy, Bilateral**
**Salpingectomy-Oophorectomy, Bilateral**

---

**ICD-10-CM (circle all that apply):** C56.1, C56.2, C56.3, C56.9, N80.1, N80.2, N80.8, N80.9, Z15.01, Z15.02, Z15.09, Z80.3, Z80.41, Other _____

**ICD-10-PCS (circle all that apply):** 0UT20ZZ, 0UT24ZZ, 0UT27ZZ, 0UT28ZZ, 0UT2FZZ, 0UT70ZZ, 0UT74ZZ, 0UT77ZZ, 0UT78ZZ, 0UT7FZZ, Other _____

**CPT® (circle all that apply):** 58661, 58720, 58950, Other _____

---

**JA2384**



2012.2 Procedures Adult Criteria
Breast Reconstruction

# 2012.2 Procedures Adult Criteria

## Breast Reconstruction[1, 2, 3]

| PATIENT: | Name | | D.O.B. | | ID# | | GROUP# | |
|---|---|---|---|---|---|---|---|---|
| CPT®/ICD: | Code | | Facility | | Service Date | | | |
| PROVIDER: | Name | | | | ID# | | Phone# | |
| | Signature | | | | Date | | | |

ICD-9:

ICD-10:

CPT®:

INDICATIONS (choose one and see below)

☐ 100   Reconstruction post mastectomy
☐ 200   Reconstruction post partial mastectomy/lumpectomy
☐ 300   Reconstruction of contralateral breast post mastectomy
☐ Indication Not Listed (Provide clinical justification below)

☐ 100   Reconstruction post mastectomy **[One]**[4]
    ☐ 110   Immediate reconstruction at time of mastectomy
    ☐ 120   Delayed reconstruction with clear margins by pathology

☐ 200   Reconstruction post partial mastectomy/lumpectomy **[One]**[5]
    ☐ 210   Immediate reconstruction at time of partial mastectomy/lumpectomy
    ☐ 220   Delayed reconstruction **[Both]**
        ☐ 221   With clear margins by pathology
        ☐ 222   Adjuvant Rx completed[6]

☐ 300   Reconstruction of contralateral breast post mastectomy[7*RIN, 8]



EXHIBIT
50

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested.  IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you.  Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries.  IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions.  IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services.  All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider.  InterQual® and InterQual® Review Manager © 2012-2019 Change Healthcare LLC and/or one of its subsidiaries.  All Rights Reserved.  CPT only © 2011 American Medical Association.  All Rights Reserved.

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

DHHRBMS002754

**JA2385**



## Notes

**(1)**
Implant/Tissue Expander - Outpatient
Autologous Tissue Reconstruction - Inpatient

**(2)**
There are many procedures for breast reconstruction after mastectomy including reconstruction using tissue expanders and implants (either saline or silicone), autologous tissue reconstruction (e.g., pedicle or free flaps of the transverse rectus abdominal muscle, latissimus dorsi muscle), or an autologous flap and breast implant combination (Fernandez-Frias et al., J Am Coll Surg 2009; 208(1): 126-133; Hu and Alderman, Surg Clin North Am 2007; 87(2): 453-467, x). These criteria do not specify the type of procedure. Which procedure to perform is a matter of clinical judgement.

**(3)**
Chronic conditions that should be assessed prior to reconstructive surgery that are significant risk factors include obesity, nicotine use, diabetes, and chronic obstructive pulmonary disease (Hu and Alderman, Surg Clin North Am 2007; 87(2): 453-467, x).

**(4)**
There is not consensus or specific guidelines regarding the choice of immediate versus delayed breast reconstruction after a mastectomy (Fernandez-Frias et al., J Am Coll Surg 2009; 208(1): 126-133).

**(5)**
While breast reconstruction surgery post partial mastectomy or lumpectomy is uncommon, surgery such as a local perforator flap may be necessary in the smaller breasted woman to achieve symmetry.

**(6)**
Adjuvant therapy may consist of radiation or chemotherapy.

**(7)-RIN:**
**For reduction mammoplasty, see the "Reduction Mammoplasty, Female" criteria subset.**

**(8)**
Contralateral breast surgery may be necessary to achieve symmetry. These procedures may include reduction mammoplasty, augmentation, or mastopexy.

DHHRBMS002755

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

**JA2386**



2012.2 Procedures Adult Criteria
Breast Reconstruction

**ICD-9:** 85.50, 85.53, 85.54, 85.70, 85.71, 85.72, 85.73, 85.74, 85.75, 85.76, 85.79, 85.84, 85.85

**ICD-10-PCS:** 0H0T07Z, 0H0T0JZ, 0H0T0KZ, 0H0T37Z, 0H0T3JZ, 0H0T3KZ, 0H0TX7Z, 0H0TXJZ, 0H0TXKZ, 0H0U07Z, 0H0U0JZ, 0H0U0KZ, 0H0U37Z, 0H0U3JZ, 0H0U3KZ, 0H0UX7Z, 0H0UXJZ, 0H0UXKZ, 0H0V07Z, 0H0V0JZ, 0H0V0KZ, 0H0V37Z, 0H0V3JZ, 0H0V3KZ, 0H0VX7Z, 0H0VXJZ, 0H0VXKZ, 0HRT075, 0HRT076, 0HRT077, 0HRT078, 0HRT079, 0HRT07Z, 0HRT0JZ, 0HRT0KZ, 0HRU075, 0HRU076, 0HRU077, 0HRU078, 0HRU079, 0HRU07Z, 0HRU0JZ, 0HRU0KZ, 0HRV075, 0HRV076, 0HRV077, 0HRV078, 0HRV079, 0HX5XZZ, 0KXH0ZZ, 0KXH4ZZ, 0KXJ0ZZ, 0KXJ4ZZ, 0KXK0Z6, 0KXK4Z6, 0KXL0Z6, 0KXL4Z6

**CPT®:** 19324, 19325, 19340, 19342, 19357, 19361, 19364, 19366, 19367, 19368, 19369

DHHRBMS002756

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

 2012.2 Procedures Adult Criteria
Mastectomy, Modified Radical (MRM)

# 2012.2 Procedures Adult Criteria

## Mastectomy, Modified Radical (MRM)[1, 2]

| PATIENT: | Name | D.O.B. | ID# | GROUP# |
|---|---|---|---|---|
| CPT®/ICD: | Code | Facility | Service Date | |
| PROVIDER: | Name | | ID# | Phone# |
| | Signature | | Date | |

ICD-9:

ICD-10:

CPT®:

INDICATIONS (choose one and see below)

☐ 100   Invasive breast cancer
☐ 200   Palliative debulking for locally advanced breast cancer
☐ Indication Not Listed (Provide clinical justification below)

☐ 100   Invasive breast cancer **[Both]**
    ☐ 110   By Bx
    ☐ 120   No distant metastases[3]

☐ 200   Palliative debulking for locally advanced breast cancer[4]

**EXHIBIT**
**51**

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested.  IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you.  Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries.  IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions.  IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services.  All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider.  InterQual® and InterQual® Review Manager © 2012-2019 Change Healthcare LLC and/or one of its subsidiaries.  All Rights Reserved.  CPT only © 2011 American Medical Association.  All Rights Reserved.

DHHRBMS002757

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

**JA2388**



2012.2 Procedures Adult Criteria
Mastectomy, Modified Radical (MRM)

## Notes

**(1)-DEF:**
A modified radical mastectomy (MRM) involves removal of the entire breast and axillary lymph nodes, sparing the pectoral muscle.

**(2)**
Studies show that partial mastectomy or lumpectomy with postoperative radiation offers similar survival and local control as MRM. MRM is done, rather than partial mastectomy, if there is fixation or invasion of the chest wall or skin. Other factors that may influence the choice of procedure include anaplastic cell type, multicentric disease, extensive intraductal involvement, inability to obtain adequate margins with lumpectomy, and size of lesion relative to breast size (Carlson et al., J Natl Compr Canc Netw 2009; 7(2): 122-192; American College of Radiology, J Am Coll Surg 2007; 205(2): 362-376). In the absence of restricting medical or pathological factors, the decision to perform MRM or lumpectomy is ultimately based on patient preference (McCready et al., Can J Surg 2005; 48(3): 185-194).

**(3)**
Bone scan, liver scan, and CT are used for the detection of metastases in patients with breast cancer and a high pretest probability of metastasis. When the clinical assessment, CXR, and blood tests (including alkaline phosphatase and LFTs) are normal, these scans have very low yield (Carlson et al., J Natl Compr Canc Netw 2009; 7(2): 122-192).

**(4)**
While systemic therapy can control metastatic cancer, it cannot cure it. MRM is performed if systemic therapy (chemotherapy or hormonal therapy) cannot control tumor growth and there is impending skin breakdown or chest wall invasion. If the tumor erodes into a blood vessel, the mastectomy may need to be performed urgently.

DHHRBMS002758

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

JA2389

**InterQual®**

2012.2 Procedures Adult Criteria
Mastectomy, Modified Radical (MRM)

**ICD-9:**      85.43
**ICD-10-PCS:**  0HTT0ZZ, 0HTU0ZZ, 0HTV0ZZ
**CPT®:**       19307

DHHRBMS002759

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

**JA2390**



2012.2 Procedures Adult Criteria
Mastectomy, Partial, +/- Axillary Dissection

# 2012.2 Procedures Adult Criteria

## Mastectomy, Partial, +/- Axillary Dissection [1, 2*MDR, 3, 4]

| PATIENT: | Name | | D.O.B. | | ID# | | GROUP# | |
|---|---|---|---|---|---|---|---|---|
| CPT®/ICD: | Code | | Facility | | Service Date | | | |
| PROVIDER: | Name | | | | ID# | | Phone# | |
| | Signature | | | | Date | | | |

ICD-9:

ICD-10:

CPT®:

INDICATIONS (choose one and see below)

☐ 100   Invasive breast cancer
☐ 200   Palliative debulking for locally advanced breast cancer
☐ Indication Not Listed (Provide clinical justification below)

☐ 100   Invasive breast cancer **[All]**
   ☐ 110   By Bx
   ☐ 120   No fixation to/invasion of skin/chest wall **[≥ One]**[5]
      ☐ 121   By PE
      ☐ 122   By imaging[6]
   ☐ 130   No distant metastases[7]

☐ 200   Palliative debulking for locally advanced breast cancer[8]

**EXHIBIT**
52

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested.  IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you.  Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries.  IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions.  IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services.  All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider.  InterQual® and InterQual® Review Manager © 2012-2019 Change Healthcare LLC and/or one of its subsidiaries.  All Rights Reserved.  CPT only © 2011 American Medical Association.  All Rights Reserved.

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

DHHRBMS002760

JA2391

 **InterQual®**

2012.2 Procedures Adult Criteria
Mastectomy, Partial, +/- Axillary Dissection

## Notes

**(1)**
These criteria include the following procedures:
Lumpectomy
Mastectomy, Segmental
Quadrantectomy

**(2)-MDR:**
Axillary node dissection is not indicated for ductal carcinoma in situ (DCIS) or lobular carcinoma in situ (LCIS) (Carlson et al., J Natl Compr Canc Netw 2009; 7(2): 122-192). Because these findings by pathology demonstrate noninvasive disease, requests for axillary node dissection in these patients require secondary medical review.

**(3)**
Breast-conserving treatment is a term that encompasses lumpectomy, partial mastectomy, quadrantectomy, or segmental mastectomy procedures. Breast-conserving treatment is excision of the primary tumor and adjacent breast tissue typically followed by irradiation. The choice of breast-conserving treatment or modified radical mastectomy (MRM) is determined by the extent of disease and the ability of the patient to tolerate radiation therapy. For breast conserving surgery, the tumor size must be small enough to ensure complete tumor removal with an acceptable cosmetic outcome (Hammer et al., Cleve Clin J Med 2008; 75 Suppl 1: S10-16). Reported survival rates of ≥ 5 years following breast-conserving treatment have been shown in many studies to be similar to that of MRM (Carlson et al., J Natl Compr Canc Netw 2009; 7(2): 122-192; Jatoi and Proschan, Am J Clin Oncol 2005; 28(3): 289-294). Although appropriate for many patients, breast-conserving treatment remains underutilized as a treatment option, in part due to inappropriate patient selection, socioeconomic disparities, geographic practice patterns, and patient concerns over lifetime risk and fear of recurrence (Lee et al., Breast J 2009; 15(1): 34-40; McGuire et al., Ann Surg Oncol 2009; 16(10): 2682-2690; Smith et al., J Am Coll Surg 2009; 209(4): 425-433 e422).

**(4)**
There are few studies regarding long-term survival and recurrence rates of breast-conserving treatment for males with invasive breast cancer (Lanitis et al., J Med Case Reports 2008; 2: 126; Golshan et al., Breast 2007; 16(6): 653-656). Difficulty obtaining clear margins with the small volume of available breast tissue has made simple mastectomy the preferred treatment (Contractor et al., World J Surg Oncol 2008; 6: 58).

**(5)**
The chest wall is defined as structures deep to the pectoral muscles.

**(6)**
Imaging may include mammography or US.

**(7)**
Bone scan, liver scan, and CT are used for the detection of metastases in patients with breast cancer and a high pretest probability of metastasis. When the clinical assessment, CXR, and blood tests (including alkaline phosphatase and LFTs) are normal, these scans have very low yield (Carlson et al., J Natl Compr Canc Netw 2009; 7(2): 122-192).

**(8)**
The mastectomy (and removal of enlarged axillary nodes) is performed for local control of disease.

DHHRBMS002761

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

Page 2 of 3

JA2392

**InterQual®**

2012.2 Procedures Adult Criteria
Mastectomy, Partial, +/- Axillary Dissection

**ICD-9:** 40.23, 85.20, 85.21, 85.22, 85.23
**ICD-10-PCS:** 0H5T0ZZ, 0H5U0ZZ, 0H5V0ZZ, 0HBT0ZZ, 0HBU0ZZ, 0HBV0ZZ
**CPT®:** 19301, 19302

DHHRBMS002762

Licensed for use exclusively by Keystone Peer Review Organization, Inc..                    Page 3 of 3

**JA2393**



2012.2 Procedures Adult Criteria
Mastectomy, Prophylactic, Total/Simple

# 2012.2 Procedures Adult Criteria

## Mastectomy, Prophylactic, Total/Simple[1*RIN, 2, 3]

| PATIENT: | Name | | D.O.B. | | ID# | | GROUP# | |
|---|---|---|---|---|---|---|---|---|
| CPT®/ICD: | Code | | Facility | | Service Date | | | |
| PROVIDER: | Name | | | | ID# | | Phone# | |
| | Signature | | | | Date | | | |

ICD-9:

ICD-10:

CPT®:

## INDICATIONS (choose one and see below)

☐ 100   Woman w/o breast cancer by Hx
☐ 200   Woman with invasive breast cancer of contralateral breast
☐ Indication Not Listed (Provide clinical justification below)

☐ 100   Woman w/o breast cancer by Hx **[One]**
    ☐ 110   BRCA1/BRCA2 gene mutation by genetic testing[4, 5]
    ☐ 120   Atypical breast hyperplasia by Bx[6]
    ☐ 130   Diffuse microcalcifications
    ☐ 140   Breast cancer in first degree relative by Hx **[One]**[7, 8]
        ☐ 141   ≥ 2 first degree relatives with unilateral breast cancer[9]
        ☐ 142   ≥ 1 first degree relative with bilateral breast cancer[9]
        ☐ 143   ≥ 1 first degree relative with premenopausal breast cancer

☐ 200   Woman with invasive breast cancer of contralateral breast[10, 11]

EXHIBIT
53

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested.  IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you.  Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries.  IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions.  IQ is intended solely for use as screening guidelines with respect to medical appropriateness of health care services.  All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider.  InterQual® and InterQual® Review Manager © 2012-2019 Change Healthcare LLC and/or one of its subsidiaries.  All Rights Reserved.  CPT only © 2011 American Medical Association.  All Rights Reserved.

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

DHHRBMS002763

**JA2394**



2012.2 Procedures Adult Criteria
Mastectomy, Prophylactic, Total/Simple

## Notes

**(1)-RIN:**
**These criteria cover requests for either unilateral or bilateral prophylactic mastectomy.**

**(2)-DEF:**
A total or simple mastectomy involves the removal of nearly all breast tissue with the nipple-areolar complex.

**(3)**
Prophylactic mastectomy is one option that may reduce the risk of breast cancer in women who are at high risk for developing the disease. Women at high risk include those with BRCA1 or BRCA2 mutations, a positive family history, or breast cancer in the other breast. Although studies have shown risk reduction of ≥ 90% with this surgery, there is insufficient evidence that it improves overall survival (American College of Obstetricians and Gynecologists, Obstet Gynecol 2009; 113(4): 957-966; Giuliano et al., Ann Surg Oncol 2007; 14(9): 2425-2427; Lostumbo et al., Cochrane Database Syst Rev 2004; (4): CD002748).

**(4)**
Up to 10% of all breast and ovarian cancers are believed to be hereditary. Analysis of the BRCA1 and BRCA2 genes can identify an individual's predisposition to developing breast or ovarian cancer. BRCA1 and BRCA2 are tumor-suppressor genes responsible for regulating the growth of breast epithelial cells. Mutations of either of these genes can result in uninhibited growth of these cells. The estimated lifetime risk of developing breast cancer for those with a BRCA mutation is estimated to be 65% to 74% (American College of Obstetricians and Gynecologists, Obstet Gynecol 2009; 113(4): 957-966). Male mutation carriers have a 5% to 10% lifetime risk of developing breast cancer (Berliner and Fay, J Genet Couns 2007; 16(3): 241-260).

**(5)**
Women with a BRCA1 or BRCA2 gene mutation are also more likely to develop breast cancer at an earlier age. The risk of developing cancer varies depending on the penetrance of the gene mutation (e.g., higher life expectancy for low-penetrance mutations) (Jatoi and Anderson, Surg Clin North Am 2008; 88(4): 845-861, vii-viii). These mutations are commonly seen in families of Ashkenazi ancestry; an estimated 1 in 40 Ashkenazi Jews carry the mutation (American College of Obstetricians and Gynecologists, Obstet Gynecol 2009; 113(4): 957-966).

**(6)**
Women with atypical hyperplasia have a four- to five-fold increased risk of developing breast cancer (Hollingsworth et al., Am J Surg 2004; 187(3): 349-362). Atypical hyperplasia is more strongly associated with the development of premenopausal breast cancer than with postmenopausal disease (Vogel, Surg Clin North Am 2003; 83(4): 733-751).

**(7)-DEF:**
A first degree relative is defined as a blood-related sibling, parent, or child.

**(8)**
The listed family history patterns have been associated with an increased incidence of BRCA1 or BRCA2 gene mutations (U.S. Preventive Services Task Force, Am Fam Physic 2006; 73(5): 869-874).

**(9)**
A patient has a four- to six-fold increased risk of developing breast cancer if her 2 sisters had breast disease or her mother and a sister had unilateral breast cancer. There is a two-fold increase if a mother or sister had the disease. The patient is at even greater risk when the disease is bilateral (Willey and Cocilovo, Obstet Gynecol 2007; 110(6): 1404-1416; Nelson et al., Ann Intern Med 2005; 143(5): 362-379).

**(10)**
There is insufficient evidence to show improved disease-free survival rates in women who undergo prophylactic mastectomy performed on the breast contralateral to the diagnosed cancer. However, since the remaining breast is at increased risk for the development of cancer, patients report significant reduction in their anxiety levels when undergoing contralateral prophylactic mastectomy (Lostumbo et al., Cochrane Database Syst Rev 2004; (4): CD002748).

**(11)**
Despite advances in imaging and chemoprevention therapy, psychological factors may influence a woman to choose surgery, among them anxiety over having cancer, a need to reduce perceived risk of further cancer, and concern over being able to raise her children (Tan et al., Hered Cancer Clin Pract 2009; 7(1): 6; Yi et al., Cancer 2009; 115(5): 962-971; Tuttle et al., J Clin Oncol 2007; 25(33): 5203-5209).

DHHRBMS002764

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 288 of 489



2012.2 Procedures Adult Criteria
Mastectomy, Prophylactic, Total/Simple

**ICD-9:**       85.41, 85.42
**ICD-10-PCS:**  0HTT0ZZ, 0HTU0ZZ, 0HTV0ZZ
**CPT®:**        19303

DHHRBMS002765

JA2396

InterQual®

## 2021, July 2021 Release CP:Procedures

**Subset:** Reduction Mammoplasty, Female (Adolescent) [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14]

**Requested Service:** Reduction Mammoplasty, Female (Adolescent)

**Age:** Age ≥ 13 and < 18

| Patient: | Name: | DOB: | ID #: | GROUP #: |
|---|---|---|---|---|
| | Sex (circle): M / F | Height: | Weight: | |
| Provider/PCP: | Name: | Fax #: | Phone #: | |
| | NPI/ID #: | Signature: | | Date: |
| Servicing: | Vendor/Facility: | | Phone #: | |
| | Diagnosis/ICD: | Service Date: | Authorization:   /  /   to   /  / | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Choose one of the following options and continue to the appropriate section

☐ 10. Breast reduction of contralateral breast post-mastectomy
☐ 20. Macromastia or gigantomastia

☐ 10. Breast reduction of contralateral breast post-mastectomy

  1. Choose one: [15]
    ☐ A) Imaging within 1 year and negative for tumor or malignant changes
    ☐ B) Imaging within 1 year and positive for tumor or malignant changes
    ☐ C) Imaging not performed with 1 year of reduction mammoplasty
    ☐ D) Other clinical information (add comment)

    • If option A selected, then the rule is satisfied; you may stop here  **(Outpatient)**
    • No other options lead to the requested service

☐ 20. Macromastia or gigantomastia

  1. Choose one:
    ☐ A) Symptomatic macromastia or gigantomastia
    ☐ B) Asymptomatic macromastia or gigantomastia [16]
    ☐ C) Other clinical information

    • If option A selected, then go to question 2
    • No other options lead to the requested service

EXHIBIT
54

DHHRBMS002766

**JA2397**

InterQual®                                                    2021, July 2021 Release CP:Procedures
                                                    **Reduction Mammoplasty, Female (Adolescent)**
                                                    **Reduction Mammoplasty, Female (Adolescent)**

---

*Macromastia or gigantomastia (continued...)*

2. No change in cup-size for at least 6 months [17]
   ☐ A) Yes
   ☐ B) No

   > • If option Yes selected, then go to question 3
   > • No other options lead to the requested service

3. Choose all that apply: [18]
   ☐ A) Chronic back or neck or shoulder pain and other etiologies excluded
   ☐ B) Breast pain from excessive breast tissue and other etiologies excluded
   ☐ C) Paresthesias of hands or arms and other etiologies excluded
   ☐ D) Permanent shoulder grooving from bra straps
   ☐ E) Persistent intertrigo at the inframammary folds [19]
   ☐ F) Other clinical information (add comment)

   > • If 2 or more options A, B, C, D or E selected and option F not selected, then go to question 4
   > • No other options lead to the requested service

4. Choose one: [20]
   ☐ A) Palpable mass or lesion on physical examination
   ☐ B) Significant breast asymmetry
   ☐ C) No palpable mass or lesion or breast asymmetry
   ☐ D) Other clinical information (add comment)

   > • If option C selected, then the rule is satisfied; you may stop here  **(Outpatient)**
   > • If option A or B selected, then go to question 5
   > • No other options lead to the requested service

5. Choose one: [20, 21]
   ☐ A) Biopsy or imaging negative for tumor or malignant changes
   ☐ B) Biopsy positive for tumor or malignant changes
   ☐ C) Imaging positive for tumor or malignant changes
   ☐ D) Biopsy or imaging not performed
   ☐ E) Other clinical information (add comment)

   > • If option A selected, then the rule is satisfied; you may stop here  **(Outpatient)**
   > • No other options lead to the requested service

---

**Reference**

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.
**2nd** - Secondary review required. Criteria cannot be met.
*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

DHHRBMS002767

Licensed for use exclusively by KEPRO

**JA2398**

InterQual®                                    2021, July 2021 Release CP:Procedures
                                              **Reduction Mammaplasty, Female (Adolescent)**
                                              Reduction Mammaplasty, Female (Adolescent)

## Notes:

**1:**
Unlike adult females who have reached skeletal maturity with known completed breast growth, the Schnur Scale, which quantifies a specific amount of breast tissue to be removed based on the patient's body surface area (BSA), does not appear to be used routinely for adolescents who plan for reduction mammaplasty. Retrospective studies have outlined estimates of breast tissue to be removed in this population. Rather than BSA, body mass index (BMI) seems to correlate with the amount of breast tissue taken out in adolescents. Although estimates were gathered postoperatively and were not used to determine medical appropriateness prior to surgery, these studies have some overlap suggesting the higher the BMI, the more breast tissue is removed. Generally, individuals with a healthy weight were estimated to have at least 650 grams removed bilaterally, overweight individuals at least 800 grams, and obese individuals were estimated to have at least 1,000 grams removed. More research is needed to clearly outline how many grams is appropriate to remove in each breast, as the current studies estimate total grams removed bilaterally and there are no guidelines on best practices in the adolescent population (Pike et al., J Adolesc Health 2015, 57: 277-81; Xue et al., J Pediatr Adolesc Gynecol 2013, 26: 228-33; Webb et al., Ann Plast Surg 2012, 68: 257-60).

**2:**
As with adult females, there is a strong association between macromastia and obesity in adolescents. Because the incidence of obesity is increasing at a younger age, it is often difficult for practitioners to distinguish between idiopathic macromastia or gigantomastia versus obesity-related macromastia or gigantomastia. Encouraging weight loss in adolescents may have some benefits such as decreased body mass index (BMI). However, required weight loss prior to reduction mammaplasty in adolescents remains controversial. Not only are many adolescents unable to participate in exercise because their large breast size poses a barrier, but they are often too embarrassed. Also, there is no evidence to support the theory that weight loss will reduce breast size to such a degree that will relieve symptoms of macromastia (Pike et al., J Adolesc Health 2015, 57: 277-81; Wolfswinkel et al., Semin Plast Surg 2013, 27: 49-55).
A small retrospective study concluded that reduction mammaplasty did not show significant decrease in BMI in this population at a two-year follow-up assessment. Instead, there was a small increase in BMI seen among overweight and obese patients. Practice varies in terms of weight loss requirements prior to surgery. As weight loss may be encouraged to prevent postoperative complications and promote healthy eating habits, literature suggests additional diet and nutritional counseling and exercise programs be initiated prior to surgery and encouraged post-surgery (Pike et al., J Adolesc Health 2015, 57: 277-81; Wolfswinkel et al., Semin Plast Surg 2013, 27: 49-55). Surgical intervention should be performed to treat physiological symptoms of macromastia (e.g., back, shoulder or neck pain, bra strap grooving), rather than be used as weight loss treatment or serve as motivation for adolescents to participate in exercise more regularly (Pike et al., J Adolesc Health 2015, 57: 277-81).

**3:**
A large retrospective study analyzed national estimates of inpatient hospital stays for individual's ages 12 years to 20 years using the Agency for Healthcare Research and Quality Kids Inpatient Database from 2000 to 2009 who received reduction mammaplasty. This review states that surgery to treat macromastia is safe with few early postoperative complications accompanied with short hospital stays. Only 42 patients (3.19%) had complications (e.g., infections, hemorrhage, hematoma). Duration of stay was 1 day in 85% and less than 1 day was 3% (Soleimani et al., Surgery 2015, 158: 793-801).

**4:**
Literature reviews suggest that age should not determine the medical appropriateness of reduction mammaplasty in females with macromastia or gigantomastia. Instead, severity of symptoms should govern suitability for surgery. It has been proven that young females in their adolescence who suffer physically from macromastia or gigantomastia benefit from surgical intervention, have high satisfaction and symptom relief, would recommend surgery to others, and have significant improvement in emotional status (The American College of Obstetricians and Gynecologists (ACOG), ACOG Revises Breast Cancer Screening Guidance. 2017; Wolfswinkel et al., Semin Plast Surg 2013, 27: 49-55).

**5:**
This is a procedure that can be performed for either medically necessary or cosmetic purposes. The criteria as written are intended solely for use in determining the medical appropriateness of this procedure and do not cover this procedure when performed for cosmetic reasons.

DHHRBMS002768

InterQual®                                                    2021, July 2021 Release CP:Procedures
                                                    **Reduction Mammaplasty, Female (Adolescent)**
                                                    Reduction Mammaplasty, Female (Adolescent)

**6:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**7:**
Retrospective studies demonstrate an overall low complication rate after breast reduction mammaplasty; however, a higher body mass index and smoking are associated with an increased risk for wound complications, reoperation, and a slower recovery (Imahiyerobo et al., Annals of Plastic Surgery 2015, 75: 370-5; Fischer et al., Aesthetic Surgery Journal/The American Society for Aesthetic Plastic surgery 2014, 34: 66-73; Gust et al., Aesthetic Surgery Journal/The American Society for Aesthetic Plastic surgery 2013, 33: 1140-7). These risks, along with weight loss and smoking cessation for appropriate patients, should be discussed preoperatively.

**8:**
Breast development is variable and may continue beyond the age of 18. Since there is a possibility of regrowth of tissue after mammaplasty, complete breast development is ideal prior to considering mammaplasty in adolescents; however, females younger than 18 years of age with no change in cup size for at least six months and who experience the same physical symptoms as adults are candidates for mammaplasty.

**9:**
I/O Setting: Outpatient

**10:**
These criteria address medically necessary surgical resection of macromastia or gigantomastia. If breast enlargement is due primarily to excessive fatty tissue, liposuction can be used. Liposuction has not been established as a medically necessary procedure for breast reduction, and is considered cosmetic, even when it is used in conjunction with mammaplasty to remove fatty tissue and glandular breast tissue. Liposuction is not covered in these criteria.

**11:**
POL: It is a matter of local medical policy whether to require submission of photographs prior to approval of the procedure.

**12:**
These criteria include the following procedure:
Breast Reduction, Female

**13:**
Reduction mammaplasty is associated with significant improvement in preoperative symptoms and quality of life, and has been shown to result in increased participation in exercise programs and other physical and social activities (Singh and Losken, Plast Reconstr Surg 2012, 129: 562-70). Studies, including the Breast Reduction Assessment of Outcome and Value study (BRAVO), reported that reduction mammaplasty reduced or eliminated symptoms of macromastia regardless of body weight, bra cup size, or weight of tissue resected (Cunningham et al., Plast Reconstr Surg 2005; 115(6): 1597-1604; Chadbourne et al., Mayo Clin Proc 2001; 76(5): 503-510). One systematic review of breast reduction, augmentation, and prophylactic subcutaneous mastectomy concluded that an increase in breast size is associated with an increased risk of breast cancer (Jansen et al., Journal of Plastic, Reconstructive & Aesthetic Surgery: JPRAS 2014, 67: 1615-23). A large retrospective study suggests that reduction mammaplasty is associated with decreasing risk of breast cancer in women (Carlson, Clin Plast Surg 2016, 43: 341-7).

**14:**

DHHRBMS002769
Licensed for use exclusively by KEPRO

**JA2400**

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 293 of 489

Case 3:20-cv-00740   Document 261-2   Filed 06/14/22   Page 52 of 66 PageID #: 8246

InterQual®                                                        2021, July 2021 Release CP:Procedures
**Reduction Mammaplasty, Female (Adolescent)**
Reduction Mammaplasty, Female (Adolescent)

InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**15:**

Women with a history of breast cancer are at an increased risk for recurrence. InterQual® external peer reviewers agree that imaging should be performed within one year of reduction mammoplasty of the contralateral breast following mastectomy as imaging both breasts would have been done at the time of the mastectomy. If more than one year has lapsed, repeat imaging should be done to rule out tumor or malignant changes.

**16:**

Breast asymmetry, hypomastia, macromastia and gynecomastia can have significant psychosocial impact, not only in adolescent males and females, but also in adults. Retrospective and prospective studies using the Rosenberg Self-Esteem Scale state that these individuals often suffer from low self-esteem and seek surgery to relieve emotional instability (Nuzzi et al., Plast Reconstr Surg 2014, 134: 1116-23; Nuzzi et al., Plast Reconstr Surg 2013, 131: 890-6; Neto et al., Aesthetic Plast Surg 2012, 36: 223-5).

**17:**

Juvenile breast hypertrophy usually presents with excessive and rapid breast growth over a 6 month period (Wolfswinkel et al., Semin Plast Surg 2013, 27: 49-55). Ideally, surgical intervention to help reduce the size of breast tissue should not commence until the breast size has stabilized. The American College of Obstetricians and Gynecologists has not obtained consensus among practitioners regarding appropriate timing of reduction mammoplasty in adolescent females. InterQual® consultants agree that there be no change in cup-size for at least 6 months, or until the patient has reached skeletal maturity. Others rely heavily on the degree of breast ptosis or the severity of symptoms as the deciding factor regardless of breast growth completion (The American College of Obstetricians and Gynecologists (ACOG), Committee Opinion: Committee on Adolescent Health Care. 2017; Wolfswinkel et al., Semin Plast Surg 2013, 27: 49-55).

**18:**

The American Society of Plastic Surgeons defines symptomatic breast hypertrophy as a syndrome of persistent neck and shoulder pain, grooving from bra straps, chronic intertrigo rash of the inframammary fold, frequent episodes of headache, backache, and upper extremity peripheral neuropathies caused by the increase in volume and weight of breast tissue beyond normal proportions (American Society of Plastic Surgeons, Reduction Mammaplasty Evidence-Based Practice Guidelines 2011).

**19:**

**Def:** Intertrigo is a superficial dermatitis occurring on apposed skin surfaces which predisposes to erythema, maceration, itching, and secondary infection.

**20:**

Malignancy is extremely rare in women with macromastia or gigantomastia. Cause for concern would include significant breast asymmetry, mass, or lesions. Therefore, it may be appropriate to perform a biopsy or imaging study (e.g., ultrasound, mammogram, MRI) to rule out malignancy prior to breast reduction. Benign breast fibroadenomas should also be ruled out as they can be similar in appearance and symptomology to macromastia or gigantomastia (Wolfswinkel et al., Semin Plast Surg 2013, 27: 49-55).

**21:**

Imaging and biopsy can differentiate benign from malignant masses and can be used when screening is required based on a patient's age, or to rule out malignancy in patients who are symptomatic or have other high-risk factors.

DHHRBMS002770

**ICD-10-CM (circle all that apply):** N60.11, N60.12, N60.19, N62, N65.0, N65.1, Z85.3, Other _____

**ICD-10-PCS (circle all that apply):** 0H0T0JZ, 0H0T37Z, 0H0U0JZ, 0H0U3JZ, 0H0V0JZ, 0H0V3JZ, 0HBT0ZZ, 0HBT3ZZ, 0HBU0ZZ, 0HBU3ZZ, 0HBV0ZZ, 0HBV3ZZ, 0HRT0JZ, 0HRT3JZ, 0HRU0JZ, 0HRU3JZ, 0HRV0JZ, 0HRV3JZ, Other _____

**CPT® (circle all that apply):** 19318, Other _____

**JA2402**

InterQual®

## 2021, July 2021 Release CP:Procedures

**Subset:**    Reduction Mammoplasty, Male (Adolescent) [1, 2, 3, 4, 5, 6, 7, 8, 9]

**Requested Service:**    Reduction Mammoplasty, Male (Adolescent)

**Age:**    Age ≥ 13 and < 18

| Patient: | Name: | DOB: | ID #: | GROUP #: |
|---|---|---|---|---|
| | Sex (circle): M / F | Height: | Weight: | |
| Provider/PCP: | Name: | Fax #: | Phone #: | |
| | NPI/ID #: | Signature: | | Date: |
| Servicing: | Vendor/Facility: | | Phone #: | |
| | Diagnosis/ICD: | Service Date: | Authorization:  /  /  to  /  / | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Gynecomastia

    1. Choose one:
      ☐ A) Symptomatic gynecomastia
      ☐ B) Asymptomatic gynecomastia [10]
      ☐ C) Other clinical information

      | |
      • If option A selected, then go to question 2
      • No other options lead to the requested service

    2. Choose all that apply:
      ☐ A) Breast pain or tenderness [11]
      ☐ B) Grade I or grade II or grade III or grade IV gynecomastia by physical examination [12, 13, 14]
      ☐ C) Contributory conditions excluded or treated ≥ 6 months [15, 16]
      ☐ D) Gynecomastia persists beyond 2 years of onset [17]
      ☐ E) Other clinical information (add comment)

      • If the number of options selected is 4 and option E not selected, then go to question 3
      • No other options lead to the requested service



EXHIBIT
55

DHHRBMS002772

**JA2403**

**InterQual®**

**2021, July 2021 Release CP:Procedures**
**Reduction Mammoplasty, Male (Adolescent)**
**Reduction Mammoplasty, Male (Adolescent)**

---

*Gynecomastia (continued...)*

3. Choose one: [18]
   - ☐ A) Medications deemed noncontributory
   - ☐ B) Contributory medications discontinued
   - ☐ C) Requires medication that contributes to gynecomastia for which there is no acceptable alternative medication
   - ☐ D) Other clinical information (add comment)

   > • If option A, B or C selected, then the rule is satisfied; you may stop here  **(Outpatient)**
   > • No other options lead to the requested service

---

**Reference**

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

**JA2404**

InterQual®                                                                    2021, July 2021 Release CP:Procedures
                                                                    **Reduction Mammoplasty, Male (Adolescent)**

**Reduction Mammoplasty, Male (Adolescent)**

## Notes:

**1:**
Gynecomastia is commonly seen in newborns, adolescents and men older than age 60, yet spontaneous resolution frequently occurs in newborns and adolescents and does not require intervention. Males whose gynecomastia does not resolve on its own and who are symptomatic may be candidates for reduction mammoplasty to remove glandular breast tissue (Dickson, Am Fam Physician 2012, 85: 716-22).

**2:**
POL: It is a matter of local medical policy whether to require submission of photographs prior to approval of the procedure.

**3:**
These criteria address surgical resection (e.g., reduction mammoplasty, subcutaneous mastectomy) of gynecomastia, including mixed gynecomastia. If breast enlargement in male patients is due primarily to excess fatty tissue and not glandular hypertrophy, liposuction can be used for reducing breast size. Since liposuction only removes fatty tissue and not breast tissue, liposuction is not covered by these criteria.

**4:**
These criteria include the following procedures:
Breast Reduction, Male
Mastectomy for Gynecomastia
Mastectomy, Subcutaneous, Male

**5:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**6:**
Nearly 50% to 65% of adolescent males will experience some degree of gynecomastia at Tanner stage 3 or 4. When spontaneous resolution does not occur, some males will pursue surgery due to physical symptoms, or because of significant emotional distress (Rew et al., J Adolesc 2015, 43: 206-12; Dickson, Am Fam Physician 2012, 85: 716-22). A large systematic review states that adolescent males with gynecomastia are often overweight or obese, yet do not experience significantly higher rates of complications after surgery than those who are normal weight. Weight loss prior to surgery may be advised in some cases to achieve normal weight for overall health reasons, but is not always necessary prior to reduction mammoplasty to prevent complications. Delaying surgery in symptomatic patients until weight loss is achieved is not advised as it may perpetuate emotional distress (Rew et al., J Adolesc 2015, 43: 206-12).

**7:**
This is a procedure that can be performed for either medically necessary or cosmetic purposes. The criteria as written are intended solely for use in determining the medical appropriateness of this procedure and do not cover this procedure when performed for cosmetic reasons.

**8:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias

DHHRBMS002774

**JA2405**

InterQual®                                    2021, July 2021 Release CP:Procedures
                                              Reduction Mammoplasty, Male (Adolescent)
                                              Reduction Mammoplasty, Male (Adolescent)

following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**9:**
I/O Setting: Outpatient

**10:**
Breast asymmetry, hypomastia, macromastia and gynecomastia can have significant psychosocial impact, not only in adolescent males and females, but also in adults. Retrospective and prospective studies using the Rosenberg Self-Esteem Scale state that these individuals often suffer from low self-esteem and seek surgery to relieve emotional instability (Nuzzi et al., Plast Reconstr Surg 2014, 134: 1116-23; Nuzzi et al., Plast Reconstr Surg 2013, 131: 890-6; Neto et al., Aesthetic Plast Surg 2012, 36: 223-5).

**11:**
Gynecomastia is commonly associated with breast pain, which can range in intensity from mild tenderness or sensitivity to constant pain and pressure.

**12:**
True gynecomastia can present as a rubbery or firm, subareolar mass that can be unattached or adherent to the skin.

**13:**
The American Society of Plastic Surgeons has adopted the following grading system for gynecomastia (American Society of Plastic Surgeons, Practice Parameters: Gynecomastia. 2004). :
• Grade I: Small breast enlargement with localized button of tissue that is concentric around the areola
• Grade II: Moderate breast enlargement exceeding areola boundaries with edges that are indistinct from the chest
• Grade III: Moderate breast enlargement exceeding areola boundaries with edges that are distinct from the chest with skin redundancy present
• Grade IV: Marked breast enlargement with skin redundancy and feminization of the breast

**14:**
InterQual® consultants agree that adolescent males with grade I gynecomastia that has persisted for at least two years, who have discontinued all possible contributory medications, and who have breast pain or tenderness are candidates for medically necessary reduction mammoplasty.

**15:**
Medical conditions associated with gynecomastia include hypogonadism, hyperthyroidism, renal disease, malnutrition, cirrhosis or liver disease, testicular or prostate tumors, Klinefelter syndrome, and XXY males. Attempts should be made to address these underlying causes of gynecomastia prior to considering surgical resection.

**16:**
Medical treatment for gynecomastia involves blocking estrogen effects in the breast tissue using antiestrogens (e.g., tamoxifen), decreasing estrogen production using aromatase inhibitors (e.g., testactolone), or giving androgens (Morcos and Kizy, J Fam Pract 2012, 61: 719-25). While tamoxifen is not approved by the U.S. Food and Drug Administration for the treatment of gynecomastia, it has been well studied and does reduce breast pain and swelling. Gynecomastia that has been present for longer than 1 year and is fibrotic does not generally regress spontaneously or resolve with medication (Morcos and Kizy, J Fam Pract 2012, 61: 719-25).

**17:**
Spontaneous resolution of gynecomastia in adolescent males tends to occur within six months to two years of onset. If gynecomastia persists after two years, surgery can be considered (Dickson, Am Fam Physician 2012, 85: 716-22).

**18:**
An integral component in the evaluation of gynecomastia is recognizing and discontinuing or changing any drugs

DHHRBMS002775

**JA2406**

USCA4 Appeal: 22-1927     Doc: 20-5      Filed: 10/31/2022     Pg: 299 of 489

Case 3:20-cv-00740   Document 261-2   Filed 06/14/22   Page 58 of 66 PageID #: 8252

InterQual®                                                    2021, July 2021 Release CP:Procedures
                                                              Reduction Mammoplasty, Male (Adolescent)
                                                              Reduction Mammoplasty, Male (Adolescent)

that can cause the disorder, as the problem may recur after surgical correction if the drugs are continued. Medications that can cause breast enlargement include certain hormones, chemotherapeutic agents, psychoactive drugs, antibiotics, and antiulcer drugs, as well as drugs of abuse (e.g., marijuana, heroin, amphetamines, anabolic steroids) (Morcos and Kizy, J Fam Pract 2012, 61: 719-25).

DHHRBMS002776

Licensed for use exclusively by KEPRO

**JA2407**

InterQual®                                                    2021, July 2021 Release CP:Procedures
                                                             Reduction Mammoplasty, Male (Adolescent)
                                                             Reduction Mammoplasty, Male (Adolescent)

---

**ICD-10-CM (circle all that apply):** N62, Other _____

**ICD-10-PCS (circle all that apply):** 0H0T0JZ, 0H0T3JZ, 0H0U0JZ, 0H0U3JZ, 0H0V0JZ, 0H0V3JZ, 0HBT0ZZ, 0HBT3ZZ, 0HBU0ZZ, 0HBU3ZZ, 0HBV0ZZ, 0HBV3ZZ, 0HRT0JZ, 0HRT3JZ, 0HRU0JZ, 0HRU3JZ, 0HRV0JZ, 0HRV3JZ, Other _____

**CPT® (circle all that apply):** 19300, 19318, Other _____

---

DHHRBMS002777

Licensed for use exclusively by KEPRO                                    Page 6 of 6

**JA2408**

 **InterQual®**

# 2012.2 Procedures Adult Criteria

## Reduction Mammoplasty, Female[(1, 2*RIN, 3)]

| PATIENT: | Name | | D.O.B. | | ID# | | GROUP# | |
|---|---|---|---|---|---|---|---|---|
| CPT®/ICD: | Code | | Facility | | Service Date | | | |
| PROVIDER: | Name | | | | ID# | | Phone# | |
| | Signature | | | | Date | | | |

ICD-9:

ICD-10:

CPT®:

## INDICATIONS (choose one and see below)

☐ 100   Macromastia (gigantomastia), bilateral
☐ 200   Breast reduction of contralateral breast post mastectomy
☐ Indication Not Listed (Provide clinical justification below)

---

☐ 100   Macromastia (gigantomastia), bilateral **[Both]**[(4)]
   ☐ 110   Symptoms **[≥ Two]**
      ☐ 111   Back/neck/shoulder pain
      ☐ 112   Breast pain
      ☐ 113   Paresthesias of hands/arms
      ☐ 114   Permanent shoulder grooving from bra straps
      ☐ 115   Intertrigo[(5)]
   ☐ 120   Excess breast tissue per breast to be removed (estimated amount) **[≥ One]**[(6, 7)]
      ☐ 121   199 g to 238 g and BSA 1.35 to 1.45
      ☐ 122   239 g to 284 g and BSA 1.46 to 1.55
      ☐ 123   285 g to 349 g and BSA 1.56 to 1.69
      ☐ 124   ≥ 350 g

☐ 200   Breast reduction of contralateral breast post mastectomy[(8)]



EXHIBIT
56

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. InterQual® and InterQual® Review Manager © 2012-2019 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT only © 2011 American Medical Association. All Rights Reserved.

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

DHHRBMS002778

**JA2409**



2012.2 Procedures Adult Criteria
Reduction Mammoplasty, Female

## Notes

**(1)**
These criteria include the following procedure:
Breast Reduction, Female
Mastectomy, Subcutaneous, Female

**(2)-RIN:**
Liposuction can be used for moderate reduction of primarily fatty breast tissue. Liposuction is not covered in these criteria.

**(3)-POL:**
It is a matter of local medical policy whether to require submission of photographs prior to approval of the procedure.

**(4)**
Reduction mammoplasty is associated with significant improvement in preoperative symptoms and quality of life, and has been shown to result in increased participation in exercise programs and other physical and social activities (Spector and Karp, Plast Reconstr Surg 2007; 120(4): 845-850).

Given the wide range of body habitus, it is difficult to define the size of breast enlargement that is pathologic. Macromastia has been defined as a chronic pain complex involving at least 3 anatomic sites of the upper body in women with bilateral breast hypertrophy (Blomqvist et al., Plast Reconstr Surg 2000; 106(5): 991-997). Bra size (e.g., greater than a D cup) and estimated amount of breast tissue to be removed (from 0.8 to 2.0 kg) have also been used to identify macromastia (Dancey et al., J Plast Reconstr Aesthet Surg 2008; 61(5): 493-502; Kerrigan et al., Plast Reconstr Surg 2001; 108(6): 1591-1599).

Weight loss is advisable from an overall health standpoint in the overweight patient, but there is no data to support the theory that weight loss will reduce breast size to such a degree as to relieve the symptoms of macromastia. Studies, including the Breast Reduction Assessment of Outcome and Value study (BRAVO), reported that reduction mammoplasty reduces or eliminates symptoms of macromastia regardless of body weight, bra cup size, or weight of tissue resected (Cunningham et al., Plast Reconstr Surg 2005; 115(6): 1597-1604; Chadbourne et al., Mayo Clin Proc 2001; 76(5): 503-510). Prospective studies on surgical and nonsurgical interventions in the treatment of macromastia demonstrated that while reduction mammoplasty improved pain and overall health status, conservative measures (e.g., weight loss) did not provide effective, permanent relief of symptoms (O'Blenes et al., Plast Reconstr Surg 2006; 117(2): 351-358; Miller et al., Plast Reconstr Surg 2005; 115(4): 1025-1031).

**(5)-DEF:**
Intertrigo is a superficial dermatitis occurring on apposed skin surfaces which predisposes to erythema, maceration, itching, and secondary infection.

**(6)**
The Schnur scale is one method to determine medical necessity and requires a specific amount of breast tissue be removed based on the patient's body surface area (BSA) (Dancey et al., J Plast Reconstr Aesthet Surg 2008; 61(5): 493-502; Schnur, Ann Plast Surg 1999; 42(1): 107-108).

**(7)-POL:**
Studies have correlated the weight of breast tissue removed with the likelihood of the procedure being done for medical or cosmetic purposes; however, this can only be used as a retrospective measure (Glatt et al., Plast Reconstr Surg 1999; 103(1): 76-82; Schnur, Ann Plast Surg 1999; 42(1): 107-108). Whether to use the Schnur scale or another scale to determine the medical appropriateness of this procedure is a matter of local medical policy.

**(8)**
After reconstruction or use of a prosthesis, breast reduction of the contralateral breast may be needed to achieve symmetry (Hu and Alderman, Surg Clin North Am 2007; 87(2): 453-467, x; Antoniuk, Obstet Gynecol Clin North Am 2002; 29(1): 209-223, ix.).

DHHRBMS002779

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

**JA2410**

**InterQual®**

2012.2 Procedures Adult Criteria
Reduction Mammoplasty, Female

**ICD-9:**      85.31, 85.32, 85.33, 85.34, 85.36
**ICD-10-PCS:**  0HBT0ZZ, 0HBT3ZZ, 0HBU0ZZ, 0HBU3ZZ, 0HBV0ZZ, 0HBV3ZZ
**CPT®:**       19300, 19304, 19318

DHHRBMS002780

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

**JA2411**



2012.2 Procedures Adult Criteria
Reduction Mammoplasty, Male

# 2012.2 Procedures Adult Criteria

## Reduction Mammoplasty, Male[1, 2*RIN, 3]

| PATIENT: | Name | | D.O.B. | | ID# | | GROUP# | |
|---|---|---|---|---|---|---|---|---|
| CPT®/ICD: | Code | | Facility | | Service Date | | | |
| PROVIDER: | Name | | | | ID# | | Phone# | |
| | Signature | | | | Date | | | |

ICD-9:
ICD-10:
CPT®:

## INDICATIONS (choose one and see below)

☐ 100   Gynecomastia, bilateral/unilateral
☐ Indication Not Listed (Provide clinical justification below)

---

☐ 100   Gynecomastia, bilateral/unilateral **[All]**[4, 5]
    ☐ 110   Breast pain/tenderness[6]
    ☐ 120   Grade II/III/IV gynecomastia by PE[7, 8, 9]
    ☐ 130   Mammogram/US negative for cyst/tumor[10]
    ☐ 140   Contributory conditions excluded/treated ≥ 6 mos[11, 12]
    ☐ 150   Medication review **[One]**[13]
        ☐ 151   Medications deemed noncontributory
        ☐ 152   Contributory medications discontinued
        ☐ 153   Requires medication that contributes to gynecomastia for which there is no acceptable alternative medication

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested.  IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you.  Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries.  IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions.  IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services.  All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider.  InterQual® and InterQual® Review Manager © 2012-2019 Change Healthcare LLC and/or one of its subsidiaries.  All Rights Reserved.  CPT only © 2011 American Medical Association.  All Rights Reserved.

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

**EXHIBIT**
**57**

DHHRBMS002781

**JA2412**

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 305 of 489



2012.2 Procedures Adult Criteria
Reduction Mammoplasty, Male

## Notes

**(1)**
These criteria include the following procedures:
Breast Reduction, Male
Mastectomy for Gynecomastia
Mastectomy, Subcutaneous, Male

**(2)-RIN:**
**These criteria address surgical resection (e.g., reduction mammoplasty, subcutaneous mastectomy) of gynecomastia. If breast enlargement in male patients is due primarily to excess fatty tissue and not glandular hypertrophy, liposuction can be used for breast reduction. Since liposuction only removes fatty tissue and not breast tissue, liposuction is not covered by these criteria.**

**(3)**
In male patients, reduction mammoplasty is done for symptomatic gynecomastia and is performed as an open procedure or a combination of surgical excision and liposuction. The specific surgical technique will vary depending on the amount of glandular breast tissue and fat removed and the amount of skin resected. Surgical excision of breast tissue is used for true gynecomastia, as glandular tissue cannot be suctioned (Devalia and Layer, Surgeon 2009; 7(2): 114-119; Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015). Reduction mammoplasty is indicated for gynecomastia not related to malignancy or caused by other treatable causes (Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519; American Society of Plastic Surgeons, Practice Parameters: Gynecomastia. 2004 [cited 2010]).

**(4)-DEF:**
True gynecomastia is a benign proliferation of the glandular component of male breast tissue and is caused by an excess of circulating estrogen, a deficiency of androgens, or an altered androgen-to-estrogen ratio. Pseudogynecomastia is breast enlargement due to fat or adipose accumulation. Mixed gynecomastia is breast enlargement secondary to both glandular and fat tissue.

**(5)**
Gynecomastia can occur in males of any age but is more commonly seen in puberty or in males over the age of 60 (Braunstein, N Engl J Med 2007; 357(12): 1229-1237; Hanavadi et al., Breast 2006; 15(2): 276-280). In more than half of all cases, gynecomastia occurs bilaterally. Carcinoma should be considered in cases of unilateral enlargement, induration, fixation, skin dimpling, bloody nipple discharge, or a hard, asymmetric mass (Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015; Braunstein, N Engl J Med 2007; 357(12): 1229-1237; Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519).

**(6)**
Gynecomastia is commonly associated with breast pain, which can range in intensity from mild tenderness or sensitivity to constant pain and pressure (Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519; Di Lorenzo et al., Lancet Oncol 2005; 6(12): 972-979). Surgical resection would only be done in symptomatic patients.

**(7)**
Gynecomastia can be differentiated from pseudogynecomastia by comparing the subareolar, glandular breast tissue with the adjacent adipose tissue (Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015; Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519). True gynecomastia usually presents as a rubbery, discrete subareolar mass that is freely mobile and unattached to the skin (Braunstein, N Engl J Med 2007; 357(12): 1229-1237).

**(8)**
Symptomatic gynecomastia that does not respond to medical treatment may require surgical intervention. A grading system aids in determining the appropriate surgical intervention for treating gynecomastia.
The American Society of Plastic Surgeons has adapted the various classification systems for gynecomastia into a grading system (American Society of Plastic Surgeons, Practice Parameters: Gynecomastia. 2004 [cited 2010]):
• **Grade I:** Small breast enlargement with localized button of tissue that is concentric around the areola
• **Grade II:** Moderate breast enlargement exceeding areola boundaries with edges that are indistinct from the chest
• **Grade III:** Moderate breast enlargement exceeding areola boundaries with edges that are distinct from the chest with skin redundancy present
• **Grade IV:** Marked breast enlargement with skin redundancy and feminization of the breast

**(9)**
The goal of surgical correction is to restore the normal male contour with minimal scarring, which can be accomplished in a variety of ways: by simple excision of breast tissue perhaps with removal of some subcutaneous fat or, in more advanced cases, subcutaneous mastectomy with resection of redundant skin (Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015; Ratnam, Aesthet Surg J 2009; 29(1): 26-31; American Society of Plastic Surgeons, Practice Parameters: Gynecomastia. 2004 [cited 2010]; Simon et al., Plast Reconstr Surg 1973; 51(1): 48-52). Subcutaneous mastectomy, although generally reserved for higher grades of gynecomastia, may be appropriate for symptomatic gynecomastia when simple excision of breast tissue is deemed not adequate. Minimally invasive

DHHRBMS002782

**JA2413**

USCA4 Appeal: 22-1927      Doc: 20-5      Filed: 10/31/2022      Pg: 306 of 489



procedures (e.g., laser therapy, mammotome, RFA) are still considered investigational (Devalia and Layer, Surgeon 2009; 7(2): 114-119).

**(10)**
Bilateral mammography and US are helpful in the evaluation of gynecomastia and are used as adjuncts to PE. These imaging modalities can distinguish true breast tissue from adipose tissue, as well as differentiate benign from malignant masses (Devalia and Layer, Surgeon 2009; 7(2): 114-119; Morakkabati-Spitz et al., Radiology 2006; 238(2): 438-445; Wise et al., J Am Coll Surg 2005; 200(2): 255-269).

**(11)**
Medical conditions associated with gynecomastia include hypogonadism, hyperthyroidism, renal disease, malnutrition, cirrhosis or liver disease, testicular or prostate tumors, Klinefelter's syndrome, and XXY males. Attempts should be made to address these underlying causes of gynecomastia prior to considering surgical resection.

**(12)**
Various medications have been used to treat gynecomastia. Medical treatment for gynecomastia involves blocking estrogen effects in the breast tissue using antiestrogens (e.g., tamoxifen), decreasing estrogen production using aromatase inhibitors (e.g., testactolone), or giving androgens (Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519; Hanavadi et al., Breast 2006; 15(2): 276-280). While tamoxifen is not approved by the FDA for the treatment of gynecomastia, it has been well studied and does reduce breast pain and swelling. Other medications are used less often, and there is little evidence to support their use (Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015). Gynecomastia that has been present for longer than 1 year and is fibrotic does not generally regress spontaneously or resolve with medication (Braunstein, N Engl J Med 2007; 357(12): 1229-1237).

**(13)**
An integral component in the evaluation of gynecomastia is recognizing and discontinuing any drugs that can cause the disorder. Contributory medications should be discontinued or changed to an alternative medication if possible prior to surgical treatment, as the problem may recur after surgery if the drugs are continued. Medications that can cause breast enlargement include certain hormones, chemotherapeutic agents, psychoactive drugs, antibiotics, and antiulcer drugs, as well as drugs of abuse (e.g., marijuana, heroin, amphetamines, anabolic steroids) (Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015; Cuculi et al., CMAJ 2007; 176(5): 620; Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519).

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

Page 3 of 4

DHHRBMS002783

**JA2414**



2012.2 Procedures Adult Criteria
Reduction Mammoplasty, Male

**ICD-9:**      85.31, 85.32, 85.34, 85.36
**ICD-10-PCS:**  0HBT0ZZ, 0HBT3ZZ, 0HBU0ZZ, 0HBU3ZZ, 0HBV0ZZ, 0HBV3ZZ
**CPT®:**       19300, 19304, 19318

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

Page 4 of 4
DHHRBMS002784

**JA2415**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually
and on behalf of all others similarly situated,

        *Plaintiffs*,

    v.

WILLIAM CROUCH, *et al.*,

        *Defendants.*

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

**SUPPLEMENTAL DECLARATION OF WALT AUVIL**

I, Walt Auvil, do hereby declare as follows:

1.     I am more than 18 years of age, have personal knowledge of the facts set forth herein, and am otherwise competent to testify to the matters set forth herein.

2.     I am an attorney with and owner of The Employment Law Center, PLLC, and counsel for Plaintiffs in this matter. I submit this supplemental declaration in support of Plaintiffs' opposition to Defendants' motion for summary judgment.

3.     Attached to this declaration are true and correct copies of the documents listed in the table below. Entries in the table indicate where documents have been excerpted.

4.     Sensitive, protected, and/or irrelevant information has been redacted on certain pages of the attached exhibits in accordance with Federal Rule of Civil Procedure

**JA2416**

5.1(a) and Local Rule of Civil Procedure 5.2.1.(a), with black boxes placed over the

redacted text.

| Exhibit | Description |
|---------|-------------|
| 34 | Inter  ual, 2012.2 Procedures Adult Criteria, Reduction Mammoplasty, Male, DHHRBMS002781-84 |
| 35 | Inter  ual, 2021 Reduction Mammoplasty, Male (Adolescent), DHHRBMS002772-77 |
| 36 | Excerpt of Dep. Tr. of Pltf. Shauntae Anderson |
| 37 | Slip op. for Mem. Op. and Order in *Kadel v.   ol  ell*, No. 1:19-cv-272 (M.D.N.C.) ( une 10, 2022) |

I declare under penalty of per ury under the laws of the United States of America that the

foregoing is true and correct.

Dated this 14th day of  une, 2022.                    /s/ Walt Auvil
                                                       Walt Auvil

**JA2417**



# 2012.2 Procedures Adult Criteria

## Reduction Mammoplasty, Male[1, 2*RIN, 3]

| | | | |
|---|---|---|---|
| PATIENT: | Name | D.O.B. | ID# | GROUP# |
| CPT®/ICD: | Code | Facility | Service Date | |
| PROVIDER: | Name | | ID# | Phone# |
| | Signature | | Date | |

ICD-9:

ICD-10:

CPT®:

INDICATIONS (choose one and see below)

☐ 100   Gynecomastia, bilateral/unilateral
☐ Indication Not Listed (Provide clinical justification below)

☐ 100   Gynecomastia, bilateral/unilateral **[All]**[4, 5]
   ☐ 110   Breast pain/tenderness[6]
   ☐ 120   Grade II/III/IV gynecomastia by PE[7, 8, 9]
   ☐ 130   Mammogram/US negative for cyst/tumor[10]
   ☐ 140   Contributory conditions excluded/treated ≥ 6 mos[11, 12]
   ☐ 150   Medication review **[One]**[13]
      ☐ 151   Medications deemed noncontributory
      ☐ 152   Contributory medications discontinued
      ☐ 153   Requires medication that contributes to gynecomastia for which there is no acceptable alternative medication

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested.  IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you.  Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries.  IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions.  IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services.  All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider.  InterQual® and InterQual® Review Manager © 2012-2019 Change Healthcare LLC and/or one of its subsidiaries.  All Rights Reserved.  CPT only © 2011 American Medical Association.  All Rights Reserved.

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

EXHIBIT
57

JA2418

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 311 of 489



2012.2 Procedures Adult Criteria
Reduction Mammoplasty, Male

## Notes

**(1)**
These criteria include the following procedures:
Breast Reduction, Male
Mastectomy for Gynecomastia
Mastectomy, Subcutaneous, Male

**(2)-RIN:**
**These criteria address surgical resection (e.g., reduction mammoplasty, subcutaneous mastectomy) of gynecomastia. If breast enlargement in male patients is due primarily to excess fatty tissue and not glandular hypertrophy, liposuction can be used for breast reduction. Since liposuction only removes fatty tissue and not breast tissue, liposuction is not covered by these criteria.**

**(3)**
In male patients, reduction mammoplasty is done for symptomatic gynecomastia and is performed as an open procedure or a combination of surgical excision and liposuction. The specific surgical technique will vary depending on the amount of glandular breast tissue and fat removed and the amount of skin resected. Surgical excision of breast tissue is used for true gynecomastia, as glandular tissue cannot be suctioned (Devalia and Layer, Surgeon 2009; 7(2): 114-119; Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015). Reduction mammoplasty is indicated for gynecomastia not related to malignancy or caused by other treatable causes (Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519; American Society of Plastic Surgeons, Practice Parameters: Gynecomastia. 2004 [cited 2010]).

**(4)-DEF:**
True gynecomastia is a benign proliferation of the glandular component of male breast tissue and is caused by an excess of circulating estrogen, a deficiency of androgens, or an altered androgen-to-estrogen ratio. Pseudogynecomastia is breast enlargement due to fat or adipose accumulation. Mixed gynecomastia is breast enlargement secondary to both glandular and fat tissue.

**(5)**
Gynecomastia can occur in males of any age but is more commonly seen in puberty or in males over the age of 60 (Braunstein, N Engl J Med 2007; 357(12): 1229-1237; Hanavadi et al., Breast 2006; 15(2): 276-280). In more than half of all cases, gynecomastia occurs bilaterally. Carcinoma should be considered in cases of unilateral enlargement, induration, fixation, skin dimpling, bloody nipple discharge, or a hard, asymmetric mass (Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015; Braunstein, N Engl J Med 2007; 357(12): 1229-1237; Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519).

**(6)**
Gynecomastia is commonly associated with breast pain, which can range in intensity from mild tenderness or sensitivity to constant pain and pressure (Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519; Di Lorenzo et al., Lancet Oncol 2005; 6(12): 972-979). Surgical resection would only be done in symptomatic patients.

**(7)**
Gynecomastia can be differentiated from pseudogynecomastia by comparing the subareolar, glandular breast tissue with the adjacent adipose tissue (Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015; Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519). True gynecomastia usually presents as a rubbery, discrete subareolar mass that is freely mobile and unattached to the skin (Braunstein, N Engl J Med 2007; 357(12): 1229-1237).

**(8)**
Symptomatic gynecomastia that does not respond to medical treatment may require surgical intervention. A grading system aids in determining the appropriate surgical intervention for treating gynecomastia.
The American Society of Plastic Surgeons has adapted the various classification systems for gynecomastia into a grading system (American Society of Plastic Surgeons, Practice Parameters: Gynecomastia. 2004 [cited 2010]):
• **Grade I:** Small breast enlargement with localized button of tissue that is concentric around the areola
• **Grade II:** Moderate breast enlargement exceeding areola boundaries with edges that are indistinct from the chest
• **Grade III:** Moderate breast enlargement exceeding areola boundaries with edges that are distinct from the chest with skin redundancy present
• **Grade IV:** Marked breast enlargement with skin redundancy and feminization of the breast

**(9)**
The goal of surgical correction is to restore the normal male contour with minimal scarring, which can be accomplished in a variety of ways: by simple excision of breast tissue perhaps with removal of some subcutaneous fat or, in more advanced cases, subcutaneous mastectomy with resection of redundant skin (Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015; Ratnam, Aesthet Surg J 2009; 29(1): 26-31; American Society of Plastic Surgeons, Practice Parameters: Gynecomastia. 2004 [cited 2010]; Simon et al., Plast Reconstr Surg 1973; 51(1): 48-52). Subcutaneous mastectomy, although generally reserved for higher grades of gynecomastia, may be appropriate for symptomatic gynecomastia when simple excision of breast tissue is deemed not adequate. Minimally invasive

Licensed for use exclusively to Keystone Peer Review Organization, Inc..

Page 2 of 4

DHHRBMS002782

 **InterQual®**                                    2012.2 Procedures Adult Criteria
                                                           Reduction Mammoplasty, Male

procedures (e.g., laser therapy, mammotome, RFA) are still considered investigational (Devalia and Layer, Surgeon 2009; 7(2): 114-119).

**(10)**
Bilateral mammography and US are helpful in the evaluation of gynecomastia and are used as adjuncts to PE. These imaging modalities can distinguish true breast tissue from adipose tissue, as well as differentiate benign from malignant masses (Devalia and Layer, Surgeon 2009; 7(2): 114-119; Morakkabati-Spitz et al., Radiology 2006; 238(2): 438-445; Wise et al., J Am Coll Surg 2005; 200(2): 255-269).

**(11)**
Medical conditions associated with gynecomastia include hypogonadism, hyperthyroidism, renal disease, malnutrition, cirrhosis or liver disease, testicular or prostate tumors, Klinefelter's syndrome, and XXY males. Attempts should be made to address these underlying causes of gynecomastia prior to considering surgical resection.

**(12)**
Various medications have been used to treat gynecomastia. Medical treatment for gynecomastia involves blocking estrogen effects in the breast tissue using antiestrogens (e.g., tamoxifen), decreasing estrogen production using aromatase inhibitors (e.g., testactolone), or giving androgens (Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519; Hanavadi et al., Breast 2006; 15(2): 276-280). While tamoxifen is not approved by the FDA for the treatment of gynecomastia, it has been well studied and does reduce breast pain and swelling. Other medications are used less often, and there is little evidence to support their use (Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015). Gynecomastia that has been present for longer than 1 year and is fibrotic does not generally regress spontaneously or resolve with medication (Braunstein, N Engl J Med 2007; 357(12): 1229-1237).

**(13)**
An integral component in the evaluation of gynecomastia is recognizing and discontinuing any drugs that can cause the disorder. Contributory medications should be discontinued or changed to an alternative medication if possible prior to surgical treatment, as the problem may recur after surgery if the drugs are continued. Medications that can cause breast enlargement include certain hormones, chemotherapeutic agents, psychoactive drugs, antibiotics, and antiulcer drugs, as well as drugs of abuse (e.g., marijuana, heroin, amphetamines, anabolic steroids) (Johnson and Murad, Mayo Clin Proc 2009; 84(11): 1010-1015; Cuculi et al., CMAJ 2007; 176(5): 620; Narula and Carlson, Endocrinol Metab Clin North Am 2007; 36(2): 497-519).

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

Page 3 of 4

DHHRBMS002783

**JA2420**

      2012.2 Procedures Adult Criteria
                          Reduction Mammoplasty, Male

**ICD-9:**       85.31, 85.32, 85.34, 85.36
**ICD-10-PCS:**  0HBT0ZZ, 0HBT3ZZ, 0HBU0ZZ, 0HBU3ZZ, 0HBV0ZZ, 0HBV3ZZ
**CPT®:**        19300, 19304, 19318

Licensed for use exclusively by Keystone Peer Review Organization, Inc..

Page 4 of 4
DHHRBMS002784

**JA2421**

InterQual®

## 2021, July 2021 Release CP:Procedures

**Subset:**   Reduction Mammoplasty, Male (Adolescent) [1, 2, 3, 4, 5, 6, 7, 8, 9]

**Requested Service:**   Reduction Mammoplasty, Male (Adolescent)

**Age:**   Age ≥ 13 and < 18

| Patient: | Name: | | DOB: | ID #: | GROUP #: |
|---|---|---|---|---|---|
| | Sex (circle): M / F | | Height: | Weight: | |
| Provider/PCP: | Name: | Fax #: | | Phone #: | |
| | NPI/ID #: | | Signature: | | Date: |
| Servicing: | Vendor/Facility: | | | Phone #: | |
| | Diagnosis/ICD: | | Service Date: | Authorization:   /  /   to   /  / | |

InterQual® criteria (IQ) is confidential and proprietary information and is being provided to you solely as it pertains to the information requested. IQ may contain advanced clinical knowledge which we recommend you discuss with your physician upon disclosure to you. Use permitted by and subject to license with Change Healthcare LLC and/or one of its subsidiaries. IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider. © 2021 Change Healthcare LLC and/or one of its subsidiaries. All Rights Reserved. CPT® only © 2011-2020 American Medical Association. All Rights Reserved.

ICD-10:

CPT®:

**INSTRUCTIONS:** Answer the following questions

☐ 10. Gynecomastia

   1. Choose one:
     ☐ A) Symptomatic gynecomastia
     ☐ B) Asymptomatic gynecomastia [10]
     ☐ C) Other clinical information

> • If option A selected, then go to question 2
> • No other options lead to the requested service

   2. Choose all that apply:
     ☐ A) Breast pain or tenderness [11]
     ☐ B) Grade I or grade II or grade III or grade IV gynecomastia by physical examination [12, 13, 14]
     ☐ C) Contributory conditions excluded or treated ≥ 6 months [15, 16]
     ☐ D) Gynecomastia persists beyond 2 years of onset [17]
     ☐ E) Other clinical information (add comment)

> • If the number of options selected is 4 and option E not selected, then go to question 3
> • No other options lead to the requested service


EXHIBIT
55

DHHRBMS002772

**InterQual®**                                    **2021, July 2021 Release CP:Procedures**
**Reduction Mammoplasty, Male (Adolescent)**

---

*Gynecomastia (continued...)*

3. Choose one: [18]

☐ A) Medications deemed noncontributory

☐ B) Contributory medications discontinued

☐ C) Requires medication that contributes to gynecomastia for which there is no acceptable alternative medication

☐ D) Other clinical information (add comment)

> • If option A, B or C selected, then the rule is satisfied; you may stop here  **(Outpatient)**
> • No other options lead to the requested service

---

**Reference**

**Ltd** - This requested service is designated as 'Limited Evidence' in this clinical scenario. Criteria cannot be met.

**2nd** - Secondary review required. Criteria cannot be met.

*Off-label* - Use of a drug for an indication not approved by the U.S. Food and Drug Administration (FDA).

DHHRBMS002773

**InterQual®**                                   **2021, July 2021 Release CP:Procedures**
**Reduction Mammoplasty, Male (Adolescent)**
**Reduction Mammoplasty, Male (Adolescent)**

## Notes:

**1:**
Gynecomastia is commonly seen in newborns, adolescents and men older than age 60, yet spontaneous resolution frequently occurs in newborns and adolescents and does not require intervention. Males whose gynecomastia does not resolve on its own and who are symptomatic may be candidates for reduction mammoplasty to remove glandular breast tissue (Dickson, Am Fam Physician 2012, 85: 716-22).

**2:**
POL: It is a matter of local medical policy whether to require submission of photographs prior to approval of the procedure.

**3:**
These criteria address surgical resection (e.g., reduction mammoplasty, subcutaneous mastectomy) of gynecomastia, including mixed gynecomastia. If breast enlargement in male patients is due primarily to excess fatty tissue and not glandular hypertrophy, liposuction can be used for reducing breast size. Since liposuction only removes fatty tissue and not breast tissue, liposuction is not covered by these criteria.

**4:**
These criteria include the following procedures:
Breast Reduction, Male
Mastectomy for Gynecomastia
Mastectomy, Subcutaneous, Male

**5:**
InterQual® content contains numerous references to gender. Depending on the context, these references may refer to either genotypic or phenotypic gender. At the individual patient level, a variety of factors, including, but not limited to, gender identity and gender affirmation via surgery or hormonal manipulation, may affect the applicability of some InterQual criteria. This is most often the case with genetic testing and procedures that assume the presence of gender-specific anatomy. With these considerations in mind, all references to gender in InterQual have been reviewed and modified when appropriate. InterQual users should carefully consider issues related to patient genotype and anatomy, especially for transgender individuals, when appropriate.

**6:**
Nearly 50% to 65% of adolescent males will experience some degree of gynecomastia at Tanner stage 3 or 4. When spontaneous resolution does not occur, some males will pursue surgery due to physical symptoms, or because of significant emotional distress (Rew et al., J Adolesc 2015, 43: 206-12; Dickson, Am Fam Physician 2012, 85: 716-22). A large systematic review states that adolescent males with gynecomastia are often overweight or obese, yet do not experience significantly higher rates of complications after surgery than those who are normal weight. Weight loss prior to surgery may be advised in some cases to achieve normal weight for overall health reasons, but is not always necessary prior to reduction mammoplasty to prevent complications. Delaying surgery in symptomatic patients until weight loss is achieved is not advised as it may perpetuate emotional distress (Rew et al., J Adolesc 2015, 43: 206-12).

**7:**
This is a procedure that can be performed for either medically necessary or cosmetic purposes. The criteria as written are intended solely for use in determining the medical appropriateness of this procedure and do not cover this procedure when performed for cosmetic reasons.

**8:**
InterQual® Procedures criteria are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from our independent panel of clinical experts. To generate the most appropriate recommendations, a comprehensive literature review of the clinical evidence was conducted. Sources searched included PubMed, ECRI Guidelines Trust®, Agency for Healthcare Research and Quality (AHRQ) Comparative Effectiveness Reviews, the Cochrane Library, Choosing Wisely, Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations, and the National Institute of Health and Care Excellence (NICE). Other medical literature databases, medical content providers, data sources, regulatory body websites, and specialty society resources may also have been used. Relevant studies were assessed for risk of bias

DHHRBMS002774

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 317 of 489

Case 3:20-cv-00740    Document 262-3    Filed 06/14/22    Page 5 of 7 PageID #: 8111

InterQual®                                                    2021, July 2021 Release CP:Procedures
**Reduction Mammoplasty, Male (Adolescent)**
*Reduction Mammoplasty, Male (Adolescent)*

following principles described in the Cochrane Handbook. The resulting evidence was assessed for consistency, directness, precision, effect size, and publication bias. Observational trials were also evaluated for the presence of a dose-response gradient and the likely effect of plausible confounders.

**9:**
I/O Setting: Outpatient

**10:**
Breast asymmetry, hypomastia, macromastia and gynecomastia can have significant psychosocial impact, not only in adolescent males and females, but also in adults. Retrospective and prospective studies using the Rosenberg Self-Esteem Scale state that these individuals often suffer from low self-esteem and seek surgery to relieve emotional instability (Nuzzi et al., Plast Reconstr Surg 2014, 134: 1116-23; Nuzzi et al., Plast Reconstr Surg 2013, 131: 890-6; Neto et al., Aesthetic Plast Surg 2012, 36: 223-5).

**11:**
Gynecomastia is commonly associated with breast pain, which can range in intensity from mild tenderness or sensitivity to constant pain and pressure.

**12:**
True gynecomastia can present as a rubbery or firm, subareolar mass that can be unattached or adherent to the skin.

**13:**
The American Society of Plastic Surgeons has adopted the following grading system for gynecomastia (American Society of Plastic Surgeons, Practice Parameters: Gynecomastia. 2004). :
• Grade I: Small breast enlargement with localized button of tissue that is concentric around the areola
• Grade II: Moderate breast enlargement exceeding areola boundaries with edges that are indistinct from the chest
• Grade III: Moderate breast enlargement exceeding areola boundaries with edges that are distinct from the chest with skin redundancy present
• Grade IV: Marked breast enlargement with skin redundancy and feminization of the breast

**14:**
InterQual® consultants agree that adolescent males with grade I gynecomastia that has persisted for at least two years, who have discontinued all possible contributory medications, and who have breast pain or tenderness are candidates for medically necessary reduction mammoplasty.

**15:**
Medical conditions associated with gynecomastia include hypogonadism, hyperthyroidism, renal disease, malnutrition, cirrhosis or liver disease, testicular or prostate tumors, Klinefelter syndrome, and XXY males. Attempts should be made to address these underlying causes of gynecomastia prior to considering surgical resection.

**16:**
Medical treatment for gynecomastia involves blocking estrogen effects in the breast tissue using antiestrogens (e. g., tamoxifen), decreasing estrogen production using aromatase inhibitors (e.g., testactolone), or giving androgens (Morcos and Kizy, J Fam Pract 2012, 61: 719-25). While tamoxifen is not approved by the U.S. Food and Drug Administration for the treatment of gynecomastia, it has been well studied and does reduce breast pain and swelling. Gynecomastia that has been present for longer than 1 year and is fibrotic does not generally regress spontaneously or resolve with medication (Morcos and Kizy, J Fam Pract 2012, 61: 719-25).

**17:**
Spontaneous resolution of gynecomastia in adolescent males tends to occur within six months to two years of onset. If gynecomastia persists after two years, surgery can be considered (Dickson, Am Fam Physician 2012, 85: 716-22).

**18:**
An integral component in the evaluation of gynecomastia is recognizing and discontinuing or changing any drugs

DHHRBMS002775

**InterQual®**  **2021, July 2021 Release CP:Procedures**
**Reduction Mammoplasty, Male (Adolescent)**

that can cause the disorder, as the problem may recur after surgical correction if the drugs are continued. Medications that can cause breast enlargement include certain hormones, chemotherapeutic agents, psychoactive drugs, antibiotics, and antiulcer drugs, as well as drugs of abuse (e.g., marijuana, heroin, amphetamines, anabolic steroids) (Morcos and Kizy, J Fam Pract 2012, 61: 719-25).

DHHRBMS002776

Licensed for use exclusively by KEPRO

**JA2426**

USCA4 Appeal: 22-1927    Doc: 20-5    Filed: 10/31/2022    Pg: 319 of 489

**InterQual®**

**2021, July 2021 Release CP:Procedures**
**Reduction Mammoplasty, Male (Adolescent)**
**Reduction Mammoplasty, Male (Adolescent)**

**ICD-10-CM (circle all that apply):** N62, Other _____

**ICD-10-PCS (circle all that apply):** 0H0T0JZ, 0H0T3JZ, 0H0U0JZ, 0H0U3JZ, 0H0V0JZ, 0H0V3JZ, 0HBT0ZZ, 0HBT3ZZ, 0HBU0ZZ, 0HBU3ZZ, 0HBV0ZZ, 0HBV3ZZ, 0HRT0JZ, 0HRT3JZ, 0HRU0JZ, 0HRU3JZ, 0HRV0JZ, 0HRV3JZ, Other _____

**CPT® (circle all that apply):** 19300, 19318, Other _____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN and SHAUNTAE
ANDERSON  individually and on behalf of all
others similarly situated,

                *Plaintiffs*,

        v.

WILLIAM CROUCH, *et al.,*

                *Defendants*.

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

**PLAINTIFFS  REPLY MEMORANDUM OF LA    IN SUPPORT OF MOTION TO
EXCLUDE EXPERT TESTIMONY OF STEPHEN B. LEVINE, M.D.**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ..................................................................................................... 1

A.  Defendants' Attempt to Rewrite Dr. Levine's Report in Their Response, Misquote
Plaintiffs' Memorandum of Law, and Mischaracterize Fourth Circuit Precedent Does
Not Make Dr. Levine's Testimony Admissible.. ............................................... 4

B.  Defendants' Attempts to Rehabilitate Dr. Levine's Methodologically Unreliable and
Scientifically Unsupported Testimony Fail........................................................ 9

1.  Dr. Levine's Unsupported Criticisms of the WPATH SOC Make Him An Outlier
in This Field and Render His Proposed Testimony Unreliable............................. 9

2.  Dr. Levine's Failure to Account for Contrary Scientific Literature and His
Misrepresentation of Existing Data About Gender Affirming Medical Care
Renders His Related Opinions Unreliable............................................. 12

3.  Defendants' Attempts to Address the Methodological Flaws in Dr. Levine's
Report by Rewriting it Must Fail. ..................................................... 13

4.  Defendants Fail to Establish Dr. Levine's Unsupported Opinions About "Rapid
Onset Gender Dysphoria" and "Detransition" As Reliable or Supported by
Scientific Evidence........................................................................ 15

C.  Defendants Cannot Tout Dr. Levine as a Qualified Expert Based on His Experience and
Then Dismiss that Experience When It Contradicts Their Arguments. ............... 17

III.  CONCLUSION ................................................................................................. 20

i

**JA2429**

## I.      INTRODUCTION

Defendants opposition fails to meaningfully grapple with the deficiencies described in Dr. Levine s testimony. Instead, Defendants attempt to shift, or in some cases, remove the legal goal posts altogether. Specifically, Defendants suggest that what is at issue is not whether their discriminatory exclusion violates the Equal Protection Clause, Section 1557 ("Section 1557") of the Patient Protection and Affordable Care Act ("ACA") or the Medicaid Act's Comparability and Availability requirements but whether gender affirming surgeries are "medically necessary," and claim this justifies admitting Dr. Levine's opinions wholesale. ECF No. 260 at 3. Defendants misconstrue the relevant *Daubert* standard and willfully ignore the Fourth Circuit's most recent and relevant affirmation of "the indispensable nature of district courts' Rule 702 gatekeeping function in all cases in which expert testimony is challenged." *ardis v. verhead Door Cor .*, 10 F.4th 268, 284 (4th Cir. 2021). Finally, Defendants attempt to rehabilitate Dr. Levine's testimony from the damage done by his own concessions at deposition by rewriting the record. But even this attempt at revisionist history cannot overcome the witness's myriad inconsistencies, methodological failures and scientifically unsupported conclusions. The Court should disregard Defendants' plea for lackadaisical gatekeeping and instead exclude the challenged expert's testimony because of his lacking qualifications, and the fact that his testimony is neither relevant nor scientifically reliable.

## II.     ARGUMENT

Though Defendants would have this Court ignore Fourth Circuit precedent, it is well established that when considering expert testimony, " t he party offering the expert carries the burden of establishing admissibility by a preponderance of the evidence." *Coo er v. mith e he , n .*, 259 F.3d 194, 199 (4th Cir. 2001); *see also mith v. yeth Ayerst Lab ys Co.*, 278

1

**JA2430**

F. Supp. 2d 684, 691 (W.D.N.C. 2003) ("The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of proof.") Defendants fail to meet this burden, however, and are unable to overcome Plaintiffs' specific challenges to Dr. Levine's qualifications and the scientific reliability of his methods and proffered opinions.

As Plaintiffs noted in their opening brief in support of the instant motion, other federal courts have resoundingly dismissed Dr. Levine's opinions about transgender people and the treatment of gender dysphoria. This occurred as recently as 11 days ago, by a federal district court within the Fourth Circuit. On June 10, 2022, Judge Loretta C. Biggs of the Middle District of North Carolina issued a ruling in the *Kadel v.  ol  ell*, No. 1:19-CV-272, 2022 WL 1046313 (M.D.N.C. Apr. 7, 2022), where transgender plaintiffs challenged a similar exclusion of coverage of gender affirming care within the North Carolina State Employee Health Insurance Plan. Ruling on a motion to exclude the expert testimony of Dr. Levine, the Court held that "notably, Levine does not testify that medical and surgical care for gender dysphoria is categorically inappropriate." Memorandum Opinion and Order at 33, Kadel v. Folwell, No. 1:19-CV-272, 2022 WL 1046313 (M.D.N.C. Apr. 7, 2022), ECF No. 234. The Court also held that "Levine's testimony regarding desistance rates does not appear to be based on reliable methodology." *d*. at 36. Like Levine's testimony in this case, the Court found that:

> I t does not appear that he offers any *ategori al o inion* as to the medical necessity of medical and surgical treatments of gender dysphoria, nor does he testify that healthcare providers are prescribing such treatment without due caution and informed consent beyond his anecdotal "experience." To the extent that Defendants seek to introduce testimony from Levine to that effect, he has not provided the Court with any data or methodology from which such claims could be made. Levine has conducted no research to identify which physicians are proceeding as he does, and which do not, rendering any broader opinion about the practice of such healthcare providers pure speculation. *d*. at 37 (emphasis added).

Finally, *Kadel* also found that Levine's references to a " Transgender Treatment Industry'

2

does not appear to be based on any science whatsoever" and is "nothing more than rank speculation designed to distract or inflame the jury and has no business in expert testimony." *Id.* at 37, 32.[1] After narrowing the scope of admissible testimony by Dr. Levine, *Kadel* rejected Defendants' argument Levine's testimony created "a genuine issue of material fact as to whether the Plan's exclusion substantially excludes ineffective treatments." *Id.* at 50. There, as here, Defendants pointed to Dr. Levine's testimony to argue that medical treatments for gender dysphoria are categorically ineffective. But the Court rejected that argument based on *Levine s o n testimony*:

> T hat is not Levine's testimony. He testifies that the available research is not sufficiently reliable to prove that treatments are effective, but repeatedly and emphatically testifies that this lack of high-level research is not reason to justify withholding treatment from all gender dysphoric patients. Rather he testifies that doctors and patients, when fully aware of the risks and elusive benefits of available treatments, should decide if medicine or surgery is necessary, as he does *in his o n ra ti e*. This is Plaintiffs' request: that they and their doctors, not their sex or transgender status, determine when their treatments are appropriate. Levine does not and cannot reliably testify as to how often doctors prescribe unnecessary treatments or fail to obtain informed consent. *Id.* (emphasis in original).

So too here, Levine's proposed opinions are undercut by his own testimony under oath, a blow from which Defendants cannot recover. Dr. Levine Fain Dep. Tr. 88:10-13, ECF No. 254-03; Dr. Levine Kadel Dep Tr. at 73:4-7 ("Q: Is the worrisomeness about a patient's future health, is that a reason to ban all medical care for gender dysphoria? A: Absolutely not."); 84:21-85:1 ("Q: Given all those concerns you have, is that a reason to deny all medical interventions to people with gender dysphoria? A: No …."); 85:4-11 ("Q: Are those concerns you raised justifications in your mind for denying medical interventions to people who have gender dysphoria? A: You know, I'm not advocating denying endocrine treatment or surgical treatment."); 152:1-6 ("Q: Do you think

---

[1] Dr. Levine's similar proposed testimony here lacks any scientific basis and should be excluded by this Court as similarly based on nothing more than "conspiratorial accusations": "There is also an entire industry of mental health clinicians, hormone prescribers, surgeons and even hospitals who have built lucrative lines of business from scaling the costly transgender healthcare' model." Dr. Levine Expert Disclosure 10, ECF No. 254-02.

3

**JA2432**

because that study showed that some people committed suicide after gender affirming surgery that no patient should be able to access gender affirming surgery? A: That would be illogical"); 154:3-5 ("Q: But you're not recommending total bans on gender affirming surgery? A: I'm not recommending total bans."); 160:23-25 ("I did not say that gender affirming treatment in general should be stopped. I've never said that."), ECF No. 254-04. Thus, Levine's testimony also does not create a genuine issue of material fact as to whether the Plan's exclusion substantially excludes ineffective treatments.

> **A.    Defendants Attempt to Rewrite Dr. Levine's Report in Their Response, Misquote Plaintiffs Memorandum of Law, and Mischaracterize Fourth Circuit Precedent Does Not Make Dr. Levine's Testimony Admissible.**

Defendants' opposition grasps for straws in response to Plaintiffs' motion to exclude Dr. Levine's irrelevant opinions about how a person is "biologically defined," his personal and scientifically unsupported opinions "gender exploratory psychotherapy" as a treatment for gender dysphoria, and the Fourth Circuit's observations about the medical community's consensus about appropriate treatment protocols for gender dysphoria. In response, Defendants attempt to rewrite their own expert witness's testimony, including by suggesting his opinions are scientifically supported when they are not, misquoting Plaintiffs' arguments, and mischaracterize the controlling Circuits Court of Appeals decision.

First, Defendants argue that Dr. Levine's scientifically unsupported opinion that biology is defined only by chromosomes, regardless of any other sex related characteristics, is relevant because it is the basis for another of his opinions. ECF No. 260 at 10. Putting aside Defendants' assertion that Dr. Levine relies on an unsupported opinion of *his own* for another of his opinions, Defendants then troublingly state that Dr. Levine has offered the opinion that "gender affirming surgeries do not and cannot fully achieve the results desired by patients." *Id.* But Defendants cite

4

**JA2433**

no portion of Dr. Levine s report or deposition to support this assertion. To the extent they intend to invoke Dr. Levine s distasteful suggestion that no transgender person can ever become a "complete man" or a "complete woman," that is scientifically unsupported and rooted in disrespectful stereotypes that transgender men are not men, and that transgender women are not women. This is not expert testimony. Nor could Dr. Levine purport to offer such an opinion given that he cannot possibly assert specialized knowledge about what results are desired by Plaintiffs here, the class they represent, or even any patients with whom he has not directly discussed the matter.[2]

Second, instead of meaningfully confronting Dr. Levine's admitted lack of scientific evidence for his assertions that "gender exploratory psychotherapy" is the only appropriate treatment for gender dysphoria, Defendants employ several unsuccessful arguments. First, Defendants mischaracterize Plaintiffs' motion to accuse Plaintiffs of "attempting to make Dr. Levine a pariah." ECF No. 260 at 11. Such an ad hominem attack is unfounded and not reflected anywhere in Plaintiffs' brief. Dr. Levine's meaning of the term "gender exploratory psychotherapy" as set out in his testimony is wholly at odds with the way that other professional agencies and behavioral health organizations define that term, such as the Substance Abuse and Mental Health Services Administration ("SAMHSA")[3] and the American Academy of Child and

---

[2] Defendants make the first of several peculiar attempts to respond to Plaintiffs' well-supported arguments by suggesting that if certain opinions of Dr. Levine's must be excluded, so too must Plaintiffs' experts on the same category. ECF No. 260 at 10, 19-20. By doing so, Defendants suggest this "tit for tat" is the standard by which the Court should evaluate the exclusion of Dr. Levine's opinions. This is also not the appropriate venue for such arguments about Plaintiffs' experts. Defendants could have filed similar motions to exclude the testimony of Plaintiffs' experts, but notably, did not. These arguments are therefore untimely and improperly raised.
[3] Substance Abuse and Mental Health Servs. Admin., Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth (2015), available at https://store.samhsa.gov/sites/default/files/d7/priv/sma15-4928.pdf

Adolescent Psychiatry. Those agencies and professional organizations recognize that, properly done, such therapies "foster healthy development, especially for sexual and gender diverse youth, as they *integrate their se ual orientation, gender identity, and or gender e    ression, into their overall identity    ithout any    re determined out ome*." *Conversion    hera y*, https://www.aacap.org/aacap/Policy_Statements/2018/Conversion_Therapy.aspx (last visited June 20, 2022). In stark opposition, Dr. Levine clearly favors placing a thumb on the scale to try to persuade younger patients through "gender exploratory therapy" to no longer be transgender, or that the cause of their gender dysphoria is related to their race, developmental disability, their residence in a foster home, their status as an adoptee, their history of psychiatric illness, or even having been assigned female at birth, rather than simply their being transgender. Dr. Levine Expert Disclosure    10, 87, 88, 156, 157, 160, 164, ECF No. 254-02. Notably, "conversion therapy" is defined by the American Academy of Child and Adolescent Psychiatry as "any therapeutic intervention operating under the premise that a specific gender identity and/or expression is pathological" and "imposed with the intent of promoting a particular…gender as a preferred outcome." That is Dr. Levine's preferred outcome as well. Indeed, in each of the articles that Dr. Levine cites to about the supposed impact of "gender exploratory therapy" each young person's gender dysphoria is treated by the young person "reinvesting" in their assigned sex at birth, not by continuing to assert a gender identity different from the one they were assigned at birth. ECF No. 254-02 Dr. Levine Expert Disclosure    37. If Dr. Levine's characterization of "gender exploratory therapy" were in line with its widely accepted clinical meaning, he would not rely on sources that have as their goal causing the patient to identify with their birth assigned sex. These unreliable opinions present by Dr. Levine throughout his testimony do not pass the rigorous gatekeeping requirements of FRE 702 and *Daubert* standards.

6

**JA2435**

Third, Defendants return to their tried-and-true strategy of rewriting Dr. Levine's testimony and misrepresenting which of his opinions have scientific support in the hopes the Court will ignore its gatekeeping obligations in this dispute. Defendants allege that Dr. Levine "cites to peer-reviewed literature showing … a growing consensus supporting the use of psychotherapy as a first treatment modality for gender dysphoria." But whether therapy is an initial treatment option for transgender people says nothing about the categorical ban Defendants maintain on surgical care, and indeed, Dr. Levine has testified repeatedly that he does not support such bans. Dr. Levine Fain Dep. Tr. 88:10-13, ECF No. 254-03; Dr. Levine Kadel Dep Tr. at 73:4-7 ("Q: Is the worrisomeness about a patient's future health, is that a reason to ban all medical care for gender dysphoria? A: Absolutely not."); 84:21-85:1 ("Q: Given all those concerns you have, is that a reason to deny all medical interventions to people with gender dysphoria? A: No …."); 85:4-11 ("Q: Are those concerns you raised justifications in your mind for denying medical interventions to people who have gender dysphoria? A: You know, I'm not advocating denying endocrine treatment or surgical treatment."); 152:1-6 ("Q: Do you think because that study showed that some people committed suicide after gender affirming surgery that no patient should be able to access gender affirming surgery? A: That would be illogical"); 154:3-5 ("Q: But you're not recommending total bans on gender affirming surgery? A: I'm not recommending total bans."); 160:23-25 ("I did not say that gender affirming treatment in general should be stopped. I've never said that."), ECF No. 254-04. Contrary to Defendants' suggestion, Dr. Levine provided no other citation or scientific support for this assertion in his report or elsewhere. Dr. Levine Expert Disclosure  160, ECF No. 254-02. Regardless, this opinion is simply irrelevant both to Dr. Levine s own clinical practices, and to the issues in the case. Dr. Levine himself does not preclude his own patients from receiving this care and writes letters of authorization so they can obtain it. Dr. Levine Fain Dep. Tr. at 84:4-85:4;

139:14-19, ECF No. 254-03; Dr. Levine Kadel Dep. Tr. at 55:13-17; 56:2-5; 112:16-21; 176:8-16,

ECF No. 254-04; Soneeya Bench Trial Day 1 Tr. at 1-100:15-22, ECF No. 254-05. Additionally,

as Plaintiffs explained in their summary judgment opposition brief, concerns about medical

necessity are indisputably post-hoc, and therefore irrelevant under the heightened scrutiny Grimm

requires for Plaintiffs Equal Protection claims, and for Plaintiffs' Medicaid Act claims. Pls.'

Summ. J. Opp. at 12-13, ECF No. 262; see also *la   v.   is onsin De  t of  ealth  ervs.*, 395 F.

Supp. 3d 1001, 1020-21 (W.D. Wis. 2019) (finding that lack of evidence of any systematic review

of medical necessity before or after adopting exclusion renders the concern post-hoc), 1021 n.28

(same for expert testimony constructed for litigation and not considered by decision-makers).

Finally, Defendants would have this Court ignore Fourth Circuit precedent about "the

indispensable nature of district courts' Rule 702 gatekeeping function" as well as its persuasive

and informative observations about accepted treatment protocols. As such, the Fourth Circuit has

observed in *rimm* that,

> Fortunately, we now have modern accepted treatment protocols for gender dysphoria.
> Developed by the World Professional Association for Transgender Health (WPATH), the
> Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming
> People (7th Version 2012) (hereinafter "WPATH Standards of Care") represent the
> *onsensus a   roa h of the medi al and mental health  ommunity*, Br. of Medical Amici
> 13, and have been recognized by various courts, *in luding this one*, as the authoritative
> standards of care, *see De  lonta v.   ohnson*, 708 F.3d 520, 522–23 (4th Cir. 2013); *see also
> dmo*, 935 F.3d at 769; *Keohane v.   ones*, 328 F. Supp. 3d 1288, 1294 (N.D. Fla. 2018),
> vacated sub nom. *Keohane v.   la. De  t of Corrs.  e  y*, 952 F.3d 1257 (11th Cir. 2020).
> "There are no other competing, evidence-based standards that are accepted by any
> nationally or internationally recognized medical professional groups." *dmo*, 935 F.3d at
> 769 (quoting *dmo v.  daho De  t of Corr.*, 358 F. Supp. 3d 1103, 1125 (D. Idaho 2018)).

*rimm v.  lou ester Cnty.  h.  d.*, 972 F.3d 586, 595-96 (4th Cir. 2020) (emphasis added).

Ultimately, Defendants' attempts to shoehorn Dr. Levine's irrelevant testimony within the zone of

admissibility fail and must be denied.

8

**JA2437**

**B.    Defendants  Attempts to Reha ilitate Dr. Levine s Methodologically Unrelia le and Scientifically Unsupported Testimony Fail.**

Defendants "say so" that Dr. Levine's opinions should be admitted, and that his proposed testimony will survive the Court's gatekeeping duties under Rule 702 and *Daubert* and its progeny, including  *ardis*, is not enough.

**.    Dr. Levine s Unsupported Criticisms of the    PATH SOC Make Him An Outlier in This Field and Render His Proposed Testimony Unrelia le.**

It is worth noting at the outset that the only Fourth Circuit case Defendants cite in their response to Plaintiffs' instant motion runs contrary to their arguments about Dr. Levine's criticisms of the WPATH SOC. ECF No. 260 at 2-3. Specifically, a challenged expert's disagreement with what is otherwise the recognized medical and scientific consensus calls into question *their reliability* because general acceptance in the relevant scientific community is an important element of reliability.  *ee  ease v.  ord Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017). As Plaintiffs have explained at length in their opening brief, the WPATH SOC are the generally accepted and recognized protocols for the treatment of gender dysphoria in the United States and elsewhere, and Dr. Levine testified in this case and others[4] that he generally abides by them in his clinical practice. ECF No. 255 at 5. Even still, Defendants argue that because Dr. Levine's report mischaracterizes the findings of the Dahlen et al. article, quotes statements from the incoming WPATH president Dr. Marci Bowers that she has since clarified and disavowed, and "includes citations" that his testimony about WPATH SOC is reliable. These arguments simply do not survive this Court's gatekeeping inquiry, or the standards set forth in FRE 702 and *Daubert*.

---

[4] Contrary to Defendants' assertion, the previous testimony given under oath of any expert witness, including Dr. Levine, in other similar cases is directly relevant to the reliability of the opinions he proposes to offer in this case.

**JA2438**

Defendants repetition of Dr. Levine's mischaracterization of the Dahlen et al. article is not a rebuttal to Plaintiffs' argument. ECF No. 260 at 14. Plaintiffs take issue with, and Defendants have no response for, Dr. Levine's inaccurate characterization that " a  recently published systematic review found the current WPATH SOC7 (sic) guidelines to be of very low quality and unfit tools for clinical decision making," a statement found nowhere in the Dahlen article, nor a conclusion supported by the article itself.  *d.* Defendants notably have no response to the article's significant qualification that "evaluations of clinical practice guidelines in other medical areas including cancer, diabetes, pregnancy, and depression" "tend to show room for improvement," and that "finding poor quality CPGs is not confined to this area of healthcare." Dahlen Article at 8-9, ECF No. 254-08. Dr. Levine's suggestion that this is somehow uniquely true for the WPATH SOC is unsupported, and it simply cannot be that such a methodologically unsound conclusion is admissible under FRE 702 and *Daubert*. The article's authors also note that " i ncluding gender minority/trans people in guidelines can be considered a matter of health equity, where CPGs have a role to play. GRADE suggests that CPG developers consider equity at various states in creating guidelines..." *d.* This recommendation runs directly counter to Dr. Levine's assertion that because attendance at WPATH's "biennial meetings has been open to trans individuals who are not licensed professionals" that "WPATH can no longer be considered a purely professional organization." Dr. Levine Expert Disclosure at   68, ECF No. 254-02. Indeed, the Dahlen et al. article does not support the reliability of Dr. Levine's testimony in the ways that Defendants allege.

 " A  reliable expert would not ignore contrary data, misstate the findings of others, make sweeping statements without support, and cite papers that do not provide the support asserted."   *yree v.  oston   i. Cor* ., 54 F. Supp. 3d 501, 520 (S.D.W. Va. 2014). And yet, Defendants attempt to justify Dr. Levine's ignoring the subsequent statements of Dr. Marci Bowers that

disavow statements quoted by Dr. Levine for the purpose of undermining WPATH. Dr. Bowers'

Statement, ECF No. 254-09. Dr. Bowers says that what she hopes for "most of all, is that my out-

of-context comments will not be excerpted to weaponize ongoing attacks on transgender persons,"

and that "we are best served by our support of WPATH and its goal of establishing evidence-based

care that affirms gender identity as another important aspect of global diversity." *d.* at 3.

Defendants believe Dr. Levine's failure to account for these subsequent statements by Dr. Bowers

has "no bearing on the admissibility of Dr. Levine's opinions." ECF No. 260 at 14. This Court

disagrees. *yree*, 54 F. Supp. 3d at 520 (cleaned up) ("An expert's opinion may be unreliable if he

fails to account for contrary scientific literature and instead "selectively chooses his support from

the scientific landscape.").

Finally, Defendants misunderstand their burden in submitting reliable and

methodologically sound expert testimony when they assert that Dr. Levine's opinion that "a

growing number of countries are deviating from WPATH and Endocrine Society guidelines"

should not be excluded because "Dr. Levine's report includes citations[5] to support his opinions."

ECF No. 260 at 14-15. Plaintiffs have already explained that the citations Dr. Levine provides are

not from peer-reviewed, scientific sources, and the even *the sour es themselves* do not stand for

the proposition Dr. Levine alleges. In fact, those sources admit instead that Sweden, Finland, and

the UK still allow access to puberty blockers, hormone therapy and other medical interventions,

which Dr. Levine also conceded when pressed at deposition. Dr. Levine Fain Dep. Tr. 106:4-

---

[5] Defendants assert that the number of citations Dr. Levine includes in his report helps to establish
Dr. Levine as qualified and his testimony as reliable and relevant under FRE 702 and *Daubert*
standards. ECF No. 260 at 7, 13 ("Dr. Levine's opinions are supported by 242 citations").
Defendants point to no authority for this assertion, including nothing within Rule 702, *Daubert,* or
its progeny. Indeed, quantity is not the same as quality in the admissibility of proposed expert
testimony.

**JA2440**

108:8;191:20-192:16, ECF No. 254-03. Likely because Dr. Levine's citations fail to support his opinion, Defendants cite in their reply to a source Dr. Levine did not identify in his report or at deposition as a source upon which he relied in forming his opinions. ECF No. 260 at 15. Defendants' untimely inclusion of this source should not be allowed as it violates the expert witness' obligation under Rule 26 that their expert disclosure include all sources upon which they have relied in forming their opinions.  However, even if the Court found this source admissible at this juncture, the article simply does not support Dr. Levine's asserted opinion. It states that the Swedish National Board of Health and Welfare "recommends restraint when it comes to hormone therapy," but defendants omitted the sentence that immediately follows: " a t the same time, it is important that children and young people suffering from gender dysphoria are taken seriously, well treated and offered adequate care measures." ECF No. 252-07.  It is worth noting that Defendants already provide coverage for hormone therapy in their Medicaid program, so this articles' recommendations have no relevance to the surgical care exclusion at the center of this case. Finally, the article does not conclude that Sweden, or a "growing number of countries," are deviating from providing the medical care in accordance with WPATH, or the Endocrine Society guidelines, protocols that Dr. Levine continues to generally adhere to in his own clinical practice.

### .    Dr. Levine s Failure to Account for Contrary Scientific Literature and His Misrepresentation of E isting Data A out Gender Affirming Medical Care Renders His Related Opinions Unrelia le.

At the outset it must be noted that Defendants mischaracterize Plaintiffs' arguments and misquote their opening brief in support of the instant motion.[6] Plaintiffs do not seek only to exclude Dr. Levine's opinions included in the non-exhaustive list of paragraphs from his report on page 15

---

[6] Defendants write that "Plaintiffs specifically cite to Paragraphs 23, 39, 51, 55 and 118 through 124 of Dr. Levine's Report…" Plaintiffs cite these as a non-exhaustive list of examples of Dr. Levine's unreliable opinions in this vein.

12

**JA2441**

of their memorandum, but instead to exclude *all* of Dr. Levine's opinions that assert that gender affirming medical care is "experimental, risky and without lasting benefit." Nevertheless, Defendants again misunderstand the preponderance of evidence burden they bear in proving the admissibility of Dr. Levine's opinions in this case. Defendants suggest that the mere fact that Dr. Levine provides "support" for his opinions is sufficient to survive this Court's rigorous gatekeeping role under Rule 702. ECF No. 260 at 15. But "if the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." *yree*, 54 F. Supp. 3d at 520 (cleaned up). Such is the case here. As Plaintiffs discussed in their opening brief, Dr. Levine fails to acknowledge or account for "recent studies demonstrating that medical treatments for transgender adolescents and adults have favorable outcomes across many measures." ECF No. 255 at 11. Defendants make no attempt to explain or defend Dr. Levine's omissions in this regard. Defendants also notably offer no response to Plaintiffs' arguments about Dr. Levine's misrepresentation about two key studies showing positive long-term outcomes for transgender people who underwent gender reassignment via surgical interventions. ECF No. 255 at 11-12.

.    **Defendants  Attempts to Address the Methodological Fla  s in Dr. Levine s Report  y Re  riting it Must Fail.**

Defendants attempt to rehabilitate another of Dr. Levine's unreliable opinions regarding "desistance" by ignoring Plaintiffs' arguments about specific methodological flaws and again attempting to introduce a source not found in Dr. Levine's report or deposition transcript. ECF No. 260 at 17. To begin, Defendants turn to their oft-repeated refrain that because Dr. Levine provides *any su  ort* for his opinions whatsoever, regardless of whether the support is legitimate, that his opinions should be admitted in this case. Fortunately, that is not the standard by which expert testimony is evaluated and "proposed testimony must because supported by appropriate

13

**JA2442**

validation   i.e.,  good grounds' based on what is known." *yree*, 54 F. Supp. 3d at 526 (citing *Daubert v. Merrell Do    Pharm.*, 509 U.S. 579, 590 (U.S. 1993)). Defendants fail to address Plaintiffs' arguments that Dr. Levine's sources to support this opinion are not "good grounds," nor based on what is known. Specifically, Defendants have *no ans   er* for Dr. Levine's failure to rely on *any data or s ientifi  literature* that studied transgender children or adolescents diagnosed under the current DSM V criteria for gender dysphoria other than to admit that "some of the literature cited to by Dr. Levine did analyze treatment outcomes using diagnostic criteria from the DSM-IV," which differed in significant ways from the current diagnostic criteria. ECF No. 260 at 17. Defendants go no further than this before attempting to distract the court with a key misrepresentation. Defendants state that "most of the literature cited to by Dr. Levine is from 2020 and 2021…Levine Report   90 (ECF 252-11)." While two of the three articles Dr. Levine relies on were published in 2020 and 2021, all three of articles use the same data collected from children whose gender non-conforming behavior was diagnosed between        *and*        , not 2020 or 2021. ECF No. 255 at 13. As Plaintiffs have already discussed in their opening brief, Dr. Levine points to no "recent available literature in the field" that analyzes data from children diagnosed with "Gender Dysphoria in Children" using the current and authoritative DSM-V which was released in 2013. ECF No. 255 at 17. Dr. Levine's citations to "papers that do not provide the support asserted" cannot be used to establish his opinion as reliable in this case.

Further, Defendants should not be permitted to submit in their reply to the instant motion a source that Dr. Levine did not include in his expert disclosure nor identify at deposition as a basis for this opinion. ECF No. 260 at 17 (citing De Vries, et al., *Reliability and Clini al   tility of ender  dentity Related Diagnoses  Com arisons bet een the  CD  ,  CD  ,  D M   , and  D M  *, 8(2) LGBT HEALTH 133 (2021)).  Even if the Court does consider this improperly cited

source, it does not stand for the proposition that Defendants allege, nor provide any additional support for Dr. Levine's challenged opinion. First, Defendants omit from their description that the study's purpose was to assess the "reliability and clinical utility" of the ICD-11, which has not yet been adopted in the United States, in comparison to other criteria. Defendants also omit the methods which involved sixty-four health care providers assessing videos of two children, two adolescents, and two adults for gender incongruence. This study notably did not purport to actually diagnose any of the six individuals, nor did it engage in long-term follow-up of the children and adolescents to see if they continued to experience gender incongruence or any other data points beyond "clinicians evaluating all four systems as convenient and easy to use." De Vries, et al., *Reliability and Clini al tility of ender dentity Related Diagnoses Com arisons bet een the CD , CD , D M , and D M* , 8(2) LGBT HEALTH 133 (2021). No matter how Defendants try to slice it, Dr. Levine's reliance on data collected under sweeping, outdated diagnostic criteria of the DSM III, III-R, IV and IV-R cannot pass muster to support this opinion and therefore it must be excluded.

.       **Defendants Fail to Esta lish Dr. Levine s Unsupported Opinions A out Rapid Onset Gender Dysphoria and Detransition As Relia le or Supported y Scientific Evidence.**

In the service of attempting to salvage Dr. Levine's opinions from exclusion by this Court's gatekeeping obligations under Rule 702, Defendants misstate Plaintiffs' arguments, attempt to introduce a source that Dr. Levine did not include in his report or deposition testimony, and simply repeat Dr. Levine's unsupported opinions. Defendants' first sleight of hand to defend Dr. Levine's opinions about "rapid onset gender dysphoria" conflates an increase in the number of children and adolescents reporting to clinics for treatment of gender dysphoria with the scientifically unsupported hypothesis known as "rapid onset gender dysphoria." Dr. Levine Expert Disclosure

15

**JA2444**

92, ECF No. 254-02.[7] Such a manipulation does not comport with the scientific method. "Rapid onset gender dysphoria" as a clinical term has not been "documented in the literature," contrary to Defendants' (and Dr. Levine's) assertions. This hypothesis was first posited in an article based on what parents, *not the adoles ents themselves*, described as their view that their adolescent experienced a "sudden onset of gender dysphoria." ECF No. 260 at 18. The researcher who introduced the term had to correct and republish the article, explicitly admitting that "rapid onset gender dysphoria is not a formal mental health diagnosis," and that "the report did not collect data from adolescents and young adults or clinicians and therefore *does not validate the henomenon*." Correction to Littman Article, ECF No. 254-18. Dr. Levine's report points to *no eviden e* to validate this hypothesis. Significantly, Dr. Levine did not cite in his report or discuss at deposition the one study to investigate the "rapid onset gender dysphoria hypothesis" that did use adolescent clinical data   and which found no evidence to support the hypothesis. Bauer Article, ECF No. 254-19. " I f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." *yree*, 54 F. Supp. 3d at 520 (cleaned up). Nor do Plaintiffs' experts support this hypothesis, and Defendants misrepresent their testimony by suggesting otherwise. ECF No. 260 at 18-19. Dr. Olson-Kennedy testified regarding a demographic shift seen at some gender clinics, but in no way suggested that it is accounted for by so-called "rapid onset gender dysphoria," and to the contrary suggested that other dynamics are likely the cause instead. Declaration of Carl S. Charles, Ex. U at 23:23-25:20; 55:6-56:10.

---

[7] Dr. Levine also attempts to use the WPATH SOC Version 8 draft's omission of "rapid onset gender dysphoria" and "detransition" as reasons to discredit the group and the forthcoming standards. For reasons discussed above, WPATH is under no obligation to include unscientific hypotheses and unverified reports from the internet in its internationally used Standards of Care.

16

**JA2445**

Defendants repeat Dr. Levine's unsupported opinion that "a growing number of individuals are coming out publicly to discuss their own detransition." ECF No. 260 at 19. Dr. Levine conceded at deposition that he has no scientific evidence to support his opinion that the number of people "detransitioning" is growing, or that the number of people who report "detransition" is greater now that it has even been historically. Dr. Levine Fain Dep. Tr. at 158:8-159:2, 160:25-161:9; 163:9-24, ECF No. 254-3. Defendants offer no explanation for why any of Dr. Levine's scientifically unsupported opinions should be admitted under the Rules of Evidence or *Daubert* standards as applied to proposed testimony in this case. As such, these and others of Dr. Levine's opinions must stop at the gates of this Court.

### C.    Defendants Cannot Tout Dr. Levine as a Qualified E pert Based on His E perience and Then Dismiss that E perience  hen It Contradicts Their Arguments.

Defendants take a "have their cake and eat it too" approach to the application of Dr. Levine's experience to the admissibility of his testimony in this case. They recite Dr. Levine's credentials at length and argue that has the requisite "education, training, experience, and knowledge" required by Rule 702 and *Daubert*, and highlight his "50 years of clinical practice." ECF No. 260 at 6-7. As a preliminary matter, credentials alone are "insufficient to support  an expert's testimony."  *el ,  n . v. Meyer Cor .,* U.S., 679 F.3d 146, 162 (4th Cir. 2012) (cleaned up). But when it comes time to reconcile the factual reality of Dr. Levine's years of clinical experience as described at his deposition in this and many other cases, Defendants suddenly deem that experience "irrelevant to the issues of this case." ECF No. 260 at 7.  The undisputable reality of Dr. Levine's experience is that he has, for the entirety of his nearly 50-year clinical practice, written letters of approval for transgender patients in his care to access endocrine and surgical treatment and does not believe those treatments should be categorically denied. ECF No. 255 at 4-

17

**JA2446**

5. This practice continues even to the present: in the last few months he approved surgical interventions for *several* incarcerated transgender people at Framingham Prison in Massachusetts, people who otherwise could not access this care and must rely on the State to provide them access to it. Dr. Levine Fain Dep. Tr. at 84:4-85:4, ECF No. 254-03. Similarly, Defendants concede, as they must, that Dr. Levine has rarely treated a pre-pubescent child in his 50-year practice. ECF No. 260 at 20. Despite this fatal blow to Dr. Levine's qualifications and the reliability of his testimony in this area, Defendants claim *e a tly the o osite*: that Dr. Levine has "education, training, experience and knowledge in the field of psychiatry and treating gender dysphoric children." *d*. Dr. Levine conceded otherwise. Dr. Levine Fain Dep. Tr. at 28:23-29:6; 62:6-14, ECF No. 254-03; Dr. Levine B.P.J. Dep. Tr. at 87:1-7, ECF No. 254-21. " A ny expert, including physicians, must have the specialized knowledge or skill in the specific area in which the testimony is proffered." *mith*, 278 F. Supp. 2d at 698 (emphasis added); *see also legant Massage, LLC v. tate arm Mut. Auto. ns. Co.*, 2022 WL 433006, at 9 (E.D. Va. Feb. 11, 2022) ("the Fourth Circuit has recognized that experience and expertise in one area does not automatically qualify someone as an expert in another similar area"); *Maldonado v. A le, n .*, 2021 WL 1947512, at 17 (N.D. Cal. May 14, 2021) (chemical engineer not qualified to opine about "reliability engineering," because "slapping the label engineering' on an expert or opinion is insufficient to show expertise across that expansive field"). As Plaintiffs have already demonstrated, Dr. Levine lacks both specialized skill or knowledge about the treatment and diagnosis of pre-pubescent children and he does not write, research or publish about them. ECF No. 255 at 18-20. Defendants' vague references to "his own published works and the works of others" do not address this failure. ECF No. 260 at 20. Defendants simply cannot have it both ways: either Dr. Levine is a qualified expert with experience that contradicts Defendants' arguments about the relevance and reliability

of his testimony in this case, or he is not. Either way, the Court must exclude his testimony.

In Defendant's efforts to diminish the fact that Dr. Levine's clinical practice supports the relief Plaintiffs seek, they obfuscate the meaning of "medical necessity" and fail to stretch Dr. Levine's testimony to cover the gap. ECF No. 260 at 7. Defendants suggest, without evidence or citation to the record, that Dr. Levine's provision of approval letters for surgery, a practice consistent with the WPATH SOC Version 7 is not "an admission of medical necessity." *Id.* While this may be Defendants' opinion, it does not comport with the reality that Dr. Levine's letters (and those of other psychiatrists in this field) are used to support determinations of medical necessity for insurance coverage. Indeed, those determinations cannot be made without a provider's "letter of approval," as Defendants own internal documents confirm. Defs' InterQual Sheets, ECF No. 254-17. Additionally, nowhere in Dr. Levine's report does he demonstrate "experience, education, training or knowledge" about the concept of "medical necessity" beyond suggesting repeatedly that it should not be conflated with gender-affirming medical care. Dr. Levine Expert Disclosure 81, 82, 84, ECF No. 254-02. Instead, Dr. Levine alleges that establishing a basis for medical necessity for gender affirming medical care is "challenging" because science hasn't established a "causal mechanism" of gender dysphoria and because "the nature of the diagnosis is in flux." *Id.* at 94. Yet again, this unsupported opinion fails the tests for relevance and reliability. Dr. Levine cites to *no s ientifi authority* for the idea that the cause of an illness or medical condition must be "scientifically established" for treatment to be medically necessary. If that dubious standard were used by West Virginia Medicaid to determine medical necessity then they would decline to treat a host of debilitating and widespread conditions with no "scientifically established" cause including

19

**JA2448**

pediatric cancers[8], Type 1 Diabetes[9], and multiple sclerosis.[10] Plaintiffs already dispensed with Dr. Levine's unsupported and unreliable opinion that the diagnosis of gender dysphoria is in flux in their opening brief. ECF No. 254 at 14. At base, treatments for gender dysphoria under West Virginia Medicaid have already been established to be a medically necessary service, given the range of treatments Defendants already cover for gender dysphoria. ECF No. 261 at 1. Dr. Levine's scientifically unsupported personal beliefs about "medical necessity" are irrelevant and unreliable, and the Court should find them inadmissible under FRE 702 and *Daubert* and progeny.

### III.  CONCLUSION

Accordingly, Plaintiffs respectfully request that this Court grant the instant motion and exclude Dr. Levine's purported expert testimony as inadmissible under *Daubert* and the Federal Rules of Evidence.

---

[8]  Risk Factors and Causes of Childhood Cancer, Am. Cancer Soc'y (Oct. 15, 2019), https://www.cancer.org/cancer/cancer-in-children/risk-factors-and-causes.html#: :text=But%20 the%20causes%20of%20DNA,without%20having%20an%20outside%20cause.

[9]  Diabetes, Mayo Clinic (Oct. 30, 2020), https://www.mayoclinic.org/diseases-conditions/diabetes/symptoms-causes/syc-20371444#: :text=Causes%20of%20type%201%20 diabetes,with%20little%20or%20no%20insulin.

[10] What Causes M.S.?, Nat'l Multiple Sclerosis Soc'y, https://www.nationalmssociety.org/What-is-MS/What-Causes-MS#: :text=The%20cause%20of%20MS%20is,of%20the%20body s%20 immune%20system).

Dated: June 21, 2022

/s/ Walt Auvil
Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058  Fax: 304-485-6344
auvil__theemploymentlawcenter.com

Anna P. Prakash, MN Bar No. 0351362
Nicole J. Schladt, MN Bar No. 0400234
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4700
Minneapolis, MN 55402
Phone: 612-256-3200  Fax: 612-338-4878
aprakash__nka.com
nschladt__nka.com

Sasha Buchert, OR Bar No. 070686
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
Phone: 202-804-6245  Fax: 202-429-9574
sbuchert__lambdalegal.org

*Attorneys for Plaintiffs*

   Admitted Pro Hac Vice

Respectfully submitted,

Avatara Smith-Carrington, MD Bar
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
Phone: 214-219-8585  Fax: 214-481-9140
asmithcarrington__lambdalegal.org

Tara L. Borelli, GA Bar No. 265084
Carl Charles, NY Bar No. 5427026
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: 470-225-5341  Fax: 404-506-9320
tborelli__lambdalegal.org
ccharles__lambdalegal.org

Nora Huppert, CA Bar No. 330552
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Phone: 312-663-4413  Fax: 312-663-4307
nhuppert__lambdalegal.org

**JA2450**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

   *Plaintiffs*,

  v.

WILLIAM CROUCH, *et al.*,

   *Defendants.*

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

### CERTIFICATE OF SERVICE

 I hereby certify that the foregoing document, and any attachments, were served

electronically on June 21, 2022, on the following counsel for Defendants in this case:

Lou Ann S. Cyrus (WVSB # 6558)
Roberta F. Green (WVSB #6598)
Caleb B. David (WVSB #12732)
Kimberly M. Bandy (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953, Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus   shumanlaw.com, rgreen   shumanlaw.com
cdavid   shumanlaw.com, kbandy   shumanlaw.com

*Attorneys for Defendants   illiam Crou h  Cynthia   eane  and   est  irginia De artment of
ealth and   uman Resour es,   ureau for Medi al   ervi es*

Dated: June 21, 2022    Respectfully submitted,

        s/ Walt Auvil
        Walt Auvil, WV Bar No. 190
        THE EMPLOYMENT LAW CENTER, PLLC
        1208 Market Street
        Parkersburg, WV 26101
        Phone: 304-485-3058
        Facsimile: 304-485-3058
        auvil   theemploymentlawcenter.com

22

**JA2451**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN and SHAUNTAE
ANDERSON*; individually and on behalf of all
others similarly situated.*,*

|  |  |
|---|---|
| *Plaintiffs*, | CIVIL ACTION NO. 3:20-cv-00740 |
| | HON. ROBERT C. CHAMBERS |
| v. | |
| WILLIAM CROUCH, *et al.,* | |
| *Defendants*. | |

**DECLARATION OF CARL S. CHARLES**

Pursuant to 28 U.S.C. § 1746, I, Carl S. Charles, do hereby declare as follows:

1.      I am over 18 years of age.

2.      I am a Senior Attorney at Lambda Legal Defense and Education Fund, Inc.  and

serve as counsel of record for the plaintiffs in the above-captioned matter.

3.      I have personal knowledge of the facts stated herein, except those stated upon

information and belief, and if called upon, could and would testify competently to them.

4.      I submit this declaration in support of Plaintiffs' Motion to Exclude Expert

Testimony of Stephen B. Levine, M.D. ("Dr. Levine.").

5.      Attached as **Exhibit U** is a true and correct copy of excerpts of the transcript of

the deposition of Dr. Joanna Olson-Kennedy, taken on April 25, 2022, in relation to the above

captioned matter.

I declare under the penalty of perjury that the foregoing is true and correct. Dated this 21st

day of June 2022.

1

**JA2452**

Carl S. Charles

```
                                                      Page 1

 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                    HUNTINGTON DIVISION
 4
 5   CHRISTOPHER FAIN; ZACHARY     )
     MARTELL; BRIAN MCNEMAR, SHAWN )
 6   ANDERSON a/k/a SHAUNTAE       )
     ANDERSON and LEANN JAMES,     )        Civil Action No.
 7   individually and on behalf of )
     all others similarly          )          3:20-cv-00740
 8   situated,                     )
                                   )
 9             Plaintiffs,         )
                                   )
10   vs.                           )
                                   )
11   WILLIAM CROUCH, in his        ) REMOTE VIDEOTAPED DEPOSITION OF
     official capacity as Cabinet  )
12   Secretary of the West         )    JOHANNA OLSON-KENNEDY, M.D.
     Virginia Department of Health )
13   and Human Resources; CYNTHIA  )         April 25, 2022
     BEANE, in her official        )
14   capacity as Commissioner for  )
     the West Virginia Bureau for  )
15   Medical Services; WEST        )
     VIRGINIA DEPARTMENT OF HEALTH )
16   AND HUMAN RESOURCES, BUREAU   )
     FOR MEDICAL SERVICES; JASON   )
17   HAUGHT, in his official       )
     Capacity as Director of the   )
18   West Virginia Public          )
     Employees Insurance Agency;   )
19   and THE HEALTH PLAN OF WEST   )
     VIRGINIA, INC.,               )
20                                 )
               Defendants.         )
21   _____)
22
23
24
25   Reported By: Amy E. Simmons, CSR, RPR, CRR, CRC
```

Page 2

```
 1            REMOTE VIDEOTAPED DEPOSITION OF
 2              JOHANNA OLSON-KENNEDY, M.D.
 3
 4        BE IT REMEMBERED that the remote videotaped
 5    deposition of JOHANNA OLSON-KENNEDY, M.D., was taken via
 6    videoconference by the Defendants before Veritext Legal
 7    Solutions, Amy E. Simmons, Court Reporter and Notary
 8    Public in and for the County of Ada, State of Idaho, on
 9    Monday, the 25th day of April, 2022, commencing at the
10    hour of 8:39 a.m. Pacific Daylight Time in the
11    above-entitled matter.
12
13
14    APPEARANCES (Remotely):
15
      For the Plaintiffs:   LAMBDA LEGAL DEFENSE
16                          AND EDUCATION FUND, INC.
                            By:  Tara L. Borelli, Esq.
17                          1 West Court Square, Suite 105
                            Decatur, Georgia  30030
18                          Telephone:  (404) 897-1880
                            Facsimile:  (404) 506-9320
19                          tborelli@lambdalegal.org
20
                            LAMBDA LEGAL DEFENSE
21                          AND EDUCATION FUND, INC.
                            By:  Avatara Smith-Carrington, Esq.
22                          3500 Oak Lawn Avenue, Suite 500
                            Dallas, Texas  75219-6722
23                          Telephone:  (214) 219-8585
                            Facsimile:  (214) 219-4455
24                          asmithcarrington@lambdalegal.com
25
```

```
                                                        Page 3
 1    APPEARANCES (Contd.):
 2
      For the Plaintiffs:  THE EMPLOYMENT LAW CENTER
 3                         By:  Walt Auvil, Esq.
                           1208 Market Street
 4                         Parkersburg, West Virginia 26101
                           Telephone:  (304) 485-3058
 5                         Facsimile:  (304) 485-6344
                           auvil@theemploymentlawcenter.com
 6
 7    For the Defendants:  SHUMAN MCCUSKEY SLICER, PLLC
                           By:  Caleb B. David, Esq.
 8                         Post Office Box 3953
                           Charleston, West Virginia  25339
 9                         Telephone:  (304) 345-1400
                           Facsimile:  (304) 343-1826
10                         cdavid@shumanlaw.com
11
      Videographer:        Jonathan Hernandez
12
13    Also Present:        Michele Clanton-Lockhart
14
15
16
17
18
19
20
21
22
23
24
25
```

## DEPOSITION OF DR. JOHANNA OLSON-KENNEDY

Page 6

1    Plaintiffs.

2            THE WITNESS:  My name is Johanna Olson-Kennedy.

3    I am the expert witness here on behalf of the Plaintiffs.

4            THE VIDEOGRAPHER:  Thank you.  Now will

5    the court reporter please administer the oath.

6

              OHANNA OLSON-KENNEDY, M.D.,

7

     a witness having been first duly sworn remotely to

8

     tell the truth, the whole truth and nothing but the

9

     truth, was examined and testified as follows:

10

11           MS. BORELLI:  And before Mr. David begins his

12   questions, we'd like to put a stipulation on the record.

13           The stipulation is that for purposes of

14   this deposition, an objection to form will

15   preserve all objections to form without needing to

16   specifically state them.

17           Mr. David, is that agreeable to you?

18           MR. DAVID:  That is agreeable to me.

19           MS. BORELLI:  Thank you.

20           MR. DAVID:  And, Tara, before I get

21   going, do we want to note Walt's appearance?  I

22   just wanted to make sure.

23           MS. BORELLI:  Sure.  Walt, do you want to

24   state your appearance?

25           MR. AUVIL:  Walt Auvil for the Plaintiffs.

**DEPOSITION OF DR. JOHANNA OLSON-KENNEDY**

Page 23

1   gender dysphoria in a patient, do you use the

2   DSM-5 criteria for diagnosis?

3           MS. BORELLI:  Objection; form.

4           THE WITNESS:  Yes.

5       Q.   (BY MR. DAVID)  Are there any other

6   criteria that you rely upon in making the

7   diagnosis outside of the DSM-5?

8           MS. BORELLI:  Objection; form.

9           THE WITNESS:  I think that making the

10  diagnosis in addition to what's in the DSM, I lean

11  on my clinical experience, 16 years of doing this

12  work, to facilitate that diagnosis.

13      Q.   (BY MR. DAVID)  Are there other

14  diagnostic criteria other than what's listed in

15  the DSM-5?

16          MS. BORELLI:  Objection; form.

17          THE WITNESS:  No.  Those are the

18  diagnostic criteria.

19      Q.   (BY MR. DAVID)  And I believe you just

20  said that you have 16 years of clinical

21  experience; is that correct?

22      A.   That's correct.

23      Q.   Over your 16 years of clinical

24  experience, have you seen a shift in the patient

25  population from primarily individuals who were

## DEPOSITION OF DR. JOHANNA OLSON-KENNEDY

Page 24

```
 1    assigned male at birth to now individuals who were
 2    assigned female at birth?
 3              MS. BORELLI:  Objection; form.
 4              THE WITNESS:  We have seen a shift in
 5    that ratio.
 6        Q.  (BY MR. DAVID)  Do you have an
 7    explanation for why that shift is occurring?
 8              MS. BORELLI:  Objection; form.
 9              THE WITNESS:  I have thoughts about it,
10    yes.
11        Q.  (BY MR. DAVID)  Okay.  And I'll ask you
12    your thoughts in a second.
13              Are you aware of any literature that has
14    looked into that specific shift and determined why
15    that shift has occurred?
16              MS. BORELLI:  Objection; form.
17              THE WITNESS:  No.
18        Q.  (BY MR. DAVID)  And now can you tell me
19    your thoughts on why that shift has occurred?
20              MS. BORELLI:  Objection; form.
21              THE WITNESS:  I think that there are many
22    things that have to be considered.  The first is,
23    you know, I work in a youth clinic.  So I see
24    people that primarily are accessing services at
25    around the age of 16.  And their experiences are
```

## DEPOSITION OF DR. JOHANNA OLSON-KENNEDY

Page 25

1   of gender dysphoria -- their gender dysphoria is

2   emerging around the time that they start puberty.

3            I think that it is critical to understand

4   that the development of chest tissue is the first

5   beginnings of puberty for people designated female

6   at birth.

7            Because of that, it is likely that that

8   change of puberty is the thing that is either

9   exacerbating or creating the experience of gender

10  dysphoria for them in a way that they can

11  verbalize and talk about.

12       Q.   (BY MR. DAVID)  Okay.  So would the rise

13  in individuals who were assigned female at birth

14  coming out as transgender in recent years compared

15  to previously be more or less that that population

16  has always existed, but now it's more acceptable

17  from society's point of view to come out as

18  transgender?

19            MS. BORELLI:  Objection; form.

20            THE WITNESS:  Yes, I believe so.

21       Q.   (BY MR. DAVID)  Okay.  And so as a result

22  of that, individuals who were assigned male at

23  birth were, I guess, overrepresented in the ratio

24  because those who were assigned female at birth

25  were not comfortable coming out as transgender

## DEPOSITION OF DR. JOHANNA OLSON-KENNEDY

Page 55

1    been a shift in the ratio with more individuals

2    presenting with -- who were assigned female at

3    birth than previously were presenting --

4            MS. BORELLI:  Objection; form.

5            I apologize, Caleb.

6            MR. DAVID:  You're okay.  I'm being a

7    little clumsy with this, so I'll start over.

8        Q.   (BY MR. DAVID)  We previously talked at

9    the beginning of your deposition about there is a

10   shift in the ratio of your patient population from

11   primarily those who were assigned male at birth to

12   now a greater number who were assigned female at

13   birth; is that right?

14           MS. BORELLI:  Objection; form.

15           THE WITNESS:  Well, let me clarify.

16   There was not a time -- we -- there was not a

17   time -- I'm going to go back because the

18   historical context is important.

19           We've been providing services at our

20   division of adolescent medicine since the '90s.

21   But since we started tracking our new referrals,

22   we -- in 2010 to 2015, there was an equal ratio.

23           And then in -- sorry, 2014-2015, we

24   started getting a higher number of people

25   designated female at birth new for consultation.

## DEPOSITION OF DR. JOHANNA OLSON-KENNEDY

Case 3:20-cv-00740   Document 266-2   Filed 06/21/22   Page 10 of 11 PageID #: 8349

```
                                                 Page 56

1        Q.   (BY MR. DAVID)  Okay.  Has that
2   population that you've seen starting to shift from
3   2014-2015, has it continued to today?
4             MS. BORELLI:  Objection; form.
5             THE WITNESS:  We still have -- it evened
6   out a little bit -- at our center it evened out a
7   little bit over the last year or two years, but we
8   still have -- more than 50 percent of the people
9   seeking services are designated female at birth,
10  but it has evened out a little bit more.
11       Q.   (BY MR. DAVID)  Okay.  Has that cohort of
12  patients that has shifted that ratio been involved
13  in studies regarding the efficacy of the services
14  that you specifically provide, puberty blockers
15  and hormone therapy?  And we'll leave out the oral
16  contraceptives.
17            But for puberty blockers and for the
18  hormone therapy, has that cohort of patients been
19  studied?
20            MS. BORELLI:  Objection; form.
21            THE WITNESS:  In -- are you talking about
22  just broadly speaking, or in our program?
23       Q.   (BY MR. DAVID)  Well, let's start broadly
24  speaking.
25            MS. BORELLI:  Same objection.
```

Page 207

1                    REPORTER'S CERTIFICATE

2

STATE OF IDAHO   )

3                    )   ss.

COUNTY OF ADA    )

4

5       I, AMY E. SIMMONS, Certified Shorthand Reporter

6  and Notary Public in and for the State of Idaho, do

7  hereby certify:

8       That prior to being examined, the witness named in

9  the foregoing deposition was by me duly sworn remotely to

10  testify to the truth, the whole truth and nothing but the

11  truth;

12       That said deposition was taken down by me in

13  shorthand at the time and place therein named and

14  thereafter reduced to typewriting under my direction, and

15  that the foregoing transcript contains a full, true

16  and verbatim record of said deposition.

17       I further certify that I have no interest in the

18  event of the action.

19       WITNESS my hand and seal this 10th day of May,

20  2022.

21

                              AMY E. SIMMONS

22                            CSR, RPR, CRR, CRC and Notary

                              Public in and for the

23                            State of Idaho.

24

25  My Commission Expires: 06-13-2022

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

CHRISTOPHER FAIN and SHAUNTAE
ANDERSON, individually and on
behalf of all others similarly
situated,

                Plaintiffs,

vs.                                No. 3:20-CV-00740

WILLIAM CROUCH, et al.,

                Defendants.

_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

CASE MANAGEMENT CONFERENCE

WEDNESDAY, JULY 13, 2022, 1:00 P.M.

---o0o---

For the Plaintiffs:    THE EMPLOYMENT LAW CENTER
                       1208 Market Street
                       Parkersburg, West Virginia  26101
                       BY:  WALT AUVIL

                       LAMBDA LEGAL DEFENSE AND
                       EDUCATION FUND
                       1 West Court Square, Suite 105
                       Decatur, Georgia  30030
                       BY:  TARA L. BORELLI
                       and  CARL SOLOMON CHARLES

              (Appearances continued next page...)

Reported by:  KATHY L. SWINHART, CSR
              Official Court Reporter
              (304) 528-2244

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

**JA2464**

```
 1                    APPEARANCES (Continued)

 2
      For the Plaintiffs (Cont'd):
 3
                    LAMBDA LEGAL DEFENSE AND
 4                  EDUCATION FUND
                    3500 Oak Lawn Avenue, Suite 500
 5                  Dallas, Texas  75219
                    BY:  AVATARA ANTOINETTE SMITH-CARRINGTON
 6
                    NICHOLS KASTER
 7                  4700 IDS Center
                    800 South 8th Street
 8                  Minneapolis, Minnesota  55402
                    BY:  ANNA P. PRAKASH
 9                  (Appearing via videoconference)

10    For the Defendants:

11                  SHUMAN MC CUSKEY & SLICER
                    Post Office Box 3953
12                  Charleston, West Virginia  25339
                    BY:  LOU ANN S. CYRUS
13                  and  CALEB B. DAVID
                    and  KIMBERLY M. BANDY
14
                Also Present:
15
                    CYNTHIA BEANE, Commissioner
16                  West Virginia Bureau of Medical Services

17

18

19

20

21

22

23

24

25
```

**JA2465**

1

1          HUNTINGTON, WEST VIRGINIA

2        WEDNESDAY, JULY 13, 2022, 1:01 P.M.

3                 ---o0o---

4        THE COURT:  Good afternoon.

5        MS. BORELLI:  Good afternoon.

6        MX. SMITH-CARRINGTON:  Good afternoon, Your Honor.

7        THE COURT:  Before we start, I note that we have at

8   least one individual who is participating by videoconference.

9   I want to instruct you -- and I don't recall, I don't think

10  any media requested to listen by phone.  But in any event,

11  anyone who is not here is prohibited from recording any part

12  of this proceeding.  Federal law prohibits the recording of

13  any audio or video in federal courtrooms, and so I simply

14  instruct you not to make any recording of this.

15        With that, we're here today primarily, or almost

16  exclusively, I guess, to present arguments concerning the

17  cross motions for summary judgment.  What I'd like to do is

18  start with plaintiffs' counsel.  Each side will be given

19  plenty of opportunity to respond and provide rebuttal or

20  reply.

21        So, with that, are you ready to make a presentation?

22        MS. BORELLI:  Yes, Your Honor.

23  Thank you.

24        THE COURT:  All right.

25        MS. BORELLI:  Good afternoon, Your Honor.  Tara

2

1   Borelli with Lambda Legal on behalf of plaintiffs.  And my

2   pronouns are she and her.

3         With the Court's permission, I will argue all aspects

4   of plaintiffs' summary judgment motion except the Medicaid Act

5   claims, which will be handled by counsel Smith-Carrington, who

6   uses they/them pronouns.  And we, of course, wish to thank the

7   Court for its accommodation to allow Ms. Prakash to argue the

8   class cert motion virtually.

9         Regarding the equal protection claim, this case asks

10  whether West Virginia Medicaid violates federal law's

11  guarantee of freedom from sex and transgender status

12  discrimination through its blanket ban on surgical care for

13  transgender participants when cisgender participants face no

14  such exclusion.  The answer is, yes, this violates federal

15  law.

16        With respect to equal protection, heightened scrutiny

17  is required for multiple reasons.  First, the exclusion is

18  facial sex discrimination because it targets the fact of

19  gender transition on its face by excluding, quote, transsexual

20  surgery.  The exclusion itself thus makes precisely clear who

21  is targeted; that is, transgender people.

22        THE COURT:  Let me interrupt you on this point.  And I

23  know there are implications for this in other parts of the

24  argument, but one of the things that I tried to think through

25  is that in this case, first, it does appear the Medicaid

3

1   program had a blanket exclusion for any gender transition

2   treatment.  It appears through the evidence that, in fact, one

3   of the plaintiffs and other individuals have gotten some

4   treatments, hormone treatments specifically, among other

5   things.  So I'm kind of puzzled at what the current state of

6   the exclusion is and then might want to have a follow-up

7   question about that.

8        So what's your view of the current state of the

9   exclusion under West Virginia's Medicaid program?

10       MS. BORELLI:  So our understanding, Your Honor, is

11  that the exclusion is for surgery, but it is a blanket

12  exclusion of surgery across the board.  And that actually

13  points to how arbitrary this exclusion is, because West

14  Virginia Medicaid recognizes the diagnosis of gender

15  dysphoria.  They accept that a number of forms of care can be

16  medically necessary for it.  And so they cover, for example,

17  hormone therapy, counseling, lab work and office visits.

18       But arbitrary --

19       THE COURT:  Let me ask you about this, because I think

20  it might have some bearing on the equal protection argument.

21       So I understand that in some of these cases, and for

22  instance in the Grimm case, the leading Fourth Circuit case,

23  that the exclusions were blanket exclusions.  In Grimm, of

24  course, it's a blanket exclusion over using the restroom.  But

25  in some of the other cases I've seen there were blanket

4

1    exclusions that precluded hormone treatment and so forth for

2    people seeking to change their gender identity.

3         And so the question I've got is that if it's only

4    aimed here at surgery and not at other treatment regimens for

5    transgender people seeking to conform to their gender

6    identity, does it really support an inference of

7    discrimination?

8         MS. BORELLI:  Yes, Your Honor.  And Grimm is actually

9    a perfect analogy because there was discrimination in that

10   case based on restroom use and gender markers on records.  But

11   as the school argued in that case, there were other

12   circumstances in which the school did not discriminate against

13   Gavin Grimm, the transgender plaintiff, so the analysis is the

14   same.  No matter whether the discrimination is targeted to a

15   particular benefit or is an across-the-board exclusion, that

16   makes this case a lot like Fletcher, which was the challenge

17   to the Alaska state employee health plan, where there the

18   exclusion also was surgical, but it was a categorical

19   exclusion of all surgery.

20        And part of what the courts have observed is how

21   arbitrary it is to recognize the diagnosis and a variety of

22   forms of care but to, without justification, draw the line at

23   surgery and refuse that form of treat.  The usual equal

24   protection analysis applies even if the state has drawn the

25   line right at surgery.

5

1        THE COURT:  Okay.  So here you argue that this is the

2   type of facial discrimination that should be reviewed at an

3   intermediate level of scrutiny.  So would you address the

4   defendant's arguments concerning determining who is similarly

5   situated for plaintiffs?  And then I'd like you to discuss

6   some of the evidence in the record pertaining to the

7   defendant's purported interests in supporting its exclusion.

8        MS. BORELLI:  Thank you, Your Honor.

9        So on the subject of being similarly situated, we have

10  testimony in the record from Dr. Schechter, who is the only

11  surgical expert in the case.  He performs hundreds and

12  hundreds of these surgeries, and he has given unrebutted

13  testimony that the surgical procedures here are similar or the

14  same even down to the level of procedure codes.

15       So, for example, there is something called current

16  procedural terminology, CPT codes, and those are the codes

17  used to specify the procedure being performed.  And as he

18  testified, the CPT codes themselves illustrate that this is

19  the same because, for example, if a cisgender woman required a

20  vaginoplasty for a congenital absence of a vagina, the same

21  CPT code might be used for her vaginoplasty and for a

22  gender-confirming vaginoplasty for a transgender woman because

23  the procedures are similar or the same.

24       On the subject of the government interests, Your

25  Honor --

6

1         THE COURT:  Before we get off of this argument, as I

2  understand it, the defendant, and I guess plaintiffs don't

3  dispute this, uses I think it's InterQual and then another

4  utilization review company, Kepro, I think, or something like

5  that.

6         MS. BORELLI:  Yes, my -- yes.

7         THE COURT:  Yeah.  Can you explain what these entities

8  do, and why it is that the defendant's wrong if they -- when

9  they characterize these standards as being standards that

10  reveal the differences between the same surgical procedure for

11  gender confirmation versus other uses.

12         MS. BORELLI:  Yes, Your Honor.

13         So our understanding is that Kepro is the vendor that

14  West Virginia Medicaid uses, ah, to make determinations about

15  medical necessity and coverage.  And Kepro relies on standards

16  produced by InterQual, which is a nationally accredited

17  organization that produces these standards for determining

18  medical necessity based on continuous review of the most

19  current evidence-based research literature.

20         So what defendants have pointed to in the InterQual

21  sheets is to say that the same procedures for cisgender people

22  and transgender people, if you look at the titles of those

23  policies, some titles refer to treatment for one diagnosis,

24  some titles refer to treatment for gender dysphoria.  That is

25  not a relevant difference.  All that really says is cisgender

7

1    people receive some of these procedures, and transgender

2    people are denied access to the care that InterQual would be

3    very willing to give them were it not for the exclusion.

4        THE COURT:  So these standards contained in InterQual

5    and Kepro don't reveal a significant difference in the nature

6    of the surgical procedure itself, whether it's for gender

7    confirmation or cancer treatment or something else?

8        MS. BORELLI:  That's correct, Your Honor.

9        So defendants have also pointed in their briefs to the

10   idea that a transgender woman, for example, who requires a

11   vaginoplasty, she might also require procedures like a

12   penectomy, for example.  Those are also procedures covered

13   through West Virginia Medicaid, and that is undisputed.  So

14   there is no relevant difference revealed in those InterQual

15   sheets.

16       THE COURT:  Do the standards -- so InterQual and Kepro

17   also have standards for these procedures when used for gender

18   confirmation?

19       MS. BORELLI:  That's correct.  And those sheets, which

20   are in the record, Your Honor, what they reveal is that

21   InterQual says that the procedures here can be medically

22   necessary; that the sooner the diagnosis and treatment are

23   provided, the more successful the care is; and delaying

24   treatment is not a reasonable treatment option.

25       THE COURT:  And do these reasonably track in a

8

1    parallel fashion the InterQual/Kepro standards for the same

2    treatments for cisgender individuals?

3           MS. BORELLI:  Yes, Your Honor.

4           As Dr. Schechter testified, the procedures do not

5    differ.  It is the reason a person might need them that may

6    differ.  But all that reason does is point to who is cisgender

7    and who is transgender, and that is sex-based discrimination.

8           THE COURT:  Do any of these things, whether it's the

9    InterQual, Kepro or the billing standards, reveal whether or

10   not the cost of these procedures is significantly different

11   between care provided for cisgender or transgender people for

12   a different diagnosis versus transgender for gender

13   confirmation?

14          MS. BORELLI:  So I'm not aware that the InterQual

15   sheets contain any information pointing to differential cost.

16   Dr. Schechter, however, did testify and said, because these

17   procedures are the same, the cost is the same, right down to

18   that CPT code.

19          THE COURT:  And the billing code standard that you

20   talked about doesn't provide information about relative cost,

21   comparative cost?

22          MS. BORELLI:  No.  And Dr. Schechter's testimony is

23   that it is the same.

24          So, in addition to that, Your Honor, I want to offer

25   one more way to think about Kepro and InterQual, which is this

9

1    is the state system.  They contract with this vendor.  The

2    vendor uses InterQual, and cisgender people receive coverage

3    for care that InterQual would approve as medically necessary.

4    They can get that as a matter of course if they qualify under

5    the InterQual standards.  Transgender people cannot.  And the

6    only reason is because of the exclusion for, quote,

7    transsexual surgery.  Were it not for that exclusion, and

8    defendants admitted this in their briefing, plaintiffs would

9    be able to submit claims and be covered if they met the

10   InterQual criteria.  So it is the exclusion that discriminates

11   based on sex, which separates transgender people from the care

12   they would otherwise receive.

13          THE COURT:  How does -- how do these standards inform

14   a decision about whether or not -- if it does, whether or not

15   these surgical treatments for gender confirmation for

16   transgender people is recognized within the standard of care

17   as medically necessary?

18          MS. BORELLI:  So, Your Honor, there are several

19   sources the Court can actually look to on that point.

20          One is Grimm itself.  So Grimm reviewed the standard

21   of care, which is promulgated by the World Professional

22   Association for Transgender Health, also known as WPATH.  And

23   Grimm says it's clear that these standards -- the standard of

24   care is recognized as a matter of consensus among medical and

25   mental health professionals --

10

1     THE COURT:  But Grimm didn't involve the provision of

2 medical care.  As I recall, that was in the context of

3 identifying gender dysphoria as a recognized medical

4 condition, and that -- that wasn't really a discussion about

5 the propriety -- the standard of care or the treatment, was

6 it?

7     MS. BORELLI:  Well, Your Honor, there were arguments

8 raised in that case about the care that Gavin Grimm had

9 received, and evidence of his care was presented to the court

10 because it affected his secondary sex characteristics.  And so

11 there were arguments about the irrationality of requiring a

12 transgender young man with facial hair and a deep voice, for

13 example, to use the girls' restroom as defendant suggested

14 would be appropriate.

15     And so Grimm undertakes this comprehensive look at the

16 standard of care as part of setting the stage for its

17 analysis, and it does say that the medical consensus has

18 recognized that these are authoritative.  And, second, I would

19 point the Court to the InterQual sheets themselves.  They rely

20 on WPATH as an authoritative set of standards of care and the

21 Endocrine Society, although hormone treatment is not at issue

22 here.

23     But the care that plaintiffs' experts describe,

24 standard of care, there's agreement on all of these fronts

25 that this is the standard of care.  And even defendants have

11

admitted -- and this was in response to request for admission
No. 1, that gender-confirming care can be medically necessary.
So I don't believe there's any material dispute of fact on
this point, Your Honor.

THE COURT:  Is it medically necessary only if there's
a diagnosis of gender dysphoria?

MS. BORELLI:  A diagnosis is a typical first step
in --

THE COURT:  Is it a necessary step?

MS. BORELLI:  Typically a diagnosis code would be
required for, ah, insurance coverage of, you know, a
particular procedure.  But, again, the Medicaid program here
recognizes this diagnosis, and they cover a number of types of
care on the basis of the diagnosis, and so I -- I don't
believe there's any dispute about the validity of the
diagnosis itself.  There is, again, just this block interposed
solely by that exclusion that prevents transgender people from
getting the benefit of the InterQual standards that cisgender
people receive.

THE COURT:  Why do you think the State drew the line
here with gender-confirming surgery where it appears to allow
other gender-confirming treatment like hormones and so forth?

MS. BORELLI:  I don't know, Your Honor.  The testimony
in the record is that there is no reason in medicine or
science to draw that line.

12

1    There is -- there is no reason to take something

2    widely recognized as sometimes urgently needed treatment for

3    this care, and indeed InterQual itself recognizes that this

4    kind of treatment should not be delayed, that that is not a

5    reasonable treatment option.

6    THE COURT:  Well, I know that in -- I will confess,

7    I've looked a lot of the records.  This is a huge record that

8    you've presented me with.  I haven't had time to look at

9    literally every footnote cite to things in the record or read

10    through everything completely.

11    Be that as it may, I do recall that you've argued that

12    the defense has no substantive evidence to support its claim

13    that the cost of covering gender-confirming surgery is such

14    that they can reasonably draw the line for the fiscal

15    integrity of the program.

16    Tell me what -- where the evidence is and the sources

17    of the evidence that you -- that the defendant has relied upon

18    in making that claim as best you understand it.

19    MS. BORELLI:  Your Honor, that's the key.  They have

20    not relied on anything.  The admissions of their witnesses

21    were that there's been no research, no analysis performed of

22    cost or any other matter related to this exclusion.  Those are

23    admissions of their organizational representatives.

24    We also have a stipulation on the docket with the

25    Court, and that stipulation says that the defendants are not

13

1  aware of a single document considered by anybody responsible

2  for adopting or maintaining the exclusion, let alone any

3  analysis of cost.

4       On the other hand, the evidence that plaintiffs have

5  introduced related to cost is the testimony of Dr. Schechter

6  and Dr. Karasic, who testified that this care is cost

7  effective, and indeed providing this medically necessary care

8  is more effective than treating the effects of denying the

9  care, including depression, anxiety, suicidality and others.

10      THE COURT:  I remember in looking through some of the

11 exhibits, and I can picture this better than I can identify it

12 in the record -- I think when it was used in deposition, it

13 was Exhibit 33 or something to that effect.  As I recall,

14 plaintiffs cited this, and it's a different number under the

15 docket system than 33, but said, well, here's what the

16 defendant's representatives -- and I assume these are like

17 30(b)(6) representatives -- here's what they said they took

18 into consideration in deciding not to extend coverage for

19 surgery for gender confirmation.

20      And it consisted of three or four, as I recall,

21 journal articles, one which was a survey that was done of all

22 the states examining the Medicaid policy with respect to each

23 state when it comes to similar exclusions.  And so can you --

24 do you know what I'm talking about, first of all?  Can you

25 tell me where that fits in the evidence that the Court ought

14

1    to be considering?

2         MS. BORELLI:  Yes, Your Honor.  And we regret the

3    confusion caused here, but the background to help the Court

4    understand how we arrived at what is the operative stipulation

5    on the docket now is that, in response to discovery requests,

6    defendants identified a series of documents that may have been

7    considered by decisionmakers.  Ah, in the course of a

8    subsequent 30(b)(6) representative -- there were several in

9    this case.  In the course of one of the depositions of those

10   representatives, the parties reached a stipulation about

11   exactly what had been considered by the decisionmakers.  An

12   incorrect version of that stipulation was uploaded on the

13   docket.  To their credit, defendants caught the error,

14   notified us, and we then filed a superseding stipulation,

15   which says it supersedes the prior one.

16        And that stipulation clarifies that there are no

17   documents of which they are aware that any decisionmaker or

18   person who has decided to maintain the exclusion has

19   considered.

20        THE COURT:  All right.  So you don't at this point

21   have evidence that any of these decisionmakers considered, for

22   instance, the particular journal article survey that I was --

23        MS. BORELLI:  That's correct.  And, in fact, the

24   stipulation is that they have not considered those documents.

25        THE COURT:  All right.  But it's your position that

15

1   they stipulated that they have no sort of documents or studies

2   relied upon to estimate the cost of this -- of covering this

3   type of service?

4          MS. BORELLI:  That's correct, Your Honor.  And that's

5   why we think it could be reasonably characterized as post-hoc.

6   We don't think that the evidence currently meets their burden

7   to show that it actually motivated a decisionmaker.

8          THE COURT:  I know they also cited, and there may be

9   testimony from some of their representatives about this, about

10  the CMS study that was done I think in 2016 or so, maybe '17,

11  where CMS reported that at that point, it didn't have

12  sufficient peer-reviewed information to be able to say that

13  this type of surgical treatment for gender conformity had

14  long-term benefits and was otherwise within the standard of

15  care.

16         Can you tell me, did the defendants rely in part on

17  that study?

18         MS. BORELLI:  So, ah, they stipulated that they did

19  not, but I do want to address the substance of it.  Because

20  this -- these documents from HHS actually support plaintiffs,

21  and not defendants.  And if the Court wants to go back and

22  refer to a portion of the record in writing with a lengthy

23  explanation, Dr. Schechter's rebuttal report does so.

24         So here's the answer, Your Honor.  They point to a

25  second decision of HHS, and they ignore the first one.  And

16

1    the first one is what is relevant and matches this case.

2            In that first decision of HHS, it was asked to

3    consider the blanket ban on surgical care for Medicare

4    participants.  And HHS reviewed it and said, this is

5    unsupportable and struck that ban, and so Medicare no longer

6    has a blanket ban on surgical care.  That is exactly the

7    relief plaintiffs seek here.

8            The subsequent decision to which they point involved a

9    request for Medicare to issue a national coverage

10   determination.  Many, many services under Medicare do not have

11   NCDs.  What that would involve is --

12           THE COURT:  Meaning they're not mandated as part of

13   the --

14           MS. BORELLI:  Correct.

15           That's because, as Dr. Schechter explains, a national

16   coverage determination means that a service would be available

17   without limitation.  And in a population that involves people

18   who are older, where age may be a risk for surgery, ah, it

19   doesn't make sense to have it be available without any

20   limitation.

21           But that is consistent with a variety of care that is

22   available under Medicare.

23           THE COURT:  Well, then to be clear about it, there are

24   other coverages within the West Virginia Medicaid program for

25   services that would be characterized as optional by CMS.

17

1          MS. BORELLI:  Yes, that's right, Your Honor.

2          THE COURT:  And so the State can't claim that we don't

3   provide this service because we are restricting our available

4   services to that which is mandated and nothing more.

5          MS. BORELLI:  Right.

6          So, yes, Your Honor, on that point about CMS and this

7   argument that they're simply following the advice of CMS, ah,

8   we don't believe there's any substance to this argument, Your

9   Honor, because CMS is not the ultimate arbiter of any state's

10  obligations to comply with the Constitution or with federal

11  law.  States do have an obligation to follow their statutory

12  and constitutional obligations regardless of whether a federal

13  agency has explicitly told them that they must do so.  And so

14  we think that disposes of the argument that they're simply --

15  they're doing what CMS might say is or isn't required.  Their

16  obligation is to the Constitution and the Affordable Care Act,

17  not to what this federal agency has or hasn't told them.

18         THE COURT:  All right.  I think we've kind of been

19  diverted to talking about some of the evidence in the record

20  concerning the State's interest and so forth.  Let's come back

21  to this equal protection claim, then.

22         So you've kind of, through this discussion of the

23  record, I think maybe answered my questions about what the

24  State asserted as its interest that should be balanced by the

25  Court even under intermediate scrutiny.

18

1          The defendant argues persistently that this -- this

2    surgery exclusion should not be considered as targeting a

3    group or a class but, rather, targeting a particular treatment

4    or condition.  And while there is certainly more elaborate

5    discussion, and I'm going to let them articulate that, one of

6    the cases they cite or argue about a fair amount is the

7    pregnancy case decided by the Supreme Court several years ago.

8          And we've all struggled with how you pronounce that,

9    because other than the extent to which I've read about in this

10   case, I didn't recall it even.

11         So tell me how you distinguish that case from this

12   one.

13         MS. BORELLI:  Yes, Your Honor.

14         We think it's Geduldig, but --

15         THE COURT:  Sounds pretty --

16         MS. BORELLI:  -- I shouldn't be quoted on that.

17         So we would point the Court for a particularly cogent

18   discussion of how Geduldig does, and more importantly does

19   not, apply to an exclusion like this to a recent summary

20   judgment decision by the Middle District of North Carolina in

21   a case called Kadel.

22         THE COURT:  I've read it a bunch of times, so I'm

23   pretty familiar with it.

24         MS. BORELLI:  Yes.

25         THE COURT:  And I will say that, as is true with some

19

1  of the other cases that I've read here, you kind of get

2  hopefully deeper levels of understanding when you spend more

3  time with it.  But it still does trouble me that in Geduldig,

4  if that is close -- first, what's your understanding of the

5  level of scrutiny that the court was applying there?

6      MS. BORELLI:  So the court was applying heightened

7  scrutiny.

8      THE COURT:  I didn't see them say that anywhere.  It

9  almost seemed to me it was more like a rational basis test,

10 but I don't feel confident making that judgment.

11     In any event, what the -- even at a -- well, at a

12 heightened scrutiny, then you would think it would require

13 much more justification, and yet they certainly found that the

14 exclusion for pregnancy disability was constitutional.

15     So how does it differ, then?

16     MS. BORELLI:  Your Honor, I apologize.  In my last

17 answer, I may have misunderstood the Court's question.

18     Were you referring to the level of scrutiny in Kadel?

19     THE COURT:  No, I was still talking about --

20     MS. BORELLI:  I see.  I apologize.

21     THE COURT:  Okay.

22     MS. BORELLI:  So, yes, in Geduldig, I don't actually

23 recall the level of analysis the court applied.  It may have

24 been rational basis.  I don't know that it was entirely clear.

25     THE COURT:  Honestly I don't see that they gave it a

20

1   label, which is just kind of unusual when you read all these

2   other cases how --

3           MS. BORELLI:  Yes, Your Honor.

4           THE COURT:  -- the court is to identify a level of

5   scrutiny.

6           MS. BORELLI:  That said, I -- I happen to be partial

7   to the Kadel analysis, and it's not just because we're counsel

8   in that case as well.

9           So what the Kadel court said is if you look at

10  Geduldig's statement about pregnancy -- so the court there

11  says:  Pregnancy is an objectively identifiable condition.

12  And what the court meant by that is you can reference it and

13  describe it without reference to sex.

14          And the Kadel court says there is no -- no way to talk

15  about the exclusion at issue in this case without referencing

16  sex, gender or transgender status, and that is what

17  distinguishes Geduldig --

18          THE COURT:  Honestly it does seem odd to say that you

19  can describe pregnancy without referencing sex because only

20  females can get pregnant.  And so, you know, that seemed to me

21  to be a little bit of a simplistic explanation that I kind of

22  struggled with accepting.

23          MS. BORELLI:  Right.  Now, that language comes from

24  Geduldig itself.

25          THE COURT:  Uh-huh.

21

1          MS. BORELLI:  And so the Kadel court says, accepting

2    that analysis for what it is, ah, it simply is not the same as

3    the exclusion here, which references sex explicitly on its

4    face, and that's equally true of the exclusion here.  The

5    exclusion is for transsexual surgery.  It references sex

6    explicitly.  It references transgender people explicitly.  It

7    is a world apart from the exclusion considered in Geduldig.

8          THE COURT:  Okay.

9          MS. BORELLI:  If the Court has no further questions,

10   Your Honor.

11         THE COURT:  Well, not on equal protection.

12         MS. BORELLI:  Okay.  Does the Court have any questions

13   about the Affordable Care Act?  I can address it briefly.

14         THE COURT:  Yes, please.

15         MS. BORELLI:  So the Affordable Care Act, we believe

16   it raises pure questions of law.  West Virginia Medicaid

17   admitted in its answer to the complaint that it is a health

18   program or activity that receives federal financial

19   assistance, ah, and that makes it a covered entity under the

20   Affordable Care Act.  We don't understand there to be any

21   dispute between the parties about that key element of the

22   claim.

23         And then the analysis of sex discrimination in the

24   Affordable Care Act comes directly from Title IX because the

25   ACA borrows its anti-discrimination standard from Title IX.

22

1  That makes Grimm and Bostock directly controlling for this

2  statutory claim.  Grimm, of course, was ruling on a Title IX

3  claim, and Grimm relied interchangeably on Title VII and equal

4  protection principles, ah, to determine what constitutes sex

5  discrimination.

6          And we think that means that the answer has to be this

7  is sex --

8          THE COURT:  What about the district judge's

9  forbearance of that issue in Kadel?

10         MS. BORELLI:  So, Your Honor, what I would say about

11 that is, we think that the statutory language is clear, and

12 there are slightly distinct positions of the parties here.  So

13 there is -- there is no question here that this defendant is a

14 covered entity.  They've admitted it.  The defendant in Kadel

15 has sought to contest that, and so the court said it was

16 interested in rulemaking around that issue.

17         But here --

18         THE COURT:  Whether or not the coverage extends to an

19 insurance claim.

20         MS. BORELLI:  Right.  Yes.  So there is a state health

21 plan that is its own independent entity there providing state

22 employee health coverage.

23         Here there is just no contest --

24         THE COURT:  The West Virginia health plan is no longer

25 a party here.

23

1          MS. BORELLI:  The state employee -- correct, Your

2     Honor, the state employee health plan is no longer a party

3     here.  So we think that there is simply no contest based on

4     defendant's own binding admissions, and that would -- that

5     would make the Kadel treatment of that claim, that aspect of

6     that claim irrelevant.

7          THE COURT:  All right.  Thank you.

8          MS. BORELLI:  Thank you, Your Honor.

9          THE COURT:  Someone else, then, is going to argue

10    about the Medicaid Act?

11         MS. BORELLI:  Yes, Your Honor.

12         THE COURT:  All right.

13         MS. BORELLI:  Thank you so much.

14         MX. SMITH-CARRINGTON:  Good afternoon.  May it please

15    the Court.  My name is Avatara Smith-Carrington, I use the

16    they/them pronouns, and I represent Christopher Fain and

17    Shauntae Anderson.

18         Participation in the Medicaid program is optional.

19    However, once a state has chosen to take part in the program,

20    they must comply with all federal statutory and regulatory

21    requirements.  West Virginia has participated in the Medicaid

22    program since its inception and does so to service its most

23    vulnerable citizens, which also includes transgender West

24    Virginians.

25         Defendant's exclusion of coverage for

24

1    gender-confirming surgical care violates two provisions of the

2    Medicaid Act.

3        First, the exclusion violates the comparability

4    requirement because it discriminates on the basis of

5    diagnosis.  Second, it violates the availability requirement,

6    because it excludes gender-confirming surgical care regardless

7    of medical necessity.

8        In Flack versus Wisconsin Department of Health

9    Services, the district court considered an exclusion similar

10   to the one that is at issue here.  In Flack, the district

11   court found that the exclusion violated the comparability

12   requirement because the same medical treatments were covered

13   when used to treat other medical conditions that were not due

14   to dysphoria.

15       Recognizing that the availability requirement mandates

16   that states make covered treatments available in sufficient

17   amount, duration and scope in order to reasonably achieve its

18   purpose, the district court also found that the exclusion

19   violated the availability requirement because Wisconsin

20   Medicaid failed to make covered treatments available in

21   sufficient amount, duration and scope.

22       Simply put, once Wisconsin Medicaid offered to cover a

23   form of care, they were required to cover that form of care

24   for everyone so long as it was medically necessary.  Because

25   the exclusion failed to make available medically necessary

25

1    covered treatments, Wisconsin Medicaid violated the
2    availability requirement.
3         The same is true here.  Although defendants admit they
4    provide coverage for the relevant procedures, chest surgery,
5    hysterectomy, vaginoplasty, penectomy, defendants arbitrarily
6    draw a line at providing coverage for gender-confirming
7    surgical care regardless of medical necessity, which violates
8    the availability requirement.
9         And defendants violate the comparability requirement
10    by denying coverage for gender-confirming surgical care when
11    indicated for gender dysphoria, but covering the same surgical
12    procedures when necessary for other medical conditions.
13    Ultimately defendants violate both the availability and
14    comparability requirement.
15         Your Honor, at this time, I would be happy to answer
16    any questions that you might have on these two claims.
17         THE COURT:  In addition to discussing medical
18    necessity as one of the factors, I see some of the case law --
19    this might be based upon the statute where there is a mention
20    of utilization controls or utilization review.
21         What does that mean, and why does that not provide the
22    defendant discretion to draw the line here about the surgical
23    procedures?
24         MX. SMITH-CARRINGTON:  Understood.
25         So in Bontrager versus Indiana Family and Social

26

1    Services Administration, the Seventh Circuit in that case

2    found that when a state uses financial obligations as a reason

3    to shirk its obligations to cover medically necessary care,

4    that is not an appropriate use of what would be considered a

5    utilization control procedure.

6         So in Bontrager, the Seventh Circuit found that

7    Indiana's thousand dollar budgetary cap on medically necessary

8    dental services, that didn't constitute a proper utilization

9    control procedure.  So even though here defendants assert

10   that, you know, a budgetary issue is a reason for -- or even

11   though defendants here assert that the budget is a utilization

12   control procedure, that would not be proper when you're

13   looking at the availability requirement.

14        THE COURT:  Has any court or any relevant agency

15   explained what utilization control means, then?

16        MX. SMITH-CARRINGTON:  So the definition of a

17   utilization control procedure remains somewhat up in the air

18   in terms of, like, how other courts interpret it.  But what is

19   clear is that when it usually is used, it's around numerical

20   limitations on other services.

21        So, for example, in the Fourth Circuit there's another

22   case of Charleston Memorial Hospital where it's talking about

23   inpatient and outpatient hospital days, so hospital stays.

24   And in that case, the Fourth Circuit found that that was

25   proper because the services were still provided ultimately,

27

1    and essentially the services were still made available.

2          And so other courts look at utilization control

3    procedures not with regard to what, ah, defendants are doing

4    here with regard to the budget, but more so in terms of, like,

5    limitation on services that are already made available.

6          THE COURT:  So, for instance, being able to discharge

7    someone from an assisted living facility back home at a

8    reduced cost by still providing access to the same services.

9          MX. SMITH-CARRINGTON:  Correct, Your Honor.

10          THE COURT:  All right.  Are there any particular

11    district court or circuit opinions other than the one you

12    mentioned that you think are real helpful to the Court in

13    deciding this?

14          Many of the cases that I've read -- and I'm certainly

15    not going to claim that I've read all of what both sides have

16    cited, but a number of them which discuss equal protection and

17    the ACA don't get into the Medicaid Act.  So are there any

18    particular cases you think are helpful for the analysis?

19          And one I remember, and I'm going to say I think it's

20    the Cruz case out of New York, was a pretty elaborate detailed

21    discussion of how that judge applied availability and

22    comparability.  And I'm not sure how -- how much I see of an

23    explanation here to mirror what that judge analyzed.

24          MX. SMITH-CARRINGTON:  I understand.

25          So I would first say that I would first point the

28

1   Court to Flack v. Wisconsin.  You can also look at Cruz --

2            THE COURT:  Was that --

3            MX. SMITH-CARRINGTON:  Oh, sorry.

4            THE COURT:  What stuck in my mind about Flack is that

5   was at a preliminary injunction stage.

6            MX. SMITH-CARRINGTON:  Yeah, so -- well, they ruled at

7   the preliminary injunction stage for plaintiffs there, and

8   then they permanently enjoined the exclusion from being

9   enforced as well.  So Flack versus Wisconsin would be a good

10  case to look at.  Also, Cruz versus Zucker is also a good one.

11           But even if you're looking at the two requirements or

12  if you're looking at the availability requirement or you're

13  looking at the comparability requirement, there are a couple

14  of great cases.  So, for example, if you're looking at the

15  availability requirement, I would definitely point the Court

16  to Bontrager versus Indiana Family and Social Services

17  Administration.  And for the comparability requirement, which

18  prohibits discrimination on the basis of diagnosis, I would

19  point the Court to White versus Beal or Davis versus Shah,

20  which perfectly handle the analysis there.

21           THE COURT:  And those cites are in your --

22           MX. SMITH-CARRINGTON:  Yes.

23           THE COURT:  All right.  Thank you.

24           MX. SMITH-CARRINGTON:  Okay.  Thank you.

25           THE COURT:  All right.  For the defense?

29

1          MS. CYRUS:  Thank you, Your Honor.

2          May it please the Court, opposing counsel.  My name is

3    Lou Ann Cyrus, and I represent the defendants to this case,

4    the West Virginia Department of Health and Human Services,

5    Bureau for Medicaid -- and I'll call that either DHHR or

6    Medicaid if that is okay.

7          THE COURT:  Sure.

8          MS. CYRUS:  As well as the cabinet secretary, who is

9    Bill Crouch, and as well as the commissioner for the Bureau

10   for Medical Services, who is Cynthia Beane, who actually is

11   here today in person, Your Honor.

12         One thing I would say at the outset, and the Court has

13   seized on this, and the Court is exactly right, there is a

14   huge, huge distinction here between all the other cases that

15   have been discussed in that -- and when this case was

16   initially filed, the plaintiffs alleged in both the complaint

17   and the amended complaint, and the Court alluded to this

18   earlier, that there was a categorical exclusion of all

19   services, gender-confirming services that transgender folks

20   need.  Well, that is not a correct statement, and we

21   demonstrated -- and the Court asked, you know, has that been

22   changed, corrected?  No, it's remained the same throughout

23   this case from the outset.

24         We did -- we covered all those things except the

25   transsexual surgery, and that is a huge difference because

30

1  all -- and we can go through these.  The cases that the Court

2  has mentioned and been discussed, Flack specifically, talk --

3  there was an exclusion for all transgender services.

4       THE COURT:  Let me try to clarify this.

5       MS. CYRUS:  Yes.

6       THE COURT:  This is probably something I can and will

7  understand more clearly from this going over the briefing in

8  more detail after the arguments today, but it does seem to me

9  that it has been part of a written policy that

10 gender-confirming services were excluded.  But now, as I

11 understand it, the fact is that some of the gender-confirming

12 treatment, for instance, hormone treatment, has nonetheless

13 been provided.

14       But is it true that you still have the literal

15 language as part of the policy that excludes these things?

16       MS. CYRUS:  The Medicaid manual is what contains the

17 language, and it excludes -- it has non-covered -- exclusion

18 is somewhat of a misnomer, but it's non-covered services --

19       THE COURT:  It's the broad language --

20       MS. CYRUS:  -- of transsexual -- transsexual surgery

21 is what is not covered, Your Honor.

22       THE COURT:  Only transsexual surgery.

23       MS. CYRUS:  That's correct.  And the whole gamut of

24 everything else is -- they cover the hormones, the therapy,

25 psychiatric, psychological evaluations, the lab work that has

31

1    to be done, doctors' visits.  And it's only the surgery.

2             THE COURT:  So how does that make it different in your

3    mind?

4             MS. CYRUS:  Well, because it's not a -- it's not

5    discrimination based upon sex.  If you take the plaintiffs'

6    argument, because these folks are transgender, and that

7    transgender is based on sex, it's discrimination based on sex.

8    No, actually it's not.

9             That would be the case if we were like these other

10   states where they provide no services to transgender

11   individuals for their -- their trans -- gender-affirming care.

12   In this instance, we only exclude -- don't cover the diagnosis

13   of gender dysphoria for gender-confirming surgery.  And it's

14   not even limitation on the diagnosis because the hormones that

15   are provided are also for the diagnosis of gender dysphoria as

16   is pretty much everything else that is covered.

17            So it's limited to a particular procedure or

18   procedures.  It's a category of procedures, which are the

19   surgical procedures, and those -- that's not based on sex.

20   That is based on the procedures.

21            So this would be a different case, Your Honor, if it

22   were what the plaintiffs alleged in the complaint, the amended

23   complaint, that we provide no coverage, and we exclude all

24   services for transgender individuals.  Because transgender

25   individuals have the exact same services as cisgender

32

1    individuals, and that's what's significant here.

2          If we have two buckets, we have this bucket is

3    everything that Medicaid provides as coverage, the other

4    bucket is for everyone, over here is what they provide for

5    cisgender -- I'm sorry -- transgender individuals, these two

6    buckets are exactly the same.  What the plaintiffs are trying

7    to do is add more to the transgender bucket to add in the

8    transgender gender-affirming surgery.

9          THE COURT:  In Grimm, the Fourth Circuit determined

10   that a quasi suspect class can be identified as transgender

11   individuals.  So how do you get around applying that same

12   determination in this case?

13         MS. CYRUS:  Well, here, again, this -- Grimm is

14   distinguishable, as is Bostock, because Grimm dealt with a

15   policy that affected all transgender students, all of them.

16   It was based on their sex of being transgender, and that's not

17   the case here.

18         Again, this -- we are not -- we don't have a policy

19   that applies to all transgender people.  Even the plaintiffs'

20   expert has testified what we're talking about is a subgroup of

21   a subgroup of a subgroup, Your Honor.  It is -- it would be

22   transgender individuals who are diagnosed with gender

23   dysphoria, who then seek gender-confirming surgery, and then

24   who are then cleared and available to have surgery.

25         So -- because their expert, Dr. Schechter, has

33

1    admitted and testified, number one, not all transgender people

2    are diagnosed with gender dysphoria; number two, not everyone

3    who has gender dysphoria seeks gender-confirming surgery; and,

4    number three, of those who would seek gender-confirming

5    surgery, not all of them will be approved.

6            For example, Mr. Fain is a perfect example.  He would

7    like to have surgery, he says, but he has a smoking habit, and

8    he is not ready to proceed with surgery until he stops smoking

9    because he understands the risks that have been explained to

10   him.

11           THE COURT:  But isn't this just kind of parallel to

12   the University of Virginia case where the court observed that

13   it's still discrimination if you create bars that keep women

14   out or make it more difficult for them to get in, even though

15   it is certainly true not all women would want to go there?

16           MS. CYRUS:  Well, but in that instance, again,

17   you're -- it's applying to a whole sex.  In that case, it was

18   female.

19           THE COURT:  And treating them as a class.

20           MS. CYRUS:  Right, and we're -- and that's not what

21   West Virginia Medicaid does here, Your Honor.  They aren't

22   doing anything that applies to all transgender individuals.

23           And, remember, transgender is the protected class that

24   has been -- that is recognized based on sex if you adopt that

25   from Grimm, but I don't know that it necessarily applies here

34

1    at all.

2        THE COURT:  Well, I don't know that this language came

3    from Grimm, it's probably post-hoc, but part of the test that

4    the court laid out concerning whether there was a suspect

5    class was in the case of sex, and transgender status, was

6    whether you could explain the policy without using any

7    reference or making any reference to any of these words that

8    are relevant to sex or -- or transgender.

9        It seems to me that you can't describe the State's

10    policy here not covering this surgery without explaining that

11    it's not covered because these people are transgender or

12    seeking to confirm a sexual identity -- gender identity that

13    is not the same as their birth identity.

14        So how do I -- how do I avoid applying that test?

15        MS. CYRUS:  Yes, Your Honor.  Well, because, as we

16    talked about, this isn't necessarily on the basis of being

17    transgender.  If there were a policy that applied to all

18    transgender people, obviously that would be on the basis of

19    being transgender.

20        This is simply --

21        THE COURT:  But isn't that just like saying that we

22    don't have a prohibition against hiring black people because

23    we do hire some, but we don't hire all, we don't have to hire

24    all, not all will apply?

25        I don't quite understand how I treat this as not being

35

1    discriminatory just by saying, well, it only applies to the

2    people who are transgender who want the surgery and who could

3    otherwise meet the criteria.

4        MS. CYRUS:  Well, again, black people would be a whole

5    protected class.  That is -- that is the distinguishable

6    characteristic, is the whole class here is not being

7    implicated.  It is a subgroup of a subgroup of a subgroup.

8        THE COURT:  Well, I guess kind of what I mean, I'm

9    confused by this because it's a -- only a portion of the

10   transgender population would seek or otherwise qualify for

11   this surgery, but how does that allow for them to be treated

12   differently as a class?

13       I mean, yeah, it's a subclass of all transgender

14   people, but it is still a class that is based upon sex and

15   transgender status, which the circuit and the United States

16   Supreme Court have recognized are suspect classifications.

17   And if they're suspect classifications, even if it only

18   affects a small portion of them, the Court still has to apply

19   either heightened or rational basis test to it.

20       MS. CYRUS:  Well, first of all, I mean, Grimm -- there

21   is -- this is a case of first impression.  There is no case in

22   this district or in the Fourth Circuit that addresses Medicaid

23   benefits.  Grimm dealt with -- it's a bathroom policy, and,

24   you know, Bostock dealt with employment practices.

25       These are Medicaid benefits that are health benefits,

36

1   and there are -- there are cases where it's been recognized

2   that the agency -- because Medicaid has constraints, it has

3   limitations, and it cannot provide everything for everyone,

4   and so it has -- based upon utilization procedures and so

5   forth, it doesn't cover -- it can't possibly cover everything.

6   And -- but this is not excluding people -- everyone who is

7   transgender.  This is simply saying they are not paying for

8   the procedure -- ah, for surgical procedures for transgender

9   individuals who have gender dysphoria.  That -- and that is

10  all it is saying.

11          And the other -- the significance here in terms of the

12  analysis -- and the analysis, Your Honor, is really very much

13  the same in all of these causes of action.  Whether it be

14  equal protection or the Medicaid Act, you can't treat one

15  group differently than the other.  And in this case, as I've

16  indicated, every single thing that the cisgender people are

17  entitled to under Medicaid in West Virginia the transgender

18  folks are entitled to.  No one who is cisgender is -- has

19  services available to them that the transgender folks do not

20  have available.

21          You know, as -- Mr. Fain, for example, had a

22  hysterectomy.  If a transgender person has breast cancer, they

23  will get a mastectomy.  And so all of the services that are

24  available to cisgender individuals are available to

25  transgender individuals.  That is -- that's the focus here.

37

1    There is no discrimination because they're being treated the

2    same, Your Honor.

3            And I will point out that Dr. Schechter --

4            THE COURT:  Well, but is it the same if they can't get

5    treatment that is determined to be medically necessary?

6            MS. CYRUS:  Well, but it -- the test is, is it the

7    same?  They have to be in all relevant respects --

8            THE COURT:  Isn't that the same, two people who want

9    the same treatment, different diagnoses, but in each case

10   medically necessary treatment?

11           MS. CYRUS:  Well, I -- I'm not sure if the Court is

12   asking is it -- and making, just for sake of argument, an

13   assumption that the treatment is the same, but it's actually

14   not the same.

15           The surgery -- and Dr. Schechter admits this -- that

16   would be done for someone who is a biological male, ah, to get

17   a vaginoplasty is totally different than the procedure for a

18   biological female.  And there actually is a district court

19   case that talked about that, which -- with an inmate who

20   wanted -- who was complaining because he could not obtain --

21           THE COURT:  Give me the name of that case so I don't

22   forget to look at it.

23           MS. CYRUS:  Okay.

24           THE COURT:  Is it Williams from Louisiana maybe?

25           MS. CYRUS:  Well, I had marked here.

38

1          It's Williams versus Kelly, Your Honor --

2          THE COURT:  Yes.

3          MS. CYRUS:  -- where the inmate was claiming she had

4     gender dysphoria and denying the sexual reassignment surgery

5     violated her equal protection right.

6          And the court -- the court actually said, and this is

7     an argument we've made, this debate does not fit within an

8     equal protection analysis.  It doesn't fit because the

9     procedures aren't the same.  And the court actually said --

10    this is the same argument that we're making.

11         The plaintiff wasn't claiming that she was being

12    treated differently than other inmates with gender dysphoria.

13    She was saying she was being treated differently than

14    cisgender females, and those are not similarly situated.

15         And so what I thought was a really good point, they

16    talk about it in that case, is the fact that there are

17    biological differences that make it impossible to say that a

18    surgery on a male is the same on a female in the same area of

19    the body because -- and it even says, a biological female has

20    a vagina, a biological male does not.  And on the other hand,

21    of course, a biological male has a penis, and a biological

22    female does not.

23         Lord help me, my grandmother would turn over in her

24    grave hearing me talking about this.  I apologize.

25         However, there are biological differences.  These are

39

1    not the same surgeries.

2        THE COURT:  Well, I'm curious, did you have -- I know

3    you have a couple of experts.  I've only started looking at

4    Dr. Levine.  But do you have evidence in your part of the

5    record that explains what is really different about these

6    surgeries based upon the diagnosis difference here?

7        MS. CYRUS:  Well, the ex -- we did not have an expert

8    who testified on that, but, you know what, we ended up we

9    didn't need one because the plaintiffs' expert, Dr. Schechter,

10   talked about that.  And he actually said that the differences,

11   for example, for a mastectomy, how it's performed would be

12   different, ah, from someone having a tumor removed versus a

13   mastectomy for transgender persons.

14       THE COURT:  This is one of the things I think that's

15   important for me to dig deeper in the record than I've been

16   able to, so I'm curious.

17       It's easy to say, well, they're different because you

18   start off with different anatomy.  But what I'm expecting you

19   to be able to demonstrate when you make this argument is that

20   it's -- that it's a fundamentally different procedure such

21   that surgeons who do this work would say this is really

22   different from treating -- providing the same surgery for

23   someone who is cisgender or transgender with a different

24   diagnosis.

25       So just to say that they're different sounds to me

40

1 honestly just a bit superficial, at least more superficial

2 than I think I should accept.  And so what I'm wondering is,

3 does anybody, their doctor or do you have any other evidence

4 you can point me to where it explains how these things are

5 different so that I can get a better grasp of it?

6 　　　　Because here's what I've seen and some of the record

7 shows, first, that it doesn't seem that those procedures are

8 more costly when it's a treatment, a surgical treatment done

9 for gender conformity versus cancer treatment or prophylactic

10 treatment of some kind.  If they're not really different in

11 cost, then I start to think, well, they must not be that much

12 different for the surgeon to do because I can't imagine that

13 it wouldn't be reflected in the cost.

14 　　　　Quite honestly, I think most people, average citizens

15 have kind of assumed that surgery for gender conformity is a

16 much more elaborate and expensive type surgery that frankly

17 makes people skeptical of whether it should be done or whether

18 it should be covered.  And so what I'm wondering is, what

19 evidence is there from your perspective in this record that

20 would support me saying, yes, this really is fundamentally or

21 significantly different surgery when it's done for gender

22 conformity versus a different diagnosis, but it's labeled the

23 same procedure.

24 　　　　MS. CYRUS:  Well, Dr. Schechter, who is the

25 plaintiffs' expert, did say that what is involved for a

41

1    gender-affirming surgery is different; that the procedure for

2    making a male anatomy below the belt, for lack of a better

3    term, into female anatomy is not a comparable procedure or

4    service that a cisgender individual would receive. And he

5    also said there's not one mastectomy procedure for all

6    purposes. There would be different ways to perform the

7    mastectomy.

8         And, I mean, by definition, someone who is getting a

9    gender-affirming surgery is -- is getting a different

10   procedure than a cisgender individual. Those are -- those are

11   different procedures, and they are for different medical needs

12   as well.

13        But on the equal protection issue, it's not just

14   enough to show that they've been treated differently from

15   others for whom they are similarly situated. There also has

16   to be a showing of intentional or purposeful discrimination in

17   the Morrison versus Garraghty case, which is a Fourth Circuit

18   opinion.

19        There is no showing that there was any intentional

20   conduct here, any intent to discriminate. Secretary Bill

21   Crouch testified he didn't even know this was not covered

22   until this lawsuit was filed, and he's been in office since

23   2017. Commissioner Beane, likewise, said she had never looked

24   into it, and no one's in fact challenged it. This is the

25   first time it's been challenged. So there's not been any

42

1    purposeful discrimination here.

2          And I'll go back to something the Court asked earlier.

3    They -- we don't know when it was first adopted.  We were able

4    to -- the farthest they were able to go back was 2004 and see

5    that it was -- transsexual surgery was listed as a non-covered

6    service, back to 2004.  But no one who is at the agency knows,

7    you know, why -- why it was there.  We just -- they just know

8    it's there, it's never been reviewed, it's never been

9    challenged.  And they have very limited resources.

10          And importantly -- this is a really important point to

11    this.  I know that plaintiffs' counsel said, well, it doesn't

12    matter that CMS reviewed it and that CMS -- that doesn't give

13    us license to discriminate or words to that effect.  Well, CMS

14    is the agency.  They -- the federal government currently

15    provides the State of West Virginia 80 percent of its Medicaid

16    dollars, and it's -- and more than it normally is at the

17    moment due to COVID, but 80 percent of its funds are coming

18    from the federal government.  CMS approves Medicaid's plan as

19    well as any other amendments.

20          And there is a case cited by plaintiffs, the Davis

21    case, Davis v. Shah, which is a Second Circuit case, which --

22    it dealt with the Medicaid Act comparability provision that

23    actually said there is a presumption, if there has been a

24    review by the federal government, that all laws, applicable

25    laws are complied with.

43

1          And here the question -- I wish I knew the answer.  If
2     it's not -- if there's a problem with the plan, why hasn't CMS
3     told us that?  Why not, number one.  Number two, why did they
4     tell Medicare they did not have to cover it?  Why did -- why?
5     Why wouldn't they -- if the plaintiffs are right, why did --
6     why didn't CMS tell -- HHS, I'm sorry, tell Medicare you must
7     cover this or it's unconstitutional?

8          And so the reason for that is because it's not.  As I
9     said, this is a matter of first impression in this district,
10    in the Fourth Circuit, and certainly the U.S. Supreme Court
11    has not addressed it.

12         THE COURT:  If I -- I understand.  So if I agree with
13    you and say that this is not an exclusion or non-coverage that
14    targets a suspect class and that, therefore, there is not
15    discrimination based upon that, then you really don't have to
16    have a justification for it.

17         MS. CYRUS:  Well, it would be a rational basis.  I
18    think there's a rational basis, which is a very low standard.

19         The State --

20         THE COURT:  Well, okay.  Then if I'm going to apply a
21    rational basis, what is your proffered explanation,
22    justification of what state interest is advanced here?
23    Because it sounds like you stipulated away much of it.  You've
24    apparently stipulated that you don't have any cost status, so
25    you can't say, well, we're not covering this surgery because

44

1    it's expensive or going to cost the program more.

2          You've indicated that you -- well, you tell me.  What

3    are your state interests if I apply a rational basis and --

4          MS. CYRUS:  Well, there were two state interests that

5    were given as the reasons that -- for the -- we believe for

6    this to -- to exist.  One is that obviously CMS has not told

7    us that we are required to have it.  Because I will say,

8    during the pendency of this lawsuit, CMS has sent letters to

9    Commissioner Beane's office saying you must covered these

10   COVID-related procedures, mandating coverage for certain

11   things, and they've never done that with this.

12         But, number two, Your Honor, West Virginia Medicaid is

13   projecting a budget deficit in 2024 of over $128 million.

14   If -- unless the Legislature decides, which there is no

15   indication at this time they're going to give more money, they

16   are going to have to -- the testimony is they're going to have

17   to cut services somehow.

18         In fact, there was a bill this past legislative

19   session, 2022, to provide blood pressure cuffs for individuals

20   who needed them in the homes in West Virginia.  That was going

21   to cost $500,000.  The Legislature said, no, we're not paying

22   that.

23         There also was a bill seeking an employee at a cost of

24   $75,000, and the Legislature said, no, we're not -- we're not

25   providing those funds.

45

1          So -- and that's a huge distinction from Flack versus

2    Wisconsin, Your Honor.  West Virginia is not Wisconsin.

3    Wisconsin has a $9 billion Medicaid budget.  West Virginia is

4    a fraction of that.  There was no indication and in none of

5    these cases is there a discussion like we have in West

6    Virginia where we are going to be in a deficit.

7          THE COURT:  You mentioned CMS obviously implicitly

8    approved this, and so I guess it's fair to characterize this

9    non-coverage of gender-confirming surgery as being optional.

10   They don't -- CMS doesn't disallow it, doesn't prohibit it,

11   but it doesn't mandate it.

12         But, in fact, Medicaid -- West Virginia Medicaid

13   provides a number of services that are not mandated.  Isn't

14   that the case?

15         MS. CYRUS:  It does provide some services that are

16   optional.  But the U.S. Supreme Court in Alexander versus

17   Choate actually said Medicaid programs don't guarantee that

18   each -- each recipient is going to get the level of health

19   care precisely tailored to his or her particular needs.  The

20   states get substantial discretion to choose the proper mix of

21   amount, scope and duration, limitations of coverage as long as

22   the services and care provided is in the best interest of the

23   recipients.

24         So --

25         THE COURT:  Let me -- hold on.  I'm familiar with that

46

1    language.

2           If I'm applying a rational basis test, and you're

3    telling me that the legitimate state interest that supports

4    this decision by the State is that CMS didn't mandate this

5    service, how can I agree with that when the State provides a

6    number of services that aren't mandated by CMS?  How is

7    that -- how does that sustain your position that this is a

8    legitimate government interest and not a pretext?

9           MS. CYRUS:  Well, first of all, I want to make clear

10   to the Court, we believe equal protection does not apply here,

11   so the Court's not applying a standard at all.  But if it were

12   to apply, it would apply the least restrictive standard --

13          THE COURT:  Rational basis.

14          MS. CYRUS:  -- which is why I said rational basis.

15          But we believe there is ample evidence that, as the

16   Williams court said, this -- these facts don't fit into the

17   box of equal protection.  So the Court, in our view, doesn't

18   even get to apply the stand -- get to that point.

19          THE COURT:  I understand.

20          MS. CYRUS:  Yes.

21          THE COURT:  Yeah, so what I was trying to do is have

22   you articulate -- if I disagree with you and find that there's

23   at least a rational basis test that applies to this, I'm

24   trying to discern exactly what state interests you believe

25   support this exclusion, and what the evidence is in the record

1    to support the basis for that interest.

2          So the first one you said was, well, CMS doesn't

3    mandate it, and, in fact, they've approved us not having that

4    coverage.  And my response was to say, well, okay, but there

5    are other coverages that the state Medicaid program provides

6    that aren't mandated by CMS, so I don't see how that's very

7    strong evidence in support of that state interest.

8          I assume that another state interest is the cost.  But

9    the plaintiffs have pointed out that the record is devoid of

10   information that the State can point to that it relied upon in

11   deciding that covering this kind of surgery would be expensive

12   and make it difficult for the Medicaid program.  It sounds

13   like you even stipulated that you don't really have data or

14   evidence to support that.

15         MS. CYRUS:  Well, the evidence -- the data and the

16   evidence would be the budget that we produced that shows a

17   shortfall of over $128 million in 2024.

18         THE COURT:  This is a multi-billion-dollar program,

19   and so honestly, you know, the plaintiffs point out that there

20   are a very small number of people that would likely be

21   considered for this type of gender-confirming surgery if

22   Medicaid did cover it, and that it would actually be perhaps

23   less expensive than not covering it because these people end

24   up accessing the medical system for treatment of the results

25   of their gender dysphoria, and that the procedures aren't

48

1   really fundamentally different whether it's for gender

2   conformity or cancer treatment or something else.

3          And so none of that would support the State concluding

4   that this is too expensive to add to the coverage, so I'm

5   trying to give you a chance to tell me where in the record you

6   think there's evidence to support the State's position, if

7   that's what it is, that none of this would be a significant

8   cost addition to the program.

9          MS. CYRUS:  Well, we're not arguing necessarily that

10  it is a significant cost.  We obviously don't know what that

11  is right now because we don't -- so --

12         THE COURT:  Has the State done anything to try to

13  figure that out that you know of?

14         MS. CYRUS:  The State has not because no one had ever

15  challenged it.  It had never been a topic of discussion.  And

16  these folks who are there now, during their tenure, know they

17  haven't looked into that.

18         But the U.S. Supreme Court said in Beal versus Doe --

19  that was a case where they wanted Medicaid to fund

20  non-therapeutic abortions.  Nothing in the Medicaid Act

21  suggests states are required to fund every medical procedure

22  that falls within the delineated categories of medical care,

23  and it gives states broad discretion to determine the extent

24  of medical services that are reasonable.

25         This is -- this is an issue that is best left to the

49

1    states, ah, to decide.

2         THE COURT:  Well, I mean, it sounds to me like you're

3    saying that there is never an availability or comparability

4    requirement, and I don't think you really mean that because

5    there obviously is.  Here we're talking about -- I have not

6    looked at the abortion decision, but I will, but it does

7    strike me that that is probably not analogous.

8         Here we're talking about medically necessary treatment

9    that is being denied to a suspect class.  Even if I'm applying

10   a rational basis test for it, I'm not hearing evidence that

11   the State has got cost information that would support its

12   decision to maintain this exclusion or this non-coverage.  And

13   we're talking here about treatment that you do provide to

14   other people, the types of treatment, the types of surgeries.

15   I understand your argument that it's fundamentally different,

16   but it also may be the type of surgical treatment that is

17   provided for other diagnoses.

18        MS. CYRUS:  Yes, and we do dispute that.  We dispute

19   that it's the same procedure, but also this -- the State is

20   going to have a deficit.  I'm not sure how they could add

21   anything to the -- they are going to be in a position, the

22   testimony is they are going to be in a position of having to

23   cut existing services in order to maintain the budget.

24        THE COURT:  Well, I don't minimize the challenge that

25   the State faces.  I've been there, I've been to the

50

1     Legislature myself, so I certainly appreciate the long-term

2     and annual difficulties in coming up with a budget.  In this

3     state, it's been particularly challenging.  But we're talking

4     about a multi-billion-dollar program.  And the plaintiffs'

5     evidence is that the costs to Medicaid would essentially be

6     negligible and not drive some huge deficit in the Medicaid

7     program, and that the State has to and the department has to

8     balance this every year.

9         I'm sure with rising costs and other challenges, every

10     year requires an adjustment in the payments that will be made

11     to providers and in the coverage and utilization review and

12     those things, so you don't, you know, dig a deeper hole.  I

13     guess I'm just saying I have trouble believing, with the

14     absence of specific information, that the State can say, well,

15     if we extend this coverage for gender confirmation surgery,

16     we're going to significantly widen this projected gap down the

17     road.  I don't see where in the record that there is evidence

18     to support it.

19         MS. CYRUS:  The evidence is that the State is going to

20     be in a deficit where they're not able to take on any new

21     services.  And so -- and under the Medicaid Act, there is a

22     decision, Casillas versus Dains, ah, that talks about a state

23     is not required to fund a benefit it currently provides to no

24     one.  And it's our position that these transsexual surgeries

25     are not being provided to anyone, so it doesn't discriminate.

51

1          It could apply -- it complies with the Medicaid Act,

2     it complies with equal protection, as well as the Affordable

3     Care Act.

4          THE COURT:  All right.  Do you want to make a response

5     to the argument about the Medicaid availability and

6     comparability argument?

7          MS. CYRUS:  Well, yes.

8          So I think we sort of touched on that because one of

9     the cases actually says that, at least in terms of the

10    availability and the comparability, both of those sort of rise

11    and fall together.  They're very similar, and it's a very

12    similar argument to equal protection because it's basically

13    the State can't provide services to one group, we can't

14    provide services to the medically needy that -- and not

15    provide it to the categorically needy.

16         The difference being, the Court probably knows this,

17    categorically needy are those who just -- they have a need

18    overall, versus the medically needy, who they can take care of

19    their basic needs, but they have huge medical needs.  And so

20    it's the same analysis.

21         You could see based on the briefs from both sides

22    there's not a whole lot added on those arguments because it

23    follows the equal protection that there -- that they have to

24    be different for there to be -- you know, for there to be some

25    action.

52

1        So they -- the State provides the same thing to all

2   the groups.  You know, the only thing different is they don't

3   provide transsexual surgery coverage to anyone, to anyone.

4   That is, they don't prohibit anyone from that.  So there is --

5   no one is being treated differently.

6        THE COURT:  All right.  Thank you.

7        MS. CYRUS:  So -- thank you.

8        THE COURT:  All right.  I'll give each of you a chance

9   for rebuttal, and then we'll hear a reply.

10       MS. BORELLI:  Thank you, Your Honor.

11       Unless the Court has initial questions, I'll just

12  proceed to respond.

13       THE COURT:  Go ahead.

14       MS. BORELLI:  So I think one of the first points that

15  my colleague raised was an argument that there is a big

16  distinction between this case and the others because only

17  surgery is excluded.  The case law is replete with cases

18  involving challenges to one specific benefit.  There is no

19  requirement in the law that there must be discrimination

20  across the board or else there is no claim, and that is the

21  position they're asking this Court to take.

22       And so a perfect example of this is the Fletcher case

23  which involved a surgery-only bar, and the court there

24  examined the benefit in question and applied precisely the

25  same analysis as happens routinely in other cases where there

53

1    is discrimination with respect to a particular benefit or

2    aspect of government treatment or employment.

3         Number two, responding to the argument that my

4    colleague made saying that this is, quote, adding more to the

5    trans bucket to get gender-affirming surgery, that is not an

6    accurate characterization of what this claim asks.  This claim

7    asks for equal treatment, not special treatment.

8         So other cisgender people can get the same procedures

9    where they're medically necessary.  Transgender people are

10   simply asking for the same rule to apply, lift the blanket

11   exclusion so that they can get the benefit of the InterQual

12   criteria that everyone else does.

13        THE COURT:  In response to my questions, counsel for

14   the defendant pointed to your expert's deposition testimony

15   where, according to the defense, the expert conceded that

16   there are very significant differences between these types --

17   these different surgical procedures when it's a transgender

18   gender confirmation procedure versus something else.

19        Can you respond to that?

20        MS. BORELLI:  So the expert opinion that Dr. Schechter

21   offered is that the procedures are the same or similar.  That

22   is his opinion.  It's a surprising misrepresentation in my

23   view to point to his deposition testimony -- and it's

24   recounted in the briefs, and so the Court will see the quote

25   in the briefs.

54

1          What Dr. Schechter is saying in the very first

2     sentence of that quote is, there are a variety of surgical

3     techniques used for any surgery, and that is equally true, as

4     he says explicitly, for transgender people and cisgender

5     people.  And those techniques are generally the same.  But

6     what he said is a surgeon might pick one technique based on a

7     particular individual's circumstance.  That's just the nature

8     of surgery.  That does not differ between transgender people

9     and cisgender people.

10          We think his testimony is clear on its face.

11          THE COURT:  All right.  So you believe his testimony

12     would fall more in line with the -- for instance, the surgeon

13     testifying about the difference between performing a

14     particular procedure on a 45-year-old male versus perhaps a --

15     who has other health conditions versus a 25-year-old male who

16     has got excellent health conditions or something --

17          MS. BORELLI:  We think that is clear in that very

18     first sentence of the quote that they rely on, yes, Your

19     Honor.

20          THE COURT:  And does he also provide testimony based

21     on his experience and knowledge and profession as to the

22     relative costs for these various procedures, whether it's for

23     gender confirmation or some other diagnosis?

24          MS. BORELLI:  Yes.  He addresses the topic.

25          He doesn't provide specific numbers, of course,

55

1    because --

2              THE COURT:  Right

3              MS. BORELLI:  -- that might vary depending on

4    locality.

5              But because his testimony is that the procedures are

6    the same, he says, you know, safety and efficacy is the same.

7    Cost is the same.

8              And so to use an example that my colleague just

9    pointed to about vaginoplasty in an effort to argue that these

10   are different -- I think Ms. Cyrus said that a cisgender woman

11   has a vagina, and a transgender woman does not.  One of his

12   examples is that a surgeon performing this care would view it

13   in the following way.  There are cisgender women who get

14   vaginoplasty because they have a congenital absence of a

15   vagina, and that is like a transgender woman.  And the very

16   same CPT codes may be used, and that generally means that

17   there's no divergence in billing because it's the same

18   procedure being billed.

19             So, Your Honor, there is also an argument that has

20   been made that this doesn't apply to all transgender people.

21   Ah, the policy itself does indeed, including by its own terms.

22   It literally says it bars transsexual surgery.  It doesn't

23   make distinctions among transgender people.  The fact that not

24   everyone will require a surgery at any given time, ah, doesn't

25   change the fact that it's a discriminatory barrier that on its

56

1  face applies to all trans people.

2         This is, and I believe the Court referenced this, just

3  like the U.S. versus VMI case.  Not every woman will want to

4  subject herself to the adversarial educational method at the

5  Virginia Military Institute, but it is discrimination to deny

6  the opportunity to those who do.  Phillips versus Martin

7  Marietta would be another example.  Not every woman is a

8  mother of a preschool-age child, but an employer who refuses

9  to hire those women discriminates based on sex.  The same

10 logic applies here.

11        There was discussion with respect to Mr. Fain and I

12 think his standing, and I just want to point to the aspects of

13 the record that we think make very clear he's testified that

14 he is ready for the surgery.  He has the required letters for

15 the surgery.  Dr. Karasic evaluated him, confirmed that it's

16 medically necessary.  This exclusion is the barrier that

17 prevents him from being able to qualify for that surgery.  He

18 has standing to challenge it.

19        Number five, there was an argument that Grimm

20 shouldn't apply because it's not about Medicaid and a

21 suggestion that this Court should view this case as asking

22 purely questions of first impression, but that is not how the

23 law works.

24        So, for example, Grimm's statement that discrimination

25 based on transgender status receives heightened scrutiny in

57

1    and of itself, separate from sex discrimination, that

2    pronouncement applies in every context.  There isn't a

3    separate rule, for example, for race or sex discrimination

4    that's context dependent.  Generally speaking, the standard of

5    review that the government makes a classification based on

6    that characteristic, generally that standard of review applies

7    across contexts.  Grimm -- Grimm does apply here even though

8    this applies in the specific context of health services.

9         I think we've addressed Dr. Schechter's testimony and

10   how to properly view it.

11        The Williams versus Kelly case that was discussed as

12   part of that conversation, I think it's telling, Your Honor,

13   that defendants want to continually point the Court to cases

14   outside of this circuit in a very different legal landscape

15   like a decision at a preliminary screening stage, which is

16   Williams versus Kelly, by a pro se person incarcerated, in the

17   Fifth Circuit which has a dramatically different legal

18   landscape and nothing like Grimm that guides the Court's

19   analysis.

20        When the Court looks at the cases decided in this

21   circuit, by courts that are bound by Grimm and follow that

22   guidance, we believe the analysis should look similar to

23   Kadel, for example, and that that's a more analogous case to

24   review.

25        In terms of the same care, ah, I just want to

58

1    reemphasize again, there are a series of admissions from the

2    defendants about whether the same procedures are covered for

3    cisgender people.  That is undisputed, and the briefs and the

4    record do point to these admissions.

5         Hysterectomy, oophorectomy, penectomy, phalloplasty,

6    vaginoplasty, chest surgeries.  Feminizing chest surgeries for

7    cisgender women are covered.  Masculizing chest surgeries for

8    men and boys who have gynecomastia are covered.  There is just

9    no dispute that the same procedures are available to cisgender

10   people who qualify under the InterQual standards.

11        On the topic of Secretary Crouch and Commissioner

12   Beane and whether there's intent, there is no requirement in

13   the law that a specific office holder be the one to have

14   written the exclusion themselves with their own pen or have

15   taken specific steps that are personal to them beyond the

16   actual enforcement.  What we do have under the tenure of these

17   officials -- I don't think there's any dispute of which I'm

18   aware that they were appropriate officials to enjoin, and that

19   that's the relevant question.

20        It simply isn't the case that if back in 2004, under

21   different leadership, an exclusion was adopted, and then that

22   office holder left, that there can never be a claim then, that

23   that just immunizes the discrimination no matter how much

24   subsequent officials continue to enforce it.  That's what we

25   have here.  It remains in the policy manual, and that

59

1   exclusion is written every single year into each contract with
2   every managed care organization with which the program
3   contracts.  And so the exclusion is actively enforced, and
4   these are appropriate people to enjoin should the Court find
5   that that is appropriate.
6       And then on the subject of HHS, I would just reiterate
7   again, the decision of HHS that they ignore is this case.
8   That's the decision of HHS that says a blanket exclusion is
9   inappropriate, and it cannot be supported.  The medical
10  literature does not support it.  That is what HHS ruled.  That
11  is this case.  That's all the plaintiffs are asking for is
12  enjoining enforcement of the exclusion.
13      And finally on the topic of limited resources, I will
14  just point out, all public entities have limited resources.
15  The point -- and the law is we think very, very clear on this.
16  The point under the equal protection clause is that that
17  burden is a shared burden.  It cannot be -- public fisk cannot
18  be protected on the backs of a vulnerable minority group.
19  Whatever the burden of those limited resources is, it must be
20  borne equally by all.
21      If the Court has no further questions --
22      THE COURT:  No.  Thank you.
23      MS. BORELLI:  -- I'll turn it over to my colleague.
24  Thank you.
25      THE COURT:  All right.

60

1          MX. SMITH-CARRINGTON:  Hello.  So I just wanted to

2   address two different points that were raised by our

3   colleague.

4          So first with regard to whether or not the

5   availability requirement and comparability requirement rise

6   and fall together, it is our position that the availability

7   requirement and comparability requirement, while they are

8   complimentary, these two different claims are very distinct.

9          So, again, with regard to the availability

10  requirement, it mandates that once a state has chosen to cover

11  a form of care, they must cover that form of care for all

12  Medicaid participants so long as it is medically necessary.

13  Whereas the comparability requirement prohibits discrimination

14  on the basis of diagnosis.  So I just wanted to address that.

15          And then the other point that I wanted to address was

16  the reference to, I believe -- and hopefully I say this name

17  correctly -- Casillas v. Daines, which is a district court

18  decision, and it had to do with New York Medicaid.  And

19  specifically in Casillas v. Daines, the reference there was to

20  another case, specifically Rodriguez v. City of New York.  And

21  in Rodriguez v. City of New York, that case is factually

22  distinguishable from what is happening here.

23          So in Rodriguez, the Medicaid participants there were

24  asking the state to cover a benefit that it didn't provide to

25  anyone else.  So essentially, again, the Medicaid participants

1  were asking for the state to fund a benefit that no other

2  Medicaid participant received.  Here, that's not the case.

3         Defendants have already admitted that they provide

4  coverage for the relevant procedures.  So, again,

5  hysterectomy, chest surgery, penectomy, phalloplasty,

6  vaginoplasty, these are all procedures that are already

7  covered.  And then with regard to, again, specifically the

8  comparability requirement, these procedures are simply denied,

9  our plaintiffs are refused coverage on the basis of diagnosis.

10        So, again, with regard to Casillas v. Daines, which is

11  pointing to Rodriguez v. City of New York, that is a factually

12  distinguishable case because here plaintiffs are not asking

13  for the Medicaid program to provide a benefit that it doesn't

14  provide to anyone else.  They're asking for simply the

15  coverage to be extended to them because these benefits are

16  already provided.

17        THE COURT:  All right.  Thank you.

18        All right.  Ms. Cyrus?

19        MS. CYRUS:  Your Honor, I just wanted initially to

20  read -- this is from our motion -- Dr. Schechter's explanation

21  of what is involved in a vaginoplasty for gender-affirming

22  surgery.

23        (As read:)  The typical procedure involves formation

24  of a vulva --

25        THE COURT:  Read slowly.

62

1    MS. CYRUS:  Sorry.

2    (As read:)  The typical procedure involves formation

3  of a vulva and associated structures, meaning the clitoris and

4  labia, removal of the penis and testicles, most often

5  construction of a vaginal canal.  In such surgeries, tissue

6  from the penis is used to construct the vaginal canal, labia

7  and clitoris.

8    So that is a different procedure because it involves

9  parts of the body that aren't present in a biological female.

10    Also, with regard to what -- I am not sure the basis

11  of saying we cover these procedures.  Gynecomastia surgery is

12  only covered if the patient has actual physical pain.  It's

13  not covered for some -- for emotional or mental symptoms.

14    And also, hypomastia, that is a procedure plaintiffs'

15  expert, the rebuttal expert said that would be comparable to a

16  mastectomy.  We don't cover the hypomastia.  What that --

17  hypomastia is when a female, a biological female has small

18  breasts that don't develop.  So the hypomastia is what

19  plaintiffs' rebuttal expert said would be comparable to the

20  mastectomy or chest reconstruction.  Medicaid does not cover

21  that procedure.

22    THE COURT:  Does Medicaid consider that cosmetic?

23    MS. CYRUS:  No, Your Honor -- yes, it's my

24  understanding it is.

25    And by the argument plaintiffs are making, that would

63

1    be based upon sex, and we ought to be covering that.  I mean,
2    that is also not covered.
3          So -- but also I wanted to go back to, under the
4    rational basis test, we're not required to show that we
5    actually required on the bases.
6          And also with regard to the optional coverages, the
7    testimony has been things that are optional, there have
8    been -- a number of them have been the subject of legislative
9    appropriations just for those items, and that's how those have
10   been covered.  We -- Medicaid provides service up to the
11   budget, and the budget, we're up to the limit at this point.
12         So -- also, there is no blanket exclusion.  I've heard
13   blanket exclusion since the day practically this came in the
14   door.  That's because I assume there are other states that do
15   have a blanket exclusion.  That's not West Virginia.  We --
16   Medicaid covers everything for these folks except their
17   surgical procedures.  That is not discrimination based upon
18   their sex, i.e. being transgender.  That is based upon a
19   procedure.  They're not -- they're not singling them out for
20   being transgender.  Those are -- that is a category based upon
21   a diagnosis.
22              THE COURT:  All right.
23              MS. CYRUS:  Thank you, Your Honor.
24              THE COURT:  Thank you.
25              All right.  That concludes the argument on the summary

64

1    judgment.  We're going to take a brief recess, and then we'll

2    deal with the class certification motion when we resume.

3         All right?  Take about a 10-minute recess.

4         THE COURT SECURITY OFFICER:  All rise.  This Court is

5    now in recess.

6        (Recess taken from 2:35 to 2:46 p.m.)

7         THE COURT:  All right.  We'll now turn to the motion

8    for class certification.

9         Plaintiffs' counsel may proceed.

10        MS. PRAKASH:  Thank you, Your Honor.  My name is Anna

11   Prakash.  My pronouns are she/her.  I'm with the law firm of

12   Nichols Kaster in Minneapolis, and I'm one of plaintiffs'

13   counsel.  Thank you for accommodating me over video.

14        So there are two primary points I want to emphasize

15   for the Court with respect to class certification.  The first

16   is what plaintiffs are not asking for in this case, and the

17   second is the importance of the class action mechanism even

18   though the named plaintiffs are seeking an injunction.

19        So as to the first point, plaintiffs are not asking

20   this Court to decide that any one class member has gender

21   dysphoria; that any one class member is eligible for surgery;

22   that any one class member meets medically necessary criteria;

23   that any one class member should be approved for surgery; or

24   that any one class member should submit a claim for insurance

25   coverage, because those are individualized issues.  But you

65

1    don't get to any of those issues, the defendants, the class

2    members, their doctors, they don't have to grapple with those

3    issues in the context of insurance coverage until and unless

4    the exclusion is struck down.  Here that means being held

5    unlawful and having an injunction issue.

6            All we're asking for is the opportunity to get to that

7    everything else.  That everything else, medical necessity for

8    each person, eligibility and the like, those are outside the

9    scope of this case because that claims process, those

10    decisions as to whether or not to have surgery can only occur

11    in this context if the exclusion comes down.

12            So there is one particular case, and I think Your

13    Honor is familiar with it, that I would like to point you to,

14    and that's the Baxley case that Your Honor decided a couple

15    years ago.  There are a couple lines in that opinion that I

16    think apply quite directly here.

17            This was, as you recall, a jail class of people who

18    were challenging the healthcare there.  And the opinion says:

19    Plaintiffs need not show that every class member will use the

20    healthcare system at the regional jail.  Instead, they simply

21    need to show that the entire class is subject to the same

22    policies.

23            And then the opinion goes on to say that the claimed

24    injury is the exposure to policies and practices that place

25    both the named and unnamed class members at substantial risk

66

1    of harm.  And that is what we have here.

2         Everyone -- and I think this was covered in Your

3    Honor's questions during the summary judgment portion of

4    today's hearing -- everyone is subject to this risk of not

5    being allowed to have their certain kinds of healthcare, here

6    surgery, covered because of the exclusion.

7         And so, you know, when the defendants point to Dukes,

8    as they do in their brief over and over again, and they

9    highlight the question that the Supreme Court asks, why was I

10   disfavored, the answer for every single class member is

11   because you're seeking what defendants call transsexual

12   surgery.  If you are seeking that, you are being discriminated

13   on the basis of sex and being transgender.  That question can

14   be answered for every single person.

15        The second point I want to make is that the class

16   action mechanism in this case remains important.  I think, you

17   know, at first blush one can say if the named plaintiffs

18   prevail, then an injunction will issue, end of story, the

19   exclusion is gone.  But class certification in this case

20   matters for three reasons.

21        One is that each class member will have, if this case

22   is certified, an independent enforceable right.  And that

23   matters in the context of them eventually making claims or

24   seeking surgery because they wouldn't have to go through any

25   kind of res judicata analysis in the event that they meet with

67

1    resistance.

2         The second reason is that, if for some reason the

3    named plaintiffs after judgment were able to obtain the

4    surgery, if that happens during the pendency of an appeal, for

5    example, if the class is certified, it is a legal entity, and

6    it survives any kind of mootness challenge that may occur down

7    the road.

8         And the last is that this is the type of case, and we

9    say it in our brief, that Rule 23(b)(2) was made for.  It is

10   made for the instance in which a defendant or a party acts or

11   fails to act on grounds generally applicable to the class.

12   And here the class is defined as all transgender West Virginia

13   Medicaid participants who are seeking or will seek care banned

14   by the exclusion.

15        So those are the main points I'd like to make.  If

16   Your Honor has any specific questions, I'm happy to answer

17   those.

18        THE COURT:  What did you determine from your review of

19   the defendant's response that defendant contested other than

20   this commonality sort of question?

21        MS. PRAKASH:  Right.  So other than the commonality

22   question, the defendant contested numerosity as well as

23   adequacy.

24        With respect to numerosity, it is undisputed that

25   there are at least 686 West Virginia Medicaid participants who

68

1    have a diagnosis of gender dysphoria.  If just 5 percent, just

2    over 5 percent of those people were to seek surgery, that

3    would bring the number of people seeking surgery to 40.

4         The other thing that I think is important in the

5    context of numerosity is that we're talking about the

6    impracticability of joinder.  You know, this is a statewide

7    program.  We're not going to go find every single person, nor

8    do we need to, for the purpose of certifying a (b)(2) class.

9    It is sufficient that we know, with respect to the sensitivity

10   of the issues and the way that people may or may not come

11   forward, that they will become known to defendants if and when

12   they apply for such surgery.

13        The other point under numerosity, and then I'll turn

14   to adequacy, is that InterQual guidelines themselves -- and I

15   think there's been a lot of discussion of those.  I would like

16   to point the Court to plaintiffs' summary judgment Exhibit 26,

17   which is docket 250-30.  And in that first set of guidelines,

18   I think it's on, like, page 3 or something, InterQual starts

19   going through various steps that -- that support the method of

20   determining whether somebody should have a certain surgery.

21        In those comments, they cite to WPATH, which is the

22   association that my colleague Ms. Borelli referred to.  They

23   also talk about estimating the number of gender-affirming

24   surgeries nationwide.  And so I think in just 2017 alone,

25   there were something like 8300 which they point to.  So I

69

1  think applying that in this case and considering
2  impracticability of joinder, the numerosity issue is
3  satisfied.

4       With respect to adequacy, it is notable that
5  defendants do not challenge the adequacy of counsel, and they
6  do not challenge the adequacy of the plaintiffs with respect
7  to anything related to, you know, truthfulness or the ability
8  to see through a litigation or look out for the class's best
9  interests.  Those are things that a defendant typically brings
10  up in opposition to certification.  Instead, the only thing
11  they point to is this mention of puberty-delaying treatment.

12       So obviously our plaintiffs, the class representatives
13  here are adults.  They are not seeking puberty-delaying
14  treatment.  But puberty-delaying treatment is just another
15  form of gender-confirming treatment.  And plaintiffs and the
16  class representatives and the class do not have to be
17  precisely identical in order for them to have the same type of
18  claim based on the same type of things that warrant
19  certification.

20       But, as you heard Ms. Cyrus say, this is potentially
21  not an issue at all because it sounds like, according to
22  Ms. Cyrus, everything is covered except surgery, and so the --
23  you know, the ink spilled on puberty-delaying treatment in the
24  context of certification was probably for nothing if it is in
25  fact a covered service.

70

1          THE COURT:  All right.  And so with regard to

2    puberty-delaying treatment, the effect of including or not

3    removing it from the class would simply be that, to the extent

4    Medicaid provides puberty-affirming or delaying treatment to

5    cisgender or other diagnoses, they'd have to -- they couldn't

6    have a blanket of non-coverage for gender-conforming treatment

7    here?

8          MS. PRAKASH:  I think that is correct.  You know, I am

9    not familiar with all of the other ways in which

10   puberty-delaying treatment is indicated for cisgender people,

11   but Your Honor's explanation or summary of it is in the

12   analysis, right.  Like, this is a form of gender-confirming

13   care.  And to the extent they are not providing this medically

14   necessary care, when they are providing medically necessary

15   care for cisgender folks, that is a violation of the law.

16          And, again, going into whether it should be provided

17   to one class member or the other is outside the scope of this

18   case because all we're asking for is that exclusion to be

19   struck down.

20          THE COURT:  All right.  Thank you.

21          For the defense?

22          MR. DAVID:  Thank you, Your Honor.  Caleb David on

23   behalf of the defendants.

24          And I'd like to start with something that opposing

25   counsel said, was that number two is the importance of the

71

1   class form in this case. And as the Court recognizes, if the

2   Court finds that the exclusion, as plaintiffs are calling

3   it -- we call it just simply it's a non-covered service along

4   with dozens others.

5        But if the Court finds that the non-covered service

6   violates the equal protection clause, violates the ACA, is

7   discriminatory, that applies to everyone. It does not simply

8   apply to Christopher Fain and Shauntae Anderson. It applies

9   to everyone.

10        After the Obergefell decision, same-sex couples did

11   not have to litigate to go and have -- and be able to get

12   married. That is something that applied to everyone

13   regardless of the fact that there was not a class form in that

14   case.

15        So specifically for the plaintiffs' first two claims,

16   the claims under the equal protection clause and under Section

17   1557 of the Affordable Care Act, there is no benefit, there is

18   no judicial economy, there is nothing that would benefit the

19   parties or -- or the proposed class members from the class

20   form.

21        And the other aspect is that, in terms of numerosity,

22   commonality, typicality and adequacy of representation,

23   plaintiffs have not met their burden. It is their burden, and

24   plaintiffs are the ones that have to show that they have met

25   those requirements, the first requirement being numerosity.

1     And as plaintiffs have alleged, there are 686

2     individuals that have been identified as having some

3     gender-related diagnosis.  Those diagnostic codes do not say

4     gender dysphoria.  They say things such as gender identity

5     disorder unspecified or transsexual -- there are different

6     diagnostic codes.  None of them are specific to gender

7     dysphoria, but they are related.

8          However, as plaintiffs conceded and plaintiffs'

9     experts have conceded, within that subset of 686 is the subset

10    of individuals who will seek gender-confirming care.  At this

11    stage, there are two people that we know of in West Virginia

12    who are seeking gender-confirming surgery.  That is

13    Christopher Fain and Shauntae Anderson.  There is no one else

14    who has made a claim, who has come forward to say that they

15    are seeking surgeries.  So at this point in time, the only

16    number that we know of that fits into plaintiffs' class is

17    two.

18         Plaintiffs' class definition is all transgender people

19    who are or will be enrolled in West Virginia Medicaid and who

20    are seeking or will seek gender-confirming care barred by the

21    exclusions.  So the 686 number might fit that first part, all

22    transgender people who are or will be enrolled in West

23    Virginia Medicaid, and we'll grant that there may be

24    additional ones in the future.  However, that does not cover

25    the second part of the definition, and that is who are seeking

73

1   or will seek gender-confirming care barred by the exclusions.

2          So all we know at this point, and all that the

3   plaintiffs have proven, is that there are two individuals who

4   fit the full class definition.  Both of those individuals have

5   been joined in this action, and, therefore, joinder is not

6   impracticable.

7          THE COURT:  When you have a non-coverage or an

8   exclusion, however you want to characterize it, it does seem

9   to me that that can be presumed to discourage people from

10  seeking the benefit at issue because the policy is pretty

11  clear.  So while I am not going to quarrel with your numbers,

12  but shouldn't we reasonably conclude that that probably

13  underestimates the number of people who might seek the benefit

14  of this class?

15         MR. DAVID:  And, Your Honor, and to your point, there

16  does not have to be a 100 percent certainty as to what the

17  numbers are.

18         THE COURT:  Sure.

19         MR. DAVID:  However, we know that the number is

20  somewhere between two and 686 right now.  We don't know what

21  it is, if it's above that 40, the magic number of 40

22  threshold.  We don't know -- there has not been testimony from

23  an expert that says of individuals who seek gender-confirming

24  care that is non-surgical care at this point, this percentage

25  of individuals goes on to seek surgical care.  That doesn't

74

1    exist.

2            THE COURT:  I thought one of the plaintiffs' experts

3    did have sort of a projection that -- they used some, I guess,

4    national percentage.

5            MR. DAVID:  So Dr. Schechter's testimony was that one

6    in 200 individuals in America are transgender.  Of those .5

7    percent of individuals who are transgender, one in -- I

8    believe it was one in 500 are -- or excuse me -- one in five

9    seek gender-confirming care.  There was not something that was

10   specific to gender-confirming surgery, and so all we know is

11   that one in 1,000 individuals in America will seek

12   gender-confirming care at some point based on Dr. Schechter's

13   testimony, but it was not specific to the surgery.

14           And that is what we're dealing with in the class

15   definition now, now that the evidence has shown that the

16   hormone therapy and psychiatric and psychological therapies

17   are covered.  So we're -- looking specifically at surgeries,

18   we know somewhere between two and 686.  The only proven number

19   at this point is two, and essentially we would be guessing at

20   anything in between those two numbers.

21           THE COURT:  All right.

22           MR. DAVID:  Now, the commonality and typicality are

23   obviously somewhat interrelated.  And in terms of the claims

24   for Affordable Care Act and under the equal protection clause,

25   in terms of commonality there is no doubt, as I just conceded,

75

1    that if it applies to one, it's going to apply to all.  There

2    is no doubt about that.  But in terms of the Medicaid Act, it

3    is slightly different.

4          And the Medicaid Act's comparability requirements

5    state that you cannot provide some category -- you cannot

6    provide care to medically needy individuals that you do not

7    provide to categorically needy individuals.  So off the bat,

8    of those 686 individuals that potentially could be there, but

9    somewhere in between two and 686, there has to be some

10   analysis whether those individuals are medically needy or

11   categorically needy.  There also has to be an analysis of

12   medical necessity for those particular claims under the

13   Medicaid Act.

14         Plaintiffs' counsel has stated in here that we only

15   have to provide medically necessary care under the Medicaid

16   Act.  That is, I believe, undisputed.  And medical necessity

17   requires -- as plaintiffs' experts have testified to and our

18   expert has testified to, requires a review of the patient's

19   history, physical exam, mental health examinations, patient's

20   goals, desires, expectations, and conversations with primary

21   care providers and mental health professionals.  All of that,

22   of course, is within those InterQual guidelines that

23   plaintiffs' counsel has referred to, and so all of that is a

24   highly individualized, ah, assessment.

25         Plaintiffs have stated in their arguments here today

76

1   that they are not asking for the Court to find that anyone has

2   gender dysphoria, meets medical necessity criteria or meets

3   insurance criteria, but also stated that one of the reasons

4   that the class form is necessary is so that there is a legally

5   protected and enforceable right, and it bars against res

6   judicata in the future.

7        Well, in terms of the Medicaid Act claims, res

8   judicata could not possibly apply just simply by saying that

9   the -- the policy is exclusionary and discriminatory and

10   unconstitutional.  There has to be an analysis of each

11   individual's circumstances, and so there -- there isn't going

12   to be res judicata even if they are members of the class, and

13   the only question is whether the Medicaid Act requires --

14   excuse me.  The only question -- if the only question is that

15   the policy and its language that this is a non-covered service

16   is unlawful under the Medicaid Act, that analysis does not

17   entitle anyone to any actual surgery or any actual services.

18   All -- what plaintiffs' counsel is saying is that they would

19   be entitled to a -- an enforceable right that is subject to

20   res judicata.

21        It would be a completely different issue that would be

22   litigated in terms of whether they are entitled to the actual

23   services.

24        THE COURT:  Well, isn't that true under equal

25   protection or the ACA?

77

1          MR. DAVID:  Absolutely, Your Honor, and that -- but

2     the elements of proof that are required for equal protection

3     analysis and for Section 1557 of the Affordable Care Act end

4     at whether or not this is discriminatory or violates equal

5     protection principles.  It ends there.

6          In terms of the Medicaid Act, it doesn't end at

7     whether this is discriminatory between categorically and

8     medically needy individuals.  It ends when there is a

9     determination of medical necessity.  The regulations that

10    accompany the Medicaid Act specifically provide for the

11    ability for services to be denied based on medical necessity

12    and utilization management.

13         THE COURT:  All right.  I understand your position.

14         MR. DAVID:  So -- and, Your Honor, on the last two

15    points.

16         Typicality, our argument on that is simply that

17    Christopher Fain and Shauntae Anderson are not typical of the

18    rest of these individuals who could potentially be in this

19    class because, again, we don't know what services those

20    individuals are going to be looking for.  And we also at this

21    point, even two years into litigation, do not know exactly

22    which gender-confirming surgeries are -- the plaintiffs are

23    seeking to have covered.

24         So we understand that Christopher Fain is seeking a

25    double mastectomy.  Shauntae Anderson is seeking breast

78

1   augmentation and a vaginoplasty.  We know that those are

2   surgeries that these two individuals are seeking.  However,

3   there has been testimony in this case from plaintiffs' experts

4   that surgeries such as facial feminization, vocal shave,

5   electrolysis, hair implants, other body contouring can all be

6   medically necessary surgeries for gender-confirming surgery.

7   We don't know if -- at this point whether the plaintiffs'

8   claims in this case, the named plaintiffs' claims are typical

9   of the class members, whether the class members are going to

10  seek the same types of surgeries, as there's been a dispute

11  here today that there are types of mastectomies and

12  mastectomies that are covered for certain purposes.

13        Electrolysis is not covered for any purpose.  Vocal

14  shave is not covered for any purpose.  And so there has to be

15  some analysis under the Medicaid Act to say, well, you -- you

16  cover this service for cisgender people.  If the Court accepts

17  the plaintiffs' argument that covering mastectomy for one

18  reason for cisgender individuals means that it has to be

19  covered for all other reasons, it's a different analysis for

20  something like vocal shave, which is not covered for any

21  cisgender people, nor is it covered for transgender people.

22  So there are comparability issues in that instance.

23        So the typicality is -- is precluded in this instance

24  because of the specific issues that need to be proven under

25  the Medicaid Act.

79

1          And finally on adequacy of representation, we do not

2     dispute that plaintiffs' counsel appears to be qualified and

3     capable of handling this.  And in terms of keeping in contact

4     with their counsel, the plaintiffs do also appear to be

5     adequate in terms of that.

6          The only issues that we have raised really with

7     adequacy of representation are, again, the typicality type

8     issues, such as plaintiffs also asserted in their class

9     certification motion -- or excuse me -- in their motion for

10    summary judgment that there may be questions about puberty

11    blockers.  That's something that neither Mr. Fain nor

12    Ms. Anderson are seeking.  Their claims would not be typical

13    of children or adolescents even though the class definition

14    would include both children and adolescents who also are

15    subject to different diagnostic criteria for gender dysphoria.

16         So, Your Honor, for all of those reasons, we believe

17    that the class form is entirely unnecessary for the Affordable

18    Care Act and equal protection claims, and that it is improper

19    for the Medicaid Act claims.  Thank you.

20         THE COURT:  All right.  Thank you.

21         Ms. Prakash, I'll allow you to reply.

22         MS. PRAKASH:  Thank you, Your Honor.

23         So let me start with numerosity.  Opposing counsel

24    just talked about not needing to have a hundred percent

25    certainty on numerosity, and I would submit to the Court that

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

**JA2544**

1    the vast majority of circuits that have considered the

2    standard at class certification have settled on preponderance

3    of the evidence, more likely than not, like, what gets you

4    just that much over the 50 percent mark.  And courts in this

5    circuit -- although the Fourth Circuit has not weighed in on

6    this, courts in this circuit have applied the preponderance

7    standard.

8        So if you take that we have 686 people, if you take

9    that we know that the two named plaintiffs here are seeking or

10   will seek this surgery, and we know, as Your Honor pointed

11   out, that there is a chilling effect when you know that the

12   thing that you want is not covered by insurance, if we take

13   all of that combined with that 8300 number from the InterQual

14   guidelines, I think we get to the more likely than not in

15   terms of people who will seek or are seeking this surgery, not

16   to mention the impracticability of joinder, which doesn't

17   depend on a certain number.

18       There is an analogy that I do want to draw with

19   respect to numerosity before I move on, and that is in the

20   context of wage cases, specifically wage and hour cases, where

21   you have an opt-in mechanism under the Fair Labor Standards

22   Act, and you might have a state law Rule 23 class that is an

23   opt-out mechanism.  And courts have taken the view that the

24   low opt-in rate is supportive of the superiority of the class

25   action device because it doesn't require somebody to take that

81

1    affirmative step to challenge their employer, their insurer,

2    their healthcare coverage, to out themselves in any way.

3    You're just automatically included, and that is the beauty of

4    a class action.

5         Moving on from numerosity, with respect to commonality

6    I think we heard defense counsel there concede that, and

7    typicality as to the equal protection claim and the Affordable

8    Act claim -- the Affordable Care Act claim.

9         With respect to the Medicaid claims, what I heard was

10   a complaint that all of the potential surgeries that could

11   qualify as gender-confirming surgeries have not been listed or

12   provided in this case.  I think that is untrue as a factual

13   matter because we have all of the InterQual guidelines, and

14   defendant produced those in response to document requests that

15   asked for specific comparators.

16        The other reason that I think -- the other reason that

17   I think that that argument doesn't really fly is that the

18   defendants themselves -- the defendants don't look into those

19   individual issues on what type of surgery.  Instead, they just

20   say if you are seeking transsexual surgery or sex

21   transformation surgery or sex change surgery, it's not

22   covered.  And what we are asking for is the InterQual

23   guidelines for gender-affirming surgery to be applied in the

24   same way that the defendant applies all of their other

25   InterQual guidelines.

82

1          And, again, I would point the Court to that docket

2      250-30.  It's a checklist.  It's does the patient have X, Y

3      and Z?  If so, move to No. 2.  Does the patient have X, Y and

4      Z?  If so, move to No. 3 and so on and so forth.

5          We are just asking that those guidelines with respect

6      to gender-affirming surgery actually be used such that

7      coverage decisions can be made on an individualized basis.

8      But that can't happen with the exclusion as written and as

9      enforced by defendant.

10         I don't have anything else for the Court unless you

11     have questions for me.

12         THE COURT:  Well, what about his argument on the

13     Medicaid Act and the -- what's the effect of a class that just

14     broadly states that the exclusion or the non-coverage is

15     prohibited?  Does that implicate the issues he raised about

16     the Medicaid Act being -- specifically requiring, for

17     instance, medical necessity for various treatments?

18         MS. PRAKASH:  I don't think so, because I think the

19     analysis is the same.

20         If you look at it, as Ms. Borelli had pointed out, as

21     having those InterQual guidelines apply to cis people, but not

22     having them apply to transgender folks, you do the side by

23     side of medically necessary care is being provided on this

24     side to cisgender folks and medically necessary care is not

25     being provided on this side to transgender folks.

83

1           And we are not asking, class certification doesn't ask

2      for the Court to make a decision on ultimately whether for any

3      one person, surgery would be medically indicated.  But as the

4      class as a whole, because of their sex, because of their

5      transgender status, and the fact, as the class is defined, are

6      seeking or will seek -- and these are defendant's words --

7      what defendant calls transsexual surgery, in other words, care

8      barred by the exclusion, that brings everyone under the same

9      category of being denied services because of diagnosis or

10     diagnoses leading to these types of procedures, and because

11     defendant has chosen to cover surgical procedures for

12     cisgender folks, but not in the -- in this instance for

13     transgender folks.

14           THE COURT:  You mentioned that if I certify this class

15     the way you've tendered it, that the Court would effectively

16     prohibit the defendant from applying the so-called exclusion

17     or the non-coverage.  And you referred to, I guess, it's

18     assertion of fact that in that event, the state Medicaid

19     program would be obligated to follow the InterQual criteria

20     for surgery for gender confirmation diagnoses; is that right?

21           MS. PRAKASH:  They would be obligated to provide equal

22     care.  And right now, the way that they determine how care is

23     provided is by using their vendor, Kepro, which then utilizes

24     the InterQual guidelines.  So if they change to some other set

25     of guidelines, if they go through a different process, it just

84

1    needs to be provided on the same basis to transgender folks as

2    it is to cisgender folks.

3        THE COURT:  Okay.  And by the operation of that fact,

4    the Medicaid program would be applying essentially the

5    InterQual standards for a given treatment or a given type of

6    surgery whether it's for gender confirmation or whether it's

7    for some other diagnosis?

8        MS. PRAKASH:  Yes, provided that -- there is this

9    medical necessity part, right -- provided that it is medically

10   necessary.  But that's what the guidelines help determine.

11       THE COURT:  All right.  Anything else?

12       MS. PRAKASH:  No, Your Honor.

13       THE COURT:  Thank you very much.  I appreciate your

14   participation.  Thank all of you.

15       Well, this has been very helpful to help sort of

16   crystallize and focus the issues.  I have been working on

17   this, I expect to work on it fairly intensely for the next

18   couple of weeks.  I don't think I'm going to have a decision

19   out for at least two weeks or more.  And, you know, when you

20   hear a judge say that, you probably automatically add a little

21   time to it.

22       I know this is important.  I know that at this point

23   really the case -- we don't even have a scheduling order in

24   place to go beyond this, so I'm very cognizant of that.  And

25   for that and the obvious reasons, I'll try to get a ruling on

85

1    this as quickly as I can, but it is going to take me a few

2    weeks at least.

3         With that, I thank all of you for your presentations,

4    both in writing and orally.  You're outstanding lawyers, you

5    obviously know the case quite well, and you articulated your

6    clients' positions very clearly.  So thank you.

7         Is there anything else we need to take up at this

8    time?

9         MS. CYRUS:  No, Your Honor.

10        THE COURT:  If not, thank you all.  We stand

11   adjourned.

12        THE COURT SECURITY OFFICER:  All rise.

13        THE COURT:  We're adjourned.

14        THE COURT SECURITY OFFICER:  Court is adjourned.

15             (Proceedings were concluded at 3:21 p.m.)

16                      ---o0o---

17

18

19

20

21

22

23

24

25

```
1   CERTIFICATION:

2           I, Kathy L. Swinhart, CSR, certify that the foregoing

3   is a correct transcript from the record of proceedings in the

4   above-entitled matter as reported on July 13, 2022.

5

6

7   July 27, 2022_____
    DATE

8

9   /s/ Kathy L. Swinhart_____
    KATHY L. SWINHART, CSR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

**JA2551**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

CHRISTOPHER FAIN,
SHAUNTAE ANDERSON,
individually and on behalf of all others similarly situated,

                    Plaintiffs,

v.                                                    CIVIL ACTION NO.   3:20-0740

WILLIAM CROUCH, in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
CYNTHIA BEANE, in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services;
WEST VIRGINIA DEPARTMENTOF HEALTH AND
HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES,

                    Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion for Class Certification Pursuant to Federal

Rule of Civil Procedure 23. ECF No. 248. Plaintiffs ask this Court to certify the proposed class of

"all transgender people who are or will be enrolled in west Virginia Medicaid and who are seeking

or will seek gender-confirming care barred by the Exclusion." It is clear to this Court that Plaintiffs

meet the requirements of Rule 23 to justify the certification of this class. Accordingly, the Court

**GRANTS** Plaintiffs' Motion. ECF No. 248.

### BACKGROUND

The Plaintiffs in this case are transgender West Virginian Medicaid participants. Plaintiff

Christopher Fain is a 46-year-old transgender man enrolled in West Virginia Medicaid and is

seeking surgical treatment for his gender dysphoria diagnosis. *Fain Tr.*, ECF No. 252-5, at 22, 23.

**JA2552**

Plaintiff Shauntae Anderson is a 45-year-old transgender woman enrolled in West Virginia Medicaid and is also seeking the surgical treatment for her gender dysphoria. *Anderson Dep.*, ECF No. 250-11, at 11–12. The proposed class in this class exceeds 600 people annually, as 686 participants in the West Virginia Medicaid Program submitted at least one claim with a diagnosis for gender dysphoria or gender incongruence in 2021. *Defs.' Resp. to Pls.' Second Set of Interrogs.*, ECF No. 250-6, at 5.

The West Virginia Medicaid Program provides a blanket exclusion for "transsexual surgery," stating that such a service is not covered "regardless of medical necessity." *Ex. 23*, ECF No. 250-27, at 5–6. Thus, any transgender Medicaid participant in West Virginia who may be diagnosed with gender dysphoria is barred from coverage for the surgical treatment of this diagnosis.

## STANDARD OF REVIEW

Rule 23(a) of the Federal Rules of Civil Procedure establishes four class certification requirements: (1) a class so numerous that joinder of all members is impracticable; (2) questions of law or fact common to the class; (3) a representative party whose claims and defenses are typical of the class's claims and defenses; and (4) a representative party that will fairly and adequately protect the class's interests. Fed. R. Civ. P. 23(a); *Monroe v. City of Charlottesville*, 579 F.3d 380, 384 (4th Cir. 2009). In addition to these four requirements, a plaintiff must also demonstrate that the proposed class action fits into one of three forms permitted by Rule 23(b). *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 163 (1974).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The plaintiffs seeking certification "must affirmatively demonstrate [their] compliance with the Rule—that is, [they] must be prepared to prove that there are in fact

-2-

**JA2553**

sufficiently numerous parties, common questions of law or fact, etc." *Id.*; *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (noting that the plaintiff bears the burden of proving it has complied with Rule 23). Nevertheless, "the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *EQT*, 764 F.3d at 358 (quoting *Wal-Mart*, 564 U.S. at 350–51). This "rigorous analysis" may "entail some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart*, 564 U.S. at 351, but courts have been cautioned not to "engage in free-ranging merits inquiries at the certification stage," *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## DISCUSSION

As a threshold matter, this Circuit requires that, in addition to the explicit requirements of Rule 23, proposed classes must be "readily identifiable." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). This means that "[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.* The goal of this requirement is to avoid "mini-trials" to determine who is or is not a class member. *Id.* (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).

While all potential class members have yet to be identified, it does not mean that such class members are not identifiable. *Id*. at 358 ("The plaintiffs need not be able to identify every class member at the time of certification."). Here, the criteria Plaintiffs present are clear. The class is comprised of all transgender people who are or will be enrolled in west Virginia Medicaid and who are seeking or will seek gender-confirming care. Such factors are well documented and easily ascertainable. Thus, while not all class members have been identified, such members can be easily identified.

1. <u>Numerosity</u>

Plaintiffs assert that the size of the class exceeds the numerosity requirement and that joinder of all class members is impracticable. *See* Fed. R. Civ. P. 23(a)(1) (noting that the first requirement for a class action is that "the class is so numerous that joinder of all members is impracticable"). There is no "mechanical test" or minimum class size requirement, but courts have generally found numerosity present when a class has 40 or more members. *Baxley v. Jividen*, 338 F.R.D. 80, 86 (S.D.W. Va. 2020) (citing *Holsey v. Armour & Co.*, 734 F.2d 199, 217 (4th Cir. 1984)). Plaintiffs argue they easily satisfy the numerosity requirement, as their proposed class includes at least 686 Medicaid participants (which filed claims related to gender dysphoria or gender incongruence between January 1 and September 30, 2021). This Court agrees. The joinder of this many plaintiffs would be impracticable, given that all potential plaintiffs are not yet known and reside all over the state of West Virginia. *See Flack v. Wisconsin Dep't of Health Servs.*, 331 F.R.D. 361, 368 (W.D. Wis. 2019) (noting that, in a motion to certify a class challenging the exclusion of gender confirming surgeries in a state Medicaid program, "the proposed class may be too numerous to join in a single lawsuit, especially since some members of the class are not capable of being identified until sometime in the future).

Defendants argue that the characterization of the 686 Medicaid members is not accurate, explaining that, while 686 participants made claims related to a number of gender identity disorders, the number does not necessarily mean that those claims were all related to that particular gender identity diagnosis. Further, not all of those participants necessarily made claims related to gender-confirming care. But Defendants misunderstand the boundaries of the proposed class. Plaintiffs seek to ensure that all transgender Medicaid participants who may experience gender

-4-

**JA2555**

dysphoria are not precluded from surgical treatment by the current Medicaid exclusion. While all 686 transgender Medicaid participants are not currently seeking surgical care for gender dysphoria, it is only transgender participants that have the potential to receive this diagnosis. The boundaries of this class include all transgender Medicaid participants who may experience gender dysphoria and who may require the surgical treatment of such diagnosis; this includes all 686 identified Medicaid participants and any individual who meets these criteria in the future.

Defendants also argue that the proposed class is unworkable, as it is broadly made up of transgender individuals who seek gender-confirming care, while the determination of whether such individuals would be eligible for this care must be assessed on a case-by-case basis. However, this position mischaracterizes the issue. The exclusion precludes the surgical care categorically—it is a barrier to surgical care altogether. A doctor providing someone an individualized assessment determining whether surgical treatment would be appropriate would not be meaningful when surgical care to treat gender dysphoria is not available to any transgender Medicaid participants. The exclusion precluding coverage for surgical care must be eliminated before such determinations can be made, giving transgender Medicaid participants with gender dysphoria this treatment option.

Thus, the Court finds that Plaintiffs have met the numerosity requirement.

2. <u>Commonality</u>

Plaintiffs argue that commonality is met because each member has suffered the same injury due to exclusion that categorically denies transgender participants coverage for gender-confirming surgical care. Commonality requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Although "[a] single common question will suffice, . . . it must be of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the

claims in one stroke." *EQT*, 764 F.3d at 360 (quoting *Wal-Mart*, 564 U.S. at 350).

The exclusion precludes coverage to all transgender Medicaid participants with gender dysphoria from receiving surgical treatment for that diagnosis. This exclusion applies to every member of the class without exception; it is a barrier for all transgender participants who seek or who may seek this treatment. Defendants argue that the proposed class do not present common questions of law, rather, that the question as to whether a class member may be approved or denied coverage for a surgical treatment of gender dysphoria cannot be answered by this Court in the resolution of this case. But again, Defendants' position misunderstands the nature of the issue. Plaintiffs do not ask this Court to make a determination about whether the individual transgender Medicaid participants with gender dysphoria diagnoses may get surgical treatment. Like Defendants point out, the determination of whether surgical treatment is appropriate is a case-by-case analysis done by a health professional. Plaintiffs merely ask this Court to 1) determine whether the exclusion violates the Constitution, the ACA, and the Medicaid Act, and 2) enjoin Defendants from enforcing the exclusion. *See Baxley*, 338 F.R.D. at 87 (finding that plaintiffs challenged defendants' policies and practices and that such claims were "consistent with common questions presented" by other similar certified jail classes); *see Flack*, 331 F.R.D. at *369 (finding that the lawfulness of the exclusion for gender-confirming surgery was a question common to all members of the proposed class). Only once these issues have been resolved can the individualized determinations regarding the appropriateness of the surgical treatment be take place. These issues are common to all members of the proposed class; thus, the Court finds Plaintiffs have meet the commonality requirement.

3.  Typicality of proposed class representatives

Federal Rule 23 requires that "the claims… of the representative parties are typical of the claims… of the class." Fed. R. Civ. P. 23(a)(3). To meet the typicality requirement, the proposed class representatives must show that "the claims or defenses of the class and class representatives arise from the same event or pattern or practice and are based on the same legal theory." *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 238 (S.D.W. Va. 2005) (quotations omitted).

Plaintiffs argue that the proposed class representatives have claims identical to the those of the class they seek to represent, as, like all transgender Medicaid participants, they are denied without exception access to surgical care for gender dysphoria on the basis of sex and transgender status. This Court agrees. The exclusion invidiously discriminates against Plaintiffs as much as it would other members of the class (transgender Medicaid participants who are seeking or may seek surgical treatment for gender dysphoria). The relief sought is identical to other class members—the declaration of the exclusion's unlawfulness and an injunction precluding the enforcement of it. *See Flack*, 331 F.R.D. at 369 (finding that the plaintiffs' claims were identical to those of the other class members, as they arose from the enforcement of the challenged exclusion).

Defendants argue that the claims of each proposed class member are unique and thus are not common. To Defendants, the claims of each proposed class members are actually individualized assessments of whether the participants experience gender dysphoria and whether surgical care is appropriate to treat this diagnosis—a case-by-case determination. Due to the individualized nature of this determination, Defendants also assert that, as a matter of law, they are entitled to assert any individual affirmative defenses. As previously discussed, this mischaracterizes the issue before the Court. The determination of whether surgical care is appropriate for a participant is still individualized. Defendants may still assert affirmative defenses

to demonstrate that a participant was denied care for a lawful reason. Plaintiffs merely ask the Court to preclude Defendants from asserting the exclusion as a reason to deny coverage.

Thus, Plaintiffs have met the typicality requirement.

4. Plaintiffs as representatives

The class representatives must "fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). The counsel representing the class must also be capable of "fairly and adequately" representing the interest of the class. Fed. R. Civ. P. 23(g). This analysis takes into consideration "(1) whether there is conflict between the representatives and class members, and (2) whether the representatives will vigorously prosecute the matter on behalf of the class." *Baxley*, 338 F.R.D. at *89 (internal quotations omitted).

Plaintiffs here are adequate representatives. There are no conflicts of interest between Plaintiffs and the proposed class. Plaintiffs also share a common interest with the proposed class in seeking a declaration that the exclusion is unlawful and seeking an injunction precluding Defendants from enforcing the exclusion. While Defendants argue that Plaintiffs are inadequate because they have not presented any facts that an exclusion for puberty-delaying treatment exists nor have they sought such treatments, this argument again misses the mark. Plaintiffs seek to represent all transgender people who are or will be enrolled in west Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the exclusion. If puberty-confirming care is barred by the exclusion, then Plaintiffs' representation—seeking the declaration of the exclusion's unlawfulness and an injunction against its enforcement—is adequate. If this care is not barred from the exclusion, then such care is not the subject of this matter and the proposed class and Plaintiffs would have equal access to it, as it would not be excluded on the basis of sex and transgender status.

-8-

**JA2559**

Further, Plaintiffs' proposed class counsel can fairly and adequately represent the proposed class. Plaintiffs have provided ample background on their counsel, Nichols Kaster, Lambda Legal Defense and Education Fund, Inc., and the Employment Law Center. Lambda Legal has extensive experience with civil right and class action litigation, specifically with LGBT issues. *See generally Aff. of Smith-Carrington*, ECF No. 248-4. Nichols Kaster is a top plaintiffs' litigation firm representing many class litigation matters. *See generally Aff. of Schladt*, ECF No. 248-2; *see Ex. A. to Aff. of Schladt*, ECF No 248-3. Walt Auvil, as the sole member of the Employment Law Center, has served as lead counsel on many discrimination cases in state and federal court in West Virginia and has also been lead counsel on class action matters. *See generally Aff. of Walt Auvil*, ECF No. 248-1.

5.   The proposed class satisfies the requirements of Rule 23(b)(2)

Rule 23(b)(2) provides that "[a] class action may be maintained if Rule 23(a) is satisfied and if…the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "As the Supreme Court has instructed, '[t]he key to the (b)(2) class is the indivisible nature of the…remedy warranted.'" *EQT Prod. Co.*, 764 F.3d at 357 (citing *Wal-Mart Stores, Inc.*, 564 U.S. at 360). Class certification is appropriate "only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc.*, 564 U.S. at 360.

Here, certification of the class seems appropriate given that the exclusion applies broadly to all members of the proposed class. A declaratory judgment finding that the exclusion is unlawful and an injunction enjoining Defendants from enforcing the exclusion would be appropriate to the class as a whole. Upon Plaintiffs' successful motion for summary judgment, the

declaratory judgment and injunction sought would provide "meaningful, valuable" and "indivisible" relief to each class member. *Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015).

The Court finds that certification here is warranted, as the exclusion affects all proposed class members, and the declaratory and injunctive relief sought would benefit all class members. *See Flack*, 331 F.R.D at *370 ("[C]ertification of the Proposed Class is warranted under Rule 23(b)(2) because the categorical coverage ban on gender-confirming care under the Challenged Exclusion is generally applicable to the class, making a final injunction and corresponding declaratory judgment appropriate to the full class." (internal citations omitted)).

## CONCLUSION

For the foregoing reasons, the Court finds that certification of the proposed class is appropriate. Accordingly, the Court **GRANTS** Plaintiffs' Motion for Class Certification. ECF No. 248.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        August 2, 2022

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

**JA2561**

**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

CHRISTOPHER FAIN,
SHAUNTAE ANDERSON,
individually and on behalf of all others similarly situated,

                Plaintiffs,

v.                                  CIVIL ACTION NO.   3:20-0740

WILLIAM CROUCH, in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
CYNTHIA BEANE, in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services;
WEST VIRGINIA DEPARTMENTOF HEALTH AND
HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are cross motions for summary judgment filed by Plaintiffs (transgender individuals who receive healthcare through the West Virginia Medicaid Program) and Defendants (the State actors and agencies responsible for administering the Medicaid Program). ECF Nos. 250, 252. This case challenges the constitutionality of the West Virginia Medicaid Program's exclusion of the surgical treatment of gender dysphoria.

As it currently stands, the West Virginia State Medicaid Program does not afford coverage for gender-conforming surgical care as treatment for gender dysphoria. Ultimately, the exclusion in the healthcare plan precludes coverage for these surgical treatments when a person is diagnosed with gender dysphoria. However, the same or similar surgical treatments are available to persons when the diagnosis requiring that treatment is not gender dysphoria. It is undisputed that the criteria

**JA2562**

determining whether or not such treatment is covered under the Medicaid Program hinges on a diagnosis—but when treatment is precluded for a diagnosis based on one's gender identity, such exclusion invidiously discriminates on the basis of sex and transgender status. Thus, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 250) and **DENIES** Defendants' Motion for Summary Judgment (ECF No. 252).

## BACKGROUND

The Plaintiffs in this case are transgender West Virginian Medicaid participants. Plaintiff Christopher Fain is a 46-year-old transgender man enrolled in West Virginia Medicaid. He receives hormone therapy for his gender dysphoria diagnosis. Because of this diagnosis, he seeks a bilateral mastectomy. Two physician letters recommend this treatment. *Fain Tr.*, ECF No. 252-5, at 22. However, he has not formally sought coverage for this surgical procedure or received a denial letter. *Id.* at 23. He felt such an exercise would be futile, knowing that the surgery is excluded under his insurance policy. *Id.*

Plaintiff Shauntae Anderson is a 45-year-old transgender woman enrolled in West Virginia Medicaid. She also receives hormone therapy for her gender dysphoria diagnosis. She seeks vaginoplasty and breast reconstruction surgery to relieve her gender dysphoria. *Anderson Tr.*, ECF No. 250-11, at 11–12. Plaintiff Anderson noted that she has not spoken with a doctor about these procedures because it is known such surgeries are not covered and speaking about the unavailable treatment would cause her distress. *Anderson Tr.*, ECF No. 252-4, at 43.

Medicaid is a federal-state program providing health insurance for eligible persons. 42 U.S.C. § 1396–1396w-5. West Virginia has participated in the Medicaid program since its inception in 1965. The purpose of the program is to "furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the cost of necessary medical services." 42

U.S.C. § 1396-1. Medicaid for West Virginia has an annual budget of between \$4.5 and \$5.1 billion. *Manning Tr.*, ECF No. 250-16, at 13. CMS subsidizes 74% to 81% of the state's program. *Beane Tr.*, Ex. 250-13, at 31, 40.

Mountain Health Trust is West Virginia's Medicaid Program. Eligible Medicaid participants may choose a primary health provider and select one of three managed care organizations (MCOs). Each plan provides participants with Medicaid-covered health services. While 85% of Medicaid participants receive coverage through Mountain Health Trust, the remaining 15% receive care through a fee for service model where Medicaid pays providers directly.

Defendants maintain a comprehensive state plan for medical assistance which is detailed in a Medicaid Policy Manual. *Beane Tr.*, ECF No. 250-13, at 28. The Policy Manual provides a blanket exclusion for "transsexual surgery," stating that such a service is not covered "regardless of medical necessity." *Ex. 23*, ECF No. 250-27, at 5–6. Additionally, BMS's contract with each of the three MCOs has an explicit exclusion of coverage for "transsexual surgery." *See Aetna Contract*, ECF No. 250-33; *see UniCare Contract*, ECF No. 250-34; *see The Health Plan Contract*, ECF No. 250-35. The exclusion for "transsexual surgery" was adopted around 2004 and has been maintained since without review. *See Becker Tr.*, ECF No. 250-14, at 11–12; *Beane Tr.*, ECF No. 250-13, at 43–44.

Defendant West Virginia Department of Health and Human Resources, Bureau for Medical Services (BMS) is a bureau of the West Virginia Department of Health and Human Resources (DHHR) and is the agency responsible for administering the Medicaid program in West Virginia. BMS receives funding from the U.S. Department of Health and Human Services—federal funds. Defendant Bill Crouch is the Cabinet Secretary of DHHR and is responsible for ensuring that BMS

-3-

**JA2564**

meets the federal requirements. He is also responsible for developing a managed care system to monitor the services provided by the Medicaid program. *See* W. Va. Code § 9-2-9(a)(1). Defendant Cynthia Beane is the Commissioner of BMS. She is responsible for administering the state Medicaid plan and ensuring that it complies with the Affordable Care Act (ACA) and Medicaid Act.

### STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### DISCUSSION

Plaintiffs bring the following claims against Defendants:

**JA2565**

1.  Denial of Equal Protection under the Fourteenth Amendment

2.  Violation of the Affordable Care Act

3.  Violation of the Comparability Requirement of the Medicaid Act

4.  Violation of the Availability Requirement of the Medicaid Act

The Court will address each claim.

1.  <u>Equal Protection under the Fourteenth Amendment</u>

Plaintiffs assert that the exclusion for the surgical treatment of gender dysphoria violates their rights under the Equal Protection clause of the Fourteenth Amendment. The Equal Protection Clause provides that "[n]o State shall… deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). A claim for an equal protection violation requires a plaintiff to show that they have "been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Once this demonstration is made, next the court must "determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 43 U.S. 432, 440 (1985).

a.  <u>Resolution of facts related to Equal Protection analysis</u>

Important to the Court's review of the Equal Protection claim are some key factual findings.

i.  *Policy exclusion and covered services*

The exclusion at issue here is the exclusion for "transsexual surgery," stating that such a service is not covered "regardless of medical necessity." *Ex. 23*, ECF No. 250-27, at 5–6.

Nonetheless, the policy does cover other treatments related to transgender healthcare. The policy covers psychiatric diagnosis evaluation, psychotherapy, psychological evaluation, counseling, office visits, hormones, and lab work when medically necessary even if the treatments are related to gender-confirming care. *Tr. of Proceedings*, ECF No. 269, at 32–33; *see Beane Tr.*, ECF No. 250-13, at 5, 50. Transgender individuals are covered for the same care as cisgender individuals when such treatment is not the surgical treatment for gender dysphoria.

The West Virginia Medicaid Program uses a utilization management vendor called Kepro to determine whether a service is covered. *See Sarah Young Dep.*, ECF No. 250-18, at 23. Kepro is a screening tool that determines the medical necessity of a treatment, and this system uses nationally accredited criteria established by InterQual. *Id.* at 24. The criteria are derived from a systematic and continuous review of current, evidence-based literature, and also include input from an independent panel of clinical experts. *Id.* at 26. InterQual relies on guidelines promulgated by the World Professional Association of Transgender Health (WPATH) and the Endocrine Society that provide guidance on transgender health treatments. *See generally InterQual Composite*, ECF No. 250-30. Due to the exclusion, Medicaid does not follow the InterQual/Kepro guidance for surgical care to treat gender dysphoria.

       *ii.*     *Material differences between surgery for gender-confirming and surgeries for non-gender-confirming treatments*

Defendants assert that the surgical procedures provided to treat gender dysphoria are distinct from those provided to cisgender and transgender patients for non-gender-confirming purposes. To support this position, Defendants point to the InterQual guidelines for gender-affirming care, which are utilized by Kepro. Defendants argue that, because InterQual has guidelines that are specific to gender-affirming surgical services, they are distinct from the

-6-

**JA2567**

guidelines that relate to the surgeries covered by Medicaid. To Defendants, the fact that there are these separate and distinct InterQual guidelines relating to gender-affirming surgical services proves that the procedures are different. But this argument lacks merit. InterQual's guidelines to determine the medical necessity of surgery to treat gender dysphoria are based on the diagnosis of gender dysphoria; thus, the criteria to determine the medical necessity of surgery to treat a different diagnosis would be based on that different diagnosis. That does not make the actual surgical treatments materially different.

In fact, Defendants' assertion that the surgical services provided for gender dysphoria are fundamentally different from those provided for cisgender and transgender patients is unsupported by the expert and other evidence in the record. In his expert report, Dr. Loren Schechter explains that the same surgical treatments can be performed to address several different diagnoses. *Dr. Schechter Expert Report*, ECF No. 250-23, at 17–18. For example, a vaginoplasty can be performed for a transgender patient to treat gender dysphoria or for a non-transgender woman as a treatment for congenital absence of the vagina. *Id.* at 18. When documenting and billing for these surgical treatments, health care providers utilize Current Procedural Terminology (CPT) codes developed and maintained by the American Medical Association. *Id.* at 17–18. The same CPT codes are used to document and bill the same surgical treatment when performed for a transgender patient with gender dysphoria and for any patient for a different diagnosis.

Defendants also assert that the techniques used to perform gender-affirming surgeries and those used to perform non-gender-confirming surgeries are different, supporting their argument that the procedures are distinct. But, to support this claim, Defendants offer no evidence themselves and instead mischaracterize Plaintiffs' expert testimony. It is true that there are many techniques used for the same kind of surgeries, and the specific technique used by a surgeon will

JA2568

"depend upon the specific situation" or would depend on "the clinical conditions" of the individual patient *Dr. Schechter Dep.*, ECF No. 252-15, at 40–41. For example, there "is a wide range of indications or techniques used to perform mastectomy, whether for gender-affirming mastectomy or for a mastectomy pertaining to oncologic reasons or for risk reduction mastectomies, meaning removing a breast that is not cancerous but may have an increased predilection or risk of breast [cancer.]" *Id.* at 40. However, the "technical act of a mastectomy" can be performed to treat both a non-gender dysphoria related diagnosis and a gender dysphoria related diagnosis. *Id.* Based on the expert opinion of Dr. Schechter, this Court finds that a surgery, such as a mastectomy, for a gender dysphoria diagnosis and the same surgery for a non-gender dysphoria diagnosis, are not materially different

### iii.    Costs associated with the surgeries

In their memoranda, Defendants put forth cost considerations as a legitimate governmental interest to support the exclusion. Defendants assert that Medicaid is projecting a budget deficit within two years. *Beane Dep.*, ECF No. 252-3, at 46. Thus, their argument goes, if the program were to include coverage for surgical care for gender dysphoria, the program would have to "cut existing services or receive additional appropriations from the [L]egislature." *Id.* Defendants also note the Legislature's hesitancy to increase the Medicaid budget. *Id.*

But Defendant's cost-related argument is unsupported by the record. First, the Court notes that, puzzlingly, Defendants stipulated to the fact that there are "no documents of which they are aware that were considered in adopting and/or maintaining the Exclusion" in the Medicaid Program.[1] *Corrected Stipulation of Pls. and Defs.*, ECF No. 258. It is curious as to how, in the face of this stipulation, Defendants can assert that the exclusion was adopted with cost

---

[1] Defendants admit that there is no known reason as to why this Exclusion was ever adopted in the first place. *See Beane Dep.*, ECF No. 250-13, at 42–43.

considerations in mind. Cost information could have been ascertained by Defendants, but it appears that there has been no direct cost analysis regarding surgical care to treat gender dysphoria at all.[2]

Beyond Defendants' failure to rely on any cost-related documents in consideration of the exclusion, the information in the record that does pertain to costs shows that the cost of providing this coverage is not burdensome. There are a relatively small number of people affected by the exclusion. *See Dr. Karasic's Dep.*, ECF No. 252-8, at 4–5 (noting that around one person in 200 identifies as transgender, while around one in 1,000 is in clinical care for gender dysphoria); *Grimm v. Gloucester Cty. School Bd.*, 972 F.3d 586, 594 (4th Cir. 2020) (noting that only "approximately 0.6% of the United States adult population" identifies as transgender). In fact, Defendants provided that, through September of 2021, there were 686 West Virginia Medicaid participants who have submitted one or more claims with a diagnosis code for gender dysphoria or gender incongruence. *Defs.' Resp. to Pls.' Second Set of Interrogs.*, ECF No. 250-6, at 5. Further, there is no evidence in the record to show that surgeries to treat gender dysphoria are any more or less costly than those similar surgeries to treat other diagnoses. *See Dr. Karasic's Expert Report*, ECF No. 252-8, at 65–66 ("[W]hen a form of treatment is covered for cisgender people under an insurance plan, it is generally not disproportionately costly to cover the same treatment for transgender people simply because it is provided to treat gender dysphoria."). As discussed above, such surgeries are in all relevant aspects the same, so it logically flows that a surgery to treat gender dysphoria will not be significantly more expensive than one for a different diagnosis. Given the fact that very few individuals will seek such treatment, the Court is unpersuaded that

---

[2] Information about how other states apply policies regarding the coverage of surgical treatment for gender dysphoria could have been ascertained. *See Becker Tr.*, ECF No. 250-14, at 18 (discussing documents reviewed by Becker).

providing coverage for this treatment would be too burdensome of a cost.

Further, this assertion flies in the face of unrefuted expert testimony. Dr. Schechter's expert report discusses research of the cost-effectiveness of gender confirmation surgeries. *Dr. Schechter Expert Report*, ECF No. 250-23, at 17–18. Citing to research done at the John Hopkins Bloomberg School of Public Health, the Commonwealth of Massachusetts Group Insurance Commission, and the University of Colorado, Dr. Schechter opines that gender confirmation surgeries typically result in a "significant reduction of gender dysphoria," while those suffering from gender dysphoria without access to these surgeries tend to "have higher rates of negative health outcomes such as depression, HIV, drug abuse, and suicidality." *Id.* at 18. The research shows that "the one-time costs of gender confirmation surgeries coupled with standard post-operative care, primary and maintenance care, were overall less expensive at 5- and 10-year marks as compared to the long-term treatment of the negative health outcomes associated with the lack of insurance and resulting healthcare access." *Id.* at 18–19. Thus, overall, Dr. Schechter notes that these surgeries are both affordable and a "nominal percentage of the care offered through group health plans." *Id.* at 19.

Defendants can point to no evidence in the record to support the assertion that providing coverage for surgical treatment of gender dysphoria is too costly. In fact, Defendants concede that they have not conducted or ever obtained any cost analysis information to rebut Plaintiffs' claims. The only evidence in the record points to the contrary—that the surgical treatment of gender dysphoria is ultimately cost-effective and comparable to surgery for other diagnoses.

b.  The exclusion discriminates based on transgender status

"In determining what level of scrutiny applies to a plaintiff's equal protection claim, we look to the basis of the distinction between the classes of persons." *Grimm*, 972 F.3d at 607 (citing

*United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4, (1938)). The classifications in most

state policies are generally held to be valid when those classifications drawn are "rationally related

to a legitimate state interest." *Cleburne*, 473 U.S. at 440. However, "[t]his general rule 'gives

way'… when the policy discriminates based on membership in certain suspect classes." *Kadel v.*

*Folwell*, 1:19-cv-272, 2022 WL 2106270, *18 (M.D.N.C. June 10, 2022) (citing *Cleburne*, 473

U.S. at 440). The Fourth Circuit has determined that policies that discriminate on sex or

transgender status are reviewed under a heightened scrutiny. *Grimm*, 972 F.3d at 608–10.[3,4]

Policies that classify based on a quasi-suspect classification are found to be unconstitutional unless

they are "substantially related to a sufficiently important governmental interest." *Cleburne*, 473

U.S. at 441.

   Plaintiffs' Equal Protection claim is grounded in the assertion that transgender West

---

   [3] When considering whether a certain group constitutes a quasi-suspect class, the Fourth Circuit analyzed four factors:
-  Whether the class historically has been subject to discrimination
-  Whether the class has a defining characteristic that bears a relation to its ability to perform or contribute to society
-  Whether the class may be defined as a discrete group by obvious, immutable, or distinguishing characteristics
-  Whether the class lacks political power.

*Grimm v. Gloucester Cty. School Bd.*, 972 F.3d 586, 607–08 (4th Cir. 2020) (internal citations omitted).[3] The *Grimm* court discussed the history of discrimination of transgender peoples in education, employment, housing, healthcare access, and military service, in addition to the history of violence and harassment of transgender peoples. The court then opined that one's transgender status "bears no… relation" to one's ability to "perform or contribute to society." *Id.* at 612 (internal quotation omitted). Moving on, the court discussed that a person's gender identity is "as natural and immutable as being cisgender," and that transgender people constitute a minority lacking political power, as only 0.6% of the United States population identify as transgender.

   Many courts have held that discrimination against transgender persons is sex-based discrimination for Equal Protection purposes because such policies punish transgender persons for gender non-conformity, thus relying on sex stereotypes. *Id.* at 608. Thus, this Court follows *Grimm* and finds that the Plaintiffs in this case fall within a quasi-suspect class, necessitating the application of heightened scrutiny.

   [4] At the outset, the Court notes that Defendants have argued that *Grimm* should not apply to this analysis. Defendants argue that the matter before this Court is a case of first impression, entirely novel from the *Grimm* case, where the Fourth Circuit considered a challenge to a policy requiring students to use bathrooms based on their biological, or birth-assigned, sex. Here, in contrast, the Court is grappling with a Medicaid benefits case. But the context of the cases is immaterial to the application of the applicable level of scrutiny. Regardless of the specific set of facts under which each case arises, the Court must use the appropriate level of scrutiny to analyze each of the policies. The four-factor test enumerated in *Grimm* aids this Court's determination of whether a suspect class exists here.

Virginia Medicaid participants are denied the medically necessary surgeries that participants receiving those same surgeries for non-gender dysphoria related treatments are allowed—thus, the classification is based on transgender status. Defendants refute this assertion, claiming that the exclusion does not take into consideration gender status, but instead is based on diagnosis, i.e., surgeries are excluded for the diagnosis of "gender dysphoria," not excluded for transgender people. Further, Defendants say that transgender Medicaid participants are not denied any coverage that similarly situated persons have. According to Defendants, the persons affected by the exclusion, transgender people suffering from gender dysphoria seeking surgery, are similarly situated only to other transgender people suffering from gender dysphoria seeking surgery—thus, there is no disparate treatment, as surgery for gender dysphoria is not covered for anyone. Defendants assert that Plaintiffs cannot seek comparison with cisgender persons who seek surgeries for reasons for other than gender-confirmation, because those procedures sought by cisgender persons are not gender-confirmation procedures, making the groups not "in all relevant aspects alike." Defendants further assert that, because other gender-confirming treatments are made available under the West Virginia Medicaid Program, and that only a subgroup of transgender people will ever seek surgery, Defendants are not discriminating against transgender people.

The Court is not persuaded by Defendant's arguments. First, inherent in a gender dysphoria diagnosis is a person's identity as transgender. In other words, a person cannot suffer from gender dysphoria without identifying as transgender. *See Kadel*, 2022 WL 2106270, at *20 ("even if the Court credited Defendant's characterization of the Plan as applying only to diagnoses of gender dysphoria, it would still receive intermediate scrutiny. Discrimination against individuals suffering from gender dysphoria is also discrimination based on sex and transgender status. As with the

-12-

**JA2573**

Plan's exclusions, one cannot explain gender dysphoria 'without referencing sex' or a synonym." (quoting *Grimm*, 972 F.3d at 608)). Transgender people have access to the same surgeries for other diagnosis—the exclusion is aimed specifically at a gender change procedure. Thus, the exclusion targets transgender people because they are transgender.

Second, the Court turns to the argument that transgender individuals with gender dysphoria seeking gender-confirmation surgery are not similarly situated to individuals seeking the same surgeries for reasons other than gender-confirmation. Defendant supports this position by relying on a report and recommendation out of the Eastern District of Louisiana, where a pro se prisoner filed a § 1983 action alleging that defendants were deliberately indifferent to her need for medical treatment for gender dysphoria and violated her right to equal protection. *Williams v. Kelly*, No. 17-12993, 2018 WL 4403381, at *1 (E.D. La. Aug. 27, 2018). The report found that plaintiff was not similarly situated to cisgender patients seeking vaginal surgeries, so her Equal Protection claim failed. *Id.* at *12. This Court is neither bound nor persuaded by this report. The *Williams* court was not bound by *Grimm*'s sex discrimination analysis and decided that case before *Bostock*'s guidance for analyzing sex discrimination against transgender people. *See Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020). Further, the majority of cases support this Court's analysis.[5]

The Court disagrees with Defendants' position. The exclusion at issue here denies coverage to transgender people with a gender dysphoria diagnosis seeking medically necessary surgeries. "Similarly situated persons in all relevant aspects alike" cannot refer only to people from the same exact group—the legal standard simply asks the Court to look to persons "in all *relevant* respects alike." *Morrison*, 239 F.3d at 654 (emphasis added). The *Grimm* court agreed, rejecting a similar argument where the school board contended that the plaintiff, a transgender boy, was not similarly

---

[5] *See Grimm*, 972 F.3d at 609–10; *see Kadel v. Folwell*, 1:19-cv-272, 2022 WL 2106270, *21 (M.D.N.C. June 10, 2022); *see Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020).

situation to cisgender boys, but only to biological girls. *Grimm*, 972 F.3d at 609–10. The Fourth Circuit opined that embedded in this argument is the bias that gender identity is a choice, and that adopting this framing of the issue would give in to stereotyping. *Id.* at 610.

The relevant comparison here is to persons who seek the same, medically necessary surgeries for non-gender dysphoria related treatments. The West Virginia Medicaid Program provides, for example, medically necessary mastectomies for non-gender dysphoria related diagnoses. The only difference between this scenario and the Plaintiffs' circumstances is that Plaintiffs seek these surgeries to treat gender dysphoria—thus, a distinction hinging on their transgender identity. There are InterQual standards, which are evidence-based standards, that determine the medical necessity of a procedure—these standards exist for both gender dysphoria treatment surgeries and non-gender-affirming surgeries, providing objective basis for determining when such treatments will be covered. Additionally, the surgeries for both gender-affirming and non-gender-affirming reasons utilize the same CPT codes in documenting and billing. The only difference, which results in the preclusion of coverage for Plaintiffs, is that their diagnosis is for gender dysphoria, arising from their identity as transgender.

Lastly, the Court disagrees with Defendants' assertion that, because West Virginia Medicaid provides coverage for some treatments of gender dysphoria, excluding coverage for surgical treatments for gender dysphoria is not discriminatory, as only a subset of transgender individuals will seek this treatment. Defendant relies on *Toomey v. Arizona*, a report and recommendation that found that a policy exclusion which "discriminates against some natal females but not all...is not, on its face, discrimination on the basis of sex." No. CV-19-0035-TUC-RM, 2020 WL 8459367, *4 (D. Ariz. Nov. 30, 2020).[6] This is an out-of-district case and is non-

---

[6] The Court notes that this report and recommendation was denied in part by the District Court. *Toomey v. Arizona*, 19-cv-00035, 2021 WL 753721 (D. Ariz. Feb 26, 2021).

binding on this Court. The District Judge in this matter did not discuss the magistrate's report and recommendation regarding this analysis in detail, but rather, found that 1) plaintiffs had not met the heightened standard for such relief and 2) the preliminary injunctive relief sought by plaintiffs was the same as the ultimate relief sought in the case, and without a showing of extraordinary circumstances, such relief could not be granted at the preliminary injunction phase. *Toomey v. Arizona*, 19-cv-00035, 2021 WL 753721 *5–*6 (D. Ariz. Feb 26, 2021). The report was adopted only to the extent that it recommended denying the Motion for Preliminary Injunction on the grounds that Plaintiff had not met the heightened standard. *Id.* at *6. The rest of the report was rejected by the District Court. *Id.* Thus, this report and recommendation is not persuasive to this Court's analysis.

Further, the Supreme Court has made clear that it "does [not] matter if an employer discriminates against only a subset of men or women." *Bostock*, 140 S. Ct. at 1775; *see also Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (finding that, even though only some women will become pregnant or have children, the refusal to hire women with preschool-aged children was facial sex discrimination). The exclusion here denies surgical care to all transgender people who may seek surgery to treat gender dysphoria—that subset of transgender people is equally protected against discrimination. Further, the narrow question addressed by this Court is the exclusion of surgical care. Simply because the West Virginia Medicaid Program does not discriminate in all aspects does not permit it to discriminate narrowly against transgender surgical care.

c.  The exclusion discriminates on its face

Generally, a plaintiff must show that a policy based on sex or transgender status had discriminatory intent. But such a showing is unnecessary when the policy tends to discriminate on

-15-

its face. *Kadel*, 2022 WL 2106270, at *18 (citing *Shaw v. Reno*, 509 U.S. 630, 642 (1993)). The Court looks to the language of the policy to determine whether it is facially neutral or whether it explicitly references gendered or sex-related terms. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485 (1982).

In *Grimm*, the Fourth Circuit found that a bathroom policy that required students to use bathrooms according to their "biological genders" discriminated on the basis of sex. *Grimm*, 972 F.3d at 608–10. The court reasoned that the policy "necessarily rests on a sex classification" and "cannot be stated without referencing sex." *Id.* at 608. Further, the court found that the bathroom policy propagated sex stereotyping, as the transgender plaintiff was viewed as "failing to conform" to sex stereotypes. *Id.* The *Grimm* court also found that the policy further discriminated on the plaintiff's status as a transgender boy, noting that "[m]any courts…have held that various forms of discrimination against transgender people constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Id.*

Looking to the language of the exclusion, it is clear that the exclusion discriminates on its face. The exclusion denies coverage for "transsexual surgery." This language refers explicitly to sex—one seeking a "transsexual surgery" seeks to change from their sex assigned at birth to the sex that more accurately reflects their gender identify. Only individuals who identify as transgender would seek "transsexual surgery," and as the Supreme Court reasoned in *Bostock v. Clayton County, Georgia*, one cannot consider the term "transgender" without considering sex. *Bostock*, 140 S. Ct. at 1746 ("[T]ry writing out instructions for who should check the [transgender] box [on a job application] without using the words man, woman, or sex (or some synonym). It can't be done."). Following this reasoning, the Court finds that the exclusion references sex on its

face. *See Kadel*, 2022 WL 2106270, at *19 (finding that the health plan's exclusions for sex changes or modifications and related care facially discriminate); *see also Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020) ("In sum, defendant's policy of excluding coverage for medically necessary surgery such as vaginoplasty and mammoplasty for employees, such a[s] plaintiff, whose natal sex is male while providing coverage for such medically necessary surgery for employees whose natal sex is female is discriminatory on its face and is direct evidence of sex discrimination.").

Defendants point to *Geduldig v. Aiello* to support their argument that the exclusion is facially neutral. 417 U.S. 484 (1974). In *Geduldig*, the Court found that a disability insurance program which exempted from coverage any work loss resulting from pregnancy did not discriminate based on sex. *Id.* at 494. The Court reasoned that pregnancy was a physical condition divorced from gender, and while only women can get pregnant, the group of members who were not pregnant included both men and women. *Id.* at 496. Here, the nonsuspect class—those not seeking surgical treatment for gender dysphoria—are treated more favorably, as their materially same surgeries are covered. This is unlike *Geduldig*, where men were not treated more favorably under the challenged policy. And, as the *Kadel* court found, the exclusion precludes a specific treatment that is connected to a person's sex and gender identity—not just a single "objectively identifiable physical condition with unique characteristics." *Kadel*, 2022 WL 2106270, at *21.

Thus, it is the opinion of the Court that the exclusion at issue here facially discriminates on the basis of sex and transgender status. Thus, there is no need for Plaintiffs to show discriminatory intent or purpose.

d.  Heightened Scrutiny Analysis

Finding that the exclusion does discriminate on the basis of sex and transgender status, the

Court must determine whether the exclusion survives heightened scrutiny. It does not.

Classifications based on sex and transgender status "fail[ ] unless [they are] substantially related to a sufficiently important governmental interest." *Grimm*, 972 F.3d at 608 (citing *Cleburne*, 473 U.S. at 441). The governmental interests that Defendants put forward to support the exclusion are unsupported by the evidence in the record.

### 1. Cost

Defendants assert cost considerations as a reason to justify the exclusion. However, as previously discussed, Defendant has not supported with any evidence in the record its concern about the costs of providing coverage for surgical treatments of gender dysphoria. In fact, Defendant stipulated to having not considered any documents, let alone any documents considering costs, in adopting this exclusion. *See* ECF No. 258. Further, all the evidence in the record point to the long-term cost-efficiency of providing this coverage, contradicting Defendants' assertion. Thus, cost considerations have not been established as an important governmental purpose that justifies the discrimination.

### 2. Consistency with CMS policy

Next, Defendants claim that providing coverage consistent with what is required by the Centers for Medicare and Medicaid Services (CMS) is an important governmental purpose for the exclusion. CMS oversees Medicaid by maintaining the Medicaid regulations and approving state plans and state plan amendments. *See Sarah Young Dep.*, ECF No 252-1, at 42–43. The Medicaid Program bases "all of [its] policies and procedures within the confines of the federal regulation, the state code, state laws, and [it] ensure[s] that the covered services are available to members." *Id.* at 20. CMS communicates with the Medicaid Program to dictate changes to the program or clarify a policy. *Id.* at 21. Further, CMS generally has an active role in reviewing and approving

-18-

JA2579

of changes to Medicaid coverage. *Id.* at 17. CMS neither mandates nor prohibits coverage for the surgical care of gender dysphoria—this decision is left up to the individual states. *See id.* at 42.

Defendants assert that Secretary Crouch and Commissioner Beane have relied on guidance from CMS and the Department of Human Health Services (HHS) to determine required coverages. Since surgical treatment of gender dysphoria is not a mandated coverage dictated by CMS, Defendants assert that excluding this coverage is simply following CMS guidance and is an important governmental interest. Further, Defendants note that CMS has never notified the West Virginia Medicaid program that excluding this coverage is in violation of any law, thus, they argue, the Exclusion is not unlawful. *Id.* at 37.

Importantly, the lack of a mandate by CMS does not permit Defendants to ignore their obligations under the Constitution. CMS's lack of guidance on the matter does not give a green light for the states to enact discriminatory policies. Defendants' purported governmental interest in providing coverage consistent with what is required by CMS rings hollow in light of the fact that the West Virginia Medicaid Program covers other services which would be characterized as optional by CMS. *Tr. of Proceedings*, ECF No. 269, at 45.

Defendants also point to a 2016 study by HHS, discussed by Dr. Stephen Levine, where HHS refused to mandate coverage for transgender surgeries, leaving such decisions up to the individual states due to the lack of evidence regarding the long-term benefits of such surgeries. *Dr. Stephen Levine's Expert Report*, ECF No. 252-11, at 14. But this assertion regarding the long-term benefits is inconsistent with the body of literature on this topic. As Dr. Karasic points out in his rebuttal report, gender confirming surgery "has been studied extensively, with much evidence of the effectiveness of such treatment." *Dr. Karasic's Rebuttal Report*, ECF No. 250-21, at 16; *see also id.* at 14 (citing to a Cornell University study which found a "robust international consensus

-19-

**JA2580**

in the peer-reviewed literature that gender transition, including medical treatments such as hormone therapy and surgeries, improves the overall well-being of transgender individuals.).[7] Further, the underlying HHS study to which Dr. Levine references followed the agency's decision to <u>eliminate</u> a categorical ban on gender-affirming surgery, like the ban found in the West Virginia Medicaid Program. *See Dr. Loren Schechter's Rebuttal Report*, ECF No. 250-24, at 5.

Thus, the Court does not find that the adherence to the required services as mandated by CMS to be a sincere or compelling governmental interest.

### 3. *Question of medical necessity*

Lastly, Defendants question the medical necessity of the surgical treatment of gender dysphoria. This assertion is without support in the record. Dr. Schechter directly addresses the medical necessity of surgical care to treat gender dysphoria. *See Dr. Schechter's Expert Report*, ECF No 250-23, at 12–13; *see Dr. Schechter's Rebuttal Report*, ECF No. 250-24, at 13. As Dr. Schechter points out, these procedures are "clinically indicated to treat the underlying medical condition of gender dysphoria." *Dr. Schechter's Expert Report*, ECF No. 250-23, at 13. Dr. Schechter discusses that the "prevailing consensus of the medical community recognizes "that procedures used to treat gender dysphoria are reconstructive, not experimental, and are medically necessary." *see Dr. Schechter's Rebuttal Report*, ECF No. 250-24, at 13. The techniques used to perform these surgeries are well-established and used to perform many different surgeries, not just gender confirming surgeries. *Id.* Gender confirming surgeries have been performed "for decades" and have demonstrated benefits. *Id.*

There are Standards of Care promulgated by the World Professional Association of

---

[7] Dr. Karasic also points out the potential bias in Dr. Levine's testimony, as recognized by the Judge Jon Tigard in the Northern District of California. *See Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015) (where the court gave Dr. Levine's opinion very little weight due to his misrepresentations of the Standards of Care and illogical inferences).

Transgender Health (WPATH) that provide clinical criteria for the medical interventions to treat gender dysphoria. *Dr. Karasic's Expert Report*, ECF No. 250-20, at 8. These Standards of Care are recognized by a number of leading medical professional entities, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the Endocrine Society, the Pediatric Endocrine Society, the American College of Obstetrics and Gynecology, the American College of Physicians, and the World Medical Association, among others. *Id*. Similarly, the Endocrine Society has published a clinical practice guideline providing protocols for the medically necessary treatment of gender dysphoria. Further, many of the major medical organizations have opposed the blanket denial of this medically necessary care. *Id.* at 10. The medical treatments for gender dysphoria have been studied extensively, and have been shown to improve "quality of life and measures of mental health" for patients. *Id.* at 11–12 (citing to the Cornell University study that supported gender affirming "hormone and surgical treatment improved the well-being of transgender individuals").

Further, InterQual has developed clinical standards of care to determine the medical necessity of surgical treatment for gender dysphoria. For example, the InterQual standards created for vaginoplasty for gender affirmation surgery note that "[d]elaying treatment for those with gender dysphoria is not a reasonable treatment option." *InterQual Composite*, ECF No. 250-30, at 36. These standards note that this procedure can be performed for medically necessary purposes and that the criteria found therein is intended to determine the medical appropriateness of the procedure. *Id.* at 38. The InterQual standards for the surgical care of gender dysphoria would be utilized by West Virginia Medicaid Program's Kepro system if the exclusion at issue here did not prohibit coverage of this treatment.

The argument that surgical treatment of gender dysphoria is not medically necessary is

**JA2582**

wholly unsupported by the record, and importantly, is refuted by the majority of the medical community. Thus, the Court finds that concern for the medical necessity of this treatment is not a sufficiently important governmental interest.

    e.   <u>The exclusion does not survive heightened scrutiny, thus, violating Equal Protection</u>

The Court has discussed Defendants' purported governmental interests that are upheld by the exclusion. None survive heightened scrutiny. Without a sufficiently important governmental interest, this exclusion must fail. Thus, the Court finds that the exclusion violates the Equal Protection Clause of the Fourteenth Amendment.

    2.   <u>Violation of the Affordable Care Act</u>

The Affordable Care Act (ACA) "aims to increase the number of Americans covered by health insurance" through the creation of "a comprehensive national plan to provide universal health insurance coverage." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 583 (2012). An important component of the ACA is the anti-discrimination mandate in section 1557. *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Sup. 3d 1, 11 (D.D.C. 2020). This section provides that "[e]xcept as otherwise provided… an individual shall not, on the ground prohibited under title VI of the Civil Rights Act…[and] title IX…be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance…". 42 U.S.C. § 18116. Because the ACA explicitly incorporates Title VI and Title IX, and the Fourth circuit looks to Title VII to guide the evaluation of claims under Title IX, the test announced in *Bostock* is the appropriate test to determine whether a policy discriminates in violation of the ACA. *Kadel*, 2022 WL 2106270, at *29.

To prevail on a section 1557 claim, a plaintiff most show that:

1. Defendant is a health program or activity that receives federal funds, and
2. Plaintiff was subjected to discrimination in healthcare services on the basis of sex.

*See id.*

BMS has already admitted that it is a "health program or activity" for purposes of Section 1557 analysis. *See Defs.' Answer to Am. Compl.*, ECF No 151, ¶ 15 ("These Defendants further admit that West Virginia Medicaid is jointly funded by the State of West Virginia and the federal government. These Defendants admit that BMS is a recipient of federal funds from the U.S. Department of Health and Human Services, including Medicaid funding."). Thus, the first element of the 1557 claim is met.

Pursuant to the Equal Protection analysis above, this Court has found that Plaintiffs were subjected to discrimination in healthcare services on the basis of sex. The exclusion precludes individuals who are seeking surgical treatment of gender dysphoria from coverage. As already noted by this Court, a transgender identity is inherent in an individual who suffers from gender dysphoria. Transgender status, and thus, this exclusion, cannot be understood without a reference to sex. *See Bostock*, 140 S. Ct. at 1746. Plaintiffs are subjected to discrimination on the basis of sex.

Defendants make the argument that, historically, the term "sex" has referred to the binary sexes of male and female. Gender identity, Defendants assert, is something entirely distinct from the sexes, and thus, for the purposes of the ACA, Defendants cannot be guilty of discrimination because transgender status does not implicate this binary categorization—*Bostock* rejects this limitation on the scope of discrimination.

-23-

JA2584

Defendants also to *Hennessy-Waller v. Snyder* out of the District of Arizona to support their position. 529 F. Supp. 3d 1031 (D. Ariz. 2021). At the outset, the *Hennessy-Waller* court was deciding a motion for preliminary injunction, which requires a different standard than this Court deciding motions for summary judgment. In that case, the plaintiffs were transgender minors enrolled in the state Medicaid who were diagnosed with gender dysphoria. The Medicaid program covered other treatments for gender dysphoria but excluded coverage for gender reassignment surgeries. With respect to the plaintiffs' ACA claim, the court reasoned that the exclusion only precluded coverage for surgical treatment; other treatment was covered, so plaintiffs could not show that there was discrimination. *Id.* at 1045. Further, the District of Arizona also questioned the safety of these procedures for adolescents. *Id.* Defendants here made similar arguments. But as already discussed, this Court fundamentally disagrees with these positions. First, Defendants are not permitted to discriminate on one aspect of healthcare just because they do not discriminate across the board for all treatments. The issue here is narrow regarding the discrimination with respect to surgical care, and this Court found that the exclusion does discriminate. Second, the safety, effectiveness, and medical necessity have been clearly demonstrated by the expert evidence in the record and is confirmed by the many major health organizations supporting the safety and effectiveness of this treatment. The *Hennessy-Waller* court did not have the robust medical evidence in the record that this Court has before it; this case is unpersuasive here.

Thus, because this Court finds that Defendants are a "health program or activity" under the ACA, and that Plaintiffs have been subjected to discrimination on the basis of sex, Defendants have violated ACA section 1557.

3.  <u>Violation of Medicaid</u>

Plaintiffs assert that the Exclusion violates the Availability and Comparability requirements of the Medicaid Act, because coverage for medically necessary treatments for gender dysphoria are excluded from coverage while the same treatments are covered for other medically necessary reasons.

The Medicaid Program is established in Title XIX of the Social Securities Act. 42 U.S.C. §§ 1396 *et seq*. The purpose of this act is to enable "each State, as far as practicable under the conditions in such state, to furnish… medical assistance [to individuals] whose income and resources are insufficient to meet the costs of necessary medical services." *Id.* § 1396-1. Participation in Medicaid is optional—however, once a state elects to participate in the Medicaid program, it is subject to federal laws and regulations. *See Antrican v. Odom*, 290 F.3d 178, 183 n.2 (4th Cir. 2002); *Flack v. Wisconsin Dep't of Health and Servs.*, 395 F. Supp. 3d 1001, 1015 (W.D. Wisc. 2019) (noting that a state Medicaid Program "must comply with all federal statutory and regulatory requirements").

Plaintiffs allege violations of both Medicaid's Availability and Comparability requirements. The Court will address each.

### a. Violation of Medicaid's availability requirement

A state Medicaid Program "must… provide… for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17), (21), (28), (29), and (30) of section 1905(a)." 42 U.S.C. § 1396a(a)(10)(A). A state must provide coverage for mandatory categories of treatment and must cover services when they (1) fall within a category of mandatory medical services or optional medical services that the state has elected to provide; and (2) are "medically necessary" for a particular participant. *See Beal v. Doe*, 432 U.S. 438 (1977). The state "may place appropriate limits on a service based on such criteria as medical necessity or

-25-

JA2586

on utilization control procedures." 42 C.F.R. § 440.230. "These limits must be 'reasonable' and 'consistent with the objectives of the [Medicaid] Act." *Flack*, 395 F. Supp. 3d at 1015 (quoting *Rush v. Parham*, 625 F.2d 1150, 1155 (5th Cir. 1980)).

Plaintiffs here assert that BMS has either mandated or chosen to cover the same surgical procedures for non-gender-dysphoria related treatment and that the unrebutted evidence in the record demonstrates the medical necessity of surgical care. This Court agrees. The surgical care precluded by the exclusion is made available and covered by Medicaid when the surgical care is to treat diagnoses other than gender dysphoria. Indeed, the same CPT codes are used to document the surgeries, whether performed for gender dysphoria treatment or for treatment of another diagnosis. And, there is ample evidence in the record to support the medical necessity of the treatments. *See Alvarez v. Betlach*, 572 F. App'x 519, 521 (9th Cir. 2014) (discussing that states are prohibited "from denying coverage of 'medically necessary' services that fall under a category covered in their Medicaid plans." (quoting *Beal v. Doe*, 432 U.S. 438, 444 (1977)); *see Bontrager v. Ind. Fam.   Soc. Servs. Admin.*, 697 F.3d 604, 608 (7th Cir. 2012) ("[T]he State is required to provide Medicaid coverage for medically necessary in those service areas that the State opts to provide such coverage."); *see Beal*, 432 U.S. at 444 ("[S]erious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage…").

Defendants point to *Casillas v. Daines* to support the contention that regulations permit a Medicaid Program to place limits on services, even when those services are required to be covered. 580 F. Supp. 2d 235, 245–46 (S.D.N.Y. 2008). Notably, *Casillas* is nonbinding on this Court, and was not even followed within the Southern District of New York. *See Cruz v. Zucker*, 116 F. Supp. 3d 334 (S.D.N.Y. 2015). And, while states are granted "discretion to choose the proper mix of amount, scope, and duration limitations on coverage," such choices must ensure that the "care and

services are provided in 'the best interests of the recipients.'" *Alexander v. Choate*, 469 U.S. 287, 303 (1985) (quoting 42 U.S.C. § 1396a(a)(19)). The limitations must also be consistent with the Medicaid Act. *Id.* at 303 n.23. When a state Medicaid Program does choose to limit services, it cannot limit a service it has elected to cover based on diagnosis—this Court finds that such a limitation would not be "appropriate." *See e.g. Bontrager*, 697 F.3d at 609 (finding that a budgetary cap on coverage for medically necessary procedures was not a proper utilization control procedure). The exclusion violates the availability requirement.

> b.  *Violation of Medicaid's comparability requirement*

The State Medicaid Program provides coverage for both the "categorically needy" and "medically needy" participants. "Categorically needy" individuals receive some form of public assistance, *see* 42 U.S.C. § 1396a(a)(10)(A), while "medically needy" individuals are those "whose incomes are too large to qualify as categorically needy," yet "lack the funds to pay for medical expenses." *Benjamin H. v. Ohl*, No. Civ. A. 3:99-0338, 1999 WL 34783552, *3 (S.D.W. Va. July 15, 1999) (citing *Schweiker v. Gray Panthers*, 453 U.S. 34, 37 (1981)).

The Medicaid statute provides that:

> The medical assistance made available to…any individual described in subparagraph (A)—
> (i)    Shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual and
> (ii)   Shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A);

42 U.S.C. § 1396a(a)(10)(B). Further, the regulations promulgated pursuant to the Medicaid Act provide that:

> (a) The plan must provide that the services available to any categorically needy recipient under the plan are not less in amount, duration, and scope than those services available to a medically needy recipient; and
> (b) The plan must provide that the services available to any

**JA2588**

individual in the following groups are equal in amount, duration,
and scope for all recipients within the group:
a.   The categorically needy
b.   A covered medically needy group

42 C.F.R. § 440.240. The regulations also provide that "[t]he agency may place appropriate limits

on a service based on such criteria as medical necessity or on utilization control procedures." 42

U.S.C. § 440.230.

Plaintiffs assert that Defendants violate the comparability requirement of the Medicaid Act

by providing particular services to some Medicaid participants but not others based solely on

diagnosis. This Court has found that the surgeries, such as mastectomies, which are covered to

treat non-gender dysphoria diagnoses are materially the same as the surgeries provided to treat

gender dysphoria. Thus, the difference in treatment clearly violates the comparability requirement,

which requires that all persons within a specific category be treated equally. *See White v. Beal*,

555 F.2d 1146, 1151 (3d Cir. 1977) ("We find nothing in the federal statute that permits

discrimination based upon etiology rather than need for the services.").

Defendants rely on *Rodriguez v. City of New York* to support their argument that, since

surgical treatment for gender dysphoria is not covered for any Medicaid participant, there is no

violation of the comparability requirement. 197 F.3d 611 (2d Cir. 1999). But their reliance on

*Rodriguez* is misplaced. In *Rodriguez*, plaintiffs challenged the failure of New York City to

provide personal-care services to Medicaid recipients. A key distinction in *Rodriguez* is that the

benefit sought by Plaintiffs was provided to no one. *Id.* at 616. Here, the surgeries sought by

Plaintiffs are materially the same to covered procedures that treat other diagnoses. The exclusion

essentially denies services to some categorically needy persons while the same services are

provided for other persons with similar needs. *See Davis v. Shah*, 821 F.3d 231, 258 (2d Cir. 2016)

(discussing that an analysis under the comparability requirement must "entail some independent

-28-

**JA2589**

judicial assessment of whether a state has made its services available to all categorically needy individuals with equivalent medical needs").

The exclusion "fails to make covered treatments available in sufficient amount, duration and scope" and discriminates on the basis of diagnosis. *Flack*, 395 F. Supp. 3d at 1019 (internal quotation omitted). Thus, it violates the comparability requirement of the Medicaid Act.

4. <u>Standing</u>

Lastly, Defendants argue that Plaintiffs lack the standing to bring this case because neither has suffered an injury in fact. To establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). Defendants argue that, because Plaintiffs have not submitted a claim for and been denied gender-affirming care by Medicaid, they cannot show injury in fact, and thus, lack standing.

However, Defendants enacted a clear policy excluding coverage for surgical care of gender dysphoria with no exceptions. This caused an actual, concrete injury to Plaintiffs by essentially constructing a discriminatory barrier between them and health insurance coverage. This is not a hypothetical injury. Plaintiffs requesting coverage would have been futile due to the exceptionless exclusion, and the law does not require Plaintiffs to take such futile acts. *Townes v. Jarvis*, 577 F.3d 543, 547 n.1 (4th Cir. 2009). "In the context of applications for government benefits… [the] threshold requirement… may be excused… where a plaintiff makes a substantial showing that the application for the benefit… would have been futile." *Safari Club Int'l v. Jewell*, 842 F.3d 1280,

-29-

1286 (D.C. Cir. 2016) (internal quotations omitted). Defendants' policy was clear—a request for coverage would have been denied under the exclusion. Thus, Plaintiffs have standing.

**CONCLUSION**

The West Virginia Medicaid Program exclusion denying coverage for the surgical care for gender dysphoria invidiously discriminates on the basis of sex and transgender status. Such exclusion violates the Equal Protection clause of the Fourteenth Amendment, the Affordable Care Act, and the Medicaid Act. Defendants are enjoined from enforcing or applying the exclusion.

Thus, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 250) and **DENIES** Defendants' Motion for Summary Judgment (ECF No. 252).

The Court also **DENIES as MOOT** the Motion to Exclude Expert Testimony of Stephen B. Levine, M.D. ECF No. 254. Resolving the Motion for Summary Judgment in favor of Plaintiffs moots this Motion.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        August 2, 2022

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN and SHAUNTAE
ANDERSON, individually and on behalf of all
others similarly situated,

        *Plaintiffs*,

    v.

WILLIAM CROUCH, *et al.*,

        *Defendants.*

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

## **JUDGMENT ORDER**

IT IS ORDER AND ADJUDGED that judgment is entered in favor of plaintiffs Christopher Fain, Shauntae Anderson, and the certified Rule 23 Class against defendants William Crouch, Cynthia Beane, and the West Virginia Department of Health and Human Resources, Bureau for Medical Services (the State actors and agencies responsible for administering the Medicaid Program in West Virginia) declaring that the West Virginia State Medicaid Program's exclusion of gender-confirming surgical treatment for transgender West Virginia Medicaid participants violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116; the Medicaid Act's Availability Requirement, 42 U.S.C. § 1396a(a)(10)(A); and the Medicaid Act's Comparability Requirement, 42 U.S.C. § 1396a(a)(10)(B).

IT IS FURTHER ORDERED AND ADJUDGED that defendants William Crouch, Cynthia Beane, and the West Virginia Department of Health and Human Resources, Bureau for Medical Services are PERMANENTLY ENJOINED from enforcing or applying the exclusion.

1

**JA2592**

IT IS FURTHER ORDERED AND ADJUDGED that plaintiffs shall have up to and including 45 days after the date of entry of this judgment to file a bill of costs, and a motion for attorney's fees and costs.

IT IS FURTHER ORDERED AND ADJUDGED that the court retains jurisdiction to enforce the judgment.

Approved as to this ___17___th day of August, 2022.

_____
Honorable Robert C. Chambers
U.S. District Court Judge

**JA2593**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

**CHRISTOPHER FAIN,**
**SHAUNTAE ANDERSON,** individually
and on behalf of all others similarly situated,

                    **Plaintiffs,**                **Civil Action No. 3:20-cv-00740**
                                                        **Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA**
**DEPARTMENT OF HEALTH AND HUMAN**
**RESOURCES, BUREAU FOR MEDICAL**
**SERVICES,**

                    **Defendants.**

**<u>NOTICE OF APPEAL</u>**

Defendants William Crouch, Cynthia Beane, and West Virginia Department of Health and

Human Resources, Bureau for Medical Services appeal to the United States Court of Appeals for

the Fourth Circuit from the certification of a class and final judgment as set forth in two

Memorandum Opinion and Orders entered on August 2, 2022, [ECF Nos. 270, 271] and the

Judgment Order entered on August 17, 2022 [ECF No. 273].

                                    **WILLIAM CROUCH,**
                                    **CYNTHIA BEANE, and**
                                    **WEST VIRGINIA DEPARTMENT OF**
                                    **HEALTH AND HUMAN RESOURCES,**
                                    **BUREAU FOR MEDICAL SERVICES,**
                                    **By Counsel**

**JA2594**

/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esq. (WVSB #6558)
Roberta F. Green, Esq. (WVSB #6598)
Caleb B. David, Esq. (WVSB #12732)
Kimberly M. Bandy, Esq. (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

JA2595

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**CHRISTOPHER FAIN,**
**SHAUNTAE ANDERSON,** individually
and on behalf of all others similarly situated,

                **Plaintiffs,**                **Civil Action No. 3:20-cv-00740**
                                              **Hon. Robert C. Chambers, Judge**

**v.**

**WILLIAM CROUCH,** in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
**CYNTHIA BEANE,** in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services; **WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, BUREAU FOR MEDICAL
SERVICES,**

                **Defendants.**

## <u>CERTIFICATE OF SERVICE</u>

        Defendants William Crouch, Cynthia Beane and West Virginia Department of Health and

Human Resources, by counsel, hereby certify that on the 31st day of August, 2022, a true and exact

copy of their ***Notice of Appeal*** was served on counsel via electronic means as follows:

Walt Auvil (WVSB#190)             Avatara Smith-Carrington, Visiting Attorney
***Counsel for Plaintiffs***           (MD Bar)
The Employment Law Center, PLLC    ***Counsel for Plaintiffs***
1208 Market Street               Lambda Legal Defense and Education Fund,
Parkersburg, WV 26101          Inc.
(304) 485-3058                  3500 Oak Lawn Avenue, Suite 500
(304) 485-6344 (fax)           Dallas Texas 75219
auvil@theemploymentlawcenter.com   (214) 219-8585
                                   (214) 481-9140 (fax)
                                   asmithcarrington@lambdalegal.org

## JA2596

Tara L. Borelli, Visiting Attorney
(GA Bar No. 265084)
Carl Charles, Visiting Attorney
(NY Bar No. 5427026)
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
1 West Court Square, Suite 105
Decatur, GA  30030
(470) 225-5341
(404) 506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org


Sasha Buchert, Visiting Attorney
(OR Bar No. 070686)
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Nora Huppert, Visiting Attorney
(CA Bar No. 330552)
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund,
Inc.
65 E. Wacker Pl,, Suite 2000
Chicago, IL 60601
(312) 663-4413
(312) 663-4307
nhuppert@lambdalegal.org


Anna P. Prakash, Visiting Attorney
(MN Bar No. 0351362)
Nicole J. Schladt, Visiting Attorney
(MN Bar No. 0400234)
***Counsel for Plaintiffs***
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4700
Minneapolis, MN  55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com


/s/Kimberly M. Bandy
Lou Ann S. Cyrus, Esq. (WVSB #6558)
Roberta F. Green, Esq. (WVSB #6598)
Caleb B. David, Esq. (WVSB #12732)
Kimberly M. Bandy, Esq. (WVSB #10081)
***Counsel for William Crouch, Cynthia Beane, and
West Virginia Department of Health and Human
Resources, Bureau for Medical Services***
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV  25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**JA2597**