No. 22-1927

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

CHRISTOPHER FAIN, *et al.*,

*Plaintiffs-Appellees,*

v.

WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Southern District of West Virginia in Case No. 3:20-cv-00740 (Chambers, J.)

## AMICUS CURIAE BRIEF OF THE STATE OF WEST VIRGINIA SUPPORTING APPELLANTS AND REVERSAL

PATRICK MORRISEY
 *Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY
GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
lindsay.s.see@wvago.gov

LINDSAY S. SEE
 *Solicitor General*
 *Counsel of Record*

MICHAEL R. WILLIAMS
 *Senior Deputy Solicitor General*

*Counsel for Amicus Curiae State of West Virginia*

# TABLE OF CONTENTS

Interest Of The Amicus Curiae.................................................................1

Introduction.............................................................................................1

Argument.................................................................................................3

I.    The District Court Did Not Afford West Virginia's Coverage
Decision Sufficient Deference..........................................................3

II.   The District Court Improperly Decided Disputed Issues Of
Material Fact On Summary Judgment.............................................16

III.  In Any Case, This Court Should Clarify That States Are Not
Universally Required To Pay For Sex Reassignment Surgery
Under Medicaid ..............................................................................24

Conclusion.............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abigail All. for Better Access to Developmental Drugs*
   *v. von Eschenbach,*
   495 F.3d 695 (D.C. Cir. 2007)................................................................4

*Adams v. Lab'y Corp. of Am.,*
   760 F.3d 1322 (11th Cir. 2014)...........................................................21

*Addis v. Whitburn,*
   153 F.3d 836 (7th Cir. 1998)..................................................................8

*Alexander v. Choate,*
   469 U.S. 287 (1985)................................................................................8

*Animal Legal Def. Fund v. FDA,*
   836 F.3d 987 (9th Cir. 2016)................................................................16

*Bayse v. Dozier,*
   No. 5:18-CV-00049, 2019 WL 3365854 (M.D. Ga. May 21, 2019)..................2

*Black & Decker Corp. v. United States,*
   436 F.3d 431 (4th Cir. 2006)................................................................19

*Boone v. Everett,*
   671 F. App'x 864 (4th Cir. 2016)..........................................................22

*Bostock v. Clayton Cnty.,*
   140 S. Ct. 1731 (2020) ..........................................................................24

*Bragdon v. Abbott,*
   524 U.S. 624 (1998)..............................................................................14

*Cameron v. Tomes,*
   990 F.2d 14 (1st Cir. 1993) ..................................................................13

*Campbell v. Kallas,*
   936 F.3d 536 (7th Cir. 2019)..................................................................2

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Casillas v. Daines*,
    580 F. Supp. 2d 235 (S.D.N.Y. 2008).................................................................3

*In re Childers-Gray*,
    487 P.3d 96 (Utah 2021) ....................................................................................2

*City of Akron v. Akron Ctr. for Reprod. Health, Inc.*,
    462 U.S. 416 (1983).....................................................................................13, 14

*Dandridge v. Williams*,
    397 U.S. 471 (1970)............................................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..........................................................................................20

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) ..........................................................................4, 13, 24

*Doe 2 v. Shanahan*,
    917 F.3d 694 (D.C. Cir. 2019)...........................................................................5

*Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022) ............................................................................14

*Douglass v. United Servs. Auto. Ass'n*,
    65 F.3d 452 (5th Cir. 1995)..............................................................................17

*Druley v. Patton*,
    601 F. App'x 632 (10th Cir. 2015)..................................................................15

*Edmo v. Corizon, Inc.*,
    949 F.3d 489 (9th Cir. 2020)...........................................................................14

*Erie Ins. Exch. v. Stark*,
    962 F.2d 349 (4th Cir. 1992)...........................................................................18

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Fowler v. United States,*
    647 F.3d 1232 (10th Cir. 2011)................................................................17

*Franciscan All., Inc. v. Burwell,*
    227 F. Supp. 3d 660 (N.D. Tex. 2016) .......................................................2

*Geduldig v. Aiello,*
    417 U.S. 484 (1974)..................................................................................24

*Gibson v. Collier,*
    920 F.3d 212 (5th Cir. 2019) ...............................................1, 2, 5, 14

*Gonzales v. Carhart,*
    550 U.S. 124 (2007)....................................................................................4

*Great Atl. & Pac. Tea Co. v. Cottrell,*
    424 U.S. 366 (1976)....................................................................................4

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020)..............................................................14, 24

*Hall v. Florida,*
    572 U.S. 701 (2014)..................................................................................14

*HCMF Corp. v. Allen,*
    238 F.3d 273 (4th Cir. 2001)......................................................................1

*Inmates of Occoquan v. Barry,*
    844 F.2d 828 (D.C. Cir. 1988)..................................................................13

*Kansas v. Hendricks,*
    521 U.S. 346 (1997)....................................................................................4

*Kosilek v. Spencer,*
    774 F.3d 63 (1st Cir. 2014) ...............................................................2, 5, 20

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Lamb v. Norwood,*
   262 F. Supp. 3d 1151 (D. Kan. 2017)................................................................1

*Levin v. Com. Energy, Inc.,*
   560 U.S. 413 (2010)................................................................................................7

*Mario v. P&C Food Markets, Inc.,*
   313 F.3d 758 (2d Cir. 2002) ........................................................................5, 21

*Martin v. Duffy,*
   977 F.3d 294 (4th Cir. 2020).............................................................................18

*Martinez v. Cnty. of Alameda,*
   512 F. Supp. 3d 978 (N.D. Cal. 2021).............................................................18

*McCown v. Humble Oil & Ref. Co.,*
   405 F.2d 596 (4th Cir. 1969).............................................................................16

*Negron v. Caleb Brett U.S.A., Inc.,*
   212 F.3d 666 (1st Cir. 2000) .............................................................................17

*Nnadozie v. Genesis HealthCare Corp.,*
   730 F. App'x 151 (4th Cir. 2018)......................................................................22

*Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs,*
   No. CIV.A. 3:11-0149, 2012 WL 8503238
   (S.D. W. Va. May 3, 2012) ................................................................................21

*Olmstead v. L.C. ex rel. Zimring,*
   527 U.S. 581 (1999)..............................................................................................8

*Otto v. City of Boca Raton,*
   981 F.3d 854 (11th Cir. 2020)...........................................................................13

*Pharm. Rsch. & Mfrs. of Am. v. Walsh,*
   538 U.S. 644 (2003)..............................................................................................8

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Reyazuddin v. Montgomery Cnty.*,
   789 F.3d 407 (4th Cir. 2015)...........................................................19

*Roberts v. Gestamp W. Va., LLC*,
   45 F.4th 726 (4th Cir. 2022) .........................................................22

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973).............................................................................7

*Scott v. Harris*,
   550 U.S. 372 (2007).........................................................................16

*Sedar v. Reston Town Ctr. Prop., LLC*,
   988 F.3d 756 (4th Cir. 2021)...........................................................23

*Simpkins v. DuPage Hous. Auth.*,
   893 F.3d 962 (7th Cir. 2018)...........................................................16

*Smith v. Ozmint*,
   578 F.3d 246 (4th Cir. 2009)...........................................................23

*Smith v. Rasmussen*,
   249 F.3d 755 (8th Cir. 2001).............................................................7

*Stenberg v. Carhart*,
   530 U.S. 914 (2000)...........................................................................4

*Stock Equip. Co., a Unit of Gen. Signal Corp. v. Tenn. Valley
   Auth.*,
   906 F.2d 583 (11th Cir. 1990)..........................................................17

*Straits v. City of Lancaster*,
   No. 2:16-CV-725, 2018 WL 736021 (S.D. Ohio Feb. 5, 2018) ...........23

*TFWS, Inc. v. Schaefer*,
   325 F.3d 234 (4th Cir. 2003)...........................................................19

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of City of Camden,*
465 U.S. 208 (1984)...................................................................7

*United States R.R. Ret. Bd. v. Fritz,*
449 U.S. 166 (1980)..................................................................13

*United States v. Carter,*
669 F.3d 411 (4th Cir. 2012).....................................................22

*Wachter v. United States,*
877 F.2d 257 (4th Cir. 1989).....................................................20

*Webster v. Chesterfield Cnty. Sch. Bd.,*
38 F.4th 404 (4th Cir. 2022) .....................................................23

*White v. Aronson,*
302 U.S. 16 (1937).....................................................................25

*White v. Farrier,*
849 F.2d 322 (8th Cir. 1988).......................................................4

*Williams v. Kincaid,*
45 F.4th 759 (4th Cir. 2022) .....................................................24

*Wis. Dep't of Health & Fam. Servs. v. Blumer,*
534 U.S. 473 (2002)....................................................................9

## Statutes

42 U.S.C. § 1320e-1 ..................................................................12

42 U.S.C. § 1396a ........................................................................8

## Regulation

85 Fed. Reg. 37,160 (June 19, 2020)......................................6, 14

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

**Rules**

FED. R. APP. P. 26 ...................................................................................1

FED. R. CIV. P. 56.................................................................................18

**Other Authorities**

Anna Rodriguez, *Culture War Politics & the Rise of Religious Exemptions Against Reproductive Health Access: Pitting Patients Against Religious Freedom Is A Losing Game,* 25 J. GENDER, RACE & JUST. 1 (2022) ...........................................10

Bryce T. Daniels, *Eighth Amendment Jurisprudence and Transgender Inmates: The 'WPATH' to Evolving Standards of Decency,* 2021 MICH. ST. L. REV. 255 (2021) .........................................6, 15

David Orentlicher, *Cost Containment and the Patient Protection and Affordable Care Act,* 6 FIU L. REV. 67 (2010).......................................12

DEPARTMENT OF DEFENSE, REPORT AND RECOMMENDATIONS ON MILITARY SERVICE BY TRANSGENDER PERSONS (Feb. 22, 2018) ....................................................................................6

E. Coleman, *et al.*, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8,* 23 INT'L J. OF TRANSGENDER HEALTH S1 (2022) ............................15

EMPL. PRAC. GUIDE 2534234, EMPLOYMENT PRACTICES LETTER NO. 1175 ISSUE NO. 2240 (2022), 2022 WL 2534234 .......................10

*Fast Facts,* WV DHHR (2018), https://bit.ly/3CXMeYr............................11, 12

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

George P. Smith, II, *Limiting the Boundaries of Assisted Reproductive Technology and Physiological Autonomy*, 25 QUINNIPIAC HEALTH L.J. 355 (2022) .......................................................10

INDIAN HEALTH SERVICE, INDIAN HEALTH MANUAL (2019), https://bit.ly/3TMv31L ...............................................................................6

Jay M. Zitter, *Gender Reassignment or "Sex Change" Surgery as Covered Procedure Under State Medical Assistance Program*, 60 A.L.R.6th 627 (2010).........................................................21

Jerry L. Dasti, *Advocating A Broader Understanding of the Necessity of Sex-Reassignment Surgery Under Medicaid*, 77 N.Y.U. L. REV. 1738 (2002)...........................................................10

*Medicaid Spending*, KAISER FAMILY FOUNDATION, https://bit.ly/3SZ7W40 .................................................................................9

Mem. from Tamara Jensen, *et al.*, CMS, on Gender Reassignment Surgery for Medicare Beneficiaries with Gender Dysphoria (CAG-00446N) (Aug. 30, 2016) .........................................5

Mem. from Thomas Moffit, IRS, to Mary Hamilton (IRS CCA 200603025) (Jan. 20, 2006)..................................................6

Michael Zaliznyak, *et al.*, *Which U.S. States' Medicaid Programs Provide Coverage for Gender-Affirming Hormone Therapy and Genital Gender-Affirming Surgery for Transgender Patients?: A State-by-State Review, and a Study Detailing the Patient Experience to Confirm Coverage of Service*, 18 J. SEX. MED. 410 (2021)..............................................................2

Nicole R. Gabriel, *Resurrecting the Nineteenth Amendment: Why Strict Voter ID Laws Unconstitutionally Discriminate Against Transgender Voters*, 56 IDAHO L. REV. 155 (2020).........................9

ix

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

Noa Ben-Asher, *The Necessity of Sex Change: A Struggle for Intersex and Transsex Liberties,* 29 HARV. J. L. & GENDER 51 (2006) ............................................................22

Paul Hruz, *Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria,* 87 LINACRE Q. 34 (2020) .................15

Sara Dahlen, *et al.*, *International Clinical Practice Guidelines for Gender Minority/Trans People: Systematic Review and Quality Assessment,* 11 BMJ OPEN 1 (2021) ................................15

*Total Medicaid Spending,* KAISER FAMILY FOUNDATION, https://bit.ly/3Tmk92g .............................................................9

*Transgender Health Care,* HEALTHCARE.GOV, https://bit.ly/ 3CylPiz...............................................................2

W. Va. S.B. 620 (2022) ........................................................9

William V. Padula, *et al.*, *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis,* 31 J. GEN. INT'L MED. 394 (2016) .................................................12

## INTEREST OF THE AMICUS CURIAE

The State of West Virginia holds a direct interest in this litigation. This appeal considers whether the State's Medicaid plan must pay for Medicaid enrollees to receive surgical treatments for gender dysphoria. Under Medicaid, "each state administers its own program." *HCMF Corp. v. Allen*, 238 F.3d 273, 275-76 (4th Cir. 2001). The district court, however, partially stripped West Virginia of its right to choose how to run its plan. Beyond that basic problem, States like West Virginia have a substantial interest in ensuring the health and wellbeing of their residents. Likewise, States hold a substantial interest in ensuring that taxpayer funds are well spent. The district court's decision strikes at both these sovereign interests, too. West Virginia thus submits this brief under Federal Rule of Appellate Procedure 29(a)(2) to explain why this Court should reverse the decision below—or, at the very least, appropriately narrow its reach and effect to limit the harm to state sovereignty.

## INTRODUCTION

"[S]ex reassignment surgery remains one of the most hotly debated topics within the medical community today." *Gibson v. Collier*, 920 F.3d 212, 224 (5th Cir. 2019); *see also*, *e.g.*, *Lamb v. Norwood*, 262 F. Supp. 3d 1151, 1158 (D. Kan. 2017) ("[T]he treatment of gender dysphoria is a highly controversial issue for which there are differing opinions."). As other circuits have observed, "there is no consensus in the medical community about the necessity and efficacy of sex reassignment surgery as a treatment for gender dysphoria."

1

*Gibson*, 920 F.3d at 221 (citing *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (en banc)). Indeed, courts and medical experts alike cannot even seem to agree "on the exact definition of 'sex-reassignment surgery.'" *In re Childers-Gray*, 487 P.3d 96, 122 (Utah 2021).

"[F]acing [this] gray area of professional opinion," *Campbell v. Kallas*, 936 F.3d 536, 547 (7th Cir. 2019), different States and agencies have responded in different ways. Like West Virginia, a majority of States do not cover "genital gender-affirming surgery" under their Medicaid programs.[*] At the federal level, "the government's own health insurance programs … do not mandate coverage for transition surgeries; the military's health insurance program … specifically excludes coverage for transition surgeries; and the government's own medical experts reported 'conflicting' study results of transition procedures—'some reported benefits while others reported harms.'" *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 693 (N.D. Tex. 2016). Even "many" private insurance schemes do not cover sex reassignment surgeries. *See Transgender Health Care*, HEALTHCARE.GOV, https://bit.ly/3CylPiz (last visited Oct. 19, 2022).

Given this lack of "consensus," the district court should have tread carefully before "insert[ing] itself" into the debate. *Bayse v. Dozier*, No. 5:18-

---

[*] *See* Michael Zaliznyak, *et al.*, *Which U.S. States' Medicaid Programs Provide Coverage for Gender-Affirming Hormone Therapy and Genital Gender-Affirming Surgery for Transgender Patients?: A State-by-State Review, and a Study Detailing the Patient Experience to Confirm Coverage of Service*, 18 J. SEX. MED. 410 (2021).

CV-00049, 2019 WL 3365854, at *10 (M.D. Ga. May 21, 2019). It did not. The court refused to defer to the State's choices on these challenging and sensitive issues. Instead, it ordered the plan to pay for sex reassignment surgeries for *any* person who might *ever* be enrolled in West Virginia Medicaid. In doing so, the district court improperly weighed the evidence and resolved disputed issues of fact at the summary-judgment stage. And it stretched precedents from both this Court and the U.S. Supreme Court to foreclose West Virginia from exercising the sort of discretion that Congress intended and our federalist system of government requires.

West Virginia's choice not to cover certain surgeries for a particular condition is not an issue of federal concern. This Court should therefore reverse.

## ARGUMENT

## I. The District Court Did Not Afford West Virginia's Coverage Decision Sufficient Deference.

The district court was quick to dismiss the State's interests in placing some reasonable limits on the services it pays for under Medicaid. But the district court should have deferred to the State's choice given that the State was acting out of concern for "the health of its citizens and the conservation of limited medical resources." *Casillas v. Daines*, 580 F. Supp. 2d 235, 247 (S.D.N.Y. 2008) (denying claim challenging disallowance of reimbursement for gender reassignment surgery under Medicaid). The lower court erred in ignoring both those concerns.

3

**A.**    First, the Supreme Court has recognized the States' "wide discretion … in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). In fact, in areas of medical "disagreement," federal courts must be particularly "cautious" and afford States "especially broad" options. *Kansas v. Hendricks*, 521 U.S. 346, 360 n.3 (1997). This deference applies "even when the laws at issue concern matters of great social significance and moral substance." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022). Deference here reflects a fundamental element of our "constitutional scheme"—that "the States retain broad power to legislate protection for their citizens in matters of local concern such as public health." *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976) (cleaned up). Not only does this deference enliven federalism, but it also acknowledges the courts' institutional limits. "[T]he democratic branches are better suited to decide the proper balance between the uncertain risks and benefits of medical technology, and are entitled to deference in doing so." *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 713 (D.C. Cir. 2007). After all, "[c]ourts are ill-equipped to evaluate the relative worth of particular surgical procedures." *Stenberg v. Carhart*, 530 U.S. 914, 968 (2000) (Kennedy, J., dissenting).

The issues here implicate matters of serious "uncertainty" in medicine. Twenty-five years ago, one circuit described "transsexualism" as "a very complex medical and psychological" matter. *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988). Little has changed since. Courts repeatedly recognize

4

that there remains "considerable scientific uncertainty concerning whether gender transition treatments (e.g., sex reassignment surgery) fully remedy … the mental health problems associated with gender dysphoria." *Doe 2 v. Shanahan*, 917 F.3d 694, 726 (D.C. Cir. 2019) (Williams, J., concurring) (cleaned up); *see also*, *e.g.*, *Gibson*, 920 F.3d at 226 ("[S]ex reassignment surgery remains an issue of deep division among medical experts."); *Kosilek*, 774 F.3d at 89 (observing the "significant contrary evidence regarding the breadth and variety of acceptable treatment for [gender identity disorder] within the medical community"); *Mario v. P&C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) (affirming, under de novo review, an ERISA plan administrator's finding that "there was substantial disagreement in the medical community about whether gender dysphoria was a legitimate illness and uncertainty as to the efficacy of reassignment surgery").

Courts are not alone in spotting uncertainty here. In 2016, for example, the Centers for Medicare and Medicaid Services concluded that "there [wa]s not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively." Mem. from Tamara Jensen, *et al.*, CMS, on Gender Reassignment Surgery for Medicare Beneficiaries with Gender Dysphoria (CAG-00446N) (Aug. 30, 2016), https://perma.cc/9S73-4WQB. That decision rested on over 500 articles, studies and reports. *Id.*; *see also* Nondiscrimination in Health and Health

Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160, 37,198 (June 19, 2020) (U.S. Department of Health and Human Services confirming that "there is no medical consensus to support one or another form of treatment for gender dysphoria"). Similarly, in 2018 the Department of Defense described "considerable scientific uncertainty and overall lack of high quality scientific evidence demonstrating the extent to which transition-related treatments … remedy the multifaceted mental health problems associated with gender dysphoria." DEPARTMENT OF DEFENSE, REPORT AND RECOMMENDATIONS ON MILITARY SERVICE BY TRANSGENDER PERSONS 5 (Feb. 22, 2018), https://perma.cc/7369-K2VC. The Indian Health Service's purchased referred care program also will not pay for gender reassignment surgery because the Service still considers it "experimental." *See* INDIAN HEALTH SERVICE, INDIAN HEALTH MANUAL, at Ex. 2-3-B (2019), https://bit.ly/3TMv31L. Even the Internal Revenue Service (though later overturned by the Tax Court) initially declined to allow surgery costs as medical-expense deductions because those surgeries remained "controversial." Mem. from Thomas Moffit, IRS, to Mary Hamilton (IRS CCA 200603025) (Jan. 20, 2006).

In sum, "[t]he incongruences in state laws, administrative-agency determinations, Medicaid allotment, and Medicare necessity determinations" show that sex reassignment surgery has not yet reached "consensus accepted by the medical community as a medically necessary treatment for gender-dysphoric patients." Bryce T. Daniels, *Eighth Amendment Jurisprudence*

6

*and Transgender Inmates: The 'WPATH' to Evolving Standards of Decency*, 2021 MICH. ST. L. REV. 255, 278-79 (2021). Considering this "lack of consensus in the medical community and the availability of other treatment options," States like West Virginia have justifiably determined not to cover surgical procedures for gender dysphoria. *Smith v. Rasmussen*, 249 F.3d 755, 760 (8th Cir. 2001).

But despite all this, the district court showed no concern for the State's decisions regarding these complex medical issues. Instead, it declared that the "majority of the medical community" felt otherwise, so "concern for the medical necessity of this treatment" could not justify the State's preference to abstain from paying for it. JA2583. That indifference to the State's judgment was error.

**B.** A second problem lurks, as the Supreme Court's cases also "show[] … a proper reluctance to interfere by prevention with the fiscal operations of the state governments." *Levin v. Com. Energy, Inc.*, 560 U.S. 413, 422 (2010) (cleaned up); *see also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40 (1973) ("This Court has often admonished against such interferences with the State's fiscal policies under the Equal Protection Clause."). It is "particularly appropriate" for courts to exercise "caution" "when a government body is merely setting conditions on the expenditure of funds it controls." *United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208, 223 (1984). And here again, the principle binds even when it comes to sensitive matters like

medical care. "No State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities." O*lmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 612 (1999) (Kennedy, J., concurring in the judgment). These "political" judgments must be left to the States, as "[g]rave constitutional concerns are raised when a federal court is given the authority to review the State's choices in [such] basic matters." *Id.* at 612-13. All in all, "the Constitution does not empower [federal courts] to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Dandridge v. Williams*, 397 U.S. 471, 487 (1970).

Nothing about Medicaid erases the state discretion that underlies this second brand of deference. The Medicaid Act "gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in 'the best interests of the recipients.'" *Alexander v. Choate*, 469 U.S. 287, 303 (1985) (quoting 42 U.S.C. § 1396a(a)(19)). The statute guarantees States "flexibility in designing plans that meet their individual needs" and "considerable latitude in formulating the terms of their own medical assistance plans." *Addis v. Whitburn*, 153 F.3d 836, 840 (7th Cir. 1998). A State may even rely on "state interests unrelated to the Medicaid program itself when … fashioning the particular contours of its own program." *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 666 (2003) (plurality op.). Thus, particularly where the "superintending federal agency" has given States "latitude," courts have "not

been reluctant to leave a range of permissible choices to the States." *Wis. Dep't of Health & Fam. Servs. v. Blumer*, 534 U.S. 473, 495 (2002).

The Medicaid spending decision here falls within the heartland of this money-minded deference. Medicaid is an enormous state budgetary burden that must be carefully managed. In fiscal year 2021 alone, West Virginia spent more than $771 million of its own funds on the program; the total budget including federal funds exceeds $4 billion. *See Federal and State Share of Medicaid Spending*, Kaiser Family Foundation, https://bit.ly/3SZ7W40 (last visited Oct. 19, 2022); *Total Medicaid Spending*, Kaiser Family Foundation, https://bit.ly/3Tmk92g (last visited Oct. 19, 2022). The State takes its role as a steward of these substantial taxpayer funds seriously. During the 2022 legislative session, for instance, the West Virginia Legislature declined to pass a measure that would have purchased blood pressure cuffs for some individuals at a cost of just over $500,000. JA1203. In the same session, the Legislature decided not to spend $75,000 for a single full-time employee to administer another Medicaid program. JA1486. In still another instance, the same Legislature could not pass a single $500 expansion (per enrollee) of Medicaid's adult dental-care coverage. *See* W. Va. S.B. 620 (2022). And all this concern for fiscal prudence proved to be justified, as Medicaid is expected to be "in the red" just two years from now. JA1203.

On top of Medicaid's already sizable and precarious fiscal burden, however, the district court has compelled the State to pile on costs for a procedure that is "often prohibitively expensive." Nicole R. Gabriel,

*Resurrecting the Nineteenth Amendment: Why Strict Voter ID Laws Unconstitutionally Discriminate Against Transgender Voters*, 56 IDAHO L. REV. 155, 159 (2020). One oft-cited figure suggests that "[t]he cost of surgery alone is approximately $37,000 for male-to-female transsexuals, and approximately $77,000 for female-to-male transsexuals." Jerry L. Dasti, *Advocating A Broader Understanding of the Necessity of Sex-Reassignment Surgery Under Medicaid*, 77 N.Y.U. L. REV. 1738, 1769 n.127 (2002). But even those figures do not include "the psychoanalytic treatment required to obtain a recommendation for surgery and life-long hormone treatments" that follow it. *Id.* at 1742. Thus, many sources contemplate even higher expenses, especially as medical costs have escalated in recent years. *See, e.g.*, EMPL. PRAC. GUIDE 2534234, EMPLOYMENT PRACTICES LETTER NO. 1175, ISSUE NO. 2240 (2022), 2022 WL 2534234 (noting how "[c]osts for gender reassignment surgery [in one case] could total $186,100"); George P. Smith, II, *Limiting the Boundaries of Assisted Reproductive Technology and Physiological Autonomy*, 25 QUINNIPIAC HEALTH L.J. 355, 379 n.144 (2022) ("Today, the approximate cost of surgery for a male to female transsexual is $140,450.00 and approximately $124,400.00 for female to male assignment."); Anna Rodriguez, *Culture War Politics & the Rise of Religious Exemptions Against Reproductive Health Access: Pitting Patients Against Religious Freedom Is A Losing Game*, 25 J. GENDER, RACE & JUST. 1, 11 n.57 (2022) ("[G]ender affirming surgeries often cost more than $100,000 out of pocket.").

The district court incorrectly overlooked all this. It instead predicted that few people would seek out these surgeries—and even if they did, it noted that the surgeries are not more expensive than some other surgeries. But that kind of weighing is the sort of judgment the State has a right to make for itself. Because Medicaid has a flat budget, every dollar spent on a reassignment surgery is a dollar not spent elsewhere. Every decision to spend is a decision to deny care in some other context. These judgments are especially difficult in a State where economic conditions are sometimes dire, medical services are sometimes limited and expensive, and serious medical problems (like opioid addiction, cancer, heart disease, and more) are widespread. *See*, *e.g.*, *Fast Facts*, W. Va. DHHR (2018), https://bit.ly/3CXMeYr (last visited Oct. 19, 2022) (noting "West Virginia ranked 2nd highest nationally in the prevalence of general health of adults as either fair or poor"). The State has the better eye for *all* the considerations and tradeoffs that go into its budget; the district court lost sight of this broader context. And beyond that, the district court's logic produces absurd results—following it, in all but the most extreme cases a court would be able to wave away the cost of a particular procedure or treatment as insignificant in the grand scheme of things. But as the Legislature's careful stewardship in years past shows, a few dollars here and a few dollars there add up quickly. The realities of state Medicaid budgets mean that there will always be some restrictions on spending, even for services that might seem essential to some.

The district court also concluded that any concerns about cost "fl[ew] in the face of unrefuted expert testimony." JA2571. But its analysis on this point only underscores why courts are ill-equipped to make these kinds of judgments at all. Relying on a study by Johns Hopkins and others, the district court agreed with Plaintiffs' experts that surgeries produced lower medical expenses over the five- or ten-year timeframes than no surgeries. *Id.* Yet the cited study says no such thing. Instead, it compares costs of "*no* health benefits for transgender patients" (that is, no insurance coverage at all) against the costs of providing all benefits to those persons. William V. Padula, *et al.*, *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, 31 J. GEN. INT'L MED. 394 (2016) (emphasis added). But as even the district court recognized, West Virginia does not deny *all* transgender-related health benefits; it only declines to pay for some surgeries. *See* JA2567. The comparison, then, falls apart. And even taking the study on its own terms, it still concluded that insurance coverage would produce more costs over the five- and ten-year time horizons. Padula, *et al.*, *supra*. It just found these costs were justified because they were less than an assumed willingness-to-pay-value for each "quality-adjusted life year." *Id.* The State can hardly be faulted for not embracing that reasoning, as "Medicaid programs are prohibited from using such a measure as a threshold for coverage." David Orentlicher, *Cost Containment and the Patient Protection and Affordable Care Act*, 6 FIU L. REV. 67, 80 & n.65 (2010) (citing 42 U.S.C. § 1320e-1).

When States face competing demands for public assistance and hold only limited public funds, they "must necessarily engage in a process of line-drawing." *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). Where to draw that funds-versus-no-funds line is a "legislative, rather than judicial, consideration." *Id.* The district court was wrong to forget that.

**C.** Rather than defer to the State's choices, the district court favored "Standards of Care promulgated by the World Professional Association of Transgender Health (WPATH)." JA2581-2582. It erred in doing so. Although the "position of the American Medical Association" and similar interest groups may interest "a legislative committee," the district court "did not explain why these sources shed light on the meaning of the Constitution." *Dobbs*, 142 S. Ct. at 2267. They don't.

"Nothing in the Constitution mechanically gives controlling weight to one set of professional judgments." *Cameron v. Tomes*, 990 F.2d 14, 20 (1st Cir. 1993); *see also City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 467 (1983) (O'Connor, J., dissenting) (explaining that a State may consider factors "well-beyond what various medical organizations have to say"). And the "institutional positions" of "professional organizations … cannot define the boundaries of constitutional rights." *Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020) (detailing how professional organizations have erred on key issues); *see also Inmates of Occoquan v. Barry*, 844 F.2d 828, 837 (D.C. Cir. 1988) ("Nor will it do to invoke the standards of professional organizations as showing failings of purportedly

13

constitutional significance."). Even moving beyond the Constitution, the Supreme Court has cautioned lower courts in statutory cases against finding "no triable issue[s] of fact" based on statements from a "professional organization." *Bragdon v. Abbott*, 524 U.S. 624, 651-52 (1998) (rejecting circuit court's reliance on dental organization's policies in case under Americans with Disabilities Act). Among other things, relying on these organizations' guidelines—which "at best represent the views of a small professional elite"— could introduce "instability" into the law because they so often change. *Hall v. Florida*, 572 U.S. 701, 731-33 (2014) (Alito, J., dissenting); *accord City of Akron*, 462 U.S. at 456 (O'Connor, J., dissenting).

The district court chose especially poorly when it relied on WPATH criteria. Although this Court has approvingly cited them in dicta, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020), "WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate over sex reassignment surgery," *Gibson*, 920 F.3d at 221; *see also Doe v. Snyder*, 28 F.4th 103, 112 (9th Cir. 2022) (referring to evidence that "WPATH's Standards of Care are not universally endorsed"); *Edmo v. Corizon, Inc.*, 949 F.3d 489, 497 (9th Cir. 2020) (O'Scannlain, J., respecting the denial of rehearing en banc) ("The WPATH Standards are merely criteria promulgated by a controversial private organization with a declared point of view."); *accord* 85 Fed. Reg. at 37,198 (HHS describing WPATH as an "advocacy group"). In fact, name notwithstanding, WPATH's guidelines do not constitute "standards of care" at all; they are "flexible"

14

clinical guidelines.  E. Coleman, *et al.*, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 INT'L J. OF TRANSGENDER HEALTH S1, S531 (2022); *see also*, *e.g.*, *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (characterizing WPATH standards as "flexible guidelines").

WPATH's guidelines have serious substantive problems.  Below, expert testimony from Dr. Stephen Levine—a co-chair of the WPATH standard-of-care committee for version five of the guidelines—explained at length why they do not deserve deference.  *See* JA1871-1873, JA1892-1897 ("WPATH is a problematically conflicted organization that misrepresents itself as a credible group.").  And other literature confirms that, because of problems like "inconsistent use of systematic reviews in generating recommendations," the various iterations of the WPATH standards have "not be[en] considered 'gold standard.'"  Sara Dahlen, *et al.*, *International Clinical Practice Guidelines for Gender Minority/Trans People: Systematic Review and Quality Assessment*, 11 BMJ OPEN 1, 8 (2021) (referring to WPATH Version 7 standards); *accord* Daniels, *supra*, at 279-90 (describing problems arising in WPATH standards based on substantive errors, misuse of underlying research, and more); Paul Hruz, *Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria*, 87 LINACRE Q. 34, 37 (2020) ("Despite the endorsement of gender affirmation approaches by several medical organizations including the Endocrine Society and [WPATH], it is important to recognize the low quality of scientific evidence used in generating

15

these treatment recommendations." (cleaned up)).  So the district court should not have faulted the State for declining to follow WPATH's recommendations.

* * * *

The district court should not have given the State's measured assessments such short shrift.  Its choice to elevate the views of private medical organizations over those of state officials is reason enough to reverse.

## II.    The District Court Improperly Decided Disputed Issues Of Material Fact On Summary Judgment.

Throughout its opinion, the district court also decided disputed issues at the summary-judgment stage.  "The fact that both parties move[d] for summary judgment does not establish that there is no issue of fact."  *McCown v. Humble Oil & Ref. Co.*, 405 F.2d 596, 597 n.1 (4th Cir. 1969).  Yet the district court seemed to assume otherwise.

**A.**    Right from the start, the district court created a problem when it announced that "some key factual findings" were "[i]mportant" to its analysis. JA2566; *see also*, *e.g.*, JA2569 (making a factual finding that two surgeries are not materially different).  District courts may not make factual findings on summary judgment—a truism repeated time and again by courts far and wide. *See*, *e.g.*, *Scott v. Harris*, 550 U.S. 372, 378 (2007) ("As this case was decided on summary judgment, there have not yet been factual findings by a judge or jury."); *accord Simpkins v. DuPage Hous. Auth.*, 893 F.3d 962, 965 (7th Cir. 2018) ("[O]n summary judgment, a district court makes no factual findings of its own."); *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 989-90 (9th Cir.

16

2016) ("By definition, summary judgment may be granted only when there …
[is] no factfinding by the district court.  Thus, where the district court has
made a factual determination, summary judgment cannot be appropriate."
(cleaned up)); *Fowler v. United States*, 647 F.3d 1232, 1239 (10th Cir. 2011)
("Because summary judgment may only be based on undisputed facts,
however, such 'factual findings' … were inappropriate for summary
judgment."); *Douglass v. United Servs. Auto. Ass'n*, 65 F.3d 452, 457 (5th Cir.
1995) ("[A] summary judgment involves only legal issues, *not* findings of
fact.").

So the district court's reliance on "factual findings" is good enough
reason to vacate.

**B.**     This issue is also no mere formalistic timing problem, as the
district court resolved several disputed issues in ways it should not have.

Cost is one example.  The district court dismissed the State's cost
concerns in part because the record did not contain the specific documents that
the State relied on in concluding that cost loomed large in providing sex
reassignment surgeries.  *See* JA2569-2570, JA2579.  But "no rule of law"
requires a party—let alone a government asserting a particular interest—to
preserve and present contemporaneous documentary evidence for every fact
it asserts.  *Negron v. Caleb Brett U.S.A., Inc.*, 212 F.3d 666, 673 (1st Cir. 2000);
*cf. Stock Equip. Co., a Unit of Gen. Signal Corp. v. Tenn. Valley Auth.*, 906
F.2d 583, 595 (11th Cir. 1990) (rejecting the "broad contention that
documentary evidence is required to substantiate a claim for costs").  In fact,

17

the summary-judgment rule expressly provides that a party may rely on depositions—among many other things—to support its factual positions on summary judgment. *See* FED. R. CIV. P. 56(c)(1)(A). And here, more than one lay witness explained that West Virginia had determined to deny coverage given the costs of these surgeries and the limits on the Medicaid program's budget. *See*, *e.g.*, JA1130-1133 (testifying about budgeting considerations with surgeries); *see also* ECF No. 252-3, at 20, 45-46 (same). Dr. Levine elaborated on why costs would be substantial, too. *See* JA1885-1888. Maybe the district court thought that the lack of documents made all this testimony less convincing. But if so, the court "erred in making credibility determinations at the summary-judgment stage." *Martin v. Duffy*, 977 F.3d 294, 306 (4th Cir. 2020).

Beyond that, the district court summarily concluded that the costs of providing the surgery would not be "burdensome." JA2570-2571. Yet whether the financial burden is sufficiently small that West Virginia should be compelled to bear it—to the extent this question is a proper one for a court at all—is a "fundamentally factual" inquiry. *Martinez v. Cnty. of Alameda*, 512 F. Supp. 3d 978, 985 (N.D. Cal. 2021) (discussing undue burden in ADA context). That remains true even if a plaintiff's expert insists the costs are small, as expert testimony does not trump all other evidence. "Neither the factual assumptions underlying an expert's opinion nor the expert's inferences from the facts assumed are automatically established by the absence of directly countering expert opinion." *Erie Ins. Exch. v. Stark*, 962 F.2d 349,

18

353 (4th Cir. 1992). And anyway, the district court appeared to misunderstand the import of the expert evidence it relied on, which then led it to overestimate the purported cost savings from these surgeries. *See* Section I.B, *supra*.

**C.** Costs were not the only problem—the district court also erred when it endorsed one side's expert over the other's on the issue of benefits from the surgeries. When opposing experts conflict, "[t]he evidence … sets up a battle of the experts, which should not be resolved at summary judgment." *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 417 (4th Cir. 2015); *see also TFWS, Inc. v. Schaefer*, 325 F.3d 234, 242 (4th Cir. 2003) (reversing grant of summary judgment where the district court favored one side's view of a regulatory scheme over another's). "Weighing all of this expert testimony should … be[] left for trial because witness credibility cannot be assessed on summary judgment." *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006).

Here, Dr. Levine explained how "[t]he body of evidence shows a lack of long-term demonstrated efficacy" from these surgeries "and points to a growing risk of harm and regret." JA1869; *see also* JA1873-1877 (Dr. Levine expanding on questions over long-term benefits of the surgeries at issue). He detailed how quality studies have been unable to confirm claimed benefits and described how many complications can follow from surgery and related treatments. JA1903-1926. Dr. Levine also explained how contrary studies that found benefits from surgery "are typically short-term and suffer from significant methodological limitations." JA1874. Thus, expert testimony

provided medical reasons to believe that benefits did not justify forcing the State to fund this particular kind of surgery.

The district court was unconvinced; it believed "the body of literature" (as characterized by the plaintiff's rebuttal expert) said differently. JA2580. But even if the district court were right, summary judgment should not be decided by counting noses. Perhaps broad disagreement with an expert's opinion may be a basis to attack the expert's credibility, but it is not a reason to end the case before trial (assuming the testimony is not excluded, and it was not here). Indeed, rejecting expert testimony out-of-hand because it is supposedly inconsistent with the "body of literature" seems to re-embrace the "rigid 'general acceptance' requirement" that the Supreme Court rejected 30 years ago. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993). And ultimately, the district court was merely picking a side in the battle of the experts—an especially inappropriate act when, as here, even the most minimal of evidence can carry the day. *See, e.g.*, *Wachter v. United States*, 877 F.2d 257, 261 (4th Cir. 1989) (relying on an "excerpt" from a "medical journal article" to conclude that the "relative merits" of a particular surgical procedure was still a matter of "considerable disagreement among surgeons").

The district court seems to hint at what might have motivated its factfinding when it alludes to Dr. Levine's "potential bias" in a footnote. *See* JA2581. This allegation against Dr. Levine is questionable given his distinguished career as a clinician and service as a court-appointed expert on this subject. *See Kosilek*, 774 F.3d at 77-78 (describing Dr. Levine's report).

20

But it is also beside the point on summary judgment. "Whether and, if so, the extent to which an expert's philosophical bent biases her review is a credibility determination that has always been within the province of the jury." *Adams v. Lab'y Corp. of Am.*, 760 F.3d 1322, 1335 (11th Cir. 2014); *see also Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs,* No. CIV.A. 3:11-0149, 2012 WL 8503238, at *2 (S.D. W. Va. May 3, 2012) (Chambers, J.) ("Any bias on the part of [an expert] is appropriate material for cross-examination," but not a reason to exclude his or her testimony.).

**D.**    The district court also mistakenly concluded that all the surgeries that Plaintiffs demand are medically necessary. "The argument that surgical treatment of gender dysphoria is not medically necessary," the district court said, "is wholly unsupported by the record, and importantly, is refuted by the majority of the medical community." JA2582-2583. Both rationales were in error.

*First*, Defendants did support their argument with evidence. Defendants cited both academic literature, *see* ECF No. 253, at 20 nn.11 & 12, and expert testimony from Dr. Levine, *see* JA1860-1934, *see also generally* ECF No. 252-20 to 252-22, to establish that medical science has not yet confirmed that these surgeries are necessary for the treatment of gender dysphoria. That evidence is not atypical. *See*, *e.g.*, *Mario*, 313 F.3d at 765-66 (affirming ERISA plan administrator's determination that sex reassignment surgeries were not medically necessary); *accord* Jay M. Zitter, *Gender Reassignment or "Sex Change" Surgery as Covered Procedure Under State*

21

*Medical Assistance Program*, 60 A.L.R. 6th 627 (2010) ("[M]any Medicaid administrators have been reluctant to cover such operations since sex change procedures are seen as … not medically necessary."); Noa Ben-Asher, *The Necessity of Sex Change: A Struggle for Intersex and Transsex Liberties*, 29 HARV. J. L. & GENDER 51, 60 (2006) ("[C]ourts have been considerably hesitant to recognize the medical necessity in sex reassignment.").

Even under the district court's heightened-scrutiny standard—which, as Defendants explain, should not have applied here anyway—Defendants were allowed to rely on that kind of evidence. *See*, *e.g.*, *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (explaining that a government "may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense" under intermediate scrutiny). The district court was thus not entitled to "offer[] a version of the facts that almost exclusively relies on [Plaintiffs'] account" by "[o]verlooking [Defendants'] evidence." *Boone v. Everett*, 671 F. App'x 864, 866 (4th Cir. 2016); *see also Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 160 (4th Cir. 2018) (reversing grant of summary judgment where the district court "completely ignored" contrary evidence).

*Second*, the view of the "majority of the medical community" should not settle an issue like medical necessity on summary judgment. The standard at that stage, after all, is not "majority rules." Rather, a district court errs anytime it "fail[s] to credit evidence that contradicts some of its key factual conclusions." *Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 732 (4th Cir.

2022). Thus, as one court put it: "[A]n opposing party may successfully defeat … a motion [for summary judgment] with the testimony of a single witness, even if, in theory, ten other witnesses contradict the single witness' testimony." *Straits v. City of Lancaster*, No. 2:16-CV-725, 2018 WL 736021, at *1 (S.D. Ohio Feb. 5, 2018). And this case was no ten-to-one match. As should be plain by this point, the medical community continues to grapple with whether these surgeries are necessary. Defendants presented evidence that they may not be, and the district court could not reject it at this stage solely because it thought one side had the better of the argument.

* * * *

The tenor of the district court's opinion is hard to miss. The court thought Defendants had a weak case, and it was "not persuaded." JA2573. Yet "the aim of summary judgment is not to … dispose of so-called weak cases, but instead to determine whether a rational jury could find in the plaintiff's favor such that the case should continue." *Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 412 (4th Cir. 2022). "[S]ummary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits," *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021), especially when the movant bears the ultimate burden of persuasion at trial, *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009). The district court should have thus denied Plaintiffs summary judgment given the many material factual issues still in play.

23

**III. In Any Case, This Court Should Clarify That States Are Not Universally Required To Pay For Sex Reassignment Surgery Under Medicaid.**

Even if this Court decides not to reverse the district court's opinion outright, it should be clear about the limited reach of the decision below.

A casual reader might easily conclude that the opinion below prohibits a State from *ever* denying Medicaid coverage for sex reassignment surgeries. Letting that misapprehension stand would be a serious error. Nothing in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), requires that result, seeing as how *Bostock* expressly limited itself to both the Title VII employment context and to the practice of "firing employees" because of their protected trait. *Id.* at 1753. Nor does this Court's decision in *Grimm v. Gloucester County School Board*, *supra*, decide this case, as *Grimm* applied heightened scrutiny to a bathroom policy targeted at transgender persons. The West Virginia policy here does not speak to transgender identity, but applies to persons seeking surgical treatment for gender dysphoria. This Court has been careful to distinguish gender dysphoria from transgenderism. *See Williams v. Kincaid*, 45 F.4th 759, 768 (4th Cir. 2022) ("[A] diagnosis of gender dysphoria … concerns itself primarily with distress and other disabling symptoms, rather than simply being transgender."). And the Supreme Court has warned courts away from equating "regulation of a medical procedure that only one sex" or, in this case, gender identity, "can undergo" with discrimination based on sex or gender identity itself. *Dobbs*, 142 S. Ct. at 2245-46 (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). So in those ways,

24

"the context of the[se] cases" is far from "immaterial" (as the district court thought) because medical issues present different considerations.  JA2572.

So if the Court decides that this decision should stand at all, it should at a minimum make plain that the decision is based on the particular facts and evidence presented in the district court below.  *See*, *e.g.*, JA2585 (district court explaining that its decision on a claim was purportedly based on "the record that [the] [c]ourt ha[d] before it").  In other words, a different outcome might appropriately follow if a party presents different evidence on the factual questions that appear to have driven the district court's thinking here.  *Cf. White v. Aronson*, 302 U.S. 16, 21 (1937) (emphasizing that federal court opinions must "[o]f course … be read in connection with the facts").

In truth, the Court should avoid this half-a-loaf outcome, too.  The record justifies nothing short of complete reversal.  But if the Court disagrees, it should make clear that if a different state actor exercises its judgment and discretion to exclude these same procedures, it should be given a chance to show that its interests justify that choice.

## CONCLUSION

The Court should reverse the judgment below.

25

Respectfully submitted,

PATRICK MORRISEY
   ATTORNEY GENERAL

/s/ Lindsay S. See
Lindsay S. See
   *Solicitor General*
   *Counsel of Record*

Michael R. Williams
   *Senior Deputy Solicitor General*

OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021

Dated: November 7, 2022        *Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

1.    This response brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 6,294 words.

2.    This response brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as required by Fed. R. App. 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Lindsay S. See
Lindsay S. See