No. 22-1927

IN THE

# United States Court of Appeals
# for the Fourth Circuit

_____

**CHRISTOPHER FAIN and SHAUNTAE ANDERSON, individually and on behalf of all others similarly situated,**

*Plaintiffs-Appellees,*

**v.**

**WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; CYNTHIA BEANE, in her official capacity as Commissioner of the West Virginia Bureau for Medical Services; and WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES,**

*Defendants-Appellants.*

_____

On Appeal from the U.S. District Court for the Southern District of West Virginia
No. 3:20-cv-00740

_____

**PLAINTIFFS-APPELLEES' RESPONSE BRIEF**
_____

Avatara Smith-Carrington
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
Phone: 202-804-6245

Anna P. Prakash
Nicole J. Schladt
NICHOLS KASTER, PLLP
80 South 8th Street, Suite 4700
Minneapolis, MN 55402
Phone: 612-256-3200

*Additional counsel for Plaintiffs-Appellees listed on following page.*

Tara L. Borelli
Carl Charles
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: 470-225-5341

Nora Huppert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Phone: 312-663-4413

Walt Auvil
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058

*Counsel for Plaintiffs-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _22-1927_         Caption: _Christopher Fain, et al. v. William Crouch, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Christopher Fain_
(name of party/amicus)

_____

 who is _____Plaintiff-Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Avatara Smith-Carrington          Date: Nov. 30, 2022

Counsel for: Plaintiffs-Appellees

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 22-1927        Caption: Christopher Fain, et al. v. William Crouch, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Shauntae Anderson
(name of party/amicus)


who is _____Plaintiff-Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Avatara Smith-Carrington _____    Date: _____ Nov. 30, 2022 _____

Counsel for: Plaintiffs-Appellees _____

Print to PDF for Filing

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................1

STATEMENT OF THE ISSUES...................................................................3

STATEMENT OF THE CASE .....................................................................5

    A.    The Parties ..................................................................................5

    B.    The Medicaid Program and the Exclusion.................................7

    C.    The Standard of Care for Treatment of Gender Dysphoria. ...............11

SUMMARY OF ARGUMENT ...................................................................14

ARGUMENT ..............................................................................................17

I.      STANDARD OF REVIEW................................................................17

II.    THE EXCLUSION VIOLATES EQUAL PROTECTION ..........................18

    A.    Heightened Scrutiny Applies Because the Exclusion Discriminates Based on Sex and Transgender Status .................................18

    B.    Transgender Medicaid Participants Are Similarly Situated to Cisgender Medicaid Participants.........................................20

            1.    Distorting the expert testimony does not show any relevant difference ..................................................................21

            2.    Assuming *arguendo* that diagnosis is the correct comparison, this simply underscores sex discrimination at work........................................................................23

            3.    Defendants' other attempts to narrow the meaning of "similarly situated' contravene the purpose of Equal Protection ..................................................................24

            4.    Defendants' cited authorities are unpersuasive.........................26

C.    The Exclusion Facially Classifies Based on Sex and Transgender Status ..................................................................................27

D.    The Exclusion's Facial Discrimination Obviates the Need to Show Intentional Discrimination, Although it is Plainly Present .......32

E.    The Exclusion Cannot Survive Any Level of Review ........................34

III.    THE EXCLUSION VIOLATES THE ACA ................................................38

IV.    THE EXCLUSION VIOLATES THE MEDICAID ACT ..........................40

A.    Availability Requirement ...................................................41

B.    Comparability Requirement ...............................................46

V.    THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS HAVE STANDING ........................................................................50

VI.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CERTIFYING THE CLASS ......................................................................52

CONCLUSION .................................................................................58

REQUEST FOR ORAL ARGUMENT .................................................58

CERTIFICATE OF COMPLIANCE ....................................................59

CERTIFICATE OF SERVICE .............................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. Rumsfeld*,
    464 F.3d 456 (4th Cir. 2006) ..............................................................27

*Alexander v. Choate*,
    469 U.S. 287 (1985)...........................................................................43

*Alvarez v. Betlach*,
    572 F. App'x 519 (9th Cir. 2014) ...............................................41, 42

*Ariz. All. for Cmty. Health Ctrs v. Ariz. Health Care Cost Containment Sys.*,
    47 F.4th 992 (9th Cir. 2022) ......................................................40, 41

*Baxley v. Jividen*,
    338 F.R.D. 80 (S.D.W. Va. 2020) ...................................................54

*Beal v. Doe*,
    432 U.S. 438 (1977)...........................................................................42

*Berry v. Schulman*,
    807 F.3d 600 (4th Cir. 2015) .....................................................52, 53

*Bontrager v. Ind. Fam. & Soc. Servs. Admin.*,
    697 F.3d 604 (7th Cir. 2012) ...................................................*passim*

*Bostock v. Clayton Cnty.*,
    140 S. Ct. 1731 (2020)......................................................18, 28, 40

*Boyden v. Conlin*,
    341 F. Supp. 3d 979 (W.D. Wisc. 2018) ...............................*passim*

*Brandt v. Rutledge*,
    47 F.4th 661 (8th Cir. 2022) ..............................................23, 32, 33

*Brandt v. Rutledge*,
    551 F. Supp. 3d 882 (E.D. Ark. 2021)..............................................32

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993)..................................................................30, 39

*Brown v. Nucor Corp.*,
    785 F.3d 895 (4th Cir. 2015) .....................................................52, 53

*Buscemi v. Bell*,
    964 F.3d 252 (4th Cir. 2020) ...........................................................17

*Butler v. Drive Auto. Indus. Of Am., Inc.*,
    793 F.3d 404 (4th Cir. 2015) ...........................................................17

*Casillas v. Daines*,
    580 F. Supp. 2d 235 (S.D.N.Y. 2008) ............................................49

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the
    Law v. Martinez*,
    561 U.S. 661 (2010)..........................................................................30

*City of Los Angeles, California v. Patel*,
    576 U.S. 409 (2015)..........................................................................31

*Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*,
    421 F.3d 170 (3rd Cir. 2005) ...........................................................32

*Cole v. City of Memphis*,
    839 F.3d 530 (6th Cir. 2016) ...........................................................56

*Cruz v. Zucker*,
    116 F. Supp. 3d 334 (S.D.N.Y. 2015) .............................................49

*Cyrus ex rel. McSweeney v. Walker*,
    233 F.R.D. 467 (S.D.W. Va. 2005) ..................................................54

*Davis v. Shah*,
    821 F.3d 231 (2d Cir. 2016) ..............................................16, 41, 46

*Defs. of Wildlife v. N. C. Dep't of Transp.*,
    762 F.3d 374 (4th Cir. 2014) ......................................................17, 38

*Diaz v. Brewer*,
  656 F.3d 1008 (9th Cir. 2011) ............................................................36

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022).........................................................28, 30, 31

*Doe v. Snyder*,
  28 F.4th 103 (9th Cir. 2022) ...............................................................40

*Edelman v. Jordan*,
  415 U.S. 651 (1974)...........................................................................36

*Eknes-Tucker v. Marshall*,
  No. 2:22-cv-184, 2022 WL 1521889 (M.D. Ala. May 13, 2022) .....................31

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) ..............................................................57

*Flack v. Wisc. Dep't of Health Servs.*,
  328 F. Supp. 3d 931 (W.D. Wis. 2018) ........................................19, 20

*Flack v. Wisc. Dep't of Health Servs.*,
  331 F.R.D. 361 (W.D. Wis. 2019).........................................................54

*Flack v. Wisc. Dep't of Health Servs.*,
  395 F. Supp. 3d 1001 (W.D. Wis. 2019) ....................................*passim*

*Flaming v. Univ. of Tex. Med. Branch*,
  NO. H-15-2222, 2016 WL 727941 (S.D. Tex. Feb. 24, 2016)....................26, 27

*Fletcher v. Alaska*,
  443 F. Supp. 3d 1024 (D. Alaska 2020) ......................................18, 26

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)...........................................................................31

*Geduldig v. Aiello*,
  417 U.S. 484 (1974)..................................................................*passim*

*Graham v. Richardson,*
    403 U.S. 365 (1971).........................................................................36

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ................................................ *passim*

*Gunnells v. Healthplan Servs., Inc.*,
    348 F.3d 417 (4th Cir. 2003) .........................................................17

*Harris v. McRae*,
    448 U.S. 297 (1980).................................................................28, 42

*Harris v. Rainey*,
    299 F.R.D. 486 (W.D. Va. 2014)....................................................57

*Hennessy-Waller v. Snyder*,
    529 F. Supp. 3d 1031 (D. Ariz. 2021) ...........................................40

*In re Modafinil Antitrust Litig.*,
    837 F.3d 238 (3d Cir. 2016), *as amended* (Sept. 29, 2016) ..............54

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    7 F.4th 227 (4th Cir. 2021**)** ....................................................53, 54

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977).......................................................................16

*Jennings v. Univ. of N.C.*,
    482 F.3d 686 (4th Cir. 2007) .........................................................39

*Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*,
    12 F.4th 422 (4th Cir. 2021) ..........................................................11

*Kelley v. Norfolk & W. Ry. Co.*,
    584 F.2d 34 (4th Cir. 1978) ...........................................................55

*Knussman v. Maryland*,
    272 F.3d 625 (4th Cir. 2001) .........................................................31

*Krakauer v. Dish Network, L.L.C.*,
   925 F.3d 643 (4th Cir. 2019) ...............................................................56

*Lange v. Houston County, Georgia*,
   499 F. Supp. 3d 1258 (M.D. Ga. 2020) ..............................................32

*Lankford v. Sherman*,
   451 F.3d 496 (8th Cir. 2006) ...............................................................43

*Lawrence v. Texas*,
   539 U.S. 558 (2003)..............................................................................30

*Loving v. Virginia*,
   388 U.S. 1 (1967).................................................................................24

*McMain v. Peters*,
   No. 2:13-cv-01632, 2018 WL 3732660 (D. Or. Aug. 2, 2018).........26

*Mem'l Hosp. v. Maricopa Cnty.*,
   415 U.S. 250 (1974)..............................................................................36

*Mennonite Gen. Hosp., Inc. v. Molina Healthcare of P.R.*,
   319 F. Supp. 3d 587 (D.P.R. 2018) ....................................................43

*Morrison v. Garraghty*,
   239 F.3d 648 (4th Cir. 2001) .......................................................15, 20

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979)..............................................................................33

*Phillips v. Martin Marietta Corp.*,
   400 U.S. 542 (1971)..............................................................................25

*Pinchback v. Armistead Homes Corp.*,
   907 F.2d 1447 (4th Cir. 1990) .............................................................50

*Plyler v. Doe*,
   457 U.S. 202 (1982)..............................................................................36

*Reed v. Reed,*
    404 U.S. 71 (1971) ........................................................................24, 31

*Rodriguez v. City of New York,*
    197 F.3d 611 (2d Cir. 1999) .........................................................48, 49

*Safari Club Int'l v. Jewell,*
    842 F.3d 1280 (D.C. Cir. 2016) .........................................................50

*Schroer v. Billington,*
    577 F. Supp. 2d 293 (D.D.C. 2008) ...................................................19

*Shapiro v. Thompson,*
    394 U.S. 618 (1969).............................................................................36

*Shelton v. Bledsoe,*
    775 F.3d 554 (3d Cir. 2015) ..............................................................55

*Shook v. El Paso Cnty.,*
    386 F.3d 963 (10th Cir. 2004) ..........................................................56

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016), *as revised* (May 24, 2016) ..............................51

*Thorn v. Jefferson-Pilot Life Ins. Co.,*
    445 F.3d 311 (4th Cir. 2006) .............................................................56

*Toomey v. State of Arizona,*
    No. CV-19-00035, 2019 WL 7172144
    (D. Ariz. Dec. 23, 2019) ..........................................................*passim*

*Toomey v. Arizona,*
    No. 19-cv-0035-TUC-RM, 2020 WL 2465707 (D. Ariz. May 12, 2020),
    *report and recommendation adopted*, 2020 WL 3197647 (D. Ariz. June 15,
    2020) ....................................................................................................54

*Townes v. Jarvis,*
    577 F.3d 543 (4th Cir. 2009) .............................................................50

*United States v. Virginia,*
   518 U.S. 515 (1996)......................................................25, 34, 37

*Washington v. Seattle Sch. Dist. No. 1,*
   458 U.S. 457 (1982)......................................................27

*West Virginia v. Thompson,*
   475 F.3d 204 (4th Cir. 2007) ......................................41

*White v. Beal,*
   555 F.2d 1146 (3d Cir. 1977......................................44, 48

*Williams v. Kelly,*
   No. 17-12993, 2018 WL 4403381 (E.D. La. Aug. 27, 2018)............................26

*Williams v. Kincaid,*
   45 F.4th 759 (4th Cir. 2022) ......................................23

**Statutes**

42 U.S.C. § 1396a(a)(10)(B)......................................................47

42 U.S.C. § 1396a(a)(19)......................................................43

**Regulations**

42 C.F.R. § 440.230(a), (b)......................................................44

42 C.F.R. § 440.230(c)......................................................47

42 C.F.R. § 440.230(d) ......................................................44

42 C.F.R. § 440.240(b) ......................................................47

**Rules**

Fed. R. Civ. P. 23(a)(1)......................................................53

Fed. R. Civ. P. 23(b)(2)......................................................16, 52, 55, 56

Fed. R. Civ. P. 23(b)(3)......................................................56

Fed. R. Civ. P. 23(c)(2)(A) ......................................................56

**Other Authorities**

U.S. Dep't of Defense Instruction 1300.28, "In-Service Transition for Transgender
Service Members" (April 30, 2021), https://dod.defense.gov/Portals/1/
features/2016/0616_policy/DoD-Instruction-1300.28.pdf ................................10

U.S. Dep't of Health & Human Servs., Departmental Appeals Bd., Appellate
Division NCD 140.3, Docket No. A-13-87, Decision No. 2576 (May 30, 2014),
https://www.hhs.gov/sites/default/files/static/dab/decisions/board-
decisions/2014/dab2576.pdf ...........................................................................10

World Professional Association for Transgender Health,
*Standards of Care for the Health of Transgender, Transsexual,
and Gender-Nonconforming People* ..........................................................11, 12

American Psychiatric Association, *Diagnostic and Statistical Manual of
Mental Disorders-5th edition* ............................................................................21

## INTRODUCTION

West Virginia participates in the Medicaid program to "serve [its] most vulnerable citizens," including transgender people. Despite this, West Virginia's Medicaid program ("Medicaid") discriminates on the basis of sex and transgender status by categorically banning coverage for "transsexual surgery" (the "Exclusion"). The Exclusion inflicts anguish and physical harm on transgender Medicaid participants and impacts their daily functioning. Christopher Fain is a transgender man denied chest surgery because of the Exclusion. As a result, he wears a compression garment on his chest, which chafes, and causes deep sores and difficulty breathing. Hugging family and friends makes him feel physically sick because it exacerbates his gender dysphoria. Shauntae Anderson is a transgender woman denied chest surgery and vaginoplasty. She experiences "agonizing" distress daily which makes basic grooming functions such as bathing difficult. She fears for her personal safety because without surgery, she is more likely to be recognized as transgender, which has engendered harassment in the past.

Medicaid denies the same surgical procedures to Plaintiffs Fain and Anderson for gender-confirming care that it covers when cisgender participants require them for other reasons. Moreover, gender-confirming surgical care is denied despite the fact that Medicaid (i) accepts the diagnosis of gender dysphoria; and (ii) covers multiple forms of care to treat it, including hormone therapy, office visits, and lab

1

work.  Even one of Medicaid's own Rule 30(b)(6) witnesses struggled to explain

why the program provides some forms of gender-confirming care to transgender

participants, while arbitrarily banning surgical care:

> A:    If we're not going to provide the surgery, we can at least provide
> access to [hormone] therapy and it may help these folks. And so
> … it's a story of compassion …
>
> ***
>
> Q:    Why didn't that compassion extend to [surgery] for gender
> dysphoria?
>
> A:    *I don't know the answer to that*.

JA507-508 (emphasis added).

In fact, Defendants could not identify a single reason the Exclusion had

been adopted at its inception, and testified that no analysis or research

regarding the Exclusion had been performed since that time.  The district court

correctly found the Exclusion lacks adequate justification and granted

Plaintiffs summary judgment under the Equal Protection Clause of the

Fourteenth Amendment, Section 1557 ("Section 1557") of the Affordable

Care Act ("ACA"), and the Medicaid Act's Comparability and Availability

Requirements.  JA2591.  The district court also certified a Rule 23 class of

"all transgender people who are or will be enrolled in [W]est Virginia

Medicaid and who are seeking or will seek gender-confirming care barred by

the Exclusion."  JA2552.  This Court should affirm.

# STATEMENT OF THE ISSUES

1.     Whether under the Fourteenth Amendment's Equal Protection Clause, the district court:

A.     Correctly concluded that transgender Medicaid participants are similarly situated to cisgender participants who receive the same kinds of surgeries that Plaintiffs are denied for gender-confirming care.

B.     Correctly found that Defendants' express Exclusion of surgery for "transsexual" people facially discriminates against transgender people, distinguishing it from *Geduldig v. Aiello*, 417 U.S. 484 (1974), which analyzed the condition of pregnancy.

C.     Correctly applied intermediate scrutiny because the Exclusion discriminates based both on sex and transgender status.

2.     Whether the Exclusion violates the ACA's protections against sex discrimination in a covered health program or activity.

3.     Whether under the Medicaid Act, the district court:

A.     Correctly found that the Exclusion violates the Availability Requirement because Defendants failed to make covered treatments available in sufficient amount, duration and scope.

3

B.      Correctly found that the Exclusion violates the Comparability Requirement because the same surgical treatments are covered to treat medical conditions other than gender dysphoria.

C.      Correctly declined Defendants' late-raised request to defer to the Centers for Medicare & Medicaid Services' ("CMS") "implicit judgment" in approving the state plan, without any agency analysis or reasoning on this issue.

4.      Whether the district court correctly found that Plaintiffs have standing.

5.      Whether the district court properly exercised its discretion in certifying the class.

## STATEMENT OF THE CASE

### A.     The Parties.

Plaintiffs Christopher Fain and Shauntae Anderson are participants in West Virginia's Medicaid program.  JA287, JA293.  Both have resided in West Virginia for the majority of their lives.  JA287, JA293.  And both are denied urgently-needed medical care because of Medicaid's Exclusion for "transsexual surgery," regardless of medical necessity.   JA934-935; *see also* JA943 (also banning "Sex change surgery") (together, the "Exclusion").

Mr. Fain is a 46-year-old transgender man.  JA287.  He has been diagnosed with gender dysphoria and receives hormone therapy.  JA289.  To avoid being incorrectly identified as female and reduce the severe distress he feels regarding the presence of his large, typically-female-appearing chest, Mr. Fain requires a mastectomy.  JA289-290.  Mr. Fain's gender dysphoria is so severe that he feels physically sick when hugging family and friends because that simple act of connection makes him acutely aware of his chest.  JA290.  Mr. Fain uses a chest compression garment known as a binder, but prolonged use causes chafing, deep sores, and difficulty breathing.  JA289. A mastectomy would alleviate Mr. Fain's overwhelming distress and eliminate his need for the binder, but the Exclusion categorically bars it.  JA290.

Plaintiff Shauntae Anderson is a 45-year-old transgender woman.  JA293-294.

She has been diagnosed with gender dysphoria and receives hormone therapy. JA295. This treatment, however, is not sufficient to relieve her anguish from the lack of alignment between her gender identity and her body. JA295. Ms. Anderson requires gender-confirming surgery, including vaginoplasty and chest reconstruction surgery. JA296. The distress Ms. Anderson experiences is "agonizing" and negatively impacts her life "day in and day out." JA295. Otherwise mundane acts that are basic to functioning such as bathing, grooming, and using the restroom cause Ms. Anderson severe distress. JA295-296. Additionally, she often worries about her personal safety because the lack of alignment between her body and her gender identity makes her more likely to encounter harassment or even violence. JA296. The Exclusion categorically bars the medically necessary care Ms. Anderson needs to alleviate her gender dysphoria. JA295.

Although neither Plaintiff submitted a futile request for surgery, both are eligible and would seek surgery were coverage available. JA2615, JA2619. Mr. Fain has two physician letters recommending a mastectomy, including one confirming his surgical candidacy. JA1358-1360. But as he testified, "I already know that I'll be denied .... It seems pointless to go and ask my doctor to do something when we both know the result will be a denial." JA1363.[1] Ms. Anderson

---

[1] Defendants misrepresent Mr. Fain's testimony regarding smoking. Br. 5 n.2. As he plainly testified, "I can quit smoking any time, it's whether or not I can handle

also testified that two doctors "have instructed [her] that they would refer [her] to the places that—for the next step in [her] gender confirmation," but have not because the care is not covered and they know "what kind of distress that would cause [her] to even talk about it."  Mot. to Supplement Joint App., SA1-2; JA1313-1314.

Plaintiffs sued Secretary of the West Virginia Department of Health and Human Resources Bill Crouch, and Commissioner of the Bureau for Medical Services Cynthia Beane, in their official capacities under the Equal Protection Clause and the Medicaid Act, JA121-122; and the West Virginia Department of Health and Human Resources, Bureau for Medical Services ("BMS") under the ACA (collectively, "Defendants").  JA122.  BMS is the designated state agency responsible for administering the Medicaid program.  JA131, JA178.

### B.    The Medicaid Program and the Exclusion.

West Virginia has participated in Medicaid since the program's inception, and does so to "serve [its] most vulnerable citizens," including transgender people. JA417-419.  Medicaid is jointly funded by the federal and state government, with federal funding subsidizing the majority of the state's program.  JA425.  BMS's receipt of federal funding renders it a health program or activity within the meaning of Section 1557 of the ACA.  JA154-155, JA199.  The state's Medicaid program

---

the cravings afterwards.  But, yes, I could actually lay them down today and go have surgery tomorrow if I needed to."  JA1362.

covers all CMS-mandated services and a number of optional services.   JA391, JA453-456, JA1035-1036.

BMS already accepts the diagnosis of gender dysphoria and recognizes that at least some forms of care are medically necessary to treat it, covering "counseling, office visits, hormones, and lab work."  Br. of Appellants ("Br.") 3; JA491.  BMS admits the treatment it covers necessarily has "been deemed medically necessary" by virtue of being covered.  JA458.  BMS nonetheless categorically excludes "[t]ranssexual surgery," regardless of medical necessity.  JA459, JA931-943.

Although Defendants claim that they do not make distinctions based on transgender status because their system does not track gender identity, Br. 6, the Exclusion does that tracking by its very application.  The Exclusion of "transexual surgery" appears in Medicaid's policy manual, and BMS mandates that its contractors enforce it as well.   BMS contracts with several managed care organizations ("MCO") that coordinate coverage for participants based on guidelines for covered services.  JA427-428.  BMS's contract with each MCO explicitly states that the MCO is "not permitted to provide" gender-confirming surgery.   JA1039-1050.   Accordingly, the three participating MCOs[2] exclude gender-confirming surgical care: (1) UniCare excludes "[s]ex transformation

---

[2] The three MCOs are (1) UniCare Health Plan of West Virginia, (2) The Health Plan, and (3) Aetna Better Health of West Virginia.  JA500-501.

procedures and hormone therapy for sex transformation procedures;" (2) The Health Plan provides that "[s]ex change, hormone therapy for sex transformation, and gender transition procedures/expenses will not be paid;" and (3) Aetna Better Health excludes "[s]ex transformation procedures." JA944-966.

The Exclusion dates back to at least 2004. JA390, JA436. Organizational designees for BMS could not identify why the Exclusion was adopted, JA437, and are not aware of any documents considered by those who created or maintain the Exclusion, JA2212-2213. BMS has not revisited the decision to maintain the Exclusion since it was adopted. JA437. As a general matter, the Medicaid program has not performed any research or analysis regarding providing access to gender-confirming care. JA393-394.

The Exclusion bars coverage for gender-confirming surgical care regardless of medical necessity. JA459. However, Defendants provide coverage for the same surgical procedures when medically necessary to treat conditions other than gender dysphoria. For example, Defendants concede that cisgender Medicaid participants receive coverage for chest surgery (JA304, JA324-325); hysterectomy (JA304, JA330-332); vaginoplasty (JA304, JA332); and orchiectomy, penectomy, and phalloplasty procedures (JA304, JA333-334).

Despite being unable to identify the process leading to the adoption of the Exclusion or anything considered since then, BMS's organizational designees

identified two purported governmental interests. With no evidence that either actually has been considered by decision-makers, these interests are impermissibly post-hoc. Nonetheless, Defendants identified: (1) providing "coverage that is mandated for coverage by [CMS]," and (2) "budgetary/cost considerations." JA310. On the former, BMS admitted that CMS does not bar such coverage, and the decision to exclude coverage thus "resides with BMS." JA457. BMS's representative identified no communications with or analysis from CMS about this care—simply that she searched and could not "find any directive from CMS telling me I have to cover this service." JA440-443.[3]

Regarding budgetary considerations, BMS has not conducted any research into the cost of gender-confirming surgery. JA533, JA461. Nonetheless, BMS's representative testified that BMS has not had to cut coverage based on budget

---

[3] As the district court explained, the claim by Defendants' expert that the U.S. Department of Health and Human Services ("HHS") evaluated evidence about gender-confirming care and "refused to mandate coverage" is misleading. Br. 11-12. HHS previously *eliminated* a blanket exclusion for gender-confirming care in Medicare, finding that it did not even satisfy a reasonableness standard. JA2581; *see also* https://www.hhs.gov/sites/default/files/static/dab/decisions/board-decisions/2014/dab2576.pdf. Defendants point to a subsequent HHS decision declining to issue a National Coverage Determination ("NCD") requiring the care to be made available without limitation, but that was based on Medicare-specific factors such as advanced age. Many forms of care lack an NCD, and gender-confirming care *is available* on a case-by-case basis. JA776-777. Other major federal programs cover this care as well, including the military. *See* Dep't of Defense Instruction 1300.28, https://dod.defense.gov/Portals/1/features/2016/0616_policy/DoD-Instruction-1300.28.pdf.

shortfalls during her more than 20-year tenure, JA518, JA529, and federal matching funds already help subsidize the counseling and hormone therapy that West Virginia currently covers for gender dysphoria, JA444-446.

### C.    The Standard of Care for Treatment of Gender Dysphoria.

Gender identity is a person's deeply felt, inherent sense of their gender. JA595-596.  Although most people are cisgender, meaning their gender identity matches their sex assigned at birth, transgender people have a gender identity that does not match their sex assigned at birth.  JA876; *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020).  Left untreated, the dissonance between one's gender identity and sex assigned at birth can be associated with clinically significant distress or impairment of functioning.  JA596-598.  The medical diagnosis for that incongruence and the attendant distress or impairment is gender dysphoria.  JA596, JA696-697.

Being transgender is widely accepted as a normal variation in human development; just like being cisgender, being transgender is natural and is not a choice.  JA597-598; *Grimm*, 972 F.3d at 594; *Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 427 (4th Cir. 2021) (same).

Developed by the World Professional Association for Transgender Health ("WPATH"), the Standards of Care for the Health of Transgender, Transsexual, and Gender-Nonconforming People ("SOC") "represent the consensus approach of the

medical and mental health community … and have been recognized by various courts, including this one, as the authoritative standards of care." *Grimm*, 972 F.3d at 595 (emphasis added; collecting authorities); JA597.  The goal of treatment is to bring a person's body into greater alignment with their gender identity.  JA697.

The American Medical Association ("AMA") along with other leading health organizations recognize the SOC as authoritative.  JA597.   "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." *Grimm*, 972 F.3d at 595-96; JA599.

In fact, Defendants' own tool to screen for medical necessity, InterQual, relies on the SOC in its criteria.  *See, e.g.*, JA696-973.  InterQual provides nationally accredited, evidence-based standards for determining medical necessity.  JA967-1014.   BMS's utilization management vendor, Kepro, relies on the InterQual guidelines for medical necessity determinations.  JA488-490.

Gender dysphoria is widely recognized as a medical condition, for which treatment can be medically necessary.  JA696-697, JA700-701.  InterQual policies also recognize that "gender affirmation surgery" can be medically necessary.  JA967-1014.   For example, the InterQual guidelines provide that the chest reconstruction and vaginoplasty procedures Mr. Fain and Ms. Anderson seek here "can be performed for … medically necessary … purposes"; the "sooner the

12

diagnosis is made and treatment options are discussed, the more successful the individual is when transitioning"; and "[d]elaying treatment for those with gender dysphoria is not a reasonable treatment option." *See, e.g.*, JA969, JA971. Defendants admit that the sole reason Medicaid does not allow those policies to be used is the Exclusion.  Br. 9.

As Dr. Loren Schechter, an expert in gender-confirming surgery explained, surgeons "use many of the same procedures [for gender-confirming care] that they use to treat other medical conditions." JA702-703; *see also* JA779-780.  This is also illustrated by the use of Current Procedural Terminology ("CPT") codes developed by the AMA.  JA2568.  "The same CPT codes are used to document and bill the same surgical treatment when performed for a transgender patient with gender dysphoria and for any patient for a different diagnosis."  JA2568; JA705-706 ("[t]he same … codes may apply to a particular procedure regardless of whether … performed on a transgender patient or a non-transgender patient.  For example, vaginoplasty may be performed for a non-transgender woman as treatment for congenital absence of the vagina or for a transgender woman with gender dysphoria. The same CPT code(s) may be used for both procedures.").  Defendants introduced no contrary testimony from the one psychiatrist who testified in their support, let alone from any surgeon.

Major medical organizations, including the AMA, American Academy of

Pediatrics, the Endocrine Society, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, the American Congress of Obstetricians and Gynecologists, and the American Academy of Family Physicians agree that medical treatment for gender dysphoria is safe, effective, and medically necessary. JA600.

Defendants emphasize that not all transgender people receive care for gender dysphoria. Br. 7. But not all have access to gender-confirming care, and not all require ongoing care if treatment has alleviated their symptoms. JA705. Additionally, the undisputed facts showed that, by definition, only transgender people seek gender-confirming care—or in the words of the Exclusion, "transsexual surgery." JA686-688.

Medicaid averages 520,000 to 525,000 participants per year. JA414. Defendants identified 686 Medicaid participants in discovery with a diagnosis code for gender dysphoria or gender incongruence between January 1 and September 30, 2021. JA2172-2173.

## SUMMARY OF ARGUMENT

The district court correctly found that the Exclusion, which expressly targets transgender ("transsexual") people, is facially discriminatory based on sex and transgender status and violates the Constitution's guarantee of Equal Protection. JA2574 (finding that the Exclusion "cannot be stated without referencing sex" and

therefore "necessarily rests on a sex classification" (quoting *Grimm*, 972 F.3d at 608)). Defendants claim that Plaintiffs are not similarly situated to the cisgender participants who receive coverage for the same surgical procedures, but every supposed difference simply distills to the fact that Plaintiffs are transgender. That does not supply the "relevant" difference required to defeat their claims. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

The Exclusion's facial discrimination distinguishes it from *Geduldig*, 417 U.S. 484, which analyzed a pregnancy classification that the Supreme Court viewed as facially neutral. Nothing about the Exclusion here is facially neutral. And while the justifications Defendants offer for the Exclusion are indisputably post-hoc, they cannot survive any level of review. Defendants cannot hide behind another government agency to excuse the discriminatory classification they chose themselves. JA2580. Nor can they shunt the burden of cost-savings onto the backs of a vulnerable group. JA2569-2571.

The Exclusion constitutes impermissible sex discrimination under the ACA for the same reasons it violates Equal Protection, and Defendants do not contest any other element of Plaintiffs' ACA claim.

Defendants also claim the district court erred in finding that the Exclusion violates two provisions of the Medicaid Act. First, the district court was correct to find that the Exclusion violates the Availability Requirement because the services

(1) fall within a category of mandatory or optional medical services that the state elects to provide; and (2) are medically necessary. *See Bontrager v. Ind. Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 608 (7th Cir. 2012). Second, the district court correctly found a violation of the Comparability Requirement because Defendants admit the Exclusion discriminates with respect to diagnosis. *Davis v. Shah*, 821 F.3d 231, 257-258 (2d Cir. 2016).

Defendants argue that Plaintiffs lack standing because they have not sought the surgical care categorically barred by the Exclusion. But as the district court found, "requesting coverage would have been futile due to the exceptionless exclusion, and the law does not require Plaintiffs to take such futile acts." JA2590 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977)).

Finally, the district court did not abuse its broad discretion in certifying an injunctive relief class under Rule 23(b)(2). JA2552. Defendants challenge the district court's numerosity finding, arguing that the class is overbroad and not ascertainable because of a variety of "individualized" issues regarding whether one is a candidate for surgery. But the district court correctly understood that the issue is not about individualized determinations for each class member, but the categorical bar that prevents them from ever making such a showing. The undisputed facts show almost 700 participants in one year with a diagnosis of gender dysphoria, JA2172-2173, which more than suffices for the necessary showing of numerosity. And

Defendants provide no reason they cannot ascertain which participants would receive denials under the Exclusion—discovery has shown they can.

This Court should affirm.

## ARGUMENT

## I.    STANDARD OF REVIEW.

A grant of summary judgment is reviewed *de novo*, "drawing reasonable inferences in the light most favorable to the non-moving party." *Butler v. Drive Auto. Indus. Of Am., Inc.*, 793 F.3d 404, 407 (4th Cir. 2015) (cleaned up). "Because the district court's grant of summary judgment disposed of cross-motions for summary judgment," this Court considers each motion "on its own merits to determine whether either of the parties deserves judgment as a matter of law," with all inferences taken "in the light most favorable to the party opposing that motion." *Defs. of Wildlife v. N. C. Dep't of Transp.*, 762 F.3d 374, 392-93 (4th Cir. 2014).

The Court reviews de novo whether a plaintiff has standing. *Buscemi v. Bell*, 964 F.3d 252, 258 (4th Cir. 2020) (cleaned up).

District courts "have wide discretion in deciding whether or not to certify a class and their decisions may be reversed only for abuse of discretion" within the framework of Rule 23. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (cleaned up).

## II. THE EXCLUSION VIOLATES EQUAL PROTECTION.

### A. Heightened Scrutiny Applies Because the Exclusion Discriminates Based on Sex and Transgender Status.

As the district court correctly found, the Exclusion's expressly sex-based terms—excluding coverage for "transsexual surgery"—evince facial discrimination based on sex. This is true for at least four reasons.

First, the Exclusion's explicitly sex-based terms reveal facial sex discrimination. The exclusions in the BMS policy manual for "[t]ranssexual surgery" and "[s]ex change surgery" "cannot be stated without referencing sex" and therefore "necessarily rest[] on a sex classification." JA2574 (quoting *Grimm*, 972 F.3d at 608); *see also* JA944-966 (MCO exclusions for "sex change" and "sex transformation" procedures).

Second, as the Supreme Court has explained, when the government takes adverse action against "a transgender person who was identified as a male at birth but who now identifies as a female," while treating more favorably "an otherwise identical [person] … identified as female at birth," the government "intentionally penalizes a person" based on sex. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741-42 (2020). This is what the Exclusion does. For example, Ms. Anderson could access medically necessary vaginoplasty and chest reconstruction surgery if her sex assigned at birth was female. But because her sex assigned at birth was male, she cannot. *See Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020) (where

18

plan "covers vaginoplasty and mammoplasty surgery if it reaffirms an individual's natal sex, but denies coverage for the same surgery if it diverges from an individual's natal sex," that constitutes "discrimination because of sex"); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 995 (W.D. Wisc. 2018) (discrimination in coverage for vaginoplasty based on one's birth-assigned sex is a "straightforward case of sex discrimination").

Third, discrimination "on the basis that an individual was … in the process of *changing* their sex" is "discrimination based on sex." *Flack v. Wisc. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 949 (W.D. Wis. 2018) (emphasis added); *see also Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008) ("refusal to hire [plaintiff] after being advised that she planned to … undergo[] sex  reassignment surgery was literally discrimination because of … sex") (cleaned up). The same is true here because the Exclusion prohibits surgical coverage for gender transition.

Fourth, discrimination against transgender people also "punish[es] transgender [people] for gender non-conformity, thereby relying on sex stereotypes." *Grimm*, 972 F.3d at 608; *see also id*. at 608-09 (collecting authorities); JA2572.  Here, the Exclusion "entrenches" the sex-stereotyped "belief that transgender individuals must preserve the genitalia and other physical attributes of their [birth-assigned] sex over not just personal preference, but specific medical and

psychological recommendations to the contrary." *Boyden*, 341 F. Supp. 3d at 997; *see also Flack*, 328 F. Supp. 3d at 951.

Heightened scrutiny also is required because the Exclusion discriminates based on transgender status. JA2572-2573. As this Court has confirmed, discrimination based on transgender status is presumptively unconstitutional and subject to "at least" heightened scrutiny. *Grimm*, 972 F.3d at 607. There can be no serious dispute that the Exclusion discriminates on the basis of transgender status. *See Toomey v. State of Arizona*, No. CV-19-00035, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019) (exclusion "singles out transgender individuals for different treatment" because "transgender individuals are the only people who … seek gender reassignment surgery"); JA686-688 (expert testimony explaining that only transgender people require gender-confirming care). Indeed the "transsexual surgery" care prohibited by the Exclusion names the targeted group on its face: "transsexual"—or in modern terms, transgender—people. JA934-935.

### B. Transgender Medicaid Participants Are Similarly Situated to Cisgender Medicaid Participants.

Defendants claim Plaintiffs are not similarly situated to cisgender Medicaid participants, but their argument simply reduces to the fact that Plaintiffs are transgender and cisgender participants are not. That does not supply the "relevant" difference required to negate an Equal Protection claim. *Morrison*, 239 F.3d at 654 (cleaned up).

Like their cisgender counterparts, Plaintiffs are enrolled in Medicaid, JA287, JA293; seek to access only care that is medically necessary, JA2615, JA2619; have a diagnosis recognized by InterQual's utilization guidelines, JA967-1014; and seek care recognized by InterQual as medically necessary, JA967-1014. No party disputes that Medicaid covers the same procedures for cisgender participants that it denies to Plaintiffs, such as hysterectomy, vaginoplasty, and chest reconstruction surgeries. JA304, JA324-325, JA330-334.

Additionally, as the district court found, InterQual's "evidence-based standards" to "determine the medical necessity of a procedure … exist for both gender dysphoria treatment surgeries and non-gender-affirming surgeries," provide an equally "objective basis for determining when such treatments will be covered."[4] JA2575. And the same CPT codes are used for documenting and billing the procedures regardless of whether they are for gender-confirming care. JA2575.

### 1. Distorting the expert testimony does not show any relevant difference.

Dr. Schechter testified that the surgical procedures Plaintiffs seek are

---

[4] Defendants argue that the Diagnostic and Statistical Manual of Mental Disorders recognizes the diagnosis of gender dysphoria, and Medicaid does not provide surgical coverage for any other diagnosis recognized in that Manual. Br. 10. But as Dr. Schechter testified, gender dysphoria is also widely recognized as a medical condition. JA700-701, JA1650-1652 ("[T]hat there may be mental health manifestations of a medical condition does not mean that ... [it] is not a medical condition …. [nor is this] unique to gender incongruence.").

materially the same as those covered for cisgender participants, JA702-703, and administering surgical care to treat gender dysphoria does not make the surgical techniques themselves different. JA700-701. Having left this testimony unrebutted by their own expert below, Defendants mischaracterize Dr. Schechter's testimony as emphasizing the differences in surgical procedures. Br. 20 (citing Dr. Schechter's testimony at JA1687-1688). But as the district court observed, Dr. Schechter merely pointed out that various techniques might be used for any given surgery, which is true of surgery generally, whether for gender-confirming care or otherwise. JA2568-JA2569; JA1687-1688.

And though Defendants claim that the existence of the InterQual guidelines for gender-confirming care itself shows that "the services are … different," this is not a serious argument. Br. 9. That InterQual's guidelines have "different criteria" (Br. 8) to determine the existence of a gender dysphoria *diagnosis* does not change that the surgical procedures to *treat* that diagnosis are similar. JA701-702. Differential treatment based on a gender dysphoria diagnosis is not neutral, but instead is "a distinction hinging on … transgender identity." JA2575.[5]

---

[5] Defendants' attempt to use specific procedures to make their point fails. Defendants argue that a vaginoplasty for a transgender woman is different because tissue from the penis may be used to create the vaginal canal. Br. 9. All that means is that a transgender woman has an additional source of tissue that may be used to perform the surgery. Defendants offered no *evidence* below that this somehow renders the surgery different in some material way, and simply repeat their own unsubstantiated say-so here.

Further, the fact that Defendants cover other forms of care says nothing about whether Plaintiffs are similarly situated to cisgender participants for the surgical care at issue. *Cf.* Br. 21 (arguing that Mr. Fain is only similarly situated to others when he receives healthcare for other reasons). Nor does this coverage erase Defendants' *intent* to deny coverage for surgery, as Defendants suggest. Br. 31. Defendants need not deny all coverage across the board in order to intentionally deny surgical coverage.

## 2. Assuming *arguendo* that diagnosis is the correct comparison, this simply underscores sex discrimination at work.

Even if the correct comparison is diagnosis, this is simply another articulation of the Exclusion's sex discrimination. As the district court explained, "inherent in a gender dysphoria diagnosis is a person's identity as transgender"; by definition, "a person cannot suffer from gender dysphoria without identifying as transgender." JA2573; *see also Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022) (gender dysphoria is "closely connected to transgender identity") (cleaned up). Put differently, "one cannot explain gender dysphoria without referencing sex or a synonym." JA2574 (cleaned up). Nor can gender dysphoria be diagnosed without reference to one's sex assigned at birth. JA596; *see also Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022) (rejecting similar argument because exclusions of gender-confirming care "distinguish[] between those who may receive certain types of medical care and those who may not" based on their birth-assigned sex).

23

### 3. Defendants' other attempts to narrow the meaning of "similarly situated" contravene the purpose of Equal Protection.

Defendants argue there is no discrimination because "all members" are denied gender-confirming care. Br. 8, 21. But "[n]o cisgender person would seek, or medically require, gender reassignment." *Toomey*, 2019 WL 7172144, at *6; *cf. Loving v. Virginia*, 388 U.S. 1, 9 (1967) ("the fact of equal application does not immunize" government action from Equal Protection review).

Equally flawed is Defendants' claim that transgender Medicaid participants are only similarly situated to themselves—*i.e.*, to "other Medicaid members who seek gender-confirming surgery." Br. 21. As the district court observed, the similarly situated inquiry "cannot refer only to people from the same exact group." JA2574. A "classification must … rest upon some ground of difference having a fair and substantial relation to the object of the legislation …." *Reed v. Reed*, 404 U.S. 71, 76 (1971) (cleaned up). And arguing that cisgender participants are different "because the procedures sought by cisgender individuals are not gender-confirming procedures," Br. 21, merely articulates that cisgender individuals are not transgender.

Defendants also argue there can be no claim unless "all transgender people" are harmed, Br. 8, but that is not the law. For example, although "most women would not choose [the Virginia Military Institute's] adversative method" of

24

education, that did not change the state's sex discrimination against women who would so choose but were precluded from enrolling. *United States v. Virginia*, 518 U.S. 515, 542 (1996). Not every woman will become pregnant or have children, but that subset of women is equally protected from sex discrimination. *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971). The same is true for Medicaid participants who require surgical care. The Exclusion is not concerned with how many transgender participants require surgical care—it simply denies care to them all.

And Defendants' suggestion that the only comparable procedures are ones they do not cover, Br. 10, 24, is belied by the record. In truth, a cisgender women can obtain surgery to reconstruct a feminine chest contour if needed after cancer treatment, but transgender women cannot obtain surgery to reconstruct a feminine chest contour. JA304, JA2385-2387. Similarly, cisgender men can receive surgery for gynecomastia so that they can have typically masculine chests, but transgender men cannot. JA2418-2427. While Medicaid does not cover chest-masculinizing surgery for gynecomastia based solely on psychosocial symptoms, Br. 10-11, 24, that is not what Plaintiffs seek either. Like the other conditions Medicaid covers, gender dysphoria is recognized as a medical condition in the InterQual guidelines, and the lack of access to chest surgery has caused Mr. Fain a series of physical symptoms. JA289-290. Pointing to other conditions that Medicaid does not cover,

such as hypomastia, does not change the analysis. Br. 10, 24. The InterQual guidelines recognize that, for example, the chest reconstruction procedures Plaintiffs seek here are indeed medically necessary, JA969-970, and it is undisputed that Medicaid covers chest reconstruction surgeries to masculinize or feminize the chest of cisgender participants, JA304, JA324-325.

### 4. Defendants' cited authorities are unpersuasive.

Defendants rely upon *Williams v. Kelly*, which involved an incarcerated pro se plaintiff, and was decided by a district court not bound by *Grimm* and two years before *Bostock*. No. 17-12993, 2018 WL 4403381, at *1 (E.D. La. Aug. 27, 2018); JA2574. Moreover, the great weight of the cases supports the district court's analysis. *See, e.g.*, *Fletcher*, 443 F. Supp. 3d 1024; *Flack v. Wisc. Dep't of Health Servs.*, 395 F. Supp. 3d 1001 (W.D. Wis. 2019); *Toomey*, 2019 WL 7172144; *Boyden*, 341 F. Supp. 3d 979.

Neither of Defendants' other authorities involve claims of sex discrimination or transgender people. Br. 22-23 (citing *McMain v. Peters*, No. 2:13-cv-01632, 2018 WL 3732660 (D. Or. Aug. 2, 2018), *aff'd*, 773 F. App'x 997 (9th Cir. 2019) and *Flaming v. Univ. of Tex. Med. Branch*, NO. H-15-2222, 2016 WL 727941 (S.D. Tex. Feb. 24, 2016)). Nor do they hold that a sex discrimination claim must be analyzed as a medical condition claim. Instead, those cases analyzed discrimination between medical conditions because that is what the plaintiffs alleged. *See McMain*, 2018

WL 3732660, at *1 (involving incarcerated *pro se* litigant seeking hormone therapy for bipolar disorder and post-traumatic stress disorder); *Flaming*, 2016 WL 727941, at *9 (involving claim that prison doctors discriminated in denying pain medication to non-cancer patients).

### C.    The Exclusion Facially Classifies Based on Sex and Transgender Status.

The Exclusion is not neutral.  Defendants argue that mere reference to sex on the face of a classification is not enough, analogizing to a statute in *Adkins v. Rumsfeld* that neutrally defined "spouse" as "husband or wife."  Br. 25 (citing *Adkins*, 464 F.3d 456 (4th Cir. 2006)).  The Exclusion is nothing like *Adkins*, where the statute required male and female service members alike to pay a portion of their retirement to former spouses, and the female plaintiffs sought relief from this neutral requirement arguing that men were more likely to have their own income.  464 F.3d at 468-69.

The district court was correct to instead follow *Grimm* and *Bostock's* analysis of discrimination against transgender people.[6]  JA2577-2578.  Defendants protest that intermediate scrutiny is not required for a policy that "simply refers" to sex, and

---

[6] Defendant object to the district court's reference to *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982), Br. 25 n.10, but the court merely cited it for the proposition that courts "look[] to the language of the policy" to determine whether it is facially discriminatory.  JA2577.  Defendants identify no error with that basic principle.

that Plaintiffs must show differential treatment. Br. 25; Br. 26 (mischaracterizing the ruling as relying on "mere usage of the term 'transsexual'" without finding "different treatment"). But differential treatment is exactly what the record proves. JA2576-2577.

Defendants argue next that the Exclusion merely discriminates based on "whether the member seeks gender-confirming surgery." Br. 26. That is the point. If the surgery conforms with one's sex assigned at birth, it is covered. If it conforms with a different gender identity, it is denied. That is sex discrimination. *See Bostock*, 140 S. Ct. at 1741-42.

Defendants cannot dodge the Exclusion's explicit discrimination by invoking *Geduldig* and *Dobbs*. Br. 24-29, 32 (citing *Geduldig*, 417 U.S. 484 and *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)).[7] First, *Geduldig* did not consider a facial classification, but rather what it viewed as a facially-neutral pregnancy exclusion, and in which circumstances such a proxy can constitute sex discrimination. *Geduldig* explained its view that "pregnancy is an *objectively* identifiable physical condition with unique characteristics," and accordingly does not "involv[e] discrimination based upon gender as such." 417 U.S. at 496 n.20

---

[7] *Harris v. McRae*, which held that "poverty … is not a suspect classification" in the context of Medicaid's decision to restrict abortion funding, is not instructive here where the Exclusion discriminates facially and intentionally based on sex. 448 U.S. 297, 323 (1980).

(emphasis added). The Exclusion here does. As the district court explained, *Geduldig* "reasoned that pregnancy was a physical condition divorced from gender," while the Exclusion is different because it "precludes a specific treatment that is connected to a person's sex and gender identity—not just a single objectively identifiable physical condition …." JA2578 (cleaned up); *see also Boyden*, 341 F. Supp. 3d at 999-1000. *Geduldig* thus does not speak to the kind of explicit sex classification found in the Exclusion here.

Second, *Geduldig* is inapplicable because Defendants admitted that cisgender participants receive the same kinds of treatments denied transgender people for gender-confirming care. JA577-578. After finding that pregnancy is a facially-neutral condition rather than an express gender-based classification, *Geduldig* examined alternatively whether sex discrimination can be found on the basis that "only women can become pregnant." 417 U.S. at 496 n.20.[8] This was not sufficient, the Court held, when no one else received more favorable treatment. *Id.* at 496-97 (there is "no risk from which men are protected and women are not," or "from which women are protected and men are not"). Again, the Exclusion is different. As the district court noted, "[h]ere, the nonsuspect class—those not seeking surgical

---

[8] Accepting the premise for the sake of argument, Plaintiffs note that some transgender men and nonbinary people can and do become pregnant.

treatment for gender dysphoria—are treated more favorably, as their materially same surgeries are covered." JA2578.

The more relevant precedent discussed in *Dobbs* is *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273-274 (1993). As *Bray* explained, "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed. A tax on wearing yarmulkes is a tax on Jews." 506 U.S. at 270. This describes the Exclusion. Just as a tax on wearing yarmulkes is a tax on Jewish people, an exclusion of care for gender dysphoria is an exclusion of transgender people. *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 689 (2010) ("Our decisions have declined to distinguish between status and conduct" when the two are closely correlated); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring). As the district court correctly found, "[o]nly individuals who identify as transgender would seek 'transsexual surgery.'" JA2577; *Toomey*, 2019 WL 7172144, at *6.

Defendants' primary argument is that because they can characterize the Exclusion as dividing participants into (1) those seeking gender-confirming surgery, and (2) "all other persons" (including "cisgender people" who are wholly unaffected by the Exclusion), there is no discrimination. Br. 28. But "[t]he proper focus … is

30

the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of Los Angeles, California v. Patel*, 576 U.S. 409, 418 (2015) (cleaned up).

In other words, *Geduldig* does not stand for the proposition that so long as the government can recast the group unaffected by the classification as "everybody," Equal Protection is satisfied. For example, a rule providing family leave only to women as "primary caregivers" would create two groups of people: (1) men denied that status, and (2) those who are not primary caregivers, including both men and women. *Knussman v. Maryland*, 272 F.3d 625, 635 (4th Cir. 2001). But that is unmistakably an Equal Protection violation. *Id.*; *see also Eknes-Tucker v. Marshall*, No. 2:22-cv-184, 2022 WL 1521889, at *10 (M.D. Ala. May 13, 2022) (finding similar argument did not apply where the category of people penalized consists entirely of transgender people).

*Dobbs* and *Geduldig* did not hold, as Defendants suggest (Br. 32), that sex-based classifications can only be shown if there is invidious intent—although intent is clearly present here. *Geduldig* instead concluded more narrowly that not every pregnancy classification is an explicit sex-based classification "like those considered in" *Reed v. Reed*, 404 U.S. 71 (1971), and *Frontiero v. Richardson*, 411 U.S. 677 (1973). *Geduldig*, 417 U.S. at 496 n.20. Where facial discrimination is *not* present, a court would examine whether "distinctions … are mere pretexts designed to effect

31

an invidious discrimination against the members of one sex or the other." *Id.* That is the case here. The Exclusion was designed to bar gender-confirming care "which is only sought by transgender individuals." *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 889 (E.D. Ark. 2021), *aff'd Brandt*, 47 F.4th 661. This is what *Geduldig* and *Bray* clarify is prohibited: a pretextual classification designed to impose differential treatment.[9]

### D. The Exclusion's Facial Discrimination Obviates the Need to Show Intentional Discrimination, Although it is Plainly Present.

Defendants' argument that there is no evidence of intentional discrimination is not based in the record. Br. 29-31. While no showing of intent is needed because the Exclusion facially discriminates, *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3rd Cir. 2005), intent is plain to see. Defendants admit that the Exclusion "has been *maintained* year-to-year without change." Br. 30 (emphasis added). BMS enforces the Exclusion in part through its MCOs, expressly writing into their contracts that they are "not permitted to provide" gender-confirming

---

[9] For all these reasons, *Lange v. Houston County, Georgia*, 499 F. Supp. 3d 1258 (M.D. Ga. 2020), finding a similar exclusion facially neutral, is an outlier that fails to persuade.

So few of the cases examining exclusions of gender-confirming care support Defendants' position that Defendants are reduced to propping up portions of a magistrate's report and recommendation that the Arizona district court *rejected*. Br. 29 n.12 (citing *Toomey v. Arizona*, No. 19-cv-0035, 2020 WL 8459367 (D. Ariz. Nov. 30, 2020), report and recommendation adopted in part, rejected in part, No. 19-cv-00035, 2021 WL 753721 (D. Ariz. Feb. 26, 2021)).

surgery.  JA1039-1050.  This deliberate policy choice—"maintained year-to-year" and written into all MCO contracts—suffices to show intent.

The fact that the Exclusion was adopted prior to the time Secretary Crouch and Commissioner Beane assumed their positions is irrelevant.  Br. 30.  Neither one disputes that they have enforcement authority and are appropriate parties for the district court to have enjoined.

Nor is this analogous to *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979). *Feeney* found that mere disparate impact from a gender-neutral hiring preference— for which both women and men could qualify—is not sufficient on its own to establish intent.  *Id.* at 275.  That is a world apart from Defendants' targeted Exclusion of "transsexual surgery."

As explained further below, Defendants' inability to demonstrate a single justification that actually motivated the Exclusion confirms that no adequate governmental interest supports it.  Defendants contort this fact, suggesting that the lack of any documented justification equates to a lack of discriminatory intent.  Br. 30.  But this "conflates the classifications drawn by the law with the state's justification for it."  *Brandt*, 47 F.4th at 670.  The fact that a classification is unjustified does not make it benign.

Defendants argue that the lack of an express CMS mandate for coverage extinguishes any intent to discriminate on their part.  Br. 30-31.  But the directive to

administer government healthcare free from invidious sex discrimination is found in the Equal Protection Clause. Further, BMS's 30(b)(6) designee admitted both that (1) CMS does not prohibit this care—in fact, CMS *subsidizes* the existing counseling and hormone therapy coverage—and (2) the decision to exclude gender-confirming surgery thus "resides with BMS." JA457. The lack of an express mandate to cover gender-confirming care has not stopped Defendants from covering hormone therapy and cannot excuse arbitrarily barring surgery either.

### E.    The Exclusion Cannot Survive Any Level of Review.

Defendants do not even attempt to argue that the Exclusion survives heightened review, but the Exclusion cannot pass muster under any level of review. Defendants repeat that the Exclusion "is not directed at transgender individuals at all, but a specific procedure." Br. 31. The Exclusion shows otherwise. The transgender ("transsexual") people targeted are named expressly on the Exclusion's face.

Because the Exclusion "rests on sex-based classifications *and* because transgender people constitute at least a quasi-suspect class," Defendants must carry the heavy burden of showing that it substantially relates to an important governmental interest. *Grimm*, 972 F.3d at 607-10. Defendants must also prove that their justifications are genuine, "not hypothesized or invented post hoc in response to litigation." *Virginia*, 518 U.S. at 533.

Defendants cannot meet this burden. They admit that "[t]he reason for initial adoption of the [Exclusion] is unknown." Br. 4 (citing JA1127). And they have not once since its adoption revisited whether the Exclusion is justified. JA437. Defendants are not aware of any documents considered by anyone responsible for adopting or maintaining the Exclusion. JA2212-2213. They cannot meet their burden to demonstrate any genuine motivation for the classification, past or present.

Defendants nonetheless offer two rationales for the Exclusion: cost, and medical necessity. Regarding cost, BMS admits that it has conducted zero research or analysis on that issue. JA533, JA461. Federal matching funds already help subsidize the counseling and hormone therapy that West Virginia currently covers to treat gender dysphoria, JA444, and BMS's designee testified that BMS has not had to cut coverage based on shortfalls during her more than 20-year tenure. JA518, JA529. This argument rings particularly hollow given Defendants' own emphasis on the proportionately small number of people affected. Br. 7-8, 53-54. As this Court has observed, transgender people are only "approximately 0.6% of the United States adult population." *Grimm*, 972 F.3d at 594. The expert testimony explained that surgical procedures generally do not cost more merely because they are performed for gender-confirming care; and peer-reviewed literature indicates that treating gender dysphoria is more cost-effective than treating the serious health consequences that result from refusing to treat it. JA705-707.

More importantly, under any level of review, a state may not "protect the public fisc by drawing an invidious distinction." *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974); *see also Graham v. Richardson*, 403 U.S. 365, 374-75 (1971) (same); *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974) (same); *Diaz v. Brewer*, 656 F.3d 1008, 1014 (9th Cir. 2011) (under rational basis review, the state cannot justify denying same-sex partners health coverage merely because it saves money). Defendants must "do more than show" that denying equal coverage to transgender people "saves money," *Shapiro*, 394 U.S. at 633—otherwise, this does nothing "more than justify [the] classification with a concise expression of an intention to discriminate." *Plyler v. Doe*, 457 U.S. 202, 227 (1982); *see also Flack*, 395 F. Supp. 3d at 1008; *Boyden*, 341 F. Supp. 3d at 1001. Simply put, West Virginia cannot balance its budget on the backs of a vulnerable minority group.[10]

With respect to medical necessity, the district court correctly found no material dispute of fact. As an initial matter, this interest is indisputably post-hoc. No fewer than three Rule 30(b)(6) witnesses for BMS confirmed that the purported

---

[10] The district court did not err in declining to credit the cost-related speculation of Defendants' psychiatrist, Br. 34, as he himself testified that he lacks expertise on the topic. JA1887-1888 (testimony of psychiatrist that a "proper economic analysis … be conducted" for reliable information about cost, and stating that "[w]hatever the impressive skills of individual physicians maybe, economic analysis is not one of them. This includes myself.").

justifications for the Exclusion were (1) lack of guidance from CMS regarding gender-confirming care, and (2) cost concerns. JA534-535, JA438-440, JA1129-1134. Defendants also verified these as their only two governmental interests in written discovery. JA310. Accordingly, Defendants' effort to invoke medical necessity concerns, including by citing expert testimony constructed for this litigation, fails under heightened scrutiny. *Virginia*, 518 U.S. at 516; *see also Flack*, 395 F. Supp. 3d at 1020-21 (Wisconsin Medicaid could not carry its burden under heightened scrutiny when it failed to provide evidence that it considered medical necessity before the exclusion was adopted, and that expert reports prepared in connection with litigation do not suffice).

Regardless, even if the Court considers this post-hoc rationale, nothing in the record supports it. BMS already accepts the diagnosis of gender dysphoria and recognizes that at least some forms of care are medically necessary to treat it because BMS covers counseling and hormone therapy, arbitrarily excluding surgical care. JA491. BMS admits that any treatment it covers, such as its existing counseling and hormone therapy coverage, necessarily has "been deemed medically necessary" by virtue of being covered, JA458, and admits that "Gender-Confirming Care can be medically necessary for the treatment of gender dysphoria" with the understanding that the treatment continues to evolve. JA303, JA488. Defendants have engaged in no substantive consideration of the purported justifications for the Exclusion—

37

which is not tailored to medical necessity at all but simply denies coverage across the board.  JA437, JA459.  And the InterQual guidelines Defendants use recognize the medical necessity of gender-confirming care.  JA967-1014.

The district court correctly found that nothing about Defendants' expert creates a material dispute of fact.[11]  As Dr. Levine testified repeatedly in this and other cases, he does not support blanket bans like the one challenged here.  JA1977 (Dr. Levine's testimony that categorical bans are "draconian"); *see also* JA2193 (collecting Dr. Levine's consistent and repeated testimony that he does not support categorical bans).  His opinions thus do not contradict the relief Plaintiffs seek, and accordingly could not create a material dispute of fact.

## III.    THE EXCLUSION VIOLATES THE ACA.

The district court correctly held that the Exclusion discriminates against Plaintiffs on the basis of sex in violation of the ACA.  As the court recognized, although *Bostock* interprets Title VII, it guides this Circuit's evaluation of Title IX claims.  *See* JA2583; *see also Grimm*, 972 F.3d at 616 (relying on *Bostock's* Title

---

[11] Defendants' one-sided argument that the district court erred in not construing all inferences in favor of Defendants, Br. 34, ignores that the parties filed cross-motions for summary judgment, requiring the same inferences in Plaintiffs' favor with respect to Defendants' motion. *Defs. of Wildlife*, 762 F.3d at 392-93.  Additionally, the court did not need to rule on Plaintiffs' motion to exclude Dr. Levine's testimony given the undisputed evidence that he simply does not support the kind of blanket ban actually at issue here.  Br. 35 n.14.  Notably, Defendants did not move to exclude the testimony of any of Plaintiffs' experts.

VII analysis to interpret Title IX's broad, remedial protections against sex discrimination); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to … Title VII … for guidance in evaluating a claim brought under Title IX.").

Defendants' arguments do not change this. Defendants assert that there is no sex discrimination because Title IX refers only "to the binary sex of male and female." Br. 36. But Defendants' "binary sex" theory cannot be found anywhere in *Grimm*, which does not support the notion that transgender or cisgender people must fit rigid "binary" conceptions of sex. *See Grimm*, 972 F.3d at 621 ("transgender individuals often defy binary categorization") (Wynn, J., concurring). Even accepting Defendants' argument, however, Plaintiffs have shown discrimination. *See* Sect. II(A), *supra*.

Defendants next argue that even if *Bostock* states the appropriate test, the district court misapplied it. Br. 37. That is incorrect. First, Defendants assert that "Medicaid's policy does not classify based on sex or transgender identity" and instead simply "designate[s] certain services as non-covered." Br. 37. But the "designation" is based on sex and transgender status. Defendants also maintain that Plaintiffs have not shown harm because the policy is applied "uniformly." *Id*. But as explained above, a policy is not immunized simply because Defendants claim to "uniformly" apply it to those for whom it is irrelevant. *See Bray*, 506 U.S. at 270.

Defendants' final argument claims there is no evidence of intentional

discrimination. Br. 37. But "sex is necessarily a but-for cause when an employer discriminates against … transgender employees"; and "an employer who discriminates on these grounds inescapably intends to rely on sex in its decisionmaking." *Bostock*, 140 S. Ct. at 1742. The same is true of the government's discrimination challenged here.

*Hennessy-Waller v. Snyder* is unpersuasive. Br. 837-38 (citing 529 F. Supp. 3d 1031 (D. Ariz. 2021), *aff'd Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022)). There the court declined on a limited record to grant a request for a preliminary injunction under the heightened standard for disturbing rather than maintaining the status quo. 28 F.4th at 106, 111-113. That decision is not instructive here, where all evidence is in and shows that Plaintiffs are entitled to relief.

## IV.    THE EXCLUSION VIOLATES THE MEDICAID ACT.

Defendants argue that deference must be afforded to CMS's approval of "Medicaid's State plan," Br. 38, but the Exclusion does not reside in the state plan.[12] Even still, Defendants are wrong to suggest that courts automatically defer to CMS's approval of state plans or state plan amendments. For example, in *Ariz. All. for Cmty. Health Ctrs v. Ariz. Health Care Cost Containment Sys.*, Arizona argued that CMS's reasoning was "implicit in the approval" of its state plan and entitled to

---

[12] The Exclusion appears in a separate policy manual, in addition to several MCO communications and materials. JA931-966, JA1039-1050.

deference. 47 F.4th 992, 1004 (9th Cir. 2022). The Ninth Circuit disagreed, finding no deference was owed where the record lacked any evidence of CMS's reasoning. CMS itself has previously explained as amicus curiae that not all state plan approvals necessarily reflect "any measured consideration" of the issue. *Davis*, 821 F.3d at 247. Ultimately, the absence of any basis in the record for CMS's approval fails to warrant any deference. *Cf. West Virginia v. Thompson*, 475 F.3d 204, 213 (4th Cir. 2007) (providing deference where CMS rejected state plan amendment after requesting data from West Virginia, "consider[ing] a variety of evidence," and conducting administrative review by a CMS hearing officer).

## A. Availability Requirement.

The district court correctly ruled that Defendants' Exclusion violates the Availability Requirement. Plaintiffs must show that the services (1) fall within a category of mandatory or optional medical services that the state elected to provide; and (2) are medically necessary. *See Alvarez v. Betlach*, 572 F. App'x 519, 520-521 (9th Cir. 2014) (finding that the Medicaid Act "prohibits states from denying coverage of 'medically necessary' services that fall under a category covered in their Medicaid plans"); *Bontrager*, 697 F.3d at 608 (a "State is required to provide

41

Medicaid coverage for medically necessary treatments in those service areas that the State opts to provide such coverage"); *Beal v. Doe*, 432 U.S. 438, 444 (1977).[13]

On the first requirement, there is no dispute that BMS is either mandated or chooses to cover the same surgical procedures that Plaintiffs need. JA304. And on the second, were it not for the Exclusion, Medicaid would evaluate requests for gender-confirming surgical care using InterQual criteria, which recognize that the care can be medically necessary. JA967-1014. Still, Defendants argue that they have the discretion to decline coverage here. Br. 44. They do not.

Defendants attempt to rewrite the test, claiming that "Plaintiffs have not demonstrated that gender-confirming care is required to be covered under the Medicaid Act." Br. 40. But Plaintiffs are only required to show that the kinds of surgical procedures they require fall within a category of mandatory *or* optional medical services that the state elected to provide. *Alvarez*, 572 F. App'x at 519-521. There is no dispute that BMS is either mandated or chooses to cover the same surgical procedures that Plaintiffs need. Although Defendants assert that gender-

---

[13] Defendants assert that the court "selectively quoted one portion of *Beal v. Doe*, 432 U.S. 438, 444 (1977) for the proposition that 'serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage.'" Br. 42. Defendants also argue that the law does not require Medicaid to cover all medically necessary services. *Id.* (citing *Harris v. McRae*, 448 U.S. 297). But Plaintiffs' claim is not "cover all medically necessary care." Rather, Medicaid must cover the care Plaintiffs seek because it already covers the care for others, and the care is medically necessary.

confirming surgical procedures are "different from covered procedures," Br. 38, the record shows that they are materially the same for the reasons described above in Section II(B). JA2587. Accordingly, the record is clear that the surgical procedures required for gender-confirming care are the same procedures Defendants cover. JA304, JA324-325, JA330-334. Once a category of services is covered, "a state's failure to provide Medicaid coverage for … medically-necessary services within [that] covered Medicaid category is both per se unreasonable and inconsistent with the stated goals of Medicaid." *Lankford v. Sherman*, 451 F.3d 496, 511 (8th Cir. 2006).

Defendants argue that they "retain broad discretion" over covered benefits, but the Exclusion finds no refuge in their cited authorities. Br. 41-42. First, *Alexander v. Choate* did not interpret an Availability Requirement claim. 469 U.S. 287, 303 (1985) (Medicaid participants brought an action under the Rehabilitation Act and relied in part on 42 U.S.C. § 1396a(a)(19), which is part of the general requirements for state plans). Second, *Choate* notes that while the Medicaid Act confers broad discretion, states are required to be reasonable and "*consistent with the Medicaid Act*." 469 U.S. at 303 n.23 (emphasis added); *see also Mennonite Gen. Hosp., Inc. v. Molina Healthcare of P.R.*, 319 F. Supp. 3d 587, 591 (D.P.R. 2018). That includes the Availability Requirement that the Exclusion violates. *See* JA2587-

2588 (holding that in exercising their discretion, states "must ensure that the care and services are provided in the best interests of the recipients") (cleaned up).

A state's Medicaid plan must "specify the amount, duration, and scope of each service that it provides," and "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." *Bontrager*, 697 F.3d at 608 (quoting 42 C.F.R. § 440.230(a), (b)).  Plaintiffs do not dispute that BMS has discretion to "place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." *Id*. (quoting 42 C.F.R. § 440.230(d)).  But that discretion is not boundless.  *See Flack*, 395 F. Supp. 3d at 1015 (the limits states place on a service must be reasonable and consistent with the objectives of the Medicaid Act); *White v. Beal*, 555 F.2d 1146, 1151 (3d Cir. 1977) ("[W]hen a state decides to distribute a service as part of its participation in Title XIX, its discretion to decide how the service shall be distributed, while broad, is not unfettered: the service must be distributed in a manner which bears a rational relationship to the underlying federal purpose of providing the service to those in greatest need of it").

Defendants claim that there "is ample evidence in the record to rebut the medical necessity of surgical care."  Br. 43.  But as described above, this post-hoc argument was manufactured for this litigation, and Defendants introduced no competent evidence creating a material dispute of fact with respect to the blanket Exclusion actually at issue here.  Moreover, there is no dispute that this care can be

medically necessary, which BMS has already admitted. *See also* JA303 (BMS's admission that "Gender-Confirming Care can be medically necessary for the treatment of gender dysphoria," "with the understanding that this area of treatment continues to evolve"); JA488 (admitting nothing has evolved since Defendants' admission).

Dr. Levine's opinion that this care "is driven by patient desire and not any objective standard" for medical necessity is counter-factual. Br. 43. The InterQual standards are objective "evidence-based standards." JA967-1014. In support of this argument, Defendants reference only inadmissible hearsay, Br. 43 nn.18-19, and the materials they cite do not actually support their arguments, as Plaintiffs' experts have explained. *See* JA777-778, JA665 (explaining Littman article, and Bränström and Panchankis correction); and *supra* n.3 (explaining CMS memo). Additionally, the documents Defendants cite "do not create a material dispute of fact in large part because they were not relied on by [BMS] in evaluating the Exclusion, either before or after it became effective." *Flack*, 395 F. Supp. 3d at 1016.

Defendants mention in passing that the reason for maintaining the Exclusion is, in part, "utilization management considerations such as budgetary constraints." Br. 44. However, the "implementation of such a [utilization control] procedure [does not] allow[] a state to shirk its primary obligation to cover medically necessary treatments." *Bontrager*, 697 F.3d at 610 (finding that state's monetary cap, which

serves to exclude medically necessary treatment, is not a utilization control procedure). Additionally, "when a service goes completely unprovided, it has obviously not been provided in an amount sufficient to achieve its purpose." *Bontrager*, 697 F.3d at 611. The district court was correct in finding that the Exclusion violates the Availability Requirement.

> ### B.    Comparability Requirement.

Defendants argue that the district court erred in holding that the Exclusion violates the Comparability Requirement, Br. 44, despite acknowledging that "the comparability requirement[] prohibit[s] the provision of an identical service to one group to the exclusion of another." Br. 48. And it is undisputed that Defendants cover the relevant procedures denied to Plaintiffs on the basis of diagnosis. JA304, JA324-325, JA330-333.

The Comparability Requirement "prohibits discrimination among individuals with the same medical needs stemming from different medical conditions by requiring participating States to provide medical assistance to all participants in equal amount, duration, and scope." *Flack*, 395 F. Supp. 3d at 1018; *see also Davis*, 821 F.3d at 257-258 (finding that it would violate the Comparability Requirement to allow a state to deny medical benefits to "some … individuals that it provides to others with the exact same medical needs simply by defining such services— however arbitrarily—as aimed at treating only some medical conditions"); 42 U.S.C.

§ 1396a(a)(10)(B); 42 C.F.R. § 440.240(b) (services available must be "equal in amount, duration, and scope"); 42 C.F.R. § 440.230(c) (Medicaid "may not arbitrarily deny or reduce the amount, duration, or scope of a required service … to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition.").

Defendants do not dispute that Medicaid coverage for the surgical procedures to treat gender dysphoria is made available only for other diagnoses.  JA304, JA324-325, JA330-333.  This violates the Comparability Requirement.  Instead, Defendants argue that "Medicaid does not cover gender-confirming surgeries for any member regardless of gender identity, and it provides the same services to all members regardless of gender identity."  Br. 45.  But Defendants' argument improperly merges the diagnosis with the underlying care.  The question is not whether cisgender people receive surgery for the same diagnosis of gender dysphoria; the question is whether Defendants cover the same kinds of surgical care for other diagnoses but exclude it for gender dysphoria—and that is undisputed.  Mr. Fain's coverage history is a helpful example of Defendants' diagnosis-based discrimination.  "In 2018, [Mr. Fain] had a hysterectomy, which was not a gender-confirming surgery, that was covered by Medicaid."  Br. 7 n.3.  If Mr. Fain sought Medicaid coverage for that same procedure, a hysterectomy, to treat his gender

dysphoria—Defendants would have denied the care, as they are doing today with respect to his chest surgery.

As the Third Circuit found in *White v. Beal*, "nothing in the federal statute [] permits discrimination based upon etiology rather than need for the service." 555 F.2d at 1151 (enjoining a Pennsylvania Medicaid policy that covered glasses for individuals with eye disease or pathology, but not for those with ordinary refractive errors). Contrary to Defendants' assertion, Plaintiffs' position is not that "Medicaid is required to provide coverage for [surgical care] for any and all diagnoses," Br. 46, but that under the Comparability requirement, once Defendants cover surgical care, they must do so free from discrimination based on diagnosis. Defendants also assert that accepting Plaintiffs' argument "would mean that, if Medicaid covers mastectomy for a diagnosis of breast cancer, then it must cover any type of mastectomy for any member for any reason." Br. 47. But there are clear limiting factors: a valid medical diagnosis and a determination that the care is medically necessary. Both are established here, but the Exclusion prevents actual consideration of either.

*Rodriguez v. City of New York* involved a different claim, where plaintiffs sought coverage for "safety monitoring as an independent service," which was not offered to any participants under New York Medicaid. 197 F.3d 611, 614 (2d Cir. 1999); *see also id.* at 616 (finding that the Medicaid Act "does not require a state to

fund a benefit that it currently provides to no one"). As another district court explained, "Here, by contrast [to *Rodriguez*], plaintiffs allege that the specific treatments they seek are already provided to other Medicaid recipients but have been denied to them on the basis of their [gender dysphoria] diagnoses alone." *Cruz v. Zucker*, 116 F. Supp. 3d 334, 346 (S.D.N.Y. 2015). *Rodriguez* itself recognized that the Comparability Requirement's "proper application is in situations where the same benefit is funded for some recipients but not others." *Rodriguez* at 616. This is that case.

*Casillas v. Daines*, 580 F. Supp. 2d 235 (S.D.N.Y. 2008), which rejected a Comparability Requirement claim brought by transgender plaintiffs, is an outlier. Moreover, the same district court that issued *Casillas* declined to follow it in a subsequent case. *See Cruz*, 116 F. Supp. 3d at 343 (stating that while "*Casillas* is entitled to this Court's respectful attention … in the end, the Court finds itself in disagreement with that decision's reasoning and conclusions"). As *Cruz* held, in "enacting the Comparability Requirement, Congress made clear that the states may not blithely provide services to some of their needy residents while denying the same services to others who are equally needy." *Id*. at 346. Again, this is that case.

For the reasons set forth above, the district court's Medicaid Act rulings should be affirmed.

## V.     THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS HAVE STANDING.

Defendants take issue with only one element of standing: whether Plaintiffs have sustained an injury in fact.  Plaintiffs have.  As the district court cogently explained:

> Defendants enacted a clear policy of excluding coverage for surgical care of gender dysphoria with no exceptions.  This caused an actual, concrete injury to Plaintiffs by essentially constructing a discriminatory barrier between them and health insurance coverage.  This is not a hypothetical injury.  Plaintiffs requesting coverage would have been futile due to the exceptionless exclusion, and the law does not require Plaintiffs to take such futile acts.

JA2590.  None of Defendants' arguments undermine this reasoning.

Defendants argue Plaintiffs have not been denied coverage for gender-confirming surgery, Br. 49, but "[t]he law does not require" Plaintiffs to perform "such a futile act."  *Townes v. Jarvis*, 577 F.3d 543, 547 n.1 (4th Cir. 2009).  For example, in the employment realm, "[i]t is now accepted that the failure to apply for a job does not preclude recovery if a claimant can demonstrate" that discrimination would have rendered the application futile.  *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1451 (4th Cir. 1990) (cleaned up).  And it makes sense that, as here, "[i]n the context of applications for government benefits [the] threshold [standing] requirement [of applying for benefits] may be excused [] where a plaintiff makes a substantial showing that the application for the benefit [] would have been futile."  *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1286 (D.C. Cir. 2016) (cleaned up).

Defendants do not dispute that their Medicaid policy, on its face, prohibits coverage for "transsexual surgery." JA934-935. Moreover, Plaintiffs testified that they did not pursue surgery because they knew doing so would be futile. JA1363 ("I already know that I'll be denied …. [I]t seems pointless to go and ask my doctor to do something when we both know the result will be a denial."); JA1314 ("[T]here is no sense in them discussing it any further …. The doctors have discussed with me that it's not covered. So there is nothing that they can do about it."). Mr. Fain testified that he has received the necessary two letters from a doctor recommending that he have a mastectomy—including a "surgical candidacy letter." JA1357-1360.[14] And two doctors "have instructed [Ms. Anderson] that they would refer [her] … for the next step in [her] gender confirmation," but have not yet "because they know that Medicaid does not cover it, and … what kind of distress that would cause [her] to even talk about it." Mot. to Supplement Joint App., SA1-2; JA1313-1314. Accordingly, Plaintiffs' injury is far from speculative. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), *as revised* (May 24, 2016) (holding that "the risk of real harm" can constitute a "concrete injury" for purposes of standing).

---

[14] Again, that Mr. Fain smokes is of no moment and certainly does not deprive him of standing. The Exclusion bars him from coverage regardless of his current smoking status. Regardless, as he testified, "I can quit smoking any time, it's whether or not I can handle the cravings afterwards. But, yes, I could actually lay them down today and go have surgery tomorrow if I needed to." JA1362.

51

## VI.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CERTIFYING THE CLASS.

The Fourth Circuit "typically review[s] a district court's certification order for abuse of discretion." *Brown v. Nucor Corp.*, 785 F.3d 895, 901 (4th Cir. 2015). "A district court abuses its discretion when it materially misapplies the requirements of Rule 23." *Id.* at 902. In other words, the district court's decision to certify the class in this case should be given "substantial deference" absent "an error of law or clear error in finding of fact." *Berry v. Schulman*, 807 F.3d 600, 608 (4th Cir. 2015). The district court made no such error.

Pursuant to Federal Rule of Civil Procedure 23(b)(2), the district court certified a class of "all transgender people who are or will be enrolled in [W]est Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusion." JA2552. Defendants argue that this class is overbroad and so numerosity and ascertainability are not satisfied. In doing so, they point to questions such as which class members have a gender dysphoria diagnosis, medical necessity, and eligibility. Br. 50-54. But as the district court correctly responded below, "this position mischaracterizes the issue." JA2556. Plaintiffs did not bring this case requesting that the court determine whether every single transgender Medicaid participant in West Virginia is eligible for gender confirming surgery, has a specific diagnosis, or should otherwise undergo surgery. They brought this case to eliminate the Exclusion that bars coverage regardless of any such showing.

Indeed, Defendants admit a bar on coverage exists regardless of any individualized issues. JA459. Thus, the Exclusion prevents any inquiry into eligibility. So, whether surgery would ultimately be deemed medically necessary for each class member is irrelevant to class certification because the injury and legal violations in this case exist because of the Exclusion's blanket ban. Every class member would need the Exclusion eliminated to ever reach any type of individualized inquiry. Against this backdrop, the district court's certification order makes perfect sense. *See* JA2556 ("The exclusion precluding coverage for surgical care must be eliminated before such determinations can be made, giving transgender Medicaid participants with gender dysphoria this treatment option."). The district court made no error of law or clear error in finding of fact. Its certification decision should stand. *See Berry*, 807 F.3d at 608; *Brown*, 785 F.3d at 901.

Looking specifically at the numerosity factor under Federal Rule of Civil Procedure 23(a)(1) and the related ascertainability question, this reasoning holds. Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable." While the numerosity requirement does not specify a particular number of class members necessary for certification, courts often find numerosity satisfied when a class numbers 40 members, with classes between 20 and 40 members considered "gray area" cases. *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021). Here, Defendants identified 686 Medicaid

participants who have submitted one or more claims and also have a diagnosis code for gender dysphoria or gender incongruence between January 1 and September 30, 2021. JA2172-2173.

Even still, numbers are not necessarily determinative. District courts in this Circuit have "considerable discretion in making numerosity determinations." *In re Zetia*, 7 F.4th at 236 (quoting *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249 (3d Cir. 2016), *as amended* (Sept. 29, 2016)). *See e.g., Cyrus ex rel. McSweeney v. Walker*, 233 F.R.D. 467, 470 (S.D.W. Va. 2005) (numerosity requirement satisfied because it would be "impracticable to identify and join each new individual" of a fluid class of Medicaid recipients scattered across the states); *see also Baxley v. Jividen*, 338 F.R.D. 80, 86 (S.D.W. Va. 2020) (numerosity requirement satisfied due to the "overwhelmingly large and continuously changing size of the class" of jail detainees). Moreover, Courts throughout the country have held that joinder of similar classes would be impracticable. *See, e.g., Toomey v. Arizona*, No. 19-cv-0035-TUC-RM, 2020 WL 2465707, at *3 (D. Ariz. May 12, 2020), *report and recommendation adopted*, 2020 WL 3197647 (D. Ariz. June 15, 2020) ("Even if Toomey is overestimating the size of his class [of transgender state employee health plan participants] by a factor of four, his class is still too numerous for joinder to be practicable. The evidence proffered by the plaintiff is sufficient for the court to form a reasonable judgment."); *Flack v. Wisc. Dep't of Health Servs.*, 331 F.R.D.

361, 368-370 (W.D. Wis. 2019) (certifying a class of transgender Wisconsin Medicaid participants because "even if joinder were possible it would be ill-advised and difficult to achieve because of the sensitive nature of the claims, the plaintiffs' limited financial means, and their varied locations across the state"). Accordingly, the district court held that the class meets the numerosity requirement:

> While all 686 transgender Medicaid participants are not currently seeking surgical care for gender dysphoria, it is <u>only</u> transgender participants that have the potential to receive this diagnosis. The boundaries of this class include all transgender Medicaid participants who may experience gender dysphoria and who may require the surgical treatment of such diagnosis; this includes all 686 identified Medicaid participants and any individual who meets these criteria in the future.

JA2556. This is not error. *See Kelley v. Norfolk & W. Ry. Co.*, 584 F.2d 34, 35 (4th Cir. 1978) ("The issue [of numerosity] is one primarily for the District Court, to be resolved in the light of the facts and circumstances of the particular case.").[15]

Relatedly, ascertainability does not carry the weight Defendants suggest where, as here, certification is under Rule 23(b)*(2)*. In fact, courts have found ascertainability an inappropriate requirement for such classes. *See e.g., Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015) ("a judicially-created implied requirement of ascertainability—that the members of the class be *capable* of specific

---

[15] Even if less than one-tenth of all current members required surgery—and even setting aside future participants who are part of the class—that would still be well over 40 members.

enumeration—is inappropriate for (b)(2) classes"); *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("ascertainability is inappropriate in the (b)(2) context"); *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) ("many courts have found Rule 23(b)(2) well suited for cases where the composition of a class is not readily ascertainable"). *See also Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 330 n.25 (4th Cir. 2006) ("Unlike Rule 23(b)(3), Rule 23(b)(2) neither requires that absent class members be given notice … nor allows class members the opportunity to opt-out …. *See* Fed. R. Civ. P. 23(c)(2)(A). By requiring that injunctive or declaratory relief predominate, therefore, Rule 23(b)(2) ensures that the benefits of the class action inure to the class as a whole …."). This is sensible given that injunctive relief sought through the 23(b)(2) mechanism would be implemented across the board as opposed to, for example, allocating damages to specific individuals.

Even when considering ascertainability in the Rule 23(b)(3) context, this Circuit has explained "[t]he goal [of ascertainability] is not to identify every class member … but to define a class in such a way as to ensure that there will be some administratively feasible way … to determine whether a particular individual is a member …." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (cleaned up). Defendants have already identified 686 potential class members through discovery. JA2172-2173. In doing so, Defendants demonstrated that it is

possible to determine whether a particular Medicaid participant has submitted one or more claims and have a diagnosis code for gender dysphoria or gender incongruence. This answers any ascertainability question. *See EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014).

Litigation related to marriage for same-sex couples in this Circuit is instructive. In *Harris v. Rainey*, the defendant argued that a proposed class of "all same-sex couples in Virginia who have not married in another jurisdiction" and "all same-sex couples in Virginia who have married in another jurisdiction" failed to meet the ascertainability requirement of Rule 23. 299 F.R.D. 486, 495 (W.D. Va. 2014). The court rejected this argument, holding that same-sex class members would be ascertainable when they sought a marriage license or sought recognition of their out-of-state marriage. *Id.*

The same is true in this case: Observable and objective actions determine whether a transgender person falls within the class definition by virtue of their claim for gender-confirming surgical care. *See* JA2554 ("The class is comprised of all transgender people who are or will be enrolled in West Virginia Medicaid and who are seeking or will seek gender-confirming care. Such factors are well documented and easily ascertainable. Thus, while not all class members have been identified, such members can be easily identified.")

For all of these reasons, this Court should affirm.

## CONCLUSION

Plaintiffs respectfully request that this Court affirm the district court's order in full.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs-Appellees respectfully request oral argument on the issues presented herein because this appeal concerns significant issues regarding the regarding the application of Equal Protection and federal statutory jurisprudence.

Dated: November 30, 2022

Respectfully submitted,

/s/ Avatara Smith-Carrington
Avatara Smith-Carrington
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Phone: 202-804-6245

Tara L. Borelli
Carl Charles
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: 470-225-5341

Nora Huppert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Phone: 312-663-4413

Anna P. Prakash
Nicole J. Schladt
NICHOLS KASTER, PLLP
80 South 8th Street, Suite 4700
Minneapolis, MN 55402
Phone: 612-256-3200

Walt Auvil
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058

*Counsel for Plaintiffs-Appellees*

58

# CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing filing complies with the relevant type-volume limitation and typeface requirements of the Federal Rules of Appellate Procedure and Federal Circuit Rules.

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,981 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  November 30, 2022          /s/ Avatara Smith-Carrington
                                   Avatara Smith-Carrington
                                   LAMBDA LEGAL DEFENSE AND EDUCATION
                                   FUND, INC.
                                   1776 K Street, N.W., 8th Floor
                                   Washington, DC  20006-2304
                                   Phone: 202-804-6245

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2022, I filed the foregoing document through the Court's CM/ECF system, which will serve an electronic copy on all registered counsel of record.

Dated: November 30, 2022

/s/ Avatara Smith-Carrington
Avatara Smith-Carrington
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
Phone: 202-804-6245

Tara L. Borelli
Carl Charles
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: 470-225-5341

Nora Huppert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Phone: 312-663-4413

Anna P. Prakash
Nicole J. Schladt
NICHOLS KASTER, PLLP
80 South 8th Street
Suite 4700
Minneapolis, MN 55402
Phone: 612-256-3200

Walt Auvil
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058

*Counsel for Plaintiffs-Appellees*