# 22-1927

# United States Court of Appeals for the Fourth Circuit

CHRISTOPHER FAIN; SHAUNTAE ANDERSON, individually
and on behalf of all others similarly situated,

*Plaintiffs-Appellees*,

v.

WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the
West Virginia Department of Health and Human Resources; CYNTHIA BEANE,
in her official capacity as Commissioner for the West Virginia Bureau for Medical
Services; WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
Bureau for Medical Services,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Southern District of West Virginia
No. 3:20-cv-00740

**BRIEF FOR STATES OF NEW YORK, COLORADO, DELAWARE,
ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS,
MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO,
OREGON, RHODE ISLAND, VERMONT, AND
WASHINGTON, AND THE DISTRICT OF COLUMBIA
AS AMICI CURIAE IN SUPPORT OF APPELLEES**

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
DANIEL S. MAGY
  *Assistant Solicitor General*
    *of Counsel*

*(Counsel listing continues on signature pages.)*

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-6073

Dated: December 7, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................ii

INTERESTS OF AMICI CURIAE ..........................................................1

ARGUMENT ...........................................................................................2

POINT I

AMICI PROTECT ACCESS TO GENDER-AFFIRMING HEALTHCARE
BASED ON WELL-ACCEPTED MEDICAL STANDARDS ...............................2

    A.   Discrimination Against Transgender People in Access
        to Healthcare Significantly Harms Amici and Their
        Residents. .........................................................................3

    B.   Amici's Laws and Policies Promote Access to Gender-
        Affirming Medical Care Based on Established Medical
        Standards. ..........................................................................6

    C.   Amici's Laws and Policies Have Improved Health
        Outcomes for Transgender People at a Negligible
        Cost to the States. ............................................................13

POINT II

THE DISCRIMINATORY COVERAGE EXCLUSION VIOLATES THE
EQUAL PROTECTION CLAUSE ...............................................................15

CONCLUSION ......................................................................................21

i

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020) ................................................................ 15-16, 18

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) .................................................................... 19

*Geduldig v. Aiello,*
   417 U.S. 484 (1974) .................................................................... 17-18

*Grimm v. Gloucester Cnty. Sch. Bd.,*
   972 F.3d 586 (4th Cir. 2020) .................................................... 11, 15-18

*Loving v. Virginia,*
   388 U.S. 1 (1967) ....................................................................... 16

*Memorial Hosp. v. Maricopa Cnty.,*
   415 U.S. 250 (1974) .................................................................... 19

**Laws & Regulations**

*Colorado*

3 Colo. Code Regs. § 702-4:4-2-62 ............................................... 12

*Illinois*

Ill. Admin. Code tit. 50, § 2603.35 ............................................... 9

*Maine*

Me. Rev. Stat. Ann.
   tit. 5, § 285 ............................................................................. 9
   tit. 24-A, § 4320-L .................................................................. 9

*Maryland*

Md. Code Ann., Ins. § 15-1A-22 .................................................. 9

**Laws & Regulations**                                                      **Page(s)**

*New Jersey*

Ch. 176, 2017 N.J. Laws 1412 ...................................................................9

*New York*

N.Y. Ins. Law
    § 2607 ...............................................................................................7
    § 3243 ...............................................................................................7
    § 4330 ...............................................................................................7

11 N.Y.C.R.R. § 52.72 ..............................................................................7

18 N.Y.C.R.R. § 505.2 ..........................................................................7, 10

*Washington*

Wash. Rev. Code Ann. § 48.43.0128 ....................................................9, 13

Wash. Admin. Code § 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 ..........................................................9

*District of Columbia*

D.C. Code § 31-2231.11 .............................................................................9

**Miscellaneous Authorities**

Amy E. Green et al., *Association of Gender-Affirming Hormone
    Therapy with Depression, Thoughts of Suicide, and Attempted
    Suicide Among Transgender and Nonbinary Youth*,
    70 J. Adolescent Health 643 (2021),
    https://www.jahonline.org/article/S1054-139X(21)00568-1/fulltext .......14

Ann P. Haas et al., Am. Found. for Suicide Prevention &
    Williams Inst., *Suicide Attempts Among Transgender and
    Gender Non-Conforming Adults: Findings of the National
    Transgender Discrimination Survey* (2014),
    https://williamsinstitute.law.ucla.edu/wp-
    content/uploads/Trans-GNC-Suicide-Attempts-Jan-2014.pdf ............3

## Miscellaneous Authorities                                        Page(s)

Arjee Restar et al., *Gender Affirming Hormone Therapy Dosing Behaviors Among Transgender and Nonbinary Adults*, Humans. & Soc. Scis. Commc'ns, Sept. 7, 2022, https://www.nature.com/articles/s41599-022-01291-5 ...................... 13

Centers for Disease Control & Prevention, *HIV and Transgender People* (Apr. 2022), https://www.cdc.gov/hiv/pdf/group/gender/transgender/cdc-hiv-transgender-factsheet.pdf ............................................... 4

Department of Vt. Health Access, Medical Policy, Gender Affirmation Surgery for the Treatment of Gender Dysphoria (last reviewed Nov. 1, 2019), https://tinyurl.com/mry2eww8 ......... 9-10

District of Columbia Dep't of Ins., Sec. & Banking, Bulletin 13-IB-01-30/15, Prohibition of Discrimination in Health Insurance Based on Gender Identity or Expression (revised Feb. 27, 2014), https://tinyurl.com/45brcr62 ................... 9, 12

Emily Newfield et al., *Female-to-Male Transgender Quality of Life*, 15 Quality of Life Rsch. 1447 (2006), https://www.ncbi.nlm.nih.gov/pubmed/16758113 ............................... 4

Erin Digitale, *Better Mental Health Found Among Transgender People Who Started Hormones as Teens*, Stanford Med. News Ctr. (Jan. 12, 2022), https://tinyurl.com/369mhmth ............... 13

Gabriel R. Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, Pediatrics, June 2019, https://publications.aap.org/pediatrics/article/143/6/e2018290 2/76816/School-Restroom-and-Locker-Room-Restrictions-and ........... 5

Illinois Dep't of Hum. Rts. et al., *Guidance Relating to Nondiscrimination in Healthcare Services in Illinois* (June 26, 2020), https://tinyurl.com/ujwfyezn ..................................... 9

**Miscellaneous Authorities**                                        **Page(s)**

Illinois Dep't of Ins., Bulletin 2020-16, Health Insurance
   Coverage for Transgender, Nonbinary, and Gender
   Nonconforming Individuals, and for Individuals of All
   Sexual Orientations (June 15, 2020),
   https://insurance2.illinois.gov/cb/2020/CB2020-16.pdf ....................... 9

Jack L. Turban et al., *Access To Gender-Affirming Hormones
   During Adolescence and Mental Health Outcomes Among
   Transgender Adults*, PLOS One, Jan. 12, 2022,
   https://journals.plos.org/plosone/article?id=10.1371/journal.pone.
   0261039 .......................................................................................... 14

Letter from Mike Kreidler, Wash. Ins. Comm'r, to Health
   Ins. Carriers (June 25, 2014),
   https://www.insurance.wa.gov/sites/default/files/documents/g
   ender-identity-discrimination-letter.pdf ............................................. 9

Louise Morales-Brown, *What to Know About Mental Health Among
   Transgender Individuals*, Med. News Today (May 20, 2021),
   https://www.medicalnewstoday.com/articles/transgender-
   mental-health ....................................................................................... 4

Massachusetts Off. of Consumer Affs. & Bus. Regul., Div. of
   Ins., Bulletin 2014-03, Guidance Regarding Prohibited
   Discrimination on the Basis of Gender Identity or Gender
   Dysphoria Including Medically Necessary Transgender
   Surgery and Related Health Care Services (June 20, 2014),
   https://tinyurl.com/mu4dxa2v ............................................................ 8

Massachusetts Off. of Consumer Affs. & Bus. Regul., Div. of
   Ins., Bulletin 2021-11, Continuing Applicability of Guidance
   Regarding Prohibited Discrimination on the Basis of Gender
   Identity or Gender Dysphoria Including Medically Necessary
   Gender Affirming Care and Related Services (Sept. 9, 2021),
   https://tinyurl.com/4d7jt4r7........................................................... 8, 12

**Miscellaneous Authorities**                                                    **Page(s)**

Maximus Ctr. for Health Dispute Resolution, Appeal
    Determination in File No. MN2014-0075 (Aug. 11, 2014),
    https://www.outfront.org/sites/default/files/Dept%20of%20Co
    mmerce%20external%20review.pdf ................................................... 11

Michael Zaliznyak et al., *Which U.S. States' Medicaid Programs
    Provide Coverage for Gender-Affirming Hormone Therapy
    and Gender-Affirming Genital Surgery for Transgender
    Patients?: A State-by-State Review, and a Study Detailing
    the Patient Experience to Confirm Coverage of Services*,
    18 J. Sexual Med. 410 (2021), https://tinyurl.com/yk98mpwx ........... 10

Michelle M. Johns et al., *Transgender Identity and Experiences
    of Violence Victimization, Substance Use, Suicide Risk, and
    Sexual Risk Behaviors Among High School Students -
    19 States and Large Urban School Districts, 2017*,
    68 Morbidity & Mortality Wkly. Rep. 67 (2019),
    https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf ........ 5

Minnesota Dep't of Com. & Minn. Dep't of Health,
    Admin. Bulletin 2021-3, Gender Identity
    Nondiscrimination Requirements (Dec. 30, 2021),
    https://mn.gov/commerce-stat/pdfs/bulletin-2021-3.pdf ............... 11-12

Morning Consult & The Trevor Project, *How COVID-19 Is Impacting
    LGBTQ Youth* (2020), https://www.thetrevorproject.org/wp-
    content/uploads/2020/10/Trevor-Poll_COVID19.pdf ...................... 3, 6

Movement Advancement Project & GLSEN, *Separation and
    Stigma: Transgender Youth and School Facilities* (2017),
    https://www.glsen.org/sites/default/files/2019-
    11/Separation_and_Stigma_2017.pdf .................................................... 5

Movement Advancement Project, *Healthcare Laws and Policies:
    Nondiscrimination in Private Insurance and Bans on
    Transgender Exclusions* (updated June 22, 2022),
    https://www.lgbtmap.org/img/maps/citations-nondisc-insurance.pdf ...... 7

**Miscellaneous Authorities**                                    **Page(s)**

New Mexico Off. of Superintendent of Ins., Bulletin 2018-013,
    Transgender Non-Discrimination in Health Insurance
    Benefits (Aug. 23, 2018), https://www.osi.state.nm.us/wp-
    content/uploads/2019/06/Bulletin2018-013.pdf....................................9

New York State Dep't of Fin. Servs., Ins. Circular Letter No. 7,
    Health Insurance Coverage for the Treatment of
    Gender Dysphoria (Dec. 11, 2014),
    https://www.dfs.ny.gov/insurance/circltr/2014/cl2014_07.htm......7, 12

New York State Dep't of Fin. Servs., Ins. Circular Letter No. 8,
    Discrimination Based on Sexual Orientation, Gender Identity or
    Expression, or Transgender Status (July 23, 2019),
    https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2019_08....8

New York State Off. of Mental Health, Mem. to Plan Adm'rs,
    Clinical Review Criteria for the Treatment of Gender
    Dysphoria (Mar. 18, 2020),
    https://omh.ny.gov/omhweb/bho/docs/clinical_review_criteria
    _for_the_treatment_of_gender_dysphoria.pdf ...................................11

Office for C.R., U.S. Dep't of Educ., *Education in a Pandemic:
    The Disparate Impacts of COVID-19 on America's Students* (2021),
    https://www2.ed.gov/about/offices/list/ocr/docs/20210608-impacts-of-
    covid19.pdf ..............................................................................6

Oregon Health Auth., *Prioritized List: Guideline for Gender
    Dysphoria, Frequently Asked Questions* (last updated Mar. 2019),
    https://www.oregon.gov/oha/HPA/DSI-HERC/FactSheets/Gender-
    dysphoria.pdf ...........................................................................12

Press Release, Colo. Dep't of Regul. Agencies, *Division of
    Insurance Announces a New Resource for LGBTQ Coloradans*
    (June 1, 2020), https://doi.colorado.gov/press-release/division-
    of-insurance-announces-a-new-resource-for-lgbtq-coloradans..........12

**Miscellaneous Authorities**                                                          **Page(s)**

Press Release, GLBTQ Legal Advocs. & Defs., *EqualityMaine,
    Maine Transgender Network, GLAD and Maine Women's
    Lobby Announce Health Coverage for Transgender
    Individuals Under MaineCare* (Oct. 3, 2019),
    https://tinyurl.com/3bycvbtx ............................................................... 12

Press Release, N.Y. State Dep't of Fin. Servs., *NYS Office of Mental
    Health and Department of Financial Services Announce NY
    Insurance Carriers Complying with State Requirements to Provide
    Coverage for All Gender-Affirming Treatments* (June 29, 2021),
    https://www.dfs.ny.gov/reports_and_publications/press_releases/
    pr202106292 ......................................................................................... 8

Rhode Island Off. of the Health Ins. Comm'r, Health Ins.
    Bulletin 2015-3, Guidance Regarding Prohibited
    Discrimination on the Basis of Gender Identity or
    Expression (Nov. 23, 2015), https://tinyurl.com/y3a22dk9 ............... 12

Sandy E. James et al., *The Report of the 2015 U.S. Transgender
    Survey* (Nat'l Ctr. For Transgender Equal. 2016),
    http://www.transequality.org/sites/default/files/docs/usts/US
    TS%20Full%20Report%20-%20FINAL%201.6.17.pdf ......................... 3

Vermont Dep't of Fin. Regul., Ins. Bulletin 174, Guidance Regarding
    Prohibited Discrimination on the Basis of Gender Identity
    Including Medically Necessary Gender Dysphoria Surgery
    and Related Health Care (revised June 12, 2019),
    https://dfr.vermont.gov/sites/finreg/files/regbul/dfr-bulletin-
    insurance-174-gender-dysphoria-surgery.pdf ..................................... 9

William V. Padula et al., *Societal Implications of Health Insurance
    Coverage for Medically Necessary Services in the U.S.
    Transgender Population: A Cost-Effectiveness Analysis*,
    31 J. Gen. Internal Med. 394 (2016),
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4803686/pdf/11
    606_2015_Article_3529.pdf ............................................................... 15

**Miscellaneous Authorities**                          **Page(s)**

World Pro. Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (ver. 7, 2012), https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English2012.pdf?_t=1613669341 ..................................... 10

## INTERESTS OF AMICI CURIAE

The States of New York, Colorado, Delaware, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont, and Washington, and the District of Columbia file this brief as amici curiae in support of appellees. Amici strongly support the right of transgender people to live with dignity, be free from discrimination, and have equal access to healthcare. Accordingly, amici have adopted laws and policies aimed at combatting discrimination against transgender people who seek access to healthcare—including policies that guarantee nondiscriminatory insurance coverage of gender-affirming medical care. Amici are also committed to supporting their transgender residents who rely on Medicaid for healthcare coverage. To that end, amici's state Medicaid programs uniformly cover medically necessary, gender-affirming care.

Amici have a strong interest in this case. Among other things, amici recognize that discrimination based on transgender status—especially in access to healthcare—causes tangible economic, emotional, and health harms to valued members of our communities. Amici also have a substantial interest in ensuring that the Equal Protection Clause is properly

applied to protect transgender Americans from stigma and discrimination. Amici's experience demonstrates that protecting access to gender-affirming care improves health outcomes for our transgender residents at little cost to the public fisc.

## ARGUMENT

## POINT I

### AMICI PROTECT ACCESS TO GENDER-AFFIRMING HEALTHCARE BASED ON WELL-ACCEPTED MEDICAL STANDARDS

Amici's laws protect their transgender residents by increasing their access to healthcare, not by denying it. Lack of access to healthcare for transgender individuals results in devastating and tangible economic, emotional, and health consequences. Accordingly, many of the amici have worked to ensure that their residents have access to gender-affirming healthcare and to allow doctors to practice medicine in adherence both to well-accepted medical standards and to our anti-discrimination laws. In amici's experience, these laws and policies protect state residents without harm to the public fisc and without the administrability challenges suggested by appellants.

**A.      Discrimination Against Transgender People in Access to Healthcare Significantly Harms Amici and Their Residents.**

Transgender people face significant barriers to receiving both routine and transition-related care, including lack of adequate insurance coverage, provider ignorance about the health needs of transgender people, and outright denial of services.[1] Denial of access to medically necessary care has serious consequences for transgender residents and public health generally. Transgender people with gender dysphoria often suffer from severe distress due to the stigma associated with their gender identity.[2] Among transgender people, there are higher rates of suicidal thoughts and attempts than in the overall U.S. population.[3] The risks are especially high among transgender youth.[4] If unaddressed, gender dysphoria can

---

[1] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey* 93 (Nat'l Ctr. For Transgender Equal. 2016) (internet); *see also* Morning Consult & The Trevor Project, *How COVID-19 Is Impacting LGBTQ Youth* slide 25 (2020) (internet). (For sources available online, full URLs appear in the Table of Authorities. All URLs were last visited on December 7, 2022.)

[2] *See* James et al., *supra*, at 103.

[3] Ann P. Haas et al., Am. Found. for Suicide Prevention & Williams Inst., *Suicide Attempts Among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey* 2 (2014) (internet).

[4] *See, e.g.*, *id.*

impact quality of life, cause fatigue, and trigger decreased social function-ing.[5] Those suffering from gender dysphoria have an increased risk of HIV and AIDS due to inadequate access to care.[6]

Access to gender-affirming healthcare and other medical interven-tions that improve mental health are especially important to transgender and nonbinary minors, who already experience additional stresses stem-ming from discrimination, harassment, and stigma experienced in their daily lives.[7] The Centers for Disease Control and Prevention has found that transgender students are more likely to report feeling unsafe at or

---

[5] *See* Emily Newfield et al., *Female-to-Male Transgender Quality of Life*, 15 Quality of Life Rsch. 1447 (2006) (underline).

[6] *See* Ctrs. for Disease Control & Prevention, *HIV and Transgender People* (Apr. 2022) (internet).

[7] "People who identify as transgender have higher rates of mental health complications than those in the general population due to stigma and discrimination. In addition to a higher prevalence of mental health issues, transgender people typically experience barriers to healthcare, such as refusal of care, violence, and a lack of provider knowledge. This suggests that these experiences, and not being transgender itself, may predict and contribute towards mental health difficulties." Louise Morales-Brown, *What to Know About Mental Health Among Transgender Individuals*, Med. News Today (May 20, 2021) (internet).

going to and from school, being bullied at school, being threatened or injured with a weapon at school, being forced to have sex, and experiencing physical and sexual dating violence.[8] About 23.8 percent of transgender students reported being threatened or injured with a weapon at school, for example, compared with 6.4 percent of cisgender boys and 4.1 percent of cisgender girls.[9] Transgender students who experienced higher levels of victimization due to their gender identity were three times more likely to have missed school in a given month than other students.[10] Transgender youth whose restroom and locker room use was restricted were more likely to experience sexual assault compared with those without restrictions.[11] These harms have been further exacerbated by the COVID-19

---

[8] Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 69 (2019) (internet).

[9] *Id.*

[10] Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth and School Facilities* 4 (2017) (internet).

[11] Gabriel R. Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, Pediatrics, June 2019, at 1 (internet).

pandemic and the limited availability of healthcare resources.[12] Indeed, about 34 percent of transgender and nonbinary youth reported that the pandemic has been "[m]uch more stressful" compared with 20 percent of cisgender heterosexual youth.[13]

## B.    Amici's Laws and Policies Promote Access to Gender-Affirming Medical Care Based on Established Medical Standards.

Given the significant adverse consequences described above, amici have enacted laws and regulations explicitly prohibiting insurers from discriminating against medically necessary, transition-related care in their insurance policies. These protections increase access to healthcare for transgender individuals by barring discriminatory health insurance coverage that contravenes both best medical practice and legal standards prohibiting discrimination on the basis of gender identity.

---

[12] *See* Off. for C.R., U.S. Dep't of Educ., *Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students* iv, 27-30 (2021) (internet).

[13] Morning Consult & The Trevor Project, *supra*, at slide 20.

Since 2012, at least 24 States and the District of Columbia have prohibited health insurance discrimination against transgender people.[14] In New York, for example, laws and regulations ensure that transgender patients are not denied or limited coverage for care that is ordinarily available.[15] In 2014, the New York State Department of Financial Services (NYDFS) confirmed that New York law prohibits health plans subject to its jurisdiction from denying "medically necessary treatment otherwise covered by a health insurance policy or contract . . . solely on the basis that the treatment is for gender dysphoria."[16] In 2019, NYDFS reconfirmed that "New York state law prohibits discrimination based on sexual

---

[14] Movement Advancement Project, *Healthcare Laws and Policies: Nondiscrimination in Private Insurance and Bans on Transgender Exclusions* (updated June 22, 2022) (internet).

[15] *See, e.g.*, N.Y. Ins. Law §§ 2607 (prohibiting issuers from refusing to issue insurance policy or contract, or cancel or decline to renew such policy or contract, because of the sex of the applicant or policyholder, and defining sex to include transgender status), 3243, 4330 (prohibiting discrimination in health insurance policies or contracts because of sex, and defining sex to include transgender status); 11 N.Y.C.R.R. § 52.72 (same); 18 N.Y.C.R.R. § 505.2(*l*) (expanding Medicaid coverage for gender-affirming care).

[16] NYDFS, Ins. Circular Letter No. 7, Health Insurance Coverage for the Treatment of Gender Dysphoria (Dec. 11, 2014) (internet).

orientation, gender identity or expression, or transgender status."[17] And in 2021, NYDFS announced that insurance carriers in New York, including some that previously excluded some or all gender-affirming treatments, were complying with the new requirements to provide coverage for all gender-affirming treatments for gender dysphoria.[18]

Likewise, in 2014, the Massachusetts Division of Insurance issued guidance stating that "denial of coverage for medically necessary treatment based on an individual's gender identity or gender dysphoria by any [insurance] Carrier is sex discrimination that is prohibited under Massachusetts law."[19] Many other States' laws, regulations, and guid-

---

[17] NYDFS, Ins. Circular Letter No. 8, Discrimination Based on Sexual Orientation, Gender Identity or Expression, or Transgender Status (July 23, 2019) (internet).

[18] Press Release, NYDFS, *NYS Office of Mental Health and Department of Financial Services Announce NY Insurance Carriers Complying with State Requirements to Provide Coverage for All Gender-Affirming Treatments* (June 29, 2021) (internet).

[19] Mass. Off. of Consumer Affs. & Bus. Regul., Div. of Ins., Bulletin 2014-03, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Transgender Surgery and Related Health Care Services 1 (June 20, 2014) (internet). The Massachusetts Division of Insurance reaffirmed this guidance in 2021. *See* Mass. Off. of Consumer Affs. & Bus. Regul., Div. of Ins., Bulletin 2021-11, Continuing Applicability of Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria

ance likewise prohibit insurers from gender identity discrimination in healthcare.[20]

Consistent with their support of transgender rights, many amici's state Medicaid programs include coverage for medically necessary, gender-

---

Including Medically Necessary Gender Affirming Care and Related Services (Sept. 9, 2021) (internet).

[20] *See, e.g.*, **District of Columbia**: D.C. Code § 31-2231.11(c); D.C. Dep't of Ins., Sec. & Banking, Bulletin 13-IB-01-30/15, Prohibition of Discrimination in Health Insurance Based on Gender Identity or Expression (revised Feb. 27, 2014) (internet). **Illinois**: Ill. Admin. Code tit. 50, § 2603.35; Ill. Dep't of Hum. Rts. et al., *Guidance Relating to Nondiscrimination in Healthcare Services in Illinois* (June 26, 2020) (internet); Ill. Dep't of Ins., Bulletin 2020-16, Health Insurance Coverage for Transgender, Nonbinary, and Gender Nonconforming Individuals, and for Individuals of All Sexual Orientations (June 15, 2020) (internet). **Maine**: Me. Rev. Stat. Ann. tit. 5, § 285(9)(G); Me. Rev. Stat. Ann. tit. 24-A, § 4320-L. **Maryland**: Md. Code Ann., Ins. § 15-1A-22(d). **New Jersey**: Ch. 176, 2017 N.J. Laws 1412. **New Mexico**: N.M. Off. of Superintendent of Ins., Bulletin 2018-013, Transgender Non-Discrimination in Health Insurance Benefits (Aug. 23, 2018) (internet). **Vermont**: Vt. Dep't of Fin. Regul., Ins. Bulletin 174, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity Including Medically Necessary Gender Dysphoria Surgery and Related Health Care (revised June 12, 2019) (internet); Dep't of Vt. Health Access, Medical Policy, Gender Affirmation Surgery for the Treatment of Gender Dysphoria (last reviewed Nov. 1, 2019) (internet). **Washington**: Wash. Rev. Code Ann. § 48.43.0128(3); Wash. Admin. Code § 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; Letter from Mike Kreidler, Wash. Ins. Comm'r, to Health Ins. Carriers (June 25, 2014) (internet).

affirming healthcare.[21] For example, New York provides Medicaid coverage for several "gender reassignment surgeries, services, and procedures, based upon a determination of medical necessity made by a qualified medical professional."[22] Vermont similarly provides Medicaid coverage for medically necessary gender reassignment surgery if certain criteria are met.[23]

Amici's laws and policies are rooted in well-established medical standards recognizing that medical necessity determinations are properly grounded in evidence-based medicine.[24] For example, the New York State Office of Mental Health issued a memorandum in 2020 requiring New York–regulated insurance policies to develop evidence-based and peer-reviewed criteria to be used when making medical necessity determina-

---

[21] *See* Michael Zaliznyak et al., *Which U.S. States' Medicaid Programs Provide Coverage for Gender-Affirming Hormone Therapy and Gender-Affirming Genital Surgery for Transgender Patients?: A State-by-State Review, and a Study Detailing the Patient Experience to Confirm Coverage of Services*, 18 J. Sexual Med. 410, 414-17 (2021) (internet).

[22] 18 N.Y.C.R.R. § 505.2(*l*)(4).

[23] Dep't of Vt. Health Access, Medical Policy, *supra*, at 2.

[24] *See* World Pro. Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* 14 (ver. 7, 2012) (internet).

tions for the treatment of gender dysphoria, and to submit those criteria to the Office of Mental Health for review and approval.[25] The Minnesota Department of Commerce applies to insurers the medical standards set forth by the World Professional Association for Transgender Health (WPATH),[26] an international professional association that provides evidence-based standards of care for transgender people.[27] Massachusetts similarly recommends insurance carriers "consult the most up-to-date medical standards set forth by nationally recognized medical experts in

---

[25] N.Y. State Off. of Mental Health, Mem. to Plan Adm'rs, Clinical Review Criteria for the Treatment of Gender Dysphoria (Mar. 18, 2020) (internet).

[26] Although amicus West Virginia criticizes the WPATH standards (*see* Amicus Curiae Br. of the State of W. Va. (W. Va. Br.) at 14-16), this Court has already found that they "represent the consensus approach of the medical and mental health community" and have "been recognized . . . as the authoritative standards of care," *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021).

[27] *See* Maximus Ctr. for Health Dispute Resolution, Appeal Determination in File No. MN2014-0075 (Aug. 11, 2014) (internet); *see also* Minn. Dep't of Com. & Minn. Dep't of Health, Admin. Bulletin 2021-3, Gender Identity Nondiscrimination Requirements 2 (Dec. 30, 2021) (internet) ("Determination of medical necessity and prior authorization protocols for gender dysphoria-related treatment must be based on the most recent, published medical standards set forth by nationally recognized medical experts in the transgender health field.").

the transgender health field, including but not limited to those issued by the" WPATH.[28]

Many other amici similarly follow established medical standards.[29] The District of Columbia, for example, has instructed that determinations of "medical necessity" for insurance coverage purposes "must also be guided by providers in communication with individual patients" in accordance with established standards.[30] Washington forbids insurers from "deny[ing] or limit[ing] coverage for gender affirming treatment"

---

[28] Mass. Off. of Consumer Affs. & Bus. Regul., Bulletin 2021-11, *supra*, at 2.

[29] *See, e.g.*, **Colorado**: 3 Colo. Code Regs. § 702-4:4-2-62; Press Release, Colo. Dep't of Regul. Agencies, *Division of Insurance Announces a New Resource for LGBTQ Coloradans* (June 1, 2020) (internet). **District of Columbia**: D.C. Dep't of Ins., Sec. & Banking, Bulletin 13-IB-01-30/15, *supra*, at 3-4. **Maine**: Press Release, GLBTQ Legal Advocs. & Defs., *EqualityMaine, Maine Transgender Network, GLAD and Maine Women's Lobby Announce Health Coverage for Transgender Individuals Under MaineCare* (Oct. 3, 2019) (internet). **Minnesota**: Minn. Dep't of Com. & Minn. Dep't of Health, Admin. Bulletin 2021-3, *supra*, at 2. **New York**: NYDFS, Ins. Circular Letter No. 7, *supra*. **Oregon**: Or. Health Auth., *Prioritized List: Guideline for Gender Dysphoria, Frequently Asked Questions* (last updated Mar. 2019) (internet). **Rhode Island**: R.I. Off. of the Health Ins. Comm'r, Health Ins. Bulletin 2015-3, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression 1 (Nov. 23, 2015) (internet).

[30] D.C. Dep't of Ins., Sec. & Banking, Bulletin 13-IB-01-30/15, *supra*, at 4.

when it is medically necessary and "prescribed in accordance with accepted standards of care."[31]

Taken together, these laws and policies reflect amici's core commitment to protecting the equality of all people, regardless of their gender identity, and ensuring that people with gender dysphoria are not denied necessary healthcare.

## C. Amici's Laws and Policies Have Improved Health Outcomes for Transgender People at a Negligible Cost to the States.

Amici's laws and policies have improved health outcomes for transgender people at negligible cost to States. The benefits of access to healthcare coverage for transgender people include, among other things, reduced suicide risk, lower rates of substance use, and increased adherence to HIV treatment.[32] And studies overwhelmingly show that mental health

---

[31] Wash. Rev. Code Ann. § 48.43.0128(3)(a).

[32] Erin Digitale, *Better Mental Health Found Among Transgender People Who Started Hormones as Teens*, Stanford Med. News Ctr. (Jan. 12, 2022) (internet) ("Transgender adults who started gender-affirming hormone therapy as teens had better mental health than those who waited until adulthood or wanted the treatment but never received it . . . ."); Arjee Restar et al., *Gender Affirming Hormone Therapy Dosing Behaviors Among Transgender and Nonbinary Adults*, Humans. & Soc. Scis. Commc'ns, Sept. 7, 2022, at 1, 2 (internet) ("[H]ormone use has been shown to significantly improve psychological functioning and quality of

for transgender minors especially improves when they have access to early treatment. A 2021 survey of nearly 12,000 transgender and nonbinary youth found that, for youth under the age of 18, use of gender-affirming hormone therapy was associated with 39 percent lower odds of recent depression and 38 percent lower odds of attempting suicide in the past year compared to youth who wanted, but did not receive, such therapy.[33] Similarly, in 2016, a study supported by the Massachusetts Group Insurance Commission found that the benefits of gender-affirming medical treatment outweigh the costs, noting that "these additional expenses hold

---

life, reduce suicidal attempts and ideations, promote body satisfaction, and decrease gender dysphoria and is therefore considered medically necessary for many trans people.").

[33] Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643, 643 (2021) (internet); *see also* Jack L. Turban et al., *Access To Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, PLOS One, Jan. 12, 2022, at 1, 8 (internet) ("After adjusting for demographic and potential confounding variables, access to [gender-affirming hormones] during adolescence (ages 14–17) was associated with lower odds of past-month severe psychological distress . . . , past-year suicidal ideation . . . , past-month binge drinking . . . , and lifetime illicit drug use . . . when compared to access to [gender-affirming hormones] during adulthood.").

good value for reducing the risk of negative endpoints—HIV, depression, suicidality, and drug abuse."[34]

## POINT II

### THE DISCRIMINATORY COVERAGE EXCLUSION VIOLATES THE EQUAL PROTECTION CLAUSE

The district court correctly determined that the West Virginia State Medicaid Program violates the Equal Protection Clause because it denies medically necessary, gender-affirming surgical care on the basis of sex. As the district court explained, the Medicaid exclusion "facially discriminates on the basis of sex and transgender status," and is therefore subject to heightened scrutiny, because it necessarily rests on a sex classification. (Mem. Op. & Order (Op.) at 15-18 (Aug. 2, 2022), Dist. Ct. ECF No. 271.) The Supreme Court in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and this Court in *Grimm v. Gloucester County School Board*, 972 F.3d 586, have found that discrimination based on transgender status is necessarily sex discrimination "because it is impossible to discriminate against a

---

[34] William V. Padula et al., *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, 31 J. Gen. Internal Med. 394, 394 (2016) (internet).

person for being . . . transgender without discriminating against that individual based on sex," *Bostock*, 140 S. Ct. at 1741; *accord Grimm*, 972 F.3d at 616. Here, the exclusion discriminates against transgender individuals because it fails to cover medically necessary treatments on the sole basis that those services relate specifically to the person's transgender status or are treatment for a gender dysphoria diagnosis.

Harkening back to "'a limited view of the Equal Protection Clause which has not withstood analysis in the subsequent decisions of'" the Supreme Court, *Loving v. Virginia*, 388 U.S. 1, 10 (1967) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 188 (1964)), appellants' argument boils down to the assertion that West Virginia's Medicaid program does not discriminate on the basis of sex or transgender status because its exclusion for gender-affirming surgical care is "uniformly applied to all members" regardless of gender identity (Br. of Appellants at 21; *see id.* at 37). But that is not the relevant inquiry. For example, Virginia's ban on interracial marriage in *Loving* applied equally to all Virginians. Yet the Supreme Court struck it down because even if it applied equally, it impermissibly and unjustifiably "rest[ed] solely upon distinctions drawn according to race." *Loving*, 388 U.S. at 10-11. Similarly, the school board

16

in *Grimm* argued that its policy requiring students to use restrooms that match their biological gender did not violate equal protection because it "applie[d] to everyone equally." 972 F.3d at 609. The Court rejected this argument, reasoning that it was like "saying that racially segregated bathrooms treated everyone equally, because everyone was prohibited from using the bathroom of a different race." *Id.*

The reasoning of *Loving* and *Grimm* directly applies here. As the district court explained, while the coverage exclusion may exist for all members, the only individuals impacted by the coverage exclusion are transgender members. (Op. at 12-13.) This is clear from the plain language of the exclusion, which speaks in gendered terms, excluding coverage for "transsexual surgery." (*Id.* at 16 (quotation marks omitted).) The exclusion therefore draws an invidious distinction based on sex that must survive heightened scrutiny. *See Grimm*, 972 F.3d at 608 (explaining that heightened scrutiny applied to policy that could not "be stated without referencing sex" (quotation marks omitted)).

The Supreme Court's decision in *Geduldig v. Aiello*, 417 U.S. 484 (1974), does not alter this conclusion. In *Geduldig*, the Supreme Court held that a disability insurance program did not discriminate based on

17

sex "by not paying insurance benefits for disability that accompanies normal pregnancy and childbirth." *Id.* at 492, 494. Unlike in *Geduldig*, West Virginia's Medicaid program does not make distinctions on conditions or diagnoses but on treatments that are "connected to a person's sex and gender identity." (Op. at 17.) The exclusion of pregnancy as a compensable disability is not the same as the exclusion of a medically necessary treatment solely on the grounds that it is gender-affirming when the same treatment is approved for cisgender members. As explained above, the latter exclusion is transgender discrimination, which the Supreme Court has held is necessarily sex discrimination. *See Bostock*, 140 S. Ct. at 1741. Because the exclusion here specifically excludes coverage for treatment that is medically necessary for transgender individuals when it approves such coverage for cisgender members,[35] it discriminates on the basis of transgender status, and therefore on the basis of sex. *See id.*; *see also Grimm*, 972 F.3d at 608.

---

[35] For example, as the district court explained, West Virginia's Medicaid program covers medically necessary mastectomies for diagnoses not related to gender dysphoria, but a transgender individual will not receive coverage for a mastectomy to treat gender dysphoria. (Op. at 14.)

18

Because the coverage exclusion is subject to heightened scrutiny, appellants were required to establish that the exclusion is "substantially related to a sufficiently important government interest." *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985). As the district court also correctly determined, they failed to do so. Appellants cannot justify the exclusion on the ground that the Centers for Medicare and Medicaid Services (CMS) does not require them to cover gender-affirming surgical care because "the lack of a mandate by CMS does not permit [appellants] to ignore their obligations under the Constitution." (Op. at 19.) Nor can appellants justify the exclusion for cost reasons. The district court concluded that there was no record evidence support for appellants' purported concern about costs. (*Id.* at 18.) And, in any event, it is well established that a State may not "protect the public fisc by drawing an invidious distinction between classes of its citizens." *Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974). For that reason, there is no merit to amicus West Virginia's assertion that covering medically necessary gender-affirming surgery would be too expensive. *See* W. Va. Br. at 9-13, 17-19. Appellants' claims also fly in the face of amici's own experi-

19

ences in funding medically necessary, gender-affirming healthcare. See *supra* at 13-15.

Finally, appellants did not show that the coverage exclusion was justified because it protects the public from purportedly ineffective or unnecessary medical treatments. The district court correctly found that appellants' assertions were insufficient to meet their burden on summary judgment because they lacked "support in the record" and were "refuted by the majority of the medical community." (Op. at 20-22.) As explained above, amici's overwhelming experience shows that gender-affirming healthcare improves healthcare outcomes among transgender people with minimal cost to the State. Moreover, to the extent that appellants or amicus West Virginia are concerned that some treatments may be medically unnecessary or harmful (*see* W. Va. Br. at 21-23), they can tailor those concerns by denying coverage only for such care. But there is no justification for a blanket refusal to cover medically necessary, gender-affirming surgical care.

## CONCLUSION

The Court should affirm the decision below.

Dated:    New York, New York
          December 7, 2022

                                   Respectfully submitted,

                                   LETITIA JAMES
                                     *Attorney General*
                                     *State of New York*

                          By:    */s/ Daniel S. Magy*
                                 DANIEL S. MAGY
                                 Assistant Solicitor General

BARBARA D. UNDERWOOD              28 Liberty Street
  *Solicitor General*             New York, NY 10005
ESTER MURDUKHAYEVA                (212) 416-6073
  *Deputy Solicitor General*
DANIEL S. MAGY
  *Assistant Solicitor General*
       *of Counsel*


*(Counsel listing continues on the next page.)*

21

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King
  Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

SUSANNE R. YOUNG
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 4,082 words and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)-(7) and the corresponding local rules.

 /s/ *Kelly Cheung*