No. 22-1927

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

Christopher Fain; Shauntae Anderson,
*individually and on behalf of all others similarly situated*,

*Plaintiffs-Appellees,*

v.

William Crouch, *in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources*; Cynthia Beane, *in her official capacity as Commissioner for the West Virginia Bureau for Medical Services*; West Virginia Department of Health and Human Resources, Bureau for Medical Services,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of West Virginia at Huntington
Case No. 3:20-0740

## BRIEF OF *AMICI CURIAE* CONSTITUTIONAL LAW PROFESSORS IN SUPPORT OF APPELLEES AND IN SUPPORT OF AFFIRMANCE

Katie R. Eyer
Professor of Law
Rutgers Law School
217 North Fifth Street
Camden, NJ 08102
215-262-6554
katie.eyer@rutgers.edu

Kathleen Hartnett
COOLEY LLP
3 Embarcadero Center
20th Floor
San Francisco, CA 94111
415-693-2071
khartnett@cooley.com

Andrew Barr
COOLEY LLP
1144 15th Street, Ste. 2300
Denver, CO  80202
720-566-4121
abarr@cooley.com

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

**Page**

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ...............1

INTRODUCTION ..................................................................................................1

I.    The Exclusion at Issue Here Facially Discriminates on the Basis of Sex and Transgender Status.................................................................................2

II.   *Geduldig v. Aiello* Does Not Require This Court to Ignore the Facial Discrimination in this Case.....................................................................7

     A.    The Supreme Court's Decision in *Geduldig*. ........................................8

     B.    *Geduldig* Does Not Affect the Finding of Facial Discrimination in This Case. ...................................................................10

        1.    Unlike in *Geduldig*, the Exclusion Here Explicitly Classifies Based on Sex. ........................................................11

        2.    *Geduldig* Did Not Hold That Proxies Can Never Be Facially Discriminatory. .........................................................13

     C.    *Geduldig* Did Not Create a Special Rule for the Insurance Context. ........................................................................16

     D.    *Geduldig* Did Not Hold That Discrimination Affecting Only Part of a Protected Class Is Exempt From Heightened Scrutiny. ......20

     E.    Regardless Whether the Exclusion Facially Discriminates, the District Court's Ruling Should be Affirmed....................................22

III.   This Court's Opinion Will Have Substantial Implications. .........................24

CONCLUSION ....................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Peña,*
  515 U.S. 200 (1995)................................................................11, 21

*Bostock v. Clayton Cnty.,*
  140 S.Ct. 1731 (2020)...........................................................4, 5, 22

*Boyden v. Conlin,*
  341 F.Supp.3d 979 (W.D. Wis. 2018) ...................................6

*Brandt by & through Brandt v. Rutledge,*
  47 F.4th 661 (8th Cir. 2022) ..................................................6

*Bray v. Alexandria Women's Health Clinic,*
  506 U.S. 263 (1993).............................................................*passim*

*Califano v. Goldfarb,*
  430 U.S. 199 (1977)...............................................................18

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez,*
  561 U.S. 661 (2010).........................................................2, 4, 14

*City of Chicago v. Wilson,*
  389 N.E.2d 522 (Ill. 1978) ...................................................15

*City of L.A., Dep't of Water & Power v. Manhart,*
  435 U.S. 702 (1978)...........................................................13, 18

*De'Lonta v. Angelone,*
  330 F.3d 630 (4th Cir. 2003) .................................................19

*De'lonta v. Johnson,*
  708 F.3d 520 (4th Cir. 2013) .................................................19

*Dobbs v. Jackson Women's Health Org.,*
  142 S.Ct. 2228 (2022)......................................................16, 24, 25

*Doe v. Snyder,*
  28 F.4th 103 (9th Cir. 2022) .................................................7

# TABLE OF AUTHORITIES
## continued

**Page(s)**

*Eknes-Tucker v. Marshall*,
--- F.Supp.3d ----, 2022 WL 1521889 (M.D. Ala. May 13, 2022) ................ 6, 15

*Fain v. Crouch*,
--- F.Supp.3d ----, 2022 WL 3051015 (S.D. W. Va. Aug. 2, 2022) ........... *passim*

*Flack v. Wis. Dep't of Health Servs.*,
328 F.Supp.3d 931 (W.D. Wis. 2018) ................................................. 6

*Fletcher v. Alaska*,
443 F.Supp.3d 1024 (D. Alaska 2020) ............................................. 6

*Flowers v. Mississippi*,
139 S.Ct. 2228 (2019) ................................................................ 21

*Geduldig v. Aiello*,
417 U.S. 484 (1974) ............................................................. *passim*

*Gilbert v. Gen. Elec. Co.*,
519 F.2d 661 (4th Cir. 1975), *rev'd sub nom*, *Gen. Elec. Co. v.
Gilbert*, 429 U.S. 125 (1976) ...................................................... 10, 13

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) .................................................... 4

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ................................................... *passim*

*Guinn v. United States*,
238 U.S. 347 (1915) ................................................................ 25

*Johnson v. California*,
543 U.S. 499 (2005) .............................................................. 20, 22

*Kadel v. Folwell*,
--- F.Supp.3d ----, 2022 WL 3226731 (M.D.N.C. Aug. 10, 2022) ................ 6, 12

*Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*,
12 F.4th 422 (4th Cir. 2021) ..................................................... 3, 19

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ................................................... 16

# TABLE OF AUTHORITIES
### continued

**Page(s)**

*Lange v. Houston Cnty.*,
--- F.Supp.3d ----, 2022 WL 1812306 (M.D. Ga. June 2, 2022) ......................... 7

*Lange v. Houston Cnty.*,
499 F.Supp.3d 1258 (M.D. Ga. 2020) ................................................ 7

*Lawrence v. Texas*,
539 U.S. 558 (2003) ........................................................... 14

*Loving v. Virginia*,
388 U.S. 1 (1967) .............................................................. 7

*Nev. Dep't of Hum. Res. v. Hibbs*,
538 U.S. 721 (2003) ........................................................... 23

*Obergefell v. Hodges*,
576 U.S. 644 (2015) ........................................................... 15

*Peltier v. Charter Day Sch., Inc.*,
37 F.4th 104 (4th Cir. 2022) (en banc) .......................................... 22

*Phillips v. Martin Marietta Corp.*,
400 U.S. 542 (1971) (per curiam) ............................................... 21

*Rice v. Cayetano*,
528 U.S. 495 (2000) ........................................................... 14

*Sylvia Dev. Corp. v. Calvert Cnty.*,
48 F.3d 810 (4th Cir. 1995) ................................................. 11, 18

*Toomey v. Arizona*,
2020 WL 8459367 (D. Ariz. Nov. 30, 2020), *rejected in relevant
part* 2021 WL 753721 (D. Ariz. Feb. 26, 2021) .................................. 7

*United States v. Virginia*,
518 U.S. 515 (1996) ............................................................ 7

*Wengler v. Druggists Mut. Ins. Co.*,
446 U.S. 142 (1980) ........................................................... 18

*Williams v. Kincaid*,
45 F.4th 759 (4th Cir. 2022) ............................................ *passim*

# TABLE OF AUTHORITIES
## continued

**Page(s)**

**Other Authorities**

Fed. R. App. P. 29(a)(4)(E) .......................................................................1

Jennifer Levi & Kevin M. Barry, *Transgender Rights & the Eighth Amendment*, 95 S. Cal. L. Rev. 109 (2021) ......................................19

Justice William J. Brennan, Jr., Opinions of William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, October Term, 1973 (on file with the Library of Congress in William J. Brennan, Jr. Papers, Box II:6, Folder 17) ...........................................8

Justice Potter Stewart, Second Draft Opinion, *Geduldig v. Aiello* (May 15, 1974) (on file with Yale Manuscripts & Archives in Potter Stewart Papers, Box 93)........................................................................9

Katie Eyer, *Transgender Equality and* Geduldig *2.0*, Ariz. St. L. J. (forthcoming), available at https://ssrn.com/abstract=4240925 ......................7, 8

Michele Goodwin, *Fetal Protection Laws: Moral Panic and the New Constitutional Battlefront*, 102 Cal. L. Rev. 781 (2014)...................................23

Reva Siegel, Serena Mayeri & Melissa Murray, *Equal Protection in* Dobbs *and Beyond: How States Protect Life Inside and Outside of the Abortion Context*, 43 Colum. J. of Gender & the Law (forthcoming 2023), available at https://ssrn.com/abstract=4115569 ...........................................2, 8, 23

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are professors of constitutional law. (A list of signatories is attached as Addendum A.) Their interest in this case is the proper application of equal protection law. Although the *amici* differ in their views on many subjects, they agree that the Appellants' arguments here rest on an inaccurate understanding of the Equal Protection Clause, and must be rejected.

## INTRODUCTION

The Appellants argue that discrimination on the basis of "transsexual surgery"—the language of the exclusion at issue in this case—is not facial discrimination under the Equal Protection Clause. This argument is spurious. Government discrimination against "transsexual surgery" plainly facially discriminates on the basis of both transgender status and sex, and thus must be subjected to intermediate scrutiny. Moreover, Appellants' argument that they administer the exclusion on the basis of "gender dysphoria" is itself an admission that they discriminate on the basis of sex and transgender status.

*Geduldig v. Aiello*, 417 U.S. 484 (1974), does not require this Court to abandon this common-sense conclusion.[2] *Geduldig* held that pregnancy

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* declare that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person—other than the *amici* or its counsel—contributed money that was intended to fund preparing or submitting this brief.

discrimination is not facially and categorically sex discrimination. It did not hold that explicitly sex-based provisions must be treated as something other than facial discrimination. So too, *Geduldig* did not preclude close proxies for a subordinated status from being deemed facially discriminatory. *See, e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993); *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 689 (2010). Nor did *Geduldig* adopt any of the other far-reaching propositions that Appellants attribute to it here.

Because the exclusion challenged here is facially discriminatory based on sex and transgender status, and because *Geduldig* does not alter the ordinary equal protection rules for identifying facial discrimination, this Court should reject Appellants' arguments.

## I.    The Exclusion at Issue Here Facially Discriminates on the Basis of Sex and Transgender Status.

The exclusion at issue in this case prohibits coverage for "transsexual surgery," regardless of medical necessity.[3] *Fain*, 2022 WL 3051015, at *3 (quoting

---

[2] There are important arguments in the legal scholarship that *Geduldig* has been superseded by subsequent constitutional sex discrimination precedents. *See, e.g.*, Reva Siegel, Serena Mayeri & Melissa Murray, *Equal Protection in* Dobbs *and Beyond: How States Protect Life Inside and Outside of the Abortion Context*, 43 Colum. J. of Gender & the Law (forthcoming 2023), available at https://ssrn.com/abstract=4115569. Because *Geduldig* is inapplicable to the instant case even assuming it wholly remains good law, amici do not take up these arguments herein. In so doing, amici do not imply any views on whether such arguments ought to prevail elsewhere.

[3] West Virginia uses a management tool called Kepro to determine medical necessity. Because of the categorical exclusion in this case, West Virginia does not follow the Kepro medical necessity guidelines for surgical care of gender

Plan exclusion). Thus, the question for this Court is whether discrimination against "transsexual surgery" is facial discrimination on the basis of transgender status or sex, triggering intermediate equal protection scrutiny. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607-11 (4th Cir. 2020) (holding that discrimination on the basis of sex and transgender status each independently require heightened equal-protection scrutiny). Because the answer to this question is yes, this Court should reject the Appellants' arguments to the contrary.

As an initial matter, discrimination against "transsexual surgery" is, on its face, discrimination on the basis of transgender status. As the District Court observed in this case, "[o]nly individuals who identify as transgender would seek transsexual surgery." *Fain*, 2022 WL 3051015, at *8 (internal quotation marks omitted). And for those who undergo such surgical procedures, "transsexual surgeries" are a core, and medically necessary, aspect of effectuating their transgender identity. *See Grimm*, 972 F.3d at 594 (describing transgender people as those who "express a gender that, on a binary, we would think of as opposite to their assigned sex."); *see also Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 427-28 (4th Cir. 2021) (acknowledging that gender-affirming surgical care "can be a critical part of transitioning," and that such surgeries are "safe, effective, and often medically necessary" (internal quotation marks and

---

dysphoria. *See Fain v. Crouch*, --- F.Supp.3d ----, 2022 WL 3051015, at *3 (S.D. W. Va. Aug. 2, 2022).

citation omitted)). Thus, discrimination against "transsexual surgery" facially discriminates on the basis of transgender status. *See, e.g.*, *Bray*, 506 U.S. at 270 ("A tax on wearing yarmulkes is a tax on Jews."); *Christian Legal Soc'y*, 561 U.S. at 689 (relying on *Bray* to "decline[] to distinguish between status and conduct" in the context of sexual orientation discrimination); *see also Grimm*, 972 F.3d at 599, 609-10 (treating policy discriminating on the basis of "gender identity issues" as facially discriminatory on the basis of transgender status); *Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022) (suggesting that a statute excluding gender dysphoria from coverage would be facially discriminatory against transgender people "as a class").

Discrimination with respect to "transsexual surgery" also facially discriminates on the basis of sex.[4] By definition, the question of whether a given surgical procedure is a disfavored "transsexual surgery" can only be undertaken by reference to the person's sex assigned at birth. *See Grimm*, 972 F.3d at 608 (finding policy that required students to use restroom consistent with their sex assigned at birth to be facial sex discrimination). Thus, for example, the same procedure that would not be considered an excluded "transsexual surgery" for a

---

[4] It is impossible to discriminate on the basis of transgender status without also discriminating on the basis of sex. *See, e.g.*, *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1741-42 (2020); *Glenn v. Brumby*, 663 F.3d 1312, 1316-17 (11th Cir. 2011). Thus, while amici separately analyze the issue of facial sex discrimination, this conclusion also follows inescapably from the conclusion that the provision facially discriminates based on transgender status.

person assigned female at birth (such as a medically necessary vaginoplasty) would be considered an excluded "transsexual surgery" procedure for a person assigned male at birth. *See* JA304 (Defendant's Response to Plaintiffs' First Set of Requests for Admissions); *see also Bostock*, 140 S.Ct. at 1741-42 (discrimination against a person identified male at birth on the basis of "traits or actions that [an employer] tolerates in [a person] identified as female at birth" necessarily constitutes sex discrimination). The provision also on its face enforces sex stereotypes (by prohibiting only surgical procedures that are intended to lead to non-conformity with sex assigned at birth), something this Court has found independently justifies a conclusion that government action discriminates on the basis of sex. *See Grimm*, 972 F.3d at 608-09.

Finally, it is undisputed that—as the exclusion is administered—it is exclusively applied to disallow surgical procedures required by virtue of an individual's gender dysphoria diagnosis. *See Fain*, 2022 WL 3051015, at \*1 (noting that "it is undisputed" in this litigation that coverage for "the same or similar surgical treatments" is determined based on whether they are necessitated by an individual's gender dysphoria diagnosis, or some other diagnosis); *see also* Br. of Appellants at 20-22, 31 (describing those who seek surgery pursuant to a gender dysphoria diagnosis as the disfavored group under the exclusion). As this Court has observed, gender dysphoria is "very 'closely connected to transgender

identity.'" *Williams*, 45 F.4th at 772 (citations omitted). As such, this Court has suggested that discrimination on the basis of gender dysphoria "would discriminate against transgender people as a class[.]" *Id.* In addition, gender dysphoria itself— "clinically significant distress and anxiety resulting from incongruence between an individual's gender identity and birth-assigned sex"—is a condition that is facially sex-based.[5] *See Kadel v. Folwell*, --- F.Supp.3d ----, 2022 WL 3226731, at *4 (M.D.N.C. Aug. 10, 2022) (citation omitted). Thus, Appellants' acknowledgment that the exclusion is administered on the basis of gender dysphoria is an independent basis for affirming the District Court's conclusion that heightened scrutiny applies.

Given the straightforward nature of this reasoning, it is unsurprising that courts around the country have—with virtual unanimity—concluded that similar provisions are facially discriminatory based on sex and transgender status. *See, e.g.*, *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 669-70 (8th Cir. 2022); *Fain*, 2022 WL 3051015, at *7-8; *Boyden v. Conlin*, 341 F.Supp.3d 979, 995-96 (W.D. Wis. 2018); *Eknes-Tucker v. Marshall*, --- F.Supp.3d ----, 2022 WL 1521889, at *9-10 (M.D. Ala. May 13, 2022); *Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931, 948-52 (W.D. Wis. 2018); *Fletcher v. Alaska*, 443 F.Supp.3d

---

[5] A person assigned female at birth would not be diagnosed with gender dysphoria if they had a "clinically significant" level of anxiety and distress surrounding their lack of stereotypically *female* bodily features.

6

1024, 1030 (D. Alaska 2020) (Title VII); *see also Doe v. Snyder*, 28 F.4th 103, 113 (9th Cir. 2022) (suggesting that the District Court erred in finding exclusion to be non-discriminatory).[6]

## II.   *Geduldig v. Aiello* **Does Not Require This Court to Ignore the Facial Discrimination in this Case.**

Appellants offer little in the way of meaningful arguments to rebut the obvious facial discrimination in this case. Instead, they rely on a novel and legally erroneous reading of *Geduldig v. Aiello*, 417 U.S. 484 (1974), to argue that this Court is precluded from finding facial discrimination here.[7] *See* Br. of Appellants

---

[6] *Lange v. Houston Cnty.*, 499 F.Supp.3d 1258, 1275 (M.D. Ga. 2020) is, as far as amici are aware, the only case *ever* to reach the conclusion that the type of exclusion at issue in this case is not facially discriminatory based on sex and/or transgender status under the Equal Protection Clause. The *Lange* court, like Appellants here, relied on a misreading of *Geduldig* to reach this conclusion. *See infra* Part II (explaining the errors in this reasoning). Nevertheless, the *Lange* court did properly conclude in subsequent proceedings that the provision facially discriminated on the basis of sex under Title VII and that it was likely intentionally discriminatory as a matter of equal protection law. *See Lange v. Houston Cnty.*, --- F.Supp.3d ----, 2022 WL 1812306, at *9-14 (M.D. Ga. June 2, 2022). The only other decision cited by defendants on this issue is a Magistrate Report and Recommendation which was rejected in relevant part by the District Judge. *See Toomey v. Arizona*, 2020 WL 8459367, at *5 (D. Ariz. Nov. 30, 2020), *rejected in relevant part* 2021 WL 753721, at *6 (D. Ariz. Feb. 26, 2021). The rejected Report and Recommendation relied on the same erroneous reading of *Geduldig* (and its progeny, *Gilbert*), addressed herein. *See Toomey*, 2020 WL 8459367, at *2-3, *5.

[7] Appellants also suggest that Plaintiffs are required to point to a similarly situated comparator to trigger heightened equal protection scrutiny, even where a provision is facially discriminatory. *See* Br. of Appellants at 20-24. In the interest of space, amici do not fully address this argument, but simply observe that Appellants' purported requirement makes no sense in the context of facial discrimination (since the similarly situated construct is a way of proving non-facial discrimination) and is unsupported by Supreme Court precedent. *See, e.g., United States v. Virginia*, 518 U.S. 515, 531-34 (1996) (in the context of facial discrimination, proceeding to the applicable level of scrutiny without any similarly situated inquiry); *Loving v. Virginia*, 388 U.S. 1, 7-11 (1967) (same); *see generally* Katie Eyer, *Transgender Constitutional Law*, 171 U. Penn L. Rev. at 79-83 (forthcoming), *available at*

at 24-29. Because these arguments rest on an erroneous understanding of *Geduldig*, they must be rejected. *See* Katie Eyer, *Transgender Equality and* Geduldig *2.0*, Ariz. St. L. J. (forthcoming), available at https://ssrn.com/abstract=4240925.

### A.    The Supreme Court's Decision in *Geduldig*.

*Geduldig v. Aiello*, <u>417 U.S. 484</u> (1974), presented the question of whether the exclusion of pregnancy from a state disability program violated the Equal Protection Clause. At that time, the Court had not yet recognized that sex discrimination should receive heightened scrutiny under the Equal Protection Clause. *See, e.g.*, Siegel, *et al.*, *Equal Protection in* Dobbs *and Beyond*, *supra* note 2, at 6. Nor had the Court held that pregnancy discrimination ought to be treated as sex discrimination as such. The plaintiffs in the case thus faced the dual burden of persuading the Court that pregnancy discrimination was sex discrimination and that sex discrimination generally merited heightened scrutiny.

As internal archival records reflect, a majority of the Court was unpersuaded on either front. *See* Justice William J. Brennan, Jr., Opinions of William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, October Term, 1973, at XVIII-XX (on file with the Library of Congress in William J. Brennan, Jr. Papers, Box II:6, Folder 17). Indeed, the initial draft opinion for the

---

https://ssrn.com/abstract=4173202 (reviewing the ways that the "similarly situated" construct is still used in equal protection doctrine, none of which apply here).

majority in *Geduldig* did not even address the Plaintiff's contention that pregnancy

discrimination ought to be treated as sex discrimination. *See* Justice Potter Stewart,

Second Draft Opinion at 1-12, *Geduldig v. Aiello* (May 15, 1974) (on file with

Yale Manuscripts & Archives in Potter Stewart Papers, Box 93). Ultimately, in

response to Justice Brennan's dissent, a footnote was added to the majority opinion

addressing the pregnancy discrimination argument. *See Geduldig*, <u>417 U.S. at 496</u>

n.20. Thus, the Court's full analysis of the issue was as follows:

> The dissenting opinion to the contrary, this case is thus a far cry from
> cases like *Reed v. Reed* and *Frontiero v. Richardson*, involving
> discrimination based upon gender as such. The California insurance
> program does not exclude anyone from benefit eligibility because of
> gender but merely removes one physical condition—pregnancy—
> from the list of compensable disabilities. While it is true that only
> women can become pregnant, it does not follow that every legislative
> classification concerning pregnancy is a sex-based classification like
> those considered in *Reed*, *supra* and *Frontiero*, *supra*. Normal
> pregnancy is an objectively identifiable physical condition with
> unique characteristics. Absent a showing that distinctions involving
> pregnancy are mere pretexts designed to effect an invidious
> discrimination against the members of one sex or the other,
> lawmakers are constitutionally free to include or exclude pregnancy
> from the coverage of legislation such as this on any reasonable basis,
> just as with respect to any other physical condition.
>
> The lack of identity between the excluded disability and gender as
> such under this insurance program becomes clear upon the most
> cursory analysis. The program divides potential recipients into two
> groups—pregnant women and nonpregnant persons. While the first
> group is exclusively female, the second includes members of both

sexes. The fiscal and actuarial benefits of the program thus accrue to members of both sexes.[8]

*Id.* (internal citations omitted).

Given the Court's cursory treatment of whether pregnancy discrimination should be deemed sex discrimination, and the unsettled nature of heightened scrutiny for sex in general at the time, confusion existed in the immediate aftermath of *Geduldig* as to the basis for the Court's opinion. *See, e.g.*, *Gilbert v. Gen. Elec. Co.*, 519 F.2d 661, 666-67 (4th Cir. 1975) (reading *Geduldig* as holding that the exclusion was sex discrimination, but that it survived rational basis review), *rev'd sub nom*, *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976) ("*Gilbert*"). But the Supreme Court's subsequent cases have treated *Geduldig* as standing for the proposition that pregnancy discrimination is not, on its face, categorically sex discrimination. *See, e.g.*, *Gilbert*, 429 U.S. at 135; *Bray*, 506 U.S. at 271-74.

### B.    *Geduldig* Does Not Affect the Finding of Facial Discrimination in This Case.

Under the Equal Protection Clause, there are two ways of establishing facial discrimination. Most obviously, where a provision explicitly classifies on the basis

---

[8] Having concluded that pregnancy discrimination itself was not in this instance sex discrimination, the Court also observed in the main text of the opinion that "[t]here is no evidence in the record that the selection of the risks insured by the program worked to discriminate against any definable group or class …. There is no risk from which men are protected and women are not." *Id.* at 496-97.

10

of protected class status, it will be deemed facially discriminatory.[9] *See, e.g.*, *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 213 (1995). So too, where the government relies upon a sufficiently close proxy for a protected class status, this will be deemed facially discriminatory. *See, e.g.*, *Bray*, 506 U.S. at 271-72.[10] Both of these ways of establishing facial discrimination are at issue here, and neither are superseded by *Geduldig*.[11]

### 1. Unlike in *Geduldig*, the Exclusion Here Explicitly Classifies Based on Sex.

It is obvious, but is worth stressing in view of Appellants' arguments here, that the first method of establishing facial discrimination—explicit classification—was not at issue in *Geduldig*. The provision at issue in *Geduldig* did *not* explicitly rely on sex or any other protected class status. *Geduldig*, 417 U.S. at 489. Rather the provision referred only to pregnancy, a status the Court then understood to be

---

[9] Amici use the term "protected class" as shorthand for groups defined by classifications (such as sex, race, or in this circuit, transgender status) subject to more than ordinary rational basis review.

[10] Where a facially neutral provision is administered in a way that explicitly classifies based on a protected characteristic, or a close proxy for that characteristic, this also will be deemed facially discriminatory. *See, e.g.*, *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 (4th Cir. 1995). This is not truly a distinctive way of establishing facial discrimination, but rather simply an acknowledgment that explicit classification or use of close proxies in administration is equally susceptible of a facial discrimination analysis.

[11] There are numerous other ways that a provision could be found to be discriminatory, and thus trigger heightened scrutiny, even if it is not deemed facially discriminatory, many of which are also implicated in this case. *See* Part II.D., *infra*.

distinct from sex.[12] *Id.*; *see also Kadel*, 2022 WL 3226731, at *21 & n.7. The Court in *Geduldig* thus did not have the occasion to address—and certainly did not hold—that explicit discrimination based on a protected characteristic should be treated as not facially discriminatory.

Thus, *Geduldig* has no relevance to this Court's evaluation of the explicit sex-based classification at issue in this case. As explained above, *see supra* Part I, the exclusion challenged here—of all "transsexual surgeries"—is an expressly sex-based classification. Contrary to Appellants' argument, the exclusion does not merely reference sex, it engages in facial classification on the basis of sex by making eligibility for benefits turn on the sex assigned at birth of the person seeking the procedure.[13] *See, e.g.*, *Grimm*, 972 F.3d at 608 ("[W]hen a School District decides what bathroom a student may use based upon the sex listed on the student's birth certificate, the policy necessarily rests on a sex classification" (internal quotation marks and citation omitted)). The exclusion also explicitly and facially enforces conformity to gender stereotypes. *See id.* at 608-09 (finding

---

[12] Although this may seem overly formalistic, it was in fact the core holding of *Geduldig*. *See id.*, 417 U.S. at 496 n.20 (holding that pregnancy exclusion was not categorical facial discrimination on the basis of sex and characterizing pregnancy as "an objectively identifiable physical condition with unique characteristics").

[13] The same is true to the extent the Appellants discriminate on the basis of gender dysphoria in administering the program. As explained *supra* note 5 and accompanying text, gender dysphoria is itself an explicitly sex-dependent diagnosis.

provision to be sex discriminatory where the manner in which it was enforced was based on sex stereotypes).

It would turn *Geduldig* on its head to treat it as a basis for ignoring explicit facial discrimination, as opposed to a limitation on where proxies should be deemed facially discriminatory. *Cf. City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 714-15 (1978) (rejecting the argument that *Geduldig*, or its progeny, *Gilbert*, was controlling where an insurance plan "[o]n its face … discriminate[d] on the basis of sex" as opposed to "discriminat[ing] on the basis of a special physical disability"). For this reason alone, this Court can (and should) reject Appellants' argument that the District Court erred in applying intermediate scrutiny.

> **2.    *Geduldig* Did Not Hold That Proxies Can Never Be Facially Discriminatory.**

The provision at issue in *Geduldig did* rely on a status (*i.e.*, pregnancy) that some believed (and many continue to believe) is a sufficiently close proxy for sex to be deemed facially and categorically sex-based. That argument—that pregnancy discrimination is facially and categorically sex discrimination—was, however, rejected in *Geduldig*, and in subsequent cases construing *Geduldig*. *See, e.g.*, *Geduldig*, 417 U.S. at 496 n.20; *Gilbert*, 429 U.S. at 135; *Bray*, 506 U.S. at 271-74.

Importantly, however, the Court did not conclude in *Geduldig* that proxies may *never* be categorically facially discriminatory—only that pregnancy was not. *Geduldig*, 417 U.S. at 496 n.20; *see also Bray*, 506 U.S. at 271 (in discussing *Geduldig*, observing that there may nevertheless be some classifications that are so closely linked to a protected status as to be deemed discriminatory without further inquiry). And indeed, both this Court and the Supreme Court have continued to treat close proxies for status—including close proxies for transgender status—as facially discriminatory even after *Geduldig*. *See*, *e.g.*, *Christian Legal Soc'y*, 561 U.S. at 689 (observing that "[o]ur decisions have declined to distinguish between status and conduct" in the context of sexual orientation discrimination); *Rice v. Cayetano*, 528 U.S. 495, 514 (2000) (treating ancestry discrimination as facial race discrimination, where ancestry was a proxy for race); *Bray*, 506 U.S. at 270 ("A tax on wearing yarmulkes is a tax on Jews."); *Grimm*, 972 F.3d at 599, 609-10 (treating policy discriminating on the basis of "gender identity issues" as facially discriminatory on the basis of transgender status); *Williams*, 45 F.4th at 772 (suggesting that a statute excluding gender dysphoria from coverage would be facially discriminatory against transgender people "as a class").[14]

---

[14] For other cases in which the Supreme Court has declined to distinguish between proxies for sexual orientation, and sexual orientation itself, *see, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (observing that "[w]hen homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination[.]" (emphasis added)); *Id.* at 583 (O'Connor, J., concurring in judgment) ("While it is true that the law

The instant case involves precisely the type of close proxies that the courts have deemed facially discriminatory, notwithstanding *Geduldig*. Both "transsexual surgery" and "gender dysphoria" are so intimately related to transgender status as to be virtually indistinguishable from such status. Incongruity between sex assigned at birth and an individual's gender identity and/or presentation lies at the very heart of transgender status. *See, e.g.*, *Grimm*, <u>972 F.3d at 594</u>. "Gender dysphoria" and "transsexual surger[ies]" are not distinct from this defining characteristic of transgender status, they are simply the medical terms relied on to refer to that incongruity, and the surgical procedures used to treat it. *See, e.g.*, *Williams*, <u>45 F.4th at 759</u>; *Fain*, <u>2022 WL 3051015</u>, at \*8; *Eknes-Tucker*, <u>2022 WL 1521889</u>, at \*10.

Indeed, considering the implications of Appellants' argument for other equal protection contexts, such as public employment, or criminal law, makes clear how erroneous that argument is. Would this Court find that a law criminalizing those who undergo "transsexual surgery" was not facially discriminatory based on transgender status? *Cf. City of Chicago v. Wilson*, <u>389 N.E.2d 522, 529</u> (Ill. 1978) (striking down criminal law targeting "appear[ing] in a public place . . . in a dress

---

applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances [the] law is targeted at … gay persons as a class."); *Obergefell v. Hodges*, <u>576 U.S. 644, 670</u> (2015) (state provisions disallowing marriage by same-sex couples "demean[] gays and lesbians" and "teach[] that gays and lesbians are unequal in important respects").

not belonging to his or her sex" as applied to transgender plaintiff). Or that a blanket ban on hiring those who have "gender dysphoria" did not so discriminate? *Cf. Karnoski v. Trump*, 926 F.3d 1180, 1191 (9th Cir. 2019) (describing the second version of transgender military ban, which relied on a gender dysphoria diagnosis as a disqualifier). As *Geduldig* and its progeny make clear, unless this Court is prepared to answer these questions in the affirmative, it must find facial discrimination in the instant case. *See, e.g.*, *Bray*, 506 U.S. at 271-74 (applying *Geduldig* to preclude a § 1985(3) conspiracy claim based on obstruction of access to abortion); *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228, 2245-46 (2022) (in dicta, suggesting that *Geduldig* applies to the criminal regulation of pregnancy).[15]

## C.   *Geduldig* Did Not Create a Special Rule for the Insurance Context.

In arguing that *Geduldig* ought to be controlling here, Appellants imply— though they nowhere clearly state—that because this case involves the *content* of insurance benefits, it cannot involve facial discrimination. Br. of Appellants at 16,

---

[15] There was no equal protection claim in *Dobbs* and thus the Supreme Court's discussion of *Geduldig* in *Dobbs* is dicta. As referenced *supra* note 2, there are strong arguments that this dicta is erroneous. Nevertheless, *Dobbs*' dicta illustrates the potential for *Geduldig*'s reasoning regarding facial classifications to be extended even to the criminal law context. Thus, should this Court conclude that discrimination against "transsexual surgery" or "gender dysphoria" is not facial discrimination in the instant context, that ruling could potentially reach many other types of anti-transgender discrimination, far outside of the insurance context. *See* Part III, *infra*.

26-29. In so doing, Appellants rely on *Geduldig*'s language stating that the Defendant at issue there did "not discriminate with respect to the persons or groups who are eligible for disability insurance protection under the program" to seemingly suggest that discrimination in the insurance benefits context can never trigger heightened scrutiny, so long as all groups receive the same benefits package. Br. of Appellants at 27 (quoting *Geduldig*, 417 U.S. at 494). Appellants' novel reading of this language in *Geduldig* is unsupported and must be rejected.

As an initial matter, Appellants misperceive the significance of the language they quote from *Geduldig*. That language was not targeted at the pregnancy exclusion, but rather simply ruled out *another* theoretical way of proving sex discrimination. *See Geduldig*, 417 U.S. at 494 (in the immediately following sentence, observing that "[t]he classification challenged in this case relates to the asserted underinclusiveness of the set of risks that the State has selected insure."). Of course, had the Plan at issue in *Geduldig* afforded a different package of benefits to men and to women, that *independently* would have established facial sex discrimination. This passage in *Geduldig* simply recognized that this *other* way of proving sex discrimination was not applicable on the facts.

But *Geduldig* did not hold—and as far as amici are aware, no court has *ever* held—that discrimination in the *content* of a benefits plan cannot trigger heightened equal protection scrutiny (even where the same benefits plan is given to

17

all).[16] Indeed *Geduldig* itself held directly to the contrary, by recognizing that pregnancy benefits exclusions that were shown to be intentionally discriminatory would be subject to sex discrimination standards. *Geduldig*, <u>417 U.S. at 496</u> n.20. As such, even Appellants agree that if the exclusion in this case is found to be intentionally discriminatory, intermediate scrutiny would apply. Br. of Appellants at 16 (arguing that the District Court erroneously did not require the plaintiffs to prove intent, but apparently agreeing that the exclusion would be subject to heightened scrutiny if intent were proven). But intent and facial classification are simply alternative ways of establishing discrimination. *See, e.g.*, *Sylvia Dev. Corp.*, <u>48 F.3d at 819</u>. Thus, the Appellants' concession that this Court would properly apply heightened scrutiny if the coverage exclusion at issue here were shown to be intentionally discriminatory is fatal to Appellants' argument on this front.

Nor is it the case, as Appellants seem to imply, that benefits exclusions by definition cannot be facially discriminatory. Indeed, the exclusion at issue in this case is plainly facially discriminatory. *See supra* Part I. And it is easy to imagine other facially discriminatory benefits exclusions, such as, for example, an exclusion on coverage for cross-racial fertility services, or on hospital charges for

---

[16] To the extent that Appellants seek to make a broader claim—that discrimination in the benefits or insurance context is, as a general matter, exempt from the normal rules of equal protection doctrine—this argument is clearly foreclosed by Supreme Court precedent. *See, e.g.*, *Califano v. Goldfarb*, <u>430 U.S. 199, 216-17</u> (1977); *Wengler v. Druggists Mut. Ins. Co.*, <u>446 U.S. 142, 150-52</u> (1980); *see also Manhart*, <u>435 U.S. at 714-15</u> (same, under Title VII).

"interracial" pregnancies. In these instances, the insurance policy would "not discriminate with respect to the persons or groups which are eligible for … protection under the program," but rather in the content of benefits. *Geduldig*, 417 U.S. at 494. Nevertheless, the underlying exclusions are plainly facially discriminatory, and would be subject to heightened scrutiny review, even if all members received the same package of benefits.

Finally, while not necessary to sustain a determination of facial discrimination, it is worth noting that facially discriminatory benefits exclusions like those at issue here often arise from the same discriminatory biases that infect other types of discrimination. As decisions of this Court and others reflect, it has long been the practice to deny transgender people transition-related medical coverage, and access to transition-related care, based on false perceptions that being transgender is a choice, and that medically necessary gender-affirming care is simply "cosmetic" or "experimental." *See, e.g.*, *De'Lonta v. Angelone*, 330 F.3d 630, 635-36 (4th Cir. 2003); *De'lonta v. Johnson*, 708 F.3d 520, 522-23, 525-26 (4th Cir. 2013); *see also Kadel*, 12 F.4th at 427-28 (observing that the gender-affirming procedures like those at issue in this case "are not cosmetic, elective, or experimental. Rather, they are safe, effective, and often medically necessary" (internal quotation marks and citation omitted)); Jennifer Levi & Kevin M. Barry, *Transgender Rights & the Eighth Amendment*, 95 S. Cal. L. Rev. 109, 120-22, 148-

53, 155-56 (2021) (describing the modern medical and legal consensus that gender affirming care "is neither experimental nor cosmetic"). As Appellants' briefing reflects, the exclusion in the instant case is undergirded by similar biases. *See* Br. of Appellants at 35, 43. Thus, just as heightened scrutiny is important in other contexts to ensure that group-based biases are not the basis for facial discrimination, so too it is necessary here. *See, e.g.*, *Johnson v. California*, 543 U.S. 499, 506 (2005) (holding that the use of racial classifications, even in the prison context, was subject to strict scrutiny to "smoke out" illegitimate uses of race (citation omitted)).

### D.  *Geduldig* Did Not Hold That Discrimination Affecting Only Part of a Protected Class Is Exempt From Heightened Scrutiny.

Appellants' final argument based on *Geduldig* rests on language from the opinion observing that:

> The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes.

*Geduldig*, 417 U.S. at 496 n.20. Because, Appellants suggest, not all transgender people are diagnosed with gender dysphoria, or seek out "transsexual surgery," there are members of "both classes" (*i.e.*, transgender people and non-transgender people) who fall in the group of those who are not affected by the exclusion. Br. of

Appellants at 28-29. Appellants thus suggest (though they do not expressly argue) that *Geduldig* requires discrimination to categorically affect all members of a group in order to be deemed discriminatory.

To the extent this is Appellants' argument, it is plainly incorrect. Neither at the time that *Geduldig* was decided, nor today, must all members of a protected group be affected by discrimination for a challenged practice to be unconstitutional. Indeed, the Supreme Court has held that the right to be free from disparate treatment under the Equal Protection Clause is a "personal" right (not one decided by reference to overall treatment of groups), *see Adarand*, 515 U.S. at 227, 230, and that "even a single instance of [protected class] discrimination" must be evaluated under the relevant equal protection strictures, *Flowers v. Mississippi*, 139 S.Ct. 2228, 2242 (2019); *see also Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 543-44 (1971) (per curiam) (holding that policy discriminating against a sub-class of women, mothers, was sex discrimination under Title VII).

Notably, defendants address this part of their argument only to the District Court's conclusion that the exclusion facially discriminates on the basis of transgender status, not to its holding that it discriminates on the basis of sex, and thus appear to have waived any argument that the fact that both men and women are affected by the exclusion renders it non-discriminatory with respect to sex. Nonetheless, amici observe that any such argument, if properly raised, would be

meritless. Both this Court and the Supreme Court have recognized that the "equal application" of a facially discriminatory provision does not render it facially neutral. *See, e.g.*, *Johnson*, 543 U.S. at 506; *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 125 (4th Cir. 2022) (en banc) ("A state actor's imposition of gender-based restrictions on one sex is not a defense to that actor's gender-based discrimination against another sex."). Such equal discrimination does not eliminate the existence of protected class-based discrimination, it "doubles it." *Bostock*, 140 S.Ct. at 1741. As such, arguments that facial discrimination cannot exist here because the exclusion does not implicate all members of the transgender community—or because the discrimination equally affects those assigned male and female at birth—are erroneous.

### E.    Regardless Whether the Exclusion Facially Discriminates, the District Court's Ruling Should be Affirmed.

For all of the above reasons, the exclusion at issue in this case is facially discriminatory, and *Geduldig* does not require a contrary conclusion. But even if this Court were to accept Appellants' arguments that this case is analogous to *Geduldig*, it should *still* affirm the District Court. *Geduldig* did not hold that pregnancy discrimination can *never* be deemed sex discrimination. On the contrary, *Geduldig* held that pregnancy discrimination must be deemed sex discrimination where it serves as a "pretext[] designed to effect an invidious discrimination against the members of one sex or the other[.]" *Geduldig*, 417 U.S.

at 496 n.20. And subsequent Supreme Court cases have also recognized that pregnancy discrimination that arises from or reinforces gender stereotypes, or that is applied unequally to a protected group, is sex discrimination triggering heightened scrutiny. *See, e.g.*, *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 736 (2003); *see also* Siegel, *et al.*, *Equal Protection in* Dobbs *and Beyond*, *supra*; Michele Goodwin, *Fetal Protection Laws: Moral Panic and the New Constitutional Battlefront*, 102 Cal. L. Rev. 781, 857-59, 868-73 (2014).

In the instant case, all of these ways of proving discrimination are applicable, even if this Court concludes that the exclusion is not categorically facially discriminatory. As Appellees describe in their brief, the record establishes that the exclusion was intentionally—not incidentally—discriminatory against transgender people. *See* Br. of Appellees at 31-38. And the exclusion directly enforces gender stereotypes, by denying coverage only for those procedures that produce gendered results that are inconsistent with sex assigned at birth. *See supra* at 5. Finally, as observed, *supra*, the exclusion necessarily denies coverage for procedures for those assigned male at birth that would be approved for those assigned female—and vice versa. *See supra* at 4-5. Thus, regardless of whether the exclusion here is deemed facially discriminatory, this Court should affirm the District Court's holding that the exclusion discriminates on the basis of sex and transgender status.

## III.   This Court's Opinion Will Have Substantial Implications.

Appellants' arguments that *Geduldig* precludes a finding of facial discrimination may seem unimportant here, given that alternative bases exist in this case for finding discrimination. *See supra* Part II.E. But Appellants' arguments are in fact sweeping in their implications. Amici thus conclude by briefly stressing the importance of this Court recognizing that the exclusion at issue in this case is *facially* discriminatory.

As described above, *Geduldig*'s holding—that pregnancy discrimination is not facially and categorically sex discrimination—was initially decided in the context of insurance. But it was later extended by the Court to other contexts, including, most recently in dicta to the criminal regulation of pregnancy. *See, e.g.*, *Bray*, 506 U.S. at 271-74; *Dobbs*, 142 S.Ct. at 2245-46 (dicta). Thus, whatever this Court decides in this case is virtually assured to be applied in other contexts. These contexts could include all of the diverse arenas in which the transgender community faces discrimination, including those that this Court has recently found to be facially discriminatory. *See, e.g.*, *Grimm*, 972 F.3d at 608-10; *see also* *Williams*, 45 F.4th at 772.

In the instant case, where intentional discrimination also exists, the decision whether to find facial discrimination, in particular, may seem of little moment. But the reality is that matters deeply. As the experience of pregnancy discrimination

shows, if a classification is not deemed facially discriminatory, government entities are likely to continue to feel at liberty to use it as a basis for discrimination—and are likely to in fact avoid heightened scrutiny in many contexts when they do. *See, e.g.*, *Bray*, 506 U.S. at 271-74; *Dobbs*, 142 S.Ct. at 2245-46 (dicta).

This Court should not permit government entities to so easily evade its holdings. *Cf. Guinn v. United States*, 238 U.S. 347, 364-65 (1915) (striking down "Grandfather Clause" provision as a transparent proxy for race). Under Appellants' argument, government actors could simply substitute virtual synonyms for the word "transgender"—or employ other transparent evasions such as prohibiting "cross-sex" behavior or dress—and have those policies be deemed facially neutral. Whether or not plaintiffs could successfully make the more difficult and fact-intensive showing of intent in such cases, they should not need to. This Court should reject Appellants' transparent attempt to undermine this Court's precedents, and find the exclusion at issue here to be facially discriminatory.

## CONCLUSION

The District Court correctly concluded that the provision at issue in this case is facially discriminatory on the basis of sex and transgender status. Nothing in the Supreme Court's opinion in *Geduldig v. Aiello* is to the contrary. Amici urge this Court to affirm the District Court's holding that the provision is subject to intermediate scrutiny under the Equal Protection Clause.

Dated:        December 7, 2022        /s/ Kathleen Hartnett

Kathleen Hartnett
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
415-693-2071
khartnett@cooley.com

Katie R. Eyer
Professor of Law
Rutgers Law School
217 North Fifth Street
Camden, NJ 08102
215-262-6554
katie.eyer@rutgers.edu

Andrew Barr
COOLEY LLP
1144 15th Street, Ste. 2300
Denver, CO  80202
720-566-4121
abarr@cooley.com

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,493 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated:        December 7, 2022        /s/ Kathleen Hartnett

_Attorney for Amici Curiae_

## CERTIFICATE OF SERVICE

I certify that on December 7, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated:        December 7, 2022        /s/ Kathleen Hartnett

*Attorney for Amici Curiae*

# ADDENDUM A

## List of Signatories[*]

Carlos A. Ball, Distinguished Professor of Law and Judge Frederick Lacey Scholar, Rutgers Law School

Kevin M. Barry, Interim Dean and Professor of Law, Quinnipiac University School of Law

Courtney Cahill, Professor of Law, UCI Law

Erwin Chemerinsky, Dean and Jesse H. Choper Distinguished Professor of Law, Berkeley Law

David B. Cruz, Newton Professor of Constitutional Law, University of Southern California Gould School of Law

Deborah Dinner, Professor of Law, Cornell Law School

Katie Eyer, Professor of Law, Rutgers Law School

Courtney G. Joslin, Martin Luther King Jr. Professor of Law, UC Davis School of Law

Naomi Schoenbaum, Associate Professor of Law, George Washington University Law School

Brian Soucek, Professor of Law and Chancellor's Fellow, UC Davis School of Law

Ezra Young, Visiting Assistant Professor of Law, Cornell Law School

---

[*] The brief presents the views of the individual signers. Institutions are listed for identification purposes only.