# NO. 22-1927

In The
# United States Court Of Appeals For The Fourth Circuit

**CHRISTOPHER FAIN; SHAUNTAE ANDERSON,**
**individually and on behalf of all others similarly situated,**
*Plaintiffs - Appellees,*

**v.**

**WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; CYNTHIA BEANE, in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, Bureau for Medical Services,**
*Defendants – Appellants.*

------------------------------

**STATE OF WEST VIRGINIA,**
*Amicus Supporting Appellants,*

**COLORADO; DELAWARE; DISTRICT OF COLUMBIA; FAIRNESS WEST VIRGINIA; MOUNTAIN STATE JUSTICE, INC.; NATIONAL HEALTH LAW PROGRAM; CENTER FOR MEDICARE ADVOCACY; CONSTITUTIONAL LAW PROFESSORS; AMERICAN MEDICAL ASSOCIATION; ENDOCRINE SOCIETY; NATIONAL ASSOCIATION OF NURSE PRACTITIONERS IN WOMEN'S HEALTH; AMERICAN PSYCHIATRIC ASSOCIATION; SOCIETY OF OB/GYN HOSPITALISTS; ILLINOIS; MAINE; MARYLAND; MASSACHUSETTS; MINNESOTA; NEVADA; NEW JERSEY; NEW MEXICO; NEW YORK; OREGON; RHODE ISLAND; VERMONT; WASHINGTON,**
*Amici Supporting Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT HUNTINGTON**

_____

# REPLY BRIEF OF APPELLANTS

_____

**Kimberly M. Bandy**
**Lou Ann S. Cyrus**
**Caleb B. David**
**Roberta F. Green**
Sнuмaн Mccuskey
  Slicer PLLC
**P. O. Box 3953**
**Charleston, WV  25339**
**(304) 345-1400**

*Counsel for Appellants*

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................... 1

ARGUMENT ....................................................................................... 1

I.     The District Court's Impermissible Weighing of Evidence Resulted in Its Order Erroneously Granting Summary Judgment In Favor of Plaintiffs-Appellees ............................................... 1

II.    The District Court Erred in Granting Summary Judgment to Plaintiffs Based Upon the Equal Protection Clause ............................. 6

     A.    The District Court Incorrectly Determined that the Plaintiffs Were Treated Differently From Similarly Situated Medicaid Members ........................................ 6

     B.    The District Court Incorrectly Determined that the Policy Facially Discriminates ............................................... 8

     C.    The District Court Erred By Circumventing Plaintiffs' Burden to Show Intentional Invidious Discrimination, Which Has Not Been Met ......................................... 13

     D.    The Court Erred In Applying Heightened Scrutiny Instead of Rational Basis Review, Which the Policy Meets ............... 15

III.    The District Court Erred in Granting Summary Judgment in Favor of Plaintiffs for Violation of Section 1557 of the Affordable Care Act ........................................................... 19

IV.    The District Court Erred in Granting Summary Judgment in Favor of Plaintiffs for Violation of the Medicaid Act ...................... 20

     A.    Defendants Have Not Violated the Medicaid Act's Availability Requirements ....................................... 20

B.    Defendants Have Not Violated the Medicaid Act's Comparability Requirements ......................................................25

V.    The District Court Erred in Finding that Plaintiffs Have Standing and, Therefore, Erred in Denying Defendants' Motion for Summary Judgment ..............................................................................26

VI.   The District Court Abused its Discretion in Finding that Plaintiffs Satisfied the Numerosity Requirement for Class Certification, Therefore, the District Court Erred in Granting Plaintiffs' Motion for Class Certification ...........................................27

CONCLUSION ..............................................................................................27

CERTIFICATE OF COMPLIANCE ....................................................................29

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Alexander v. Choate*,
    469 U.S. 287 (1985)....................................................................20

*Bostock v. Clayton Cty.*,
    140 S. Ct. 1731 (2020).............................................................8, 15

*Boyden v. Conlin*,
    341 F. Supp. 3d 979 (W.D. Wisc. 2018) ......................... 8-9, 10, 11

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993)....................................................................13

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022)................................................................14

*Doe v. Snyder*,
    2022 U.S. App. LEXIS 6217 (9th Cir. Mar. 10, 2022) .................. 20

*Eknes-Tucker v. Marshall*,
    No. 2:22-cv-184, 2022 WL 1521889 (M.D. Ala. May 13, 2022) .................12

*Flack v. Wis. Dep't of Health Servs.*,
    328 F. Supp. 3d 931 (W.D. Wis. 2018) ..........................................9

*Geduldig v. Aiello*,
    417 U.S. 484 (1974).................................................11, 12, 13, 14

*Giarratano v. Johnson*,
    521 F.3d 298 (4th Cir. 2008) .................................................16, 17

*Gibson v. Collier*,
    920 F.3d 212 (5th Cir. 2019) .........................................................5

*Grimm v. Gloucester Cty. School Bd.*,
    972 F.3d 586 (4th Cir. 2020) ...............................................*passim*

*Harris v. Pittman*,
　　927 F.3d 266 (4th Cir. 2019) ............................................................2

*Hennessy-Waller v. Snyder*,
　　529 F. Supp. 3d 1031 (D. Ariz. 2021) ............................................ 20

*Jacobs v. N.C. Admin. Off. of the Cts.*,
　　780 F.3d 562 (4th Cir. 2015) .......................................................1, 2

*Kosilek v. Spencer*,
　　774 F.3d 63 (1st Cir. 2014) ..............................................................5

*Lange v. Houston Cty., Georgia*,
　　499 F. Supp. 3d 1258 (M.D. Ga. 2020) ...................................12, 13

*McCown v. Humble Oil & Ref. Co.*,
　　405 F.2d 596 (4th Cir. 1969) ...........................................................2

*Pers. Adm'r of Mass. v. Feeney*,
　　442 U.S. 256, 99 S. Ct. 2282 (1979) ..............................................15

*Roberts v. Gestamp W. Va., LLC*,
　　45 F.4th 726 (4th Cir. 2022) ...........................................................6

*Schott v. Olszewski*,
　　401 F.3d 682 (6th Cir. 2005) .........................................................25

*U.S. v. Reveron Martinez*,
　　836 F.2d 684 (1st Cir. 1988) ...........................................................6

*Williams v. Kelly*,
　　2018 U.S. Dist. LEXIS 157002 (E.D. La. Sept. 14, 2018)............7

*Williams v. Kelly*,
　　Civil Action No. 17-12993,
　　2018 U.S. Dist. LEXIS 158119 (E.D. La. Aug. 27, 2018)............7

iv

**Statutes:**

42 U.S.C. § 1396a(a)(10)(A)-(B)...................................................................*passim*

42 U.S.C. § 18116..............................................................................1, 15, 19, 20

**Constitutional Provisions:**

U.S. Const. amend. XIV ..........................................................1, 6, 13, 15

**Other Authorities:**

1B J. Moore *et al.*, MOORE'S FEDERAL PRACTICE (2d ed. 1985) ..............................6

**INTRODUCTION**

In an effort to justify the district court's conclusions below, Plaintiffs mischaracterize Medicaid's policy. Plaintiffs draw a false distinction between coverage available to transgender members and cisgender members. Plaintiffs argue that Medicaid denies coverage to them for surgical procedures "for gender-confirming care that it covers when cisgender participants require them for other reasons." Resp. Br. p. 1. This is not correct. There are no procedures that are covered for cisgender people that are not covered for all people. Covered surgical procedures are available to all persons who meet the coverage criteria, regardless of gender identity. Medicaid does not cover, for any member, surgery to alter breasts, genitalia, or reproductive organs without a physical injury or disease other than for the congenital absence of genitalia. This policy is applied uniformly and the particular member's sex, gender, or transgender status has no bearing upon the policy. The policy does not discriminate based on sex or transgender status and does not violate the Equal Protection Clause, the Affordable Care Act, or the Medicaid Act.

**ARGUMENT**

**I.    The District Court's Impermissible Weighing of Evidence Resulted in Its Order Erroneously Granting Summary Judgment In Favor of Plaintiffs-Appellees.**

"In considering a motion for summary judgment, the district court must 'view the evidence "in the light most favorable to the"' nonmoving party." *Jacobs v. N.C.*

1

*Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (additional citations omitted). "The court therefore cannot weigh the evidence or make credibility determinations." *Jacobs,* 780 F.3d at 569 (additional citations omitted). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). Plaintiffs attempt to justify the district court's impermissible weighing of the evidence with several arguments, none of which has merit.

Plaintiffs correctly state that the parties filed cross-motions for summary judgment. This is not inconsistent with Medicaid's position, nor is it justification for the district court to disregard evidence that is inconsistent with its conclusions. Medicaid has asserted that it is entitled to summary judgment as a matter of law because the facts demonstrate that its policy does not discriminate based upon sex or transgender status, and it does not violate the Medicaid Act. The district court evidently concluded that evidence was present in the record which could enable a jury to find in Plaintiffs' favor, and thus denied summary judgment for Medicaid. However, the presence of cross-motions for summary judgment does not permit a district court to disregard evidence on one side of an issue or to weigh evidence. "The fact that both parties move for summary judgment does not establish that there is no issue of fact." *McCown v. Humble Oil & Ref. Co.*, 405 F.2d 596, 597 n. 1 (4th Cir. 1969) (additional citation omitted). Because there are factual issues that were

2

important to the district court's decision and that are in dispute, the district court committed error in granting summary judgment in favor of Plaintiffs. Instead, the case should be remanded for a trial to resolve those factual issues.

Second, Plaintiffs appear to argue that the district court was free to disregard the entirety of Dr. Levine's opinions because he "does not support the kind of blanket ban actually at issue here." Resp. Br. p. 38. As an initial matter, Medicaid's policy does not "ban" any treatment. The question, rather, is whether surgical treatment for gender dysphoria must be financially covered by Medicaid. There is no "ban" at issue in this case, so whether or not Dr. Levine would be in favor of a "ban" of certain treatment is irrelevant. Indeed, Dr. Levine opines that the "right to bodily autonomy via 'gender-affirming' hormonal and surgical interventions should not be confused with medical necessity." JA1866. Thus, Dr. Levine opines that some in the medical community, including Plaintiffs' expert witnesses, conflate the issues of bodily autonomy—that is, whether patients have a right to choose certain treatments—with medical necessity—that is, whether a procedure has proven efficacy in curing a disease or treating an ailment.

Beyond this crucial misrepresentation, Plaintiffs misconstrue Dr. Levine's essential opinions. Dr. Levine opines that gender-affirming care is not medically necessary care. Specifically, Dr. Levine opines that gender-affirming care "has not been shown to result in significant lasting improvements in mental health or

3

reduction in suicidality/suicide long-term." JA1866. Dr. Levine further opines, on the other hand, that there are "significant risks of complications associated with gender-affirming hormonal and surgical interventions. The established risks include adverse effects on bone health, cardiovascular health, and fertility. There are many other risks that are just now emerging in the literature." JA1866. Dr. Levine opines that there are non-surgical, non-invasive therapies to ameliorate the symptoms of gender dysphoria and that a growing number of European nations are now prioritizing psychotherapy as the first line of treatment for gender dysphoria. JA1867. These opinions culminate into Dr. Levine's final opinion, which is that coverage decisions related to treatment of gender dysphoria should balance the benefits and harms of providing certain treatments. The harms identified by Dr. Levine include risks of harm to youth, long-term health risks, and cost implications on the already-strained Medicaid system. JA1867-1868. Dr. Levine's opinions created genuine issues of material fact regarding medical necessity and the efficacy of providing coverage for surgical treatment of gender dysphoria. The district court was not permitted to disregard Dr. Levine's opinions or to make factual determinations best left to a jury.

The district court made a credibility determination, mentioning alleged "potential bias" on the part of Dr. Levine. JA2581. However, Dr. Levine is a qualified and knowledgeable witness. He has served as an independent expert

appointed by the United States District Court for the District of Massachusetts to "assist in determining what constituted the medical standard of treatment for [gender identity disorder]." *Kosilek v. Spencer*, 774 F.3d 63, 77-78 (1st Cir. 2014). Despite his qualifications, the district court discounted Dr. Levine's opinions in favor of wholly endorsing those of WPATH. The WPATH guidelines have been recognized by other courts as not reflecting consensus in the medical community, but rather, representing only one side of a widely recognized medical debate over the issue of sex reassignment surgery. *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019). Because Dr. Levine had helped to author the fifth version of the WPATH Standards of Care, the Fifth Circuit found it "notable that Dr. Levine expressed concerns that later versions of WPATH were driven by political considerations rather than medical judgment," and that they suffered from an absence of rigorous research in the field. *Id.* at 222. The district court committed error by choosing one side of a contested medical debate as a basis for granting summary judgment.

The Plaintiffs attempt to bootstrap on the district court's expressed preference for certain evidence over other conflicting evidence by relying upon language from other decisions involving transgender individuals. For example, they point out that this Court favorably discussed the WPATH guidelines in *Grimm v. Gloucester Cty. School Bd.*, 972 F.3d 586, 595-596 (4th Cir. 2020). Resp. Br., p. 12. To the extent that other cases discuss the state of medical science at any given time, those

discussions do not amount to legal rules or principles. This Court is not bound by the discussion of facts in other decisions, but instead, must consider that the state of medical science, as well as our understanding of it, can and does undergo change over time. Statements of the law are binding in future cases before the same court, but "the facts of each successive case must be determined by the evidence adduced at trial[.]" *U.S. v. Reveron Martinez*, 836 F.2d 684, 691 (1st Cir. 1988) (quoting 1B J. Moore *et al.*, MOORE'S FEDERAL PRACTICE ¶0.401 at 3 (2d ed. 1985)). The fact that this Court favorably discussed the WPATH guidelines in *Grimm*, which did not even involve a health care issue, does not have any evidentiary value in this case, nor does it allow the district court to assign more weight to the WPATH guidelines than other competent evidence present in the record on the other side of an issue. The district court "fail[ed] to credit evidence that contradicts some of its key factual conclusions," and committed error. *Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 732 (4th Cir. 2022).

## II.     The District Court Erred in Granting Summary Judgment to Plaintiffs Based Upon the Equal Protection Clause.

### A.     The District Court Incorrectly Determined that the Plaintiffs Were Treated Differently From Similarly Situated Medicaid Members.

Plaintiffs' argument, which the district court adopted, is based upon the flawed premise that Medicaid does not cover gender-confirming surgical procedures when the same kinds of treatments are covered for cisgender participants who require that

care for other reasons. Covered surgical care is covered for all participants who meet the criteria for covered services and is not limited to cisgender participants. Therefore, the distinction Plaintiffs attempt to draw between coverage available to transgender members as opposed to cisgender members simply does not exist.

For example, Plaintiffs claim that "no party disputes" that "Medicaid covers the same procedures for cisgender participants that it denies to Plaintiffs, such as hysterectomy, vaginoplasty, and chest reconstruction surgeries." Resp. Br. p. 21, citing JA304, JA324-325, JA330-334. This statement is not only disputed but refuted by the evidence. Medicaid's policy does not deny hysterectomy, vaginoplasty, and chest reconstruction surgeries to transgender participants if they seek such treatments due to physical injury or disease, as long as they meet the coverage criteria. The policy is applied the same way to cisgender participants.

Plaintiffs argue that making any distinction with respect to diagnosis simply "underscores" sex discrimination. However, there is ample case law demonstrating that in the healthcare context, similarly-situated individuals are those seeking treatment for the same diagnosis. This is true regardless of whether the treatment for different diagnoses may be the same, and whether one of those diagnoses is gender dysphoria. *Williams v. Kelly*, Civil Action No. 17-12993, 2018 U.S. Dist. LEXIS 158119 at *29 (E.D. La. Aug. 27, 2018) (adopted by *Williams v. Kelly*, 2018 U.S. Dist. LEXIS 157002 (E.D. La. Sept. 14, 2018)).

**B.** **The District Court Incorrectly Determined that the Policy Facially Discriminates.**

Plaintiffs argue that Medicaid's policy discriminates based on sex for at least four reasons. First, Plaintiffs argue that the Medicaid policy uses explicitly sex-based terms which reveal facial discrimination. Resp. Br. p. 18. However, Medicaid does not in fact make any distinction with respect to the gender identity of the person seeking gender-confirming care. The policy language describes the benefit, not any characteristic of the person seeking the benefit in any particular case. Additionally, the policy can be stated without referring to sex: Medicaid does not cover, for any member, surgery to alter breasts, genitalia, or reproductive organs without a physical injury or disease other than for the congenital absence of genitalia. The policy is not tied to the sex of the person seeking the service and does not discriminate based on sex.

Next, Plaintiffs argue that treating a person identified as female at birth more favorably than a transgender person who was identified as a male at birth but now identifies as female "'intentionally penalizes a person' based on sex." Resp. Br. p. 18 (quoting *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741-42 (2020)). Medicaid's policy does not do this. Any member seeking surgery to alter breasts, genitalia, or reproductive organs without a physical injury or disease, other than for the congenital absence of genitalia, would be denied, regardless of how that person was identified at birth or how the person currently identifies. This is not sex discrimination. The cited analysis from *Boyden v. Conlin*, 341 F. Supp. 3d 979, 995

8

(W.D. Wisc. 2018), simply does not apply because coverage is not determined based upon considerations of whether a surgery "reaffirms an individual's natal sex," nor is coverage based upon "one's birth-assigned sex." Resp. Br. p. 19.

Plaintiffs next argue that the policy discriminates "on the basis that an individual was . . . in the process of *changing* their sex" which is "discrimination based on sex." Resp. Br. p. 19 (quoting *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 949 (W.D. Wis. 2018)) (emphasis added). Again, the policy does not do this. Instead, it looks at whether the member is seeking surgery to alter breasts, genitalia, or reproductive organs without a physical injury or disease other than for the congenital absence of genitalia. Medicaid does not discriminate on the basis of whether a member is changing their sex. Medicaid covers the vast majority of gender-confirming treatments that may be sought by its members, including office visits and hormones. This would not be the case if Medicaid discriminated based upon an individual member being in the process of changing their sex or based upon their transgender status.

Fourth, Plaintiffs assert that discrimination against transgender people "punish[es] transgender [people] for gender non-conformity, thereby relying on sex stereotypes." Resp. Br. p. 19 (quoting *Grimm,* 972 F.3d at 608). Plaintiffs allege that the policy entrenches the sex-stereotyped belief that individuals must preserve the genitalia of their birth-assigned sex. Resp. Br. p. 19. The problem with these

arguments is that Plaintiffs have not pointed to anything in the record indicating that Medicaid makes a determination relative to its policy based upon sex stereotypes or gender non-conformity.

Plaintiffs allege that heightened scrutiny is required because the policy discriminates based on transgender status because it singles out transgender individuals for different treatment. Resp. Br. p. 20. The policy does not do this. Any person seeking surgery to alter breasts, genitalia, or reproductive organs without a physical injury or disease, other than for the congenital absence of genitalia, would be denied regardless of transgender status. Medicaid covers many other treatments that are considered gender-confirming treatments and provides coverage for its entire package of services to transgender beneficiaries, which would not be the case if it discriminated based upon transgender status.

Medicaid's system is based upon binary male or female designations and does not designate gender identity. JA1462-1464; JA1109. Thus, Medicaid's system has no way to distinguish whether the designation in the system matches a person's "birth-assigned sex" or not. By extension, a person's "birth-assigned sex" can play no role in Medicaid's decision if it does not collect that data. There is equally no evidence in the record here that Medicaid's policy has any connection to any sex-stereotyped belief at all, much less one related to "reaffirming" one's birth-assigned sex. To the extent *Boyden* makes that generalization, it is not persuasive as applied

10

to the facts of this case. Moreover, *Boyden* recognizes that where the policy at issue "does not treat individuals differently based on sex," *Boyden*, 341 F. Supp. 3d at 999-1000, the rational basis test would apply as set forth in *Geduldig v. Aiello*, 417 U.S. 484 (1974).

The analogy between the instant case and *Geduldig* is simple. The *Geduldig* Court explained:

> The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups – pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes.

*Id.* at 496 FN 20. In other words, though the Court accepted that the group of pregnant women is "exclusively female," discrimination based upon pregnancy did not create a sex-based classification because not all women are pregnant. *Id.* In the instant case, Plaintiffs argue that Medicaid's policy creates a group of individuals with gender dysphoria who are treated differently than other persons because they seek gender-confirming surgery which is not covered. Under the reasoning in *Geduldig*, this does not create a sex-based classification because not all transgender people have gender dysphoria and seek surgery.

By the same analysis, Medicaid's policy does not create a sex-based classification because it divides members into two groups – those who seek gender-confirming surgery, and all other persons. While the first group may be exclusively

comprised of transgender individuals, the second group includes all other persons, whether cisgender, transgender, or other identity, who do not seek gender-confirming surgery. Plaintiffs focus on the fact that the group of "all other persons" includes cisgender people who are unaffected by the policy. Resp. Br. p. 30. While this is true, it also includes transgender people who are unaffected by the policy because they do not seek gender-confirming surgery. This highlights the fact that, as in *Geduldig*, the distinction made by Medicaid is not based upon transgender status, nor is it based upon sex, because transgender individuals are in *both* the group seeking gender-confirming surgery and the group not seeking gender-confirming surgery.[1]

Though the district court attempted to distinguish *Geduldig* by characterizing pregnancy as a "physical condition divorced from gender," this does not fit with *Geduldig's* acknowledgement that the group of pregnant women created by the subject policy was "exclusively female." JA2578; *Geduldig,* 417 U.S. at 496 FN 20. A policy that affects some, but not all, transgender individuals, is not discrimination on the basis of sex or transgender identity. *Lange v. Houston Cty., Georgia*, 499 F. Supp. 3d 1258 (M.D. Ga. 2020). Such a classification is not a suspect or quasi-suspect class; therefore, rational basis review applies. *Geduldig,* 417 U.S. at 494-495. Plaintiffs dismiss *Lange* as an "outlier." Resp. Br. p. 32, fn 9. However, unlike

---

[1] *Eknes-Tucker v. Marshall*, No. 2:22-cv-184, 2022 WL 1521889, *10 (M.D. Ala. May 13, 2022), which addresses only a motion for preliminary injunction, does not acknowledge or attempt to distinguish *Geduldig,* and is inconsistent with that case.

the cases relied upon by Plaintiffs, *Lange* is squarely consistent with *Geduldig*, which makes its conclusion a persuasive one. Under such analysis, a healthcare plan exclusion for "sex change surgery" is facially neutral for purposes of the Equal Protection Clause. *Lange*, 499 F. Supp. 3d at 1275.

Plaintiffs argue that targeting certain activities, particularly if those activities are engaged in predominantly by a particular class of people, can be evidence of an intent to disfavor that class, relying on *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). However, *Bray* itself rejected an argument that because voluntary abortion is an activity engaged in only by women, disfavoring it invidiously discriminates against women as a class. *Id.*, at 271. The Supreme Court explained that "sex-based discriminatory intent is something beyond sexually discriminatory effect." *Id.*, at 272 n.3. Plaintiffs argue that *Geduldig* and *Bray* prohibit a pretextual classification designed to impose differential treatment. However, Medicaid's policy does not do this and is instead applied uniformly without regard to sex or transgender status.

### C.    The District Court Erred By Circumventing Plaintiffs' Burden to Show Intentional Invidious Discrimination, Which Has Not Been Met.

The Supreme Court recently reiterated that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretext designed to effect an invidious

discrimination against members of one sex or the other.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022) (quoting *Geduldig*, 417 U.S. at 496 n.20). By the same token, a policy that regulates a medical procedure that only transgender individuals would undergo does not trigger heightened scrutiny because there is no evidence of intent to effect invidious discrimination.

Plaintiffs appear to rely upon the fact that the policy has been maintained year-to-year without change as evidence of intent to effect invidious discrimination. However, this suggests nothing more than the fact a policy was put in place well over a decade ago and has not been revisited since.[2] This is not evidence of intentional invidious discrimination.

Plaintiffs additionally argue that Medicaid "mandates that its contractors" enforce its policy that "transsexual surgery" is not a covered service, and that this suffices to show intent. Resp. Br. pp. 8, 32-33. However, as described by BMS, the language relied upon by Plaintiffs does not prohibit the MCOs from providing coverage outside the policy if they elect to do so. JA1185-1189; JA1456-1459. Instead, it relates to the fact that such coverage is not included within the capitation rate paid by Medicaid to the MCO. JA1185-1189; JA1456-1459. In other words, it reflects the fact that MCOs will not be *reimbursed* for coverage of services outside

---

[2] It is unknown when the policy was initially adopted, as it could not be determined from the change log what changes were added in 2004. No earlier versions could be located. JA1123-1124, JA1141.

the policy. This aspect of administering Medicaid's policies through its contractors is likewise not evidence of discriminatory intent. There is nothing in the record to imply that the decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296 (1979).

### D.    The Court Erred In Applying Heightened Scrutiny Instead of Rational Basis Review, Which the Policy Meets.

Because there is no evidence of intent to effect invidious discrimination, the court erred in applying heightened scrutiny. Although Plaintiffs argue that *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) supports their position, *Grimm* was decided on vastly different facts. *Grimm* was decided in the context of a school's bathroom policy. It had nothing to do with the provision of medical coverage under Medicaid or otherwise.[3] *Grimm* applied heightened scrutiny "because the bathroom policy rests on sex-based classifications and because transgender people constitute at least a quasi-suspect class." *Grimm*, 972 F.3d at 607. As discussed above, Medicaid's policy does not rest on sex-based classifications, and it does not discriminate against "transgender people" as a class; therefore,

---

[3] Similarly, *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) did not decide any issue in the context of the provision of medical coverage under the Equal Protection Clause, the ACA, or the Medicaid Act.

*Grimm's* analysis does not apply here. *Grimm* had an abundant factual record regarding adoption of the bathroom policy in question, whereas in the instant case, there is no record regarding the genesis of Medicaid's policy. The Fourth Circuit found that the plaintiff in *Grimm* was "viewed as failing to conform" to sex stereotypes. *Id.* at 608. Here, there are no facts suggesting that Medicaid's policy is based on any such considerations or stereotypes.

Under rational basis review, it is Plaintiffs' burden "to negate every conceivable basis which might support" the alleged unequal treatment. *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (citation omitted). The policy complained of by Plaintiffs is rationally related to the State's interests in providing coverage consistent with what is required by CMS and in conserving financial resources available to the Medicaid program for the benefit of providing services to its members on an ongoing basis. There is also evidence in the record with respect to the disputed medical necessity of gender-confirming surgery, as well as the lack of evidence of long-term benefits of such treatment. Thus, the rational basis test has been satisfied.

Plaintiffs argue that the reasons for the policy are "impermissibly post-hoc." Resp. Br. p. 10. This argument disregards the practical realities of administering the Medicaid program. While there may not be contemporaneous documents specifically so stating, it would be nonsensical for Plaintiffs to argue that Medicaid

administrators are not aware of budgetary constraints or that they do not consider their budget or finances in administering Medicaid. Likewise, it seems illogical for Plaintiffs to suggest that Medicaid administrators would not have an ongoing interest in covering those services required by CMS. There is nothing "post-hoc" about these considerations.[4]

Plaintiffs characterize the first reason as "lack of guidance" from CMS regarding gender-confirming care. Resp. Br. p. 37. However, this is not an accurate characterization of the government interest here. Medicaid has stated that it is not mandated by CMS to cover gender-confirming surgery, so it does not do so. JA438-440.

The second reason is cost. The district court erred in declining to consider the cost information in the record. Medicaid is projecting a budget deficit within two years. JA1203. The projections demonstrate an inability to maintain services at the current level beginning in fiscal year 2024, with projected deficits for 2024, 2025, 2026, and 2027 each well exceeding $100 million. JA1471-1473, JA1491-1492. Absent receiving necessary funds, Medicaid will "have to make decisions about what will be cut and where." JA1474. Medicaid does not need to perform any cost

---

[4] Regardless, "post-hoc" considerations are not "impermissible" in a rational basis analysis. Rather, it is Plaintiffs' burden "to negate every *conceivable* basis which might support" the alleged unequal treatment. *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (additional citation omitted) (emphasis added).

analysis specific to gender-confirming surgery to know that adding to existing coverages will impact its already strained budget.

Plaintiffs suggest that Dr. Levine stated that he lacks expertise to speak about cost at all. Resp. Br. p. 36. That was not his statement. Instead, acknowledging that "economic analysis" is not generally within the skill set of physicians, he cautioned that a proper economic analysis should be conducted before accepting any assertions by Dr. Karasic that costs are negligible. JA1887-1888. This does not mean that Dr. Levine cannot speak to any aspect of costs. Indeed, he identified financial considerations that must be taken into account, such as the "life-long costs of transgender interventions which are ever-growing in numbers and complexity, the cost of managing complications, fertility preservation, the costs of covering detransition procedures that will grow in numbers, and even the cost of potential future litigation over lack of safeguarding of youth and vulnerable populations." JA1934.

Plaintiffs argue that the state may not draw an invidious distinction to save money. Resp. Br. p. 36. However, Medicaid does not draw any invidious distinction. Instead, it declines to cover surgery to alter breasts, genitalia, or reproductive organs without a physical injury or disease other than for the congenital absence of genitalia, and this policy is applied uniformly.

Medicaid has consistently relied upon the fact that it covers what CMS deems to be required. JA1178-1179, JA1182-1184, JA1191-1199. Medicaid clearly has

relied on the absence of mandated coverage, so the conclusion of HHS and CMS in declining to mandate the coverage based on the lack of evidence of long-term benefits is relevant to this inquiry, as well as information that supports such a conclusion. Additionally, Medicaid does not cover services that are not medically necessary. Medicaid has raised a genuine disputed issue of fact with respect to whether gender-confirming surgeries are medically necessary. There is nothing inconsistent in Dr. Levine's position that certain treatments, though not considered medically necessary, may still be beneficial to an individual patient. Similarly, there is nothing inconsistent in Medicaid's acknowledgment that some treatments for gender dysphoria, such as counseling and hormones, may be medically necessary, while other treatments, such as surgery, are not.

## III. The District Court Erred in Granting Summary Judgment in Favor of Plaintiffs for Violation of Section 1557 of the Affordable Care Act.

Plaintiffs allege that Defendants have drawn a classification that discriminates against Plaintiffs based on sex. However, as explained above, Medicaid does not in fact make any distinction with respect to the sex or gender identity of the person seeking gender-confirming surgery. The policy language describes the benefit, not any characteristic of the person seeking the benefit. Furthermore, *Grimm* was decided on vastly different facts and did not reach any conclusion in the context of the provision of medical coverage. Medicaid's policy does not rest on sex-based classifications, and it does not discriminate against "transgender people" as a class;

19

therefore, *Grimm's* analysis does not apply here. On the other hand, *Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1045 (D. Ariz. 2021) (*aff'd by Doe v. Snyder*, 2022 U.S. App. LEXIS 6217 (9th Cir. Mar. 10, 2022) more closely fits the facts of the instant case, and this court should reach the conclusion that Plaintiffs cannot succeed on their claim under Section 1557 where the challenged policy "only excludes gender reassignment *surgery*—it does not exclude coverage for other treatments for gender dysphoria such as hormone therapy." *Id.* (emphasis in original).

As the Supreme Court has explained, "Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs." *Alexander v. Choate*, 469 U.S. 287, 303 (1985). Instead, the benefit provided by Medicaid "remains the individual services offered[.]" *Id.* Medicaid does not classify coverage based on transgender identity. Instead, it has designated certain services as non-covered services. This does not violate the ACA, and Medicaid is entitled to summary judgment on this claim.

## IV.    The District Court Erred in Granting Summary Judgment in Favor of Plaintiffs for Violation of the Medicaid Act.

### A.    Defendants Have Not Violated the Medicaid Act's Availability Requirements.

The district court erroneously concluded that "[t]he exclusion violates the availability requirement." JA2588. This conclusion relied upon the court's erroneous finding that gender-confirming procedures are not materially different from covered

procedures, and that the medical necessity of the surgeries is "unrebutted." JA2587.
In their Brief, Plaintiffs claim that Medicaid is either mandated to or chooses to cover
"the same surgical procedures that Plaintiffs need." Resp. Br. p. 42. This argument
again conflates gender-confirming surgery with medically necessary care and
conflates gender-confirming surgical procedures with surgical procedures to repair
physical injuries or remove diseased tissue.

In discovery, Defendants admitted that Medicaid provides partial or full
coverage for members who undergo mastectomies, breast reduction surgeries, and
chest reconstruction surgeries for some diagnoses not related to gender-confirming
care. JA304. Defendants also admitted that Medicaid provides partial or full
coverage for vaginoplasties for some diagnoses not related to gender-confirming
care. JA304. The record is devoid, however, of any admission that Medicaid covers,
for any member, surgery to alter breasts, genitalia, or reproductive organs without a
physical injury or disease other than for the congenital absence of genitalia. Plaintiffs
do not claim or even argue that Medicaid covers any such surgical procedure.

On the other hand, the record is replete with instances in which Medicaid does
not cover surgical procedures to alter breasts, genitalia, or reproductive organs
without a physical injury or disease. Medicaid does not cover surgery for
hypomastia, regardless of gender identity. JA1818-1819. Likewise, Medicaid does
not cover surgery for gynecomastia based solely on psychosocial symptoms,

regardless of gender identity. JA1819, JA2405. Medicaid does provide coverage for mastectomy for breast cancer, and Medicaid provides that coverage regardless of a patient's sex, gender, or gender identity.

Despite being unable to identify a single diagnosis for which Medicaid provides coverage, for any member, for surgery to alter breasts, genitalia, or reproductive organs without a physical injury or disease other than for the congenital absence of genitalia, Plaintiffs claim that the record is clear that gender-confirming surgeries are the same procedures provided by Medicaid to cisgender beneficiaries. Resp. Br. p. 43. To demonstrate that all the diagnoses and all the procedures are the same, Plaintiffs rely upon discovery responses from Defendants in which Medicaid identifies, as a sample listing, 63 separate diagnostic codes and 29 distinct procedure codes associated with mastectomy, breast reduction surgery, and chest reconstruction surgery that are covered under Medicaid's policy. JA324-325. None of the 63 diagnostic codes or 29 procedure codes provides coverage to alter breasts without a physical injury or disease.

Plaintiff's argument that a mastectomy is a mastectomy mischaracterizes Medicaid's treatment of gender-confirming surgeries in an attempt to find discrimination where none exists. Boiling down Medicaid's coverage position to its basic principles, Medicaid does not provide coverage, for any member, for surgery to alter breasts, genitalia, or reproductive organs without a physical injury or disease

22

other than for the congenital absence of genitalia. When cancerous breast tissue is removed in a mastectomy, pathology shows the presence of diseased tissue. When breast tissue is removed in a mastectomy to treat gender dysphoria, pathology shows healthy breast tissue. As Plaintiffs' plastic surgery expert, Loren Schechter, M.D., testified, the tissue does not have to be necrotic or gangrenous or cancerous or predisposed to become cancerous. JA1662-1663. Instead, the role of the plastic surgeon is "making the body congruent with their identity," not curing a disease or physical ailment. JA1650. Plaintiffs have failed to identify any covered surgical procedure with a surgical indication being incongruence. Thus, the diagnoses are not the same, the procedures are not the same, the indications for the procedures are not the same, and the outcomes are not the same. Indeed, neither Dr. Schechter nor Plaintiffs' expert psychiatrist Dan Karasic, M.D. was able to identify any other DSM-V diagnosis that is used as an indication for surgery. JA1651-1656; JA1424.

Plaintiffs further attempt to mischaracterize the record by suggesting that Defendants admitted in discovery that gender-affirming surgery is medically necessary. Resp. Br. pp. 44-45. Plaintiffs state that "there is no dispute that this care can be medically necessary, which BMS has already admitted." Resp. Br. pp. 44-45. The discovery responses referred to by Plaintiff are not specific to gender-affirming surgery. Plaintiffs' Request for Admission asked Defendants to "[a]dmit that Gender-Confirming Care can be medically necessary care for the treatment of

gender dysphoria." JA303. Defendants responded, "Upon information and belief, experts may differ in opinion as to whether gender-confirming care is medically necessary, both in general and with respect to a particular patient. This Request is admitted with the understanding that this area of treatment continues to evolve." JA303. Medicaid provides coverage for psychiatric therapy and hormonal therapy for gender dysphoria and believes that those treatment modalities can be medically necessary for the treatment of gender dysphoria. Medicaid has never admitted, nor does it believe, that surgical treatment is medically necessary treatment for gender dysphoria.

By the plain language of the statute and its accompanying regulations, the Medicaid Act's availability requirements do not mandate coverage for gender-confirming care. Thus, gender-confirming surgery is an optional service that may be provided to Medicaid members but is not required. To the extent gender-confirming surgery falls into a category of mandatory coverage, Defendants have permissibly exercised their discretion and chosen the proper mix of amount, scope, and duration limitations on coverage for gender-confirming care in the best interests of members based, in part, on considerations such as medical necessity and on utilization management considerations such as budgetary constraints. Therefore, the district court erroneously granted summary judgment in favor of Plaintiffs and erroneously

found that Medicaid's categorization of gender-confirming surgery violated the Medicaid Act's availability requirements.

### B.    Defendants Have Not Violated the Medicaid Act's Comparability Requirements.

The district court erroneously concluded that the policy "violates the comparability requirement[.]" JA2590.  This conclusion relied upon the court's erroneous finding that surgeries "which are covered to treat non-gender dysphoria diagnoses are materially the same as the surgeries provided to treat gender dysphoria." JA2589. The district court's erroneous conclusion also adopted the Plaintiffs' misinterpretation of the comparability requirements of the Medicaid Act.

Plaintiffs argue that the Medicaid Act's comparability requirement mandates that "once Defendants cover surgical care, they must do so free from discrimination based on diagnosis." Resp. Br. p. 48. This is incorrect. The plain language of the Medicaid Act's accompanying regulations prohibits three types of discrimination: (1) against the categorically needy; (2) among the categorically needy; and (3) among the medically needy. *See Schott v. Olszewski*, 401 F.3d 682, 686 (6th Cir. 2005) ("Under the Act, states must provide comparable medical assistance to all Medicaid recipients within each classification, so long as the medically needy do not receive greater benefits than the categorically needy (although the reverse is permitted)."). Plaintiffs claim that "discrimination" exists because Medicaid provides coverage for mastectomies for some diagnoses but not for gender

dysphoria. As discussed in detail above, this is not discriminatory, and the procedures are not the same. Rather, Medicaid does not cover, for any member, surgery to alter breasts, genitalia, or reproductive organs without a physical injury or disease other than for the congenital absence of genitalia. This policy is applied uniformly to all categorically needy and medically needy beneficiaries. Therefore, the district court erred in finding that Medicaid's policy violates the Medicaid Act's comparability requirements.

## V.    The District Court Erred in Finding that Plaintiffs Have Standing and, Therefore, Erred in Denying Defendants' Motion for Summary Judgment.

Plaintiffs have failed to establish standing because neither has suffered an injury in fact. Neither has submitted a claim for and been denied gender-affirming care by Medicaid. JA1299-1307, JA1336-1348. Neither has submitted a claim for gender-affirming surgery. JA1315-1316, JA1362-1363. Mr. Fain testified that he is not willing to undergo surgery until he has kicked his smoking habit, which has not yet occurred. JA1362. Ms. Anderson has never had a treating physician find that she requires gender-affirming surgery to treat her gender dysphoria. JA1313-1314.

Plaintiffs argue that Medicaid mischaracterizes Mr. Fain's testimony. However, his self-serving statement that he could quit smoking any time does not change the fact that, as long as he is a smoker, Mr. Fain is not in a position to undergo surgery. Thus, neither Plaintiff has established a concrete and particularized injury

that is actual or imminent. Therefore, both Plaintiffs lack standing, and the Defendants-Appellants are entitled to summary judgment.

## VI.   The District Court Abused its Discretion in Finding that Plaintiffs Satisfied the Numerosity Requirement for Class Certification, Therefore, the District Court Erred in Granting Plaintiffs' Motion for Class Certification.

Plaintiffs argue that numerosity is met because 686 Medicaid members had a diagnosis code for "gender dysphoria or gender incongruence" between January 1 and September 30, 2021. Resp. Br. p. 14, JA319-320. However, that number provides no information about the number of individuals seeking treatment for a diagnosis of gender dysphoria or gender incongruence, because it captures all individuals who made claims for any reason during the first nine months of 2021 who also had a diagnosis code for gender dysphoria or gender incongruence. JA1517-1520. The reason for the care requested by these individuals was not necessarily tied to any gender identity disorder diagnosis, so it is speculative to consider all such individuals as part of the class. JA1517-1520.

## CONCLUSION

Defendants request that this Court find that the Plaintiffs lack standing and remand the case to the district court with instructions to enter judgment in favor of Defendants for lack of standing. In the alternative, Defendants request that this Court vacate the district court's judgment which granted summary judgment in favor of Plaintiffs and issued a permanent injunction and remand the case to the district court

27

with instructions to enter summary judgment in favor of Crouch, Beane, and Medicaid on all counts. In the alternative, Defendants request that the case be remanded for a trial on the merits. Defendants request that this Court vacate the Order of the district court certifying a class.

Respectfully submitted,

*/s/ Kimberly M. Bandy*
Kimberly M. Bandy
Lou Ann S. Cyrus
Caleb B. David
Roberta F. Green
SHUMAN MCCUSKEY
  SLICER PLLC
P. O. Box 3953
Charleston, WV  25339
(304) 345-1400

*Counsel for Appellants*

**CERTIFICATE OF COMPLIANCE**

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

       this document contains <u>6,470</u> words.

2.    This document complies with the typeface requirements because:

       This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman.</u>

Dated: December 20, 2022      Respectfully submitted,

                                  */s/ Kimberly M. Bandy*
                                    Kimberly M. Bandy
                                    Lou Ann S. Cyrus
                                    Caleb B. David
                                    Roberta F. Green
                                    SHUMAN MCCUSKEY
                                      SLICER PLLC
                                    P. O. Box 3953
                                    Charleston, WV  25339
                                    (304) 345-1400

                                    *Counsel for Appellants*