# Exhibit D

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DYLAN BRANDT, et al.,                                              PLAINTIFFS

V.                                    4:21CV00450 JM

LESLIE RUTLEDGE,[1] et al.,                                        DEFENDANTS

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs bring their claims under the Fourteenth Amendment's Equal Protection and

Due Process Clauses and the First Amendment. Pursuant to Federal Rule of Civil Procedure

52(a), the Court makes the following specific findings of fact and conclusions of law. Act

626 is unconstitutional. The Court determines that Plaintiffs are entitled to judgment in their

favor on all claims. The State is permanently enjoined from enforcing Act 626.

### I.    Procedural History

On April 6, 2021, the Arkansas Legislature passed House Bill 1570, Act 626 of

the 93rd General Assembly of Arkansas, codified at Ark. Code Ann. §§ 20-9-1501 to 20-

9-1504 and 23-79-164 ("Act 626").[2] Act 626 prohibits a physician or other healthcare

professional from providing "gender transition procedures" to any individual under

eighteen years of age and from referring any individual under eighteen years of age to

any healthcare professional for "gender transition procedures."

> "Gender transition procedures" means the process in which a person goes
> from identifying with and living as a gender that corresponds to his or her
> biological sex to identifying with and living as a gender different from his
> or her biological sex, and may involve social, legal, or physical changes;

---

[1] Tim Griffin succeeded Leslie Rutledge as Arkansas Attorney General.
[2] The Arkansas Legislature titled the Act as "Arkansas Save Adolescents from Experimentation (Safe)
Act." Because the title is misleading, the Court will refer to the Act as "Act 626" in this order.

(6)(A) "Gender transition procedures" means any medical or surgical service, including without limitation physician's services, inpatient and outpatient hospital services, or prescribed drugs related to gender transition that seeks to:

(i)      Alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex; or

(ii)     Instill or create physiological or anatomical characteristics that resemble a sex different from the individual's biological sex, including without limitation medical services that provide puberty-blocking drugs, cross-sex hormones, or other mechanisms to promote the development of feminizing or masculinizing features in the opposite biological sex, or genital or nongenital gender reassignment surgery performed for the purpose of assisting an individual with a gender transition.

AR LEGIS 626 (2021), 2021 Arkansas Laws Act 626 (H.B. 1570). The Act creates a

private right of action for an "actual or threatened" violation. The Act does not define a

"threatened violation." The statute of limitations for bringing an administrative or judicial

proceeding under the Act is two years. However, an individual under eighteen years of

age may bring an action throughout their minority through a parent and may bring an

action in their own name for twenty years after reaching majority. A party who prevails

under the Act must be awarded attorneys' fees.

Arkansas Governor Asa Hutchinson vetoed HB1570 because he believed it

created "new standards of legislative interference with physicians and parents as they

deal with some of the most complex and sensitive matters concerning our young people."

He explained his concern that HB1570 "put[] the state as the definitive oracle of medical

care, overriding parents, patients and health-care experts" and described the bill as a "vast

government overreach." The Governor added that "The leading Arkansas medical

associations, the American Academy of Pediatrics and medical experts across the country

all" opposed the bill, voicing concerns that "denying best practice medical care to transgender youth can lead to significant harm to the young person." He also noted that HB1570 "does not grandfather in those young people who are currently under hormone treatment," and that those adolescents would "be left without treatment" when Act 626 went into effect. (Pls.' Ex. 17).

HB1570 was enacted into law as Act 626 on April 6, 2021, following the Legislature's override of Governor Hutchinson's veto. *See* Pls.' Ex. 16, at 10; Pls.' Ex. 26; Pls.' Ex. 27. A simple majority of the Arkansas General Assembly overrode the Governor's veto.

Plaintiffs filed a complaint alleging that Act 626 violates the Equal Protection Clause, Due Process Clause, and the First Amendment. Plaintiffs seek a declaratory judgment on each claim and a permanent injunction of enforcement of Act 626. Plaintiffs filed a motion for a preliminary injunction. After a hearing, the Court granted the motion for preliminary injunction on the record and filed a written order supplementing the ruling on August 2, 2021. The State appealed the Court's Order to the Eighth Circuit Court of Appeals. On August 25, 2022, the Eighth Circuit affirmed, *see Brandt by & through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022).

The Court held an eight-day bench trial on this matter. At trial, the Court heard testimony from: Plaintiffs' fact witnesses—Plaintiffs Joanna Brandt, Dylan Brandt, Aaron Jennen, Donnie Ray Saxton, Amanda Dennis, and Dr. Kathryn Stambough; and Dr. Michele Hutchison;[3] Plaintiffs' expert witnesses—Dr. Dan Karasic, Dr. Deanna Adkins, Dr. Jack Turban, and Dr. Armand Antommaria; the State's fact witnesses—Dr.

---

[3] During the trial, the Court dismissed Plaintiff Hutchison as a party because she no longer practices medicine in the State of Arkansas.

3

Stephanie Ho, Dr. Janet Cathey, Cathy Campbell, Dr. Roger Hiatt, Laura Smalts, and Clifton Francis "Billy" Burleigh Jr.; and the State's expert witnesses—Dr. Stephen Levine, Prof. Mark Regnerus, Dr. Patrick Lappert, and Dr. Paul Hruz.

The Court also received exhibits from both parties, as well as testimony from Defendant Amy Embry (the Rule 30(b)(6) designee of Defendant Arkansas State Medical Board), Dr. Rhys Branman and non-party Representative Robin Lundstrom by deposition designations.

The parties filed post-trial briefs (ECF Nos. 265, 266) and proposed findings of fact (ECF Nos. 257, 259) for the Court's consideration.

Plaintiffs contend that Act 626 categorically prohibits transgender adolescents[4] with gender dysphoria from treatment that the patient, their parents, and their medical providers agree is medically necessary and in the adolescent's best interest. They allege that the Act singles out individuals in need of medically necessary gender-affirming care solely because the individual's gender identity does not conform to their assigned sex at birth. The State asserts that Arkansas has a compelling government interest in protecting the health and safety of its citizens, particularly "vulnerable" children who are gender nonconforming or who experience distress at identifying with their biological sex. AR LEGIS 626 (2021). The State also contends that it has a compelling government interest in ensuring the ethical standards of the healthcare profession.

---

[4] Under Arkansas law, a minor is a person under the age of eighteen (18) years old. The term "adolescent" is used to describe a person from the time they begin puberty until they reach adulthood on their eighteenth birthday. For purposes of this opinion, the Court will use the terms "adolescent" and "minor" interchangeably.

II.     **Findings of Fact**[5]

A. **Gender Identity, Gender Incongruence and Gender Dysphoria**

1.    "Gender identity" refers to a person's deeply felt internal sense of belonging to a particular gender. (Tr. 24:11-15, ECF No. 219 (Karasic)). It is a "core part of who you are." (Tr. 266:6-11, 267:11-15, ECF No. 219 (Adkins)).

2.    Most people are "cisgender" and have a gender identity that aligns with their sex assigned at birth—the sex placed on their birth certificate at birth based on their external genitalia. (Tr. 24:16-20, ECF No. 219 (Karasic)).

3.    Transgender people have a gender identity that does not align with their birth-assigned sex. (Tr. 24:21-23, ECF No. 219 (Karasic)).

4.    "Gender incongruence" is a condition where a person's gender identity does not align with their birth-assigned sex.

5.    There is no evidence that gender incongruence is the result of a dysfunctional family life, and many transgender people come from healthy, supportive families. (Tr. 100:4-16, ECF No. 219 (Karasic)).

6.    Gender identity is not something that an individual can control or voluntarily change. *Id.* at 29:13-15 (Karasic); 267:11-15 (Adkins).

7.    Efforts to change a person's gender identity to become congruent with their birth-assigned sex have been attempted in the past without success and with harmful effects. *Id.* at 29:16-20, 30:3-24 (Karasic).

---

[5] These facts are accurate as of the date of trial.

8.   Efforts to change an individual's gender identity can harm individuals by increasing feelings of shame and creating an expectation that change is possible when it is not, which can increase a sense of failure. *Id.* at 30:12-19 (Karasic).

9.   Because efforts to change an individual's gender identity through therapy are ineffective, such efforts are now considered unethical by many mental health organizations including the American Psychological Association. *Id.* at 30:3-11 (Karasic); Tr. 325:18-326:4, ECF No. 220 (Turban).

10.  Although people cannot voluntarily change their gender identity, a person's understanding of their gender identity can change over time. (Tr. 30:25-31:9, ECF No. 219 (Karasic); 266:12-267:15, 270:24-271:1 (Adkins); Tr. 331:9-15, ECF No. 220 (Turban)).

11.  Research and clinical experience show that when gender incongruence continues after the onset of puberty, it is very unlikely that the individual will come to identify with their sex assigned at birth later in life. *Id.* at 310:16-25 (Turban); Tr. 267:25-268:7, 271:2-15, ECF No. 219 (Adkins); 98:7-25, 173:2-9 (Karasic).

12.  The term "transgender male" refers to a person who was assigned female at birth who has a male gender identity. "Transgender female" refers to a person who was assigned male at birth who has a female gender identity.

13.  The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders-5 ("DSM") is a list of mental health disorders put out by the American Psychiatric Association and updated periodically. (Tr. 25:16-20, ECF No. 219 (Karasic)). It compiles criteria for psychiatric diagnoses that are generally relied on by practitioners in the psychiatric profession. *Id.* at 142:10-15 (Karasic).

14.    The lack of alignment between one's gender identity and their sex assigned at birth (gender incongruence) can cause significant distress. The medical term for this distress is gender dysphoria. *Id.* at 24:7-10 (Karasic).

15.    Gender dysphoria can increase with the onset of puberty and the development of secondary sex characteristics that do not align with one's gender identity. *Id.* at 37:14-22 (Karasic).

16.    The diagnostic criteria for gender dysphoria in adolescents and adults include incongruence between an individual's experienced or expressed gender and their sex assigned at birth lasting for at least six months and accompanied by clinically significant distress or impairment in social or occupational function. *Id.* at 26:20-27:3 (Karasic).

17.    The diagnosis of gender dysphoria is made by a clinician who assesses whether a patient meets criteria based on a clinical interview, the clinician's observations of the patient, and the reports of the minor's parents. *Id.* at 27:7-28:1 (Karasic). This is how diagnoses of other mental health conditions are generally made. *Id.* at 28:2-5 (Karasic); Tr. 894:23-895:6, ECF No. 246 (Levine).

18.    Gender dysphoria is a serious condition that, if left untreated, can result in other psychological conditions including depression, anxiety, self-harm, suicidality, and impairment in functioning. (Tr. 28:17-21, ECF No. 219 (Karasic); 236:11-19 (Adkins)).

19.    It is widely recognized in the medical and mental health fields that, for many people with gender dysphoria, the clinically significant distress caused by the condition can be relieved only by living in accordance with their gender identity, which is referred to as gender transition. This can include social transition—e.g., dressing, grooming, and using a name and pronouns consistent with one's gender identity—and, for adolescents and

adults, may also include gender-affirming medical care—i.e., medical treatments to align the body with one's gender identity. (Tr. 111:1-18, ECF No. 219 (Karasic); 197:16-20, 232:23-233:5 (Adkins); Tr. 324:18-325:3, ECF No. 220 (Turban)).

20.     There is evidence of a rise in referrals to gender clinics in the United States in recent years. The increase in gender clinic patients is not surprising given the undisputed testimony that there is an increase in awareness of gender dysphoria and an increase in the number of gender clinics and insurance coverage for treatment, making such care available when it previously was not. (Tr. 77:17-78:15, 79:3-79:10, ECF No. 219 (Karasic)).

21.     If any adolescents are seeking care at gender clinics because of social influence, they would not meet the criteria of gender dysphoria or be considered for gender-affirming medical treatment unless they had a longstanding incongruent gender identity and clinically significant distress. *Id.* at 87:6-88:1 (Karasic).

**B. <u>The Science and Resulting Guidelines</u>**

22.     The Arkansas chapter of the American Academy of Pediatrics, the Arkansas Academy of Pediatrics, the American College of OB/GYN, the American Academy of Child Adolescent Psychologists, the American Academy of Child and Adolescent Psychiatry, the Arkansas Psychological Association, and other scientific and medical organizations all recognized the effectiveness and safety of gender-affirming medical care. (Pls.' Ex. 24 at 30:20-31:17, 32:4-19; Pls.' Ex. 25 at 40:19-42:16).

23.     Two professional associations, the World Professional Association for Transgender Health (WPATH) and the Endocrine Society,[6] have published widely-accepted clinical

---

[6] Both associations joined in an Amici Curiae brief in support of Plaintiffs' Motion for Preliminary Injunction. (ECF No. 30).

practice guidelines for the treatment of gender dysphoria. *Id.* at 31:11- 22, 33:22-34:1 (Karasic).

24. WPATH is a professional association that develops treatment recommendations through a committee of renowned experts in transgender health. *Id.* at 31:23-25, 32:13-18 (Karasic). WPATH has been publishing guidelines for the treatment of gender dysphoria and prior diagnoses related to gender incongruence since 1979. Its current version—the WPATH Standards of Care for the Treatment of Transgender and Gender Diverse People, Version 8—was published in 2022. *Id.* at 31:17-22 (Karasic).

25. The Endocrine Society is a professional society of over 15,000 endocrinologists and endocrinology researchers. (Tr. 383:11-14, ECF No. 220 (Antommaria)).

26. The Endocrine Society first published guidelines for the treatment of gender dysphoria in 2011 with a second edition in 2017. They are called Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Guideline. (Tr. 31:17-22, 33:12-17, ECF No. 219 (Karasic)).

27. The Endocrine Society Guideline for treatment of gender dysphoria is similar to other clinical practice guidelines published by the Endocrine Society concerning other medical treatments. *Id.* at 198:10-16 (Adkins).

28. Like other clinical practice guidelines, the WPATH Standards of Care and Endocrine Society Guidelines were developed by experts in the field, including clinicians and researchers, who used systematic processes for collecting and reviewing scientific evidence. *Id.* at 32:13-18, 102:14-103:2 (Karasic).

29. Both WPATH and the Endocrine Society, like other large medical and mental health associations such as the American Psychiatric Association, develop guidelines for

treatment as well as advocate for policies relevant to their patient populations. *Id.* at 104:25-105:21 (Karasic).

30. The WPATH Standards of Care and Endocrine Society Guidelines for the treatment of gender dysphoria are recognized as best practices by the major medical and mental health professional associations in the United States, including the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the American Medical Association, and the American Academy of Child and Adolescent Psychology. *Id.* at 34:2-12 (Karasic).

31. The WPATH Standards of Care and Endocrine Society Guidelines are widely followed by clinicians. *Id.* at 34:13-19 (Karasic); 197:24-198:20, 273:5-8 (Adkins).

32. Transgender care is not experimental care.

33. Providing treatment for gender dysphoria does not cause a person to be or remain transgender and there is no treatment that can change a person's gender identity. *Id.* at 29:13-20, 98:7-99:21 (Karasic).

34. Under the WPATH Standards of Care and Endocrine Society Guidelines, treatment for gender dysphoria differs depending on whether the patient is a prepubertal child, an adolescent, or an adult. *Id.* at 35:20-37:13 (Karasic).

35. Under the WPATH Standards of Care and Endocrine Society Guidelines, before puberty, treatment is focused on support for the child and family. Some prepubertal children may socially transition. No medical interventions are indicated or provided for the treatment of gender dysphoria in prepubertal children. *Id.* at 36:5-10 (Karasic); 198:21-199:2 (Adkins).

36. In addition to social transition, medical interventions such as medications to delay puberty ("puberty blockers" or "pubertal suppression"), hormone therapy, and in some more rare instances, surgery, may become medically indicated for youth who experience distress after the onset of puberty (i.e., during adolescence) under the WPATH Standards of Care and Endocrine Society Guidelines. *Id.* at 36:11-37:13; 38:19- 39:1 (Karasic); 199:3-12 (Adkins).

37. Under the WPATH Standards of Care and Endocrine Society Guidelines, treatment decisions for adolescents with gender dysphoria are individualized based on the needs of the patient, and gender-affirming medical treatments are not indicated or appropriate for all adolescents with gender dysphoria. *Id.* at 43:9-12 (Karasic); 200:18-24 (Adkins).

38. As with clinical practice guidelines in other areas of medicine, the WPATH Standards of Care recognize that it may be appropriate for doctors to deviate from the guidelines in individual cases where, in the clinician's judgment, such deviation is appropriate. (Tr., 35:11-19, 187:5-188:15, ECF No. 219 (Karasic)).

## C. **Informed consent**

39. The WPATH Standards of Care and Endocrine Society Guidelines have provisions for informed consent for treatment that are consistent with principles of informed consent used throughout the field of medicine. (Tr. 401:4-15, ECF No. 220 (Antommaria)).

40. In general, before any medical treatment is provided to a patient, the health care provider must obtain informed consent. Informed consent means patients—and in the case of minors, their parents or guardians—are informed of the potential risks, benefits, and alternatives to treatment so they can weigh them and decide whether to pursue treatment. (Tr. 53:7-13, ECF No. 219 (Karasic); Tr. 380:10-19, ECF No. 220 (Antommaria)).

41.     In general, adolescents are able to understand the risks, benefits, and alternatives to a medical intervention. *Id.* at 381:1-8, 381:18-22 (Antommaria). The assent of adolescents—meaning their agreement with the proposed course of treatment— should be obtained. *Id.* at 380:20-381:8 (Antommaria).

42.     Even when adolescents are able to understand the risks, benefits, and alternatives to treatment and assent to treatment, their parents or guardians must still provide informed consent. *Id.* at 380:1-9 (Antommaria).

43.     The WPATH Standards of Care and Endocrine Society Guidelines provide that, before gender-affirming medical treatments are provided to adolescent patients, the patient and their parents or guardians must be informed of the potential risks, benefits and alternatives to treatment and consent must be provided by the parents or guardians. *Id.* at 400:11-401:3 (Antommaria); Tr. 274:7-275:19, ECF No. 219 (Adkins).

44.     For hormonal therapy, the WPATH Standards of Care and Endocrine Society Guidelines specifically provide that patients and their parents or guardians must be informed of the potential impact of treatment on fertility and counseled on options for preserving fertility. (Tr. 400:11-21, ECF No. 220 (Antommaria); Tr. 53:25-54:12, ECF No. 219 (Karasic)).

45.     The WPATH Standards of Care also provide that clinicians should inform families about the nature and limits of the evidence base regarding gender-affirming medical treatment for adolescents as part of the informed consent process. *Id.* at 55:7- 16 (Karasic).

46.     The WPATH Standards of Care provide that, before any potentially irreversible medical treatments, families should be informed that some individuals may come to feel gender-affirming medical care is not a good fit for them as their feelings about their gender identity could change. *Id.* at 54:13-55:6 (Karasic).

47.  In some cases, a mental health diagnosis may impair an individual's medical decision-making capacity, in which case treatment would be delayed. (Tr. 382:7-11, ECF No. 220 (Antommaria); 321:12-322:3 (Turban)). Having a mental health diagnosis does not necessarily mean that an individual lacks medical decision- making capacity. *Id.* at 382:12-14 (Antommaria). If a patient suffers from depression or anxiety, that does not mean they cannot consent to treatment. *Id.* at 414:2-11 (Antommaria); Tr. 1056:3-22; ECF No. 248 (Lappert)).

48.  The informed consent process is adequate to enable minor patients and their parents to make decisions about gender-affirming medical care for adolescents.

**D. Medical Interventions**

**Step One: Psychotherapy**

49.  The WPATH Standards of Care spell out that the comprehensive mental health assessment prior to medical treatments for adolescents should include a thorough history of the person's gender identity and the stability of that identity; an assessment of other conditions that could affect presentation like a co-occurring psychiatric disorder; and the adolescent's cognitive maturity to make decisions and understand the future consequences of those decisions and their capacity to participate in care. (Tr. 43:13-45:2, ECF No. 219 (Karasic)).

50.  The WPATH Standards of Care provide that any co-occurring mental health conditions should be addressed. *Id.* at 48:17-21 (Karasic); Tr. 199:21-24, ECF No. 219 (Adkins).

51.  The WPATH Standards of Care recognize that autism spectrum disorder is present in higher rates among youth with gender dysphoria and that this needs to be considered when diagnosing and assessing a patient for treatment. WPATH Standards of Care

recommend that when assessing patients who have autism spectrum disorder, more time may be needed and differences in communication should be taken into account. *Id.* 48:6-16 (Karasic).

52.     The WPATH Standards of Care and Endocrine Society Guidelines recommend that mental health professionals should be involved in decisions about whether medical treatments are indicated and appropriate for a given adolescent. *Id.* at 45:23-46:9; 47:1-7 (Karasic); Tr. 307:13-22, ECF No. 220 (Turban). WPATH Standards of Care specifically recommend that "health care professionals involve relevant disciplines, including mental health and medical professionals, to reach a decision about whether [medical interventions] are appropriate and remain indicated throughout the course of treatment until the transition is made to adult care."[7] (Tr. 45:23-46:9, ECF No. 219 (Karasic)).

53.     The WPATH Standards of Care and Endocrine Society Guidelines provide for a comprehensive mental health assessment and diagnosis before an adolescent is provided gender-affirming medical treatment. *Id.* at 43:13-44:13,155:17-22 (Karasic); Tr. 322:10-19, ECF No. 220 (Turban).

54.     Psychotherapy can be important for individuals with gender dysphoria to address and alleviate other conditions such as depression and anxiety, but it does not alleviate the underlying distress due to the incongruence between a person's gender identity and birth-assigned sex. (Tr. 29:16-20, 64:1-7, ECF No. 219 (Karasic)). There are no psychotherapeutic interventions that have been demonstrated to be effective at alleviating the gender dysphoria itself. *Id.* at 99:22-100:3 (Karasic).

---

[7] Quotes from the WPATH Standards of Care refer to the current edition, version 8.

55.    Not all individuals experiencing gender incongruence decide to seek treatment beyond

psychotherapy.

**Step Two: Puberty Blockers**

56.    The purpose of puberty blockers is to alleviate or prevent the worsening of the distress of

gender dysphoria by pausing the physical changes that come with puberty. This treatment

also provides the patient time to further understand their gender identity before initiating

any irreversible medical treatments. *Id.* at 233:9-22 (Adkins); Tr. 318:7-22, ECF No. 220

(Turban).

57.    Gonadotropin hormone-releasing hormone, or GnRH agonists (often referred to as

puberty blockers), pause puberty at the stage it was in when treatment started. (Tr.

202:23-203:16; 233:6-14, ECF No. 219 (Adkins)).

58.    Under the WPATH Standards of Care and Endocrine Society Guidelines, puberty

blockers may be indicated as treatment for gender dysphoria for youth who have been

confirmed to have started puberty, which is referred to as Tanner Stage 2. *Id.* at 205:3-15

(Adkins). Tanner Stage 2 begins at the first sign of puberty. (Tr. 205:5-7, ECF No. 219

(Adkins)). The age at which youth begin puberty varies significantly but typically starts

between the ages of eight and fourteen for those assigned female at birth and between the

ages of nine and fourteen for those assigned male at birth. *Id.* at 211:8-21 (Adkins).

**Step Three: Hormone Therapy**

59.    The purpose of hormone therapy is to alleviate the distress of gender dysphoria by

aligning the body to be more congruent with the individual's gender identity. *Id.* at 37:23-

38:2 (Karasic); 234:3-8 (Adkins); Tr. 417:21-418:9, ECF NO. 220 (Antommaria).

15

60.    Under the WPATH Standards of Care and Endocrine Society Guidelines, hormone

       therapy—estrogen and anti-androgens for transgender girls, and testosterone for

       transgender boys— may be indicated for some adolescents with gender dysphoria. (Tr.

       36:11-21, ECF No. 219 (Karasic)).

61.    Transgender females treated with estrogen and anti-androgens will go through hormonal

       puberty like their cisgender female counterparts. They will develop typically female

       secondary sex characteristics such as breasts, softened skin, and fat distribution typical of

       females. *Id.* at 215:11-18 (Adkins).

62.    The WPATH Standards of Care and Endocrine Society Guidelines do not recommend

       hormone therapy for adolescents with gender dysphoria unless the patient's articulation

       of their gender identity has been long-lasting and stable. The WPATH Standards of Care

       specifically provide that hormone therapy should be recommended to adolescents only if

       the experience of gender incongruence has lasted for years. (Tr. 50:20- 51:4, ECF No.

       219 (Karasic)).

63.    The WPATH Standards of Care and Endocrine Society Guidelines also require that,

       before providing hormone therapy, adolescents should demonstrate the emotional and

       cognitive maturity to understand the risks and be able to think into the future and

       appreciate the long-term consequences. *Id.* at 52:19-53:6 (Karasic); Tr. 400:22-401:15,

       ECF No. 220 (Antommaria).

64.    The WPATH Standards of Care provide detailed guidance to clinicians about how to

       assess adolescents' maturity. (Tr. 58:17-59:8, ECF No. 219 (Karasic)).

**Step Four: Surgery**

65. The Arkansas Children's Hospital Gender Clinic does not provide surgical treatment to patients. (Tr., ECF No. 275 at 605:8-11 (Stambough); 520:14-18 (Hutchison)).

66. Genital surgeries for adolescents are extremely rare. (Tr. 36:11-21, 55:10-16; ECF No. 219 (Karasic); Tr. 820:23-24, ECF No. 246 (Levine)). In their many years of treating adolescents with gender dysphoria, neither Dr. Karasic nor Dr. Adkins has ever referred a minor patient for genital surgery. (Tr. 186:23-25, 189:21-190:5, ECF No. 219 (Karasic); 231:17-19 (Adkins)).

67. With respect to genital surgeries for minors, the Endocrine Society Guideline does not recommend any such surgeries until after age 18. *Id.* at 38:19-39:9 (Karasic). The WPATH Standards of Care do not have an age threshold for vaginoplasty but recommends that it should be offered only to patients under 18 with great caution after a thorough assessment of the patient's maturity. It does not recommend phalloplasty for anyone under 18. *Id.* at 36:22-37:7, 38:8-18 (Karasic).

68. In the rare instance that an adolescent has gender-affirming surgery, the overwhelming majority of surgeries are chest surgeries for adolescent transgender males. *Id.* at 36:18-20 (Karasic).

69. The WPATH Standards of Care and Endocrine Society Guidelines provide that chest masculinization surgery may be appropriate for some transgender male adolescents prior to age 18 to help align the body with the individual's gender identity to alleviate gender dysphoria. There are no specific age requirements but, like the requirements for hormone therapy, the gender incongruence must be long-standing, and the patient must be deemed

to have the cognitive maturity to understand the risks and effects of this treatment. *Id.* at 158:11-23 (Karasic).

**E.  Gender-Affirming Medical Care for Adolescents in Arkansas**

70.    The Arkansas Children's Hospital ("ACH") Gender Clinic is the primary provider of gender-affirming medical care for adolescents with gender dysphoria in Arkansas. It has seen more than 300 patients since it opened in 2018. (Tr. 516:13-517:1, 520:19-21, ECF No. 275 (Hutchison)).

71.    The ACH Gender Clinic's protocols[8] are aligned with the WPATH Standards of Care and Endocrine Society Guidelines. *Id.* at 518:20-23 (Hutchison); 602:21-604:20 (Stambough).

72.    In February 2022, leadership at ACH changed the protocols of the Gender Clinic to stop initiating gender-affirming medical care for patients under 18 who were not already receiving such treatment, while continuing such treatment for patients who were already receiving such care. *Id.* at 551:13-552:4 (Hutchison). The Hospital sent a letter to patients' families informing them that the change was due to concern that Act 626 might go into effect in the near future and disrupt patients' care. *Id.* at 552:5-17 (Hutchison); 602:10-20 (Stambough). The Clinic continues to provide hormone therapy to 81 patients under age 18. *Id.* at 602:21-603:4 (Stambough). Because the change in protocol was based on Act 626, Dr. Stambough expects that, if the law is permanently enjoined, the Gender Clinic will resume providing gender-affirming medical care for new patients. *Id.* at 603:5-10 (Stambough).

---

[8] References to ACH Gender Clinic protocols throughout these findings of fact refer to the protocols in place prior to February 2022, unless otherwise specified.

73.    Gender-affirming medical treatments that may be provided to adolescents at the ACH

Gender Clinic include puberty blockers, estrogen, testosterone blockers, and testosterone.

*Id.* at 518:24-519:15 (Hutchison).

74.    The ACH Gender Clinic creates individualized treatment plans tailored to the particular

needs of each patient. *Id.* at 521:1-9 (Hutchison); 604:2-6 (Stambough).

75.    Not every adolescent patient seen at the ACH Gender Clinic requests or receives gender-

affirming medical interventions. *Id.* at 522:4-11 (Hutchison); 604:21-606:19

(Stambough).

76.    ACH Gender Clinic patients work with Clinic staff and their therapists to assess their

gender identity. Some patients who have come to the Clinic with issues related to their

gender identity eventually came to identify with their birth-assigned sex. Those patients

did not receive medical interventions. *Id.* at 548:10-20 (Hutchison); 605:18-606:19

(Stambough).

77.    Sometimes, ACH Gender Clinic staff do not feel some adolescent patients are ready for

gender-affirming medical interventions and treatment will not be provided. *Id.* at 522:16-

25, 539:18-22 (Hutchison).

78.    Only four ACH Gender Clinic patients have been treated with puberty blockers. That is

because most patients come to the Clinic at older ages when such treatment would not be

indicated. (Tr. 519:12-15; 521:10-19, ECF No. 275 (Hutchison)). Patients who have

already progressed significantly into puberty are not appropriate candidates for puberty

blockers. *Id.* at 521:22-522:3.

79.   The ACH Gender Clinic protocols provide that the following criteria must be met before

initiating hormone therapy (estrogen and testosterone blockers for transgender girls, or

testosterone for transgender boys) for adolescents:

a.      the patient must be assessed by the Clinic's psychologist;

b.      the patient must meet the DSM-5 criteria for gender dysphoria;

c.      the patient must have a consistent and persistent gender identity;

d.      the patient must be in counseling with a therapist;

e.      the patient's therapist must be consulted and must not identify any concerns

about starting treatment;

f.      the patient must have the cognitive maturity to understand and weigh the risks

and benefits of treatment;

g.      the patient's parent must provide informed consent;

h.      the patient must receive a medical assessment including baseline lab work; and

i.      the patient must be 14 years of age or older.

*Id.* at 524:16-526:9, 529:25-530:14, 531:7-9 (Hutchison).

80.   The psychological evaluation conducted by the ACH Gender Clinic psychologist is

comprehensive and includes an assessment for gender dysphoria, the patient's degree of

dysphoria and the specific sources of distress, and other psychological assessments (e.g.,

for depression or anxiety) tailored to the patient's mental health needs. *Id.* at 526:18-

527:12 (Hutchison).

81.   The ACH Gender Clinic determines whether a patient's gender identity is persistent and

consistent through information collected from the patient, the patient's parents, the

patient's therapist, the Clinic psychologist, and the Clinic physician. *Id.* at 528:5-19 (Hutchison).

82.   At the ACH Gender Clinic, it is common for Clinic patients to have a long-standing transgender identity by the time they come to the Clinic. The average length of time between when Clinic patients first identify as transgender and when they first tell a parent is 6.5 years. *Id.* at 528:20-25 (Hutchison).

83.   The ACH Gender Clinic has very rarely had patients who only recently discovered their gender incongruence. In those cases, the patient would not be considered for hormone therapy for some time because there would be a need to see if the patient's gender identity remained consistent and persistent over time. *Id.* at 529:1-13 (Hutchison).

84.   At the ACH Gender Clinic, the assessment of the patient's maturity is based on information from the parents, the Clinic psychologist, the Clinic physician, and the patient's therapist. *Id.* at 539:4-17 (Hutchison).

85.   Where patients do not demonstrate the maturity to understand the potential risks and benefits of treatment, the ACH Gender Clinic will defer medical treatment. *Id.* at 539:18-540:1 (Hutchison).

86.   In cases in which an ACH Gender Clinic patient's therapist has expressed concerns about beginning hormone therapy, e.g., if they had concerns about the patient's maturity or mood stability, treatment was delayed. *Id.* at 530:15-531:6 (Hutchison).

87.   At the ACH Gender Clinic, no minor is provided hormone therapy unless the patient, their parents, their doctor, the Clinic psychologist, and the patient's therapist all approve treatment. *Id.* at 522:16-25, 530:15-531:14 (Hutchison).

88.  At the ACH Gender Clinic, for those patients who are treated with hormone therapy, the average length of time between a patient's first visit to the Clinic and the start of hormone therapy is about 10.5 months. *Id.* 529:18-24 (Hutchison).

89.  The average age of beginning hormone therapy for ACH Gender Clinic patients is 16. *Id.* at 526:10-17 (Hutchison).

90.  In the ACH Gender Clinic's informed consent process, the information provided to patients and their parents includes information about the possible risks and side effects of treatment, including potential risks to fertility related to hormone therapy and discussion of fertility preservation options. *Id.* at 531:15-532:18, 537:21- 538:14 (Hutchison); 613:20-614:3 (Stambough).

91.  The ACH Gender Clinic's informed consent process includes informing families about the limitations on what is known about the effects and risks of treatments. *Id.* at 533:3-11 (Hutchison); 604:12-19 (Stambough).

92.  Drs. Hutchison and Stambough similarly observed great distress in their gender dysphoric adolescent patients at the ACH gender clinic. Suicidal ideation and self-harm were common; some patients had attempted suicide, sometimes multiple times. *Id.* at 542:6-543:2 (Hutchison); 609:5-17 (Stambough).

**F.  The Parent and Minor Plaintiffs**[9]

**The Brandt Family**

93.  Plaintiff Dylan Brandt is 17 years old. (Tr. 658:8-12, ECF No. 275 (Joanna Brandt); 688:14-15 (Dylan Brandt)).

---

[9] Dylan Brandt, Sabrina Jennen, Brooke Dennis, and Parker Saxton are referred to collectively as the "Minor Plaintiffs." Joanna Brandt, Lacey and Aaron Jennen, Amanda and Shayne Dennis, and Donnie Saxton are referred to collectively as the Parent Plaintiffs. Kathryn Stambough is referred to as the Physician Plaintiff.

94.    Plaintiff Joanna Brandt is Dylan's mother. *Id.* at 658:6-9 (J. Brandt).

95.    The Brandts live in Greenwood, Arkansas. *Id.* at 658:4-5 (J. Brandt); 688:10-11 (D. Brandt).

96.    Dylan was assigned female at birth, but his gender identity is male. *Id.* at 659:10-15 (J. Brandt); 688:16-20 (D. Brandt).

97.    Dylan's distress around his gender began before puberty. *Id.* at 689:13-24 (D. Brandt).

98.    Dylan informed his mother of his gender dysphoria through a letter he gave her in June 2019, when he was 13 years old. *Id.* at 659:16-18 (J. Brandt).

99.    Dylan has been diagnosed with gender dysphoria. *Id.* at 665:9-10 (J. Brandt).

100.   After informing his mother, Dylan started socially transitioning—using he/him pronouns and the name Dylan. *Id.* at 691:4-10 (D. Brandt); 662:14- 19 (J. Brandt). He already had short hair but cut his hair shorter and in more typically masculine ways. *Id.* at 663:10-19 (J. Brandt). He also began to shop in the boys' section of stores. *Id.* at 663:20-664:4 (J. Brandt). Through these steps, Dylan began to be recognized as a boy more in public. *Id.* at 664:5-7 (J. Brandt).

101.   Dylan's mood improved after he started to be recognized as a boy. *Id.* at 663:22-664:23 (J. Brandt).

102.   Dylan was referred to the ACH Gender Clinic by his pediatrician. *Id.* at 665:11-16 (J. Brandt).

103.   Dylan's first visit to the ACH Gender Clinic was in January 2020. *Id.* at 666:22- 25 (J. Brandt). At that visit, he and his mother met with Dr. Michele Hutchison— the director of the Gender Clinic at the time—and the Clinic's social worker. (Tr. 514:25-515:4, 517:14, ECF No. 275 (Hutchison); 667:1-7 (J. Brandt). Dr. Hutchison explained the

possible treatment options for adolescents with gender dysphoria and the risks and benefits of those treatments. *Id.* at 667:8-18, 668:6-11 (J. Brandt).

104. During his first visit to the ACH Gender Clinic, Dylan and his mother and Dr. Hutchison discussed mental health therapy. Dylan had been in therapy prior to that visit, but he was between therapists at the time and the Gender Clinic referred him to a therapist near where he lived. *Id.* at 667:19-668:3 (J. Brandt).

105. Menstrual cycles were causing Dylan great distress, Dr. Hutchison prescribed menstrual suppression medication at that January 2020 visit. *Id.* at 668:16-669:5 (J. Brandt).

106. Menstrual suppression did not alleviate Dylan's gender dysphoria. *Id.* at 669:8-10 (J. Brandt).

107. Eventually, Dylan began testosterone therapy in August 2020. This decision was made by his mother, a Clinic psychologist who evaluated him, his therapist, Dr. Hutchison, and Dylan. Everyone agreed it was appropriate for him.[10] *Id.* at 670:22-672:8 (J. Brandt)).

108. Dr. Hutchison had informed Dylan and his mother of the potential risks of treatment more than once. Joanna asked a lot of questions at the Clinic and had done research to make sure she was making the best medical decision for her child. *Id.* at 661:14-23, 662:20-663:7, 667:8-18, 668:6-15, 669:11-25, 670:1-21, 671:7-19 (J. Brandt).

109. As a parent, Joanna routinely makes medical decisions for her minor children. *Id.* at 658:13-21 (J. Brandt).

110. Dylan has now been on cross-sex hormone therapy for over two and a half years. *Id.* at 672:9-10 (J. Brandt).

---

[10] The trial transcript contains a typographical error. The visit at the ACH Gender Clinic was in August 2020, not August 2002 the date included in the trial transcript.

111.   Testosterone treatment has significantly alleviated Dylan's gender dysphoria. *Id.* at 673:3-25 (J. Brandt)).

112.   Dylan has not experienced any negative side effects from testosterone therapy. *Id.* at 672:11-12 (J. Brandt); 694:14-19 (D. Brandt).

113.   Dylan has continued regular therapy with a counselor. (Tr. 695:6-7, ECF No. 275 (D. Brandt).

114.   If Act 626 were to go into effect, medically detransitioning is not an option for Dylan. *Id.* at 696:3-10 (D. Brandt). His mother Joanna fears that stopping treatment would negatively affect his mental health and he would "lose all" of "who he has become." *Id.* at 675:4-14 (J. Brandt).

115.   Dylan and Joanna have discussed moving out of state or traveling out of state regularly for treatment if he cannot continue receiving treatment in Arkansas because of Act 626. *Id.* at 675:15-676:9 (J. Brandt); 696:11-12 (D. Brandt).

**The Jennen Family**

116.   Plaintiff Sabrina Jennen is 17 years old. (Tr. 447:18-20, ECF No. 220 (Jennen)).

117.   Plaintiffs Lacey and Aaron Jennen are her parents. *Id.* at 447:8-21 (Jennen).

118.   Sabrina has two younger sisters. *Id.* at 447:18-21 (Jennen).

119.   The Jennens live in Fayetteville, Arkansas. *Id.* at 459:25-460:1 (Jennen).

120.   Sabrina was assigned male at birth, but her gender identity is female. *Id.* at 448:15-20 (Jennen).

121.   Sabrina informed her parents of her gender dysphoria in July 2020, when she was 15. *Id.* at 448:21-449:23

122.    After informing her parents, Sabrina started to see a counselor, Cathy Campbell. *Id.* at
452:3-10, 454:1-2 (Jennen); Tr. 72:16-18, ECF No. 282 (Campbell). Sabrina continues to
see Ms. Campbell regularly. (Tr. 454:3-8, ECF No. 220 (Jennen)).

123.    Ms. Campbell diagnosed Sabrina with gender dysphoria. *Id.* at 453:15-25(Jennen); Tr.
77:12-78:2, ECF No. 282 (Campbell).

124.    In the Summer of 2020, Sabrina started socially transitioning— she began to go by the
name Sabrina and use she/her pronouns while at home. At the time, she and her family
had just moved to Fayetteville, so she prepared to start the new school year as Sabrina.
(Tr. 452:3-13, ECF No. 220 (Jennen)).

125.    Sabrina and Ms. Campbell first discussed hormone therapy in September 2020 when
Sabrina described her intense distress. (Tr. 75:15-76:7, ECF No. 282 (Campbell). After
that session, Sabrina discussed hormone therapy with her parents, who were initially
hesitant. *Id.* at 76:20-24 (Campbell); Tr. 454:11-18, ECF No. 220 (Jennen).

126.    Because Ms. Campbell does not counsel patients about the medical risks of hormone
therapy, she gave the Jennens Dr. Stephanie Ho's name and contact information so that
they could speak with a medical doctor in Fayetteville who could best answer their
questions. *Id.* at 76:25-77:8 (Campbell); Tr. 454:11-20, ECF No. 220 (Jennen)).

127.    Sabrina's parents wanted to do more research and better understand the potential risks
and benefits of hormone therapy before consenting to Sabrina beginning treatment. *Id.* at
454:21-455:17, 456:10-17 (Jennen).

128.    Sabrina and her parents visited Dr. Ho's office in December 2020. *Id.* at 455:18-22
(Jennen). They met with a certified nurse practitioner who independently diagnosed
Sabrina with gender dysphoria. (Tr. 82:18-83:1, ECF No. 282 (Ho). Dr. Ho's staff also

provided verbal and written information to the Jennens about hormone therapy, including the risks and benefits and information related to fertility preservation, and answered the Jennens' questions. (Tr. 455:23-456:7, ECF No. 220 (Jennen)).

129.    Before starting hormone therapy, Sabrina had therapy sessions with Ms. Campbell every other week for several months. *Id.* at 454:5-18 (Jennen); (Tr. 75:1-4, ECF No. 282 (Campbell)). During that time, Sabrina's parents participated in some joint family sessions with Ms. Campbell. *Id*. at 75:5-14 (Campbell); Tr. 453:18-23, ECF No. 220 (Jennen).

130.    Sabrina and her parents discussed and researched hormone therapy. They "took a lot of time, thought and prayer" about whether Sabrina should undergo hormone treatment for her gender dysphoria, and they made the decision as a family to move forward with exploring hormone treatment. (Tr. 456:10-17, 457:15-19, ECF No. 220 (Jennen)).

131.    Dr. Ho did her own assessment and diagnosed Sabrina with gender dysphoria. (Tr. 749:14- 16, ECF No. 224 (Ho)). She also reviewed with the family how hormone therapy works and the potential risks and benefits of the treatment. (Tr. 456:25-457:11, ECF No. 220 (Jennen)). Sabrina and her parents consented to Sabrina receiving hormone therapy, and Dr. Ho prescribed a testosterone blocker and estrogen. *Id.* at 457:15-19, 458:1-5 (Jennen).

132.    Aaron and Lacey Jennen routinely make medical decisions for their children. *Id.* at 457:12-14 (Jennen).

133.    Ms. Campbell had no concerns about Sabrina's ability to assent to hormone therapy. (Tr. 77:25-78:2, ECF No. 282 (Campbell)).

134. Sabrina has regularly visited Dr. Ho for monitoring and treatment since January 2021. Approximately every three months, Dr. Ho reviews lab tests to monitor Sabrina's hormone levels and check in about Sabrina's dysphoria. (Tr. 458:6- 16, ECF No. 220 (Jennen)).

135. Sabrina's therapist and doctor agree that hormone therapy is benefitting Sabrina. (Tr. 78:24-79:9, ECF No. 282 (Campbell); Tr. 749:20-21, ECF No. 224 (Ho)).

136. Ms. Campbell could readily see the change in Sabrina's mental health after starting hormone therapy; she was happier and more outgoing than Ms. Campbell had ever seen her. (Tr. 78:3-16, ECF No. 282 (Campbell)).

137. For Aaron Jennen, Sabrina not receiving gender-affirming medical care is "not an option." Tr. 462:5-8, 462:20- 463:11, ECF No. 220 (Jennen)). He testified that he would "worry about her withdrawing back into the person that she was before she started it, a person that was unhappy, that said things to her mother and I like, what's the point of life. Saying things like, I don't see a future for myself, which is difficult because how amazing she is." *Id.* at 463:12-20 (Jennen). Aaron testified that if Act 626 went into effect, they would either move or travel out of state to get treatment for Sabrina. *Id.* at 462:5-19 (Jennen).

**The Saxton Family**

138. Parker Saxton was 17 years old at the start of trial. (Tr. 430:14-15, ECF No. 220 (Saxton)).

139. Donnie Ray Saxton is Parker's father. *Id.* at 430:9-19 (Saxton).

140. The Saxtons live in Vilonia, Arkansas. *Id.* at 444:15-16 (Saxton).

141.  Parker was assigned female at birth, but his gender identity is male. *Id.* at 431:15-20 (Saxton).

142.  Puberty caused significant distress for Parker. He suffered from anxiety and depression and would not socialize or answer his phone even with his closest friends. *Id.* at 432:12-15, 433:2-20 (Saxton). It was "troubling" for Donnie to watch. *Id.* at 433:2-7 (Saxton).

143.  Donnie took Parker to see a therapist and psychiatrist who treated him for anxiety and depression. *Id.* at 434:7-18 (Saxton).

144.  Parker was aware of his gender identity since around age 9. (Tr. 557:21-22, ECF No. 275 (Hutchison). He informed his father in a letter in 2019 when he was approximately 14 years old. (Tr. 431:24-432:4, 434:7-10; ECF No. 220 (Saxton)).

145.  At the time Donnie read Parker's letter, he "didn't have a clue what transgender meant outside of what we see in the news and everything." *Id.* at 434:19-435:2 (Saxton).

146.  If someone were to stereotype the most unlikely parent of a transgender child, it would be Donnie Ray Sexton. Donnie is a good and loving father.

147.  In June 2020, when Parker was 15, Parker's psychiatrist referred him to the Gender Clinic at ACH. *Id.* at 435:11-14, 25 (Saxton).

148.  At the ACH Gender Clinic, Parker initially was prescribed Depo-Provera as a menstrual suppressant to alleviate the distress caused by his period. *Id.* at 437:20-21 (Saxton).

149.  The menstrual suppression helped alleviate some of Parker's gender dysphoria but did not fully address it. Parker still had depression, social anxiety, compulsive bathing, and an aversion to his reflection. *Id.* at 437:22-438:9 (Saxton).

150.  Parker went to follow-up visits at the ACH Gender Clinic regularly. *Id.* at 438:14, 439:8 (Saxton).

151.    About three or four months after his first visit, Parker expressed that he thought testosterone might be helpful for him. *Id.* at 439:9-12 (Saxton).

152.    On May 27, 2021, Parker began testosterone therapy. *Id.* at 442:21-25 (Saxton). Before starting treatment, Parker was evaluated by an ACH psychologist who confirmed the gender dysphoria diagnosis and conducted a psychological evaluation of Parker. *Id.* at 440:4-19 (Saxton). At the May 27th appointment, Parker, Donnie, and Dr. Hutchison extensively discussed the risks and benefits of treatment—including the potential impact on Parker's fertility—and they ultimately decided to move forward. *Id.* at 439:11-441:3, 442:25-443:15 (Saxton).

153.    As a parent, Donnie routinely makes medical decisions for his children. *Id.* at 430:21-25 (Saxton).

154.    Testosterone therapy has significantly alleviated Parker's gender dysphoria. *Id.* at 443:18-20 (Saxton).

155.    Parker's doctors also observed the positive impact of testosterone therapy on Parker's gender dysphoria. (Tr. 559:9-23, ECF No. 275 (Hutchison); Tr. 619:13-15, EF No. 275 (Stambough).

156.    Before Parker turned 18 in November 2022, the Saxton family talked about what they would do if Act 626 were to take effect and Parker could no longer receive testosterone therapy in Arkansas. It was a "hard talk," and they concluded that they'd "have to pick up and leave." (Tr. 445:21-446:17, ECF No. 220 (Saxton)).

157.    After HB 1570 was introduced, the possibility of care being prohibited resulted in Parker Saxton going to such a "dark place" that his father started sleeping near him because of concern he might hurt himself. *Id.* at 441:15-24, 442:2-14 (Saxton).

**The Dennis Family**

158. Plaintiff Brooke Dennis is 10 years old and is in fifth grade. (Tr. 638:18-21, ECF No. 275 (Dennis).

159. Plaintiffs Amanda and Shayne Dennis are her parents. *Id.* at 638:5-12 (Dennis).

160. Brooke has an older brother and a younger sister. *Id.* at 638:17-18 (Dennis).

161. The Dennises live in Bentonville, Arkansas. *Id.* at 650:3-10 (Dennis).

162. Brooke was assigned male at birth, but her gender identity is female. *Id.* at 639:11-15 (Dennis).

163. Brooke started identifying as a girl in second grade. *Id.* at 639:16-19 (Dennis).

164. Brooke continues to have fear, anxiety, and distress about the fact she could go through a typically male puberty. *Id.* at 620:21-621:6 (Stambough); 648:17-649:2 (Dennis).

165. Shortly after Brooke expressed her female gender identity to her mother in April 2020, the Dennises made an appointment for Brooke to see a therapist. *Id.* at 644:3-10 (Dennis). The Dennises wanted to have "as much information as possible to be able to make a good decision" on "how to move forward." *Id.* at 643:22- 24, 649:24-650:2 (Dennis).

166. After Brooke saw the therapist for a while, the therapist diagnosed Brooke with gender dysphoria. *Id.* at 644:13-17 (Dennis).

167. After the Dennises discussed Brooke's gender with her pediatrician, the pediatrician referred them to the ACH Gender Clinic. *Id.* at 644:18-645:6 (Dennis).

168. In October 2020, the Dennises had their first visit at the ACH Gender Clinic and met with Dr. Hutchison and other staff. *Id.* at 645:7-12 (Dennis). The purpose of the first visit was to help the family learn about the Clinic and the care they provided and get information about gender dysphoria and what they should be learning more about. *Id.* at 645:7-646:15

(Dennis). They discussed Brooke's history and childhood. *Id.* at 645:22-25 (Dennis). No medical treatments for gender dysphoria were indicated for Brooke because she has not yet started puberty. *Id.* at 645:7-648:16 (Dennis); 620:18-20 (Stambough).

169. Brooke continues to express "a lot" of distress about her body related to her gender. She is specifically anxious about going through puberty. *Id.* at 620:18-621:6 (Stambough); 647:9-23, 648:7-649:11 (Dennis).

170. Brooke is still receiving counseling related to her gender dysphoria. *Id.* at 649:12-14 (Dennis).

171. As parents, Amanda and Shayne routinely make medical decisions for their three children. *Id.* at 649:15-17 (Dennis).

172. Act 626 is causing great anxiety for the Dennis family. Amanda and Shayne have discussed what they would do if Act 626 takes effect and Brooke is not able to get gender-affirming medical treatment in Arkansas. They would need to regularly travel out of state or move out of state to get Brooke care, and either scenario would be logistically, financially, and emotionally difficult. *Id.* at 652:11-22 (Dennis).

173. If the family were to move away, Amanda might have to give up her job as head of business operations for the digital ad platform at Sam's Club within the Walmart Enterprise, which would cause financial hardship for the family. *Id.* at 650:11- 14, 651:17-652:1, 654:3-656:18, 653:2-655:22 (Dennis).

174. Amanda Dennis testified about the financial impact on the family, as well as the impact on the care of her other two children and an aging relative, her job, and Brooke's attendance at school if she and Brooke had to regularly travel out of state for medical care. *Id.* at 652:11-657:11 (Dennis).

### G. <u>Studies and Findings on Treatments Prohibited by Act 626</u>

175. Decades of clinical experience have shown that adolescents with gender dysphoria experience significant positive benefits to their health and well-being from gender-affirming medical care. (Tr. 67:8-12, ECF No. 219 (Karasic); 233:15-22 (Adkins); Tr. 298:7-18, 305:2-19, ECF No. 220 (Turban); Tr. 543:3-544:11, ECF No. 275 (Hutchison); Tr. 606:20-608:6, 609:22-610:1, ECF No. 275 (Stambough)).

176. Clinical experience shows the long-term effectiveness of gender-affirming medical care as some adolescents with gender dysphoria are able to discontinue antidepressants and anti-anxiety medications after receiving gender-affirming medical care. (Tr. 231:23-232:7, ECF No. 219 (Adkins); Tr. 64:8-65:19, ECF No. 219 (Karasic)).

177. There are 16 scientific studies assessing the use of puberty blockers and hormone therapy to treat adolescents with gender dysphoria, and this body of research has found these treatments are effective at alleviating gender dysphoria and improving a variety of mental health outcomes including anxiety, depression, and suicidality. (Tr. 295:16-18, 298:7-18, 300:24-301:2, 301:5-17, 302:20-303:8, 303:22-305:1, ECF No. 220 (Turban); Tr. 68:15-69:14, ECF No. 219 (Karasic)).

178. The studies evaluating the use of puberty blockers to treat gender dysphoria saw improvements in mental health or that patients did not experience worsening of mental health as is typically the case when children with gender dysphoria go through puberty. (Tr. 299:5-301:2, 318:5-22, ECF No. 220 (Turban)).

179. The studies evaluating the use of hormone therapy to treat adolescents with gender dysphoria had findings similar to the results of dozens of studies of gender-

affirming hormones for adults—both sets of studies found significant improvements in mental health. *Id.* at 302:20-303:21 (Turban).

180. Conclusions cannot be drawn from any single study (in any area of medical research), but the body of medical research as a whole shows that gender-affirming medical treatments are effective at improving mental health outcomes for adolescents with gender dysphoria. *Id.* at 300:21-301:2 (Turban).

181. The evidence base supporting gender-affirming medical care for adolescents is comparable to the evidence base supporting other medical treatments for minors. *Id.* at 389:25-390:3; 409:9-15 (Antommaria).

182. The evidence supporting gender-affirming medical care for adolescents with gender dysphoria includes scientific studies, that are cross-sectional and longitudinal, and clinical experience. *Id.* at 295:22-296:8, 299:5-14, 305:2-19 (Turban). Longitudinal studies follow mental health before and after treatment. *Id.* at 296:24-2951 (Turban). Cross-sectional studies compare people who receive treatment and do not receive treatment at one point in time. *Id.* at 296:3-6 (Turban).

183. There are no randomized controlled clinical trials evaluating the efficacy of gender-affirming medical care for adolescents. *Id.* at 296:9-13 (Turban). Such research is not possible because it would not be ethical or feasible to have a study in which a control group is not provided treatment that is known from clinical experience and research to benefit patients. *Id.* at 296:14-297:3 (Turban); 363:13-364:5, 385:23-386:7 (Antommaria). Additionally, it would not be possible to blind the studies to researchers and participants given the obvious physical effects of the treatments. *Id.* at 365:1-24,

387:16-388:2 (Antommaria); 296:14-297:11 (Turban); Tr. 67:19-68:14, ECF No. 219 (Karasic).

184. It is common for clinical practice guidelines in medicine to make recommendations based on low or very low-quality evidence such as cross-sectional and longitudinal studies. (Tr. 377:24-378:2, ECF No. 220 (Antommaria); Tr. 1269:12-17, ECF No. 249 (Hruz)).

185. The treatments banned by Act 626 are widely recognized in the medical community, including by the major professional medical associations, as effective treatments for adolescents suffering from gender dysphoria, based on the clinical experience and scientific research. (Tr. 34:2-12, 102:3-103:12, ECF No. 219 (Karasic)).

186. There are no other evidence-based treatments besides those prohibited by Act 626 that are known to alleviate gender dysphoria. (Tr. 326:16-327:5, ECF No. 220 (Turban)).

**H. <u>Potential Risks and Side Effects of the Gender-Affirming Care</u>**

187. As with other medical treatments, gender-affirming medical treatments can have potential risks and side effects that must be weighed by patients and their parents after being informed of those risks and side effects by their doctors. (Tr. 390:4-392:4, 394:24-395:3, 400:11-21, 401:4-15, ECF No. 220 (Antommaria)).

188. The risks of gender-affirming medical care are not categorically different than the types of risks that other types of pediatric healthcare pose. *Id.* at 390:24-391:6 (Antommaria).

189. For many adolescents the benefits of treatment greatly outweigh the risks.

190. For many adolescents, gender-affirming medical care significantly alleviates the distress of gender dysphoria, improves their mental health, and enables them to engage in school and social activities.

191.    Adverse health effects from gender-affirming medical care are rare when treatment is
        provided under the supervision of a doctor. (Tr. 220:25-221:9, ECF No. 219 (Adkins)).

192.    The evidence showed that the risks associated with the treatments prohibited by Act 626
        are comparable to the risks associated with many other medical treatments that parents
        are free to choose for their adolescent children after weighing the risks and benefits. (Tr.
        930:17, ECF No. 246 (Levine); Tr. 1319:2-4, ECF No. 249 (Hruz)). Off-label use of
        drugs is both permitted and common in Arkansas. (Pl.'s Ex. 9, at 137:21-25 (Embry)).

193.    There is nothing unique about the risks of gender-affirming medical care for adolescents
        that warrants taking this medical decision out of the hands of adolescent patients, their
        parents, and their doctors.

194.    It is common for adolescents to undergo medical treatments that carry comparable or
        greater risks than gender-affirming medical care. (Tr. 389:25- 390:3, 394:20-395:3, ECF
        No. 220 (Antommaria)).

195.    There are treatments for conditions other than gender dysphoria that can impair a minor's
        fertility, e.g., treatments for certain rheumatologic conditions, kidney diseases, and
        cancers. *Id.* at 391:6-9; 417:8-12 (Antommaria); Tr. 222:23:19-24, ECF No. 219
        (Adkins). Some of these treatments are provided at ACH, when appropriate for the
        particular patient. (Tr. 615:10-12, ECF No. 275 (Stambough)). Patients and families are
        similarly informed of the risk and weigh it in deciding whether to undergo the medical
        treatment. (Tr. 222:19-24, 227:2-5, ECF No. 219 (Adkins); Tr. 615:13-25, ECF No. 275
        (Stambough)).

196.    Except for the potential risk to fertility, the risks associated with puberty blockers,
        testosterone, estrogen and anti-androgens are the same regardless of the condition for

which they are being used and whether they are used to treat birth- assigned males or

birth-assigned females. (Tr. 206:18-21, 217:4-25, 219:13-220:2, ECF No. 275 (Adkins)).

197.    Puberty blockers that are used to delay puberty as treatment for gender dysphoria are also

used to treat other conditions, including central precocious puberty. Central precocious

puberty is puberty that starts earlier than the typical age for the start of puberty. (Tr.

204:11-18, ECF No. 219 (Adkins); Tr. 1223:6-10, ECF No. 249 (Hruz)). Precocious

puberty can occur when a child is as young as two. (Tr. 211:3-5, ECF No. 219 (Adkins)).

198.    Decades of clinical experience and research on the use of puberty blockers, both for

treatment of central precocious puberty and gender dysphoria, have shown this treatment

to be safe. (Tr. 212:25-213:2, ECF No. 219 (Adkins)).

199.    Patients on puberty blockers for precocious puberty are, on average, treated for a longer

period of time than gender dysphoria patients. (Tr. 210:19-211:7, ECF No. 219

(Adkins)). For precocious puberty, pubertal suppression treatment can last as long as nine

years. For gender dysphoria, pubertal suppression treatment typically does not last for

more than three or four years. This is the case at the ACH Gender Clinic. (Tr. 210:19-

211:7, ECF No. 220 (Adkins); Tr. 540:2-542:5, ECF No. 275 (Hutchison)).

200.    An expected effect of puberty blockers is the delay of rapid accrual of bone

mineralization that occurs during puberty. (Tr. 205:16-207:12, ECF No. 219 (Adkins);

Tr. 390:8-16, ECF No. 220 (Antommaria)). While patients are on puberty blockers, they

continue to accrue bone mineralization at prepubertal rate. (Tr., 209:2-13, ECF NO. 219

(Adkins)). Once puberty blockers are stopped and puberty resumes—either the person's

endogenous puberty or an exogenous puberty prompted by hormone therapy—the accrual

of bone mineralization increases at the usual pubertal rate. *Id.* at 209:2-210:1 (Adkins)).

201. Generally, a patient will reach the normal range of bone density within "two to three years after [a patient is] on either gender-affirming hormones or go[es] through [endogenous] puberty." *Id.* at 210:2-7 (Adkins).

202. There have been some patients who do not achieve full bone density after treatment with puberty blockers. These patients tend to have had low bone density and risk factors for low bone density to begin with. Such risk factors include a family history of osteoporosis, low Vitamin D status, low physical activity, poor nutritional status, or low weight. *Id.* at 210:8-18 (Adkins).

203. Puberty blockers are fully reversible. If an adolescent discontinues such treatment, endogenous puberty will resume. *Id.* at 206:13-17, 208:21- 209:1 (Adkins).

204. If a patient treated with puberty blockers stops treatment and resumes their endogenous puberty, the medication has no impact on fertility. *Id.* at 208:21- 209:1, 222:25-223:1 (Adkins).

**Masculinizing Hormone Therapy**

205. Testosterone is used to treat cisgender adolescent male patients for a number of conditions including delayed puberty, hypogonadism (where the brain does not tell the body to go through puberty), and micropenis. *Id.* at 213:11-19 (Adkins); Tr. 1248:19-1249:2, ECF No. 249 (Hruz).

206. Risks associated with taking testosterone, regardless of the condition for which it is used or the birth-assigned sex of the patient, include changes in cholesterol profile and blood thickness (hematocrit) to the typical male range. *Id.* at 215:19-216:20, 217:4-9, 221:10-222:2, 278:8-12 (Adkins); Tr. 390:20-23, ECF No. 220 (Antommaria); Tr. 1249:23-1250:8, ECF No. 249 (Hruz).

207.   When treatment is monitored by a doctor to ensure appropriate therapeutic levels, adverse health effects are rare. (Tr. 220:25-221:9, ECF No. 219 (Adkins)).

208.   When birth-assigned females are treated with testosterone, it can impact fertility. *Id.* at 216:21-217:3 (Adkins).

209.   If testosterone therapy follows treatment with puberty blockers at Tanner 2 such that the ovaries never develop, it can cause infertility. This is discussed with patients and parents prior to initiating treatment. If maintaining fertility is important to the family, there are ways to manage treatment to preserve fertility, for example, by delaying the start of puberty blockers until a later stage of puberty or temporarily stopping blockers to allow ovaries to develop. *Id.* at 225:12-226:4; 226:5-22. (Adkins).

**Feminizing Hormone Therapy**

210.   Hormone treatments used to treat transgender females with gender dysphoria— estrogen and anti-androgens—are used to treat many other conditions. (Tr. 203:1-25, ECF No. 219 (Adkins).

211.   Estrogen is used to treat cisgender adolescent girls for a number of conditions including delayed puberty, ovarian failure, and Turner Syndrome (a congenital condition that prevents puberty from occurring). *Id.* at 214:3-11 (Adkins); Tr. 632:10-13, ECF No. 275 (Stambough); Tr. 1257:22-1258:10, ECF No. 249 (Hruz).

212.   Anti-androgens are used to treat cisgender adolescent girls and women with polycystic ovarian syndrome and hirsutism. (Tr. 213:20-214:2, ECF No. 219 (Adkins); Tr. 1245:10-25, ECF No. 249 (Hruz)).

213.   The risks of estrogen, regardless of the condition it is being used for and whether used on birth-assigned females or birth-assigned males, include blood clots (increasing stroke

risk), lower hemoglobin levels, and increase in prolactin. (Tr. 218:1-219:16, ECF No. 219 (Adkins); Tr.1259:15-24, 1261:18-21, ECF No. 249 (Hruz)). Adverse health effects of feminizing hormone therapy present primarily among those who use excessive and unmonitored amounts of estrogen. (Tr. 278:13-279:8, ECF No. 219 (Adkins)).

214.    The risks and side effects of anti-androgens, regardless of the condition it is being used for and whether used to treat birth-assigned females or birth-assigned males, include an increase in potassium levels. *Id.* at 217:10-25 (Adkins).

215.    When treatment with estrogen or anti-androgens is monitored by a doctor to ensure appropriate therapeutic levels, adverse health effects are rare. *Id.* at 218:1-219:16; 220:6-21 (Adkins).

216.    When estrogen is used to treat birth-assigned males, it can impact fertility. This is therefore discussed with patients and parents prior to initiating treatment and fertility preservation options are discussed. *Id.* at 219:17-220:12 (Adkins).

217.    If feminizing treatment follows treatment with puberty blockers at Tanner 2 such that the testicles never developed, it can cause infertility. *Id.* at 225:17-226:4 (Adkins).

**Chest Masculinization Surgery**

218.    The surgical risks of chest masculinization surgery are comparable to the risks related to other chest surgeries adolescents may undergo, including mastectomy or breast reduction for cisgender girls and gynecomastia surgery for cisgender boys. (Tr. 391:10-392:16, ECF No. 220 (Antommaria).

**I. Desistance, Detransitioning and Regret**

219.    There are some individuals who undergo gender-affirming medical treatment who later come to regret that treatment and, for some, it was because they came to identify with

their birth-assigned sex (sometimes referred to as detransitioning). This can happen with individuals who medically transitioned as adolescents or as adults. Regret over a medical procedure is not unique to gender-affirming medical care and is common in medicine. (Tr. 77:1-16, ECF No. 219 (Karasic)).

220. In Dr. Karasic's clinical experience treating thousands of patients with gender dysphoria over 30 years, none of his patients came to identify with their sex assigned at birth after medically transitioning. *Id.* at 72:11-18 (Karasic). Some of Dr. Karasic's patients have halted their medical transition for other reasons such as lack of insurance coverage or fear of losing family support. Some of these patients later resumed their medical transition. None of his patients who stopped or paused medical transition did so because they came to identify with their sex assigned at birth. *Id.* at 72:19-73:17 (Karasic).

221. Detransition is taken seriously by WPATH and medical providers. Parents and patients are advised of the potential that patients may ultimately come to a different understanding about their gender later in life. *Id.* at 75:13-24 (Karasic). The desistance studies relied on by the State to assert that gender incongruence will naturally desist for most youth were focused on prepubertal children and say nothing about the likelihood of gender incongruence desisting among adolescents, the group affected by Act 626. (Tr. 311:1-11, ECF No. 220 (Turban); Tr. 88:2-89:6, 93:2-17, ECF No. 219 (Karasic)).

222. "Watchful waiting" is an approach used by some health care providers with pre-pubertal children with gender dysphoria. It entails following prepubertal children with gender dysphoria and not encouraging social transition prior to puberty. It is not a recognized approach for adolescents with gender dysphoria because it is understood that, at that point, gender incongruence is unlikely to desist. Even gender clinics using the "watchful

41

waiting" approach for prepubertal children provide gender-affirming medical care to patients whose gender dysphoria persisted past the onset of puberty. *Id.* at 96:21-98:6 (Karasic).

223.    Providing gender-affirming medical care does not cause youth to persist rather than desist in their gender incongruence. Adolescents with gender dysphoria are unlikely to desist whether or not they receive gender-affirming medical care. And youth do not receive medical treatment unless their gender incongruence has persisted into adolescence. *Id.* at 96:16-20, 99:4-25 (Karasic).

224.    Billy Burleigh and Laura Smalts testified about their experiences transitioning as adults and subsequently detransitioning. They stated they feel regret about their medical transitions. The Court finds these anecdotal experiences credible but also irrelevant to the issues to be decided. These witnesses' experiences are irrelevant to this case given that (i) neither sought nor received gender-affirming care as a minor (ii) both transitioned as adults (Tr. 1156:13-21, ECF No. 247 (Smalts); 1199:3-17, 1200:9-14 (Burleigh)); (iii) neither was treated in Arkansas *Id.* at 1157:2-11 (Smalts);  1210:15-23 (Burleigh)); (iv) they both detransitioned as a result of a religious experience and (v) continued to struggle with living consistently with their birth-assigned sex after deciding to detransition *Id.* at 1158:2-13, 1159:2-1160:2 (Smalts); 1203:10-1206:3, 1206:16-1207:1, 1207:8-13, 1207:22-25 (Burleigh)).

**J. Regulation of Medicine in Arkansas**

**The Arkansas State Medical Board Regulates the Practice of Medicine in Arkansas**

225.    All states have medical boards that safeguard the practice of medicine by evaluating accusations of unprofessional conduct and taking disciplinary action against providers,

which may include withdrawal of a medical professional's license. (Tr. 402:17-20, ECF No. 220 (Antommaria)).

226.    The Arkansas State Medical Board (the "Board") is the state entity charged with regulating the practice of medicine in Arkansas. (Pl, Ex. 9 at p. 42:7-11 (Embry)). The Board's structure and functions are governed by the Arkansas Medical Practices Act ("AMPA"). (Pls.' Ex. 11, at Subchapter 3, p. 21-25).

227.    The Board's mission is "to protect the public and act as their advocate by effectively regulating the practices of medical doctors. . .." (Pls.' Ex. 12; Pls.' Ex. 9 at 45:9-25 (Embry)). The Board regulates all the roughly 19,000-20,000 healthcare professionals whom it licenses. (Pls.' Ex. 9 at 42:20- 22, 43:19-25 (Embry)).

228.    The Board is authorized "to promulgate and put into effect such rules and regulations as are necessary to carry out the purposes of the Arkansas Medical Practices Act." (Pls.' Ex. 9 at 46:2-6 (Embry); Pls.' Ex. 11 Section 17-95-303(2) at 23). While the Board typically enacts regulations pursuant to explicit statutory requirements or requests made by legislators, if the Board has a concern about how medical care is being provided in a particular field, it can also draft a rule regarding that subject and submit it to the legislature for approval. (Pls.' Ex. 9 at 46:15-47:21, 49:4-10, 49:20-505, 54:15-20, 62:25-63:19 (Embry).)

229.    The Board tries to enact regulations that are consistent with best practices in a particular field. (Pls.' Ex. 9 at 60:22-61:3 (Embry)). The Board has worked with professional associations such as the Arkansas Medical Society in drafting rules, reviewing their best practice guidelines, and soliciting their expertise as professionals within their field. (Pls.'

Ex. 9 at 59:8-60:21 (Embry)). The Board may also look to national groups like the American Medical Association for information. (Pls.' Ex. 9 at 63:20-64:10 (Embry)).

**The Board Investigates and Disciplines Medical Providers for Unprofessional Conduct**

230.    The Board is authorized to investigate and discipline the medical practitioners whom it licenses for unprofessional conduct, including ethical violations as determined by the Board. (Pls.' Ex. 9, at 93:22-24, 96:6-976, 101:9-102:5 (Embry); Pls.' Ex. 11 Section 17-95-409(a)(1) -(a)(2) at 28-29). Investigations are often based on complaints filed with the Board. Sometimes issues come to the Board's attention through other means, such as the news. (Pls.' Ex. 9 at 43:9-18, 44:8-9, 72:21-74:18 (Embry)).

231.    The Board may, and does, investigate whether doctors are practicing their profession in a way that could endanger the public health or welfare. (Pls.' Ex. 9 at 72:6- 18 (Embry); Pls.' Ex. 11 at 17-80-106(c)(2) at 2).

232.    Failure to follow accepted medical practice can be a reason for investigation, and the Board considers accepted standards in a field of medicine when assessing whether there has been a violation of the AMPA. (Pls.' Ex. 9 at 81:16-19, 83:17-23 (Embry)).

233.    The penalties that the Board may impose for unprofessional conduct include revoking or suspending licenses, issuing reprimands, imposing probation, and levying fines. (Pls.' Ex. 9 at 109:17-113:6, 114:3-115:3 (Embry); Pls.' Ex. 11 17-95-410(e)(3) at 29).

234.    When issues concerning particular medical care arise, the Legislature and the Board pass laws and regulations to address how care is provided; they do not prohibit medical treatments. (Pls.' Ex. 9 at 137:11-20 (Embry)).

235.    When over-prescription of opioids resulted in the opioid epidemic and caused harm to the public in Arkansas, the Legislature passed the Chronic Intractable Pain Treatment Act.

(Pls.' Ex. 9 at 126:8-127:11 (Embry); Pls.' Ex. 11 Section 17-95-701 at 34-35). Rather than categorically banning opioids, the law provides a system of incremental sanctions for doctors who overprescribe opioids, beginning with monitoring prescribing habits, then voluntarily surrendering a DEA license for a period of time, then suspending the physician's license, and finally revoking the license. (Pls.' Ex. 11 Section 704(c)(1) at 35). Doctors have faced discipline for improper prescription of opioids under this section, including monitoring and the surrender of their DEA licenses. (Pls.' Ex. 9 at 130:5-8, 130:20-131:18 (Embry)). This system of incremental sanctions for improper prescription of opioids serves to effectively protect the public from harmful conduct. (Pls.' Ex. 9 at 131:19-22 (Embry)).

236. Because of serious risks related to gastric bypass surgery, the Legislature and Board established informed consent requirements before a doctor can perform gastric bypass surgery. (Pls.' Ex. at 132:13-133:2 (Embry); Pls.' Ex. 11 Subsections A through M of Rule 27 mandate a lengthy list of various complications and information that the informed consent process must address; Pls.' Ex. 9 at 133:23-134:6 (Embry)). This includes 33 potential surgical complications, nutritional complications, psychiatric complications, eight pregnancy complications, and 22 additional complications. *Id.* at 134:7-135:20 (Embry)). The rule further requires that licensees inform patients that there is no guarantee of weight loss or long-term weight management as a result of getting surgery, and that a lifetime of follow-up medical care is required. *Id.* at 135:4-20 (Embry)). The informed consent provisions in the Board's regulation related to gastric bypass surgery effectively protect the public from harm. *Id.* at 136:6-14 (Embry).

237.    After the FDA concluded that it was "no longer reasonable to believe that oral

formulations of [hydroxchloroquine] and [chloroquine] may be effective in treating

COVID-19, nor [was] it reasonable to believe that the known and potential benefits of

these products outweigh their known and potential risks," (Pls.' Ex. 15). The Arkansas

Department of Health updated its guidance to indicate that this use "should be avoided"

in hospital and outpatient settings. But the guidance noted that "Unapproved use (i.e., 'off

label use') of these medications is left to the discretion of individual clinicians and their

patients." *Id.* The Board has not considered passing a regulation prohibiting the use of

hydroxychloroquine to treat COVID. (Pls.' Ex. 9 at 143:21-24 (Embry)). The Board has

received several complaints about a doctor inappropriately prescribing ivermectin to treat

incarcerated people with COVID at a county jail. *Id.* at 78:8-79:14, 144:14-23 (Embry).

The Board has not considered passing a rule prohibiting the use of ivermectin to treat

COVID-19. *Id.* at 148:13-16 (Embry); Pls.' Ex. 18 at 81:21-82:21 (Branman).

238.    Arkansas does not ban medical treatments for lack of randomized controlled clinical trials

supporting their use. (Pls.' Ex. 9 at 206:23-207:4 (Embry)).

239.    Arkansas does not ban medical treatments with a limited evidence base. *Id.* at 205:9-

206:6 (Embry).

240.    Even where there are known risks of a treatment and no evidence of effectiveness, the

Board leaves treatment decisions to patients, parents, and their physicians. *Id.* at 208:10-

16 (Embry).

241.    Arkansas does not ban medical treatments for minors on the rationale that minors cannot

provide informed assent. In Arkansas, parents usually are required consent to medical

treatment for their minor children, and the decision about whether to undergo care is between the physician and the parent and the minor patient. *Id.* at 174:2-15 (Embry).

242.  The Board is not aware of any minors in Arkansas who have been harmed by gender-affirming care. *Id.* at 227:17-22 (Embry).

243.  The Board has never received a complaint regarding gender-affirming medical care for minors or adults. *Id.* at 152:3-16 (Embry); Pls.' Ex. 18 at 103:7-10 (Branman).

244.  Since Embry became Executive Director in 2018, there has not been discussion about gender-affirming medical care for adults or minors at any Board meeting. (Pls.' Ex. 9 at 152:25-153:25, 217:2-6 (Embry)).

245.  Since Embry has been director, the Board has not considered passing a regulation concerning gender-affirming medical care. *Id.* at 154:2-6 (Embry). No one at the Board ever suggested to Embry that they saw a need for a regulation concerning gender-affirming medical care. *Id.* at 154:7-11 (Embry).

246.   If there is an issue regarding the over-prescription of gender-affirming medical treatment, the Board can propose a regulation to address that, as it did for the over-prescription of opioids. *Id.* at 210:25-211:11, 211:25-212:10 (Embry).

247.  If there are doctors providing gender-affirming medical treatments to adolescents without adequately informing them of the risks of those treatments, the Board could propose an informed consent regulation, as it did for gastric bypass surgeries. *Id.* at 212:11-21, 213:20-25 (Embry).

248.  The Board is the licensing entity for physicians who are providing procedures prohibited by Act 626. *Id.* at 179:25-180:6, 180:11-14 (Embry). The Board is ready to field any complaints alleging violations of Act 626 as those arise. *Id.* at 182:13-19 (Embry).

249.   If the Board receives a complaint that a doctor was providing gender-affirming medical
       care to an adolescent, the Board will follow the same general process that it uses for other
       complaints to determine whether the Act was violated. *Id.* at 182:4-12, 182:20-183:14
       (Embry); Pls.' Ex. 18 at 108:3-110:3 (Branman).

250.   Under the Act, the referral for or provision of gender transition procedures to a minor
       constitutes unprofessional conduct. (Pls.' Ex. 9 at 178:20-179:6 (Embry)). If a doctor
       provided gender-affirming care prohibited by Act 626, the Board would have to make a
       finding of unprofessional conduct under the statute. *Id.* at 184:25-185:6 (Embry). The
       doctor would then be subject to discipline by the Board, including the potential
       revocation of their license to practice. *Id.* at 185:7-9, 185:22-186:2 (Embry).

### K. Policy Concerns Expressed at Trial

251.   The Arkansas chapter of the American Academy of Pediatrics, the Arkansas Academy of
       Pediatrics, the American College of OB/GYN, the American Academy of Child
       Adolescent Psychologists, the American Academy of Child and Adolescent Psychiatry,
       the Arkansas Psychological Association opined that HB1570 would penalize medical
       providers for "simply following best medical practices to provide or even refer for
       appropriate effective care that is based in science and evidence," cause immediate and
       irreversible harm to adolescents receiving care in-state, and limit physicians' ability to
       refer youth to care supported by medical experts. (Pls.' Ex. 23 at 25:25-27:10, 27:11-21).

### L. The Harm to Plaintiffs and Others Should Act 626 Take Effect

252.   If Act 626 takes effect, adolescents whose parents and doctors agree that gender-
       affirming medical care is appropriate treatment for their gender dysphoria will be unable
       to receive that care in their home state and unable to get referrals from their doctors to

receive care in other states. This will cause irreparable harm to the Plaintiff adolescents, Plaintiff parents and Plaintiff doctor.

253.    The harms are severe and irreparable for adolescents with gender dysphoria who need but are unable to access gender-affirming medical care.

254.    The fact that transgender adults face elevated rates of physical and mental health issues due to stigma, discrimination, and having lived with gender dysphoria is not a reason to deny treatment to adolescents with gender dysphoria; if anything, it supports the need for access to treatment. (Tr. 47:16-25, ECF No. 219 (Karasic))

255.    Denying gender-affirming medical care to adolescents with gender dysphoria until they reach age 18 means their bodies would go through irreversible pubertal changes inconsistent with their gender identity. *Id.* at 234:18-235:7 (Adkins).

256.    Delaying gender-affirming medical care when indicated puts patients at risk of worsening anxiety, depression, hospitalization, and suicidality. *Id.* at 236:11- 19, 237:1-5 (Adkins); 111:19-112:3 (Karasic)

257.    Act 626 will impact Arkansas adolescents with gender dysphoria who need but are unable to access care. After ACH changed its policy in February 2022 to stop initiating gender-affirming medical care for new patients given the possibility of Act 626 taking effect, many patients for whom puberty blockers or hormone therapy are indicated have been unable to access care elsewhere. (Tr. 611:10-20, ECF No. 275 (Stambough)). These patients are experiencing anxiety and distress. *Id.* at 611:21-612:6 (Stambough).

258.    Not all adolescents with gender dysphoria will live to age 18 if they are unable to get gender-affirming medical treatment. (Tr. 28:22-25, ECF No. 219 (Karasic) (testifying about adolescent patients with gender dysphoria who made suicide attempts); 236:14-25

(Adkins) (testifying about losing a patient to suicide); Tr. 612:20-613:15, ECF No. 275 (Stambough) ("I am not hyperbolic when I say that I have concerns that not every patient would be able to make it to 18."); 549:12-18 (Hutchison) (testifying that she is "worried that we're going to lose some kids" if the law takes effect)).

259.   For those adolescents who are already being treated with puberty blockers or hormone therapy and who would be forced to discontinue treatment, experts on both sides agree that the harms are severe.

260.   The State's expert, Dr. Levine, described the psychological impact of cutting off gender-affirming medical care for those currently receiving it as "shocking" and "devastating." He testified he would expect doctors to "find a way" to help those patients, even providing treatment in violation of the law. (Tr. 913:6-914:4, 914:24-915:12, ECF No. 246 (Levine) (suggesting doctors would provide care "privately . . . that you don't know about," "under the radar")).

261.   Discontinuing testosterone in transgender males would cause a decrease in facial and body hair growth, a return to a more typically feminine body shape, and lower muscle mass, resulting in the body not being well-aligned with their gender identity. (Tr. 235:8-17, ECF No. 219 (Adkins)).

262.   Discontinuing testosterone suppression and estrogen in transgender females would result in the patient's beard coming back and shifts in body fat—less hips and chest—that do not align with their gender identity. *Id.* at 235:20-236:10 (Adkins).

263.   Accessing care out of state is a considerable challenge with significant financial costs, and it is not something all families have the resources to do. Having to regularly travel out of state to take a child to doctor visits can be a great financial and logistical challenge

to families. (Tr. 675:15-677:5, 696:13-24, ECF No. 275 (J. Brandt); 652:11-657:11

(Dennis); Tr. 462:20-463:11, ECF No. 220 (Jennen); 445:21-446:17 (Saxton).

264.    Pursuant to Act 626, doctors who provide gender-affirming medical care to minor

patients are engaging in unprofessional conduct and are subject to losing their medical

license. (Pls.' Ex. 16 at 20-9-1504(a)).

265.    Dr. Levine, the State's expert, expressed concern about the possibility of doctors losing

their licenses for continuing to provide gender-affirming medical care. He testified that

would be "[d]raconian" and a loss of a community resource. (Tr. 915:13-916:7, 917:16-

918:11, ECF No. 246 (Levine)).

266.    Requiring doctors to discontinue gender-affirming medical care that they are currently

providing to adolescent patients—and prohibiting them from referring those patients to

obtain care elsewhere—conflicts with their ethical obligation not to abandon patients

under the AMPA. (Pls.' Ex. 14 at 20-6-202(a)(2); Pls.' Ex. 9 at 244:2, 19-22; 244:23-24;

236:17-237:4 (Embry)).

267.    The AMPA provides that "healthcare providers are prohibited legally and ethically from

abandoning a patient before treatment has been concluded." (Pls.' Ex. 14 at 20-6-

202(a)(2); Pls.' Ex. 9 at 244:2, 19-22; 244:23-24; 236:17-237:4 (Embry)). Under this

provision, if a doctor who is treating a patient is required to stop care before treatment is

concluded, the doctor has an ethical obligation to help the patient find care from another

doctor. *Id.* at 199:13-20 (Embry).

268.    Doctors can be disciplined by the Board for abandoning a patient in violation of Ark.

Code Ann. § 20-6-202. *Id.* at 201:5-9 (Embry). "Healthcare providers are prohibited

legally and ethically from abandoning a patient before treatment has been concluded."

Ark. Code Ann. § 202(a)(2). The Board recognizes the harms of abandoning patients prior to the completion of treatment. *Id.* at 237:23-238:3, 283:13-17 (Embry); Pls.' Ex. 18 at 130:18-19 (Branman).

### M.  Plaintiffs' Experts

#### Dan H. Karasic, M.D.

269.  Dr. Dan Karasic is a psychiatrist with over 30 years of experience treating thousands of patients with gender dysphoria, including hundreds of adolescents. He is a professor emeritus of psychiatry at the University of California-San Francisco, where he has been on the faculty since 1991. Dr. Karasic received his medical degree from Yale School of Medicine and completed his residency at UCLA.

270.  Dr. Karasic was a co-author of the current and previous versions of the WPATH Standards of Care and was on the committee to revise the categories of gender identity disorders for DSM-V. He has trained over 1,000 health care providers in transgender health care, served as an expert consultant to organizations including the United Nations Development Programme, and given invited presentations around the world. Dr. Karasic has also published several books and scholarly articles on transgender health. In 2006, Dr. Karasic was given the honor of being named a Distinguished Fellow of the American Psychiatric Association. (Pls.' Ex. 2; Tr. 23:11-20, ECF No. 219 (Karasic)).

271.  Many of Dr. Karasic's patients, including adolescents, were profoundly impaired by gender dysphoria. He has had patients who were withdrawn from school or social interaction, patients who were suicidal or made suicide attempts, and patients who engaged in other forms of self-harm such as cutting their breasts or genitals, prior to getting treatment. *Id.* at 28:6-16, 29:9- 12 (Karasic).

**Deanna Adkins, M.D.**

272.  Dr. Deanna Adkins is a pediatric endocrinologist with 22 years of experience since

completing medical school at the Medical College of Georgia and her residency at the

University of North Carolina Hospitals. Dr. Adkins is an associate professor of pediatrics

at Duke University, where she has been on the faculty since 2004. She is the director of

the Duke University Child and Adolescent Gender Care Clinic.

273.  She has treated approximately 600 adolescent patients with gender dysphoria.

274.  Dr. Adkins also treats patients for a variety of other conditions requiring hormonal

therapies, including differences of sexual development. (Pls.' Ex. 3; Tr. 195:25-196:21,

213:3-214:17, ECF No. 219 (Adkins)).

**Jack Turban III, M.D.**

275.  Dr. Jack Turban is a child and adolescent psychiatrist whose work has focused on the

treatment of patients with gender dysphoria. After completing medical school at Yale and

his residency at Massachusetts General Hospital and McLean Hospital in Boston, Dr.

Turban completed a fellowship in Child and Adolescent Psychiatry at Stanford

University School of Medicine. Dr. Turban is an associate professor of child and

adolescent psychiatry at the University of California, San Francisco School of Medicine

where he treats adolescents and children with gender dysphoria. He also conducts

scientific research on the mental health and treatment of adolescents with gender

dysphoria and has published over 20 peer reviewed articles on the subject. (Pls.' Ex. 1;

Tr. 292:10-293:6, 293:13-294:1, ECF No. 220 (Turban)).

**Armand H. Matheny Antommaria, M.D, Ph.D.**

276.    Dr. Armand Antommaria is a pediatrician, pediatric hospitalist, and bioethicist. He

completed medical school at the Washington University School of Medicine and his

residency at the University of Utah. He is currently the director of the Ethics Center at

Cincinnati Children's Hospital Medical Center and a professor at the University of

Cincinnati School of Medicine. As director of the Ethics Center, Dr. Antommaria

provides clinical ethics consultation and works with a variety of medical teams to address

ethical issues that arise in the care that they provide, including the transgender clinic and

the differences of sex development clinic. He has also published numerous scholarly

articles about medical ethics. (Pls.' Ex. 4; Tr. 357:19-359:11, ECF No. 220

(Antommaria)).

**Kathryn Stambough, M.D.**

277.    Plaintiff Dr. Kathryn Stambough earned her medical degree from Washington University

School of Medicine in St. Louis and completed a fellowship in Pediatric and Adolescent

Gynecology at Baylor College of Medicine Texas Children's Hospital in Houston. (Tr.

598:2-9, ECF No. 275 (Stambough)).

278.    Dr. Stambough is an assistant professor at the University of Arkansas for Medical

Sciences ("UAMS") and a member of the Division of Pediatric and Adolescent

Gynecology. *Id.* at 598:20-599:3 (Stambough).

279.    Dr. Stambough has a clinical appointment at ACH where she practices in multiple clinics:

the Gender Clinic; the Gynecology Clinic; the In-STEP Clinic, which cares for patients

with differences of sexual development; and the Spinal Cord Disorders Clinic. She also

has a clinical appointment and serves as a member of the team at UAMS in the Adult

Gender Clinic. *Id.* at 599:14-600:22 (Stambough).

280. Dr. Stambough has been practicing in the ACH Gender Clinic since August 2020. She

has been the Clinic's medical director since July 2022. *Id.* at 601:10-24 (Stambough).

281. Currently, 248 patients are being actively seen in the ACH Gender Clinic. *Id.* at 601:25-

602:6 (Stambough).

282. The Clinic currently is providing hormone therapy to 81 patients. *Id.* at 602:21-603:4

(Stambough).

283. Dr. Stambough treats patients in the Gender Clinic, including with puberty blockers and

hormone therapy. *Id.* at 604:2-20, 619:7-12 (Stambough).

284. Dr. Stambough has seen the distress of gender dysphoria experienced by her adolescent

patients and how gender-affirming medical care alleviates that distress and improves her

patients' health. *Id.* at 606:23-607:22 (Stambough).

285. If Act 626 takes effect, Dr. Stambough would be unable to provide medically necessary

care to patients and would be forced to leave them to needlessly suffer. *Id.* at 610:2-21,

612:3-613:15 (Stambough).

286. In the course of her practice, Dr. Stambough sometimes refers patients to another

healthcare provider which involves discussions with the patients and their families. *Id.* at

615:13-17 (Stambough). In making a referral, Dr. Stambough's discussion with her

patients includes options for where to obtain the care. *Id.* at 615:18-25 (Stambough).

287. If Act 626 were to go into effect, Dr. Stambough would be unable to make all the

referrals necessary to care appropriately for her Gender Clinic patients. *Id.* at 616:1-5

(Stambough).

288.    Some of Dr. Stambough's gender dysphoria patients would not be able to bring a lawsuit

on their own behalf to challenge Act 626 for various reasons, including not being out to

members of their extended family or keeping their gender identity private in certain other

contexts. *Id.* at 618:20-25 (Stambough).

**Plaintiffs' Expert Opinions Generally**

289.    Plaintiffs' experts' extensive experience, their testimony in court, and their demeanor and

responsiveness to questions asked by both sides and the Court, show that all four of

Plaintiffs' expert witnesses have deep knowledge of the subject matter of their testimony

and were fully qualified to provide the opinion testimony they offered. They have

provided credible and reliable testimony relevant to core issues in this case.

**N. The State's Experts**

**Stephen B. Levine, M.D**.

290.    Dr. Stephen Levine is a licensed physician and Clinical Professor of Psychiatry at Case

Western Reserve University School of Medicine where he attended medical school. He

co-created the first gender identity clinic in Ohio in 1974 and has been seeing patients

since that time. He has authored five books on sexual health, is the Senior Editor of the

first three editions of the Handbook of Clinical Sexuality for Mental Health Professions.

He has authored numerous invited papers, commentaries, chapters, and book reviews and

was awarded a lifetime achievement award from the Society for Sex Therapy and

Research in March 2005. (Def. Tr. Ex. 1).

291.    Dr. Levine was the State's only expert witness who has experience treating patients with

gender dysphoria. In his practice, he has enabled minor patients with gender dysphoria to

access hormone therapy on a case-by-case basis. (Tr. 785:3-6, ECF No. 246 (Levine)).

Dr. Levine does not support banning gender-affirming medical care for adolescents with gender dysphoria. He has concerns about Act 626's impact on youth who are currently receiving gender-affirming hormones.

292.  Dr. Levine testified that doctors who provide gender-affirming medical care to adolescents with gender dysphoria encourage patients to identify as transgender and provide hormones immediately without assessing patients and addressing other mental health conditions or informing patients and their parents of the risks and the limitations of the evidence regarding treatments. *Id.* at 809:18- 810:4; 811:21-812:10; 824:5-14 (Levine). He offered no evidence that treatment was being provided this way in Arkansas or anywhere in the United States. Dr. Levine conceded he has no knowledge of how most gender clinics provide care and, thus, does not know how common it is for care to be provided in the way he described. *Id.* at 887:19-888:25 (Levine). He further does not know how care is provided by doctors in Arkansas. *Id.* at 888:24-891:16 (Levine).

293.  The Court found Dr. Levine a very credible witness who struggles with the conflict between his scientific understanding for the need for transgender care and his faith.

**Mark Regnerus, Ph.D.**

294.  Professor Mark Regnerus testified that all the major professional medical groups' support for gender-affirming medical care for adolescents with gender dysphoria is grounded in ideology rather than science. (Tr. 994:22-996:10, 1000:17-1001:1, ECF No. 248 (Regnerus)). Professor Regnerus' testimony did not offer any support for his conclusion, and the Court finds that there is no evidence to support this assertion.

295.  Professor Regnerus, a sociologist whose work has focused on sexual relationship behavior and religion, has no training or experience related to the fields of medicine or

mental health care, or the treatment of gender dysphoria. *Id.* at 974:5-977:22 (Regnerus).

He has never worked in a medical or mental health clinical setting. *Id.* at 977:1-22

(Regnerus).

296.    The Court does not credit the testimony of Professor Regnerus and gives it no weight

because the Court finds that he lacks the qualifications to offer his opinions and failed to

support them.[11]

**Patrick W. Lappert, M.D.**

297.    Dr. Patrick Lappert is Board-Certified in Surgery and Plastic Surgery. He is the Founding

Director of both the Pediatric Cleft Palate and Craniofacial Deformities Clinic and the

Wound Care Center at Naval Hospital Portsmouth, Virginia. He served the Office of the

Surgeon General-U.S. Navy as a Specialty Leader in Plastic and Reconstructive Surgery.

---

[11] This is not the first time that Professor Regnerus's testimony as an expert witness has been questioned by a court. The district court in *DeBoer v. Snyder* found that Regnerus's research and testimony that gay parenting caused adverse outcomes in children was "entirely unbelievable and not worthy of serious consideration" and a "fringe viewpoint that is rejected by the vast majority of [the studies' authors'] colleagues across a variety of social science fields." *DeBoer v. Snyder*, 973 F. Supp. 2d 757, 766-68 (E.D. Mich.), rev'd on other grounds, 772 F.3d 388 (6th Cir. 2014), rev'd sub nom. *Obergefell v. Hodges*, 576 U.S. 644, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015); *see e.g., Kitchen v. Herbert*, 755 F.3d 1193, 1225 (10th Cir. 2014) (citing Rule 28(j) Letter at 2, No. 13–4178 (10th Cir., filed Apr. 9, 2014) (acknowledging that appellants' main scientific authority [Regnerus's research] on this issue "cannot be viewed as conclusively establishing that raising a child in a same-sex household produces outcomes that are inferior to those produced by man-woman parenting arrangements"); Ian Farrell & Nancy Leong, Gender Diversity and Same-Sex Marriage, 114 Colum. L. Rev. Sidebar 97, 101 (2014) (noting the "now-discredited study by Mark Regnerus" which was "suspect from creation--it was funded by conservative think tanks" and "suspect in methodology[.] . . . Moreover, Regnerus's department at the University of Texas publicly stated that it did not sanction his work. Social Science Research, in which the study originally appeared, later performed an audit and announced that the study should not have been published[.]"); Nathaniel Frank, What Does Mark Regnerus Want?, Slate (July 10, 2014, 10:20 AM), http://www.slate.com/blogs/outward/2014/07/10/mark_regnerus_ is_back_with_more_anti_gay_family_science.html (on file with the Columbia Law Review); Philip N. Cohen, 200 Researchers Respond to Regnerus Paper, Family Inequality (June 29, 2012, 11:00 AM), http://familyinequality.wordpress.com/2012/06/29/200-researchers-respond-to-regnerus-paper/ (on file with the Columbia Law Review) (finding peer-review process abnormally short and questioning reviewers' expertise and impartiality); Dep't of Sociology, Statement from the Chair Regarding Professor Regnerus, Univ. of Tex. at Austin (Apr. 12, 2014), http:// www.utexas.edu/cola/depts/sociology/news/7572 (on file with the Columbia Law Review) ("Dr. Regnerus' opinions ... do not reflect the views of the Sociology Department of The University of Texas at Austin."); Darren E. Sherkat, The Editorial Process and Politicized Scholarship: Monday Morning Editorial Quarterbacking and a Call for Scientific Vigilance, 41 Soc. Sci. Res. 1346, 1347-49 (2012) (finding "serious flaws and distortions" in Regnerus's paper)).

298.    Dr. Lappert has no training or professional experience in mental health or gender
        dysphoria and has never provided gender-affirming surgery. He acknowledges that he is
        not an expert in the treatment of gender dysphoria. (Tr. 1040:16-1042:18, ECF No. 248
        (Lappert)).

299.    Like Professor Mark Regnerus and Dr. Paul Hruz, Dr. Lappert was recruited by the
        Alliance Defending Freedom ("ADF") at a seminar held in Arizona. The meeting was
        held to gather witnesses trained in various fields that would be willing to testify in favor
        of laws passed that limit transgender care. The ADF is an organization committed to
        protecting God's design for marriage and family. (Tr. 1029:16-1031:24, ECF No. 248
        (Regnerus)). The ADF is not a scientific organization, but a Christian-based legal
        advocacy group. *Id.* at 1080:21-25 (Lappert). While there is nothing nefarious about an
        organization recruiting witnesses to testify for their cause, it is clear from listening to the
        testimony that Professor Mark Regnerus, Dr. Paul Hruz, and Dr. Lappert were testifying
        more from a religious doctrinal standpoint rather than that required of experts by
        *Daubert*.

300.    Dr. Lappert offered opinions regarding the circumstances under which he believes
        cosmetic or aesthetic surgeries are ethically appropriate in adults and minors and the
        potential risks of various surgeries outside of the context of gender transition. The
        relevance of Dr. Lappert's testimony was unclear. The Court finds that he is not qualified
        to offer relevant opinions given his lack of experience related to gender dysphoria.

301.    Dr. Lappert does not meet the requirements under *Daubert* to give opinions relevant to
        this case.

302.  Dr. Lappert acknowledged that his opinions were his own and were inconsistent with his peers and the American Society of Plastic Surgeons. *Id.* at 1080:5-9, 1081:16-21 (Lappert).

**Paul W. Hruz, M.D., Ph.D.**

303.  Dr. Paul Hruz is a Pediatric Endocrinologist. He is currently the Associate Professor of Pediatrics, Endocrinology and Diabetes and the Associate Professor of Pediatrics, Cell Biology & Physiology at Washington University of St. Louis School of Medicine. He received his M.D. and Ph.D. in Biochemistry from the Medical College of Wisconsin. He received certification in Healthcare Ethics from the National Catholic Bioethics Center in 2017. In addition to teaching and authorship of many articles and papers, Dr. Hruz practices Pediatric Endocrinology at St. Louis Children's Hospital.

304.  Dr. Hruz has never treated a patient for gender dysphoria. (Tr. 1317:21-23, ECF No. 249 (Hruz)).

305.  The legislative findings in Act 626 assert that there is insufficient evidence of the efficacy of gender-affirming medical care for minors. Some of the state's expert witnesses—Dr. Levine and Dr. Hruz—offered opinions to that effect. (Tr. 833:12-16, ECF No. 246 (Levine); Tr. 1274:15-25, ECF No. 249 (Hruz)). The Court does not credit these opinions because it finds that the evidence showed that decades of clinical experience in addition to a body of scientific research demonstrate the effectiveness of these treatments. For the same reason, the Court finds that the treatments banned by Act 626 are not "experimentation" on youth, as suggested by the Act's title. ARK. CODE ANN. § 20-9-1501 (2021) ("Arkansas Save Adolescents from Experimentation (SAFE) Act"); Tr. 382:25-383:4, ECF No. 220 (Antommaria)).

306.    Dr. Hruz suggested that the Court should disregard the body of research showing benefits of gender-affirming medical care for adolescents because it is low-quality research, and the studies have methodological limitations such as lack of a control group or cross-sectional design. (Tr. 1275:20-1277:4, 1277:18-1278:21, 1279:7-1280:22, 1291:14-1292:8, ECF No. 249 (Hruz)). The Court declines to do that. The Court finds that the quality of the evidence supporting gender-affirming medical interventions for adolescents with gender dysphoria is comparable to the quality of evidence supporting many other medical treatments minors and their families may pursue. And while the Court recognizes that the studies on gender-affirming medical care for adolescents, like studies in all areas of medical research, have strengths and weaknesses, it does not credit Dr. Hruz's assessment that the entire body of research is, therefore, meaningless. The body of research, taken as a whole, shows these treatments provide significant benefits to adolescents with gender dysphoria.

307.    Dr. Hruz also testified about risks of puberty blockers, testosterone, anti-androgens, and estrogen, suggesting this is a basis to prohibit gender-affirming medical care for adolescents. *Id.* at 1247:4-10; 1257:11-20, 1261:18-25; 1262:1-1263:13 (Hruz). The weight of evidence speaks to the contrary.

308.    Like Plaintiffs' experts, Dr. Hruz recognized that apart from the potential impact on fertility, the risks of these treatments also exist when these medications are provided to treat other conditions in cisgender patients. *Compare Id. with* 1229:24- 1230:22, 1249:14-1250:8, 1259:15-1260:3 (Hruz). These risks have not prevented Dr. Hruz from providing these medications to cisgender patients in his pediatric endocrine practice. *Id.* at 1222:22-24, 1244:11-17, 1248:16-18, 1257:21-24 (Hruz).

**Defendant's Expert Opinions Generally**

309.    The State suggests that Act 626 is consistent with medical guidelines issued by "nations around the world." *See* Def. Tr. Br. at 21. Their experts referenced guidelines issued by government health authorities in Sweden, Finland, and the United Kingdom. But the Court finds that the evidence showed that none of these guidelines have prohibited gender-affirming medical care for minors. (Tr. 405:19-406:6, 406:20-407:24, ECF No. 220 (Antommaria)).

310.    In Sweden, Finland and the United Kingdom, gender-affirming medical care is provided to adolescents with gender dysphoria when indicated under their guidelines. For example, in Finland, the guidelines provide that hormone therapy can be provided to minors based on a thorough case-by-case consideration if it can be ascertained that the adolescent's identity as the other sex is of a permanent nature and causes severe dysphoria. (Tr. 938:23-939:3, ECF No. 246 (Levine)). In the United Kingdom, the National Health Service has expanded care from one central clinic to regional clinics to broaden access to care. (Tr. 406:20-407:19, ECF No. 220 (Antommaria)).

311.    Most of the State's expert witnesses, Professor Mark Regnerus, Dr. Stephen Lappert, and Dr. Paul Hruz, were unqualified to offer relevant expert testimony and offered unreliable testimony. Their opinions regarding gender-affirming medical care for adolescents with gender dysphoria are grounded in ideology rather than science. *See also Doe v. Ladapo*, 2023 WL 3833848, at *2 (N.D. Fla. June 6, 2023) (comments on expert testimony of Lappert and Hruz); *Kadel v. Folwell*, 620 F. Supp. 3d 339, 368 (M.D.N.C. 2022) (same).

III.  **Conclusions of Law**

A. **Standing**

Constitutional standing requires that at least one plaintiff demonstrate they have

suffered a concrete and particularized injury that is fairly traceable to the challenged

action and is likely to be redressed by a court ruling in the plaintiff's favor. *See Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "To show standing under Article III

of the U.S. Constitution, a plaintiff must demonstrate (1) injury in fact, (2) a causal

connection between that injury and the challenged conduct, and (3) the likelihood that a

favorable decision by the court will redress the alleged injury." *Iowa League of Cities v.*

*EPA*, 711 F.3d 844, 869 (8th Cir. 2013) (citations omitted). The undisputed evidence at

trial established that, if the Act were to go into effect, (i) three of the Minor Plaintiffs—

Parker Saxton, Dylan Brandt, and Sabrina Jennen—would have to discontinue treatment

that they, their parents, and their doctors all agree is medically indicated for them and

benefitting their health and well-being, and Minor Plaintiff Brooke Dennis would be

unable to obtain treatment she will imminently need; (ii) the Parent Plaintiffs would have

to watch their children suffer the loss of care or endure severe personal and financial

hardship to access care for their children in other states, and (iii) the Physician Plaintiff,

Dr. Kathryn Stambough, would be unable to treat her patients who need care, leaving

them to suffer, and unable to refer them to other doctors to provide care when necessary.

As the Court has held, those injuries are directly traceable to the Act and would be

redressed by a permanent injunction barring its enforcement. The evidence presented at

trial confirms that Plaintiffs have standing to pursue their claims.

B. **Equal Protection**

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction

that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne*

*Living Ctr*., 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

"Put another way, state action is unconstitutional when it creates 'arbitrary or irrational'

distinctions between classes of people out of 'a bare ... desire to harm a politically

unpopular group.'" *Grimm v. Gloucester Cnty. Sch. Bd*., 972 F.3d 586, 607 (4th Cir.

2020), as amended (Aug. 28, 2020) (quoting *Cleburne*, 473 U.S. at 446–47). It protects

against intentional and arbitrary discrimination. *See Vill. of Willowbrook v. Olech*, 528

U.S. 562, 564 (2000) (per curiam). State action is generally presumed to be lawful and

will be upheld if the classification drawn by the statute is rationally related to a legitimate

state interest. *City of Cleburne*, 473 U.S. at 440.

The rational basis test, however, does not apply when a classification is based upon

sex. Rather, a sex-based classification is subject to heightened scrutiny, as sex

"frequently bears no relation to the ability to perform or contribute to society." *Id.* at

440–41 (quoting *Frontiero v. Richardson*, 411 U.S. 677 (1973)). Act 626 discriminates

on the basis of sex because a minor's sex at birth determines whether the minor can

receive certain types of medical care under the law. *Brandt by & through Brandt v.*

*Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022). The evidence presented at trial supports this

conclusion. A minor assigned male at birth is not prohibited under Act 626 from

receiving testosterone or surgical procedures "such as subcutaneous mastectomy, voice

surgery, liposuction, lipofilling, pectoral implants, or various aesthetic procedures" for

the purpose of aligning himself with his biological sex. Act 626 does not prohibit a minor

assigned female at birth from receiving estrogen or surgical procedures "such as augmentation mammoplasty, facial feminization surgery, liposuction, lipofilling, voice surgery, thyroid cartilage reduction, gluteal augmentation, hair reconstruction or other aesthetic procedures" to enhance her appearance as long as the enhancements align with her biological sex. "The biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not. The Act is therefore subject to heightened scrutiny." *Id.* at 670 (citing *Heckler v. Mathews*, 465 U.S. 728, 744 (1984)).

The Act also discriminates against transgender people. The law prohibits medical care that only transgender people choose to undergo, i.e, medical or surgical procedures related to gender transition.[12] "[T]ransgender people constitute at least a quasi-suspect class." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020); *accord Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020) (discrimination for being transgender is discrimination "on the basis of sex"). Transgender people satisfy all indicia of a suspect class: (1) they have historically been subject to discrimination; (2) they have a defining characteristic that bears no relation to their ability to contribute to society; (3) they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) they are a minority group lacking political power. *See Grimm*, 972 F.3d at 610-613.

"[A]ll gender-based classifications today warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (citing *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127,136 (9th Cir. 1994) (internal quotation marks omitted)); *see also Harrison v.*

---

[12] The State argues that people who are not transgender may seek gender transition procedures. There is no evidence in the record to support this argument.

*Kernan*, 971 F.3d 1069, 1077 (2020); *Flack v. Wis. Dept. of Health Servs.*, 328 F. Supp. 3d 931, 952 (W.D. Wisc. 2018) (recognizing that "heightened scrutiny may be appropriate either on the basis of sex discrimination or through recognizing of transgender as a suspect or quasi-suspect class.")).

"Statutes that discriminate based on sex must be supported by an 'exceedingly persuasive justification.' The government meets this burden if it can show that the statute is substantially related to a sufficiently important government interest." *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022) (quoting *United States v. Virginia*, 518 U.S. 515, 531-33 (1996)). Heightened or intermediate scrutiny imposes a burden "rest[ing] entirely on the State" to demonstrate an "exceedingly persuasive" justification for the differential treatment. *Virginia*, 518 U.S. at 533. A state "must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (internal quotation marks and citations omitted). And "[t]he justification must be genuine, not hypothesized or invented post hoc in response to litigation." *Id.*

The State claims that by banning gender-affirming care the Act advances the State's important governmental interest of protecting children from experimental medical treatment and safeguarding medical ethics. Throughout this litigation, the State has attempted to meet their heavy burden by offering the following assertions in support of banning gender-affirming medical care for adolescents: (i) that there is a lack of evidence of efficacy of the banned care; (ii) that the banned treatment has risks and side effects; (iii) that many patients will desist in their gender incongruence; (iv) that some patients

will later come to regret having received irreversible treatments; and (v) that treatment is being provided without appropriate evaluation and informed consent. The evidence presented at trial does not support these assertions.

### a. **Efficacy**

The evidence at trial showed that the prohibited medical care improves the health and well-being of many adolescents with gender dysphoria. Three of Plaintiffs' experts and two Arkansas doctors detailed the significant mental health benefits of gender-affirming medical care for adolescents with gender dysphoria which they have observed clinically. Drs. Karasic, Turban, and Adkins have collectively treated thousands of patients with gender dysphoria and testified about their own clinical experiences witnessing the positive, life-changing impact of gender-affirming medical interventions on their adolescent patients as well as the comparable experiences of their colleagues around the country. (Tr. 67:8-12, ECF No. 219 (Karasic); 233:15-22 (Adkins); Tr. 298:7-18, 305:2-19, ECF No. 220 (Turban); Tr. 543:3-544:11, ECF No. 275 (Hutchison), 606:20-610:1 (Stambough). Drs. Stambough and Hutchison similarly testified about the many positive impacts of gender-affirming medical interventions on the health and well-being of their adolescent patients in Arkansas. (Tr. 543:3-544:11, ECF No. 275 (Hutchison), 606:20-610:1 (Stambough)). The testimony showed that the benefit of this care is long lasting. *Id.*

The State put forth no evidence contesting the extensive clinical experience of Plaintiffs' witnesses. In fact, the State's only expert witness to have ever treated patients for gender dysphoria, Dr. Levine, testified that he felt a decision about whether an adolescent should pursue hormone therapy should be made by a "team of well-informed

doctor[s], scientifically well-informed, parents that have a respect for the doctor and have met with the doctor numerous times, and the doctor who has a relationship with the patient." (Tr. 909:7:25, ECF No. 246 (Levine)). He went on the say that "after that patient has had a process of psychotherapy where these matters, their ambivalence, the uncertainty, their eating disorders, and their self-harm episodes, et. cetera, have been thoroughly explored—if that team of doctors, patient, and parent want to do that [hormone therapy] that's what doctors do. We do that for cancer as well, you know." *Id.*

Plaintiffs' experts testified about the body of research demonstrating that the banned medical interventions improve patient health. (Tr. 295:16-18, 298:7-18, 300:24-301:17, 302:20-303:8, 303:22-305:1, ECF No. 220 (Turban); 219:68:15-69:14 (Karasic)). Dr. Turban testified about the sixteen studies conducted in multiple countries over the past twenty years that collectively show that use of pubertal suppression and gender-affirming hormones to treat adolescents with gender dysphoria improves patient health and prevents the worsening of distress upon the onset of puberty. *Id.* at 295:16-18 (Turban). He testified as well that the studies about the efficacy of hormone therapy show positive outcomes consistent with dozens of studies about the efficacy of such therapy to treat gender dysphoria in adults. *Id.* at 302:20-303:21 (Turban).

This expert testimony about positive research and clinical evidence was bolstered by the unrebutted testimony of the Parent Plaintiffs who explained how gender-affirming medical care positively transformed the lives of their adolescent children with gender dysphoria. For adolescents, like Minor Plaintiffs Parker Saxton, Dylan Brandt, and Sabrina Jennen, this care allowed them to grow from depressed, anxious, and withdrawn young people into happy and healthy teenagers who looked forward to their futures.

The State offered no evidence to refute the decades of clinical experience demonstrating the efficacy of gender-affirming medical care. Additionally, the State's experts offered no evidence-based treatment alternatives. When asked at trial what would happen if a law like Act 626 were to go into effect, Dr. Turban explained:

> It would be emotional to think about. Because the reality is that we frequently in clinic have families that are coming to us with these young people who are really struggling with severe anxiety, depression, sometimes suicidal thoughts, sometimes their mental health is declining so dramatically that they can't go to school, and it's my job to tell families what the evidence-based approaches are to help their child. So if these treatments were not an option, I'd be left without any evidence-based approaches to treat this young person's gender dysphoria.

(Tr. 326:16-327:5, ECF No. 220 (Turban)).

The evidence showed that based on the decades of clinical experience and scientific research, it is widely recognized in both the medical and mental health fields—including by major medical and mental health professional associations—that gender-affirming medical care can relieve the clinically significant distress associated with gender dysphoria in adolescents.[13] The State failed to provide sufficient evidence that the banned treatments are ineffective or experimental.

b. **Risks and Side Effects**

It is undisputed that puberty blocking hormones delay the rapid accrual of bone mineralization that occurs during puberty. (Tr. 205:16-201:12, ECF No. 219 (Adkins)); Tr. 390:8-16, ECF No. 220 (Antommaria)). This is a risk for cisgender and transgender

---

[13] The State urges the Court to disregard the major medical organizations' views about gender-affirming medical care for adolescents with gender dysphoria, claiming they are based on ideology rather than science. To support this claim, they offered the testimony of Professor Mark Regnerus, but his testimony did not offer any support for this assertion. *See* Pls.' Proposed FOF ¶ 383. To accept this claim would require the Court to both credit Professor Regnerus' testimony and the notion that every major medical association in the United States is driven by ideology rather than science and patient well-being. There is no basis and no evidence supporting such a conspiratorial assessment of all the major medical associations.

adolescents. Puberty blocking hormones do not stop bone mineralization. Instead, adolescents on these hormones continue to accrue bone mineralization at a prepubertal rate. (Tr. 209:2-13, ECF No. 219 (Adkins)). Once puberty blockers are stopped and puberty resumes, either the person's endogenous puberty or an exogenous puberty prompted by hormone therapy, the accrual of bone mineralization increases at the usual pubertal rate. *Id.* at 209:2-210:1 (Adkins).

It is undisputed that when adolescent birth-assigned females with gender dysphoria are treated with testosterone, their fertility can sometimes be impaired. If testosterone follows puberty blockers at certain stages of the adolescent's development, the adolescent can become infertile. These risks are discussed with patients and parents and fertility options are discussed. There are also risks associated with testosterone therapy given to cisgender adolescent males including changes in cholesterol profile and blood thickness. However, Dr. Adkins testified that when a doctor monitors treatment to ensure appropriate therapeutic levels, adverse health effects are rare. *Id.* at 220:25-221:9 (Adkins).

Estrogen and anti-androgens are used to treat birth-assigned males with gender dysphoria. It is undisputed that when estrogen is used to treat birth-assigned males, it can sometimes impair their fertility. If estrogen treatment follows puberty blockers at certain stages of the adolescent's development, the adolescent can become infertile. When estrogen or anti-androgens are given to birth-assigned males, the hormones can limit the patient's sexual arousal or ability to orgasm. *Id.* at 229:17-230:2 (Adkins). These risks are discussed with patients and parents. The risks can be managed by the doctor to preserve fertility or treatment can be provided to address a decrease in sexual satisfaction in most

cases. There are also risks for cisgender females from treatment with estrogen or anti-androgens. Again, when a doctor monitors treatment to ensure appropriate therapeutic levels, adverse health effects are rare.

The State failed to provide sufficient evidence that Act 626's ban on transgender care is justified by the risks of the treatment. As stated, the evidence at trial showed the risks associated with gender-affirming care for adolescents are no greater than the risks associated with many other medical treatments that are not prohibited by Act 626. (Tr. 390, ECF No. 220 (Antommaria); Tr. 212:11-12, ECF No. 219 (Adkins)). The evidence showed that the banned treatments are effective to treat gender dysphoria and the benefits of the treatments greatly outweigh the risks. The State failed to meet their burden to show that the risks of gender-affirming care banned by Act 626 substantially outweigh the benefits.

c. **Desistance and Regret**

The State argues that minors with gender dysphoria will desist with age. They contend that there is a significant risk of harm to a minor who elects to undergo gender hormone therapy or surgery because they will eventually identify with their sex assigned at birth and regret the treatment they sought as a minor. The State offered the testimony of Dr. Levine to support this argument. The Court found Dr. Levine's testimony to be inconsistent and unreliable in this area. To the contrary, the evidence proved that there is broad consensus in the field that once adolescents reach the early stages of puberty and experience gender dysphoria, it is very unlikely they will subsequently identify as cisgender or desist. (Tr. 310:13-25, ECF No. 220 (Turban)). The testimony confirmed

that for most people gender identity is stable over their lifetime. (Tr. 31, ECF No. 219 (Karasic)).

d. **Proper Evaluation and Informed Consent**

      The State spent a great deal of time at trial arguing that the number of children identifying as transgender has increased in the last decade and researchers theorize that the increase could be due to mental illness, social encouragement, or abuse. The State argues that the "affirmative" model of treating gender dysphoria which utilizes puberty blockers, cross-sex hormones and surgeries allows doctors to "throw caution out the window." (Post-Tr. Br., ECF No. 265 at 4). However, there was no evidence that doctors in Arkansas negligently prescribe puberty blockers or cross-sex hormones to minors.

      The State argues that many doctors do not require mental health counseling before treatment and will let children get hormone therapy and permanently altering surgeries upon demand. The evidence at trial did not support the State's argument. The State's experts admitted that they have had no contact with any Arkansas doctors or information about how doctors in Arkansas treat minors with gender dysphoria. (Tr. 113:1-12, ECF No. 246 (Levine)). There was no evidence presented that surgeons in Arkansas are performing gender transforming surgeries on minors much less performing surgeries on demand. In fact, the evidence confirmed that doctors in Arkansas do not perform gender transition surgeries on any person under the age of 18, the age which Act 626 targets.

      There was testimony that WPATH Standards of Care, which are aligned with the ACH Gender Clinic protocols, recommend a comprehensive bio-psychosocial assessment of adolescent patients who present with gender identity related concerns and seek gender transition care. (Tr. 43:13-47:7, ECF No. 219 (Karasic)). The Standards of Care

"recommend healthcare professionals involve relevant disciplines including mental health and medical professionals to reach a decision about whether puberty suppression, hormone initiation, or gender-related surgery for gender diverse and transgender adolescents are appropriate and remain indicated throughout the course of treatment until transition is made to adult care." *Id.* Before initiating gender-affirming medical treatment to adolescents, the WPATH Standards of Care state that the patient should have a history of gender diversity lasting years and meet the criteria for a gender dysphoria diagnosis. *Id.* at 50-51. The diagnostic criteria for gender dysphoria includes six months of clinically significant distress or social or occupational impairment. *Id.* This six-month period is in addition to the years of gender diversity history that the Standards of Care require. *Id.*

Dr. Hutchinson testified that while she was the medical director at the Arkansas Children's Hospital Gender Clinic she always did a full assessment of an adolescent seeking care for gender dysphoria. (Tr. 523:10-528:19, ECF No. 275 (Hutchison)). Her assessment included family history, physical history, and psychosocial evaluations. *Id.* Before cross-sex hormone therapy could be prescribed in the Clinic, the adolescent had to meet the criteria for a gender dysphoria diagnosis, meet with a clinical psychologist, have ongoing therapy with a therapist, show consistent and persistent gender identity in their affirmed gender and show mood stability. *Id.* Dr. Cathey, an Arkansas doctor, testified that she requires a diagnosis of gender dysphoria before prescribing feminizing or masculinizing hormone therapy to minors (Tr. 754-759, 54-59, ECF No. 224 (Cathey)). After a diagnosis, she will prescribe hormones to minors aged 16 and older but only with parental consent. *Id.*

Rather than protecting children or safeguarding medical ethics, the evidence showed that the prohibited medical care improves the mental health and well-being of patients and that, by prohibiting it, the State undermined the interests it claims to be advancing. Further, the various claims underlying the State's arguments that the Act protects children and safeguards medical ethics do not explain why only gender-affirming medical care—and all gender-affirming medical care—is singled out for prohibition. The testimony of well-credentialed experts, doctors who provide gender-affirming medical care in Arkansas, and families that rely on that care directly refutes any claim by the State that the Act advances an interest in protecting children.

Based on the record, the Court concludes that Act 626 prohibits medical care on the basis of sex and the State has failed to meet its demanding burden of proving the Act advances its articulated interests. The Court finds that Act 626 violates Plaintiffs' rights to equal protection.

### C. <u>Due Process</u>

Even if the Court found that Act 626 passed constitutional muster under the Equal Protection Clause, it fails under due process analysis. The Due Process Clause of the Fourteenth Amendment forbids states to "deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. The Clause also includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997). "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*,

530 U.S. 57, 65 (2000); *see also Kanuszewski v. Mich. Dep't of Health and Human Serv's*, 927 F.3d 396, 419 (6th Cir. 2019) ("[P]arents' substantive due process right to make decisions concerning the care, custody, and control of their children includes the right to direct their children's medical care."). Parents are presumed to be acting in the best interest of their children. *Parham v. J.R.,* 442 U.S. 584, 602 (1979).

As the Court has previously found, the Parent Plaintiffs have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary. "[T]the Fourteenth Amendment 'forbids the government to infringe . . . 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). Strict scrutiny is the appropriate standard of review for infringement of a fundamental parental right. However, even under the heightened scrutiny standard, Act 626 fails.

The State has a compelling interest in "safeguarding the physical and psychological well-being of a minor. . .." *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982). As explained, the State has failed to present evidence that the gender-affirming procedures banned by Act 626 jeopardize the physical or psychological well-being of a minor with gender dysphoria. There is no evidence that the Arkansas healthcare community is throwing caution to the wind when treating minors with gender dysphoria.

Moreover, the evidence shows that the Arkansas Medical Board has successfully navigated the regulation of the healthcare community in controversial areas such as the

opioid crisis and gastric bypass surgery. The Arkansas Medical Board is the best option for regulating the ethical considerations as well as the duties of the healthcare community in circumstances like the treatment of gender dysphoria. Plaintiff Parents' testimony at trial confirmed that they have made the decision to get gender-affirming care for their children after discussions with and observations of their child, thorough research, counseling, and consultation with a doctor. They are acting in the best interest of their children. Act 626 would take away these parents' fundamental right to provide healthcare for their children and give that right to the Arkansas Legislature.

Further, Act 626's ban of all gender transition procedures "including without limitation physician's services, inpatient and outpatient hospital services, or prescribed drugs related to gender transition" is not narrowly tailored to achieve the State's articulated interests. Though the State applauds the efforts of European countries to restrict gender-affirming care for minors with gender dysphoria, the State's expert testified that no other country in the world has taken Arkansas's broad stance. None of these countries have imposed a ban on all gender-affirming care.

For these reasons, the Court finds that Act 626 violates the Parent Plaintiffs' rights to substantive due process.

**D. <u>First Amendment</u>**

Act 626 provides that "[a] physician, or other healthcare professional shall not refer any individual under eighteen (18) years of age to any healthcare professional for gender transition procedures." Ark. Code Ann. § 20-9-1502(b). Dr. Stambough claims that Act 626 restricts her freedom of speech by barring her from referring her patients to other healthcare professionals for gender transition treatment in violation of the First

Amendment. The State argues that the Act targets conduct, not communication, by healthcare professionals. In support, the State cites to the definition of "referral" on Healthcare.gov. (Defs.' Post-Tr. Br., ECF 265 at 25.). The website defines referral as follows:

> A written order from your primary care doctor or you to see a specialist or get certain medical services. In many Health Maintenance Organizations (HMOs), you need to get a referral before you can get medical care from anyone except your primary care doctor. If you don't get a referral first, the plan may not pay for the services.

https://www.healthcare.gov/glossary/referral (last visited May 24, 2023).

The State argues that writing an order, or "referring," a patient to another physician for gender transition procedures amounts to a treatment order. A treatment order is professional conduct subject to regulation by the State, even if it incidentally involves speech. The State argues that the Act's purpose is to encourage speech in the form of psychotherapy for treatment of gender dysphoria.

The Court is not persuaded by these arguments. The Act does not define the word "refer." Prosecutors and the Arkansas State Medical Board are unlikely to rely on the Health Insurance Marketplace's website when determining whether a healthcare professional has violated Act 626. Had the Arkansas Legislature intended to bar physicians from writing an order directing a patient to seek gender transition procedures from another provider it could have included that statement in the Act. *See* S.B. 184, ALA. 2022 Reg. Sess. (2022); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1149 (M.D. Ala. 2022) (Alabama's transgender healthcare ban legislation prohibits the "prescribing or administering" of gender transition treatment which is conduct not speech.).

As written, Act 626 clearly regulates speech and not conduct as argued by the State. It prevents doctors from informing their patients where gender transition treatment may be available. It effectively bans their ability to speak to patients about these treatments because the physician is not allowed to tell their patient where it is available. "[A] State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 439 (1963); *see also Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("[T]his Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.'").

Act 626 is a content and viewpoint-based regulation of speech because it restricts healthcare professionals from making referrals for "gender transition procedures" only, not for other purposes. As a content and viewpoint-based regulation, it is "presumptively unconstitutional" and is subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Again, the State explains that it has a compelling interest in keeping children away from gender transition procedures because their efficacy and safety are doubtful. The problem with this argument is that the State has failed to prove that gender-affirming care for minors with gender dysphoria is ineffective or riskier than other medical care provided to minors. The State also contends it has a compelling interest in regulating the ethics of the medical profession. There was no evidence presented that an Arkansas physician or healthcare provider has been ethically compromised in their treatment of adolescents with gender dysphoria or their communication with patients regarding gender

transitioning procedures. As stated, the Arkansas Medical Board has proven to be an effective regulator of Arkansas healthcare professionals in controversial areas of medicine.

For these reasons, the Court finds that the State has failed to prove that its interests in the safety of Arkansas adolescents from gender transitioning procedures or the medical community's ethical decline are compelling, genuine, or even rational. Act 626 violates Dr. Stambough's rights under the First Amendment.

### E. <u>Permanent Injunction</u>

Plaintiffs seek permanent injunctive relief. To obtain a permanent injunction, Plaintiffs were required to "show actual success on the merits." *Miller v.* Thurston, 967 F.3d 727, 735 (8th Cir. 2020). Substantial evidence at trial demonstrated that Act 626 violates Plaintiffs' constitutional rights. Testimony from the Minor Plaintiffs, their parents, Dr. Stambough and the experts proved that they would suffer immediate and irreparable harm from Act 626 if it were to go into effect. This harm to Plaintiffs and the public interest is outweighed by any potential harm to the State of Arkansas caused by the entry of a permanent injunction.

### IV.   <u>Conclusion</u>

For these reasons, the Court hereby orders that Defendant Tim Griffin, in his official capacity as Attorney General of the State of Arkansas, and all those acting in concert with him, including employees, agents, successors in office, and the members of the Arkansas State Medical Board are permanently enjoined from enforcing House Bill

1570, Act 626 of the 93rd General Assembly of Arkansas, codified at Ark. Code Ann. §§

20-9-1501 to 20-9-1504 and 23-79-164. The Clerk is directed to close the case. [14]

IT IS SO ORDERED this 20th day of June, 2023.

_____
James M. Moody Jr.
United States District Judge

---

[14] The Court retains jurisdiction to consider motions for attorneys' fees.