# Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|                                                        |     |                          |
| ------------------------------------------------------ | --- | ------------------------ |
| K. C., *et al.*                                        | )   |                          |
|                                                        | )   |                          |
| Plaintiffs,                                            | )   |                          |
|                                                        | )   |                          |
| v.                                                     | )   | No. 1:23-cv-00595-JPH-KMB |
|                                                        | )   |                          |
| THE INDIVIDUAL MEMBERS OF THE                          | )   |                          |
| MEDICAL LICENSING BOARD OF                             | )   |                          |
| INDIANA in their official capacities, *et al.*         | )   |                          |
|                                                        | )   |                          |
| Defendants.                                            | )   |                          |

**ORDER GRANTING IN PART PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

Recently enacted by the Indiana General Assembly, Senate Enrolled Act
480 is scheduled to become effective July 1, 2023. If it takes effect, S.E.A. 480
will prohibit physicians and other practitioners from knowingly providing
gender transition procedures to a minor, and from aiding or abetting another
physician or practitioner in the provision of gender transition procedures to a
minor. Gender transition procedures banned by S.E.A. 480 include the use of
puberty-blocking drugs, cross-sex hormone therapy, and gender reassignment
surgery. Plaintiffs are four minor children, many of their parents, and a doctor
and her family medical practice. Alleging that S.E.A. 480 violates the United
States Constitution and other federal laws, Plaintiffs ask the Court to enter a
preliminary injunction that would prohibit Defendants—who are various State
officials—from enforcing S.E.A. 480.

The State has a strong interest in enforcing democratically enacted laws.
And Defendants have shown that there are important reasons underlying the

State's regulation of gender transition procedures for minors. Still, Plaintiffs have carried their burden of showing some likelihood of success on their claims that S.E.A. 480 would violate their equal protection rights under the Fourteenth Amendment and free speech rights under the First Amendment. Under the evidence available at this preliminary stage, there is not a "close means–end fit" between the State's important reasons for regulating the provision of gender transition procedures to minors and S.E.A. 480's broad ban of those procedures. So, when the State's interests are weighed against the likelihood that Plaintiffs will be able to show that S.E.A. 480 would violate their constitutional rights and the risk of irreparable harm, Plaintiffs are entitled to a preliminary injunction.

Plaintiffs' motion for a preliminary injunction is therefore **GRANTED in part** to the extent that, while this case is pending, Defendants may not enforce S.E.A. 480's prohibitions on (1) providing gender transition procedures for minors except gender reassignment surgery and (2) speech that would aid or abet gender transition procedures for minors. Dkt. [9]. Plaintiffs motion is **DENIED in part** as to the ban on gender reassignment surgeries. Plaintiffs lack standing to challenge that ban because gender reassignment surgeries are not provided to minors in Indiana.

## I.
## Facts & Background

The parties have submitted joint stipulated facts, dkt. 51, and more than 3,000 pages of evidence. Dkt. 26; dkt. 48; dkt. 49; dkt. 58. They also jointly recommended to the Court that there was no need for an evidentiary hearing,

*see* dkt. 22 at 3; dkt. 56, so the Court's recitation of the relevant facts is based on the written materials submitted with the parties' briefing.

### A. Sex, gender, and gender dysphoria

A person's sex is generally identified at birth based on external genitalia. Dkt. 51 at 1 (parties' stipulated facts). Gender or gender identity, by contrast, commonly refer to a person's psychological and/or cultural sense of their sex or gender. Dkt. 26-1 at 7 (Karasic decl.); dkt. 48-2 at 12–13 (Hruz report). Most people's sex and gender identity match, but "[f]or transgender people, their assigned sex does not align with their gender identity." Dkt. 26-1 at 7 (Karasic decl.).

Gender dysphoria is a mental-health diagnosis recognized in the Fifth Edition of the American Psychological Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), and can be diagnosed in pre-pubertal children, adolescents, or adults. Dkt. 51 at 2–3. The DSM-5 defines gender dysphoria as "[a] marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by" certain diagnostic criteria. *Id.* Gender dysphoria in adolescents or adults "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* at 3.

"There is no medical or surgical treatment indicated for children with gender dysphoria pre-puberty." *Id.* at 4. However, once puberty begins, "[a]dolescents diagnosed with gender dysphoria . . . may be prescribed puberty-delaying medications." Dkt. 26-2 at 13 (Shumer decl.). Then, in mid-

adolescence, patients may be prescribed hormones—testosterone, or estrogen with a testosterone suppressant. *Id.* at 16. Gender-transition surgeries may also be considered, *see* dkt. 26-3 at 7 n.11 (Turban decl.), but in Indiana no "provider performs gender-transition surgery on persons under the age of 18." Dkt. 51 at 4.

### B. Senate Enrolled Act 480

In early 2023, the Indiana General Assembly passed S.E.A. 480 and Governor Holcomb signed it into law. S.E.A. 480 (to be codified at Ind. Code §§ 25-1-22-1 *et seq.* (eff. July 1, 2023)).

S.E.A. 480 would prohibit physicians and other medical practitioners from "knowingly provid[ing] gender transition procedures to a minor." S.E.A. 480 § 13(a). The statute defines "gender transition" as "the process in which an individual shifts from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex." *Id.* § 3. It defines "sex" as "the biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles." *Id.* § 12. And "gender" as "the psychological, behavioral, social, and cultural aspects of being male or female." *Id.* § 1.

Under S.E.A. 480, the prohibited "gender transition procedures" include "any medical or surgical service . . . that seeks to:

> (1) alter or remove physical or anatomical characteristics or features that are typical for the individual's sex; or

> (2) instill or create physiological or anatomical characteristics that are different from the individual's sex."

*Id.* § 5(a).  The statute then excludes:

> (1)    Medical or surgical services to an individual born with a medically verifiable disorder of sex development, including an individual with:
>> (A) external sex characteristics that are irresolvably ambiguous;
>> (B) forty-six (46) XX chromosomes with virilization;
>> (C) forty-six (46) XY chromosomes with undervirilization; or
>> (D) both ovarian and testicular tissue.
>
> (2)    Medical or surgical services provided when a physician or practitioner has diagnosed a disorder or condition of sexual development that the physician or practitioner has determined through genetic or biochemical testing that the individual does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action.
>
> (3)    The treatment of any infection, injury, disease, or disorder that has been caused by or exacerbated by the performance of gender transition procedures.
>
> (4)    Any medical or surgical service undertaken because the individual suffers from a physical disorder, physical injury, or physical illness that would, as certified by the physician or practitioner, place the individual in imminent danger of death or impairment of major bodily function unless the medical or surgical service is performed.
>
> (5)    Mental health or social services other than gender transition procedures as defined in subsection (a).
>
> (6)    Services for a disorder or condition of sexual development that is unrelated to a diagnosis of gender dysphoria or gender identity disorder.

*Id.* § 5(b), *see* § 13(c).

Medical services prohibited under S.E.A. 480 can thus include "medical services that provide puberty blocking drugs, gender transition hormone therapy, or genital . . . or nongenital gender reassignment surgery." *Id.* § 5(a)(2).[1]  Physicians and other medical practitioners are further prohibited from "aid[ing] or abet[ting] another physician or practitioner in the provision of" prohibited gender transition procedures to a minor. *Id.* § 13(b).

Physicians or medical practitioners who violate S.E.A. 480 are subject to discipline by their regulating licensing boards. *Id.* § 15; Ind. Code § 25-1-9-4(a)(3) (providing for discipline for licensed medical providers who "knowingly violate[ ] any state statute . . . regulating the profession in question").  Private individuals may also bring lawsuits alleging violations of S.E.A. 480.  S.E.A. 480 § 17.

### C. Plaintiffs

K.C. is the ten-year-old child of Nathaniel and Beth Clawson. *See* dkt. 51 at 5.  "K.C. was identified male at birth," but before the age of 4 "grabbed a pair of scissors, and asked to cut off K.C.'s penis, asserting that it should not be there." *Id.*  An IU Health pediatrician diagnosed K.C. with gender dysphoria. *Id.*  K.C. "socially transitioned [to female] before K.C. was 4 years old and uses female pronouns." *Id.*  In 2017, K.C. first visited the Riley Gender

---

[1] S.E.A. 480 provides a limited extension to its July 1, 2023 effective date: physicians or medical practitioners may "continue to prescribe . . . until December 31, 2023," gender transition hormone therapy to individuals who were taking that therapy "on June 30, 2023, as part of a gender transition procedure."  S.E.A. 480 § 13(d).

Health Clinic, which "again diagnosed [K.C.] with gender dysphoria."  *Id.* at 6.

K.C. began taking a puberty blocker in 2023.  *Id.*

M.W. is the 16-year-old child of Ryan and Lisa Welch.  *Id.*  "M.W. was

identified female at birth" and "was diagnosed with gender dysphoria in

adolescence."  *Id.* at 6–7.  At the age of 12, M.W. "declared that M.W. is a

transgender male" and now "uses a stereotypically male first name and male

pronouns."  *Id.* at 7.  "M.W. was prescribed testosterone" in July 2022, and

continues to receive testosterone.  *Id.* at 7.

A.M. is the 11-year-old child of Emily Morris.  *Id.* at 8.  "At birth, A.M.

was identified as male," but "[b]efore A.M. was 4 years of age, A.M. stated to

family members that A.M. was a girl and was thinking about trying to cut off

A.M.'s penis."  *Id.*  "A.M. socially transitioned before the age of 4" and since

then "has used a stereotypically female first name and female pronouns."  *Id.*

A.M. has been diagnosed with gender dysphoria and receives a puberty

blocker.  *Id.* at 9-10.

M.R. is the 15-year-old child of Maria Rivera.  *Id.* at 10.  "M.R. was

identified as female at birth" and in December 2021 "declared . . . that M.R. is a

transgender male."  *Id.*  "M.R. now consistently uses a stereotypically male first

name and male pronouns."  *Id.*  M.R. has been diagnosed with gender

dysphoria and receives testosterone under a prescription from Dr. Catherine

Bast at Mosaic Health and Healing Arts ("Mosaic").  *Id.* at 11.

Dr. Bast is a board-certified family-practice physician at Mosaic in

Goshen, Indiana.  *Id.* at 11–12.  Mosaic currently treats 72 minor patients who

are diagnosed with gender dysphoria and are prescribed either puberty blockers or hormones.  *Id.* at 12.

### D. Defendants

The individual members of the Medical Licensing Board of Indiana serve as members of the board that is responsible for the licensing and discipline of medical providers, and that grants and revokes licenses to Indiana medical practitioners.  *See* dkt. 1 at 5; Ind. Code §§ 25-1-9-1 *et seq.*

The Executive Director of the Indiana Professional Licensing Agency oversees the Medical Licensing Board.  Ind. Code §§ 25-0.5-3-1 *et seq*; 25-1-6-3.

The Attorney General of Indiana investigates complaints against licensed medical providers and can pursue discipline from the Medical Licensing Board.  Ind. Code § 25-1-7-2.

The Secretary of Indiana Family and Social Services Administration is the director of the FSSA, which administers Medicaid in Indiana.  Ind. Code § 12-15-1-1.

### E. Procedural history and preliminary-injunction evidence

Plaintiffs brought this action in April 2023, alleging that S.E.A. 480's restrictions violate (1) the minor plaintiffs' Fourteenth Amendment equal protection rights; (2) the parent plaintiffs' "fundamental rights protected by due process" under the Fourteenth Amendment, (3) the medical-provider plaintiffs' First Amendment speech rights; and (4) Medicaid provisions in 42 U.S.C. §§ 18116 and 1396d(a).  Dkt. 1 at 42–45.  Plaintiffs have filed a motion for a

preliminary injunction under Federal Rule of Civil Procedure 65, requesting that the Court "prohibit[ ] the enforcement of" S.E.A. 480.  Dkt. 9.

The parties have agreed that there should not be an evidentiary hearing. *See* dkt. 22 at 3; dkt. 56.  To develop the preliminary-injunction record, the parties have conducted substantial discovery, filed a statement of stipulated facts, and designated extensive evidence.  *See* dkt. 26; dkt. 48; dkt. 49; dkt. 51. In total, excluding citations and supporting exhibits, Plaintiffs have designated more than 100 pages of expert opinions, dkt. 26; dkt. 58, and Defendants have designated more than more than 300 pages of expert opinions, dkt. 48.  The parties' complete evidentiary filings span more than 3,000 pages.  Dkt. 26; dkt. 48; dkt. 49; dkt. 58.

Despite the volume of designated evidence and the contradicting expert opinions, the parties have designated only a small portion of the evidentiary filings in their briefs, generally relying on summaries of evidence in their experts' reports.  *See* dkt. 54; dkt. 59.

### 1. Plaintiffs' experts

Plaintiffs have designated three experts, who have provided reports of their opinions.

Dr. Dan Karasic, a Professor Emeritus of Psychiatry at the University of California, San Francisco School of Medicine, has "provided care for thousands of transgender patients" over thirty years.  Dkt. 26-1 at 3.  He's worked with the World Professional Association for Transgender Health ("WPATH") and co-authored the *WPATH Standards of Care for the Health of Transsexual,*

*Transgender, and Gender Nonconforming People. Id.* at 4.  Dr. Karasic's expert report details his opinions on gender identity, gender dysphoria, appropriate medical treatments, and harms of denying gender-affirming care.  *Id.* at 6–18.

Dr. Daniel Shumer is a pediatric endocrinologist, an Associated Professor of Pediatrics at Mott Children's Hospital at Michigan Medicine, and the Medical Director of the Comprehensive Gender Services Program at Michigan Medicine, University of Michigan.  Dkt. 26-2 at 1.  He has extensively researched "gender identity in pediatrics and the treatment of gender dysphoria" and has "been treating patients with gender dysphoria as a pediatric endocrinologist since 2015." *Id.* at 2.  Dr. Shumer's expert report addresses evidence-based treatments for gender dysphoria in minors, including their safety and efficacy. *Id.* at 6–23.

Dr. Jack Turban is an Assistant Professor of Child & Adolescent Psychiatry at the University of California, San Francisco School of Medicine and the director of the Gender Psychiatry Program in the Division of Child & Adolescent Psychiatry.  Dkt. 26-3 at 2.  His expert report includes opinions about the effects of gender-dysphoria treatment on mental health.  *Id.* at 4–18.

Plaintiffs' experts have each filed supplemental reports addressing the opinions of Defendants' experts.  Dkt. 58.  Defendants have filed a motion to exclude many of the opinions from Plaintiffs' experts, arguing that they are unreliable.  *See* dkt. 62; dkt. 63.[2]

---

[2] Plaintiffs have orally moved to strike that motion because it violates the parties' stipulation regarding the admissibility of evidence discussed at the June 5, 2023 status conference, *see* dkt. 56, and was filed too late in the preliminary-injunction

## 2. Defendants' experts

Defendants have designated five experts, who have provided reports detailing their opinions.

Dr. James Cantor is the Director of the Toronto Sexuality Centre. Dkt. 48-1 at 9. He is trained as a clinical psychologist and neuroscientist and has researched "the development of sexual orientation, gender identity, hypersexuality, and atypical sexualities." *Id.* at 8. His expert report opines on the strength of the medical evidence regarding gender-dysphoria treatments as well as the safety and effectiveness of those treatments. *Id.* at 11–131.

Dr. Paul Hruz, an Associate Professor of Pediatrics in the Division of Pediatric Endocrinology and Diabetes at Washington University School of Medicine, has "participated in the care of hundreds of infants and children, including adolescents, with disorders of sexual development." Dkt. 48-2 at 2. Dr. Hruz's opinions address the use of puberty blockers and hormone therapy to treat endocrine disorders and gender dysphoria. *Id.* at 9–52.

Dr. Dianna Kenny was a Professor of Psychology at the University of Sydney for thirteen years and is now "a psychodynamic psychotherapist" and "child, marriage, and family therapist." Dkt. 48-3 at 3-4. For the past five years, she has "engaged in exploratory psychotherapy with children,

---

proceedings. Many of the points raised in support of Defendants' motion to exclude could and should have been made in their response brief. Dkt. 54. This case's preliminary-injunction proceedings have been carefully scheduled to ensure thorough and fair review before S.E.A. 480's July 1, 2023 effective date, and none of those orders anticipated a motion to exclude filed after preliminary-injunction briefing was complete. *See* dkt. 21; dkt. 25; dkt. 56. However, for the reasons below, it's unnecessary to strike Defendants' motion to exclude.

adolescents, and their families who are struggling with gender dysphoria." *Id.* at 4. Dr. Kenney's report addresses social aspects of gender dysphoria. *Id.* at 10–126.

Dr. Daniel Weiss, a practicing endocrinologist, has provided care for adults and children, and has completed extensive medical research. Dkt. 48-4 at 3. He opines on the history and safety of treatments for gender dysphoria. *Id.* at 5–30.

Dr. Kristopher Kaliebe is an Associate Professor in the University of South Florida Medical School's Department of Psychiatry. Dkt. 48-5 at 3. He supervises a child and adolescent psychiatry clinic and treats pediatric patients with gender dysphoria. *Id.* at 7. His expert report opines on the history of gender dysphoria diagnoses and the strength of the evidence regarding gender-dysphoria treatments. *Id.* at 10–71.

The Court held oral argument on June 14, 2023. Dkt. 66.

## II.
## Preliminary Injunction Standard

Injunctive relief under Federal Rule of Civil Procedure 65 is "an exercise of very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021). To obtain such extraordinary relief, the party seeking the preliminary injunction carries the burden of persuasion by a clear showing. *See id.*; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Determining whether a plaintiff "is entitled to a preliminary injunction involves a multi-step inquiry." *Int'l Ass'n of Fire Fighters, Local 365 v. City of E.*

*Chi.*, 56 F.4th 437, 446 (7th Cir. 2022). "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied." *Id.* "If these threshold factors are met, the court proceeds to a balancing phase, where it must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 545. This "involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). "In the final analysis, the district court equitably weighs these factors together, seeking at all times to minimize the costs of being mistaken." *Cassell*, 990 F.3d at 545.

### III.
### Analysis

### A. Standing to challenge S.E.A. 480's prohibition on gender reassignment surgery

Gender reassignment surgery is one of the "gender transition procedures" that S.E.A. 480 prohibits for minors. S.E.A. 480 §§ 5(a); 13(a). The statute defines "gender reassignment surgery" as "any medical or surgical service that seeks to surgically alter or remove healthy physical or anatomical characteristics or features that are typical for the individual's sex, in order to instill or create physiological or anatomical characteristics that resemble a sex

different from the individual's sex . . . knowingly performed for the purpose of assisting an individual with a gender transition."  *Id.* § 2.

The parties have stipulated that "[n]o Indiana provider performs gender-transition surgery on persons under the age of 18."  Dkt. 51 at 4.  Defendants therefore argue that Plaintiffs lack standing to seek a preliminary injunction against S.E.A. 480's prohibition on gender-transition surgery.  Dkt. 54 at 30.  Plaintiffs contend that they have standing because they are challenging the prohibition on "'gender transition procedures' generally."  Dkt. 59 at 22.

Standing is a constitutional doctrine "rooted in the traditional understanding of a case or controversy" and "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–38 (2016); U.S. CONST. Art. III, § 2.  To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo*, 578 U.S. at 338.  Here, Plaintiffs must have standing as to each piece of their claim.  *See Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 661 (7th Cir. 2015) ("The fact that a plaintiff has suffered an injury that is traceable to one kind of conduct does not grant that plaintiff standing to challenge other, even related, conduct; standing is not dispensed in gross.");  *Mueller v. Raemisch*, 740 F.3d 1128, 1132–33 (7th Cir. 2014) (holding that the plaintiffs had standing to challenge the requirement to continually update sex-offender registry information, but not to challenge the prohibition on changing their names, since they had no intention

14

of doing so). "To have standing for prospective injunctive relief, a plaintiff must face a 'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical.'" *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017); *see Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (recognizing a plaintiff's "burden to demonstrate standing in the context of a preliminary injunction motion"). Put simply, a preliminary injunction can be appropriate only if there are "continuing, present adverse effects." *Simic*, 851 F.3d at 738.

Here, the stipulated facts show that no minor could receive gender-transition surgery from a physician or other practitioner in Indiana, regardless of S.E.A. 480. Dkt. 51 at 4. Plaintiffs therefore cannot show that S.E.A. 480's prohibition on gender-transition surgery would cause any minor in Indiana an injury that is likely to be redressed by a favorable judicial decision. Plaintiffs therefore lack standing to seek a preliminary injunction against S.E.A. 480's prohibition on gender-transition surgery for minors. *See Speech First*, 968 F.3d at 644.

### B. Fourteenth Amendment equal protection claims

"The Fourteenth Amendment's Equal Protection Clause guarantees that 'No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.'" *Hope v. Comm'r of Ind. Dep't of Corr.*, 9 F.4th 513, 528–29 (7th Cir. 2021) (quoting U.S. CONST. amend. XIV, § 1). This "is essentially a direction that all persons similarly situated should be treated alike." *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F.3d 1034, 1050 (7th Cir. 2017).

15

Plaintiffs argue that S.E.A. 480 "violates the equal protection rights of the plaintiff youth" because it impermissibly "discriminates on the basis of both sex and transgender status." Dkt. 27 at 26–27. Defendants respond that S.E.A. 480 instead makes reasonable classifications "based on age, procedure, and condition—not sex or transgender status." Dkt. 54 at 40.

### 1. Sex-based classifications and heightened scrutiny

"Generally, state action is presumed to be lawful [under the Equal Protection Clause] and will be upheld if the classification drawn by the statute is rationally related to a legitimate state interest." *Whitaker*, 858 F.3d at 1050. That "rational basis test, however, does not apply when a classification is based upon sex." *Id.* Sex-based classifications are instead "subject to heightened scrutiny," requiring "the state to demonstrate that its proffered justification is 'exceedingly persuasive.'" *Id.*; *accord Sessions v. Morales–Santana*, 582 U.S. 47, 59 (2017) (recognizing "the heightened scrutiny that now attends 'all gender-based classifications'"). "This requires the state to show that the 'classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Whitaker*, 858 F.3d at 1050 (quoting *United States v. Virginia*, 518 U.S. 515, 524 (1996)).

Plaintiffs argue that heightened scrutiny applies here because, under S.E.A. 480, sex is the determining factor as to whether a treatment is prohibited. Dkt. 27 at 27–30. Defendants respond that S.E.A. 480 draws

distinctions based on other factors, such as medical condition and procedure, rather than based on sex.  Dkt. 54 at 40.

S.E.A. 480 defines "sex" as "the biological state of being male or female, based on the individual's sex organs, chromosomes, and endogenous hormone profiles."  S.E.A. 480 § 12.  And it prohibits "a physician or other practitioner" from "knowingly provid[ing] gender transition procedures to a minor."  *Id.* § 13(a).  "[G]ender transition" is defined as "the process in which an individual shifts from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex."  *Id.* § 3.  And a "gender transition procedure" is defined as:

> any medical or surgical service . . . that seeks to:
> (1) alter or remove physical or anatomical characteristics or features that are typical for the individual's sex; or
> (2) instill or create physiological or anatomical characteristics that resemble a sex different from the individual's sex, including medical services that provide puberty blocking drugs, gender transition hormone therapy, or genital gender reassignment surgery or nongenital gender reassignment surgery knowingly performed for the purpose of assisting an individual with a gender transition.

*Id.* § 5(a).

Sex-based classifications are therefore central to S.E.A. 480's prohibitions.  Section 5(a)(1), for example, prohibits procedures seeking to "alter or remove physical or anatomical characteristics or features that are typical for the individual's sex."  But it does not prohibit a person from seeking to "alter or remove" a characteristic or feature typical of the opposite sex, under

17

S.E.A. 480's definition of sex.  Similarly, section 5(a)(2) prohibits the creation of physiological or anatomical characteristics or features "that resemble a sex different from the individual's sex."  But it does not prohibit a medical provider from creating physiological or anatomical characteristics or features that resemble that individual's sex.  In other words, the statute allows physicians and other practitioners to "instill or create" characteristics "resembl[ing]" female anatomical characteristics for females but not for males, and male anatomical characteristics for males but not for females.  It's therefore impossible for a medical provider to know whether a treatment is prohibited without knowing the patient's sex.  S.E.A. 480's prohibitions therefore "cannot be stated without referencing sex."  *Whitaker*, 858 F.3d at 1051.

Despite that statutory language, Defendants argue that S.E.A. 480's classifications are instead "based on age, procedure, and medical condition" and "encompass both sexes and all gender identities."  Dkt. 54 at 40. Defendants therefore contend that because S.E.A. 480 prohibits all gender-transition procedures, for both males and females, there's no sex-based classification.  *See id.* at 40–41 (relying on *Geduldig v. Aiello*, 417 U.S. 484 (1974)).  But *Geduldig* was about pregnancy, which doesn't always trigger heightened scrutiny since it's an "objectively identifiable physical condition" and not necessarily a proxy for sex, even though "only women can become pregnant."  417 U.S. at 496 n.20.  S.E.A. 480's prohibitions, by contrast, do not prohibit certain medical procedures in all circumstances, but only when used for gender transition, which in turn requires sex-based classifications.

Indeed, under S.E.A. 480's plain language, a medical provider can't know whether a gender *transition* is involved without knowing the patient's sex and the gender associated with the goal of the treatment.  S.E.A. 480 §§ 3, 5(a).

In short, without sex-based classifications, it would be impossible for S.E.A. 480 to define whether a puberty-blocking or hormone treatment involved transition from one's sex (prohibited) or was in accordance with one's sex (permitted).  That's certainly why S.E.A. 480's plain text defines "sex," *id.* § 12; defines "gender transition" in sex-based terms, *id.* § 3; and then phrases its prohibitions in terms that repeatedly rely on those definitions, *id.* §§ 5(a), 13(a) (prohibitions centering on what is "typical for the individual's sex" and "characteristics that resemble a sex different from the individual's sex").  At bottom, sex-based classifications are not just present in S.E.A. 480's prohibitions; they're determinative.

Defendants further argue that the rationale for heightened scrutiny doesn't apply to S.E.A. 480.  Dkt. 54 at 31–33 (arguing that when "medical procedures take account of basic, immutable biological differences" between males and females, that does not trigger heightened scrutiny and does not rely on "stereotypes").  The Supreme Court has indeed applied heightened scrutiny while recognizing that "[p]hysical differences between men and women are enduring" and that "[t]he two sexes are not fungible." *United States v. Virginia*, 518 U.S. 515, 533 (1996).  It has therefore explained that the purpose of heightened scrutiny is not to "make sex a proscribed classification" but to ensure that sex-based classifications do not "create or perpetuate the legal,

social, and economic inferiority of women" or men.  *Id.*; *Sessions*, 582 U.S. at
72.

 While S.E.A. 480 prohibits both male and female minors from using
puberty blockers and cross-sex hormone therapy for gender transition, it
nonetheless draws sex-based classifications under current Seventh Circuit
precedent.  *See Whitaker*, 858 F.3d at 1050.  For the reasons argued by
Defendants, perhaps the Seventh Circuit or the Supreme Court will hold that a
legislative sex-based classification like that made in S.E.A. 480 is presumed
lawful and subject to only rational basis review.  But *Whitaker* holds that
rational basis review "does not apply when a classification is based upon sex."
858 F.3d at 1050.  Instead, a sex-based classification triggers heightened
scrutiny that requires the state to show that the "classification serves
important governmental objectives and that the discriminatory means
employed are substantially related to the achievement of those objectives."  *Id.*

 The Eighth Circuit reached the same conclusion in a case involving a
substantially similar statute.  *Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022).
There, the court held that heightened scrutiny applied to the challenged
Arkansas statute because "[t]he biological sex of the minor patient is the basis
on which the law distinguishes between those who may receive certain types of
medical care and those who may not."  *Id.* at 670.  The same is true here.

Because S.E.A. 480's prohibitions are "inherently based upon" sex classifications, "heightened review applies."  *Whitaker*, 858 F.3d at 1051.[3]

### 2. Heightened scrutiny applied to S.E.A. 480

"Successful defense of legislation that differentiates on the basis of gender . . . requires an 'exceedingly persuasive justification.'"  *Sessions v. Morales–Santana*, 582 U.S. 47, 58 (2017).  "For a gender-based classification to withstand such scrutiny, it must 'serve important governmental objectives,' and 'the discriminatory means employed must be substantially related to the achievement of those objectives."  *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 728–29 (2003) (quoting *Virginia*, 518 U.S. at 533).  In other words, there must be a "close means–end fit."  *Sessions*, 582 U.S. at 68.

Plaintiffs argue that S.E.A. 480 does not survive heightened scrutiny because there's no important government interest to justify prohibiting "safe, effective, and medically necessary treatment for the health and well-being of adolescents suffering from gender dysphoria."  Dkt. 27 at 30.  Defendants contend that the prohibited treatments are unsafe and their effectiveness is unproven, so S.E.A. 480 is justified by the State's interests in protecting the wellbeing of minors and regulating the medical profession.  Dkt. 54 at 33–40.

Certainly, the proffered state interests are legitimate.  "[I]t is clear that a legislature may pass valid laws to protect children."  *Packingham v. North Carolina*, 582 U.S. 98, 106 (2017).  And it's similarly "clear [that] the State has

---

[3] Because S.E.A. 480's sex-based classification triggers heightened scrutiny, the Court does not address what level of scrutiny a transgender-based classification alone might warrant.

a significant role to play in regulating the medical profession." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007).  But heightened scrutiny requires a "close means–end fit," so it's not enough for the State's interests to justify *some* regulation of gender transition procedures for minors.  Instead, the State's interests must justify S.E.A. 480's *prohibition* of gender transition procedures for minors.  *Sessions*, 582 U.S. at 68; *cf. Packingham*, 582 U.S. at 106 (explaining, in the First Amendment context, that "the assertion of a valid governmental interest cannot, in every context, be insulated from all constitutional protections").

S.E.A. 480's scope is broad.  As Defendants acknowledge, the statute "generally prohibits licensed medical providers from knowingly providing, or aiding and abetting another practitioner in providing, gender transition procedures to a minor."  Dkt. 54 at 27–28.  Indiana thus opted to ban—rather than otherwise regulate—gender transition procedures for minors.  Defendants argue that this ban is justified because gender transition procedures "subject vulnerable minors to unproven, harmful, and irreversible procedures."  Dkt. 54 at 33.  In support, they have designated medical evidence supported by expert reports.  *See generally* dkt. 48.

There is thus designated evidence in the record that puberty blockers carry risks of increased brain pressure and reductions in bone density and "may cause hot flashes, weight gain, fatigue and mood alterations."  Dkt. 48-4 at 20 (Weiss decl.); dkt. 48-2 at 25 (Hruz decl.).  And while puberty blockers are prescribed when puberty starts far too soon, high-quality medical research on

22

their use to delay puberty past a typical age is exceptionally limited.  *See* dkt. 48-2 at 46 (Hruz decl.); dkt. 48-4 at 21–22 (Weiss decl.).  Indeed, the consensus from all sides is that more research is needed to explore these risks.  *See* dkt. 48-4 at 21–23 (Weiss decl.) (identifying statements from healthcare organizations including The Endocrine Society); dkt. 48-1 (Cantor decl.) (summarizing WPATH's calls for further research).

There's also evidence that the cross-sex hormone therapies prohibited by S.E.A. 480 have risks as well.  Those include fertility impairment, lower bone density, disfiguring acne, high blood pressure, weight gain, abnormal glucose tolerance, breast cancer, liver disease, thrombosis (blood clots in veins or arteries), and cardiovascular disease.  Dkt. 48-2 at 44–46 (Hruz decl.).  Hormone therapy is used to treat medical conditions other than gender dysphoria, but—similar to puberty blockers used for gender transition—the "long term effect[s]" of using of cross-sex hormones for gender transition are "currently unknown."  *Id.* at 44.

This designated evidence thus provides support for Defendants' view that the safety and effectiveness of puberty blockers and hormone therapy is uncertain and unsettled.  It also supports Defendants' position that the State has good reasons for regulating gender transition procedures for minors.  Nevertheless, Plaintiffs argue that these "concerns are based on mischaracterizations and distortions about the diagnosis and treatment of gender dysphoria."  Dkt. 59 at 2.  Maybe Plaintiffs will be able to prove that's true at a trial where Defendants' experts are subject to cross-examination on

the strength of their opinions.  *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (explaining that admissible expert evidence "is to be tested . . . with the familiar tools of 'vigorous cross-examination [and] presentation of contrary evidence'").  But based on the paper record available here, the Court finds that Defendants have designated some evidence in support of their position.

Even so, heightened scrutiny requires more—the regulation must have an "exceedingly persuasive justification" and a "close means–end fit." *Sessions*, 582 U.S. at 59, 68.  In other words, the State's specific "means" (S.E.A. 480's broad ban) must fit its "ends" (protecting minors and regulating the medical profession).  *Sessions*, 582 U.S. at 68; *Virginia*, 518 U.S. at 531 ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' *for that action.*" (emphasis added)).

So, for example, when the Supreme Court considered the male-only education offered at the Virginia Military Institute, it recognized that sex-based classifications can serve legitimate interests yet not survive heightened scrutiny.  *Virginia*, 518 U.S. at 535–36.  Therefore, in that case, while "[s]ingle-sex education affords pedagogical benefits to at least some students," and "diversity among public educational institutions can serve the public good," those "benign justifications" were not enough to justify VMI's "categorical exclusions." *Id.*

Here, S.E.A. 480 categorically bans the use of puberty blockers and hormone therapy for gender transition for minors.  And Plaintiffs have designated evidence of risks to minors' health and wellbeing from gender

dysphoria if those treatments can no longer be provided to minors—prolonging of their dysphoria, and causing additional distress and health risks, such as depression, posttraumatic stress disorder, and suicidality. *See* dkt. 26-1 at 16–17 (Karasic decl.).[4]  Those treatments could no longer be used if S.E.A. 480 goes into effect.  So, while the State has identified legitimate reasons for regulation in this area, the designated evidence does not demonstrate, at least at this stage, that the extent of its regulation was closely tailored to uphold those interests.  Plaintiffs therefore have shown some likelihood of success on the merits of their equal protection claim.  *See Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

Nor does "the normal rule that courts defer to the judgments of legislatures in areas fraught with medical and scientific uncertainties" settle the issue here.  *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2268 (2022).  Defendants argue that S.E.A. 480 fits comfortably within this vast zone of legislative discretion, but they have not cited any authority making that

---

[4] In their motion to exclude expert testimony, Defendants argue that Dr. Karasic's opinion is unreliable and therefore inadmissible. Dkt. 62; dkt. 63 at 26–27.  But Dr. Karasic bases his opinion on his experience "provid[ing] care for thousands of transgender patients," including "patients over the years who were unable to access gender-affirming care when it was clinically indicated." Dkt. 26-1 at 3, 17.  That includes minors, "many" of whom then had "increased depression, anxiety, suicidal ideation and self-harm, increased substance use, and a deterioration in school performance." *Id.* at 17.  Defendants argue that this experience is "unspecified" and unsupported, dkt. 63 at 26–27, but it is enough to pass *Daubert* gatekeeping. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586–87 (7th Cir. 2000) (explaining that "experience in treating patients" can qualify a medical expert and "[m]edical professionals reasonably may be expected to rely on self-reported patient histories").  Other than this ruling, Defendant's motion to exclude expert testimony is **DENIED without prejudice** as unnecessary at this stage because this order does not rely on the challenged opinions in concluding that Plaintiffs have carried their preliminary-injunction burden.  Dkt. [62].

principle controlling here, when heightened scrutiny applies to an equal protection claim. *See id.* at 2245–46 (*Dobbs* explaining that it did not involve "heightened constitutional scrutiny" but instead "the same standard of review" that applied to "other health and safety measures").

Nevertheless, Defendants argue that "the State has no less restrictive means" than S.E.A. 480 "to advance its interests." Dkt. 54 at 36. They reason that there's "no test for gender dysphoria and no reliable way to know whether it will resolve without lifechanging medical interventions." *Id.*

Defendants don't explain, however, why uncertainty about a gender-dysphoria diagnosis or about how long gender dysphoria may persist leaves the State without more tailored alternatives to S.E.A. 480. At the hearing on Plaintiffs' motion, Defendants emphasized that regardless of any expert testimony, the risks and uncertainties identified in systematic reviews conducted by certain European countries justified S.E.A. 480's ban on gender transition procedures for minors. But reliance on those reviews also does not achieve the "close means–end fit" required.

Most detrimental to Defendants' position is that no European country that has conducted a systematic review responded with a ban on the use of puberty blockers and cross-sex hormone therapy as S.E.A. 480 would. Instead, Defendants' designated evidence is that (1) the English National Health Service has proposed that puberty blockers be used only "in the context of a formal research protocol," (2) Finland's health service has restricted puberty blockers and cross-sex hormone therapies to when gender dysphoria is

severe and other psychiatric symptoms have ceased, (3) the "leading Swedish pediatric gender clinic" has limited puberty blockers and cross-sex hormones to those sixteen and older in monitored clinical trials[5], (4) the Académie Nationale de Médecine of France has advised providers "to extend as much as possible the psychological support stage" before turning to hormone treatments, and (5) the "Dutch Protocol" developed in the Netherlands involves age restrictions on certain treatments and requires "resolution of mental health issues before any transition." Dkt. 48-1 at 16–21, 110–11 (Cantor decl.).

In short, these European countries all chose less-restrictive means of regulation. In Defendants' view, however, the data from the systematic reviews gives the State unfettered discretion to choose how to regulate gender transition procedures for minors—up to and including a broad prohibition. But that does not take into account the "close means–end fit" that heightened scrutiny requires of sex-based classifications. *Sessions*, 582 U.S. at 59, 68.

Plaintiffs therefore have shown some likelihood of success on their claim that S.E.A. 480's prohibitions on puberty blockers and hormone therapy for minors violate the Equal Protection Clause. *See id.* at 68.

### C. First Amendment speech claims

In addition to its treatment prohibitions, S.E.A. 480 prohibits physicians and other medical practitioners from "aid[ing] or abet[ting] another physician or practitioner in the provision of" prohibited gender transition procedures to a

---

[5] The Swedish National Board of Health, however, has not imposed those restrictions but "recommends restraint." Dkt. 48-1 at 20.

minor.  S.E.A. 480 § 13(b).  It's uncontested that § 13(b) would prohibit any action that aids or abets a gender transition procedure.  *See* dkt. 54 at 52.  It therefore sweeps up both speech—such as medical referrals and discussing a shared patient's care—and conduct—such as driving a minor to receive prohibited care or assisting a surgery.  *See id.*

Plaintiffs Dr. Bast and Mosaic therefore challenge this provision as applied to its regulation of speech, arguing that it violates medical providers' First Amendment free speech rights because it prohibits making referrals for or providing information about gender transition procedures.  Dkt. 27 at 49; dkt. 59 at 35.  Defendants respond that § 13(b) regulates speech only incidentally and is valid as part of a broader regulatory statute.  Dkt. 54 at 52–53.

It is "true that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  But burdens on speech are "incidental" only when they flow indirectly from the core purpose of the regulation—like an employment anti-discrimination ordinance requiring the removal of a "White Applicants Only" sign, or an ordinance against outdoor fires preventing flag burning.  *Id.*; *see also Morgan v. White*, 964 F.3d 649, 652 (7th Cir. 2020) (holding that it's an incidental burden on speech when a COVID-related social distancing order makes it harder for a campaign to "round up signatures").  Here, the speech that section 13(b) would prohibit would itself be "aiding and abetting," rather than being incidental to separate, prohibited conduct.  *See Expressions Hair Design v. Schneiderman*, 581 U.S.

37, 47 (2017) (holding that a ban on surcharges for using a credit card regulated speech directly rather than incidentally because it dictated how stores communicated prices); *Hurley v. Irish–American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557 (1995) (holding that a ban on discrimination based on sexual orientation violated the First Amendment as applied to a parade).[6]

S.E.A. 480 § 13(b) therefore appears to burden speech "on its face and in its practical operation" because "aiding and abetting" directly prohibits referrals and collaboration among medical providers.  *Sorrell*, 564 U.S. at 567. Moreover, the regulation triggers heightened scrutiny because it's "directed at certain content and is aimed at particular speakers."  *Id.* at 567, 571.  Section 13(b) singles out medical providers and only one category of medical treatment—gender transition procedures.

Plaintiffs therefore have some likelihood of success on their First Amendment challenge to S.E.A. 480's aiding and abetting provision, as applied to the speech they have shown to be regulated by that provision.  *Cf. Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021) (finding likelihood of success on a First Amendment challenge to a ban on referrals as part of a similar statute), *aff'd*, 471 F.4th 661, 671–72 (8th Cir. 2022).[7]

---

[6] Defendants also argue that S.E.A. 480 § 13(b) is permissible as "an integral part . . . of a valid . . . statute."  Dkt. 54 at 52.  But for the reasons explained above, Plaintiffs have some likelihood of success on challenges to other portions of S.E.A. 480 as well.

[7] Because Plaintiffs have shown some likelihood of success for these reasons as to the portions of S.E.A. 480 that they have standing to challenge, the Court does not address Plaintiffs' arguments that S.E.A. 480 (1) denies parents the fundamental right

### D. Remaining preliminary injunction factors

#### 1. Irreparable harm

Plaintiffs must also show that they would suffer irreparable harm without an injunction. *See Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021). "Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.'" *Id.*

Minor Plaintiffs argue that they would suffer irreparable harm if S.E.A. 480 took effect because they would have to stop receiving puberty blockers or hormone therapy to treat the severe condition of gender dysphoria. Dkt. 27 at 52–53. Defendants respond that psychotherapy is available as an alternative treatment. Dkt. 54 at 54–55.

Medical harms, including to mental health, can constitute irreparable harm, *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F.3d 1034, 1044–46 (7th Cir. 2017), and Defendants do not contest that gender dysphoria is a psychiatric diagnosis that requires "clinically significant distress" to diagnose, dkt. 54 at 14. *Accord Brandt*, 551 F. Supp. 3d at 892 (finding irreparable harm on a similar record), *aff'd*, 471 F.4th at 671–72. And—again—there's evidence that puberty blockers and cross-sex hormone therapy reduces distress for some minors diagnosed with gender dysphoria. *See* dkt. 26-1 at 3, 16–17

---

to dictate their children's medical care, (2) violates federal Medicaid law, and (3) violates the Affordable Care Act. Dkt. 27 at 33–49.

(Karasic decl.); dkt. 48-12 at 18, 20 (B. Clawson Dep.) (explaining the effects of treatment on K.C.); dkt. 48-14 at 13–14 (Morris Dep.) (same for A.M.); dkt. 48-15 at 19 (R. Welch Dep.) (same for M.W.); dkt. 48-17 at 20 (Rivera Dep.) (same for M.R.). The risk of irreparable harm therefore supports a preliminary injunction. *See Whitaker*, 858 F.3d at 1045 (The irreparable harm requirement does not "require that the harm be certain to occur before a court may grant relief on the merits. Rather, harm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial.").

Plaintiffs have also satisfied the irreparable-harm requirement on their First Amendment speech claim. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) ("[V]iolations of First Amendment rights are presumed to constitute irreparable injuries.").

### 2. Balancing

Because Plaintiffs have some likelihood of success on the merits of constitutional claims, a preliminary injunction is in the public interest. *See Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019) ("Enforcing a constitutional right is in the public interest."). While the State has a strong interest in enforcing democratically enacted laws, that interest decreases as Plaintiffs' likelihood of success on the merits of their constitutional claims increases. *See Higher Soc'y of Ind. v. Tippecanoe Cty.*, 858 F.3d 1113, 1116 (7th Cir. 2017). And for the reasons above, Plaintiffs risk suffering irreparable harm absent an injunction. As a result, the balance of harms favors granting a preliminary injunction against the portions of S.E.A. 480 that Plaintiffs have

some likelihood of success in challenging.  *See Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

### 3. Bond Requirement

Federal Rule of Civil Procedure 65(c)'s bond requirement is waived.  *See BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, 912 F.3d 1054, 1058 (7th Cir. 2019).  "There is no reason to require a bond" in a case in which "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction."  *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).  Here, Defendants have not argued a likelihood of money damages or requested a bond.  Any party may request an injunction bond while this case remains pending.

### E. Scope of the injunction

Plaintiffs are therefore entitled to a partial injunction preventing the enforcement of S.E.A. 480's prohibitions on:

(1) gender transition procedures, except gender reassignment surgery, S.E.A. 480 § 13(a); and

(2) "aid[ing] or abet[ting] another physician or practitioner in the provision of" prohibited gender transition procedures to a minor, as applied to speech, *id.* § 13(b).  The injunction will run against the regulated speech Plaintiffs have identified—providing patients with information, making referrals to other medical providers, and providing medical records or other information to other medical providers.

Defendants briefly argue that any injunction must be limited to the named plaintiffs. Dkt. 54 at 55–56. They rely on *Doe v. Rokita*, which identified "a problem with the remedy" when a court provides final relief enjoining a statute's application to non-parties without certifying a class action. *Id.* (citing 54 F.4th 518, 519 (7th Cir. 2022)). *Doe*, however, does not apply here because Plaintiffs seek a preliminary injunction while their motion for class certification remains pending. *See* dkt. 10; *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 886 (7th Cir. 2011). Therefore, for the reasons in the Court's order regarding a stay of class-certification briefing, the Court can use its equitable power to issue an injunction prohibiting Defendants from enforcing the enjoined portions of S.E.A. 480 against any provider, as to any minor. *See* dkt. 41 ("[A] court may issue a classwide preliminary injunction in a putative class action suit prior to a ruling on the class certification motion . . . .").[8]

---

[8] Indeed, briefing on class-certification was stayed at Defendants' request. And Defendants' submissions in support of that request did not mention their view that a stay would later preclude preliminary relief beyond the named plaintiffs. Dkt. 29. Defendants' counsel do not explain why it's appropriate to file such a motion to stay and then raise their view of the scope of available relief for the first time more than a month later in their preliminary-injunction response brief. *See* dkt. 54.

**IV.**

**Conclusion**

Plaintiffs' motion for a preliminary injunction is **GRANTED in part**.  Dkt. [9].[9]  A separate injunction shall issue contemporaneously with this order.  *See* Fed. R. Civ. P. 65(d).

The assigned magistrate judge is asked to enter a case management plan for resolving this case.  The Court will then set a trial date.

**SO ORDERED.**

Date: 6/16/2023

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel

---

[9] The motion for leave to file brief as *amici curiae* of Arkansas, Alabama, and 14 other states is **GRANTED**.  Dkt. [53].

34