# SHUMAN McCUSKEY SLICER PLLC
## ATTORNEYS AT LAW

116 South Stewart Street, 1st Floor
Winchester, VA 22601
Telephone: 540.486.4195
Facsimile: 540.486.4912

**1411 Virginia Street East, Suite 200**
**P.O. Box 3953**
**Charleston, WV 25339**
**Telephone: 304.345.1400**
**Facsimile: 304.343.1826**

300 Wedgewood Drive, Suite 110
Morgantown, WV 26505
Telephone: 304.291.2702
Facsimile: 304.291.2840

**WWW.SHUMANLAW.COM**

Caleb B. David
cdavid@shumanlaw.com

October 20, 2023

*Via Electronic Case Filing in Case No. 22-1927*
Patricia S. Connor, Clerk of the Court
Lewis F. Powell, Jr. Unted States Courthouse Annex
1100 East Main Street, Suite 501
United States Court of Appeals for the Fourth Circuit
Richmond, Virginia 23219

Re:     *Fain v. Crouch*, No. 22-1927
             Notice of Supplemental Authority, FRAP 28(j); Fourth Cir. R. 28(e)

Dear Ms. Connor:

    Pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure and Fourth Circuit Rule 28(e), Defendants-Appellants respectfully submit the attached decision, noting the issue decided and the page of argument supported in Defendants-Appellants' Opening Brief and Reply Brief. In the case below, the District Court denied the plaintiffs' motion for preliminary injunction seeking to enjoin an Oklahoma statute prohibiting healthcare providers from administering gender-affirming care to patients under the age of 18 due to alleged violation of, *inter alia*, the Equal Protection Clause.

A.     Exhibit A:     *Poe, et al. v. Drummond, et al.*, Civil Action No. 23-cv-177-JFH-SH, 2023 U.S. Dist. LEXIS 179641, 2023 WL 6516449 (N.D. Okla. Oct. 5, 2023)
        1.    *Id.* at 11 (rejecting plaintiffs' claim of facial, sex-based classification and finding that "[t]he use of these 'gendered terms' reflects the nature of the procedure being regulated, not an intention to discriminate between people of different sexes" and that "the Court must look to the language of the statute and examine whether [the statute] uses gendered terms to distinguish between groups of people" rather than "to identify the procedures at issue"); Appellants' Br. 24-29; Reply Br. 8-13.

WINCHESTER, VA    |    CHARLESTON, WV    |    MORGANTOWN, WV

October 20, 2023
P a g e | **2**
_____

2.      *Id.* at 16 (rejecting plaintiffs' discrimination argument and finding that, "[a]lthough the statute does restrict a specific course of treatment that only transgender individuals would normally request, that fact alone does not render the statute invalid" and does not trigger heightened scrutiny unless there is invidious discrimination, as the Supreme Court held in *Geduldig*); Appellants' Br. 29-35; Reply Br. 13-19.

3.      *Id.* at 29-32 (finding that administration of drugs for different diagnoses, and/or for treatment of physiological versus psychological diagnoses, and/or to achieve different results is a different procedure for purposes of equal protection analysis); Appellants' Br. 20-24; Reply Br. 6-7.

Respectfully submitted,

/s/ Caleb B. David

Caleb B. David

Enclosures

cc:    All Counsel of Record, via ECF

**Certificate of Service**

I hereby certify that, on October 20, 2023, I caused to be electronically filed the foregoing letter and attached decision using the CM/ECF System, which will send notice of such filing to Counsel of Record.

/s/ Caleb B. David_____
Caleb B. David

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

**PETER POE**, *et al.*,

         **Plaintiffs,**

v.

         **Case No. 23-CV-177-JFH-SH**

**GENTNER DRUMMOND**, *et al.*,

         **Defendants.**

<u>**OPINION AND ORDER**</u>

Before the Court is a motion for preliminary injunction ("Motion") filed by Plaintiffs Benjamin, Bethany, and Brandon Boe; Donna and Daphne Doe; Lauren and Lydia Loe; Paula, Patrick, and Peter Poe; Rachel, Richard, and Ryan Roe, and Shauna Lawlis ("Plaintiffs"). Dkt. No. 5. Defendants oppose the Motion.[1] For the reasons stated herein, the Motion is DENIED.

**BACKGROUND**

On September 29, 2022, the Oklahoma State Legislature enacted Senate Bill 3 ("SB 3"), conditionally appropriating $39.4 million to the University Hospitals Authority "for the construction and equipping of facilities designed to expand the capacity of behavioral health care" for pediatric patients. S.B. 3, 58th Leg., 2nd Ex. Sess. (Okla. 2022). The appropriation was subject to the condition that the University Hospitals Authority not budget or expend any appropriated funds for the benefit of any facility performing "gender reassignment medical treatment" on patients under the age of 18. *Id.* In October 2022, OU Medicine issued a statement indicating that

---

[1] In responding to the complaint and preliminary injunction motion, Defendants have separated themselves into two subgroups: (1) OU Medicine, Inc. ("OU Medicine") and Dr. Richard Lofgren in his official capacity as President and Chief Executive Officer of OU Health ("Dr. Lofgren") (collectively the "OU Defendants"); and (2) the remaining defendants (collectively the "State Defendants"). Each subgroup filed a separate response to the Motion. Dkt. No. 85; Dkt. No. 86.

it had "ceased hormone-related prescription therapies and surgical procedures for gender affirming services on patients under the age of 18" because of SB 3 (the "SB 3 Policy"). Dkt. No. 2 at 26.[2]

On May 1, 2023, the Oklahoma State Legislature enacted Senate Bill 613 ("SB 613" or the "Act"), codifying that a healthcare provider "shall not knowingly provide gender transition procedures to any child." 63 O.S. § 2607.1(B). SB 613 defined "gender transition procedures" as "medical or surgical services performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex," including "surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex" and "puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex." *Id.* at § 2607.1(A)(2)(a).[3] Under SB 613, a minor receiving puberty-blocking drugs ("puberty blockers") or cross-sex hormones at the time of the law's enactment may continue receiving such drugs or hormones for a period of six (6) months for the sole purpose of "gradually decreasing and discontinuing" their use. *Id.* at § 2607.1(A)(2)(b)(7). Healthcare providers who administer Treatment Protocols to minors in violation of SB 613 may face adverse proceedings by their professional licensing boards and may be subject to criminal and civil penalties. *Id.* at § 2607.1(D)-(F).

On May 2, 2023, Plaintiffs—five transgender youth who are receiving Treatment Protocols ("Minor Plaintiffs"),[4] their parents and legal guardians ("Parent Plaintiffs"), and one healthcare

---

[2] All record citations use ECF pagination.

[3] Referred to collectively as the "Treatment Protocols."

[4] Brandon Boe is taking cross-sex hormones. Dkt. No. 6-9 at 4. Daphne Doe is taking puberty blockers and cross-sex hormones. Dkt. No. 6-7 at 4. Lydia Loe is taking cross-sex hormones.

provider ("Provider Plaintiff")—filed a complaint seeking declaratory and injunctive relief. Dkt. No. 2. Plaintiffs allege that SB 613 violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates based on sex and transgender status. *Id.* at 48-53. Parent Plaintiffs also allege that SB 613 violates the Due Process Clause of the Fourteenth Amendment because it limits their fundamental right to seek and follow medical advice for their children. *Id.* at 56-57.

Four of the five Minor Plaintiffs received Treatment Protocols through OU Medicine before the enactment of SB 3. These Plaintiffs ("OU Minor Plaintiffs") and their parents and guardians (collectively, "OU Plaintiffs") also challenge the SB 3 Policy. *Id.* at 53-56, 58-61. OU Minor Plaintiffs allege that, like SB 613, the SB 3 Policy violates the Equal Protection Clause because it discriminates against them based on sex and transgender status. *Id.* at 53-56. OU Plaintiffs collectively allege that the SB 3 Policy violates the nondiscrimination provision of the Affordable Care Act ("ACA"). *Id.* at 58-61; *see* 42 U.S.C. § 18116.[5]

In the instant Motion, Plaintiffs seek to enjoin the enforcement of SB 613 on the equal protection and due process grounds set forth in their complaint. Dkt. No. 6.

---

Dkt. No. 6-11 at 4. Peter Poe is taking puberty blockers. Dkt. No. 6-5 at 3. Ryan Roe is taking puberty blockers. Dkt. No. 6-14 at 4.

[5] Although the heading for Plaintiffs' fourth claim indicates that it is brought by OU Plaintiffs [Dkt. No. 2 at 58], the complaint includes additional allegations pertaining to Provider Plaintiff [*Id.* at 60]. Specifically, Plaintiffs allege that: (1) Provider Plaintiff is "a recipient of federal financial assistance and therefore subject to [the ACA's] nondiscrimination mandate"; and (2) "[i]t is impossible for the [Provider] Plaintiff to continue to comply with her obligations under [the ACA] and also comply with the restrictions imposed by [the] SB 3 Policy." *Id.* Due to the inconsistency, it is not clear whether Provider Plaintiff is also asserting a claim under the ACA.

## AUTHORITY AND ANALYSIS

### I.   Jurisdiction

A federal court may issue injunctive relief if it has subject matter jurisdiction over the claim and personal jurisdiction over the parties. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007); *Thomas v. Bolls*, No. 18-CV-00692-GPG, 2018 WL 9489245, at *2 (D. Colo. May 16, 2018) (citing *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983)).

### A.   Subject Matter Jurisdiction

Federal courts possess subject matter jurisdiction for all claims "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "A case arises under federal law if its well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994) (internal quotation marks and citation omitted). Here, Plaintiffs' claims under 42 U.S.C. § 1983 for alleged violations of the Fourteenth Amendment to the United States Constitution [Dkt. No. 2 at 48-57] and under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116 [*id.* at 58-61] satisfy the conditions necessary for jurisdiction under § 1331.

### B.   Personal Jurisdiction

"To exercise jurisdiction in harmony with due process, defendants must have minimum contacts with the forum state, such that having to defend a lawsuit there would not offend traditional notions of fair play and substantial justice." *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (brackets and internal quotation marks omitted) (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008)). Plaintiffs state that a substantial part of the events giving rise to their claims occurred in this district. Dkt. No. 2 at 9. Plaintiffs

also state that Defendants have ties to Oklahoma through their status as members of three groups: state officials or agencies in Oklahoma; officers, board members, or trustees of those state agencies sued in their official capacity; and officers or board members of several Oklahoma state medical licensing boards. *Id.* at 11-16. This is sufficient for a prima facie showing of personal jurisdiction.

## II.    Standing

"Article III of the Constitution permits federal courts to decide only 'Cases' or 'Controversies.' To establish a case or controversy, a plaintiff must possess standing to sue." *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (internal citations and quotation marks omitted). "[T]o demonstrate standing, a plaintiff must show: (1) that he or she has suffered an injury in fact; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely that the injury will be redressed by a favorable decision." *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 898 (10th Cir. 2016) (citations and quotation marks omitted). "The injury alleged must be concrete and particularized, and the threat of that injury must be actual and imminent, not conjectural or hypothetical." *Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012) (citations and quotation marks omitted). Here, Plaintiffs' alleged injury in fact is their actual and imminent loss of access to the Treatment Protocols, and the risk of disciplinary action to Provider Plaintiff by her licensing board or the courts. These imminent threats are fairly traceable to SB 613 and would be redressed by a decision in Plaintiffs' favor on the constitutionality of SB 613. Plaintiffs have made a prima facie showing of standing to assert a facial challenge to SB 613.

## III.    Plaintiffs' Preliminary Injunction Burden

A preliminary injunction is "an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (citation and

quotation marks omitted).  *See also Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").  A court may only grant preliminary injunctive relief, pursuant to Federal Rule of Civil Procedure 65, if plaintiffs meet their burden to demonstrate that:  (1) they are substantially likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) their threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018).[6]  However, the likelihood-of-success inquiry is often dispositive in the case of a constitutional challenge.

At the outset, it must be observed that, "every time a court recognizes an asserted right as a fundamental right protected by the Constitution, the court, 'to a great extent, place[s] the matter outside the arena of public debate and legislative action.'"  *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1220 (11th Cir. 2023) (alteration in original) (quoting *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997)).  For this reason, "the Supreme Court has instructed courts addressing substantive due process claims to 'engage[] in a careful analysis of the history of the right at issue' and 'be "reluctant" to recognize rights that are not mentioned in the Constitution.'"  *Id.* (quoting *Dobbs v. Jackson Women's Health Org.,* 142 S.Ct. 2228, 2246-47 (2022)).  This highlights an initial obstacle to Plaintiffs' requested relief.  That is, Plaintiffs do not argue that the original fixed meaning of either the due process guarantee or the equal protection guarantee covers their claims.  When faced with a similar challenge to bans on procedures for minors in Kentucky and Tennessee,

---

[6]  Although this case involves challenges to both SB 613 and the SB 3 Policy, Plaintiffs only seek to enjoin the enforcement of SB 613.  Dkt. No. 2 at 48-61; Dkt. No. 5 at 1; Dkt. No. 6 at 31. Therefore, the Court will consider the factors set forth above as they pertain to Plaintiffs' SB 613 claims only.

the Sixth Circuit noted the plaintiffs' lack of historical analysis of these constitutional guarantees

and discerned:

> That prompts the question whether the people of this country ever agreed to remove debates of this sort—over the use of innovative, and potentially irreversible, medical treatments for children—from the conventional place for dealing with new norms, new drugs, and new public health concerns: the democratic process. Life-tenured federal judges should be wary of removing a vexing and novel topic of medical debate from the ebbs and flows of democracy by construing a largely unamendable Constitution to occupy the field.

*L.W., by and through Williams v. Skrmetti,* --- F.4th ---, 2023 WL 6321688, at *5 (6th Cir. Sept.

28, 2023).

Plaintiffs face another challenge in that they seek to extend constitutional guarantees into

new territory.  The *Skrmetti* court addressed this as well:

> There is nothing wrong with that, to be certain.  But this reality does suggest that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing.  Constitutionalizing new areas of American life is not something federal courts should do lightly, particularly when "the States are currently engaged in serious, thoughtful" debates about the issue.

*Id.* at *6 (quoting *Glucksberg*, 521 U.S. at 719).

These two concerns highlighted in *Skrmetti* are also present here.  Plaintiffs' burden to

establish that the purported rights at issue fall within the original fixed meaning of constitutional

guarantees—or are of the kind that support newly recognized constitutional guarantees (despite

ongoing, vigorous public debate)—is a heavy one.  Understanding the significant nature of this

burden, the Court now turns to the alleged rights Plaintiffs claim are violated by SB 613.

## IV.    Plaintiffs' Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall

deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend.

XIV, § 1.  This clause "seeks to ensure that any classifications the law makes are made without

respect to persons, that like cases are treated alike, [and] that those who appear similarly situated

are not treated differently without, at the very least, a rational reason for the difference." *SECSYS,*
*LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012) (citation and quotation marks omitted).

 To establish a violation of the Equal Protection Clause, a plaintiff must first show that the
state engaged in intentional discrimination in a manner that harmed the plaintiff. *Ashaheed v.*
*Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (recognizing that a party who asserts an equal
protection violation "has the burden of proving the existence of purposeful discrimination causing
an adverse effect" (citation and quotation marks omitted)). Intent can be established by either: (1)
direct proof of a distinction between groups that is evident from the face of the law or other state
action; or (2) circumstantial evidence that, despite being facially neutral, the state action was taken
with the purpose of discriminating against a particular group. *See id.* (recognizing that intentional
discrimination can be established through circumstantial evidence that "the plaintiff was treated
differently from similarly situated persons who are alike in all relevant respects") (citations and
quotation marks omitted); *SECSYS*, 666 F.3d at 686 (detailing "several forms" of intentional
discrimination that, if established, require an inquiry into whether the state's intentional
classification is permissible).

 Once a plaintiff demonstrates he or she was adversely affected by the state's intentional
discrimination, the Court turns to the question of "whether the state's intentional decision to
discriminate can be justified by reference to some upright government purpose." *SECSYS*, 666
F.3d at 686. The Equal Protection Clause does not prohibit a state from making *any* distinctions
between people; instead, it requires that, to the extent meaningful distinctions are made between
groups of individuals, it can nevertheless be said that the state action "treat[s] similarly situated
persons similarly." *Id.* (citing *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439-40

(1985)) (recognizing that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike").

The question of whether a state's classification is justified by reference to an upright purpose depends upon the classification at issue. If the government action concerns fundamental rights or distinguishes between individuals based upon a suspect classification—such as race or national origin—the state action will be subject to strict scrutiny and will be upheld only if it is "narrowly tailored to further a compelling government interest." *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) (citing *Goetz v. Glickman*, 149 F.3d 1131, 1140 (10th Cir. 1998)). State action that distinguishes among groups based on "quasi-suspect" classifications, such as sex, are subject to an intermediate standard of review and will be upheld so long as the discriminatory means serves "important governmental objectives" and is "substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 516 (1996) (citation and quotation marks omitted). Where the state action does not implicate a fundamental right or draw a distinction based upon a suspect class, rational basis scrutiny applies, and the Court's inquiry will be directed to whether the classification is rationally related to a legitimate purpose. *See Price-Cornelison v. Brooks*, 524 F.3d 1103, 1110 (10th Cir. 2008). Given the different standards of scrutiny that apply to the different types of distinctions that a legislature may draw, the Court must take care to accurately identify the distinction that the Oklahoma Legislature made in SB 613.[7]

---

[7] In a sense, there is a level of overlap between Plaintiffs' due process and equal protection claims. "[I]f a classification impinge[s] upon the exercise of a fundamental right, the Equal Protection Clause requires the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." *Kitchen v. Herbert*, 755 F.3d 1193, 1218 (10th Cir. 2014) (citation and quotation marks omitted) (alteration in original); *see Fowler v. Stitt*, No. 22-CV-115-JWB-SH, 2023 WL 4010694, at *18 (N.D. Okla. June 8, 2023).

The Court concludes that SB 613 restricts particular medical procedures for individuals under a particular age. The evidence is apparent from the face of the Act itself, which is not a wholesale prohibition on gender affirming care for transgender individuals but is instead a legislative determination that only adults may have access to gender affirming care through the Treatment Protocols.

## A. Age Classification

SB 613 does not prevent any adult—male or female—from undergoing Treatment Protocols in connection with gender affirming care; it only prevents minors from doing so. *See Eknes-Tucker*, 80 F.4th at 1227 (agreeing that Alabama's similar act "is best understood as a law that targets specific medical interventions for minors, not one that classifies on the basis of any suspect characteristic under the Equal Protection Clause"). Facially, the distinction made is between adults who are ready to make life-altering decisions and minors who, at least in the eyes of the legislature, are not. This is precisely the type of age-based legislative decision that courts have long accepted as being subject to rational basis review. *See Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1155 (D.C. Cir. 2004) (concluding that "classifications based on youth—like those based on age in general—do not trigger heightened scrutiny for equal protection purposes"); *Bykofsky v. Borough of Middletown*, 401 F. Supp. 1242, 1266 (M.D. Pa. 1975) (recognizing that "youths under the age of eighteen have traditionally been regulated and restricted by American law in many ways," including through limitations on their ability to enter into contracts, purchase certain goods, work at certain jobs, and be held liable for criminal behavior), *aff'd*, 535 F.2d 1245 (3d Cir. 1976).

## B. Sex Classification

The Court rejects Plaintiffs' argument that the Act is discriminatory on its face because it makes distinctions in "explicit gendered terms."  Dkt. No. 6 at 18-19.  True, SB 613 uses terms such as "sex" and "gender" to discuss the Treatment Protocols, but the use of those terms is due to the fact the Act itself concerns "medical or surgical services performed for the purpose of attempting to affirm [a] minor's perception of his or her gender or biological sex . . . ."  63 O.S. § 2607.1(A)(2).  The use of these "gendered terms" reflects the nature of the procedure being regulated, not an intention to discriminate between people of different sexes.  *See Eknes-Tucker*, 80 F.4th at 1228 (rejecting argument that a similar statutory classification was sex-based where "the statute refer[red] to sex only because the medical procedures that it regulates—puberty blockers and cross-sex hormones as a treatment for gender dysphoria—are themselves sex-based").  Indeed, it would be difficult, if not impossible, for the legislature to regulate this area without using the challenged terms.  *See Skrmetti*, 2023 WL 6321688, at *14 (rejecting the argument that the use of the word "sex" in Kentucky and Tennessee statutes banning medical procedures similar to the Treatment Protocols for minors constituted sex discrimination, explaining, "The Acts mention the word 'sex,' true.  But how could they not?  The point of the hormones is to help a minor transition from one gender to another, and laws banning, permitting, or otherwise regulating them all face the same linguistic destiny of describing the biology of the procedures.").

Rather than applying a litmus test in which the presence of the word "sex" or "gender" necessitates intermediate scrutiny, the Court must look to the language of the statute and examine whether SB 613 uses gendered terms to distinguish between groups of people.  The Court finds that it does not.  Where the Act uses gendered terms, it does so to identify the procedures at issue.

As noted, SB 613 uses the terms "gender" and "sex" when articulating the "gender transition procedures" that are prohibited for minors. *See* 63 O.S. § 2607.1(A)(2)(a). It likewise provides specific examples of the procedures that individuals cannot undergo before reaching the age of majority, including "surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex" and drugs that "promote the development of feminizing or masculinizing features consistent with the opposite biological sex." *Id.*

The Act does not use sex as a means to distinguish between groups—treatments allowed by SB 613 are allowed for *all* minors, regardless of sex. *Id.* at § 2607.1(A)(2)(b). Similarly, *all* minors, regardless of sex, are prohibited from undergoing certain procedures for the purpose of gender transition before reaching the age of majority. 63 O.S. § 2607.1(B) ("A health care provider shall not knowingly provide gender transition procedures to any child."); *id.* at § 2607.1(A)(1) (defining a "child" as "*any person* under the age of eighteen (18) years of age") (emphasis added). So far, they are equal. *See Eknes-Tucker*, 80 F.4th at 1228 (holding that the challenged statute did "not establish an unequal regime for males and females" where the law restricted certain treatments for treating gender discordance "for *all* minors").

Plaintiffs argue that, notwithstanding the facially neutral application, SB 613 has the effect of discriminating based on sex because it "enforces sex stereotypes and gender conformity." Dkt. No. 6 at 19-20. They point to *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731 (2020), where the Supreme Court held that an employer violates Title VII when it takes an adverse employment action against an individual because that person is transgender. *Accord Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021) (recognizing that "transgender discrimination . . . is

discrimination 'because of sex' prohibited under Title VII"). According to Plaintiffs, the reasoning of *Bostock* equally applies to equal protection claims.

At one point, it could have appeared that one circuit might agree with Plaintiffs' argument. *See Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (recognizing that discrimination against a transgender individual because of his or her gender non-conformity is gender stereotyping prohibited by Title VII and the Equal Protection Clause). However, the Eleventh Circuit recently removed any belief that could be so. *See Eknes-Tucker*, 80 F.4th at 1228-29 (rejecting application of *Bostock* and *Brumby* in upholding Alabama's similar ban on gender affirming procedures for minors, explaining that neither of those cases dealt with the Equal Protection Clause as applied to laws regulating medical treatments). More importantly, the Tenth Circuit has not accepted Plaintiffs' theory about the application of *Bostock* here.

Absent binding precedent to the contrary, this Court will not extend the reasoning of *Bostock*—a Title VII case concerning an adverse employment action—to this case, which concerns a materially different governing law, materially different language, and materially different facts. *See id.* at 1229 (concluding that because *Bostock* "concerned a different law (with materially different language) and a different factual context," that decision bore "minimal relevance" to the question of whether the statutory prohibition against certain gender transition procedures violated the Equal Protection Clause). *See also Skrmetti,* 2023 WL 6321688, at *16-17 (contrasting the facts in *Bostock,* where adult employees were "fired . . . because their behavior did not match stereotypes of how adult men or women dress or behave," with the laws at issue, which "do not deny anyone general healthcare treatment based on any such stereotypes[, but] merely deny the same medical treatments to all children facing gender dysphoria if they are 17 or under"); *Students for Fair Admissions v. Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring)

(comparing the text of Title VII with the Equal Protection Clause and concluding that the suggestion that "such differently worded provisions should mean the same thing is implausible on its face").

Even if this Court were to hold that classifications based upon "gender conformity" (or lack thereof) constitute sex-based classifications under the Equal Protection Clause, this would not advance Plaintiffs' claims. This is not a case where a state action is being taken to further a particular gender stereotype or prohibit conduct that contravenes that stereotype. *See Eknes-Tucker*, 80 F.4th at 1229 (concluding that rational basis scrutiny applied to a law targeting certain medical interventions associated with gender dysphoria, as that law did not "further any particular gender stereotype"); *Skrmetti,* 2023 WL 6321688, at *18 ("Recognizing and respecting biological sex differences does not amount to stereotyping . . . .") Instead, this is a case where the Oklahoma Legislature has prohibited *all* minors from using certain medical procedures to treat gender dysphoria. The law does not further gender stereotypes by taking adverse actions against those who fail to conform to them; it simply requires that adolescents reach the age of majority before undergoing certain medical interventions to treat the psychological condition of gender dysphoria.

### C. Transgender Status Classification

Plaintiffs take the position that, even if SB 613 does not distinguish on the basis of gender (or conformance with gender norms), the statute is nevertheless subject to heightened scrutiny because it treats transgender individuals differently than other individuals. The Court disagrees. First, the Supreme Court has not recognized transgender status as a suspect class.[8] In addition, the

---

[8] "The bar for recognizing a new suspect class is a high one. The Supreme Court 'has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so.'" *Skrmetti,* 2023 WL 6321688, at *18 (quoting *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015)).

Tenth Circuit "has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims," and has analyzed such claims under the rational basis standard. *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015).[9] *See also Skrmetti,* 2023 WL 6321688, at *18-19 (discussing the considerations the Supreme Court has highlighted when recognizing a new suspect class and explaining why transgender status is not likely to qualify under such considerations).  Furthermore, even if heightened scrutiny were to apply to classifications based on transgender status, the Court would not find that SB 613 makes such a classification.

The Court is not persuaded by Plaintiffs' argument that SB 613 is part of a "larger legislative strategy to discriminate against transgender people, including by restricting access to gender-affirming care for people of all ages" [Dkt. No. 6 at 21-22 & n.3] for three reasons.  First, although Plaintiffs suggest that 15 bills were introduced as part of a legislature-wide strategy to discriminate against transgender people, they cite only two: HB 1011 and SB 345.  *Id.*  Neither of these bills received a floor vote,[10] which undercuts Plaintiffs' claims; if these bills were components of an overarching discriminatory strategy, it seems unlikely that they would have died in committee.  Second, Plaintiffs provide no evidence for their claim that SB 613 was one of 15 similar bills.  The Court declines to further inquire into Oklahoma's legislative records concerning the nature and purpose of these purported bills when Plaintiffs apparently did not believe the endeavor to be worth their own time.  It would seem likely, however, that had any bills made more

---

[9] Unpublished appellate decisions are not precedential but may be cited for their persuasive value. *See* 10th Cir. R. 32.1; Fed. R. App. P. 32.1.

[10] *See* http://www.oklegislature.gov/BillInfo.aspx?Bill=hb1011&Session=2300 and http://www.oklegislature.gov/BillInfo.aspx?Bill=sb345&Session=2300.  The Court takes judicial notice of these governmental records.  *See High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1175 n.1 (10th Cir. 2019).

progress than HB 1011 or SB 345, Plaintiffs would have cited them. Third, one of the bills referenced by Plaintiffs, HB 1011, sought to ban Treatment Protocols for anyone under the age of 21, rather than under the age of 18. The legislature's decision to enact SB 613, with its lower age restriction, undermines Plaintiffs' argument that the legislature was operating with the goal of invidious discrimination against all transgender individuals. Plaintiffs' theory is simply insufficient to establish a likelihood that they will prove that SB 613 was part of an impermissible scheme to discriminate against transgender people.

The Court likewise rejects Plaintiffs' claim that SB 613 discriminates against transgender individuals because it "singles out medical care that only transgender people need or seek." Dkt. No. 6 at 18. Although the statute does restrict a specific course of treatment that only transgender individuals would normally request, that fact alone does not render the statute invalid. As the Supreme Court recently recognized when addressing whether a state's regulation of abortion was a sex-based classification, the "regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S.Ct. at 2245-46 (alteration in original) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). Just as the "goal of preventing abortion does not constitute invidiously discriminatory animus against women," *id.* at 2246, the goal of prohibiting minors from accessing a course of treatment that "only transgender people need or seek" [Dkt. No. 6 at 18] does not itself constitute discriminatory animus against transgender people. Where, as here, there is no evidence of pretext for discrimination, SB 613's classification scheme does not trigger a heightened standard of review. *See Eknes-Tucker*, 80 F.4th at 1230 (holding that, because there was no evidence that the regulation was pretext for discrimination against transgender individuals, the ban's "relationship

to transgender status [did] not warrant heightened scrutiny").  Accordingly, the legislature's classification scheme will be upheld so long as it survives rational basis review.  *See* Section VI, *infra.*

## V.    Parent Plaintiffs' Substantive Due Process Claim

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  Two types of substantive rights have been recognized within the Due Process Clause: enumerated rights, set out in the first eight Amendments, and implied rights, "a select list of fundamental rights that are not mentioned anywhere in the Constitution."  *Dobbs*, 152 S.Ct. at 2246.  This case involves implied rights.  *See Fowler v. Stitt*, --- F. Supp. 3d ---, 2023 WL 4010694, at *8 (N.D. Okla. June 8, 2023) ("The Constitution makes no express reference to . . . one's gender, nor does it reference a right to be treated consistent with one's gender identity.  Thus, Plaintiffs must show that the right is somehow implicit in the constitutional text . . . ."), *appeal docketed*, No. 23-5080 (10th Cir. July 7, 2023).

An implied rights substantive due process analysis generally requires two steps.  The Court must first "carefully describe the asserted fundamental liberty interest," then "decide whether the asserted liberty interest, once described, is objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Seegmiller v. LaVerkin City*, 528 F.3d 762, 769 (10th Cir. 2008) (citation and quotation marks omitted).[11]

---

[11]  A second test, referred to as the "shocks the conscience" test, is sometimes appropriate for a substantive due process case (usually, though not exclusively, in cases involving challenged actions by the executive branch of government).  *Seegmiller*, 528 F.3d at 767.  "Conduct that shocks the judicial conscience . . . is deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'"  *Id.* (quoting

## A. Description of the Interest

"That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected . . . ." *Glucksberg*, 521 U.S. at 727 (1997) (first citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 852 (1992); and then citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33-35 (1973)).  "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225-26 (1985)).  The Supreme Court emphasized the need for precise framing in *Glucksberg*, explaining:

> By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action.  We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the [judiciary].

521 U.S. at 720 (internal citations and quotation marks omitted).  Rights framed as "[v]ague generalities . . . will not suffice." *Chavez v. Martinez*, 538 U.S. 760, 776 (2003).

*Glucksberg* demonstrated the type of the precise framing required.  In that case, terminally ill patients and treating physicians who challenged a state law banning physician-assisted suicide

---

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  The Tenth Circuit has cautioned that "[c]ourts should not unilaterally choose to consider only one or the other" test. *Id.* at 769.  Here, no party raised the "shocks the conscience" test, and the Court does not believe it to be appropriate under the facts of this case.  "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense," *id.* at 767 (citation and quotation marks omitted), and nothing in the record gives the Court concern that the ordinary legislative process through which SB 613 was codified would qualify as egregious.  Therefore, the Court focuses on the "fundamental liberty" test.

argued that "our liberty jurisprudence, and the broad, individualistic principles it reflects, protect[ed] the liberty of competent, terminally ill adults to make end-of-life decisions free of undue government interference."  521 U.S. at 724 (citation and quotation marks omitted).  The Court narrowed the issue significantly, framing the question presented as "whether the protections of the Due Process Clause include a right to commit suicide with another's assistance."  *Id.*

Similarly, "[a]lthough many of the Court's 'privacy' decisions have implicated sexual matters, the Court has never indicated that the mere fact that an activity is sexual and private entitles it to protection as a fundamental right."  *Seegmiller*, 528 F.3d at 770 (quoting *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1236 (11th Cir. 2004)).  Rather than considering broad, generalized rights, courts have examined "more narrowly defined right[s]" such as that "of married couples to obtain and use contraceptives."  *Id.* (citing *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965)).[12]

The direction to district courts is clear:  an asserted implied right must be narrowly and precisely expressed.  Thus, "our first job in assessing a substantive due process claim is to make a 'careful description' of the allegedly violated right."  *Browder v. City of Albuquerque*, 787 F.3d 1076, 1078 (10th Cir. 2015) (quoting *Glucksberg*, 521 U.S. at 721).  Here, the parties frame the disputed liberty interest differently.  Plaintiffs describe the asserted right as "the fundamental right[] of parents to seek appropriate medical care for their minor children."  Dkt. No. 6 at 25. Defendants describe the asserted right as a "fundamental right for parents to choose for their

---

[12]  Even when distinguishing *Glucksberg*, the Supreme Court structured the question presented based on the action that plaintiffs wanted to perform rather than the characteristics of the plaintiffs. *See Obergefell v. Hodges*, 576 U.S. 644, 671 (2015).  More recently, the Court reiterated the *Glucksberg* standard in *Dobbs*, directing lower courts to "exercise the utmost care" and avoid "freewheeling judicial policymaking" in structuring substantive due process inquiries.  142 S.Ct. at 2247-48.

children to use puberty blockers, cross-sex hormones, and surgeries for the purposes of effectuating a gender transition." Dkt. No. 86 at 35. The Court examines each.

Federal precedent "historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). Parents are presumed to act in the best interest of their children. *Id.* at 602-03 ("That some parents may at times be acting against the interests of their children . . . creates a basis for caution[] but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests.") (internal citation and quotation marks omitted).

Because "[t]he law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," *id.* at 602, "the interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by [the] Court," *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). Parental obligations toward children include the "'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Parham*, 442 U.S. at 602. "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Id.* at 603. "Nonetheless, [the Court has] recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Id.*

Although the Tenth Circuit has "never specifically recognized or defined the scope of a parent's right to direct her child's medical care" it has expressed confidence in the position that "a parent's general right to make decisions concerning the care of her child includes, to some extent, a more specific right to make decisions about the child's medical care." *PJ ex rel. Jensen v.*

*Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010) (citation and quotation omitted).  At the same time, "parental rights, including any right to direct a child's medical care, are not absolute." *Id.* at 1197-98 (first citing *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); and then citing *Parham*, 442 U.S. at 604).  "Indeed, states have a compelling interest in and a solemn duty to protect the lives and health of the children within their borders." *Id.* (citing *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982)).

A close examination of *Parham* and *Troxel* demonstrates that they do not support the conclusion that there is a broad, general right of the type asserted by Plaintiffs.  First, the *Parham* decision involved procedural due process, which has a far less fraught history than its substantive cousin.  *See* 442 U.S. at 620 n.23.  The question at issue in *Parham* was whether minors had a due process right to greater procedural safeguards—e.g., a judicial hearing—before their parents could commit them to a mental health institution.  *Eknes-Tucker*, 80 F.4th at 1222-23 (citing *Parham*, 442 U.S. at 610).  "*Parham* was concerned about the *procedures* a state must afford a child prior to institutionalization when the parent believes such treatment—*which is not only lawful but provided by the state itself*—is necessary." *Id.* at 1223 (emphasis added).  Because "*Parham* does not at all suggest that parents have a fundamental right to direct a particular medical treatment for their child that is prohibited by state law," it "offers no support" for Plaintiffs' substantive due process claim.  *Id.*

Next, the *Troxel* case involved a fractured Court.  530 U.S. at 60.  Four justices joined the plurality opinion, two justices concurred in judgment only, and one of those two noted that the decision did not "call for turning any fresh furrows in the 'treacherous field' of substantive due process." *Id.* at 76 (Souter, J., concurring in judgment); *see also id.* at 80 (Thomas, J., concurring in judgment).  One of the dissenting justices noted that "[d]espite this Court's repeated recognition

of [the] significant parental liberty interests, these interests have never been seen to be without limits." *Id.* at 87 (Stevens, J., dissenting). Another emphasized that "[o]nly three holdings of [the Supreme] Court rest in whole or in part upon a substantive constitutional right of parents to direct the upbringing of their children—two of them from an era rich in substantive due process holdings that have since been repudiated." *Id.* at 92 (Scalia, J., dissenting). Further, *Troxel* did not involve parental rights with respect to making medical decisions; it involved parental rights with respect to decision-making concerning the visitation of grandparents. *Id.* at 61.

Finally, the Tenth Circuit has avoided specificity, instead directing that, "[w]hen a child's life or health is endangered by her parents' decisions, in some circumstances a state may intervene without violating the parents' constitutional rights." *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (quoting *Jensen*, 603 F.3d at 1198).

This analysis leads to the inevitable conclusion that Plaintiffs' rights formulation has the same overbreadth issue as the *Glucksberg* plaintiffs' rights formulation. Here, Parent Plaintiffs allege that Oklahoma's ban on the Treatment Protocols violates their right to seek appropriate medical care for their minor children. Dkt. No. 6 at 25. In *Glucksberg*, plaintiffs alleged that Washington's ban on physician-assisted suicide violated their right to "make end-of-life decisions free of undue government interference." 521 U.S. at 724. The Supreme Court rejected this wide formulation, instead narrowing the question presented to whether individuals had an affirmative right to perform a specific activity: committing suicide with another's assistance. *Id.*

"Guideposts for responsible decisionmaking" regarding substantive due process are "scarce and open-ended" in the best of circumstances. *Collins*, 503 U.S. at 125. Guideposts regarding parental medical decisionmaking are even more nebulous. "In interpreting what is meant by the Fourteenth Amendment's reference to 'liberty,' we must guard against the natural

human tendency to confuse what that Amendment protects with our own ardent views about the liberty that Americans should enjoy." *Dobbs*, 142 S.Ct. at 2247.  Thus, following the Supreme Court's direction to "exercise the utmost care" in carefully describing the asserted fundamental liberty interest, the Court concludes that Plaintiffs' rights formulation is too much of a "vague generality" to satisfy this first step.

Defendants' framing of the issue is consistent with the approach approved by the Supreme Court.  They define the asserted right as "a fundamental right for parents to choose for their children to use puberty blockers, cross-sex hormones, and surgeries for the purposes of effectuating a gender transition." Dkt. No. 86 at 35.  This follows the method of framing presented in *Glucksberg* and other substantive due process precedents.  *See, e.g.,* 521 U.S. at 724; *Lawrence v. Texas*, 539 U.S. 558 (2003) (examining whether substantive due process includes the right for adults to perform consensual homosexual acts in private).  *Accord Eknes-Tucker*, 80 F.4th at 1221, 1224 (emphasizing that "a substantive due process analysis must focus on the specific right asserted, rather than simply rely on a related general right," and framing the issue as a right to "treat [one's] children with transitioning medications subject to medically accepted standards") (alteration in original).  The Court finds Defendants' definition is an appropriately careful description of the allegedly violated right.

### B.  Historical Analysis

Now that the Court has a definition for the allegedly infringed right, it must "examine whether the right at issue . . . is rooted in our Nation's history and tradition and whether it is an essential component of what we have described as 'ordered liberty.'"  *Dobbs*, 142 S.Ct. at 2244. Plaintiffs have not provided any historical antecedents demonstrating that a right to the Treatment

Protocols is deeply rooted.[13]  Plaintiffs have therefore failed to carry their burden of proving the liberty interest they seek is so fundamental that it must be protected through a heightened scrutiny analysis.  *Seegmiller*, 528 F.3d at 770.

The Court's conclusion is harmonious with the conclusions of numerous courts "reject[ing] arguments that the Constitution provides an affirmative right of access to particular medical treatments reasonably prohibited by the Government."[14]  *Abigail All. for Better Access to Dev'l Drugs v. von Eschenbach*, 495 F.3d 695, 710 (D.C. Cir. 2007) (en banc); *see also id.* at n.18 ("No circuit court has acceded to an affirmative access claim.").  "While our longstanding traditions may give individuals a right to refuse treatment, there is no historical support for an affirmative right to specific treatments."  *Skrmetti*, 2023 WL 6321688, at *9 (citing *Glucksberg*, 521 U.S. at 725-26).  In fact, except for one district court in Texas in 1980,[15] "it appears that every court to consider the issue has rejected the argument that access to a specific treatment or specific provider . . . is a fundamental right protected by the Constitution."  *Birchansky v. Clabaugh*, No. 417CV00209RGERAW, 2018 WL 10110860, at *18 (S.D. Iowa Oct. 17, 2018), *aff'd*, 955 F.3d

---

[13]  Borrowing Defendants' phrasing, "The reason for this is simple:  The treatments that they seek have only existed for a few decades."  Dkt. No. 86 at 35 (citing Dkt. No. 6-16 at ¶ 28).  As the Eleventh Circuit recently explained, "the earliest-recorded use of puberty blocking medication and cross-sex hormone treatment for purposes of treating the discordance between an individual's biological sex and sense of gender identity did not occur until well into the twentieth century."  *Eknes-Tucker*, 80 F.4th at 1220-21.

[14]  Some of these cases involved various forms of executive action, such as practitioner licensing laws or patients seeking access to treatments that had issues in the FDA approval process.  Here, SB 613 came about through legislative action.  The executive action cases are pertinent because the key inquiry is whether the government (regardless of branch) infringed on constitutional rights.  *Seegmiller*, 528 F.3d at 767 ("Although some precedential support exists for [an] executive versus legislative distinction, an overly rigid demarcation between the two lines of cases is neither warranted by existing case law nor helpful to the substantive analysis.").

[15]  *Andrews v. Ballard*, 498 F. Supp. 1038 (S.D. Tex. 1980) (holding the constitutional right of privacy included a patient's right to obtain acupuncture treatment).

751 (8th Cir. 2020). *See also Nat'l Ass'n for Advan. of Psych. v. Cal. Bd. of Psych.*, 228 F.3d 1043,

1050 (9th Cir. 2000) (holding that "substantive due process rights do not extend to the choice of

type of treatment or of a particular health care provider."); *Mitchell v. Clayton*, 995 F.2d 772, 775

(7th Cir. 1993) (explaining that "most federal courts have held that a patient does not have a

constitutional right to obtain a particular type of treatment or to obtain treatment from a particular

provider if the government has reasonably prohibited that type of treatment or provider"). And

the Tenth Circuit reversed a trial court's holding that the constitutional right of privacy allowed

patients to take "whatever treatment they wished regardless of whether the FDA regarded the

medication as 'effective' or 'safe.'" *Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir.

1980). The Sixth Circuit effectively summarized the issue:

> This country does not have a "deeply rooted" tradition of preventing governments
> from regulating the medical profession in general or certain treatments in particular,
> whether for adults or their children. Quite to the contrary in fact. State and federal
> governments have long played a critical role in regulating health and welfare, which
> explains why their efforts receive a strong presumption of validity. State
> governments have an abiding interest in protecting the integrity and ethics of the
> medical profession and preserving and promoting the welfare of the child. These
> interests give States broad power, even broad power to limit parental freedom when
> it comes to medical treatment.

*Skrmetti,* 2023 WL 6321688, at *7 (internal quotation marks and citations omitted).

In the case before this Court, Plaintiffs have not demonstrated a fundamental right for

parents to choose for their children to use puberty blockers, cross-sex hormones, and surgeries for

the purpose of effectuating a gender transition. "Absent a fundamental right, the state may regulate

an interest pursuant to a validly enacted state law or regulation rationally related to a legitimate

state interest." *Seegmiller*, 528 F.3d at 771. Accordingly, rational basis review applies.

## VI.    Rational Basis Review

Since both of Plaintiffs' constitutional claims call for rational basis review, the Court

examines the two claims in tandem to determine whether Plaintiffs are likely to succeed in showing

that there is no rational basis for the restrictions in SB 613.  As explained below, it is unlikely that Plaintiffs' claims will survive this level of scrutiny for numerous reasons, many of which are demonstrated by the profound debate concerning this very issue.

### A.  Legislative Debate

Where, as here, there is robust scientific and political debate concerning a significant public-policy question, a court should be loath to step in to end the debate and thereby suggest it is all-knowing.  The record in this case amply demonstrates that there is no consensus in the medical field about the extent of the risks or the benefits of the Treatment Protocols.  *See* Section VI.B., *infra*.  Plaintiffs assert throughout their briefing that the Treatment Protocols for minors are not "experimental."   While this is perhaps technically true, Plaintiffs' representations are misleading.  "Not experimental" in this case does not translate to "proven" or "established."[16]  Rather, Plaintiffs admit that experiments and scientific studies of the sort generally seen in the medical field *have not been done* in this area.  Whether such experiments or studies could be done ethically is a topic of healthy debate between the parties' experts.  *Compare* Dkt. No. 6-16 at 9, 16 *with* Dkt. No. 86-1 at 30, 132-33.  Nonetheless, it is more accurate to state that the Treatment Protocols are not "experimental" only because the experimental phase has truly not yet begun.

The Court should not cut off this debate by declaring that only one side has all the answers in its corner.  Instead, the "conventional place for dealing with new norms, new drugs, and new technologies [is] the democratic process," and "[l]ife-tenured federal judges should be wary of removing a vexing and novel topic of medical debate from the ebbs and flows of democracy." *Skrmetti*, 2023 WL 6321688, at *5.  When "Americans are engaged in an earnest and profound

---

[16]  *See, e.g.*, Dkt. No. 132-1 at 10 ("Experiments test treatments by comparing two groups (or 'arms'), one that receives the treatment and one that does not.  Because medicalized transition has not yet been tested with a two-group design, it has not yet passed the experimental stage.")

debate about the morality, legality, and practicality" of a life-altering medical intervention, courts are wise to "permit[] this debate to continue, as it should in a democratic society." *Glucksberg*, 521 U.S. at 735.[17]  The Sixth Circuit succinctly applied this general rule to the issue at hand when it explained:

> Given the high stakes of these nascent policy deliberations—the long-term health of children facing gender dysphoria—sound government usually benefits from more rather than less debate, more rather than less input, more rather than less consideration of fair-minded policy approaches.  To permit legislatures on one side of the debate to have their say while silencing legislatures on the other side of the debate under the Constitution does not further these goals.  That is all the more critical in view of two realities looming over both cases—the concept of gender dysphoria as a medical condition is relatively new and the use of drug treatments that change or modify a child's sex characteristics is even more recent.  Prohibiting citizens and legislatures from offering their perspectives on high-stakes medical policies, in which compassion for the child points in both directions, is not something life-tenured federal judges should do without a clear warrant in the Constitution.

*Skrmetti*, 2023 WL 6321688, at *6.  The legislature in this case weighed in on one side of a nationwide dispute over how to balance the truth that parents generally can be expected to know what is best for their children against the competing reality that state governments have an abiding interest "in protecting the integrity and ethics of the medical profession," *Glucksberg*, 521 U.S. at 731, and "preserving and promoting the welfare of the child," *Schall v. Martin,* 467 U.S. 253, 265 (1984) (citation and quotation marks omitted).[18]  The very existence of this dispute, and ongoing

---

[17]  It is evident that the states are engaged in thoughtful debate over this issue.  *See Skrmetti*, 2023 WL 6321688, at *6 (recognizing numerous state laws similar to those at issue restricting gender transition procedures for minors, as well as state laws providing various protections for those seeking treatment for gender dysphoria).  The Sixth Circuit observed that most of this legislative activity has occurred within the last two years and that the "[f]ailure to allow these laws to go into effect would grind these all-over-the-map gears to halt." *Id.*

[18]  "[I]t is well to remember that the most deeply rooted tradition in this country is that we look to democracy to answer pioneering public-policy questions, meaning that federal courts must resist the temptation to invoke an unenumerated guarantee to 'substitute' their views for those of legislatures."  *Skrmetti*, 2023 WL 6321688, at *7 (citing *Dobbs,* 142 S.Ct. at 2277).

thoughtful debate, is independent evidence that Plaintiffs are unlikely to establish that there is no rational basis for the legislature's decision.

### B. Safeguarding Minors

It is rational for the Oklahoma Legislature to regulate the Treatment Protocols for minors while the democratic process resolves ongoing questions of safety and efficacy. Courts have long recognized that states have a compelling interest in "safeguarding the physical and psychological well-being of [] minors." *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) (*quoting Globe Newspaper*, 457 U.S. at 607). For this reason, the judiciary has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *Id.*[19] Indeed, courts have upheld restrictions designed to protect and prevent minors from engaging in behaviors that are far less risky than the procedures banned by SB 613. *See e.g., City of Dallas v. Stanglin*, 490 U.S. 19, 28 (1989) (upholding age restriction for dance halls based upon "the city's interest in promoting the welfare of teenagers").[20]

The Court could conclude that Plaintiffs' challenge to SB 613 is unlikely to succeed based on nothing more than its own rational speculation, should it choose to do so. *F.C.C. v. Beach*

---

[19] *See, e.g., In re Hawley*, 606 N.W.2d 50, 53 (1999) (decision to charge 15 year old, but not his 13 year old partner, for conduct arising from the pair's sexual relationship did not violate Equal Protection Clause because the difference in age was a "legitimate distinguishing factor" under the statutory scheme); *Am. Ent'rs, L.L.C. v. City of Rocky Mount, N.C.*, 888 F.3d 707, 723 (4th Cir. 2018) (confirming state's interest in ensuring that sexually-oriented-business owners are of legal drinking age justified age-based restriction on ownership of such venues).

[20] *See also Qutb v. Strauss*, 11 F.3d 488, 496 (5th Cir. 1993) (affirming curfew ordinance following strict scrutiny review); *Rothner v. City of Chicago*, 929 F.2d 297, 298 (7th Cir. 1991) (affirming ordinance prohibiting minors from playing video games during school hours); *Blassman v. Markworth*, 359 F. Supp. 1, 6 (N.D. Ill. 1973) (concluding state's decision to set a minimum age for state and local officers was neither unreasonable nor irrational).

*Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (noting that, on rational basis review, "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data"). But such speculation is not necessary, as there is ample record evidence to establish that SB 613 is rationally related to a legitimate state interest for at least four distinct reasons.

### 1. Difference in Diagnoses

It is undisputed that gender transition procedures address a psychological diagnosis, rather than a physiological one. *See* Dkt. No. 119-4 at 3 (concession by Plaintiffs' expert that "[g]ender dysphoria is a psychiatric diagnosis"). A diagnosis of gender dysphoria depends upon "patients' reports of their symptoms," rather than objective diagnostic criteria, and there is no evidence that a diagnosis of gender dysphoria can be confirmed by any objective measurement or testing protocol. *Id.* at 4; Dkt. No. 86-1 at 126-27 (distinguishing a medical diagnosis, which identifies the cause of a patient's symptoms, and a psychiatric diagnosis, which labels the symptoms regardless of cause). The evidence demonstrates that a diagnosis of gender dysphoria is so tied to the patients' subjective beliefs and psychological condition that it cannot be diagnosed over a patient's objection.[21] This diagnosis is, therefore, readily distinguishable from the physiological

---

[21] Dkt. No. 86-1 at 127.

conditions—including precocious puberty[22] and disorders of sexual development[23]—that are specifically exempted from the statutory definition of "gender transition procedures." It is entirely within the legislature's purview to conclude that, while it may be appropriate for a minor to undergo hormone therapy and/or surgery to address a physiological condition, it is not appropriate for a minor to undergo such invasive procedures to treat a psychological one.[24]

## 2. Difference in Purpose and Risks

Plaintiffs argue that the same Treatment Protocols are allowed for cisgender (or non-transgender) children but unfairly banned for transgender children. As an example, Plaintiffs suggest that cisgender children are allowed access to the Treatment Protocols for precocious puberty while transgender children are denied the Treatment Protocols. But this argument misses

---

[22] Precocious puberty is a condition diagnosed by reference to objective facts and measurements, including the age of the patient, the existence of physical indicia that puberty has begun, and increased testosterone or estrogen production. Dkt. No. 86-2 at 11 (describing the stages of sexual development and the physical symptoms associated with each); *id.* at 17 (recognizing that the onset of puberty is associated with an increase in the production of sex hormones); *id.* at 22 (identifying ages with corresponding stages of pubertal development); Dkt. No. 86-3 at 16-17, 28 (describing physical changes and onset ages associated with Tanner Stage 2 of pubertal development). Minor patients being treated for the physiological condition of precocious puberty are therefore readily distinguishable from minor patients being treated for the psychological condition of gender dysphoria.

[23] Dkt. No. 86-1 at 124 (describing disorders of sexual development as "*physical* medical disorders" which can be diagnosed using objective and verifiable criteria). A physical disorder of sexual development that can be observed or detected through objective means is not "like" a psychological diagnosis that cannot be ascertained in the absence of a subjective complaint.

[24] Plaintiffs argue that neither the manner in which gender dysphoria is classified nor the subjectivity of the symptoms associated with that condition undermines the validity of a gender dysphoria diagnosis. Dkt. No. 119-4 at 4. This may be true, but this Court is not being asked whether gender dysphoria is a valid diagnosis; instead, the Court is being asked to determine whether the legislature has a rational basis for banning certain procedures for use in addressing gender dysphoria, but permitting those procedures to treat other, physiological conditions. Plaintiffs' concession that gender dysphoria is a psychological diagnosis based upon patients' subjective reports of their symptoms is particularly salient to the latter question.

an important fact. Nothing in SB 613 bans the Treatment Protocols to treat *any* child *for precocious puberty*, a physiological malady, whether the child is cisgender or transgender. Conversely, the Treatment Protocols are banned to treat *all* children *for gender dysphoria*, a psychological condition.

The evidence likewise demonstrates that minors who seek to undergo the Treatment Protocols for the purpose of affirming perceived gender face risks that are different and more extensive than those for minors who would use the same protocols for other diagnoses. Minors who undergo the Treatment Protocols for purposes of gender affirming care—in contrast to those who use the same protocols to treat precocious puberty—do so with the intent and effect of undergoing puberty later than it would be physically appropriate to do so. These are different treatments with different purposes. As a result, the risks are very different. *See* Dkt. No. 86-1 at 36 (recognizing that the "use of puberty blockers to treat precocious puberty avoids the medical risks caused by undergoing puberty growth before the body is ready," while the use of the same medication on "patients already at their natural puberty pushes them away from the mean age of the healthy population").

Undergoing puberty later than the typical range of pubertal onset carries a range of risks, including impaired brain development[25] and poorer psychosocial and educational development.[26]

---

[25] *See* Dkt. No. 86-1 at 99-100 (recognizing an association of brain development with age of pubertal onset, a correlation between the administration of GnRH-agonists and a decrease in brain activity and cognitive performance, and concerns that "blocking the process of puberty during its natural time could have a negative and potentially permanent impact on brain development"); Dkt. No. 86-2 at 25 (acknowledging that sex hormones can influence the development and maturation of the human brain); Dkt. No. 86-3 at 7.

[26] *See* Dkt. No. 86-1 at 101 (recognizing that "[u]ndergoing puberty much later than one's peers is also associated with poorer psychosocial functioning and lesser educational achievement"); Dkt. No. 86-2 at 25 (noting the importance of peer relationships during adolescence and recognizing that one reason for treating precocious puberty with puberty blockers is the generally accepted

Minors who undergo the Treatment Protocols to delay puberty for gender-transition purposes take on these risks (whether knowingly or unknowingly); those who use the same protocols for the purpose of undergoing puberty at an age-appropriate time, in contrast, attempt to avoid them. Dkt. No. 86-1 at 36; Dkt. No. 86-2 at 18, 22; Dkt. No. 86-4 at 9-10. This is a rational basis for the legislature's decision.

### 3. Difference in Length of Use

The risks associated with the Treatment Protocols also vary depending upon when and for how long they are administered. For example, the evidence suggests that puberty blockers negatively impact a child's ability to increase his or her bone density. *See* Dkt. 86-1 at 102; Dkt. No. 86-2 at 22-24. A minor who is prescribed puberty blockers during the teen years, when bone density "typically surges by about 8 to 12 percent a year," faces a different—and more serious—risk than a minor with precocious puberty whose body is not in a similar stage of growth. Dkt. No. 86-1 at 102; *see* Dkt. No. 86-2 at 22-23 (recognizing that peak bone mass is achieved in the early to late twenties for both males and females, and that "factors which lead to a lowering of peak bone mass will predispose a person to future osteoporosis").[27]

Similarly, a five-year-old who undergoes pubertal suppression will delay—for a time—sexual development until his or her body is able to withstand the changes associated with puberty, at which point puberty will be allowed to resume; a child administered puberty blockers during adolescence, by contrast, will inhibit puberty at the precise time his or her body should be

---

understanding in endocrinology that "there are psychological benefits to adolescents who go through puberty around the same time as their peers").

[27] *See also id.* at 23-24, Fig. 2 (discussing impact on puberty blocking medication on bone density and opining that any pause in normal puberty introduces a risk of inability to obtain peak bone density and creates a risk of osteoporosis, serious fractures, and impairment of bone growth).

undergoing those same changes.  *See* Dkt. No. 86-2 at 21-22.  Individuals in the latter group "will continue their chronological age progression toward adulthood and yet remain with underdeveloped genitalia," will immediately experience infertility,[28] and will run the risk of masking developmental milestones that, by their presence or absence, would give medical practitioners insight as to the individuals' overall health.  Dkt. No. 86-2 at 22; Dkt. No. 86-3 at 39 (recognizing that puberty blockers, if administered at Tanner Stage 2, "makes the full maturation of the gametes impossible"); Dkt. No. 86-3 at 39 (noting that suppressing pubertal development masks the onset of the menstrual cycle, the absence of which can be indicative of underlying physiological diseases).  The legislature's decision can readily be construed as a rational determination that the risks associated with minors' short-term use of the Treatment Protocols to treat precocious puberty are warranted, while the risks associated with minors' long-term (and often permanent)[29] use of the Treatment Protocols for gender dysphoria are not.

### 4.  Difference in Intent

Finally, the legislature's decision to ban the Treatment Protocols solely for certain purposes is warranted by the fact that the Treatment Protocols are permitted for those who seek to align their bodies with the development they would undergo without being in a diseased or disordered state, but not for those who seek to force their bodies out of alignment with such development.  When used to treat endocrine disorders, the Treatment Protocols bring the patient's body back into the hormonal states they would have been in but for the disorder.  *See* Dkt. No. 86-2 at 12.  When used

---

[28]  While there is potential for this infertility to be transient, there appears to be scant information concerning the impact of the long-term use of puberty blockers.  *See* Dkt. No. 86-2 at 20, n.5.

[29]  *See* Dkt. 86-2 at 26 (recognizing that the use of puberty blockers has altered natural desistance rates, such that puberty blockers, rather than operating as a "pause button," are instead a "pathway towards future sterilizing surgeries").

to treat precocious puberty, the Treatment Protocols allow the patient's body to go through puberty at the appropriate time, rather than at an unhealthy time. Dkt. No. 86-1 at 105. When used to treat a disorder of sexual development, the Treatment Protocols are used to correct a diagnosable condition that occurred "on the way to binary sex development." Dkt. No. 86-2 at 9. When, however, the Treatment Protocols are used to treat gender dysphoria, they have the effect of pushing the body out of alignment with the natural developmental process to permit the individual's cosmetic appearance to align with his or her perception. *See* Dkt. No. 86-1 at 36. Plaintiffs themselves acknowledge that the goal of the Treatment Protocols is not to cure the state of being transgendered. *See* Dkt. No. 6 at 8 ("Being transgender is not itself a condition to be cured."); Dkt. No. 6-2 at 11 ("[B]eing transgender or gender nonconforming is not a medical condition or pathology to be treated."). *Accord* Dkt. No. 86-3 at 7 ("[I]dentifying as transgender . . . is not a pathological condition (i.e., it is not caused by or considered to be a disease."). The legislature's decision to permit minors to have access to the Treatment Protocols for medical disorders that can be cured or corrected, but not to permit those same protocols (with greater associated risk) to treat a condition for which no "cure" is sought, is a rational one.

In sum, "states have a compelling interest in and a solemn duty to protect the lives and health of the children within their borders." *Jensen*, 603 F.3d at 1198. Where there is robust debate concerning whether that interest warrants authorizing a particular medical procedure for a minor child, the debate is best left in the hands of the legislature. Judicial deference is especially appropriate where "medical and scientific uncertainty" exists. *Gonzalez v. Carhart*, 550 U.S. 124, 163 (2007). It is certainly not the judiciary's role to cut into that thoughtful debate and decree that

one side has the right of it, and the Court declines Plaintiffs' invitation to make such a decree.[30] As evidenced by the ongoing debate on this issue, Plaintiffs stand little chance of prevailing on their claim under the rational basis standard, and their motion for injunctive relief is therefore DENIED.

## CONCLUSION

As to equal protection, SB 613 is not an outright ban on gender affirming care.  Nor is it a bill that has the intent or effect of enforcing stereotypical gender norms or discriminating against those who do not conform to those norms.  Instead, SB 613 requires only that, to the extent an individual desires to utilize certain physiological procedures to treat the psychological condition of gender dysphoria, he or she must wait until a certain age to do so.  *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000) (recognizing that states "may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest").  This permissible, age-based restriction is subject only to rational basis review, which is easily satisfied by at least the four alternative grounds identified by the Court in Section VI.B., *supra*.  Given the state of the record, the Court concludes that Plaintiffs have failed to establish that they are likely to prevail on their claim that there is no rational basis for the legitimate, age-based distinction made by the legislature.

As to substantive due process, SB 613 is rationally related to legitimate state interests because it regulates parental decision-making as to the Treatment Protocols based on the

---

[30] The Court's determination that the legislature has a rational basis for the exercise of caution in this realm should not be interpreted as a lack of concern for Plaintiffs or any minor experiencing real psychological suffering.  It should be apparent there is deep concern for the well-being of the children in this state, such that the legislature has determined caution is warranted given the magnitude of risks involved and the lack of medical and scientific evidence to support the would-be experimental treatment of gender dysphoria by use of the Treatment Protocols.

legislature's interests in protecting children, public health, and integrity of the medical profession. This an area in which medical and policy debate is unfolding and the Oklahoma Legislature can rationally take the side of caution before permitting irreversible medical treatments of its children. As the Eleventh Circuit explained:

> This case revolves around an issue that is surely of the utmost importance to all of the parties involved: the safety and well-being of the children of [our state]. But it is complicated by the fact that there is a strong disagreement between the parties over what is best for those children. Absent a constitutional mandate to the contrary, these types of issues are quintessentially the sort that our system of government reserves to legislative, not judicial, action.

*Eknes-Tucker*, 80 F.4th at 1231. Plaintiffs have not demonstrated a likelihood of success on the merits of their substantive due process claim.

Because Plaintiffs have failed to show a likelihood of success on the merits of each of their constitutional claims, their request for injunctive relief must be denied. *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 890 (10th Cir. 2021) (recognizing that where the failure to satisfy one requisite factor for obtaining preliminary injunctive relief is dispositive, a court "need not consider the other factors").

IT IS THEREFORE ORDERED that Plaintiffs' motion for preliminary injunction [Dkt. No. 5] is DENIED.

Dated this 5th day of October 2023.

JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE