# In the United States Court of Appeals for the Fourth Circuit

SHAUNTAE ANDERSON, individually and on behalf of
all others similarly situated,

*Plaintiff-Appellee,*

v.

WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the West
Virginia Department of Health and Human Resources; et al.,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the Southern District of West Virginia,
No. 3:20-cv-00740

## PLAINTIFF-APPELLEE'S SUPPLEMENTAL BRIEF

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara L. Borelli
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: 470-225-5341

Anna P. Prakash
NICHOLS KASTER, PLLP
80 South 8th Street, Suite 4700
Minneapolis, MN 55402
Phone: 612-256-3200

Walt Auvil
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058

*Additional counsel for Plaintiff-Appellee listed on following page.*

Nora Huppert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, IL 60613
Phone: 312-663-4413

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ................................................................................................1

ARGUMENT .......................................................................................................3

I.   The GVR Order Does Not Mean This Court's *En Banc* Opinion Is Wrong. ......................................................................................3

II.   *Skrmetti* Has No Impact on Plaintiff's Section 1557 Claim. .........................4

    A.   The Exclusion facially classifies enrollees based on transgender status and sex. ...........................................................5

    B.   *Skrmetti*'s and *Geduldig*'s reasoning do not apply to statutory discrimination claims. ................................................12

    C.   The Court must consider the purpose and congressional intent behind the ACA when applying Section 1557. .............................17

III.   *Skrmetti* Has No Impact on Plaintiff's Medicaid Act Claims. ....................19

    A.   *Skrmetti* has no impact on the Medicaid Act's availability requirement. ...........................................................19

    B.   *Skrmetti* has no impact on the Medicaid Act's comparability requirement. .......................................................21

    C.   *Skrmetti* does not affect the limits that states may permissibly place on Medicaid coverage. ...............................24

IV.   The Exclusion Violates the Equal Protection Clause Even Under *Skrmetti*. ...................................................................25

CONCLUSION .................................................................................................30

CERTIFICATE OF COMPLIANCE.........................................................................32

CERTIFICATE OF SERVICE ..............................................................................33

# TABLE OF AUTHORITIES

**Cases**

*Alvarez v. Betlach*,
    572 F. App'x 519 (9th Cir. 2014) ..................................................19

*Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Institutes of Health*,
    No. 25-CV-01620-LKG, 2025 WL 2377705 ..................................12

*Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977).........................................................................29

*Beal v. Doe*,
    432 U.S. 438 (1977).................................................................... 18-19

*Bontrager v. Ind. Fam. & Soc. Servs. Admin.*,
    697 F.3d 604 (7th Cir. 2012) ..........................................................23

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020)........................................................................ 5

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993).........................................................................25

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*,
    No. 3:20-CV-06145-RJB, 2022 WL 17788148.................................9

*Casteneda v. Partida*,
    430 U.S. 482 (1977)........................................................................ 26

*Christian Legal Soc'y Chapter of the Univ. of Cal.*,
*Hastings Coll. of the Law v. Martinez*,
     561 U.S. 661 (2010).......................................................................6

*Communities for Equity v. Michigan High Sch. Athletic Ass'n*,
    459 F.3d 676 (6th Cir. 2006) ...........................................................3

*Craig v. Boren*,
    429 U.S. 190 (1976)..........................................................................9

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   596 U.S. 212 (2022)........................................................16

*Davis v. Shah*,
   821 F.3d 231 (2d Cir. 2016) ............................................22

*Doe by Doe v. South Carolina*,
   No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025)............12

*Doe v. Horne*,
   115 F.4th 1083 (9th Cir. 2024) ........................................11

*Doe v. Snyder*,
   28 F.4th 103 (9th Cir. 2022) ..............................................5

*E.E.O.C. v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
   884 F.3d 560 (6th Cir. 2018) ..............................................7

*Emeldi v. Univ. of Oregon*,
   698 F.3d 715 (9th Cir. 2012) ............................................14

*Fain v. Crouch*,
   618 F.Supp.3d 313 (S.D.W. Va. 2022)..................................4

*Flack v. Wis. Dep't of Health Servs.*,
   328 F.Supp.3d 931 (W.D. Wis. 2018) ..................................7

*Flack v. Wisc. Dep't of Health Servs.*,
   395 F.Supp.3d 1001 (W.D. Wis. 2019) ................................21

*Geduldig v. Aiello*,
   417 U.S. 484 (1974)..........................................................2

*General Elec. Co. v. Gilbert*,
   429 U.S. 125 (1976)........................................................13

*Glenn v. Brumby*,
   663 F.3d 1312 (11th Cir. 2011) ..........................................7

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960) ..................................................................... 11

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ..........................................................5

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
649 F.Supp.3d 104 (D. Md. 2023) ..................................................5

*Int'l Union v. Johnson Controls*,
499 U.S. 187 (1991) .......................................................................10

*Jennings v. Univ. of N.C.*,
482 F.3d 686 (4th Cir. 2007) .........................................................10

*Kadel v. Folwell*,
100 F.4th 122 (4th Cir. 2024) ..........................................................4

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) .........................................................6

*King v. Burwell*,
576 U.S. 473, 498 (2015) ...............................................................18

*Klikno v. United States*,
928 F.3d 539 (7th Cir. 2019) ...........................................................4

*L.B. v. Premera Blue Cross*,
No. C23-0953 TSZ, 2025 WL 2326966 (W.D. Wash. Aug. 12, 2025) ...........8

*Lankford v. Sherman*,
451 F.3d 496 (8th Cir. 2006) .........................................................22

*Lorillard v. Pons*,
434 U.S. 575 (1978) .......................................................................14

*Mark H. v. Lemahieu*,
513 F.3d 922  ................................................................................11

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) ........................................................13

*Molina Healthcare of California, Inc. v. United States*,
  133 Fed. Cl. 14 (2017) ....................................................................2

*Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*,
  No. 19-10812, 2019 WL 5810308 (E.D. La. Nov. 7, 2019) ...........14

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ......................................................................16

*Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*,
  462 U.S. 669 (1983) ......................................................................13

*Parker v. Franklin Cnty. Cmty. Sch. Corp.*,
  667 F.3d 910 (7th Cir. 2012) ........................................................10

*Pers. Adm'r of Massachusetts v. Feeney*,
  442 U.S. 256 (1979) ......................................................................28

*Phillips v. Martin Marietta Corp.*,
  400 U.S. 542 (1971) ........................................................................9

*Rice v. Cayetano*,
  528 U.S. 495 (2000) ......................................................................26

*Romer v. Evans*,
  517 U.S. 620 (1996) ......................................................................11

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
  965 F.3d 945 (9th Cir. 2020) ..........................................................2

*Schroer v. Billington*,
  577 F.Supp.2d 293 (D.D.C. 2008) ..................................................7

*Stanford v. Fox Coll.*,
  No. 1:18-cv-3703, 2020 WL 814865 (N.D. Ill. Feb. 19, 2020 .......14

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ........................................................................10

*Texas v. United States*,
  798 F.3d 1108 (D.C. Cir. 2015) ........................................................3

*Tyler v. Cain*,
  533 U.S. 656 (2001) ..........................................................................4

*United States v. Skrmetti*,
  605 U.S. ___ (2025) ..........................................................................1

*Van Wyhe v. Reisch*,
  581 F.3d 639 (8th Cir. 2009) ..........................................................12

*Vincent v. Bondi*,
  127 F.4th 1263 (10th Cir. 2025) .......................................................3

*Washington v. Davis*,
  426 U.S. 229 (1976) ........................................................................11

*White v. Beal*,
  555 F.2d 1146 (3d Cir. 1977) .........................................................22

*Williams v. Kincaid*,
  45 F.4th 759 (4th Cir. 2022) .............................................................7

## Statutes, Regulations, and Legislative History

1978 U.S.C.C.A.N. 4749 ......................................................................13

42 U.S.C. § 18022 ...............................................................................16

42 U.S.C. § 18116 .....................................................................1, 10, 17

42 U.S.C. § 2000e ................................................................................13

42 U.S.C. § 1396a ........................................................................18, 20

42 U.S.C. § 300gg-3 ............................................................................15

42 U.S.C. § 300gg-4.................................................................16

42 C.F.R. § 440.240 .............................................................20, 22

42 C.F.R. § 440.230 ...............................................................19

100 CONG. REC. S13890 (December 24, 2009) ...................17

111 CONG. REC. H1855 (March 21, 2010) ..........................17

111 CONG. REC. Vol. 156, No. 45 (March 23, 2010) ..........17

123 CONG. REC. 10581 (1977).............................................13

123 CONG. REC. 10582 (1977).............................................13

123 CONG. REC. 29385 (1977).............................................13

123 CONG. REC. 29641 (1977).............................................13

124 CONG. REC. 21435 (1978).............................................13

*Nondiscrimination in Health Programs and Activities*,
    81 FED. REG. 31 (May 18, 2016) .......................................15

*Nondiscrimination in Health Programs and Activities*,
    89 FED. REG. 37 (May 6, 2024) .........................................15

*Nondiscrimination on the Basis of Sex*,
    40 FED. REG. 24128 (June 4, 1975) ..................................14

*Nondiscrimination in Health and Health Education Programs or Activities*,
    85 FED. REG. 37 (June 19, 2020).......................................15

Tenn. Code Ann. § 68-33-101 .........................................6, 26

**Other Authority**

Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role,*
    96 NOTRE DAME L. REV. 171 (2020) .................................4

**INTRODUCTION**

On September 25, 2025, the Court directed the parties to file supplemental briefs addressing "[t]he impact of *United States v. Skrmetti*, 605 U.S. __ (2025), on this appeal," with particular "focus on the Medicaid Act and Affordable Care Act claims." Doc. 128. Plaintiff-Appellee Shauntae Anderson, on behalf of herself and the certified class, respectfully submits this supplemental brief as directed. This Court's *en banc* opinion was correct before *Skrmetti*, and it remains correct now.

*First*, that this Court's request for supplemental briefing follows the Supreme Court's order to grant *certiorari*, vacate, and remand ("GVR Order") this Court's *en banc* opinion does not mean that this Court's *en banc* opinion is wrong. The GVR Order does not signal that the Supreme Court questions this Court's opinion and, in fact, GVR'd judgments are routinely reinstated on remand.

*Second*, *Skrmetti* has no impact on the claims under Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, in this case because, unlike the challenged law in *Skrmetti*, West Virginia Medicaid's exclusion for gender-affirming surgery facially classifies Medicaid enrollees based on transgender status and sex. *See* JA934-935 ("transsexual surgery"), JA943 ("[s]ex change surgery (transsexual surgery)") (together, the "Exclusion").

*Third*, *Skrmetti*'s reasoning does not apply to *statutory* discrimination claims. That is, *Skrmetti*'s reasoning arises from the conclusion in *Geduldig v. Aiello*, 417

U.S. 484 (1974), that a medical condition (pregnancy) cannot be a proxy for sex (women) under the *Equal Protection Clause* in the context of regulating medical treatment or coverage. But Congress has expressly and repeatedly rejected this holding in the statutory context. As such, *Skrmetti*'s reasoning does not apply to Ms. Anderson's Section 1557 claim.

*Fourth*, the ACA prohibits discrimination in benefit design. Indeed, Section 1557 caused a "tectonic shift in the nation's health insurance market." *Molina Healthcare of California, Inc. v. United States*, 133 Fed. Cl. 14, 19 (2017). It fundamentally changed how health insurers must operate. Insurers now have an "affirmative obligation not to discriminate"—including on the basis of sex—in the design of health plans. *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 955 (9th Cir. 2020). This underlying purpose of Section 1557, its legislative intent, and history matter and set this case apart from *Skrmetti*.

*Fifth*, *Skrmetti* has no application to Plaintiff's two Medicaid Act claims. Neither claim turns on the narrow question *Skrmetti* answered: whether denying hormone treatment to minors pursuant to a state law regulating medical practice is sex-based discrimination under the Equal Protection Clause. Nothing about *Skrmetti* changes the Medicaid Act's requirement that West Viriginia cover treatments that fall within the categories of services that the state has elected to provide and that are medically necessary. And regardless of what *Skrmetti* holds as to the Equal

Protection Clause, it simply does not address or change the Medicaid Act's prohibition on discrimination based on diagnosis.

*Finally*, even under *Skrmetti*, this Court's *en banc* opinion under the Equal Protection Clause is proper. Here, unlike the language at issue in *Skrmetti*, the Exclusion facially classifies based on sex and transgender status, it cannot be explained by anything other than animus, and it cannot survive even rational basis review, let alone the heightened scrutiny required.

This Court should once again affirm the District Court's judgment in full.

## ARGUMENT

## I. The GVR Order Does Not Mean This Court's *En Banc* Opinion Is Wrong.

As a preliminary matter, it is "well-settled" that an order to grant *certiorari*, vacate, and remand "has no precedential weight." *Texas v. United States*, 798 F.3d 1108, 1116 (D.C. Cir. 2015). Indeed, a "GVR order," as it is called, "doesn't necessarily signal a disagreement with the panel's reasoning or result." *Vincent v. Bondi*, 127 F.4th 1263, 1264 n.1 (10th Cir. 2025); *see also*, *e.g.*, *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 459 F.3d 676, 680 (6th Cir. 2006) ("[A] GVR does not indicate, nor even suggest, that the lower court's decision was erroneous."); *accord Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001) ("Our [GVR] order … was not a final determination on the merits.") (citation modified).

In fact, "a healthy proportion of GVR'd judgments are, wholly appropriately, reinstated on remand." Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role*, 96 Notre Dame L. Rev. 171, 220 (2020). "[A] GVR does not even necessarily indicate that the prior analysis has become invalid, for the new decision may turn out to be irrelevant." *Id*. A GVR order is simply "an efficient way for the Supreme Court to obtain the views of the lower courts on the effect of a new decision, whatever those views might be." *Klikno v. United States*, 928 F.3d 539, 544 (7th Cir. 2019). In short, the Supreme Court's GVR Order supplies no basis to reverse the grant of summary judgment to Plaintiff and the class.

## II.    *Skrmetti* Has No Impact on Plaintiff's Section 1557 Claim.

The District Court and the *en banc* panel of this Court properly concluded that the Exclusion unlawfully discriminates based on sex in violation of Section 1557. *See Kadel*, 100 F.4th 122, 142-56, 163-64 (4th Circ. 2024); *Fain v. Crouch*, 618 F.Supp.3d 313, 323-28, 330-31 (S.D.W. Va. 2022) (subsequent history omitted). *Skrmetti* does not warrant a different result because: (A) the Exclusion facially classifies enrollees based on transgender status and sex; (B) *Skrmetti*'s and *Geduldig*'s reasoning do not apply to statutory discrimination claims; and (C) the history, purpose, and legislative intent behind Section 1557 set this case apart from *Skrmetti*.

**A.** **The Exclusion facially classifies enrollees based on transgender status and sex.**

"[D]iscrimination based on … transgender status necessarily entails discrimination based on sex" under Title VII. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020). Under this Court's binding precedent, *Bostock*'s reasoning extends to Title IX. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020). And the grounds of Title IX are explicitly incorporated into Section 1557, prohibiting health programs receiving federal funds from discriminating on the basis of sex. 42 U.S.C. § 18116(a); *see Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F.Supp.3d 104, 112 (D. Md. 2023); *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022). *Skrmetti* did nothing to undermine that binding precedent and its application to the Exclusion.

Unlike the law at issue in *Skrmetti*, which the Court held to classify only based on age and medical use, 145 S. Ct. at 1829, the Exclusion is expressly couched in terms of sex: the Bureau for Medical Services ("BMS") categorically excludes "*Transsexual* surgery" and "*sex change* surgery" regardless of medical necessity. JA459, JA935, JA943 (emphasis added).[1] These are not incidental references to sex

---

[1] Even the three participating Managed Care Organizations have implemented the Exclusion using similar language: (1) UniCare excludes "*Sex transformation* procedures and hormone therapy for sex transformation procedures;" (2) The Health Plan provides that "*Sex change*, hormone therapy for *sex transformation*, and *gender*

5

because the "medical treatments and procedures are uniquely bound up in sex." *Skrmetti*, 145 S. Ct. at 1829. Rather, the Exclusion explicitly "regulates a class of *persons* identified on the basis of a specified characteristic." *Id*. at 1834 n.3. It relies not on proxies or general categories, but rather directly references transgender status.[2] On its face, then, the Exclusion operates differently than the law at issue in *Skrmetti*, which contained no such references. *See id*. at 1829; Tenn. Code Ann. § 68-33-101 *et seq*.

On this point, the Ninth Circuit's decision in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), is particularly instructive. There, the court found "unpersuasive" the government's argument that its exclusionary military policy was based on "gender dysphoria" and not transgender status because "*[o]n its face*, the 2018 Policy regulates *on the basis of transgender status*" and therefore "*on its face treats transgender persons differently than other persons*." *Id*. at 1201 (emphasis added). The same is true here. The Exclusion necessarily classifies based on transgender status—by using the outmoded term "transsexual"—and denying coverage for surgical care on that basis. *See* JA935, JA943.

---

*transition* procedures/expenses will not be paid;" and (3) Aetna Better Health excludes "*Sex transformation* procedures." JA944-966 (emphases added).

[2]     As the principal dissent in the *en banc* opinion acknowledged, "in the past, transgender people were sometimes called 'transsexuals.'" *Kadel*, 100 F.4th at 173 (Richardson, J., dissenting) (hereafter "principal dissent").

So coverage turns not on a particular medical condition but, rather, on whether the care leads to "sex transformation" or "sex change." This plainly equates to transgender status and, as such, is expressly based on sex.[3] By singling out "transsexual surgery," "sex transformation," or "sex change" for differential treatment, Defendants engage in sex discrimination, treating transgender people differently "as a class." *Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022); *see also E.E.O.C. v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 577 (6th Cir. 2018) ("Title VII protects transgender persons because of their transgender or *transitioning status*, because transgender or *transitioning status* constitutes an inherently gender non-conforming trait." (emphasis added)), *aff'd sub nom. Bostock*, 590 U.S. 644; *Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931, 949 (W.D. Wis. 2018) (holding that discrimination "on the basis that an individual was going to, had, or was in the process of changing their sex … is *still* discrimination based on sex"); *Schroer v. Billington*, 577 F.Supp.2d 293, 306-08 (D.D.C. 2008) (refusal to hire person who "planned to … undergo[] sex reassignment surgery was literally discrimination because of … sex"); *cf. Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th

---

[3]     In this context, we do not "distinguish between status and conduct." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 689 (2010); *see also* Plaintiff's Br. at 30, Doc. 32; *Kadel*, 100 F.4th at 148. Indeed, the Exclusion treats status and conduct the same as it explicitly equates "transsexual" status, *i.e.*, transgender status, with the conduct of "sex change." JA943.

Cir. 2011) ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes.").

Although *Skrmetti* found that *Bostock*'s "but-for" analysis did not require ruling for those plaintiffs, that analysis favors Plaintiff here. An enrollee's transgender status and sex are inextricably linked with—indeed, are determinative of—whether their medically-necessary services will be covered. That is, an enrollee's transgender or cisgender status "automatically switches" and therefore whether the surgery is covered is based on the enrollee's transgender status and sex at birth. *Skrmetti*, 145 S. Ct. at 1835. As this Court's *en banc* panel explained, "determining whether a treatment like reduction mammoplasty constitutes 'transsexual surgery' … is impossible—literally cannot be done—without inquiring into a patient's sex assigned at birth and comparing it to their gender identity." *Kadel*, 100 F.4th at 147. And as the *en banc* panel correctly observed:

> Certain gender-affirming surgeries that could be provided to people assigned male at birth and people assigned female at birth are provided to only one group under the policy. Those assigned female at birth can receive vaginoplasty and breast reconstruction for gender-affirming purposes, but those assigned male at birth cannot. And those assigned male at birth can receive a mastectomy for gender-affirming purposes, but those assigned female at birth cannot. In other words, when the purpose of the surgery is to align a patient's gender presentation with their sex assigned at birth, the surgery is covered. When the purpose is to align a patient's gender presentation with a gender identity that does not match their sex assigned at birth, the surgery is not covered.

*Id*. at 153. Put simply, sex is the "but-for" cause of Defendants' decision to cover or not cover the same surgery provided to "change" or "transform" a transgender person's sex, *i.e.*, affirm a transgender person's identity. *See L.B. v. Premera Blue Cross*, No. C23-0953 TSZ, 2025 WL 2326966, at *3 (W.D. Wash. Aug. 12, 2025). Under *Bostock*, this is facial sex discrimination.

Defendants will likely argue that, as in *Skrmetti*, the Exclusion is based solely on a medical diagnosis, not sex or transgender status. Untrue. For one, classifications can be simultaneously based on multiple grounds, and Defendants cannot avoid liability when one of the bases is prohibited. *See, e.g., Craig v. Boren*, 429 U.S. 190, 197 (1976) (applying heightened scrutiny to sex classification even though it only affected men between the ages of 18 and 20); *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (holding that employer policy that discriminated in hiring based on presumably distinct family obligations between mothers with young children and fathers with young children was presumptively unlawful sex discrimination). For another, assuming *arguendo* this was discrimination based on gender dysphoria, that is nonetheless discrimination based on transgender status. *Kadel*, 100 F.4th at 149 ("We hold that gender dysphoria, a diagnosis inextricable from transgender status, is a proxy for transgender identity."); *see also Skrmetti*, 145 S. Ct. at 1833 ("only transgender individuals seek treatment for gender dysphoria"); *C.P. by & through Pritchard v. Blue Cross Blue Shield of*

*Illinois*, No. 3:20-cv-06145-RJB, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022). And even if this Court concludes that this case turns on a diagnosis of "gender dysphoria" and not sex or transgender status discrimination, under the ACA, an exclusion based on a diagnosis can be deemed a proxy for illegal discrimination. *See*, *e.g.*, *Schmitt*, 965 F.3d at 949 (exclusion of all coverage for hearing loss can be a proxy for disability discrimination). Plus, as explained herein, *Skrmetti*'s reasoning based on *Geduldig* does not extend to the statutory context. *See infra*.

Nor will Defendants fare well on any argument that Plaintiff must prove discriminatory motive. That argument is irrelevant in the context of Section 1557. As the Supreme Court has explained, "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Int'l Union v. Johnson Controls*, 499 U.S. 187, 199 (1991) (Title VII). In other words, "[w]hether a[ defendant's] practice involves disparate treatment through explicit facial discrimination does not depend on why the [defendant] discriminates but rather on the explicit terms of the discrimination." *Id.*[4] *See also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 290 (2023) (Gorsuch, J., concurring) (explaining, as to Title VI on which Title

---

[4]     Though *Johnson Controls* was decided under Title VII, this Court "look[s] to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007).

IX is based, that the law "prohibits a recipient of federal funds from intentionally treating any individual worse even in part because of his race, color, or national origin and *without regard to any other reason or motive the recipient might assert*" (emphasis added)); *see also* 42 U.S.C. § 18116(a) (Section 1557 incorporating Title IX's grounds).[5]

In any event, as the principal dissent in the *en banc* opinion acknowledged, "it is possible that the selection of certain risks for coverage was pretextual and was really based on gender stereotypes or some other discriminatory purpose." *Kadel*, 100 F.4th at 176 n.16. And here the Exclusion is undoubtedly "mere pretext for invidious sex discrimination." *Skrmetti*, 145 S. Ct. at 1833. It is well established that intentional discrimination may be adduced from the "totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Here, Defendants have never articulated *why* the Exclusion was adopted (*see* Plaintiff's Br. at 9, Doc. 32; JA437), and the Exclusion impacts *only transgender enrollees* and no one else. Even if viewed as merely discriminatory impact, this demonstrates pretext. *See Doe v. Horne*, 115 F.4th 1083, 1103 (9th Cir. 2024) ("[A] policy's discriminatory impact may support a finding of discriminatory purpose."); *id.*, at 1104 (upholding finding

---

[5]     *See Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 917 (7th Cir. 2012) (Title IX "was modeled after Title VI, which is parallel to Title IX except it prohibits race discrimination, not sex discrimination.").

of discriminatory purposes when the law's "burdens instead fall *exclusively* on transgender women and girls"); *see also Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960) ("While in form this is merely an act redefining metes and bounds, … the *inescapable human effect* of this essay in geometry and geography is to *despoil colored citizens, and only colored citizens*, of their theretofore enjoyed voting rights." (emphasis added)). The absence of a rationale for the Exclusion's adoption likewise demonstrates pretext. *See Romer v. Evans*, 517 U.S. 620, 632 (1996) (holding that amendment's "sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects"). And after all, "[t]o 'design' something … involves some measure of intentionality." *Mark H. v. Lemahieu*, 513 F.3d 922, 936 (9th Cir. 2008). Defendants designed and affirmatively maintained their Medicaid plan to contain the Exclusion. That is more than sufficient for liability to attach.

**B.** ***Skrmetti*'s and *Geduldig*'s reasoning do not apply to statutory discrimination claims.**

*Skrmetti* held that state laws prohibiting gender-affirming medical care for minors did not facially classify based on sex for purposes of the Equal Protection Clause. 145 S. Ct. 1816. But *Skrmetti* did not address statutory sex discrimination claims, and thus "said nothing whatsoever to cause doubt as to the vitality of" this Court's binding Title IX analysis in *Grimm*. *Doe by Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *10 (4th Cir. Aug. 15, 2025) (Diaz, C.J., concurring),

*stay denied*, No. 25A234, 2025 WL 2610400, at *1 (U.S. Sept. 10, 2025); *accord*

*L.B.*, 2025 WL 2326966, at *2, *3 n.4 ("*Skrmetti* involve[d] a fundamentally

different type of claim than the ACA § 1557 claim raised in this case. … [N]othing

in *Skrmetti* undermines the validity of *Bostock* or the extension of *Bostock* from Title

VII to Title IX and/or ACA § 1557 claims." (citation omitted)).[6]

Moreover, *Skrmetti*'s conclusion that Tennessee's law classified only based on

age and medical use, not sex or transgender status, is founded on *Geduldig*. Not

only is the Exclusion here different on its face from the law at issue in *Skrmetti*, but

the *Geduldig* framework upon which *Skrmetti* heavily relies has no application in

the statutory context. After all, the Constitution sets a floor—not a ceiling—federal

statutes like the ACA may establish civil rights that rise above what the Constitution

establishes. *Cf. Van Wyhe v. Reisch*, 581 F.3d 639, 651 (8th Cir. 2009); *Mayweathers*

*v. Newland*, 314 F.3d 1062, 1070 (9th Cir. 2002). That Congress can—and has—

passed legislation expressly repudiating the reasoning of *Geduldig* that animated

*Skrmetti*'s holding speaks volumes.

---

[6]     *Cf. Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Institutes of Health*,
No. 25-CV-01620-LKG, 2025 WL 2377705, at *7-8, *11 (D. Md. Aug. 14, 2025)
(finding *Skrmetti* inapplicable in holding that directives prohibiting funding for
research related to gender identity or LGBTQI+ health violate Section 1557 of the
ACA and that *Bostock*'s reasoning applies to Section 1557).

To explain, in *General Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), the Supreme Court imported *Geduldig*'s reasoning into Title VII. In response, Congress swiftly amended Title VII by passing the Pregnancy Discrimination Act to "unambiguously" reject "the holding and the reasoning" of *Gilbert* and *Geduldig*. *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 678 (1983); *see also* 42 U.S.C. § 2000e(k); H.R. Rep. 95-948, 1978 U.S.C.C.A.N. 4749; *Newport News*, 462 U.S. at 679 n.17 (collecting statements by legislators).[7,8] The Supreme Court then recognized this understanding of statutory standards for sex discrimination, despite its holdings in *Geduldig* and *Gilbert*. *See Newport News*, 462 U.S. at 678-679 ("Proponents of the bill repeatedly emphasized that the Supreme Court had

---

[7]  *See* 123 CONG. REC. 10581, 10582 (1977) (statement by Rep. Hawkins); 123 CONG. REC. 29385 (1977) (statement by Sen. Williams); *id.*, at 29387 (statement by Sen. Javits); 123 CONG. REC. 29641 (1977) (statement by Sen. Bayh); *id.*, at 29647 (statement by Sen. Williams); 124 CONG. REC. 21435 (1978) (statement by Rep. Hawkins); *id.*, at 21439 (statement by Rep. Corrada); *id.*, at 21440 (statements of Reps. Thompson and LaFalce); *id.*, at 21441 (statement by Rep. Whalen); *id*., at 21442 (statement by Rep. Myers).

[8]  To the extent that Defendants rely on the Eleventh Circuit's recent decision in *Lange v. Houston Cnty.*, No. 22-13626, 2025 WL 2602633 (11th Cir. Sept. 9, 2025), Plaintiffs submit that *Lange* was wrongly decided and did not address Plaintiff's arguments here (or in the dissents) explaining that *Skrmetti*'s reasoning is inapplicable in the statutory context. *See Lange*, 2025 WL 2602633, at *27 (Rosenbaum, J., concurring in judgment) ("*Skrmetti* is based on *Geduldig*, whose application both Congress and the Court have emphatically rejected in the Title VII context"); *id.* at *27 (J. Pryor, J., dissenting) ("[I]n Title VII cases, this reasoning has been rejected, first by Congress and then by the Supreme Court.").

erroneously interpreted congressional intent and that amending legislation was necessary to re-establish the principles of Title VII law.").

The same statutory standards were then incorporated into Title IX when that law was enacted. *See Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012) ("[T]he legislative history of Title IX 'strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII.'").

Consistent with Congress's reaffirmation that Title VII prohibits discrimination based on pregnancy as a form of sex-based discrimination, Title IX's regulations have expressly prohibited discrimination based on pregnancy since their first formulation. *See Nondiscrimination on the Basis of Sex*, 40 Fed. Reg. 24128 (June 4, 1975); *see also* 45 Fed. Reg. at 30,959, 30,962-63 (May 9, 1980). And the courts have consistently upheld those regulations, concluding that "discrimination on the basis of pregnancy, childbirth, or related medical conditions is a form of sex discrimination prohibited by Title IX." *Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. 19-10812, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019); *accord, e.g., Stanford v. Fox Coll.*, No. 1:18-cv-3703, 2020 WL 814865, at *6 (N.D. Ill. Feb. 19, 2020).

The same is true for Section 1557 of the ACA, which was adopted in 2010. *See Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("[W]here, as here, Congress adopts

a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."). Indeed, Section 1557's regulations have consistently prohibited discrimination based on pregnancy across presidential administrations.[9] *See Hammons*, 649 F.Supp.3d at 117-18 (refusing to apply *Geduldig* to Section 1557 claim involving gender-affirming medical care "given Congress's clear disapproval of that reasoning").

These statutory protections thoroughly undermine the application of *Skrmetti*'s equal protection reasoning to the statutory claims here. *Skrmetti* held that because classifications based on pregnancy had previously been found to be facially sex-neutral *under the Equal Protection Clause*, restrictions that classify based on treatment for gender dysphoria are also facially neutral with respect to discrimination against transgender people. But for statutory protections, the converse is true. Because discrimination based on pregnancy *is* discrimination based on sex under Section 1557, restrictions on gender-confirming surgery are similarly

---

9       *See*, *e.g.*, *Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37,522, 37,699 (May 6, 2024); *Nondiscrimination in Health and Health Education Programs or Activities*, 85 Fed. Reg. 37,160, 37,179-80 (June 19, 2020); *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,375, 31,467 (May 18, 2016).

explicit discrimination against transgender people—and thus sex classifications—under Section 1557.

## C. The Court must consider the purpose and congressional intent behind the ACA when applying Section 1557.

The context of the ACA also matters. The ACA's purpose is to protect Americans from discrimination based on medical conditions or services used. *See, e.g.*, 42 U.S.C. §§ 300gg-3(b)(1) (prohibiting discrimination based on pre-existing condition), 300gg-4 (prohibiting discrimination based on health status), 18022(4)(B), (D) (essential health benefits cannot discriminate based on age, disability, medical dependency, or expected length of life), 18116(a) (prohibiting discrimination based on race, sex, disability and age). The Supreme Court agrees: "In the Affordable Care Act, Congress addressed the problem of those who cannot obtain insurance coverage because of preexisting conditions or other health issues." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 547 (2012); *see Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022). With the ACA, Congress abolished the ability of insurers to discriminate based on health condition: "Prior to the ACA's enactment, an insurer could generally design plans to offer or exclude benefits as it saw fit without violating federal antidiscrimination law … ." *Schmitt*, 965 F.3d at 948. After the ACA, health insurers have "an *affirmative obligation not to discriminate* in the provision of health care" and must "not design plan benefits in ways that discriminate." *Id.* at 955 (emphasis added). The ACA's Section 1557

was thus adopted to *statutorily* protect Americans from health insurance discrimination that targets people based on a protected characteristic by excluding or limiting coverage of medical diagnoses or procedures.

The Congressional record pertaining to the ACA documents that the ACA's reforms were particularly directed at preventing discrimination against people based on medical diagnosis, health status, or medical use. *See*, *e.g.*, 111 Cong. Rec. Vol. 156, No. 45, E462 (March 23, 2010); 111 Cong. Rec. H1855 (March 21, 2010); 110 Cong. Rec. S13890 (December 24, 2009). Congress knew that eliminating barriers to enrollment in health insurance (such as ending pre-existing condition limits), without more, would not end health insurance discrimination. Health insurers could achieve the same result by incorporating exclusions and limitations in their benefits. That is why Congress included new benefit design anti-discrimination requirements in the ACA. Congress intended the ACA to prohibit discrimination based on race, sex, age and disability, including when medical diagnoses and services are used as a proxy for such protected characteristics. *See* 42 U.S.C. § 18116(a).

Put simply, if medical diagnoses or services can never be a proxy for a protected trait even under the ACA, then the ACA's promise to eliminate benefit design discrimination would be a mirage. As this Court's *en banc* panel explained, proxy discrimination can indeed constitute facial discrimination. Health insurers could simply use medical diagnoses as the basis for exclusions and limitations to

avoid the ACA's anti-discrimination requirements. In other words, insurers could freely exclude diagnoses like gender dysphoria, autism, cancer, or HIV from coverage, without running afoul of ACA—essentially bringing back the very barriers to health coverage that the ACA was designed to end. This cannot be so. As the Supreme Court concluded, "[i]n every case we must respect the role of the Legislature, and take care not to undo what it has done." *King v. Burwell*, 576 U.S. 473, 498 (2015). *Skrmetti* cannot be interpreted to override Congress's purpose and intent when enacting the ACA.

## III. *Skrmetti* Has No Impact on Plaintiff's Medicaid Act Claims.

Just like "*Skrmetti* said *nothing whatsoever* to cause doubt as to the vitality of *Grimm*'s Title IX holding" regarding discrimination based on sex, it said even less about Medicaid Act claims that involve no sex discrimination analysis. *Doe*, 2025 WL 2375386, at *10 (emphasis added). Indeed, *Skrmetti* did not involve any claims under the Medicaid Act at all. Accordingly, and for the reasons explained below, it has no impact here.

### A. *Skrmetti* has no impact on the Medicaid Act's availability requirement.

The core requirement of the Medicaid Act's availability provision is that a state's program "must … provide … for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17), (21), (28), (29), and (30) of section 1905(a)." *Fain*, 618 F.Supp.3d at 332 (quoting

42 U.S.C. § 1396a(a)(10)(A)). A state's Medicaid program must cover treatments that "(1) fall within a category of mandatory medical services or optional medical services that the state has elected to provide; and (2) are 'medically necessary' for a particular participant." *Fain*, 618 F.Supp.3d at 332 (citing *Beal v. Doe*, 432 U.S. 438 (1977)); *see also Alvarez v. Betlach*, 572 F.App'x 519, 520-521 (9th Cir. 2014) (finding that the Medicaid Act "prohibits states from denying coverage of 'medically necessary' services that fall under a category covered in their Medicaid plans"). In other words, the availability provision "requires states to cover both mandatory and optional services in sufficient 'amount, duration, and scope to reasonably achieve its purpose.'" *Kadel*, 100 F.4th at 161 (quoting 42 C.F.R. §§ 440.230(b), (c)).

Nothing about *Skrmetti* changes requirements of the availability provision, or West Virginia's failure to create any dispute of fact with respect to the medical necessity of the surgical services at issue here. The expert evidence demonstrated that surgical care for transgender adults has been studied extensively, with a significant body of literature supporting the efficacy of that care. *Fain*, 618 F.Supp.3d at 329. The Medicaid program already accepts the diagnosis of gender dysphoria and recognizes that at least some forms of care are medically necessary to treat it because the program covers counseling and hormone therapy. JA491. Defendants admit that any treatment the program covers, such as its existing counseling and hormone therapy coverage, by definition has "been deemed

medically necessary," JA458, and that "Gender-Confirming Care can be medically necessary for the treatment of gender dysphoria" with the understanding that the treatment continues to evolve. JA303; JA488 (admitting nothing has evolved since Defendants' admission).

Defendants nonetheless arbitrarily exclude all surgical care regardless of medical necessity, despite their own utilization guidelines specifying that gender-confirming surgery can be medically necessary. JA967-1014. The lone witness which Defendants sought to qualify as an expert—a psychiatrist, not a surgeon— failed to create any dispute of material fact. As that witness testified repeatedly in this and other cases, he does not support blanket bans like the one challenged here. JA1977 (witness's testimony that categorical bans are "draconian"); *see also* JA2193 (collecting witness's consistent and repeated testimony that he does not support categorical bans).[10]

> **B.** *Skrmetti* **has no impact on the Medicaid Act's comparability requirement.**

The comparability provision requires that covered services "[s]hall not be less in amount, duration, or scope than the medical assistance made available to" other covered enrollees. 42 U.S.C. §§ 1396a(a)(10)(B). The regulations further explain

---

[10] Because this witness created no dispute of material fact, the District Court found it unnecessary to rule on Ms. Anderson's motion to exclude his proffered testimony under the federal rules governing expert testimony. *Fain*, 618 F.Supp.3d at 335.

that services covered must be "equal in amount, duration, and scope for all beneficiaries within the group." 42 C.F.R. § 440.240(b)(1). This requirement thus "prohibits discrimination among individuals with the same medical needs stemming from different medical conditions by requiring participating States to provide medical assistance to all participants in equal amount, duration, and scope." *Flack v. Wisc. Dep't of Health Servs.*, 395 F.Supp.3d 1001, 1018 (W.D. Wis. 2019).

As the District Court found, the state's program is either mandated to or has chosen to cover "the same surgical procedures for non-gender-dysphoria related treatment" as Ms. Anderson seeks on behalf of the class. *Fain*, 618 F.Supp.3d at 332. No party disputes that Medicaid covers the same procedures for cisgender participants that it denies to transgender participants, such as hysterectomy, vaginoplasty, and chest reconstruction surgeries. JA304, JA324-325, JA330-334. And the Medicaid program's own "evidence-based standards"[11] for "determin[ing] the medical necessity of a procedure exist for both gender dysphoria treatment surgeries and non-gender-affirming surgeries," and provide an equally "objective basis for determining when such treatments will be covered." JA2575. Tellingly,

---

[11]     Here, the Medicaid program employs a utilization management vendor to determine whether a service is covered. JA488-490. The vendor's screening tool to determine medical necessity uses nationally accredited criteria established by InterQual. JA967-1014. "The criteria are derived from a systematic and continuous review of current, evidence-based literature, and also include input from an independent panel of clinical experts." *Fain*, 618 F.Supp.3d at 321; *see also* JA573.

the same codes are used for documenting and billing "the surgeries, whether performed for gender dysphoria treatment or for treatment of another diagnosis." *Fain*, 618 F.Supp.3d at 332; *see also* JA2568; JA2575; JA 705-706.[12]  Accordingly, the District Court correctly found that because "the surgeries, such as mastectomies, which are covered to treat non-gender dysphoria diagnoses are materially the same as the surgeries provided to treat gender dysphoria," the Exclusion "clearly violates the comparability requirement, which requires that all persons within a specific category be treated equally."  *Fain*, 618 F.Supp.3d at 333-34.

The chasm between *Skrmetti* and the Medicaid Act is underscored by a key rationale *Skrmetti* accepted under equal protection, *i.e.*, that Tennessee's law was mere discrimination based on diagnosis. But the comparability requirement to provide coverage "equal in amount, duration, and scope for all beneficiaries within the group" *prohibits* discrimination based on diagnosis.  42 C.F.R. § 440.240(b)(1). "[N]othing in the federal statute [] permits discrimination based upon etiology rather

---

[12]    *Skrmetti*'s observation that hormone use for different indications gives rise to different medical treatments has no relevance to Medicaid Act claims. 145 S. Ct. at 1830.  Not only did *Skrmetti* not address surgery—the only treatment at issue here, on a specific factual record—but the Medicaid Act bars treating care differently simply because it is administered for one purpose versus another. *See*, *e.g.*, *Lankford v. Sherman*, 451 F.3d 496, 511 (8th Cir. 2006) (holding that once a category of services is covered, "a state's failure to provide Medicaid coverage for … medically-necessary services within [that] covered Medicaid category is both per se unreasonable and inconsistent with the stated goals of Medicaid").

than need." *White v. Beal*, 555 F.2d 1146, 1151 (3d Cir. 1977). Accordingly, it would violate the comparability requirement to allow a state to deny medical benefits to "some ... individuals that it provides to others with the exact same medical needs simply by defining such services—however arbitrarily—as aimed at treating only some medical conditions." *Davis v. Shah*, 821 F.3d 231, 257-258 (2d Cir. 2016).

### C. *Skrmetti* does not affect the limits that states may permissibly place on Medicaid coverage.

Finally, *Skrmetti* does not affect the "appropriate" or "reasonable" limits a state may place on Medicaid coverage. *Fain*, 618 F.Supp.3d at 332-33. Both before and after *Skrmetti* such controls must be reasonable and consistent with the Medicaid Act's objectives. *See Flack*, 395 F.Supp.3d at 1015; *White*, 555 F.2d at 1151 ("[W]hen a state decides to distribute a service as part of its participation in Title XIX, its discretion to decide how the service shall be distributed, while broad, is not unfettered: the service must be distributed in a manner which bears a rational relationship to the underlying federal purpose of providing the service to those in greatest need of it").

Defendants previously raised arguments about medical necessity and cost, and this Court's *en banc* panel properly rejected both. *Kadel*, 100 F.4th at 162. After all, the "implementation of such a [utilization control] procedure," including the mere invocation of budgetary concerns, "[does not] allow[] a state to shirk its primary obligation to cover medically necessary treatments." *Bontrager v. Indiana*

*Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 610 (7th Cir. 2012) (finding that state's monetary cap, which serves to exclude medically necessary treatment, is not a utilization control procedure). Additionally, "when a service goes completely unprovided, it has obviously not been provided in an amount sufficient to achieve its purpose." *Bontrager*, 697 F.3d at 611. *Skrmetti*'s narrow focus on hormonal treatments for minors tells us nothing about the medical necessity of surgical care for adults.

In summary, none of the considerations above are implicated by the narrow question decided in *Skrmetti*: whether the denial of access to hormone therapy for minors "turns on sex" as a matter of equal protection. *Skrmetti*, 145 S. Ct. at 1829. Instead, Ms. Anderson's claims seek only access to surgery, for adults, under statutory provisions that do not turn on sex discrimination.

## IV. The Exclusion Violates the Equal Protection Clause Even Under *Skrmetti*.

Mindful of this Court's direction to "focus on the Medicaid Act and Affordable Care Act claims," Ms. Anderson offers only a brief explanation of the reasons why *Skrmetti* does not foreclose her equal protection arguments in this case.

To begin, *Skrmetti* is limited in scope, turning on the specific law, context, facts, and arguments before the Court, and provides no basis for disturbing this Court's prior well-founded conclusions. *Skrmetti* emphasized the narrow nature of its ruling, focusing the entirety of its analysis on the Tennessee law's ban on

hormonal care for minors. *See, e.g.*, 145 S. Ct. at 1829 ("SB1 prohibits healthcare providers from administering puberty blockers and hormones to *minors* for certain *medical uses*, regardless of a minor's sex"). The Exclusion here, in contrast, involves only surgical coverage for transgender adults. The Exclusion fails equal protection review for at least three reasons.

First, unlike *Skrmetti*, the Exclusion here is based on transgender status, which requires heightened scrutiny both in its own right, and as a form of sex discrimination.[13] *See supra* Section II(A); Plaintiff's Br. at 34, Doc. 32. And in any event, *Skrmetti* declined to rule on whether Tennessee's "prohibitions are mere pretexts designed to effect an invidious discrimination against transgender individuals," in significant part because the plaintiffs did not raise the argument. 145 S. Ct. at 1833-34. That argument was raised here (Plaintiff's Br. at 29-30, Doc. 32;

---

[13]    As this Court has recently reaffirmed post-*Skrmetti*, *Grimm*'s holding that classifications based on transgender status are independently subject to heightened scrutiny "remains the law of this Circuit." *Doe*, 2025 WL 2375386, at *8; *id.* at *10 (Díaz, C.J., concurring) ("So *Grimm*'s conclusion that heightened constitutional scrutiny applies to a prohibition on transgender students' use of gender-affirming restrooms remains good law. As does *Grimm*'s holding that transgender people are at least a quasi-suspect class."); *see also Skrmetti*, 145 S. Ct. at 1832 ("This Court has not previously held that transgender individuals are a suspect or quasi-suspect class. And this case, in any event, does not raise that question[.]"); Plaintiff's Br. at 34, Doc. 32.

    Likewise, *Skrmetti* did not disavow the reasoning that transgender status discrimination is sex-based discrimination. *See Skrmetti*, 145 S. Ct. at 1834; *see also Bostock*, 590 U.S. at 669 ("discrimination based on … transgender status necessarily entails discrimination based on sex").

*supra* Section II(A)) and thoroughly considered by this Court, which recognized that gender transition (*i.e.*, a "sex change") "aim[s] at addressing incongruity between sex assigned at birth and gender identity." *Kadel*, 100 F.4th at 146. This is "the very heart of transgender status." *Id*. Just as "[a] tax on wearing yarmulkes is a tax on Jews," *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993), an exclusion targeting "sex changes" is an exclusion targeting transgender people.[14] *Skrmetti* itself concedes that "only transgender individuals seek treatment for gender dysphoria," *id.* at 1833, and the Court should "decline[] to distinguish between status and conduct" in this context. *Christian Legal Soc'y*, 561 U.S. at 689. That the Exclusion prohibits coverage for adults and minors alike further bolsters a finding of pretext.

Second, by its plain terms, the Exclusion expressly classifies based on sex. *See* Plaintiff's Br. at 18-20, Doc. 32; *supra* Section II(A). While Tennessee's ban on medical care for minors classified on the bases of "age" and "medical use," here the Exclusion on its face relies on sex as the determining value for classification by barring all "transsexual surgery" or "[s]ex change surgery." JA935, JA943. Unlike

---

[14]    *See also Rice v. Cayetano*, 528 U.S. 495, 514 (2000) (treating ancestry discrimination as facial race discrimination where ancestry was a proxy for race); *Casteneda v. Partida*, 430 U.S. 482, 486 (1977) (treating Spanish surname as a proxy for Mexican-American ancestry).

*Skrmetti*, this Exclusion says nothing about age, medical condition, or diagnosis, and instead uses an expressly *sex-based purpose* to exclude coverage.[15]

*Skrmetti* also supports, rather than undermines, this Court's sex stereotyping analysis. *Skrmetti* affirms that "classifications rest[ing] on impermissible stereotype" are subject to heightened scrutiny. 145 S. Ct. at 1832. Employing a fact-bound analysis to the record and minor plaintiffs in that case, *Skrmetti* found that Tennessee's specific legislative findings did not evince sex stereotyping. *See id.* (finding no impermissible stereotyping in the legislature's interest in "kids" purportedly "benefit[ing] from additional time to 'appreciate their sex' *before* embarking on body-altering paths" (emphasis added)). That analysis does not apply to this unique record or the Exclusion for adults here, which "conditions access" based "on whether the [care] will better align the patient's gender presentation with their sex assigned at birth." *Kadel*, 100 F.4th at 154. When, for example, chest surgery is available to both birth-assigned males and birth-assigned females, but only birth-assigned males receive coverage to masculinize their chest, the "difference in

---

[15] The Tennessee law at issue in *Skrmetti* was based and turned on a medical condition, explicitly adopting the definition of that condition. *See* Tenn. Code Ann. § 68-33-101(n)(2) (prohibiting specified medications and procedures only when provided "for the purpose of … [t]reating purported *discomfort* or *distress* from a discordance between the minor's sex and asserted identity"). Here, by contrast, the Exclusion targets *who* obtains surgery by prohibiting coverage for "*transsexual* surgery," *i.e.*, surgery for *transgender people*.

coverage is rooted in a gender stereotype: the assumption that people who have been assigned female at birth are supposed to have breasts, and that people assigned male at birth are not." *Id.* This "is a policy based on gender stereotypes," *id.*, and *Skrmetti* does not disturb this Court's prior analysis.

This Court's *en banc* panel was correct to find that *Geduldig*, 417 U.S. 484, does not apply, and *Skrmetti* does not change the analysis. *Kadel*, 100 F.4th at 145. *Skrmetti* explained that the Tennessee law before it, like "the law at issue in *Geduldig*," simply "regulates certain medical treatments." 145 S. Ct. at 1834 n.3. That is "different from" a law regulating "a class of *persons* identified on the basis of a specified characteristic," such as those who "menstruate" (or here, those who undergo "sex change surgery" or "transsexual surgery," JA935, JA943). *Skrmetti*, 145 S. Ct. at 1834 n.3. As *Skrmetti* clarified, "[n]either our analysis nor *Geduldig* speaks to a law that classifies on such a basis." *Id*. And again, neither *Skrmetti* nor *Geduldig* protect policies that regulate medical treatment or coverage, when such "regulation is a mere pretext for invidious sex [or transgender status] discrimination." 145 S. Ct. at 1833; *see also Geduldig*, 417 U.S. at 496-97 n.20.

Third, the Exclusion cannot be explained by anything but animus. As noted, Defendants cannot identify the provenance or any considered rationale for the Exclusion. *See* Plaintiff's Br. at 9, Doc. 32; JA437. In the absence of any explanation at all for the Exclusion's provenance—let alone a neutral,

nondiscriminatory one—it is evident the Exclusion was adopted and maintained "because of," not "in spite of," its effect on transgender people. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979); JA504-508. Indeed, it "seems inexplicable by anything but animus toward the class it affects." *Romer*, 517 U.S. at 632, 634. That is because "[s]ometimes," like here, "a clear pattern, unexplainable on grounds other than [sex and transgender status], emerges *from the effect of the state action* even when the governing legislation appears neutral on its face." *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (emphasis added). And a law is still subject to "heightened review" if "it was motivated by an invidious discriminatory purpose." *Skrmetti*, 145 S. Ct. at 1832 (citing *Personnel Adm'r of Massachusetts*, 442 U.S. at 271-274, and *Arlington Heights*, 429 U.S. at 264-266).

In any event, as Ms. Anderson previously explained, the Exclusion cannot survive any level of equal protection review. *See* Plaintiff's Br. at 34-38, Doc. 32.

## CONCLUSION

Plaintiff-Appellee respectfully requests that this Court affirm the District Court's decision.

Dated this 17th day October, 2025.       Respectfully submitted,

/s/ *Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
ogonzalez-pagan@lambdalegal.org

Tara L. Borelli
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: (470) 225-5341

Nora Huppert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Phone: (312) 663-4413

Anna P. Prakash
NICHOLS KASTER, PLLP
80 South 8th Street, Suite 4700
Minneapolis, MN 55402
Phone: (612) 256-3200

Walt Auvil
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: (304) 485-3058

*Counsel for Plaintiff-Appellee*

# CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing filing complies with the relevant typeface requirements of the Federal Rules of Appellate Procedure and Federal Circuit Rules, and the type-volume limitation of 7,500 words in this Court's Order dated September 25, 2025.  Doc. 128.

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 7,325 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: October 17, 2025

/s/ *Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
ogonzalez-pagan@lambdalegal.org

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2025, I filed the foregoing document through the Court's CM/ECF system, which will serve an electronic copy on all registered counsel of record.

Dated: October 17, 2025

/s/ *Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
ogonzalez-pagan@lambdalegal.org