No. 22-1927

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

SHAUNTAE ANDERSON, *et al.*,

*Plaintiffs-Appellees,*

v.

WILLIAM CROUCH, *et al.*,

*Defendants-Appellants.*

On Appeal From The United States District Court for the
Southern District Of West Virginia in Case No. 3:20-cv-00740 (Chambers, J.)

## SUPPLEMENTAL BRIEF OF DEFENDANTS-APPELLANTS

LOU ANN S. CYRUS
KIMBERLY M. BANDY
ROBERTA F. GREEN

SHUMAN MCCUSKEY SLICER
PLLC
P.O. BOX 3953
CHARLESTON, WV 25339
(304) 345-1400

JOHN B. MCCUSKEY
 *Attorney General*

CALEB B. DAVID
 *Deputy Solicitor General*
 *Counsel of Record*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
caleb.b.david@wvago.gov

*Counsel for Defendants- Appellants*

# TABLE OF CONTENTS

Introduction......................................................................................1

Summary Of The Argument.............................................................2

Argument..........................................................................................3

I.    *Skrmetti* resolves the Equal Protection Clause challenge......................4

    a.   Medicaid's transsexual surgery exclusion doesn't create sex-based classifications..............................................................................5

    b.   The record lacks any evidence of invidious discrimination...................6

    c.   The exclusion satisfies rational basis review...........................................8

II.   *Skrmetti* forecloses Plaintiffs' Section 1557 claim, too...........................10

III.  The Medicaid Act doesn't require States to pay for sex reassignment surgeries....................................................................................18

    a.   The Availability requirement imposes a reasonableness standard....18

    b.   *Skrmetti* confirms that efficacy concerns are reasonable...................23

    c.   *Skrmetti* also shows the exclusion has no Comparability problem.....26

Conclusion.....................................................................................29

Certificate Of Compliance.................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022) ...................................................13

*Alexander v. Choate*,
469 U.S. 287 (1985)...................................................................20

*Armour v. City of Indianapolis, Ind.*,
566 U.S. 673 (2012)...................................................................24

*Beal v. Doe*,
432 U.S. 438 (1977)...................................................................19

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020)..............................................14, 15, 17, 18

*Brandt by & through Brandt v. Griffin*,
147 F.4th 867 (8th Cir. 2025) ..................................................18

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993).....................................................................7

*Casillas v. Daines*,
580 F. Supp. 2d 235 (S.D.N.Y. 2008)......................................20

*Dandridge v. Williams*,
397 U.S. 471 (1970)...................................................................10

*Department of Education v. Louisiana*,
603 U.S. 866 (2024)...................................................................12

*Doe 2 v. Shanahan*,
917 F.3d 694 (D.C. Cir. 2019).....................................................1

*Doe by Doe v. South Carolina*,
    No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025)..................................4

*Doe v. Braun*,
    No. 1:25-CV-00596-MPB-TAB, 2025 WL 2894154 (S.D. Ind.
    Sept. 26, 2025) ..................................................................................................3

*Fam. Plan. Ass'n of Maine v. U.S. Dep't of Health & Hum.
    Servs.*,
    No. 1:25-CV-00364-LEW, 2025 WL 2591542 (D. Me. Sept. 8,
    2025) ..................................................................................................................7

*FCC v. Beach Comms., Inc.*,
    508 U.S. 307 (1993)......................................................................................25, 26

*Florida v. Dep't of Health & Hum. Servs.*,
    739 F. Supp. 3d 1091 (M.D. Fla. 2024).........................................................14

*Frontiero v. Richardson*,
    411 U.S. 677 (1973)...........................................................................................13

*Geduldig v. Aiello*,
    417 U.S. 484 (1974)......................................................................4, 6, 14, 27

*Giarratano v. Johnson*,
    521 F.3d 298 (4th Cir. 2008)...................................................................8, 24, 25

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020)............................................................................17

*Haverkamp v. Linthicum*,
    152 F.4th 618 (5th Cir. 2025) ...........................................................................9

*Hodgson v. Bd. of Cnty. Comm'rs, Hennepin Cnty.*,
    614 F.2d 601 (8th Cir. 1980)............................................................................21

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.*,
    121 F.4th 604 (7th Cir. 2024) .........................................................................10

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) .........................................................11, 21, 22, 23

*Lange v. Houston Cnty., Ga.,*
101 F.4th 793 (11th Cir. 2024) ..........................................27

*Lange v. Houston Cnty.,*
152 F.4th 1245 (11th Cir. 2025) ....................................16, 17

*Lehnhausen v. Lake Shore Auto Parts Co.,*
410 U.S. 356 (1973)...........................................................8

*Lindsley v. Nat. Carbonic Gas Co.,*
220 U.S. 61 (1911)...........................................................24

*Marquez v. Screen Actors Guild, Inc.,*
525 U.S. 33 (1998)...........................................................24

*McLaughlin v. Florida,*
379 U.S. 184 (1964)..........................................................24

*Medina v. Planned Parenthood S. Atl.,*
145 S. Ct. 2219 (2025) ...............................................20, 21

*Neese v. Becerra,*
640 F. Supp. 3d 668 (N.D. Tex. 2022) ...............................14

*Olmstead v. L.C. ex rel. Zimring,*
527 U.S. 581 (1999)..........................................................10

*Pers. Adm'r of Mass. v. Feeney,*
442 U.S. 256 (1979)........................................................6, 7

*Poe by & through Poe v. Drummond,*
149 F.4th 1107 (10th Cir. 2025) ....................................7, 17

*Rodriguez v. City of New York,*
197 F.3d 611 (2d Cir. 1999) .............................................28

*Smith v. Rasmussen,*
249 F.3d 755 (8th Cir. 2001)............................................20

*Tennessee v. Becerra,*
739 F. Supp. 3d 467 (S.D. Miss. 2024) ..............................14

iv

*United States v. Skrmetti,*
   145 S. Ct. 1816 (2025) ................................................................*passim*

**Statutes**

20 U.S.C. § 1681 ................................................................10, 13

42 U.S.C. § 1396a ................................................19, 20, 21, 26

42 U.S.C. § 1396d ................................................................19

42 U.S.C. § 18116 ................................................................10

**Other Authorities**

42 C.F.R. § 440.230 ................................................................20, 22

42 C.F.R. § 440.240 ................................................................26, 28

## INTRODUCTION

West Virginia chose not to use scarce state Medicaid funds to pay for certain expensive medical procedures that may or may not produce meaningful benefits.  The district court vetoed that judgment, concluding that federal law strips the State of any discretion.  Agreeing with Plaintiffs, the court concluded that the State's policy facially discriminated against transgender persons because the surgeries treat gender dysphoria, and "[s]ome, but not all, transgender persons develop gender dysphoria." *Doe 2 v. Shanahan*, 917 F.3d 694, 696 (D.C. Cir. 2019) (Wilkins, J., concurring).  It did not matter to the district court, for instance, that the State *does* cover other treatments for gender dysphoria—an unexpected approach for a State purportedly driven by transgender animus.

But whatever might've once been said for the district court's opinion, *United States v. Skrmetti* now settles it: the district court erred.  Neither federal statutes nor the Constitution compel States to fund sex reassignment surgeries.  As *Skrmetti* explains, classifications that hinge on "medical use" don't turn on sex.  So such classifications need only have a rational basis to survive constitutional review.  Cost, efficacy, and safety concerns provide that rational basis.  And because medical-use classifications don't turn on sex, they

also don't run afoul of the Affordable Care Act's anti-discrimination provision. As relevant here, that provision forecloses only discrimination based on *sex*.

*Skrmetti* speaks to the Medicaid Act, too, even if indirectly. The Medicaid Act requires States to make reasonable judgment calls when crafting state insurance plans. After all, the Medicaid program is a zero-sum game. Funding one service takes away from another. *Skrmetti* counsels deference to States when determining what's in their citizens' best interests on public-health issues like these. Courts should heed that counsel when considering the Medicaid Act's availability and comparability requirements.

Considering *Skrmetti*, the Court should reverse.

## SUMMARY OF THE ARGUMENT

*Skrmetti* rejects the district court's underlying assumption—classifications based on *medical use* aren't (oxymoronically) implied facial sex classifications. That's true even where the medical use might necessarily reference sex. Lacking a sex classification, the Affordable Care Act's anti-discrimination provision never even comes into the picture. And the Constitution's Equal Protection Clause is respected so long as the classification has some rational basis. By all accounts, the classification here does.

*Skrmetti* also highlights how the district court gave the State's judgments insufficient deference. In applying laws like the Medicaid Act, the state of the science matters. And when cost, efficacy, and safety of a particular procedure are matters of public debate, courts should not appoint themselves the ultimate deciders. Unfortunately, the district court did so here. So the Court should reverse.

## ARGUMENT

*United States v. Skrmetti*, 145 S. Ct. 1816 (2025), clarified how courts should analyze States' policy judgments in the medical context—and shows the district court confused some critical issues. *Skrmetti* lifted the fog: medical-use classifications don't discriminate based on sex or gender identity. Such classifications do not "afford preferential treatment for one sex over another." *Doe v. Braun*, No. 1:25-CV-00596-MPB-TAB, 2025 WL 2894154, at *6-7 (S.D. Ind. Sept. 26, 2025) (explaining how "*Skrmetti* provides an exegesis of this point") (cleaned up). And because medical-use classifications don't turn on sex, they don't violate the Affordable Care Act's anti-discrimination prohibition. What's more, *Skrmetti* reminds courts that States must be given room to draw lines in the medical context. That discretion should drive how

this Court construes the Medicaid Act.  Taking these principles together, the Court should affirm.

## I.  *Skrmetti* resolves the Equal Protection Clause challenge.

*Skrmetti* confirms what *Geduldig* already told us: "a State does not trigger heightened constitutional scrutiny by regulating a medical procedure that only one sex can undergo unless the regulation is a mere pretext for invidious sex discrimination." *Skrmetti*, 145 S. Ct. at 1833.  If a program doesn't "exclude any individual from benefit eligibility because of the individual's sex," *id.*, but instead only "removes one [] condition—[gender dysphoria]—from the list of [covered services]," *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974), then it doesn't violate the Equal Protection Clause.  That's because in the latter circumstance *no* person—of either sex—will be covered for "certain treatments for certain conditions." *Doe by Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *10 (4th Cir. Aug. 15, 2025) (Diaz, J., concurring) (characterizing *Skrmetti*).

That's how West Virginia's "transsexual surgery" exclusion operates.  It doesn't address sex.  Its application isn't bound up in a person's gender identity.  Transsexual surgery isn't covered for any Medicaid beneficiary—full

stop.  So the exclusion must only satisfy rational basis review.  It does so in spades.

> a.  **Medicaid's transsexual surgery exclusion doesn't create sex-based classifications.**

West Virginia's Medicaid policy does not hinge on an individual's sex or transgender status.  Indeed, the State does not even ask whether a given Medicaid beneficiary is transgender before deciding what benefits can be given.  JA1347-1348.  Rather, West Virginia's Medicaid Policy Manual identifies at least twenty medical services, including "[t]ranssexual surgery," that Medicaid does not cover.  JA1152-1153.  That exclusion refers to surgery intended to treat gender dysphoria.

So the exclusion "classifies on the basis of medical use." *Skrmetti*, 145 S. Ct. at 1829.  It doesn't "turn[] on sex." *Id.*  Instead, it excludes from coverage surgeries for "certain *medical uses*, regardless of a [beneficiary's] sex." *Id.*  The exclusion doesn't "prohibit [coverage] for one sex that it permits for the other." *Id.* at 1831.  Per the exclusion, "*no* [beneficiary receives coverage for surgery] to treat gender dysphoria" but beneficiaries "of *any* sex may [receive coverage for surgery] for other purposes." *Id.*

In other words, "[t]here is no risk from which men are protected and women are not[, and] there is no risk from which women are protected and

men are not." *Geduldig*, 417 U.S. at 496-97. Plaintiffs have "received insurance protection equivalent to that provided all other" beneficiaries. *Id.* at 497. They haven't suffered discrimination simply because they "encountered a risk that was outside the program's protection." *Id.*

### b. The record lacks any evidence of invidious discrimination.

Without a facial sex-based classification, Plaintiffs could salvage heightened scrutiny only by proving the exclusion "was motivated by an invidious discriminatory purpose." *Skrmetti*, 145 S. Ct. at 1832 (cleaned up). But that showing would require Plaintiffs to marshal evidence that West Virginia Medicaid "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Plaintiffs can't meet that burden, and the district court certainly didn't find that they had. There's no known reason the exclusion was adopted. JA2569. And Plaintiffs haven't put forward any discriminatory reason that it's been maintained. On the flip side, Medicaid covers non-surgical treatment for gender dysphoria. JA2652-2659. That belies an intent to discriminate. It's instead fair to suppose that West Virginia was "doing with Medicaid spending what it routinely does in any number of pieces of legislation, *i.e.*, drawing lines

between preferred and disfavored [expenditures], based on a combination of factors." *Fam. Plan. Ass'n of Maine v. U.S. Dep't of Health & Hum. Servs.*, No. 1:25-CV-00364-LEW, 2025 WL 2591542, at *2 (D. Me. Sept. 8, 2025).

Plaintiffs and the district court mistakenly rely solely on the exclusion's effect—surgery to treat gender dysphoria is not covered—to support a discriminatory intent. JA2563; Resp. Br. 32-34. In the district court's view, "when treatment is precluded for a diagnosis" that only transgender individuals have, the coverage exclusion "invidiously discriminates on the basis of sex and transgender status." JA2563.

That circular argument is not enough for three reasons. *First, Skrmetti* shows that an exclusion that "classifies on the basis of medical use" doesn't "turn[] on sex." 145 S. Ct. at 1829. *Second*, "[d]iscriminatory purpose" "implies more than intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 279. So Plaintiffs need evidence showing the exclusion exists "because of" its effect, "not merely in spite of" its effect. *Id.* (cleaned up). They have none. And *third*, obvious justifications for the exclusion exist. So it's not akin to a "tax on wearing yarmulkes," and "an intent to disfavor" cannot "readily be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993); *see also, e.g., Poe by & through Poe v. Drummond*,

7

149 F.4th 1107, 1126 (10th Cir. 2025) ("Opposition to gender transition procedures for minors cannot be considered an irrational surrogate to target transgender persons because it cannot be denied that there are common and respectable reasons for opposing it." (cleaned up)).

### c. The exclusion satisfies rational basis review.

Because the exclusion doesn't create sex-based classifications, and because Plaintiffs haven't shown that West Virginia Medicaid was motivated by an invidiously discriminatory purpose in adopting it, rational basis review applies. *See Skrmetti*, 145 S. Ct. at 1829 ("Classifications that turn on . . . medical use are subject to only rational basis review." (cleaned up)). Rational basis review is a "deferential standard." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008). Policies are "presumed to be valid and will be sustained if the classification drawn by the [policy] is rationally related to a legitimate state interest." *Id.* at 302-03 (cleaned up). To rebut that presumption, Plaintiffs bear the burden "to negate every conceivable basis which might support" the exclusion. *Id.* at 303 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

Plaintiffs didn't—and can't—show that the exclusion is wholly irrational. Both cost and efficacy concerns justified the State's reluctance to pay.

8

Questions about the surgeries' "medical efficacy and necessity," especially when paired with their significant cost, justified their exclusion. JA1130-1133, JA1200-1203, JA1471-1473, JA1491-1492, JA1866, JA1885-1888; *see also* Amicus Br. of West Virginia at 17-23 (collecting authorities speaking to cost and efficacy issues). Indeed, in *Skrmetti* itself, the Supreme Court acknowledged the growing number of European health authorities "rais[ing] significant concerns regarding the potential harms associated" with gender-affirming care. *Skrmetti*, 145 S. Ct. at 1825. Some say its efficacy is of "very low certainty"; others call it out as "an experimental practice." *Id.* At bottom, there is "ongoing debate over the efficacy" of gender-affirming care, and "medical and regulatory authorities are not of one mind about the treatments' risks and benefits." *Id.* at 1843 (Thomas, J., concurring); *see also, e.g.*, *Haverkamp v. Linthicum*, 152 F.4th 618, 620 n.1 (5th Cir. 2025) (citing *Skrmetti* and noting that the "efficacy" of sex-reassignment surgery—and even whether it is properly characterized as sex-reassignment—is "the subject of debate").

So in response to "the debate over medical treatments[,] … [s]ome [States] have decided the risks and efficacy [of transgender treatments] are too unclear and have chosen to limit access to medical treatments to adults."

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 612 (7th Cir. 2024). That's reasonable, as "[n]o State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 612 (1999) (Kennedy, J., concurring in the judgment). "[T]he Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Dandridge v. Williams*, 397 U.S. 471, 487 (1970) (cleaned up).

Uncertain efficacy and challenging costs justify reasonable bases for exclusion in Medicaid's zero-sum system. Together, they easily satisfy the "deferential standard" of rational-basis review.

## II. *Skrmetti* forecloses Plaintiffs' Section 1557 claim, too.

Section 1557 applies Title IX's "discrimination" prohibition to "any health program or activity" receiving federal funding. 42 U.S.C. § 18116(a). Title IX in turn forbids discrimination "on the basis of sex." 20 U.S.C. § 1681(a).

*Skrmetti* teaches (or reminds) that "mere reference to sex" doesn't create a sex-based classification. 145 S. Ct. at 1829. That approach "would be

especially inappropriate in the medical context" because "[s]ome medical treatments and procedures are uniquely bound up in sex." *Id.*; *see also id.* at 1830 ("In the medical context, the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny."). So a court's "task is not simply to note the words used in a law, but to determine what function those words serve in that law's operation." *Kadel v. Folwell*, 100 F.4th 122, 167-68 (4th Cir. 2024) (Richardson, J., dissenting), *vacated and remanded*, 145 S. Ct. 2838 (2025).

West Virginia Medicaid's exclusion "classifies on the basis of medical use." *Skrmetti*, 145 S. Ct. at 1829. Under the policy, "[s]ex change surgery" or "transsexual surgery" is "not covered by the Medicaid Program." JA935, JA941-943. The exclusion doesn't classify people at all. To determine the exclusion's applicability, the only relevant question is, "what is the medical use of the procedure?" If the answer is "to treat gender dysphoria," then the surgery is excluded from coverage, regardless of the patient's sex or gender identity. On the other hand, if the answer is, for example, "to treat breast cancer," then the surgery is not excluded from coverage, regardless of the patient's sex or gender identity.

So this exclusion doesn't "turn[] on sex." *Skrmetti*, 145 S. Ct. at 1829. And it doesn't then run afoul of Section 1557 of the Affordable Care Act. The Court can end its Section 1557 inquiry with *Skrmetti* and needn't analyze Title IX further.

But if the Court goes down that path, *Department of Education v. Louisiana* lights the way. 603 U.S. 866 (2024) (per curiam). There, the Biden Administration tried to redefine Title IX sex discrimination "to include discrimination on the basis of sex stereotypes, sex characteristics, . . . sexual orientation, and gender identity." *Id.* at 867 (cleaned up). But States—West Virginia included—said that "rule exceeded the bounds of the statutory text enacted by Congress." *Id.* All nine Justices agreed. *Id.* at 866-88. And the "plaintiffs were entitled to preliminary injunctive relief as to . . . the central provision that newly defines sex discrimination on the basis of sexual orientation and gender identity." *Id.* at 867; *see also id.* at 868-69 (Sotomayor, J., dissenting in part) (noting that "[e]very Member of the Court agrees respondents [we]re entitled to interim relief as to [a] provision[] of that Rule . . . defining sex discrimination").

The High Court's unanimity isn't surprising. Text and history confirm that Title IX denotes a biological binary. Title IX prohibits "discrimination"

"on the basis of sex." 20 U.S.C. § 1681(a). And though Title IX does not define sex, its ordinary meaning in 1972 is clear: the "overwhelming majority of dictionaries defin[ed] sex on the basis of biology and reproductive function." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc) (cleaned up). Just one year after Congress passed Title IX, the Supreme Court said "sex" is "an immutable characteristic" determined by "birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). And throughout Title IX, Congress refers to sex as binary. For example, Title IX permits schools to go from admitting "only students of *one sex*" to admitting "students of *both sexes*." 20 U.S.C. § 1681(a)(2) (emphases added). It also exempts "father-son or mother-daughter activities . . . but if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*." *Id.* § 1681(a)(8) (emphases added). Title IX's text makes sense only if sex means sex—not gender identity.

Title IX prohibits, "on the basis of sex," "exclud[ing] from participation in," "[denying] the benefits of," or "subject[ing] to discrimination" a person "under any education program" receiving federal funds. *Id.* § 1681(a). Its purpose is "to prohibit the discriminatory practice of treating women worse

than men and denying opportunities to women because they are women (and vice versa)." *Neese v. Becerra*, 640 F. Supp. 3d 668, 681 (N.D. Tex. 2022) (cleaned up) *vacated on other grounds by Neese v. Becerra*, 123 F.4th 751 (5th Cir. 2024). And "[i]nterpreting the word 'sex' to include gender identity would create contradictions and ambiguity within Title IX and its regulations." *Tennessee v. Becerra*, 739 F. Supp. 3d 467, 482 (S.D. Miss. 2024) (holding that plaintiffs, including State of West Virginia, were likely to succeed in challenge to regulation purporting to extend Section 1557's definition of sex to "gender identity"); *accord Florida v. Dep't of Health & Hum. Servs.*, 739 F. Supp. 3d 1091, 1117 (M.D. Fla. 2024) (same).

Under this framework, we end up where we started: The exclusion doesn't "turn[] on sex." *Skrmetti*, 145 S. Ct. at 1829. "There is no risk from which men are protected and women are not[, and] there is no risk from which women are protected and men are not." *Geduldig*, 417 U.S. at 496-97. So West Virginia Medicaid's exclusion doesn't treat women worse than men (or vice versa).

The district court didn't analyze Plaintiffs' Section 1557 claim through Title IX's sex-discrimination prohibition. Instead, it "look[ed] to Title VII to guide the" Title IX evaluation. JA2583. The district court relied on *Bostock*

*v. Clayton Cnty.*, 590 U.S. 644 (2020). *Skrmetti* left for another day the question of "whether *Bostock*'s reasoning reaches beyond the Title VII context." 145 S. Ct. at 1834. But the Court assumed for the sake of the exercise that it applied to Tennessee's law—and then explained that *Bostock* didn't "alter [its] analysis." *Id.*

The Court in *Bostock* "reasoned that Title VII's 'because of' test incorporates the traditional but-for causation standard, which 'directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.'" *Skrmetti*, 145 S. Ct. at 1834 (quoting *Bostock*, 590 U.S. at 656). Applying that test to Tennessee's law prohibiting gender-affirming care for minors, the Court found no sex-based or gender-identity-based discrimination. *Id.* That's because, "[i]f a transgender boy seeks testosterone to treat his gender dysphoria, [the law] prevents a healthcare provider from administering it to him." *Id.* (cleaned up). And "[i]f you change his biological sex from female to male, [the law] would still not permit him the hormones he seeks because he would lack a qualifying diagnosis." *Id.* But "if he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status." *Id.* So "neither his sex nor his transgender status is the but-for cause of his inability to obtain testosterone." *Id.*

15

Apply that reasoning to West Virginia's exclusion. "If a transgender [man] seeks [a mastectomy] to treat his gender dysphoria, [the exclusion] prevents" him from being reimbursed for the cost. *Skrmetti*, 145 S. Ct. at 1834; JA935, JA941-943. And "[i]f you change his biological sex from female to male, [the exclusion] would still not permit him [reimbursement for the surgery] he seeks because he would lack a qualifying diagnosis." *Id.* But "if he had such a diagnosis, he could obtain the [mastectomy] regardless of his sex or transgender status." *Id.* So "neither his sex nor his transgender status is the but-for cause of his inability to obtain [a mastectomy]." *Id.*

This analysis has been applied post-*Skrmetti*. In *Lange v. Houston County*, the en banc Eleventh Circuit considered whether Title VII required a county's employer-provided health insurance to pay for "a male-to-female sex change surgery." 152 F.4th 1245, 1248 (11th Cir. 2025) (en banc). There, the policy excluded "drugs for sex change surgery and services and supplies for a sex change and/or the reversal of a sex change." *Id.* (cleaned up). Applying *Skrmetti*'s reasoning, the Court found that the policy did not facially discriminate on the basis of sex because it did "not pay for a sex change operation for anyone regardless of their biological sex." *Id.* at 1252. And the policy didn't "facially discriminate based on transgender status" because it

"'classif[ied] based on medical use.'" *Id.* at 1253 (quoting *Skrmetti*, 145 S. Ct. at 1833). Nor did the policy "facially discriminate[] based on sex stereotypes." *Id.* at 1254. The Court reasoned that, "[i]f the plan discriminated against participants because of gender stereotypes, it would presumably cover procedures to *align* a participant's physical characteristics with those of his or her biological sex. But it does not do that." *Id.*; *see also Poe*, 149 F.4th at 1122 (applying *Skrmetti*'s read of *Bostock* to uphold a ban on certain treatments, as the law in question "prohibit[ed] certain gender transition procedures for all persons under the age of eighteen").

The result should be no different here. West Virginia Medicaid doesn't pay for sex change surgery for anyone, regardless of sex. It classifies based on medical use. And it doesn't cover procedures to align a participant's appearance with his or her biological sex. It simply "draws a line between certain treatments, which it covers, and other treatments, which it does not." *Lange*, 152 F.4th at 1255.

The analysis doesn't change under *Grimm*, either. *Grimm* combines *Bostock*'s reasoning with Title IX's principles. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616, 618 (4th Cir. 2020) (stating that *Bostock* "guides [the] evaluation of claims under Title IX" and that, "[i]n the Title IX context,

discrimination means treating that individual worse than others who are similarly situated") (cleaned up).  And under both of those tests, the exclusion doesn't discriminate on the basis of sex.  Sex simply doesn't dictate the benefits available (or not available) to Medicaid participants.  *See, e.g.*, *Brandt by & through Brandt v. Griffin*, 147 F.4th 867, 880 (8th Cir. 2025) (applying *Skrmetti* and explaining that *Bostock* did not foreclose a ban on certain gender-transition procedures because the law merely "prohibits providing medical treatment for certain purposes, and these prohibitions apply even if one switches the sex of a hypothetical" person).

Whether the Court analyzes the issue under a plain-text reading of Title IX and Section 1557, or with a *Bostock-Grimm* gloss on it, the exclusion doesn't "turn[] on sex."  *Skrmetti*, 145 S. Ct. at 1829.  *Skrmetti* shows the district court's ACA analysis was wrong.

## III. The Medicaid Act doesn't require States to pay for sex reassignment surgeries.

At first blush, one may not think *Skrmetti* speaks to Plaintiffs' Medicaid Act claims.  But *Skrmetti*'s reasonableness analysis permeates the Medicaid Act.

### a. The Availability requirement imposes a reasonableness standard.

The Medicaid Act's "availability" requirement says that participating States must "provide . . . for making medical assistance available" to eligible individuals. 42 U.S.C. § 1396a(a)(10)(A). "Medical assistance" includes broad categories of care such as "inpatient hospital services" and "physician services." *Id.* § 1396d(a)(1), (5). But the Medicaid Act "does not require States to provide funding for all medical treatment falling within" these "general categories." *Beal v. Doe*, 432 U.S. 438, 441 (1977). Rather, it requires "that state Medicaid plans establish 'reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives'" of the Act. *Id.* (quoting 42 U.S.C. § 1396a(a)(17)). "This language confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." *Id.* at 444.

The Act's "primary objective" is "to enable each State, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services." *Id.* Recognizing that States operate under different levels of practicability, the Act allows them to determine "the amount, duration, and scope of medical

assistance made available to individuals." 42 U.S.C. § 1396a(a)(10)(C)(i).

Indeed, "Medicaid programs do not guarantee that each recipient will receive

that level of health care precisely tailored to his or her particular needs."

*Alexander v. Choate*, 469 U.S. 287, 303 (1985); *see also Medina v. Planned

Parenthood S. Atl.*, 145 S. Ct. 2219, 2230 (2025) ("[S]pending-power statutes

like Medicaid are especially unlikely" to "confer an enforceable right.").

Rather, the program was designed "to provide the largest number of

necessary medical services to the greatest number of needy people." *Smith v.

Rasmussen*, 249 F.3d 755, 759 (8th Cir. 2001). So the benefit provided by

Medicaid "remains the individual services offered." *Alexander*, 469 U.S. at

303.

The Act's implementing regulations confirm that the State "may place

appropriate limits on a service based on such criteria as medical necessity or

on utilization control procedures." 42 C.F.R. § 440.230(d); *see also Casillas v.

Daines*, 580 F. Supp. 2d 235, 245-46 (S.D.N.Y. 2008) (explaining how Medicaid

plans can accordingly limit required services). The Act in fact instructs States

to implement "safeguards as may be necessary to assure … care and services

will be provided . . . [in] the best interests of the recipients." 42 U.S.C.

§ 1396a(a)(19). If Congress intended to require States to cover all care any

physician deemed medically necessary, then it would have said so in "clear and unambiguous" terms. *Medina*, 145 S. Ct. at 2235. Instead, Congress told States to establish reasonable standards, 42 U.S.C. § 1396a(a)(17), and to determine the amount, duration, and scope of services in "the best interests of the recipients," *id.* § 1396a(a)(19). That language grants States "relatively wide discretion in crafting their Medicaid plans," including "significant control, for instance, over . . . which types of services are covered." *Medina*, 145 S. Ct. at 2247 (Jackson, J., dissenting).

This broad discretion encompasses a reasonableness standard. That makes sense. "Medicaid—like every government-funded program—has limited resources. So the decision to spend money covering one procedure comes with a tradeoff: The program must forgo funding a different procedure, either now or later." *Kadel*, 100 F.4th at 189 (Richardson, J., dissenting). And sometimes excluding a given service with questionable returns will free up funds to provide more services with surer benefits. *Hodgson v. Bd. of Cnty. Comm'rs, Hennepin Cnty.*, 614 F.2d 601, 611 (8th Cir. 1980) (contemplating that a Medicaid agency can restrict services based on their "degree of medical need").

The implementing regulations don't wrest discretion from States' hands. CMS requires a State plan to "specify the amount, duration, and scope of each service that it provides for" the categorically needy and medically needy groups. 42 C.F.R. § 440.230(a)(1)-(2). States can "place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." *Id.* § 440.230(d). But States can't "*arbitrarily* deny or reduce the amount, duration, or scope of a *required* service . . . solely because of the diagnosis, type of illness, or condition." *Id.* § 440.230(c) (emphases added). So the regulations contemplate denial or reduction of amount, duration, or scope of services. They even contemplate denial of a service because of diagnosis. The denial just can't be arbitrary.

A six-Judge minority of this Court likened the analysis to "a rational-basis test": "Whenever a state's Medicaid program limits coverage for a procedure that would otherwise" be required, "its decision to do so must be 'reasonable.'" *Kadel*, 100 F.4th at 190 (Richardson, J., dissenting). "Reasonable" should mean "objectively reasonable." *Id.* Like in a rational-basis review, "the state must merely provide a justification for its decision—which may be after-the-fact—that could lead a reasonable person to believe

that the decision was made in the 'best interests' of the state's Medicaid recipients as a whole." *Id.*

### b. *Skrmetti* confirms that efficacy concerns are reasonable.

This is where *Skrmetti* comes in. *Skrmetti* deferred to the Tennessee Legislature's concerns about sterility, "increased risk of disease and illness," and "adverse and sometimes fatal psychological consequences." 145 S. Ct. at 1835 (cleaned up). The State also considered the relative newness of gender-dysphoria treatments—we likely don't know all the "harmful effects" because these treatments aren't "supported by high-quality, long-term medical studies." *Id.* (cleaned up). And the State reasonably believed that "less invasive approaches" could treat gender dysphoria and "result in better outcomes." *Id.* at 1836 (cleaned up). At bottom, the State "concluded that there is an ongoing debate among medical experts regarding the risks and benefits" of treatments, and the State's ban on those treatments "responds directly to that uncertainty." *Id.* The Court declined to "second-guess the lines" the State drew, affording it "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Id.* (cleaned up).

*Skrmetti*'s rational-basis analysis should inform this Court's reasonableness analysis. Courts have often used the terms interchangeably.

*See Lindsley v. Nat. Carbonic Gas Co.*, 220 U.S. 61, 78 (1911) ("A classification having some reasonable basis does not offend against [the Equal Protection Clause.]"); *see also Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012) ("[R]ational basis review requires deference to reasonable underlying legislative judgments." (cleaned up)); *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45 (1998) (explaining in another context that an action is "arbitrary" if it "can be fairly characterized as so far outside a 'wide range of reasonableness' that it is wholly 'irrational'" (cleaned up)); *McLaughlin v. Florida*, 379 U.S. 184, 190 (1964) (explaining that a classification can fail rational-basis review where it is implemented "arbitrarily"); *Giarratano*, 521 F.3d at 303 ("The rational basis standard requires the government to win if any set of facts reasonably may be conceived to justify its classification." (cleaned up)). The same concerns expressed by Tennessee were expressed by Defendants' expert, Stephen B. Levine, M.D.

Dr. Levine opined that gender-affirming care "has not been shown to result in significant lasting improvements in mental health or reduction in suicidality/suicide long-term," so it can't be "conflated" with "[m]edically necessary care." JA1866. He noted "significant risks of complications," including "adverse effects on bone health, cardiovascular health, and fertility."

*Id.* And "[t]here are many other risks" still "emerging in the literature." *Id.*
Dr. Levine also pointed to "a range of treatments to ameliorate gender dysphoria, from non-invasive to highly invasive." JA1867. And non-invasive approaches like "psychotherapy should be the first line of treatment for all gender dysphoric youth" according to some European research programs. JA1933. These facts and opinions lead to the conclusion that coverage decisions should balance the benefits and harms of providing certain treatments. Put another way, does the State draw a reasonable line?

West Virginia's policy draws a line more generous than the one *Skrmetti* found rational. It covers psychiatric diagnostic evaluation, psychotherapy, psychological evaluation, counseling, office visits, hormones, and lab work. Op. Br. 3-4 (collecting joint appendix citations). The line is drawn at "transsexual surgery." So, for example, a transgender female Medicaid patient's estrogen and counseling may be covered to treat gender dysphoria, but a vaginoplasty is not. There exist "plausible reasons," *FCC v. Beach Comms., Inc.*, 508 U.S. 307, 313 (1993), that a State may stop there. Plaintiffs' expert explained that vaginoplasty "involves formation of a vulva and associated structures, meaning clitoris and labia, removal of the penis and testicles, [and] most often construction of a vaginal canal." JA1659. And "[t]he [removal of the testicles]

would be permanent and irreversible." JA1659. Stopping short of "permanent and irreversible" in the face of "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field" can't be unreasonable or arbitrary. *Skrmetti*, 145 S. Ct. at 1837. Especially when there is "evidence that discordance between sex and gender can be resolved by less invasive approaches." *Id.* at 1836 (cleaned up).

> c. ***Skrmetti* also shows the exclusion has no Comparability problem.**

The "comparability" requirement says that States must provide "that the medical assistance made available to any individual" eligible under the availability requirement "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B). Its accompanying regulations require a State to "provide that the services available to any categorically needy beneficiary . . . are not less in amount, duration, and scope than those services available to a medically needy beneficiary." 42 C.F.R. § 440.240(a). And within the categorically and medically needy groups, the State "must provide that the services available to any individual . . . are equal in amount, duration, and scope for all beneficiaries." *Id.* § 440.240(b).

The district court read these provisions to mean that, if a State covers a procedure for one condition, then it must for all conditions. JA2588-2589. This leads to an absurd result. By blinding itself to the underlying diagnosis and focusing on the sought-after procedures' mechanics, the lower court lost sight of how surgeries for gender dysphoria address *different* medical needs than facially similar surgeries do. Consider an amputation—an amputation for a gangrenous limb is a much different medical need than an amputation for an individual with body integrity identity disorder. And anyway, it's not even true that these surgeries are mechanically the same. Opening Br. 8-11; *see also, e.g., Lange v. Houston Cnty., Ga.*, 101 F.4th 793, 802 (11th Cir. 2024) (Brasher, J., dissenting) (describing how "a natal man's 'vaginoplasty'"—of the sort Anderson seeks here—will be very different from a natal woman's), *rev'd en banc*, 152 F.4th 1245 (11th Cir. 2025).

*Skrmetti* is, again, instructive. The Court reaffirmed *Geduldig*'s holding that "exclud[ing] from coverage certain disabilities . . . did not discriminate." *Skrmetti*, 145 S. Ct. at 1833 (citing *Geduldig*, 417 U.S. at 486, 492-97). That's because the "fiscal and actuarial benefits of the program . . . accrue to members of both sexes." *Geduldig*, 417 U.S. at 496 n.20. Put differently, because Medicaid doesn't cover "transsexual surgery," it can provide a

broader "amount, duration, and scope" of other benefits to all categorically and medically needy individuals. *See* 42 C.F.R. § 440.240. And it does just that uniformly—regardless of sex or gender identity.

The district court attempted "to graft a new requirement on this Section: If two different benefits are 'comparable' and one is provided, the other must be as well." *Rodriguez v. City of New York*, 197 F.3d 611, 615-16 (2d Cir. 1999). But the comparability provision "does not require a state to fund a benefit that it currently provides to no one." *Id.* at 616. Rather, the "only proper application is in situations where the same benefit is funded for some recipients but not others." *Id.* (cleaned up).

Former Plaintiff Fain's history explains the difference. He received a hysterectomy for a non-gender-dysphoria-related condition. Medicaid covered the procedure because he met medical criteria for his condition. But Medicaid doesn't cover hysterectomy to treat gender dysphoria. That's not a service covered for anyone, regardless of sex or gender identity. If, however, Medicaid denied coverage because Mr. Fain identifies as a man—despite meeting the covered medical criteria—then the denial would have treated some categorically needy individuals different than others. That hypothetical situation would violate the comparability requirement.

The "transsexual surgery" exclusion doesn't suffer that comparability concern. It applies to men and women equally. It applies equally regardless of gender identity. All categorically needy beneficiaries receive coverage for the same services. All medically needy beneficiaries receive coverage for the same services. Nothing in the record says otherwise.

## CONCLUSION

The Court should reverse the judgment below.

Respectfully submitted,

LOU ANN S. CYRUS
KIMBERLY M. BANDY
ROBERTA F. GREEN

SHUMAN MCCUSKEY SLICER
PLLC
P.O. BOX 3953
CHARLESTON, WV 25339
(304) 345-1400

JOHN B. MCCUSKEY
  *Attorney General*

/s/ Caleb B. David
CALEB B. DAVID
  *Deputy Solicitor General*
  *Counsel of Record*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
caleb.b.david@wvago.gov

Dated: October 17, 2025

*Counsel for Defendants-Appellants*

**CERTIFICATE OF COMPLIANCE**

1.     This supplemental brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 5,807 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as required by Fed. R. App. 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

*/s/ Caleb B. David*
Caleb B. David