No. 22-1927

# In the United States Court of Appeals for the Fourth Circuit

SHAUNTAE ANDERSON, individually and on behalf of all others similarly situated,

*Plaintiff-Appellee*,

v.

WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Southern District of West Virginia, No. 3:20-cv-00740, Hon. Robert C. Chambers

## PLAINTIFF-APPELLEE'S PETITION FOR REHEARING *EN BANC*

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara L. Borelli
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Suite 105
Decatur, GA 30030
Phone: (470) 225-5341

Anna P. Prakash
NICHOLS KASTER, PLLP
80 South 8th Street, Suite 4700
Minneapolis, MN 55402
Phone: (612) 256-3200

Walt Auvil
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: (304) 485-3058

*Counsel for Plaintiff-Appellee and the Class*

Additional counsel for Plaintiff-Appellee listed on the following page.

Nora Huppert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, IL 60613
Phone: (312) 663-4413

Karen L. Loewy
Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
Phone: (202) 804-6245

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION AND LOCAL RULE 40(B) STATEMENT ................................1

ARGUMENT ...............................................................................................3

    I.    The Panel Erred in Applying *Skrmetti* and *Geduldig* to Section 1557..............3

    II.   The Panel's Proxy Discrimination Reasoning and Holding Conflict with Established Law and Precedent. .......................................................................7

    III.   The Panel Erred in its Analysis of and Holding on Pretext. ........................11

    IV.   The Panel Erred in Its Sex Stereotyping Analysis and Holding. ..................13

    V.   The Panel's Opinion Violates Principles of Party Presentation. ......................15

CONCLUSION ...........................................................................................17

CERTIFICATE OF COMPLIANCE....................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Campbell v. Drexel Univ.*,
785 F.Supp.3d 48 (E.D. Pa. 2025)..................................................................5

*Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*,
421 F.3d 170 (3d Cir. 2005)................................................... 7, 9, 10

*Conley v. Nw. Fla. State Coll.*,
145 F.Supp.3d 1073 (N.D. Fla. 2015) .................................................5

*Crouch v. Anderson*,
145 S. Ct. 2835 (2025) ......................................................................1

*Davis v. Guam*,
932 F.3d 822 (9th Cir. 2019) ...........................................................7, 10

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ...............................................................16

*Geduldig v. Aiello*,
417 U.S. 484 (1974)............................................................................1

*Gen. Elec. Co. v. Gilbert*,
429 U.S. 125 (1976)............................................................................3

*Gerdom v. Cont'l Airlines*,
692 F.2d 602 (9th Cir. 1982) ..............................................................9

*Gordon v. Aetna Life Ins. Co.*,
No. 3:24-cv-1447, 2026 WL 643134 (D. Conn. Mar. 8, 2026).............................6

*Greenlaw v. United States*, 554 U.S. 237 (2008) .......................................15

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020), as amended (Aug. 28, 2020) .................................13

*Guinn v. United States*,
238 U.S. 347 (1915) ............................................................................9

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
649 F.Supp.3d 104 (D. Md. 2023)...........................................................6

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*,
499 U.S. 187 (1991) ...................................................................................9

*Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), *cert. granted, judgment vacated sub nom. Crouch v. Anderson*, 145 S. Ct. 2835 (2025), *and cert. granted, judgment vacated*, 145 S. Ct. 2838 (2025) ................................... 7, 8, 10

*Lorillard v. Pons*,
434 U.S. 575 (1978)...................................................................................5

*McWright v. Alexander*,
982 F.2d 222 (7th Cir. 1992) ..................................................................9, 10

*Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*,
462 U.S. 669 (1983)................................................................. 2, 3, 4

*Obergefell v. Hodges*,
576 U.S. 644 (2015)..................................................................................14

*Pers. Adm'r of Massachusetts v. Feeney*,
442 U.S. 256 (1979)..............................................................................11, 12

*Pfeiffer by Pfeiffer v. Marion Ctr. Area Sch. Dist.*,
917 F.2d 779 (3d Cir. 1990)......................................................................5

*PFLAG, Inc. v. Trump*,
769 F.Supp.3d 405 (D. Md. 2025)..............................................................14

*Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Illinois*,
159 F.4th 646 (9th Cir. 2025) ...............................................................10, 11

*Rice v. Cayetano*, 528 U.S. 495 (2000)............................................................9, 10

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
965 F.3d 945 (9th Cir. 2020) ...............................................................7, 10

*Sovereign Mil. Hospitaller Ord. of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Ord. of Saint John of Jerusalem, Knights of Malta, the Ecumenical Ord.*,
702 F.3d 1279 (11th Cir. 2012)..................................................................15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ...............................................................................9

*United States v. Sineneng-Smith*,
   590 U.S. 371 (2020) ..............................................................................15

*United States v. Skrmetti*,
   605 U.S. 495 (2025).................................................................. 1, 10, 13, 14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977).............................................................................11

*Washington v. Davis*,
   426 U.S. 229 (1976)........................................................................11, 12

*Williams v. Kincaid*,
   45 F.4th 759 (4th Cir. 2022) ...............................................................16

## Statutes

20 U.S.C. § 1681(a)(1)-(9) ..........................................................................4

Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ...................................3

## Regulations

*Nondiscrimination in Health and Health Education Programs or Activities,*
   *Delegation of Authority*,
   85 Fed. Reg. 37160 (June 19, 2020).....................................................6

*Nondiscrimination in Health Programs and Activities*,
   89 Fed. Reg. 37522 (May 6, 2024).......................................................6

*Nondiscrimination in Health Programs and Activities*,
   81 Fed. Reg. 31376 (May 18, 2016)......................................................6

*Nondiscrimination on the Basis of Sex*,
   40 Fed. Reg. 24128 (June 4, 1975) .......................................................5

*Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance,* 45 Fed. Reg. 30955 (May 9, 1980) ...............................................................5

## Other Authorities

123 Cong. Rec. 10582 (1977) (statement of Rep. Hawkins)....................................4

H.R. Rep. 95-948, 1978 WL 8570 (Mar. 13, 1978) ......................................................4

## Rules

Fed. R. App. P. 32(f).................................................................................................18

Fed. R. App. P. 40(d)(3) ..........................................................................................18

Local Rule 40(b)(iii)-(iv) ..........................................................................................1

## INTRODUCTION AND LOCAL RULE 40(B) STATEMENT

The panel's decision in this case conflicts with precedents of the Supreme Court, this Court, and other Courts of Appeal, as well as raises questions of exceptional importance that warrant rehearing by the *en banc* Court. *See* Local Rule 40(b)(iii)-(iv). Left to stand, it will lead to confusion in the lower courts, create a circuit split, undermine established principles, and threaten the rights and civil liberties of an already-vulnerable population.

The question is whether the West Virginia Medicaid Program's policy of excluding all coverage for gender-confirming surgical care—termed "transsexual surgery" in the policy and referred to as "the Exclusion" herein—violates the law. Presumably recognizing the importance of this question, this Circuit previously granted *en banc* review *sua sponte* and ruled in Plaintiff's favor. However, following the decision in *United States v. Skrmetti*, 605 U.S. 495 (2025), the Supreme Court granted certiorari, vacated this Circuit's opinion, and remanded the case to consider *Skrmetti*. *See Crouch v. Anderson*, 145 S. Ct. 2835 (2025). Following briefing and argument, the panel held that *Skrmetti* forecloses Plaintiff's claims.

*En banc* review is again needed. The panel's opinion improperly applies the framework of *Geduldig v. Aiello*, 417 U.S. 484 (1974), and *Skrmetti* to Plaintiff's claims under Section 1557 of the Affordable Care Act. The opinion does so even though Congress has rejected the application of *Geduldig*'s reasoning to statutory

1

claims, which the Supreme Court has acknowledged, *see Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 678 (1983), and even though the text and legislative histories of Section 1557 and Title IX demonstrate that *Geduldig*'s reasoning does not apply.

Further, the panel's opinion analyzed proxy discrimination under a standard that this Circuit previously rejected and that conflicts with precedent. And given the record, the panel's conclusion that there was no proxy discrimination is equally wrong. So, too, with pretext. The panel's opinion ignores Supreme Court precedent on the applicable standard, as well as record evidence that both the district court and this Circuit previously found to support judgment for Plaintiff.

The panel's opinion also conforms to debunked stereotypes about transgender people and, in doing so, conflicts with this Circuit's precedent on sex stereotyping. The panel's opinion also improperly expands *Skrmetti* beyond its limited holding in a manner that reaches all transgender adults without a legal basis or any limitation.

And the panel relied upon "evidence" it obtained on its own and which was not presented by any party. The panel did so while ignoring established evidence that is actually part of the record. This violates the party presentation principle.

If not corrected, the opinion will continue to threaten longstanding principles about how to evaluate cases like this, and the grave impact of contravening these principles and related precedent will fall most harshly on those that Section 1557 and

the Equal Protection Clause were designed to protect. The Court should grant rehearing *en banc*.[1]

## ARGUMENT

**I.     The Panel Erred in Applying *Skrmetti* and *Geduldig* to Section 1557.**

The framework of *Geduldig* and *Skrmetti* has no application in the statutory context. The panel's opinion assumes the opposite, relying upon the incorrect application of *Geduldig* to Title VII, *see Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), and extending *Geduldig* and *Skrmetti* to Title IX and, thus, Section 1557. That is error.

As the Supreme Court recognized, when Congress enacted the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), Congress: (1) corrected the outcome of *Gilbert*; <u>and</u> (2) "unambiguously" rejected "the reasoning" of *Gilbert* and *Geduldig*. *See Newport News*, 462 U.S. at 678. Here, however, the panel failed to properly acknowledge what *Newport News* did, *i.e.*, that Congress had rejected the reasoning of *Gilbert* and *Geduldig* in the statutory context. Op. at 30 n.17. That Congress so "unambiguously" rejected the reasoning underscores just how far off the mark the panel's opinion sits.

Indeed, there is no question that Congress disavowed the application of *Geduldig*'s reasoning to the statutory context in *Gilbert.* As Congress explained, "[i]n

---

[1] Plaintiff does not seek rehearing regarding her Medicaid Act claims.

enacting Title VII, Congress mandated equal access to employment," but "the Supreme Court's narrow interpretations of Title VII tend to erode our national policy of nondiscrimination in employment." H.R. Rep. 95-948, 1978 WL 8570, at \*3 (Mar. 13, 1978). In fact, Congress took the position that the <u>dissent</u> in *Gilbert* "correctly interpreted" federal civil rights law. *Id.* at \*2; *see also Newport News*, 462 U.S. at 679 ("Proponents of the bill repeatedly emphasized that the Supreme Court had erroneously interpreted congressional intent and that amending legislation was necessary to re-establish the principles of Title VII law.").[2] "This view—that a classification which harms only women and does so on the basis of a factor inextricably linked to gender—is contrary to any sensible approach to what constitutes discrimination." 123 Cong. Rec. 10582 (1977) (statement of Rep. Hawkins). Congress explained, if it "were not to clarify its original intent, and the Supreme Court's interpretations of Title VII [in *Gilbert*] were allowed to stand, Congress would yield to an intolerable potential trend in employment practices." H.R. Rep. 95-948, 1978 WL 8570, at \*4.

What is more, the text and legislative histories of Title IX and Section 1557 demonstrate that *Geduldig*'s and *Gilbert*'s reasoning does not apply. Title IX's sweeping antidiscrimination rule broadly prohibits sex discrimination absent an express carveout in the statute. *See* 20 U.S.C. § 1681(a)(1)-(9). No carveout authorizes

---

[2] See legislative history attached in Addendum A.

4

the discrimination at issue here. Rather, consistent with Congress's reaffirmation that Title VII prohibits discrimination based on pregnancy as a form of sex-based discrimination, Title IX's regulations have expressly prohibited discrimination based on pregnancy as a form of sex discrimination, even long before the Pregnancy Discrimination Act's enactment. *See Nondiscrimination on the Basis of Sex*, 40 Fed. Reg. 24128 (June 4, 1975); *see also* 45 Fed. Reg. 30955, 30959, 30962-63 (May 9, 1980). And though the Pregnancy Discrimination Act only amended Title VII, courts around the country have held that discrimination based on pregnancy is discrimination based on sex under Title IX. *See, e.g., Campbell v. Drexel Univ.*, 785 F.Supp.3d 48, 54 n.23 (E.D. Pa. 2025) (citing *Pfeiffer by Pfeiffer v. Marion Ctr. Area Sch. Dist.*, 917 F.2d 779, 784 (3d Cir. 1990)); *Conley v. Nw. Fla. State Coll.*, 145 F.Supp.3d 1073, 1076 (N.D. Fla. 2015).

The same is true for Section 1557, which incorporates Title IX and for which the legislative history demonstrates that sometimes adverse treatment based on a medical condition or procedure (such as pregnancy) that only a specific group people (women) may experience or undergo constitutes unlawful discrimination against the group. "[W]here … Congress adopts a new law," like Section 1557, "incorporating sections of a prior law," like Title IX, "Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978). As such,

5

Section 1557's regulations have consistently prohibited discrimination based on pregnancy across presidential administrations.[3] For the same reasons, courts have recognized that discrimination based on gender dysphoria is discrimination based on transgender status and therefore sex. *See, e.g.*, *Gordon v. Aetna Life Ins. Co.*, No. 3:24-cv-1447, 2026 WL 643134, at *25 (D. Conn. Mar. 8, 2026); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F.Supp.3d 104, 117-18 (D. Md. 2023).

Under the panel's holding extending *Geduldig* and *Skrmetti*'s reasoning to the statutory context, however, discrimination based on pregnancy would be lawful under Title IX and Section 1557. Thus, the panel's decision creates a conflict with a whole body of law that is of grave importance. In short, by not recognizing Congress's rejection of *Gilbert*'s reasoning and animating principle and the Supreme Court's acknowledgment of the same, the panel's opinion contravenes the prior-construction and legislative acquiescence canons of statutory construction. Legislative history shows that the principle that animated *Geduldig* and *Skrmetti* in the equal protection context—*i.e.*, that regulation of a medical condition or procedure that only a specific group people may experience or undergo does not constitute discrimination against said group—is not applicable in the statutory context. For this reason, *Skrmetti* does not apply and rehearing *en banc* is warranted.

---

[3] *See Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37522, 37699 (May 6, 2024); 85 Fed. Reg. 37160, 37179-80 (June 19, 2020); 81 Fed. Reg. 31376, 31467 (May 18, 2016).

## II. The Panel's Proxy Discrimination Reasoning and Holding Conflict with Established Law and Precedent.

"Proxy discrimination is a form of facial discrimination." *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019); *see also Kadel v. Folwell*, 100 F.4th 122, 150 (4th Cir. 2024) (cleaned up) (subsequent history omitted); *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005). It "arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Davis*, 932 F.3d at 837. Thus, under a proxy theory, the crucial question is whether the "fit" between the protected category and the alleged proxy is "sufficiently close" to make a discriminatory inference plausible. *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 959 (9th Cir. 2020) (holding, under Section 1557, a medical condition (hearing loss) may serve as a proxy for a protected group (people with a disability)). Here, in analyzing Plaintiff's proxy discrimination argument—which applies to the equal protection and Section 1557 claims in this case—the panel made two crucial errors.

*First*, the panel held that "to establish a presumption that the Exclusion discriminates by proxy, Plaintiffs must show that the choice to exclude gender dysphoria from coverage is so irrational that nothing could explain it other than an intent to discriminate against transgender persons." Op. at 23. This echoes the

7

principal dissent's argument in the prior *en banc* proceedings in this case. *See Kadel*,

100 F.4th at 170. But as the majority explained *en banc*:

> There are two problems with these criteria. First, they assume that the presence of a nondiscriminatory reason means the absence of a discriminatory reason. But rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern. The question therefore is not whether there is a non-discriminatory reason for a policy, but instead whether there is a discriminatory reason for it. When there is proof that a discriminatory purpose has been *a* motivating factor in the decision, judicial deference is no longer justified.
>
> … A law that pays state employees with XX chromosomes 75 percent of what state employees with XY chromosomes are paid has a rational, nondiscriminatory reason: it saves the state … money. But under the principal dissent's framework, not only would that law be facially neutral; it would also be supported by a "rational, nondiscriminatory reason." A court therefore could not find that the law discriminated on the basis of gender until it conducted a full-blown *Arlington Heights* evidentiary inquiry. This would require us to ignore the obvious.
>
> Second, the principal dissent's "no rational, nondiscriminatory explanation" criteria would muddle the traditional equal-protection analysis. The second step of that analysis asks whether a discriminatory law can be justified by the state's nondiscriminatory interest in the law. The principal dissent's analysis would require asking the state-interest question twice: first to determine whether a facially neutral law is nevertheless discriminatory and second to determine whether a discriminatory law can nevertheless be justified.

*Id.* at 152-53 (cleaned up). The same holds true now. In essence, the panel has

reduced proxy discrimination to mere rational basis review, such that heightened

scrutiny can never be applied to law or policy that discriminates based on a protected

8

characteristic via proxy. This is counter to precedent. *See*, *e.g.*, *Rice v. Cayetano*, 528 U.S. 495, 509-10 (2000); *Guinn v. United States*, 238 U.S. 347, 364-65 (1915).

In the statutory context, the panel's approach is also wrong because it ignores that when there is *facial* discrimination—which proxy discrimination is—the presence of a nondiscriminatory reason for the policy does not justify the facial discrimination. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). Indeed, Title IX "prohibits a recipient of federal funds from intentionally treating any individual worse even in part because of his race, color, or national origin and without regard to any other reason or motive the recipient might assert." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 290 (2023) (Gorsuch, J., concurring) (discussing Title VI, upon which Title IX was modeled). As such, "a recipient of federal funds may never discriminate," *id.*, on the basis of sex under Title IX and facial sex discrimination cannot be immunized by an alleged nondiscriminatory justification. *See*, *e.g.*, *Cmty. Servs., Inc.*, 421 F.3d at 177; *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) (policy excluding service dogs or wheelchairs would be discrimination based on disability, "even if the stated purpose of the policy were a benign one); *Gerdom v. Cont'l Airlines*, 692 F.2d 602, 608 (9th Cir. 1982). Thus, the panel's opinion conflicts with precedent and established law in other circuits.

*Second*, the fit between people experiencing gender dysphoria and transgender people is incredibly strong, as "only transgender individuals seek treatment for gender dysphoria." *Skrmetti*, 605 U.S. at 519; *see also Kadel*, 100 F.4th at 149 (noting "gender dysphoria" is "a diagnosis inextricable from transgender status"). Nonetheless, the panel held that "we cannot presume discriminatory intent from the fact that gender dysphoria happens to occur in exclusively transgender persons," because "[t]he fact that a law targets something closely or exclusively associated with a protected class cannot alone support a presumption of discriminatory intent." Op. at 23 (cleaned up). But *Skrmetti* does not foreclose Plaintiff's proxy discrimination theory. *See Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Illinois*, 159 F.4th 646, 672 (9th Cir. 2025). "[T]he fit between the classification at issue and the [protected] group it covers is so close that a classification on the basis of [the protected characteristic] can be inferred[.]" *Davis*, 932 F.3d at 838.

Further, the proxy discrimination determination is ultimately a factual inquiry that can be "aided … by any evidence of record that informs the analysis." *Cmty. Servs., Inc.*, 421 F.3d at 179; *see also, e.g., Rice*, 528 U.S. at 509-10 (considering history in determining proxy discrimination); *Kadel*, 100 F.4th at 150 n.22; *Schmitt*, 965 F.3d at 959; *McWright*, 982 F.2d at 228. Here, Defendants admit that medical treatments for gender dysphoria are sometimes necessary, *see* JA303; JA488;

10

JA967-1014 (Defendants' utilization guidelines specifying that gender-confirming surgery can be medically necessary), such that they "cannot justify [their] categorical exclusion by citing medical necessity." *Pritchard*, 159 F.4th at 672. Put simply, "[s]omething else may be afoot, and that something may be invidious discrimination against transgender people." *Id*.

The panel erred in conducting its proxy discrimination analysis without considering the appropriate standard, precedent, and established law.

### III.    The Panel Erred in its Analysis of and Holding on Pretext.

Although the panel acknowledged pretext as an additional pathway to demonstrate intentional discrimination, Op. at 14, it failed to apply the correct standard to the record here. Instead, the panel determined that if it could "identify rational, nondiscriminatory reasons why the law targets who or what it does, then [it could not] presume an intent to discriminate." Op. at 12-13. But this is not how the analysis must be done. *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977); *Washington v. Davis*, 426 U.S. 229 (1976).

The Supreme Court has explained, "[d]iscriminatory purpose … implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279 (quotations omitted). The Exclusion here fits squarely within

11

this test. The Exclusion, which appears in the Medicaid program's policy manual, JA931-943, has otherwise been "selected [and] reaffirmed" on multiple occasions. *Feeney*, 442 U.S. at 279.

Defendants previously excluded coverage for gender-affirming medical care broadly, including hormone therapy. JA504. They chose to stop enforcing the exclusion as to hormones in 2017 because they knew it caused harm to transgender people. JA506-507. They kept it as to surgery despite these harms, however. JA506-508. Thus, despite awareness that both hormone and surgical exclusions can cause a patient to be "distraught," Defendants affirmatively, repeatedly readopted and enforced the Exclusion, JA505-508, including in periodically renewed agreements with Managed Care Organizations. *See*, *e.g.*, JA1045-1046, JA1049-1050.

The aforementioned evidence, along with the other pretext factors Plaintiff previously briefed, *see* Doc. 147 at 11-12 (discussing additional pretext factors, including, *inter alia*, the Exclusion's exclusive effect on transgender people and Defendants' agreement about the absence of *any* identified rationale before attorneys constructed them for the litigation), shows that the Exclusion is pretext for discrimination based on sex and transgender status.

Given the standard articulated in *Feeney* and, because intentional discrimination may be adduced from the "totality of the relevant facts," *Davis*, 426 U.S. at 242, the panel erred. And though the panel noted that "the plaintiffs in *Skrmetti*

failed to show" pretext, Op. at 14 (quotation omitted), the plaintiffs in that case in fact did "not argue[] that [the challenged provisions] are mere pretexts designed to effect an invidious discrimination against transgender individuals." 605 U.S. at 519. *Skrmetti* accordingly sheds no light here.

## IV.　The Panel Erred in Its Sex Stereotyping Analysis and Holding.

The panel's reasoning on sex stereotyping conflicts with precedent and the law in other circuits. For example, this Circuit has acknowledged the broad swath of case law holding "that various forms of discrimination against transgender people constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020), as amended (Aug. 28, 2020) (collecting cases). Indeed, as this Circuit has explained, years of attempts by mental health practitioners "to convert transgender people's gender identity to conform with their sex assigned at birth … did not alleviate dysphoria, but rather caused shame and psychological pain." *Id.* at 595; *see also* JA596. Reducing transgender people to their birth sex treats "gender identity [a]s a choice," privileging it over "medically confirmed, persistent and consistent gender identity." *Grimm*, 972 F.3d at 610. These "misconceptions … themselves reflect stereotypic notions." *Id*. (quotation omitted). The panel's opinion ignores all of this.

13

Moreover, the panel's sex stereotyping analysis misreads *Skrmetti*. Op. at 21-22, 27. Far from foreclosing Plaintiff's sex stereotyping theory, *Skrmetti* affirms that heightened scrutiny must apply to "classifications rest[ing] on impermissible stereotype." 605 U.S. at 516. Employing a fact-bound analysis to the record and the minor plaintiffs in that case, *Skrmetti* found that the Tennessee legislature's specific legislative findings did not evince sex stereotyping: the state could "conclude that *kids* benefit from *additional time* to 'appreciate their sex' *before* embarking on body-altering paths" as adults. *Id.* at 517 (emphasis added). Here, however, the panel's opinion expands this standard to all adults, and would allow, without any limiting principle, "legislature[s]" to claim an interest in "encourag[ing] citizens to appreciate … and not become disdainful of their sex." Op. at 27 (quotation omitted). The opinion reasons that this simply amounts to "recognizing biological reality," not stereotyping. Op. at 9.[4] Left to stand, the panel's reasoning could amount to judicially-endorsed regulation of transgender people's liberty to be themselves. However, "[t]he Constitution promises liberty to all within its reach," which "includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." *Obergefell v. Hodges*, 576 U.S. 644, 651-52 (2015). *En banc* review is necessary.

---

[4] The invocation of "biological reality" is not a legally neutral principle for assessing whether a policy rests on impermissible stereotypes. *Cf. PFLAG, Inc. v. Trump*, 769 F.Supp.3d 405, 444 (D. Md. 2025) (One "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist.").

14

**V.    The Panel's Opinion Violates Principles of Party Presentation.**

"In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). "[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *see also Sovereign Mil. Hospitaller Ord. of Saint John v. Fla. Priory of the Knights Hospitallers of the Sovereign Ord. of Saint John*, 702 F.3d 1279, 1296 (11th Cir. 2012) (cautioning court to limit its analysis to facts in the record, and to refrain from consulting outside sources that have not been cited, submitted, or recognized by the parties). Here, the panel deviated from these fundamental principles.

The panel considered and interpreted articles—which are better interpreted and contextualized by medical experts—that were not part of the record or presented by either party. Op. at 25 n.15. The panel's reliance on (and misconstruing of) this evidence that was not presented by any party but rather obtained *on its own*, without the benefit of context by the parties or the parties' designated experts, illustrates how it deviated from the principle of party presentation.

The panel also abused its discretion by relying on material not presented by any party, or contextualized through expert testimony, to support the contention that the Exclusion is justified based on cost concerns. Op. at 25 n.14. The panel did so

15

without grappling with the record evidence in this case, which includes Defendants' concessions on cost, such as Defendants conducting zero cost research, JA461, JA533; federal funds help subsidize the care, JA444-446; Defendants having not cut coverage due to shortfalls in decades, JA518, JA529; and unrebutted expert testimony that the care is cost-effective, JA705-707.

Similarly, the panel reduced gender dysphoria to a "mental disorder," Op. at 6, that deviates from "biological reality," *id.* at 22, and not a medical condition that has physical and biological bases and consequences. *Id.* at 20-21 & n.12. Again, this is contrary to the record. *See* JA586-587 (gender identity has "biological underpinnings"); JA596 (same); JA696 ("Gender dysphoria is a serious medical condition[.]"); JA1650-1651 (same, and noting it is based on "an incongruence between their gender identity, their internal sense of who they are, and their physical morphology, their anatomy"); JA1796. It is also contrary to case law. *See also Williams v. Kincaid*, 45 F.4th 759, 767-68, 770-71 (4th Cir. 2022); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 771 (9th Cir. 2019).

By going outside of the record to consider evidence not presented by anyone to the court, and which therefore lacked context, while simultaneously failing to grapple with the parties' evidence regarding the efficacy of this care for adults and its costs, the panel violated the principle of party presentation, further warranting *en banc* review.

16

## CONCLUSION

Plaintiff respectfully requests that the Court grant this petition for rehearing *en banc*.

Dated this 24th day of March 2026.

Respectfully submitted,

<table>
<tr>
<td>

Tara L. Borelli
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: (470) 225-5341
tborelli@lambdalegal.org

Karen L. Loewy
Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
Phone: (202) 804-6245
kloewy@lambdalegal.org
sbuchert@lambdalegal.org

Nora Huppert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, IL 60613
Phone: (312) 663-4413
nhuppert@lambdalegal.org

</td>
<td>

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Fl.
New York, NY 10005
Phone: (212) 809-8585
ogonzalez-pagan@lambdalegal.org

Anna P. Prakash
NICHOLS KASTER, PLLP
80 South 8th Street, Suite 4700
Minneapolis, MN 55402
Phone: (612) 256-3200
aprakash@nka.com

Walt Auvil
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: (304) 485-3058
auvil@theemploymentlawcenter.com

</td>
</tr>
</table>

*Counsel for Plaintiff-Appellee and the Class*

17

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing filing complies with the relevant typeface requirements of the Federal Rules of Appellate Procedure and the Court's Local Rules.

This petition also complies with the type-volume requirements set forth in Fed. R. App. P. 40(d)(3) because, excluding the exempted portions of the petition, as provided in Fed. R. App. P. 32(f), the petition contains 3,899 words.

This petition complies with the typeface and type style requirements because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: March 24, 2026

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
*Counsel for Plaintiff-Appellee*

18