No. 22-1927

# In the United States Court of Appeals for the Fourth Circuit

SHAUNTAE ANDERSON, individually and on behalf of all others similarly situated,

*Plaintiff-Appellee*,

v.

WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Southern District of West Virginia, No. 3:20-cv-00740, Hon. Robert C. Chambers

## ADDENDUM TO PLAINTIFF-APPELLEE'S PETITION FOR REHEARING *EN BANC*

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara L. Borelli
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Suite 105
Decatur, GA 30030
Phone: (470) 225-5341

Anna P. Prakash
NICHOLS KASTER, PLLP
80 South 8th Street, Suite 4700
Minneapolis, MN 55402
Phone: (612) 256-3200

Walt Auvil
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: (304) 485-3058

*Counsel for Plaintiffs-Appellees and the Class*

Additional counsel for Plaintiff-Appellee listed on the following page.

Nora Huppert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3656 North Halsted Street
Chicago, IL 60613
Phone: (312) 663-4413

Karen L. Loewy
Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
Phone: (202) 804-6245

H.R. REP. 95-948, H.R. Rep. No. 948, 95TH Cong., 2ND Sess. 1978, 1978 U.S.C.C.A.N. 4749, 1978 WL 8570 (Leg.Hist.)

P.L. 95-555, CIVIL RIGHTS ACT OF 1964-- PREGNANCY DISCRIMINATION

SEE PAGE 92 STAT. 2076

SENATE REPORT (HUMAN RESOURCES COMMITTEE) NO. 95-331, JULY

6, 1977 (TO ACCOMPANY S. 995)

HOUSE REPORT (EDUCATION AND LABOR COMMITTEE) NO. 95-948,

MAR. 13, 1978 (TO ACCOMPANY H.R. 6075)

HOUSE CONFERENCE REPORT NO. 95-1786, OCT. 13, 1978

(TO ACCOMPANY S. 995)

CONG. RECORD VOL. 123 (1977)

CONG. RECORD VOL. 124 (1978)

DATES OF CONSIDERATION AND PASSAGE

SENATE SEPTEMBER 16, 1977; OCTOBER 13, 1978

HOUSE JULY 18, OCTOBER 15, 1978

THE SENATE BILL WAS PASSED IN LIEU OF THE HOUSE BILL AFTER

AMENDING ITS LANGUAGE TO CONTAIN MUCH OF THE TEXT OF THE

HOUSE BILL. THE HOUSE REPORT (THIS PAGE) AND THE HOUSE

CONFERENCE REPORT (P. 4765) ARE SET OUT.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 95-948

MAR. 13, 1978

**\*1  \*\*4749**  THE COMMITTEE ON EDUCATION AND LABOR TO WHOM WAS REFERRED THE BILL (H.R. 6075) TO AMEND TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 TO PROHIBIT SEX DISCRIMINATION ON THE BASIS OF PREGNANCY, HAVING CONSIDERED THE SAME, REPORT FAVORABLY THEREON WITH AN AMENDMENT AND RECOMMEND THAT THE BILL AS AMENDED DO PASS.

\* \* \* \*

SUMMARY

THE PURPOSE OF H.R. 6075 IS TO AMEND TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 BY ADDING TO SECTION 701 A NEW SUBSECTION (K) WHICH CLARIFIES THAT THE PROHIBITIONS AGAINST SEX DISCRIMINATION IN THE ACT INCLUDE DISCRIMINATION IN EMPLOYMENT BASED ON PREGNANCY, CHILD BIRTH OR RELATED MEDICAL CONDITIONS.

DURING FULL COMMITTEE CONSIDERATION, AN AMENDMENT WAS ADOPTED WHICH STATES THAT BENEFITS DO NOT HAVE TO BE PROVIDED FOR ABORTION EXCEPT WHERE NECESSARY TO PRESERVE THE LIFE OF THE MOTHER.

THE PROVISIONS OF THIS BILL TAKE EFFECT IMMEDIATELY UPON ENACTMENT, EXCEPT THAT, WITH REGARD TO FRINGE BENEFITS PLANS, THE EFFECTIVE DATE IS 180 DAYS AFTER ENACTMENT. FOR A PERIOD OF AT LEAST ONE YEAR, OR UNTIL THE  **\*2**  EXPIRATION OF ANY APPLICABLE COLLECTIVE BARGAINING AGREEMENT, EMPLOYERS MAY NOT REDUCE EXISTING BENEFITS AS A MEANS OF COMING INTO COMPLIANCE.  **\*\*4750**  HOWEVER, WHERE EMPLOYEES AND EMPLOYERS SHARE THE COST OF

PRESENTLY EXISTING BENEFITS, EMPLOYERS ARE PERMITTED TO APPORTION THE THE COST OF ANY BENEFIT REQUIRED AS A RESULT OF THIS LEGISLATION.

BACKGROUND AND PURPOSE

CONGRESS ENACTED TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED BY THE EQUAL EMPLOYMENT OPPORTUNITY ACT OF 1972, TO PROHIBIT DISCRIMINATION IN EMPLOYMENT ON THE BASIS OF RACE, COLOR, RELIGION, SEX OR NATIONAL ORIGIN.

H.R. 6075 WILL AMEND TITLE VII TO CLARIFY CONGRESS' INTENT TO INCLUDE DISCRIMINATION BASED ON PREGNANCY, CHILDBIRTH OR RELATED MEDICAL CONDITIONS IN THE PROHIBITION AGAINST SEX DISCRIMINATION IN EMPLOYMENT.

THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, CHARGED WITH IMPLEMENTATION OF TITLE VII, INTERPRETED THE ACT TO INCLUDE DISCRIMINATION BASED ON PREGNANCY. THE EEOC GUIDELINES, AS AMENDED IN MARCH 1972, STATE THAT EXCLUDING APPLICANTS OR EMPLOYEES FROM EMPLOYMENT BECAUSE OF PREGNANCY OR RELATED MEDICAL CONDITIONS IS A VIOLATION OF TITLE VII. SPECIFICALLY, THESE GUIDELINES REQUIRE EMPLOYERS TO TREAT DISABILITIES CAUSED OR CONTRIBUTED TO BY PREGNANCY, MISCARRIAGE, ABORTION, CHILDBIRTH AND RECOVERY THEREFROM AS ALL OTHER TEMPORARY DISABILITIES. (SEE 29 C.F.R. 1604.10.) IT IS THE COMMITTEE'S VIEW THAT THESE GUIDELINES RIGHTLY IMPLEMENTED THE TITLE VII PROHIBITION OF SEX DISCRIMINATION IN THE 1964 ACT.

EIGHTEEN FEDERAL DISTRICT COURTS AND ALL SEVEN FEDERAL COURTS OF APPEALS WHICH HAVE CONSIDERED THE ISSUE HAVE RENDERED DECISIONS PROHIBITING DISCRIMINATION IN EMPLOYMENT BASED ON PREGNANCY, IN ACCORD WITH THE FEDERAL GUIDELINES.

CONTRARY TO THESE RULINGS AND GUIDELINES, THE SUPREME COURT, IN GENERAL ELECTRIC CO. V. GILBERT, 429 U.S. 125 (1976), [1] DECIDED IN FAVOR OF GENERAL ELECTRIC'S DISABILITY INSURANCE PLAN, WHICH EXCLUDED COVERAGE FOR WOMEN WITH PREGNANCY-RELATED DISABILITIES. THE COURT CONCLUDED THAT THIS EXCLUSION IN THE COMPANY'S BENEFITS POLICY WAS NOT GENDER-RELATED BUT CONDITION-RELATED. IT WENT ON TO INDICATE THAT BECAUSE THE PLAN DID NOT EXCLUDE ANY DISABILITY THAT COULD BE INCURRED BY BOTH MEN AND WOMEN, IT WAS NOT DISCRIMINATORY.

JUSTICE BRENNAN, IN A DISSENTING OPINION, SUPPORT THE EEOC GUIDELINES AS A REASONABLE INTERPRETATION AND IMPLEMENTATION OF THE BROAD SOCIAL OBJECTIVES OF TITLE VII. HE POINTED OUT THAT SINCE THE PLAN INCLUDED COMPREHENSIVE COVERAGE FOR MALES, AND FAILED TO PROVIDE COMPREHENSIVE COVERAGE FOR FEMALES, THE MAJORITY ERRED IN FINDING THAT THE EXCLUSION OF PREGNANCY DISABILITY COVERAGE WAS A NONDISCRIMINATORY POLICY. FURTHERMORE, JUSTICE STEVENS, IN HIS DISSENTING OPINION, ARGUED THAT 'IT IS THE CAPACITY TO BECOME PREGNANT WHICH PRIMARILY DIFFERENTIATES THE FEMALE FROM THE MALE.'

IT IS THE COMMITTEE'S VIEW THAT THE DISSENTING JUSTICES CORRECTLY INTERPRETED THE ACT.

ONCE THE COURT MAJORITY IN GILBERT CONCLUDED THAT DISCRIMINATION ON THE BASIS OF PREGNANCY WAS NOT SEX DISCRIMINATION ON ITS FACE, IT APPLIED A SECOND TEST FOR DISCRIMINATION UNDER TITLE VII: WHETHER THE **4751 *3 DISABILITY BENEFITS PROGRAM AT ISSUE HAD A DISPARATE IMPACT ON WOMEN. IN CONCLUDING THAT THERE WAS NO SUCH IMPACT, THE MAJORITY RELIED ON THE FACT THAT 'THERE IS NO PROOF THAT THE PACKAGE IS IN FACT WORTH MORE TO MEN THAN TO WOMEN.'

HOWEVER, IN A CASE DECIDED AFTER GILBERT, NASHVILLE GAS CO. V. SATTY, 54 L.ED.2D 356 (DEC. 6, 1977), THE SUPREME COURT HELD THAT A POLICY DEPRIVING WOMEN WHO ARE ABSENT FROM WORK BECAUSE OF CHILDBIRTH OF ACCUMULATED SENIORITY FOR CERTAIN PURPOSES DOES HAVE A DISPARATE IMPACT ON WOMEN, AND DOES VIOLATE TITLE VII. SATTY WAS DISTINGUISHED FROM GILBERT ON THE GROUND THAT ' . . . (THE EMPLOYER) HAS NOT MERELY REFUSED TO EXTEND TO WOMEN A BENEFIT THAT MEN CANNOT AND DO NOT RECEIVE, BUT HAS IMPOSED ON WOMEN A SUBSTANTIAL BURDEN THAT MEN NEED NOT SUFFER.' YET, WHILE THE SATTY COURT DENIED THAT 'THE DISTINCTION BETWEEN BENEFITS AND BURDENS IS . . . ONE OF SEMANTICS,' IT DID NOT EXPLAIN WHY THE 'BURDEN' APPROACH DID NOT APPLY IN GILBERT, WHERE ONLY WOMEN WERE BURDENED WITH PAYING THEIR LIVING EXPENSES OUT OF THEIR OWN SAVINGS DURING A DISABILITY PERIOD. NOR DID IT EXPLAIN WHY THE RIGHT TO RETAIN ONE'S SENIORITY WHILE ABSENT FROM WORK IS NOT A 'BENEFIT.' THUS, ALTHOUGH SATTY DID INDICATE THAT, IN SOME INSTANCES, POLICIES SINGLING OUT PREGNANCY AND CHILDBIRTH FOR SPECIAL TREATMENT CAN VIOLATE TITLE VII AS IT IS NOW, IT LEFT BOTH EMPLOYERS AND EMPLOYEES IN THE UNTENABLE POSITION OF GUESSING, WITHOUT ANY JUDICIAL GUIDANCE, WHETHER THE COURTS WOULD APPLY THE 'BENEFITS' OR THE 'BURDENS' LABEL TO A PARTICULAR POLICY.

H.R. 6075 WAS INTRODUCED TO CHANGE THE DEFINITION OF SEX DISCRIMINATION IN TITLE VII TO REFLECT THE COMMONSENSE VIEW AND TO ENSURE THAT WORKING WOMEN ARE PROTECTED AGAINST ALL FORMS OF EMPLOYMENT DISCRIMINATION BASED ON SEX. BY MAKING CLEAR THAT DISTINCTIONS BASED ON PREGNANCY ARE PER SE VIOLATIONS OF TITLE VII, THE BILL WOULD ELIMINATE THE NEED IN MOST INSTANCES TO RELY ON THE IMPACT APPROACH, AND THUS WOULD OBVIATE THE DIFFICULTIES IN APPLYING THE DISTINCTIONS CREATED IN SATTY.

THE VIEW OF NONDISCRIMINATION INCORPORATED IN H.R. 6075 IS SUPPORTED BY THE FACT THAT ALMOST HALF OF THE STATES PRESENTLY INTERPRET THEIR OWN FAIR EMPLOYMENT PRACTICES LAWS TO PROHIBIT SEX DISCRIMINATION BASED ON PREGNANCY AND CHILDBIRTH.

IN ENACTING TITLE VII, CONGRESS MANDATED EQUAL ACCESS TO EMPLOYMENT AND ITS CONCOMITANT BENEFITS FOR FEMALE AND MALE WORKERS. HOWEVER, THE SUPREME COURT'S NARROW INTERPRETATIONS OF TITLE VII TEND TO ERODE OUR NATIONAL POLICY OF NONDISCRIMINATION IN EMPLOYMENT. WE ARE LEFT IN A STATE OF NATIONAL CONFUSION AND WITH INCONSISTENT PRACTICES FROM STATE TO STATE.

AS TESTIMONY RECEIVED BY THIS COMMITTEE DEMONSTRATES, THE ASSUMPTION THAT WOMEN WILL BECOME PREGNANT AND LEAVE THE LABOR FORCE LEADS TO THE VIEW OF WOMEN AS MARGINAL WORKERS, AND IS AT THE ROOT OF THE DISCRIMINATORY PRACTICES WHICH KEEP WOMEN IN LOW-PAYING AND DEADEND JOBS. H.R. 6075 UNMISTAKABLY REAFFIRMS THAT SEX DISCRIMINATION INCLUDES DISCRIMINATION BASED ON PREGNANCY, AND SPECIFICALLY DEFINES STANDARDS WHICH REQUIRE THAT PREGNANT WORKERS BE TREATED THE SAME AS OTHER EMPLOYEES ON THE BASIS OF THEIR ABILITY OR INABILITY TO WORK.

WE RECOGNIZE THAT ENACTMENT OF H.R. 6075 WILL REFLECT NO NEW LEGISLATIVE MANDATE OF THE CONGRESS NOR EFFECT CHANGES IN PRACTICES, COSTS, OR BENEFITS BEYOND THOSE INTENDED BY TITLE VII OF THE CIVIL **4752 *4 RIGHTS ACT. ON THE CONTRARY, THE NARROW APPROACH UTILIZED BY THE BILL IS TO ERADICATE CONFUSION BY EXPRESSLY BROADENING THE DEFINITION OF SEX DISCRIMINATION IN TITLE VII TO INCLUDE PREGNANCY-BASED DISCRIMINATION. IF, HOWEVER, CONGRESS WERE NOT TO CLARIFY ITS ORIGINAL INTENT, AND THE SUPREME COURT'S INTERPRETATIONS

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.    Addendum 003   3

OF TITLE VII WERE ALLOWED TO STAND, CONGRESS WOULD YIELD TO AN INTOLERABLE POTENTIAL TREND IN EMPLOYMENT PRACTICES.

## CHRONOLOGY OF THE BILL

H.R. 5055 WAS INTRODUCED ON MARCH 15, 1977, BY MR. HAWKINS AND COSPONSORED BY 81 MEMBERS. ON APRIL 5, 1977, THE BILL WAS AMENDED AND REINTRODUCED AS H.R. 6075. THIS LEGISLATION, WHICH WAS REFERRED TO THE COMMITTEE ON EDUCATION AND LABOR, CURRENTLY HAS 119 COSPONSORS. HEARINGS WERE HELD ON THE BILL BY THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES ON APRIL 6 AND JUNE 29, 1977. ON FEBRUARY 2, 1978, THE SUBCOMMITTEE, BY VOICE VOTE, VOTED TO REPORT THE BILL WITH AMENDMENTS TO THE FULL COMMITTEE. ON MARCH 2, THE FULL COMMITTEE ON EDUCATION AND LABOR AMENDED THE BILL TO ADD A PROVISION EXEMPTING ABORTION FROM FRINGE BENEFIT COVERAGE EXCEPT WHERE THE LIFE OF THE MOTHER IS ENDANGERED, AND THEN VOTED 25 TO 6 TO REPORT THE BILL TO THE HOUSE WITH A RECOMMENDATION THAT IT PASS.

## PROVISIONS OF THE BILL

## 1. THE BASIC PRINCIPLES

THIS LEGISLATION WOULD CLEARLY ESTABLISH THAT THE PROHIBITION AGAINST SEX DISCRIMINATION IN TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 INCLUDES A PROHIBITION AGAINST EMPLOYMENT-RELATED DISCRIMINATION ON THE BASIS OF PREGNANCY, CHILDBIRTH, OR RELATED MEDICAL CONDITIONS. AS AN AMENDMENT TO TITLE VII, THIS BILL WILL APPLY TO ALL ASPECTS OF EMPLOYMENT--HIRING, REINSTATEMENT, TERMINATION, DISABILITY BENEFITS, SICK LEAVE, MEDICAL BENEFITS, SENIORITY AND OTHER CONDITIONS OF EMPLOYMENT CURRENTLY COVERED BY TITLE VII. PREGNANCY-BASED DISTINCTIONS WILL BE SUBJECT TO THE SAME SCRUTINY ON THE SAME TERMS AS OTHER ACTS OF SEX DISCRIMINATION PROSCRIBED IN THE EXISTING STATUTE. THE COMMITTEE AMENDMENT TO THE BILL ALSO PROVIDES THAT UNDER ANY HEALTH OR TEMPORARY DISABILITY INSURANCE OR SICK LEAVE PLAN AVAILABLE IN CONNECTION WITH EMPLOYMENT, NEITHER PREGNANCY NOR RELATED MEDICAL CONDITIONS MAY BE CONSTRUED TO INCLUDE ABORTIONS EXCEPT WHERE THE LIFE OF THE MOTHER WOULD BE ENDANGERED IF THE FETUS WERE CARRIED TO TERM. HOWEVER, THIS SHALL NOT PRECLUDE AN EMPLOYER FROM PROVIDING ABORTION BENEFITS OR OTHERWISE AFFECT COLLECTIVE BARGANING AGREEMENTS IN REGARD TO ABORTIONS.

IT MUST BE EMPHASIZED THAT THIS LEGISLATION, OPERATING AS PART OF TITLE VII, PROHIBITS ONLY DISCRIMINATORY TREATMENT. THEREFORE, IT DOES NOT REQUIRE EMPLOYERS TO TREAT PREGNANT EMPLOYEES IN ANY PARTICULAR MANNER WITH RESPECT TO HIRING, PERMITTING THEM TO CONTINUE WORKING, PROVIDING SICK LEAVE, FURNISHING MEDICAL AND HOSPITAL BENEFITS, PROVIDING DISABILITY BENEFITS, OR ANY OTHER MATTER. H.R. 6075 IN NO WAY REQUIRES THE INSTITUTION OF ANY NEW PROGRAMS WHERE NONE CURRENTLY EXIST. THE BILL WOULD SIMPLY REQUIRE THAT PREGNANT WOMEN BE TREATED THE SAME AS OTHER EMPLOYEES ON THE BASIS OR THEIR ABILITY OR INABILITY TO WORK.

**\*\*4753** **\*5** THE 'SAME TREATMENT' MAY INCLUDE EMPLOYER PRACTICES OF TRANSFERRING WORKERS TO LIGHTER ASSIGNMENTS, REQUIRING EMPLOYEES TO BE EXAMINED BY COMPANY DOCTORS OR OTHER PRACTICES, SO LONG AS THE REQUIREMENTS AND BENEFITS ARE ADMINISTERED EQUALLY FOR ALL WORKERS IN TERMS OF THEIR ACTUAL ABILITY TO PERFORM WORK.

IN USING THE BROAD PHRASE 'WOMEN AFFECTED BY PREGNANCY, CHILDBIRTH AND RELATED MEDICAL CONDITIONS,' THE BILL MAKES CLEAR THAT ITS PROTECTION EXTENDS TO THE WHOLE RANGE OF MATTERS CONCERNING THE CHILDBEARING PROCESS. AT THE SAME TIME, THE BILL IN INTENDED TO BE LIMITED TO EFFECTS UPON THE WOMAN WHO IS HERSELF PREGNANT, BEARING A CHILD, OR HAS A RELATED MEDICAL CONDITION, AND NOT TO INCLUDE ANY EFFECT UPON ONE WOMAN DUE TO THE PREGNANCY OF ANOTHER.

## A. DISABILITY AND SICK LEAVE BENEFITS

THE SUPREME COURT HAS DEALT WITH THE EXCLUSION OF PREGNANCY OR PREGNANCY-RELATED MEDICAL CONDITIONS FROM AN EMPLOYER'S TEMPORARY DISABILITY BENEFITS PLAN AND FROM AN EMPLOYER'S SICK LEAVE PLAN. THE COURT IN GILBERT HELD THAT GENERAL ELECTRIC'S EXCLUSION OF PREGNANCY FROM A NONOCCUPATIONAL SICKNESS AND ACCIDENT INSURANCE PROGRAM DID NOT CONSTITUTE SEX DISCRIMINATION IN VIOLATION TO TITLE VII. THE COURT IN SATTY DENIED SICK LEAVE BENEFITS TO PREGNANT EMPLOYEES.

THIS BILL WOULD PREVENT EMPLOYERS FROM TREATING PREGNANCY, CHILDBIRTH AND RELATED MEDICAL CONDITIONS IN A MANNER DIFFERENT FROM THEIR TREATMENT OF OTHER DISABILITIES. IN OTHER WORDS, THIS BILL WOULD REQUIRE THAT WOMEN DISABLED DUE TO PREGNANCY, CHILDBIRTH OR OTHER RELATED MEDICAL CONDITIONS BE PROVIDED THE SAME BENEFITS AS THOSE PROVIDED OTHER DISABLED WORKERS. THIS WOULD INCLUDE TEMPORARY AND LONG-TERM DISABILITY INSURANCE, SICK LEAVE, AND OTHER FORMS OF EMPLOYEE BENEFIT PROGRAMS.

H.R. 6075 WILL NOT REQUIRE AN EMPLOYER WHO DOES NOT PROVIDE DISABILITY BENEFITS OR PAID SICK LEAVE TO OTHER EMPLOYEES TO PROVIDE THEM FOR PREGNANT WORKERS. IN ADDITION, THE BILL WOULD PERMIT EMPLOYERS WHO PROVIDE A VOLUNTARY UNPAID LEAVE POLICY TO CONTINUE TO DO SO, AS LONG AS THE PLAN IS NOT DISCRIMINATORY. IF AN EMPLOYER HAS A DISABILITY INSURANCE PLAN OR PAID SICK LEAVE POLICY, HE OR SHE WILL NOT BE ALLOWED TO REDUCE BENEFITS TO COMPLY WITH H.R. 6075. THE ONLY TIME THE EMPLOYER WILL BE REQUIRED TO ALLOW PREGNANT WORKERS TO USE THIS LEAVE IS DURING THE TIME THEY ARE MEDICALLY UNABLE TO WORK, DURING THE SAME PERIOD OF TIME AND UNDER THE SAME TERMS APPLICABLE TO OTHER EMPLOYEE. FOR EXAMPLE, IF A WOMAN WANTS TO STAY HOME TO TAKE CARE OF THE CHILD, NO BENEFIT MUST BE PAID BECAUSE THIS IS NOT A MEDICALLY DETERMINED CONDITION RELATED TO PREGNANCY. AND, IF AN EMPLOYER HAS A TEMPORARY DISABILITY PROGRAM WHICH PAYS UP TO 15 WEEKS (AS 90 PERCENT OF DISABILITY PLANS PROVIDE FOR 15 TO 26 WEEKS) THAT DOES NOT MEAN A PREGNANT WORKER CAN RECEIVE BENEFITS FOR ALL OF THOSE 15 WEEKS. SHE MAY ONLY RECEIVE BENEFITS FOR THOSE WEEKS DURING WHICH SHE IS MEDICALLY UNABLE TO WORK. TESTIMONY BEFORE THE COMMITTEE INDICATES THAT IN 95 PERCENT OF THE CASES, THE TIME LOST FROM WORK DUE TO PREGNANCY IS 6 WEEKS OR LESS, SO BARRING ANY MEDICAL COMPLICATIONS, THIS PERIOD WOULD BE THE NORMAL TIME A PREGNANT WOMAN WOULD BE COVERED. IF, HOWEVER, MEDICAL COMPLICATIONS AROSE, WHICH IS THE CASE IN ABOUT 5 PERCENT OF ALL PREGNANCIES, THESE COMPLICATIONS SHOULD BE COVERED BY THE SAME TIME LIMITS OR DOLLAR AMOUNTS OTHERWISE PROVIDED DISABLED WORKERS.

**4754   *6  THERE HAS BEEN SOME CONCERN EXPRESSED THAT PROVIDING PREGNANCY-RELATED DISABILITIES WILL CREATE A SPECIAL POTENTIAL FOR ABUSE OR MALINGERING. HOWEVER, AS ONE DISTRICT COURT HAS OBSERVED, THERE IS 'NO BASIS FOR ASSIGNING THE TENDENCY TO MALINGER AS A SEX-RELATED CHARACTERISTIC.' LIBERTY MUTUAL V. WETZEL, 372 F.SUPP. 1146, 1164 (W.D. PA. 1974)

H.R. 6075 WOULD NOT PREVENT THE CONTROL OF POTENTIAL ABUSE IN DISABILITY BENEFITS PROGRAMS AS LONG AS THOSE CONTROLS WERE NOT DISCRIMINATORY. FOR EXAMPLE, MANY EMPLOYERS REQUIRE A PHYSICIAN'S CERTIFICATION OF AN EMPLOYEE'S INABILITY TO WORK. THIS WOULD BE ALLOWED UNDER H.R. 6075 AS LONG AS IT WAS REQUIRED OF ALL PERSONS APPLYING FOR DISABILITY OR SICK LEAVE BENEFITS. AN EMPLOYER COULD ALSO REQUIRE EXAMINATION BY A COMPANY PHYSICIAN TO CONFIRM THE MEDICAL DISABILITY. THIS, TOO, WOULD BE ALLOWED IF APPLIED TO ALL TYPES OF DISABILITIES. NO SPECIAL REQUIREMENTS CAN BE CREATED TO COVER PREGNANCY OR CHILDBIRTH ALONE.

## B. MEDICAL BENEFITS

THIS BILL WOULD REQUIRE EMPLOYERS WHO PROVIDE MEDICAL BENEFITS FOR THEIR EMPLOYEES TO COVER THE MEDICAL AND HOSPITAL COSTS OF PREGNANCY, CHILD-BIRTH, AND RELATED MEDICAL CONDITIONS UNDER THE SAME TERMS AND CONDITIONS OF COVERAGE FOR OTHER MEDICAL CONDITIONS. FOR EXAMPLE, IF THE MEDICAL PLAN COVERS ALL MEDICAL AND HOSPITAL COSTS OF EMPLOYEES, ALL THE COSTS RELATED TO PREGNANCY, CHILDBIRTH OR RELATED MEDICAL CONDITIONS MUST BE FULLY COVERED. THERE CAN BE NO SPECIAL CONDITIONS PLACED AS TO THE NUMBER OF DAYS OR DOLLAR AMOUNT UNLESS THAT LIMITATION APPLIES TO ALL DISABILITIES COVERED BY THE MEDICAL BENEFITS PLAN.

AGAIN, THIS BILL DOES NOT REQUIRE AN EMPLOYER TO HAVE A MEDICAL BENEFITS PLAN. HOWEVER, IF SUCH A PLAN EXISTS, AN EMPLOYER FOR A PERIOD OF ONE YEAR MAY NOT REDUCE THE BENEFITS TO COMPLY WITH THIS BILL, AND THE PLAN MUST COVER PREGNANCY, CHILDBIRTH, AND OTHER RELATED MEDICAL CONDITIONS.

## C. OTHER EMPLOYMENT POLICIES

IN ADDITION TO THE IMPACT OF THIS BILL ON FRINGE BENEFIT PROGRAMS, OTHER EMPLOYMENT POLICIES WHICH ADVERSELY AFFECT PREGNANT WORKERS ARE ALSO COVERED. THESE POLICIES INCLUDE: REFUSAL TO HIRE OR PROMOTE PREGNANT WOMEN; TERMINATION OF PREGNANT WOMEN; MANDATORY LEAVE FOR PREGNANT WOMEN ARBITRARILY ESTABLISHED AT A CERTAIN TIME DURING THEIR PREGNANCY AND NOT BASED ON THEIR INABILITY TO WORK; REINSTATEMENT RIGHTS, INCLUDING CREDIT FOR PREVIOUS SERVICE AND ACCRUED RETIREMENT BENEFITS; AND ACCUMULATED SENIORITY.

REGARDING SENIORITY, THE SUPREME COURT RECENTLY HELD IN THE SATTY CASE THAT DENYING SENIORITY TO ABSENT PREGNANT EMPLOYEES DURING LEAVES AS WELL AS DENYING COMPETITIVE SENIORITY FOR JOB BIDDING WHEN THEY RETURN, DOES IMPOSE A SUBSTANTIAL BURDEN ON WOMEN AND IS THEREFORE PROHIBITED BY TITLE VII.

ALTHOUGH RECENT ATTENTION HAS BEEN FOCUSED ON THE COVERAGE OF DISABILITY BENEFITS PROGRAMS, THE CONSEQUENCES OF OTHER DISCRIMINATORY EMPLOYMENT POLICIES ON PREGNANT WOMEN AND WOMEN IN GENERAL HAS HISTORICALLY HAD A PERSISTENT AND HARMFUL EFFECT UPON THEIR CAREERS. WOMEN ARE STILL SUBJECT TO THE STEREOTYPE THAT ALL WOMEN ARE MARGINAL WORKERS. UNTIL A WOMAN PASSES THE CHILD-BEARING AGE, SHE IS VIEWED **4755  *7 BY EMPLOYERS AS POTENTIALLY PREGNANT. THEREFORE, THE ELIMINATION OF DISCRIMINATION BASED ON PREGNANCY IN THESE EMPLOYMENT PRACTICES IN ADDITION TO DISABILITY AND MEDICAL BENEFITS WILL GO A LONG WAY TOWARD PROVIDING EQUAL EMPLOYMENT OPPORTUNITIES FOR WOMEN, THE GOAL OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   Addendum 006   6

D. NONAPPLICABILITY OF SECTION 703(H)

IN ADDITION TO MANDATING EQUAL TREATMENT FOR PREGNANT WORKERS, SECTION 1 OF THE BILL EXPRESSLY PROVIDES THAT 'NOTHING IN SECTION 703(H) SHALL BE INTERPRETED TO PERMIT OTHERWISE'. THIS DISCLAIMER WAS NECESSITATED BY THE SUPREME COURT'S RELIANCE IN THE GILBERT CASE ON SECTION 703(H) OF TITLE VII ('THE BENNETT AMENDMENT') WHICH IN EFFECT PROVIDES THAT CERTAIN PRACTICES AUTHORIZED BY THE EQUAL PAY ACT, 29 U.S.C. 206(D), DO NOT VIOLATE TITLE VII. THE COURT IN GILBERT NOTED THAT A REGULATION ISSUED UNDER THE EQUAL PAY ACT PROVIDES THAT CERTAIN GENDER-BASED DIFFERENTIATIONS DO NOT VIOLATE THE EQUAL PAY ACT. (SEE 29 C.F.R. 800.116(D). WHILE THE GILBERT OPINION IS SOMEWHAT VAGUE AS TO THE PERTINENCE OF THIS REGULATION, IT DOES APPEAR THAT THE COURT REGARDED THE BENNETT AMENDMENT AND THE EQUAL PAY ACT REGULATION, TAKEN TOGETHER, AS SOMEHOW INSULATING PREGNANCY-BASED CLASSIFICATIONS FROM THE PROSCRIPTIONS OF TITLE VII.

THEREFORE, THE COMMITTEE DETERMINED THAT IT WAS NECESSARY TO EXPRESSLY REMOVE THE BENNETT AMENDMENT FROM THE PREGNANCY ISSUE IN ORDER TO ASSURE THE EQUAL TREATMENT OF PREGNANT WORKERS.

E. ABORTION

BECAUSE THE BILL APPLIES TO ALL SITUATIONS IN WHICH WOMEN ARE 'AFFECTED BY PREGNANCY, CHILDBIRTH, AND RELATED MEDICAL CONDITIONS,' ITS BASIC LANGUAGE COVERS DECISIONS BY WOMEN WHO CHOSE TO TERMINATE THEIR PREGNANCIES. THUS, NO EMPLOYER MAY, FOR EXAMPLE, FIRE OR REFUSE TO HIRE A WOMAN SIMPLY BECAUSE SHE HAS EXERCISED HER RIGHT TO HAVE AN ABORTION.

MANY MEMBERS OF THE COMMITTEE WERE TROUBLED, HOWEVER, BY ANY IMPLICATION THAT AN EMPLOYER WOULD HAVE TO PAY FOR ABORTIONS NOT NECESSARY TO PRESERVE THE LIFE OF THE MOTHER THROUGH MEDICAL BENEFITS OR OTHER FRINGE BENEFIT PROGRAMS, EVEN IF THAT EMPLOYER-- A CHURCH ORGANIZATION FOR EXAMPLE-- HARBORED RELIGIOUS OR MORAL OBJECTIONS TO ABORTION; SUCH A REQUIREMENT, IT WAS FELT, COULD COMPROMISE THE RELIGIOUS FREEDOM OF SUCH EMPLOYERS. THE COMMITTEE, THEREFORE, AMENDED THE LANGUAGE OF THE BILL TO DEAL WITH THE PROBLEM, BY MAKING CLEAR THAT SUCH EMPLOYERS WILL NOT BE REQUIRED TO PAY FOR ABORTIONS EXCEPT WHERE THE LIFE OF THE MOTHER WOULD BE ENDANGERED IF THE FETUS WAS CARRIED TO TERM. AT THE SAME TIME, THE BILL AS AMENDED MAKES PLAIN THAT THERE IS NO INTENT TO ALTER THE EFFECT OF ANY OTHER LAWS, INCLUDING THE NATIONAL LABOR RELATIONS ACT, UPON THE QUESTION OF BENEFITS FOR ABORTION, OR TO FORBID EMPLOYERS TO PROVIDE SUCH BENEFITS IF THEY WISH TO.

FURTHER, THE EXCLUSION OF ABORTION BENEFITS FROM THE BILL IS INTENDED TO BE LIMITED TO BENEFITS FOR THE ABORTION ITSELF. IF A WOMAN SUFFERS COMPLICATIONS FROM AN ABORTION, MEDICAL PAYMENTS AND DISABILITY OR SICK LEAVE BENEFITS FOR THE TREATMENT OF THE COMPLICATIONS WOULD BE COVERED.

**4756 *8 2. TRANSITION PROVISIONS

AS THE GILBERT DECISION PERMITS EMPLOYERS TO EXCLUDE PREGNANCY-RELATED COVERAGE FROM EMPLOYEE BENEFIT PLANS, H.R. 6075 PROVIDES FOR TRANSITION PERIOD OF 180 DAYS TO ALLOW

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

EMPLOYEES TO COMPLY WITH THE EXPLICIT PROVISIONS OF THIS AMENDMENT. IT IS THE COMMITTEE'S INTENTION TO PROVIDE FOR AN ORDERLY AND EQUITABLE TRANSITION, WITH THE LEAST DISRUPTION FOR EMPLOYERS AND EMPLOYEES, CONSISTENT WITH THE PURPOSES OF THE BILL. SINCE THE BILL IS MERELY REESTABLISHING THE LAW AS IT WAS UNDERSTOOD PRIOR TO GILBERT BY THE EEOC AND BY THE LOWER COURTS AND AS IT NOW EXISTS IN MANY STATES, A PROTRACTED DELAY IN IMPLEMENTATION WOULD NOT BE APPROPRIATE. SIX MONTHS WAS SELECTED AS THAT PERIOD WHICH WOULD BE MORE THAN ADEQUATE TO PERMIT ORDERLY IMPLEMENTATION OF NEW COVERAGE AND WHICH WOULD ALSO RECOGNIZE THE PRESSING NEED TO MAKE NONDISCRIMINATORY COVERAGE MANDATORY AS SOON AS PRACTICABLE.

SECTION 2(A) PROVIDES FOR AN IMMEDIATE EFFECTIVE DATE INSOFAR AS THE BILL AFFECTS EMPLOYMENT POLICIES OTHER THAN FRINGE BENEFITS, INCLUDING REFUSING TO HIRE PREGNANT WOMEN, FIRING WOMEN WHO BECAME PREGNANT, DENYING SENIORITY, AND FORCING WOMEN TO TAKE MANDATORY MATERNITY LEAVE.

MANY, IF NOT ALL SUCH POLICIES, ARE PRESUMABLY INVALID UNDER PRESENT LAW AS INTERPRETED IN SATTY. FURTHER, SUCH POLICIES USUALLY DO NOT RESULT IN ANY COST-SAVING TO EMPLOYERS, AND ELIMINATING THEM WOULD NOT REQUIRE ANY ACTURIAL ADVICE OR SUBSTANTIAL ADMINISTRATIVE CHANGES. FINALLY, THESE POLICIES CAN HAVE LONG-TERM, RATHER THAN SHORT-TERM, EFFECTS ON WOMEN'S CAREERS, SO THEIR IMMEDIATE ELIMINATION IS VITAL.

SECTION 3 PROVIDES THAT EMPLOYERS WHO, ON THE DATE OF ENACTMENT, ARE IN VIOLATION OF THIS BILL AS TO FRINGE BENEFITS MAY NOT, IN ORDER TO COME INTO COMPLIANCE WITH THE ACT BY THE EFFECTIVE DATE PROVIDED BY SECTION 2(B), DECREASE BENEFITS OR COMPENSATION TO ANY EMPLOYEE WHO PAYS INSURANCE PREMIUMS, OR MAKES CONTRIBUTIONS TO A LABOR-MANAGEMENT JOINTLY TRUSTEED FRINGE BENEFIT FUND WHICH DOES NOT PROVIDE EQUAL COVERAGE AS THIS BILL WOULD REQUIRE, WOULD EITHER HAVE TO INCREASE PREMIUMS OR CONTRIBUTIONS SUFFICIENTLY TO COVER HIS/HER SHARE OF THE INCREMENTAL COST OF EQUAL BENEFITS FOR PREGNANT WOMEN, OR PAY EQUAL BENEFITS DIRECTLY TO AFFECTED WOMEN. HOWEVER, IF AN EMPLOYER NOW PAYS ONLY A PORTION OF THE COST OF INSURANCE OR OF THE TRUST FUND CONTRIBUTIONS, THE PREMIUMS OR CONTRIBUTIONS NEED ONLY BE INCREASED BY THAT SAME PORTION OF THE INCREMENTAL COST, AND EMPLOYEES GENERALLY (BUT NOT ONLY WOMEN, OR ONLY PREGNANT WOMEN) WOULD HAVE TO PAY THEIR USUAL PORTION OF THE INCREMENT.

SECTION 3 ALSO RECOGNIZES THAT THERE ARE MANY REASONS WHY EMPLOYEE FRINGE BENEFITS PROGRAMS ARE ALTERED IN A WAY WHICH COULD REDUCE BENEFITS TO SOME EMPLOYEES. FOR EXAMPLE, DECISIONS TO CHANGE INSURANCE CARRIERS MAY LEAD TO ALTERATIONS IN A PLAN DETRIMENTAL TO SOME INDIVIDUALS SIMPLY BECAUSE ONE COMPANY OFFERS A DIFFERENT PACKAGE THAN ANOTHER AT THE SAME COST. THIS BILL WOULD NOT FREEZE BENEFIT PLANS IN EXISTENCE WHEN IT IS ENACTED, BUT WOULD ALLOW ALL CHANGES WHICH THE EMPLOYER CAN DEMONSTRATE ARE FOR REASONS ENTIRELY INDEPENDENT OF THIS BILL.

**4757   *9  THIS LIMITATION IN H.R. 6075 ON AN EMPLOYER'S ABILITY TO REDUCE BENEFITS FOR PURPOSES OF COMPLIANCE IS NOT NOVEL. THE EQUAL PAY ACT EXPRESSLY PROVIDES THAT

* * * AN EMPLOYER WHO IS PAYING A WAGE RATE DIFFERENTIAL IN VIOLATION OF THIS SUBSECTION SHALL NOT, IN ORDER TO COMPLY WITH THE PROVISIONS OF THIS SUBSECTION, REDUCE THE WAGE RATE OF ANY EMPLOYEE. 29 U.S.C. 206(D)(1).

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Addendum 008

IT MUST BE EMPHASIZED IN THIS REGARD THAT THE ONE YEAR LIMITATION IN H.R. 6075 MUST NOT BE CONSTRUED AS PERMISSION FOR EMPLOYERS WHO DO NOT COMPLY IMMEDIATELY TO REDUCE BENEFITS BECAUSE OF THE BILL SIMPLY BECAUSE THE TIME LIMIT HAS RUN.

SECTION 3 DOES NOT LIMIT THE REMEDIAL DESCRETION OF COURTS WHEN CASES ARE BROUGHT ALLEGING NONCOMPLIANCE WITH SECTION 1 AS INCORPORATED IN TITLE VII AFTER THE BILL IS EFFECTIVE. RATHER, ORDINARY TITLE VII REMEDIAL PRINCIPLES THEN WOULD APPLY. IN ALL OF THE PRE-GILBERT PREGNANCY CASES, FOR EXAMPLE, THIS ALWAYS MEANT REQUIRING THE EMPLOYER TO PAY THE WOMEN DISCRIMINATED AGAINST MORE, RATHER THAN PAYING THE OTHER EMPLOYEES LESS.

COST ESTIMATE: IMPACT OF LEGISLATION

NO ADDITIONAL COST TO THE GOVERNMENT WILL BE INCURRED AS A RESULT OF ENACTMENT OF THIS BILL. COST ESTIMATES WERE PROVIDED TO THE COMMITTEE BY A NUMBER OF SOURCES, PUBLIC AND PRIVATE, BY SUPPORTERS AND OPPONENTS OF THE BILL. THE BILL WILL INCREASE EMPLOYER COSTS IN TWO AREAS: DISABILITY INSURANCE AND HEALTH INSURANCE. WITH RESPECT TO DISABILITY INSURANCE, IT IS POSSIBLE TO PREDICT THE COST WITH A FAIRLY SUBSTANTIAL DEGREE OF RELIABILITY; HEALTH INSURANCE COSTS HAVE PROVED FAR MORE DIFFICULT TO PREDICT, FOR REASONS WHICH WILL BE EXPLAINED BELOW.

1. DISABILITY BENEFITS

THE COST ESTIMATES FOR DISABILITY INSURANCE RANGED FROM A LOW OF $130 MILLION (AFL-CIO) TO A HIGH OF $571 MILLION (HEALTH INSURANCE ASSOCIATION OF AMERICA). HOWEVER, THE COMMITTEE BELIEVES THE LABOR DEPARTMENT'S $191.5 MILLION ESTIMATE IS THE BEST AVAILABLE ESTIMATE. THE LABOR DEPARTMENT'S FIGURES ASSUME AN AVERAGE DISABILITY DURATION OF SEVEN AND ONE HALF WEEKS, AN AVERAGE WEEKLY BENEFIT AMOUNT OF $80, AND A BIRTH RATE OF 66.7 BIRTHS PER 1,000 WOMEN 15 TO 44 YEARS OF AGE. FURTHER, DOL TOOK INTO ACCOUNT MORE PRECISELY THAN THE OTHERS THE PERCENTAGE OF WORKING WOMEN WHO WOULD BENEFIT FROM THE BILL. MOST SIGNIFICANTLY, DOL'S FINAL ESTIMATE DOES NOT INCLUDE WORKERS ALREADY COVERED FOR PREGNANCY, DISABILITY (EITHER BECAUSE OF STATE LAW REQUIREMENTS OR BECAUSE THEIR EMPLOYERS HAVE CHOSEN TO PROVIDE SUCH COVERAGE), A FACTOR ALL OF THE HIGHER ESTIMATES FAIL TO TAKE INTO ACCOUNT. A DETAILED EXPLANATION OF THE DOL ESTIMATE APPEARS ON PAGE 180 OF THE RECORD OF HEARINGS BEFORE THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES OF THE COMMITTEE ON EDUCATION AND LABOR, ON H.R. 5055 AND H.R. 6075 (APRIL 6, 1977).

TRANSLATING ITS NATIONAL TOTAL ESTIMATE TO COST INCREASE PER EMPLOYEE, DOL CONCLUDES:

**4758  *10  WE ESTIMATE THAT THE COST INCREASE OF H.R. 6075 WILL AMOUNT TO TWENTY CENTS PER WEEK PER WORKER, FOR EMPLOYEES NOW COVERED UNDER A TDI PLAN WHICH EXCLUDES PREGNANCY. THERE WILL BE A COST INCREASE OF FOUR CENTS PER WEEK PER WORKER FOR EMPLOYEES NOW COVERED UNDER TDI PLANS WHICH PROVIDE LIMITED PREGNANCY DISABILITY BENEFITS. THE DEPARTMENT'S ESTIMATE OF THE TOTAL COST INCREASES (INCLUDING ADMINISTRATIVE COSTS) IS $191.5 MILLION, OR ONLY 3.5 PERCENT OF TOTAL CONTRIBUTIONS REQUIRED. THESE TOTAL DOLLAR AMOUNTS ARE RELEVANT ONLY WHEN COMPARED TO CONTRIBUTIONS, NUMBER OF WORKERS, OR TOTAL PAYROLL. WE BELIEVE IT IS ALSO ESSENTIAL TO NOTE THAT TEMPORARY DISABILITY INSURANCE CONTRIBUTIONS REPRESENT 1.4 PERCENT OF THE WAGE PACKAGE FOR COVERED WORKERS IN PRIVATE INDUSTRY AND

H.R. 6075 WILL INCREASE THAT PERCENTAGE ONLY TO 1.50 PERCENT. THIS TOTAL AMOUNTS TO ONLY 1 1/2 CENTS PER DOLLAR OF WAGES.

GENERALLY, IT IS NOT ANTICIPATED THAT DISABILITY BENEFIT COSTS WILL RISE SUBSTANTIALLY. FOR INSTANCE, CALIFORNIA'S DISABILITY INSURANCE PROGRAM FOR PREGNANT WOMEN, ENACTED IN 1976, AND PROVIDING FOR BENEFITS FOR 3 WEEKS PRIOR TO DELIVERY AND 3 WEEKS AFTER, HAS GIVEN THE STATE A $52 MILLION SURPLUS.

CALIFORNIA'S EXPERIENCE SHOWS THAT ONLY $13.2 MILLION IN BENEFITS WERE CLAIMED IN 1977 ALTHOUGH PAYROLL TAXES TO PAY FOR THE PROGRAM RAISED $65.3 MILLION. ONLY 40,708 CLAIMS WERE FILED FOR BENEFITS INSTEAD OF 115,000 EXPECTED AND THE AVERAGE BENEFIT PAID TO WOMEN WAS LESS THAN PREDICTED.

## 2. HEALTH INSURANCE

WITNESSES WHO TESTIFIED BEFORE THE SUBCOMMITTEE WERE UNABLE TO PRODUCE RELIABLE COST ESTIMATES FOR HEALTH INSURANCE. THERE ARE SEVERAL REASONS FOR THIS: FIRST, BECAUSE OF THE UNAVAILABILITY OF SUFFICIENT DATA, THEY WERE UNABLE TO ESTIMATE THE COSTS WHICH MIGHT BE INCURRED UNDER MEDICAL BENEFIT PLANS UNDER THIS LEGISLATION. SECONDLY, MATERNITY HOSPITAL COSTS AND DELIVERY COSTS WHICH VARY WIDELY THROUGHOUT THE UNITED STATES WOULD HAVE TO BE OBTAINED. FINALLY, EXISTING HEALTH PLANS VARY IN THEIR TREATMENT OF PREGNANCY AS WELL AS OTHER CONDITIONS, MAKING IT DIFFICULT TO SUPPORT COST ESTIMATES.

THE COST OF THIS LEGISLATION WOULD NOT INCLUDE THE PROVISION OF MEDICAL BENEFITS FOR MATERNITY IN STATES, SUCH AS NEW YORK, WHERE INSURANCE FOR MATERNITY IS MANDATORY UNDER STATE LAW. NOR WOULD THE COST OF THIS LEGISLATION INCLUDE ADJUSTMENTS TO PROVIDE NONDISCRIMINATORY COVERAGE OF MEDICAL CONDITIONS RELATED TO PREGNANCY WHERE NONDISCRIMINATION IS ALREADY MANDATED BY STATE LAW.

## STATE TREATMENT OF PREGNANCY

THE REQUIREMENT OF FRINGE BENEFIT COVERAGE OF WORKERS DISABLED BY PREGNANCY AND RELATED CONDITIONS TAKES TWO BASIC FORMS UNDER STATE LAW: (1) A PROVISION FOR COVERAGE IN SOME FORM UNDER A STATE DISABILITY INSURANCE LAW OF (2) A REQUIREMENT OF EQUAL TREATMENT OF PREGNANT WORKERS UNDER A STATE FAIR EMPLOYMENT PRACTICES LAW. THE REQUIREMENTS IN (2) ARE IN SOME STATES EXPLICITLY SET FORTH IN THE STATE FEP LAW OR IN OTHER STATES MAY RESULT FROM AGENCY INTERPRETATIONS (EITHER **4759  *11** IN REGULATIONS OR AGENCY OPINIONS) OR STATE COURT DECISIONS. AT LEAST 22 STATES, INCLUDING THE MOST POPULOUS STATES, NOW MANDATE SOME FORM OF PREGNANCY DISABILITY COVERAGE THROUGH ONE OF THE MECHANISMS DESCRIBED ABOVE. THE SIGNIFICANCE OF THIS STATE COVERAGE FOR H.R. 6075 IS MANIFOLD: FIRST, MANY EMPLOYERS ARE ALREADY UNDER A STATE LAW OBLIGATION TO PROVIDE BENEFITS TO PREGNANT DISABLED WORKERS. PASSAGE OF THE BILL THUS HAS LITTLE OR NO ECONOMIC IMPACT ON SUCH EMPLOYERS. SECOND, EMPLOYERS WHO OPERATE IN SEVERAL STATES FACE DIFFERENT REQUIREMENTS DEPENDING ON THE STATE; LIKEWISE, THE RIGHTS OF PREGNANT EMPLOYEES DEPEND ON THE LAWS OF THE STATE IN WHICH THEY ARE EMPLOYED.

THE FOLLOWING SIX STATES, AS WELL AS THE DISTRICT OF COLUMBIA, SPECIFICALLY INCLUDE PREGNANCY IN THEIR FAIR EMPLOYMENT PRACTICES LAWS: ALASKA, CONNECTICUT, MARYLAND, MINNESOTA, OREGON, AND MONTANA.

TWELVE ADDITIONAL STATES HAVE, SINCE GILBERT INTERPRETED THE PROHIBITIONS ON SEX DISCRIMINATION IN THE STATE'S FEP LAWS TO REQUIRE EQUAL TREATMENT OF PREGNANT WORKERS. IN THREE INSTANCES, STATE COURTS HAVE SO INTERPRETED THE STATE FEP LAWS (NEW YORK, PENNSYLVANIA, WISCONSIN); IN AT LEAST NINE ADDITIONAL STATES, THE STATE ENFORCEMENT AGENCY HAS SO CONSTRUED THE STATE LAW. THOSE STATES ARE: ILLINOIS, INDIANA, IOWA, KANSAS, MASSACHUSETTS, MICHIGAN, MISSOURI, SOUTH DAKOTA, AND WASHINGTON.

OTHER STATE FEP LAWS MAY BE SO INTERPRETED IN THE FUTURE. NONE OF THE STATE LAWS WHICH REQUIRE COVERAGE OF PREGNANCY IN DISABILITY BENEFIT PROGRAMS HAS AN ABORTION EXCEPTION. SPECIFICALLY, THE FOLLOWING EIGHT STATES REQUIRE COVERAGE OF ABORTION: HAWAII, KANSAS, MASSACHUSETTS, NEW JERSEY, NEW YORK, PENNSYLVANIA, RHODE ISLAND AND WISCONSIN.

FINALLY, FIVE STATES HAVE TEMPORARY DISABILITY LAWS UNDER WHICH EMPLOYEES OF PRIVATE EMPLOYERS ARE ASSURED PARTIAL WAGE REPLACEMENT IF THEY BECOME TEMPORARILY DISABLED. EACH OF THOSE FIVE STATES REQUIRES COVERAGE OF DISABILITIES ARISING FROM PREGNANCY, ALTHOUGH THE EXTENT OF COVERAGE VARIES. THOSE STATES, AND THE TYPE OF COVERAGE REQUIRED, ARE AS FOLLOWS:

CALIFORNIA

COVERAGE FOR COMPLICATIONS OF PREGNANCY AND CHILDBIRTH ON SAME BASIS AS OTHER DISABILITIES. DISABILITY ASSOCIATED WITH NORMAL CHILDBIRTH-MAXIMUM COVERAGE OF THREE WEEKS BEFORE AND THREE WEEKS AFTER CHILDBIRTH.

HAWAII

PREGNANCY-RELATED DISABILITIES TREATED LIKE ALL OTHER DISABILITIES.

NEW JERSEY

COVERAGE FOR COMPLICATIONS OF PREGNANCY AND CHILDBIRTH ON SAME BASIS AS OTHER DISABILITIES. DISABILITY ASSOCIATED WITH NORMAL CHILDBIRTH-- MAXIMUM COVERAGE OF FOUR WEEKS BEFORE AND FOUR WEEKS AFTER CHILDBIRTH.

NEW YORK

SAME AS CALIFORNIA AND NEW JERSEY. EIGHT WEEK LIMIT ON BENEFITS FOR DISABILITIES ARISING FROM NORMAL (UNCOMPLICATED) CHILDBIRTH.

RHODE ISLAND

$250 MAXIMUM FOR PREGNANCY-RELATED DISABILITIES.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

IN RESPONSE TO A REQUEST SUBMITTED BY CHAIRMAN HAWKINS OF THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES, THE CONGRESSIONAL **4760 *12 BUDGET OFFICE COMPLETED A COST ASSESSMENT OF H.R. 6075, RESULTING IN THE ISSUANCE OF THE FOLLOWING CORRESPONDENCE:

CONGRESSIONAL BUDGET OFFICE,

U.S. CONGRESS,

WASHINGTON, D.C., FEBRUARY 15, 1978.

HON. AUGUSTUS F. HAWKINS,

CHAIRMAN, SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES, COMMITTEE ON EDUCATION AND LABOR, U.S. HOUSE OF REPRESENTATIVES, WASHINGTON, D.C.

DEAR MR. CHAIRMAN: PURSUANT TO SECTION 403 OF THE CONGRESSIONAL BUDGET ACT OF 1974, THE CONGRESSIONAL BUDGET OFFICE HAS REVIEWED H.R. 6075, A BILL TO AMEND TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 TO PROHIBIT SEX DISCRIMINATION ON THE BASIS OF PREGNANCY, AS ORDERED REPORTED BY THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES, FEBRUARY 2, 1978.

BASED ON THIS REVIEW, IT APPEARS THAT NO ADDITIONAL COST TO THE GOVERNMENT WOULD BE INCURRED AS A RESULT OF ENACTMENT OF THIS BILL.

SINCERELY,

ROBERT A. LEVINE,

(FOR ALICE M. RIBLIN, DIRECTOR).

THE COMMITTEE CONCURS WITH THE COST ESTIMATE OF THE CONGRESSIONAL BUDGET OFFICE.

INFLATION IMPACT

IN COMPLIANCE WITH CLAUSE (2)(1)(4) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES, THE COMMITTEE ESTIMATES THAT THE INFLATIONARY IMPACT OF THE BILL WILL NOT BE SIGNIFICANT.

THE BILL CONTEMPLATES NO GOVERNMENT SPENDING, AND THE PRIVATE SECTOR COSTS ASSOCIATED WITH THE EXPANSION OF FRINGE BENEFIT COVERAGE OCCASIONED BY THIS LEGISLATION OVER THAT CURRENTLY PROVIDED WILL BE OF RELATIVELY SMALL CONSEQUENCE (E.G., THE DEPARTMENT OF LABOR HAS STATED THAT 'TEMPORARY DISABILITY INSURANCE CONTRIBUTIONS REPRESENT ONLY 1.4 PERCENT OF THE WAGE PACKAGE FOR COVERED WORKERS IN PRIVATE INDUSTRY AND H.R. 6075 WILL INCREASE THAT PERCENTAGE ONLY TO 1.50 PERCENT.' [2]

BECAUSE THIS BILL WILL ENCOURAGE WOMEN TO REMAIN IN THE WORK FORCE DURING AND AFTER PREGNANCY, IT SHOULD OPERATE TO REDUCE EMPLOYEE REPLACEMENT, RETRAINING

AND UNEMPLOYMENT COMPENSATION COSTS WHILE INCREASING LABOR MARKET STABILITY AND PRODUCTIVITY.

## OVERSIGHT

IN COMPLIANCE WITH CLAUSE 2(1)(3)(D) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES, THE COMMITTEE STATES THAT NO OVERSIGHT FINDINGS OR RECOMMENDATIONS OF THE COMMITTEE ON GOVERNMENT OPERATIONS WERE SUBMITTED TO THE COMMITTEE. THE COMMITTEE HAS MADE NO OVERSIGHT FINDINGS WITH RESPECT TO THE PREGNANCY DISABILITY ISSUE DURING THIS SESSION OF CONGRESS.

## **4761  *13  SECTION-BY-SECTION ANALYSIS

### SECTION 1

THIS SECTION AMENDS SECTION 701 OF THE CIVIL RIGHTS ACT OF 1964 BY ADDING A NEW SUBSECTION 701(K) WHICH BROADENS THE DEFINITION OF SEX DISCRIMINATION IN THE ACT TO INCLUDE DISCRIMINATION ON THE BASIS OF PREGNANCY, CHILDBIRTH OR RELATED MEDICAL CONDITIONS. IT ALSO MAKES CLEAR THAT FRINGE BENEFIT PROGRAMS MUST TREAT WOMEN AFFECTED BY THOSE CONDITIONS EQUALLY TO OTHER EMPLOYEES ON THE BASIS OF THEIR ABILITY OR INABILITY TO WORK, EXCEPT IN REGARD TO BENEFITS FOR ABORTIONS NOT NECESSARY TO PRESERVE THE LIFE OF THE MOTHER; AND THAT NOTHING IN SECTION 703(H) OF THE ACT MAY BE INTERPRETED TO PERMIT OTHERWISE.

### SEC. 2

SECTION 2(A) OF THIS SECTION OF THE BILL SPECIFIES AN IMMEDIATE EFFECTIVE DATE FOR THE PROHIBITION OF DISCRIMINATION ON THE BASIS OF PREGNANCY, CHILDBIRTH OR RELATED MEDICAL CONDITIONS, EXCEPT AS PROVIDED IN SECTION 2(B). SECTION 2(B) SPECIFIES AN EFFECTIVE DATE 180 DAYS AFTER THE DATE OF ENACTMENT FOR THE RECEIPT OF EQUAL BENEFITS UNDER FRINGE BENEFIT PROGRAMS.

### SEC. 3

PROHIBITS THE REDUCTION OF BENEFITS AS A MEANS OF COMPLIANCE WITH THE ACT AT LEAST FOR A PERIOD OF 1 YEAR AFTER THE DATE OF ENACTMENT, OR UNTIL THE EXPIRATION OF ANY APPLICABLE COLLECTIVE BARGAINING AGREEMENT. HOWEVER, IT ALSO MAKES CLEAR THE FACT THAT THE COST OF INCREASING BENEFITS MAY BE APPORTIONED BETWEEN EMPLOYERS AND EMPLOYEES, IF PRESENT COSTS ARE APPORTIONED, AND THAT BENEFITS MAY BE REDUCED AT ANY TIME IF THE EMPLOYER CAN SHOW REASONS OTHER THAN COMPLIANCE WITH THIS LEGISLATION.

\* \* \* \*

### *15  DISSENTING VIEWS OF MR. WEISS

THE ORIGINAL CONCEPT OF THIS LEGISLATION WAS TO PROVIDE A LEGISLATIVE REMEDY FOR AN ADVERSE SUPREME COURT RULING WHICH SAID THAT WOMEN WORKERS WHO BECAME PREGNANT DID NOT HAVE TO BE COVERED BY DISABILITY PLANS. H.R. 6075, AS ORIGINALLY PROPOSED, IS AN

AMENDMENT TO THE CIVIL RIGHTS ACT OF 1965; ITS PURPOSE BEING TO INSURE EQUAL TREATMENT OF WOMEN IN EMPLOYMENT-RELATED MATTERS.

IN APPENDING AN ANTI-ABORTION RIDER TO THIS LEGISLATION, THE COMMITTEE HAS BEEN DIVERTED FROM THE ORIGINAL PURPOSE OF PROTECTING THE RIGHTS OF WOMEN EMPLOYEES TO PROTECTING THE RIGHTS OF THEIR EMPLOYERS. I VOTED AGAINST THE BILL AS REPORTED WITH THE ANTI-ABORTION LANGUAGE BECAUSE IT ADDS A NEW FORM OF DISCRIMINATION IN PLACE OF THE ONE IT SEEKS TO ELIMINATE.

ANTI-ABORTION LANGUAGE WILL NOT PROTECT EMPLOYERS: IT WILL MAKE THEM TARGETS

THERE IS A GREAT IRONY ABOUT THE DECISION OF THE COMMITTEE. EVERY MEMBER KNOWS THAT EMPLOYERS AND THEIR REPRESENTATIVES ARE QUITE CAPABLE OF PRESENTING THEIR VIEWS ON ISSUES WHICH COME BEFORE US; DURING THE COURSE OF THE 95TH CONGRESS, EVERY MEMBER OF THE COMMITTEE HAS RECEIVED LITERALLY THOUSANDS OF PIECES OF CORRESPONDENCE **4762 CONCERNING SUCH ISSUES AS COMMON SITUS PICKETING, MINIMUM WAGE, AND LABOR LAW REFORM, TO NAME JUST A FEW. YET NOT ONE EMPLOYER WHO ALLEGEDLY WOULD BE PROTECTED BY THE ANTI-ABORTION PROVISION HAS COME FORWARD TO PROMOTE IT.

IT IS LOGICAL TO ASK, WHY? BECAUSE THIS AMENDMENT WILL NOT PROTECT EMPLOYERS; IT WILL TURN THE FOCUS OF THE BATTLE OVER ABORTION DIRECTLY ON TO THEM. I AM SURE THAT THERE WILL BE ATTEMPTS BY THE OPPONENTS OF ABORTION COVERAGE TO HAVE MAJOR CORPORATIONS ELIMINATE SUCH COVERAGE IN THEIR BENEFIT PLANS; LIKEWISE, SMALLER BUSINESSES WILL BE SUBJECT TO PRESSURE TO ALTER THEIR BENEFITS PACKAGES. I AM SURE THAT NEITHER EMPLOYERS NOT LABOR UNIONS BARGAINING COLLECTIVELY WITH THEM WILL BE PLEASED BY SUCH A PROSPECT.

UNEQUAL TREATMENT OF WOMEN WILL CONTINUE: EARNED BENEFITS MAY BE DENIED THEM

WHILE EXPOSING EMPLOYERS TO NEW-- AND UNEXPECTED-- PRESSURES, THE ANTI-ABORTION PROVISION WILL PERPETUATE UNEQUAL TREATMENT FOR WOMEN WORKERS. HEALTH BENEFITS ARE NOT GIFTS OF THE EMPLOYER TO THE EMPLOYEE; LIKE WAGES AND OTHER FRINGE BENEFITS, THEY ARE EARNED. IN MANY CASES, EMPLOYEES ARE CONTRIBUTING TO THEIR HEALTH BENEFIT PLANS; ACCORDING TO FIGURES MADE AVAILABLE BY THE SOCIAL SECURITY ADMINISTRATION, ONE-THIRD OF ALL HEALTH PLANS ARE CONTRIBUTED TO SOLELY OR IN PART BY EMPLOYEES. THE DISCRIMINATORY ASPECT OF THE ANTI-ABORTION LANGUAGE IS OBVIOUS: MALE EMPLOYEES-- REGARDLESS OF WHETHER THEY HAVE CONTRIBUTED *16 TO THEIR HEALTH PLANS OR NOT-- WOULD BE COVERED FOR ALL SURGICAL PROCEDURES; FEMALE EMPLOYEES-- EVEN IF THERE IS NO EMPLOYER CONTRIBUTION-- WOULD BE SUBJECT TO EMPLOYER DISCRETION CONCERNING COVERAGE FOR ABORTION. THE DISCRIMINATORY ASPECT COULD NOT BE MORE BLATANT.

THE COMMITTEE'S ACTION EFFECTS HEALTH INSURANCE
PLANS WITHOUT KNOWING HOW THEY OPERATE

UNLIKE THE ISSUE OF PREGNANCY DISABILITY, THE ABORTION EXCLUSION HAS NOT BEEN ADOPTED WITH ANY UNDERSTANDING OF CURRENT HEALTH INSURANCE PRACTICES. THERE ARE 51,600 DIFFERENT HEALTH INSURANCE PLANS AVAILABLE TO 58.2 MILLION AMERICANS IN THE PRIVATE SECTOR WHO CONTRIBUTE SOME $27.1 BILLION FOR COVERAGE. FIFTY-FIVE PERCENT OF THESE PLANS ARE NEGOTIATED; 45 PERCENT ARE NOT.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ABORTION COVERAGE IS NOW COMMON

ACCORDING TO THE NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS. AND THE HEALTH INSURANCE ASSOCIATION OF AMERICA, ABORTION COVERAGE IS NOW COMMON IN MOST HEALTH INSURANCE PLANS. SPOKESMEN FOR THESE REPRESENTATIVES OF THE INDUSTRY INDICATED TO MEMBERS OF MY STAFF THAT CURRENTLY THERE IS NO BAN ON SPECIFIC SURGICAL PROCEDURES EITHER BY LAW OR REGULATION REGARDING PRIVATE INSURANCE COVERAGE.

FINANCIAL CONTRIBUTION OF EMPLOYERS IS 'INSIGNIFICANT'

I KNOW THAT ONE OF THE CONCERNS OF THE MEMBERS OF THE COMMITTEE WHO APPROVED THE ABORTION EXCLUSION WAS THE FEAR THAT SOME EMPLOYERS WOULD BE FORCED TO MAKE GREAT FINANCIAL CONTRIBUTIONS TO ABORTION **4763 SERVICES IF THE AMENDMENT HAD NOT BEEN ADOPTED. INDUSTRY REPRESENTATIVES HAVE STATED TO MY OFFICE THAT THERE ARE NO INDUSTRYWIDE STATISTICS ON ABORTION, BUT ADDED THAT ABORTION AS A PROCEDURE AFFECTING INSURANCE PREMIUMS IS 'INSIGNIFICANT.'

ALSO, INSURANCE INDUSTRY REPRESENTATIVES WERE UNABLE TO PREDICT THAT PRECLUDING ABORTIONS WOULD RESULT IN A LOWERING OF PREMIUMS TO EMPLOYERS; THEY WERE NOT ABLE TO SPECULATE AS TO WHAT PERCENTAGE OF THE AVERAGE HEALTH PLAN PREMIUM WOULD BE APPLIED FOR ABORTION SERVICES. AGAIN, THEY DID SAY IT WOULD BE INSIGNIFICANT.

MOST LIKELY RESULT OF THE ANTIABORTION AMENDMENT:
NO CHANGE IN PREMIUMS AND A LOSS OF COVERAGE

AS A RESULT OF THE ADOPTION OF THIS AMENDMENT, WE MAY FIND OURSELVES IN A SITUATION WHERE THERE IS NO CHANGE IN THE EMPLOYER'S CONTRIBUTION FOR HEALTH BENEFITS, BUT BENEFITS WHICH ARE EARNED BY WOMEN AND WHICH THEY CURRENTLY HAVE WOULD BE ELIMINATED.

RELIGIOUS INSTITUTIONS ARE PROTECTED

THE OTHER MAJOR CONCERN OF MANY MEMBERS OF THE COMMITTEE IS WHETHER RELIGIOUS INSTITUTIONS WOULD BE FORCED TO PROVIDE ABORTION COVERAGE BY VIRTUE OF THIS LEGISLATION. THEY WOULD NOT. SENATOR JACOB JAVITS, IN HIS PRESENTATION BEFORE THE SENATE, STATED THAT IT WAS NOT THE INTENTION NOR DESIGN OF THE SPONSORS OF THIS LEGISLATION TO INTERFERE WITH THE FIRST AMENDMENT RIGHTS OF A CHURCH WHICH HAS A RELIGIOUS *17 TENET RESPECTING ABORTION; THE CHURCH'S POSITION, ACCORDING TO SENATOR JAVITS, IS PROTECTED UNDER THE FIRST AMENDMENT.

ALSO, AS WE KNOW, SECTION 702 OF THE CIVIL RIGHTS ACT, ALLOWS RELIGIOUS INSTITUTIONS TO HIRE SOLELY MEMBERS OF THEIR OWN FAITH. IT IS DOUBTFUL THAT AN EMPLOYEE-MEMBER OF A CHURCH WHICH PROHIBITS ABORTIONS WOULD SEEK ABORTION COVERAGE FROM THE CHURCH. INDEED, THERE HAS NEVER BEEN A COURT CASE CONCERNING FAILURE TO COVER ABORTIONS BY EITHER A SECULAR OR RELIGIOUS INSTITUTION.

STATES HAVE PROMOTED SIMILAR LEGISLATION WITHOUT EXCLUSIONS

THE STATES HAVE TAKEN AN ACTIVE ROLE CONCERNING PREGNANCY DISABILITY LEGISLATION. HALF THE STATES NOW INTERPRET THEIR FAIR EMPLOYMENT PRACTICES LEGISLATION TO PROHIBIT SEX DISCRIMINATION ON THE BASIS OF PREGNANCY AND CHILD BIRTH. CONNECTICUT AND MINNESOTA HAVE RECENTLY ADOPTED LEGISLATION BASED ON THE UNAMENDED VERSION OF H.R. 6075. NOT ONE STATE HAS ANTI-ABORTION LANGUAGE IN ITS LAWS CONCERNING PREGNANCY DISABILITY AND IN NOT ONE STATE IS THERE LEGISLATIVE ACTIVITY TO INCLUDE SUCH A BAN.

SUPPORT FOR AN UNAMENDED BILL COMES FROM BOTH SIDES OF THE ABORTION DISCUSSION

THE VERY NATURE OF THIS BILL-- UNAMENDED-- IS TO HELP WOMEN CARRY THEIR PREGNANCIES TO TERM. IN ITS ORIGINAL FORM, THE LEGISLATION WAS SUPPORTED BY A DIVERSE COALITION OF PRO-LIFE, LABOR, AND WOMEN'S ORGANIZATIONS. MANY OF THESE GROUPS BELIEVE THAT AN ABORTION PROVISION IS UNNECESSARY IN THIS LEGISLATION.

**4764 DURING THE JUNE 29, 1977, HEARING WHICH THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES CONDUCTED, DR. DOROTHY CZARNECKI, A REPRESENTATIVE OF THE AMERICAN CITIZENS CONCERNED FOR LIFE, OF PHILADELPHIA, PA., RESPONDED IN THE FOLLOWING MANNER WHEN I ASKED HER IF THIS LEGISLATION, H.R. 6075, INCREASES THE LIKELIHOOD OF ABORTION:

DR. CZARNECKI. THIS LEGISLATION WOULD SAVE BABIES IN MY OPINION. IT WOULD ENCOURAGE A WOMAN TO KEEP A PREGNANCY OR DO WHAT SHE WANTS. IT GIVES THE WOMAN A CHOICE.

IN FURTHER QUESTIONING, I ASKED:

IN THE EVENT A FEMALE EMPLOYEE DECIDES TO ABORT A PREGNANCY, DO YOU THINK THAT THE EMPLOYEE SHOULD BE DENIED MEDICAL COVERAGE AND DISABILITY FROM COMPLICATIONS RESULTING FROM THE MEDICAL PROCEDURE?

DR. CZARNECKI. I FEEL WE SHOULD TREAT THIS AS A CONDITION, PERIOD.

THE LIST OF SUPPORTERS FOR THIS LEGISLATION WITHOUT AN ABORTION AMENDMENT IS ENDLESS; IT INCLUDES MANY GROUPS WITH WHOM ALL OF US WORK REGULARLY:

AFL-CIO.

AFSCME.

LEADERSHIP CONFERENCE ON CIVIL RIGHTS.

NEA.

LEAGUE OF WOMEN VOTERS.

UNITED AUTO WORKERS.

UNITED STEEL WORKERS.

INTERNATIONAL LADIES GARMENT WORKERS UNION.

COALITION OF LABOR UNION WOMEN.

AMERICAN ASSOCIATION OF UNIVERSITY WOMEN.

**\*18**  ONE GROUP, ALONE, LOBBIED FOR THE AMENDMENT

THE ONLY GROUP WHICH ACTIVELY CAME FORWARD TO PROMOTE THE ANTI-ABORTION PROVISION WAS THE UNITED STATES CATHOLIC CONFERENCE, THE CONFERENCE OF BISHOPS, AND NEVER AT A PUBLIC HEARING. IN FACT, THERE IS NOT A SINGLE WORD OF TESTIMONY ON THE RECORD SUPPORTING THE ANTI-ABORTION AMENDMENT IN THIS BILL.

PREGNANCY DISABILITY COVERAGE FACES AN UNCERTAIN FUTURE AS
A RESULT OF THE ANTI-ABORTION LANGUAGE: WOMEN WILL SUFFER

DURING THE COURSE OF THE 95TH CONGRESS, THE MEMBERS OF CONGRESS HAVE HAD 11 OPPORTUNITIES TO MAKE THEIR POSITION KNOWN ON THE ISSUE OF FEDERAL FUNDING OF ABORTION; UNLIKE THE HYDE AMENDMENT, THIS LEGISLATION, UNAMENDED, DOES NOT INVOLVE PUBLIC SUBSIDIZATION OF ABORTION.

WE ARE NOW FACED WITH THE PROSPECT THAT PREGNANCY DISABILITY LEGISLATION WILL NOT BE ENACTED THIS YEAR AS A RESULT OF THE FEARS OF THE MEMBERS OF THIS COMMITTEE. THE SENATE HAS VOTED NOT TO APPEND AN ANTI-ABORTION RIDER TO THEIR VERSION OF THIS LEGISLATION; OUR 5-MONTH BATTLE OVER THE HYDE AMENDMENT WHICH STALLED THE LABOR-HEW APPROPRIATIONS WILL LIKELY BE REPEATED. AS A RESULT, WOMEN, WHOSE RIGHTS WE HAVE SOUGHT TO PROTECT, WILL SUFFER.

FINALLY, THE MEMBERS OF CONGRESS MUST REALIZE THAT AS A RESULT OF AMENDING H.R. 6075 WITH AN ABORTION PROHIBITION, WE MUST PREPARE OURSELVES FOR A LEGISLATIVE AGENDA WHICH WILL REQUIRE OUR VOTING ON ABORTION AT EVERY TURN. IF THIS LEGISLATION, WHICH CAN BE CONSIDERED **\*\*4765**  NOTHING BUT 'PRO-LIFE,' MUST BE AMENDED BY THOSE WHO OPPOSE ABORTION, NO BILL WHICH COMES BEFORE THE HOUSE OF REPRESENTATIVES CAN BE INSURED OF FREEDOM FROM SUCH AN AMENDMENT.

THE CROWNING IRONY IS THAT THE ANTI-ABORTION AMENDMENT NOT ONLY UNDERCUTS THE VERY PURPOSE OF THIS LEGISLATION BUT IT WOULD UNDERCUT AS WELL THE AIM OF THE 'PRO-LIFE' FORCES TO ENCOURAGE WOMEN TO CARRY THEIR PREGNANCIES TO TERM. THE AIM OF THE AMENDMENT'S PROPONENTS HAS TRAGICALLY MISFIRED. THE AMENDMENT IS ANTI-EMPLOYER, ANTI-LABOR, ANTI-WOMAN, AND ANTI-LIFE. IT IS MY SINCERE HOPE THAT IN THE FINAL ANALYSIS, THE ANTI-ABORTION RIDER TO THIS LEGISLATION WILL NOT PREVAIL.

TED WEISS.

1 97 S.CT. 401, 50 L.ED.2D 343.

2 DEPARTMENT OF LABOR ESTIMATE OF THE COST IMPACT OF H.R. 6075, SUBMITTED MAY 31, 1977, TO THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: \*\*\*\*\*. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Addendum 017   17

H.R. REP. 95-948, H.R. Rep. No. 948, 95TH Cong., 2ND Sess. 1978, 1978 U.S.C.C.A.N. 4749, 1978 WL 8570 (Leg.Hist.)

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

*April 5, 1977*   **EXTENSIONS OF REMARKS**   **10581**

Some new sugar substitutes have already undergone intermittent public taste testing. Five years ago, the Miralin Co. introduced a derivative of a West African berry that, when consumed before a meal, gave sour foods a sweet taste. But the FDA, rejecting the company's plea that it was not strictly a food additive, forced the Miralin compound off the market. Abbott Laboratories is now running a high-pressure campaign for the reinstatement of cyclamates, which were banned in 1969. Abbott's argument: the cyclamates that produced cancers in laboratory rats were tainted with saccharin. Yet another product is xylitol. Extracted from birch trees, it is sold in some European countries as a sweetener for diabetics. Its appeal is limited, however, because it contains just as many calories as natural sugar.

Even the two most promising alternatives to saccharin are more than a year from commercial production, largely because of the work involved in confirming their absolute safety. One of these, aspartame, is a compound of two substances found naturally in many foods; it tastes exactly like sugar, is 180 times sweeter and leaves no aftertaste. The other compound, known as Neo-DHC, is, ironically, derived from naringin, the main bitter component of citrus-fruit rinds. Neo-DHC can be produced most easily from grapefruit and Seville oranges.

### RESOLUTION

Aspartame was actually cleared for marketing in 1974, but was withdrawn when a scientist objected that the compound could produce brain lesions. Moreover, questions were raised about the accuracy of the testing procedures used by G.D. Searle & Co., which developed aspartame. Those problems now seem likely to be resolved—but not for at least eighteen months. Animal studies suggest that Neo-DHC, which was developed by Robert M. Horowitz and Bruno Gentili of the Department of Agriculture, is extraordinarily safe. Two companies are preparing to petition for its use in toothpaste, mouthwash and chewing gum. Its major disadvantage is a strong aftertaste, which makes it hard to use in diet drinks.

One major reason saccharin can't be replaced sooner is simply commercial. It costs millions of dollars to develop a new product, and the relative safety of the substitute is not established until the final testing phase. It's an expensive—and long-term—investment gamble. Thus, unless Congress unexpectedly agrees to alter the Delaney clause, dieters and diabetics are likely to face a prolonged period of life without sweetness.

---

SWEET AND SOUR

## HON. BOB GAMMAGE

OF TEXAS

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, April 5, 1977*

Mr. GAMMAGE. Mr. Speaker, it has recently come to my attention that the sugar industry is in need of relief because of rapidly falling sugar prices. Moreover, I believe the sugar producer's argument—that lowering import quotas for sugar will not help the sugar growers and will damage the sugar producers—is sound.

Rather than arbitrarily lowering the sugar import quota, which may result in an adverse economic impact on sugar growers, refiners, and skyrocketing prices to consumers; I suggest the Secretary of Agriculture consider other alternatives—possibly the institution of a nonrecourse loan/target price system similar to that used in other agricultural programs.

Mr. Speaker, I call to the attention of my colleagues, the Houston Post editorial of March 15, 1977, recognizing the need for immediate relief for the sugar industry:

### SWEET AND SOUR

A federal agency's decision that imported sugar is hurting U.S. sugar farmers could prove a bitter spoonful for American consumers, depending on what the Carter administration decides to do about it. The International Trade Commission (ITC) found earlier this month that increased amounts of raw sugar being shipped here for processing were depressing the market prices below the production costs of domestic sugar cane and sugar beets. The ITC is expected to recommend remedies in a few days.

The President will have the final say.

Whatever it does, the administration faces a no-win situation. If it decides to take no action to aid U.S. sugar growers—which isn't likely—they will be angry. If it curbs imports or raises tariffs on raw sugar, thus increasing prices, consumers will be irked and U.S. sugar processors and their foreign suppliers will be unhappy. Tightening up on the sugar quota could also provoke retaliation by other nations. The government could pay subsidies in the form of price supports or crop loans similar to those made on other farm commodities, but some producers don't like this approach because such subsidies are highly visible targets for criticism. Furthermore, the payments could increase the federal deficit. Any help the administration may decide to give U.S. sugar farmers will have to be paid for by the public, either as consumers or taxpayers.

Agriculture Secretary Bob Bergland is reportedly considering a combination of import quotas and price supports to put a 13- to 14-cent-a-pound floor under sugar, which is now selling for about 11 cents. The U.S. Cane Sugar Refiners' Association, which opposes forcing up sugar prices by restricting quotas or raising tariffs, says an increase of 3 cents a pound could cost U.S. consumers more than $1 billion a year in higher prices for sugar and products containing sugar.

A group composed of five of these refiners is urging the ITC to reverse its findings that imports hurt U.S. sugar growers. The refiners, who buy substantial amounts of foreign raw sugar, have a vested interest in keeping the status quo, of course. But they advance a cogent argument that raising sugar prices could work to the disadvantage of American sugar growers by making corn syrup sweeteners (fructose) more competitive with sugar. This sugar substitute quickly captured 10 per cent of the market when sugar prices shot to record highs of more than 60 cents a pound in 1974. Though the sharp drop in raw sugar prices during the past two years has inhibited the growth of fructose production, sugar industry sources say it could eventually supply 25 to 50 per cent of the sweetener demand, particularly for food processing and other industrial uses which account for 70 per cent of the market.

There has been talk of reviving the old Sugar Act or enacting a similar law, but this seems to have only minority support in the industry. For four decades before it expired in 1974, the Sugar Act lent stability to the business by providing price floors but no ceilings, leading critics to charge—with justification—that it protected the industry at the expense of the consumer.

Any way you spoon it, the sugar problem is a sensitive pocketbook issue. But if U.S. sugar producers are to be helped, it would be cheaper to give that aid in the form of temporary price supports or loans rather than tinker with the quota or tariff structure. Sugar producing and consuming nations will meet in Geneva next month to try to work out a new international sugar agreement that could significantly alter our policy on this troubled commodity. The result could

be a greater stability in the market and a stronger position for the American sugar producer. We should avoid any interim action that could sour this possibility. Besides, it's time the American consumer got a break.

---

LEGISLATION TO PROHIBIT DISCRIMINATION ON THE BASIS OF PREGNANCY

---

## HON. AUGUSTUS F. HAWKINS

OF CALIFORNIA

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, April 5, 1977*

Mr. HAWKINS. Mr. Speaker, on March 15 I, along with 92 cosponsors, introduced H.R. 5055, a bill to amend title VII of the Civil Rights Act of 1964 to make clear that employment-related discrimination based on pregnancy, childbirth, and related conditions is discrimination based on sex and therefore banned by title VII.

I am reintroducing that bill today with 17 additional cosponsors, with one change. A new section has been added to provide simply that employers who are now discriminating in regard to pregnancy-related disabilities will not be able, if this bill is enacted, to decrease, or cause to be decreased, the benefits or compensation provided to their employees generally in order to come into compliance. The Equal Pay Act has a similar provision, and the courts have generally interpreted title VII to the same effect—that is, that an employer who has been discriminating may not create equality by harming other employees; rather, the employer must raise the discriminatees to the position of the other employees. I regard this rule as a basic premise of what constitutes nondiscrimination; the reason for including this provision here, which merely restates existing law, is simply that employers have been explicitly stating that one result of a bill such as this would be a loss of benefits or compensation to other employees, and I and my cosponsors decided on reflection that it is wise to make clear that this cannot occur.

H.R. 5055 does not really add anything to title VII as I and, I believe, most of my colleagues in Congress when title VII was enacted in 1964 and amended in 1972, understood the prohibition against sex discrimination in employment. For, it seems only commonsense, that since only women can become pregnant, discrimination against pregnant people is necessarily discrimination against women, and that forbidding discrimination based on sex therefore clearly forbids discrimination based on pregnancy. Indeed, six Federal courts of appeal, 18 Federal district courts, the Equal Employment Opportunity Commission, fair employment practices agencies of many States, and the highest courts of five States have so held.

But the U.S. Supreme Court, in General Electric Corp. against Gilbert and IUE, decided otherwise this last December. To understand the need for H.R. 5055, some history and discussion of the GE litigation is helpful.

In 1973, the Supreme Court, in Geduldig against Aiello, held that California

Addendum 019

USCA4 Appeal: 22-1927    Doc: 167-2    Filed: 03/24/2026    Pg: 22 of 45

could constitutionally deny disability benefits funded by State taxes to women unable to work because of disability due to a normal pregnancy. In a footnote not really pertinent to the constitutional decision, the six-member majority stated:

This case is a far cry from cases * * * involving discrimination based upon gender as such. The California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition—pregnancy—from the list of compensable disabilities. * * * The program divides potential recipients into two groups—pregnant women and non-pregnant persons. While the first group is exclusively female, the second includes members of both sexes.

This view—that a classification which harms only women and does so on the basis of a factor inextricably linked to gender is not discrimination against women just because not all women are affected—is contrary to any sensible approach to what constitutes discrimination. For, as Mr. Justice Stephens noted in his dissent in Gilbert—

It is the capacity to become pregnant which primarily distinguishes the female from the male, so that a rule which treats pregnancy as unique by definition . . . discriminates on account of sex.

But Geduldig was in any event based squarely on constitutional law, not title VII. And all the courts of appeals which after Geduldig considered the issue under title VII held that Congress in passing that statute clearly intended to forbid discrimination based on pregnancy, even if the Constitution did not prohibit such discrimination. As those courts noted, and as the Supreme Court in Gilbert agreed, Congress obviously in passing statutes may forbid actions which are perfectly constitutional, and thereby make such actions illegal. And the EEOC, the agency entrusted primarily with enforcing title VII, has long had guidelines which interpret title VII to prohibit pregnancy discrimination.

In Gilbert, however, the Supreme Court, faced with the question whether an employer may consistently with title VII, provide employees with disability pay for absences due to any medical cause other than pregnancy or childbirth, including all illnesses peculiar to man, that this Congress must have intended title VII to have only the same reach, as regards what constitutes discrimination based on sex as the Court held applied under the Constitution.

This was an extraordinary assumption to entertain. The equal protection clause, construed in Geduldig, does not use the word "discriminate" anyway, so there was no reason at all for the Court to believe that we intended by using that word in subsection 703(a)(1) of title VII to limit the reach of title VII to actions which would violate the equal protection clause if done by a State. And, more astonishing, we enacted title VII, including the sex discrimination provision, fully 9 years before the Supreme Court informed us that it did not view discrimination based on pregnancy as discrimination based on sex as a constitutional matter. We could not possibly have intended to incorporate constitutional concepts not yet announced, and I for one

certainly did not contemplate the limited approach taken by the Court in Geduldig.

Therefore, H.R. 5055 is designed to make clear that whatever may be true as a constitutional matter, this Congress does regard discrimination based on pregnancy as discrimination based on sex, and, in particular, that employers, labor unions, and others covered by title VII must treat pregnant women as they treat other employees similar in their ability, or inability, to work. This means, for example, that if an employer permits other employees to continue working unless their doctors regard them as physically unable to work, it may not force pregnant women off the job, as many employers have done in the past, while they are perfectly able to perform their jobs. It means that employers and labor unions which permit other employees to retain seniority while on leaves of absence or while disabled may not deprive women of seniority if they are absent for a limited period due to pregnancy, as some employers do. It means that an employer who provides a certain number of sick days a year for each employee to use when unable to work may not forbid women to use their sick days when unable to work due to pregnancy or childbirth. And it means that an employer who provides disability insurance to other employees unable to work may not single out pregnancy-related disabilities for exclusion from the disability plan.

It is also important to understand what this bill would not do. Like title VII generally, it merely requires that employers not discriminate. Thus, an employer who does not now provide disability benefits to his employees will not have to provide such benefits to women disabled due to pregnancy or childbirth. Rather, this bill would simply require employers to treat disability due to pregnancy, childbirth, or a related medical non-work-related disability, by providing leave and benefits for the same period, on the same terms, and at the same employment rate applicable to other employees.

Nor does the bill require that employers pay pregnant women disability benefits, or provide leave, simply because they are pregnant, or because they prefer to stay home after childbirth for an extended period. Rather, it recognizes that for most of the time a woman is pregnant she is, in most cases, able to continue working, and should be allowed to do so. It also recognizes that pregnancy and childbirth does cause some period during which a woman is medically unable to work. For 95 percent of women, that period is 6 weeks or less. It is only during this period, unless there are complications which cause the woman to be disabled longer, for which disability benefits or leave are required on the same basis applicable to other employees with temporary disabilities.

I believe enactment of this bill is necessary if the prohibition against sex discrimination in title VII is to be meaningful. For discrimination against pregnant women is one of the chief ways in which women's careers have been impeded and women employees treated like second-

class employees. For example, prior to the enactment of title VII of the Civil Rights Act of 1964, most employers discharged a woman as soon as she became obviously pregnant. When the new mother returned to work after her baby was born, she began again as a new employee. Whether she went back to work for her former employer, or whether she found a new employer, she started at the bottom of the seniority ladder. Usually she lost not only seniority but also all previously earned pension credit. This loss of seniority had a lifetime impact on her pay and benefits, for these often were negotiated on the basis of continuous service, and also an impact upon her ability to obtain more responsible positions. And, the loss of service credit toward a pension similarly had a lifetime impact; she had to work more years before she could retire, and when she finally could retire, she had a substantially smaller pension benefit than others with the same number of years of service. Of course, for a woman who had more than one child, she began again as a new employee without seniority status and without pension credits after the birth of each child, with multiplied harmful effects on her pay, position, and pensions. Since a large proportion of women are likely to become pregnant in their working careers, such pregnancy discrimination accounts in large part for the fact that women were—and are—in lower paying and less responsible jobs.

Similarly, the refusal to pay pregnant women disability benefits or sick leave available to other temporarily disabled employees has effects which go far beyond the simple loss of income for a period of time. First, the loss of income itself can have devastating effects: 25 million women workers or 70 percent of the women who work do so because they are single, divorced or widowed, or because their husbands earn under $7,000 per year; and 1 in 10 babies is born to a single, divorced, or widowed mother.

Thus, if disability benefits are not paid, the loss of a mother's salary, even temporarily, can make it difficult for many families to provide their children proper nutrition and health care, and may result in forcing some families onto welfare because of the loss of income. Further, some mothers, unable to afford the loss of income, may be discouraged from carrying their pregnancy to term. And, some women may be forced to seek lower paying or less responsible jobs which do provide benefits for time lost due to pregnancy-related disability, because they cannot take the risk of going without income should they become pregnant. Finally, disability, sick leave, and other leave programs are basically designed to allay fears that workers will be left without income during critical periods; they thus assure that employees are productive, committed workers when they are well and do not try to come to work and endanger their health—and therefore their productivity—when they are not well. If women disabled due to pregnancy do not have this assurance, they perceive the message quite readily—that the employer is not concerned about their well-being and does not regard them as valued, career employees.

Addendum 020

April 5, 1977 | EXTENSIONS OF REMARKS | 10583

Indeed, while one of the arguments made opposing pregnancy disability coverage is that women do not return after childbirth, that argument is in fact circular: It is little wonder if some women who are forced to leave several months before they are disabled and not provided disability benefits available to other similarly situated employees are not interested in returning to an employer who has treated them in this way. In fact, statistics show that over one-half of women who take pregnancy leave even under discriminatory conditions do return; but they also show that in companies which have begun paying pregnancy disability benefits on the same terms available to other employees return rates have risen dramatically—by more than 50 percent. These companies have reported that as a result of the increased return rate, paying disability benefits for pregnancy-related disabilities is entirely cost-effective, since the savings in training costs for new employees more than covers the cost of providing benefits.

The main argument raised against prohibiting pregnancy-related discrimination is that it will be costly. But eradicating invidious discrimination by definition costs money: It is cheaper to pay all black workers less than all white workers, or all women less than all men. The fact that it would cost employers money did not prevent Congress from enacting the Equal Pay Act or title VII, and it should not prevent this Congress from making clear that title VII prohibits this form of sex discrimination as well.

Further, the cost figures which employers groups have been promoting are vastly inflated and, indeed, based on assumptions which themselves involve stereotypes based on sex. For example, the $1.5 billion figure introduced by GE in the Gilbert litigation assumed that women would be absent due to pregnancy an average of 30 weeks, even though the undisputed evidence in the same case was that 95 percent of women would be disabled only an average of 6 weeks. As one judge presented with similar calculations observed, the assumption that women will claim benefits for a period much longer than their actual disability is equivalent to "assigning the tendency to malinger as a sex-related characteristic. If, as defendant suggests, the employer can make as much or more money on disability than at work be true, then the fault lies with the particular insurance plan and not with the female sex." The $1.5 billion figure also ignored the fact that women are paid on the average less than men, and calculated the benefits at the male rate of pay. And, it does not take account of the fact that at least 14 States, including such large States as New York, New Jersey, and California, now require as a matter of State law that employers provide disability benefits for pregnancy-related disabilities, so that the cost of providing coverage in those States is not fairly counted as a cost of any Federal legislation on the question. Finally, such calculations do not include an offset for the extent to which practicing pregnancy discrimination is itself costly—forcing productive, experienced

CXXIII——666—Part 9

workers off the job, for example, costs employers money in lost productivity and training; and if the lost income is not replaced by employers directly, it may have to be replaced indirectly by unemployment or welfare benefits.

Our best figures at present suggest that the direct national cost of covering all women who work for companies with disability plans for pregnancy-related disabilities not now covered is about $150 million; this figure includes women working in States where such coverage is mandated by State law and does not take account of the monetary benefits of providing such coverage, so that it is probably rather high. We will be trying through hearings to get updated cost figures, to aid my colleagues in the deliberations on this bill, but I am convinced that the net cost, if any, will prove rather minimal in comparison to the increase in equity and justice to women which is the goal of this bill.

In sum, this legislation is necessary to assure that the goal set by title VII in 1964—equality of women in the work place—becomes a reality. I am hopeful that this House will move swiftly to enact this bill into law so that the harmful effects of the Gilbert decision will be short-lived.

---

## LEGISLATIVE NEWSLETTER

# HON. EDWARD J. PATTEN
### OF NEW JERSEY
IN THE HOUSE OF REPRESENTATIVES
*Tuesday, April 5, 1977*

Mr. PATTEN. Mr. Speaker, I mail a legislative newsletter to my constituents twice a year to keep them informed of some of my legislative work and goals.

I feel that it is important to do this, for constituents have the right to know what we are doing as their representatives.

My first newsletter this year, follows, and it was approved by both majority and minority counsel in the House Post Office and Civil Service Committee before it went to press.

The newsletter follows:

ECONOMIC STIMULUS PROGRAM WILL HELP RECOVERY

In his moving farewell address to Congress in January, President Ford said, "the State of the Union is good, but we must go on making it better and better . . ." As I listened to his last speech to Congress in the House Chamber, I felt that he was a sincere, honest and dedicated Chief Executive who did his best after inheriting serious economic and political problems. Most Members of Congress respected and liked President Ford.

Eight days later, Jimmy Carter became 39th President of the United States and in his brief but impressive inaugural address not only called for a "new national spirit of unity and trust," but expressed the conviction that most Americans wanted to hear: "I believe America can be better. We can be even stronger than ever before."

Those words of optimism and hope were implemented by the new President when he sent his Economic Stimulus Program to Congress soon after his inauguration. No realist can claim that it will create and convert recession to recovery overnight. It will, however, contribute to the recovery the Nation

has been hoping for during the past several years.

HIGHLIGHTS OF THE ECONOMIC PROGRAM

President Carter's plan for strengthening the economy consists of a variety of important programs which will help people in several vital areas and I was happy to vote for it. The main provisions call for: acceleration of local public works projects; continuation of revenue sharing; anti-recession aid for areas of high unemployment to maintain basic services; expansion of public service jobs; employment and training assistance; special payments to those who receive certain retirement benefits; a tax rebate; and others.

The President deserves credit for the vigorous and active leadership he has shown in attacking the recession and by expressing deep interest in human rights everywhere. Other legislative action on the Carter agenda includes such areas as consumer advocacy, election reform, hospital cost control, an anti-inflation program, and the vital field of energy. He has made a good start.

The 95th Congress has also made an impressive beginning. Even before the new President was inaugurated, the House was working on four priorities recommended by the Democratic leadership: an Economic Stimulus Program; ethics reform; government reorganization; and an energy program. A recent Harris survey disclosed that by a margin of 59–29 percent, the majority of Americans expect the new Congress to compile a positive legislative record. They will not be disappointed.

NEW PUBLIC WORKS BILL SHOULD HELP 15TH DISTRICT COMMUNITIES

In late December, the Economic Development Administration (EDA) announced almost $100 million in Federal construction grants to N.J. to help stimulate the stagnant economy. It was disturbing to me that except for a $330,000 award to Monmouth Junction, Middlesex County and its communities failed to receive any of the grants, despite a 9.3 percent unemployment rate and over 30,-000 jobless. It was obvious that the Public Works Employment Act needed improvement so I co-sponsored a better bill which should increase the chances of Middlesex and Union counties getting more grants to help the thousands of persons looking for work. The bill I helped sponsor is a considerable improvement over the previous legislation (doubling the funds nationaly to $4 billion, eliminating 30 percent of the funds for areas with lower numbers of unemployed, etc.). Before mid-April, President Carter will probably sign a bill which is in a House-Senate conference. It will be a real help in combating the recession.

---

BILLS COSPONSORED IN NEW CONGRESS

The new Congress (1977–78) is determined to achieve a proud and responsive legislative record in areas ranging from strengthening the economy to improving health and education. With the support of the Carter Administration, there is strong confidence that these legislative plans and hopes will be accomplished. Some of the bills I've helped sponsor so far, would:

Extend Federal Emergency Unemployment Compensation benefits for an additional 65 weeks.

Authorize a career education program for elementary and secondary schools.

Improve the Federal Water Pollution Control Act in the battle against pollution.

Expand the Public Works Employment Act and help our jobless and communities with 100% Federal construction grants.

Create a U.S. Dept. of Energy and consolidate most energy functions.

Provide grants to states for compensating persons injured by criminals.

## I. SUMMARY

H.R. 3259, as amended by the committee, would accomplish three objectives:

To suspend until the close of June 30, 1980, the duty now applicable to certain horses, thus ending tariff discrimination among breeds and avoiding customs valuation and bonding problems;

To assure a continued Canadian crude petroleum supply at the lowest cost to U.S. refiners located near the Canadian border by permitting the duty-free entry of Canadian crude petroleum and crude shale oil provided that an equivalent amount of domestic or duty-paid foreign crude petroleum or crude shale oil is exported to Canada from the United States; and

To reduce the cost to patients of doxorubicin hydrochloride, an anticancer drug, by suspending until the close of June 30, 1980, the import duty on that drug.

## II. REASONS FOR THE BILL

The provisions of the bill regarding horses end the tariff discrimination among breeds, some of which are now entitled to duty-free treatment while others are not, avoid customs valuation problems with respect to foals and horses which have not yet raced, and avoid bonding problems resulting when a horse entered under a temporary bond is purchased in a claiming race.

The provisions of the bill regarding Canadian petroleum are intended to assure a continued crude petroleum supply at the lowest cost to U.S. refiners located near the Canadian border. Because of lack of pipelines and other factors, northern tier U.S. refiners do not have economical access to sufficient sources of crude petroleum except from Canada. The Canadian Government has established export quotas on crude petroleum to the United States, but has agreed to supply crude petroleum to the United States in excess of export quotas in exchange for exports to Canada from the United States of an equivalent quantity of crude petroleum. Duty-free treatment for imports of Canadian crude petroleum as provided by the bill would remove one economic barrier to such exchanges.

The provisions of the bill regarding doxorubicin hydrochloride are intended to reduce costs to cancer patients using the drug. There is no domestic production of doxorubicin hydrochloride. To the extent that savings from the duty-free treatment provided by the bill are passed along to the ultimate consumer, a cancer patient could have his drug bill reduced by as much as $50 to $75 per course of treatment.

## TRANSFER OF MEASURES TO UNANIMOUS CONSENT CALENDAR

Mr. ROBERT C. BYRD. Mr. President, there are two measures on the calendar that are ready for transfer to the Unanimous Consent Calendar. Therefore, I ask that the clerk transfer Order Nos. 380 and 386 to the Unanimous Consent Calendar.

The PRESIDING OFFICER. They will be so transferred.

## FEDERAL ELECTION COMMISSION

Mr. ROBERT C. BYRD. Mr. President, I ask the Chair to lay before the Senate a message from the House of Representatives on S. 1435.

The PRESIDING OFFICER (Mr. ZORINSKY) laid before the Senate the amendments of the House of Representatives to the bill (S. 1435) to authorize appropriations for the Federal Election Commission for fiscal year 1978, as follows:

Strike out all after the enacting clause, and insert: That section 319 of the Federal Election Campaign Act of 1971 (2 U.S.C. 439c) is amended by striking out "and" after "1976", and by inserting after "1977" the following: ", and $8,123,000 for the fiscal year ending September 30, 1978".

Amend the title so as to read: "An Act to amend the Federal Election Campaign Act of 1971 to extend the authorization of appropriations contained in such Act."

### UP AMENDMENT NO. 837

Mr. ROBERT C. BYRD. Mr. President, I move that the Senate concur in the amendment of the House of Representatives, which is in the nature of a substitute for S. 1435, with an amendment.

The PRESIDING OFFICER. The amendment will be stated.

The legislative clerk read as follows:

The Senator from West Virginia (Mr. ROBERT C. BYRD) proposes an unprinted amendment numbered 837:

Strike the amount, "$8,123,000" where it appears at line 6, and insert in lieu thereof "$7,811,500."

The PRESIDING OFFICER. The question is on agreeing to the motion of the Senator from West Virginia.

The motion was agreed to.

## PRIVILEGE OF THE FLOOR

Mr. NELSON. Mr. President, I ask unanimous consent that Mr. Scott Ginsburg of my staff be accorded the privilege of the floor during the consideration of the legal services bill and rollcall votes thereon.

The PRESIDING OFFICER. Without objection, it is so ordered.

## RECESS SUBJECT TO THE CALL OF THE CHAIR

Mr. ROBERT C. BYRD. Mr. President, the time is not running against either side, I assume.

The PRESIDING OFFICER. At this point it is not.

Mr. ROBERT C. BYRD. I thank the Chair. I ask unanimous consent that the Senate stand in recess awaiting the call of the Chair.

There being no objection, at 4:14 p.m. the Senate took a recess, subject to the call of the Chair.

The Senate reassembled at 4:32 p.m., when called to order by the Presiding Officer (Mr. ZORINSKY).

## PROHIBITION OF SEX DISCRIMINATION ON THE BASIS OF PREGNANCY

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the Senate, at this time, proceed to the consideration of Calendar Order No. 308 for not to exceed 30 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

The bill will be stated by title.

The legislative clerk read as follows:

A bill (S. 995) to amend title VII of the Civil Rights Act of 1964 to prohibit sex discrimination on the basis of pregnancy.

The PRESIDING OFFICER. Is there objection to the present consideration of the bill?

Mr. ROBERT C. BYRD. Mr. President, is it clearly understood that at the end of 30 minutes, the Senate will proceed with the consideration of the saccharin bill?

The PRESIDING OFFICER. That is the order.

There being no objection, the Senate proceeded to consider the bill which had been reported from the Committee on Human Resources with amendments as follows:

On page 1, at the beginning of line 1, insert "SECTION 1.";

On page 2, beginning with line 7, insert the following new section:

SEC. 2. (a) Except as provided in subsection (b) the amendment made by this Act shall be effective on the date of enactment.

(b) The provisions of the amendment made by section 1 of this Act shall not apply to any fringe benefit program or fund, or insurance program which is in effect on the date of enactment of this Act, for a period of one hundred and twenty days after the date of enactment of this Act.

SEC. 3. Until the expiration of a period of one year from the date of enactment of this Act or, if there is an applicable collective-bargaining agreement in effect on the date of enactment of this Act, until the termination of that agreement, no person who, on the date of enactment of this Act is providing either by direct payment or by making contributions to a fringe benefit fund or insurance program, benefits in violation with this Act shall, in order to come into compliance with this Act, reduce the benefits or the compensation provided any employee on the date of enactment of this Act, either directly or by failing to provide sufficient contributions to a fringe benefit fund or insurance program: *Provided,* That where the costs of such benefits on the date of enactment of this Act are apportioned between employers and employees, the payments or contributions required to comply with this Act may be made by employers and employees in the same proportion: *And provided, further,* That nothing in this section shall prevent the readjustment of benefits or compensation for reasons unrelated to compliance with this Act.

So as to make the bill read:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. That section 701 of the Civil Rights Act of 1964 is amended by adding at the end thereof the following new subsection:

"(k) The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title shall be interpreted to permit otherwise."

SEC. 2. (a) Except as provided in subsection (b) the amendment made by this Act shall be effective on the date of enactment.

(b) The provisions of the amendment made by section 1 of this Act shall not apply to any fringe benefit program or fund, or insurance program which is in effect on the date of enactment of this Act, for a period of one hundred and twenty days after the date of enactment of this Act.

SEC. 3. Until the expiration of a period of one year from the date of enactment of this Act or, if there is an applicable collective-bargaining agreement in effect on the date of enactment of this Act, until the termination of that agreement, no person who, on the date of enactment of this Act is providing either by direct payment or by making contributions to a fringe benefit fund or insurance program, benefits in violation with this Act shall, in order to come into compliance with this Act, reduce the benefits or the compensation provided any employee on the date of enactment of this Act, either directly or by failing to provide sufficient contributions to a fringe benefit fund or insurance program: *Provided,* That where the costs of such benefits on the date of enactment of this Act are apportioned between employers and employees, the payments or contributions required to comply with this Act may be made by employers and employees in the same proportion: *And provided, further,* That nothing in this section shall prevent the readjustment of benefits or compensation for reasons unrelated to compliance with this Act.

The PRESIDING OFFICER. Who yields time?

Mr. WILLIAMS. I inquire what the time agreement is that we are operating under at this time.

The PRESIDING OFFICER. There are 3 hours on the bill. There are 2 hours on any amendment in the first degree, and 30 minutes on any amendment in the second degree.

Mr. WILLIAMS. I thank the Chair.

I yield myself such time as I may use within the agreement entered into, but we shall not proceed beyond 30 minutes at this time on this bill.

Mr. President, last December, in the case of Gilbert against General Electric, the Supreme Court ruled that title VII does not protect working women who are disabled by pregnancy or related conditions from discrimination under employee benefit plans. The Court held that title VII's prohibitions against sex discrimination do not preclude discrimination based on pregnancy. This decision nullified what I believe, and what the majority of the members of our committee believe, was the intent of Congress in enacting title VII—to protect all individuals from sex discrimination in employment—including pregnant women.

The bill before us will overcome the Court's decision and provide important protection for women affected by pregnancy as the testimony received by the labor subcommittee well illustrates. It is most important that this protection be provided to our Nation's working women.

It is important because a large number of working women need its protection for their financial security, and the security of their families.

Two-thirds of the 36 million women in our labor force work because of pressing economic need. These women are either single, widowed, divorced, or separated, or they have husbands earning less than $10,000 per year. It is a shocking fact that, among full-time workers employed throughout 1975, the median earnings of women were less than three-fifths of the median earnings of men. Our Nation's working women earned only 59 cents for every dollar earned by working men. Women were required to work nearly 9 days to earn the same gross income that men earn in only 5 days.

This legislation is also important because, in the long run, it will permit the 36 million working American women to assume their rightful place, and make a full contribution in our Nation's economy. Too often, sex discrimination has denied working women an opportunity to pursue a career. One reason for the gap between the earnings of men and women is that 90 percent of the entire female work force is concentrated in 10 female occupations.

These shocking statistics cannot be made better unless working women are provided effective protection against discrimination on the basis of their childbearing capacity. Testimony received by the Labor Subcommittee has shown that most policies and practices of discrimination against women in the workforce result from attitudes about pregnancy and the role of women who become pregnant which are inconsistent with the full participation of women in our economic system.

Because of their capacity to become pregnant, women have been viewed as marginal workers not deserving the full benefits of compensation and advancement granted to other workers.

The reported title VII cases reveal a broad array of discriminatory practices based upon erroneous assumptions about pregnancy and the effect it has on the capacity of women to work.

In some of these cases, the employer refused to consider women for particular types of jobs on the grounds that they might become pregnant, even though the evidence revealed that pregnant women are perfectly capable of performing the work in question. Even more common is the refusal to provide training, or advancement to management, because of the concern that women might become pregnant and leave the employer's service.

A common practice has been to place pregnant women on mandatory unpaid leave, regardless of their ability or inability to work. In some cases, women thus discriminated against are permitted to return to their former employment after delivery; but in other cases, mandatory leaves result in loss of previous position, lower pay, and loss of seniority and other benefits. In the extreme case, women who become pregnant have simply been terminated by their employers.

These practices have profound effects upon the ability of women to maintain their employment, and to advance their financial and career interest. Loss of seniority has frequently resulted in lower retirement benefits, loss or reduction of vacation and sick leave benefits, and the loss of opportunity for advancement or training.

Thus, the overall effect of discrimination against women because they might become pregnant, or do become pregnant, is to relegate women in general, and pregnant women in particular, to a second-class status with regard to career advancement and continuity of employment and wages.

These practices reach all working women of childbearing age, but they fall most heavily upon women who become pregnant; and 80 percent of women become pregnant in their working lives. In fact, approximately 40 percent of all pregnant women are employed during their pregnancy, and almost 40 percent of mothers with children under 6 years of age are employed.

Prior to the Supreme Court's decision in the Gilbert case, title VII was an important factor in protecting working women from sex discrimination. In 1964, 40 percent of all employers still did not even provide unpaid maternity leaves—women were simply fired. Among employers who did provide leave, more than one-half forced women onto leave before the 7th month of pregnancy. Only 6 percent of employers permitted women to use their sick leave for pregnancy-related illness or disability.

Title VII, which was interpreted to prohibit all forms of employment discrimination against women, including discrimination because of pregnancy, had a dramatic effect on these practices. By 1973, 73 percent of women workers received maternity leave accompanied by reemployment rights; and 26 percent were permitted to use sick leave for pregnancy-related illness and disability.

Now, however, the Gilbert decision has changed this effect of title VII and has left a gaping hole in the protection which title VII affords to working women.

This legislation will close that hole in a very straightforward way. It amends title VII by adding to section 701 of that statute a new subsection (k) which makes clear that the prohibitions against sex discrimination in the act include discrimination in employment on the basis of pregnancy or pregnancy-related disabilities. This legislation will prohibit not only discrimination in the provision of disability benefits, which was the type of discrimination which occurred in the Gilbert case, but it will also prohibit discrimination on the basis of pregnancy or conditions arising out of pregnancy for all employment-related purposes.

The central purpose of the bill is to require that women workers be treated equally with other employees on the basis of their ability or inability to work. The key to compliance in every case will be equality of treatment. In this way, the law will protect women from the full range of discriminatory practices which have adversely affected their status in the work force.

Section 2 of this bill provides that title VII's basic prohibition against discrimination based on pregnancy will be effective immediately upon enactment. There is no reason not to provide women with immediate protection against discriminatory employment practices.

However, section 2(B) of the bill will delay the effective date of this legislation as it will apply to fringe benefit and insurance plans. This delay will provide a reasonable period within which employers and insurance companies can make necessary adjustments in existing plans, in order to bring them into compliance with the law.

Addendum 023

USCA4 Appeal: 22-1927     Doc: 167-2     Filed: 03/24/2026     Pg: 26 of 45

Section 3 of the bill makes clear what employers can and cannot do in adjusting their fringe benefit programs to come into compliance with this legislation. Based upon the experience of the Justice Department and the Equal Employment Opportunity Commission under title VII, we believe that most employers will come into compliance in a short period of time.

It is also the committee's view that this legislation ought not to interfere with the legitimate expectations of employees, as regards their current fringe benefit coverage, or result in instability in labor-management relations. For this reason, section 3 provides that current benefit levels may not be reduced as a means of coming into compliance with this bill, and that prohibition would prevail for prescribed periods of time.

These periods were prescribed on the assumption that, after employers have come into compliance and been in compliance for some time, it is very unlikely that changes in fringe benefit packages would be made because of the need to provide equal benefit for pregnant women.

Mr. President, the committee found that the cost of equal treatment of pregnancy has been greatly exaggerated. It is likely that employers will find, after some experience, that the cost of equality in this regard is not significant; and the impetus to alter benefit packages for this reason will disappear.

Accordingly, section 3 provides that benefits may not be reduced as a means of compliance for a period of 1 year or, where this is a collective bargaining agreement, until the expiration of that agreement. The latter provision recognizes the importance of stability in labor relations during the term of a collective bargaining agreement and, therefore, prevents reductions due to this legislation during the term of a current agreement.

In the committee's view, these time periods will provide all affected parties with an opportunity to gain experience with the actual impact of the legislation.

Thereafter, careful and informed consideration can be given to the desirability of readjusting fringe benefit programs in the context of nondiscriminatory coverage of all covered conditions.

Mr. President, the effect of this temporary prohibition against reducing benefits as a means of complying with the legislation is mitigated by a proviso that appears in section 3. This proviso permits employers to apportion the increased cost associated with this legislation between themselves and their employees, in the same proportion that applies to the cost of existing benefits. For example, where employers and employees presently share the cost of these fringe benefit programs on a 50–50 basis, any increased cost as a result of this legislation may also be shared on a 50–50 basis.

A second proviso to section 3 makes it explicit that the prohibition against reducing benefits does not apply where the employer reduces benefits for reasons unrelated to this legislation.

In this way, the bill makes it clear that we are not "freezing" benefits. Employers will remain free to adjust benefits at any time for reasons unrelated to this legislation, and will be free to adjust benefits for any reason after 1 year, or upon the expiration of any applicable collective bargaining agreement.

Mr. President, I would also like to address briefly several issues which arose during the course of the committee's deliberations.

With regard to the cost of this legislation, the committee received helpful testimony from many witnesses. We have carefully examined this testimony, and it is the committee's view that the cost of this legislation to employers, while not negligible, will not be unduly burdensome.

The committee believes that the $191.5 million estimate made by the Department of Labor with regard to the costs which will be incurred under existing temporary disability plans is the most reliable estimate received by the committee with regard to such plans. This amount would be a 3.5-percent increase in the cost of temporary disability plans: It represents five one-hundredths of 1 percent increase as a percent of total payroll cost for workers covered by temporary disability insurance plans. I say that is not negligible, but it is not the heavy burden that was described by some who had escalated the figure, in some mysterious way, into the billions. Not so. These figures are hard figures from the Department of Labor that I am sure we can rely on.

Another significant cost factor will be incurred by employers who maintain discriminatory health insurance and hospitalization insurance plans. Although the committee did receive one estimate of cost which might be incurred under these plans, several other witnesses testified that they could not make an accurate estimate of cost under health insurance and hospitalization insurance plans because of the great variety of those plans and because of a lack of sufficient analytical data as a basis for that estimate.

In this regard, it is important to bear in mind that this legislation does not require that any employer begin to provide health insurance where it is not presently provided. Rather, it requires that employers who do provide health insurance do so on a nondiscriminatory basis. Because some plans do not cover maternity costs at all, while others provide limited coverage, and because the degree of coverage required for nondiscrimination would depend upon the degree to which conditions unrelated to maternity are covered, the costs incurred as a result of this legislation would be extremely variable from plan to plan.

The committee's report on this legislation, No. 95–331, discusses this matter in more detail and provides some analysis of existing health plans. A review of the Department of Labor's digest of health insurance plans revealed that, in 1974, only 41 percent of plans appeared to be discriminatory under this legislation.

With regard to cost, it is also important to note that this legislation will not increase the costs of employers who are already subject to State laws which mandate the equal provision of benefits for pregnancy and related conditions. At least 23 States currently interpret their own laws to require the equal provision of benefits to women affected by pregnancy and childbirth. In those States, most employers are already subject to State law and the effect of this legislation will be to reinforce the State requirement of nondiscrimination with a Federal requirement.

Another question which arose during committee consideration of this bill is whether there should be a special provision concerning abortion. In this regard, I think it is important to observe that this is a pro-life bill. The practical effect of this legislation will be to encourage women to bear their children rather than to undergo voluntary termination of their pregnancies.

The purpose of the bill is to insure that women who are disabled by conditions related to pregnancy are compensated fairly and given a fair amount of assistance with their medical bills, in relation to their fellow employees who are disabled by other medical conditions. Because full-term pregnancies almost always result in greater disability and higher medical expenses, this bill will provide an important financial cushion for women who might otherwise seek to avoid those burdens by electing abortion.

Finally, Mr. President, I want to emphasize testimony received by the Committee from the American Nurses' Association, and from an eminent obstetrician, Dr. Andre Hellegres, which documented the concrete connection between loss of income during the disability phase of pregnancy and a deterioration of the health of the pregnant woman and of her child which results from impaired access to a healthful life situation.

In addition, there is a relationship between infant prematurity and income. It is estimated that prematurity costs the Nation $1 billion per year for care and hospital nursing alone, not to mention the cost of certain lasting effects which can result from prematurity.

These problems can affect an enormous number of our Nation's children. Approximately 40 percent of all pregnant women work and, as we know, a large number of them are heads of households, or have unemployed or low-income husbands. In March 1976, nearly 46 percent of our children under age 18 had mothers in the workforce. There were 14.3 million children in families in which the father was either absent, unemployed, or not in the labor force. In each of these circumstances, the children were better off in terms of family income if their mothers were in the labor force; although families headed by women have lower family income generally than families headed by men.

The cost of this bill, therefore, cannot be measured in terms of what it will cost to pay for benefit plans which cover women during their pregnancy-related disabilities. We must also consider the cost which is imposed on society when working women and their families are denied adequate income for a decent standard of living. This cost is felt in terms of medical complications for both the women and their children, and it is

Addendum 024

USCA4 Appeal: 22-1927      Doc: 167-2        Filed: 03/24/2026      Pg: 27 of 45

felt in terms of the loss to our economy of the productive value of their talents and energies.

In summary, Mr. President, this legislation restores to our working women a very basic and fundamental protection against sex discrimination, one which we intended to provide to them when title VII was enacted. The fundamental importance of this protection—to our working women, to their families, and to American industry itself—has been made manifest during our consideration of this legislation. We had a unanimous vote of the committee in reporting this bill. I am confident that these facts are well recognized in this body, and that we will pass this legislation and restore this important protection for working women.

Mr. President, I ask unanimous consent that the following members of the staff of our committee be granted all the privileges of the floor during the debate on S. 995 and during rollcall votes: Stephen Paradise, Darryl Anderson, Michael Forscey, Michael Goldberg, Donald Zimmerman, John Rother, and Gerald Lindrew.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. WILLIAMS. Mr. President, with this measure coming up as it does, during a recess from the bill that was the pending business, and inasmuch as it will not be reached later this day, we know that our opening statements will be available. There will be an opportunity to review the record before we return to the debate, unless we are fortunate to have an opportunity to read it again this calendar day.

Mr. JAVITS. Mr. President, I am pleased to join with Senator WILLIAMS in urging passage of S. 995, legislation which would prohibit sex discrimination in employment on the basis of pregnancy. This legislation does not represent a new initiative in employment discrimination law, neither does it attempt to expand the reach of title VII of the Civil Rights Act of 1964 into new areas of employment relationships. Rather, this bill is simply corrective legislation, designed to restore the law with respect to pregnant women employees to the point where it was last year, before the Supreme Court's decision in *Gilbert* v. *General Electric Corp.*, 426 U.S. 125 (1976). In that case, the Court held that the exclusion of pregnancy and related conditions from an otherwise comprehensive disability insurance plan did not constitute sex discrimination in violation of title VII.

I hope the Senate will recognize the remedial purpose of the bill and approve it as reported from the Human Resources Committee.

The bill was thoroughly considered by the committee. We held extensive hearings, in which the administration, labor groups, civil rights organizations, women's groups and pro-life organizations all endorsed the bill, and several businesses informed the committee of their employment practices already in conformance with the bill's requirements. In addition to this very broad base of support, it is important to note that approximately 25 States have already, either legislatively or by administrative action, prohibited discrimination in employment against women who become pregnant. Thus, all that this legislation does is make uniform for the entire country not only a principle that we thought was well-established nationally prior to last year, but also a principle that continues to be enforced in half of the States of this country.

This principle, that discrimination against pregnant women is sex discrimination, is the substance of S. 995. As Mr. Justice Stevens stated,

(b)y definition, such a rule discriminates on account of sex; for it is the capacity to become pregnant which primarily differentiates the female from the male.

Accordingly, the bill would prohibit as sex discrimination any personnel practice, fringe benefit program or other employment related action which treats pregnancy or pregnancy-related conditions differently than other conditions which also cause inability to work for limited periods.

The bill requires equal treatment when disability due to pregnancy is compared to other disabling conditions. Although several State legislatures, including New York, have chosen to address the problem by mandating certain types of benefits for pregnant employees, S. 995 does not go that far. Instead, the bill adopts as its standard equality of treatment, and thereby permits the personnel and fringe benefit programs already in existence for other similar conditions to be the measure of an employer's duty toward pregnant employees. It definitely does not require a particular fringe benefit program; it does not require a certain disability benefit level; it does not require an unlimited duration for the benefit period; it does not require employer to hire pregnant women.

This approach represents only basic fairness for employees who become pregnant. Without this legislation, they may face a series of obstacles to continuing the pregnancy to term while maintaining their jobs and their incomes. Many women temporarily disabled by pregnancy have been forced to take leave without pay or to resign. In so doing, they have forfeited the income which holds their families together, which helps assure their children adequate nutrition and health care, and which helps keep their families from resorting to welfare. Faced with the dual cost of being forced to pay their medical costs plus losing their wages, many low-income women have felt that only one alternative remained—even unwanted abortion. Where other employees who face temporary periods of disability do not have to face the same loss, it is especially important that we not ask a potential mother to undergo severe disadvantages in order to bring another life into the world. I would hope that we all can see the injustice that has occurred and that continues to occur without this bill.

Mr. President, we can no longer in this country legislate with regard to women workers on the basis of outdated stereotypes and myths. The facts are that women, like men, often need employment to support families, that women, like men, find their work and their careers important sources of self-esteem and personal growth, and that women, like men, have the skills and motivation to make important contributions to this country's life, if only we will clear away the arbitrary restraints that sometimes stand in the way. I believe that this body's commitment to equality of treatment by sex is firm, and thus we should now reaffirm the policy of equality on the job, especially when the female employee is uniquely female, when she is pregnant.

Arbitrary job discrimination against women based on pregnancy or childbirth has no place in our society. It is my belief that the Federal Government, as a matter of vital social policy, has the responsibility of enacting those laws necessary to assure women of their opportunity for full participation in the workforce.

As in all legislation designed to correct social injustices, this bill will entail some costs to employers and to the public. In my judgment, however, the costs entailed are quite insignificant in light of the principle that underlies the bill. That discrimination on account of pregnancy or childbirth is sex discrimination, and that pregnancy and childbirth are conditions of unequalled importance to every family, are fundamental truths. We cannot let the estimate of very marginal percentage increases in the cost of these benefits, estimated at less than 5 percent of existing benefit costs, stand in the way of the full guarantee against sex discrimination in employment. As in the landmark Civil Rights Act of 1964, the legislation before the Senate now is designed to establish a principle that clearly outweighs any marginal costs incurred in its implementation.

Mr. President, the Supreme Court has provided us with an opportunity within our constitutional authority to amend title VII to make clear that sex discrimination includes classifications based on pregnancy. I urge my colleagues to support S. 995 and by so doing, to demonstrate once again our commitment to the achievement of genuinely equal opportunity for women.

Mr. STAFFORD. Mr. President, a parliamentary inquiry.

The PRESIDING OFFICER. The Senator will state it.

Mr. STAFFORD. It is my understanding that at 5 o'clock we will return to the pending legislation on saccharin. Is my understanding correct?

The PRESIDING OFFICER. That will occur at 5:04.

Mr. WILLIAMS. Mr. President, will the Senator yield?

Mr. STAFFORD. I yield.

Mr. WILLIAMS. Mr. President, the Senator from Indiana (Mr. BAYH) has been one of the leaders in the Senate in advancing this measure. I am glad he is in the Chamber as we begin our debate on the sex discrimination bill dealing with pregnancy and pregnancy related conditions and disability. He was with us at the time of the introduction of the bill and he was very forceful.

Mr. BAYH. I want to compliment him

as chairman of the committee for the leadership role he has played not only in holding hearings but also in being the chief sponsor, and I, along with several others, appreciate very much the opportunity to have joined with him.

I cannot think of an area where our country should make an extra effort to see that equality of treatment is accorded to all of our citizens to a greater degree than in the area of health. Brown against Board of Education, of course, was the landmark decision in the area of equality of education many years ago. But, unfortunately, we still have today rather substantial evidence in certain circumstances where certain classes of citizens who happen to be women are discriminated against relative to their ability to get health services delivered.

As will come out plainly in the debate, and has been mentioned before by our distinguished chairman and chief sponsor of the bill, what this measure is designed to do is not to say to manufacturers and employers "Thou shalt provide disability," but, indeed, "if you do either voluntarily or through the negotiating process between the work force and management determine that the work force should be covered by disability, thou shalt not discriminate against a classification within the work force, women, because women are uniquely capable of becoming pregnant."

I think we can make a good case on this not only on the basis of equity, but I think chapter and verse can be displayed or will be put on the record to show that those corporations that have provided pregnancy disability for women in the work force have really benefited as a result thereof.

Those who say this will present an unnecessary cost burden upon the industry in question should look at the record. The record shows, it seems to me, beyond dispute that in those instances where disability benefits for pregnancy have been made available for women in the work force, the time away from the job has been shorter, and thus the loss to the employer has been less, and the number of women who returned to the job, thus prohibiting the need to go out and get new workers and retrain them and reequip them for the job, the number of workers returning has been greater.

All of this, of course, is beneficial to the person who is running the plant.

So I think you can make a good dollars-and-cents case and, in my judgment, beyond dispute you can make a good case on the basis of the constitutional question of equity.

I again appreciate the distinguished Senator from New Jersey's contribution he has made to bring this to our attention, and I am looking forward to a successful legislative endeavor once again with him.

Mr. WILLIAMS. Mr. President, parliamentary inquiry.

The PRESIDING OFFICER. The Senator will state it.

Mr. WILLIAMS. Under the agreement entered into, is there any more time on this bill or have we reached the time limit?

The PRESIDING OFFICER. The Senator has 1 more minute remaining.

Mr. STAFFORD. Mr. President, if the Senator will yield to me for that minute——

Mr. WILLIAMS. I will be happy to yield to the Senator from Vermont.

Mr. STAFFORD. I would like to reaffirm the statement of the chairman of the committee. The bill came out of our committee with a unanimous vote.

I will also tell the distinguished chairman of the committee that I thought his explanation of this bill was an excellent one. It is too bad there were not more Senators on the floor to hear it, but it covered all of the details in excellent fashion.

I hope our colleagues, Mr. Chairman, will have the opportunity between now and the vote later tonight or tomorrow morning to read your opening statement for their full understanding of this important legislation.

Mr. WILLIAMS. I appreciate that.

It has been a great pleasure to work with the Senator from Vermont, as we developed this legislation in our committee. Our relationship has been productive in this, as in other matters; and it is a pleasure to work for these measures that are designed to bring new opportunities to people who are denied equal opportunities, as women have been denied certain opportunities as a result of the Supreme Court's decision in the Gilbert case.

Mr. BAYH. Mr. President, I ask unanimous consent that a member of my staff, Barbara Dixon, be accorded the privilege of the floor during the debate which will occur and the votes which will occur on S. 995.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. KENNEDY. Mr. President, we can set right the injustice of unequal health protection for male and female employees by passing S. 995. This amends section 701 of the Civil Rights Act of 1964 by providing that employers who offer disability benefits must offer them to cover pregnancies.

As a cosponsor of this legislation, and as one who spoke strongly in support of it in testimony delivered before the Labor Subcommittee, I welcome it to the Senate floor. It is a vital piece of legislation and must be passed.

It is only a shame that 13 years after passage of the Civil Rights Act we must still be addressing an elementary issue such as the one we face today.

In Gilbert against General Electric, the Supreme Court decided that employers did not have to include coverage for pregnancy and related illnesses in their disability plans. After all, neither men nor women were covered for their pregnancies.

But, as Justices Brennan and Marshall said in their dissent "A realistic understanding of conditions found in today's labor environment warrants taking pregnancy into account in fashioning disability policies."

Forty-seven percent of the labor force in the United States today are women. Seven of every 10 girls born today will at some point in their adult lives become a part of the labor force. In the past 30 years, the number of working mothers has tripled. In the past decade, women accounted for over 50 percent of the increase in the civilian labor force.

It is critical to remember that women work because they have to. Seventy percent of the women who work, over 25 million, are women who need the money to support their families, as they are either the sole wage earner, are married to husbands who earn less than $7,000 a year, or are single, divorced, or widowed.

Approximately 85 percent of working women become pregnant at some point during their working lives. Of the women who are briefly disabled by their pregnancies, 60 percent return to work.

At present, many of these women return to work at jobs that have not provided any disability coverage to them during the period of time they were medically certified as disabled.

Since women work to support their families, depriving them of such coverage at a time they and their families are very much in need of it discriminates not only against these women but against their families as well. This discrimination handicaps children who are born into families where a paycheck—possibly the only paycheck—has arbitrarily vanished.

This devastating effect is unfair and cuts to the heart of the Civil Rights Act. For, medical matters of far less serious concern are covered by these policies when they happen to affect men. Thus, the protections and attractions of the workplace are more comfortable for men than they are for women. I would call that discrimination.

Now, an employer can provide disability benefits for cosmetic surgery but not provide such benefits to women with genuine pregnancy-related disabilities. Many, though not all, fringe benefit plans follow a discriminatory pattern of providing for types of cosmetic surgery, or nonessential surgery such as vasectomies, but not pregnancies. And pregnancy is as voluntary or involuntary as skiing accidents, or diseases caused by smoking, yet the latter events are almost always covered by major medical plans.

The proposed amendment conforms to the 1972 guidelines of the Equal Employment Opportunity Commission.

This amendment does not require all employers to provide disability insurance plans; it merely requires that employers who have disability plans for their employees treat pregnancy-related disabilities in the same fashion that all other temporary disabilities are treated with respect to benefits and leave policies.

The time has come for Congress to guarantee to the 39 million working women of this Nation that sex discrimination in employment is ended. The time has come for all of us to understand that the Nation's economy and the economic resources and stability of countless families depend to a significant degree on the earnings of women who make up over 40 percent of our country's workers. The time has come to end for all time the ridiculous notion that with the tremendous challenges facing this

*September 15, 1977*     **CONGRESSIONAL RECORD — SENATE**     **29389**

Nation, we can any longer afford to waste, through discrimination, the wealth of talent and energy in our Nation's work force. Congress must take the responsibility of changing this situation by enacting this amendment.

## SACCHARIN STUDY, LABELING, AND ADVERTISING ACT

The PRESIDING OFFICER. Under the previous order, the Senate will resume consideration of S. 1750, which the clerk will report.

The assistant legislative clerk read as follows:

S. 1750, a bill to amend the Public Health Service Act and the Federal Food, Drug, and Cosmetic Act, as amended, to conduct studies concerning toxic and carcinogenic substances in foods, to conduct studies concerning saccharin, and so forth.

The Senate continued with the consideration of the bill.

The PRESIDING OFFICER. The clerk will report the pending committee amendment.

The assistant legislative clerk read as follows:

On page 10, beginning with line 7 down through line 16 on page 11, insert new language.

The PRESIDING OFFICER. Who yields time?

RECESS SUBJECT TO THE CALL OF THE CHAIR

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the Senate stand in recess awaiting the call of the Chair, and I think we can get started in 2 or 3 minutes.

There being no objection, the Senate, at 5:05 p.m. took a recess, subject to the call of the Chair.

The Senate reassembled at 5:10 p.m., when called to order by the Presiding Officer (Mr. ZORINSKY).

The PRESIDING OFFICER. The Senator from Massachusetts.

Mr. KENNEDY. Mr. President, what is the pending business?

The PRESIDING OFFICER. The clerk will state the pending committee amendment.

The assistant legislative clerk read as follows:

On page 10, beginning with line 7, insert new language down through line 16 on page 11.

The PRESIDING OFFICER. All time on the amendment has expired.

Mr. KENNEDY. Mr. President, I understand that is a committee amendment; am I correct in that?

The PRESIDING OFFICER. The Senator is correct.

Mr. KENNEDY. And there is a series of still pending committee amendments that have to be accepted.

The PRESIDING OFFICER. That is the last committee amendment.

The PRESIDING OFFICER. The Senator from Nevada.

Mr. CANNON. Mr. President, I call up amendment No. 834 and ask for its immediate consideration.

The PRESIDING OFFICER. The amendment will be stated.

The assistant legislative clerk read as follows:

The Senator from Nevada (Mr. CANNON) for himself and Mr. CRANSTON, Mr. DOMENICI, Mr. GOLDWATER, Mr. HAYAKAWA, Mr. STEVENS, Mr. STONE, Mr. THURMOND, Mr. TOWER, Mr. WALLOP, and Mr. ZORINSKY proposes amendment No. 834.

The amendment is as follows:

Beginning on line 7, page 10, strike out through line 10, page 11.

Mr. CANNON. Mr. President, there really is no debate necessary on this amendment as it is merely an amendment to insure that the print media and the electronic media are treated equally in terms of any advertising requirements Congress may or may not impose in this area.

This would strike the committee amendment requiring the warning to be printed in the advertisements in written communications.

It just does for the printed media precisely what we did in the previous amendment for the electronic media.

I have no desire to take any additional time.

I am willing to yield back my time unless there is further debate on this.

The PRESIDING OFFICER. The yeas and nays have been previously ordered on this amendment and would have to be vitiated.

Mr. KENNEDY. Mr. President, I yield myself what time I may use.

Mr. President, during the course of the debate on the previous two amendments that dealt with the electronic media the case was made, and the case was also made in the committee, first, that we are giving extraordinary discretion to the Secretary of HEW in fashioning a health message which would communicate the potential risk to the American consumer. There was serious resistance and reluctance among the membership to grant that kind of a broad authority to the Secretary of HEW, even though the committee believes that there is an extremely important and vital health issue in which the Secretary of HEW should be involved in protecting the health of the American consumer.

But the Senate went on record on that particular issue, saying we do not want to grant that authority based upon either the record of the committee or in the findings of the principal health officers of this country.

Then we went to the question that we will not grant that particular discretion which would give broad authority to the Secretary of HEW, without getting together with the Federal Communications Commission or other regulatory agencies. So then we indicated what we felt would be a fallback position which was to insist that in the electronic media they would still have the warning aspect added to the radio or to the television communication.

All that it would do in terms of television would require the same kind of warning label that would go on any of the particular food items or other items that had saccharin in it and we would require the similar kind of tag line which we add on the basis of all political advertising, a small simple tag line about the potential risk to your health and the potential risk of cancer. The

Senate went on record in opposition to that because they said:

In a short ad of 10 seconds or 20 seconds that is advertising these soft drinks that have saccharin we just cannot add that particular message.

Here we want to strike with regard to advertising even in the printed media.

In the area of cigarettes we do include a warning, and all we are trying to do in terms of the printed media is include a similar kind of warning.

The proponents of this particular amendment cannot say:

That is going to interfere with the broadcast industry or it is going to be a health message which is difficult to define, we cannot really do it, we do not have the knowledge or wherewithal or the understanding about how to do it.

All we are really saying is we are going to do the same thing in the area of the cancer-forming agent of saccharin in animals that we do in terms of smoking. It will be just lying there. The printed media will just be staring us in the face. It will not be a moving object. It will just be printed there, and people can give it what kind of consideration they want.

The simple kind of label that we mentioned before that indicates that:

Cancer has been found. The product contains saccharin which causes cancer in animals. Use of this product may increase your risk of developing cancer.

The members of the Commerce Committee want to strike that from the printed advertisement.

Mr. President, I think whatever legitimate arguments that the committee had before about unreasonable allocation of authority and power to the Secretary of HEW in an area where they were interested falls on this particular issue.

Mr. President, I know, although the argument has not been made here, some believe if we are going to strike it out in terms of the electronic media we should strike it out with regard to the printed media in order for fairness and equity.

Mr. President, if that is a constitutional issue or question, let the courts decide it, and I do say if we are going to commit discrimination let us discriminate in favor of the health of the American people on this particular issue.

That is what we are asking when we are talking about the danger of cancer in terms of the American society.

Mr. President, I would hope this amendment will be defeated.

I reserve the remainder of my time.

Mr. CANNON. Mr. President, the Senator did properly anticipate, I think, that this would raise the due process issue. If we treat the electronic media in one fashion, we need to treat the printed media in a similar fashion; otherwise we might well have an attack on the ground of due process.

I say to my good friend from Massachusetts that we are not proposing to make any change in the warning that is on the product itself. That warning remains there, and if the Senator is providing for the test here, within the bill, which again I support, if the results of those tests come back with some conclusive results such as we found in the

Addendum 027

USCA4 Appeal: 22-1927	Doc: 167-2	Filed: 03/24/2026	Pg: 30 of 45

we would surely be very far along in our battle against inflation of health costs generally. Frankly, I do not expect to support an across-the-board 9 percent limitation, but I do see a need for consolation and reorganizations which will help bring costs down.

I am deeply concerned about the special situation that exists in many small communities across the country, my study of the access to health services in small towns and rural areas leads me to believe that the administration's hospital cost containment proposal would do irreparable harm to rural Americans.

Two provisions of this proposal pose a special threat to small, community hospitals.

First, its 9 percent limit on hospital revenue increases could jeopardize their existence because they tend to operate on slim financial margins.

Second, its directives to increase hospital efficiency by reducing the number of beds in areas where occupancy rates are low would have the same effect because small, community hospitals traditionally have the lowest occupancy rates of any hospitals in the Nation.

The problem is that it is not fair or accurate to judge small community hospitals on the basis of their financial status and occupancy rates alone. They can never compete with metropolitan area hospitals in these categories. Their situations are different. But the service they provide to their communities is just as important.

For this reason, I want to voice my support for the actions congressional committees are taking to address the special problems of small hospitals. As approved by the Senate Human Resources Committee, S. 1391 would exempt from the hospital cost containment program all hospitals that have fewer than 2,000 admissions annually—about equivalent to an exemption for hospitals with less than 50 beds.

In addition, hospitals that are the sole community providers would be exempt if they have fewer than 4,000 admissions per year, under the Senate bill. The House Ways and Means Health Subcommittee agreed to exempt from the program all hospitals with less than 4,000 admissions a year.

The situation in my home State of Iowa illustrates the need for such action. A study by the Iowa Health Systems Agency concluded that empty hospital beds account for $100 million a year in hospital spending. If the proposed national goal of 4 beds per 1,000 population were imposed upon Iowa, more than half of Iowa's 134 community hospitals would have to be shut down entirely. The focus of these shut-downs would likely be in the small communities, where the occupancy rates are the lowest. However, such a move would entirely ignore the socioeconomic and health effects that would result from closing hospitals in rural areas.

A recent report by interstudy for HEW, entitled "Reducing Excess Hospital Capacity," concluded that:

No very precise estimate of the net savings achievable by excess hospital capacity can be made. Rather each individual community, with all its idiosyncratic factors, must be examined to see what is possible. For example, in an isolated rural community the need to have available beds because there is no other hospital to go to may override closing hospital capacity that is usually idle.

While the report did make a strong argument for retiring hospital beds and entire hospitals, it noted that these steps would have harmful side-effects for the local medical care system and for the economy of several communities. I believe that this would most accurately relate to communities that contain just one hospital:

Their ability to draw and hold physicians may be hampered;

Alternate sources of in-patient care may not be within a reasonable distance;

Local employment may significantly drop in areas in which the hospital is a major employer; and

The community may be less attractive to new residents and employers.

I am especially troubled by the potential impact of hospital closings upon the availability of primary health services in rural areas. The numerous hearings conducted by the Rural Development Subcommittee have made clear to me that physicians are very reluctant to locate in communities that do not have, or are not in close proximity to, a hospital.

I fear that a trend toward the centralization of hospitals would be accompanied by the further centralization of physicians and of basic health care services. Our Nation is currently attempting to reverse this very trend toward the geographic maldistribution of physicians, and a policy of reducing the number of small hospitals would clearly be antagonistic to that objective.

I recently received a letter, for example, from a small town doctor, C. D. Gibson of Sac City, Iowa, who poignantly described the probable impact of closing small hospitals in his area that have relatively low occupancy rates. Dr. Gibson predicted that:

If all the hospitals 90 beds or under were closed in NW Iowa north of highway 20 and west of I–35 there would only be hospitals in Sioux City, Ft. Dodge, and perhaps Spencer and Clear Lake. Inside of one or two years, there would be very few doctors in this area and so the people would be the ones really suffering.

Exemption of these small hospitals will have a minimal impact upon hospital costs. A 1975 survey of American hospitals by the American Hospital Association found that the 2,935 community hospitals that have fewer than 100 beds constitute only about 10 percent of the total community hospital expenses in the United States.

In my home State of Iowa, 87 of the State's 134 community hospitals have less than 100 beds, but they account for just 18 percent of the total hospital expenses in Iowa. In fact, the five Iowa hospitals that have 500 or more beds account for substantially more expenses than the 87 small hospitals combined.

Clearly, this small hospital exemption from the cost containment program would be of great benefit to rural hospitals and the communities they serve, without a significant impact on the total hospital cost picture.

I ask unanimous consent that a table that illustrates this point be printed in the RECORD.

There being no objection, the table was ordered to be printed in the RECORD, as follows:

HOSPITAL DATA BY SIZE OF HOSPITAL

| Community hospitals (beds) | United States | | | Iowa | | |
|---|---|---|---|---|---|---|
| | Number | Occupancy (percent) | Expenses | Number | Occupancy (percent) | Expenses |
| 6 to 24 | 299 | 48.0 | $118,995 | 5 | 56.2 | $1,470 |
| 25 to 49 | 1,155 | 56.7 | 963,080 | 42 | 52.5 | 28,685 |
| 50 to 99 | 1,481 | 64.7 | 2,884,775 | 40 | 62.7 | 53,885 |
| 100 to 199 | 1,363 | 71.2 | 6,702,614 | 24 | 69.6 | 90,386 |
| 200 to 299 | 678 | 77.1 | 6,767,720 | 8 | 71.1 | 56,276 |
| 300 to 399 | 378 | 79.7 | 5,804,028 | 9 | 68.7 | 86,080 |
| 400 to 499 | 230 | 81.1 | 4,759,138 | 1 | 80.2 | 17,281 |
| 550 or more | 291 | 80.9 | 10,961,213 | 5 | 74.4 | 125,191 |

Source: American Hospital Association 1975 annual survey.

Mr. CLARK. As a further step to deal with the small hospital problem, I recommend that Congress also remove the obstacles to merging hospital and nursing home patients within the same facility. This modification would accomplish a number of useful objectives. Small rural hospitals would have an opportunity to reduce the number of under-utilized beds and thereby reduce their costs. Also, long-term care services would become more available in regions that previously had little or no such resources.

A study of long-term care services in Iowa found that 18 of the 20 Iowa counties with the highest proportions of elderly persons had no skilled or extended care beds at all. This is despite the fact that Iowa's small hospital occupancy rates average around 60 percent.

The Iowa Hospital Association has endorsed this change by stating in a letter to me:

We think that this is a needed reform to make the most appropriate and cost effective use of underused hospital facilities. The present medicare reimbursement regulations prohibit the use of unused hospital beds for long term care patients.

In fact, an experimental program of this sort is now operating in Iowa. Blue Cross/Blue Shield of Iowa reported to me recently that this "Iowa Swing Bed" program has attracted the participation of 15 Iowa hospitals, and another 16 hospitals have requested consideration for inclusion in the program.

I urge my colleagues to consider this proposal as an integral part of the hospital cost containment program now being drafted.

Mr. President, I yield the floor.

Mr. ROBERT C. BYRD. Mr. President, have all the orders been completed?

The PRESIDENT OFFICER (Mr. ZORINSKY). They have.

## PROHIBITION OF SEX DISCRIMINATION ON THE BASIS OF PREGNANCY

The PRESIDING OFFICER. Under the previous order, the Senate will now resume consideration of S. 995, which the clerk will state by title.

*September 16, 1977*     **CONGRESSIONAL RECORD — SENATE**     **29641**

The assistant legislative clerk read as follows:

A bill (S. 995) to amend title VII of the Civil Rights Act of 1964 to prohibit sex discrimination on the basis of pregnancy.

The Senate resumed consideration of the bill.

(Remarks made by Mr. EAGLETON at this point are printed later in today's RECORD.)

Mr. BAYH. Mr. President, as one of the original sponsors of S. 995, it gives me great pleasure to say a few words here today in support of this legislation which seeks to end discrimination against pregnant workers. This legislation was made necessary by an unfortunate decision rendered by the Supreme Court in the case of *Gilbert* v. *General Electric* 45 U.S.L.N. 4031 (1976). In handing down its decision last December, the Court declared that employment discrimination against a woman on account of pregnancy or childbirth did not constitute sex discrimination under title VII of the Civil Rights Act of 1964.

In making this finding, the Court specifically held that the General Electric Co., in denying temporary disability benefits to women unable to work due to pregnancy, childbirth, or complications thereof, was not in violation of title VII's statutory prohibition of discrimination on the basis of sex in employment or fringe benefit plans.

The Supreme Court decision in Gilbert runs directly counter to six unanimous Federal Appellate Court decisions, the sex discrimination guidelines implementing title VII issued by the Equal Employment Opportunity Commission and the the intent of Congress in prohibiting sex discrimination in employment under the 1964 Civil Rights Act. In addition, while the Gilbert case itself only pertained to disability insurance, the Court's broad exclusion of pregnancy discrimination under title VII holds many unfortunate implications for other related issues such as hiring or firing of pregnant workers.

I. BACKGROUND: GILBERT AGAINST GENERAL ELECTRIC

The particular issue contested in the Gilbert decision concerned the payment of temporary nonoccupational disability benefits to women workers who were medically determined to be physically unable to work due to pregnancy, childbirth, or related medical conditions such as miscarriage or hypertension. Temporary disability benefits are defined as payments made on a voluntary basis by companies to compensate workers for wages lost while they are physically unable to work; 63 percent of the civilian work force has some form of temporary disability coverage.

In the case of General Electric, the company voluntarily provided these benefits to all of its employees in an amount equal to 60 percent of an employee's straight time weekly wages up to a maximum benefit of $150 per week for up to 26 weeks for any one disability. The General Electric plan offered disability payments for all types of male disabilities including vasectomies, circumcisions, prostatectomies, as well as covering hair transplants, injuries incurred as a result of a fight, sports injuries, and incapacity due to alcoholism or drug abuse. Specifically excluded from coverage by the GE plan are disabilities which arise from pregnancy, childbirth, or complications therefrom.

Interestingly, plans such as General Electric's represent only 40 percent of all disability plans offered in the United States. Sixty percent of the disability plans in this Nation voluntarily cover pregnancy and childbirth. Among the companies offering the more comprehensive, nondiscriminatory coverage are IBM, Firestone, Xerox, Cummins Engine, Martin-Marietta, and Polaroid.

The plaintiffs in the Gilbert case brought action against General Electric on the grounds that GE's disability pay excluding pregnancy and childbirth was a violation of title VII of the Civil Rights Act which prohibits employment discrimination on the basis of sex. In support of their case, the plaintiffs pointed to the sex discrimination guidelines implementing title VII issued by the Equal Employment Opportunity Commission. According to these guidelines:

Disabilities caused by or contributed to by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom are, for all job related purposes, temporary disabilities, and should be treated as such under any health or temporary disability insurance or sick leave plan available in connection with employment. Written and unwritten employment policies and practices shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they apply to other temporary disabilities.

Unfortunately, the Court, basing much of its argument on the Court's prior decision in *Geduldig* v. *Aiello*, 417 U.S. 484 (1974) rejected the argument that discrimination against a woman on the basis of pregnancy is discrimination against a woman on the basis of her sex. The Court in Aiello had rejected an equal protection challenge to a similar disability insurance program financed by the State of California. Holding that the same principle applied in the statutory challenge under title VII, Justice Rehnquist stated:

As there is no proof that the package is in fact worth more to men than to women, it is impossible to find any gender-based discriminatory effect in this scheme because women disabled as a result of pregnancies do not receive benefits; that is to say, gender-based discrimination does not result simply because an employer's disability benefit plan is less than all-inclusive. For all that appears, pregnancy-related disabilities constitute an additional risk, unique to women, and the failure to compensate them for this risk does not destroy the presumed parity of the benefits . . .

==The Court's strained logic in the majority opinion was well articulated by both Justices Brennan and Stevens in their separate dissents.== Commenting on the GE plan, Justice Stevens stated:

By definition such a rule discriminates on account of sex; for it is the capacity to become pregnant which primarily differentiates the female from the male.

In addition to setting a disturbing precedent for other pregnancy-related sex discrimination cases, the majority decision in Gilbert has several other far-reaching consequences for working women. First, the decision permits companies to deny temporary disability payments to women who are disabled as a result of medical complications arising from pregnancy or childbirth. This means that women who suffer from miscarriage, massive hemorrhaging, or toxemia in connection with pregnancy or childbirth cannot receive disability benefits on the same basis as a man who is disabled from a hair transplant.

Second, the Gilbert decision would allow companies to deny coverage for any nonpregnancy related medical condition or accident occuring while an employee is on pregnancy leave. A spokesperson for General Electric gave a synopsis of how this policy works in testimony before the district court. He stated that if a male employee has taken an unpaid leave of absence, and within the first several days of this leave is struck by a car, he is provided full coverage under the GE plan. If a pregnant woman is on an unpaid leave of absence and within the first few days of her leave is struck by a car, she receives no coverage whatsoever under the disability plan.

Third, the denial of temporary disability benefits for that period when a woman is physically unable to work due to pregnancy, childbirth or related medical conditions has potentially devastating economic consequences for millions of working women. A brief look at the statistics on working mothers helps to document the importance of disability payments for these women. The number of working mothers has more than tripled since 1950. About 85 percent of all working women will be pregnant at some time during their working lives. Many of these working mothers are the heads of families. Seventy percent, or over 25 million of the women who work, are either their families' sole wage earner, are married to husbands who earn less than $7,000 per year or are single, divorced, or widowed.

A more vivid illustration of the economic consequences of denying disability benefits to pregnant workers is revealed in the case history of Mrs. Sherrie O'Steen, one of the plaintiffs in the Gilbert case. Mrs. O'Steen went to work for General Electric at its Portsmouth, Va., plant on June 1, 1971, at which time she was given an employee handbook stating that pregnant workers would be required to go on unpaid leave at the end of their sixth month. At no time during her employment at GE was she told that the company's practice in the regard was held unconstitutional. She accidentally became pregnant in 1972.

Shortly thereafter, she was separated from her husband, and became the sole supporter of her 2-year-old daughter. After going on unpaid leave, Mrs. O'Steen was forced to apply for welfare in order to continue to be able to support herself, her daughter, and her unborn baby. Before she could receive her first welfare check, her electricity and gas were turned off because she could not afford to pay

USCA4 Appeal: 22-1927    Doc: 167-2    Filed: 03/24/2026    Pg: 32 of 45

the bills. For the months of November and December, Mrs. O'Steen and her daughter lived without any light, heat, refrigeration, or cooking facilities. Mrs. O'Steen's nervous state over her lack of income threatened the loss of her unborn child.

### II. POTENTIAL IMPACT OF S. 995

In handing down its decision in Gilbert, the Court made it clear that if the Congress wanted to make sure that discrimination on the basis of pregnancy was to be considered sex discrimination, it would have to make that clear by passing legislation so stating. This is precisely what the legislation before us today does—it adds a new section to section 701 of the Civil Rights Act of 1964 specifying that for the purposes of that act, discrimination on the basis of sex shall include discrimination on the basis of pregnancy, childbirth, or related medical conditions. The legislation will go into effect immediately upon enactment except for the requirements of the legislation pertaining to fringe benefit plans which would go into effect 120 days after enactment.

What would the impact of this legislation be on our Nation's businesses? First, nothing under this legislation would require a company to offer either a health insurance or a disability insurance plan if it is not presently doing so. The legislation only affects those companies who voluntarily provide such coverage to their employees.

Second, the legislation would not require employers to provide hospital medical coverage for maternity. What it does require is that where hospitalization is offered for other disabilities, it must be offered on the same basis for pregnancy related disabilities. Companies may not single out pregnancy-related disabilities for reduced coverage.

Third, the legislation will not require that companies provide the same pregnancy coverage for the dependents of male employees that it provides to its female employees. There remains the question, however, of whether dependents of male employees must receive full maternity coverage if the spouses of female employees are provided complete medical coverage. While it is difficult to second-guess the courts, I feel that the history of sex discrimination cases under the 14th amendment in addition to previous interpretations of the Title VII regulations relating to the treatment of dependents will require that if companies choose to provide full coverage to the dependents of their female employees, then they must provide such complete coverage to the dependents of their male employees.

Fourth, in terms of disability pay, the legislation would require that disability based on pregnancy, childbirth or related medical conditions be treated as any other disability under a company plan. This does not mean that a woman who has a normal pregnancy can collect benefits for the duration of her pregnancy; rather it means that a woman could collect disability benefits for that period of time when she has been medically certified as physically unable to work due to pregnancy or a related medi-

cal condition. According to the Department of Labor, that period of time for women employees in most companies is 7.5 weeks.

Fifth, the enactment of this legislation will not be excessively costly to the American businessman. This is not to say that no expenditures would be required. The Department of Labor has estimated that the cost of this legislation as it pertains to disability insurance will be $119.5 million. This figure represents only a 3.5-percent increase in temporary disability costs nationwide and only a 0.05-percent increase in total payroll costs for workers covered by temporary disability plans.

The Department of Labor was unable to estimate the cost of this legislation as it pertains to health insurance; however, 25 States already require that companies must not discriminate on the basis of pregnancy or childbirth in their health insurance plans.

### III. CUMMINS ENGINE

I think one of the best ways to assess the impact of this legislation is to take a closer look at companies which already voluntarily provide such coverage to their female employees. One such corporation is located in my own State of Indiana, Cummins Engine, Inc.

Cummins Engine has had a policy which provided temporary disability benefits to women workers disabled by pregnancy for approximately 5 years now. When the company first extended disability benefits to its women workers disabled by pregnancy, it limited the coverage to a maximum of 4 weeks. In 1973, the company changed this policy so that pregnancy would be treated as any other disability under the Cummins plan.

Cummins Engine has a short term disability payments program for each of its three groups of Columbus-based employees. These programs differ in that the hourly employees are enrolled in an insured program while salaried employees receive disability pay in the form of a salary continuation plan. In practice this means that hourly employees receive a flat disability benefit of approximately $100 per week for a maximum of 52 weeks. Salaried employees receive their full salary for the first 3 months of disability, 75 percent of their salary for the next 3 months, and then 60 percent thereafter.

The administration of these disability plans are similar in that an employee must be under the care of a licensed physician and must furnish a statement from the physician certifying the disability. Disabilities arising from pregnancy or childbirth are treated as any other medical disability under both of these plans.

One concern that is raised by those who are fearful of requiring coverage for pregnancy-related disabilities is that women workers will abuse the system. These critics contend that women will take advantage of the liberal benefits and collect for as long as 30 weeks. The experience of Cummins shows that this is not the case for a majority of women workers who take disability coverage for pregnancy-related disabilities. Information gathered from the medical staff

and doctors in the Columbus area indicated that the average length of disability for normal childbirth was 6 to 8 weeks. Cummins found that this normally spanned the time from approximately 2 weeks before to 4 to 6 weeks after delivery. There are instances of women workers with complications arising from their pregnancy or childbirth which physically incapacitated these workers for longer than 8 weeks, but Cummins' record shows this to be the exception, not the rule.

Another concern that has been raised regarding S. 995 is its potential cost to employers. In order to put the cost of this legislation in perspective, Cummins has provided me with data on their disability program for a sample year, 1976. These figures are derived from the three employee categories at Cummins, hourly employees in the shop, hourly employees in the office, and salaried employees.

The shop hourly employees are paid $100 weekly when they are unable to work because of an accident or illness. During 1976 this group consisted of 5,428 employees, of which 235 were women, and a total of $4,780 was paid in weekly disability payments to five female employees for maternity related disabilities. Two of these disabilities involved complications and extended for 10 and 20 weeks respectively while the remaining three disabilities were for a period of 6 weeks.

The office hourly employees are paid $102 weekly when they are unable to work because of an accident or illness. During 1976 this group consisted of 1,571 employees, of which 733 were women, and a total of $31,259 was paid in weekly disability payments to 41 female employees for maternity related disabilities. Eight of these disabilities involved complications and extended for periods ranging from 9 to 30 weeks while the remaining 33 disabilities fell within the normal 6 to 8 weeks referred to earlier.

The salaried employees are paid their full salary for the first 3 months of a disability and 75 percent of salary for the next 3 months. During 1976 this group consisted of 2,124 employees, of which 100 were women, and a total of $22,400 was paid in disability payments to 7 female employees for maternity related disabilities. Two of these disabilities involved complications and extended for 8 months and 3½ months while the remaining five disabilities fell within the normal 6- to 8-week period.

The total benefits paid to hourly employees at Cummins during 1976 for maternity related disabilities was $36,039 as compared to a total of $1,300,000 in disability payments for all hourly employees. This means that the cost of providing pregnancy-related disability coverage was only 2.7 percent of the total cost of the benefit program for all hourly employees.

It seems clear that Cummins Engine has found the provision of pregnancy-related disability benefits to its women employees a satisfactory experience. The cost of providing such coverage has not been overbearing, and the statistics as provided by the company show that a

Addendum 030

*September 16, 1977*     **CONGRESSIONAL RECORD — SENATE**     29643

majority of women do not need to take more than 8 weeks of coverage.

Swift congressional action on this legislation is extremely important to the women workers of our Nation. Forty-five percent of all married women are now in the work force, and this Nation owes these women equal protection under our laws. Discrimination against pregnant workers remains one of the areas of employment discrimination facing women in the work force. I urge my colleagues to support this measure before us today and help eliminate one of the last barriers of sex discrimination in employment.

Mr. WILLIAMS. Mr. President, because of the time situation that we are in, I ask unanimous consent, after calling for a quorum, that any time taken on this bill be taken equally from either side on this bill.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. WILLIAMS. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. EAGLETON. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. EAGLETON. Mr. President, I ask unanimous consent that a member of my staff, Steve Roling, be granted privilege of the floor during deliberations and voting on S. 995.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. EAGLETON. Mr. President, I suggest the absence of a quorum and I ask unanimous consent that the time be equally charged on the bill.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. WILLIAMS. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. WILLIAMS. Mr. President, I move that the committee amendments be considered and agreed to en bloc and considered as original text for the purpose of further amendment.

The PRESIDING OFFICER. The question is on agreeing to the committee amendments en bloc.

The committee amendments were agreed to en bloc.

Mr. WILLIAMS. Mr. President, the Senator from Missouri (Mr. EAGLETON) wishes to speak now on an amendment. It deals with the question of the definition of pregnancy and related medical conditions, and the amendment says:

This shall not be construed to include abortions except where the life of the mother would be endangered if the fetus were carried to term.

That amendment will be offered later, but we will be debating that now; and I know that the Senator from Indiana

wants to speak to the issue, and I yield to the Senator.

The PRESIDING OFFICER. The Senator from Indiana.

(Remarks by Mr. BAYH, Mr. WILLIAMS, and Mr. JAVITS at this point are printed later in today's RECORD during consideration of Mr. EAGLETON's amendment.)

The PRESIDING OFFICER. Who yields time?

Mr. WILLIAMS. Mr. President, I have no further statement at this time. We are working under an agreement by which amendments will be offered this morning and the voting will begin at noon.

Therefore, I yield the floor and await any amendments which might be offered.

The PRESIDING OFFICER. If neither side yields time, the time runs equally.

Mr. HATCH. Mr. President, I have a clarification——

The PRESIDING OFFICER. Who yields time to the Senator from Utah?

Mr. JAVITS. How much time do we have, Mr. President?

The PRESIDING OFFICER. The Senator from Jersey has 30 minutes, and the Senator from New York has 70 minutes.

Mr. JAVITS. Mr. President, I yield 20 minutes to the Senator.

Mr. HATCH. Mr. President, I ask unanimous consent that Caroline Randel, of Senator HANSEN's staff, be granted the privileges of the floor during the consideration of the pending legislation.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. HATCH. Do the managers and sponsors of this bill intend S. 995 to be preemptive of State laws so that no employer shall be required to take any action with regard to any pregnancy related disability benefit, or to pay any such benefit, which shall exceed the requirements of this act, by reason of any State or local law or ordinance or by any regulation or order of any Federal, State or local department or agency?

To put it in a somewhat different way, if a State law defines sex discrimination to include discrimination against pregnant women but the law contains a cap on the length of disability benefits, would that State law supersede this law so that it would be enforceable?

Will the distinguished manager of the bill help me in regard to that particular question?

Mr. WILLIAMS. I suggest to the Senator from Utah that title VII does not preempt State laws which would not require violating title VII. This is made clear by existing law. Section 708 of title VII, as well as section 706(c), expressly provides that State laws which protect employees from discrimination shall remain in effect unless they operate to permit or require discrimination. The question of a State law which provides or permits a cap on periods of disability—is that the question being raised by the Senator from Utah?

Mr. HATCH. Yes. I use that as a specific example.

Mr. WILLIAMS. I would think that here, again, the title VII test would apply and it would be a question of whether

there was discrimination. Within the State law, if all disabilities were classified in terms of time, I would say that that would meet the test of nondiscrimination. I would think if a State law did select, and it were found through all the tests on discrimination that the classification and selection were discriminatory, then the State law that discriminated would not be permitted to stand on a test.

Mr. HATCH. If it is nondiscriminatory, it should take preemption over the Federal law in this matter?

Mr. WILLIAMS. That would be my interpretation of the law as it is. Whether the Supreme Court would agree, we never know. That situation has been tested in law and that is the conclusion we draw.

Mr. HATCH. So far as our legislative history here is concerned, that is the correct senatorial interpretation. What about conflicts between the State and Federal law? Would the State law preempt the Federal laws except in the matter where the Supreme Court or the Federal law states there is discrimination?

Mr. WILLIAMS. If there were clear conflicts on this issue and the States attempted to permit what this legislation in an amendment of the Civil Rights Act would prohibit, obviously the Federal law would prevail, if there were a clear conflict.

I would like to offer an example of a clear conflict. We define discrimination in our terms in this amendment, pregnancy and related conditions being sex discrimination. If the negative were included in a State law, that would be in absolute conflict with the Federal law and the Federal law would prevail.

Mr. HATCH. Again where we have known discrimination?

Mr. WILLIAMS. What I am stating is the most stark conflict where it was positively set at the State level that this particular situation, pregnancy, is not discrimination. In the same context, we say it is discrimination and we would prevail at the Federal level.

Mr. HATCH. But where there is, in effect, no discrimination, then the State law would prevail?

Mr. WILLIAMS. That is correct.

Mr. HATCH. And it would preempt the Federal law?

Mr. WILLIAMS. In all of the tests of discrimination, there clearly is an opportunity for the State to act.

Mr. HATCH. I cite the footnote which I think bears out what the distinguished floor manager has said. That is on page 3 of the committee report, which says:

Since title VII does not preempt State laws which would not require violating title VII, these States would be able to continue to endorse their State laws if this bill were enacted.

Let me go a little bit further. The phrase "women affected by pregnancy, childbirth or related medical conditions," appearing on page 2, lines 1 and 2, appears to be overly broad, and is not limited in terms of employment. It does not even require that the person so affected be pregnant.

several essential amendments when S. 995 pregnancy disability benefits bill, reaches Senate floor.

Bill intervenes in area of employee benefits where cost in substantial and potential for abuse great. Since 50 percent of female employees who take pregnancy leave do not return to job, as shown in General Electric case upheld by Supreme Court, pregnancy disability benefit amounts to form of severance pay not provided other workers.

While Chamber believes bill should be rejected, because added cost of pregnancy payments will likely deter establishment of new company plans, three amendments would improve bill significantly: (1) limit benefit period to no more than six weeks; (2) exclude from coverage any pre-existing pregnancy when employer's disability plan excludes other pre-existing conditions (3) defer effective date one year from enactment, enabling employers to bring existing plans into conformity.

HILTON DAVIS,
*Chambers of Commerce of
the United States.*

Mr. HATCH. Mr. President, I have a mailgram from Dale D. Stone, senior vice president of the Sun Co., Inc., formerly the Sun Oil Co.; a mailgram from William L. Kreutz, director of public affairs, Owens-Corning Fiberglass Corp.; and a telegram from A. J. Dragonette, president of the Fabri Form Co., Cambridge, Ohio, which I ask unanimous consent to have printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

[Mailgram]

PHILADELPHIA, PA.
*September 13, 1977.*

Hon. ORRIN G. HATCH,
*United States Senate,
Washington, D.C.*

DEAR SENATOR HATCH: I understand you will be offering three amendments to Senate bill S. 995 either this afternoon or tomorrow morning. I want you to know that we at Sun Company support you in this effort.

We believe that disability benefits should be extended to our pregnant female employees, excluding employees who are pregnant when hired, allowing one full year for implementation of these benefits and limiting the term of disability coverage under normal circumstances to six weeks will enable us to provide reasonable coverage for our employees and will minimize the possibility for abuse of benefits provided.

Sincerely,

DALE D. STONE,
*Senior Vice President, Sun Company,
Inc. (formerly Sun Oil Company).*

[Mailgram]

TOLEDO, OHIO,
*September 14, 1977.*

Senator ORRIN G. HATCH,
*U.S. Senate,
Washington, D.C.*

DEAR SENATOR HATCH: We have been following the Senate Human Resources Committee's consideration of S. 995 to prohibit employment distinctions based on pregnancy. While Owens Corning Fiberglass has a concern for some of the provisions contained in the bill, we are equally concerned with the effective date of those provisions should the legislation be passed by Congress. We believe that a period of 12 months is necessary to revise personnel policies, provide for anticipated employment changes and to implement the proposed requirements, we ask that your deliberations give considera-

tion to the company's need for an orderly transition of employment practices.

WILLIAM L. KREUTZ,
*Director of Public Affairs, Owens Corning
Fiberglass Corp.*

[Telegram]

FABRI FORM CO.
*Cambridge, Ohio.*

Senator HATCH,
*Dirksen Senate Office Building,
Washington, D.C.*

More legislation is mandating benefits normally negotiated at the bargaining table. Such legislation detracts from the traditional process. S995 is such legislation. We support the Hatch amendment because we cannot afford the cost of pregnancy disability without the year you are providing.

A. J. DRAGONETTE,
*President.*

Mr. HATCH. Mr. President, these basically support the amendment I am bringing forth at this time, as well as the other amendments I intend to offer with regard to this bill, one of which has been basically accepted in principle.

I reserve the remainder of my time.

Mr. WILLIAMS. Mr. President, I yield myself such time as I may require on this amendment.

I understand that this amendment is No. 832, which would extend the effective date with regard to fringe benefit plans from 120 days after enactment to 1 year.

I say to my colleague and good friend from Utah that during the course of the committee's deliberations regarding this legislation, we received suggestions regarding an effective date with regard to fringe benefit plans, ranging from immediately to 1 year after enactment. That is the outer limit that was suggested to us. That is the time that is included in the amendment before us— 1 year after enactment.

The bill as reported by the committee makes the legislation effective with regard to such plans 120 days after enactment. The effective date which is provided by the bill will provide a reasonable period within which employers and insurance companies can make necessary adjustments in existing plans in order to bring them into compliance with the law. I state that on the basis of abundant evidence.

In deciding that 120 days will be a sufficient period of time for this purpose, we considered not only the needs of employers and insurance companies but also the needs of the women who will be protected by this legislation.

I believe that the time period provided in the bill gives full recognition to the practical necessity of a period for coming into compliance and also recognizes the pressing need to make this legislation effective as soon as possible.

Mr. President, I suggest the absence of a quorum, the time to be equally divided.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will call the roll.

The second assistant legislative clerk proceeded to call the roll.

Mr. WILLIAMS. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. WILLIAMS. Mr. President, there are numerous examples for employers to follow as they come into compliance with this law. This bill is merely reestablishing the law as it was understood prior to the Supreme Court's recent decision. Employers who were following the common interpretation of title VII before the Supreme Court's decision, and employers in the numerous States which require equal benefit under State law, have already adjusted to the principle of equality.

As I have already stated, no fewer than 23 States already require that benefits be paid without discrimination on the basis of pregnancy or related conditions. Of course, many employers have voluntarily adopted policies of nondiscrimination. Taken together, employers covered by State laws prohibiting discrimination, and employers who have adopted nondiscrimination policies of their own, make up a very large body of experience which provides numerous patterns for examples to be followed by employers who will be required to change their employment practices as a result of this legislation.

During the hearings on this bill, the International Union of Electrical Workers provided the committee with a list of collective bargaining agreements which they have entered with various employers providing temporary disability benefits on a nondiscriminatory basis. These companies are of various sizes, and operate in various States; but they have all been able to adjust their plans to accommodate the agreement to provide benefits on a nondiscriminatory basis.

I would also like to call the Senators' attention to a digest of selected health and insurance plans compiled by the U.S. Department of Labor in 1974. This study of 148 health and insurance plans shows that 87 plans have maternity benefits which treat pregnancy as any other temporary disability, as compared with 61 plans which do not treat pregnancy equally. The companies which did then provide equal benefits represent a wide variety of industries, and are located in many different States.

Moreover, there is good reason to believe that substantial progress has been made since 1974. A Prentice-Hall survey of maternity leave policies done in 1972, revealed that considerable progress in eliminating discrimination had occurred in the 7-year period from 1965 to 1972. Furthermore, the survey revealed that many policies were then presently being reviewed. The survey reported, and I quote "Over half the survey respondents are contemplating making changes in their maternity-leave policies, or at least are reviewing their policies. In two out of three cases, this is being done to conform company policies to EEOC guidelines."

Employers who are still discriminating against their women workers on the basis of conditions related to pregnancy will, therefore, have numerous examples to follow in coming into compliance. They should have no difficulty selecting an appropriate pattern and making any necessary changes in their employment

Addendum 032

practices within the 4-month period provided by this legislation.

For these reasons, I oppose the proposed amendment.

Mr. President, I ask unanimous consent that statistical material indicating the States that require coverage for pregnancy and pregnancy-related disabilities be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

LIST OF STATES WHICH REQUIRE COVERAGE FOR PREGNANCY AND PREGNANCY-RELATED DISABILITIES

Alaska, California, Colorado, Connecticut, District of Columbia, Hawaii, Illinois, Indiana, Iowa, Kansas, Maryland.

Michigan, Minnesota, Montana, New Hampshire, New Jersey, New York, Oklahoma, Oregon, Pennsylvania, South Dakota, Washington, Wisconsin.

Mr. WILLIAMS. Mr. President, I ask unanimous consent that a table submitted to the subcommittee by a Justice Department witness, which lists leading firms in a variety of industries which pay temporary disability benefits for disabilities arising out of pregnancy, be printed in the RECORD.

There being no objection, the appendix was ordered to be printed in the RECORD, as follows:

### APPENDIX A

PLANS OF "LEADING FIRMS IN A VARIETY OF INDUSTRIES" [1] WHICH PAY TEMPORARY DISABILITY BENEFITS FOR DISABILITIES ARISING OUT OF PREGNANCY

| Name of company | Digest of 100 Selected Health and Insurance Plans, 1954 [2] | | 1971 edition, vol. II | | 1974 edition, vol. II | |
|---|---|---|---|---|---|---|
| | Weeks | Page | Weeks | Page | Weeks | Page |
| Aluminum Co. of America | 6 | 91 | 6 | 1 | 6 | 1 |
| American Can | 6 | 103 | 6 | 7 | 6 | 7 |
| American Seating | 6 | 43 | 26 | 9 | 26 | 9 |
| American Standard | Not listed | | 6 | 11 | 6 | 11 |
| American Sugar | 6 | 7 | Not listed | | Not listed | |
| American Viscose | 6 | 67 | Not listed | | Not listed | |
| Amstar Corp | 6 | 19 | 6 | 15 | 6 | 15 |
| Armour & Co | 6 | 19 | 8 | 17 | 8 | 17 |
| Armstrong Cork | 6 | 25 | 6 | 19 | 6 | 19 |
| Association of Master Painters | 13 | 163 | Not listed | | Not listed | |
| Bethlehem Steel | 6 | 97 | 6 | 21 | 6 | 21 |
| Borden, Inc | Not listed | | 6 | 23 | 6 | 23 |
| Brewers' Board of Trade | Not listed | | None | | 26 | 25 |
| Campbell Soup | 4 | 7 | 8 | 31 | 8 | 33 |
| Caterpillar | 6 | 115 | 6 | 35 | 6 | 37 |
| Chase Brass & Copper | None | 91 | 6 | 41 | 6 | 43 |
| Chicago Lithographers | 6 | 61 | Not listed | | Not listed | |
| Cluett Peabody | Not listed | | 6 | 49 | 6 | 51 |
| Colt's Manufacturing Co | 6 | 7 | Not listed | | Not listed | |
| Cone Mills | 6 | 25 | 6 | 53 | 6 | 55 |
| Construction Industry | Not listed | | 13 | 61 | 13 | 63 |
| Continental Can | 6 | 109 | 6 | 63 | 6 | 65 |
| Crown Fellerbach | Not listed | | 6 | 67 | 6 | 67 |
| Deere & Co | 6 | 109 | 6 | 69 | 6 | 71 |
| Distillery Ind | Not listed | | 6 | 73 | 6 | 75 |
| Dow Chemical | 6 | 61 | 6 | 79 | 6 | 79 |
| E. I. duPont | Not listed | | 6 | 97 | 6 | 85 |
| Firestone | 6 | 79 | 6 | 87 | 52 | 93 |
| F.N.I.C. Corp | Not listed | | Not listed | | 6 | 95 |
| Ford | 6 | 127 | 6 | 97 | 6 | 99 |
| Furniture Industry | 6 | [3] 43 | 6 | 101 | 6 | 103 |
| GM | 6 | 127 | 6 | 111 | 6 | 113 |
| B. F. Goodrich | 6 | 73 | 6 | 117 | 6 | 119 |
| Greyhound | Not listed | | 6 | 122 | 6 | 124 |
| Hotel Association of New York City | (?) | | 6 | 125 | 6 | 125 |
| Florsheim Shoe | 6 | 79 | 6 | [4] 135 | 6 | [5] 139 |
| IBM | Not listed | | 52 | 143 | 52 | 143 |
| International Harvester | | [11] 115 | 6 | 141 | 6 | 146 |
| International Paper | 6 | 49 | 6 | 147 | 6 | 151 |
| Jewerly Manufacturers | 6 | [6] 145 | 6 | 151 | 6 | 155 |
| Johnson & Johnson | 6 | 145 | 8 | 153 | 8 | 157 |
| Kennecott Copper | 6 | 151 | 6 | 155 | 6 | 159 |
| Kroehler Manufacturing | Not listed | | 6 | 159 | 6 | [7] 163 |
| LTV Aerospace | Not listed | | 6 | 167 | 52 | 171 |
| Luggage & Leather Ind. [3] | 6 | 85 | 6 | 171 | 6 | 173 |
| Maritime Ind. [3] | None | [4] 175 | 6 | 177 | 6 | 179 |
| Massachusetts Leather Manufacturers Association | 6 | 85 | 6 | 181 | 6 | 183 |
| Metalworking & Repair Services | Not listed | | 6 | 187 | 6 | 189 |
| Nabisco | 6 | [7] 7 | 6 | 201 | 6 | 203 |
| National Auto Transporters Association | 6 | 169 | 6 | 203 | Not listed | |
| National Steel | Not listed | | 6 | 205 | 6 | 205 |
| New York Shipping Association | Not listed | | 6 | 207 | 6 | 207 |
| North American Rockwell | Not listed | | 6 | 211 | 6 | 211 |
| Northwest Forest Products Association | Not listed | | 6 | 215 | 6 | 211 |
| Owens-Illinois | 6 | 91 | 6 | 217 | 6 | 213 |
| Pacific Maritime Association | Not listed | | 6 | 221 | 6 | 221 |
| PPG Industries | Not listed | | 6 | 233 | 6 | 229 |
| Printing Industry Lithographers | Not listed | | 6 | 239 | 26 | 239 |
| Publishers Association of New York City | None | 61 | None | 243 | 26 | 239 |
| Pullman | 6 | [9] 133 | 6 | 245 | 6 | 241 |
| RCA | None | 12 | 8 | [7] 251 | 8 | [7] 251 |
| Retail Trade Ind | Not listed | | 20 | 257 | 20 | 257 |
| Retail Drug Ind | Not listed | | Not listed | | 6 | 83 |
| Retail, Wholesale & Warehouse, Inc | Not listed | | 6 | 247 | 6 | 253 |
| Rockwell International Corp | Not listed | | Not listed | | 6 | 255 |
| Sperry Rand | 6 | [10] 138 | 6 | 265 | 6 | 263 |
| Swift & Co | 6 | [12] 18 | 8 | 277 | 8 | 273 |
| Trucking Industry Central States | 6 | 169 | 6 | 283 | 6 | 279 |
| Trucking, Warehousing & Ind. Western States | Not listed | | None | | 6 | 281 |
| TRW, Inc | Not listed | | 6 | 275 | 6 | 283 |
| Uniroyal | Not listed | | 6 | 291 | 6 | 287 |
| United Air Lines | Not listed | | 6 | 293 | 6 | 289 |
| United States Steel | 6 | 103 | 6 | 297 | 6 | 291 |
| Upholstering & Allied Trades [3] | 6 | 49 | 6 | 303 | 6 | 289 |
| Westvaco | Not listed | | 6 | 307 | 6 | 303 |
| Wyandotte Worsted Co | Not listed | | 6 | 311 | 6 | 307 |

[1] The preface to U.S. Department of Labor, Bureau of Labor Statistics, Digest of Health and Insurance Plans, 1974 edition, vol. I (GPO 1975), p. iii states: "This two-volume digest, a continuation of a series begun in 1955, summarizes the principal features of selected health and insurance plans for office and nonoffice employees in the private sector of the economy. * * * The 2 volumes in combination present a picture of the health and insurance programs available to employees of leading firms in a variety of industries."

[2] Listing in this publication taken from column in each plan description headed "Maternity Provisions", "Accident & Sickness" subcolumn. In all cases the number of weeks refers to the maximum number of weeks for which regular benefits were provided for maternity. All plans listed in cols. 2 and 3 were in effect in 1954. Preface to 1954 bulletins at iii.

[3] Various employers.

[4] There were 3 listings—1 for each of 3 Florsheim units.

[5] Called "Interco Inc., Florsheim Shoe Co."

[6] "Jewelry Industry, Assoc. Jewelers. Inc., Jewelry Crafts Assoc., and other employers."

[7] For nonunion salaried employees.

[8] Called National Biscuit Co.

[9] Called Pullman-Standard Car Manufacturing Co.

[10] Called Sperry Gyroscope Co.

[11] No number of weeks, paid in lump sum of $50.

[12] Covered by paid sick leave plan.

Source: U.S. Department of Labor, Bureau of Labor Statistics, "Digest of One-hundred Selected Health and Insurance Plans Under Collective Bargaining, 1954," Bulletin No. 1180 (June 1955); U.S. Department of Labor, Bureau of Labor Statistics, "Digest of Health and Insurance Plans" 1971 edition (GPO 1972), vol. II, and 1974 edition (GPO 1975) vol. II.

Mr. WILLIAMS. Mr. President, I ask unanimous consent that an attachment to testimony received by the committee, which shows the list of employers with whom International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC, has collective bargaining agreements providing income maintenance during absences due to pregnancy-related disabilities for equal amounts and same maximum duration as coverage for other disabilities, be printed in the RECORD.

There being no objection, the list was ordered to be printed in the RECORD, as follows:

ATTACHMENT

(List of employers with whom International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC, has collective bargaining agreements providing income maintenance during absences due to pregnancy-related disabilities for equal amounts and same maximum duration as coverage for other disabilities)

The International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC or one of its locals has collective bargaining agreements with the following employers which provide that the employer will pay temporary disability benefits for absences due to pregnancy-related disabilities in the same amounts and for the same duration as for other disabilities:

NAME OF EMPLOYER, LOCATION, MAXIMUM DURATION, AND RANGE OF WEEKLY BENEFITS

A & B Beacon Business Machines Corp., New York, N.Y., 26 weeks, 60 percent of weekly wages but not more than $95.

A. E. Electronics, New York, N.Y., 26 weeks, 60 percent of weekly wages but not more than $95.

Acme Electric Co., Cuba, N.Y., 25 weeks, 60 percent of weekly wages but not more than $95.

Acrylic Optics (and Detroit Optometric Centers), Detroit, Mich., 26 weeks, $70–$130.

Admiral Optical Co., Detroit, Mich., 26 weeks, $70–$130.

Aetnacraft Industries, Inc., Brooklyn, N.Y., 26 weeks, 60 percent of weekly wages but not more than $95.

Airco Speer Carbon Graphite, St. Marys, Pa., 13 weeks, $55.

B & J Optical Services, Inc., Lincoln Park, Okla., 26 weeks, $70–$130.

Birchbach Company, Inc., Freeport, N.Y., 26 weeks, 60 percent of weekly wages but not more than $104.

Addendum 033

USCA4 Appeal: 22-1927    Doc: 167-2    Filed: 03/24/2026    Pg: 36 of 45

have been able to reach accord on these matters.

However, I am very concerned that we are saddling business with a $2.5 billion unnecessary cost that has to be passed on to the consumer, which could become a reasonable cost. In other words, we can tell him what it should be, if we would set the time, if we put some reasonableness in this, so that he can figure out actually what it is going to cost.

Mr. JAVITS. If we are going to do that, why should we not set a schedule for tonsils, appendectomy, strep throat, influenza, a broken leg, a broken arm, and a dislocated shoulder?

What the Senator wants us to do is to set an insurance schedule, but with only one item, instead of the whole multiplicity of disability items which are involved.

Mr. HATCH. No. I submit that in almost every disability plan, those are already set.

Mr. JAVITS. That is fine. We are not going to contest that, but we are not going to set them here; that is our point. Our point is that the employer has the problem of demonstrated comparability and good faith. What the Senator wishes us to do is to substitute us for individual employers who are subject to that test, on one particular item—to wit, pregnancy. I cannot see that. I think Senator WILLIAMS is right. That would encourage much more litigation. What we are doing is leaving the situation the way it was before the Supreme Court decided the Gilbert case last year. That is all we are doing.

Mr. HATCH. No, we are doing a lot more than that. We are imposing on and mandating to all companies that presently have disability coverage that they now have to provide for pregnancy disability. That is a far greater step than what existed prior to the Gilbert case.

But just let me add this: I do not think anybody would seriously argue that pregnancy is a disease or that it is anything but a normal physical condition that is voluntarily, in most cases, sought out and achieved, where broken legs and broken arms and other types of disabilities do not fit in that category.

I also understand, and the thing that persuades me and pushes me toward voting for this bill, except for this one defect in the bill, as I see it, is if disability programs can have hair transplants and vasectomies and things of that order that I do not consider to be diseases, then maybe we should do something for the lady who has to work who happens to become pregnant.

I have no problem with that. What I have a problem with is really centering around the uncertainty that is caused because of our failure to recognize this is not a disease, because I think of our failure to not put into effect with definiteness, so we can be actuarially positive about this thing or at least reasonable about this, the time that the committee admits is the average time for pregnancy. I think it is a mistake to do it, and I do think we are going to have much more litigation with cited incorrect statistics before the subcommittee hearing this matter with respect to the average

CXXIII——1866—Part 23

time women have taken off, in spite of the committee's assertion that it is 4 to 8 weeks disability, and which has been instead somewhere between 11 and 12 weeks.

All I am trying to say is let us do this for the women of America. Let us do it and let us do it even though we acknowledge it is not a disease, and let us do it even though we do not have to do it because the Supreme Court has said we do not have to do it, but let us do it because maybe it is right to do it, but let us do it with reason. That is all I am asking.

Of course, we have argued most of these things in committee, and I do not mean to be unduly oppressing the Senate or my two distinguished colleagues with it at this time, but I do think to argue this is going to lead to more litigation by being definite than by being indefinite I think is wrong.

Mr. JAVITS. If I may sum up my position—gluttony, which causes a lot more illness than pregnancy, is also voluntary; so is not taking exercise or not getting sufficient air; so is not going for an affirmative checkup to the doctor every year or every 6 months; so is neglecting your eyes by not getting the proper glasses. I mean, if we are going to get into that, that is ad infinitum.

I must oppose the selection of this one item on the ground that we are doing the pregnant woman some kind of a favor. The fact is what we are doing, what we are dealing with here, is an actual disability which is prejudicial to millions of women, and it is, therefore, a discriminaton which we should not accept.

What the Senator wishes us to do is to single this out, to make an actuarial insurance schedule for this one but not for 50 others which are just as voluntary. Therefore, it seems to me that we would only complicate our lives infinitely more by taking that kind of an approach to this problem.

May I point out, too, if I may just complete my argument, that when I said that what we are trying to do was to restore the situation to what it was, the fact is that before the Supreme Court decision there did not seem to be any question in the minds of many of us that where there was to be disability coverage for women under comprehensive disability plans.

Now, some employers held out against that, and the Supreme Court decided with them. It does not make it right and does not change the fundamental reach of the Civil Rights Act which definitely stated that you could not or you should not discriminate on the ground of sex. And so we are, in pursuance of an intent which we legislated in 1964, simply saying to the Court, "This is what we meant and we mean it and, therefore, because you left us no choice, we are going to make clear in a separate statute that is what we meant and what we mean today."

But I do not see why we should import into that intent an arbitrary limitation for this particular disability, particularly where we ourselves state, the whole committee states, and the Senate

would state in acting upon our representation, that classifications and protections are absolutely in order so long as they are not inherently discriminatory. Therefore, I believe that to select out this particular disability for this particular kind of restriction is bad policy.

The Senator says my State does it and Senator WILLIAMS' State does it. Well, we often run into those situations here with many States. I do not agree with everything my State does. I do not think it is a paragon of virtue, and I will tell the Senator, for example, that in workmen's compensation I am ashamed of my State as to the inadequacy of its workmen's compensation laws, the compensation which it gives to the disabled worker.

So while I am impressed with such a fact—and it is incumbent upon me to express my agreement or disagreement with it, which I do, I flatly disagree with it—I am not going to lend myself as a Senator of the United States to making what I consider to be a serious injustice here, because my State happens to do it.

So, Mr. President, I believe for the reasons which I have stated, and in view of the protections which we agree are inherent in the law now, and will continue to be inherent in the law, that the amendment should be rejected.

Mr. HATCH. Mr. President, I appreciate the remarks of my distinguished colleague from New York. I would cite to him, though, that some of the illustrations given do not fall within the same category as pregnancy, which is generally desired and totally predictable in terms. In other words, we know it is going to be 9 months.

The committee submitted 4 to 8 weeks of disability as the average. I provided in my amendment that if there is an extraordinary condition or a complication that sets in that obviates the 6-week limitation, I would be willing to go to 8 weeks, to go to the outer limits of what the report says. I want definiteness, I want certitude.

I want this to work for business. I do not want extraordinary costs to be passed on to the consumers in our society.

I think my position is reasonable. I might mention that four-fifths of the States that have disability, pregnancy disability, coverage or provide for it in their statutes also provide caps, such as the States of New Jersey and New York, which I wholeheartedly endorse and with which I agree.

I think it is a far more reasonable approach than just leaving this as an undetermined amount to be determined by the certifying physician.

Then, to do it for one select segment of society may be all right, but let us permit society to have some limitations to that one select approach, and let us have some definiteness in it so that the business world, so that the rest of the people in our society, do not have to be hung up or generally disadvantaged because we want to be generous here in the U.S. Senate.

I have deep respect for both of my colleagues, as they both know, tremendous respect for them. We happen to disagree,

There was no objection.

The SPEAKER pro tempore. The gentleman from Texas (Mr. ROBERTS) and the gentleman from Arkansas (Mr. HAMMERSCHMIDT) each will be recognized for 20 minutes.

The Chair recognizes the gentleman from Texas (Mr. ROBERTS).

Mr. ROBERTS. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, the reported bill is a very deserving piece of legislation. It will not affect very many veterans, but those it will benefit are our most severely disabled service-connected veterans, and I strongly support the bill.

I now yield to the gentleman from Mississippi, SONNY MONTGOMERY, the very able chairman of our Subcommittee on Compensation, Pension, and Insurance, for a brief explanation of the bill.

Mr. MONTGOMERY. Mr. Speaker, I thank my chairman for giving me this opportunity to briefly explain the bill H.R. 11891, which has come about as a result of several studies conducted by the paralyzed veterans of America.

Under current law, additional compensation is payable to veterans with service-connected disabilities so severe as to require aid and attendance. Under the provisions of H.R. 11886 which has already been passed by the House, this amount would be increased to $600 monthly.

This bill is designed to provide additional support for the most severely service disabled veteran. Essentially, it provides an added allowance of $300 monthly supplementing the present aid and attendance allowance for a small category of severely disabled veterans. The added allowance or second level, goes to those requiring "constant medical aid and attendance" as opposed to a base level aid and attendance payment of those whose needs could be met by regular unskilled, nonmedical care.

Basically, all of the veterans for whom this provision would apply are catastrophically disabled and are confined to wheelchairs or bedridden. Many require assistance with such tasks as getting up in the morning, getting dressed or even eating.

In summary, the bill will provide a two-tier, aid and attendance allowance that would benefit some 3,000 catastrophically disabled veterans at a first-year cost of $11.2 million.

It has been suggested that the gross cost of this additional allowance would be partly offset by the savings to the Government realized by those veterans who would otherwise be hospitalized at Government expense. In a survey undertaken by the paralyzed veterans of America, they report that it costs approximately $116 a day to hospitalize a veteran in a VA hospital.

Mr. Speaker, the bill meets a real need. I can assure my colleagues the cost is within our budget allocation.

I urge that the bill be adopted.

Mr. BEARD of Rhode Island. Mr. Speaker, will the gentleman yield?

Mr. MONTGOMERY. I yield to the gentleman from Rhode Island.

Mr. BEARD of Rhode Island. Mr. Speaker, I certainly join with my colleague, the gentleman from Mississippi (Mr. MONTGOMERY), in support of this worthwhile legislation.

I do not think it is too much to ask. As indicated, it is a small amount of money for the few who really need this help.

I certainly give my support to H.R. 11891.

Mr. HAMMERSCHMIDT. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I rise in support of H.R. 11891, which will create a two-tier aid and attendance allowance, awarding an additional $900 a month in aid and attendance allowance, rather than the current $563 a month, for those service-connected veterans who are so seriously disabled that they require constant medical aid and attendance.

This legislation, if passed, will continue the current rate of $563 above regular compensation for veterans who can be attended by unskilled, nonmedical assistants. The very seriously disabled, however, would receive the higher amount of $900, in order to offset additional expenses brought on by the requirement of constant trained medical care. There are now approximately 3,000 veterans who would fit into this category. They are mostly quadriplegics, so totally disabled that they are unable to do anything for themselves. These are proud individuals who once were the cream of the crop, physically, of our Nation. It is tragic enough that their service to our country resulted in wounds and injuries that now require them to be fed and bathed and dressed by others. It is our affirmative obligation to see that they are provided the best care available.

Paying these deserving veterans an extra $337 a month to help defray the costs of round-the-clock care will, in many instances, obviate the need for them to become institutionalized, at an average cost to the taxpayers of $116 a day. It will also help preserve their dignity, and whatever independence they are now able to maintain, I heartily recommend this legislation to my colleagues.

Mr. HILLIS. Mr. Speaker, will the gentleman yield?

Mr. HAMMERSCHMIDT. Mr. Speaker, I yield 2 minutes to the distinguished gentleman from Indiana (Mr. HILLIS), a member of the subcommittee.

Mr. HILLIS. Mr. Speaker, I thank the gentleman for yielding me this time.

Mr. Speaker, I strongly support H.R. 11891 which would provide a two-step aid and attendance compensation system for certain severely disabled veterans and urge my colleagues to vote for the bill as well. Under present law, severely disabled veterans are entitled to an additional $563 monthly if they are in need of aid and attendance by another person. The remedy contained in H.R. 11891 is that there are varying levels of assistance required—some need constant aid while others are capable of caring for themselves occasionally. This bill will provide $900 per month for the most severely disabled—those in need of constant medical aid and attendance— and $563 for those who can partially care for themselves. All of the veterans for whom this new provision would apply—approximately 3,000—are catastrophically disabled. Virtually all are confined to wheelchairs or are bedridden.

I urge a favorable vote for this needed legislation.

Mr. MONTGOMERY. Mr. Speaker, I yield 1 minute to the distinguished gentleman from Puerto Rico (Mr. CORRADA).

Mr. CORRADA. Mr. Speaker, I rise in support of H.R. 11891, a bill to increase aid and attendance allowance for severely disabled service-connected veterans who require constant medical treatment.

There are a good number of veterans in Puerto Rico who will be greatly benefitted by the enactment of this legislation. The sensitivity demonstrated by the House Committee on Veterans' Affairs in providing for a two-step aid and attendance compensation payment system for certain severely disabled veterans, is worth praising. There are veterans for whom the current level of aid and attendance will be sufficient to meet their needs. But, for those veterans in constant medical aid attendance, this legislation is a must that will give them some relief. I agree with the committee that in addition to the mental and emotional strain caused by such disability, enormous financial pressures often exist. H.R. 11891 recognizes the expenses associated with being disabled as in the case of those confined to wheelchairs or are bedridden.

I support this legislation and urge you to vote for it.

Mr. MONTGOMERY. Mr. Speaker, I have no further requests for time.

Mr. HAMMERSCHMIDT. Mr. Speaker, I have no further requests for time.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from Texas (Mr. ROBERTS) that the House suspend the rules and pass the bill, H.R. 11891.

The question was taken.

Mr. HAMMERSCHMIDT. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The SPEAKER pro tempore. Pursuant to clause 3 of rule XXVII, and the Chair's prior announcement, further proceedings on this motion will be postponed.

---

## PROHIBITION OF SEX DISCRIMINATION BASED ON PREGNANCY

Mr. HAWKINS. Mr. Speaker, I move to suspend the rules and pass the bill (H.R. 6075) to amend title VII of the Civil Rights Act of 1964 to prohibit sex discrimination on the basis of pregnancy, as amended.

The Clerk read as follows:

H.R. 6075

*Be it enacted by the Senate and House of Representatives of the United States of America assembled,* That title VII of the Civil Rights Act of 1964 is amended as follows:

SECTION 1. Section 701 is amended by adding thereto a new subsection (k) as follows:

"(k) The term 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related

*July 18, 1978*     **CONGRESSIONAL RECORD — HOUSE**     21435

purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title shall be interpreted to permit otherwise. As used in this subsection, neither 'pregnancy' nor 'related medical conditions', as they relate to eligibility for benefits under any health or temporary disability insurance or sick leave plan available in connection with employment, may be construed to include abortions, except where the life of the mother would be endangered if the fetus were carried to term: *Provided,* That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.".

SEC. 2. (a) Except as provided in subsection (b) the amendment made by this Act shall be effective on the date of enactment.

(b) The provisions of the amendment made by section 1 of this Act shall not apply to any fringe benefit program or fund, or insurance program which is in effect on the date of enactment of this Act until one hundred and eighty days after enactment of this Act.

SEC. 3. Until the expiration of a period of one year from the date of enactment of this Act or, if there is an applicable collective-bargaining agreement in effect on the date of enactment of this Act, until the termination of that agreement, no person who, on the date of enactment of this Act is providing either by direct payment or by making contributions to a fringe benefit fund or insurance program, benefits in violation of this Act shall, in order to come into compliance with this Act, reduce the benefits or the compensation provided any employee on the date of enactment of this Act, either directly or by failing to provide sufficient contributions to a fringe benefit fund or insurance program: *Provided,* That where the costs of such benefits on the date of enactment of this Act are apportioned between employers and employees, the payments or contributions required to comply with this Act may be made by employers and employees in the same proportion: *And provided further,* That nothing in this section shall prevent the readjustment of benefits or compensation for reasons unrelated to compliance with this Act.

The SPEAKER pro tempore. Is a second demanded?

Mr. SARASIN. Mr. Speaker, I demand a second.

The SPEAKER pro tempore. Without objection, a second will be considered as ordered.

There was no objection.

The SPEAKER pro tempore. The gentleman from California (Mr. HAWKINS) will be recognized for 20 minutes and the gentleman from Connecticut (Mr. SARASIN) will be recognized for 20 minutes.

The Chair now recognizes the gentleman from California (Mr. HAWKINS).

Mr. HAWKINS. Mr. Speaker, I yield myself 4 minutes.

Mr. Speaker, Congress enacted title VII of the Civil Rights Act of 1964 to prohibit discrimination in employment on the basis of race, color, religion, sex or national origin. However, in the case of Gilbert against General Electric, the Supreme Court ruled on December 7, 1976, in a 6-to-3 decision that the exclusion of pregnancy from an employer's disability benefits plan did not constitute sex discrimination under title VII.

H.R. 6075 was introduced during the first session of the 95th Congress to clarify congressional intent that sex discrimination includes discrimination

based on pregnancy and specifically to define the standards which require that pregnant workers be treated the same as other employees on the basis of their ability or inability to work. This legislation reflects no new legislative mandate of the Congress nor effects changes in practices beyond those intended by title VII. On the contrary, the narrow approach of the bill is simply to eliminate confusion by expressly clarifying that the definition of sex discrimination in title VII includes pregnancy-based discrimination.

The Subcommittee on Employment Opportunities conducted hearings on this legislation on April 6 and June 29, 1977. One of the witnesses who testified before the subcommittee was also one of the plaintiffs in the Gilbert case. Sherrie O'Steen presented the subcommittee with vivid testimony of the economic consequences which she suffered as a result of denial of disability benefits for pregnancy.

Required by her employer, GE, to stop working after her 6th month of pregnancy, Sherrie O'Steen turned to every source to maintain her existence when her husband left her. But society turned its back on this young mother: GE stopped paying her. Welfare delayed payments until after the birth of her baby.

For the months of November and December 1972, Sherrie O'Steen, her new baby, and her 2-year-old daughter lived in an unlighted and unheated house in rural Virginia with only cold sandwiches and water for sustenance.

So, she joined the class action suit to insure that other mothers-to-be could be spared her anguish.

And on December 7, 1976, in Gilbert against General Electric, the Supreme Court of the United States joined the others in turning their backs on this pregnant woman and other pregnant workers.

Sherrie O'Steen went to her last forum, the Congress of the United States, and pointedly asked that this bill pass so that "no one will ever have to suffer as I suffered during the time of my pregnancy."

Today, we have the opportunity to insure that genuine equality in the American labor force is more than an illusion and that pregnancy will no longer be the basis of unfavorable treatment of working women.

On behalf of Sherrie O'Steen and all working women in America, I ask for your support of this legislation.

The major provisions of the bill as reported by the committee are:

A new subsection (k) is added to section 701 of title VII which clarifies that the prohibitions against sex discrimination in the act include discrimination in employment based on pregnancy, childbirth, or related medical conditions. The bill makes clear that fringe benefit programs must treat women affected by these conditions the same as other employees based on their ability or inability to work. However, many Members of the committee were troubled by the fact that an employer would have to pay for abortions unnecessary to preserve the life of the mother. Therefore, the committee

amended the bill to allow an employer to deny sick leave, disability, and health benefits for abortion except where the life of the mother would be endangered if the fetus were carried to term. The committee amendment intends that if a woman suffers complications from an abortion, medical payments, and disability or sick leave would be covered.

The bill also specifies an immediate effective date for the prohibition of discrimination on the basis of pregnancy. However, the bill provides for a 6-month delay for the effective date of fringe benefit provisions. This delay is designed to provide employers with a reasonable period of time in which to set up the administrative mechanism for providing those benefits.

The bill also prohibits the reduction of benefits as a means of compliance with the act for a period of 1 year or until the expiration of the collective bargaining agreement in effect on the date of enactment. However, the benefits may be reduced at any time for reasons unrelated to compliance with the act. Moreover, where employers and employees share the costs of presently existing benefits, employers will be permitted to apportion the costs of any benefit required as a result of this legislation.

It is important to note that this legislation would not require an employer to have a temporary disability plan or provide other employee benefits. Rather, the bill requires that employers who currently provide benefits for other disabilities must provide the same benefits for pregnancy. In addition, the bill requires that employers who provide medical benefits for employees would have to cover medical and hospital costs of pregnancy on the same basis.

H.R. 6075 does not prevent the control of potential abuses or malingering in disability benefits programs as long as these controls are nondiscriminatory. For example, an employer could require a physician's certification of the employee's inability to work or an examination of the employee by the company's physician to confirm medical disability. However, these requirements must apply to all disabilities, not just pregnancy.

While recent attention has focused on the exclusion of disability benefits for pregnancy, the Court's decision in the Gilbert case also adversely affects pregnant workers with respect to other employment policies such as mandatory maternity leaves, denial of sick leave pay and loss of seniority because of pregnancy leave. These policies would be prohibited upon enactment of H.R. 6075.

This legislation is urgently needed in order to insure the equal treatment of men and women in the workplace, especially with respect to fringe benefit programs. Because many of the disadvantages imposed on women are predicated upon their capacity to become pregnant, genuine equality in the American labor force is no more than an illusion as long as employers remain free to make pregnancy the basis of unfavorable treatment of working women.

Mr. Speaker, I urge my colleagues to vote for H.R. 6075.

Mr. SARASIN. Mr. Speaker, I yield myself 5 minutes.

Addendum 036

**21436**          **CONGRESSIONAL RECORD — HOUSE**        *July 18, 1978*

Mr. Speaker, I rise in support of H.R. 6075. In doing so, I want to urge the Members to listen carefully to this debate and to keep in mind precisely what it is that this bill would and would not do.

It would require employers of 15 or more employees to provide coverage for pregnancy, childbirth, and related medical conditions for their employees, in their temporary disability, sick leave, and health insurance plans on the same terms as all other disabling conditions are covered. It would not require any coverage at all where no temporary disability, or sick leave, or health insurance plan is provided. It would not require extending coverage beyond job-related disability if that is all the existing coverage provides. It does not apply to any fringe benefit plan in effect on the date of enactment until 180 days after enactment, which should permit sufficient time to make necessary adjustments. For a period of 1 year after enactment, or until the expiration of an applicable collective-bargaining agreement, an employer would not be permitted to reduce benefits or contributions to a fund for any employee in order to come into compliance with the act.

With the exception of one provision relating to the coverage of abortions, this bill is identical to S. 995, which passed the Senate last September 16 by a vote of 75 to 11. The substance of this bill was regarded as required by the title VII prohibition on the basis of sex from the time final regulations were promulgated in November of 1965 until December 7, 1976, when the U.S. Supreme Could held (6–3) in General Electric Co. against Gilbert that title VII does not require equal treatment of pregnancy disability. This bill would restore the interpretation of title VII prior to that decision, an interpretation which was upheld by six different U.S. circuit courts of appeals prior to the Supreme Court decision.

This bill also provides equal treatment of pregnancy disability nationally, which I think is essential. Today, 10 States have statutes with requirements identical to this bill, and in one other the highest State court has ruled that title VII will continue to be applied as it was before the Gilbert decision. The States have authority under the Constitution to go beyond requirements of Federal law in these matters, so long as their laws do not conflict with the Federal law. So I think it is economically and socially desirable to have a consistent treatment of the rights of women in employment throughout the United States.

Mr. Speaker, without going into all the fine points of the legal argument in the Gilbert case, let me simply say that I agree wholeheartedly with the dissent of Justice Stevens. In discussing the rule that excluded pregnancy disability from coverage under a temporary disability policy, he said:

By definition, such a rule discriminates on account of sex; for it is the capacity to become pregnant which primarily differentiates the female from the male.

Before addressing the reasons why I am so firmly convinced that this bill should become law, let me address the most controversial feature in the committee-reported bill—the provision which would exclude from required coverage any abortion "except where the life of the mother would be endangered if the fetus were carried to term." I opposed that amendment in the committee because I did not want to see that very difficult and very emotional issue raised in the context of this bill, particularly in view of the fact that some States are going to require such coverage as a part of their equal employment opportunity laws whatever we do here. But the amendment was adopted 19 to 12, and I fully support the bill with the amendment. I want the House to understand my position on this, because I think there are some very persuasive reasons for voting for this bill as reported.

First, we have to understand the amendment in the context of this bill. This bill, without the amendment, would require covered employers to include benefits on account of elective abortions, even if they were morally opposed to doing so. It would require such coverage even if a union's membership overwhelmingly opposed it on religious or moral grounds and the employer agreed with them. One of our colleagues sent around a "Dear Colleague" letter on the issue saying the amendment should be deleted because the issue should be left to the collective-bargaining process. That is a misreading of the situation. The bill without the amendment takes the whole issue out of the collective-bargaining arena. If comprehensive health or disability insurance is provided employees for non-job-related disability, pregnancy disability must be included as defined in the bill and cannot be bargained away. What the amendment does, then, is to make coverage of abortions where the life of the mother is not at risk an optional matter. They can be included if the employer chooses. They can be included as a part of a collective-bargaining agreement. All the amendment does is to say that coverage of elective abortions is not mandatory. That is a completely different situation from any we have dealt with before, where we were debating whether Federal funds should be used to pay for elective abortions.

To summarize, Mr. Speaker, this bill as amended simply removes compulsory coverage of abortions where the life of the mother is not at risk; it leaves that coverage permissive, elective, and a subject of collective bargaining. I think that is a fair posture for the Federal Government in this extremely sensitive area, and one with which most citizens would agree.

I know there is dissatisfaction among those who oppose this provision with the procedure we are utilizing which does not permit amendment. But the procedure is being used, not to stifle debate but to speed up the process toward enactment. The debate is useful, but to delay this important bill further in order that those who oppose the abortion provision could offer an amendment to strike it—an amendment which we all know would fail by a wide margin—is not in the best interest of this legisla-

tion or of the vast majority of working women who urgently need the protection of this legislation. The cold fact is that whatever procedure we utilize, this House is not going to approve a bill without the abortion provision in it. The other body rejected a similar provision by only three votes last September, and there is some question from the reported debate whether most of those voting fully understood the impact of the amendment offered by Senator EAGLETON.

The benefits of this legislation are obvious. What is not so obvious is that protection for the income of women employees during the 6 to 8 weeks they may be away from work to have a child is becoming an economic and social imperative. Whether one approves or not, the fact is that the most dramatic change in the American workforce in the past decade is the growth of employment of women. Fifty percent of all women aged 16 and above are employed; they constitute 42 percent of the current American workforce of 100.3 million workers. This compares to 35 percent of the workforce in 1965.

Even more to the point of this bill, 61.4 percent of American women in the age group 25 to 34 years—the group among whom most births occur—are now employed. This compares to only 45 percent of that age group in 1970, a mere 8 years ago. This dramatic increase simply confirms what our sociologists have been observing: that more and more women are choosing to have both a career and a family and that this has profound implications for our society.

Among those implications is that even a temporary loss of a working woman's income is very often a severe blow to the family economy. In a great many cases the woman is the sole or main wage-earner in the family; in even more cases the wife is not working as a matter of convenience to supply the funds for luxury items, but as a matter of necessity to help provide for necessities of life. It may well be, as some have observed, that some of yesterday's luxuries are today's necessities—but such observations almost invariably are made by those who enjoy today's luxuries, to say nothing of all the necessities.

Increasingly the working wife and mother has become a commonplace in our society. Protecting her income is protection of family income. Providing pregnancy disability benefits as a required part of a non-work-related disability benefit package encourages working women to have children. It tends to remove a major reason for elective abortion—the fear of lost income. So this bill is a profamily, prolife bill which merits our support.

Mr. Speaker, this bill restores equity to the treatment of fringe benefits in employment under title VII. Some have argued that pregnancy is not a sickness or injury, but a voluntary condition. In the overwhelming majority of cases that is, of course, true. But it is also true that under most temporary disability plans if a man—or a woman, for that matter—voluntarily plays football or goes skiing and breaks an arm or a leg they are covered. Or if they voluntarily consume

alcohol or drugs with adverse health effects they are covered for it. Typically, all sorts of purely effective surgical procedures are covered. So I have never been persuaded by that argument against covering pregnancy disability.

Finally, there is the issue of costs. Of course, there are no Federal appropriations involved. There will be additional costs to employers, and in most cases to both employers and employees, for increased insurance premiums where pregnancy disability is not now covered, or covered with limitations which would not be permissible after this legislation becomes effective. Many, and perhaps most, major employers provide most or all of the required coverage. Cost estimates have ranged from a completely unrealistic $130 million for disability alone to a high (and probably inflated estimate) of $2.5 billion by groups opposed to the legislation. The estimates are difficult to make because there has been no thorough analysis of existing health plan coverage for pregnancy. But even the maximum costs are minuscule when spread among all covered employers and employees. They fade into insignificance in a $2 trillion economy.

Mr. Speaker, the costs of not enacting this legislation are enormous and they will continue to fall solely on working women and their families. As in the case of the plaintiff in the Gilbert case, they will in many instances involve additional public welfare costs. Then there will be the tragic loss from abortion by working women who feel that they or their children cannot afford a substantial income loss due to pregnancy and childbirth. Finally, there is the moral loss if our national equal employment opportunity law continues to be interpreted in a way which singles out women for unequal treatment in major fringe benefit programs.

For all of these reasons, I urge that the bill be approved.

Mr. HAWKINS. Mr. Speaker, I yield such time as he may consume to the gentleman from Rhode Island (Mr. BEARD).

Mr. BEARD of Rhode Island. Mr. Speaker, I wholeheartedly support H.R. 6075.

I think it is important that the Members not be confused as to my particular amendment. This amendment does not diminish the legal rights of any party by imposing any moral, religious, or ethnic convictions of one group of people, and really it goes to the contrary.

What the amendment to this bill really states is that a manufacturer or an organization will not be forced to pay for abortions unless the life of the mother is in danger. I think it is in that category that the amendment should be considered.

It also provides for collective bargaining. If they can provide through collective bargaining abortion rights in this particular bill, my amendment would not apply; or if it was done by agreement of the organization or the company, it would not apply.

So I do not think this is taking anyone's rights away. It is making it so we are not forcing down someone's throat the enforcement of that right or the duty of having to pay for abortions, although that may be contrary to that particular organization's or individual's belief.

On that point I just want to say that I certainly do support the bill, including, of course, my amendment, in its entire scope, and I hope my colleagues will join in that support. When we get to the conference, I believe there will certainly be full support, and this bill will finally give us some balance for the sake of the millions and millions of women who are affected by this legislation.

Mr. SARASIN. Mr. Speaker, I yield 2 minutes to the gentleman from New York (Mr. GREEN).

Mr. GREEN. Mr. Speaker, in the course of the 95th Congress, we have had to make many difficult legislative decisions. Today, as we consider H.R. 6075, the pregnancy disability bill, I believe we are faced with one of the most difficult choices of this session. We must decide whether to vote for H.R. 6075 on its merits because it is a vitally necessary piece of legislation, or whether to vote against the bill because we are morally opposed to an antiabortion amendment, which was added in committee by Representative EDWARD BEARD.

Although I have these grave reservations, I have decided to support this bill because I believe this will be the only opportunity we will have to vote on this issue during this session of Congress. H.R. 6075 is being considered today under the procedure of suspension of the rules, which means that we must cast our vote either for or against the entire bill, with a two-thirds majority required for passage. This procedure does not allow an opportunity to debate or delete the antiabortion provision. I deeply regret that the Democratic leadership has used the suspension procedure—abused it would be more accurate—to achieve that result.

We have before us a bill of critical importance to all women in this country, and particularly workingwomen, one that will provide rights workingwomen should have had years ago. The Supreme Court ruled in 1976 that it was not discrimination based on sex for an employer to refuse to pay workingwomen benefits for pregnancy-related disabilities, even though workers may receive disability payments for all other medical conditions. The Court made it clear that in order to overturn the ruling, Congress would have to pass a law prohibiting discrimination against pregnant workers.

H.R. 6075 accomplishes this. It amends title VII of the Civil Rights Act of 1964 to prohibit sex discrimination in employment on the basis of pregnancy, childbirth, or related medical conditions. In so doing, it affords workingwomen the opportunity for comprehensive medical protection which men have and insures that they are protected against all forms of employment discrimination against sex. I applaud the intent of this legislation.

While many employers hold the view that women will become pregnant and leave the labor force, making them "marginal workers," the facts belie this erroneous assumption.

In the post-World War II era, there has been a dramatic shift in the composition of the female work force. Younger women have entered the working world in greater numbers. Women ranging from 25 to 34 years of age now represent 61.4 percent in the labor force population. This increase is surprising since the majority of women in this age bracket are mothers with dependent children in the home.

The Bureau of Labor Statistics reported last week that the percentage of working age women holding temporary or permanent jobs reached a new high of 56 percent in 1977. Therefore, this legislation, which requires that pregnant workers be treated the same as other employees on the basis of their ability or inability to work—will help provide equal employment opportunities for millions of women—the goal of title VII of the Civil Rights Act of 1964.

However, there is one provision in this bill, added in committee, which I find completely unacceptable. It grants employers the option to deny their employees coverage for abortions under any medical, health or disability plans. I believe that this amendment subverts the original purpose of this legislation because it adds another limitation on the rights of female employees in a bill designed to free them of discrimination based on sex.

The addition of this abortion amendment is particularly disheartening when we consider that the bill is designed to make pregnancy a realistic option for working women. It is also astounding to me that this bill should have become the vehicle for what I consider to be an antichoice abortion amendment when abortion has not been an issue in this regard. In his dissenting views in the committee report on the bill, my colleague from New York, TED WEISS stated that at least "half the States now interpret their fair employment practices legislation to prohibit sex discrimination on the basis of pregnancy and child birth." Indeed, no States have included any antiabortion language in their laws concerning pregnancy disability. I also think it is highly significant that during hearings held on the pregnancy disability bill, no employers testified for the amendment.

Last September, the Senate overwhelmingly passed pregnancy disability legislation. Those of us who are morally opposed to the Beard amendment can only hope that it will be deleted when this legislation reaches conference.

Mr. HAWKINS. Mr. Speaker, I yield 2 minutes to the gentleman from New York (Mr. WEISS).

Mr. SARASIN. Mr. Speaker, I also yield 2 minutes to the gentleman from New York (Mr. WEISS).

The SPEAKER pro tempore (Mr. SISK). The gentleman from New York (Mr. WEISS) is recognized for 4 minutes.

Mr. WEISS. Mr. Speaker, I appreciate the courtesy of the distinguished chairman of the Subcommittee on Employment Opportunities, the gentleman from California (Mr. HAWKINS), and the ranking minority member, the gentleman from Connecticut (Mr. SARASIN), in yielding me this time.

Mr. Speaker, I rise in opposition to

Addendum 038

suspending the rules and passing H.R. 6075, and I do so for two reasons:

First. The bill as reported by committee substitutes a new form of discrimination for the one it seeks to eliminate. The purpose of the original pregnancy disability legislation—of which I am a cosponsor—was to insure equal treatment of women in employment related matters. This was to be accomplished by providing a legislative remedy for an adverse Supreme Court decision which said that women workers who became pregnant did not have to be covered by disability plans.

During committee consideration an amendment was adopted which gives the employer sole discretion concerning coverage for abortion in employee benefit packages. An employer may, therefore, veto coverage for abortion even if he has not contributed to his female employee's health and benefit plan.

In contrast, male employees—regardless of whether they have contributed to their own health plans or not—will continue to be covered for all surgical procedures without the review and approval of the employer. The discriminatory aspect of this provision could not be more blatant.

Second. I oppose this motion because I am troubled by the procedure under which we are considering this legislation. I had hoped that H.R. 6075 would come to the floor with an open rule so that I could present for discussion and debate a motion to strike the provision allowing employer discretion over abortion coverage. The presence of this provision renders this bill controversial, to say the least. As such, I do not believe that it should be considered under suspension of the rules.

The Members of this House should be able to assume with confidence that bills which are considered on the Suspension Calendar are either minor or without controversy, preferably both. Otherwise we will be called upon to give them the close scrutiny which this system has been established to preclude. Improper use of the Suspension Calendar is not only unfair to Members of the House but jeopardizes the continued existence of the Suspension Calendar.

For both of these reasons I urge a "no" vote.

Mr. Speaker, I include at this point my dissenting views which appeared in the report accompanying H.R. 6075, as follows:

PROHIBITION OF SEX DISCRIMINATION BASED ON PREGNANCY—DISSENTING VIEWS OF MR. WEISS

The original concept of this legislation was to provide a legislative remedy for an adverse Supreme Court ruling which said that women workers who become pregnant did not have to be covered by disability plans. H.R. 6075, as originally proposed, is an amendment to the Civil Rights Act of 1965; its purpose being to insure equal treatment of women in employment-related matters.

In appending an anti-abortion rider to this legislation, the committee has been diverted from the original purpose of protecting the rights of women employees to protecting the rights of their employers. I voted against the bill as reported with the anti-abortion language because it adds a new form of discrimination in place of the one it seeks to eliminate.

ANTI-ABORTION LANGUAGE WILL NOT PROTECT EMPLOYERS: IT WILL MAKE THEM TARGETS

There is a great irony about the decision of the committee. Every member knows that employers and their representatives are quite capable of presenting their views on issues which come before us; during the course of the 95th Congress, every member of the committee has received literally thousands of pieces of correspondence concerning such issues as common situs picketing, minimum wage, and labor law reform, to name just a few. Yet not one employer who allegedly would be protected by the anti-abortion provision has come forward to promote it.

It is logical to ask, why? Because this amendment will not protect employers; it will turn the focus of the battle over abortion directly on to them. I am sure that there will be attempts by the opponents of abortion coverage to have major corporations eliminate such coverage in their benefit plans; likewise, smaller businesses will be subject to pressure to alter their benefits packages. I am sure that neither employers nor labor unions bargaining collectively with them will be pleased by such a prospect.

UNEQUAL TREATMENT OF WOMEN WILL CONTINUE: EARNED BENEFITS MAY BE DENIED THEM

While exposing employers to new—and unexpected—pressures, the anti-abortion provision will perpetuate unequal treatment for women workers. Health benefits are not gifts of the employer to the employee; like wages and other fringe benefits, they are earned. In many cases, employees are contributing to their health benefit plans; according to figures made available by the Social Security Administration, one-third of all health plans are contributed to solely or in part by employees. The discriminatory aspect of the anti-abortion language is obvious: Male employees—regardless of whether they have contributed to their health plans or not—would be covered for all surgical procedures; female employees—even if there is no employer contribution—would be subject to employer discretion concerning coverage for abortion. The discriminatory aspect could not be more blatant.

THE COMMITTEE'S ACTION EFFECTS HEALTH INSURANCE PLANS WITHOUT KNOWING HOW THEY OPERATE

Unlike the issue of pregnancy disability, the abortion exclusion has not been adopted with any understanding of current health insurance practices. There are 51,600 different health insurance plans available to 58.2 million Americans in the private sector who contribute some $27.1 billion for coverage. Fifty-five percent of these plans are negotiated; 45 percent are not.

ABORTION COVERAGE IS NOW COMMON

According to the National Association of Insurance Commissioners, and the Health Insurance Association of America, abortion coverage is now common in most health insurance plans. Spokesmen for these representatives of the industry indicated to members of my staff that currently there is no ban on specific surgical procedures either by law or regulation regarding private insurance coverage.

FINANCIAL CONTRIBUTION OF EMPLOYERS IS "INSIGNIFICANT"

I know that one of the concerns of the members of the committee who approved the abortion exclusion was the fear that some employers would be forced to make great financial contributions to abortion services if the amendment had not been adopted. Industry representatives have stated to my office that there are no industrywide statistics on abortion, but added that abortion as a procedure affecting insurance premiums is "insignificant."

Also, insurance industry representatives were unable to predict that precluding abortions would result in a lowering of premiums

to employers; they were not able to speculate as to what percentage of the average health plan premium would be applied for abortion services. Again, they did say it would be insignificant.

MOST LIKELY RESULT OF THE ANTIABORTION AMENDMENT: NO CHANGE IN PREMIUMS AND A LOSS OF COVERAGE

As a result of the adoption of this amendment, we may find ourselves in a situation where there is no change in the employer's contribution for health benefits, but benefits which are earned by women and which they currently have would be eliminated.

RELIGIOUS INSTITUTIONS ARE PROTECTED

The other major concern of many members of the committee is whether religious institutions would be forced to provide abortion coverage by virtue of this legislation. They would not. Senator Jacob Javits, in his presentation before the Senate, stated that it was not the intention nor design of the sponsors of this legislation to interfere with the first amendment rights of a church which has a religious tenet respecting abortion: the church's position, according to Senator Javits, is protected under the first amendment.

Also, as we know, section 702 of the Civil Rights Act, allows religious institutions to hire solely members of their own faith. It is doubtful that an employee-member of a church which prohibits abortions would seek abortion coverage from the church. Indeed, there has never been a court case concerning failure to cover abortions by either a secular or religious institution.

STATES HAVE PROMOTED SIMILAR LEGISLATION WITHOUT EXCLUSIONS

The States have taken an active role concerning pregnancy disability legislation. Half the States now interpret their fair employment practices legislation to prohibit sex discrimination on the basis of pregnancy and child birth. Connecticut and Minnesota have recently adopted legislation based on the unamended version of H.R. 6075. Not one State has anti-abortion language in its laws concerning pregnancy disability and in not one State is there legislative activity to include such a ban.

SUPPORT FOR AN UNAMENDED BILL COMES FROM BOTH SIDES OF THE ABORTION DISCUSSION

The very nature of this bill—unamended—is to help women carry their pregnancies to term. In its original form, the legislation was supported by a diverse coalition of pro-life, labor, and women's organizations. Many of these groups believe that an abortion provision is unnecessary in this legislation.

During the June 29, 1977, hearing which the Subcommittee on Employment Opportunities conducted, Dr. Dorothy Czarnecki, a representative of the American Citizens Concerned for Life, of Philadelphia, Pa., responded in the following manner when I asked her if this legislation, H.R. 6075, increases the likelihood of abortion:

"Dr. CZARNECKI. This legislation would save babies in my opinion. It would encourage a woman to keep a pregnancy or do what she wants. It gives the woman a choice."

In further questioning, I asked:

"In the event a female employee decides to abort a pregnancy, do you think that the employee should be denied medical coverage and disability from complications resulting from the medical procedure?

"Dr. CZARNECKI. I feel we should treat this as a condition, period."

The list of supporters for this legislation without an abortion amendment is endless; it includes many groups with whom all of us work regularly:

AFL-CIO, AFSCME, Leadership Conference on Civil Rights, NEA, League of Women Voters, United Auto Workers, United Steel Workers, International Ladies Garment Workers

*July 18, 1978*    **CONGRESSIONAL RECORD—HOUSE**    21439

Union, Coalition of Labor Union Women, American Association of University Women.

#### ONE GROUP, ALONE, LOBBIED FOR THE AMENDMENT

The only group which actively came forward to promote the anti-abortion provision was the United States Catholic Conference, the conference of bishops, and never at a public hearing. In fact, there is not a single word of testimony on the record supporting the anti-abortion amendment in this bill.

#### PREGNANCY DISABILITY COVERAGE FACES AN UNCERTAIN FUTURE AS A RESULT OF THE ANTI-ABORTION LANGUAGE: WOMEN WILL SUFFER

During the course of the 95th Congress, the Members of Congress have had 11 opportunities to make their position known on the issue of Federal funding of abortion; unlike the Hyde amendment, this legislation, unamended, does not involve public subsidization of abortion.

We are now faced with the prospect that pregnancy disability legislation will not be enacted this year as a result of the fears of the members of this committee. The Senate has voted not to append an anti-abortion rider to their version of this legislation; our 5-month battle over the Hyde amendment which stalled the Labor-HEW appropriations will likely be repeated. As a result, women, whose rights we have sought to protect, will suffer.

Finally, the Members of Congress must realize that as a result of amending H.R. 6075 with an abortion prohibition, we must prepare ourselves for a legislative agenda which will require our voting on abortion at every turn. If this legislation, which can be considered nothing but "pro-life," must be amended by those who oppose abortion, no bill which comes before the House of Representatives can be insured of freedom from such an amendment.

The crowning irony is that the anti-abortion amendment not only undercuts the very purpose of this legislation but it would undercut as well the aim of the "pro-life" forces to encourage women to carry their pregnancies to term. The aim of the amendment's proponents has tragically misfired. The amendment is anti-employer, anti-labor, anti-woman, and anti-life. It is my sincere hope that in the final analysis, the anti-abortion rider to this legislation will not prevail.

Mr. BEARD of Rhode Island. Mr. Speaker, will the gentleman yield?

Mr. WEISS. I yield to the gentleman from Rhode Island.

Mr. BEARD of Rhode Island. I thank the gentleman for yielding.

Mr. Speaker, the gentleman from New York (Mr. WEISS) mentioned discrimination, that this bill gives the sole power to the employer to discriminate. That is not true at all. That is not true. It allows for collective bargaining. It allows for negotiation if they have a contract.

Mr. WEISS. It only occurs if there is a negotiation process which allows for it. Most employees, unfortunately are not represented by unions in those instances, it is solely up to the employer. What you are going to be doing is putting the burden on unions and employers to be subjected to pressure on pro- and anti-abortion matters. It just simply is not appropriate or right.

Mr. BEARD of Rhode Island. Mr. Speaker, I disagree with the gentleman.

Mr. SARASIN. Mr. Speaker, I yield 2 minutes to the gentleman from Minnesota (Mr. QUIE).

Mr. QUIE. Mr. Speaker, I rise in strong support of this legislation. Originally,

when the U.S. Supreme Court made its decision in the case of Gilbert against General Electric Co., I know a number of people felt we should not enter into this area. They felt we should not make it a civil right that a woman employee will be able to receive pregnancy disability benefits on the same basis that other temporary disabilities are covered. After the study in our committee, we came to the conclusion, and I strongly came to that conclusion, that this is necessary in order for women employees to enjoy equal treatment in fringe benefit programs. It should be a civil right as long as employers are providing this kind of disability insurance and sick leave and health insurance to their employees for other health reasons.

Also, when the gentleman from Rhode Island (Mr. BEARD) offered the amendment to exempt from required coverage any abortion except one necessary to protect the life of the mother, I supported the amendment.

There are some who feel it is unwise to bring this up under suspension of the rules, thus denying an opportunity to offer an amendment to strike the abortion language. However, if one looks at the vote of this body at previous times, I think one would expect that a strong majority would be supporting the provision added by Mr. BEARD of Rhode Island. Therefore, I do not find it offensive to use this procedure to expedite enactment of this legislation.

I believe that this is a good piece of legislation and ought to be adopted. It will protect the income of millions of working women to the benefit of their families. This bill will strengthen the American family in a period in which we are seeing a dramatic increase in the number of working wives and mothers. I urge my colleagues to support it.

Mr. HAWKINS. Mr. Speaker, I yield 3 minutes to the gentleman from Hawaii (Mr. AKAKA).

Mr. AKAKA. Mr. Speaker, I commend the chairman and the subcommittee for their leadership in carrying this bill toward passage.

Mr. Speaker, I support this bill H.R. 6075, which requires that employers treat disabilities arising from pregnancy just as any other disability.

The State of Hawaii has required exactly that since 1973 with great success. Hawaii is one of five States requiring employers to provide disability insurance so that when employees are unable to work, they will receive a partial income replacement to tide them over. Since 1973, the Hawaii temporary disability insurance law has included within the definition of disability those disabilities caused by pregnancy or termination of pregnancy.

One of the concerns raised about H.R. 6075 has been that insuring pregnancy disability will significantly raise the employer's disability insurance costs. The Hawaii experience thus far has indicated that major increases will not occur. In fact, according to information compiled by the Hawaii Disability Compensation Division and submitted at the subcommittee hearings on this bill, only two of the six major temporary disability in-

surers in Hawaii have raised rates between 1970 and 1975, and those increases were minor. Four companies actually lowered their rates after pregnancy was included because they had overestimated their costs.

Another concern I have heard expressed is that the average duration of women's compensated disabilities will greatly increase when employers include pregnancy disabilities in their plans. Again, the Hawaii experience indicates that this problem is unlikely to materialize. In 1975, the average duration figure for women actually was lower than that for men, even though pregnancy disabilities were included in the calculations. The average duration for men was 5.1 weeks; the average duration for women was only 4.4 weeks.

This bill is of great importance to working women in this country—80 percent of whom will become pregnant at some point during their worklife. The bill simply requires that pregnant workers be fairly and equally treated. The Hawaii experience with equal treatment under the State disability insurance law suggests that the price of equality will be minor and the benefits substantial.

Mr. SARASIN. Mr. Speaker, I have no further requests for time.

Mr. HAWKINS. Mr. Speaker, I yield 2 minutes to the gentleman from Puerto Rico (Mr. CORRADA).

Mr. CORRADA. Mr. Speaker, I rise in support of H.R. 6075, the pregnancy disability bill, which is a legislative initiative to remedy the Supreme Court's holding in Gilbert against General Electric, whereby an employer was permitted to discriminate against a woman on the basis of pregnancy, denying her sick leave or disability income, while allowing all types of other medical conditions, including cosmetic surgery. This is tantamount to discrimination on the basis of sex, and should come under the purview and guarantees of the Civil Rights Act of 1964.

In today's economy, whereby women constitute 41 percent of the labor force, and total 25 million workers, it is imperative that we provide for their welfare and job security. Most of these women are in their childbearing years. This bill will facilitate a woman's choice to conceive and bear children without facing undue economic hardships.

I especially wish to support the Beard amendment, which we approved in the full committee. The Beard amendment prevents an employer from being forced by an act of Congress to partially or fully underwrite the cost of nontherapeutic abortions. This amendment is strongly supported by the U.S. Catholic Conference, the National Right to Life Committee, and the Church of Jesus Christ of the latter Day Saints.

I urge you to support the bill as adopted by the Education and Labor Committee.

Mr. HAWKINS. Mr. Speaker, I yield 2 minutes to the gentleman from New Jersey (Mr. THOMPSON).

Mr. THOMPSON. Mr. Speaker, I rise in support of H.R. 6075, a bill to prohibit sex discrimination on the basis of pregnancy.

Addendum 040

21440                 CONGRESSIONAL RECORD — HOUSE                 *July 18, 1978*

This bill is necessary because of a ruling by the Supreme Court in *General Electric Co.* v. *Gilbert*, 429 U.S. 125 (1976), which held that it was not a violation of title VII of the Civil Rights Act for General Electric's disability insurance plan to exclude coverage for women with pregnancy-related disabilities.

H.R. 6075 seeks only to clarify what most feel was the original intent of Congress in enacting the Civil Rights Act— that the title VII prohibitions against sex discrimination in employment include discrimination based on "pregnancy, childbirth, or related medical conditions." This was the position of the EEOC and the overwhelming majority of the Federal courts which addressed the issue prior to the Gilbert decision.

The bill simply adds a new subsection (k) to section 701 of title VII which makes it clear that the act's prohibitions against sex discrimination include discrimination in employment based on pregnancy, child birth or related medical conditions.

No new programs are created. No Federal funds are involved. The bill does not provide for any new paperwork or reporting requirements, nor does it require the establishment of any new benefit programs where none currently exist. The bill merely requires equality in treatment where such programs exist.

While the committee added antiabortion language which I opposed, the effect of the language is to leave the issue of coverage for abortions up to local employers and the collective bargaining process. While I believe this language is unnecessary and undesirable, those who support the bill believe that the overwhelming majority of disability insurance plans will eventually contain this type of coverage.

So in spite of that language, I am going to fully support H.R. 6075. This is an important issue for the women of this country, and we can delay no further in ending this type of discrimination. I urge my colleagues to support this legislation.

Mr. HAWKINS. Mr. Speaker, I yield 3 minutes to the gentlewoman from New York (Mrs. CHISHOLM).

Mrs. CHISHOLM. Mr. Speaker, I rise in support of this legislation clarifying prohibitions against sex discrimination under title VII of the Civil Rights Act of 1964. Through broadening certain prohibitions, H.R. 6075 would make it illegal to discriminate against employees based on pregnancy, child birth, or related medical conditions.

While it may be obvious to my colleagues that I support this bill because it affords some 41 percent of this Nation's labor force some greater degree of protection and security without fear or reprisal due to their decision to bear children, I also strongly support the manner in which this legislation comes before the House for consideration.

As a member of the Rules Committee, I can speak with some degree of authority in insisting that the Suspension Calendar must be further utilized as a vehicle to consider important legislative issues. The Rules Committee now faces a backlog of at least 60 bills that await hearings for a rule. In addition, a very large number of bills have received rules,

but have also been stalled in reaching the floor for consideration by the full House. I think all of us would be disturbed if we were unable to vote on pregnancy disability legislation due to the inability of the House or the Rules Committee to facilitate its swift passage to the floor. While we cannot discount our legislative process which permits adequate time for debate and amendments, I feel strongly that a single issue is at stake.

The issue is whether or not we as leaders of this country will assure equality at the workplace for pregnant workers. We must seize this opportunity to make a stand on this issue and to assure, before the end of the 95th Congress both the House and Senate will give the President legislation to correct a grave inequity in this Nation's labor practices.

Mr. SARASIN. Mr. Speaker, I yield 2 minutes to the gentleman from California (Mr. MILLER).

Mr. MILLER of California. Mr. Speaker, I thank the gentleman from Connecticut for yielding.

Mr. Speaker, I reluctantly rise to oppose this legislation. I do so reluctantly because I do recognize that it is a major step forward in terms of coverage for millions of women in this country on a subject that I have fought for, for many years, including the time when I was a staff person in the California State Legislature. I drafted the first legislation to provide this benefit to women in California.

But my concern here is with the amendment dealing with abortion, which I believe is another governmental statement and intrusion into the private lives of women. In this case, whereas the former speaker on this subject, the gentleman from New Jersey (Mr. THOMPSON) just said that no governmental moneys are expended, we yet find ourselves intruding into the collective bargaining arrangements between employers and employees and suggest somehow we are going to do something, when in fact all the testimony is to the contrary.

What I think we have really is the makings of a very discriminatory statement against those women we are trying to help when we suggest that in their case the Government is going to speak with an official voice and try to create a presumption of how those plans are being made.

It is for that reason I reluctantly oppose this legislation. I would hope that perhaps we would submit it to the full House for full debate. I say that without even the greatest confidence that the views I hold would prevail, but I think it is a matter of that importance because it will have, when it leaves this House, if it does, the official stamp of the Federal Government directing in what case those plans will be made under directives of the Federal Government and discriminating against those women who seek to take advantage of other services.

Mr. SARASIN. Mr. Speaker, again I rise in support of the bill and urge its passage.

I disagree with the statements of the gentleman from California that somehow we are entering into the negotiating process. I think we have left that process free.

I urge support of the bill.

● Mr. LaFALCE. Mr. Speaker, I urge my colleagues to support H.R. 6075, the bill to prohibit sex discrimination based on pregnancy. The purpose of this civil rights legislation is to eliminate sex discrimination in disability and insurance programs on the basis of pregnancy by amending title VII of the Civil Rights Act of 1964 to clearly include among the prohibited discriminations those based on pregnancy, childbirth, and related medical conditions in employee health benefit plans.

This bill is a necessary measure to counteract recent Supreme Court decisions that have endorsed sex discriminations in employers' insurance programs. In Gilbert against General Electric the Supreme Court did a great disservice to working women of childbearing age by ruling that exclusion of pregnancy from disability benefit plans did not violate title VII of the Civil Rights Act. The Court's holding, that an employer has a right to discriminate against pregnant workers, was contrary to many previous decisions in lower district courts and courts of appeals. The New York State Court of Appeals has, in fact, ruled in exact opposition to the Supreme Court's holding in Gilbert.

Furthermore, exclusion of pregnancy related disabilities from coverage under title VII was never the intention of Congress as evidenced by the Equal Employment Opportunity Commission guidelines to its implementation.

Clearly this unjustifiable and blatant discrimination based on sex has created an intolerable situation and must be remedied.

In the Gilbert case, the Supreme Court held that exclusion of benefits on the basis of pregnancy was not sex discrimination because it related to "condition" rather than "gender." H.R. 6075 will solve this problem by simply stating that such discrimination is indeed prohibited by title VII. As was intended by the original act, all workers would be treated the same in regard to health insurance coverage, where the issue is not the gender or condition of the employee but ability to work.

The participation of women in today's work force is growing, and whether that participation is by choice, economic necessity, or both, it is an aberration of justice to allow inequality among workers to continue. In recent years, the greatest increase in labor force participation by women has been within the 20 to 34 age group, the most fertile childbearing years. During these years, it is likely working women are building up job experience and seniority, making plans for continued participation in the work force.

Women should be encouraged to remain in the work force and should not face potentially catastrophic consequences from loss of a job or seniority owing to pregnancy. Employers who believe pregnant women are unable to continue working or do not desire to return to work are imposing stereotypical notions on their employees which are archaic and undocumented by available statistics. The Supreme Court's ruling

*July 18, 1978*     **CONGRESSIONAL RECORD — HOUSE**     21441

in Gilbert has served to reinforce the outdated argument that women depend upon men, and not their jobs, for support.

A ruling such as this has no place in a society which professes equality. H.R. 6075 will bring us one step closer to equality and the end of sex discrimination in the business world.●

● Mrs. COLLINS of Illinois. Mr. Speaker, I rise today in support of H.R. 6075, Pregnancy Disability Benefits, which would end widespread abuse of pregnant women in the workplace.

As a result of the recent U.S. Supreme Court ruling in General Electric Co. against Gilbert which held that discrimination on the basis of pregnancy did not constitute sex discrimination under title VII of the Civil Rights Act of 1964, I and 116 of my colleagues in the House cosponsored H.R. 6075 which amends title VII to expand the statutory definition of sex discrimination to include pregnant workers.

The need for enactment of H.R. 6075 is clear. In Gilbert, the Supreme Court ruled that General Electric's (GE) practice of providing insurance to employees for a variety of conditions including vasectomies, hair transplants, and cosmetic surgery, while denying the same benefits to women disabled by pregnancy did not discriminate against those women employees. The Court's ruling, therefore, allows employers to discharge pregnant employees on the basis of their condition, to be placed on maternity leave or to lose other employment benefits such as seniority.

Opposition to this legislation has focused on the allegation that the cost of implementation is prohibitive; however, the Department of Labor estimate of the cost of impact of H.R. 6075 indicates that expansion of fringe benefit coverage to include pregnancy disability would not result in significant cost increases for the employer. A labor report stated, "(T)emporary disability insurance contributions represent only 1.4 percent of the wage package for covered workers in private industry and H.R. 6075 will increase that percentage to only 1.5 percent."

I urge my colleagues to join me in ending the practice of discrimination based on pregnancy by expediting approval of H.R. 6075.●

● Mr. GARCIA. Mr. Speaker, I sadly rise in support of H.R. 6075, the bill to amend title VII of the Civil Rights Act to prohibit pregnancy as grounds for discrimination against women. I have grave reservations about perpetuating one form of repellent and injurious discrimination at the same time as I seek to end another.

Mr. Speaker, the case, General Electric against Gilbert, that gave rise to the need for this legislation is a New York case, originally. As many of you know, I served in the New York State Legislature, and the question of pregnancy disability is not a new one for me. It was one of the first, and always one of the most difficult, that the organized women's issue lobbyists chose to grapple with in Albany. They argued long and hard. And they were well-prepared. And

eventually they won. And they won without any limiting amendments, and they won in the face of heavy lobbying by the insurance industry and the business lobby. It is almost beyond my comprehension why that struggle is still being waged.

This piece of legislation is simple justice. Those who argue against insurance coverage for pregnancy-related disabilities can only be those with a financial interest. Surely, it is not those who care about human and civil rights for all Americans, and those who have realistically assessed the costs of this change in our laws.

It is interesting to me that those who would deny a woman a right to an abortion have joined with those who feel such limitations are heinous in support of this bill. It is clear that to defeat this bill would strike a blow against those women who want to have children. The U.S. Department of Labor last week released statistics that indicate that 56 percent of all American women work. Most of them work because they must, and I have often wondered how many prospective mothers we have lost because they knew they would not have any income at the time it was needed most.

Passage of this legislation is a truly life-affirming act that we can all encourage. But it is, as well, with its severe and unfortunate limitation, a difficult bill to support. I do so reluctantly, with the hope that the conferees on the bill will carry with them a sense of the House that the offensive language in the bill will be eliminated.●

● Mr. GOLDWATER. Mr. Speaker, I rise in opposition to H.R. 6075, which would amend the Civil Rights Act and which would, in effect, mandate that any company which provides a health benefit plan or a disability plan include pregnancy benefits. I fully realize that my opposition could be interpreted as a vote against motherhood—it is not—it is a vote against further, unwarranted Federal interference in what should be a negotiable item between labor and management. I mean, what are we next going to mandate? Eye or dental care?

I have heard persuasive arguments today in support of the Beard amendment, and the crux of those arguments is that inclusion of abortion benefits should be a negotiable item between employers and employees. I even heard one argument that we should not "shove abortion benefits down the throats of employers." Fine, I agree, but then what gives the Federal Government the right to shove maternity benefits down their throats?

Let me give you an example of what I am talking about. About 3 years ago one of my legislative assistants' husband's company took a vote amongst its covered employees on the question of providing maternity benefits under their health insurance plan. The employees voted overwhelmingly against the extra coverage at the extra cost, but guess who voted for it? Men. The women who voted against it were single; were covered by their spouses' plan; or were not planning on any additional children. I have heard a lot about freedom of choice today, but apparently these employees are not go-

ing to be left with any choice whatsoever—they are going to have to pay for maternity benefits whether they want them or not.

This bill does not give an employer an opportunity to deny disability benefits if the woman chooses not to return to work. Yes; a lot of women do return to their jobs—and I believe their jobs and their seniority should be protected. But, it is also a rather common practice for a woman to quit working for a lengthy time in order to raise their children. This is not uncommon. I personally know of many such cases. Does this mean that these particular women may receive what amounts to severance pay not available to any other employee? Under this bill, that is precisely what we are mandating.

In closing, I would like to emphasize that I have nothing against private employers providing maternity benefits, and I have no objection to employees demanding those benefits in their labor negotiations—I personally think it is a good benefit. However, I believe that is precisely where the issue should remain—within the jurisdiction of labor-management negotiations. In short, I do not believe it is proper, reasonable, or fair for the Federal Government to dictate terms and benefits of private insurance plans.●

● Mr. WHALEN. Mr. Speaker, I am pleased that the House finally is voting on pregnancy disability legislation.

This issue first arose in late 1976, when the Supreme Court delivered its decision in the case of General Electric Co. against Gilbert. The Court held that it was not a violation of the Civil Rights Act to offer a comprehensive health plan but to deny benefits to pregnant workers.

Many of us on Capitol Hill immediately objected to the Court's decision, saying that it certainly was our intent that title VII of the Civil Rights Act should protect all workers, pregnant or otherwise, from sex discrimination. Soon after the Gilbert decision representatives from labor and public interest organizations met with a group of congressional staffers, including a representative from my office, to draft corrective legislation.

In March of 1977 I joined Gus Hawkins and dozens of our colleagues as an original sponsor of H.R. 6075, a bill to protect pregnant workers from sex discrimination in employment benefits, especially health and disability plans. Given the obvious need for the legislation, it has been very disappointing to see how long it has taken for the House to take up this very simple bill.

Part of the problem, of course, was the addition of the Beard amendment in committee earlier this year. That says that even though health and disability plans must extend to pregnant workers, employers can elect to deny benefits in cases involving abortions.

Mr. Speaker, it is well known that I am a staunch opponent of abortion. I have consistently supported legislation to make abortions illegal and to cut off Federal funds that might be used to pay for abortions. Nevertheless, I object to the Beard amendment that was added to H.R. 6075. In my opinion it is unnecessary and inappropriate.

21442                   CONGRESSIONAL RECORD — HOUSE                   *July 18, 1978*

First, there is the basic fact that we cannot continue to inject the abortion issue into every passing bill that is remotely related to the subject. This is a very emotional and divisive issue that can tie up the legislative process for weeks. In fact, I expect that inclusion of the Beard amendment in this legislation will prompt a sharply contested conference with the Senate that could otherwise be avoided.

Second, there is the important point that when we legislate to end sex discrimination in health and disability plans we are stepping into a traditional labor-management relations issue. I have no qualms about doing this in broad terms, to enforce the letter and the spirit of the Civil Rights Act. But, I believe we should exercise restraint in legislating with regard to specific items, such as coverage of benefits for abortion. Remember, we are dealing now with a subject that is legal and which does not involve the expenditure of any public money.

As I stated in a "Dear Colleague" letter that I sent around on May 1, what really is at issue in the Beard amendment is the question of labor-management relations. Employee benefits are properly a matter for negotiation between the parties. So long as abortions remain legal in this country, I do not think this proposed intervention into a negotiable contract issue is appropriate.

Having said all this, I must also note that I intend to vote for passage of H.R. 6075—including the Beard amendment. I do so because it is brought before us under a suspension of the rules, on a take it or leave it basis. We have no opportunity to amend this legislation today.

It is my hope that my colleagues, including those who oppose the Beard amendment as I do, will join in support of H.R. 6075, so we can get this legislation into conference and on its way to the President's desk.●

● Mr. TSONGAS. Mr. Speaker, although I cannot be here today to vote in favor of the pregnancy disability bill, I want to express my strong support for this legislation. If women—more than 40 percent who now work—are ever to have equal employment opportunities, we must entitle them to disability coverage for pregnancy.

By simply adding to Federal law a definition of sex bias—that it includes discrimination "on the basis of pregnancy, childbirth or related medical conditions," this Congress would go a long way toward assuring women equality in the job market. It would assure that women who work either out of choice or necessity are not penalized for having a family. It would also put an end to an unrealistic and unfair system that forces women to choose between family and career—clearly a function of sex bias in the law, which no longer reflects the conditions of women in our society.●

● Mrs. BURKE of California. Mr. Speaker, I rise in support of H.R. 6075, a bill to prohibit sex discrimination based on pregnancy. This bill is particularly important to me since I was the first Member of Congress ever to be granted maternity leave while serving in the House of Representatives.

This bill is of great economic importance to all workingwomen for the simple reason that women work for the same reasons that men do: compelling economic necessity. Today, there are more than 18 million workingwomen whose husbands earn less than $10,000 per year. Of that number, 6 million have husbands earning less than $5,000 per year. Since the Bureau of Labor Statistics reports that it now costs almost $11,000 to provide a low standard of living for an urban family of four, it is fair to say that these women are working to provide food, clothing, and shelter for themselves and their families and not for extravagant luxuries.

More women are working than ever before. Between 1960 and 1974, the greatest increase in the labor force participation by women occurred within the 20 to 34 age group, the most fertile child-bearing years. By 1975, 40 percent of our work force was composed of women.

However, while 40 percent of our labor force has some type of disability coverage, only 40 percent of these benefit plans include pregnancy disability coverage. This means that of the 12.5 million women workers covered by sick and accident disability insurance, fewer than 5 million are protected in any way from wage loss or provided medical compensation for pregnancy disability. This means that millions of vulnerable women may be fired or forced to take unpaid leave. They may be denied medical and sick leave benefits at a time when they need them most.

I would like now to address the question of leave time. The average leave time under most pregnancy disability plans is 6 weeks. However, two factors contribute to misleading statistics concerning pregnancy leave. For example, many employers may require women workers to leave work months before they are disabled. For another, many employers impose arbitrary dates for returning to work based on the old stereotype that women are unable to continue working or do not desire to return. However, the Equal Employment Opportunity Commission has reported in Senate hearings that women workers consistently go back to their jobs when they have that opportunity: in 1976, 73 percent returned to work after an average absence of 47.5 days after delivery.

It is now considered desirable by the medical profession that pregnant women continue their usual activities until they go into labor and a former president of the American College of Obstetricians and Gynecologists has testified that most women are fully recovered and able to resume work within a few weeks after delivery.

H.R. 6075 is an important bill because it takes note of the changing role of women in the work force. On behalf of our workingwomen and their families, I urge my colleagues to support this fair and much-needed legislation.●

● Mr. MICHAEL O. MYERS. Mr. Speaker, ever since the Supreme Court decision in Gilbert against General Electric in 1976, there has been great need for legislative action to insure the equal treatment of women in the work force.

I am pleased that H.R. 6075 to amend title VII of the Civil Rights Act of 1964 has finally been considered by the House of Representatives.

This legislation will clarify the original intent of Congress that sex discrimination in title VII includes pregnancy-based discrimination. At a time in this country's history when full equality for women in the workplace is being recognized as one of our highest priorities, it is imperative that we set aside discrimination based on pregnancy. The right of women to work and their right to bear children cannot be considered mutually exclusive.

There was once a time in this Nation when most women of child-bearing age did not have to work in order to provide a decent living for themselves and their families. This is no longer the case. With severe inflationary problems most families find it necessary to have both adults working. The second income is no longer used primarily for luxury items, but more and more just to maintain a mid-level standard of living for the family. To penalize these women for needing to work undermines the fabric of our society.

Women in the work force are a necessary and most productive asset to our Nation. To deny them pregnancy benefits when men receive benefits for almost any type of medical service is clearly discriminatory.

This Nation has always stood for full equality for all its people. I am pleased to be a Member of the House of Representatives at a time when it acts to insure that this equality extends to the women of our Nation who must work and who also choose to continue in the role of mother. It is time that these women are commended for their dual contribution to our society and not penalized for it.

I strongly support the actions of this body in passing the amendments to title VII to include pregnancy disability benefits and I urge all my colleagues to do likewise.●

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from California (Mr. HAWKINS) that the House suspend the rules and pass the bill H.R. 6075, as amended.

The question was taken.

Mr. BADHAM. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The SPEAKER pro tempore. Pursuant to clause 3 of rule XXVII, and the Chair's prior announcement, further proceedings on this motion will be postponed.

---

GENERAL LEAVE

Mr. HAWKINS. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days in which to revise and extend their remarks and include extraneous matter on the bill H.R. 6075.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from California?

There was no objection.

Addendum 043